IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

WESTERN CONVENIENCE STORES, INC., a Colorado corporation,
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant.

## COMPLAINT

Plaintiffs Western Convenience Stores, Inc. and Western Truck One, LLC (hereinafter collectively referred to as "Plaintiffs"), by and through their attorneys, Bennington Johnson Biermann & Craigmile, LLC, state and allege as follows for their Complaint in this action:

### PARTIES

1. Plaintiff Western Convenience Stores, Inc. (hereinafter "WCS") is a Colorado corporation with its principal place of business at 9849 East Easter Avenue, Centennial, Colorado.

2. Plaintiff Western Truck One, LLC (hereinafter "WTO") is a Colorado limited liability company with its principal place of business at 9849 East Easter Avenue, Centennial, Colorado.

3. Defendant Suncor Energy (U.S.A.) Inc. (hereinafter "Suncor") is a Delaware corporation with its principal place of business, according to its last filing with the Colorado Secretary of State, at 7800 East Orchard Road, Suite 300, Greenwood Village, Colorado.

## JURISDICTION AND VENUE

4. This Court has personal jurisdiction over Defendant Suncor as: (a) its principal place of business is located in the State of Colorado; (b) it did business in the State of Colorado at times material to this action; (c) it purposefully availed itself of the rights and privileges of the State of Colorado at times material to this action; and (d) it committed the wrongful acts and omissions described below, with resulting injury, damages, loss or other consequences in, among other states, the State of Colorado.

5. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a) as Plaintiffs assert a claim under the Robinson-Patman Act, 15 U.S.C. § 13(a). This Court has supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367 as they form part of the same case or controversy.

6. Pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391, venue is proper in the District of Colorado as: (a) the Defendant transacted business in the State of Colorado and has its principal place of business in Colorado; (b) substantial parts of the events or omissions giving rise to Plaintiffs' claims occurred in Colorado; and (c) one of the contracts at issue in this lawsuit, the *Master Product Purchase and Sale Agreement* (hereinafter "Master Agreement"), provides that the exclusive venue for actions arising out of the performance thereof shall be brought in a federal or state court located within the City of Denver, State of Colorado.

## GENERAL ALLEGATIONS

7. Since 1990, Plaintiff WCS has been in the business of operating convenience stores in Colorado and Nebraska which sell as principal products gasoline and diesel fuel. WCS is an independent retailer as it does not identify with a single supplier and does not sell self-branded fuel. WCS is what is known as a "discounter" in the retail fuel industry.

8. Pursuant to the Master Agreement and predecessor agreements, as well as oral agreements between the parties, Suncor has supplied WCS a substantial portion of the petroleum products (hereinafter "fuel") retailed by WCS. The Master Agreement, together with General Terms and Conditions which are incorporated therein, purport to govern all transactions or agreements entered into or consummated between WCS and Suncor for the purchase and sale of fuel.

9. Plaintiff WTO is a trucking company (*i.e.*, a "Carrier" as defined in the Terminal Access Agreement described below) which is affiliated with Plaintiff WCS. WTO transports to WCS stores fuel loaded onto WTO vehicles at terminals such as those operated by Suncor. WTO operates 10 trucks, 24 hours per day, every day, in a virtually non-stop delivery operation of 8 to 10 million gallons of fuel per month to 42 WCS stores located in Colorado and Nebraska.

10. WTO's access to Suncor terminals has been governed by a May 10, 2006 *Terminal Access Agreement* (hereinafter "Access Agreement") and predecessor agreements between WTO and Suncor as well as oral agreements between the parties. The Access Agreement provided WTO with access to Suncor terminals located in Commerce City and Grand Junction, Colorado.

11. At those terminals, WTO loaded not only fuel purchased directly from Suncor, but also fuel purchased from third-parties (hereinafter "middlemen") who have the right to purchase Suncor fuel and resell it to others via Suncor's terminals. Those terminals thus act as a point of delivery for Suncor fuel being sold to WCS by Suncor directly, as well as Suncor fuel being sold to WCS by third parties acting as middlemen for Suncor fuel.

12. When a middleman delivers fuel at a Suncor terminal, the fee for using the terminal is paid by that middleman, creating revenue (and presumably profit) to Suncor from the use of its

terminal by the middleman, thus relieving Suncor from depending on the creditworthiness of the ultimate purchaser, *e.g.,* WCS, in order to be paid for use of the Suncor terminal.

13. This access to fuel from middlemen is of particular importance to WCS as Suncor would occasionally put WCS on *allocation*, that is, limit the amount of fuel that WCS could purchase directly from Suncor during a given period. When allocations occurred, WCS could still obtain fuel from middlemen such as Sapp Bros Petroleum, Inc. and Offen Petroleum, Inc. to make up for demand at WCS's 42 retail facilities not supplied directly by Suncor.

