IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant.

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Western Convenience Stores and Western Truck One, LLC, by and through their attorneys, Bennington Johnson Biermann & Craigmile, LLC, move as follows for an order preliminarily enjoining Defendant from denying Plaintiffs access to Defendant's petroleum terminals to take delivery of fuel products purchased from third parties.

### CERTIFICATION OF COMPLIANCE WITH D.C.COLO.LCivR 7.1.A

Pursuant to D.C.COLO.LCivR 7.1.A , the undersigned certifies that counsel for Plaintiffs have conferred with counsel for Defendant Suncor Energy (U.S.A) Inc. (hereinafter "Suncor") regarding this motion and the relief set forth herein. Despite efforts to confer, Suncor would not agree to the relief sought herein, and the parties were unable to reach agreements that otherwise would have obviated the need for this Motion.

### I. SUMMARY

As set forth more fully in the Complaint (Doc. No. 1), this case involves Defendant Suncor's abrupt termination of fuel sales to Plaintiffs after Plaintiffs discovered and complained

about discriminatory price practices and Suncor's subsequent arbitrary and improper termination of Plaintiffs' access to its fuel terminals to take delivery of fuel purchased both from Suncor and from third parties.

Without access to Suncor terminals to take delivery of fuel purchased from third parties, there is a substantial risk that Plaintiffs will suffer severe and irreparable harm. In contrast, granting the preliminary injunctive relief sought here will result in *no* harm to Defendant Suncor. Plaintiffs request and are entitled to a preliminary injunction to maintain the status quo during the pendency of this action.

## II.     BACKGROUND FACTS

1.     <u>Facts Leading up to Access Termination.</u>

For the past twenty years, Plaintiff Western Convenience Stores ("WCS") has operated convenience stores in Colorado and Nebraska which sell as their principal products gasoline and diesel fuel (hereinafter "fuel"). *Exhibit A, H. Taraghi Declaration, ¶ 2, Complaint ¶ 7.* WCS is an independent retailer that does not identify with a single fuel supplier or sell branded fuel such as, for example, Phillips 66® or Shell®. *Id.* WCS is known in the industry as a "discounter" and sells millions of gallons of gas every month to consumers at prices generally below prices that are offered by other retailers. *Exhibit A ¶ 3; Complaint ¶ 7.*

Defendant Suncor Energy (U.S.A.), Inc. ("Suncor"), based in Colorado, is: (a) a developer and refiner of fuel; (b) a supplier and distributor of fuel ultimately sold by retailers such as WCS; and (c) a retailer of fuel under certain brands, including Phillips 66® and Shell®. *Complaint ¶ 3, p. 7;* http://www.suncor.com/en/about/904.aspx. According to its website, Suncor supplies approximately 35% of Colorado's fuel needs. *Id.* Pursuant to a *Master Purchase and Sale*

*Agreement* and various predecessor and oral agreements, WCS has purchased and retailed billions of dollars of Suncor fuel.  *Complaint* ¶¶ *8, 15.*

Plaintiff Western Truck One ("WTO") is a trucking company affiliated with Plaintiff WCS.  *Complaint,* ¶ *9.*  WTO transports to WCS stores fuel loaded onto WTO trucks at fuel terminals such as those operated by Suncor in Commerce City and Grand Junction, Colorado.  *Id.*  WTO operates 10 trucks, 24 hours per day, every day, in a virtually non-stop delivery operation of fuel per month to WCS's 42 Colorado and Nebraska stores.  *Id.*   WTO's access to Suncor's fuel terminals has been governed by a May 10, 2006 *Terminal Access Agreement* (*Exhibit B*, hereinafter "Access Agreement") and various predecessor and oral agreements between the parties.  *Id.* ¶ *10.*  It is the Access Agreement rather than the *Master Purchase and Sale Agreement* which is the subject of Plaintiffs' request for preliminary injunctive relief.

