IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation; WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

 Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

 Defendant.

## SUNCOR'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Suncor Energy (U.S.A.) Inc. ("Suncor") responds to Plaintiffs' Motion for Preliminary Injunction [5], filed July 7, 2011 ("Motion").

### INTRODUCTION

Plaintiffs, Western Convenience Stores ("WCS") and Western Truck One, LLC ("WTO"), seek a mandatory injunction forcing Suncor to alter the *status quo* to allow WTO to come on to Suncor's property to take delivery of gasoline and diesel fuel ("Product"). *See* Motion at 1 and 17 (¶2).

Plaintiffs' Motion should be denied. Mandatory injunctions altering the *status quo* are disfavored and are subject to a heightened standard. *Schrier v. Univ. of Colo.,* 427 F.3d 1253, 1259-62 (10th Cir. 2005); *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft,* 389 F.3d 973, 975-76 (10th Cir. 2004); *see* Motion at 10 (acknowledging standard and citing cases).

Plaintiffs cannot satisfy that heavy burden.  Even if Plaintiffs' Motion is construed as a request for a typical prohibitory injunction, it still fails.

As a threshold matter, Plaintiffs cannot satisfy the most basic element of all – irreparable harm.  *Plaintiffs admit they are not now suffering any irreparable harm,* but they worry that the gas supply might be threatened during the summer and that some natural disaster might occur— "all [of which] can have a *substantial* and unanticipated negative effect on supply of fuel that is the core of WCS's business."  *See* Motion at 8-9 (emphasis added); Taraghi Declaration, Exh. A to the Motion, ¶9.  Tenth Circuit law is clear: "'Merely serious or substantial' harm is not irreparable harm."  *Schrier,* 427 F.3d at 1267 (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).  This is not a pleading defect that can be cured. As discussed further below, Plaintiffs' claim of irreparable harm is conclusory and speculative, based on a natural disaster occurring, if it occurs at all, at some unknown time in the future.  *See* Motion at 14.  That is not sufficient.  *E.g., Conn. v. Mass.,* 282 U.S. 660, 674 (1931).

Plaintiffs' Motion also fails to satisfy the other elements necessary for preliminary relief: (1) likelihood of success on the merits; (2) a favorable balancing of the harms; and (3) a public interest supporting the requested relief.  *See Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

## STATEMENT OF MATERIAL FACTS

### Suncor's customers.

1.      Suncor is a Delaware corporation with its principal place of business in Denver, Colorado.  It is in the business of refining and selling petroleum products, including gasoline and diesel fuel ("Product").

2.      Suncor's customers differ in the length of their sales contracts. Certain customers have long term contracts of one to ten years. Other customers are "spot" purchasers, from one to three months duration.

3.      WCS was a "spot" customer. It purchased Product on contracts, subject to the terms of a Master Product Purchase and Sales Agreement described in paragraphs 8 and 9, below (the "Master PSA"), for one month in duration and on a single occasion for three months – never longer.

4.      Suncor is *not* the only source of supply for petroleum products in the Denver area. There are five other terminals within less than seven miles of Suncor's Commerce City terminal. ConocoPhillips and NuStar Energy have terminals about a quarter-mile east of Suncor's terminal. Sinclair Oil Corporation, Rocky Mountain Pipeline System LLC, and Ethanol Management Company LLC have terminals about seven miles away.

### WTO agreed that Suncor could revoke access "immediately," "without cause."

5.      WTO is a Colorado limited liability company that transports petroleum products. *See* Complaint, ¶¶2 and 9.

6.      In May 2006, WTO and Suncor entered into a Terminal Access Agreement by which Suncor permitted WTO to access Suncor's terminals. In paragraph 1, WTO agreed that "any permission of access granted by Suncor … may be revoked *immediately* by Suncor, *without cause*, as a matter of right." *See* Exhibit 1, ¶4 at 2 (emphasis added)[1]. In Paragraph 25, WTO and Suncor agreed to a very strict anti-waiver provision, requiring any waiver to be in writing and signed by the party to be bound. *Id.* at 7-8.

---

[1] *See* Exhibit 11, attached, authenticating Suncor's business record exhibits.

