

Michael E. Korenblat
SUNCOR ENERGY (U.S.A.) INC.

717 17th Street, Suite 2900
Denver, CO 80202
Telephone: 303.793.8052
Facsimile: 303.793.8057
mkorenblat@suncor.com

June 9, 2011

Kenneth R. Bennington, Esq.
BENNINGTON JOHNSON BIERMANN & CRAIGMILE LLC
3500 Republic Plaza
370 17th Street
Denver, CO 80202
Fax: 303.629.5718
e-mail: krb@benningtonjohnson.com

**VIA FIRST CLASS MAIL AND E-MAIL**

Re:   Western Convenience Stores, Inc.'s Failure to Pay Suncor for Gasoline and Diesel Fuel

Dear Mr. Bennington:

On behalf of Suncor Energy (U.S.A.) Inc. ("Suncor"), I am writing in response to your letter, dated Friday, June 3, 2011.

As you are aware, your client, Western Convenience Stores, Inc. ("Western"), owes Suncor **$3,755,141.95, plus interest,** for gasoline and diesel fuel supplied by Suncor from May 9, 2011 to May 23, 2011. Western has taken delivery of Suncor's petroleum products, sold it to third parties, kept the proceeds, and failed to pay Suncor by dishonoring fully authorized drafts on Western's bank account.

As discussed below, all of the assertions in your letter are without merit, and confirm that Suncor's decision to stop supplying Western with petroleum products was absolutely correct.

To begin, any suggestion that Suncor has treated Western unfairly or improperly is simply not true. The <u>sole</u> reason that Suncor stopped selling petroleum products to Western was that Suncor had genuine concerns with Western's creditworthiness and ability to pay -- which concerns have proven to be very well founded.

**EXHIBIT 10**

Two important events caused Suncor to decide to have its credit department conduct a review of Western's financial condition. First, on May 4, 2011, the U.S. Department of Justice and U.S. Environmental Protection Agency announced publicly in a press release that Western had entered into a settlement and consent decree, making Western jointly and severally liable to pay a $2.5 million penalty for violating the Clean Air Act by producing "millions of gallons of illegal gasoline by mixing natural gasoline, a byproduct of natural gas production, and ethanol with gasoline previously certified to meet Clear Air Act requirements." (the "$2.5 Million Consent Decree"). Upon learning about the $2.5 Million Consent Decree, Suncor became very concerned about how this new $2.5 million liability would affect Western's ability to continue to pay Suncor for petroleum products.

Second, as you are aware, Suncor and Western are parties to a Master Product Purchase and Sale Agreement that was entered into in 2007 (the "Master PSA"). The Master PSA, however, is not, in and of itself, an agreement to purchase and sell petroleum products. Instead, the Master PSA sets forth the general terms and conditions that govern both (1) any agreement that Suncor and Western enter into for the purchase and sale of petroleum products, and (2) any actual sales or delivery of petroleum products from Suncor to Western when there is no other written agreement.

Historically, Western had entered into short-term ("spot") purchase contracts with Suncor (usually for one month), the general terms and conditions of which were governed by the Master PSA. The last signed contract that Suncor and Western entered into expired on April 30, 2011 (the "April Contract"). It was a three month contract.

Upon the expiration of the April Contract, Western wanted to enter into a new twelve month contract. In light of the $2.5 Million Consent Decree, Suncor management was unwilling to enter into any contract, let alone a twelve month contract (which was much longer than the short term contracts customarily entered into with Western), until Suncor's credit department had reviewed and was fully satisfied with Western's creditworthiness. Pending that review, Suncor and Western exchanged e-mails regarding the supply of petroleum products for the month of May 2011.

In May, Suncor's credit department requested and obtained the combined unaudited and preliminary financials of Western and Western's affiliate, HDT, LLC, for the fiscal year ending on March 31, 2011. HDT, LLC owns the retail gas stations leased to and operated by Western. A review of these financials revealed that: (1) Western posted a net loss of $2.5 million in 2010, (2) Western's equity position was negative $4 million, (3) Western's long term debt was $16.7 million, and (4) Western had a negative cash balance in the amount of $396,910.38 -- all of which were major red flags. On May 18, 2011, Suncor met with Western, including Western's principal, Mr. Hossein Taraghi, and discussed the $2.5 Million Consent Decree and Suncor's concerns with Western's creditworthiness. At that meeting, Suncor explored having Western provide a deposit to guaranty future purchases. Mr. Taraghi responded that Western did not have the funds to provide a deposit.

On Friday, May 20, 2011, Suncor's credit department completed its final credit review. The results of Suncor's objective internal model for evaluating customer credit limits provided that Western should not be extended any credit, and that, at a minimum, pre-payment would be required to continue to sell petroleum products to Western.

On the same day, May 20, 2011, Suncor informed Western that (1) based on the credit review, Western no longer qualified for the extension of credit, and (2) as a result, Western would have to pre-pay Suncor for further purchases of gasoline or diesel fuel. To be clear, at this time, Western could still purchase petroleum products from Suncor, provided it pre-paid for them. As a courtesy, Suncor specified that Western's prepayment obligation would not commence until Tuesday 24, 2011 in order to give Western time to transition. This allowed Western to continue to purchase petroleum products on credit for a few days, which Western took full advantage of from May 20th through May 23rd.

