IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

      Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

      Defendant.

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

      Plaintiffs Western Convenience Stores and Western Truck One, LLC, by and through their attorneys, Bennington Johnson Biermann & Craigmile, LLC, submit this reply in support of their motion for an order preliminarily enjoining Defendant from denying Plaintiffs access to Defendant's petroleum terminals to take delivery of fuel products purchased from third parties, i.e., *middlemen*.

### 1. SUNCOR ADMITS THAT IT WILL SUFFER NO ECONOMIC INJURY IF THIS PRELIMINARY INJUNCTION IS GRANTED.

      Suncor admits that it does not care if WCS purchases at Suncor terminals fuel sold by middlemen. Suncor just does not want WCS trucks (i.e. WTO fuel tankers) to do the job.

> Suncor denied WTO's trucks access to its terminals but has not "prevented Western from purchasing gasoline of diesel fuel directly from other third parties, including customers of Suncor," either at Suncor's terminals using third party trucks or elsewhere.

*See* Suncor's Response to Motion for Preliminary Injunction, Doc. # 13, at ¶ 24. The "third parties, including customers of Suncor" are *middlemen*. *Id*. Suncor admits that it does not have

any objection to WCS buying from those middlemen at Suncor terminals, if WCS hires other tanker trucks at what it knows to be considerable expense.

The only justification for excluding WTO trucks is that, to enjoin Suncor from doing so, would curtail Suncor's contract and property rights. In other words, Suncor argues no injury at all that can be characterized as economic. It might as well allege hurt feelings. Notably, the curtailment of its property rights, that now hurts its feelings, has been in existence since May of 2006 in the form of the Terminal Access Agreement. Nothing concrete is offered as to why that contract cannot stay in effect while the Court sorts out the antitrust case.

### 2. THIS INJUNCTION DOES NOT ALTER THE STATUS QUO.

In its Response to the Motion for Preliminary Injunction (Doc. # 13), Suncor attempts to spin the Plaintiffs' motion as seeking to alter the *status quo*. *See* Response, Doc. # 13, at p. 1. To the contrary, the Plaintiffs seek an order maintaining Plaintiffs' access to the Suncor terminals to purchase fuel from middlemen as it has existed since 2006. The 10th Circuit has observed that defining the *status quo* depends on the facts of the case. However, it has held, where the act to be enjoined disturbs a long-standing condition, the *status quo* is the last uncontested status between the parties:

> These holdings lead us to conclude the definition of "status quo" for injunction purposes depends very much on the facts of a particular case. *Valdez* and *Dominion Video* support the position that the status quo in this case should be viewed as the time when the plaintiffs were exercising their religious freedoms before the government enforced the CSA against them. As UDV asserts in its brief, the church was possessing its sacrament and practicing its religion. *See* Aple. Br. at 53. Like *Dominion Video,* it was the government's enforcement action which *changed* the status quo and became the impetus for this litigation. *See Dominion Video,* 269 F.3d at 1155. Hence, the last *uncontested* status between the parties was the plaintiffs' uninhibited exercise of their faith. It is the government's attempt to disrupt that status that UDV seeks to enjoin.

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1178 (10th Cir. 2003) (emphasis within original).  In the context of this case, it is Suncor's attempt to disrupt the *status quo* that the Plaintiffs seek to enjoin.

### 3. IF SUNCOR'S BEST ARGUMENT ON THE MERITS IS THAT WCS IS A "SPOT CUSTOMER," THE INJUNCTION SHOULD BE GRANTED.

Suncor argues without any support at all that WCS was a "spot customer."  *See* Response, Doc. # 13, at ¶¶ 2-3.  Overlooked by that characterization are the facts that: (1) WCS has been purchasing fuel on a long-term contract in existence since January of 2007, (2) the WCS/Suncor relationship has existed for nearly 10 years, and (3) during that time WCS has purchased billions of dollars in Suncor fuel which has been retailed by WCS in Colorado and Nebraska.

Under the parties' custom and practice in place for several years, Suncor extended to WCS a $3 million line of credit permitting WCS ten days following delivery to pay for any fuel supplied directly by Suncor.  *Id.  See* Complaint, Doc. # 1, at ¶ 16.  While portions of WCS's credit terms with Suncor were reduced to writing in *Confirmation of Purchase/Sale Agreements* (sometimes well after the period of time covered by a particular agreement), other elements of WCS's credit terms were the subject of verbal agreements only.  *Id.*

The Court will eventually have to determine whether the discriminatory sales to WCS and its competitors are indeed reasonably comparable.   In any event, that issue will be resolved in an analysis far more sophisticated than reliance on the newly minted Suncor label, *spot customer*.

### 4. THE EPA CONSENT DECREE WAS A PRETEXT FOR SUNCOR'S ACTIONS, NOT THE GENUINE BASIS.

Suncor states that the EPA consent decree and WCS's financials caused Suncor to initiate a credit review and ultimately revoke WCS's line of credit. *See* Response, Doc. # 13, at ¶ 16. If the credit worthiness of WCS was truly a concern to Suncor, then Suncor's actions prior to termination do not show it.

As the fuel blending of interest to the EPA had not involved Suncor products or terminals, Ewing and Moss were only somewhat interested in the impact of the $2.5 million fine against three companies, which was an element of the settlement with EPA. *See* Exhibit A to Motion, Doc. # 5-1, ¶ 7.

