```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
      Case No. 11-CV-01611-MSK-CBS
 3    _____

 4    WESTERN CONVENIENCE STORES, INC.
      a Colorado corporation,
 5
      WESTERN TRUCK ONE, LLC
 6    a Colorado limited liability company,

 7        Plaintiffs,

 8    vs.

 9    SUNCOR ENERGY, (U.S.A.), INC.,
      a Delaware corporation,
10
          Defendants.
11    _____

12           Proceedings before CRAIG B. SHAFFER, United
      States Magistrate Judge, United States District Court
13    for the District of Colorado, commencing at 9:13 a.m.,
      September 28, 2011, in the United States Courthouse,
14    Denver, Colorado.

15    _____
             WHEREUPON, THE ELECTRONICALLY RECORDED
16    PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

17    _____
                           APPEARANCES
18
              MR. KENNETH R. BENNINGTON, ESQ., and
19             MS. KATHLEEN E. CRAIGMILE, ESQ.
              Appearing on behalf of the Plaintiffs.
20
      MR. JOHN R. ROBERTSON, ESQ., MR. WILLIAM L. MONTS, ESQ.,
21           and MR. ANTHONY J. SHAHEEN, ESQ.
              Appearing on behalf of the Defendants.
22

23    _____

24                        MOTION HEARING

25
```

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

```
 1              P R O C E E D I N G S
 2              (Whereupon, within the electronically recorded
 3   proceedings are herein transcribed, pursuant to order of
 4   counsel.)
 5              THE COURTROOM DEPUTY:  All rise.
 6              THE COURT:  Please, everybody have a seat.
 7   All right.  We're on the record in Western Convenience
 8   Stores, Inc. versus Suncor Energy, 11-CV-1611.  I'll
 9   take appearances of counsel.
10              MR. BENNINGTON:  Good morning, Your Honor.
11   Kenneth Bennington and Kathleen Craigmile for the
12   plaintiffs.
13              MS. CRAIGMILE:  Good morning, Your Honor.
14              THE COURT:  Okay.  Good morning.
15              MR. ROBERTSON:  Good morning, Your Honor.
16   Robby Robertson.  I also have with me Anthony Shaheen
17   and Mr. William Monts.  We represent the defendant.
18              THE COURT:  All right.  This poses a threshold
19   issue.  I need to ask you, what do you all envision as
20   the scope of my role in light of Judge Krieger's order
21   of reference?  How much or how little do you want me to
22   do?  Because she gave you the chance to consent to me
23   deciding this motion or, alternatively, I can simply
24   write a recommendation which would almost guarantee that
25   you build in more time and money.  What would you like
```

1    to do?

2              MR. BENNINGTON:  I have been proceeding in the

3    assumption that you will rule, Your Honor.

4              THE COURT:  Okay.  What's Suncor's view?

5              MR. ROBERTSON:  Your Honor, plaintiff wants to

6    put on its case and we're here to defend it.

7              THE COURT:  No.

8              MR. ROBERTSON:  I mean --

9              THE COURT:  But the -- the order of reference

10   was is that you could either consent to me deciding the

11   motion, or under 636(c) --

12             MR. ROBERTSON:  I see.  Could I confer with --

13             THE COURT:  Sure.  Absolutely.  You can have

14   just a mass conferral.

15             MR. ROBERTSON:  And, Your Honor, since --

16   actually, my client hasn't -- isn't here and the last

17   word he gave us was to go ahead and ask Your Honor

18   respectfully to give a recommendation.

19             THE COURT:  Okay.  I'm happy to do that.

20             MR. ROBERTSON:  I apologize, I can't change --

21   I don't -- that's the last word I got.

22             THE COURT:  No, and your client absolutely has

23   the right to decide it.  I don't necessarily see the

24   economic efficiency of that, but that's fine.

25             MR. ROBERTSON:  And I agree, but I just don't

1    have the authority to change my mind, so --

2              THE COURT:  No, I understand.  Okay.  I have

3    reviewed the motion, the response and the reply.  I have

4    read the exhibits that you tendered and I have read the

5    cases you cited and I have done my own research.  But I

6    will turn the matter over to you.  It's plaintiff's

7    motion, so please.

8              MR. BENNINGTON:  You want an opening, Your

9    Honor or should we proceed direct to --

10              THE COURT:  I mean, I've read everything and I

11    suspect your opening is simply going to tell me what's

12    in your motion.

13              MR. BENNINGTON:  It is.  I'm happy to proceed.

14              THE COURT:  Well, suffice to say that having

15    read your motion, there's really not much surprise left.

16    So, why don't --

17              MR. BENNINGTON:  Yeah.

18              THE COURT:  -- you just go ahead and begin.

19              MR. BENNINGTON:  Very good.

20              THE COURT:  Sir, come on up.  Sir, what I'd

21    ask you to do is have a seat.  That chair does not roll

22    so --

23              MR. TARAGHI:  Okay.

24              THE COURT:  Now, once you get yourself

25    comfortably positioned, please raise your right hand.

1          (Whereupon, the witness, Mr. Hossein Taraghi,

2     was sworn to tell the truth by the Court.)

3          THE WITNESS:  Yes, I do.

4          THE COURT:  What I'd like you to do is start

5     by stating your full name and spelling your last name.

6          THE WITNESS:  Okay.  Hossein Taraghi.  Last

7     name is spelled T, as in Tom, A-R-A-G-H-I.

8          THE COURT:  Counsel, please.

9                    DIRECT EXAMINATION

10    BY MR. BENNINGTON

11    Q     Good morning, Mr. Taraghi.

12    A     Good morning.

13    Q     Why are you here today?

14    A     To get access to -- to Suncor, Suncor facilities.

15    Q     Why?

16    A     If I don't it will be very detrimental to me.

17    Q     Does it threaten the existence of your business?

18    A     Yes, it is.

19    Q     All right.  Let's back up a bit.  Would you tell

20    Judge Shaffer some of the background of your company.

21    How did it start and what does it do?

22    A     Um, I started in 1982 as a clerk for 7-11 and I

23    start -- I bought my first store in 1989, and now I have

24    43 gas station with the -- with C store.

25    Q     What is a C store?

```
 1    A     It is a convenience store, which we sell snacks

 2    like 7-11 types.

 3    Q     And what else?

 4    A     And gasoline.

 5    Q     In terms of relative importance, which is the more

 6    important -- if there is one, which is the more

 7    important for your business, gasoline or everything

 8    else?

 9    A     Everything is important, but gasoline is the most

10    important part of it.

11    Q     If you don't have gasoline at your stores what

12    happens?

13    A     I won't be in business.

14    Q     Where do you sell -- first of all, where are your

15    stores?

16    A     My stores in -- 39 of them in Colorado and three in

17    Nebraska.

18    Q     Just in rough numbers, how much gasoline do you

19    sell per month from those stores?

20    A     I sell 7.5 million fuel.

21    Q     And when you say fuel, you're including what?

22    A     Diesel.

23    Q     And --

24    A     E85.

25    Q     E85, meaning gasoline?
```

1    A    It is type of gasoline.  It's flex fuel.

2    Q    So of all the fuel products you sell -- let's go

3    back through that.  What are the -- the -- the basic

4    fuel products that you sell?  You said diesel is one?

5    A    Right.

6    Q    Then what?

7    A    Gasoline.

8    Q    And?

9    A    E85.

10   Q    E85.  Now, with respect just to your stores in

11   Nebraska, approximately how many gallons of fuel have

12   you shipped to Nebraska this year, to your stores there?

13   A    I would say 800,000 a month would be, multiply by

14   12.

15   Q    Twelve months?

16   A    Whatever month is, yeah.

17   Q    I see.  $800,000 or --

18   A    Gallons.

19   Q    800,000 gallons a month --

20   A    Correct.

21   Q    -- goes to Nebraska for sale there; is that right?

22   A    Approximately, yes.

23   Q    Who owns Western Convenience Stores?

24   A    Myself and my wife.

25   Q    Now, let's talk about the other plaintiff.  There's

1    another plaintiff in the suit that you have brought

2    called Western Truck One.  What is that company?

3    A    That's the freight company.

4    Q    What does the freight company do for you in your

5    business?

6    A    I have total of nine trucks and tankers which

7    supplies all the Western Convenience Stores.

8    Q    In both Colorado and Nebraska?

9    A    And Nebraska, yes.

10   Q    You own your own trucks now?

11   A    Yes, I do.

12   Q    Why do you own your own trucks?

13   A    Because just in cost factor and also the

14   reliability of the stores, make sure stores always

15   supply, and give me a little flexibility.  And

16   financially it is better to have my own trucks.  It's

17   just a lot of reasons.

18   Q    Let's talk about financially.  What would it do to

19   the price per gallon, your cost per gallon, of getting

20   fuel to the pump at your store if you had to hire

21   somebody else, some other company to transport the fuel?

22   A    It -- it would be -- cost higher, and also it will

23   be -- sometimes they run out your stores, because I have

24   a high volume stores.  Some of these freight companies

25   they can't supply as productive as my own trucks, and --

1    it's just I had them for eight years.  It's just that's

2    the way to go.

3    Q    All right.  Of course we're here talking about your

4    access to Suncor's terminal.  Let's go back though and

5    describe for the court, please, your history with

6    Suncor.  First describe Suncor.

7    A    Suncor is refinery, and they are the big players in

8    Colorado.  And they have control of -- you know, of a

9    lot of things because they are big.  There are two

10   refineries in Colorado, say it that way, owned by

11   Suncor.  For the rest of them it comes by pipeline from

12   other states.

13   Q    Let me make sure I understand.  Suncor owns the

14   only two refineries in Colorado?

15   A    That's correct.

16   Q    In addition then to refining raw petroleum into

17   fuel products what else does Suncor do in Colorado?

18   What do they do with that fuel?

19   A    Also -- also, they have terminal in Grand Junction,

20   and also there's another terminal that they lease from a

21   company called Fuel Manager that -- they have really

22   full control of those terminals that they have in Grand

23   Junction.  But the other terminals in Grand Junction,

24   they are branded terminals which is very -- it's very --

25   it's just really next to nothing for me to get product

1    except the ones Suncor has it.  And right now I can't

2    even get anything from that place.  I have to pull the

3    gas from Denver all the way to Grand Junction.

4    Q    Okay.  We'll get to that.

5    A    Yeah.

6    Q    When you -- you used the word branded.  Would you

7    please describe the -- tell us the difference between

8    branded and unbranded fuel.

9    A    Branded stations, they fly the oil companies' flag,

10   like Conoco, Shell, and et cetera.

11   Q    As --

12   A    But unbranded I have my own flag that says Western.

13   Q    Typically, are you able -- that is, is Western

14   Convenience Store able to by fuel that it needs from

15   refineries or suppliers that are branded?

16   A    Yes.

17   Q    Do those branded -- does that branded supply make

18   up the substantial portion of your fuel needs?

19   A    Correct.

20   Q    Now, you said unbranded sources of fuel is where

21   you get at least some of your fuel; is that right?

22   A    I buy from branded and unbranded, yeah.

23   Q    In the past, up until May of this year, how did

24   Suncor fit into your -- supplying your fuel needs; that

25   is, the fuel needs of Western Convenience Store?

1   A     The majority of my fuel needs was coming from

2   Suncor.

3   Q     Can you estimate a percentage for us?

4   A     70 to 80 percent.

5   Q     How long had this relationship with Suncor been

6   going on?

7   A     Ever since they came and bought the Conoco

8   refinery, 2004.

9   Q     Now, does Suncor also sell at retail; that is --

10   A     Yes, they do.

11   Q     What are the flags, to use your words, or what are

12   the brands that --

13   A     They used to be ConocoPhillips.  Right now they're

14   Shell.

15   Q     What else?

16   A     I'm not aware of the rest of it.

17   Q     Are there Suncor stations or Shell stations in

18   addition to Phillips 66 stations?

19   A     Correct.

20   Q     All those are stations that are in some way

21   supplied or run by Suncor; is that right?

22   A     Not all of them.  Some of them, right.

23   Q     In any event, is it accurate to say -- let me start

24   again.

25           You compete with Suncor at the retail level?

1    A    Yes, I do.

2    Q    Now, how -- how do you -- how does Suncor

3    distribute its fuel that you buy, that Western

4    Convenience Stores buy?

5    A    I send my truck to their facility and I pull fuel

6    and take them to my stores.

7    Q    And where are those facilities -- and these

8    facilities you're talking about, are these the

9    terminals?

10   A    They are terminals and refineries.  There's two

11   refineries that I pull that -- and also there is one

12   terminal that, they don't own it, is in Fountain and

13   there is another terminal -- two terminals they have in

14   Grand Junction that I pull from.

15   Q    I'm asking about the terminals that Suncor

16   controls.  And that's one in Commerce City, correct?

17   A    Two in Commerce City.  There's two --

18   Q    All right.

19   A    -- two refineries.

20   Q    And then where else?

21        THE COURT:  Okay.  Let's -- let's make sure

22   that we keep the terminology or the expression straight.

23   Tell me specifically.  You said that Suncor has two

24   refineries.

25        THE WITNESS:  Correct.

```
1              THE COURT:  Where are those refineries
2    physically located?
3              THE WITNESS:  They are in Commerce City,
4    Colorado.
5              THE COURT:  Okay.
6              THE WITNESS:  They are both across the street
7    from each other.
8              THE COURT:  Okay.  So there's two refineries.
9    And then how many terminals does Suncor have?
10             THE WITNESS:  They have one that they own in
11   Grand Junction.
12             THE COURT:  Okay.  Now -- so when -- when you
13   refer to Commerce City although you're using the term
14   terminals, there you're referring to refineries?
15             THE WITNESS:  I try not to, but if I did --
16   usually I try to --
17             THE COURT:  No.  And I just want to make
18   certain that we're consistent.
19             THE WITNESS:  Okay.
20             THE COURT:  So there's two -- there's two
21   facilities, whether we call them refineries or they call
22   them terminals.  There's two Suncor facilities in
23   Commerce City?
24             THE WITNESS:  Correct.
25             THE COURT:  And then there is a terminal in
```

1     Grand Junction?

2              THE WITNESS:  Correct.

3              THE COURT:  And that's what Suncor has in the

4     state of Colorado?

5              THE WITNESS:  That's what -- that's what I

6     know, yes.

7              THE COURT:  Okay.

8     Q    (By Mr. Bennington)  I'd like you to look at

9     Exhibit 2.  Do you have a book in front of you there?

10    A    Yes.

11    Q    Can you identify Exhibit 2, please.  There it is,

12    Tab 2.  Do you recognize that document?

13    A    It's master product purchase and sale agreement.

14    Is that the one?

15    Q    Yes.  Is this the -- well, you tell us.  What is

16    this document?

17    A    It's the -- its product purchase agreement.

18    Q    Is this the agreement under which you have been

19    buying fuel?

20    A    Correct.

21    Q    Now, this one is dated January 17th, 2007.

22    A    But --

23    Q    Has your relationship with Suncor been going on

24    before that?

25    A    Yes.

15

1   Q    Now, during the -- the years since this agreement

2   was signed; that is, January of 2007, since then, has

3   the price that you have paid Suncor for fuel been set

4   all that time?

5   A    Yes.

6   Q    How is it set?

7   A    Rack minus four and a half on the gasoline, and

8   three on diesel.

9   Q    And by four and a half, you mean four and a half

10  cents?

11  A    Discount.

12  Q    Four and a half cents?

13  A    Four and a half cents, yeah.

14  Q    And what do you mean by rack?

15  A    There's a rack price.  Is -- is reported every day

16  on Opus.

17  Q    So whatever they publicly report as their rack

18  price --

19  A    Right.

20  Q    -- you buy at four and a half cents less than that?

21  A    That's correct, on the gasoline.

22  Q    And how about with respect to diesel?

23  A    Three cents discount.

24  Q    And how long has that -- well, let me ask it this

25  way.  Has that pricing relationship, or pricing

1    structure I should say, been in effect since January of

2    2007 during the current contract?

3    A    Yes.

4    Q    Now -- go ahead.

5    A    Thank you.

6    Q    Now, even though the price has been set or was set

7    in advance since this contract was signed, could Western

8    Convenience Stores always buy all of the fuel it needed

9    from Suncor?

10   A    No, not all of it.

11   Q    Why would that happen?  Why could not Western buy

12   all of its needs?

13   A    I couldn't get it.

14   Q    Because, what?  They weren't allocating it to you,

15   or you couldn't get there?  Why couldn't you get it?

16   A    They would give me what they can.  I mean, they

17   said at the time this is what they can give me and they

18   gave me -- and at the beginning of the month, I mean,

19   they gave me -- they say we have this much, make a

20   contract and I pull it.

21   Q    So at the beginning of the month -- I want to make

22   sure I understand -- you're told you can buy so many

23   truckloads or gallons this month?

24   A    Correct.

25   Q    Regardless of whether that's everything you need?

1    A    Correct.

2    Q    How do you deal -- how does Western deal with that

3    uncertain supply?

4    A    If they gave me that at -- at the beginning of the

5    month, then I plan to get rest of them from other

6    people.

7    Q    Now, let's talk about buying fuel from other

8    people.  Do you still buy fuel from other people

9    through --

10   A    Yes, I do.

11   Q    -- through Suncor terminals?

12   A    No.  I'm not allowed to go there.  I'm --

13   Q    Now -- okay.  That's my fault.  My question was not

14   precise.

15   A    Okay.

16   Q    Before May of this year, before the terminations

17   that we'll talk about soon here, before then were you

18   able to buy fuel from other people using Suncor

19   terminals?

20   A    Yes.

21   Q    Describe for Judge Shaffer how that worked.  How

22   would you buy from other people?  Who are those other

23   people?

24   A    What happened, we -- as I said, if I don't get all

25   my product from Suncor -- I get some, and I need some

1    more and there are third parties which they have, they

2    pull gas from Suncor, and I go through their account and

3    pull from Suncor.  The third party.  It's a third party.

4    And if -- right now I can't do that.  I cannot do that.

5    Q    So, let's back up.  In order to deal with

6    uncertainties in your supply, you would buy from

7    middlemen, correct?

8    A    That's correct.

9    Q    Using the Suncor terminals?

10   A    That's correct.

11   Q    Who are those middlemen?

12   A    Middlemens, they have account with Suncor like I

13   do.  And sometimes you get to allocation, or I need some

14   product I can go through them.  They have some product

15   in there.  They sell it to me, and I go pull it.

16   Q    Tell us the names of some of those companies.

17   A    Oh, we have Western Petroleum out of Minnesota.  I

18   have DATS.  I have Sapp Brothers, Incorporated.  I have

19   Offen Petroleum, and et cetera.  Just to give you a name

20   of a few.

21   Q    Are these companies, these middlemen that you just

22   named off, are they companies that -- from whom you are

23   now seeking access through the Suncor terminals to buy

24   fuel?

25   A    Yes.

1    Q    Now, during this relationship, at least since

2    January of 2007 when you signed the last contract, did

3    you have an understanding with Suncor that when they put

4    you on some sort of allocation, couldn't sell you all

5    the fuel you needed, you could go to middlemen using

6    their terminals?

7    A    Yes.

8    Q    Did you regard that as a commitment to you that

9    they made, you can do this?

10   A    Yes.

11   Q    Now, we won't go through this contract, but the

12   contract doesn't say that anywhere.  Is that your

13   understanding?

14   A    Yes.

15   Q    Was this understanding written down, this

16   understanding with Suncor that you could use their

17   terminals to buy from --

18   A    It was my understanding, yes.

19   Q    But not in writing?

20   A    Not in writing.

21   Q    Was it important that during these times of

22   allocation, or during the times that you couldn't buy

23   all the fuel you needed, was it important -- how

24   important was it that you be able to buy from middlemen

25   using the Suncor terminal?

1    A    Very important.

2    Q    Why?

3    A    Because sometimes, you know, there are shortages,

4    there are incidences that happens to other pipelines,

5    other refineries.  They can't bring product in.  And

6    you -- you have to have all the sources that you have in

7    order to do -- to run your business productively,

8    otherwise you can't.

9    Q    What happens at one of your stores if you just --

10   they run out of fuel and you just can't get it to them

11   that day?

12   A    What do you mean by that?

13   Q    Well, if your stores don't have fuel, what happens?

14   A    They don't have --

15            MR. ROBERTSON:  Objection, speculation.  I

16   don't think this has ever happened.

17            THE COURT:  Well, whether it's happened or not

18   I don't think -- I think it's -- common sense would

19   suggest that if the store doesn't have fuel what happens

20   is they don't sell fuel, and I think that would be

21   pretty self-evident, wouldn't it?  Now, if you'd like

22   him to say that, but I can connect those two dots pretty

23   well on my own.

24            MR. BENNINGTON:  Fair enough.

25   Q    (By Mr. Bennington)  Let's broaden it from a

```
 1    particular store.  If you have a substantial number of
 2    stores to which you cannot provide fuel, what's going to
 3    happen to Western Convenience Stores' business?
 4    A    They go out --
 5              MR. ROBERTSON:  Again, it calls for
 6    speculation.
 7              THE COURT:  I suppose, but I'll give it
 8    whatever weight.  To some extent all of this involves
 9    speculation.  I'll go ahead and allow it.  Objection
10    overruled.
11    A    We go out of business.
12    Q    (By Mr. Bennington)  Now, before your dispute with
13    Suncor emerged in May of 2011, what were the terms under
14    which -- let's say the credit terms under which Western
15    Convenience Stores could buy fuel?
16    A    Ten days.
17    Q    All right.  What does that mean?  Ten days?
18    A    You buy --
19    Q    You've got to remember that everybody -- we don't
20    all know your business, so you've got to expand on it a
21    little bit.  What happens in 10 days?
22    A    When you buy fuel today you have 10 days to pay.
23    Q    So each load of fuel that you guys pick up at the
24    terminal you have 10 days to pay for it?
25    A    That's correct.
```

1    Q    How much -- what is the volume of credit -- how

2    many dollars can you have out at any one time?

3    A    It was between three to five million.

4    Q    How is that memorialized?  Was that understanding

5    -- were those credit terms written down anywhere?

6    A    Three million it was.

7    Q    And how did it get to five million sometimes?

8    A    Because there was no issue.  I was -- even

9    sometimes 12 million there was no issue.

10   Q    Are you saying that you exceeded the cap on your

11   credit?

12   A    Correct.

13   Q    And did Suncor complain or say that you were in

14   breach of your deal with them?

15   A    No.  I had to call them and tell them to pull it

16   out of my account.

17   Q    You were calling them and telling them to --

18   A    Pull it out of my account.

19   Q    -- get their money?

20   A    That's right.

21   Q    Why were you doing that?

22   A    Because I didn't want to get -- get -- something

23   happen to the bank or something.  Or somebody gets into

24   the bank, I just didn't want something to happen to that

25   money that I can't -- I have to pay.  That was my

1    responsibility.  I have to make sure that -- pull it out

2    of there.  I don't want that money to sit there.

3    Q    All right.  How long had this $3 million and 10

4    days to pay been in effect --

5    A    Since --

6    Q    -- up until May?

7    A    -- 2004.

8    Q    I'm sorry.  Let me finish.  How long had it been in

9    effect since -- up until May of when this all came

10   apart?

11   A    Since 2004.

12   Q    Now, I'd like you to -- each month you said you

13   were informed of what your allocation was for that

14   month; is that right?

15   A    Correct.

16   Q    How was that done?  Is that by phone?  By some sort

17   of document?  How?

18   A    Halfway, yes or no.  Sometimes was, sometimes

19   wasn't.  But sometimes they give me all the product they

20   told me, sometime they don't give me all the products.

21   Q    All right.

22   A    I have to go scramble and get them from someplace

23   else.

24   Q    I'd like you to look at Exhibit 11.

25        MR. BENNINGTON:  Your Honor, these are not in

1    evidence as far as I'm concerned, so I want to offer

2    Exhibit 1 which he identified as the -- I'm sorry,

3    Exhibit 2 as the master purchase and sale agreement, and

4    I'm going to offer Exhibit 11 as well.

5            MR. ROBERTSON:  And, Your Honor, what we've

6    done is put all the exhibits as joint exhibits in the

7    binder.  So both sides exhibits are in here, and we were

8    under the understanding we were both going to jointly

9    offer all of them.  I have no objection to any of the

10   exhibits in the book.

11           THE COURT:  Well, gentlemen, just to save time

12   do you want to offer all of the of the exhibits, 1

13   through 16 at this time?

14           MR. ROBERTSON:  Yes, Your Honor.

15           MR. BENNINGTON:  I don't.  Well, let me

16   explain.

17           THE COURT:  No.  No.  No.  That's fine.  I

18   mean, that's, I guess, part and parcel of the adversary

19   process, but that -- that's fine.

20           MR. BENNINGTON:  Well, I'm not being a jerk

21   about this.

22           THE COURT:  No.  No.  You can be --

23           MR. BENNINGTON:  There's a financial --

24           THE COURT:  No.  No, counsel --

25           MR. BENNINGTON:  There are documents --

1            THE COURT:  Counsel.  Counsel, I absolutely

2    reserve your right to be a jerk.  Don't worry about it.

3            MR. BENNINGTON:  I'm not trying to be, and I

4    hope I'm not.

5            THE COURT:  No.  No.  And I'm not trying to be

6    facetious.  We'll do it any way you want to do it.

7            MR. BENNINGTON:  Okay.  All right.

8            THE COURT:  So at this point you're offering

9    Exhibit 2 and that's unopposed.  So the court will

10   accept Exhibit 2.

11           MR. BENNINGTON:  And I'll offer --

12           THE COURT:  And Exhibit 2 is deemed admitted.

13           (Whereupon, Exhibit No. 2 was admitted into

14   evidence.)

15           MR. BENNINGTON:  -- Exhibit 11.

16           THE COURT:  And you're offering Exhibit 11.

17           MR. ROBERTSON:  Just 2?

18           MR. BENNINGTON:  No.

19           THE COURT:  And apparently Exhibit 11 is

20   not --

21           MR. BENNINGTON:  We're getting to Exhibit 11.

22   I can lay a foundation or I'll offer it right now.

23           MR. ROBERTSON:  I have no problem with any

24   exhibit in the book, Your Honor.

25           MR. BENNINGTON:  All right.  So I'm offering

1    Exhibit 11.

2            THE COURT:  Okay.  Without objection,

3    Exhibit 11 is admitted.

4            (Whereupon, Exhibit No. 11 was admitted into

5    evidence.)

6    Q   (By Mr. Bennington)  Mr. Taraghi, look at

7    Exhibit 11, would you please.  What is -- what is this?

8    A    This is not my form.  I don't know.  I'm trying to

9    see what it is.  It's something.

10   Q    All right.  Your fuel buyer is going to be here,

11   Mr. Wehrle, perhaps I should be asking him about it.  I

12   think --

13   A    Probably, because I don't really know what this is.

14   Q    I'm sorry.  Let's move on.  What is -- we talked

15   about the fact that, you mentioned, at some point you

16   had to prod Suncor to go to your bank and get paid for

17   gasoline that had been outstanding in terms of payment.

18   How does that mechanism work?  How do you pay for the

19   gasoline that you take delivery of and buy from Suncor

20   under the terms that you just mentioned?

21           MR. ROBERTSON:  Objection, Your Honor.  Vague.

22   And I'd just like to make a point.  This man is talking

23   about two different companies, and I don't think the

24   record is being clear at all as far as who "you" is,

25   who's paying for what.  I think -- and it is very

1    important, we believe, in this case.

2              THE COURT:  Well, certainly.  I understood

3    that when he was talking about companies, he's talking

4    about Western to the extent that he's talking about -- I

5    mean, I think right now we're still talking about the

6    convenience stores because I don't think the trucking

7    company --

8              MR. ROBERTSON:  Yes, sir.

9              THE COURT:  -- purchases any fuel.

10             MR. ROBERTSON:  I just want that clear on the

11   record as to what we're talking about.

12             THE COURT:  Go ahead.

13   Q    (By Mr. Bennington)  How does Western Convenience

14   Stores pay for fuel that it gets from Suncor?  What's

15   the process?

16   A    ACH.

17   Q    What --

18   A    They initiate -- Suncor initiates ACH through my

19   banks and they get paid automatically.  It's automatic

20   payment.

21   Q    Do you have any approval process over that?  Are

22   you involved --

23   A    Yes, I do.

24   Q    -- in that process?  How are you involved in that

25   process?

1    A    I can check it.  I check all my payments every day

2    before -- they call it positive pay, and go check it.

3    Q    Which means -- positive pay means that before --

4    A    We'll check it to see if --

5    Q    It actually does get --

6    A    Go ahead.  Sorry.

7    Q    Before I actually get paid, what has to happen?

8    How do you have to be involved?

9    A    I approve it.

10   Q    So you approve each for transfer of funds?

11   A    Yes.

12   Q    Now, at some time this year, or at any time, did

13   you come to some realization about how Suncor was

14   extending prices between you as -- you as compared to

15   your competitors?

16   A    Yes.

17   Q    What did you learn?

18   A    That they're offering 10 cents extra to my

19   competitors, and they are not offering to me.

20   Q    Who are the competitors that we're talking about?

21   A    It is -- the information I have is Kroger and also

22   their own retail, and then Shell.

23   Q    So, what you know now is Kroger, Shell, and their

24   own retail outlets are getting 10 cents -- getting fuel

25   for 10 cents a gallon less than you're paying?

1    A    Yes.

2    Q    How do you know this?  First of all, let me ask you

3    this.  Have you mentioned this to anybody at Suncor?

4    A    Yes, I have.

5    Q    Who?

6    A    Steve Ewing.  I mean --

7    Q    Who is Steve --

8    A    Steve Ewing and Steve Moss both.

9    Q    Okay.  Who are Mr. Ewing and Mr. Moss?  Who do you

10   know them to be from Suncor?

11   A    Steve Moss was the rep that I directly communicate

12   with.  And Steve Ewing is Steve -- Steve Moss's boss

13   which is the director of operation, I think, in Suncor.

14   Q    Is it your understanding that Mr. Moss has

15   authority over sales to both you and these competitors

16   that you just named off?

17   A    He did.

18   Q    In addition to -- we'll get to how this was

19   admitted to you by Mr. Ewing, but in addition to this

20   admission, did you have -- how else, if any -- what

21   other ways did you realize that your competitors were

22   getting a better price?

23   A    Because I am experienced myself.  I've been in this

24   business for 30 years.  We do -- we do see what --

25   because it was about four months and I'm going trying to

```
1    go up, I am not making any money, and everybody is just
2    chipping their prices down for just big period of the
3    time.  And I knew that 10 cents is offered.  I was --
4    would buy -- they would told me already, even admitted
5    by Steve Ewing to me, that he was offering it, but he
6    didn't tell me who, except he said their own retail.
7    But -- or branded people.  But -- and I was trying --
8    just very scrambling trying to figure out how I can --
9              THE COURT:  A couple things, Mr. Taraghi.  I
10   don't want to cut you off and I certainly want to give
11   you --
12             THE WITNESS:  Sure.
13             THE COURT:  -- as much time as you want to
14   testify.  But it would be helpful to me, and I think the
15   record would be clearer, if you answered the specific
16   question asked.  Now, your lawyer asked you how -- apart
17   from whatever statements Mr. Ewing may have made how did
18   you know that these three entities, Kroger, Shell, and
19   Suncor's own retail outlets were getting the
20   10-cents-per-gallon price break and you really haven't
21   answered that question.  How did you know -- separate
22   and apart from any statements that Mr. Ewing made, how
23   did you know that they were getting a 10-cent price
24   break?  That's the specific question.
25             THE WITNESS:  I was told from the people that
```

```
 1    they were purchasing that they were getting 10 cents and
 2    all --
 3              THE COURT:  So you were told by purchasers for
 4    Kroger and Shell that they were getting --
 5              THE WITNESS:  Shell.
 6              THE COURT:  Shell.
 7              THE WITNESS:  Shell.
 8              THE COURT:  Okay.  So the specific answer is
 9    you spoke to someone at Shell and someone at Shell said
10    they were getting a 10-cent price break.
11              THE WITNESS:  And also Steve Ewing, when I
12    confront him he admitted to that.
13              THE COURT:  Maybe if we could just focus on
14    the --
15              THE WITNESS:  Sure.
16              THE COURT:  -- specific questions being asked.
17              THE WITNESS:  No problem.
18    Q    (By Mr. Bennington)  Now, apart from -- from
19    learning specifically about this 10-cent differential,
20    10-cent price break that Suncor is extending other
21    purchasers, what could you tell just by your observation
22    of the market?  What was going on that made you think
23    that somebody else is getting a better price?  You
24    started to answer that.  You tried to.
25    A    Right.  Because I can see the behavior of the --
```

1    Q    Okay.

2    A    -- retailers on the street.

3    Q    Tell us the behavior of the retailers on the street

4    that suggested to you that they're getting a better deal

5    than you.

