# EXHIBIT 1

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs and Counterclaim Defendant,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant, Counterclaimant, Third-Party Plaintiff,

HOSSEIN and DEBRA LYNN TARAGHI,

    Third-Party Defendants.

## DECLARATION OF STEVEN EWING

Pursuant to 28 U.S.C. §1746, Steven Ewing states as follows:

1. I am the Director of Rack Forward Sales for Suncor Energy (U.S.A.) Inc. ("Suncor") and have been since approximately September 2010. Prior to assuming the position of Director, I was Manager of Rack Forward Sales. Before that, I was Manager of Retail Sales for the company-owned retail gas stations of Suncor's subsidiary, Suncor Energy Sales Inc. I make this Affidavit based on my personal knowledge.

2. "Rack forward" is a Canadian term and it refers to petroleum products that leave the refinery sales rack going forward. For purposes of this litigation, that would include gasoline and diesel fuel.

3. I was deposed in this case as a Rule 30(b)(6) deponent so I have a good understanding of the issues involved. I also reviewed "Plaintiffs' Motion Challenging Defendant's Designation of Certain Documents and Data as 'Highly Confidential' Pursuant to the Protective Order" ("Motion") and the exhibits attached to it.

4. As Director and Manager of Rack Forward Sales, I have the responsibility of negotiating and approving contracts for the sale of gasoline and diesel fuel. As a result, I have become very familiar with pricing and the highly competitive nature of gasoline and diesel fuel sales, both at the supply level where Suncor operates and at the retail level where Western Convenience Stores ("WCS") operate. Indeed, "meeting competition" was one of the topics on

which I was deposed. This is a business in which everyone is trying to get an edge or an advantage over its competitor.

5. Plaintiffs have attached as Exhibit A to their Motion the first five pages of a pricing spreadsheet for the Dillon Companies, Inc., d/b/a King Soopers and City Market ("Dillon"), which, among other matters, sets forth prices and volumes for January 2009. They have also attached as Exhibit B a "Confirmation of Purchase/Sale Agreement" for February 1, 2010 through January 31, 2011 for Mini Mart, Inc., d/b/a Loaf N Jug ("Mini Mart"), and a transaction summary for Mini Mart from February 1, 2010 through January 31, 2011 which set forth prices and volume requirements (collectively, "Confirmations").

6. The pricing and volume information in Exhibits A and B is regarded in the industry as highly confidential, with disclosure severely limited and tightly controlled. Mr. Taraghi knows that. In the January 17, 2007 Master Product Purchase and Sale Agreement between Suncor and WCS, which Mr. Taraghi signed, he agreed to keep such information strictly confidential and not to disclose it to third parties.

7. The January 17, 2007 Master Product Purchase and Sale with WCS provides in Section 23 ("Confidentiality") that "Suncor and [WCS] each agrees to hold in the **strictest confidence** the terms of this Agreement or any information containing any of the terms of this Agreement, **including pricing and volume information**." *See* Master Product Purchase and Sale Agreement, Dep. Exh. 2, at p. A-4 attached hereto (emphasis added) and also at p. 2, ¶6.

8. The confidentiality requirement in the Master Product Purchase and Sale Agreement is so strict that neither Suncor nor WCS may disclose the terms of the Agreement or the pricing and volume information "to any third party without the prior written consent of the other Party, unless required by law or government." The only exception being that each may make such disclosure "to its attorneys, tax advisors, and its employees, provided that prior to any such disclosure, such persons agree to be bound by the terms of this Section [23]."

9. In addition, Section 24 of the Master Product Purchase and Sale Agreement provides that if either Suncor or WCS "receives a subpoena or other legal process ... relating to [the] Agreement," it shall notify the other party.

10. All of Suncor's Master Product Purchase and Sale Agreements with its customers have the same confidentiality provisions as in WCS's Agreement, including those with Dillon and Mini Mart. Based on my experience, such provisions are standard in the industry and are necessary because of the highly competitive nature of gasoline and diesel fuel sales. Based on my experience in negotiating and approving those agreements with other Suncor customers, Suncor's customers require and rely on those confidentiality provisions.

11. Disclosure of pricing sheets similar to the one attached as Exhibit A and Confirmations similar to those attached as Exhibit B to the Motion would cause substantial business or competitive injury to Suncor and its customers because of the pricing and volumetric information they contain. That information, if disclosed to Mr.Taraghi or any of Suncor's current or past customers, would give that customer an unfair competitive advantage that could be exploited in the marketplace. I contrast that with the email attached as Exhibit C which, while

confidential, could be disclosed to Mr. Taraghi because it is a one-time discount and does not contain any volume or pricing information.

