# EXHIBIT 2

EXHIBIT 2

MOTION HEARING - SEPTEMBER 28, 2011

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 11-CV-1611-MSK-CBS

WESTERN CONVENIENCE STORES, INC.,
a Colorado corporation,

WESTERN TRUCK ONE, LLC
a Colorado limited liability company,
            Plaintiffs,
      vs.
SUNCOR ENERGY, (U.S.A.), INC.,
a Delaware corporation,

            Defendants.

Proceedings before CRAIG B. SHAFFER, United
States Magistrate Judge, United States District Court
for the District of Colorado, commencing at 9:13 a.m.,
September 28, 2011, in the United States Courthouse,
Denver, Colorado.

WHEREUPON, THE ELECTRONICALLY RECORDED
PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

APPEARANCES

MR. KENNETH R. BENNINGTON, ESQ., and
MS. KATHLEEN E. CRAIGMILE, ESQ.
Appearing on behalf of the Plaintiffs.

MR. JOHN R. ROBERTSON, ESQ., MR. WILLIAM L. MONTS, ESQ.,
and MR. ANTHONY J. SHAHEEN, ESQ.
Appearing on behalf of the Defendants.

MOTION HEARING

## Page 2

1             PROCEEDINGS
2       (Whereupon, within the electronically recorded
3   proceedings are herein transcribed, pursuant to order of
4   counsel.)
5       THE COURTROOM DEPUTY:  All rise.
6       THE COURT:  Please, everybody have a seat.
7   All right.  We're on the record in Western Convenience
8   Stores, Inc. versus Suncor Energy, 11-CV-1611.  I'll
9   take appearances of counsel.
10      MR. BENNINGTON:  Good morning, Your Honor.
11  Kenneth Bennington and Kathleen Craigmile for the
12  plaintiffs.
13      MS. CRAIGMILE:  Good morning, Your Honor.
14      THE COURT:  Okay.  Good morning.
15      MR. ROBERTSON:  Good morning, Your Honor.
16  Robby Robertson.  I also have with me Anthony Shaheen
17  and Mr. William Monts.  We represent the defendant.
18      THE COURT:  All right.  This poses a threshold
19  issue.  I need to ask you, what do you all envision as
20  the scope of my role in light of Judge Krieger's order
21  of reference?  How much or how little do you want me to
22  do?  Because she gave you the chance to consent to me
23  deciding this motion or, alternatively, I can simply
24  write a recommendation which would almost guarantee that
25  you build in more time and money.  What would you like

## Page 3

1   to do?
2       MR. BENNINGTON:  I have been proceeding in the
3   assumption that you will rule, Your Honor.
4       THE COURT:  Okay.  What's Suncor's view?
5       MR. ROBERTSON:  Your Honor, plaintiff wants to
6   put on its case and we're here to defend it.
7       THE COURT:  No.
8       MR. ROBERTSON:  I mean --
9       THE COURT:  But the -- the order of reference
10  was is that you could either consent to me deciding the
11  motion, or under 636(c) --
12      MR. ROBERTSON:  I see.  Could I confer with --
13      THE COURT:  Sure.  Absolutely.  You can have
14  just a mass conferral.
15      MR. ROBERTSON:  And, Your Honor, since --
16  actually, my client hasn't -- isn't here and the last
17  word he gave us was to go ahead and ask Your Honor
18  respectfully to give a recommendation.
19      THE COURT:  Okay.  I'm happy to do that.
20      MR. ROBERTSON:  I apologize, I can't change --
21  I don't -- that's the last word I got.
22      THE COURT:  No, and your client absolutely has
23  the right to decide it.  I don't necessarily see the
24  economic efficiency of that, but that's fine.
25      MR. ROBERTSON:  And I agree, but I just don't

## Page 4

1   have the authority to change my mind, so --
2       THE COURT:  No, I understand.  Okay.  I have
3   reviewed the motion, the response and the reply.  I have
4   read the exhibits that you tendered and I have read the
5   cases you cited and I have done my own research.  But I
6   will turn the matter over to you.  It's plaintiff's
7   motion, so please.
8       MR. BENNINGTON:  You want an opening, Your
9   Honor or should we proceed direct to --
10      THE COURT:  I mean, I've read everything and I
11  suspect your opening is simply going to tell me what's
12  in your motion.
13      MR. BENNINGTON:  It is.  I'm happy to proceed.
14      THE COURT:  Well, suffice to say that having
15  read your motion, there's really not much surprise left.
16  So, why don't --
17      MR. BENNINGTON:  Yeah.
18      THE COURT:  -- you just go ahead and begin.
19      MR. BENNINGTON:  Very good.
20      THE COURT:  Sir, come on up.  Sir, what I'd
21  ask you to do is have a seat.  That chair does not roll
22  so --
23      MR. TARAGHI:  Okay.
24      THE COURT:  Now, once you get yourself
25  comfortably positioned, please raise your right hand.

