**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation,
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

    Third-Party Defendants.

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL**

---

Plaintiffs Western Convenience Stores, Inc. and Western Truck One, LLC, by and through their undersigned counsel, submit this reply in support of their Motion to Compel (Doc. 52, "Motion") and in response to Defendant's Memorandum in Opposition to same (Doc. 66, "Opposition").

**I.  SUMMARY OF REPLY**

Suncor argues that Plaintiffs seek "massive" amounts of accounting records based purely on speculation and that responding to Plaintiffs' requests would take approximately four months and require Suncor to pay outside consultants more than $160,000.  Suncor's arguments ignore several key facts:

First, Suncor has refused to produce *any* of the accounting records sought by Request for Production 3 through 10, not simply those it now asserts would take months and tens of thousands of dollars to produce. The affidavit of Mr. Conner confirms that Suncor could have responded to Requests for Production 3, 4, 6, 7 and 10 in a short period of time and at a modest cost. Doc. 66-1 ¶ 13. Had Suncor done so -- either at the time they served the discovery responses or prior to Plaintiffs' filing of the Motion in response to Plaintiffs' attempts to confer -- Plaintiffs: (a) may have been able to identify issues regarding pricing or pricing concessions warranting further investigation; (b) would have been in a substantially better position to determine whether other requested accounting records would contain information relevant to Plaintiffs' claims; and (c) would have been in a better position to assess the accuracy of Mr. Conner's estimates regarding the cost of responding to the other document requests. *See* Exhibit 1 ¶ 4. By refusing to produce any of the requested accounting records, Suncor has substantially delayed this case and impeded Plaintiffs' ability to pursue their claims.

Second, as addressed below, after deposing a key Suncor witness, Plaintiffs timely identified eight customers for which they (at least initially) will seek discovery data, including customer-specific accounting data. Suncor has not provided any information that would permit Plaintiffs or the Court to determine whether Mr. Conner's statements regarding the asserted burden associated with Requests for Production 5, 8 and 9 are reasonable or accurate. However, as Plaintiffs have substantially narrowed the group of customers for which information initially will be sought, the burden associated with providing responsive information should be a fraction of that suggested by Suncor's Opposition.

Third, the Motion is not premised on speculation as Suncor asserts. The exhibits attached to the Motion (and additional documents attached to this Reply) reflect that Suncor provided fuel customers price concessions in the form of discounts or rebates; these discounts or rebates were not provided to WCS. To date, information regarding these price concessions has trickled out in the form of discrete documents (mostly emails) produced with hundreds of other documents discussing other subjects. Plaintiffs are entitled to records and data showing how Suncor accounted for these transactions, the dollar amounts actually discounted or rebated, and the aggregate economic effects of the discounts, rebates or other concessions. As set forth in the attached declaration of Ms. Betzer, accounting records, in particular journal entries reflecting receivables from and payables to favored customers, would contain such data. Exhibit 1 ¶¶ 5-20.

Fourth, Suncor's attempt to narrow this case solely to sales of unbranded gasoline has no merit. The allegations of Plaintiffs' Complaint are not limited to sales of unbranded gasoline or to Favored Retailers selling unbranded gasoline (*see* Doc. 1 ¶¶ 25-32). The issue of whether Suncor's unbranded gasoline sold to WCS and its Shell and Phillips 66 branded gasoline are of "like grade and quality" is an issue of fact which cannot be disposed of in the context of a discovery dispute.

## II.  REPLY

In its introductory statement, Suncor misapprehends the background events, the status of the parties' discovery agreements and, in particular, the nature of the records that are the subject of the Motion. *See* Opposition at 2. Suncor describes its efforts following the April 20 hearing to provide Plaintiffs with information so that the parties could reach an agreement as to an initial sample of customers for which Suncor would provide pricing data spreadsheets for fuel sales.

