THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs/Counter Defendants,

v.

SUNCOR ENERGY (U.S.A.), INC. a Delaware corporation,

    Defendant/Counter Claimant/Third-Party Plaintiff,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

    Third-Party Defendants.

_____

**OBJECTION OF INTERESTED PARTY DILLON COMPANIES, INC. TO MAGISTRATE JUDGE'S ORDER DATED AUGUST 17, 2012**
_____

Comes now interested party Dillon Companies, Inc. ("Dillon"), by and through its attorneys, Montgomery Little & Soran, P.C., and respectfully submits this objection ("Objection") to the August 17, 2012 Order of the Magistrate Judge (Court Minutes/Minute Order, Doc. # 95) ("the Order").

## CERTIFICATE OF COMPLIANCE

Pursuant to D.C. Colo. L. Civ. R. 7.1(A), counsel for Dillon certifies that he discussed the relief requested in this Objection with counsel for Plaintiffs during a phone call on August 31, 2012. Plaintiffs' counsel will oppose same.

## INTRODUCTION

Dillon is filing this Objection out of an abundance of caution and to preserve its rights to appeal this matter to the District Court Judge under F.R.C.P. 72(a). Dillon recently provided additional and detailed information to the Magistrate Judge regarding that certain Western Convenience Stores, Inc. and Western Truck One, LLC Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises in this action ("the Subpoena") (Doc. #57-1) (Exhibit A). In order to aid in conserving judicial resources, Dillon respectfully requests that the District Court Judge stay any ruling concerning this Objection until after the Magistrate Judge issues an order regarding the new information that Dillon is providing to the Court. Pursuant to Colo. L. Civ. R. 30.2B, a separate motion to stay the Magistrate Judge's August 17, 2012 Order is being filed contemporaneously with this Objection.

Today the undersigned counsel discussed the requests in the Subpoena with Plaintiffs' counsel in detail for about 50 minutes. The conversation was very productive and helped to clarify many issues. Dillon's counsel is meeting with Plaintiffs' counsel in person on September 5, 2012 to further consult regarding this matter.

In addition, a Status Conference has been set by the Magistrate Judge for September 7, 2012. Dillon respectfully requests the opportunity to attempt to resolve this matter by first consulting again with Plaintiffs' counsel and then taking any pending matters up with the Magistrate Judge.

## FACTUAL BACKGROUND

1.  On or about April 26, 2012, Plaintiffs served Dillon with the Subpoena (Doc. #57-1) (Exhibit A).

2.  On May 17, 2012, Dillon filed a Motion to Quash or Modify Subpoena (Motion to Quash or Modify Subpoena, Doc. # 57) ("Motion to Quash/Modify").

3.  On July 16, 2012, the Court held a hearing concerning the Motion to Quash/Modify. (Courtroom Minutes/Minute Order, Doc. #88).

4.  On July 25, 2012, Plaintiffs filed a status report concerning Plaintiffs' negotiations with Dillon regarding modifying the Subpoena. (Status Report Regarding Dillon Companies' Motion to Quash Subpoena, Doc. # 89).

5.  On August 1, 2012, Plaintiffs filed a second status report concerning Plaintiffs' negotiations with Dillon regarding modifying the Subpoena. (Plaintiffs' Second Status Report Regarding Dillon Companies' Motion to Quash Subpoena and Request for Further Hearing, Doc. # 92).

6.  On August 17, 2012, Dillon filed a status report regarding the subpoena.[1] (Dillon's Status Report Re: Plaintiffs' Subpoena, Doc. # 94).

7.  Also on August 17, 2012, the Court held a hearing concerning Dillon's Motion to Quash/Modify. (Court Minutes/Minute Order, Doc. # 95). During the hearing, the Court found that Dillon's Motion to Quash/Modify was partially moot because Plaintiffs had modified the requests in the Subpoena. The Court therefor denied Dillon's Motion to Quash/Modify and ordered Dillon to comply with Plaintiffs' modified requests.

8.  On August 27, 2012, Dillon filed a status report regarding this matter. (Status Report by Interested Party Dillon Companies, Inc. in Compliance With August 17, 2012 Order of Magistrate Judge, Doc. # 99). The status report includes declarations from two Dillon employees including additional information regarding the information Dillon has that may be responsive to the Subpoena. Dillon is also filing a Declaration of Susan Giannola Pursuant to 28 U.S.C. § 1746 ("Giannola Declaration") (Exhibit D), Director of Supermarket Petroleum Operations for The Kroger Co., contemporaneously with this Objection which provides additional information.

9.  On August 29, 2012, Plaintiffs filed a response to Dillon's status report. ("Response") (Plaintiffs' Response to Dillon Companies Status Report, Doc. # 100).

