**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

      Plaintiffs/Counter Defendants,

v.

SUNCOR ENERGY (U.S.A.), INC. a Delaware corporation,

      Defendant/Counter Claimant/Third-Party Plaintiff,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

      Third-Party Defendants.

_____

**BRIEF IN SUPPORT OF INTERESTED PARTY DILLON COMPANIES, INC.'S
OBJECTION TO MAGISTRATE JUDGE'S ORDER DATED AUGUST 17, 2012**
_____

      Comes now interested party Dillon Companies, Inc. ("Dillon"), by and through its

attorneys, Montgomery Little & Soran, P.C., and respectfully submits this Brief in

Support of its Objection (Doc. # 107, "Objection") to the August 17, 2012 Order of the

Magistrate Judge (Court Minutes/Minute Order, Doc. # 95, "the Order").

**INTRODUCTION**

In this case, Plaintiffs Western Convenience Stores, Inc. and Western Truck

One, LLC ("Plaintiffs") allege that Defendant Suncor Energy (U.S.A.), Inc. ("Suncor")

violated the Robinson Patman Act, 15 U.S.C. § 13(a). Specifically, Plaintiffs claim that

Suncor sold petroleum products to a number of Plaintiffs' competitors, including Dillon,

at prices lower than the prices Plaintiff paid Suncor for petroleum products of like grade

and quality.

Dillon is not a party to this action. Dillon became an interested party in this case

on April 26, 2012, when Plaintiffs served Dillon with a Subpoena to Produce

Documents, Information or Objects or to Permit Inspection of Premises ("the

Subpoena") (Doc. #57-1) (Exhibit A).  A portion of the information sought pursuant to

Plaintiffs' Subpoena constitutes trade secrets of Dillon under the Colorado Uniform

Trade Secrets Act (the "Act"). Dillon's disclosure of this information to Plaintiffs – direct

competitors of Dillon – would cause Dillon to suffer a substantial competitive

disadvantage vis-à-vis its competitors.

The requests for trade secret information set forth in the Subpoena are not

reasonably calculated to lead to the discovery of admissible evidence. The requested

the information is irrelevant to Plaintiffs' case and/or Plaintiffs do not have a substantial

need for the information. Compliance with Plaintiffs' Subpoena would also impose an

undue burden on Dillon and would cause Dillon to incur a substantial expenditure of

time, effort and financial resources.

2

Dillon's status as a non-party and Plaintiffs' hint that they may use the information obtained pursuant to the Subpoena in a separate antitrust case against Dillon, require heightened protection of the information requested from Dillon and close regulation of Plaintiffs' discovery requests to Dillon. In balancing Plaintiffs' alleged need for Dillon's disclosure of trade secret information against the resulting injury such disclosure would cause Dillon, the resulting adverse effects and burden imposed on Dillon clearly outweigh any benefit Plaintiffs might derive from receipt of the requested trade secret information.

## **FACTUAL BACKGROUND**

1.      On or about April 26, 2012, Plaintiffs served Dillon with the Subpoena (Doc. #57-1) (Exhibit A).

2.      On May 17, 2012, Dillon filed a Motion to Quash or Modify Subpoena (Motion to Quash or Modify Subpoena, Doc. # 57) ("Motion to Quash/Modify").

3.      On July 16, 2012, the Court held a hearing concerning the Motion to Quash/Modify. (Courtroom Minutes/Minute Order, Doc. #88).

4.      On July 25, 2012, Plaintiffs filed a status report concerning Plaintiffs' negotiations with Dillon regarding modifying the Subpoena. (Status Report Regarding Dillon Companies' Motion to Quash Subpoena, Doc. # 89).

5.      On August 1, 2012, Plaintiffs filed a second status report concerning Plaintiffs' negotiations with Dillon regarding modifying the Subpoena. (Plaintiffs' Second

Status Report Regarding Dillon Companies' Motion to Quash Subpoena and Request for Further Hearing, Doc. # 92).

6.      On August 17, 2012, Dillon filed a status report regarding the subpoena.[1] (Dillon's Status Report Re: Plaintiffs' Subpoena, Doc. # 94).

