THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs/Counter Defendants,

v.

SUNCOR ENERGY (U.S.A.), INC. a Delaware corporation,

    Defendant/Counter Claimant/Third-Party Plaintiff,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

    Third-Party Defendants.

---

### DECLARATION OF SUSAN GIANNOLA PURSUANT TO 28 U.S.C. § 1746

---

1.    I am Susan Giannola. I am employed as the Director of Supermarket Petroleum Operations for The Kroger Co. ("Kroger"). Dillon Companies Inc. ("Dillon"), dba King Soopers, is a subsidiary of Kroger. Loaf 'N Jug Inc. is a dba of Mini Mart Inc. which is a subsidiary of Dillon.

2.    I have been an employee of Kroger since 1999, when I was hired as a Training Manager for the Supermarket Petroleum Group. In that role, I was responsible for training each of the several divisions of Kroger on how to price fuel and operate fuel sites. In 2006, I was promoted to Manager of Supermarket Petroleum Operations

**EXHIBIT D**

where I oversaw the fuel pricing and day-to-day management of each site. As Manager of Supermarket Petroleum Operations, I also took on responsibility for site selection and approval for new Kroger fuel stations.

3. I have been in my current position as Director of Supermarket Petroleum Operations since 2008. As Director of Supermarket Petroleum Operations, I oversee all operational aspects of Kroger's petroleum business. Specifically, I am involved in assessing and evaluating the performance and profitability of each division with respect to the provision of petroleum products to consumers. I develop expense guidelines and standards for each division and I review and approve corporate training standards. I also provide guidance concerning market-specific retail pricing and continue to partake in the real estate selection and approval process for new Kroger fuel sites.

4. I have reviewed the Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises in a Civil Action (#57-1) issued by Plaintiffs Western Convenience Stores, Inc. and Western Truck One, LLC in this matter dated April 26, 2012 ("Subpoena") (Exhibit A).

5. My Declaration addresses subpart (h) of request number 5, request numbers 8 and 9 and subparts (d), (e), (f), (g), (h), (o) and (p) of request number 10 of the Subpoena. The requested information constitutes trade secrets belonging to Kroger in that it is the confidential processes, procedures, business and financial information relating to Kroger's petroleum operations, which are secret and of great value to Kroger. As such, Kroger takes substantial precautions in protecting the confidentiality of this information.

2

Request No. 5(h)

6.     Request No. 5(h) asks for Dillon's identification of the net and gross quantity of fuel purchased by Kroger from Suncor for specific Kroger fuel site locations from January 1, 2009 to present.  The net and gross quantity of fuel purchased for retail sales at these locations directly reflects Kroger's sales data regarding the market for petroleum in those locations. Kroger bases what is known as its "go-to-market strategy" on its sales data. Kroger's "go-to-market strategy" means the way in which Kroger approaches the market in its effort to remain competitive and to maintain and grow sales. Kroger's chosen approach to the market is based on its analysis of several components including, surveys of nearby competitors, area traffic volume, store visibility and access, sales projections and rate-of-return projections. Each one of these components is an important aspect of Kroger's go-to-market strategy. As more components are viewed together, Kroger's entire go-to-market strategy becomes visible and ascertainable.

7.     Similarly, because net and gross quantity of fuel purchased is based directly on Kroger's go-to-market strategy, disclosure of this information and any other information based on the strategy reveals Kroger's go-to-market strategy itself.

8.     Given that Plaintiffs are direct competitors of Kroger, compliance with Plaintiffs' request would cause Kroger to disclose a direct reflection of its sales-data and its go-to-market strategy to a direct competitor. Such disclosure would put Kroger at a competitive disadvantage. Kroger does not share sales data with any third-party outside

3

of the Kroger Company without entering into a non-disclosure agreement (drafted by Kroger) with the third-party.

Request No. 8

9.  Request No. 8 asks Dillon to disclose daily pump prices from January 1, 2009 to May 31, 2011 for each grade of petroleum at each of its fuel site locations located in a specified geographic area. Kroger recognizes that a pump price alone does not constitute a trade secret. However, an aggregate of pump prices over time and throughout different locations is a direct reflection of Kroger's "go-to-market strategy" because this information reflects the ultimate decisions about price made by Kroger at different times, in different circumstances and in different geographic areas. An aggregate of pump prices over time and throughout different locations is also an aspect of Kroger's "go-to-market strategy" because this data is a component considered in the development of Kroger's go-to-market strategy.

10.  Requiring Kroger to disclose any aspect of its "go-to-market strategy" to a direct competitor such as the Plaintiffs puts Kroger at a competitive disadvantage.