14. WCS acquiesced to the uncertain supply from Suncor based on the verbal and implied promise, confirmed by the parties' custom and practice, that during allocation of Suncor fuel, WCS could meet its needs by purchasing fuel from middlemen for delivery at Suncor terminals. This promise was crucial to WCS's business, as any disruption of the 24/7 delivery of fuel to WCS stores would be catastrophic to its operations.

15. Over the course of its relationship with Suncor, WCS has purchased, and WTO has transported from Suncor terminals, *billions* of dollars in Suncor fuel to be retailed by WCS in Colorado and Nebraska.

16. Under the parties' custom and practice in place for several years, Suncor has extended to WCS a $3 million line of credit permitting WCS 10 days following delivery to pay for any fuel supplied directly by Suncor. Portions of WCS's credit terms were reduced to writing in *Confirmation of Purchase/Sale Agreements* signed by the parties from time-to-time both before and after the period of time covered. Other elements of WCS's credit terms with Suncor were the subject of verbal agreements alone.

17. On multiple occasions, in or about late April and early May 2011, without basis or advance notice to WCS, Suncor manager, Steven Ewing, advised WCS that Suncor was "cutting

[WCS] off" from any further fuel delivery. This generally occurred on Friday afternoons, leaving WCS little ability to meet the heavy weekend demand for its retail stores. Upon being advised by WCS that this practice was improper and contrary to the parties' oral and written agreements, Suncor reinstated fuel delivery each time, but not before causing substantial disruption to WCS's business.

18. On May 18, 2011, representatives of Suncor and WCS met ostensibly to discuss this pattern of Friday brinksmanship, as well as Suncor refinery and supply issues and other matters related to the parties' ongoing relationship under the Master Agreement. Suncor was represented by Mr. Ewing and his subordinate, Steve Moss, the Suncor representative assigned to WCS. WCS was represented by its CEO, Hossein Taraghi, and by Chris Wehrle, WCS's fuel buyer.

19. At this meeting, Messrs. Ewing and Moss stated that Suncor's supply of fuel was tight; that Suncor's own retail operations had not made as much money in the previous year as they had made in previous years; and that, like WCS, many of Suncor's other retailers had experienced "a tough year." Mr. Ewing also acknowledged that these issues were temporary for all of the retailers, as it is commonly understood in the industry that fuel retailers suffer monthly losses for most months of the year that are made up for in two or three profitable months each year. Mr. Taraghi reiterated that this had been WCS's experience and that sales/profits for WCS were looking very strong for May and June 2011.

20. During the meeting, and based upon his observation of fuel prices posted by his competitors, Mr. Taraghi indicated that it appeared that Suncor was granting substantial discounts and rebates to WCS competitors who are Suncor's larger retail customers, but not to WCS. Moss and Ewing specifically admitted that Suncor had been providing discounts to larger

retailers that had not been provided to Western. They stated they would see if the same discount could be made available to WCS, but that never occurred.

21. At the close of the May 18, 2011 meeting, Suncor representatives asked if WCS would be willing in the future to shorten payment terms or prepay for its purchases. Mr. Taraghi responded that such a change would not be acceptable and that it would be a poor business decision for WCS to consider changing the 10-day payment term under which Suncor and WCS had operated for the past several years. However, Mr. Taraghi assured Suncor's representatives that if Suncor needed additional security for WCS's line of credit and payment terms, Western would be happy to provide real estate holdings as collateral. Neither Ewing, nor Moss, nor anyone else at Suncor ever followed up with WCS to discuss security or to further discuss Suncor's request to change payment terms.

22. On Friday, May 20, 2011, Steve Moss contacted Plaintiff WCS via telephone and notified it that Suncor had revoked the previous practice of allowing WCS 10 days to pay for delivered product. In response to what WCS regarded as a breach and repudiation of its agreements with Suncor which were certain to cause WCS substantial damage, WCS thereafter caused its banks not to honor any further draw requests from Suncor. On May 23, 2011, Steven Ewing, not yet knowing that draw requests would not be honored, contacted WCS via telephone and notified it that Suncor had elected to immediately suspend all petroleum product sales to WCS.

23. On or about May 25, 2011, Mr. Ewing contacted Plaintiff WTO via telephone and notified it that Suncor was revoking WTO's access to Suncor's terminals, thus precluding WTO from loading, not only fuel purchased directly from Suncor, but also fuel being purchased from middlemen.