At the Suncor Commerce City and Grand Junction terminals, WTO loaded not only fuel purchased directly from Suncor, but also fuel purchased from third parties, *i.e.*, middlemen, who purchase Suncor fuel and resell it to others via the Suncor terminals.  *Id.* ¶ ¶ *10-11.*  This access to fuel purchased from middlemen has been of particular importance to WCS as Suncor occasionally put WCS on allocation, that is, limited the amount of fuel that WCS could purchase directly from Suncor during a particular period.  *Id.* ¶ *13.*  When allocations occurred, WCS still could obtain fuel from third-party middlemen such as Sapp Brothers Petroleum, Inc. and Offen Petroleum, Inc. to make up for demand not met directly by Suncor.  *Id.*  WCS acquiesced to the uncertain supply from Suncor based on the verbal and implied promise, confirmed by the parties' custom and practice, that during allocation of Suncor fuel, WCS still could meet its needs and those of its customers by purchasing fuel from middlemen for delivery at Suncor terminals.  *Id.* ¶ *14.*  This promise was crucial to WCS's business, as any disruption of the 24/7 delivery of fuel to

WCS stores would be catastrophic to its operations and ability to deliver fuel to the consumer public.  *Id.*

Under the parties' custom and practice in place for several years, Suncor extended to WCS a $3 million line of credit permitting WCS ten days following delivery to pay for any fuel supplied directly by Suncor.  *Id.  ¶ 16.*  While portions of WCS's credit terms with Suncor were reduced to writing in *Confirmation of Purchase/Sale Agreements* (sometimes well after the period of time covered by a particular agreement), other elements of WCS's credit terms were the subject of verbal agreements only.  *Id.*

On multiple occasions in late April and early May 2011, without grounds or advance notice to WCS, Suncor manager Steven Ewing advised WCS that Suncor was "cutting [WCS] off" from any further fuel sales from Suncor.  *Id. ¶ 17.*  This generally occurred on Friday afternoons, impairing WCS's ability to meet the heavy weekend demand for its retail stores.  *Id.*   In response to WCS's complaints that this practice was improper and contrary to the parties' oral and written agreements, Suncor  reinstated fuel delivery each time, but not before causing substantial disruption to WCS's business.  *Id.*

On May 18, 2011, representatives of Suncor and WCS met ostensibly to discuss this pattern of Friday brinksmanship, Suncor refinery and supply issues, and a recent consent decree between the U. S. Environmental Protection Agency and certain companies, including WCS, relating to fuel blending.  *Id. ¶ 18, Exhibit A ¶¶ 2,7.*  Suncor was represented in the meeting principally by Mr. Ewing and his subordinate, Steve Moss, the Suncor representative assigned to WCS.  *Complaint ¶ 18.*  WCS was represented by its CEO, Hossein Taraghi, and by Chris Wehrle, WCS's fuel buyer.  *Id.*

At the meeting, Messrs. Ewing and Moss stated that Suncor's supply of fuel was "tight," that Suncor's own retail operations had not made as much money in the previous year as they had made in previous years, and that many of Suncor's branded retailers had experienced "a tough year." *Id. ¶ 19.* Mr. Ewing also acknowledged that it is commonly understood in the industry that fuel retailers suffer monthly losses for most months of the year that are made up for in two or three profitable months each year. *Id.* Mr. Taraghi reiterated that this had been WCS's experience and that sales/profits for WCS were looking strong for May and June 2011. *Id.*

At the meeting, the parties briefly discussed the EPA consent decree, which involved Rocky Mountain Pipeline System, LLC ("Rocky Mountain"), Offen Petroleum and WCS. *Exhibit A ¶ 7.*[1] As the subject fuel blending had not involved Suncor products or terminals, Ewing and Moss were only somewhat interested in the financial impact of the $2.5 million fine which was an element of the settlement with EPA. *Exhibit A ¶ 7.* Mr. Taraghi explained that the EPA had focused primarily on Rocky Mountain's terminals where the blending had occurred,

---

[1] According to the EPA, the nature of the proceeding was as follows:

> The Defendants produced gasoline at Rocky Mountain's terminals in Dupont and Fountain by blending natural gasoline and ethanol with previously certified gasoline (PCG) in tanker trucks. Natural gasoline is a byproduct of natural gas production.
> Section 211 of the Clean Air Act allows refiners to produce gasoline by adding blendstocks to previously certified gasoline, but anyone that produces gasoline by this method must meet the same emissions standards as other refiners and must comply with similar sampling, testing and quality assurance requirements to ensure that the gasoline meets the applicable standards.
> The complaint alleges that the Defendants violated the fuels regulations promulgated under the Clean Air Act by failing to comply with sampling, testing, and recordkeeping requirements. The complaint also alleges that the Defendants failed to comply with the renewable fuel standards and that some of the gasoline that they produced did not meet the gasoline volatility standards, which are designed to limit emissions of volatile organic compounds (VOCs) from gasoline.

http://www.epa.gov/compliance/resources/cases/civil/caa/rockymountainpipeline.html

and that Rocky Mountain would be paying the entire fine to EPA. *Id.* He further explained that WCS eventually would be liable to reimburse some portion of the fine to Rocky Mountain, but that would occur in the future after the public comment period and after court approval of the consent decree. *Id.*

During the meeting, based upon his observation of fuel prices posted by his competitors, Mr. Taraghi complained that Suncor was granting significant discounts or rebates to WCS competitors, such as Suncor's larger retail customers and its branded retailers, but not to WCS. *Complaint ¶ 20.* In response, Moss and Ewing specifically admitted that Suncor had been providing significant discounts to other retailers that had not been provided to WCS. *Id.* They stated they would see if the same discounts could be made available to WCS, but that never occurred. *Id.*

At the close of the May 18, 2011 meeting, Suncor representatives asked if WCS would be willing in the future to shorten payment terms or prepay for its purchases. *Id. ¶ 21.* Mr. Taraghi responded that it would not be acceptable to change the 10-day payment term under which Suncor and WCS had operated for the past several years, particularly in light of the fact that there was no grounds for such a change. *Id.* However, Mr. Taraghi offered that if Suncor truly believed that it needed additional security for WCS's line of credit and payment terms, WCS would be willing to provide real estate as collateral. *Id.* Neither Ewing, nor Moss, nor anyone else at Suncor ever followed up with WCS to discuss security or to further discuss Suncor's request to change payment terms. *Id.*

Rather, on Friday, May 20, 2011, Steve Moss contacted Plaintiff WCS via telephone and notified it that Suncor had revoked the previous practice of allowing WCS 10 days to pay for delivered fuel. *Id. ¶ 22.* In response to what WCS regarded as a breach and repudiation of its

agreements with Suncor which were certain to cause WCS substantial damage, WCS thereafter caused its banks not to honor further draw requests from Suncor. *Id.* On May 23, 2011, Steven Ewing, not yet knowing that draw requests would not be honored, contacted WCS via telephone and notified it that Suncor had suspended all petroleum product sales to WCS. *Id. ¶ 22.*

Two days later, on May 25, 2011, Ewing contacted Plaintiff WTO via telephone and stated that Suncor had revoked WTO's access to Suncor's terminals, thus precluding WTO from loading not only fuel purchased directly from Suncor, but also fuel purchased from middlemen such as Sapp Brothers and Offen Petroleum. *Id. ¶ 23.* Later, Suncor memorialized its verbal notices to WCS and WTO with a letter from its in-house attorney indicating that the decision to terminate direct sales and terminal access was based on its determination that WCS was not sufficiently creditworthy. *E.g., id. ¶ 24.*

In fact, there was no reason for Suncor to terminate WTO's terminal access for the purchase of fuel through middlemen. The price for the fuel and fee for using the terminal are paid entirely by the middleman. *Id. ¶ 12.* Therefore, Suncor does not depend at all on the creditworthiness of the ultimate purchaser or the trucking company to be paid for the use of the Suncor terminal. *Id.* Moreover, when a middleman delivers fuel to its own buyers via a Suncor terminal, the fee paid by that middleman creates revenue (and presumably profit) to Suncor for the use of its terminal. *Id.* Thus, Suncor's termination of WTO terminal access was punitive, done as a result of WCS's complaints about price discrimination and in an effort to eliminate competition from a discounter.