**WCS agreed Suncor could suspend sales and withdraw credit.**

7.      WCS is a Colorado corporation that operates convenience stores. *See* Complaint,

¶¶1 and 7. *WCS is not a party to the Terminal Access Agreement.*

8.      In 2007, Suncor and WCS entered into the Master PSA, attached as Exhibit 2, that

governs the sale and delivery of Product. *WTO is not a party to the Master PSA.*

9.      In paragraph 5 of Exhibit A to the Master PSA, WCS agreed that if it failed to

make payment, Suncor "shall have the right to immediately cease supplying or selling Product"

to it. *See* Exhibit 2 at A-1. In paragraph 17, WCS agreed that "[i]f Suncor, *in its sole discretion,*

believes it has grounds for *insecurity* regarding the performance of any obligation under this

Agreement by Counterparty … (including, without limitation, … Counterparty's *failure to timely*

*pay any invoice)*… Suncor *shall have the right* to do one or more of the following: (a) *without*

*notice, suspend indefinitely any and all sales of Product* to Counterparty, (b) *without notice,*

suspend, withdraw, alter, or *terminate any credit or line of credit* previously extended to

Counterparty." *Id.* at A-3 (emphasis added).

10.     Prior to this dispute, WCS obtained 60% of its petroleum products from Suncor

and 40% from others. Now it obtains 100% from others. *See* Motion at 8.

11.     Subject to the Master PSA, WCS purchased Product on credit extended by

Suncor, with payment by electronic funds transfer ("EFT") due ten days after WCS obtained the

Product.

12.     Suncor extended credit "at its sole and absolute discretion." *See* Exhibit A to

Master PSA, attached as Exhibit 2, ¶16 at A-3.

**WCS's $2.5 million EPA Consent Decree caused Suncor to initiate a credit review.**

13.    In late April, WCS approached Suncor about entering into a one year contract to replace the three month contract that was about to expire. Subject to the terms of the Master PSA, Suncor had previously sold Product to WCS only on a spot basis.

14.    On May 4, 2011, while Suncor was still considering WCS's request, the Department of Justice and the Environmental Protection Agency announced that WCS, Rocky Mountain Pipeline System, LLC and Offen Petroleum, Inc. had entered into a consent decree by which WCS was jointly and severally liable to pay $2.5 million for violating the Clean Air Act ("Consent Decree"). Suncor learned about the Consent Decree the next day. *See* Exhibit 3.

15.    The Consent Decree concerned Suncor and it initiated a review of WCS's credit. *See* Exhibit 4.

16.    To perform that review, Suncor requested and received from WCS financial information. *See* Exhibit 5. Those financials revealed that WCS and its affiliate HDT, LLC, from whom WCS leases the gas stations it operates, (i) had posted a net loss of $2.5 million in 2010, (ii) their equity position was negative $4 million, (iii) their long term debt was $16.7 million and (iv) that WCS had a negative cash balance of $396,910.38. *See* Exhibit 6, ¶¶3-5.

17.    On May 20, 2011, Suncor completed its review and determined, based on the results of its objective credit model, that WCS should be denied credit. *Id.,* ¶¶5 and 6. That same day, Suncor informed WCS that its credit was withdrawn and that it would have to prepay any purchases after May 24, 2011. See Complaint, ¶22. Under the Master PSA, Suncor could have suspended all sales and credit without notice, but it did not. *See* ¶9, above.

**WCS owes Suncor $3.755 million for Product taken between May 9-25.**

18.     On May 18, 2011, Suncor originated a $436,710.80 draw request for Product

WCS purchased and took on or about May 9. *See* Exhibit 7.  On May 20, 2011, Suncor

originated a $785,694.85 draw request for Product purchased and taken on or about May 11-13.

*See* Exhibit 8.  On May 23, 2011, Suncor originated a $268,625.86 draw request for Product

purchased and taken on or about May 14. *See id.*  Thereafter, Suncor originated eight more draw

requests for purchases from May 15 through May 25.  The total amount due and owing is

$3,755,141.95, plus interest at 12% per annum. *See* Exhibit 2, ¶20 at A-4; Exhibit 6, ¶11.

19.     These eleven draw requests were denied either because WCS had insufficient

funds in its account or because WCS stopped payment. *See* Exhibit 7; Complaint, ¶22.