On Monday, May 23, 2011, however, Suncor was advised that the first of several electronic draw requests on Western's bank, properly originated by Suncor pursuant to an Electronic Funds Transfer Agreement ("EFT Agreement") between Suncor and Western, was dishonored. In particular, this draw, which was in the amount of $436,710.80, was rejected for insufficient funds. Understandably, as a result, that same day, Suncor made the decision to suspend all petroleum product sales to Western effective immediately.[1] Western's conduct had not only confirmed Suncor's concerns about its ability to pay, but also demonstrated that Western was not trustworthy. Thereafter, additional properly authorized electronic draw requests for over $3.3 million were also dishonored. Western's conduct in causing the draw requests to be dishonored clearly violated the EFT Agreement.

Suncor's suspension of sales to Western was expressly authorized by and in accordance with multiple provisions of the General Terms and Conditions of the Master PSA ("GT&Cs").

1. Under Section 3 (Payment), "[i]n the event that Counterparty [Western] fails or ceases to make payment to Suncor ..., Suncor shall have the right to immediately cease supplying or selling Product to Counterparty and to terminate this Agreement."

2. Under Section 16 (Credit), Suncor may extend credit or a line of credit to Western on such terms as Suncor shall specify from time to time and has the right to modify or withdraw such credit and/or credit terms at any time without notice.

---

[1] To be clear, Suncor did not "terminate" the Master PSA, but rather suspended all sales of petroleum products to Western. Notwithstanding the foregoing, Suncor reserves all of its termination rights under the Master PSA. In addition, as stated above, Suncor does not have any current contract in effect with Western for the sale of any petroleum products.

3. Under Section 17 (Security), if Suncor, in its sole discretion, believes that it has grounds for insecurity regarding performance of Western for any reason, including, without limitation, failure to timely pay an invoice, Suncor may, without notice, suspend indefinitely any and all sales of petroleum products to Western and make Performance Assurance (as defined in the GT&Cs and which includes prepayment) a condition precedent to the further supply of products and/or extension of credit to Western.

4. Under Section 18 (Default), if Western fails to pay any amount due on or before the second business day following the due date, Suncor "shall, in addition to any other rights or remedies which it may have at law or in equity, have the right, at its sole discretion, to (a) immediately withhold and/or suspend the delivery or acceptance of Product upon notice, or (b) terminate this Agreement and/or any transactions hereunder."

Suncor clearly had the ability to: (1) change its credit terms, (2) suspend and condition future petroleum product sales upon Performance Assurance (including prepayment) based on Suncor's belief that it had grounds for insecurity for any reason, and (3) suspend petroleum product sales upon Western's failure to timely pay for such products. Suncor did nothing improper in ceasing to sell product to Western. It did what any prudent business would do in light of the clear evidence of Western's lack of creditworthiness.

In addition, there was nothing improper with Suncor's decision to revoke the access of Western Truck One, LLC ("WTO"), Western's affiliate, to Suncor's petroleum product terminals. Suncor's action was squarely authorized pursuant to the express terms of the Terminal Access Agreement (Master Agreement) by and between Suncor and WTO (the "TAA"). Specifically, under Section 4 of the TAA, Suncor has the unilateral right to revoke, suspend, or restrict "any permission of access granted by Suncor" ... "<u>without cause, as a matter of right</u> with respect to Carrier [WTO] ... upon notice (either oral or written, including by e-mail) to Carrier; provided, however, that if such notice is oral, Suncor shall provide written confirmation to Carrier within five (5) days after the oral notice."[2] (Emphasis added). Suncor provided oral notice and a written confirmation to WTO of its revocation of access on May 25, 2011.

Under Section 4 of the TAA, Suncor is not required to have any reason or justification to revoke any carrier's access to Suncor's terminals – which are Suncor's own property. Regardless, Suncor had good reason to revoke WTO's access, namely to protect Suncor from further potential losses.

Furthermore, Western and WTO have absolutely no basis for asserting that the revocation of WTO's access to Suncor's terminals somehow resulted in tortious

---

[2] Contrary to your letter, Suncor did not "terminate" the TAA. Instead, as provided in Suncor's letter, dated May 25, 2011, Suncor simply revoked WTO's access to all of its terminals. Notwithstanding the foregoing, Suncor reserves the right to terminate the TAA itself.

interference of contract between them and third parties or restricted their ability to compete. Suncor has acted fully within its contractual rights. In addition, Suncor has in no way prevented Western from purchasing gasoline or diesel fuel directly from other third parties, including customers of Suncor.

Finally, Western's assertion that Suncor's actions were anticompetitive is equally groundless. While Western was a customer of Suncor, Suncor treated Western exactly the same as all of Suncor's other similarly situated customers.

In summary, Suncor considers all of the allegations raised in your letter to be completely without any factual or legal basis. Suncor will vigorously defend against any such claims asserted by Western.

As you know, Suncor has sent three separate demand letters to Western pursuant to C.R.S. § 13-21-109 – the Colorado Bad Check Statute – providing Western notice that Suncor will commence a lawsuit to recover up to three times the amount owed to Suncor, totaling **$11,265,425.85** (3x $3,755,141.95), if Western fails to pay Suncor within the applicable fifteen (15) day deadlines stated in each of Suncor's notices – the last deadline of which is on Friday, June 23, 2011.

I strongly urge that Western pay Suncor in full the **$3,755,141.95** in full, prior to the applicable deadlines. As you are aware, Suncor is willing to forego interest on this amount if it receives payment on or before the applicable deadlines. You may direct payment in the form of a Cashier's Check or other readily available funds directed to my attention, or by wire transfer to Suncor's account.

Very truly yours,

Michael E. Korenblat, Esq.
Director, Legal Affairs – R&M U.S.A.

cc:   Mr. Steve Ewing