When representatives of Suncor and WCS met on May 18, 2011, well after the consent decree was on the table, and after Suncor had received not only the explanation that another party was going to pay the fine which WCS might have to partially reimburse, and after Suncor had received WCS's most recent financials, Suncor was more interested in talking about its own supply and cash flow problems. Messrs. Ewing and Moss stated that Suncor's supply of fuel was "tight," that Suncor's own retail operations had not made as much money in the previous year as they had made in previous years, and that many of Suncor's branded retailers had experienced "a tough year." Id. at ¶ 7.

During the meeting, WCS's Taraghi complained that Suncor was granting significant discounts or rebates to WCS competitors, such as Suncor's larger retail customers and its branded retailers, but not to WCS. *Id.* at p 6. In response, Moss and Ewing admitted that Suncor had been providing significant discounts to other retailers which had not been provided to WCS. *Id.* They stated they would see if the same discounts could be made available to WCS, but that

never occurred. *Id.* Rather than insisting on termination, as Suncor now claims, the Suncor people were concerned about the relationship and offered to deal with the WCS complaints.

They did ask if WCS would be willing in the future to shorten payment terms or prepay for its purchases, but that was in the context of their own supply and cash flow issues. Complaint, Doc. # 1, at ¶ 21. For example, Taraghi offered that, if Suncor truly believed that it needed additional security for WCS's line of credit and payment terms, WCS would be willing to provide real estate as collateral, but neither Ewing, nor Moss, nor anyone else at Suncor followed up. *Id.*

The entire exchange is inconsistent with the argument now urged by Suncor that it had concluded that a combination of the consent decree and WCS's financials caused Suncor to terminate the Plaintiffs immediately. In fact, it was the discovery and complaint about price discrimination that was at the root of the termination.

5. **THE IRREPARABLE HARM TO WHICH WCS IS EXPOSED IS NOT REMOTE, PARTICULARLY IN LIGHT OF THE FACT THAT THE INJUNCTION WILL CAUSE SUNCOR NO HARM AT ALL.**

The irreparable harm requirement for injunctive relief is satisfied by the Plaintiffs' showing of "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011), *quoting RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (internal quotation marks omitted).

An inability to calculate damages, harm to a business's goodwill, or diminishment of competitive positions in the marketplace each will support determination of irreparable harm. *See, e.g., Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-39 (2d Cir. 1995). Accordingly, this Court has previously recognized that a threatened loss of business constitutes

irreparable harm. *Bray v. QFA Royalties, LLC*, 486 F.Supp.2d 1237, 1247-48 (D. Colo. 2007), *citing Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1207 (2d Cir. 1970) ("having run the business for 20 years, family's loss of car dealership was not entirely measurable in monetary terms").

If Plaintiffs cannot take delivery of fuel from third-parties at Suncor's terminals, any natural, other disaster or other circumstance causing a fuel shortage will mean empty tanks at WCS stores, WCS's inability to deliver fuel to consumers, and the necessary shutting down of stores.  As the testimony will establish, such disasters and circumstances occur all the time, in particular during the summer months.  In short, absent the preliminary injunctive relief sought, Plaintiffs stand to suffer a loss of stores -- and the concomitant loss of business goodwill and competitive positions -- and Suncor will succeed in its apparent intent to run Plaintiffs out of business.  That injury will be irreparable.

**6. TYING THE AMOUNT OF THE BOND TO THE AMOUNT OF SUNCOR'S CLAIM FOR PAYMENT IS ILLOGICAL AND IMPROPER.**

Suncor suggests that the Court should require a bond in the amount it claims to be due under *invoices* which WCS refused to pay after the price discrimination was discovered.  What Suncor ignores, however, is that the amount of the bond must be tied to the harm that Suncor might suffer as the result of the preliminary injunction. *See Adolph Coors Co. v. A & S Wholesalers, Inc.*, 561 F.2d 807, 813 (10th Cir. 1977) (as a general rule, an enjoined party is only entitled to the amount of the bond as damages for a wrongfully granted injunction); *see also Lever Bros. Co. v. Int'l Chemical Workers Union, Local 217*, 554 F.2d 115, 120 (4th Cir. 1976) (the sum posted on an injunction bond should not reflect the amount a party may recover on a trial on the merits).  In fact, the imposition of an injunction will have no effect on what Suncor

claims it is owed. The injunction will cause Suncor no economic harm at all. To the contrary, Suncor will make money from the middlemen who sell fuel to WCS via the Suncor terminals.

The Court may determine that a bond is unnecessary if there is an absence of a showing of a likelihood of harm. *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (citing *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir.1964)). Under the circumstances of this case, a bond should be nominal in the absence of any possibility of harm to Defendant Suncor.

Dated: September 20, 2011

*s/ Kenneth R. Bennington*

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON
BIERMANN & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
(303) 629-5200

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2011, I electronically filed the foregoing **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** using the CM/ECF e-filing system which will send notification of such filing to the following:

| | |
|---|---|
| Anthony J. Shaheen | J. Robert Robertson |
| Keeya M. Jeffrey | William L. Monts III |
| Holland & Hart LLP | Hogan Lovells US LLP |
| 555 17th Street, Suite 3200 | 555 Thirteenth Street, N.W. |
| Denver, CO 80201-8749 | Washington, D.C. 20004-1109 |
| AJShaheen@hollandhart.com | robby.robertson@hoganlovells.com |
| KMJeffrey@hollandhart.com | william.monts@hoganlovells.com |

*s/ Marie Newberger*