6    A    Exactly.  They're making 10 cents more than me.

7            THE COURT:  No, he's asking for specific

8    facts.  What did you see that led you to believe?

9    Q    (By Mr. Bennington)  What did you see in the

10   street?  What happened?

11   A    Not raising their prices.

12   Q    In response to price raising that you were trying

13   to do?

14   A    Because they -- the right way was to move the price

15   if you're not making money.  You can't just sit there at

16   the cost for long -- a few months.  That's just not

17   normal.

18   Q    So knowing your costs.

19   A    My costs, right.

20   Q    You were looking at the cost, or looking at the

21   prices they had on the street and you could figure what?

22   A    Because they didn't have to go up.  They were

23   making that 10 cents.  I wasn't.

24   Q    Did you also observe that there were -- in any

25   market or in any particular stations, did you also --

1    did you observe prices that if you met you would be

2    selling below cost?

3    A    One more time.

4    Q    Did you observe prices being set by your

5    competitors on the street that if you sold at that price

6    you'd be selling below cost?

7    A    Correct, yes.

8    Q    Tell us where you saw that, when you saw that.

9    A    I saw it consistently in the branded, Krogers, and

10   it was pretty stubborn market for a few months.

11   Q    Now, let's leave branded out of this because you

12   said that you don't have access to branded fuel, right?

13   Well, you don't --

14             THE COURT:  No, actually I think he said --

15             MR. BENNINGTON:  Actually, he said he did.

16             THE COURT:  -- he did have access to branded

17   fuel, but I -- it's a --

18   Q    (By Mr. Bennington)  Well, let's leave --

19             THE COURT:  -- little hard for me to follow.

20   Q    -- branded fuel out it.  I'm talking just about the

21   competitors whom Suncor supplies fuel.  All right.  And

22   tell me again, to make sure I -- we understand, were

23   they setting prices that appeared to you to be below

24   cost?

25   A    Correct.

1   Q    So what's your explanation for how they can stay in

2   business when they're setting prices like that?

3   A    They just don't do that.

4           MR. ROBERTSON:  Objection.  Foundation.

5   A    They just did not do that.

6           MR. ROBERTSON:  Objection.  Foundation.

7           THE COURT:  Yeah, I mean, counsel, the problem

8   is the question is very, very broad, and I think -- I'm

9   going to sustain that objection.  I think you're going

10  to have to lay more of a foundation because it's an

11  undifferentiated question.  And I'm not sure he's in a

12  position -- I mean, they may be selling gas as a loss

13  leader to drive people to their store to buy other

14  things.  Kroger is a grocery store.  Kroger might very

15  well say we're going to drive business to sell

16  groceries.  I don't know that this witness is qualified

17  to render the sweeping conclusion.

18  Q    (By Mr. Bennington)  Based on what you know of

19  Suncor's pricing, in order to sell fuel at -- at the

20  prices Suncor disclosed to you, what would you have to

21  do -- start again.

22          How did you respond?  How have you responded

23  to this price differential of your competitors getting a

24  10 cents better price than you?

25  A    Lose money.

1    Q    Is the fuel that we're talking about sold to your

2    stations or to you, to Western Convenience Stores, and

3    the fuel sold to competitors, is it the same stuff?

4    Same grade?  Same quality fuel?

5    A    As far as I know, yes.

6    Q    Do you have stores that compete head to head with

7    these retailers we're talking about, competitors?

8    A    Yes.

9    Q    Same neighborhoods?

10   A    Yeah, same neighborhood.  Across the street, same

11   area.  Everywhere, yeah.

12   Q    Does being in the neighborhood matter?  What

13   matters more when people are buying gasoline, in your

14   experience?

15   A    The conclusion you have to be able to compete.  If

16   you are in decept [sic] manage of the cost wise, you are

17   decept managing competing.  You have to have equal -- if

18   you don't get equally -- cost equally then you can't

19   compete.

20   Q    Let's back up.

21   A    Sure.

22   Q    Will people -- what is your experience with how far

23   people will go to find a different price?

24   A    They go.

25   Q    The best price?

1    A    They go far.  Sometimes it's surprising.

2    Q    How do they know?

3    A    They have a body gas -- everything is on-line right

4    now.  They can check it and see who is on the top, has

5    the best price.

6    Q    How is this price differential -- is this price

7    differential in Colorado and Nebraska hurting your

8    business?

9    A    Yes, tremendously.

10   Q    Are you in danger of going out of business?

11   A    I'm not, but if -- that's why I want to stop it.

12   If it continues, yes.

13   Q    Stopping the price discrimination?

14   A    That's correct.

15   Q    If it continues, what happens?

16   A    We go out of business.  Yes, it does.

17   Q    I want to talk about the people at Suncor.  You've

18   already mentioned Steve Ewing, Steve Moss.  There's

19   another person whose name will come up Diane Kriskovich.

20   Do you know who that is?

21   A    I met her once.

22   Q    At a meeting at Suncor?

23   A    At a meeting at Suncor.

24   Q    What do you understand is her job with Suncor?

25   A    She was a credit person.

1    Q    All right.  We've been talking about the events of

2    May of this year and the termination, which we'll get

3    to, of Western Convenience Stores and Western Truck One

4    in terms of access.  But I want to go back to how this

5    starts to evolve.

6              What -- what begins happening in April --

7    let's say April of this year in terms of any

8    difficulties you're having with Suncor?

9    A    I wasn't getting product that they promised me, and

10   also I wasn't getting the discount.  And also, when they

11   were promising a product, several times Friday at

12   4 o'clock in the afternoon they call me, tell me I won't

13   get anything -- or anything for this weekend.  And I

14   have to just say -- beg them, you can't do that.  I

15   mean, you've got to help me out this weekend.  I

16   can't -- I need something.  And they (unintelligible) me

17   some, a couple loads here and there, but they won't give

18   me the whole load that I have --

19   Q    Is this --

20   A    -- before 4 o'clock.

21   Q    Was this something they've done in the past or is

22   this new?

23   A    It was -- if they've done it in the past, probably

24   in about six years it was done one time.  But this time

25   it was happening just frequently.

1   Q    What was your understanding of why this was

2   happening?  Did you have --

3   A    I was trying -- I was trying just ask for meeting,

4   but she was setting up the meeting and he wouldn't show

5   up for the meeting.

6           THE COURT:  Okay.  Now one thing that would

7   help, Mr. Taraghi, again, so the record is clear, when

8   you say "he wouldn't show up" I have no idea who that --

9           THE WITNESS:  Steve Ewing.

10          THE COURT:  There we go.  If you'd use actual

11  names --

12          THE WITNESS:  Sure.  Sorry.

13          THE COURT:  -- it would help.

14          THE WITNESS:  Steve Ewing, I set up three

15  meetings with him a month in advance.  He canceled all

16  three of them.  Never showed up to discuss this.  I was

17  just absolutely going -- for eight months I was just

18  going absolutely -- trying to figure out -- myself and

19  my assistant trying to figure out how we can get fuel

20  out of them, or how we can get some commitment, they can

21  stay with the commitment.

22  Q    (By Mr. Bennington)  What's -- what's important?

23  Or why is it -- what is significant about this happening

24  on Friday?

25  A    We have to ask him because it was devastating me.

1    Q    Why -- my question is --

2    A    And I keep telling him you can't do that.

3         THE COURT:  Wait a minute.

4    A    Don't do that.

5    Q    (By Mr. Bennington)  My question relates to you.

6    Why was it significant to you?

7    A    Because after 4 o'clock on Friday who you going to

8    find?  You try to call everybody and then, you know -- I

9    mean, sometime you just have to discomfort people,

10   inconvenience people and -- and how many times I

11   would -- you know it was very hard.  It was very hard on

12   me and my employees to try to track the people down.

13   And I do a lot of volume.  It is pretty big volume that

14   you have to count -- I mean, replace.  And it was very

15   hard for us to scramble for a whole weekend.

16   Q    Let's talk about Mr. Ewing.  You had a relationship

17   -- or a relationship with Mr. Ewing before he became

18   this supervisor you've described now; is that right?

19   A    I didn't have no relation with him.

20   Q    Well, was he in the business before he --

21   A    He was.

22   Q    -- had this job at Suncor?

23   A    Yes, he was.

24   Q    What was his job before that?

25   A    He was running C stores for Suncor.

1    Q    The same business you're in?

2    A    Right, the marketing.

3    Q    Your competitors?

4    A    My competitors, exactly.

5    Q    How do you describe your relationship with him?

6    A    He was my competitor at the time.

7    Q    All right.  You said you begged and begged for a

8  meeting.  He kept putting you off.  Did you finally get

9  one?

10   A    No.  Never got one.  Except that one at the end,

11 yes.

12   Q    All right.  That's what we're talking about.

13   A    Yeah.

14   Q    May 18th of this year, right?

15   A    That's correct.

16   Q    Where did that meeting occur?

17   A    At Suncor's corporate office.

18   Q    Where?

19   A    In downtown.

20   Q    Downtown Denver?

21   A    17th Street, yes.

22   Q    All right.  Nearby?

23   A    Nearby.

24   Q    All right.  What was your understanding of the

25 purpose of this meeting?

1   A    We tried to just clear the things out.  Try to see

2   if he can come up with better terms, better

3   understanding that make it easy.  Most of the time -- I

4   mean, you know they had some issues with credit we

5   talked about and then we had issue with the delivery of

6   the product we were going to talk about, try to come up

7   with some agreement that we can ease off the situation.

8   Q    All right.  Let's first talk about who was there.

9   In addition to you and Mr. Ewing was there anybody

10  there -- who else was there from Western Convenience

11  Stores?

12  A    Chris Wehrle.

13  Q    And what is Chris Wehrle's job?

14  A    He's the fuel buyer.

15  Q    And what does that mean?  What's that job in your

16  business, in your company?

17  A    He buys all the fuel for Western Convenience

18  Stores.

19  Q    And who is there in addition to Mr. Ewing for

20  Suncor?

21  A    It was -- I apologize, I don't know his last name

22  but his first name was Doug.

23  Q    Yes.  Who else?

24  A    And Diana.

25  Q    Diana Kriskovich we already talked about?

1    A    Diana, and also Steve Ewing and Steve Moss.

2    Q    Steve Moss, again, is your rep?

3    A    He was my rep, right.

4    Q    And Ewing is his boss?

5    A    Pardon me?

6    Q    And Ewing is his boss?

7    A    Yes.

8    Q    Well, let's -- let's go through the things that

9    came up in that meeting.  Was there any discussion about

10   what kind of year both Suncor and Western were having

11   financially?

12   A    We brought that 10 cents out and he admit to it,

13   and also I said I'm having a really hard time making

14   money and I need that 10 cents.  And he said, I

15   understand, but we can't offer it to you.

16   Q    Did he tell you why he couldn't offer it to you?

17   A    He didn't give me any explanation.  He says you

18   don't get it.

19   Q    At that point what else was talked about?

20   A    And he also mentioned that even with that 10 their

21   stores are not making money.

22   Q    The other stores being who?

23   A    Suncor.  Suncor retail.  They have about 40 or some

24   stores around Colorado.

25   Q    I want to make sure I understand.  Even with the

1    10 -- 10-cent break over what you were getting they were

2    not making money?

3    A    They weren't making money.

4    Q    Did he tell you why?  Did he have any explanation

5    that he gave you as to why this was going on?

6    A    He did not.

7    Q    Now, did the subject of your involvement with EPA

8    come up at that meeting?

9    A    Yes, it did.

10   Q    All right.  Was that a big deal -- we'll get to it,

11   but was that something that Ewing regarded as important

12   to talk about, as far as you could tell?

13   A    It came to me it was, but -- but I explain it to

14   him --

15   Q    All right.

16   A    -- exactly what it was and they don't have to worry

17   about it.

18   Q    Before we explain -- we go to what it was that you

19   explained to Mr. Ewing, tell us in general what was

20   going on involving Western and EPA.

21   A    I said there were three of us involved in that EPA,

22   and it's two --

23   Q    Three of us, meaning who?  Three what?

24   A    Do you want me to say the names of them?

25   Q    Yes.

1    A    Okay.  It's Rocky Mountain Pipeline, and Offen

2    Petroleum.

3    Q    And Western Convenience.

4    A    And Western Convenience Stores.

5    Q    All right.  You're in -- go ahead?

6    A    And we have $2.5 million fine, and Rocky Mountain

7    told us that they are going to go ahead and pay EPA and

8    then they will settle it with us.  And I said we're

9    going to settle it together, because we have a relation

10    with Rocky Mountain, and then we did settle it.  It's

11    all settled.  What exactly I told Ewing at the -- Steve

12    Ewing at that time is exactly happened today.  It's all

13    settled.  They paid it.  They came to us, we settled it,

14    it's all done.

15    Q    Very briefly, what was the problem with EPA?  What

16    were they -- what were they upset about?

17    A    We were blending natural gasoline and that's a

18    blend -- blendstock into our gasoline and they want to

19    go through stuff, they just find some procedurals that

20    they thought we didn't follow, but --

21    Q    Is it illegal by itself to blend natural gas with

22    gasoline?

23    A    No, it's not.

24    Q    Do other branded and unbranded retailers sell

25    gasoline blended with natural gas?

1            MR. ROBERTSON:  Objection, foundation.  I

2    don't know how he can know that.

3    Q    (By Mr. Bennington)  Do you know?

4            THE COURT:  Go ahead and --

5            MR. BENNINGTON:  I'll rephrase, Your Honor.

6            THE COURT:  -- lay a foundation.

7    Q    (By Mr. Bennington)  Do you know if this blending

8    you're talking about is -- is that unusual in your

9    business?

10   A    I can tell you right now, what we did we can go

11   ahead and do it again.

12   Q    EPA --

13   A    EPA gave us the go-ahead to do it.  The only

14   problem was at the time it was procedural.  There are

15   certain procedures that we couldn't probably understand

16   it, we didn't follow, but it was no harm, no nothing.

17   They find nothing, just procedural.  That's why we got

18   fined.

19   Q    Who was actually doing the blending?  Who was

20   pulling the levers, running the pipes that were doing

21   the blending?

22   A    Rocky Mountain.

23   Q    All right.  So you settled.  I think you said you

24   settled with Rocky Mountain to pay part of the fine,

25   right?

1    A    Yes.

2    Q    And that's been done?

3    A    It's done.

4    Q    How much are you paying?

5    A    I pay 770,000 to Rocky Mountain.  I mean, it's by

6    paid -- we pay it in five years.

7    Q    Did you need any litigation with Rocky Mountain to

8    get this done?

9    A    No.  No litigation.

10   Q    All right.  Did the -- we're going back to this

11   May 18th meeting downtown with the Suncor people.  Did

12   the subject of your credit terms come up?

13   A    Yes, it did.

14   Q    All right.  What did Mr. Ewing raise with you or

15   say to you regarding your credit terms?

16   A    It was Diana and Mr. Ewing together.  They raised

17   it that my financial is not strong enough; that they

18   have to -- let's go back a little bit.  First, they were

19   cutting me off without even looking at my financial.

20   They said, oh, we're thinking -- without looking at any

21   documents we are thinking you are weak and we're just

22   going to keep cutting you off.

23   Q    Excuse me.  Let's -- you've got to stick with my

24   question, but I'll ask you the question right where you

25   are then.

1   A    Go and ask the question.

2   Q    Before your credit terms came up, are you saying

3   that Mr. Ewing told you that you were going to be cut

4   off or somehow your arrangement with them is going to be

5   changed?

6   A    Correct.

7   Q    What did he tell you?

8   A    He told me -- they start cutting me off before even

9   credit.

10  Q    What exactly did he tell you?  What did that mean

11  you're -- cutting you off?

12  A    They told me that they thought that I am

13  financially weak.

14  Q    Yes.

15  A    Without seeing anything.

16  Q    All right.  You said Ms. -- Ms. Kriskovich was

17  there?

18  A    Pardon me?

19  Q    Ms. Kris -- Diane Kriskovich was there?

20  A    Yes.  That's after.  On that meeting, yes.

21  Q    After -- after what?

22          THE COURT:  Now, let's back up.

23          THE WITNESS:  Let's back up.

24          THE COURT:  Let me see if I can understand.

25  You say they cut you off.  Now, before the meeting on

1    May 18th had they told you they were cutting you off or

2    did they tell you this at the meeting on May 18th?

3              THE WITNESS:  Before meeting.

4              THE COURT:  Okay.  How much before the meeting

5    on May 18th --

6              THE WITNESS:  It was about -- --

7              THE COURT:  -- did they tell you that they

8    were --

9              THE WITNESS:  -- two to three weeks before

10   that.

11             THE COURT:  One thing that would help.  You --

12   if you start to answer the question before I finish,

13   we --

14             THE WITNESS:  Sorry.

15             THE COURT:  -- may be passing each other.  So

16   sometime before the meeting on May 18th someone at

17   Suncor told you they were cutting you off?

18             THE WITNESS:  Correct.

19             THE COURT:  Who was that person?

20             THE WITNESS:  It was Steve Ewing.

21             THE COURT:  When Steve Ewing told you that he

22   was cutting you off before the meeting on May 18th, did

23   he say why they were cutting you off?

24             THE WITNESS:  They said they saw some

25   weaknesses.  The concern -- let's see.  They say they

1      have some concern about our financial.

2              THE COURT:  Now, when Mr. Ewing said he was

3      cutting you off, did he say he was cutting you off

4      completely or did he say he was changing the terms of

5      the agreement?  Because I don't know exactly what you

6      mean when you say cutting you off.

7              THE WITNESS:  It was --

8              THE COURT:  I hear that phrase saying we're

9      not selling to you anymore.

10             THE WITNESS:  He cut me off.

11             THE COURT:  So, he basically --

12             THE WITNESS:  And I had to talk to him and say

13     he can't do that.  And then I got him to open me back

14     up.

15             THE COURT:  So, Mr. Ewing -- there was some

16     conversation where Mr. Ewing said we're not selling to

17     you anymore.

18             THE WITNESS:  Until we see the financial

19     statement.

20             THE COURT:  Until we see the financials.

21             THE WITNESS:  Correct.

22             THE COURT:  Now, he made this statement to you

23     a couple weeks before the meeting on May 18th?

24             THE WITNESS:  Correct.

25             THE COURT:  So, who asked for the meeting on

1    May 18th?  You or --

2              THE WITNESS:  I did.

3              THE COURT:  You asked?

4              THE WITNESS:  Yes.

5              THE COURT:  Now, what was your reason for

6    asking for the meeting?  You said to Mr. Ewing, I would

7    like to meet with you to talk about, what?

8              THE WITNESS:  About -- discuss they had a

9    concern about EPA, they had a concern about my

10   financial.  Because they asked me for my financial and I

11   send it to them.

12             THE COURT:  All right.

13             THE WITNESS:  And then they -- I had a problem

14   with just keep cutting me off on Friday afternoon.

15             THE COURT:  Okay.  And so -- and again, I -- I

16   think the words we're using are important.  When you say

17   cutting you off on Friday afternoons what you're really

18   saying is you were frustrated because they were not

19   making deliveries to your store, or they weren't -- they

20   weren't letting you come to the terminal and purchase

21   gas --

22             THE WITNESS:  That's correct.

23             THE COURT:  -- on Fridays?

24             THE WITNESS:  That's correct.

25             THE COURT:  Which meant that you couldn't make

1    deliveries to your store on Friday.

2              THE WITNESS:  Absolutely correct.

3              THE COURT:  And did they explain to you why

4    they weren't allowing you to purchase fuel on Fridays?

5    This is before the meeting on May 18th, did Mr. Ewing or

6    someone at Suncor say this is why we will not sell fuel

7    to you on Fridays?

8              THE WITNESS:  I mentioned already two weeks

9    before that they were saying because of concern of

10   financial.  And then after two weeks on the Friday they

11   were actually cutting me off they say, oh, we don't have

12   enough product --

13             THE COURT:  Okay.  So --

14             THE WITNESS:  -- the allocation.

15             THE COURT:  Okay.  So they were telling you

16   that you couldn't purchase fuel on Fridays because they

17   didn't have enough under the allocation system?

18             THE WITNESS:  That's what they said.

19             THE COURT:  Okay.  So, based upon that

20   background you and Mr. Ewing had a meeting on May 18th?

21             THE WITNESS:  That's correct.

22             THE COURT:  And at the meeting on May 18th,

23   Mr. Ewing expressed concerns about the EPA settlement

24   and Mr. Ewing expressed concerns about your company's

25   credit status, and you expressed concern about your

1    inability to purchase fuel on Fridays.

2              THE WITNESS:  That's correct.

3              THE COURT:  Okay.  Counsel, please, go ahead.

4    Q    (By Mr. Bennington)  On those Fridays when you were

5    initially told we're not selling to -- to use your words

6    were we're cutting you off because we don't have enough

7    product, what happened when you complained?

8    A    I will get some.

9    Q    They got -- suddenly they had product?

10   A    Right.  I would get some.

11   Q    At -- while this is all going on; that is, the

12   conversation leading up to these Friday --

13   A    4 o'clock.

14   Q    -- Friday 4 o'clocks --

15   A    Right.

16   Q    -- had you been complaining all that time about a

17   better price being given to your competitors?

18   A    Correct.

19   Q    All right.  Now, let's focus on this meeting.

20   You've already discussed the fact that you discussed the

21   EPA consent decree and how that was resolved.  At that

22   point you were telling them how you thought it would be

23   resolved, and now you know it was resolved.

24   A    Resolved exactly like I told them.

25   Q    All right.  Did the subject of your credit terms

1    come up at that meeting?

2    A    Yes, it did.

3    Q    Who brought it up and what did they say?

4    A    It was Diane and Steve Ewing, they both brought it

5    up.  Yeah.

6    Q    Okay.  What was said?

7    A    They said they look at the financial statement that

8    I gave them, that they think it won't support that

9    $3 million credit line.  They have to pull it.

10   Q    How did you respond?

11   A    I respond, you know, it's been tough and, you know,

12   it's been very hard to make money.  And it's true,

13   everybody has a hard time.  Even -- and I said the

14   10 cents has been really having devastating effect on

15   me.  And also I told them, I've been with them and with

16   a lot of companies, I don't owe anybody any money.  I

17   have paid my bills to Suncor since I have been with

18   them, since 2004.  Up to that meeting there was nothing

19   outstanding.

20   Q    Did you make any offers to them to make them more

21   comfortable with your credit?

22   A    I told them I can give them any collateral they

23   want.

24   Q    Collateral?

25   A    Any personal --

1    Q    Sorry, collateral?

2    A    Collateral.

3    Q    Yes.

4    A    And any -- personal or business.  I would give it

5    to them to make them feel more secure to work with me.

6    Q    And was that offer ever followed up on?

7    A    They said -- they look -- at that time they were

8    taking -- we were talking.

9    Q    Yes.

10   A    And they said they were going to get back to me by

11   Friday.  That meeting was on Wednesday, they said they

12   would get their decision to me by Friday.

13   Q    Did they ever get a decision to you?

14   A    Friday at 5 o'clock.

15   Q    What happened?

16   A    I'm cut off.

17   Q    Any explanation, still in this meeting or by the

18   time you were cut off, for -- or any response to your

19   request that you get the same 10 cents break that

20   everybody else is getting?

21   A    Okay.  I've got to correct what I said.  That

22   Friday they call me, they said they will cut me off on

23   Monday.  I'm cut off -- I'm okay until Monday, but on

24   Monday I'm going to be cut off.

25   Q    This is Friday May 20th?

1    A    What the date is, yeah.

2    Q    All right.  You get a phone call.  This all happens

3    by phone, right, on Friday?

4    A    I -- I got a message.  It was -- somebody left a

5    message for me that I will be cut off on --

6    Q    All right.  Who left this message for you?

7    A    I think it was Steve Moss.

8    Q    All right.  And he told you what in this message?

9    A    That they decided to take my three-million-dollar

10   credit away and starting Monday I have to pay COD if I

11   want to buy gas.

12   Q    Did he say anything about confirming that you would

13   get the 10-cent additional discount that others were

14   getting?

15   A    Okay.  When he --

16        MR. ROBERTSON:  Objection, Your Honor.  This

17   message, if this is an e-mail I'd like to see the actual

18   document rather than him testify about what it is.

19        MR. BENNINGTON:  We can --

20        THE WITNESS:  I'm getting to that right now.

21        MR. BENNINGTON:  Well, first of all --

22        THE COURT:  Not -- not -- not as quickly as --

23        MR. ROBERTSON:  Best evidence.

24        THE COURT:  -- perhaps you'd like.

25        THE WITNESS:  Well, that --

```
 1              MR. BENNINGTON:  I'll ask the question --

 2              THE COURT:  Counsel, do you want to respond to

 3    that?

 4    Q    (By Mr. Bennington)  Was this message a voicemail

 5    or an e-mail?

 6    A    It was a voicemail.

 7    Q    All right.

 8    A    But I had Chris to call him and talk to him.  And

 9    then you can bring -- have Chris in here --

10    Q    All right.

11    A    -- you can ask him that question.

12    Q    Chris is Chris Wehrle who will testify --

13    A    Yes.

14    Q    -- here in a few minutes?

15    A    Yeah.  I had him call him and talk to him.

16    Q    All right.  So we're just talking now about what

17    you heard on the voicemail on your telephone, a message

18    from Mr. Moss, right?

19    A    Correct.

20    Q    And he told you your credit is being revoked?

21    A    Correct.

22    Q    And I'm asking you, did he also say -- or in

23    addition did he say anything about the 10 -- 10

24    percent -- sorry, the 10-cent price break that your

25    competitors were getting, yes or no?
```

1    A    No.

2             MR. ROBERTSON:  Objection, leading.  He can

3    just say what he heard on the voicemail without having

4    counsel tell him what's there.

5             THE COURT:  Counsel, in fairness there have

6    been a whole slough of leading questions.  If you were

7    really concerned about leading questions you're about,

8    by my calculation, maybe 45 minutes late.  And I'll

9    sustain that objection.  That is a leading question.

10            MR. ROBERTSON:  Thank you, Your Honor.  I'm

11   trying not to interrupt.  I want to keep things moving

12   as much as I can.

13            THE COURT:  Okay.

14   Q    (By Mr. Bennington)  What, if anything, did he say

15   about price differential that you had been complaining

16   about in that voicemail?

17   A    Nothing.

18   Q    What did you do in response to that -- that

19   message?

20   A    I had Chris call Steve Moss and go detail with him.

21   He probably will tell you that.

22   Q    All right.  But as a result of that conversation,

23   which Mr. Wehrle will tell us about, did anything

24   change?

25   A    No.

1    Q    What did you do then knowing that your credit had

2    been cut off?

3    A    Nothing I can do.  I mean --

4    Q    All right.  At that point were there ACH

5    transactions --

6    A    Yes.

7    Q    -- coming through?

8    A    Yes.

9    Q    Did Western pay those ACH transactions?

10    A    I reject them all.

11    Q    When you say "I reject them all" what do you mean?

12    A    Everything came through, I reject them.

13    Q    This is the positive pay system you were telling us

14    about earlier, correct?

15    A    Pardon me?

16    Q    Is it the positive pay system that --

17    A    Right.

18    Q    -- the bank has?

19    A    Right.  Electronic system, yeah.

20    Q    You have to approve each transaction?

21    A    That's correct.

22    Q    So what happened then with respect to the pending

23    transactions on Friday the 20th?  Did you reject them or

24    accept them?

25    A    Reject them.

1   Q    Why?

2   A    Because I felt they owe me money.  I'm going to --

3   I mean -- they owe me more money than I owe them.

4              THE COURT:  Okay.  Hold on.

5   A    That's why I reject them.

6              THE COURT:  Hold on for a second.  Help me

7   again to understand the transaction process.  In the

8   abstract, as I understand it you would send a Western

9   truck to pick up fuel.  Your Western truck would pick up

10   the fuel and bring it to one of your stores?

11              THE WITNESS:  Correct.

12              THE COURT:  Once the fuel was picked up at a

13   Suncor facility, then Suncor under this line of credit

14   would send a request for payment?

15              THE WITNESS:  Correct.

16              THE COURT:  Now, was it always the case that

17   by the time Suncor put in the request for payment your

18   truck had already picked up the fuel?

19              THE WITNESS:  Correct.

20              THE COURT:  So you had their product in your

21   truck, and then they go to seek payment for the product

22   that you already had?

23              THE WITNESS:  Correct.

24              THE COURT:  And how did they owe you money?

25              THE WITNESS:  Because --

1           THE COURT:  You just told me that you thought

2    they owed you more than you owed them.  How -- what part

3    of this process under which did they owe you money?

4           THE WITNESS:  Because --

5           THE COURT:  Because you had their product.

6           THE WITNESS:  It is their product.

7           THE COURT:  Well, not anymore.

8           THE WITNESS:  Okay.  Now, this is a question.

9    We had an agreement.  We had an agreement how this

10   agreement has to be implemented.  They cut me off every

11   time they want to.  They didn't give me product.  They

12   were hurting me.  They make me to the point -- now, what

13   their motivation was I'm trying to find out right now

14   from the court, and if -- if tomorrow the court decides

15   that I owe them the money, they will get it right away.

16   I don't think I owe them money because they took my

17   money from me by not giving me -- by cutting me off with

18   no reason, which we had an agreement.

19          THE COURT:  So here's --

20          THE WITNESS:  Why you not giving me that 10

21   cents --

22          THE COURT:  Here's what I understand what

23   you're saying is, is that you had picked up product at

24   their facility and they sent you a bill, essentially,

25   seeking electronic payment for that transaction.

1    Your -- your view was that by not giving you the same

2    10-cent discount they were costing you money in terms of

3    your ability to conduct business and compete with your

4    competitors.

5              THE WITNESS:  Correct.

6              THE COURT:  So when you say they owed you

7    money, you felt they owed you money because of what they

8    weren't doing for you.

9              THE WITNESS:  That's -- that's correct.  That

10   part --

11             THE COURT:  So when you say -- and I just want

12   to make sure, Mr. Taraghi, that I understand your

13   terminology.  It wasn't that they owed you money, it's

14   they had costed you money?

15             THE WITNESS:  If they giving somebody else

16   money, they're not giving them money.  They owe me

17   money.  I mean, I don't know.  You -- this is my -- I --

18             THE COURT:  In other words --

19             THE WITNESS:  I can't --

20             THE COURT:  -- what you're basically saying is

21   is that as a result of them -- you got gas from them for

22   which you recognized you owed them an obligation to

23   pay --

24             THE WITNESS:  Correct.

25             THE COURT:  -- but you felt that they had a

1    commensurate obligation to give you the same price break

2    that they were giving your competitors?

3            THE WITNESS:  If you take that 10 cents for

4    five months that I know of, it will be $6 million.

5            THE COURT:  So they had -- so, as I understand

6    it, they had been giving your competitors this price

7    break for 10 months?

8            THE WITNESS:  Five months.

9            THE COURT:  Five months.

10           THE WITNESS:  That I have information, yes.

11           THE COURT:  All right.

12           THE WITNESS:  If you calculate that, it will

13   be more than what that money is that I'm thinking they

14   owe me.

15           THE COURT:  No.  Yeah, see --

16           THE WITNESS:  That's what --

17           THE COURT:  -- I'm just trying to -- it's the

18   owing that I'm -- I'm trying to figure out --

19           THE WITNESS:  I don't know.  I'm --

20           THE COURT:  -- where that owing kicks in.

21           THE WITNESS:  They gave it to somebody else,

22   why they are not giving it to me.

23           THE COURT:  Okay.  I think I have a better

24   understanding of --

25   Q   (By Mr. Bennington)  It's not so much that they

1    owed you, it's that they had damaged you?

2    A    Yes.  I don't have that money.  I don't know how

3    you want to put it.

4         THE COURT:  Okay.  I think I have a better

5    sense.  It was the owing part that I couldn't figure out

6    where that kicked in.  Go ahead.

7    Q    (By Mr. Bennington)  All right.  We've -- what led

8    us into this was the voicemail on Friday the 20th.

9    Okay.  And the voicemail you said -- just laying the

10   background here -- Moss says your credit is revoked.

11   What happens next in terms of your dealing with Suncor?

12   A    I tried to talk to them to see if we can work

13   something out.  They said we already had a meeting.  We

14   already made the decision.  That's just our final

15   decision.