12. Although I am referring specifically to Mr. Taraghi, my concerns are not personal or limited to him. Contrary to the assertions in the Motion, my concerns are not based on "some inherent dislike or distrust of Mr. Taraghi and his company." *See* Motion, ¶13 at p. 8. They would apply to any of Suncor's past or current customers.

13. I will now address the specific substantial competitive harm that disclosure would cause Suncor. Then I will address the substantial competitive harm that disclosure would cause Suncor's customers.

14. Suncor's major competitors for gasoline and diesel sales are Holly Frontier, Sinclair, ConocoPhillips (now Phillips 66), and Valero. I am reasonably certain that WCS buys gas from one or more of those suppliers. If Mr. Taraghi or any other competitor knows the price at which Suncor is selling gas to a big customer such as Dillon, Mr. Taraghi could use that information as leverage, directly or indirectly, in negotiating with the Holly Frontier, for example.

15. I am not suggesting that Mr. Taraghi would intentionally violate the Protective Order. But in any negotiations, it would be all too easy for Mr. Taraghi to suggest or imply the prices at which Suncor is selling gas to King Soopers or Loaf N Jug or to say things in such a way which would enable Holly Frontier, for example, to determine that. In fact, it would be likely unavoidable in any such negotiations.

16. Mr. Taraghi's information would not just be limited to Dillon (King Soopers and City Market) or Mini Mart (Loaf N Jug). He also wants access to all the other spreadsheets and Confirmations similar to those in Exhibits A and B that Suncor has produced in this case. That would include spreadsheets for, among others, Offen Petroleum, Inc., which buys gas and diesel fuel from Suncor for re-sale to Safeway, and for Dats Trucking and Truman Arnold Companies, which buy gasoline and diesel fuel from Suncor for re-sale to Costco and Sam's Club. Those companies' sales to Safeway, Costco and Sam's Club are the result of a bid process. Suncor's sales to Offen, Dats and Truman Arnold are also the result of a bid process. It is very likely that, in addition to approaching Suncor, these customers have also approached Holly Frontier, Sinclair, Phillips 66, and Valero and asked them to bid on supplying them with the gasoline and diesel fuel so they could fulfill their contracts with Safeway, Costco and Sam's Club.

17. If Holly Frontier, Sinclair, Phillips 66 or Valero had information which could enable them to form an educated idea (as opposed to a guess) of the price at which Suncor was selling gasoline or diesel fuel to Offen, Dats or Truman Arnold, that would be "intelligence" which would allow them to underbid Suncor in subsequent bids to supply those companies with fuel to meet their contracts. They would have pricing information that Suncor would not have, putting Suncor at a huge competitive disadvantage. To put it differently, if the positions were reversed and I had the information in Exhibits A and B for Phillips 66, Holly Frontier, Sinclair, or Valero, I could use that information to derive the price at which they were selling gas. It would give me a substantial competitive advantage in any bid process and would enable me to approximate very closely their bids, thereby underbidding them.

18. In sum, the pricing and volume data in Exhibits A and B would provide information sufficient to allow Suncor's competitors to formulate an educated idea with respect to Suncor's prices. That is true even though the information may be for 2008 and 2009. The pricing does not change very much from year to year. Suncor entered into new two year contracts with both Dillon and Mini Mart in June 2011. The pricing did not change significantly, so that if Mr. Taraghi had access to Exhibits A and B, he would be able to approximate very closely the current pricing. WCS is incorrect when it suggests otherwise. *See* Motion, ¶12 at p. 8.

19. WCS is incorrect when it asserts that pricing information for January 2007 through May 2011 is "historical" and no longer "highly sensitive" or highly confidential. *See* Motion at ¶2 at pages 2-3 and ¶12 at p. 8. The Master Product Purchase and Sale Agreement recognizes that the confidential nature of the pricing and volume information does not expire in one or two or even five years after a given sale. The Master Product Purchase and Sale Agreement requires that pricing, volumes and other information be kept in the "strictest confidence" for two years after the *end* of the buyer-seller relationship.

20. Specifically, Section 23 of the Master Product Purchase and Sale Agreement provides that: "This Section shall survive any termination, expiration, or non-renewal of this Agreement for a period of two (2) years." Thus, both WCS and Suncor are required to keep all WCS's pricing and volumes "in the strictest confidence" for two years after the relationship has ended. That same obligation applies to all of Suncor's other customers.

21. Disclosure would also cause substantial competitive harm to Suncor's customers. WCS characterizes itself as a "discounter' in the retail fuel sales business. *See* Amended Complaint, ¶7. The pricing, volume and other information contained in Exhibits A and B (and similar spreadsheets and Confirmations) would enable WCS to approximate very closely Dillon's and Mini Mart's costs, as well as the costs for other companies for which similar documents have been provided. This would give WCS a substantial competitive advantage in pricing its gasoline *vis a vis* its competitors. Knowing its competitors costs would allow WCS to determine the "tipping point" for a competitor—that is, the lowest price at which that competitor would be willing to sell its gasoline or below which it could not go. Gasoline retail pricing is similar in many respects to a poker game. With the information in Exhibits A and B, WCS would know its competitor's "hole card."