1 (Pages 1 to 4)

MOTION HEARING - SEPTEMBER 28, 2011

Page 29

```
1   A   Yes.
2   Q   How do you know this?  First of all, let me ask you
3   this.  Have you mentioned this to anybody at Suncor?
4   A   Yes, I have.
5   Q   Who?
6   A   Steve Ewing.  I mean --
7   Q   Who is Steve --
8   A   Steve Ewing and Steve Moss both.
9   Q   Okay.  Who are Mr. Ewing and Mr. Moss?  Who do you
10  know them to be from Suncor?
11  A   Steve Moss was the rep that I directly communicate
12  with.  And Steve Ewing is Steve -- Steve Moss's boss
13  which is the director of operation, I think, in Suncor.
14  Q   Is it your understanding that Mr. Moss has
15  authority over sales to both you and these competitors
16  that you just named off?
17  A   He did.
18  Q   In addition to -- we'll get to how this was
19  admitted to you by Mr. Ewing, but in addition to this
20  admission, did you have -- how else, if any -- what
21  other ways did you realize that your competitors were
22  getting a better price?
23  A   Because I am experienced myself.  I've been in this
24  business for 30 years.  We do -- we do see what --
25  because it was about four months and I'm going trying to
```

Page 30

```
1   go up, I am not making any money, and everybody is just
2   chipping their prices down for just big period of the
3   time.  And I knew that 10 cents is offered.  I was --
4   would buy -- they would told me already, even admitted
5   by Steve Ewing to me, that he was offering it, but he
6   didn't tell me who, except he said their own retail.
7   But -- or branded people.  But -- and I was trying --
8   just very scrambling trying to figure out how I can --
9       THE COURT:  A couple things, Mr. Taraghi.  I
10  don't want to cut you off and I certainly want to give
11  you --
12      THE WITNESS:  Sure.
13      THE COURT:  -- as much time as you want to
14  testify.  But it would be helpful to me, and I think the
15  record would be clearer, if you answered the specific
16  question asked.  Now, your lawyer asked you how -- apart
17  from whatever statements Mr. Ewing may have made how did
18  you know that these three entities, Kroger, Shell, and
19  Suncor's own retail outlets were getting the
20  10-cents-per-gallon price break and you really haven't
21  answered that question.  How did you know -- separate
22  and apart from any statements that Mr. Ewing made, how
23  did you know that they were getting a 10-cent price
24  break?  That's the specific question.
25      THE WITNESS:  I was told from the people that
```

Page 31

```
1   they were purchasing that they were getting 10 cents and
2   all --
3       THE COURT:  So you were told by purchasers for
4   Kroger and Shell that they were getting --
5       THE WITNESS:  Shell.
6       THE COURT:  Shell.
7       THE WITNESS:  Shell.
8       THE COURT:  Okay.  So the specific answer is
9   you spoke to someone at Shell and someone at Shell said
10  they were getting a 10-cent price break.
11      THE WITNESS:  And also Steve Ewing, when I
12  confront him he admitted to that.
13      THE COURT:  Maybe if we could just focus on
14  the --
15      THE WITNESS:  Sure.
16      THE COURT:  -- specific questions being asked.
17      THE WITNESS:  No problem.
18  Q   (By Mr. Bennington)  Now, apart from -- from
19  learning specifically about this 10-cent differential,
20  10-cent price break that Suncor is extending other
21  purchasers, what could you tell just by your observation
22  of the market?  What was going on that made you think
23  that somebody else is getting a better price?  You
24  started to answer that.  You tried to.
25  A   Right.  Because I can see the behavior of the --
```

Page 32

```
1   Q   Okay.
2   A   -- retailers on the street.
3   Q   Tell us the behavior of the retailers on the street
4   that suggested to you that they're getting a better deal
5   than you.
6   A   Exactly.  They're making 10 cents more than me.
7       THE COURT:  No, he's asking for specific
8   facts.  What did you see that led you to believe?
9   Q   (By Mr. Bennington)  What did you see in the
10  street?  What happened?
11  A   Not raising their prices.
12  Q   In response to price raising that you were trying
13  to do?
14  A   Because they -- the right way was to move the price
15  if you're not making money.  You can't just sit there at
16  the cost for long -- a few months.  That's just not
17  normal.
18  Q   So knowing your costs.
19  A   My costs, right.
20  Q   You were looking at the cost, or looking at the
21  prices they had on the street and you could figure that?
22  A   Because they didn't have to go up.  They were
23  making that 10 cents.  I wasn't.
24  Q   Did you also observe that there were -- in any
25  market or in any particular stations, did you also --
```