The pricing data was the subject of Plaintiffs' Interrogatory Nos. 1 and 2 and Requests for Production No 1.  *See* Motion, Exhibit C (Doc 52-3) at pp. 6-7.  These discovery requests were not a subject of the Motion, as the parties have been working to identify a subset of customers other than Dillon Companies and Mini-Mart for which Suncor would gather and produce the pricing spreadsheets.  In contrast, the Motion seeks to compel production of financial statements, journal entries and related accounting data as requested in WCS Production Requests 3-10 set forth at pages 5-7 of the Motion.   While the parties contemplated that the efforts to narrow customers would also apply to accounting data maintained on a by-customer basis, Suncor has steadfastly refused to produce *any* accounting records pursuant to Plaintiffs' Requests 3-10.  Motion, pp. 5-7, Suncor objections.

In addition, Suncor's description of its efforts with respect to the sampling of pricing data as discussed at the April 20 hearing is inaccurate.   Two and a half weeks after the hearing (a week after Plaintiffs had filed this Motion), Suncor provided a list of customers that it represented to be its "top 10 Unbranded Customers," by volume, from 2008 to 2010.  *See* Exhibit 2.  Plaintiffs advised Suncor that they would need to take the deposition of Suncor's former Manager of Unbranded Sales, Steve Moss, which was scheduled for May 25, before they could appropriately commit to a narrowed list of customers for discovery of pricing information and other customer-specific data.   Notably, Mr. Moss testified that the "top 10" list provided by Suncor did not actually identify the top 10 purchasers of unbranded fuel but, rather, included branded customers who purchased "minute" amounts of unbranded fuel as well as customers who purchased diesel fuel only.  Exhibit 3 at 126:12-127:4, 132:15-135:16.  Shortly after Mr. Moss's deposition, Plaintiffs provided Suncor with a list of eight customers for which it would

initially seek pricing data and other customer-specific discovery as contemplated at the April 20 hearing. Exhibit 4. Suncor received that list prior to filing its Opposition but did not reference it or include it with its filing.

### A.     PLAINTIFFS' MOTION IS ONLY SO SPECULATIVE AS SUNCOR'S DISCLOSURE HAS REQUIRED IT TO BE.

Suncor never really contests that the information sought by the Motion is properly subject to discovery. Rather, Suncor argues that the Motion "rests entirely on speculation" by Plaintiffs that Suncor has evidence about discounts that it is not producing. Opposition at 2. The premise for Suncor's argument is that the Motion does not identify "any basis for believing that Suncor has given undisclosed discounts to other purchasers of gasoline and diesel" other than "unrelated emails using the words 'discount' and 'rebate' and phrases such as 'price support' and 'off invoice.'" *Id.* at 5. In addition, Suncor suggests that, as a result of some brief testimony by its corporate representative, Mr. Ewing, regarding the use of the term "off invoice" in a particular exhibit, it is an established fact that "[i]nvoice pricing reflects the net price paid by a Suncor customer for fuel products." *Id.*

Essentially, Suncor wants to preclude Plaintiffs from discovering further information regarding discounts and rebates to other customers (in particular, accounting records which would itemize and aggregate such data) because Plaintiffs have cited only a few discrete examples of communications evidencing rebates and discounts that were given to customers other than WCS. Suncor's argument seems to be that because Plaintiffs at this point cannot prove that the discounts or rebates were widespread, WCS gets no discovery. This argument should be rejected.

Suncor ignores the authority cited in the Motion that discovery rules should be applied liberally in antitrust cases because it is the defendant, not the plaintiff, that has control of, and ability to conceal, the facts regarding price discrimination or other challenged anti-competitive activity.  *See* Motion at 7, *citing Leonia Amusement Corp. v. Loew's, Inc.,* 16 F.R.D. 583, 584 (S.D.N.Y. 1954).  Plaintiffs attached to their Motion documents showing the existence of rebates and discounts to customers other than WCS in 2011.  These documents are not mere anomalies.  Plaintiffs attach to this Reply additional documents showing the existence of rebates or other discounts given in that year.  Exhibits 5-8.  Plaintiffs are not in a position to attach other email files showing discounts and rebates in other years as Suncor has produced email files only for 2011 despite its acknowledgement in connection with the April 20 hearing that the scope of discovery in this case is not confined to a single year.  The discovery obtained to date establishes the existence of refunds, discounts and other concessions.  Plaintiffs are entitled to discover accounting records and data which would assist Plaintiffs in identifying the timing, scope, amount and aggregate effect of such rebates and discounts for all of years that are relevant to this action, 2007 through 2011.