10. Dillon is contemporaneously filing a reply (""Reply") (Exhibit E) related to its status report. Dillon's reply includes a summary of its understanding of the Plaintiffs'

---

[1] The Magistrate Judge understandably was upset with Dillon when it filed this status report just two minutes before the hearing, for which Dillon apologizes.

4

Subpoena requests as modified by the Court's Order and the Plaintiffs' own modifications. Dillon hereby incorporates its Reply as if fully restated herein.

## LEGAL AUTHORITIES

### I.     Fed. R. Civ. P. 72(a), 28 U.S.C. § 636(b)(1)(A).

Upon timely objection to a magistrate judge's order on a non-dispositive matter, the district court shall make a de novo determination of the portions of the order to which objection is made. *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1462 (10th Cir. 1988).  Pursuant to Fed. R. Civ. P. 72(a), 28 U.S.C. § 636(b)(1)(A), the District Court will modify or set aside any portion of the order which it finds to be "clearly erroneous or contrary to law."  Under this standard, the District Court Judge may modify or set aside the Magistrate Judge's order, if the District Court Judge "is left with the definite and firm conviction that a mistake has been committed." *Ocelot Oil Corp.*, 847 F.2d at 1464.

### II.    Fed. R. Civ. P. 26.

F.R.C.P. 26(b)(1): "Discovery Scope and Limits. (1) Scope in General. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense-including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to

the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b) (2) (C)."

F.R.C.P. 26(b)(2)(B): "Specific Limitations on Electronically Stored Information. A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b) (2) (C). The court may specify conditions for the discovery."

F.R.C.P. 26(b)(2)(C): "When Required. On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

Federal Rule of Civil Procedure 26(b)(1) allows broad discovery of any matter, not privileged, which is relevant to the claim or defense of any party. *Premier Election*

6

*Solutions, Inc. v. SysTest Labs Inc.*, 2009 U.S. Dist. LEXIS 94193 (D. Colo. Sept. 22, 2009). However, Rule 26(c) limits discovery by allowing the court, for good cause, "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c). Further, a court may enter a protective order "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). Courts also consider the burden imposed on the producing party, the relevance of the request, the requesting party's need for the documents, the breadth of the document request, and the time period covered by the request. *Echostar Communications Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 396 (D. Colo. 1998).

### III.   Fed. R. Civ. P. 45.

F.R.C.P. 45(c)(1): "Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction- which may include lost earnings and reasonable attorney's fees-on a party or attorney who fails to comply."

F.R.C.P. 45(c)(3): "(3) Quashing or Modifying a Subpoena .

 (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that: (i) fails to allow a reasonable time to comply;  . . . (iii) requires disclosure

of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information . . . (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c) (3) (B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated."

## **ARGUMENT**

**IV.     Trade Secrets.**

The information sought pursuant to Plaintiffs' Subpoena in subpart (h) of Request No. 5, Request Nos. 8 and 9, and subparts (d), (e), (f), (g), (h),(o) and (p) of Request No.10 constitute trade secrets under the Colorado Uniform Trade Secrets Act (the "Act").

Under the Act, a trade secret is defined as:

"the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement,

>confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."

Colo. Rev. Stat. § 7-74-102. Factors considered in determining whether certain information constitutes a trade secret include: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).

What constitutes a 'trade secret' is a question of fact for the trial court. *Shell v. Am. Family Rights Ass'n*, 2009 U.S. Dist. LEXIS 64045 (D. Colo. July 24, 2009). The fact that certain components of information are well-known or publicly available does not preclude trade secret protection. If the combination or organization of the information is unique and offers the compiler of the information a competitive advantage, it is protectable. *Id*; *see also Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir.

2003) (protection sought for a software system that integrated several variables available in the public domain in a manner and with a result that deserved trade secret protection). "A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Rivendell Forest Prods., Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994); *Hertz v. Luzenac Group*, 576 F.3d 1103, 1110 (10th Cir. 2009).

### A.     Request No. 5(h).

In Request No. 5(h) of the Subpoena, Plaintiffs are seeking Dillon's identification of the net and gross quantity of fuel purchased by Kroger from Suncor for specific Kroger fuel site locations from January 1, 2007 to present. As set forth in the in the Giannola Declaration (Exhibit D), the net and gross quantity of fuel purchased for retail sales at these locations are trade secrets because they are a direct reflection of Dillon's sales data regarding the market for petroleum in those locations. Kroger bases what is known as its "go-to-market strategy" on its sales data. Kroger's "go-to-market strategy" is defined by Ms. Giannola as the way in which Kroger approaches the market in its effort to remain competitive and to maintain and grow sales. Kroger's chosen approach to the market is based on its analysis of several components including, surveys of nearby competitors, area traffic volume, store visibility and access, sales projections and rate-of-return projections.  Each one of these components is an important aspect of

Kroger's go-to-market strategy. As more components are viewed together, Kroger's entire go-to-market strategy becomes visible and ascertainable. Similarly, because net and gross quantity of fuel purchased is based directly on Kroger's go-to-market strategy, disclosure of this information and any other information based on the strategy reveals Kroger's go-to-market strategy itself.