7.      Also on August 17, 2012, the Court held a hearing concerning Dillon's Motion to Quash/Modify.  (Court Minutes/Minute Order, Doc. # 95).  During the hearing, the Court found that Dillon's Motion to Quash/Modify was partially moot because Plaintiffs had modified the requests in the Subpoena.  The Court therefore denied Dillon's Motion to Quash/Modify and ordered Dillon to comply with Plaintiffs' modified requests.

8.      On August 27, 2012, Dillon filed a status report regarding this matter. (Status Report by Interested Party Dillon Companies, Inc. in Compliance With August 17, 2012 Order of Magistrate Judge, Doc. # 99).

9.      On August 29, 2012, Plaintiffs filed a response to Dillon's status report. ("Response") (Plaintiffs' Response to Dillon Companies Status Report, Doc. # 100).

10.      On August 31, 2012 Dillon filed a reply (""Reply") related to its August 27, 2012 status report (Reply Regarding Status Report by Interested Party Dillon Companies, Inc., Doc. #108). In its Reply, Dillon included a summary of its

_____

[1] The Magistrate Judge understandably was upset with Dillon when it filed this status report just two minutes before the hearing, for which Dillon apologizes.

4

understanding of the Plaintiffs' Subpoena requests as modified by the Court's August 17, 2012 Minute Order and the Plaintiffs' own modifications.

11.     Also on August 31, 2012, Dillon filed three additional documents: (1) an Objection to the August 17, 2012 Minute Order (Objection of Interested Party Dillon Companies, Inc. to Magistrate Judge's Order dated August 17, 2012, Doc. #107) ("Objection"); (2) a Motion for Partial Stay of the August 17, 2012 Minute Order (Interested Party Dillon, Inc.'s Motion for Partial Stay of the August 17, 2012 Magistrate Judge's Order, Doc. #109); and (3) a Motion for Reconsideration of the August 17, 2012 Minute Order (Motion by Interested Party Dillon Companies, Inc. for Reconsideration of the August 17, 2012 Order of Magistrate Judge, Doc. #110).

12.     This Brief in Support of Dillon's Objection provides additional support and authority for the relief requested regarding Dillon's trade secret information in the August 31, 2012 Reply, the Motion for Partial Stay, the Motion for Reconsideration, and the Objection.[2]

## LEGAL AUTHORITIES

### I.     Fed. R. Civ. P. 26.

The general rules regarding discovery are set forth in Fed. R. Civ. P. 26(b), which allow for discovery regarding "any matter which is relevant to the subject matter

---

[2] This Brief does not address the issue of availability of the information requested pursuant to the Trade Secret Requests. See for example, the Declaration of John Phillips Pugh, Doc. # 108-2 and the Declaration of Jennifer McClenahan, Doc. # 108-5.

involved in the pending action." *Echostar Communs. Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 394 (D. Colo. 1988). Under Rule 26, the "relevancy" requirement is met if the requesting party can show that the information sought is "reasonably calculated to lead to the discovery of admissible evidence." *Id.*

However, Rule 26(b)(2)(C), also requires Courts to balance the needs for discovery against the burdens imposed when parties or persons are ordered to produce information or materials. *Id.* The fact that discovery is sought from a non-party is one factor that courts must consider in determining whether a party is entitled to production of the requested materials. *Id. "*The status of an entity as a non-party is a factor which weighs against disclosure." *Id.* Thus, Plaintiffs "must meet a burden of proof heavier than the ordinary burden imposed under Rule 26." *Id.*

Additionally, Rule 26(c)(1)(A) provides that: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including…forbidding the disclosure or discovery."

## II.    Fed. R. Civ. P. 45.

Pursuant to Fed. R. Civ. P. 45(c)(3)(B), a court may quash or modify a subpoena that requires the disclosure of a trade secret or other confidential research, development, or commercial information. In discovery matters, the party or person seeking to protect trade secret information must demonstrate: 1) that the subject material is trade secret information or otherwise confidential; and 2) that the disclosure

of such information *might* be harmful (emphasis added). *Id.* (citing *R & D Business Systems v. Xerox Corp.,* 152 F.R.D. 195, 196 (D. Colo. 1993); *Centurion Ind., Inc. v. Warren Steurer*, 665 F.2d 323, 325 (10th Cir. 1981)).