11.  Kroger does not share any aggregate set of daily pump prices with third-parties outside of the Kroger Company. Further, even the Kroger employees who input daily pump price data do not have access to aggregate sets of such data. Only select employees and representatives of Kroger who have a need to know such information have access to aggregate sets of daily pump prices.

12. Kroger does not publicize its fuel price information with popular resources such as "Gas Buddy." Kroger never publicizes its fuel price information except for the fuel prices displayed at each of its fuel centers.

Request No. 9

13. Request No. 9 asks Dillon to disclose the results of its fuel price surveys from January 1, 2007 to present with respect to a specified geographic area. Kroger expends extensive financial, technical and other resources in gathering and organizing the data that ultimately constitutes its fuel price surveys. Kroger's analysts gather survey data two times per day for each Kroger fuel site location. The analysts assess traffic volume, area competitors, and other pertinent information.

14. Software programs such as QuickSales, a proprietary program created by and exclusively for Kroger, process the survey data, providing Kroger with information on different aspects of its petroleum operations. The total cost paid by Kroger for the development of the QuickSales program is $798,087.00 Kroger also incurs annual maintenance costs of $650,000.00 for QuickSales.

15. Among other things, Kroger's fuel price surveys, provide analysis of market data regarding Kroger's competitors. Kroger uses this data to develop its go-to-market strategies. Analysis of Kroger's fuel price surveys also reveals the different types of information that Kroger considers in developing its go-to-market strategies.

16. Kroger does not share its fuel price surveys with parties outside of the Kroger Company. Access to fuel price surveys is limited even for employees and representatives of Kroger. The fuel price surveys can only be accessed via QuickSales.

5

QuickSales requires user credentials. There are various levels of access to QuickSales and the level of access determines what information is available to a given user.

17. Disclosure of Kroger's fuel price surveys is disclosure of yet another component of Kroger's go-to-market strategy.

Request Nos. 10(d), (e) and (f)

18. Request Nos. 10(d), (e) and (f) ask Dillon to disclose all research done by Kroger or on Kroger's behalf relating to the impact of fuel prices on sales, consumer response to price differences between retail sites, and the effects of brand loyalty and brand recognition on consumer demand and substitution. In order to obtain such information, Kroger uses focus groups and internal company studies. Kroger then analyzes and draws inferences from the gathered data. Kroger does not share the research it performs regarding its petroleum operations with parties outside of the Kroger Company.

19. Disclosure of Kroger's research relating to Request Nos. 10(d), (e) and (f) would reveal components Kroger's go-to-market strategy, including survey questions Kroger deems relevant, in obtaining information Kroger considers in developing its strategies. Such disclosure would also provide a direct competitor of Kroger with a set of information that resulted from Kroger's specialized procedures for gathering, organizing and interpreting data.

Request Nos. 10(g), (h), (o) and (p)

20. Request Nos. 10(g), (h), (o) and (p) ask Dillon to disclose all research done by Kroger or on Kroger's behalf relating to the definition of the competitive market

6

for fuel sites, the definition of the relevant market around fuel sites, competitive evaluations and price checking procedures. Kroger obtains such information by way of its fuel price surveys and the data gathered by its employees as discussed in paragraphs 13 through 17 above. As stated therein, Kroger utilizes a substantial number of its employees to gather data for Kroger's use and Kroger utilizes proprietary software programs, such as QuickSales, in order to assess the data gathered by its employees. Kroger has also developed specific research methodology for obtaining the information it uses in developing its go-to-market strategies. This information is highly confidential and would be of great economic and strategic value to Kroger's competitors.

21.     As stated above, with respect to Request Nos. 10(d), (e) and (f), disclosure of Kroger's research relating to Request Nos. 10(g), (h), (o) and (p) would reveal another component of Kroger's go-to-market strategy and would provide a direct competitor of Kroger with a set of information that resulted from Kroger's specialized procedures for gathering, organizing and interpreting data.

22.     All of the information requested by Plaintiffs and discussed herein, is protected from disclosure even within the Kroger Company. Kroger's sales data, daily pump price records, fuel price survey results, and the research performed by Kroger are accessible only through the company intranet, which is protected by an extensive firewall system. Kroger's intranet system also requires users to obtain specific authorization and passwords from Kroger's information technology ("IT") department in order to access any of the information requested by Plaintiffs.

23. Kroger acquired the information resulting from its surveys and research for its own use in developing its go-to-market strategies. Kroger never intended to disclose such information to third-parties.

24. My Declaration does not address whether the information requested by the Subpoena is available or privileged, whether the request is unduly burdensome or whether the requested information is relevant to the Plaintiffs claims in this case.

25. Capitalized terms not defined herein have the same meaning as set forth in the Subpoena.

26. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 31st day of August, 2012.

*Susan Giannola* (signature)

SUSAN GIANNOLA