24. Defendant Suncor memorialized its verbal notices to WCS and WTO with a letter dated May 25, 2011.

## PRICE DISCRIMINATION ALLEGATIONS

Suncor is a fuel refiner and seller of fuel engaged in interstate commerce. Its website states:

> Suncor's operations in Colorado and Wyoming provide a vital link between our oil sands resource base in Alberta and the growing energy market of the United States. Our operations include a refinery and terminals in Colorado, pipeline operations that stretch between Wyoming and Denver, and retail assets in Colorado that are operated under the Phillips 66 brand. Our operating communities are Commerce City, Denver, and Grand Junction in Colorado, and Cheyenne and Guernsey in Wyoming.
> * * *
> Suncor has its own network of 44 retail sites across Colorado, 38 of which are branded Shell. The remaining six locations will continue to sell Suncor products under the Phillips 66 brand, until our current marketing and license agreement with ConocoPhillips expires in 2013. Suncor also has contract agreements to supply Shell and Phillips 66 branded fuels to more than 225 outlets throughout Colorado.
>
> Suncor supplies about 35% of Colorado's gasoline and diesel fuel demand. We blend 10% ethanol into gasoline at our Commerce City refinery and sell it through our retail network. Ethanol as a fuel additive is mandated in certain parts of Colorado during the winter months.

25. Suncor has engaged in price discrimination by charging WCS more for fuel than it charges WCS's competitors, including Dillon Companies, Inc. d/b/a King Soopers Fuel Center, as well as, on information and belief, Shell and Phillips 66 branded retailers (hereinafter "Favored Retailers"). Specifically, it is WCS's information and belief that Suncor has charged WCS as much as 10 cents per gallon more than it charges Favored Retailers for like grade and quality of fuel.

26. Suncor has made hundreds of sales of fuel to WCS and Favored Retailers based upon the discriminatory price difference. WCS and the Favored Retailers compete for consumers of fuel in the same markets. WCS has a substantial number of stores that are located within a few

miles of, or otherwise directly compete with, the Favored Retailers.

27. A substantial amount of the fuel sold by Suncor to WCS is sold in interstate commerce via deliveries to WCS retail locations in Nebraska. Based on WCS records, in the first 5 months of this year, 460,156 gallons of Suncor fuel costing WCS $1,268,595.79 were directly transported to Nebraska from Suncor's Commerce City, Colorado terminal for immediate sale by WCS at its stores in that state. Suncor was aware of, and has specifically tracked, the destination and amount of each load of its fuel being delivered to Nebraska for retail sale in that state and has derived substantial revenue from WCS's sale of Suncor fuel to consumers in Nebraska.

28. Suncor's sale of fuel to WCS and Favored Retailers has occurred during reasonably contemporaneous time periods. Specifically, WCS and the Favored Retailers purchased thousands of gallons of fuel from Suncor on a daily basis when the discriminatory price difference has been in effect.

29. The fuel products sold by Suncor to WCS and Favored Retailers are of like grade and quality as they come from the same Suncor terminals, are physically identical, and are not subject to differentiation by consumers.

30. Suncor's practice of providing a discount to its Favored Retailers but not to WCS has injured competition between WCS and the Favored Retailers. The retail sale of fuel is highly competitive, and consumer decision-making with respect to the purchase of fuel is based largely on price. Heavy fuel users consider the pump price as the most important factor in deciding where to purchase.

31. As a result of Suncor's sustained price discrimination, the Favored Retailers have been able to sell fuel at a lower price than WCS which has resulted in WCS's loss of customers and thus, revenue, not only in its fuel sales, but also in the sales of other products offered in WCS

convenience stores. The sustained price discrimination has also forced WCS to sell fuel at a loss in order to meet the Favored Retailers' price, further eroding WCS revenues and its ability to compete. Accordingly, the Suncor price discrimination has injured competition between WCS and Suncor's Favored Retailers and has had the adverse effect on competition prohibited by 15 U.S.C. § 13(a).

### FIRST CLAIM FOR RELIEF
### Violation of 15 U.S.C. § 13(a)

32. Plaintiffs incorporate each of the allegations set forth above in this Claim for Relief.

33. As more specifically set forth above, Suncor sales of fuel to WCS were made in interstate commerce.

34. As more specifically set forth above, the fuel sold to WCS and Favored Retailers was of the same grade and quality.

35. As more specifically set forth above, Suncor discriminated in price between WCS on the one hand, and Favored Retailers on the other.

36. As more specifically set forth above, the discrimination had the adverse effect on competition prohibited by 15 U.S.C. § 13(a).