    2.    <u>Facts Creating Significant Risk of Irreparable Harm</u>

Suncor is the dominant supplier in Colorado, providing 35% of the state's fuel demand. Its two Commerce City refineries are the only ones in Colorado. *Exhibit A ¶ 4.* Its website states:

> Suncor's operations in Colorado and Wyoming provide a vital link between our oil sands resource base in Alberta and the growing energy market of the United States. Our operations include a refinery and terminals in Colorado, pipeline operations that stretch between Wyoming and Denver, and retail assets in Colorado that are operated under the Phillips 66 brand. Our operating communities are Commerce City, Denver, and Grand Junction in Colorado, and Cheyenne and Guernsey in Wyoming.
>
> * * *
>
> Suncor has its own network of 44 retail sites across Colorado, 38 of which are branded Shell.  The remaining six locations will continue to sell Suncor products under the Phillips 66 brand, until our current marketing and license agreement with ConocoPhillips expires in 2013. Suncor also has contract agreements to supply Shell and Phillips 66 branded fuels to more than 225 outlets throughout Colorado.
>
> Suncor supplies about 35% of Colorado's gasoline and diesel fuel demand. We blend 10% ethanol into gasoline at our Commerce City refinery and sell it through our retail network. Ethanol as a fuel additive is mandated in certain parts of Colorado during the winter months.

*http://www.suncor.com/en/about/904.aspx*.

As described above, by Suncor's admission, the supply of fuel to retailers in the region was "tight" even before WCS was terminated.  Since being terminated, WCS already has experienced new shortages of available fuel which it has had to satisfy by paying a higher price than would otherwise be the case. *Exhibit A ¶ 8.*  Prior to termination, Suncor supplied approximately 60% of the fuel loaded onto WTO trucks and delivered to WCS stores. *Id.*  WCS has had to make up the loss of that supply by going to other suppliers and paying higher prices.  *Id.*  That vulnerability to supply shortage and higher prices can be ameliorated by reinstatement of WTO access to Suncor terminals for even the limited purpose of WCS purchases of fuel from middlemen. *Id. ¶ 9.*

While WCS has managed thus far to meet consumer demand by paying more, there is a very significant risk of that fact changing at any time. *Exhibit A ¶ 10.*  Seasonal requirements for unique formulations of gasoline in the Colorado front range, natural disasters such as hurricanes in Texas and Louisiana and tornados in the Midwest, and disasters such as the July, 2010 Frontier

refinery fire in Cheyenne, all can have a substantial and unanticipated negative effect on supply of the fuel that is the core of WCS's business. *Id. ¶ 9.* Those factors, *i.e.*, tight supply that is vulnerable to all manner of disasters coupled with Suncor's control of the only refineries and more than a third of the Colorado fuel supply, mean that the termination of all access to that supply, even from middlemen, leaves WCS with virtually no slack between enough supply and the disaster of empty fuel tanks at WCS stores. *Id. ¶ 10.*

The lack of fuel at any of the 42 WCS stores in Colorado and Nebraska effectively will shut that store down. *Id.* Absent the ability to buy fuel from middlemen via Suncor terminals, WCS is exposed to a significant risk of irreparable harm likely to occur before this Court can rule on the merits. In contrast, Plaintiff WTO's access to Suncor terminals for the purpose of buying fuel from middlemen causes no harm to Suncor at all. To the contrary, it would create revenue, and presumably profit, for Suncor through the middleman's payment of fees for the use of those terminals. In short, an injunction preserving WTO access to Suncor terminals costs Suncor nothing.

### III.   JURISDICTION

This Court has exclusive jurisdiction over Plaintiffs' claims under the Robinson-Patman Act, 15 U.S.C. § 13(a). 28 U.S.C. §§ 1331, 1337(a); *Will v. Michigan Dept. of State Police*, 109 S.Ct. 2304, 2309 n. 5 (1989), *citing* 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

### IV.   ARGUMENT

Pursuant to Fed. R. Civ. P. 65, with notice to the adverse parties, a party may obtain preliminary injunctive relief when (1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant will ultimately prevail on the

merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004); *Kiowa Indian Tribe of Oklahoma v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1998). The Supreme Court has stated that the primary "limited purpose" of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch,* 101 S.Ct. 1830, 1834 (1981).