**Suncor suspended sales because of WCS's bad credit and refusal to pay.**

20.     On May 23, Wells Fargo Bank notified Suncor that the May 18 draw request for

$436,710.80 had been dishonored because WCS had insufficient funds. *See* Exhibit 7.  This

failure to pay for past purchases also gave Suncor the separate and independent right to suspend

the sale of Product to WCS and to withdraw its credit. *See* ¶ 9, above.  Thereupon, Suncor

notified WCS that it was suspending all sales of Product to WCS because of its lack of credit

worthiness, failure to pay invoices and the denial of the $436,710.80 draw request. *See*

Exhibit 7; Complaint, ¶22.

21.     Nonetheless, on May 24 and May 25, 2011, WCS intentionally purchased and

received delivery of Suncor's Product at Rocky Mountain Pipeline System, LLC's terminal in

Fountain, Colorado.  WCS purchased this Product knowing it did not intend to pay for it.  WCS

had already instructed its bank not to honor any draw requests from Suncor. *See* Complaint, ¶22.

6

**Suncor revoked WTO's access after the invoices went unpaid.**

22.     On May 24 and 25, 2011, Wells Fargo Bank notified Suncor that the May 20 draw request for $785,694.85 and the May 23 draw request for $268,625.86 had been denied because WCS had stopped payment. *See* Exhibit 8.

23.     On May 25, 2011, Suncor notified WTO it was revoking WTO's access to Suncor's terminals. *See* Exhibit 9.

24.     Suncor denied WTO's trucks access to its terminals but has not "prevented Western from purchasing gasoline or diesel fuel directly from other third parties, including customers of Suncor," either at Suncor's terminals using third party trucks or elsewhere. *See* June 9, 2011 letter, Exhibit10.

## ARGUMENT

### A.     PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM.

Plaintiffs cannot satisfy what they acknowledge is "the most important prerequisite for the issuance of a preliminary injunction" — that is, irreparable harm. *See* Motion at 13. Indeed, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.,* 356 F.3d 1256, 1260 (10th Cir. 2004) (citation omitted). WCS and WTO cannot satisfy the irreparable harm requirement for two independent reasons.

1.     WTO has not pled and cannot plead irreparable harm.

Plaintiffs have moved collectively for a preliminary injunction preserving "WTO's access to Suncor terminals." *See* Motion at 9. WCS and WTO are separate and distinct legal entities and must be kept separate for the injunction analysis. WCS is a Colorado corporation that

7

operates convenience stores and purchased Product from Suncor. *See* ¶¶7, 10-11, above. WTO is a Colorado limited liability corporation that transports petroleum products. *See* ¶5, above. In 2006, WTO entered into the Terminal Access Agreement. *See* ¶6, above. WCS is not a party to that Agreement and does not have the right to access Suncor's terminals.

Plaintiffs are not entitled to an injunction because neither of them can satisfy the irreparable harm requirement. "Because injunctive relief calls upon the Court's extraordinary powers, it must be exercised sparingly and narrowly and *only on a showing of irreparable harm by each party* before the Court." *Asian-American Licensed Beverage Ass'n v. Commonwealth of Pa.*, 2005 WL 3077246, at *5 (M.D. Pa. Nov. 3, 2000) (emphasis added); *Amer. Dairy Queen Corp. v. Brown-Port Co.*, 621 F.2d 255, 257-58 (7th Cir. 1980) (finding "no case authority" to support allowing a party to obtain an injunction based on irreparable harm to another and reaffirming that a party seeking an injunction must demonstrate irreparable harm "to itself"). Only WTO had the legal right, before Suncor revoked it, to access the terminals. However, *WTO has not pled irreparable harm. See* Motion at 8-9. WCS has pled irreparable harm, but it does not have, and never has had, the right to access the terminals. *Id.*

2.     Plaintiffs' alleged harm does not satisfy the test for irreparable harm.

To satisfy the irreparable harm requirement, the movant "must show that the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City* 348 F.3d 1182, 1189 (10th Cir. 2003) (emphasis in original). "Irreparable harm requires that the injury be 'certain, great, actual and not theoretical.'" *Walker v. Bay,* 2008 WL 4097474, at *2 (D. Colo. Sep. 2, 2008) (quoting *Wisc. Gas Co.,* 758 F.2d at 674). "'Merely serious or substantial' harm is not irreparable harm."

8

*Id.* at *2 (quoting Tenth Circuit cases); *Dominion*, 356 F.3d at 1262-63. A plaintiff must "clearly and unequivocally demonstrate[] that he will suffer irreparable harm." *Id.* at *2; *Dominion*, 356 F.3d at 1261.