16   Q    Were you still able to buy Suncor fuel later that

17   week if you had -- if you're willing to pay cash for it,

18   COD, or did they cut of off?

19   A    No.  They told me if I pay cash for it --

20   Q    All right.  What happens eventually though?  Are

21   you still able to buy fuel and pay cash for it or did

22   they change that?

23   A    Right now, no.  No.  We are out.  I mean, right now

24   I can't.

25   Q    Did you have another conversation or any

1    interchange with Steve Moss or Mr. Ewing about whether

2    they would still sell Suncor fuel to you?

3    A    They said they won't.  I did have a conversation

4    with Steve Ewing.

5    Q    All right.  When did that conversation occur?

6    A    He called me.  He told me that they will not sell

7    gas to me, and they would not allow my truck to go there

8    and pick up anything from their -- any facility they

9    own.

10   Q    So, it's two parts.  They won't sell Suncor fuel to

11   you; is that right?

12   A    Yes.

13   Q    And what else?

14   A    They would not allow my truck to go pull from third

15   party, which I can understand that.

16   Q    Third party, meaning the middlemen we've talked

17   about?

18   A    Middlemen, yes.

19   Q    What is the economic effect to your company of your

20   inability to buy fuel from middlemen at Suncor

21   terminals?

22   A    It's big.  I can't even operate without them.

23   Q    Does it also have -- are you also -- do these other

24   companies have lines of credit that they would extend to

25   you; that is, these middlemen?

1    A    Yes.

2    Q    What effect does the denial of terminal access have

3    on your ability to use those lines of credit?

4    A    None.

5    Q    No effect or you can't use them?

6    A    What do you mean?  Say it one more time.  I can't

7    understand.

8    Q    What effect does your inability to access the

9    terminals have on your ability to use the middlemen's

10    line of credit?

11    A    There is no effect.  I can't use middleman's credit

12    line.

13    Q    If you can find a place to buy fuel from?

14    A    That's correct.

15    Q    And can you find places to buy all the fuel you

16    need from those middlemen and use their lines of credit?

17    A    I can do it for a short time.  Without Suncor you

18    saying?

19    Q    Yeah.

20    A    Without Suncor for short time I can, but it's just

21    not going to be -- I'm not going to survive, no.

22    Q    Is the problem with survival just buying the volume

23    of gasoline or is there another problem?

24    A    It's a lot of problem.

25    Q    What is it besides just getting the gallons of

1    gasoline?

2    A    It's -- first of all, they do -- (unintelligible)

3    according to their website they do 35 percent.

4    Although, I thought it was a lot --

5              THE COURT:  Now, who -- who's -- you've got to

6    help me, who's they?  Because we were talking about

7    the --

8              THE WITNESS:  Suncor.

9              THE COURT:  -- middlemen.  Suncor.  Go ahead.

10   A    Suncor, according to their website, says they do 35

11   percent of Colorado.  But for my -- we use more than

12   that.  And they control a lot of pricing.  And if I

13   don't get product from them, if something happened to

14   another refineries or another pipelines for some

15   mechanical problem, fire in refinery, I'm finished.  And

16   even in the good condition, condition, it's just my

17   experience if you have 35 percent of your supplies cut

18   off on you it's very detrimental and is not as

19   productive business that you can run?

20   Q    (By Mr. Bennington)  To the extent you can find

21   supply from other people, not using Suncor's

22   terminals --

23   A    But they own --

24   Q    -- what's -- hang on, I've got the ask the

25   question.

1    A    Sorry.

2    Q    To the extent you can find gallons of gasoline not

3    at Suncor's terminal, not from Suncor, what's going on

4    with the price?  What price are you paying for that gas?

5    A    Higher.

6    Q    What is that doing to you?

7    A    That's what I said, it's not productive.  It's --

8    it's -- eventually, it gets into me.

9    Q    Let's talk about Grand Junction.  What's going on

10   in Grand Junction with -- with Western Convenience

11   Stores' supply of fuel now that you cannot access the

12   Suncor terminal to buy from middlemen?

13   A    I'm dead.  I can't buy anything there.  I have to

14   bring it from Denver.  I have to bring it from Denver or

15   I have to go to Salt Lake to get product and bring it

16   there.

17   Q    When you say bring it from Denver that means what,

18   using your trucks?

19   A    Yes.

20   Q    What does that add to the -- to your cost per

21   gallon if you have to truck it from Denver or Salt Lake?

22   A    From 13- to- 15 cents a gallon.

23   Q    Can you stay in business in Grand Junction with

24   that scenario?

25   A    As I said, you know, short-term I can.  But

1    long-term I cannot.

2            THE COURT:  And help me, Mr. Taraghi.  When

3    you talk about short-term versus long-term can you give

4    me some frame of reference in your mind what constitutes

5    short-term.

6            THE WITNESS:  It looks like, you know, we go

7    through -- an example, like sometime we go through

8    troubles, we have some money or we have -- we don't make

9    money.  Our business, when you have a lot of competition

10   you can take -- take advantage of your competition, I

11   mean suppliers competing against each other.  Now you

12   take one equation out, you are condensed that much.

13   Which especially Suncor, there are only three refineries

14   here.

15           THE COURT:  No, but my question is you've said

16   on several occasions on a short-term basis.  What does

17   that translate into in terms of days or weeks or months?

18   I don't know what short-term means.

19           THE WITNESS:  I can struggle making less money

20   and being very vulnerable, and for -- that's the

21   short-term.  I'm --

22           THE COURT:  Okay.  You're -- it's the phrase

23   short-term that I'm trying to get some clarification on

24   and you're just using the same term.  When you say

25   "short-term" how long are we talking about?

1          THE WITNESS:  A few months.

2          THE COURT:  Okay.  Stop with that.  Quit while

3     I'm ahead.

4     Q    (By Mr. Bennington)  Mr. Taraghi, you said earlier

5     you pay your bills.  Have you ever been sued before over

6     a bill?

7     A    For bill --

8     Q    For a bill?

9     A    No.

10    Q    Have you ever not paid anybody?

11    A    I have paid everybody.

12    Q    Have you ever had any judgments against you?

13    A    No.

14    Q    You ever defaulted on a loan?

15    A    No.  Not because of the payment.

16    Q    Have you had a problem with a loan that didn't have

17    anything to do with a payment?  Is that what you're

18    saying?

19    A    No.  No, I -- I have never defaulted on not paying

20    them payment.

21    Q    You've never -- is it correct to say you've never

22    defaulted on a loan, period?

23    A    Right.

24    Q    Now, what is it you want?  What are you seeking

25    today?

1    A    Access.

2    Q    Access to what?

3    A    To two refineries that Suncor has, plus one

4    terminal in Grand Junction.

5    Q    And does your -- that is, the access -- and when we

6    say access we're talking about through Western Truck

7    One?

8    A    That's correct.

9    Q    The other company you own?

10   A    That's correct.

11   Q    Does Western Truck One's access to the Suncor

12   terminals present any financial risk to Suncor?

13   A    No.

14         MR. ROBERTSON:  Objection.

15   A    No.

16         MR. ROBERTSON:  Foundation.  I don't know how

17   he would know that.

18         THE COURT:  Yeah.  You're going to have to lay

19   a foundation.

20         MR. BENNINGTON:  All right.

21   Q    (By Mr. Bennington)  Does Western Truck One pay for

22   access to the terminal?

23   A    No.

24   Q    Does Suncor ask Western Truck One for its

25   financials or for its financial status as a condition to

1    using the terminal?

2    A    No.

3    Q    Who pays for access to the terminal?

4    A    Suppliers -- I mean, customers.

5    Q    The middlemen?

6    A    Middlemen.

7    Q    How do they pay for it?

8    A    They're built in the gasoline price.

9    Q    It's built into the gasoline?  Is that what you

10   said?

11   A    Correct.

12   Q    So, as far as you know, your understanding, will

13   your access to the Suncor terminals cost Suncor

14   anything?

15   A    Nothing.

16   Q    What happens if things stay the way they are, you

17   don't have access, what happens to your business?

18   A    I go out of business.

19         MR. BENNINGTON:  I have no further questions

20   for Mr. Taraghi at this time.  Thank you.

21         THE COURT:  Cross-examination.

22         MR. ROBERTSON:  May I inquire, Your Honor.

23         THE COURT:  Sure.

24

25

```
 1                    CROSS-EXAMINATION

 2    BY MR. ROBERTSON:

 3    Q    Good morning, sir.

 4    A    Good morning.

 5    Q    And I know we haven't met before.  My name is Robby

 6    Robertson and I represent Suncor.  Okay?

 7    A    Okay.

 8    Q    Now, you said that you still do buy from middlemen

 9    today; correct, sir?  Yes or no?

10    A    Be specific.  Middlemen from who?

11    Q    Sir, you've been telling the court about middlemen

12    for the last hour, so do you, from Western Convenience

13    Store, buy from middlemen today?

14    A    Yes.

15    Q    Now, let's talk just briefly about the difference

16    in these companies.  There are two plaintiffs in this

17    case; right, sir?

18    A    Yes.

19    Q    One is called Western Truck One, and that's the

20    freight company that you described for the court; right,

21    sir?

22    A    Correct.

23    Q    And Western Truck One is a limited liability

24    corporation; correct, sir?  LLC?

25    A    Correct.  Yes.
```

1    Q    Who -- who owns it?

2    A    I own it.

3    Q    All right.  Now, the other plaintiff in this case

4    is Western Convenience Stores; right, sir?

5    A    Correct.

6    Q    And Western Convenience Stores was the one that

7    actually buys gasoline or bought gasoline from Suncor;

8    correct, sir?

9    A    Yes.

10   Q    Western Truck One never bought gasoline from

11   Suncor; correct, sir?

12   A    Yes.

13   Q    Now, you went to the Exhibit No. 2, the master

14   product and purchase sale agreement.  If you could turn

15   in your book, sir, please, to Exhibit No. 1.  Now,

16   Exhibit No. 1, this is the terminal access agreement for

17   Western Truck One; correct, sir?  It's in Tab 1.  If you

18   pull Tab 1 up.  I think you have the book upside down.

19   A    Oh, okay.

20   Q    Tab 1.

21   A    Okay.

22   Q    Now, we're looking at Tab 1, this is the terminal

23   access agreement between Western Truck One and Suncor;

24   correct, sir?

25   A    Hold on one second.  Yes.

1  Q    And you signed it; right, sir?

2  A    Correct.

3  Q    Now, in the first page you signed this agreement

4  saying you intended to be legally bound there in the

5  second paragraph on the bottom line.  Do you see that,

6  sir?

7  A    Okay.

8  Q    Is that correct?  May I ask it this way, sir.  When

9  you signed this agreement did you intend to be legally

10  bound by this agreement?

11       THE COURT:  Counsel.  Counsel, I can trust you

12  -- trust me when I tell you --

13       MR. ROBERTSON:  Yes, sir.

14       THE COURT:  -- shouting at this witness is not

15  going to make him any better, it's not going to make him

16  any smarter, and ironically enough the more you shout at

17  the witness, the slower this process will be.

18  Ironically, if you'd lower your voice and talk slower,

19  we'll actually move faster.

20       MR. ROBERTSON:  Yes, sir.

21       THE COURT:  So let's try that.

22       MR. BENNINGTON:  Thank you.

23  Q    (By Mr. Robertson)  Sir, are you with me on the

24  page?

25  A    I am.

 1    Q    Okay.

 2    A    What was the question?

 3    Q    I'm just asking you to answer the straight

 4    question.  When you signed this agreement did you intend

 5    to be legally bound to it?

 6    A    Whatever it says in here is correct.

 7    Q    Okay.  Now, sir, would you please turn to page 2 of

 8    this agreement between Western Truck One and Suncor and

 9    look at paragraph number 4.  Do you see the paragraph

10    number 4 about revocation of access rights?

11    A    Which paragraph?

12    Q    Revocation of access rights, paragraph number 4.

13    Are you there, please?

14    A    Yeah, I am there.

15    Q    Okay.  Now, do you see that Suncor can revoke

16    permission of access to the terminals that are listed

17    here without cause and as a matter of right?  Do you see

18    that, sir?

19    A    I see it, yes.

20    Q    Now, is there any other written agreement that you

21    know of besides --

22         THE COURT:  Counsel.  Counsel.

23    Q    (By Mr. Robertson) -- Exhibit No. 1?

24         THE COURT:  Counsel, lower your voice.

25    Q    (By Mr. Robertson)  Between Western Truck One, LLC,

1    and Suncor for access?  Yes or no?

2    A    No.

3    Q    Now, you talk a little bit earlier, sir, about this

4    discount that you heard about.  Western Truck One

5    doesn't get the discount; right, sir?

6    A    Right.

7    Q    Because they don't pay anything?

8    A    Correct.

9    Q    Now, the discount that you heard about, you

10   mentioned Kroger, Shell, and Suncor.  Is that right,

11   sir?

12   A    Yes.

13   Q    Now, the Suncor stations that we're talking about,

14   those are stations that my client, Suncor, owns; right,

15   sir?

16   A    Correct.

17   Q    They're not selling gasoline to themselves, are

18   they, sir?

19   A    Pardon me?

20   Q    They're not selling gasoline to themselves, are

21   they?  Or do you know?  If you don't know let me move

22   on.

23   A    I don't know how that works.

24   Q    Okay.  All right.

25   A    You'll have to ask an expert.

1   Q    Let's talk about Shell.

2   A    We'll ask expert to explain.

3   Q    Shell -- Shell sells branded fuel; right, sir?

4   A    Correct.

5   Q    And it has proprietary additives in its fuel;

6   correct, sir?

7   A    I don't know.

8   Q    Isn't it true that Shell branded fuel is chemically

9   different from the unbranded fuel that your company

10  bought from Suncor?

11  A    You're asking the wrong person that question.

12  Q    When you testified earlier when counsel asked you

13  if the fuel that you bought and the fuel that these

14  other competitors bought was of the same quality, you

15  don't have any idea; do you, sir?

16  A    He asked different question.  I answered different

17  question.  We have document to back up what question I

18  answered.

19  Q    Yes.  Sir --

20  A    This is not the same question.

21  Q    You asked -- he asked you whether it was the same

22  quality and grade, and you said as far as I know.

23  A    The question he asked, I answered that question

24  because it was --

25  Q    But --

1    A    This one you asking is different than that

2    question.

3    Q    But you don't know if it has the same chemical

4    ingredients?

5    A    The answer I -- okay.  Sir --

6         THE COURT:  No.

7    A    I'm just telling you --

8         THE COURT:  Mr. Taraghi, just go ahead and

9    answer that question.  Do you know whether the gas that

10   you buy has the same chemical ingredients and

11   constituents as the gas that they sell to Shell?

12        THE WITNESS:  I don't know.  I pull from --

13        THE COURT:  Then all you say is I don't know.

14        THE WITNESS:  I don't know.

15   Q    (By Mr. Robertson)  All right, sir.  Now, in terms

16   of this discount that you heard about, isn't it true

17   that ConocoPhillips was offering a discount, 10 cents

18   off, for it's branded fuel first?

19   A    I don't know.

20   Q    Do you know whether my client, Suncor, was

21   following a discount that ConocoPhillips was giving to

22   its customers?

23   A    That's what they told me.  I was told by -- by

24   Suncor.

25   Q    What about Chevron, sir?  Do they give discounts

1      too?  Do you know?

2      A      Whose Shell?

3      Q      Chevron.

4      A      Oh, Chevron.

5      Q      Ever heard of them?

6      A      They are not here.

7      Q      Okay.  Now, let me ask you about yourself.  You've

8      only bought unbranded fuel, let's say, in the last year

9      or so that we're talking about; right, sir?

10     A      Okay.

11     Q      Is that correct?

12     A      Yes.

13     Q      All right.  And that unbranded fuel -- is it true

14     that from time to time you were given additional

15     discounts by Suncor?

16     A      You say last year?

17     Q      How about -- how about --

18            THE COURT:  No, he said from time to time you

19     were given additional discounts.

20     A      A long time ago.

21     Q      (By Mr. Robertson)  How about in the fall of 2009?

22     Is that a long time ago?

23     A      Probably around that time, yes.

24     Q      And fall, 2008?

25     A      Yes.  Probably that time.

1    Q    Fall of 2007?

2    A    That's what I said.  I mean, you're going -- I'm

3    just going past, yeah.

4    Q    Yeah.

5    A    But I'm talking presents, no.

6    Q    And those discounts that you got for unbranded fuel

7    were not given to the branded customers; right, sir?

8    A    I don't know.

9    Q    Isn't it true that your unbranded fuel price is --

10   on the rack over a year-long period is on average lower

11   at a Suncor rack terminal than the price for branded

12   fuel?

13   A    Rack price doesn't mean nothing.

14          THE COURT:  No, Mr. Taraghi, you have to

15   answer the question --

16          THE WITNESS:  I don't know.

17          THE COURT:  -- as asked.

18          THE WITNESS:  I don't know.  I can't answer

19   that question.

20   Q    (By Mr. Robertson)  Do you know whether over a

21   complete year whether you paid more or less for gasoline

22   than other branded customers?  Yes or no?

23   A    Yes.

24   Q    You paid less; didn't you, sir?

25   A    I pay more.

1    Q    Over a whole year?

2    A    All year, last year.

3    Q    You just -- you just told me a few minutes ago you

4    didn't know.  Do you actually know whether you paid less

5    or more over a whole year?

6    A    The question is coming differently.  I'm asking --

7    answering the questions that I know of.  You asked me

8    about the rack price.  I don't know what rack price,

9    because -- you are not in my position to answer those

10   questions -- the way I understand I have to answer the

11   question.  Probably they seem the same, they are not the

12   same questions you're asking me.

13   Q    Sir, I'll try to keep it real simple.  Let's go

14   back to when you stopped buying gas -- gasoline from

15   Suncor back in May of this year.  All right, sir.  Go

16   back 12 months.

17   A    Okay.

18   Q    An entire year.  Isn't it true that on average your

19   prices for unbranded fuel were below that of branded

20   fuel?

21   A    No.

22   Q    Over the entire year?

23   A    No.

24   Q    And you're sure about that?

25   A    I'm sure about it.

1  Q    Now, you mentioned that you still are buying from
2  middlemen and you've been buying from them throughout
3  the whole summer, right?
4  A    Yep.  Since Suncor, yes.  I've been buying all the
5  time.  All 22 years I've been in business
6  from middlemen.
7  Q    In fact -- in fact, during the entire time you were
8  buying from Suncor you were also buying from other
9  people too; right, sir?
10  A    Correct.
11  Q    And you were buying from other -- like pipelines;
12  right, sir?
13  A    Correct.
14  Q    And your trucks are also picking up fuel for other
15  people, is that right, at other -- other terminals?
16  They do that today?
17  A    I pull it from other terminals?
18  Q    Yes, sir.
19  A    Yes, I do.
20  Q    And, in fact, today your trucks are going into
21  other terminals and picking up gasoline for Western
22  Convenience Stores; isn't that correct?
23  A    Correct.
24  Q    In fact, they go to Sinclair just a couple blocks
25  away from the terminal here in Denver; right, sir?

1    A    Correct.

2    Q    Now, you mentioned this meeting on the 18th of May.

3    Isn't it true that when you walked in there that the

4    person who led the meeting was Ms. Kriskovich?

5    A    Who's that?

6    Q    Her first name is Diane.

7    A    Diane Kris -- yes.

8    Q    And the person who actually set up the meeting on

9    that day was actually Mr. Wehrle; correct, sir?

10   A    Yes.

11   Q    You mentioned the EPA payment of $770,000.  And

12   then when are you going to pay that, sir?

13   A    In five years.

14   Q    Now, this is the first time you've told my client

15   that; right, sir?

16   A    They -- I wasn't -- I had no agreement then.

17   Q    It's a yes or no, sir?  The first time you've told

18   my client, right?  Correct?

19   A    First time, yes.

20   Q    Now, on the 18th when you had this discussion about

21   cutting off your credit, you mentioned a couple times

22   that you could pay COD.  Is that the same as prepay?

23   A    That's prepay, yes.

24   Q    And when you found out that they were going to cut

25   off your credit, as you discussed, you made the decision

```
 1    not to approve the ACH draws from my client; correct,

 2    sir?

 3    A    Correct.

 4    Q    And that was on the 18th of May; right, sir?

 5    A    Correct.

 6    Q    Now, isn't it true that after the 18th of May, you

 7    sent your trucks from Western Truck One onto my client's

 8    terminals to pick up gasoline?

 9    A    They told me on Friday they going to stop me on

10    Monday.

11    Q    And you went and bought over three -- picked up

12    over $3 million worth of gasoline that weekend; correct,

13    sir?

14    A    No, I didn't.

15    Q    Your people did?

16    A    You got your numbers wrong.  No, I didn't.  No, I

17    didn't.

18    Q    Did you send your trucks in to pick up gasoline

19    that weekend?

20    A    Not -- not that much.

21    Q    You did though?  You did buy some -- pick up some

22    gasoline from my client?

23    A    Just some gasoline I picked up, but I didn't pick

24    up that much.

25    Q    And you had -- because you've already told the
```

1    court this, you had no intention of paying?

2    A    It's not -- I have a whole intention to pay.

3    Q    Sir --

4    A    I don't owe, sir, to anybody.  I have all intention

5    to pay.  I said, you owe me money.  We'll -- court

6    decide that.  I'm just telling you I have all intention

7    to pay anybody.  I don't owe nobody.  I have paid my

8    bills up to today.

9    Q    Sir, on the 18th when you made this decision I'm

10   not going to honor ACH payments --

11   A    Because I was cut off.

12   Q    -- you did not call my client and tell them that

13   you were not going to make payment on any gasoline that

14   you were going to go pick up over the next few days; did

15   you, sir?  Yes or no?

16   A    Answer the -- go ahead and ask that question one

17   more time, because I want to know what the exact

18   question is.

19   Q    When you made the decision to not make payments on

20   gasoline that your company was going to buy over the

21   next few days, after that date you made the decision,

22   did you tell my client that you were not going to pay

23   for the gasoline that your trucks picked up?  Yes or no?

24   A    Answer is no.

25   Q    Now, if I go in to one of your gasoline stations,

1    sir, which I have, and I fill my tank up in my car and I

2    just drive off and don't pay, do you instruct your

3    people to call the police?

4    A    Yes, I do.

5    Q    Now, we're going to have your financial officer up

6    here in a few moments, but as president of -- of Western

7    Convenience Stores, since May to present, in this fiscal

8    year -- because your fiscal year ends in -- when, sir?

9    End of March?

10   A    You're talking too fast.  I can't understand what

11   you're saying, sir.

12   Q    Well, let me start very simply.  Your fiscal year

13   ends at the end of March; is that correct?

14   A    Yes.

15   Q    Since 1 April to today, Western Convenience Stores

16   is profitable, isn't it?

17   A    It's profitable, yeah.

18   Q    Now, when you --

19              MR. ROBERTSON:  And by the way, Your Honor, I

20   do want to move in as we're doing this now, Exhibit

21   No. 1 into evidence.

22              MR. BENNINGTON:  No objection.

23              THE COURT:  Without objection the court will

24   accept Exhibit No. 1.

25              (Whereupon, Exhibit No. 1 was admitted into

1    evidence.)

2    Q    (By Mr. Robertson)  Now, if you can turn, sir,

3    please, in your tab to Tab No. 2.  This is what you

4    talked about with counsel, this master product and

5    purchase and sale agreement.  You there, sir?

6    A    Yes, I am.

7    Q    And you do know -- and we can go line by line, but

8    you know that the company, my client, Suncor, retained

9    the right to cut off your credit if you didn't pay your

10   bills?  Do you know that, sir?

11   A    It says in here.  It is there.

12   Q    Okay.  And that's what you agreed to; right, sir?

13   A    As I said, it's here.

14   Q    And that's what you agreed to; right, sir?

15   A    Okay.

16   Q    Is that correct?

17   A    Correct.

18   Q    Now, just to be clear if we go to page A-5 of the

19   agreement?

20   A    What page?

21   Q    It's A-5 at the bottom.  It's the last physical

22   page of Tab 2.  When you're there, sir, just let me

23   know.

24   A    Okay.

25   Q    You there, sir?

1    A    Yeah.

2    Q    Now, look at paragraph 31.  You understand, sir,

3    that this agreement -- that there are no other person or

4    party that is a third-party beneficiary under this

5    agreement.  Do you know that, sir?

6    A    Yes, I see that.

7    Q    And the fact is, this agreement has nothing to do

8    with Western Truck One; isn't that correct?

9    A    Correct.

10   Q    Now, if you turn to the first page of Exhibit A,

11   which is A-1.  So just go back two pages, and we're on

12   paragraph five.  Are you there, sir?

13   A    Yes, I am.

14   Q    Okay.  Do you see in the first sentence towards the

15   end it says, Upon receipt of each invoice, make payment

16   to Suncor immediately in accordance with the terms of

17   payment provisions of this agreement without any

18   deduction or setoff.  Do you see that, sir?

19   A    Yep.

20   Q    And that's what you agreed to with my client;

21   right, sir?  Not to setoff or deduct any payments that

22   you owe; right, sir?

23   A    Right.

24   Q    But you did it anyway.  You just decided not to

25   pay; right, sir?

1    A    Right.

2    Q    Once my client found out that you were not paying

3    for the gasoline that you were picking up and taking out

4    to your gas stations, do you understand why they don't

5    want to offer you any credit, sir?

6    A    I didn't ask for credit.

7    Q    Do you understand why they don't want to give you

8    gasoline that you're not going to pay for?

9    A    I didn't ask for it.

10    Q    You are here though, aren't you?

11         THE COURT:  Counsel.

12    A    I'm asking for access.

13         THE COURT:  Counsel.  Counsel.

14    A    I'm asking for access.

15         THE COURT:  What you're asking this witness to

16    do is to agree with the philosophy or mindset of your

17    client.  That question isn't related to anybody's

18    interest.  If you want -- if you want -- the parties may

19    disagree about this.  It's not going to facilitate my

20    analysis at all.

21         MR. ROBERTSON:  Yes, sir.  Yes, Your Honor.

22         THE COURT:  Go ahead.  I mean, I think we're

23    losing sight of the fact that there is no jury here,

24    we're not toting up points.  Your job is to present the

25    facts that I need to make a recommendation to decide

1    this motion.

2              MR. ROBERTSON:  Yes, Your Honor.

3              THE COURT:  Let's focus on that objective.

4              MR. ROBERTSON:  Yes, Your Honor.

5    Q    (By Mr. Robertson)  You mentioned that if your

6    trucks go into my client's facility that there's no harm

7    to my client.  That's what you said?

8    A    I will be the same as other trucks going in there.

9    Q    That's what you want this court to authorize is to

10   allow Western Truck One to go onto my client's property

11   and pick up gasoline; correct, sir?

12   A    Correct.

13   Q    And what you want this court to do is to make my

14   client go into its computer system and give access so

15   your trucks can get in the gate; right, sir?

16   A    Correct.

17   Q    Right now they can't even get in the gate, right?

18   A    Correct.

19   Q    And then they have to then on all of the equipment

20   and all the pumps actually pump gasoline into your

21   trucks; right, sir?

22   A    Correct.

23   Q    And then if your trucks do what they did back after

24   the 18th of May, which is pick up for somebody who

25   doesn't pay, my client's got a problem; don't they, sir?

```
1    A    No, he doesn't -- they have -- there's no way I can

2    pull product from them on my account.  I do it from

3    third party.  Third party charges for it.

4    Q    Are you the only one who doesn't pay?

5    A    Pardon me?

6    Q    Are you the only one out there who doesn't pay?

7    A    I always pay.

8    Q    No, sir, you just told us you didn't pay this time.

9    A    I pay.  That's your question.  My counsel ask me

10   question, I can clear those up for you.

11   Q    Do you know what the term overfill is, sir?  Or

12   overdraw?  Ever heard of that?

13   A    Overdraw?

14   Q    Yes, sir.

15   A    Yes, I do.

16   Q    And, in fact, if your trucks pick up more than

17   they're supposed to then my client has to go get the

18   money from your trucks, right?

19   A    No, they don't.

20   Q    They have to go back to the -- the name of the

21   company your truck driver put into the machine, that may

22   or may not think they're liable for that amount of

23   money, right?

24   A    That's not correct.

25   Q    All right.  Now, as of now, in terms of how Suncor
```

1    sets the prices for your gasoline, right now you don't

2    have any agreement; right, sir?  (Unintelligible) with

3    my client?

4    A    We don't -- we don't do business right now.

5    Q    Okay.  And back at the time when all this came up,

6    at the end of April when you were complaining you said,

7    if you look in Tab 2 -- and your counsel was trying to

8    get you to look at this.  If you look at paragraph 2, do

9    you know what a confirmation procedure is?

10   A    Where is it?

11   Q    Tab 2, page 1.

12   A    Okay.

13   Q    Do you see in paragraph 2 it talks about a

14   confirmation procedure for the sale of petroleum

15   products pursuant to the terms set forth in a

16   transaction or agreement confirmation.  Do you know,

17   sir, what that's talking about?

18   A    What is your question?

19   Q    Do you know what a confirmation is?

20   A    Just ask me a question, I can answer a question.

21        THE COURT:  I think that is the question.  Do

22   you know what a confirmation is?

23   A    Okay.  Yes.

24   Q    (By Mr. Robertson)  You do know what a confirmation

25   is; right, sir?

1    A    Yeah.

2    Q    Now turn to Tab 11 that counsel pointed you to

3    earlier.  Tab 11 entitled Confirmation of Purchase,

4    slash, Sale Agreement.  Now, do you now remember what

5    Tab 11 is, sir?

6    A    Yeah, I see this contract.  Yeah.

7    Q    You know what it is; right, sir?

8    A    Yes.

9    Q    And this particular confirmation set forth the

10   terms for Suncor to sell gasoline to Western Convenience

11   Stores up until April 30th, 2011; is that correct, sir?

12   A    Correct.

13   Q    And in paragraph 7 it set the payment terms that

14   you've already testified to, net 10; right, sir?

15   A    Yes.

16   Q    And that means you have to pay within 10 days?

17   A    Yes.

18   Q    And we already know that you're well over four

19   months; right, sir?

20   A    Whatever it is, yes.

21   Q    All right.  Do you see that at the bottom in terms

22   of credit that -- the last sentence, Suncor reserves the

23   right to modify or withdraw any credit or credit terms

24   at any time without notice to counterparty, which is

25   Western Convenience Store.  Do you see that, sir?

1   A    Yes.

2   Q    And if you turn the page you see that this

3   particular confirmation, it states that it's governed by

4   the master product purchase and sale --

5   A    What page --

6   Q    -- agreement?

7   A    -- was it, sir?  What page?

8   Q    Second page of Tab 11.  Same document.

9   A    Okay.

10  Q    Very top of the page.  Are you there, sir?

11  A    Yes, I am.

12  Q    And do you see where it says that confirmation is

13  entered into pursuant to and is governed by the master

14  product purchase and sale agreement?  Do you see that,

15  sir?

16  A    Yes.

17  Q    And that was Tab No. 2 that we looked at earlier;

18  right, sir?

19  A    Right.

20  Q    And the fact is, sir, that when you went to the

21  meeting, and during that period of time up until that

22  meeting, that your company was negotiating a new

23  confirmation with Suncor; right, sir?

24  A    For what month?  Negotiating (unintelligible) for

25  what month?

1    Q    Well, by May 18th you didn't have a confirmation;

2    right, sir?

3    A    I'm not understanding what your question is.

4    Q    There's no other document from Suncor that is a

5    confirmation after April 30th, 2011; isn't that correct?

6    A    Correct.  Correct.  I understand now, yes.

7    Q    And at the meeting on May 18th, one of the reasons

8    you were there were to negotiate the terms of what you

9    were going to pay for gasoline and how much gasoline you

10   were going to buy from Suncor; right, sir?

11   A    Right.

12   Q    And your hope was that if you negotiated the terms

13   you'd end up with a new confirmation; right, sir?

14   A    Correct.

15   Q    Now, since May you have not shut down a single

16   Western Convenience Store station; correct, sir?

17   A    Correct.

18   Q    And you're still selling gasoline at every

19   location; right, sir?

20   A    Right.

21   Q    And you're still selling all the gasoline that you

22   can sell; right, sir?

23   A    Right.

24   Q    And you're also pricing below the branded stations;

25   aren't you, sir?

1    A    It just depends.

2    Q    If I go here in Denver, go to any one of your

3    stations, isn't it true that all of them are pricing

4    below their competitor branded stations?  Yes or no?

5    A    Not -- not correct.

6    Q    Where are you pricing above a branded station here

7    in Denver?