22. In addition, barring some unforeseen circumstances, a retail gasoline station's volume of business does not change significantly from year to year. You can develop a general idea of a station's volume of business based on the number of pumps it has. However, the volume information in Exhibits A and B would enable WCS to back into and estimate the business that a given retail stores does with greater precision. With that knowledge, WCS could determine better the volume of "inside sales" (the convenience store side of the business) that a given station does. That would give WCS a very significant competitive advantage in its own "inside sales" pricing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 13, 2012.

_____
Steven Ewing

5630405_1.DOCX



## MASTER PRODUCT PURCHASE AND SALE AGREEMENT

*Western Convenience*

This Master Product Purchase and Sale Agreement (the "Agreement"), is entered into and effective as of the _17th_ day of _January_, 200_7_ (the "Effective Date"), by and between Suncor Energy (U.S.A.) Inc., a Delaware corporation ("Suncor") and Western Convenience Stores, Inc., a(n) _____ ("Counterparty"). Suncor and Counterparty may hereinafter be collectively referred to as the "Parties," and each individually as a "Party."

In consideration of the mutual covenants herein and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Scope of Master Agreement - Acceptance of GTC's. Except as expressly provided in a separate written purchase and sale agreement executed by both of the Parties, this Agreement shall govern any and all transactions or agreements entered into or consummated between the Parties on or after the Effective Date hereof for the purchase and sale of any petroleum products, including without limitation gasoline, distillate, resid, slurry oil, propane, or butane, and the General Terms and Conditions attached hereto as **Exhibit A** shall be incorporated into, form a part of, and apply to any such transaction or agreement, including without limitation those governed by a Confirmation (as defined in Section 2 below).

2. Confirmation Procedure. Each of the Parties agrees that it shall be legally bound to any transaction or agreement agreed to by the Parties (orally or otherwise) for the purchase and sale of any petroleum products pursuant to the terms set forth in a transaction or agreement confirmation delivered by Suncor to Counterparty pursuant to Section 3 hereof (each, a "Confirmation"), provided that Counterparty does not deliver written Notice of its objection to any terms of the Confirmation to Suncor within two (2) business days after its receipt of the Confirmation, after which deadline the Confirmation shall be binding on Counterparty whether or not Counterparty executes and returns the Confirmation to Suncor. If Counterparty provides a timely Notice objecting to, changing, or proposing any new terms in or to a Confirmation, Suncor shall not be bound by any such proposed changes or new terms unless and until Suncor agrees to such changes or new terms in a writing signed by Suncor. If Counterparty accepts, takes delivery of, purchases, delivers, or sells any petroleum products from or to Suncor pursuant to a purported transaction or agreement documented by a Confirmation which Counterparty has timely objected to, altered, or proposed new terms for, but which changes or new terms have not been assented to in writing by Suncor as set forth above, the terms of the original Confirmation delivered by Suncor (together with the General Terms and Conditions attached hereto) shall govern any such transaction or agreement and all sales thereunder. In the event that Counterparty accepts, takes delivery of, purchases, delivers, or sells any petroleum products from or to Suncor without a valid Confirmation or separate purchase and sale agreement between the Parties, the General Terms and Conditions to this Agreement shall nonetheless govern such transactions. The Parties agree that this Section shall govern in accordance with C.R.S. § 4-1-302(a).

3. Notice. All notices required or permitted under this Agreement (each, a "Notice") shall be in writing and shall be delivered by e-mail, facsimile, or certified mail return receipt requested, at the contact information provided below. All Notices shall be deemed delivered upon the day of actual receipt by the receiving Party or confirmation of such receipt (whichever occurs first) if occurring on or before 5:00 p.m. Mountain Time, and on the day following such receipt or confirmation of receipt if occurring after 5:00 p.m. Mountain Time. Each Party may change any of its contact information below upon written notice to the other Party.

To Suncor:  Suncor Energy (U.S.A.) Inc.
7800 E. Orchard Road, Suite 300
Greenwood Village, Colorado 80111
Attn: Contract Coordinator
Fax: 303.793.8054
e-mail: contractcoordinator@suncor.com

To Counterparty:  Western Convenience
6746 S. Revere Pkwy #125
Centennial CO 80112
Attn: Angelia Spillman
Fax: 303-706-0345
e-mail: angelia@westernconveniencestores.com

4. Conflicts. To the extent, and only to the extent, that the terms in any Confirmation or other valid written purchase and sale agreement subject to this Agreement expressly contradict or are inconsistent with those set forth in **Exhibit A** hereto, the terms of the Confirmation or other purchase and sale agreement shall govern and control. Otherwise, any additional rights or obligations set forth in **Exhibit A**, even if relating to a subject matter addressed in the Confirmation or other purchase and sale agreement, shall be binding on both Parties.