8 (Pages 29 to 32)

MOTION HEARING - SEPTEMBER 28, 2011

Page 33

1   did you observe prices that if you met you would be
2   selling below cost?
3   A   One more time.
4   Q   Did you observe prices being set by your
5   competitors on the street that if you sold at that price
6   you'd be selling below cost?
7   A   Correct, yes.
8   Q   Tell us where you saw that, when you saw that.
9   A   I saw it consistently in the branded, Krogers, and
10  it was pretty stubborn market for a few months.
11  Q   Now, let's leave branded out of this because you
12  said that you don't have access to branded fuel, right?
13  Well, you don't --
14      THE COURT:  No, actually I think he said --
15      MR. BENNINGTON:  Actually, he said he did.
16      THE COURT:  -- he did have access to branded
17  fuel, but I -- it's a --
18  Q   (By Mr. Bennington)  Well, let's leave --
19      THE COURT:  -- little hard for me to follow.
20  Q   -- branded fuel out it.  I'm talking just about the
21  competitors whom Suncor supplies fuel.  All right.  And
22  tell me again, to make sure I -- we understand, were
23  they setting prices that appeared to you to be below
24  cost?
25  A   Correct.

Page 34

1   Q   So what's your explanation for how they can stay in
2   business when they're setting prices like that?
3   A   They just don't do that.
4       MR. ROBERTSON:  Objection.  Foundation.
5   A   They just did not do that.
6       MR. ROBERTSON:  Objection.  Foundation.
7       THE COURT:  Yeah, I mean, counsel, the problem
8   is the question is very, very broad, and I think -- I'm
9   going to sustain that objection.  I think you're going
10  to have to lay more of a foundation because it's an
11  undifferentiated question.  And I'm not sure he's in a
12  position -- I mean, they may be selling gas as a loss
13  leader to drive people to their store to buy other
14  things.  Kroger is a grocery store.  Kroger might very
15  well say we're going to drive business to sell
16  groceries.  I don't know that this witness is qualified
17  to render the sweeping conclusion.
18  Q   (By Mr. Bennington)  Based on what you know of
19  Suncor's pricing, in order to sell fuel at -- at the
20  prices Suncor disclosed to you, what would you have to
21  do -- start again.
22      How did you respond?  How have you responded
23  to this price differential of your competitors getting a
24  10 cents better price than you?
25  A   Lose money.

Page 35

1   Q   Is the fuel that we're talking about sold to your
2   stations or to you, to Western Convenience Stores, and
3   the fuel sold to competitors, is it the same stuff?
4   Same grade?  Same quality fuel?
5   A   As far as I know, yes.
6   Q   Do you have stores that compete head to head with
7   these retailers we're talking about, competitors?
8   A   Yes.
9   Q   Same neighborhoods?
10  A   Yeah, same neighborhood.  Across the street, same
11  area.  Everywhere, yeah.
12  Q   Does being in the neighborhood matter?  What
13  matters more when people are buying gasoline, in your
14  experience?
15  A   The conclusion you have to be able to compete.  If
16  you are in decept [sic] manage of the cost wise, you are
17  decept managing competing.  You have to have equal -- if
18  you don't get equally -- cost equally then you can't
19  compete.
20  Q   Let's back up.
21  A   Sure.
22  Q   Will people -- what is your experience with how far
23  people will go to find a different price?
24  A   They go.
25  Q   The best price?

Page 36

1   A   They go far.  Sometimes it's surprising.
2   Q   How do they know?
3   A   They have a body gas -- everything is on-line right
4   now.  They can check it and see who is on the top, has
5   the best price.
6   Q   How is this price differential -- is this price
7   differential in Colorado and Nebraska hurting your
8   business?
9   A   Yes, tremendously.
10  Q   Are you in danger of going out of business?
11  A   I'm not, but if -- that's why I want to stop it.
12  If it continues, yes.
13  Q   Stopping the price discrimination?
14  A   That's correct.
15  Q   If it continues, what happens?
16  A   We go out of business.  Yes, it does.
17  Q   I want to talk about the people at Suncor.  You've
18  already mentioned Steve Ewing, Steve Moss.  There's
19  another person whose name will come up Diane Kriskovich.
20  Do you know who that is?
21  A   I met her once.
22  Q   At a meeting at Suncor?
23  A   At a meeting at Suncor.
24  Q   What do you understand is her job with Suncor?
25  A   She was a credit person.

9  (Pages 33 to 36)