In addition, Suncor's claim that it does not engage in price discrimination among customers (either through the existence of hidden discounts or otherwise) has been substantially called into question, particularly during the deposition of Mr. Moss, the former unbranded sales manager.   For example, Mr. Moss -- who met with three Suncor attorneys for 16 hours to prepare for the deposition (Exhibit 3 at 8:2-9:4) -- testified that from 2008 through 2011, with the exception of contracts involving competitive bidding processes, all Suncor unbranded customers purchasing gas for consumer sale received the same standard cents-per-gallon ("cpg") reductions

off the Suncor rack price for its E-10, regular gasoline and diesel fuel. *Id.* at 129:16-130:12, 154:21-25. Although Mr. Moss testified there were "no exceptions" to these standard discounts and that all of his customers got the same "deal" (*id.* at 130:9-12, 154:21-25), the stewardship summary and attached "2010 Unbranded Discounts" spreadsheet Mr. Moss provided to his manager in January 2011 disclosed that Suncor in fact gave customers substantially varying cpg reductions for the same products and gave some customers additional cpg discounts in particular months. Exhibit 9, Excerpts of Deposition Exhibit 32, at pp. 2-4.[1]

Just as he claimed that Suncor provided the same standard cpg discounts to all of its unbranded customers, Mr. Moss similarly testified that when Suncor extended temporary discounts in cases of excess supply or to meet competition, Suncor's "philosophy" was to provide such discounts "across the board" to all unbranded customers. Exhibit 3 at 91:10-14. Other documents reflected that, inconsistent with Mr. Moss's testimony, it was Suncor's practice to give temporary cpg discounts to select customers only. Exhibit 5 (January 5, 2011: "We want *the following* customers to get 5 cpg discounts on both- gas and diesel- for Grand Junction and Fruita, to be effective at 6PM tonight…. **Unbranded Customers**[:] Brad Hall, Dats….." (italic emphasis added)); Exhibit 6 (February 19, 2011: "Will need to adjust unb gas discount by 2.5 *at least on some* customers" (emphasis added)). Particularly telling is that neither Mr. Moss's

---

[1] The pricing for the bid customers was based on OPIS (Oil Pricing Information Service) average pricing rather than Suncor Rack pricing. Exhibit 3 at 48:4-11. Mr. Moss indicated that he had not reviewed the document marked as Deposition Exhibit 32 during his preparation with the Suncor attorneys for his deposition but testified that the spreadsheets were documents he designed and maintained to keep track of his customers. *Id.* at 168:10-170:11. Although Suncor has produced only one of these "stewardship" reports, Mr. Moss testified that he provided these monthly to Mr. Ewing beginning in December 2010. *Id.* at 170:12-173:1.

testimony nor Suncor's documents can be reconciled with Suncor's unequivocal statement in its interrogatory responses that "Suncor did not offer any discounts to Unbranded Fuel Purchasers from January 1, 2011-May 31, 2011."  Motion, Exhibit D, Doc. 52-4 at p. 14, Response to Interrogatory No. 2.

The positions Suncor asserts in this litigation are inconsistent with statements in documents created during the relevant time frame.  Indeed, Suncor's disparate positions illustrate why the discovery sought is appropriate.  Plaintiffs are entitled in discovery to explore not only information bearing on its claims, but also information bearing on Suncor's credibility.  The records and data sought by Requests for Production 3-10 are relevant for both purposes.