Given that Plaintiffs are direct competitors of Kroger, compliance with Plaintiffs' request would cause Kroger to disclose a direct reflection of its sales-data and its go-to-market strategy to a direct competitor.

Furthermore, Dillon bases its strategies for remaining competitive on its sales data. It is not Dillon's practice to disclose Sales data to third-parties absent a non-disclosure agreement, and sales data is protected from disclosure within Dillon because employees and representatives of Dillon must obtain authorization and passwords to access the data.

Dillon's exclusive possession of its sales data provides Dillon with a competitive advantage. Given that Plaintiffs are direct competitors of Dillon, compliance with Plaintiffs' request would force Dillon to disclose its sales-data to a direct competitor, causing Dillon a severe competitive disadvantage.

### B. Request No. 8.

Request No. 8 of the Subpoena requires Dillon to disclose daily pump prices from January 1, 2007 to present for each grade of petroleum at each of its fuel site locations located in a specified geographic area. Kroger recognizes that one pump price

11

alone does not constitute a trade secret. However, as set forth in the Giannola Declaration, an aggregate of pump prices over time and throughout different locations is a direct reflection of Kroger's "go-to-market strategy" because this information reflects the ultimate decisions about price made by Kroger at different times, in different circumstances and in different geographic areas. An aggregate of pump prices over time and throughout different locations is also an aspect of Kroger's "go-to-market strategy" because this data is a component considered in the development of Kroger's go-to-market strategy. The aggregate set of pump prices requested is based on a unique set of data compiled by Dillon. Both the pump prices and the data the prices reflect afford Dillon a competitive advantage.

Requiring Kroger to disclose any aspect of its "go-to-market strategy" to a direct competitor such as the Plaintiffs puts Kroger at a competitive disadvantage.  Kroger's practice is not to share any aggregate set of daily pump prices with third-parties outside of the Kroger Company.  Further, even the Kroger employees who input daily pump price data do not have access to aggregate sets of such data.  Only select employees and representatives of Kroger who have a need to know such information have access to aggregate sets of daily pump prices.  Dillon does not publicize its fuel price information in popular publications or resources such as "Gas Buddy," and aggregate pump price information is protected from internal disclosure because specific authorization and passwords are necessary for employees and representatives of Dillon to access the information.

### C. Request No. 9.

Request No. 9 requires Dillon to disclose the results of its fuel price surveys from January 1, 2009 through May 31, 2012 with respect to a specified geographic area. As set forth in the Giannola Declaration, Dillon expends extensive financial, technical and other resources in gathering and organizing the data that ultimately constitutes is fuel price surveys.  Employees of Dillon gather survey data two times per day for each Dillon fuel site location.  The employees assess traffic volume, area competitors, and other pertinent information.

Dillon has also developed an intricate computer software program known as QuickSales that processes and stores survey data.  QuickSales provides Dillon with information concerning different aspects of its petroleum operations.  Among other things, Dillon's fuel price surveys provide analysis of market data regarding Dillon's competitors.  Dillon uses this data to develop its go-to-market strategies.  Dillon's practice is not to disclose its fuel price survey data to third parties and the data is only accessible to certain Dillon employees and representatives who are specifically authorized to access the data.  Dillon derives a competitive advantage from the exclusive possession of its fuel price survey results.

Disclosure of Dillon's fuel price survey results would reveal Dillon's methodology for obtaining the survey data because, for one thing, the specific types of information Dillon finds relevant in compiling its survey data would be disclosed.  Further, disclosure of Dillon's fuel price survey results would allow Plaintiffs access to information that

13

resulted from Dillon's specialized procedures for gathering, organizing and interpreting data

### D.     Request Nos. 10(d), (e) and (f).

Request Nos. 10(d), (e) and (f) require Dillon to disclose its research relating to the impact of fuel prices on sales, consumer response to price differences between retail sites, and the effects of brand loyalty and brand recognition on consumer demand and substitution.  As set forth in the Giannola Declaration, Dillon obtains such information for its own use, by using focus groups and internal company studies. Dillon then analyzes and draws inferences from the gathered data.  It is not Dillon's practice to share the research it performs regarding its petroleum operations with parties outside of the Dillon Company and access to such research for employees and representatives of Dillon requires specific authorization and passwords.

Disclosure of Dillon's research relating to Request Nos. 10(d), (e) and (f) would reveal Dillon's methodology, including survey questions Dillon deems relevant, in obtaining information it considers in developing its market strategies. Such disclosure would also provide Plaintiff with a set of information that resulted from Dillon's specialized procedures for gathering, organizing and interpreting data. Dillon derives a competitive advantage from exclusive possession of this information, which Dillon developed the information in the first instance, and Dillon protects the confidentiality of this information.