If the party or person presents evidence that the information sought is in fact "trade secret information, or otherwise confidential," then the burden shifts to the requesting party to demonstrate that "disclosure of the trade secrets is both relevant and necessary." *R & D Business Systems v. Xerox Corp.,* 152 F.R.D. 195, 197 (D. Colo. 1993). To meet this burden, the requesting party must prove that "it has a substantial need for the discovery which cannot otherwise be met without undue hardship." *See* Fed. R. Civ. P. 45(c)(3)(C). Based upon the evidence provided by the respective parties and/or persons, the court must then "balance the need for the disclosure of trade secret information against the injury that would result from that disclosure. *Echostar Communs. Corp, Ltd., 180 F.R.D. at 394* (citing *R & D Business Systems*, 152 F.R.D. at 197). Finally, under Fed. R. Civ. P. 45(c)(1), a court must enforce a party's duty to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."

## **ARGUMENT**

The information sought pursuant to Plaintiffs' Subpoena in subpart (h) of Request No. 5, Request Nos. 8 and 9, and subparts (d), (e), (f), (g), (h), (o) and (p) of Request No. 10 (collectively, the "Trade Secret Requests") constitutes trade secrets of Dillon

under the Act. Dillon's disclosure of this information to Plaintiffs – direct competitors of Dillon – would cause Dillon to suffer a substantial competitive disadvantage.

Dillon is a non-party to this litigation. Thus, disclosure of the information sought pursuant to the Trade Secret Requests is not necessary because such information is irrelevant to Plaintiffs' case. Plaintiffs do not have a substantial need for the information. Plaintiffs have also hinted that they may use the information obtained from Dillon to in separate lawsuit against Dillon, as Plaintiffs have openly suggested that Dillon is attempting to hide evidence of actionable anticompetitive conduct. *See* Plaintiffs' Response to Dillon Companies' Status Report, Doc. # 100 at paragraph 2.

Moreover, compliance with Plaintiffs' Subpoena would impose an undue burden on Dillon and would cause Dillon to incur a substantial expenditure of time, effort and financial resources. In balancing Plaintiffs' alleged need for Dillon's disclosure of trade secret information against the resulting injury such disclosure would cause Dillon, the burden imposed on Dillon clearly outweighs any benefit Plaintiffs might derive from the information requested pursuant to the Trade Secret Requests.[3]

---

[3] A protective order is not sufficient to protect the information requested pursuant to the Trade Secret Requests once that information has been disclosed. *See Echostar Commun. Corp. v. News Corp. Ltd.*, 180 F.R.D. 391 (D. Colo. 1988) (holding that where a party seeks the discovery of trade secret information from a non-party and the requesting party is a direct competitor of the non-party, even a fairly restrictive protective order provides insufficient protection for the non-party's trade secret information); *See also Premier Election Solutions, Inc. v. SysTest Labs, Inc.*, 2009 U.S. Dist. LEXIS 94193, 16 (D. Colo. Sept. 22, 2009) (finding that when a party requests discovery of trade secrets from a direct competitor and the balance between need and harm weighs in favor of the party or person from which discovery is sought, production

### III.    Trade Secrets.

**A.  Definition.** Pursuant to the Act, a trade secret is defined as:

> "the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes."

Colo. Rev. Stat. § 7-74-102. Trade secrets may consist of "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use the information." *Management Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765 (Colo. App. 1988). Factors considered in determining whether certain information constitutes a trade secret include: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it

---

of the data pursuant to a protective order will not adequately protect the trade secret information).

9

would take for others to acquire and duplicate the information. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003).

What constitutes a 'trade secret' is a question of fact for the trial court. *Shell v. Am. Family Rights Ass'n*, 2009 U.S. Dist. LEXIS 64045 (D. Colo. July 24, 2009). The fact that certain components of information are well-known or publicly available does not preclude trade secret protection. If the combination or organization of the information is unique and offers the compiler of the information a competitive advantage, it is protectable. *Id*; *see also Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003) (protection sought for a software system that integrated several variables available in the public domain in a manner and with a result that deserved trade secret protection). "A trade secret can exist in a combination of characteristics and components each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Rivendell Forest Prods., Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994); *Hertz v. Luzenac Group*, 576 F.3d 1103, 1110 (10th Cir. 2009).