37. WCS has suffered actual damages related to lost sales and sales below cost arising from competition with Favored Retailers, all in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF
### Breach of Contract (Master Agreement)

38. Plaintiffs incorporate each of the allegations set forth above in this Claim for Relief.

39. Among other obligations imposed by the Master Agreement, Colorado law imposes on Suncor an obligation of good faith and fair dealing when carrying out its obligations

under the Agreements.

40. Suncor's actions in withdrawing long-standing credit terms afforded to WCS were without just cause or excuse, contravened the reasonable expectations of the parties, and were a breach of its implied covenant of good faith and fair dealing.

41. Suncor's actions in suspending WCS purchases of fuel from Suncor were without just cause or excuse, contravened the reasonable expectations of the parties, and were a breach of its implied covenant of good faith and fair dealing.

42. As a result of Suncor's breach of its covenant of good faith and fair dealing, Plaintiff WCS has suffered, and continues to suffer, damages and losses in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### Breach of Contract (Access Agreement)

43. Plaintiffs incorporate each of the allegations set forth above in this Claim for Relief.

44. Among other obligations imposed by the Access Agreement, Colorado law imposes on Suncor an obligation of good faith and fair dealing when carrying out its obligations under the Agreements.

45. Suncor's actions in suspending WTO from loading fuel at Suncor terminals, including the loading of fuel sold to WCS by middlemen, were without just cause or excuse, contravened the reasonable expectations of the parties, and were a breach of the implied covenant of good faith and fair dealing.

46. As a result of Suncor's breach of the covenant of good faith and fair dealing, Plaintiff WTO has suffered, and continues to suffer, damages and losses in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Tortious Interference (WCS Contracts and Relationships with Third Parties)

47. Plaintiffs incorporate each of the allegations set forth above in this Claim for Relief.

48. Suncor knew that Plaintiff WCS was purchasing fuel from middlemen at the Suncor terminals.

49. With such knowledge, Suncor, by its words and conduct, intentionally interfered with Plaintiffs' performance of their agreements and relationships with middlemen, thereby causing a substantial adverse impact on Plaintiff WCS's ability to perform and benefit from contracts with middlemen.

50. Defendant's actions were willful and wanton.

51. As a result of Defendant's tortious interference, WCS has suffered, and continues to suffer, damages and losses in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### Tortious Interference (WCS Contract with WTO)

52. Plaintiffs incorporate each of the allegations set forth above in this Claim for Relief.

53. Suncor knew of, or had knowledge of, other facts which reasonably should have caused it to know that WTO was taking delivery of fuel from middlemen at the Suncor terminals through transport contracts with middlemen and WCS.

54. With such knowledge, Suncor, by its words and conduct, intentionally interfered with performance of the transport agreements among middlemen, WTO and WCS, thereby causing a substantial adverse impact on their businesses.

55. Defendant's actions were willful and wanton.

56. As a result of Defendant's tortious interference, Plaintiffs WTO and WCS have suffered, and continue to suffer, damages and losses in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### Violation of C.R.S. § 6-2-108

57. Plaintiffs incorporate each of the allegations set forth above in this Claim for Relief.

58. As more specifically set forth above, Suncor has engaged within the State of Colorado in the secret payment of rebates and unearned discounts to Favored Retailers not extended to WCS.

59. As more specifically set forth above, Suncor's conduct has tended to destroy competition, and has therefore amounted to unfair competition in violation of C.R.S. § 6-2-108.

60. As a result of Defendant's violation of C.R.S. § 6-2-108, Plaintiff WCS has suffered, and will continue to suffer, damages and losses in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs seek judgment in their favor and against Defendant Suncor awarding:

   a) a preliminary and permanent injunction restraining and enjoining Defendant and any persons acting with it or on its behalf:

   i. from engaging in price discrimination between WCS and any other vendor of Suncor fuel;

   ii. from suspending Suncor petroleum product sales to WCS on the terms existing before the suspension that is the subject of this action; and

   iii. from terminating Plaintiffs' access to the Suncor terminals for the purpose of obtaining fuel from Suncor and middlemen.

   b) their direct damages as shall be proven at trial;

c) indirect, general and consequential damages as shall be proven at trial;

d) treble damages, attorneys' fees and costs pursuant to 15 U.S.C. § 15;

e) costs and attorneys' fees as allowable by law;

f) pre-judgment and post-judgment interest; and

g) such further relief as the Court may find proper.

Dated: June 17, 2011

/s/ Kenneth R. Bennington

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON
BIERMANN & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
(303) 629-5200

*Attorneys for Plaintiffs*

Plaintiffs' Address:
9849 East Easter Avenue
Centennial, CO 80112