As a preliminary injunction is generally considered an extraordinary and drastic remedy, the movant carries a burden to clearly show that relief is warranted. *Mazurek v. Armstrong,* 117 S.Ct. 1865, 1867 (1997); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 975-6 (10th Cir. 2004). While this is particularly so with some types of preliminary injunctions, *i.e.*, (1) those that disturb the status quo; (2) those that are mandatory as opposed to prohibitory; and (3) those that afford the movant substantially all the relief he may recover at the conclusion of a full trial on the merits (*Schrier v. University of Colorado,* 427 F.3d 1253, 1258-59 (10th Cir. 2005)), the injunctive relief sought here does not fit within any of those disfavored categories.

<u>First</u>, the very purpose of the preliminary injunction Plaintiffs seek is to maintain the status quo. Plaintiffs do not request that Suncor be compelled to perform acts it has never performed. To the contrary, Plaintiffs simply request that Suncor be required to do that which it has done for years, namely, permit Plaintiffs access to its terminals to take delivery of fuel purchased by WCS from third parties.

<u>Second</u>, the injunction sought is not mandatory, but rather, is prohibitory in preventing the Defendants from suspending access to its fuel terminals for this limited purpose. Plaintiffs

are not seeking an order mandating that Suncor continue to sell fuel directly to WCS pursuant to the *Master Purchase and Sale Agreement* between WCS and Suncor.  Rather, Western is seeking an order prohibiting Suncor from denying WTO access to Suncor's terminal to pick up fuel purchased from third parties.

Third, the injunction sought does not begin to address the real relief sought by the Plaintiffs, and cannot be characterized as substantially all the relief to be recovered at trial.  The injunction sought in this Motion does not seek damages or other relief in connection with their assertions of unlawful price discrimination and breaches of the *Master Purchase and Sale Agreement* which governs purchases of fuel directly from Suncor.  *See, e.g., Complaint* ¶¶ *32-42.*  Nor does the injunction address damages arising from Defendant's interference with Plaintiffs' contractual and other relationships with third parties, such as Sapp Brothers and Offen.  *Id.* ¶¶ *47-56.*  The preliminary injunction sought in this Motion does not afford Plaintiffs substantially all (or even a fraction) of the relief they may recover at the conclusion of a full trial on the merits.

As set forth below, the Plaintiffs satisfy each of the requirements for preliminary injunctive relief.

**A.    THERE IS SUBSTANTIAL LIKELIHOOD THAT PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIM UNDER THE ACCESS AGREEMENT.**

As described in Sections IV.B, C and D below, the risk of irreparable harm to Plaintiffs is great in the absence of preliminary injunctive relief; there is *no* harm to Suncor if the relief is granted; and the public would be served rather than disserved if the Court grants this Motion.  Where a court finds that a party moving for preliminary injunction has established these three "harm" factors tip decidedly in its favor, the "probability of success" requirement is relaxed.

*Heideman v. South Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003), *citing Prairie Band of Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1246 (10th Cir. 2001). Thus, to establish likelihood of success on the merits in such instances, "[t]he movant need only show 'questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation.'" *Resolution Trust Corp. v. Cruce,* 972 F.2d 1195, 1199 (10th Cir. 1992) (citations omitted).

> Under Section 4 of the Clayton Act,
>
> [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found ... without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15. The Clayton Act specifically authorizes the granting of injunctive relief for violations of the Robinson-Patman Act or other antitrust laws. 15 U.S. C. § 26.

Plaintiffs will establish a prima facie case of price discrimination and, immediately after WCS complained of the price discrimination, a punitive retaliation by Suncor in terminating not only direct sales of fuel to WCS but also access by WTO to Suncor terminals to take delivery of fuel purchased from third parties. Specifically, the evidence will show that: (a) Suncor's representatives admitted the existence of price discrimination in the meeting on May 18, 2011; and: (b) Suncor's termination of WTO's terminal access, preventing WCS from obtaining fuel from middlemen, was based on no legitimate business consideration, but rather was a retaliatory response a week after the Plaintiffs' complaints about price discrimination.