Plaintiffs concede that WCS is not *now* suffering any irreparable harm[2]. Plaintiffs admit that (i) WCS has no shortage of fuel, having "ma[d]e up the loss of that supply by going to other suppliers" and (ii) "WCS has managed thus far to meet consumer demand." *See* Motion at 8. Instead, they allege only a potential future harm -- WCS has a "*vulnerability* to supply shortage" and that "any natural, other disaster or other circumstance causing a fuel shortage will mean empty tanks at WCS stores." *Id.* at 8 (emphasis added) and 14.

Plaintiffs' alleged irreparable harm is conclusory and speculative, occurring, if it occurs at all, at some uncertain time, but most likely in the summer because of unique formula requirements for gasoline, increased summer driving and natural disasters. *See* Motion at 14 and Taraghi Aff., Exhibit A, ¶9. By the time of the preliminary injunction hearing, summer will have ended and, despite their fears, Plaintiffs' alleged irreparable harm has not occurred. Furthermore, Plaintiffs have not shown that if their potential future harm occurred, they could not get fuel from the five other terminals near Suncor's terminal. *See* ¶4, above.

Speculative, uncertain harm such as Plaintiffs' is not sufficient for an injunction. Injunctions are "to prevent existing or presently threatened injuries" and "will not be granted against something *merely feared* as liable to occur at some indefinite time in the future."

---

[2] Suncor has not prevented WCS from purchasing gas or diesel fuel from other third parties, including customers of Suncor. *See* ¶24, above. Suncor is only denying WTO's trucks access to its terminals but WCS could still contract with other third parties whose trucks have approved access. *Id.* Moreover, any alleged harm is compensable in money damages and is, therefore, not irreparable. *See* Motion at 8 ("paying a higher price").

*Connecticut,* 282 U.S. at 674 (emphasis added); *Campbell v. Milyard,* 2010 WL 5110095, at *8

(D. Colo. Oct. 15, 2010) (applying *Connecticut*); *Bingham v. Zavaras,* 2010 WL 1904007, at *1

(D. Colo. May 10, 2010) (finding movant failed to prove irreparable harm through conclusory

statements); *Nasious v. Ritter,* 2010 WL 1539862, at *2 (D. Colo. Mar. 2, 2010) (rejecting claim

of irreparable harm based on "allegations … not strengthened by any documentary evidence

attached to the pleadings").

## B.   WCS AND WTO ARE NOT LIKELY TO WIN ON THE MERITS.

WCS and WTO Plaintiffs cannot establish a likelihood of success on the merits.  WCS's

and WTO's state law claims (Second through Fifth Claims for Relief), on which the motion for

preliminary injunction rests, fail because under the Master PSA and the Terminal Access

Agreement Suncor had the right to suspend sales, withdraw credit and deny WTO access to

Suncor's terminals.  Those rights defeat Plaintiffs' Second through Fifth Claims for Relief for

breach of the duty of good faith and fair dealing and for tortious interference.  The price

discrimination claims (First and Sixth Claims for Relief) are not relevant for the injunction.

### 1.   Breach of the duty of good faith and fair dealing.

In the Second Claim, Plaintiffs allege that Suncor breached the duty of good faith and fair

dealing that is implied in the Master PSA by "withdrawing long-standing credit" and

"suspending WCS purchases of fuel from Suncor."  *See* Complaint, ¶¶40-41.  In the Third Claim,

Plaintiffs allege that Suncor breached the duty of good faith and fair dealing that is implied in the

Terminal Access Agreement by suspending WTO's access to Suncor's terminals without good

cause.  *See* Complaint, ¶45.  The same legal analysis applies to the Second and Third Claims for

Relief, so they will be discussed together.

Colorado law is clear. The duty of good faith and fair dealing cannot change the existing terms of a contract. *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 623 (Colo. App. 1997). The duty of good faith and fair dealing "will not contradict terms or conditions for which a party has bargained." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). And a plaintiff cannot "rely on the implied duty of good faith and fair dealing to circumvent terms" bargained for in the contract. *Lutfi v. Brighton Community Hosp. Assoc.*, 40 P.3d 51, 59 (Colo. App. 2001). Those legal principles defeat Plaintiffs' Second and Third Claims.