8    A    Across from Diamond Shamrock.

9    Q    Now, you haven't had any of these natural disasters

10   you talked about, fires in refineries or anything, this

11   summer; right, sir?

12   A    I didn't have it, no.

13   Q    And when you say that if something like that were

14   to happen, you could have a problem; right, sir?

15   A    It happened last year.

16   Q    Well, that's what you were talking about with the

17   court earlier, right?

18   A    No, I said I would have a problem.  It doesn't

19   matter.  That would be devastating, but I would have a

20   problem even if I don't have Suncor, period.

21   Q    Okay.  Now, all these problems that could occur,

22   refineries shutting down or a fire, or things that you

23   described earlier today, that would adversely affect

24   everybody in the market; right, sir?

25   A    It does, but not --

1    Q    That's all I wanted to know.

2    A    Huh?

3    Q    That's all I wanted to know --

4    A    Sure.

5    Q    -- is it would affect everybody.  Now, the summer

6    driving season here, is that over?

7    A    Yes.

8    Q    And you still are buying gasoline from others who

9    buy from Suncor; right, sir?

10   A    No.

11   Q    You're not buying from any middlemen today?

12   A    I'm buying from middlemen, but not from Suncor.

13   Q    You --

14   A    Not through middlemen from Suncor.

15   Q    I don't think you heard my question, and maybe it

16   was inartful.  You are still buying gasoline from

17   middlemen who were buying, in turn, from Suncor today;

18   right, sir?

19   A    That question is not clear.

20   Q    Sir, you are buying from -- I'm going to start

21   over.

22        There are middlemen that you described who buy

23   gasoline from Suncor; right, sir.

24   A    Now, you have to say that middlemen, where I pull

25   the gas from.  You have to say that before I answer your

1    question.

2              THE COURT:  No, actually he doesn't.  He gets

3    to pick the questions he wants to ask.  Now, if the

4    questions he asks are objectionable then I'll step in.

5              THE WITNESS:  I'm not understanding.

6              THE COURT:  But -- but -- well, then -- then

7    what you ask him to do --

8              THE WITNESS:  Sorry.

9              THE COURT:  -- is to rephrase.  But, as a

10   strict matter you don't get to decide what questions he

11   asks.  Because if you decide that, I literally have

12   nothing to do.

13             THE WITNESS:  I see.  I'm sorry.  That's not

14   what I meant.

15             THE COURT:  And the taxpayers really want me

16   to do something.

17             THE WITNESS:  Yeah.  I apologize.

18             THE COURT:  You play your part, he'll play his

19   part, I'll play my part and we'll actually --

20             THE WITNESS:  I apologize.

21             THE COURT:  -- move right along.

22             THE WITNESS:  I apologize.  I didn't mean that

23   way.

24             THE COURT:  Okay.  Go ahead.

25             THE WITNESS:  Go ahead.

1    Q    (By Mr. Robertson)   Today Western Convenience Store

2    is buying gasoline from middlemen who, in turn, have

3    bought that gasoline from Suncor, correct?

4    A    No.

5    Q    You're not buying any gasoline from any middlemen

6    who have bought that gasoline from Suncor?

7    A    No.

8    Q    Where are you getting your gasoline from?

9    A    From middlemen who buys their gasoline from other

10   than Suncor.  But they probably buy from Suncor too.

11   They buy from Suncor too, yeah.

12   Q    Is it --

13   A    But they are not -- I am not getting Suncor

14   gasoline.  That's what I'm telling you.

15   Q    Okay.

16   A    I'm not getting Suncor gasoline.  I want that to be

17   clear.

18   Q    You're not getting it directly, but you are getting

19   it through middlemen?

20   A    No, I am not.

21   Q    All right.

22        THE COURT:  Okay.  Let me ask you, okay,

23   because you guys are just not (unintelligible).  The

24   gasoline that is brought to your convenience stores,

25   does any of that gas -- I don't care whether it comes

1    from middlemen or it just shows up in the middle of the

2    night on its own, does any of that gas that you sell in

3    your stores originate from a Suncor terminal or

4    refinery?

5            THE WITNESS:  No.

6    Q    (By Mr. Robertson)  Now, my client told you that

7    they would allow other trucks from other carriers to

8    pick up fuel that you could then buy; right, sir?

9    A    Correct.

10    Q    Like Offen, for example, they can go pick up fuel

11    there and they can turn around and sell it to you,

12    right?

13    A    Correct.

14    Q    And you decided not to take that option; right,

15    sir?

16    A    Correct.

17    Q    Now, you have bought gasoline from Offen; right,

18    sir?

19    A    Yes.

20    Q    And you have this summer, right?

21    A    Yes.

22    Q    And you could have any other independent common

23    carrier go pick up the fuel and deliver it to Western

24    Convenience Store stations; correct, sir?

25    A    Correct.

1    Q    And you just chose not to do that?

2    A    Yes.

3    Q    And the reason you don't do that is because it

4    would cost more; right, sir?

5    A    It's a lot of reasons.

6    Q    Okay.

7    A    I will explain that if you ask me.

8    Q    All right.  Let's talk a little bit about your

9    financial statement, sir.  That was something that you

10   discussed at this May 18th meeting with Ms. --

11   Ms. Kriskovich; right, sir?

12   A    Right.

13   Q    And she explained to you her concerns about giving

14   you credit; right, sir?

15   A    Pardon me?

16   Q    She explained to you her concerns about giving or

17   extending your company, WCF, credit; correct, sir?

18   A    Correct.

19   Q    And one of the reasons was over the last fiscal

20   year your company lost $3 million; right, sir?

21   A    Correct.

22   Q    Now, the actual financials that she had been given,

23   you mentioned that you gave them to my client.  Have you

24   checked the ones that Mr. Dowden gave to my client?

25   A    I check them all, but I don't know that one I

1    checked it or not.  But I checked most of them.

2    Q    Let's turn to Tab No. 5, sir.  And let me know when

3    you're there, please.  Now, sir, if you turn to the

4    second page you'll see an e-mail from Mr. Charlie

5    Dowden.  Do you see that, sir?

6    A    Second page?

7    Q    Second page of Tab No. 5.  See at the top it says

8    from Charlie Dowden May 10th, 2011?

9    A    Okay.

10   Q    And Mr. Dowden, he is your financial officer at the

11   company?

12   A    Yes.

13   Q    And do you see the financial statements that are

14   attached which are the next two pages?  Do you see that,

15   sir?

16   A    Yes.

17   Q    And have you looked at these financials before they

18   were given to my client?

19   A    Yes.

20   Q    And they were accurate to the best of your

21   knowledge; right, sir?

22   A    Yes, they are.

23   Q    As of today, sir, do you know that the gasoline

24   that you decided not to pay for from my client is in

25   excess of $3.7 million?

1    A    Say one more time.

2    Q    The amount of money that you haven't paid my client

3    for gasoline is in excess of $3.7 million; correct, sir?

4    A    It's about that, yes.

5    Q    You told the court that you thought your company

6    could go out of business in months; right, sir?  Is your

7    company going to go out of business in months?

8    A    If -- if this situation stays the same, yes.

9    Q    And you've been profitable so far until today, and

10   then sometime between now and the next few months you're

11   going to become unprofitable and go out of business?  Is

12   that what you're telling the court?

13   A    I am profitable, but I am just barely profitable.

14   Q    Okay.

15   A    Barely.

16   Q    But you're not out of business today; right, sir?

17   A    Pardon me?

18   Q    You're not out of business today?  You are not out

19   of business today; right, sir?

20   A    No, I am not.

21   Q    At what point are you going to go out of business?

22   Do you have any idea?

23   A    If Suncor stays that way, they put me out of

24   business, yes.

25   Q    Have you calculated at what point you will become

1    unprofitable?  When is that going to happen?

2    A    I'm thinking if the situation is over here if

3    Suncor wins this I will be out of business.  They will

4    put me out of business.

5    Q    No, sir.  I want I want to know have you calculated

6    when that's going to happen?

7    A    I just calculate it for you.  I said it.  After the

8    whole thing is over, if they --

9              THE COURT:  Well, when you say the whole

10   thing, what do you mean?

11             THE WITNESS:  The courts is over.

12             THE COURT:  So when this lawsuit is over.

13             THE WITNESS:  Over.

14             THE COURT:  So, what you're telling me is

15   if -- if at the end of this whole lawsuit the court

16   finally enters a judgment, if you don't win this lawsuit

17   you'll be out of business?

18             THE WITNESS:  Yes, I will.

19             THE COURT:  I don't think he has any way of

20   predicting, counsel, when this case will be over any

21   more than you can.

22             MR. ROBERTSON:  No, Your Honor, and I

23   appreciate that.

24   Q    (By Mr. Robertson)  Now, sir, do you know whether

25   the discount that you were talking about is still being

1    offered to the branded retailers by Suncor?

2    A    I don't know.

3    Q    And do you know whether that discount will be

4    offered next month?

5    A    I don't know.

6    Q    Do you know if that discount will be offered the

7    month after?

8          THE COURT:  Counsel, aren't these really

9    questions that are better asked of your witnesses?  How

10   is he going to know what discounts your client is going

11   to be offering third parties in the future?

12         MR. ROBERTSON:  Well, I think we can go there,

13   but I don't -- I don't want to waste the court's time on

14   it.  These are announced, Your Honor.  They're not

15   secret.  So, if they're out there you can see it.

16         THE COURT:  Then -- then -- it just doesn't

17   seem to be particularly an efficient use of time.

18         MR. ROBERTSON:  Yes, sir.

19   Q    (By Mr. Robertson)  Now, sir, if -- if you needed

20   money to keep your company going, your Western

21   Convenience Stores, that you've been operating since

22   1984 or '2, I forgot?

23   A    '9.

24   Q    Okay.  You've got plenty of money to do that;

25   right, sir?

1    A    In business plenty of money is not plenty of money.

2    Q    Didn't you tell my client and didn't you tell the

3    court that you could offer up other collateral of your

4    own in order to cover?

5    A    That's the collateral.  Yes, I do have a lot of

6    collateral.

7    Q    And the collateral you're talking about is what,

8    sir, 40- $50 million worth of collateral?

9    A    I have a lot of collateral.

10   Q    And you mentioned this in the meeting on the 18th

11   you said; right, sir?

12   A    Yes.

13   Q    And the collateral you were talking about was real

14   estate; correct, sir?

15   A    That's correct.

16   Q    And that real estate that you own is worth over $60

17   million; correct, sir?

18   A    The whole thing I own, yes.

19   Q    And that's what you told my client you could offer

20   as collateral; right, sir?

21   A    Not the whole thing.  Whatever I needed, yes.

22   Q    And if you don't pay for the gasoline they have to

23   go foreclose on the property and try to sell it?  Is

24   that right, sir?

25   A    Whatever they have to do, yes.

1    Q    Now, you did not offer Suncor a letter of credit;

2    isn't that correct?

3    A    Yes, it is.

4    Q    Now, you are capable of going to a bank and getting

5    a letter of credit; aren't you, sir?

6    A    No, I can't.

7    Q    Because you don't have -- you're not credit worthy?

8    A    It's very costly.

9    Q    Did you try to go to a bank and offer all this

10   collateral to see if you'd get a letter of credit from a

11   bank?  Yes or no?

12   A    I couldn't get a letter of credit.

13   Q    Did you try?  Yes or no?

14   A    I did try, yes.

15   Q    And you offered the collateral you had in order to

16   get a letter of credit?  Yes or no?

17   A    I don't remember right now.  I'm trying to remember

18   exactly.

19   Q    Which bank, sir?

20   A    I'm trying to -- I said I don't remember right now.

21   Q    All right.

22            MR. ROBERTSON:  Your Honor, that's all the

23   questions I have at this time for this witness.

24            THE COURT:  (Unintelligible).

25            MR. BENNINGTON:  Your Honor, one moment.

1          MR. ROBERTSON:  May I confer with counsel?

2          THE COURT:  Sure.

3          MR. ROBERTSON:  What?  Okay.  I neglected to

4    move in Exhibit No. 5, Your Honor.

5          MR. BENNINGTON:  No objection.

6          THE COURT:  Without objection Exhibit No. --

7          MR. ROBERTSON:  And also Exhibit No. 11.

8          MR. BENNINGTON:  No objection.

9          THE COURT:  I think.  Okay.  Exhibit 5 and

10   Exhibit 11 will be accepted into evidence.

11          (Whereupon, Exhibit Nos. 5 and 11 were

12   admitted into evidence.)

13          THE COURT:  Counsel, let me ask a couple of

14   clarifying questions and then I certainly want to give

15   you an opportunity.

16          Mr. Taraghi, would you turn to Exhibit No. 1.

17          THE WITNESS:  Sure.

18          THE COURT:  I'm just trying to understand.

19   This is the terminal access agreement executed by you on

20   behalf of Western Truck One; is that correct?

21          THE WITNESS:  Correct, yes.

22          THE COURT:  Now, other than the terminal

23   access agreement which is marked as Exhibit 1, and this

24   is dated May 10 of 2006, have you signed any more recent

25   terminal access agreements on behalf of Western Truck

1    One?

2              THE WITNESS:  I don't know right now.  I have

3    to go look at my file to see if we have signed any

4    because I -- I can't remember.

5              THE COURT:  The reason I'm asking is I just

6    need your help in interpreting this document.  If you

7    turn to page 3.  Page 3, paragraph 9 says, Attached

8    hereto as Schedule A is a list of carriers' customers

9    for whom carrier or its agents may obtain petroleum

10   products from the Suncor terminals.

11             Now, the carrier in this instance is Western

12   Truck One.  So what Schedule A supposedly is is a list

13   of Western One's customers for whom Western One can

14   purchase fuel.  And I'm looking at Exhibit A, and

15   Exhibit A lists four customers Harpel Oil, DATS

16   Trucking, Senex, and some Carry or however -- whatever

17   that is -- Transport.

18             THE WITNESS:  Cory Transport.

19             THE COURT:  Cory.  Now, which of these

20   companies represents your Western Convenience Stores?

21   Because according to Schedule A, Western Truck One can

22   only purchase -- can only pick up fuel for the customers

23   listed on Schedule A, and are any of these customers on

24   Schedule A Western Convenience Stores?

25             THE WITNESS:  No, they are not.

```
 1              THE COURT:  So on what basis was your company,

 2    Western Truck One, picking up and delivering fuel to

 3    Western Convenience Stores?

 4              THE WITNESS:  I'm sure I have some documents

 5    in my file that says that.

 6              THE COURT:  Okay.

 7              THE WITNESS:  I do have.

 8              THE COURT:  I'm just trying to figure that

 9    out.

10              THE WITNESS:  But this is not correct, it

11    looks like it.  These guys are all the freight

12    companies, if something happened to my trucks that they

13    can help me to fuel my stations.

14              THE COURT:  Okay.  Now --

15              THE WITNESS:  And also they are the middlemen

16    too.

17              THE COURT:  The middlemen -- so which of

18    these -- so are some of these companies on Schedule A

19    who you've been referring to as middlemen.

20              THE WITNESS:  Some of them are, but they --  I

21    was -- the reason -- here, the reason I put their name

22    in here as a transport.  They are a transport company

23    too.

24              THE COURT:  Okay.

25              THE WITNESS:  The reason I had them in here,
```

1      because of transportation.

2             THE COURT:  Okay.  Now, some of the middlemen

3      that you refer to, some of those middlemen companies

4      have their own trucks; is that correct?

5             THE WITNESS:  Yes, they do.

6             THE COURT:  So, if there was a middleman who

7      had its own truck, presumably that middleman would also

8      have a terminal access agreement; is that right?

9             THE WITNESS:  Yes.

10             THE COURT:  And so presumably, if there was a

11     middleman company that had its own trucks that had a

12     terminal access agreement, that middleman would have to

13     list your company, Western Convenience, as a customer?

14             THE WITNESS:  Correct.

15             THE COURT:  And in your understanding would

16     Suncor have the right to refuse to include Western

17     One -- Western Convenience as a customer on a terminal

18     access agreement?

19             THE WITNESS:  I don't know that question.

20     They have to answer that.  I don't know.

21             THE COURT:  Because what I'm looking at is

22     paragraph 9.  It says, If carrier wishes to add

23     customers then it shall provide a revised Schedule A to

24     Suncor in writing which shall replace the prior

25     Schedule A upon Suncor's consent.

1          So it comes -- am I reading this correctly?

2    Suncor has the ability to say that a transporter can't

3    deliver to a particular customer?

4               THE WITNESS:  Right.

5               THE COURT:  Okay.

6               THE WITNESS:  Right.

7               THE COURT:  Counsel.

8                    REDIRECT EXAMINATION

9    BY MR. BENNINGTON:

10   Q    Let's stay with that exhibit if you would,

11   Mr. Taraghi.

12   A    (Unintelligible).

13   Q    Note on the last page of that Exhibit A, that's

14   your signature, correct?

15   A    Is it Tab 1 or 2?

16   Q    It says Tab 1.

17              THE COURT:  It's the first exhibit.  It's what

18   we were just talking about, Mr. Taraghi.

19   A    Okay.  What page?

20   Q    (By Mr. Bennington)  The last one.  Exhibit A with

21   the handwriting, you said the trucking company.

22   A    Okay.

23   Q    Suncor didn't sign this, at least this copy.  Have

24   you ever seen a copy of it signed?

25   A    No, usually we sign and send it to them.

1    Q    And your -- and we are clear that these are not

2    customers of yours?

3    A    No, they're not my customer.

4    Q    Do you know who filled this form out that you

5    signed?

6    A    It looked like it was filled out -- this one was

7    filled out at my office.

8    Q    So if this --

9    A    As a transport.  This is like a transport, yeah.

10   Q    I understand --

11   A    Back up --

12   Q    -- that's your -- your interpretation of it.

13   A    Right.

14   Q    But did Suncor -- anybody from Suncor come to you

15   and say, oh, wait a minute, you filled out Exhibit A

16   wrong.  The wrong people are on there?

17   A    No.

18   Q    So you --

19   A    And we have the right one at the office too.  I can

20   find it for you.  Since then --

21   Q    All right.  Let's go to Exhibit 11, the

22   confirmation you were being asked about.  And this is

23   something you weren't asked about.  According to this --

24   go to the second page; that is, the back of the

25   agreement where the signatures are.

1    A    Yes.

2    Q    You see Chris Wehrle signs on behalf of your

3    company?

4    A    That's correct.

5    Q    And it's signed April 22nd?

6    A    That's correct.

7    Q    And somebody -- well, is it?

8    A    Steve Ewing, yeah.

9    Q    That's -- you recognize his signature.  He signs on

10   April 26?

11   A    Right.

12   Q    What's the period of time that this -- this

13   confirmation is supposed to cover?  Look on that first

14   page under term.

15   A    It says January 31, 2010.

16   Q    No.  No.  Look under paragraph 1, the word "term"

17   and follow over to the right.

18   A    It says February 1 through April 30th.

19   Q    When I asked you -- well, I'm not sure we covered

20   that.  Do you have an understanding as to whether these

21   confirmations were something negotiated ahead of time or

22   whether they're simply documents that were -- that

23   Suncor wanted later on?

24   A    Later on.  This one was signed later on.  We

25   already have it for like a month or two after.

1   Q    Now, Mr. Roberts [sic] kept referring to a discount

2   you heard about.  Let's be clear, did somebody admit to

3   this discount?

4   A    Yes.

5   Q    Who?

6   A    Steve Ewing.

7   Q    Does this discount have anything to do with --

8   did -- on May 26 when you had that meeting did this

9   discount have anything to do with your financial status?

10  A    Yes.

11  Q    What?

12  A    Because I sell 7.5 million multiplied by 10 cents

13  is $750,000 a month.  That's pretty simple.

14  Q    Mr. Roberts asked you about catastrophes, and you

15  had to admit a catastrophe effects everyone.  Do you

16  remember that?

17  A    Correct.

18  Q    But how, if any way, does it effect Western

19  differently in terms of why we're here today?

20  A    Because I'm unbranded.

21  Q    What does that mean?

22  A    I am treated differently than branded ones.

23  Q    How are you treated differently?

24  A    Because they -- same thing they did before, they

25  cut me off on Friday.  They don't do that to branded

1    people.  Branded is part of their alliances.  I am not

2    their alliances.

3    Q    So you're the bottom of the food chain?

4    A    I am the bottom of the food chain.

5    Q    And the catastrophe -- when was the last refinery

6    fire that affected you?

7    A    It was last year in August.

8    Q    Where?

9    A    In Cheyenne, Wyoming.  It's Frontier which supplies

10   the Denver, Colorado -- mainly Colorado.  It was pretty

11   bad.

12   Q    So if there's a refinery or some other dislocation

13   what are you saying that's going to happen in your

14   business?

15   A    Even with Suncor at that time I was struggling.

16   Q    Now, you were also -- you had to admit that other

17   -- the middlemen's trucks can come to Suncor's terminals

18   and pick up fuel and deliver it to your stores, right?

19   A    First of all, that's why I went to my -- can I

20   explain a little bit?

21   Q    Yeah, first of all, let me --

22   A    Okay.

23   Q    Okay.  I've got to walk you through this.

24   A    Go ahead.  Go ahead.

25   Q    I can't just turn you loose.  All right.  You admit

```
1    -- you have to -- you candidly agree that the

2    middlemen's trucks could come to Suncor, pick up fuel

3    and bring it to your stores?

4    A    Correct.

5    Q    Why don't you want to do that?  Why haven't you

6    done it?

7    A    Because that's why I went to my own trucking.  It's

8    just -- they ran up my -- they ran up my station,

9    because I am high volume stations.  They even refuse to

10   go more than sometimes twice.  I have a station sells

11   three loads a day.  They wouldn't go more than twice.

12   Q    How --

13   A    And then I would send them to different terminal,

14   they just don't like to go there, they are not carded

15   there.  There are a lot of things that -- I mean -- or

16   they say you have to call me a couple days ahead.

17   There's a lot of issues that I had.  My stations

18   constantly running out of the product.  That's why I

19   went to that business.  Believe me, that's not an easy

20   business to be in.

21   Q    Did price have anything to do with it as well as

22   this --

23   A    Originally I went because I tried to keep my

24   business efficient.

25   Q    Yeah.
```

1    A    But now, yes, I do a lot of price advantage for me

2    when I have my own trucking.

3              MR. BENNINGTON:  Nothing further, Your Honor.

4    Thank you.

5              THE COURT:  Any questions in light of mine?

6              MR. ROBERTSON:  No, Your Honor.

7              THE COURT:  Thank you, sir.  You can resume

8    your seat.

9              THE WITNESS:  Thank you.

10              THE COURT:  Thank you very much.

11              THE WITNESS:  Thank you.

12              THE COURT:  Counsel.

13              MR. BENNINGTON:  Chris Wehrle.

14              THE COURT:  Mr. Wehrle, come on up.  Sir, if

15    you'd have a seat.  Mr. Wehrle, if you'd raise your

16    right hand.

17              (Whereupon, the witness, Mr. Christopher

18    Wehrle, was sworn to tell the truth by the Court.)

19              THE COURT:  Please state your full name and

20    spell your last name, please.

21              THE WITNESS:  Christopher Wehrle, W-E-H-R-L-E.

22                       DIRECT EXAMINATION

23    BY MR. BENNINGTON:

24    Q    Mr. Wehrle, what is your job at Western Convenience

25    Stores?

1   A    I'm the fuel manager, so I do all the wholesale

2   fuel purchasing for our convenience stores and gas

3   stations.

4   Q    Translate that into what do you do every day that

5   the rest of us can understand?  What does that involve?

6   A    I -- I -- it starts usually, like, at night for the

7   next day from 6:00 p.m. to 6:00 p.m. is a lot of how it

8   works and I -- I gather all the prices from all the

9   suppliers, I organize it, and then we dispatch it with

10  our trucks according to where we have certain

11  allocations, locations of stores, and price of product.

12  We do that every day?

13  Q    Are you having a problem right now?

14  A    Yes.

15  Q    What is it?

16  A    It's supplying the stores at the best price.  For

17  example, today to just meet our volumes I have to go to

18  Scott City, Kansas and North Platte, Nebraska just to

19  keep our stores full.  I can't find it in here right

20  now.

21  Q    And when you say you have to go to Kansas, you mean

22  you have to send Western Truck One trucks --

23  A    Correct.

24  Q    -- empty and then come back full?

25  A    Correct.

1    Q    What does that add?  Just that little example, what

2    does that add to the price of a gallon of fuel by the

3    time you get it to the -- to your convenience store?

4    A    You know, it could be that 13 to 15 cents.  It

5    depends, you know, if it's Scott City or not.  But it's

6    typically about that much.

7    Q    Can your company survive if you've got to keep

8    doing this very long?

9    A    No.  It -- it would be difficult.

10   Q    Now, we've talked a lot about terminals, but it

11   would probably be helpful if we understood the mechanics

12   very briefly of how it works.  We know that there's a

13   truck and a driver.  Let's say he's a, you know, Western

14   Truck One driver.  Tell us what happens from the time he

15   shows up at the gate until he leaves with the fuel.

16   A    There's different terminals around the --

17   Q    Let's talk about Suncor terminals.

18   A    Okay.  Suncor in Commerce City here has an east

19   rack and a west rack.  Those are the terminals.  They

20   have two different places you can go in.  The driver

21   cards in -- and I've never been there specifically, I

22   just know the process.  But you card in, you wait in

23   line, you get up to a bay that they load your truck and

24   then you put in -- it's either a drop down menu or you

25   put in numbers for certain accounts and certain products

1    and the volumes you want.

2    Q    When you say --

3    A    They fill up and then they --

4    Q    Excuse me.  When you say card in, is that like an

5    ID card, an electronic identification card?

6    A    Yeah.  What a driver has to do -- the term carding

7    means, for any terminal they're going to -- if the

8    driver is new he'll have to go there and train to get

9    that card by the Suncor or whoever is doing it.  And

10   they usually have to go like three different times under

11   supervision to make sure they're following all the

12   rules.  After that time is done, they get their card and

13   then they can just show up there and, you know, getting

14   into a parking garage.

15   Q    So that's the first level of security is just

16   getting through the gate?

17   A    Right.

18   Q    Do you have an understanding as to whether Suncor

19   could stop access right there by just revoking someone's

20   card privileges?

21   A    Yes, they can.

22   Q    All right.  What's the next level of security or

23   the next level of authorization, let's say, to buy fuel

24   -- or sorry, take delivery?

25   A    They -- they control it.  They control everything.

122

1    They can control what -- if we're talking about our own

2    account, for example, they can say -- they control your

3    allocations.  When you go there, you can't take more

4    than they tell you you can take because it's all on a

5    computer.  If they say you can get two trucks today,

6    that's all you can get.  And if you try to take a third,

7    you shouldn't be able to get it.  They -- they control

8    that.

9            They control -- a lot of that third party

10   talk, they -- they control that with them too, but the

11   third party controls us.  We -- they tell us what we can

12   do.  It has nothing -- Suncor doesn't authorize us --

13   Q    We've got too many theys going on here.

14   A    I'm sorry.

15   Q    Let's back up.  When a third party, like a

16   middleman, goes to the Suncor terminal, they're pulling

17   fuel as you say, what happens next in terms of getting

18   it to you?

19   A    If they go pull it or if we pull on their account?

20   Q    If you pull -- if they go pull it.  The middleman

21   pulls it.

22   A    I -- in my two years with the company we haven't

23   used a middleman to pull and deliver for us.  We've

24   always used our own trucks.

25   Q    All right.

1    A     It would be the same procedure though on their own

2    account.

3    Q     Is there any way that you're aware of that Western

4    Convenience Stores and its related company, Western

5    Truck One, can send a truck to a Suncor terminal and

6    take delivery of fuel that Suncor has not approved?

7    A     The only -- if they turned it off in their systems

8    -- and I dealt directly with their suppliers.  He does

9    it all from a computer at the headquarters, and if he

10   says we can't pull they turn it off.  We can't pull.

11   They control it.

12   Q     Now, you heard the testimony of Mr. Taraghi.  As

13   far as he is aware of there is no financial burden on

14   Suncor imposed by your trucks' access to the terminals.

15   Is that consistent with your understanding?

16   A     Yes.

17            MR. ROBERTSON:  Objection, foundation.

18            THE COURT:  Yeah, why don't you lay a

19   foundation.

20   Q     (By Mr. Bennington)  You -- you direct the --

21   you're the one who tells the trucks to go there,

22   correct?

23   A     Correct.

24   Q     Do you ever get a bill -- or does Western

25   Convenience Stores ever get a separate bill for your

1    trucks using their terminals?

2    A    No.

3    Q    Have you developed an understanding in the years

4    you've been acting as the fuel buyer for Western where

5    the cost of running that terminal or using -- having all

6    the computers and, you know, terminal access, where the

7    cost of that is paid?  Have you developed that

8    understanding?  Yes or no?

9    A    Yes.

10   Q    How have you developed that understanding?

11   A    The only invoice -- or bills I receive from Suncor

12   for all the times we've been there is in a fuel invoice.

13   We don't get invoiced for a separate transaction that's

14   going into a terminal or something.  It's strictly fuel

15   invoices is what we pay them.  So, I assume it's built

16   into the fuel cost to cover that.

17   Q    Have you ever seen anything to give you any reason

18   to believe it's not built into the fuel costs?

19   A    No.

20        MR. ROBERTSON:  Objection, foundation.  He

21   still hasn't laid any foundation as to what Suncor's

22   costs are from these (unintelligible).

23        THE COURT:  That's not his question.  He

24   simply said have you ever seen anything that would

25   suggest, with an answer -- that could be answered with

1    yes or no.  If he says, yes, I have seen something then

2    I think you've got --

3              MR. ROBERTSON:  Got you.

4              THE COURT:  -- a legitimate line of inquiry.

5              MR. ROBERTSON:  Yes, Your Honor.

6              THE COURT:  But if he says no, I've never seen

7    anything, it seems to be pretty much a dead end.

8    Q    (By Mr. Bennington)  Are you familiar with the term

9    rateable business --

10   A    Yes.

11   Q    -- in your business?  What does rateable business

12   mean?

13   A    Rateable is a term that gets thrown a lot with the

14   refineries.  And it's very important to them because

15   they want rateable customers.  What it means is it's a

16   customer that they can count on to come to their

17   terminal or refinery and pull a certain amount of

18   gallons day in, day out, and it -- that makes you

19   rateable.  It's someone that's really consistent and is

20   always there and does what they say they're going to do

21   and pulls the product.

22   Q    In your experience do customers who are not

23   rateable, do they get treated differently?

24   A    Yes.

25   Q    How?

1    A    You don't -- well, you don't get as much supply.

2    You don't get -- it's get a credit lines -- like, what

3    you are if you're not rateable they see you as someone

4    that just comes in there and takes it when it's low and

5    disappears, and you're not a good customer of their's.

6    You're at the bottom of the food chain and it makes --

7    they don't like customers like that.  They

8    (unintelligible).

9    Q    With respect to Western Convenience Stores, was

10   Western Convenience Stores a rateable customer, as far

11   as you understood it, with Suncor before the termination

12   in May?

13   A    Yes.

14   Q    Was Western Convenience Stores a rateable customer

15   with anyone else up to that point?

16   A    No.

17   Q    Is there a reason for that?

18   A    Yeah.  Because we relied on Suncor for the majority

19   of our business.  So we'd go there for everything they'd

20   give us, and after that we'd have to pick and choose

21   wherever we could get gas.  So we weren't rateable at

22   those places, that just kept us full.

23   Q    Is Western Convenience Stores a rateable -- I'm

24   sorry.  Is Western Convenience Stores a rateable

25   customer provide rateable business for anybody else

1    since the termination in May?

2    A    With -- we've had to -- if I don't answer this

3    correctly, let me know.

4    Q    We'll tell you, don't worry.

5    A    I was -- um, when we were terminated in May it was

6    my job and it was very difficult to build relationships

7    with all these people I didn't have relationships with,

8    otherwise we were going to be done faster than we ever

9    imagined.  And I have had to negotiate anything I can

10   different, smaller contracts or whatever I could work in

11   a short time on a small line of credit with these

12   people.  So, yes, I've become rateable with other

13   suppliers by necessity.

14   Q    Have you become rateable to the extent you were

15   rateable with Suncor before the termination?

16   A    Not quite, no.  I -- I don't have the credit lines

17   with them yet, and they don't have the supply available

18   that Suncor was able to provide us.  So, no.

19   Q    How, if any, does the fact that you don't -- you

20   haven't built these rateable relationships, how, if any

21   way, does that make you vulnerable to dislocations in

22   the whole system, like weather, fires and stuff like

23   that?