5. Exhibits. The General Terms and Conditions attached hereto as **Exhibit A** are, by this reference, expressly incorporated into and made a part of this Agreement.

6. Confidentiality. This Agreement is to be maintained strictly confidential by the Parties pursuant to Section 23 of **Exhibit A.**

7. Counterparts. This Agreement may be executed on one or more counterparts, all of which taken together shall be deemed to constitute one and the same instrument. Each counterpart to this Agreement may be delivered by any method permitted in the Section 3 above, including facsimile or e-mail, and each counterpart so delivered shall constitute an original.

IN WITNESS WHEREOF, this Agreement is executed by the Parties as of the Effective Date.

SUNCOR ENERGY (U.S.A.) INC.

By: _____
Print Name: STEVE DOUGLAS
Title: G.M. SUPPLY & MARKETING

COUNTERPARTY:
Western Convenience Stores, Inc.

By: _____
Print Name: Hossein Taraghi
Title: pres.

2

Exhibit A
Suncor Energy (U.S.A.) Inc.
General Terms and Conditions

1.  **General.** For purposes of these General Terms and Conditions, the term "Agreement" shall mean and include these General Terms and Conditions and the applicable Master Product Purchase and Sale Agreement between the Parties ("MPPSA"), Confirmation(s) (as defined in the MPPSA), and/or other purchase and sale agreement(s) between the Parties to which these General Terms and Conditions expressly form a part. Unless otherwise defined herein, all capitalized terms herein (including "Suncor" and "Counterparty") shall be defined pursuant to the terms of the MPPSA, Confirmation, and/or or other mutually executed purchase and sale agreement, as applicable, to which this Exhibit A forms a part.

2.  **Measurement.**

**Tank Trucks/Tank Cars.** Suncor shall read its meters at the time Product is loaded into the receiving tank trucks or tank cars, as applicable, to determine bill of lading volume(s) for each delivery of Product. If meters are not available at or near the loading point, the driver or tank car loader, as applicable, shall innage/ullage each tank truck and/or tank car immediately before and immediately after delivery of the Products to determine the volume(s) of Products delivered. These innages/ullages shall be converted to net delivered gallons based on each tank truck's or tank car's official calibration tables.

**Pipelines.** At the time of delivery, the operator shall read the applicable meters installed on the pipeline(s) at or near the Delivery Point(s) to determine the volume(s) of Products delivered.

**Other.** If the applicable measurement method(s) described above are not available, the Parties shall establish another mutually acceptable method for determining the volume of Product(s) delivered.

All volumes of delivered product(s) shall be corrected for temperature to 60 degrees Fahrenheit in accordance with then current ASTM standards, which as of the effective date of this Agreement is ASTM D-1250 and Petroleum Measurement Table 6B in its latest revision. The term "barrel" means 42 U.S. gallons of 231 cubic inches per gallon. All measurements and/or tests shall be made in accordance with the latest standards or guidelines published by the API or ASTM. The meter operator shall, upon request, allow the other Party to witness meter proving and review and copy relevant meter proving records.

3.  **Demurrage.** Counterparty is responsible for any and all demurrage and detention charges incurred on rail tank cars in connection with the loading or unloading of Product pursuant to this Agreement.

4.  **Warranty.** Suncor warrants it has the right to dispose of all Product sold and transferred under this Agreement, and that the Product delivered hereunder shall conform to the specifications and descriptions contained in the Agreement and that such Product will be delivered to Counterparty free from all lawful security interests, liens and adverse claims including taxes and royalties created by, through, or under Suncor. **THE ABOVE IS SUNCOR'S ONLY WARRANTY CONCERNING THE PRODUCTS AND THIS AGREEMENT, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, CONDITIONS AND REPRESENTATIONS, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EVEN IF SUCH PURPOSES ARE KNOWN TO SUNCOR.**

5.  **Payment.** Unless otherwise agreed to in writing, Suncor shall furnish Counterparty with invoices for all Product sold and delivered to Counterparty hereunder, and Counterparty shall, upon receipt of each invoice, make payment to Suncor immediately in accordance with the terms of payment provisions of this Agreement without any deduction or set-off. If the due date falls on a Saturday, Sunday, or bank holiday, Counterparty shall make payment on the following business day. Suncor shall deliver each invoice to Counterparty by facsimile or electronic transmission, unless otherwise agreed in writing by the Parties. Each invoice shall be deemed received upon successful transmission of the invoice by Suncor to Counterparty or actual receipt by Counterparty, whichever occurs first. All payments hereunder shall be made by Electronic Funds Transfer ("EFT") or Automated Clearing House ("ACH") into such account(s) as designated by Suncor, unless otherwise agreed by the Parties. Counterparty agrees to execute an EFT or ACH authorization agreement in a form approved by Suncor from time to time. In the event that Counterparty fails or ceases to make payment to Suncor pursuant to the manner and method set forth above, Suncor shall have the right to immediately cease supplying or selling Product to Counterparty and to terminate this Agreement.