**B.    REQUEST NOS. 3, 4, 6, 7 AND 10 SEEK RELEVANT INFORMATION AND HAVE NEVER BEEN BURDENSOME.**

Requests for Production 3, 4, 6, 7 and 10 seek Suncor USA financial statements, charts of account, trial balances, general ledgers, and independent auditor reports referring to certain Suncor customers.  According to the affidavit of Mr. Conner, these documents could have been produced in slightly more than a week at a cost of less than $4,000 even if Suncor had retained outside contractors to perform the necessary work.  Opposition Exhibit 66-1 ¶ 13.  Mr. Conner manages a staff of ten finance professionals responsible for the books and reporting of Suncor Energy (U.S.A), the specific entity based in Colorado and named as the Defendant in this action.  See Exhibit 10, http://www.linkedin.com/pub/mark-conner/10/822/612 .  It is not evident why someone on Mr. Conner's internal team could not pull these basic accounting records.  In any event, even if it actually were necessary for Suncor to retain outside contractors (and even if Mr.

Conner's $3,920 estimate were accurate), in the context of this case, production of the requested documents could hardly be described as unduly burdensome.[2]

As set forth in the attached declaration of Ms. Betzer: (a) most of the documents sought by Requests 3, 4, 6, 7 and 10 are very basic accounting records which exist for all nearly all business entities and should be very easy to gather; (b) had these documents been produced, Ms. Betzer may have been immediately able to identify areas regarding pricing or pricing concession which would warrant further investigation; (c) had these documents been produced, Ms. Betzer would have been in a better position to determine whether additional accounting records, such as those in the other document requests that are the subject of the Motion, would contain relevant information or could be appropriately narrowed; and (d) the documents would contain information that is directly relevant or reasonably likely to lead to the discovery of admissible evidence.  *See* Exhibit 1, ¶¶ 5-16.  Accordingly, these documents should have been produced, and Suncor's failure to produce them alone warrants an award of attorneys' fees incurred in connection with the Motion pursuant to Fed. R. Civ. P. 37(c)(1)(A).

## C. REQUESTS NO. 5, 8 AND 9 SEEK RELEVANT INFORMATON AND ARE NOT UNDULY BURDENSOME, PARTICULARLY AS PRESENTLY NARROWED.

Requests 5, 8 and 9 seek journal entries and accounts receivable and accounts payable data showing payments, disbursements and other accounting transactions for fuel purchasers

---

[2] Plaintiffs are not privy to the hourly rates of Mr. Shaheen of Holland & Hart or Mr. Monts of Hogan & Lovells but conservatively estimate that the asserted $3,920 "outside contractor" cost of producing documents responsive to Requests 3, 4, 6, 7 and 10 would be less than one-quarter of what Suncor spent on outside attorneys' fees in preparing a single witness, Mr. Moss, for deposition.

identified in response to Plaintiffs' Interrogatory No. 1.[3]  Suncor does not and cannot take the position that the documents sought by Requests for Production 5, 8 and 9 are irrelevant to the price discrimination claims in this action or outside the scope of discovery defined by Rule 26. Rather, Suncor argues only that the requests are unduly burdensome because, according to Mr. Conner, Suncor would need to hire outside contractors to retrieve the data at a cost of $162,000. Opposition Exhibit 66-1, ¶ 7.

Other than a mantra that the hired contractors would be required to "pull," "sort" and "cull" hundreds and thousands of accounting entries, Mr. Conner offers no explanation as to why it would cost so much to search Suncor's SAP electronic accounting system to retrieve the particular journal entries and data that are the subjects of Requests 5, 8 and 9.  *Id.,* ¶¶ 5, 6, 7. Business accounting systems typically allow automated identification and retrieval of journal entries relating to a particular customer via a distinct customer number or account.  Exhibit 1, ¶ 17.  As Suncor has produced *none* of the requested accounting records, Plaintiffs have no means of determining whether Suncor in fact can sort and retrieve information by customer number or whether there is any validity at all to Mr. Conner's cost estimates.  *See id.* ¶ 7.