### E.     Request Nos. 10(g), (h), (o) and (p).

Request Nos. 10(g), (h), (o) and (p) require Dillon to disclose Dillon's research relating to the definition of the competitive market for fuel sites, the definition of the relevant market around fuel sites, competitive evaluations and price checking procedures. As set forth in the Giannola Declaration, Dillon obtains such information by way of its fuel price surveys and the data gathered by its employees as discussed in paragraph C above. As stated therein, Dillon charges several of its employees with the responsibility to gather data for Dillon's use. Dillon utilizes proprietary software programs such as QuickSales in order to store and organize the data gathered. Dillon has also developed specific methodologies for obtaining the data it uses in developing its go-to-market strategies. Dillon's practice is not to disclose the research it performs regarding its petroleum operations with parties outside of the Dillon Company. Dillon's research is accessible only to the employees and representatives of Dillon who are specifically authorized to access the research. Dillon's exclusive possession of its research relating to its petroleum operations affords Dillon a competitive advantage.

### V.     Undue Burden and Expense; Not Reasonably Calculated to Lead to the Discovery of Admissible Evidence.

Dillon herein incorporates its Reply relating to its status report, which Dillon is contemporaneously filing herewith, as if fully restated herein. For the reasons detailed in the Reply to Dillon's status report, Plaintiffs' requests are unduly burdensome and expensive to Dillon.

Further, Plaintiffs' minimal need for the information is outweighed by Dillon's strong need to preserve its trade secrets. Dillon should not have to produce this information to a direct competitor.

The information sought by Plaintiffs in the Subpoena is also not reasonably calculated to lead to the discovery of admissible evidence under the Robinson-Patman Act. Much of the information that Plaintiffs request arguably would be discoverable were this an antitrust case against Dillon, which it is not. Dillon is not a party to this matter and is being unnecessarily burdened by a search for information that Plaintiffs can readily obtain from Suncor. As Dillon understands the Subpoena, Plaintiffs are merely trying to show price discrimination by the Defendant Suncor Energy, Inc., presumably in favor of Dillon and at Plaintiffs' expense. But Plaintiffs' Response may reveal the true intent of the Subpoena: "Dillon's implacable delay and obfuscation raises the inference that it has something to hide and that, rather than being an innocent bystander, it may have played an actionable role in anticompetitive conduct aimed at its competitor, Plaintiff Western Convenience Stores (which was Suncor's largest purchaser by volume before Kroger came on the scene in 2009)." (Doc. # 100, Response, page 2). Plaintiffs should not be permitted to use the Subpoena to search for alleged antitrust violations against a competitor that is not a party to this lawsuit.

WHEREFORE, Dillon respectfully requests that the Court:

(A) permit Dillon additional time to respond to requests numbers 2 & 3 in the Subpoena as needed;

(B) quash the Subpoena with respect to requests nos. 5, 6, 7, 8, 9 and 10 because: (1) the requests are unduly burdensome and expensive; (2) Plaintiffs need for the information is outweighed by Dillon's need to protect its trade secrets; (3) the requests are not reasonably calculated to lead to the discovery of admissible evidence; and (4) the requests improperly seek to discover information in support of an anti-trust lawsuit against Dillon; and

(C) award Dillon any such further relief as deemed appropriate by the Court.

Dated: August 31, 2012.

> s/*Michael R. McCormick*
> Christopher A. Taravella, #7790
> Michael R. McCormick, #33682
> Montgomery Little & Soran, P.C.
> 5445 DTC Parkway, Suite 800
> Greenwood Village, Colorado 80111
> Phone Number: (303) 773-8100
> Fax Number: (303) 220-0412
> E-mail:  ctaravella@montgomerylittle.com
>          mmccormick@montgomerylittle.com
> *Attorney for Dillon Companies, Inc.*
> *Interested Party*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
Bennington Johnson Biermann & Craigmile, LLC
370 17th Street, Suite 3500
Denver, CO 80202

Michael Korenblat
Suncor Energy Services, Inc.
717 17th Street, Suite 2900
Denver, CO 80202

Anthony Shaheen
Keeya M. Jeffrey
Holland & Hart LLP-Denver
555 17th Street, Suite 3200
Denver, CO 80201

Philip Wayne Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart LLP
1515 Wynkoop Street, Suite 600
Denver, CO 80202

William LeitzseyMonts, III
John Robert Robertson
Hogan Lovells US LLP-DC
555 13th Street NW
Columbia Square #1300
Washington DC 20004-1109

        s/ *Michael R. McCormick*
        Montgomery Little & Soran, P.C.