**B. Secrecy Requirements.** Reasonable efforts to maintain the secrecy of a trade secret have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a "need to know basis," and controlling access to the trade secret information. The efforts to maintain secrecy are those reasonable under the circumstances and do not require that extreme and unduly expensive procedures be

taken to protect trade secrets. Uniform Trade Secrets Act § 1 (commentary), 14 Uniform Laws Annot. 541 (1980). *See also Network Telecommunications, Inc. v. Boor-Crepeau*, 790 P.2d 901, 902 (Colo. Ct. App. 1990).

### IV.   Dillon's Go-To-Market Strategy.

As a preliminary matter, in making strategic decisions regarding its petroleum product operations, Dillon refers to what is known as its "go-to-market strategy." As set forth in the Declaration of Susan Giannola (the "Giannola Declaration") (Exhibit D), Dillon expends a substantial amount of time, effort and capital in developing its go-to-market strategy. This strategy is based on the sales data collected by Dillon's employees and is defined in the Giannola Declaration as "the way in which Dillon approaches the market in its effort to remain competitive and to maintain and grow sales." Declaration of Susan Giannola at ¶ 6. Dillon's chosen approach to the market is based on its analysis of several components including, surveys of nearby competitors, area traffic volume, store visibility and access, sales projections and rate-of-return projections. *Id.* Each one of these components is an important aspect of Dillon's go-to-market strategy. *Id.* As more components are viewed together, Dillon's entire go-to-market strategy becomes visible and ascertainable. *Id.* Similarly, fuel quantities purchased by Dillon and Dillon's daily pump prices, for example, are based directly on Dillon's go-to-market strategy. Thus, disclosure of such information reveals Dillon's go-to-market strategy itself. *Id.* at ¶ 7.

## V.     Trade Secret Request No. 5(h).

In Trade Secret Request No. 5(h) of the Subpoena, Plaintiffs are seeking Dillon's identification of the net and gross quantity of fuel purchased by Dillon from Suncor for specific Kroger fuel site locations from January 1, 2009, through May 31, 2011. As set forth in the Giannola Declaration, the net and gross quantities of fuel purchased by Dillon for retail sales at the named locations during the specified time period constitute trade secret information because Dillon refers to aggregate sets of fuel quantities it purchased overtime in analyzing market trends and in making future business decisions. Dec. Giannola at ¶ 6-7. As such, Dillon's fuel quantity purchase history is confidential business information belonging to Dillon that is secret and of value to Dillon. This information affords Dillon an advantage over competitors, such as Plaintiffs, who do not possess such compilations of Dillon's purchase history data. *Id.* at ¶ 8.

Further, the requested aggregate fuel quantities directly reflect Dillon's sales data and "go-to-market strategy" regarding the retail market for petroleum in the specified locations. *Id.* at ¶ 6. As stated in Section IV above, because net and gross quantities of fuel purchased are based directly on Dillon's go-to-market strategy, disclosure of an aggregate set of fuel quantities purchased reveals Dillon's go-to-market strategy itself. *Id.* at ¶ 7.

It is not Dillon's practice to disclose compilations of the quantity of fuel purchased by Dillon to third-parties outside of the Dillon Company. *Id.* at ¶ 8. Dillon's fuel purchase history is protected from disclosure within Dillon because employees and

12

representatives of Dillon must obtain specific authorization and passwords to access the data. *Id.* at ¶ 22.

Requiring Dillon to disclose the information sought in Trade Secret Request No. 5(h) would force Dillon to provide its confidential proprietary information, from which Dillon derives a competitive advantage, to a direct competitor. *Id.* at ¶ 8. At the very least, Plaintiffs' possession of this information poses a serious threat of harm to Dillon's efforts to remain competitive in the market it shares with Plaintiffs. *Id.*

In *Echostar,* this Court, per Magistrate Judge O. Edward Schlatter, found that "disclosure to a competitor is more harmful than disclosure to a non-competitor" and ultimately, this Court denied the discovery sought pursuant to the subject non-party subpoena. *Echostar Communs. Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 395 (D. Colo. 1988).

Moreover, and especially because Dillon is a not a party to this case, it is unnecessary for Dillon to disclose the net and gross quantities of fuel it purchased from Suncor because Plaintiffs have not demonstrated a substantial need for this information which cannot otherwise be met without the imposition of undue hardship on Plaintiffs. Plaintiffs have alleged that Suncor sold fuel to Plaintiffs' competitors at lower prices than the prices Suncor charged Plaintiffs for the same fuel. In order for Plaintiffs to establish this claim, it is not substantially necessary for Plaintiffs to present Dillon's complete fuel purchase history from Suncor for the time period specified in Trade Secret Request No. 5(h). *See Echostar Communs. Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 395 (D. Colo.