As the Tenth Circuit and other circuits have recognized, Suncor's termination of Plaintiffs' access to fuel purchased from third parties -- thus facilitating a scheme to perpetuate price discrimination and removing a discounter from competition in the marketplace for fuel -- is

an injury that the antitrust laws were intended to prevent.  *See*, *e.g.,  Haynes Trane Service Agency, Inc. v. American Standard, Inc.*  51 Fed.Appx. 786, 803, 2002 WL 1972281 **15 (10th Cir. 2002) (copy attached as Exhibit C), *citing Pace Elec., Inc. v. Canon Computer Sys., Inc*., 213 F.3d 118, 145 (3d Cir. 2000) ("[A] dealer terminated for its refusal to abide by a vertical minimum price fixing agreement suffers antitrust injury."); *Greene v. General Foods Corp.,* 517 F.2d 635, 660-661 (5th Cir. 1975) (the termination of plaintiff's coffee distributorship for its failure to adhere to unlawful pricing system was a compensable injury in fact under antitrust laws); *Menominee Rubber Co. v. Gould, Inc.,* 657 F.2d 164, 166-167 (7th Cir. 1981) (a preliminary injunction restraining the termination of distribution agreement was appropriate where plaintiff alleged the threatened termination was based in part on plaintiff's refusal to comply with tying agreement in violation of antitrust laws).

Here, there is more than a reasonable likelihood that Plaintiffs can establish Suncor terminated their access to Suncor's fuel terminals as a result of their complaints (and Suncor's admission) of price discrimination.  Accordingly, they satisfy the first element for entitlement to preliminary injunctive relief.

**B.    THERE IS A SIGNIFICANT RISK THAT THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.**

The demonstration of probable irreparable harm is the most important prerequisite for the issuance of a preliminary injunction.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp., supra,* 356 F.3d at 1260-61, *citing Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990)).  The irreparable harm requirement for injunctive relief is satisfied by the plaintiff's showing of "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Crowe & Dunlevy, P.C. v. Stidham,* 640 F.3d 1140, 1157 (10th Cir. 2011), *quoting RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1210 (10th Cir. 2009)

(internal quotation marks omitted).   As part of the determination of whether the plaintiff has made that showing, the court is to assess whether the harm is likely to occur before a ruling on the merits.  *Id.*

An inability to calculate damages, harm to a business' goodwill, or diminishment of competitive positions in the marketplace each will support determination of irreparable harm. *See e.g., Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 37-39 (2d Cir. 1995).  Accordingly, this Court has previously recognized that a threatened loss of business constitutes irreparable harm.  *Bray v. QFA Royalties, LLC*,486 F.Supp.2d 1237, 1247-48 (D. Colo. 2007), *citing Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1207 (2d Cir. 1970) ("having run the business for 20 years, family's loss of car dealership was not entirely measurable in monetary terms").

If Plaintiffs cannot take delivery of fuel from third-parties at Suncor's terminals, any natural, other disaster or other circumstance causing a fuel shortage will mean empty tanks at WCS stores, WCS's inability to deliver fuel to consumers, and the necessary shutting down of stores.   As the testimony will establish, such disasters and circumstances occur all the time, in particular during the summer months.  In short, absent the preliminary injunctive relief sought, Plaintiffs stand to suffer a loss of stores -- and the concomitant loss of business goodwill and competitive positions -- and Suncor will succeed in its apparent intent to run Plaintiffs out of business.  That injury will be irreparable.

### C.     THE THREATENED INJURY TO PLAINTIFFS FAR OUTWEIGHS ANY INJURY THE PROPOSED INJUNCTION MAY CAUSE SUNCOR.

Where the injury to the moving party would be irreparable in the absence of an injunction, and inconvenience or loss to the nonmoving party is inconsequential, the injunction should be granted.  *Morton Salt Co. v. City of South Hutchinson*, 159 F.2d 897, 899-900 (10th

Cir. 1947). *See also Bergen Drug Co. v. Parke, Davis & Co.* 307 F.2d 725, 728 (3d Cir. 1962) (trial court erred in not granting preliminary injunction where Defendant had terminated a dealer complaining of price discrimination); *Lepore v. New York New, Inc.,* 346 F.Supp. 755, 761 (S.D.N.Y. 1972) (a preliminary injunction was appropriate where plaintiff distributor likely would have been forced to close his business if the defendant had terminated it as a carrier and the defendant would lose "relatively little" if the injunction was granted).