*First,* the Master PSA gave Suncor the express right to withdraw WCS's credit. Suncor extended credit "at its sole and absolute discretion." *See* ¶12, above. Under Section 17, if Suncor believed it had "grounds for insecurity" in WCS's creditworthiness, it had the right to terminate or withdraw WCS's credit. *See* ¶9, above. Suncor had such "grounds." The $2.5 million Consent Decree and the resulting credit analysis showed WCS was not creditworthy. *See* ¶¶14-17, above. The May 18 draw request that was rejected for insufficient funds confirmed WCS was not creditworthy. *See* ¶20, above.

*Second,* the Master PSA also gave Suncor the right to suspend sales to WCS. Paragraph 5 of Exhibit A to the Master PSA provides that if WCS failed to make payment, "Suncor shall have the right to *immediately* cease supplying or selling Product to" WCS (emphasis added). *See* ¶9, above. In addition to permitting Suncor to terminate WCS's credit, paragraph 17 of Exhibit A gave Suncor the right to "without notice, suspend indefinitely any and all sales" to WCS. WCS concedes it has not made payment and admits it "caused its banks not to honor any further draw requests from Suncor." *See* Complaint, ¶22. WCS owes Suncor $3.755 million for Product purchased, taken and sold, but not paid for. *See* ¶¶18-19, above.

11

*Third,* in the Terminal Access Agreement, Suncor and WTO agreed that "any permission of access granted by Suncor ... may be revoked *immediately* by Suncor, *without cause,* as a matter of right." *See* Exhibit 1, ¶4 at 2 (emphasis added). Suncor's right to revoke without cause is strictly enforced. In *Grossman v. Columbine Medical Group, Inc.*, 12 P.3d 269, 270 (Colo. App. 1999), a physician argued that the duty of good faith and fair dealing prevented his employer from terminating him without cause. The Court rejected that argument finding that the termination provision allowed the physician to be terminated for any reason and, therefore, "the physician cannot rely on the implied duty of good faith and fair dealing to circumvent terms for which he expressly bargained." *Grossman,* 12 P.3d at 271.

2.      Tortious Interference.

The Fourth Claim (tortious interference with WCS's contracts) and the Fifth Claim (tortious interference with WCS's contract with WTO) are based on Suncor's denial of access to WTO. *See* Complaint, ¶¶11, 13, 47-49, 52-54. Suncor had the absolute and enforceable legal right to revoke access. *Grossman,* 12 P.3d at 271. In the Terminal Access Agreement, WTO agreed that Suncor could revoke permission "immediately" and "without cause." *See* ¶6, above. The exercise of a legal contract right is an absolute defense to a tortious interference claim and the right "may be exercised without liability regardless of the motivation." *Radiology Prof. Corp. v. Trinidad Area Health Assoc., Inc.*, 565 P.2d 952, 954 (Colo. App. 1977), *aff'd,* 577 P.2d 748 (Colo. 1978); *Int'l Assoc. of Machinists v. Southard*, 459 P.2d 570, 572 (Colo. 1969) (no liability for breach caused by exercise of absolute right); *Lutfi,* 40 P.3d at 58, ("interference with a prospective business relationship must be both intentional *and improper*" (emphasis in original)).

12

3.    Price discrimination claims.

WCS's discriminatory pricing claims (First and Sixth Claims for Relief) are not relevant to Plaintiffs' preliminary injunction motion because they do not relate in any way to WTO's access to Suncor's terminals. In any event, WCS's price discrimination claims are fatally flawed because, among other things, WCS cannot show that it (1) was similarly situated to allegedly favored buyers or (2) suffered an antitrust injury.

The Robinson-Patman Act, 15 U.S.C. § 13(a), does not prohibit all differential pricing,[3] *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993), but only that occurring when the allegedly favored and disfavored buyers are similarly situated and the transactions on which the claim is based are reasonably comparable. *See, e.g., Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 865 (6th Cir. 2007) (Robinson-Patman "'proscribes unequal treatment of different customers in comparable transactions'") (quoting *FTC v. Borden Co.*, 383 U.S. 637, 643 (1966)); *Cleveland v. Viacom, Inc.*, 73 Fed. Appx. 736, 741 (5th Cir. 2003) ("The Robinson-Patman Act . . . prohibit[s] price discrimination only where customers are otherwise purchasing on like terms and conditions."). By its own admission, WCS is a spot purchaser of Product from Suncor. *See* Complaint, ¶ 7 (asserting that WCS "does not identify with a single supplier"). It buys not only from Suncor but also from other suppliers and is not committed to purchase any specific amount of Product from Suncor.