24   A    It's -- it's detrimental.  Every day, even now,

25   even with these rateable relationships I have to go try

1    places to get product.  And there's no guarantee it's

2    there.  Every day I don't know if I'm going to get

3    through the day right now.  And if there's a fire or a

4    -- you know, something at a refinery like what we talked

5    about in August last year at Cheyenne -- and, yes, it

6    hurts everybody in this market, absolutely, but when you

7    were getting 60 percent of your supply from one supplier

8    it hurts everybody, but now we're hurt like everybody

9    else minus that 60 percent we used to get.

10          So that's the big picture here is where it

11   makes us very nervous.  It's that it's not every day

12   maybe we're not going to make it through, but it's --

13   those things happen overnight.  Something gets struck by

14   lightning and that would be it, when we're missing that

15   volume is what we're concerned about.

16   Q    Now, occasionally you would be put on allocation,

17   this is before the termination by Suncor.  Was that --

18   was that a circumstance or state of facts that Western

19   just had to accept?

20   A    Yes.

21   Q    Why were you willing to accept them?  How did you

22   deal with it?

23   A    You don't have a choice.  You get -- you get told

24   what you're going to get and then it's my job to go to

25   that guy and beg for more, ask for more, do whatever I

1    can to get more, and if -- they'll tell you what you can

2    get.  It's not a negotiation necessarily.  They tell you

3    that's what you're going to get, that's what you're

4    going to get.

5    Q    All right.  When -- when a day a particular day

6    came along you weren't going to get enough, or a

7    particular month, what arrangement did you have with

8    Suncor, if any, that would allow you to make up the

9    volume that they weren't going to sell you directly?

10   A    There was no other arrangement with Suncor directly

11   for me to do anything else.

12   Q    How about using the terminal, their terminal?  Did

13   that have anything to do with how you'd make up the

14   allocation?

15   A    Absolutely.

16   Q    Explain that.

17   A    Like an unbranded company like ours, when we go on

18   allocation they typically give the same allocations to

19   Sapp Brothers, Offen, Western, but those companies don't

20   necessarily do the volumes we do.  So when they put

21   everyone on allocation like that, we use our volume on

22   allocation, then we go use Sapp Brothers allocation at

23   Suncor, then we'd go over to Offen and you go down, you

24   know, the chain by price.  So oftentimes, when

25   everyone's on allocation they get the same amount as us,

1    but we get to use their's too.  We have to pay more, but

2    we get access to it.

3    Q    Did the Suncor people you were dealing with know

4    that you were going to their terminal to buy from

5    middlemen when -- when you were on allocation, as far as

6    you understood it?

7    A    Oh, yes.  Yes.

8              MR. ROBERTSON:  Objection, foundation.

9              THE COURT:  On what basis did you understand

10   that, Mr. Wehrle?

11             THE WITNESS:  What he's asking is, would

12   Suncor know if we're pulling on Sapp Brothers, Offen

13   account.  Yes, they do.  Because every time you lift a

14   load of gas there's a bill of lading that's produced.

15   And this is their own terminal.  In the bill of lading

16   it says who the transport company is and whose account

17   it was pulled on.  So they know instantly that -- it's

18   documented.  Every single load is documented like that.

19             MR. ROBERTSON:  I'll just withdraw the

20   objection.

21             THE COURT:  Okay.

22   Q    (By Mr. Bennington)  Did you regard your ability to

23   use terminals to buy from middlemen in circumstances as

24   a commitment that you had from Suncor?

25   A    I'm not sure I'm clear on that.  Was it for us --

1    was the ability for us to pull from them a commitment

2    from Suncor.

3    Q    Yeah?

4    A    By letting our trucks in, I guess that's the

5    commitment if that's what you mean.

6    Q    Did any -- did Ewing or Moss ever tell you we

7    understand you're on allocation, but you can go ahead

8    and use the terminals for middlemen?

9    A    Sure.  That's -- that's very common in this

10   business.

11   Q    Now, in April you had some dislocations on Fridays.

12   Would you describe what happened.

13   A    We would get either a phone call or an e-mail and

14   it'd just say at this time we have no allocation for you

15   this weekend.  Well, we'll talk next week and see what

16   we can do.  More or less.

17   Q    What happened -- first of all, what did that mean

18   to your business if that were to be -- to be the case?

19   A    It -- it kills you.  It -- you know, everyone

20   leaves their offices on Fridays in this business a lot

21   of them early, and by doing that they're putting you in

22   a situation to --

23   Q    "They" who's they?

24   A    I'm sorry, Suncor -- or in this instance Suncor,

25   that we might not be able to replace that supply we were

1    counting on.  It's too late in the day and no one works

2    on weekends.  So you've got to get it within that next

3    hour or two.  If it comes at 4 o'clock or something and

4    you get some people at their houses and see what they

5    can do just to replenish it.  But, these -- we started

6    by just trying to communicate back to Suncor saying, you

7    know, please help us.

8    Q    Did you ever have an understanding as to why this

9    was happening?

10   A    No.

11   Q    What is your belief?  Well, never mind.  You

12   answered that question.

13        By April and this time period in which these

14   Friday occurrences were happening, was -- were you aware

15   of a ongoing, let's call it a dispute between Western

16   and Suncor over a 10 percent price differential?

17        MR. ROBERTSON:  Objection leading.

18        THE COURT:  Objection is overruled.  The

19   question was were you aware.

20        THE WITNESS:  Yes.

21        THE COURT:  Go ahead.

22   Q    (By Mr. Bennington)  How were you aware of anything

23   about this price differential?

24   A    I heard it from -- Steve Moss told us.  This is

25   before Steve -- I never really even had a discussion

1    with Steve Ewing before that meeting, but Steve Moss.

2    And it was -- I talk to suppliers every day.  It's a

3    very relationship-based business.  I also heard it from

4    a gentleman at Offen Petroleum saying it.  And he also

5    said -- I think, like, their attorney said that Conoco

6    was doing it so, you know, I heard that from him.  And

7    it's a gossip thing.  He said Suncor is also doing it,

8    you know, I know that.  And they have branded stores

9    too, so they're aware of it.  It's just a communication

10   thing.  But Steve Moss --

11   Q    Well, let's --

12   A    -- also mentioned it to us.

13   Q    All right.  Let's focus on Suncor and Moss in

14   particular.  Did he offer it to Western or did he give

15   you any explanation?

16   A    He didn't offer it to us and as our own branded rep

17   he said, you know, if it seems like it's going to

18   continue on for some time I'll do my best to try to get

19   it for you.

20   Q    Did he offer you any explanation just what -- or

21   justification as to why other people, other companies

22   were getting it but not you?

23   A    No.

24   Q    I want to focus on the May 18th meeting.  You were

25   there, correct?

1    A     Yes.

2    Q     Who set up the May 18th, meeting?

3    A     I did.

4    Q     And who was your contact at Suncor?

5    A     Steve Moss.

6    Q     What was your understanding of the purpose of that

7    meeting?

8    A     When we were getting these previous Friday

9    shutoffs, I got to e-mailing back and forth with Steve

10   Ewing just saying, come on let's -- what's going on

11   here, and he'd write stuff back.  And eventually I just

12   said to him we can't communicate this way.  I've been

13   trying to meet with you for so long, you know, you've

14   been in this position.  Let's get together and sit down

15   and figure this all out.  So it had to do with, you

16   know, shutoffs, supply, we were hoping to get in there

17   for a contract and credit, I'm assuming.  That was not

18   my part of the business, but I know that the financials

19   were sent and so those would be discussed too.

20   Q     Did Mr. Ewing ever tell you that the problems you

21   were having were because of some perception on his part

22   of Western's financials?

23   A     No.

24   Q     Was there a discussion of credit terms?

25   A     The way it was approached in the meeting was -- I'm

1    sorry, I (unintelligible) her name.

2    Q    Diane Kriskovich?

3    A    Diane had the financials and she sat down and

4    initiated the meeting and just said I'm new here, or

5    she'd been there a month, she came from another part of

6    the industry and is not familiar with how the

7    convenience store business is run.  And we were there to

8    help educate her and answer her questions on the

9    financials.  And --

10    Q    That -- go ahead.

11    A    That's what we did.  So that's how it started.  And

12    she asked us questions, we answered them, and --

13    Q    In the context of this discussion about the

14    company's financials, did Ewing or Moss say and we're

15    cutting off your credit or we're cutting you off, or

16    anything like that?

17    A    No.  No.  It was -- questions were answered and how

18    the business was explained and -- for Diane.  And the

19    meeting was very cordial.  When we walked out of it, you

20    know, Steve Ewing was explaining to her it is -- it's a

21    very tough environment in retail and all of this.  And

22    everything was discussed.  And towards the end of the

23    meeting -- I mean, it was cordial.  It sounded like they

24    do understand our business and, you know, we'll get

25    through this.

1          And at the end of the meeting Steve Ewing and

2     Doug Veginar (phonetic) I think you say his name, left,

3     and we sat there a lot longer and talked with Diane and

4     Steve Moss, Hossein and I.  And he said let's -- what

5     can we do?  Let's -- you know, let's just look at

6     options in case it comes down to something.  And we just

7     talked about -- that's where collateral came up.  They

8     said, you want to pay cash?  We said no.  We like our

9     ten-day terms.  You know, if you had to have collateral

10    we want our credit line where it is.  If -- if you've

11    got to move it we'll listen, but we'll give you

12    collateral to keep it where it is.  Whatever we can do

13    we want to keep our business relationship with you, and

14    we stressed that very strongly Diane and Steve.  We said

15    it was important to us.

16         And at that point the meeting ended and they

17    said we're going to go over everything and sit down

18    together and we'll let you know what we come up with in

19    a couple days.

20    Q    During the meeting, did the 10-cent price

21    differential come up?

22    A    Yes.

23    Q    As much as you can recall in detail, who raised

24    that and what was the discussion?

25    A    I don't know who brought it up, but it was brought

1   up that are we ever going to get this, and it -- they're

2   like we can't do it.  You know, we don't -- you know,

3   they said we don't like giving the discount either, but

4   we've got to keep our people happy more or less.  So,

5   no, we're trying to -- you know they more or less said,

6   you know, no you're not -- it wasn't a long discussion.

7   We asked for it every time we ever talked to them.  It's

8   my job too.  It's like, hey can I get a discount, can I

9   get a discount.  It happens every day.  We did it, our

10  job asked for it there and it didn't happen.

11  Q    You mentioned -- well, you didn't mention.  Were

12  you aware that there were some pick-up -- some loads of

13  fuel picked up after this dispute arose?

14  A    Um --

15  Q    Picked up at the Suncor terminal, at a Suncor

16  terminal?

17  A    For the -- from after that meeting?  I'm sorry.

18  Q    After -- after their credit terms had been cut off

19  and Mr. Taraghi decided not to authorize any more funds

20  transfers, were you aware that there were truckloads of

21  Suncor fuel, nonetheless, picked up?

22  A    I was aware from -- they said you guys can get gas

23  until 6 o'clock Monday and I was aware that it was -- I

24  think they gave us four or five trucks a day.  It wasn't

25  an open go get whatever you want.  They were on

1    allocation at that time.  They were having refinery

2    issues, so I am aware that they authorized us to go do

3    that and we did it.

4            MR. BENNINGTON:  No further questions for

5    Mr. Wehrle at the moment.

6            THE COURT:  Go ahead.  Cross.

7                    CROSS-EXAMINATION

8    BY MR. ROBERTSON:

9    Q    Sir?

10   A    Hi.

11   Q    You just mentioned that my client told you at the

12   May 18th meeting that they could -- you could continue

13   to pick up gasoline over the following weekend?  Is that

14   right, sir?

15   A    No, that's incorrect.  They didn't tell us anything

16   about that at the meeting.  It was after they made a

17   decision.

18   Q    They called you on the phone and told you you could

19   continue to pick it up; right, sir?

20   A    Right.

21   Q    They didn't tell you you could get it for free, did

22   they?  Did they?

23   A    I'm sorry, no.  They didn't tell us we could get it

24   for free.

25   Q    Now, you mentioned that there was -- you mentioned

1   Conoco, is that, you know, ConocoPhillips?

2   A    Yes.

3   Q    And you knew that ConocoPhillips had been offering

4   a 10-cent discount; right, sir?

5   A    Right.

6   Q    And you knew that Suncor followed that discount

7   with its branded customers; correct, sir?

8   A    I'm not sure the order, but I know that they were

9   matching each other, sure.

10  Q    And when ConocoPhillips stopped offering discounts

11  then so did my client, right?

12  A    I don't know.

13  Q    Didn't you see that in the marketplace?

14  A    I don't do retail.  I'm a wholesale buyer, so I

15  don't see that in the marketplace.

16  Q    Did you -- did you see there at the rack when the

17  announcements were made when the discounts were going to

18  be?

19  A    No, you can't see that at the rack.  These are

20  off-sheet discounts.  When you see it at the rack

21  they're always the same.  You can never see it.  It's

22  secret.

23  Q    When you became aware that ConocoPhillips was

24  offering a discount did you go and talk to my client and

25  ask them to give the same discount?

140

1    A    Yes.

2    Q    Did there ever come a time in the past year when

3    ConocoPhillips ceased giving that discount?

4    A    I don't know.

5    Q    To your knowledge, no; is that right?

6    A    That -- is it my knowledge that they've stopped

7    giving the discount?

8    Q    Yes, sir.  Did they ever stop at any time?

9    A    Yeah.  I believe so.

10   Q    And you mentioned the way it works at the terminal

11   or the middleman comes there and they have a card and

12   they can get through the gate and go up to the terminal;

13   right, sir?

14   A    Yes.

15   Q    And you've been on a terminal, right?

16   A    No.  Well, I've been to one, not Suncor's, excuse

17   me.

18   Q    You've been to one terminal?

19   A    Right.

20   Q    So you really can't tell us how it works at all the

21   terminals; is that fair?

22   A    Not really.  I could tell you how it works because

23   I have to talk to all the terminal --

24   Q    Is that --

25   A    -- operators.

1    Q    Sir, you've been to one terminal, right?

2    A    Yes.

3    Q    And which terminal was that?

4    A    Rocky Mountain Pipeline, the Fountain terminal.

5    Q    All right.  Is that one of my client's terminals?

6    A    They sell product there, yes.

7    Q    Okay.  And you mentioned that the way it works, you

8    watched how it worked there?

9    A    Yeah.  Yes.

10   Q    And when the middleman with the truck goes in there

11   and they use the card to get in the gate, they then have

12   to put into the pump system, there's a display there,

13   they have to put in who the fuel was for; correct, sir?

14   A    You have to put in who the fuel is from.  When you

15   card in they know who the fuel is for.

16   Q    And so, for example, if they're buying for Western

17   Convenience Store then they have to put that in the

18   machine by dragging the card across?  Is that how it

19   works?

20   A    If -- who's "they" that's buying for Western?

21   Q    The middleman with the truck.  I'm a middleman, I'm

22   a truck, I'm at the terminal and I'm picking up for

23   Western Convenience Store.

24   A    They don't pick up for Western Convenience Stores.

25   We -- we pick it up from them.

1    Q    All right.  Let's go back to the time when you had

2    Western Truck One.  Now, you don't actually manage

3    Western Truck One, correct?

4    A    No.

5    Q    Who does that?

6    A    Shaheen Taraghi, Mr. Taraghi's son.

7    Q    Okay.  And when -- when they went in there with

8    their trucks to pick up for you, or for anybody, they

9    have to tell the machine for whom they are picking up

10   fuel; correct, sir?

11   A    When they're going in the terminal?

12   Q    Yes, sir.

13   A    No.  You don't have to tell who you're going to buy

14   from.

15   Q    How did my client know who to -- who to send the

16   invoice to?  Do you know?

17   A    That's after they get into the rack.  We have

18   certain numbers and certain destination codes, so you

19   pick an exact petro X number, say, whether you're taking

20   it to Nebraska or Colorado.  After you load that it

21   generates a bill of lading, and the bill of lading gets

22   sent to Suncor's accounting department.  The accounting

23   department then bills whoever's account we pulled off at

24   that point.  So if it was Sapp Brothers, Sapp Brothers

25   gets that invoice.  We get all the bill of ladings

1    ourselves.

2    Q    And so, for example, if Western Convenience Store

3    today had the right to go on my client's property to

4    pick up fuel for Western Convenience Store that they

5    would have to tell on the console there at the rack that

6    they are picking up for Western Convenience Store, so

7    Western Convenience Store can get a bill; right, sir?

8    A    Correct.

9    Q    And when Western Convenience Store were to get a

10   bill, as of today, if the court allowed Western

11   Convenience Store trucks to pick up -- or pardon me,

12   Western Truck One to pick up for Western Convenience

13   Store, the bill would go to you, sir?

14   A    If -- if we were authorized to load on Western

15   Convenience's account, which we're not.  What we're

16   trying to get access to is third-party carriers.

17   Q    Sir, answer my question.

18   A    I'm -- can you clarify it for me then?

19   Q    No.  No, sir.  Please follow my question and answer

20   my question.  If Western -- if Western Truck One is

21   picking up for Western Convenience Store they put on the

22   rack that they are picking up a certain volume for

23   Western Convenience Store; do they not?

24   A    That is correct, yes.

25   Q    And at that point you get the bill?

1    A    That's right.

2    Q    You, Mr. Wehrle?

3    A    Well, our company, yes.  I don't personally.

4    Q    Now, you mentioned this price differential that you

5    saw with ConocoPhillips.  ConocoPhillips, that's branded

6    gas; right, sir?

7    A    They have branded and unbranded gas.

8    Q    The discount that you're talking about though is

9    only for branded, correct?

10   A    I believe so.

11   Q    And you know that Offen also picks up for

12   unbranded, right?

13   A    Yes.

14   Q    And they don't get the discount either; do they

15   sir?  To your knowledge?

16   A    I don't know what they get.

17   Q    Do you know of anybody who is unbranded who is

18   getting this 10-cent discount?

19   A    I'm not aware of who -- these discounts aren't

20   published.

21   Q    I just want to know --

22   A    I -- I --

23   Q    -- what you know.

24   A    I don't know of any --

25   Q    Thank you.

145

1    A    -- other companies --

2    Q    That's all I need to know.  That's all I need to

3    know.  Okay.  Now, in terms of branded gas and unbranded

4    gas, you do know that the -- that those two types of

5    gasoline, branded gasoline and unbranded gasoline are

6    not chemically identical, correct?

7    A    I don't.

8    Q    Do you know what additive chemicals are put into

9    each one?

10   A    I don't.

11   Q    When you buy gasoline for your convenience stores

12   do you put an additive package of chemicals in there?

13   A    No, but on the bill of ladings that we've pulled

14   from these terminals where there is unbranded and

15   branded it comes out at the same tank, and there are

16   additives that have been showed on our bill of ladings.

17   Q    And ConocoPhillips has their own additives;

18   correct, sir?

19   A    Yes.

20   Q    And when you buy unbranded gasoline you don't get

21   the ConocoPhillips chemicals in your gasoline, do you?

22   A    I'd have to look at the bill of ladings because I

23   do believe we do sometimes, and we --

24   Q    Have you ever --

25   A    And it shows additives on the bill of ladings.  We

1    did review that.

2    Q    And you do know that if you buy, for whatever

3    reason, branded gasoline you cannot sell it at an

4    unbranded gas station; correct, sir?

5    A    Um, that would be up to the branded customer.  We

6    can sell branded gas -- if a branded customer wants to

7    sell me a load of branded gas I can sell it at my

8    stores.  If you're branded with someone like Suncor or

9    Conoco and you sell somebody else's gas you are

10   breaching an agreement.  When you're unbranded and

11   independent you can put whatever company's gas, branded

12   unbranded or different, in your station.

13   Q    And Shell also has an additive package; right, sir?

14   A    Yeah, I believe so.

15   Q    You don't know?  Do you know if they do or not?

16   A    They advertise that they do.

17   Q    Now, since you've been there Western Convenience

18   Stores has bought only unbranded gasoline from Suncor;

19   correct, sir?

20   A    That's correct.

21   Q    And you do not buy Phillips 66 gasoline from

22   Suncor?  Never have, right sir?

23   A    Not since I've been there, no.

24   Q    Is that correct?

25   A    Yes, correct.

1    Q    And you don't buy Conoco, right, sir, from Suncor?

2    Never have, right, sir?

3    A    Awe --

4    Q    To your knowledge?

5    A    I don't buy Conoco from Suncor, but I buy Conoco.

6    Q    From Suncor, that was my question.

7    A    No, I don't.

8    Q    Is that correct, you --

9    A    Correct.

10   Q    All right.  And is it true that Suncor has separate

11   rack postings for unbranded and branded fuel?

12   A    Yes.

13   Q    And when you pay for the gasoline when you were

14   buying from Suncor you were paying based on a discount

15   off of the unbranded price; correct, sir?

16   A    That's correct.

17   Q    And when you go and buy unbranded gasoline from

18   other terminals besides Suncor, which you've been since

19   you've been there; right, sir?

20   A    Yes.

21   Q    When you do that, you haven't received this 10-cent

22   discount from any other terminal; have you, sir?  For

23   unbranded fuel?

24   A    Yes, I have received discounts.  Not -- it wasn't

25   10 cents during that time, but I receive additional

1    discounts.

2    Q    Have you received a 10-cent discount from any other

3    terminal for unbranded fuel, yes or no?

4    A    No.

5    Q    Now, you mentioned there could be a fire, and you

6    heard Mr. Taraghi mention there had been a fire in

7    Cheyenne.  Remember that?

8    A    Yes.

9    Q    And you're still in business, right?

10   A    Yes.

11   Q    And back on May 18th when you were told that you

12   could buy prepay, why did you choose not to do it?

13   A    It's -- it wasn't good business for us to do it

14   that way.  It would be a poor business decision that's

15   why we chose not to.

16   Q    Whose decision was it not to buy COD or prepay?

17   A    Mr. Taraghi's.

18   Q    Now, you said, sir, that you set up the meeting for

19   May 18th; right, sir?

20   A    Right.

21   Q    And when you set up that meeting on May 18th did

22   you say that Mr. Ewing never mentioned to you that there

23   was an issue with credit?

24   A    They -- they had -- once they got the financials

25   when we set the meeting I never -- Hossein may have

1    talked to Mr. Ewing, he didn't tell me anything.  I

2    don't talk -- I didn't talk with Mr. Ewing.  That was

3    between those two.  I talked to Steve Moss.

4    Q    Didn't Mr. Ewing send you an e-mail to set up the

5    meeting where he told you that they were going to

6    discuss a new confirmation contract and credit?

7    A    Possibly.  I mean, that confirmation we have been

8    trying to get a contract, yes, in place for -- for --

9    Q    You testified here earlier that -- that Mr. Ewing

10   never mentioned this credit issue for the May 18th

11   meeting.  Could you be mistaken?

12   A    I don't know.  It sounds like what you said, he

13   said we were going to discuss credit in that e-mail.

14   That doesn't --

15   Q    Would it refresh your recollection to look at an

16   e-mail that you got back at the time?

17   A    Sure.

18        MR. ROBERTSON:  Your Honor, may I approach the

19   witness?

20        THE COURT:  Yes.

21   Q    (By Mr. Robertson)  Sir, turn, please, to page 2 of

22   an e-mail that I've marked as JTX-17, bottom of the

23   page, page 2.  And look at the e-mail from Mr. Ewing to

24   yourself dated May 6th, 2011.  And when you've had a

25   chance to look at it let me know if that refreshes your

1    recollection about what Mr. Ewing had told you.  Tell me

2    when you're done, please, sir.

3    A    Am I just reading this bottom one?

4    Q    Page 2, bottom e-mail from Mr. Ewing.

5    A    Okay.

6    Q    Do you see where he says a fully executed contract

7    containing signatures?

8    A    Yeah.  Yeah.

9    Q    From --

10   A    I've read it.  So what's your question is it's --

11   Q    Yeah, does this refresh your recollection that

12   Mr. Ewing told you that for the meeting they were going

13   to discuss the contract that you were negotiating at the

14   time and a credit review?

15   A    That's what I said, we were going to discuss credit

16   in it.  You said they were going to discuss credit

17   issues.  All I said was they were going discuss --

18   there's nothing that says there's a credit issue in

19   here.  That's what you -- the question we were having a

20   problem with.  I did say that they were going to be

21   discussing credit.

22   Q    You knew that the purpose of the meeting was to

23   discuss credit; right, sir?

24   A    Sure.

25   Q    And you knew that when you got there that

1    Ms. Kriskovich was going to be there; right, sir?

2    A    Yes.

3    Q    Correct?

4    A    Yes.

5    Q    And in fact she led the meeting, right?

6    A    Yes, she led it all.

7    Q    And she is the credit manager; right, sir?

8    A    Right.

9    Q    She doesn't have anything to do with buying or

10   selling gasoline to your knowledge; does she, sir?

11   A    No.

12   Q    Is that correct?

13   A    That's correct.

14   Q    Now, after you had the meeting, it is true that you

15   thanked Mr. Ewing for setting up the meeting to discuss

16   credit with Ms. Kriskovich, right?

17   A    Among other things, yes.

18   Q    And the other things were about the retail

19   environment and how tough it's been out there over the

20   last several months, right?

21   A    That was another part of it.

22   Q    And you appreciated the fact that you could give

23   the credit department a firsthand knowledge of the way

24   your company worked; right, sir?

25   A    Yes, we were -- good to talk to her and tell her --

1    answer her questions on our business.

2    Q    Is that correct?

3    A    Yeah.

4    Q    Now, you've been there for a little over two years;

5    correct, sir?

6    A    That's correct.

7    Q    And you did understand after going through the

8    meeting with Ms. Kriskovich that there were issues with

9    your financials?

10   A    I -- from what she said -- and I don't do any of

11   the financials, and I never have reviewed any of the

12   financials, so I prefer not to answer any questions on

13   it, other than I was there and she asked questions about

14   the overall functionality of the company.  I don't know

15   any of the numbers.

16   Q    Were you aware that the company had lost over

17   $3 million, Western Convenience Stores, last year?

18   A    No.

19   Q    Was that mentioned at the meeting?

20   A    No.

21   Q    Now, sir, you do know that the -- my client decided

22   not to offer any further credit to Western Convenience

23   Stores; correct, sir?

24   A    Correct.

25   Q    And you do understand how one decides whether to

 1    offer someone credit; don't you, sir.

 2    A    No, I don't know your -- I don't know the processes

 3    and I don't what factors --

 4    Q    Haven't you spent most of your career evaluating

 5    whether people should get credit?

 6    A    I haven't, no.

 7    Q    Were you a loan originator at a Bachus lending

 8    corporation?

 9    A    I was a loan broker.  I didn't underwrite any of

10    the loans, I just processed the information.

11    Q    Is it true that -- that you purchased from all

12    major refineries and wholesalers in the Denver and

13    Nebraska markets?

14    A    Yes.

15    Q    And you also bring in product via pipeline from

16    outside the area; don't you, sir?

17    A    Yes.

18    Q    And all of your gasoline stations that you manage

19    at Western Convenience Stores, they're all unbranded;

20    correct, sir?

21    A    Correct.

22    Q    Now, when a truck goes in -- and you were

23    describing how the terminal works, and they pick up on

24    behalf of a customer like Western Convenience Store or

25    somebody else and they pick up too much product, then

1    that can create a problem for my client; right, sir?

2    A    I --

3    Q    Do you know?

4    A    I don't know that.  I mean, I don't think it's --

5    Q    Have you ever seen an occasion where you've had

6    over -- overfills or overdraws at the -- at the

7    terminal?

8    A    To the best of my knowledge on this it's called

9    skullying (phonetic) out and it's controlled to get

10   stopped before that happens.  So it can't happen

11   without -- there's -- there's protective measures put in

12   there at every terminal, which I'm guessing is

13   regulated.  And again --

14   Q    You've only seen one?

15   A    -- I'm not an expert at the terminal.

16   Q    You've only seen one.

17   A    That's right.

18   Q    So at the one you saw --

19   A    Because I've not -- I'm just saying that there's a

20   term called skullying out, the terminals would contact

21   us.  Because that means that you -- a little too much

22   went in there and so they write you up.  I'm sure Suncor

23   would have any documentation if we had any of that

24   happen.  I don't know.

25   Q    All right, sir.  Now, since this has all happened,

1    back on this meeting May 18th and what's happened since

2    then, you continue to buy gasoline from other providers;

3    right, sir?

4    A    Correct.

5    Q    And not only inside the state but also outside the

6    state through pipelines; right, sir?

7    A    Through terminals outside the state.  We haven't

8    done any pipelines stuff since --

9    Q    And what other states do you get this product from?

10   A    Nebraska, Kansas, and Utah.

11   Q    And you're still selling gasoline, as much gasoline

12   as anybody wants to buy at all of these stations; right,

13   sir?

14   A    Yes.

15   Q    Now, what -- one of the things you were discussing

16   at this meeting on the 18th was, as you can see from the

17   e-mail that -- that refreshed your memory, was a new

18   confirmation contract; right, sir?

19   A    Yes.

20   Q    Is that correct?

21   A    Yes, we've been -- we were always --

22   Q    Turn -- turn to your book, please, sir at Tab

23   No. 11.  Now, Tab No. 11 is a confirmation of purchase

24   sale agreement that you signed; right, sir?

25   A    Yes.

1    Q    And you signed on behalf of Western Convenience

2    Stores; right, sir?

3    A    Right.

4    Q    And the truck part of the business, the Western

5    Truck One, they don't ever buy or sell any gasoline from

6    my client?  Never have; right, sir?  To your knowledge?

7    A    We buy from Suncor all the time.

8    Q    No.  The truck line?

9    A    Oh, you're asking about the trucks?

10   Q    Yes, just the trucks.

11   A    No, they don't buy the gas, they transport the gas.

12   Q    It's Western Convenience Stores when they were

13   buying it -- it was the stores that were buying --

14   Western Convenience Stores were buying from my client;

15   right, sir?

16   A    That's right.

17   Q    And they were buying during this time period up

18   through April 30th, 2011 under the terms that are listed

19   here on Exhibit No. 11; correct, sir?

20   A    I don't know if we got all that product.  The

21   contracts -- you know, if Suncor has troubles they'll

22   cut you back.  This is no guarantee of product, but they

23   like to document it.  I mean, as you can see we had an

24   agreement, we talked about it, and then they sent this

25   over via an e-mail three months later after the contract

1    started and we signed it just to make it official.  I

2    mean, it was -- this was never -- I didn't see this

3    until probably about April 20th, and the contract

4    started February 1st.

5    Q    Was that the price that you paid for the gasoline,

6    sir?

7    A    Yes, that's the --

8    Q    Just yes or no.

9    A    -- price, yeah.

10   Q    Okay.  And after this date ran out, April 30th,

11   2011, you were in the process of negotiating with my

12   client for a new contract; right, sir?

13   A    He -- the way happened is --

14   Q    Just answer my question yes or no.

15   A    I got a contract in e-mail that they ended up

16   honoring and --

17   Q    That was for one --

18   A    -- I think it's right here in --

19   Q    -- one month?

20   A    What's that?

21   Q    It goes for one month?

22   A    Yeah, (unintelligible) for a month.  We were trying

23   to -- and then the negotiations, what we wanted was a

24   12-month contract, but up until that meeting Steve

25   Ewing -- part of why he's saying you're cut off, you

1      don't have a contract, I produced an e-mail from Steve

2      Moss saying you're going to get this much.  So he agreed

3      and was, like, the next time we've got to have it in

4      writing.  That's the way I'm doing business now.  Before

5      I'll -- I'm going to take this this time.  And I think

6      that's the contract we were on up until the meeting.

7      And that's where we wanted to lock in a long-term

8      contract.

9      Q    And my client asked you, Mr. Ewing asked you that

10     we needed to get it in writing from you; right, sir?

11     A    He said moving forward we've got to do it this way.

12     It's not like the old way where -- you know, we don't

13     want to do just contracts on our word like we used to

14     prior to my time there.

15     Q    And he told you as part of that process you needed

16     to do a credit review; correct, sir?  That's what he

17     told you in the e-mail we just looked at a few moments

18     ago?

19     A    Yeah.  Yeah, every refinery of every company does a

20     credit review every year.  Every other refinery we work

21     with did the same thing this last year.  Everyone does.

22     Every year they've got to see your financials.  It's

23     normal.

24     Q    Were you also aware, sir, that there was a discount

25     offered over by Sinclair for branded gasoline?