6.  **Taxes.** Counterparty shall pay, in addition to applicable prices hereunder, any and all applicable taxes, duties, imposts or other charges imposed by any governmental or regulatory authority or agency in connection with the sale of the Products to the Counterparty (excluding any taxes on the income of Suncor). Failure of Suncor to add any such tax, fee or charge to the invoice shall not relieve Counterparty from liability therefore. Counterparty shall reimburse Suncor for any interest and/or penalty assessed by any governmental or regulatory authority or agency when the penalty and/or interest is assessed as the result of false, incorrect or delinquent certification(s) made to Suncor by Counterparty. In the event Counterparty seeks to claim any

tax exemption status in connection with its purchases hereunder, Counterparty shall provide to Suncor all proper exemption certificates prior to delivery of all applicable Products that is licensed to engage in tax free transactions with respect to the Products under all international, federal, or state laws which may apply to this Agreement and the Products to be delivered hereunder.

7. Rules and Regulations; Compliance with Laws. All of the terms and provisions of this Agreement shall be subject to the applicable laws, orders, rules, regulations, and ordinances of all governmental authorities and regulatory bodies having jurisdiction, and each Party agrees to comply with all such laws, orders, rules, regulations, and ordinances during the term of this Agreement.

8. Warning. THE PRODUCT SOLD BY SUNCOR MAY BEAR OR CONTAIN HAZARDOUS CHEMICALS, RESIDUES OR OTHER HAZARDOUS MATERIALS WHICH MAY BE, OR MAY BECOME BY CHEMICAL REATIONS OR OTHERWISE, DIRECTLY OR INDIRECTLY HAZARDOUS TO LIFE, HEALTH OR PROPERTY BY REASON OF TOXICITY FLAMMABILITY, EXPLOSIVENESS, OR FOR OTHER SIMILAR OR DIFFERENT REASONS DURING TRANSPORTATION, USE, HANDLING, REMOVAL, REFINING, CLEANING OR RECONDITIONING.

Suncor has provided or shall, upon Counterparty's written request, provide Counterparty with Material Safety Data Sheets concerning the Products, which shall be made a part of this Agreement and which contain information regarding health risks and recommendations for the safe use and handling of the Product. Counterparty shall read and comply with such Material Safety Data Sheets and the above warning, and undertake to exercise the degree of care required to protect persons and properties from all hazards of the Product disclosed in the Material Safety Data Sheets and warning, including but not limited to, by: (i) providing employees of the Counterparty and its affiliates who may be handling the Products with appropriate safety equipment and ensuring such safety equipment is adequately maintained and properly used and (ii) warning third parties who may purchase or come into contact with the Products or who handle or transport the Products on behalf of the Counterparty of the aforesaid hazards of the Products.

9. Allocation. The amount of Products to be supplied to Counterparty shall be subject to any good faith allocation program which Suncor may find necessary to effect for any reason, including but not limited to shortage of Products or government regulation. Suncor may equitably allocate its available Products to its customers (including Counterparty). When an allocation program is in place, Suncor shall have the right to impose a surcharge on any gallons purchased which exceed 100% of Counterparty's allocation upon twenty-four (24) hours prior notice, which notice may be provided by e-mail or facsimile. In the event Suncor's inventory, ability to refine or sources of supply of crude petroleum or refined petroleum products are not sufficient to meet demand at Suncor's normal or assigned supply sources (regardless of whether Suncor may have diverted supply to other supply sources to alleviate shortages at such other supply sources), Suncor shall not be bound to acquire by purchase or otherwise additional quantities of crude petroleum or refined petroleum products from other suppliers or to take any other action which is uneconomic for Suncor. Suncor may, but is not obliged to, designate a temporary alternate source of supply and/or offer Counterparty temporary substitute Products. No allocation pursuant to this Section shall operate to extend the period of this Agreement and Suncor shall not be obligated to make available any quantities omitted due to any allocation program.