In any event, following Mr. Moss's deposition (and prior to the date Suncor filed its Opposition), Plaintiffs identified for Suncor eight customers for which Plaintiffs will, at least initially, seek data such as pricing information and the customer-level accounting data

---

[3]  The requests limited production to Western, Kroger, Phillips, Shell and other customers who purchased fuel for eventual retail sale in the Pertinent Geographic Area (Colorado and portions of Nebraska) and Pertinent Time Frame (2007 to the present).   Motion Exhibit C, Doc. 52-3, pp. 8-9 , p. 5 (Definitions 17, 18), p. 4 (Definition 12).   The requests did not seek production of data for customers purchasing fuel for fleet or government use or relating to transfers of fuel to internal Suncor owned or operated facilities.  *Id.*

11-cv-01611-MSK-CBS:  **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL**

Page 10

contemplated by Requests 5, 8 and 9.  Exhibit 4.  In addition, Ms. Betzer indicates that, while all of the requested data is relevant to this action, a review of the detailed transactions posted to the Accounts Receivable and Accounts Payable journals for the selected customers (as opposed to all of the journals identified in Request No. 8) would likely provide her with much of the information initially needed to assess the existence and magnitude of discounts, rebates or other concessions.  Exhibit 1 ¶ 19.[4]  As narrowed by Plaintiffs and by Ms. Betzer's concessions regarding Request 8, the burden associated with responding to Requests 5, 8 and 9 should be a fraction of that estimated by Mr. Conner.

**D.  PLAINTIFFS ARE ENTITLED TO DISCOVERY RELATING TO BRANDED AND UNBRANDED GASOLINE SALES.**

Suncor's final argument is that the evidence attached to the Motion is irrelevant to Plaintiffs' claims because: (a) WCS purchased unbranded rather than the "branded" Shell or Phillips 66 fuel referenced in the Motion's exhibits; (b) "Plaintiffs have no evidence that branded gasoline is of like grade and quality as the unbranded gasoline that Plaintiffs purchased from Suncor"; and (c) the "bulk" of WCS's Suncor fuel purchases "before 2009" were of pipeline gasoline that is different from finished gasoline typically sold by Suncor.  Opposition at 8.  This argument is a thinly veiled attempt to raise (and prevail) on a summary judgment issue without having to comply with the summary judgment rules.

---

[4]  Ms. Betzer would also need identification of the offsetting account(s) wherein all debits equal all credits within a given transaction.  For example, if a customer's balance is reduced through payment by check, the Accounts Receivable would be reduced and the offsetting account, which would be a cash/bank account, would be increased.  Ms. Betzer would need to see the entries for each involved account.  Exhibit 1 ¶ 19, n. 3.

11-cv-01611-MSK-CBS:  PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL

Page 11

With regard to Suncor's first assertion, the exhibits attached hereto (including Mr. Moss's 2010 unbranded discount spreadsheet) reflect the existence of price differences in sales to unbranded customers other than WCS. Exhibits 8, 4, 5, 6. Suncor's price discrimination involved both branded and unbranded gasoline sales, and Plaintiffs are entitled to discovery of accounting records to assist in quantifying that price discrimination.

With respect to the second assertion, the issue of whether Suncor's Shell and Phillips 66 branded gasoline and Suncor's unbranded gasoline purchased by WCS and others are of "like grade and quality" as required by the Robinson-Patman Act is an issue of fact. *See* 15 U.S.C. § 13(a). There is no clear-cut standard for determining whether products are of "like grade and quality" in the context of a Robinson-Patman claim. However, one court has summarized the varying standards as follows:

> The standards to be applied to determine whether commodities are of like grade and quality are not well defined. "Commercial identity or commercial fungibility," "substantially equivalent public demand," "similar characteristics," "cross elasticity of demand, substitutability, physical appearance, identity of performance," "same general functions," and "similar swilling characteristics" have all been used as factors determining "like grade or quality."

*Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp.*, 1974 WL 870 * 26 (D. Utah 1974), *overruled in part*, 551 F.2d 790 (10th Cir. 1977) (citations omitted).