1988) (denying discovery requests to a non-party where the requesting party did not demonstrate "substantial need" for the information or the relevancy of the information).

Colorado courts have also held that "it is axiomatic that a party cannot engage in discovery for purposes unrelated to the lawsuit at hand." *See Echostar Communs. Corp, Ltd.,* 180 F.R.D. at 395-96 (holding that a court may deny discovery sought pursuant to a party's subpoena where that party has publicly announced that it is contemplating a wide-ranging anti-trust lawsuit against the subpoenaed non-party entities, because such an announcement raises a healthy suspicion that the party is seeking discovery for purposes unrelated to the instant lawsuit). In this case, Plaintiffs' Response to Dillon Companies' Status Report, Doc. # 100, may reveal the true intent of Plaintiffs' Subpoena: "Dillon's implacable delay and obfuscation raises the inference that it has something to hide and that, rather than being an innocent bystander, it may have played an actionable role in anticompetitive conduct aimed at its competitor, Plaintiff Western Convenience Stores." This statement at least raises a "healthy suspicion" that Plaintiffs may be using discovery obtained from Dillon in this action to build a separate antitrust case against Dillon.

### VI.    Trade Secret Request No. 8.

Trade Secret Request No. 8 of the Subpoena requests that Dillon disclose daily pump prices from January 1, 2009 through May 31, 2011 for each grade of petroleum at each of its fuel site locations situated in the specified geographic areas. Dillon recognizes that one pump price alone does not constitute a trade secret. However, as

with the fuel purchase quantities requested in Trade Secret Request No. 5(h), Dillon refers to and considers aggregate sets of pump prices over time and for different fuel site locations in developing its go-to-market strategy and in making current pricing decisions. Dec. Giannola at ¶ 9. An aggregate set of Dillon's daily pump prices constitutes confidential trade secret information.

The requested pump price history is also a direct reflection of Dillon's go-to-market strategy because the history reflects Dillon's ultimate pricing decisions at different times, in different circumstances and in different geographic areas. *Id.* Both the pump prices and the data the prices reflect afford Dillon a competitive advantage in the retail fuel market it shares with Plaintiffs. *Id.* at ¶ 9-10.

It is not Dillon's practice to share aggregate sets of daily pump prices with third-parties outside of the Dillon Company. *Id.* at ¶ 11-12. Further, even the Dillon employees who input daily pump price data do not have access to aggregate sets of such data. *Id.* Only select employees and representatives of Dillon, who have a need to know such information, have access to aggregate sets of Dillon's daily pump prices. *Id.*

Moreover, Dillon does not publicize its fuel price information in popular publications or resources such as "Gas Buddy," and aggregate pump price information is protected from internal disclosure because specific authorization and passwords are necessary for employees and representatives of Dillon to access the information. *Id.*

Dillon's disclosure to a direct competitor such as Plaintiffs, of the daily pump price history requested in Trade Secret Request No. 8, which Dillon considers in

developing its go-to-market strategy and which directly reflects that strategy, threatens to put Dillon at a competitive disadvantage through the potential misuse of Dillon's own trade secret information. *Id.* at ¶ 10.

Furthermore, Dillon's disclosure of the requested daily pump price history is not necessary because, in this case, it is not relevant to Plaintiffs' allegations that Suncor sold fuel to Plaintiffs' competitors at lower prices than the prices Suncor charged Plaintiffs for the same fuel. *See Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 559-560 (U.S. 1990) (reiterating the longstanding principal that suppliers are not liable for the independent pricing decisions of their buyers). Thus, Plaintiffs cannot seek to hold Suncor liable for Dillon's retail pricing decisions.

The daily pump price history requested is also irrelevant because Dillon considers several different factors and components in establishing its go-to-market strategy and in making pricing decisions. Therefore, Dillon's daily pump prices do not reflect the prices Dillon paid Suncor for fuel in any predictable manner. Because the pump prices requested in Trade Secret Request No. 8 are irrelevant to Plaintiffs' claims against Suncor, Plaintiffs do not have a need, and certainly not a substantial need, for the information sought therein.