Here, there is a substantial risk of irreparable injury to Plaintiffs and *no* injury to Suncor if the Court orders the relief sought herein. If Plaintiffs have insufficient access to fuel to meet consumer demand, they will have empty fuel tanks and likely will have to close one or more of the 42 WCS stores. In contrast, there is no harm -- or even risk of harm to Suncor -- if the requested preliminary injunctive relief is granted and Plaintiffs retain the ability to purchase and take delivery of fuel from middlemen at Suncor terminals. The purchase price and all access fees are paid to Suncor by the middlemen rather than either of the Plaintiffs. There is no injury to Suncor at all in permitting Plaintiffs to simply take delivery of that fuel at the Suncor terminals.

**D.  ENTRY OF AN INJUNCTION WOULD NOT BE CONTRARY TO THE PUBLIC INTEREST AND WILL PRESERVE THE STATUS QUO**

As set forth above, the injunction sought preserves the status quo because it simply requires the Defendants to continue permitting Plaintiffs access to take delivery of fuel purchased from middlemen as they have done in the past. Moreover, nothing in the injunctive relief sought could cause any harm to the public interest. To the contrary, the public interest will be served by the injunction as it will promote rather than destroy competition and permit consumers to continue to purchase fuel at Plaintiffs' 42 retail stores. *See, e.g., U.S. v. Ivaco, Inc.*, 704 F.Supp. 1409, 1430 (W.D. Mich. 1989), *citing FTC v. Food Town Stores,* 539 F.2d

1339, 1346 (4th Cir. 1976) and *Christian Schmidt Brewing,* 600 F.Supp. at 1332; *United States v. Columbia Pictures Industries, Inc.,* 507 F.Supp. 412, 434 (S.D.N.Y. 1980) (recognizing in an antitrust action, that even where a preliminary injunction would result in private, financial harm to the defendant, that financial harm "must … yield to the public interest in maintaining effective competition.").

## V.  BOND

Under the Federal Rules, the Court has discretion to require a bond in an amount that serves the interests of justice.  Fed. R. Civ. P. 65(c) (bond must be posted "in such sum as the court deems proper.")  In fact, the Court may determine that a bond is unnecessary if there is an absence of a showing of a likelihood of harm.  *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (citing *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 782 (10th Cir.1964)).

Under the circumstances of this case, a bond should be nominal in the absence of any possibility of harm to Defendant Suncor.  Accordingly, the Plaintiffs suggest that a modest bond of $5,000 or less, in the nature of costs associated with the present Motion, should be required as a condition to the injunction sought.

## VI.  REQUEST FOR RELIEF

For all of the reasons set forth above, Plaintiffs respectfully request that the Court Order the following:

1. A forthwith hearing to be set, with all parties provided the opportunity to be heard and for the Court to make an immediate determination as to the appropriateness of preliminary injunctive relief;

2.       An Order restraining and enjoining Defendant Suncor and any and all related affiliates under its control from denying Plaintiffs access to Suncor's terminals to take delivery of fuel purchased by Plaintiff WCS from third parties.

3.       Other appropriate orders as will maintain the status quo related to the relationship between the parties until this matter and all claims that are asserted or may be asserted are tried.

Dated: July 6, 2011

*/s/ Kenneth R. Bennington*

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON
BIERMANN & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
(303) 629-5200

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2011, I served courtesy copies of the foregoing **MOTION FOR PRELIMINARY INJUNCTION** via email and U.S. Mail, postage prepaid to the following:

Michael E. Korenblat
Director, Legal Affairs – R&M U.S.A.
Suncor Energy Services, Inc.
717 17th Street, 29th Floor
Denver, CO 80202
mkorenblat@suncor.com

Anthony J. Shaheen
Keeya M. Jeffrey
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80201-8749
AJShaheen@hollandhart.com
KMJeffrey@hollandhart.com

*/s/ Marie Newberger*