By contrast, the allegedly favored buyers have contractual commitments to purchase specific amounts of Product from Suncor pursuant to longer term contracts. Sales on a spot basis

---

[3]  Plaintiffs also allege a price discrimination claim under Colo. Rev. Stat. § 6-2-108. Colorado's state antitrust provisions are generally construed in accord with federal antitrust law. *People ex rel. Woodard v. Colorado Springs Bd. of Realtors, Inc.*, 692 P.2d 1055, 1060-61 (Colo. 1984).

and sales pursuant to term contracts are not reasonably comparable and do not support a claim

for unlawful price discrimination. *See, e.g., Coastal Fuels of Puerto Rico, Inc. v. Caribbean

Petroleum Corp.*, 990 F.2d 25, 27 (1st Cir. 1993) (Robinson-Patman Act does not prohibit "price

differences between spot sales and long-term contract sales that reflect different market

conditions"); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1407 (7th Cir.

1989) ("No one supposes that a seller must charge the same price on contracts signed at different

times, or on long-term contracts and spot sales."). WCS's claims fail on this ground.

WCS also cannot show antitrust injury, which is injury of the type that the antitrust laws

were designed to prevent and that flows from an anticompetitive aspect of the challenged

practice. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 342 (1990); *Brunswick

Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To meet its burden, WCS must

prove that it suffered actual injury caused by an anticompetitive aspect of the alleged differential

pricing. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561-63 (1981). Denial of

terminal access, however, is not prohibited by the Robinson-Patman Act and therefore cannot

constitute a cognizable antitrust injury for purposes of Plaintiffs' Motion.

## C.   PLAINTIFFS' SPECULATIVE INJURY DOES NOT OUTWEIGH THE REAL INJURY TO SUNCOR.

Plaintiffs assert that Suncor will suffer "*no* injury" or harm if the injunction is granted.

*See* Motion at 15 (emphasis in original). Plaintiffs, however, have not suffered any injury other

than, perhaps, the purely economic one of "paying higher prices." *See* Motion at 8.

By contrast, if the injunction is granted, Suncor will have lost (i) its bargained-for

contract right under the Terminal Access Agreement to deny access to WTO's trucks and (ii) its

property right to deny a third party access to its property. These are valuable rights which

Suncor will have lost and which cannot be compensated for in money. "The right of private

contract is no small part of the liberty of the citizen, and ... the usual and most important

function of courts ... is rather to maintain and enforce contracts." *Francam Building Corp. v.*

*Fail*, 646 P.2d 345, 349 (Colo. 1982) (quoting *Baltimore & Ohio Southwestern RY v. Voyght*,

176 U.S. 498 (1900)). The right of private property is deeply ingrained in the law: "[T]he law of

the land ... postpone[s] even public necessity to the sacred and inviolable rights of private

property." Wm. Blackstone, 1 *Commentaries on the Laws of England* 134-35 (1765); *City of*

*Colo. Springs v. Yust*, 249 P.2d 151, 153 (Colo. 1952) (the right to possess and use property is

"essential and sacred").

### D.    THE PUBLIC INTEREST IS NOT AFFECTED.

WCS argues that "the public interest will be served by the injunction as it will promote

rather than destroy competition and permit consumers to continue to purchase fuel at Plaintiffs'

42 retail stores." *See* Motion at 15. Plaintiffs have presented no evidence of any effect on

competition and there is none. WCS made up for any lost supply, is still selling fuel at its stores

and "has managed thus far to meet consumer demand." *Id.* at 8.

### BOND

If the injunction is granted, Suncor requests that the bond be at least $3.755 million, plus

12% interest as specified in the Master PSA.

Dated September 2, 2011

Respectfully submitted,

*s/ William L. Monts III*
J. Robert Robertson
William L. Monts III
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Tel.:  (202) 637-5600
Fax:  (202) 637-5910
E-Mail:  robby.robertson@hoganlovells.com
              william.monts@hoganlovells.com

s/ Anthony J. Shaheen
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO  80201-8749
Phone: 303-295-8054
Fax: 303-291-9126
AJShaheen@hollandhart.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on 9/2/2011, I have caused to be presented the foregoing to the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON
BIERMANN & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
(303) 629-5200
krb@benningtonjohnson.com
kec@benningtonjohnson.com

s/ Susanne Johnson

5158216_4.DOCX