1    A    No, I was not aware.

2    Q    You pick up gasoline over at Sinclair; right, sir?

3    A    Yes.

4    Q    And you buy from Sinclair today; right, sir?

5    A    I don't know if I'm buying from them.  Today I

6    don't think I'm buying from them, but I buy from them

7    sometimes.

8    Q    And where do you buy your gasoline today?

9    A    Today I am buying it from Scott City off of Bromart

10   and Shell.  I'm in North Platte buying it from Conoco,

11   Bromart and Frontier.  And Denver I'm buying some from

12   Conoco, some from Shell, some from Frontier, and then

13   I'm going to buy some from Sapp Brothers.  Hopefully,

14   they can give me a couple to get me through the rest of

15   the day.  That's the plan.  Now, the plan doesn't always

16   work, but that's what I'm planning.

17   Q    All right, sir.  And the fuel that you use up in

18   Grand Junction, where you buying that from today?

19   A    That's coming from Denver, probably HollyFrontier

20   will supply that.

21   Q    And their -- are there other gas stations up there

22   besides just Suncor gas stations and Western Convenience

23   Stores?

24   A    Yeah, I'm sure there are.  Again, I don't do

25   retail.

1    Q    And --

2    A    I don't know -- I don't do the retail pricing to

3    know who my competition is (unintelligible).

4    Q    You do know that other gas stations in Grand

5    Junction are shipping or trucking their gasoline from

6    Denver up there; don't you, sir?

7    A    I don't.

8    Q    Don't --

9    A    I don't know how they run their business.

10   Q    What about all the customers that Western Truck One

11   have?  Are they taking any gasoline up there for other

12   stores besides Western Convenience Stores?

13   A    We don't have any other customers.  We only supply

14   our own stores.

15   Q    If you turn back to Tab No. 2, sir, and look at the

16   last page -- Tab 1, sir.  Tab 1, last page.

17   A    The section 2?

18   Q    Yes, sir, Schedule A.

19        THE COURT:  Tab 1 last page.

20   Q    (By Mr. Robertson)  Do you know who Senex is?

21        THE COURT:  Hold on.  He's not there yet.

22   Q    (By Mr. Robertson)  Tab 1, the last page.

23        THE COURT:  Tab 1.  The very last page of

24   Tab 1.  It's Schedule A.

25   Q    (By Mr. Robertson)  I'm sorry, sir.  Just let me

1        know when you're there.

2                    THE COURT:  There you go.  Right there.

3        Q    (By Mr. Robertson)  Do you know who Senex is, sir?

4        A    Yes.

5        Q    Who's Senex?

6        A    We use them for freight.

7        Q    And where do they send their gasoline to?

8        A    I don't have no idea where they -- what do you

9        mean?  Their gasoline, I don't -- I don't know where

10       they buy their gasoline and send it.  They have their

11       own stores.

12       Q    And Corey Transport, same thing, they send gasoline

13       all across the state?

14       A    I -- I don't know.  These guys -- these people --

15       here's how a terminal is set up and --

16       Q    Sir?

17       A    -- I can clear this up.

18       Q    Sir?  Sir?

19                   THE COURT:  No.  No.  Just answer his

20       questions.

21                   THE WITNESS:  Okay.

22                   THE COURT:  Your client's counsel can come

23       back and ask follow-up questions.

24                   THE WITNESS:  Sure.

25                   THE COURT:  Just answer his questions.

1          THE WITNESS:  Okay.  Sorry.  Can you ask it

2     again.

3     Q    (By Mr. Robertson)  Now, sir, do you know where

4     DATS Trucking takes its fuel for customers they have?

5     A    No, sir.

6     Q    How about Harp and Wilco?

7     A    No, sir.

8     Q    Now, sir, as you sit here today you can't tell us

9     that any other unbranded gas stations are getting this

10    10-cent discount that you've discussed; is that correct?

11    A    No, I can't tell you.

12    Q    You don't have any idea, right?

13    A    I don't.

14    Q    Is it true that your gas stations are generally

15    charging a lower price than branded gas stations?

16    A    I don't know that.  I don't do the retail.

17    Q    You don't keep track of it?

18    A    No.

19    Q    Do you price off of what the other branded stations

20    are charging?

21    A    No.  The retail people --

22    Q    Sir.  Sir, please.

23         THE COURT:  No.  Counsel.  Counsel.

24         MR. ROBERTSON:  I'm sorry.

25         THE COURT:  He has said by my calculation at

1   least three times that he doesn't get involved in

2   retail.

3            MR. ROBERTSON:  All right.

4            THE COURT:  This horse has been beaten so

5   badly that you truly do need to move on.

6            MR. ROBERTSON:  All right, sir.  Thank you,

7   Your Honor.

8   Q    (By Mr. Robertson)  Sir, in terms of your job, you

9   buy and sell gasoline.  Do you do anything else other

10  than that?

11  A    For Western Convenience?

12  Q    Yes, sir.

13  A    I just buy the gasoline, I don't -- I don't sell

14  it.

15  Q    Okay.  All right.  As far as you know today, as we

16  sit here today, you can buy all the gasoline that your

17  company, Western Convenience Stores, needs today;

18  correct, sir?

19  A    I can't answer that until the end of the day

20  because I don't know.

21  Q    I said as you sit here today you can; right, sir?

22  A    No, I can't.  I just told you.

23           THE COURT:  Well, no.  Basically, I think what

24  you mean to say, as you sit here at this precise moment

25  in time.

1        MR. ROBERTSON:  Yes.

2        THE COURT:  Because he says I don't know

3   what's going to happen this afternoon.  He doesn't even

4   know if he's going to get off the witness stand this

5   afternoon.

6   Q    (By Mr. Robertson)  How about I give you something

7   that's a little clearer, and I apologize for not being

8   clearer.  How about yesterday?  Were you able to buy the

9   gasoline you needed yesterday?

10  A    Yes.

11  Q    And every day from yesterday all the way back to

12  May you were able to get the gasoline that your stores

13  needed; correct, sir?

14  A    For the most part.  We've had stores run out, but

15  not for an extended period of time.  We've been able to

16  get a truck there to get them back up and going.

17       MR. ROBERTSON:  Thank you, sir.  I have no

18  more questions at this time, Your Honor.

19       MR. BENNINGTON:  I will make this fast, judge.

20       THE COURT:  That's okay.

21       MR. BENNINGTON:  I know we're past lunch,

22  so --

23                    REDIRECT EXAMINATION

24  BY MR. BENNINGTON:

25  Q    I just want to ask you about billing for gas

1    purchased from middlemen.  If you were to get access, if

2    Western Truck One was going to -- were to get access

3    tomorrow to the Suncor terminals to buy from, let's say,

4    Sapp Brothers, who's going to get -- who is Suncor going

5    to bill for that load of gasoline?

6    A    Sapp Brothers.

7    Q    On whose -- well, you didn't answer the question.

8    Sapp Brothers is depending on your credit not -- not

9    Suncor, correct?

10   A    Correct.

11   Q    Exhibit 11, that confirmation, up until the time of

12   the -- that Western was or -- yeah, that Western was cut

13   off, were these confirmations -- did you need to

14   negotiate and ink these confirmations in order to keep

15   buying gasoline from Suncor?

16   A    No.

17            MR. BENNINGTON:  No further questions.

18            THE COURT:  Mr. Wehrle, I do have a few

19   questions.

20            THE WITNESS:  Okay.

21            THE COURT:  You need to help me, because

22   earlier on direct examination you had indicated that you

23   were sending trucks to Nebraska and Kansas, and that you

24   said based upon sending trucks to Nebraska and Kansas to

25   pick up fuel, that that was costing you or Western

1    Convenience an additional 13 to 15 cents.  I think

2    that's what you said per gallon.  So, if I understand

3    correctly what you were saying is when you sent a

4    Western Truck One to Kansas or Nebraska to pick up fuel

5    at a refinery or a terminal there, that increased the

6    cost of that gas by 13 to 15 cents a gallon?

7              THE WITNESS:  That's correct.

8              THE COURT:  Now, I'm assuming that when

9    Mr. Taraghi asks you to get fuel, he wants you to get

10   the fuel at the best price possible.  Would that be a

11   fair assumption?

12             THE WITNESS:  That's fair.

13             THE COURT:  Now, to the extent that sending a

14   Western Truck One vehicle to Nebraska would add 13 to 15

15   cents, what would it cost if you, for instance, used a

16   Sapp Brothers vehicle to pick up fuel at Commerce City

17   and bring that fuel to your store?  What would that

18   incremental cost increase be?

19             THE WITNESS:  It depends on the store's

20   location, but part of the reason I'm going there too is

21   the price per gallon in Scott City is 13 cents less than

22   here.

23             THE COURT:  Okay.  But, I mean, in other

24   words --

25             THE WITNESS:  So, it's --

1          THE COURT:  -- at the end of the day --

2          THE WITNESS:  I'm trying -- yes, sir.

3          THE COURT:  At the end of the day what you've

4    got is you've got a number of factors that you have to

5    weigh in; where you're getting the fuel from; what's the

6    price per gallon that that particular facility is

7    charging; and then you have to increase or include

8    within your price computation or your cost computation

9    the cost of using Western Truck One vehicles.  Do you

10   ever do a price calculation based upon not using Western

11   One -- Western One trucks or is that -- you absolutely

12   have to use Western One trucks --

13         THE WITNESS:  We use other --

14         THE COURT:  -- that's just a given?

15         THE WITNESS:  We've used other trucks.  It's

16   really a logistical complication.

17         THE COURT:  Sure.

18         THE WITNESS:  Because, like Mr. Taraghi said,

19   there's some stores that just constantly have to be fed,

20   and trucks break down all the time.  And what we do is

21   we -- we do calculate that and we do use third-party

22   carriers, but to run your business as efficiently as

23   possible any time you can avoid that you're going to be

24   more successful.  So to calculate that it would be

25   different for every store.  You know, if it was a Grand

1    Junction store we have to pay more.  If it's a store in

2    Thornton, it's less.

3              THE COURT:  But -- but -- but if it was -- if

4    a decision was made that it was economically better on a

5    per-gallon basis to use someone else's truck you'd go

6    ahead and do that, wouldn't you?  I mean, you wouldn't

7    incur additional cost just for the sake of using your

8    own truck?

9              THE WITNESS:  Right.

10             THE COURT:  Okay.

11             THE WITNESS:  Yes.  I --

12             THE COURT:  So -- so, it's not -- in other

13   words, it's not a given that in every transaction,

14   regardless of the refinery, regardless of the terminal,

15   you're always going to use a Western Truck One vehicle

16   if it makes more economic sense to use somebody else?

17             THE WITNESS:  And they can logistically

18   accomplish what we need to, yeah.

19             THE COURT:  Meet your need.  In other words,

20   if a middleman with their own truck can meet your need

21   at a better price you'd go ahead and use the middleman

22   truck.

23             THE WITNESS:  I would, certainly.  If it makes

24   sense, yeah.

25             THE COURT:  And have you ever done a breakdown

1    on over a month basis or a week basis to determine the

2    price differential between using a middlemen truck or a

3    Western One truck?  Have you ever calculated that on an

4    average basis?

5         THE WITNESS:  I think Mr. Taraghi and his son

6    probably have but, again, I don't run the trucking

7    business.

8         THE COURT:  Right.  So, you --

9         THE WITNESS:  But I think they --

10        THE COURT:  You don't know?

11        THE WITNESS:  They know the costs.

12        THE COURT:  But, in other words, but when you

13   decide -- but you're the one that decides what terminal

14   to utilize or what provider to utilize.  Do you do that

15   calculation to figure it out or does Mr. Taraghi just

16   expect you as an automatic course to use a Western Truck

17   One vehicle?

18        THE WITNESS:  Here's kind of how I do it every

19   night.

20        THE COURT:  Okay.

21        THE WITNESS:  To clear it up.

22        THE COURT:  Sure.

23        THE WITNESS:  I break it out by region.  I do

24   Denver, Colorado Springs, Scott City, Cheyenne -- or

25   Cheyenne, Wyoming; Salt Lake City, Utah; and North

1    Platte, Nebraska; and Sydney, Nebraska.  All of those

2    can regionally help our stores.

3            THE COURT:  All right.

4            THE WITNESS:  I get prices from all of the

5    suppliers every night at each of those terminals, and

6    then I put out a list of the top five prices and maybe

7    what allocations are there.  When you're unbranded and I

8    don't have contracts, the allocations aren't guaranteed

9    to be there, so --

10           THE COURT:  No, I understand.

11           THE WITNESS:  So I list an order at each

12   terminal, because you're going to go there, you're not

13   going to get No. 1, you might not get No. 2, you might

14   get 3.

15           THE COURT:  Sure.

16           THE WITNESS:  So I do that for each region.

17   And then what I do -- the dispatch people that actually

18   dispatch the trucks, while I'm doing that they're

19   looking at all the tanks in the stores.  They can see

20   that on their computer and they're deciding where we

21   need the trucks to go.

22           THE COURT:  Right.

23           THE WITNESS:  And we keep trucks in the south,

24   we keep trucks in Denver, and we have a truck in Grand

25   Junction.

1          THE COURT:  But when you say "we" you mean

2     West --

3          THE WITNESS:  Western Convenience Stores, our

4     Western Truck One.

5          THE COURT:  Western Convenience.  You have

6     your own trucks.

7          THE WITNESS:  Correct.  So every night I give

8     this list to the dispatch, I have no idea where they're

9     sending the trucks.

10          THE COURT:  Well, I know, but, see --

11          THE WITNESS:  But they're --

12          THE COURT:  -- I'm now confused because I

13     thought you used Western Truck One vehicle.

14          THE WITNESS:  Yes, that's correct.  That

15     dispatches -- I'm referring to Western Truck One.  I

16     give them the best price gas from 1 to 5 at every

17     terminal that we have access to -- or every city.

18          THE COURT:  Sure.

19          THE WITNESS:  And they take that and then they

20     dispatch it for --

21          THE COURT:  Yeah, but what I'm saying though

22     is when you factor in the best price, that's the best

23     price that the terminal is offering.  So it's

24     theoretically possible that if it costs 13 cents extra

25     to send a West Truck One vehicle to Nebraska, it's

1    theoretically possible that it would be actually cheaper

2    to use a middleman truck in Commerce City.  You would

3    get the gas net to you on a cheaper basis than sending a

4    West Truck One all the way out to Nebraska.

5             THE WITNESS:  It depends.  We have stores in

6    Nebraska.  We have stores in northern Colorado.

7    Logistically it makes sense to go to Nebraska if it's

8    cheaper.  There's a lot of --

9             THE COURT:  Yeah, but see my point though is

10   see, if -- I think we need to -- I appreciate that,

11   you've got stores everywhere.

12            THE WITNESS:  Yeah.

13            THE COURT:  And I understand that there may be

14   stores, Western Convenience Stores that are

15   geographically closer to Nebraska than they would be to,

16   say, Denver.  On that basis it would make more sense to

17   send a truck on the border of Nebraska and Colorado to a

18   refinery in Nebraska than it would be to send a truck

19   all the way to Denver.  That makes sense, doesn't it?

20            THE WITNESS:  Here's kind of -- there's a lot

21   to -- I'll --

22            THE COURT:  Yeah.  But, see, my --

23            THE WITNESS:  I'll just give you an example.

24            THE COURT:  Here's my point, though.

25            THE WITNESS:  I do understand, but there's --

1    THE COURT:  No, here's my point though.  The

2    injunction that plaintiff is seeking is an injunction

3    that would require middlemen -- it would require me to

4    order that trucks in Denver, Western Truck One vehicles

5    be allowed to go to a refinery here in Commerce City to

6    purchase gas that was on the account of a middleman.

7    That's what this injunction asks me to do.  But if it

8    would still be cheaper to sent a truck to Nebraska, how

9    is that injunctive relief going to help you?  Because if

10   the --

11   THE WITNESS:  Well --

12   THE COURT:  -- if the Nebraska refinery is

13   closer to the Colorado store --

14   THE WITNESS:  That's -- maybe --

15   THE COURT:  -- you're not going to send a

16   truck all the way to Denver, are you?

17   THE WITNESS:  It could change tomorrow.  What

18   I'm --

19   THE COURT:  I understand.

20   THE WITNESS:  Here's what I'm trying to say.

21   THE COURT:  All sorts of things could happen

22   tomorrow.

23   THE WITNESS:  There's a lot --

24   THE COURT:  But, see --

25   THE WITNESS:  These things are --

1          THE COURT:  See, my problem is this.  The

2     example that your lawyer asked was it adds 13 cents or

3     15 cents to send a vehicle to Nebraska.  But if that

4     store that you're servicing is actually closer to

5     Nebraska, how is this injunction or this proposed

6     injunction going to help your company, because you're

7     still -- it's still going to be cheaper to go to

8     Nebraska.

9          THE WITNESS:  No, the prices change and

10    fluctuate by market all the time and I wouldn't send

11    them to Nebraska --

12         THE COURT:  I know but --

13         THE WITNESS:  -- if I could --

14         THE COURT:  But the problem I've got is for me

15    to recommend -- because that's all I can do, for me to

16    recommend an injunction there has to be substantial

17    likelihood of imminent harm.  And it doesn't really help

18    me when you say prices change all the time.  Because how

19    does that demonstrate imminent harm?

20         THE WITNESS:  Here, the reason -- whether it's

21    even close that we have to go there right now is because

22    the gallons we are able to get in Denver we have to keep

23    in Denver just to stay full with it.  If I could keep

24    everyone in Denver -- and take price out of it, it's

25    imminent harm, I understand.  I want to take price out

1    of this is what -- what I'm saying is, it's necessary to

2    get through the day to get gallons from the outside.

3    It's not --

4              THE COURT:  But -- but my point, though is --

5    I agree from a supply standpoint.  From a supply

6    standpoint it may be necessary to go outside of the

7    Denver area because you can't get fuel from Suncor.  I'm

8    trying to understand your counsel's question that it

9    costs more money because you have to go someplace, which

10   logically would make sense.  The longer your empty truck

11   stays on the road before it gets filled it increases

12   costs.  But I just want to focus on this question

13   because it seems to me, in theory at least, whether you

14   get gas in Colorado or you get gas in Kansas, you always

15   have the choice of what vehicle to use to get the gas.

16   And it sounds to me that your -- your general

17   presumption is, we're always going to use West Truck One

18   vehicles.

19             Now, does it -- would it necessarily make

20   sense to use a West One vehicle with those incremental

21   additional costs if you could use a middleman's own

22   truck -- and you've testified, that many of the

23   middlemen you use do in fact have their own vehicles.

24   Has anybody priced the differential for using a

25   middleman's vehicle versus a West Truck One vehicle?

1   Because you obviously want the gas at the cheapest price

2   because that maximizes your profit.  Has anybody done

3   any research to determine whether or not, ironically,

4   it's actually more expensive to use a West Truck One?

5            THE WITNESS:  I don't want to answer that, but

6   I believe they've researched the trucking company --

7            THE COURT:  Sir -- sir, I certainly don't want

8   to ask you a question you can't answer.

9            THE WITNESS:  Yeah, I -- I have not been --

10   we've priced out -- I know we have a list from other

11   freight carriers that give pricing for certain --

12            THE COURT:  But -- but --

13            THE WITNESS:  -- jurisdictions.

14            THE COURT:  -- you don't factor that into your

15   analysis, you simply look for the refinery price.

16            THE WITNESS:  Correct.

17            THE COURT:  And then you trust the West One

18   Truck dispatcher to decide what to do.

19            THE WITNESS:  Hossein and -- they --

20            THE COURT:  So -- so, it sounds like --

21            THE WITNESS:  They -- they make the logistics

22   to be most cost effective for that.

23            THE COURT:  So -- so, what you're telling me

24   is Western Convenience looks for the cheapest refinery

25   price and then they delegate ultimate choice to West

1    Truck One to decide where to send the vehicle?

2              THE WITNESS:  We look for the best price.  I

3    don't -- supply is the issue that we don't know if it's

4    there.

5              THE COURT:  Yeah.  But your best price is

6    simply price at the refinery, not price as delivered to

7    the store?

8              THE WITNESS:  My job, yes.  Exactly.

9              THE COURT:  Any questions in light of mine?

10                   REDIRECT EXAMINATION

11   BY MR. BENNINGTON:

12   Q    Mr. Wehrle, the fuel that you had to buy today from

13   Kansas, is that for stores in Nebraska or stores in

14   Denver, Colorado?

15   A    It would be southern Colorado.  There's a couple

16   stores right on that Kansas/Colorado border.

17   Q    So today's issue is supplying stores that are much

18   closer to that Nebraska terminal than Denver?

19   A    Um, they bring some of that back into Denver even

20   just because we have -- we have a small amount available

21   to us, so if there's a way to spread it out and just get

22   through it then we try our best to --

23   Q    Have you had to purchase since May of this year?

24   Have you had to go outside of the state to buy gas or

25   fuel to supply stores in Colorado because you couldn't

1    buy fuel in Colorado?

2    A    Yes.

3    Q    And is it because you couldn't buy the fuel in

4    Colorado because you did not have access to the Suncor

5    terminal?

6    A    I believe it would have helped if we had access to

7    there to -- to purchase.

8              THE COURT:  Counsel, very quickly.

9              MR. ROBERTSON:  Yes, Your Honor, just briefly.

10                        CROSS-EXAMINATION

11   BY MR. ROBERTSON:

12   Q    Truth is, sir, that you were buying gasoline in

13   Nebraska and Kansas before last night; correct, sir?

14   Just answer yes or no.

15   A    For -- well, it's going to --

16   Q    Just answer yes or no.

17   A    Did we buy a Nebraska product for Nebraska?

18   Q    Did you buy gasoline for Western Convenience Stores

19   in Nebraska -- I'll do it one at a time, in Nebraska

20   prior to May of this year?  Yes or no?

21   A    Yes.

22   Q    And did you buy in Kansas before May of this year?

23   Yes or no?

24   A    Yes.

25   Q    Okay.  If you were to buy from a middleman, whoever

1    these people are, at Suncor do you have any idea what

2    the price is that that middleman is going to buy the

3    gasoline from my client for?

4    A    Yes, I could guess.

5    Q    You can guess?  All right.

6    A    Typically, the middlemen mark everything up a penny

7    or something, depending on their supply availability.

8    Q    And you don't know what kind of discounts they get,

9    if any; correct, sir?

10   A    No, I -- I don't.

11   Q    And whatever discounts they get, would they pass

12   those along to you or maybe not?

13   A    Maybe not.

14            MR. ROBERTSON:  That's all I have, Your Honor.

15            THE COURT:  All right.  Sir, Mr. Wehrle, I

16   appreciate it.  It sounds like you're going to have a

17   busy afternoon.  We'll be in recess and I propose to

18   resume at 1:30 if that works for you all.  But you tell

19   me.  I mean, I don't want anybody to cut their lunch

20   short, but I don't have any sense of how much you've got

21   for this afternoon, so tell me what works for you all.

22            MR. BENNINGTON:  I've got no more witnesses.

23            THE COURT:  You've got how many?

24            MR. BENNINGTON:  I have no more witnesses.

25            THE COURT:  Okay.

```
 1                MR. BENNINGTON:  So we're going to start with
 2       their case after lunch and --
 3                THE COURT:  How many witnesses do you have?
 4                MR. ROBERTSON:  At most, one, Your Honor.  I
 5       have to talk to my client and see if I even need to do
 6       that.  But I can tell you right after lunch.
 7                THE COURT:  All right.  Well, why don't we do
 8       this.  It sounds like we're going to have more time.
 9       Why don't we pick up back here at 1:45.  That gives you
10       a little bit more time for lunch a little more time for
11       caucusing.  Thank you.
12                MR. BENNINGTON:  Thank you.
13                MR. ROBERTSON:  Yes, Your Honor.
14                THE COURTROOM DEPUTY:  All rise.
15                (Whereupon, there was a break taken from
16       12:45 p.m. to 1:55 p.m.)
17                THE COURTROOM DEPUTY:  All rise.
18                THE COURT:  Please everyone, I'm sorry but I
19       had a search warrant I had to -- please have a seat.
20       All right.  We are back on the record.  And before we
21       begin I want to -- if I'm laboring under a factual
22       misunderstanding I want to correct that misunderstanding
23       now.  I was under the impression that after May 20, and
24       as matters currently stand, while Western wholesale and
25       West -- well, Western Convenience and Western Truck One
```

1    they cannot go onto Suncor property.  Western

2    Convenience can purchase fuel through a middleman as

3    long as the middleman does the delivery.  Is that a

4    correct statement?

5              MR. ROBERTSON:  Yes, Your Honor.

6              THE COURT:  Are we all in agreement?

7              MR. BENNINGTON:  Yeah.

8              THE COURT:  With just that fact.  I understand

9    there's very little you agree on, but --

10             MR. BENNINGTON:  Yes.  If implicit in that

11   fact is that the middlemen are drawing -- are drawing

12   from Suncor or somewhere else, yes.

13             THE COURT:  Yeah, but in other words -- in

14   other words, if, say, for instance the refineries that

15   are located in Commerce City --

16             MR. BENNINGTON:  Yes.

17             THE COURT:  -- Western Convenience could call

18   up one of -- like, for instance, Sapp Brothers.  And

19   they could say we will buy fuel from you for delivery to

20   our stores.  Sapp Brothers could then purchase fuel from

21   the Suncor refineries in Commerce City and deliver that

22   fuel as long as it was delivered in some vehicle other

23   than a Western Truck One vehicle?

24             MR. ROBERTSON:  That's correct, Your Honor.

25             MR. BENNINGTON:  That's correct.  And, Your

1    Honor, that was the substance of questioning that you --

2              THE COURT:  Right.  Yeah.

3              MR. BENNINGTON:  -- were engaging with

4    Mr. Wehrle.  And he said he didn't know, so he couldn't

5    answer that question.  I would like to call Mr. Taraghi

6    to address that subject.

7              THE COURT:  I have no problem with that.

8              MR. BENNINGTON:  I don't want to go back over

9    stuff, but --

10             THE COURT:  No, I know.

11             MR. BENNINGTON:  But he can explain it.

12             THE COURT:  Let's not -- let's not rehash over

13   old ground but, yeah, in light of my comments if you

14   want to recall Mr. Taraghi to clarify the record, you

15   certainly can do that.

16             Mr. Taraghi, I'll remind you you're still

17   under oath.  Please, counsel.

18                   REDIRECT EXAMINATION

19   BY MR. BENNINGTON:

20   Q    Mr. Taraghi, you just heard this exchange.  It is

21   theoretically possible that Western could have -- ask

22   Sapp Brothers to send Sapp Brothers' trucks to the

23   Suncor terminals and deliver Suncor gasoline to Western

24   Convenience Store's outlets.  Is that true?

25   A    Not consistently.

1    Q    Okay.

2    A    It's not true.

3    Q    But it is possible theoretically.  In other words,

4    you can do it --

5    A    You can't do it.

6    Q    -- but there's reasons you don't do it?

7    A    You cannot do it.

8    Q    All right.  Would you explain why --

9    A    Sure.

10   Q    -- that cannot be done in real life?

11   A    First of all, we have our own trucking and the

12   other trucking companies, when you have trucking they

13   know when you give them a load when you need them, and

14   that they don't like.  They want to have some consistent

15   basis to hire and to do load for you.  And the same

16   thing with the middlemen's are the same thing.  And we

17   are not that consistent on that area.  For that reason,

18   if you call right now and say, middleman, I need three

19   loads of gasoline from Suncor.  Would you pull it for

20   me?  They might say yes, they might say no.  There is no

21   100 percent answer in there.

22          THE COURT:  And I understand, Mr. Taraghi, but

23   I also am under the impression that there is that same

24   degree of uncertainty even if you were pulling it and

25   putting it in your own trucks.  Because as you indicated

1    on direct examination, and as the master purchase

2    agreement seems to indicate, there is no guarantee that

3    if you called up today and said I want 100,000 gallons

4    that Suncor would give you 100,000 gallons.

5         So to some extent I hear what you're saying,

6    and I -- and I'm inclined to accept your representation

7    that if you use a middleman for delivery there may be

8    some uncertainties and some contingencies, but even the

9    business relationship you had with Suncor prior to

10   May 18 was replete with uncertainties and contingencies.

11   All we've done is redefine.

12        In fact, one could argue that the injunction

13   you're seeking puts you in a better position that you

14   were in prior to May 18th, because it would eliminate

15   one -- one contingency because --

16        THE WITNESS:  May I add?

17        THE COURT:  Sure.

18        THE WITNESS:  They double my inconsistency.

19        THE COURT:  How?

20        THE WITNESS:  How, because you're asking the

21   freight from middlemen and also product from Suncor.

22        THE COURT:  Right.

23        THE WITNESS:  There is inconsistency in Suncor

24   product and inconsistency in their freight.  Now you're

25   asking for two inconsistency.  When I'm using my truck I

1     have one inconsistency.

2            THE COURT:  Well, I guess.  But, see, I

3     raised -- I raised this question because in response to

4     your counsel's direct examination there was some sense

5     that you have no choice but to go to Nebraska and incur

6     additional transportation costs.  And I'm not sure

7     that's an absolute as the questioning seemed to imply;

8     we have no choice but to go to Nebraska, which costs us

9     15 cents more a gallon.  I think there is, in fact, a

10    choice.

11           THE WITNESS:  I can explain that too.

12           THE COURT:  Sure.

13           THE WITNESS:  When I get to the point -- for

14    example, today I don't -- I need three loads.  I can

15    call middleman, they can't do it.  And I can't go there

16    to get it, and I have no choice to go to Nebraska to get

17    it.  Sometimes price are okay, sometimes prices aren't

18    okay.  Well, I'm not going to let my station run out.

19    Whatever the price is I am paying to go to Nebraska or

20    Kansas to pull that product and bring it.

21           THE COURT:  I guess, but before you -- before

22    somebody makes that call, Mr. Taraghi, I'm trying to

23    understand the process.  So let's say -- for instance,

24    you always have a choice to use your truck to drive to

25    Nebraska, I readily concede that, but before you send

1    your truck down the road empty towards Nebraska do you

2    make it a standard practice to call the middleman and

3    say look, if I need fuel for this store, can you

4    guarantee me delivery today?

5              THE WITNESS:  Yes, I will.

6              THE COURT:  And if the middleman says, yes, I

7    can does it still make sense to send the same truck to

8    Nebraska?

9              THE WITNESS:  No, we don't.  We don't send

10   that (unintelligible).

11             THE COURT:  So -- so what -- you're agreeing

12   with me --

13             THE WITNESS:  Yes, I am.

14             THE COURT:  -- that you do in fact have

15   options that you can explore on a store-by-store

16   shipment-by-shipment basis thereby eliminating the need

17   for an absolute injunction which is what you're seeking

18   here.  The injunction you are seeking would basically

19   say, regardless of the economic realities, always allow

20   my trucks onto the Suncor property.  And what you're

21   saying is it's not always a fixed guarantee that the

22   middleman can't meet delivery on your schedule.  There's

23   just that element of uncertainty.  But before you send a

24   truck to Nebraska you -- you tell me, apparently, that

25   you will call the middleman.

1           THE WITNESS:  You will -- we call him.  Sure.

2           THE COURT:  And you will find out if the

3    middleman can in fact guarantee shipment at the store

4    you want on the day you need it.

5           THE WITNESS:  Right.  But that's --

6           MR. BENNINGTON:  If I may.

7           THE WITNESS:  -- in our model though.

8    Q    (By Mr. Bennington)  Is there a difference, though,

9    between the middleman telling you, no, I don't have a

10   truck to send you, as opposed to, yeah, I've got fuel at

11   the Suncor terminal, but my own fleet is too busy taking

12   care of my own station?  Is that the problem?

13   A    That's what they tell me all the time.

14          THE COURT:  Well, I guess, gentlemen --

15          MR. BENNINGTON:  And so what we're asking

16   for --

17          THE WITNESS:  When I ask that question they

18   tell me that, yeah.

19          MR. BENNINGTON:  -- Your Honor, is access to

20   buy the middleman's gasoline that he's too busy to take

21   to our station.

22          THE COURT:  Well, I understand, and that's

23   probably a better issue for argument.

24          MR. BENNINGTON:  Yes.

25          THE COURT:  I don't know if we need to have

1    Mr. Taraghi on the witness stand for that.

2              MR. BENNINGTON:  Oh, okay.

3              THE COURT:  No.  No.  You're doing exactly the

4    right thing, but --

5              MR. BENNINGTON:  We should do it later.

6              THE COURT:  He may be more comfortable sitting

7    on the hard wooden bench.  Do you have any further

8    questions?