10. Force Majeure. If either Party to this Agreement fails to observe or perform any of the covenants or obligations herein, in whole or part, to the extent that such failure is occasioned by war, flood, fire, explosion, extreme heat or cold, earthquake, storm, riot, labor dispute causing work stoppage, strike, lockout, act of God, governmental regulation, disruption or breakdown of production facilities, refining or transportation facilities, failure of transportation providers to furnish transportation, failure of suppliers to furnish supplies, any law, rule, order or action of any court, agency, or instrumentality of the federal, state, or municipal government, or any other cause or causes, whether similar or dissimilar, without enumeration, beyond the reasonable control of such Party, but excluding lack of funds or inability to pay, such failure shall be deemed not to be a breach of the covenants or obligations under this Agreement, provided that the Party claiming such failure shall give the other written notice, as soon as reasonably practicable, of the occurrence affecting it. This Section shall not, however, relieve any Party from any obligations, including obligations to pay for Products, incurred prior to validly invoking force majeure. The Parties further agree at the conclusion of any force majeure event, neither Suncor nor Counterparty shall have any obligation to each other with respect to any quantities of Product not purchased or delivered as a result of such force majeure event. No condition of force majeure shall operate to extend the term of this Agreement or any renewal thereof.

11. Indemnity. Counterparty shall defend, indemnify, and hold Suncor, its parent, subsidiaries, affiliated companies and their officers, directors, employees, and agents (the "Indemnified Parties") harmless from and against any and all liabilities, claims, actions, suits, damages, fines, penalties, judgments, losses, costs and expenses (including, without limitation, reasonable attorney's fees, court costs, and all other legal expenses) of every type and character (collectively, "Claims"), including, without limitation, for personal injury to or death of any person (including, without limitation, Counterparty's or Suncor's employees, carriers, agents, or customers) or for damage to, loss of, or destruction of any personal or real property caused by, arising out of, or resulting from the willful or negligent acts or omissions of Counterparty, its employees, agents, or representatives (the

A-2

"Counterparty Parties") with respect to this Agreement or the Products purchased and sold hereunder, including, without limitation, the storage, handling, commingling, transportation, resale, or use of such Products. Counterparty also agrees to defend, indemnify, and hold the Indemnified Parties harmless from and against any and all Claims caused by, arising out of, or resulting from any breach of this Agreement by any of the Counterparty Parties or the failure of any of the Counterparty Parties to comply with any and all applicable laws and regulations. The foregoing indemnity shall not apply to the extent that any Claim is caused by the negligence or willful misconduct of any of the Indemnified Parties.

12. Limitation of Liability. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, ARISING UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. Suncor's liability with respect to this Agreement, any Products delivered hereunder, or any action relating to the same (whether in contract, equity, tort, or otherwise) shall be limited to, and shall not exceed, the lesser of: (i) the actual amount of direct damages incurred, or (ii) the actual amount paid by Counterparty for the applicable Products giving rise to such liability. Further, any actions to enforce any rights or obligations under this Agreement must be filed against the other Party in a court in the State of Colorado no later than one (1) year after the date that the Party had actual or constructive knowledge of the events giving rise to the alleged breach of this Agreement, or such rights shall be deemed expressly waived.

13. Applicable Law; Forum Selection; Waiver of Right to Jury Trial. This Agreement shall be governed by and construed in accordance with laws of the State of Colorado, without regard to conflicts of laws principles. Each of the Parties irrevocably and unconditionally consents to the exclusive jurisdiction of the courts of the Sate of Colorado and of the United States of America located in the City of Denver, Colorado for any actions, suits, or proceedings arising out of or relating to this Agreement or the transactions contemplated thereby, and each of the Parties further agrees not to commence any action, suit, or proceeding except in such courts. Each of the Parties also hereby irrevocably and unconditionally waives any objection to the laying of venue of any such proceedings in such courts located in the State of Colorado, and waives and agrees not to plead or to make any claim than ay proceeding brought in any court in the State of Colorado has been brought in an improper or inconvenient forum. EACH OF THE PARTIES HEREBY EXPRESSLY AND UNCONDITIONALLY WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

14. Assignment. No rights or obligations arising under this Agreement shall be assigned by either Party without the prior written consent of the other Party, which consent may not be unreasonably withheld, conditioned, or delayed; provided, however, Suncor and its successors and assigns may, without the consent of or notice to the Counterparty, sell, transfer and/or assign from time to time any part of, or any interest in, the indebtedness of Counterparty to Suncor pursuant to this Agreement, together with any security interests, liens, property, guarantees and other agreements or arrangements supporting or securing payment of same, and/or declare that another person has a beneficial interest therein. Notwithstanding the foregoing, either Party may, without the consent of or notice to the other, assign its rights and obligations hereunder to any subsidiary or affiliate, provided that in no event shall such assignment relieve the assigning Party of its obligations hereunder.

15. Title and Risk of Loss. Title to and risk of loss of the Product shall pass to Counterparty (and delivery and purchase of such Product shall be deemed to occur) at and upon delivery at the Delivery Point specified in this Agreement. It is expressly understood and agreed by the Parties that the passage of title and risk of loss as set forth above is not conditioned upon the delivery or receipt of Bills of Lading or pipeline meter tickets.