None of these standards is absolute, and each necessarily involves a factual inquiry. *Id.* However, in assessing whether products meet the Robinson-Patman requirements for "like grade and quality," courts must look beyond mere physical differences to determine whether distinctions between commodities are substantial enough to "affect consumer use, preference, or marketability." *Checker Motors Corp. v. Chrysler Corp.*, 283 F. Supp. 876, 889 (S.D.N.Y.

1968), *aff'd* 405 F.2d 319 (2d Cir.), *cert. denied* 394 U.S. 999 (1969) (emphasis added) (whether differences between defendant's passenger cars and taxicabs were substantial enough to make them of unlike grade and quality was a genuine issue of fact precluding summary judgment).

Suncor attaches to its Opposition Rule 30(b)(6) testimony of a Mr. Kopp, a former Suncor chemist, that Suncor's Shell and Phillips branded gasoline each contains a certain recipe of additives not contained in Suncor's unbranded gasoline[5] and that the "performance [of the branded vs. unbranded fuel] is markedly different." Doc. 66-3. Suncor provides no evidence or basis for concluding that the physical differences between the branded and unbranded gasoline affect in any sense the "consumer use, marketability or preference" with respect to the type of fuel purchased. Rather, Suncor's own documents and deposition testimony show just the opposite.

For example, Suncor's Daily Fuel Reports, which the company uses to track the gasoline prices for competitors of Suncor-owned Shell-branded stores, reflect that Suncor's branded gasoline competes directly with both branded and unbranded gasoline. *See, e.g.,* Exhibit 11 (unbranded competitors highlighted in yellow). Similarly, Mr. Moss testified: (a) that his unbranded retail customers competed with both branded retailers and other unbranded retailers (Exhibit 3 at 67:15-21); (b) that his unbranded retail customers competed with Suncor's Shell brand stores (*id.* at 29:20-30:6); and (c) "[as] a consumer" it is his understanding "that the street price in large respect drives consumer sales" (*id.* at 67:24-68:4). In short, the only evidence

---

[5] The unbranded gasoline contains sufficient additives to comply with EPA and other governmental requirements. Exhibit 3 at 20:17-21:8. When Suncor supplies branded gasoline, it supplies its unbranded gasoline with the branded additives added at the terminal. *Id.* at 222:21-25.

**11-cv-01611-MSK-CBS: PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL**

Page 13

regarding consumer use, marketability or preference with respect to gasoline and diesel products is that branded and unbranded gasoline products are directly competitive and consumers make purchasing decisions based on price. In any event, there is no basis to deny Plaintiffs discovery of accounting or other data based on asserted distinctions between branded and unbranded gas.

With respect to the third assertion, it is correct that WCS purchased gasoline from Suncor prior to 2009 that was delivered via pipeline to a Rocky Mountain Pipeline terminal and did not have all of the components of the unbranded or branded gasoline Suncor sold for delivery at its own terminals. However, Mr. Kopp's cited testimony does not support Suncor's conclusory assertion that "finished gasoline is an entirely different product from sales of unfinished pipeline gasoline and provides no basis for price comparisons under the Robinson-Patman Act." Opposition at 8 citing Doc. 66-3 at 8:22-9:7. In any event, WCS purchased "finished" gasoline products directly from Suncor terminals both before and after 2009. Exhibit 12-14. There is no basis to preclude Plaintiffs from discovering relevant accounting records because there are arguments that some portion of the gasoline purchased by WCS may have been of a different grade and quality than gasoline purchased by other customers. Once again, the like grade and quality issue is one that must be determined at trial or on a motion for summary judgment. It would be inappropriate to determine the issue in Suncor's favor in connection with a discovery dispute.

### E. PLAINTIFFS SHOULD NOT BEAR THE COST OF THE REQUESTED DISCOVERY.

Suncor asserts that, in the event the Motion is granted, Plaintiffs should bear the cost of the discovery sought because the burden is substantial and "Plaintiffs have no evidence that

hidden discounts exist or that the financial and accounting information sought will actually result in any information" that is useful to this action.  Opposition at 9.