### VII.    Trade Secret Request No. 9.

Trade Secret Request No. 9 requests that Dillon disclose the results of its fuel price surveys from January 1, 2009 through May 31, 2011 with respect to the specified geographic area. Dillon expends extensive financial, technical and other resources in

16

gathering and organizing the data that ultimately constitutes is fuel price surveys. Dec. Giannola at ¶ 13-14. Employees of Dillon gather survey data two times per day for each Dillon fuel site location. *Id.* The employees assess traffic volume, area competitors, and other pertinent information. *Id.*

Dillon has also developed an intricate computer software program known as QuickSales that processes and stores survey data. *Id.* at ¶ 14. QuickSales provides Dillon with information concerning different aspects of its petroleum operations. *Id.* Among other things, Dillon's fuel price surveys provide analysis of market data regarding Dillon's competitors. *Id.* at ¶ 15. In turn, Dillon uses this data in developing its go-to-market strategy. *Id.* For these reasons, the results of Dillon's fuel price surveys constitute confidential trade secret information.

It is not Dillon's practice to disclose its fuel price survey data to third parties outside of the Dillon Company. *Id.* at ¶ 16. This data is accessible only to certain Dillon employees and representatives who are specifically authorized to access the information. *Id.*

Dillon's disclosure of the information requested in Trade Secret Request No. 9 would reveal the specific information that Dillon deems relevant in compiling its survey data. In other words, requiring Dillon's compliance with this request would reveal Dillon's methodology for obtaining the survey data to a direct competitor. *Id.* at ¶ 17.

Further, disclosure of Dillon's fuel price survey results would allow Plaintiffs access to information that resulted from Dillon's specialized procedures for gathering,

organizing and interpreting data. *Id.* at ¶ 13-15. Such disclosure would substantially detract from the competitive advantage Dillon derives from its exclusive possession of this data and would deprive Dillon of the value of its investment in obtaining this information.

The results of Dillon's fuel price surveys, which account for, *inter alia*, the presence of competition and traffic volume in a given area, are wholly irrelevant to Plaintiffs' claims that Suncor sold fuel to Plaintiffs at a higher price than Suncor charged Plaintiffs' competitors, including Dillon. Again, given that the information sought is not relevant to this case, Plaintiffs cannot possibly demonstrate a substantial need for this information.

Moreover, Plaintiffs and Dillon operate fuel sites in the same area locations. Thus, there is a significant risk that disclosure of the information sought in Trade Secret Request No. 9 will place Dillon at a competitive disadvantage. *See Premier Election Solutions, Inc. v. SysTest Labs, Inc.*, 2009 U.S. Dist. LEXIS 94193, 21-22 (D. Colo. Sept. 22, 2009) (holding that confidential information that may be used against the company by a direct competitor is generally afforded more protection). There is also a serious risk that Plaintiffs are seeking such information from Dillon for purposes of filing a separate action against Dillon, especially in consideration of Plaintiffs' statement set forth in Section V above.

VIII.    Trade Secret Request Nos. 10(d), (e) and (f).

Trade Secret Request Nos. 10(d), (e) and (f) request that Dillon disclose its research relating to the impact of fuel prices on sales, consumer response to price differences between retail sites, and the effects of brand loyalty and brand recognition on consumer demand and substitution. Dillon obtains such information for its own use, by using focus groups and internal company studies. Dec. Giannola at ¶ 18. Dillon then analyzes and draws inferences from the gathered data. *Id*.

It is not Dillon's practice to share the research it performs regarding its petroleum operations with parties outside of the Dillon Company and access to such research for employees and representatives of Dillon requires specific authorization and passwords. *Id*. at ¶ 18 and 22. Because Dillon expends time, effort and capital in performing research regarding its fuel operations, and Dillon's exclusive possession of the results of such research afford Dillon a competitive advantage against competitors, the information sought in Trade Secret Request Nos. 10(d), (e) and (f), is trade secret information.

Like disclosure of the information sought in Trade Secret Request No. 9, disclosure of this research would substantially detract from the competitive advantage Dillon derives from its exclusive possession of this research data and disclosure would deprive Dillon of the value of its investment in obtaining this information. *Id*. at ¶ 19.