9              MR. BENNINGTON:  Nothing from me.

10             THE COURT:  Anything?

11             MR. ROBERTSON:  Yes, Your Honor.

12             THE COURT:  The operative word here is brief.

13             MR. ROBERTSON:  Yes, sir.

14             THE COURT:  Quick.  Go.

15             MR. ROBERTSON:  Quick.

16                       RECROSS-EXAMINATION

17   BY MR. ROBERTSON:

18   Q    If the court were to grant the injunction, sir, and

19   you send a WTO truck --

20   A    I have a hard time understanding, sir.

21   Q    Oh, I'm sorry.  I'll speak up louder.  If the court

22   were to grant an injunction allowing a Western Truck One

23   truck onto Suncor's property -- are you with me so far?

24   A    Yes.

25   Q    And then they would then pick up for a middleman;

1     right, sir?

2     A     Yes.

3     Q     And that middleman would be paying for the gasoline

4     from Suncor on their credit?

5     A     Correct.

6     Q     And then you have to, in turn, then go buy from the

7     middleman; correct, sir?

8     A     Correct.

9     Q     And as you sit here today do you know if any

10    middlemen have ever approached Suncor at all to buy

11    gasoline for you, for Western Convenience Stores?

12    A     Yes.  Always.

13    Q     Sir?

14    A     They have done it always.  We always buy from

15    middleman.

16    Q     Has anybody any middleman bought for you at -- at

17    Suncor terminals?

18    A     I'm not understanding your question.  Let me see if

19    I -- can I re --

20    Q     No, sir.  Let me try it.  Try one --

21    A     Okay.  Try it.

22          MR. ROBERTSON:  I'll tell you what, Your

23    Honor, I think we've got the point here.  I don't need

24    to belabor it.  I'm finished.

25          THE COURT:  Let me -- Mr. Taraghi, again, I'm

1    just trying to figure out -- because I can appreciate as

2    a businessman why you would want certainty.  Every

3    businessman wants certainty.  And the injunction you are

4    asking me to recommend to Judge Krieger is an injunction

5    that would basically say that until this case is over,

6    however long that may last, your trucks; that is, the

7    Western Truck One vehicles, would have an absolute right

8    to go on Suncor refinery property or terminal property

9    to obtain or pull shipments on behalf of middlemen.

10   That's what you're asking me to do?

11            THE WITNESS:  That's correct.

12            THE COURT:  And you would want me to impose

13   this injunctive relief for as long as it takes for this

14   case to be concluded, whether that's a year or two years

15   or six months; is that right?

16            THE WITNESS:  That's correct.

17            THE COURT:  Isn't that seeking a better deal

18   than Western Truck One had before?  Because under the --

19   under Exhibit 1, the terminal access agreement, as I

20   read paragraph 4, paragraph 4 says any permission of

21   access may be revoked immediately.

22            So, the injunction you are seeking is not,

23   arguably, to maintain the status quo.

24            THE WITNESS:  (Unintelligible).

25            THE COURT:  So the status quo -- once I enter

 1    an injunction you have an absolute right to go on on

 2    behalf of middlemen and Suncor would lose any right to

 3    revoke that status.  That's a better deal than you

 4    currently had.

 5              THE WITNESS:  I don't want a better deal.  All

 6    I want --

 7              THE COURT:  But -- but --

 8              THE WITNESS:  I want to go --

 9              THE COURT:  See, what I'm saying, Mr. Taraghi,

10    if I enter -- if Judge Krieger enters an order that says

11    for as long this case lasts you have an absolute right

12    to go on there, that is a better deal because that would

13    effectively eliminate Suncor's right, contractually, to

14    revoke.  It's not maintaining the status quo.

15              THE WITNESS:  Can I make --

16              THE COURT:  I mean it would seem on its face,

17    counsel.  Because right now the master terminal

18    agreement conveys rights to both sides.  The injunction

19    you are seeking conveys more rights.

20              MR. BENNINGTON:  I'm prepared to argue that,

21    but do you want to do it now?

22              THE COURT:  No, but maybe you can help me with

23    that one, Mr. Taraghi.  And I'm asking as a factual

24    basis.  I don't want to intrude on your counsel's

25    argument.

1           THE WITNESS:  Sure.  I just have the same

2     right that other trucking company has to go to that

3     place.  Now, I do not want any special treatment.

4           THE COURT:  But if the evidence were to show

5     that other trucking companies have the same -- or face

6     the same right of immediate revocation, you're not

7     asking what other trucking companies have.

8           THE WITNESS:  If it's -- if they've been

9     discriminated --

10          THE COURT:  No.  The word discriminate --

11    Mr. Taraghi, the agreement -- the agreement that was

12    entered into with Western Truck says that the right of

13    access may be revoked immediately without cause as a

14    matter of right.  And so, if all -- if what you're

15    saying is I want to have the same status as any other

16    trucking company, I'm assuming that this terminal access

17    agreement is a fairly standard uniform agreement.

18          THE WITNESS:  But there have to be cause

19    though.

20          THE COURT:  No.

21          THE WITNESS:  There is no cause.

22          THE COURT:  No.  The agreement, sir --

23          THE WITNESS:  I understand --

24          THE COURT:  -- says specifically without

25    cause.

1           THE WITNESS:  I agree with that.  I am not --
2     I don't know anything about the law, but I'm just saying
3     that they are just cutting Western Truck One because of
4     Western Convenience's store.  They are two different
5     companies.  I just don't understand why that company has
6     to suffer --
7           THE COURT:  Well --
8           THE WITNESS:  -- because of this company.
9           THE COURT:  And don't misunderstand me.  I'm
10    not suggesting that's an unreasonable question.  But
11    when you tell me that you want to be put in the exact
12    same position as every other trucking company, if every
13    other trucking company has this same terminal access
14    agreement, and if every other trucking company can lose
15    access immediately without any showing of cause, then
16    the injunction that your lawyer is seeking on your
17    behalf actually puts you in a better position than any
18    other trucking company.  In fact, one might argue it
19    gives you a competitive advantage.
20          THE WITNESS:  As I said, that's not what we --
21          THE COURT:  Maybe we are bordering on
22    argument.
23          THE WITNESS:  I don't know.
24          THE COURT:  Okay.  Mr. Taraghi, you can have a
25    seat --

194

1           THE WITNESS:  Thank you.

2           THE COURT:  -- back in the -- but, sir --

3           THE WITNESS:  Yes.

4           THE COURT:  -- you're a client representative.

5      I mean, your colleagues may feel uncomfortable sitting

6      on those hard benches, if you want to sit here in a more

7      comfortable seat, you're welcome to do that.

8           THE WITNESS:  Oh, thank you.

9           THE COURT:  Absolutely.  Any additional

10     witnesses that the plaintiff would like to present?

11          MR. BENNINGTON:  No, Your Honor, thank you.

12          THE COURT:  I'll hear from defense counsel and

13     defendant's witnesses.

14          MR. ROBERTSON:  No, Your Honor, we're not

15     going to call any witnesses either, and -- at this point

16     and --

17          THE COURT:  I'm happy to hear argument then.

18          MR. ROBERTSON:  All right, sir.

19          THE COURT:  But, again, so the record is

20     clear, gentlemen, my records show that over the course

21     of this hearing I have admitted Exhibits 2, 11, 1, 5.

22     There's been a reference to, but no one has moved to

23     admit the document used to refresh recollection that's

24     JXT-17.  So, right now the only exhibits admitted would

25     be those.  But if somebody wants to move the admission

 1    of some or others I'm happy to consider that right now.

 2    But right now the records show, without some further

 3    offer, those are the only exhibits that are before the

 4    court.

 5           Obviously, the exhibits that you attached to

 6    your briefing are part of the court file and I certainly

 7    have every right to consider those.  But before we close

 8    the evidence and hear argument I just want to reiterate,

 9    that's what I show as admitted from this notebook.

10           MR. BENNINGTON:  And that's what my records

11    show too.  You know Mr. Roberts didn't offer 17 and it's

12    probably because it wasn't on the list and I

13    appreciated --

14           THE COURT:  Well, no, he didn't offer it

15    because it was only used to refresh recollection.

16           MR. BENNINGTON:  I know.

17           THE COURT:  So --

18           MR. BENNINGTON:  But it wasn't disclosed in

19    the list.

20           THE COURT:  Okay.

21           MR. BENNINGTON:  And he probably was holding

22    back because he knew that.  But I don't mind it going

23    into evidence.

24           THE COURT:  It doesn't matter, guys.  Listen,

25    I want you to make the record that you think supports

1      your respective positions.  I'm not here to cut anybody

2      off.  So, if -- if Mr. Roberts was at one time willing

3      to offer and admit all of the exhibits in the notebook,

4      and you were resistant --

5              MR. BENNINGTON:  That's correct.

6              THE COURT:  -- and so I respect that.  So

7      those are the ones that are in.  Let's go forward.  I'll

8      hear argument from I guess -- counsel?

9              MR. ROBERTSON:  I'm sorry, Your Honor.

10     Counsel said he didn't have any objection if I did offer

11     that one exhibit.  I can offer it --

12             MR. BENNINGTON:  17 should be in.

13             THE COURT:  Well, let's go ahead --

14             MR. ROBERTSON:  It's JTX-17.

15             THE COURT:  We'll go ahead and admit 17.

16             (Whereupon, Exhibit No. 17 was admitted into

17     evidence.

18             MR. ROBERTSON:  If I could give a copy to your

19     clerk, sir.

20             THE COURT:  Sure.  Please.  Counsel.

21             MR. BENNINGTON:  If I may, I'd like to first

22     address comments which are obviously critical to --

23             THE COURT:  Well, I don't know that they're

24     critical.

25             MR. BENNINGTON:  -- to the decision here.  I

1    didn't mean critical of the case.

2              THE COURT:  No.  No.  I don't even know that

3    they're critical to a decision, they just piqued my

4    interest.

5              MR. BENNINGTON:  All right.  If they're

6    piquing your interest I'm interested.  I suggest that

7    the answer is, the Tenth Circuit has said that the

8    status quo is the last undisturbed status of the parties

9    before the dispute arose.  The last undisturbed status

10   of these parties before this dispute arose was access to

11   the terminal by Western Truck One.

12             Now, admittedly, that was pursuant to a

13   contract which to that point had not -- that provision

14   had not been enforced, and at that point the parties had

15   a custom and practice of dealing -- of an enormous

16   amount of dealing with each other without it being in

17   writing.  One element of their custom and practice,

18   which is unrebutted, and I think Mr. Taraghi said this,

19   he believed he had a commitment from Suncor that when we

20   can't supply you with your needs you can draw from our

21   terminal from your middlemen.  And that's the key.

22             There was a commitment, a custom and practice

23   here that Western Convenience Stores, regardless of

24   anything else, could go there.

25             Now, the injunction -- injunctions don't arise

198

1     out of generic circumstances they arise under the

2     circumstances in which --

3             THE COURT:  Let me just -- because I want

4     to --

5             MR. BENNINGTON:  All right.

6             THE COURT:  I want to respond --

7             MR. BENNINGTON:  All right.

8             THE COURT:  -- to -- to your comment, because

9     I -- I really have read this stuff multiple times.  And

10    I guess the first thought that occurred to me in this --

11    listening to this custom or practice argument is

12    paragraph 25 of the terminal access agreement which says

13    that no custom or practice which may arise between the

14    parties in the course of operating under this agreement

15    will be construed to waive any of the parties' rights to

16    either ensure the other parties strict performance of

17    the terms and conditions of the agreement or to exercise

18    any rights granted to it.

19            So, there may very well be -- Mr. Taraghi may

20    be exactly right.  There may have been over the years a

21    custom or practice that evolved between Suncor and

22    Western Truck One.  But the very agreement that they

23    entered into said customs and practices do not override

24    or abrogate a parties' express rights under the

25    agreement.

1      But more importantly, counsel, I'm still stuck

2  with the same problem.  Because even if there was a

3  custom or practice, Suncor still had the right to

4  immediately say no more, without any showing of good

5  cause.  It was their absolute discretion to prevent any

6  trucker from coming onto the refinery property.

7      If I enter the injunction you are asking me to

8  enter aren't I, as a matter of fact, giving your client

9  a better deal?  Because the injunction that I would

10  enter doesn't mean -- the status quo between -- the

11  contractual status quo before the whole process blew up

12  still left Suncor in the position of saying today it's

13  done.  The injunction you are asking for does not in

14  fact maintain the status quo.  It would in fact override

15  the customary relationship, but more importantly it

16  would override the terms of the parties own agreement.

17  Because it would give Western Truck One an absolute,

18  unfettered right to come on the property without any

19  limitation, because if Suncor imposed any limitation

20  they would be in contempt of court.  That gives Western

21  truck a much better deal than they had before.

22      MR. BENNINGTON:  That argument, Your Honor, I

23  suggest is based on the -- the concept of the master

24  product purchase and sale agreement being the contract

25  and not modified.

1           THE COURT:  No.

2           MR. BENNINGTON:  Now, you did read an

3     integration clause.

4           THE COURT:  The only --

5           MR. BENNINGTON:  A clause that says --

6           THE COURT:  The only contract at play --

7     truly, the only contract at play as a result of your

8     proposed injunction is the terminal access agreement.

9     It's the only -- because what you're asking me to do is

10    to recommend to Judge Krieger that Western Truck One

11    have unfettered rights of access.  Well, the only

12    agreement that the parties have ever entered into with

13    respect to Western Truck One and the question of access

14    is the terminal access agreement.  The master purchase

15    agreement is of no moment to the issues raised by your

16    injunction.

17          MR. BENNINGTON:  Well, then let me focus on

18    the -- the Truck One agreement, Exhibit 1.  The evidence

19    is unrebutted that that agreement was not followed, that

20    it was modified orally.  Exhibit 11 is an example.

21          THE COURT:  I agree with you.  Counsel, I

22    agree with you, but my point is still the same.  Under

23    the waiver clause, paragraph 25, the fact that the

24    parties have achieved some customary practice in the

25    past cannot, under the literal terms of this agreement,

1    abrogate Suncor's independent contractual right to end

2    access at any time.

3          MR. BENNINGTON:  They did give up --

4          THE COURT:  The agreement says that.

5          MR. BENNINGTON:  -- that right.

6          THE COURT:  Pardon?

7          MR. BENNINGTON:  That's what I'm suggesting.

8    They gave up that right.

9          THE COURT:  But they can't.  Under the terms

10    of the agreement they can't give up the right.

11          MR. BENNINGTON:  No.  No.  No.  Sure.

12          THE COURT:  Your client agreed to that.

13          MR. BENNINGTON:  Suncor can give up that

14    right, and they did.

15          THE COURT:  No.

16          MR. BENNINGTON:  That's my point.

17          THE COURT:  But counsel, for me to accept your

18    argument I literally have to read out of the agreement

19    paragraph 25 which specifically says to the contrary.

20          MR. BENNINGTON:  Which the parties gave up.

21          THE COURT:  They can't.

22          MR. BENNINGTON:  Sure they can.

23          THE COURT:  Not according to the terms --

24          MR. BENNINGTON:  No.  No.

25          THE COURT:  -- of the contract itself,

1    counsel.

2              MR. BENNINGTON:  I suggest that the law in

3    Colorado, the substantive contract law in Colorado,

4    notwithstanding a provision like this such as, for

5    instance, no changes can be made except in writing.

6    Parties can by verbal agreement change a contract and

7    write -- and read out of it, act out of it a

8    provision --

9              THE COURT:  Except --

10             MR. BENNINGTON:  -- like that, which is

11   exactly what they did.

12             THE COURT:  Except -- except the problem is if

13   you look at paragraph 25 -- and it's not -- it's not

14   written in some foreign language.

15             MR. BENNINGTON:  I understand.

16             THE COURT:  I agree with you.  The contract in

17   paragraph 25 says the parties can, in fact, modify the

18   agreement.  So this doesn't fly in the face of Colorado

19   law.  The contract specifically says, Neither party

20   shall be deemed to have waived any right inferred by

21   this agreement or under any applicable law unless such

22   waiver is set forth in a written agreement signed by the

23   party to be bound.

24             So the parties clearly did contemplate that

25   adjustments could be made.  The parties clearly

1     contemplated that under the right set of circumstances

2     with the right procedural steps, they could modify their

3     agreement.  But the agreement is clear on its face.  You

4     cannot waive, absent a written signed document, and I

5     don't have -- there's nothing in the record, there's no

6     evidence to show that there was ever a signed waiver or

7     modification.

8          MR. BENNINGTON:  There wasn't.  We'll all

9     agree to that.  There was no signed waiver.  But these

10    parties agreed informally, verbally, that they would

11    change this thing without entering into signed

12    agreements.  They demonstrated a willingness and an

13    ability and, in fact, they did it.  They shipped, they

14    sent Western -- excuse me, the Western Truck One access

15    is governed at least in part by Western Convenience

16    Stores' right to buy fuel, and the confirmation

17    agreements that are part of that were never enforced.

18          THE COURT:  But --

19          MR. BENNINGTON:  And I suggest that the -- the

20    commitment made by Suncor to both Truck One and WCS,

21    Western, was that in a time of low supply or allocation

22    Western Truck One can go to our terminals.  That

23    commitment was made.  And now they're trying to get out

24    of that commitment for -- for no reason that benefits

25    them at all.

1           THE COURT:  All I'm saying, counsel, is with

2      all due respect, when you start your argument by saying

3      all we are seeking to do is maintain the status quo, I'm

4      not sure that's consistent with the factual record

5      before me.  Because you're not seeking to maintain the

6      status quo because the status quo is reflected in this

7      terminal access agreement.  Even though in the past --

8      what you've told me is in the past when Western

9      Convenience -- their allocation was cut off, in the past

10     Western Convenience could purchase or pull fuel from a

11     middleman using its trucks.

12          The fact that that happened in the past, the

13     fact that in the past that was allowed to happen, I

14     don't believe overrides this agreement.  Because at

15     no -- the fact that -- the fact that Suncor before let

16     Western Truck come on their property doesn't suggest

17     that they were waiving for all ten their right to

18     exclude Western Truck.

19          And so when you tell me, judge, I want a court

20     order that gives Western Truck unlimited, unfettered

21     access to drive on that property whenever they want to

22     pick up fuel through a middleman, that's a better deal

23     than the master -- than the terminal access agreement

24     ever provided.  You have to admit that.  It is a better

25     deal.

1          Now, are you suggesting that what you're

2    proposing me to do is different from what happened in

3    the past?  Probably not.  I agree in the past Western

4    Truck could go and pick up fuel purchased through a

5    middleman.  I agree with that.  I think you're 100

6    percent right.  But you're not asking me to put Western

7    Truck back where they were under the master access

8    agreement -- or the terminal access agreement, you're

9    asking me to put them in a better position because you

10   would effectively eliminate any right of Suncor to say

11   no.  And Suncor always had a right to say no under the

12   master terminal agreement.  So how can I find that

13   you're simply maintaining the status quo?

14          MR. BENNINGTON:  Well, my only response -- my

15   response is it's a right that they never exercised.

16   It's a right they gave up in their conduct.  And it's a

17   right they gave up in the course of the price

18   discrimination that they imposed on Western Convenience

19   Stores, something that is admitted.  And it's unrebutted

20   at this point that they engaged in price discrimination.

21   So, add all that up together I suggest that the status

22   quo is not being interrupted by granting this

23   injunction.

24          THE COURT:  I don't want to cut you off.

25          MR. BENNINGTON:  I'd also suggest that in

1    reaching your conclusion you have to consider the

2    relative harm that accrues to these parties by what's

3    going on.  The best that Suncor can come up with is

4    occasionally some trucks may be overfilled.  That's

5    testimony of counsel.  There's no -- no evidence at all

6    that they could be harmed by overfilled trucks.

7         There is no evidence that they'd be harmed by

8    the injunction.  Zero.  In fact, the evidence before you

9    now which is unrebutted is that they'll make money on

10   it, or at least the cost of using that terminal is born

11   by someone else.  So there is zero harm to Suncor by

12   your granting this injunction.

13        As far as the injury to Western Convenience

14   Store, that's unrebutted as well.  No expert, no -- no

15   witness, nobody from Suncor has come before you to say

16   things aren't as bad as Hossein Taraghi tells you they

17   are.  Things aren't as bad as Chris Wehrle tells you

18   they are.  They tell you that they're on the edge of

19   being toast.  They tell you that it will take one

20   disaster, one wrinkle in the market, one disruption and

21   they're gone.  That is unrebutted testimony.  And you

22   have to accept that, I suggest.

23        THE COURT:  Well, the testimony -- what

24   Mr. Taraghi said from my recollection is, is that he --

25   he did say that if this situation was allowed to

1    continue until the case was over then that would be

2    disastrous for his business.  And that's why I

3    specifically followed up and said when you mean the case

4    is over, you mean after a judgment is entered, after we

5    go through the whole trial.  He said, yes.  That's what

6    he means.  At some point in the future when this whole

7    case is over, what he said in response to my questions,

8    he said my company cannot survive if we do not win when

9    this whole case is over.

10             MR. BENNINGTON:  My recollection of that is --

11             THE COURT:  I mean, and I'm going to order a

12   transcript so the transcript is going to say.

13             MR. BENNINGTON:  Yeah.

14             THE COURT:  But I specifically asked follow-up

15   questions.

16             MR. BENNINGTON:  I remember that.

17             THE COURT:  When he said until this is over, I

18   wanted to find out what the "this" was that he was

19   referring to.  And my recollection, he said when the

20   whole case is over.

21             MR. BENNINGTON:  My suggestion is that it --

22   that the context was this could happen at any time, and

23   the when the whole case is over was kind of the far

24   ebbed of it.  But the testimony from -- other testimony

25   from him as well as Mr. Wehrle was this is an immediate

1    problem.  This isn't two years down the road when --

2    when all this happens.

3            THE COURT:  Well, I think -- I think there was

4    also from your client's own testimony that right now, at

5    least for this year, he's been running a very profitable

6    business.  And I would note that he was cut off in -- on

7    May 20th and it is now September 27.  So he's been

8    basically operating for three quarters.  He was cut off

9    in May about halfway through the year.  So far this year

10   he's apparently running at a profit.

11           MR. BENNINGTON:  But -- but he has testified.

12           THE COURT:  And he's also said that he is not

13   without gas, so he's never been in a situation this year

14   where he didn't have gas to sell.  So, he's -- he's

15   meeting all of his needs for gas, and by his own

16   testimony he's running at a profit.

17           MR. BENNINGTON:  And he's one disaster away --

18           THE COURT:  We're all --

19           MR. BENNINGTON:  -- one wrinkle in the market.

20           THE COURT:  -- one disaster away.

21           MR. BENNINGTON:  One disaster away under

22   circumstances which it makes no difference to them

23   except putting a discounter out of business, which is

24   what's going on here.  A 10-cent differential to

25   somebody who is a fly in the ointment, a burr under the

1    saddle of all of these people, and what they want to do

2    is they want him out of business because they know

3    perfectly well that if they can continue this, one

4    disaster will put him out of business, and that's the

5    point.  It's unrebutted that it takes one wrinkle and

6    he's gone, and that is exactly what they're trying to

7    accomplish under a situation in which it does them no

8    harm.  If they were standing here and had a real expert

9    or somebody, any testimony telling you that terminal

10    access was going to hurt them somehow it might make some

11    sense.

12           THE COURT:  Counsel, I agree with you, but --

13    and -- and I -- I can appreciate from your position and

14    from Mr. Taraghi's position that's an argument that I

15    would make too.  But when you say they have not come

16    forward with any evidence, the fact of the matter is

17    under Rule 65 they have no burden to come forward with

18    any evidence.  There are four specific elements that

19    have to be satisfied under Rule 65 and they have to be

20    satisfied by your client.  Suncor has no burden of

21    persuasion or proof for purposes of the instant motion.

22           MR. BENNINGTON:  But they --

23           THE COURT:  So the fact that they haven't come

24    forward with any evidence to show they have been

25    injured, it's an interesting point, I don't -- I don't

```
 1    deny that.  But as a legal matter, for purposes of

 2    Rule 65, the fact that they haven't come forward with

 3    any evidence is in some respects of no moment, because

 4    unless and until Mr. Taraghi satisfies the four elements

 5    they don't really have to do that.

 6         MR. BENNINGTON:  I understand.  We've got the

 7    burden.  But when we put a witness on who says it

 8    doesn't harm Suncor at all for us to use their terminal,

 9    no --

10         THE COURT:  That's just --

11         MR. BENNINGTON:  -- financial risk.

12         THE COURT:  That's just one of three -- that's

13    one of four elements.

14         MR. BENNINGTON:  All right.  That's one.

15         THE COURT:  And I've got to find, one -- I

16    cannot grant the motion unless I find four elements.  I

17    have to find that there is a substantial likelihood that

18    plaintiffs will eventually prevail on the merits.  And I

19    readily concede you have raised some interesting points,

20    but the test is substantial likelihood and that may be a

21    higher standard than raising interesting points.

22         Second, the moving party, in this case

23    plaintiffs, must show that it will suffer irreparable

24    injury unless injunctive relief is granted.  There has

25    to be also an offer of proof that threaten injury to the
```

1    movant outweighs whatever damage the proposed injunction

2    may cause the opposing party, and I think that's the

3    point you're getting at; and finally, the moving party

4    must show that the injunction at issue would not be

5    adverse to the public interest.  I haven't heard one

6    argument one way or the other about public interest.

7          So, for purposes of the court's analysis what

8    this outcome hinges on is factors 1 and 2:  Is there a

9    substantial likelihood the plaintiffs will prevail; and

10   two, is there clear and unequivocal evidence -- because

11   that's the standard in the Tenth Circuit -- the moving

12   party under Rule 65 has to come forward with clear and

13   unequivocal evidence, and facts to show that he or it

14   will suffer irreparable injury unless injunctive relief

15   is provided.

16         That's what I have to deal with.  And then I

17   have to determine, I suppose, whether or not this is one

18   of the three disfavored injunctions.  Because if it's

19   one of the disfavored injunctions then the standard of

20   proof becomes substantially high.

21         MR. BENNINGTON:  Let me address the

22   substantial likelihood of success on the merits.  You

23   have unrebutted testimony that Ewing admitted that

24   differentials of different prices of a 10-cent advantage

25   price was being given to Western Convenience Stores'

212

1      competitors.

2              THE COURT:  Right.

3              MR. BENNINGTON:  That, I suggest, makes a

4      front prima facie case.  Now, when we get to trial it

5      will have be more than Mr. Roberts' [sic] testimony

6      about whether it's -- it's different because they have

7      long -- these people have long-term contract or whether

8      it's different because it has some sort of detergent or

9      additive in it and so forth.

10             THE COURT:  I know, but the case law would

11     suggest those are important factors.  For instance, in

12     *Coastal Fuels of Puerto Rico, Inc. versus Caribbean*

13     *Petroleum Corporation,* found at 990 F.2d 25, a decision

14     by the First Circuit in 1993.  A case somewhat similar.

15     In that case it was a marine fuel oil buyer/reseller

16     brought an antitrust action under Robinson-Patman based

17     upon what it contended were unjustified differences in

18     prices charged by a supplier.

19             The First Circuit noted that Coastal

20     apparently paid, quote, "spot prices" -- and realize

21     that's an issue of some dispute here -- for oil.  And

22     Coastal may have bought at somewhat lower volumes.  I

23     haven't really heard any evidence today about the

24     volumes of various purchases.  The First Circuit noted,

25     however, The Robinson-Patman Act does not prohibit

1    volume-related price differences that reflect genuine

2    cost differences, nor does Robinson-Patman prohibit

3    price differences between spot sales and long-term

4    contract sales that reflect different market conditions.

5         I really haven't heard any evidence that deals

6    with market conditions.  I agree with you there is

7    evidence in the record, Mr. Ewing apparently conceded

8    that there were some customers that got a 10 -- 10-cents

9    per gallon discount over what Mr. Taraghi was being

10   charged.  That in and of itself doesn't really tell me

11   about whether or not all of those players are similarly

12   situated in terms of market conditions, or in terms of

13   involvement, or in terms of length of contract.

14        You've raised some interesting questions.  I

15   don't deny that for a second.  But the legal standard is

16   substantial likelihood, and this is at best a very

17   incomplete record from which to draw any conclusions

18   about substantial likelihood of success.

19        MR. BENNINGTON:  Substantial likelihood of

20   success is based on --

21        THE COURT:  A full and --

22        MR. BENNINGTON:  -- Ewing's admission.

23        THE COURT:  -- complete record.  A full and

24   complete record.

25        MR. BENNINGTON:  We don't -- I suggest for

1    purposes of the preliminary injunction, we don't have to

2    disprove their defenses.

3            THE COURT:  I agree.

4            MR. BENNINGTON:  Namely, that they are

5    similarly situations and so forth.

6            THE COURT:  As the court has noted, as Judge

7    Brimmer noted in 2009, quote, "because a preliminary

8    injunction is an extraordinary remedy, the right to

9    relief must be clear and unequivocal."  And I have to

10   apply the clear and unequivocal standard to the factors

11   that I have to find.  And when the factor says there's

12   got to be a substantial likelihood of success on the

13   merits, and I have to find a justification by clear and

14   unequivocal evidence, you can appreciate the dilemma.

15   Because one of the things I have to find by clear and

16   convincing -- clear and unequivocal evidence is a

17   substantial likelihood of success.  And I think we all

18   have to agree that the record currently before the court

19   is, at the very least, less than fully developed.

20           I don't deny that there is evidence of a price

21   difference but, as the court First Circuit noted, a

22   price difference in and of itself is not evidence of a

23   Robinson-Patman violation.  And I don't have enough

24   evidence to draw any conclusions as to whether or not

25   the price differential was based upon a legitimate,

```
1    lawful market considerations or was a blatant, naked
2    attempt to drive Mr. Taraghi out of business.  If it was
3    the latter then I agree with you there is a potential
4    problem.  If it was the former then it's not a violation
5    of the law.
6             MR. BENNINGTON:  That's an impossibly high
7    hurdle for someone at this --
8             THE COURT:  For purposes of an injunction it
9    may very well be.
10            MR. BENNINGTON:  -- at this point in the -- in
11   the case, so all we've got to do is not have discovery
12   and --
13            THE COURT:  Counsel.
14            MR. BENNINGTON:  -- and Bennington can't prove
15   the case.
16            THE COURT:  Counsel.  Listen, counsel, in
17   fairness, all you had to do was say, judge, in
18   anticipation of the preliminary injunction hearing I'd
19   like to do some discovery.  You could have deposed
20   people and said, look, I want -- I want a 30(b)(6)
21   deposition of somebody from Suncor who will get on the
22   witness stand and explain how or why they've chose to,
23   apparently, favor some customers with a 10 percent
24   discount.
25            But what you want me to do is you want me to
```

216

1     say or find the mere existence of the discount

2     translates into a violation of the law, and that doesn't

3     seem to be supported by the law itself.  Because that's

4     all you've given me.  All you've given me is evidence

5     that some customers got a better deal.  But you're

6     asking me to take that fact and then immediately

7     (unintelligible) and say based on that fact alone

8     there's clearly a violation of Robinson-Patman.  I don't

9     know that I can do that.  But you were certainly free to

10    conduct discovery.

11         MR. BENNINGTON:  Well, my suggestion is that

12    in view of the admission of Mr. Ewing, and in view of

13    the fact that he's not here to even explain it, in view

14    of the competitive situation between these parties where

15    they're all competing for the same customers head to

16    head in the same neighborhoods, and consumers are tied

17    into price discrimination over the internet, and that

18    there -- the inference from what Mr. Taraghi had said,

19    these people aren't situated any differently, and that

20    Ewing did not provide any kind of explanations to what

21    would justify that differential.

22         THE COURT:  But --

23         MR. BENNINGTON:  The case is there.

24         THE COURT:  But, again, I think with all --

25         MR. BENNINGTON:  And, again --

```
 1              THE COURT:  With all due respect though, your
 2      argument to some extent requires me to ignore Rule 65.
 3      What you said is they could have called Ewing to explain
 4      the price differential.  Under Rule 65 they don't have
 5      that burden.  But more importantly, sir --
 6              MR. BENNINGTON:  Yeah, but they didn't.
 7              THE COURT:  -- you -- sir, you could have
 8      served a subpoena on Mr. Ewing and brought him in here
 9      as an adverse witness and grilled him to until the cows
10      came home.  You had as much ability to get Mr. Ewing
11      here as they did --
12              MR. BENNINGTON:  Again --
13              THE COURT:  -- either in the form of a
14      deposition or in terms of a subpoena, just get here to
15      testify.
16              MR. BENNINGTON:  Well, let me suggest,
17      finally, that the case law supports a balancing of
18      equities.  As far as the public interest is concerned,
19      there's no -- there's nothing to suggest that someone
20      who -- keeping someone in business or allowing someone
21      to stay in business who's a discounter would -- would
22      disserve the public interest.  That's just not an issue
23      in the case.  The public interest would be served by
24      keeping Western Convenience Stores in business and by
25      letting them do it in such a way as to maintain their
```

1   status as a discounter with lower prices.