16. Credit. Suncor, at its sole and absolute discretion, may extend credit or a line of credit to Counterparty on such terms as Suncor shall specify from time to time, and Counterparty shall pay Suncor for Products strictly in accordance with such terms and any other payment terms applicable at the time of delivery. Suncor reserves the right to modify or withdraw such credit and/or credit terms at any time without prior notice to Counterparty.

17. Security. If Suncor, in its sole discretion, believes that it has grounds for insecurity regarding the performance of any obligation under this Agreement by Counterparty (whether or not then due) for any reason (including, without limitation, the occurrence of a Material Change in the creditworthiness of Counterparty, Counterparty's failure to timely pay any invoice, or Counterparty's breach of any credit terms extended by Suncor), Suncor shall have the right to do one or more of the following: (a) without notice, suspend indefinitely any and all sales of Product to Counterparty, (b) without notice, suspend, withdraw, alter, or terminate any credit or line of credit previously extended to Counterparty, and (c) make Performance Assurance (as defined below) a condition precedent to the further supply of Product and/or extension of credit to Counterparty, which Counterparty shall provide and maintain during the term of the Agreement or any extension thereof or until such requirement is waived by Suncor.

In this Section, "Performance Assurance" shall mean sufficient security in a form, amount, and term acceptable to Suncor, in its sole discretion, which may include, without limitation, a standby irrevocable letter of credit, a prepayment, a security interest in one or more assets, or a performance bond, and "Material Change" shall mean that the senior long-term debt or deposits of

A -3

Counterparty, or in the event of reorganization, the resulting, surviving or transferee of Counterparty is or are, as the case may be, rated less than BBB by Standard & Poor's Corporation or Baa2 by Moody's Investors Service, Inc.

18.  Default. In the event (each an "Event of Default") either Party (the "Defaulting Party"): (i) makes an assignment for any general arrangement for the benefit of creditors; (ii) files a petition or otherwise commences, authorizes, or acquiesces in the commencing of a proceeding or cause under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise becomes bankrupt or insolvent (however evidenced); (iv) is unable to pay its debts as they fall due; (v) has a receiver, provisional liquidator, conservator, custodian trustee or other similar official appointed with respect to it or substantially all of its assets; (vi) fails to provide Performance Assurance within two (2) business days (being any day other than a Saturday, Sunday or statutory holiday in Colorado) after a written request by Suncor; (vii) has breached or defaulted in the performance of any term or condition of this Agreement, and failed to have cured such breach or default within ten (10) days of receiving written notice from the other Party, or (viii) has not paid any amount due on or before the second business day following the due date for such amount; then the other Party (the "Non-Defaulting Party") shall, in addition to any other rights or remedies which it may have at law or in equity, have the right, at its sole discretion, to (a) immediately withhold and/or suspend the delivery or acceptance of Product upon notice, or (b) terminate this Agreement and/or any transactions hereunder.

19.  Quality and Quantity Claims. Counterparty agrees to give Suncor written notice of any claims of defect in quality or shortage in quantity within seven (7) days after the relevant Product is delivered. Counterparty shall inspect the Products and, whenever possible, any equipment used to make the delivery of such Products in order to determine the cause of any defects or shortages and notify Suncor within above-specified time period. IF COUNTERPARTY FAILS TO PROVIDE SUNCOR WITH WRITTEN NOTICE OF ANY CLAIM OF DEFECT OR SHORTAGE WITHIN SEVEN (7) DAYS AFTER DELIVERY OF THE PRODUCT, COUNTERPARTY AGREES THAT IS WILL HAVE WAIVED THE RIGHT TO MAKE OR PURSUE SUCH CLAIM(S). If Counterparty gives Suncor timely notice of a defect in quality, Counterparty shall give Suncor the opportunity to test the Product in question. If the Product is found to have been contaminated while in Suncor's custody, Suncor shall pay for such test. If the Product is found to have been contaminated after it has left Suncor's custody, Counterparty shall pay for such test.

20.  Interest. Counterparty shall pay interest on all amounts that are owing to Suncor and overdue at the rate of twelve percent (12%) per annum. Interest shall be calculated from the date that the amount becomes overdue, regardless of whether Suncor has made demand for payment from the Counterparty. Counterparty shall pay all of Suncor's costs and expenses (including reasonable attorney's fees, court costs, and all other legal expenses) of collecting past due payments.

21.  Notices. Notices, invoices and reports given under this Agreement shall be in writing and delivered by fax, e-mail, or other telecommunication device, or mailed by prepaid post, addressed to the Parties at the addresses given in this Agreement.