As discussed above, (i) Plaintiffs have been substantially impeded by Suncor's baseless refusal to produce *any* of the requested records, (ii) Plaintiffs have agreed to narrow the customer-specific accounting data initially sought, and thus the cost of responding to all the requests would be slight as compared to the exorbitant, arbitrary estimates of Mr. Conner; and (iii) there *is* evidence of hidden discounts contrary to Suncor's position in the Opposition, its prepared deposition testimony and its sworn interrogatory responses.  While the Sedona Principles do permit the shifting of discovery costs in some circumstances, this is not a case in which costs should be shifted.[6]  In the event that the Court deems that some cost shifting is appropriate, Plaintiffs request an order that Ms. Betzer and Mr. Horwith, Plaintiffs' e-discovery project manager, be involved in and approve the data gathering process to ensure that Suncor's contractors complete the work in a manner that is both cost-effective and compliant with Plaintiff's discovery requests.

### III.  CONCLUSION

The record now before the Court shows fully why Plaintiffs' Motion to Compel should be granted: Suncor has produced virtually nothing to date; the Plaintiffs' requests, already

---

[6] Plaintiffs recognize that discovery is a two-way street.  In response to Suncor's recent discovery requests, Plaintiffs, at their own substantial cost and effort: (a) have gathered hundreds of thousands of electronic files; (b) have searched those files for information responsive to Suncor's requests; (c) have reviewed files responsive to keyword searches related to Suncor's requests; (d) have produced more than 10,000 responsive non-privileged files to Suncor's counsel; (e) have extracted data from WCS's Enterprise Resource Planning system responsive to other Suncor requests; and (f) have produced to Suncor from this extracted data three transaction data sets containing 819,710 rows of information regarding WCS fuel deliveries, WCS sales by store, and historical competitive price information.  Exhibit 15, Declaration of Michael Horwith.

appropriate under the law, have been further tailored and narrowed; the record shows the needed discovery can be provided reasonably and easily; and there is no real support for Suncor's conclusory assertions concerning costs.

For the reasons set forth herein and in the Motion, Plaintiffs respectfully request that the Court grant their Motion, order immediate production by Suncor of documents and data responsive to Document Requests 3, 4, 6, 7 and 10, order immediate production by Suncor of documents and data responsive to Document Requests 5, 8 and 9 as narrowed by the parties' agreement to narrow customer-specific data to the customers identified on Exhibit 4, and assess sanctions against Suncor in the attorneys' fees and other fees and expenses associated with the Motion.

June 20, 2012                                         *s/ Kathleen E. Craigmile*

                                                      Kenneth R. Bennington
                                                      Kathleen E. Craigmile
                                                      Adam F. Aldrich
                                                      BENNINGTON JOHNSON BIERMANN
                                                      & CRAIGMILE, LLC
                                                      370 17th Street, Suite 3500
                                                      Denver, CO 80202
                                                      Telephone: (303) 629-5200
                                                      Facsimile: (303) 629-5718
                                                      *kec@benningtonjohnson.com*
                                                      *krb@benningtonjonson.com*
                                                      *afa@benningtonjohnson.com*

                                                      Philip W. Bledsoe
                                                      Joseph T. VanLandingham
                                                      Polsinelli Shughart PC
                                                      1225 Seventeenth Street, 29th Floor
                                                      Denver, CO 80202-5529
                                                      Telephone: (303) 572-9300

                                                      *Attorneys for Plaintiffs and Third-Party Defendants*

## CERTIFICATE OF SERVICE

      I hereby certify that, on June 20, 2012, copies of the foregoing **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL** was served on the following parties via the CM/ECF filing system:

Anthony J. Shaheen
Keeya M. Jeffrey
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80201-8749
AJShaheen@hollandhart.com
KMJeffrey@hollandhart.com

J. Robert Robertson
William L. Monts III
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
robby.robertson@hoganlovells.com
william.monts@hoganlovells.com

Philip W. Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart PC
1225 Seventeenth Street, 29th Floor
Denver, CO 80202-5529
pbledsoe@polsinelli.com
jvanlandingham@polsinelli.com

                *s/ Marie Newberger*