Also like the information sought in Trade Secret Request No. 9, Dillon's research regarding the impact of fuel prices on sales, consumer response to price differences

19

between retail sites, and the effects of brand loyalty and brand recognition on consumer demand and substitution bears little, if any, relevance to Plaintiffs' claims that Suncor sold fuel to Plaintiffs at a higher price than Suncor charged Plaintiffs' competitors, including Dillon. As such, Plaintiffs do not have a substantial need for Dillon's disclosure of its research information.

The balance of the relevant factors regarding this request weigh in favor of non-disclosure, especially in consideration of the fact that Dillon is a not a party to this case, that Plaintiffs are direct competitors of Dillon and that Plaintiffs have indicated they may file a separate action against Dillon, in which the research information sought may be relevant.

## IX.    Trade Secret Request Nos. 10(g), (h), (o) and (p).

Trade Secret Request Nos. 10(g), (h), (o) and (p) request that Dillon disclose its research relating to the definition of the competitive market for fuel sites, the definition of the relevant market around fuel sites, competitive evaluations and price checking procedures.  Dillon obtains such information by way of its fuel price surveys and the data gathered by its employees as discussed in Section VII above. Dec. Giannola at ¶ 20. As stated therein, Dillon expends significant time, effort and financial resources in acquiring, organizing and interpreting the requested research data. *Id.*

It is not Dillon's practice to disclose such research to third parties outside the Dillon Company. *Id.* at ¶ 22. The research sought in Trade Secret Request Nos. 10(g), (h), (o) and (p) is accessible only to the employees and representatives of Dillon who

are specifically authorized to access that research. *Id.* Because Dillon acquires the requested research through its own substantial efforts, and because Dillon's exclusive possession of the results of such research affords Dillon a competitive advantage against competitors, the information sought in Trade Secret Request Nos. 10(g), (h), (o) and (p) constitute trade secret information.

Disclosure of this research would cause harm to Dillon because it would substantially detract from the competitive advantage Dillon derives from its exclusive possession of this research data and disclosure would deprive Dillon of the value of its investment in obtaining this information. *Id.* at ¶ 21.

Plaintiffs' requests under Trade Secret Request No. 10 appear to be solely aimed at gathering information for an antitrust action against Dillon. The requested information bears no relevance to Plaintiffs' claims against Suncor for alleged violations of the Robinson Patman Act.

WHEREFORE, Dillon respectfully requests that the Court Quash the Subpoena with respect to Request Nos. 5(h), 8, 9, 10(d), 10(e), 10(f), 10(g), 10(h), 10(o) and 10(p) because compliance with these requests would impose a burden on Dillon that outweighs Plaintiffs' stated need for this information for the following reasons: (1) Dillon's need to protect its trade secrets; (2) Dillon should not be required to disclose confidential trade secret information to a direct competitor; (3) the information requested is at best only marginally relevant to Plaintiffs' action against Suncor; (4) Plaintiffs have not demonstrated a "substantial need" for this information; (5) Dillon is not a party to this

action; (6) production of the information would be unduly burdensome and costly for

Dillon; and (7) Plaintiffs should not be permitted to use the Subpoena to search for

alleged antitrust violations against a competitor.

Dated:  September 12, 2012.

s/*Michael R. McCormick*
Christopher A. Taravella, #7790
Michael R. McCormick, #33682
Montgomery Little & Soran, P.C.
5445 DTC Parkway, Suite 800
Greenwood Village, Colorado 80111
Phone Number: (303) 773-8100
Fax Number: (303) 220-0412
E-mail:  ctaravella@montgomerylittle.com
         mmccormick@montgomerylittle.com
*Attorney for Dillon Companies, Inc.*
*Interested Party*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
Bennington Johnson Biermann &
Craigmile, LLC
370 17th Street, Suite 3500
Denver, CO 80202

Philip Wayne Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart LLP
1515 Wynkoop Street, Suite 600
Denver, CO  80202

Michael Korenblat
Suncor Energy Services, Inc.
717 17th Street, Suite 2900
Denver, CO  80202

William LeitzseyMonts, III
John Robert Robertson
Hogan Lovells US LLP-DC
555 13th Street NW
Columbia Square #1300
Washington DC 20004-1109

Anthony Shaheen
Keeya M. Jeffrey
Holland & Hart LLP-Denver
555 17th Street, Suite 3200
Denver, CO  80201

s/ *Michael R. McCormick*
Montgomery Little & Soran, P.C.