2          Beyond that, the court has to do a balance as

3   to what -- what's the harm.  What -- what -- what is

4   this doing negatively to Suncor.  And the evidence is

5   there that it's not doing anything to Suncor.  This is

6   punitive, it's arbitrary, it's done in bad faith.  It's

7   just done to grind them in.  And on that basis I suggest

8   that you do have the discretion to lower the standard in

9   the areas that you're concerned about.

10         THE COURT:  Counsel.

11         MR. ROBERTSON:  (Unintelligible).

12         THE COURT:  Yes.

13         MR. ROBERTSON:  And I -- Your Honor, I won't

14  take much time, I just thought it would be helpful if I

15  pointed out a couple things.  I'm sure the court -- I

16  agree that we don't have any evidence on the elements of

17  the likelihood of success of Robinson-Patman in that

18  claim, and/or irreparable harm for that matter.  But the

19  court also pointed out an issue that I think is of

20  particular merit and that is the change of the contract

21  on the revocation point.  I didn't hear any evidence

22  that actually the terminal access agreement had been

23  changed.  It was the other agreement with the Western

24  Convenience Stores that had been changed.  On the

25  terminal access agreement, it is what it is and we have

1    a right there.

2          And it's such an obvious point that if the

3    court were to force us to continue that contract, we

4    still would have the right to revoke unless the court

5    took that away from us.  Unless the court changed the

6    contract.

7          And going back for years and years and years,

8    that actually is the law.  And equity courts -- there

9    were more equity courts back in the olden days than

10   there are today, but going back to the state of

11   Colorado, back in 1914 in the case of *Wolverton versus*

12   *Mountain States Telephone and Telegraph* said that a

13   court of equity never interferes where the power of

14   revocation exists.  And that was also following the

15   Supreme Court of the United States in *Express Company*

16   *versus Railroad Company* at 99 US 191 -- obviously, a

17   long time ago -- stating exactly the same point.  A

18   court of equity never interferes where the power of

19   revocation exists.

20         And the point of that, Your Honor, is that

21   unless the court were to change the status quo and

22   change the contract, then if we were to have to

23   reinstitute relationships we'd still have the right to

24   revoke tomorrow, and the next day and the next day

25   unless the court took that away from us.  And that is

1   normally not something that a court of equity does.

2   And, certainly, that kind of mandatory relief under the

3   cases that Your Honor were citing, in fact on the first

4   conference call we had, Your Honor, you told us that

5   main point.  A mandatory injunctive relief is something

6   that required a much higher standard of proof.  The

7   *O Centro* case for example, states that point very

8   clearly.

9           There's another -- and I can walk through the

10  basic elements.  I think we've done that, irreparable

11  harm, likelihood of success.  On the balance of the

12  equities there was one point that came out during the

13  testimony which I think is important on that point.  And

14  that is, normally in a court of equity one shouldn't be

15  trying to help somebody who didn't help themselves at

16  the time.  And they didn't pay.  They chose not to pay.

17  That's what caused this whole problem.

18          THE COURT:  Yeah, but they --

19          MR. ROBERTSON:  They were also offered the

20  chance to prepay.

21          THE COURT:  When -- help me to remind me

22  because I just don't remember.  When did Suncor sue for

23  breach of contract or *quantum meruit*.  I mean, you keep

24  saying that they didn't pay.  Suncor presumably had the

25  right and, in fact, had legal remedies available to it

1      if it chose to pursue them.

2              MR. ROBERTSON:  We have, Your Honor.  That's

3      in the state court.  And what we did is we sent them a

4      demand letter which we're required to under the statute.

5      We had followed all of the procedures in order to recoup

6      that money.  We're in state court now trying to get that

7      money back.

8              THE COURT:  So, you're going to pursue that

9      action in state court while this is here?

10             MR. ROBERTSON:  Yes, sir.  And we thought that

11     was a (unintelligible) because they sued us in state

12     court too, and so we were forced as a compulsory

13     counterclaim there to go ahead and proceed there.  It's

14     a Colorado statute.  It made more sense to go there.

15             And that brings up another funny point.  And

16     that is, as Your Honor rightly pointed out the only

17     contract at issue is this terminal access agreement,

18     which is only between Western Truck One and Suncor.

19     Western Truck One, as the evidence showed here today,

20     doesn't buy gasoline.  It's never bought from Suncor,

21     never buys gasoline from anybody.  They cannot assert a

22     Robinson-Patman Act claim because they've never

23     purchased anything from anybody.  They don't have a

24     federal claim.  They shouldn't be here in this court at

25     all.  Western Convenience Stores doesn't have any

222

1    standing to come in here and try to get the court to

2    change Western Truck One's contract.

3          So, I think that there's a fundamental mixing

4    of theories and who has standing to do what here in this

5    case that I think became more clear here today when

6    Western Truck One doesn't buy anything, it isn't getting

7    a discount, it doesn't have a Robinson-Patman Act

8    violation.  It has no federal claim at all, and it

9    shouldn't be in this case.  And it's just another

10   independent reason for Your Honor to deny the

11   injunction, but I thought I should make that point

12   because it is a jurisdictional issue that I feel, now

13   that the evidence is clear, it should be raised.

14         In terms of the final point on the harm to the

15   public or public interest, I think it is in the public

16   interest to enforce contracts.  I think it's in the

17   public interest that when a -- parties agree that one

18   side has a right to revoke, that that be enforced.  And

19   I don't think it's in the public interest for contracts

20   like that to be changed to give a party at a preliminary

21   injunction a remedy that is more than what they

22   bargained for at the outset.

23         We live in business based on contracts and

24   agreements, and I think those should be enforced.  And I

25   think that's really all I need to say, Your Honor,

1    unless Your Honor has any particular questions of me.

2         THE COURT:  Um, no.  I do have a couple of

3    questions for plaintiff.  You can have a seat, counsel.

4         MR. ROBERTSON:  Thank you, sir.

5         THE COURT:  I'm looking at the complaint.  The

6    complaint asserts four claims -- five claims for

7    relief -- strike that, six claims for relief.  Now, when

8    I go through the six claims for relief, the first claim

9    for relief is a claim brought under the Robinson-Patman

10   Act alleging an antitrust violation and alleges that

11   WCS, Western Convenience Store, has suffered actual

12   damages.  So, the first claim for relief is really only

13   brought on behalf of Western Convenience Store.

14        The second claim for relief is breach of the

15   master agreement which is only between Western

16   Convenience Store.  The third claim for relief is -- is

17   a breach of the access agreement with WTO.  So that's a

18   claim brought on behalf of WTO that doesn't involve

19   Western Convenience at all as a party.

20        The fourth claim for relief is a claim on its

21   face brought on behalf of Western Convenience Store.

22   The fifth claim for relief is a claim for tortious

23   interference.  Tortious interference of the contract

24   between Western Convenience Store and WTO, but I haven't

25   heard any evidence of a contract between Western

1    Convenience Store and WTO.  So I don't know exactly how

2    to factor that in.

3         And then the third claim -- or the sixth claim

4    on its face appears to be brought on behalf of Western

5    Convenience.  So the injunctive relief you are seeking

6    is injunctive relief that really only flows to Western

7    Trucking One, and the only claims for relief in the

8    complaint would implicate Western Trucking One is the

9    third claim for relief and the fifth claim for relief

10   that don't involve Robinson-Patman.

11        So, I appreciate your argument, counsel, about

12   substantial likelihood of success on the merits, but how

13   does that relate to Western Truck One?  Because Western

14   Truck One doesn't have an antitrust claim in this

15   lawsuit.  So when I measure substantial likelihood of

16   success, relative to the party that would be impacted or

17   benefited by the injunctive relief, I'm really looking

18   only at Western Truck One's claims, aren't I?  Because

19   that's the determination of substantial likelihood of

20   success, the same party that is going to reap the

21   benefit of the injunctive relief.  And that would seem

22   logical.

23        MR. BENNINGTON:  Western Convenience Stores

24   relies 100 percent on the carrier and services that the

25   trucking, provided by Western Truck One.  Western

1    Convenience Stores' ability to buy gasoline -- to buy

2    fuel is dependent entirely on the access of Western

3    Truck One, and Suncor knows it.  Suncor agreed with

4    Western Truck One that you can buy from us and we'll

5    allow your trucks in and here's an agreement with

6    Western Truck One in which you can do that.

7              THE COURT:  Yeah, but -- but my point though

8    is this.  I mean, you're telling me that because there's

9    a 10-cents price differential you've established a

10   substantial likelihood of success on the merits.  Well,

11   if this court were to grant relief under that claim for

12   relief, that -- that remedy would only go to Western

13   Convenience because they're the only party.  They're the

14   only plaintiff that has an antitrust claim.  Yet you are

15   asking me to enter an injunction that impacts, first and

16   foremost, Western Truck One.  It doesn't have an anti --

17   so I guess your argument about we've shown a substantial

18   likelihood of success on the merits it almost seems like

19   you're ships passing in the night.  Because you're --

20   you're arguing substantial likelihood of success on the

21   merits as to one plaintiff, you're seeking injunctive

22   relief as to the other who doesn't have a pricing

23   violation.

24             Because, interestingly enough, you haven't

25   really argued -- you haven't really argued substantial

1    likelihood of success on the merits as to the claims

2    that specifically are directed to Truck One, because the

3    only -- for instance, you've got a claim that says

4    tort -- you know, violation of the covenant of good

5    faith and fair dealing with respect to Truck One, but

6    the contract itself says that Suncor has an independent,

7    absolute, unfettered right for whatever reason -- good,

8    bad or indifferent -- to cut them off.

9              So what you're saying is it's implicitly bad

10   faith for you to do exactly what you've reserved the

11   right to do when the contract was executed.  Under that

12   theory, every time a party exercises their rights under

13   the contract, one could argue that's implicitly bad

14   faith.

15             MR. BENNINGTON:  That's not the whole story.

16   That's not all the evidence.

17             THE COURT:  But it's the claim that Truck One

18   has brought.  That's -- that's the battleground that

19   Truck One shows to assert.  Truck One said I've been

20   injured because they failed to abide by the implied

21   covenant.  But you haven't argued a substantial

22   likelihood of success on that question.

23             MR. BENNINGTON:  We didn't rely -- chose not

24   to rely -- let me back up.

25             The contract claims are based on good -- the

1    covenant of good faith and fair dealing.  And I have to

2    concede the law on that is that if a covenant of good

3    faith and fair dealing can't be used to void a specific

4    provision in a contract, except in the *Soderlund* case

5    which is cited in our brief.  The court found that if

6    there was a promise independent of that that was subject

7    to a covenant of good faith and fair dealing, then a

8    provision, namely a termination provision, could be

9    avoided.

10          We've taken some effort to make sure that that

11   independent promise, that additional promise is in

12   evidence, which is that if we don't have enough fuel for

13   you, we -- we will always let you go to our terminal,

14   let Western Truck One go to our terminal and pick up

15   fuel for you.

16          Now, if Western Truck One can't go to the

17   terminal then the commitment to Western Convenience

18   Stores is empty.  It's worth nothing.  So, the

19   reasonable probability of success on the merits is that

20   there is this unrebutted promise that we're going to let

21   you in there when times are tough and we can't give you

22   all the gasoline you need.  Which is exactly what's

23   going on here.  It's why we're here.

24          I want to clear up something with respect to

25   -- procedurally.  This case -- and this is outlined

1    carefully in our briefs, so I won't belabor it, but --

2          THE COURT:  That's okay.

3          MR. BENNINGTON:  -- the case was initially

4    filed in Denver District Court, it was a contract case.

5    And before we filed in federal court under the

6    Robinson-Patman Act, knowing that there's -- the federal

7    courts have exclusive jurisdiction we entered into a

8    substantial investigation to find out whether there was

9    a claim.  That state court action was never served on

10   Suncor.

11         What they did was they ran in there at

12   10 o'clock one night when I had sent a courtesy copy of

13   the federal court action to Mr. Cornblatt they ran in

14   there and filed an answer and counterclaim.  And now

15   what they're seeking to do is they filed a motion to

16   dismiss and stay here for the counterclaims.  We have

17   filed a motion to dismiss or stay in state court telling

18   the state court judge the only forum that can resolve

19   all of these claims at once is the federal court,

20   therefore, state court, you should stay or dismiss these

21   claims.

22         That's the status of the state court versus

23   federal court action.  To be sure we are here on those

24   contract claims under pendant jurisdiction.

25         THE COURT:  No, I understand exactly why

1    you're here.

2         MR. BENNINGTON:  Okay.

3         THE COURT:  And I don't know -- frankly, if it

4    were me, if I were Suncor I would essentially bring all

5    the issues here, too.  I don't see, frankly, that

6    there's any efficiency or practical value in splitting

7    these issues up and putting them in front of two courts.

8    To me, it defies reason.  But lawyers do things that

9    defy reason all the time.  So I've just decided it's an

10   occupational hazard.

11        MR. BENNINGTON:  All right.  Well, I'm done

12   defying reason for today.  That's all I have.

13        THE COURT:  No.  No.  I appreciate all your

14   arguments.  Mr. Taraghi, let me say that at the end of

15   the day I don't get the last word.  What I will be

16   required to do under Rule 65 is to write a

17   recommendation.  And the recommendation will be -- no,

18   have a seat.  Have a seat.  The recommendation will be

19   to Judge Krieger.  Judge Krieger will ultimately have to

20   decide.  So I am sure regardless of what I do we haven't

21   heard the last word.  And so I don't want you to -- to

22   leave here thinking the court doesn't appreciate the

23   testimony you've given because that would be wrong.

24        I understand exactly what you're dealing with

25   as a business person.  And I suppose if I were to look

230

1    at this on a purely pragmatic basis, your position has a

2    certain amount of superficial appeal.  As long as you

3    are paying the middleman, as a practical business

4    matter, Suncor has no reason not to allow those

5    transactions to go forward.  So, if I were looking at

6    this issue on a purely pragmatic, common-sense basis you

7    and your lawyer have raised a number of significant

8    points.  And the irony is we will never know, certainly

9    today we'll never know, what might have happened.

10          So, for instance, we'll never know what might

11   have happened if that wire transfer request hadn't been

12   bounced back for insufficient funds.  We'll never know

13   what might have happened if you'd collected that fuel on

14   a Friday and made prompt payment on a Monday.  It is

15   absolutely clear to me at some point in the process your

16   relationship with Suncor, and more specifically your

17   relationship with Mr. Ewing, got off on the wrong foot.

18   And my sense is that if we could figure out a way to put

19   everybody back if time it would benefit everybody if you

20   could formulate a way that you and Suncor could

21   peacefully exist so that your economic interests could

22   both advance.  And I'm not convinced that that can't

23   happen.  But I am convinced that unless cooler heads

24   prevail, you and Suncor will remain embroiled in

25   litigation for quite sometime.  Frankly, probably to not

1    much useful end.

2           So, the problem that I've got is if I look at

3    the situation pragmatically you make some very good

4    points, and I think your lawyers make some very good

5    points.  The problem is Rule 65 is quite specific, and

6    the case law construing Rule 65 is quite demanding.

7    Your lawyer has made some very good arguments on many of

8    the factors that govern an application of Rule 65.  And

9    if this were a matter of, you know, winning two out of

10   four you'd be walking out of here a very confident man.

11   The problem is, the case law is very clear, the

12   plaintiffs or the moving party has to win four out of

13   four, and that's the difficulty.  And that's what I'm

14   going to have to struggle with in deciding what to

15   recommend.

16          The question is going to be -- when I set

17   aside pragmatism, when I set aside the thoughts of what

18   might have been had cooler heads prevailed, I'm still

19   left with a very clear legal obligation under Rule 65 to

20   find four out of four.  And if I don't find four out of

21   four I'm afraid my obligation is quite clear.

22          This is one where, frankly, you've got to run

23   the table.  And if you can't run the table, if you don't

24   run the table then I'm afraid my discretion is very

25   limited if nonexistent.

1        Now, the one issue that has not been raised,

2    and I'm frankly kind of surprised that plaintiff has not

3    raised it.  One of the considerations I suppose might

4    be -- I mean, I suppose an argument could be made in a

5    close contest, the court can err on the side of caution

6    and grant injunctive relief with the appropriate bond.

7    But the problem is I, frankly, don't think I've reached

8    the bond question unless I find that all four elements

9    are satisfied.

10        If I were to find all four elements were

11   satisfied then I could very well say, okay, well, I

12   still need to balance those interests.  And one way I

13   can balance those interests is by imposing a bond.  But,

14   I don't reach the bond question until I find that all

15   four elements are satisfied.  A bond can't substitute

16   for one of the required elements, so we're still on the

17   same base.

18        Let me say I appreciate counsel's efforts.  I

19   appreciate the time and attention you took.  The ball is

20   obviously now in my court and I'll have to write a

21   recommendation.

22        Anything further from either side?  Yes?

23        MS. CRAIGMILE:  Your Honor, we would like to

24   go ahead and have help getting a Rule 16 conference set

25   up --

1          THE COURT:  Absolutely.

2          MS. CRAIGMILE:  And a Rule 26(f) deadline.  I

3    think that would advance --

4          THE COURT:  What would you all suggest?  Tell

5    me what you want to do.

6          MS. CRAIGMILE:  I think we could probably have

7    the Rule 16 conference --

8          THE COURT:  I mean, the bottom line is -- I

9    mean, I'm assuming you haven't -- have you had a 26(f)

10   conference?

11         MS. CRAIGMILE:  We have not.

12         THE COURT:  And I'm assuming you haven't done

13   any initial disclosures?

14         MS. CRAIGMILE:  We have not done initial

15   disclosures.  We have sent an evidentiary preservation

16   letter at the beginning of the case, which I believe

17   outlined most of the --

18         THE COURT:  And everybody, have a seat.

19   Everybody have a seat.  Have a seat.  What is the stuff

20   that you want them to preserve?

21         MS. CRAIGMILE:  Electronic documents and hard

22   copy documents that would go to the --

23         THE COURT:  Going -- going --

24         MS. CRAIGMILE:  -- pricing issues, the price

25   discrimination issues, obviously the communications

1    between parties.  So --

2            THE COURT:  Going back how far?  Since the

3    master purchase agreement I think was in 2007 --

4            MS. CRAIGMILE:  I think that that would

5    probably be a reasonable basis at -- at this point.

6            THE COURT:  And are you guys going to have a

7    problem about electronically stored information?

8            MR. ROBERTSON:  I think it would be something

9    to discuss in terms of the time limits, but we already

10   have a preservation in place, and I assume they do too.

11   And -- but I think it's something we can discuss and

12   give a stipulated order to the court.  We have other

13   things to discuss as well, obviously.

14           THE COURT:  Well, I mean -- I mean, here's the

15   point.  I think this is going to be one of those cases

16   where it probably doesn't behoove anybody to have a

17   drive-by Rule 26(f).  If it were up to me -- and I guess

18   it is up to me, which is I suppose is gratifying.  I'm

19   going to order that the parties in this case have a

20   face-to-face 26(f) conference.  I don't want you to do

21   this over the phone.  I want you to physically get

22   together.  You can either meet at somebody's office, you

23   can meet at a mutual Starbucks.  Whatever seems to be

24   most effective.  I'd like you to have a face-to-face

25   Rule 26(f) conference.

1        To the extent that discovery in this case will

2   substantially involve electronically stored information

3   I would like the parties to submit an electronic -- an

4   e-discovery protocol.  I'd like you to indicate in

5   writing how you intend to pursue the discovery of

6   electronically stored information so we don't get bogged

7   down unnecessarily.

8        In order to ensure that you have adequate time

9   to have a meaningful Rule 26(f) conference, what would

10  you suggest is a setting for a Rule 16 scheduling

11  conference?  I don't want to truncate the process to the

12  point where you don't give me a really good discovery

13  plan.

14       MS. CRAIGMILE:  I think that we would need to

15  have an initial face-to-face meeting and then an

16  opportunity to follow up and exchange a draft of the

17  protocol that we would submit.  So, I'm thinking four

18  weeks from now for the Rule 16 conference.

19       THE COURT:  I mean, whatever works.  You guys

20  tell me what works for you.  I'm at your pleasure.

21       MR. ROBERTSON:  Just to make sure we get it

22  done I'd like to just add an eensy bit more time to

23  that, Your Honor, only because I'm -- oddly enough, I'm

24  in the middle of another trial right now.  I'm --

25       THE COURT:  You do seem a bit distracted.

1          MR. ROBERTSON:  I asked for a couple days off

2     to come here, but I was (unintelligible) that I'm on

3     right now and we're supposedly finishing up here early

4     next week.  If I could just add a week to what counsel

5     suggested I think that would give me enough time to get

6     those things done.

7          THE COURT:  Well, um, now, there's -- there's

8     another possibility, and I'll leave it up to you.  If

9     you guys -- I'm looking at, for instance, Thursday --

10    oh, I've got criminal duty, so that's not going to work.

11         I could set this matter for a scheduling

12    conference for 1:30 on November 10th.  It's farther out

13    than I would like.

14         MS. CRAIGMILE:  That day works for us, Your

15    Honor.

16         THE COURT:  I really wouldn't be inclined to

17    set it out any -- I mean, I frankly would like to do it

18    sooner rather than later, but it sounds like you've got

19    things to do, both of you, in terms of other cases and

20    work in connection with this case.

21         MR. ROBERTSON:  I think that will work, Your

22    Honor.  That's a good day.

23         THE COURT:  Okay.  All right.  So we'll set a

24    scheduling conference for Thursday, November 10 at 1:30.

25    In anticipation of that scheduling conference I would

1    like to get a proposed scheduling order and a proposed

2    e-discovery protocol no later than November 1st, and I

3    will leave it to you all to schedule the 26(f)

4    conference at a time that's mutually convenient.  I

5    would like to have the initial disclosures completed no

6    later than November 4.

7          My thought process is is that hopefully with

8    the benefit of the 26(f) conference and once you have a

9    scheduling order you'll have a better sense of the scope

10   of initial disclosures.  I don't want you to go through

11   the disclosure process and then suddenly decide the

12   shape of the case is different.  So, proposed scheduling

13   order by November 1; initial disclosures should be

14   served by November 4; and we'll have a scheduling

15   conference for November 10 at 1:30.

16         Now, did I understand -- I think you all told

17   me that you have a protective order in place; is that

18   correct?  Maybe I misunderstood.

19         MS. CRAIGMILE:  (Unintelligible) Your Honor.

20         THE COURT:  Pardon?

21         MR. SHAHEEN:  Preservation.  We have a

22   preservation order.

23         THE COURT:  Preservation.

24         MR. SHAHEEN:  Exchange of letters.

25         THE COURT:  Let me ask you this because I

1    don't want -- my instincts tell me that given the scope

2    of discovery and the potential issues, one or more of

3    you are going to want a protective order, particularly

4    if you're talking about disclosing pricing information.

5    I would like to have that proposed protective order

6    submitted to me no later than November 4.  Because if

7    there are any disputes about the scope of the protective

8    order or the language of the protective order, I intend

9    to take those up at the scheduling conference.  Because

10   the bottom line is I want to have a protective order in

11   place before you folks start serving discovery, because

12   I don't want the protective order to slow the discovery

13   process down.

14           Now, how much time do you think you guys are

15   going to need to do discovery in this case?

16           MR. ROBERTSON:  Your Honor, I don't know that

17   we know enough to tell Your Honor that today.  I'd like

18   to have a discussion with them first to find out what

19   the scope of the case is really going to be and we can

20   talk about it.  I just don't know as we sit here today

21   what the scope of this is going to be.  It is -- it is

22   -- and the only reason we're here, because it's the only

23   federal question, is there's a Robinson-Patman Act case,

24   which was an antitrust case which typically takes a lot

25   of time.  But --

```
 1            THE COURT:  Well, it typically takes a long
 2    time if lawyers do things in a typical way.
 3            MR. ROBERTSON:  Right.  And I'm also --
 4            THE COURT:  That's always been my experience
 5    is that if we typically do what we typically do, you're
 6    right.  Delay is almost inevitably a product of typical
 7    behavior.
 8            MR. ROBERTSON:  I'm not -- I'm not one that
 9    delays to delay, Your Honor.  I try a lot of antitrust
10    cases and I do them promptly.  There are usually other
11    issues.  I've done two in this district with Judge
12    Matsch and we had -- you have experts, you have
13    economists, you have things like that, accountant's
14    things like that have to be done because there are
15    numbers involved, and --
16            THE COURT:  I understand.  And I'm just -- I'm
17    just giving you folks -- here's the only thing I would
18    be concerned about.  The case is currently in front of
19    Judge Krieger.  Judge Krieger will not even think about
20    setting a final pretrial until all dispositive motions
21    are decided.  And she will not set a final pretrial --
22    she won't give you a trial date until she has a final
23    pretrial conference.  So the longer it takes you all to
24    get through the discovery process, the longer we're
25    going to be waiting for some resolution of this case.
```

1    And given -- and while, again, I can't be swayed by

2    emotion and I can't be oblivious to the requirements of

3    Rule 65, I'm also not ignoring plaintiff's legitimate

4    desire to get some finality to this process.  So it's --

5    it's a juggling act.

6            So one thing that you all might want to

7    consider at the 26(f) conference, my suspicion is is

8    that the non-antitrust claims are not going to need a

9    significant amount of discovery, relatively speaking.

10   So, I guess the question is -- what you might want to do

11   is figure out is there some advantage to having, if you

12   will, phase discovery or stage discovery.

13           For instance, is there some value in

14   structuring the discovery plans such that you can get

15   all of the relevant facts for the Robinson-Patman claim

16   out at the front end, then you can -- both sides can sit

17   down and say, okay, based upon the relative strengths or

18   weaknesses of that claim or that defense, I think we

19   should talk about settling.

20           But if we wait to get all the discovery done,

21   experts and the whole shooting match, and then serve

22   dispositive motions, this could be a rather lengthy

23   process.

24           MR. ROBERTSON:  That's something we can

25   discuss, Your Honor.

1              THE COURT:  So, I mean, here's something --

2    and, please, everybody sit down.  You're making me

3    nervous.

4              One thing to think about, just to expedite the

5    process.  If you were doing this in a typical fashion

6    how many experts -- and none of this is chiseled in

7    stone, how many experts realistically do you think you

8    would need?

9              MR. ROBERTSON:  I think -- and this is just --

10   I might change my mind, but on a typical case like this

11   you normally would have an economist normally on

12   causation and markets and all that good stuff.  If there

13   are accounting issues, which we've had some already here

14   today, then usually you'd have an accountant.  And then

15   because like grade and quality you're going to need to

16   have someone who can do the chemistry.  That might be a

17   business person, but they need to have a chemist-type

18   person do that.  Those are the only three I'm aware of

19   as I sit here today, but it's -- still it's three

20   experts.

21             THE COURT:  What's your sense?  And again, I

22   realize this is a back-of-the-envelope kind of

23   calculation.

24             MR. BENNINGTON:  I'm sure we're going to have

25   roughly the same --

1          THE COURT:  Okay.

2          MR. BENNINGTON:  -- kind of experts.

3          THE COURT:  Here's something to think about.

4    And I've done this in other cases, and I think this is a

5    perfect example of a case where you should do it.  If we

6    did -- if we went through the pretrial process as we

7    typically do, what you would do is you would do all the

8    fact discovery, and then you would do experts, and then

9    you would depose experts, and then you'd file

10   dispositive motions.

11         Now, as a legal matter no one needs to depose

12   an expert to file a motion for summary judgment.  As a

13   legal matter nobody needs to depose an expert to file a

14   702 motion.  So what if, in your Rule 26(f) conference,

15   you said this.  Let's just agree that we will defer

16   expert depositions until we get a ruling on dispositive

17   motions.  Now, that achieves a couple of -- one, you

18   immediately save money; and two, you also save time.

19   Because once you get a decision on summary judgment then

20   I'm sure Judge Krieger -- and I've done this in other

21   cases with Judge Krieger, I have no doubt that Judge

22   Krieger will let you take whatever depositions you need.

23   But depending upon rulings on summary judgment it may

24   very well be that you either don't have to take expert

25   depositions or you substantially narrow the number of

1    depositions you need.

2           So, as I'm preparing a plan I would try to

3    figure out ways that I can push back expenses and I can

4    avoid unnecessary delay.  And the first one that

5    immediately comes to mind is simply agree that you won't

6    take any expert depositions until you absolutely have

7    to.  Because you don't need to.  If you can't win

8    summary judgment, or if you can't defeat summary

9    judgment with an expert report you've got a world of

10   problems that a deposition will not solve.

11          MR. ROBERTSON:  Your Honor, we agree with

12   that.  I think that in most antitrust cases they're fact

13   driven.  Even with the experts, the experts have to look

14   at the facts.

15          THE COURT:  Sure.

16          MR. ROBERTSON:  And so it's very common that

17   you do it the way Your Honor suggested.

18          THE COURT:  Yeah.  I mean, I would just push

19   all of those back, which probably means that you could

20   probably finish -- you know, if you immediately started

21   discovery the day after your 26(f) conference you can

22   jump start this process.

23          All I'm suggesting is this, folks.  I want to

24   give you the time that you need to do the discovery you

25   need, but I am also mindful that there are business

1    interests involved in this case and I want to make

2    certain that we don't get so caught up in the, quote,

3    unquote, "litigation process" that the practical

4    business consequence of that process get lost.

5         So I will be -- I'm just putting everybody on

6    notice.  To the extent that I'm involved in this case

7    for pretrial management purposes, I intend to manage

8    this case very closely.  And I will be doing whatever I

9    can, whenever I can do it, to ensure that we don't have

10   unnecessary expenditures of time and money.  I'm just

11   putting everybody on notice.

12        And I will also suggest that if you have the

13   inclination and have the time, go to the website of the

14   Sedona Conference.  I'm on the judicial advisory board

15   for the Sedona Conference and I'm on the advisory board

16   broadly for the Sedona Conference.  I've been in the

17   conference since 2006.  I'm a signatory to the

18   Cooperation Proclamation.  I take that proclamation and

19   the philosophy underlying the Cooperation Proclamation

20   very, very strongly to heart, and I would encourage you

21   to adopt the same mentality.  Don't look for things to

22   fight about.  Okay?

23        MR. ROBERTSON:  Yes, Your Honor.

24        MR. BENNINGTON:  Yes.

25        MS. CRAIGMILE:  (Unintelligible).

1          THE COURT:  Anything else we --

2          MR. BENNINGTON:  Of course.

3          THE COURT:  -- can talk about?

4          MR. BENNINGTON:  Nothing further for us, Your

5     Honor.

6          THE COURT:  All right.  I appreciate

7     everybody's patience.  Thank you all.

8          MR. BENNINGTON:  Goodbye.

9          MS. CRAIGMILE:  Thank you.

10         THE COURTROOM DEPUTY:  All rise.

11         (Whereupon, the within hearing was then in

12    conclusion at 3:19 p.m. on this date.)

13         I certify that the foregoing is a correct

14    transcript, to the best of my knowledge and belief

15    (pursuant to the quality of the recording) from the

16    record of proceedings in the above-entitled matter.

17

18

19

20    /s/ Kelly Mair                    October 14, 2011

21    Signature of Transcriber          Date

22

23

24

25

```
 1                           INDEX

 2    WITNESSES:                                PAGE NO.

 3    For the Plaintiffs:
          Hossein Taraghi
 4            Direct Examination by Mr. Bennington     5
              Cross-Examination by Mr. Robertson      72
 5            Redirect Examination by Mr. Bennington  112

 6        Christopher Wehrle
              Direct Examination by Mr. Bennington   118
 7            Cross-Examination by Mr. Robertson      138
              Redirect Examination by Mr. Bennington 164
 8            Examination by the Court                165
              Redirect Examination by Mr. Bennington 177
 9            Recross-Examination by Mr. Robertson    178

10        Recalling Hossein Taraghi
              Redirect Examination by Mr. Bennington 182
11            Recross-Examination by Mr. Robertson    188

12
                            EXHIBITS
13    Plaintiffs' Exhibits:         Offered    Received

14        1                            86         86
          2                            24         25
15        5                           108        108
          11                           25         26
16        17                          196        196

17

18

19

20

21

22

23

24

25
```