22.  Set-Off. If any amount payable by Counterparty hereunder is not paid as and when due, Counterparty authorizes Suncor to proceed without prior notice by way of set-off, counterclaim or otherwise against any assets of Counterparty that may at any time be in the possession of Suncor, including without limitation against any amounts owing from Suncor to Counterparty.

23.  Confidentiality. Suncor and Counterparty each agrees to hold in the strictest confidence the terms of this Agreement or any information containing any of the terms of this Agreement, including pricing and volume information (collectively, "Confidential Information"), and not to disclose it to any third party without the prior written consent of the other Party, unless required by law or government request subject to Section 24 (Subpoenas) below. Suncor and Counterparty shall be entitled to disclose Confidential Information to its attorneys, tax advisors, and its employees, provided that prior to any such disclosure, such persons agree to be bound by the terms of this Section. In the event either Party breaches the confidentiality obligations set forth herein, the other Party shall have the right to immediately terminate this Agreement upon notice to the other Party. This Section shall survive any termination, expiration, or non-renewal of this Agreement for a period of two (2) years.

24.  Subpoenas. In the event that either Party receives a subpoena or other legal process requesting it to produce any documents or tangible things relating to this Agreement, including any Confidential Information (collectively, a "Subpoena"), the subpoenaed Party agrees that it shall: (a) immediately provide the other Party notice of and a copy of any Subpoena, (b) if permitted by law, not produce any documents or tangible things until it receives an order from the relevant court or administrative body, or written consent from the other Party, and (c) in any event, shall only produce such documents and tangible things as are expressly required by the Subpoena or order of the court, strictly construed.

25.  Records and Audit Rights.  Each Party agrees to maintain all records created in the course of such Party's performance under this Agreement for a period of three (3) years, and shall continue to maintain such records for a period of two (2) years after the expiration of this Agreement. Each Party shall have the right to inspect and audit the other Party's books and records, at the initiating Party's sole cost and expense, upon written notice and at such times so as to not unreasonably interfere with the other Party's business, as to be mutually agreed upon by the Parties. However, a Party can only conduct one audit per

year, and the same year cannot be re-audited. This Section shall survive any termination, expiration, or non-renewal of this Agreement for a period of two (2) years.

26. Ethics; Commissions and Gifts. No director, officer, employee, or agent of either Party in their individual capacity shall give or receive any commission, fee, or rebate to or from any director, officer, employee, or agent of the other Party. Neither Party shall enter into business arrangements with the directors, officers, or employees of the other Party, unless such directors, officers, or employees are acting as representatives of the other Party.

27. Waiver. The delay or failure of any Party to enforce any of its rights under this Agreement arising from any default or breach by the other Party shall not constitute a waiver of any such default, breach, or any of the Party's rights relating thereto. No custom or practice which may arise between the Parties in the course of operating under this Agreement will construed to waive any Parties' rights to either ensure the other Party's strict performance with the terms and conditions of this Agreement, or to exercise any rights granted to it as a result of any breach or default under this Agreement. Neither Party shall be deemed to have waived any right conferred by this Agreement or under any applicable law unless such waiver is set forth in a written document signed by the Party to be bound, and delivered to the other Party. No express waiver by either Party of any breach or default by the other Party shall be construed as a waiver of any future breaches or defaults by such other Party.

28. Headings. The headings used in this Agreement are for convenience only and shall not be used for the purpose of construction or interpretation. When the context so requires, the singular shall include the plural and vice versa.

29. Entire Agreement; Modification. This Agreement reflects the entire agreement between the Parties with respect to its subject matter, and supersedes any previous agreement between the Parties relating to its subject matter. There are no oral or written agreements, inducements, statements, representations, promises, or understandings between the Parties except as expressly set forth herein. No amendment or modification to this Agreement shall be of any force or effect unless it is: (1) is in writing, (2) expressly indicates that it modifies the Agreement, (3) reflects the effective date of the modification, and (4) is signed by both Parties.

30. Severability. Each provision of this Agreement, shall be interpreted to make it effective under applicable law. If any provision of this Agreement is contrary to law, void, or unenforceable, such provision shall be ineffective only the extent of such invalidity or modified so as to conform to law, and the remainder of such provision and the Agreement shall remain in full force and effect.

31. No Third Party Beneficiaries. This Agreement is solely between Suncor and Counterparty and intended for the sole use and benefit of such Parties. No other person or party is a third party beneficiary under this Agreement.

32. Effectiveness. This Agreement shall not be binding on Suncor until Suncor signs it, and prior sales shall not be construed as a waiver by Suncor of this requirement. After Suncor has signed this Agreement, any prior sales not otherwise covered by contract shall be deemed to have been made under this Agreement.

33. Survival. The following Sections of this Exhibit A shall survive termination, cancellation, or non-renewal of this Agreement: Sections 5, 6, 11, 12, 13, 19, 20, 21, 23, and 25.

- End of Exhibit A -