1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3     Case No. 11-cv-01611-MSK-CBS

4     _____

5     WESTERN CONVENIENCE STORES, INC., et al.,

6          Plaintiffs/Counter Defendants/Third Party Defendants,

7     vs.

8     SUNCOR ENERGY (U.S.A) INC.,

9          Defendant/Counter Claimant/Third Party Plaintiff,

10    DILLON COMPANIES, INC.,

11         Interested Party.

12    _____

13         Proceedings before CRAIG B. SHAFFER, United States

14    Magistrate Judge, United States District Court for the

15    District of Colorado, commencing at 2:05 p.m., August 17,

16    2012, in the United States Courthouse, Denver, Colorado.

17    _____

18         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

19    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

20    _____

21                        APPEARANCES

22         KENNETH R. BENNINGTON, PHILIP W. BLEDSOE and ADAM

23    ALDRIDGE, Attorneys at Law, appearing for the Plaintiff.

24    _____

25                       MOTION HEARING


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

1     _____

2                    APPEARANCES: (Cont'd.)

3          ANTHONY J. SHAHEEN, Attorney at Law, appearing for

4     the Defendant, Suncor Energy.

5          ANDREW A. SMITH and SCOTT L. EVANS, Attorneys at

6     Law, appearing for the Interested Party, Dillon Companies.

7     _____

8                    P R O C E E D I N G S

9          (Whereupon, the within electronically recorded

10    proceedings are herein transcribed, pursuant to order of

11    counsel.)

12         THE CLERK: All rise.  Court is in session.

13         THE COURT: Have a seat, everyone.  Have a seat.

14    All right.  Western Convenience Stores, Inc., vs. Suncor

15    Energy, 11-cv-01611. I'll take appearances of counsel.

16         MR. BENNINGTON: Good afternoon, Kenneth Bennington

17    and Adam Aldridge for the plaintiffs --

18         THE COURT: Okay.

19         MR. BENNINGTON: -- as well as Phil Bledsoe.

20         MR. BLEDSOE: And Phil Bledsoe for the plaintiff as

21    well, Your Honor.

22         THE COURT: Okay.

23         MR. EVANS: Good afternoon, Your Honor.  Scott

24    Evans for the non-party, Dillon Companies.

25         MR. SMITH: And Andrew Smith as well.

1          THE COURT: Okay.

2          MR. SHAHEEN: Tony Shaheen on behalf of Suncor.

3          THE COURT: All right.  We are still wrestling with

4    the Motion to Quash and then I guess there is a joint Motion

5    to  Amend,  so  let's  --  bring  me  up  to  speed  on  your

6    discussions with respect to the subpoena served on Dillon.

7    What  have  you  been  able  to  work  out?   What  is  still  the

8    subject of some dispute?  Bring me up to speed.

9          MR. BENNINGTON: As of the last time we -- we were

10   with you, you ordered us to get together within 48 hours to

11   try  to  work  out  a  solution  to  this.   We  --  we  did  get

12   together within 48 hours, and attached to the Status Report

13   -- excuse me -- the Status Report which was filed July 25th,

14   we  --  that  is,  on  behalf  of  Western,  gave  to  counsel  for

15   Kroger amended specifications for the subpoena, which are in

16   the square bullet points on the -- in the pleading, in which

17   we limited the request as we understood you advised we do.

18          So at that point, counsel for Kroger went back to

19   work  with  his  client,  and  unfortunately,  I've  had  no

20   response until two minutes ago when I was handed something

21   -- a letter in writing.  I have met with Mr. Evans one more

22   time, which was yesterday.  Yesterday he was not authorized,

23   he told me, to give me whatever it was that apparently is

24   now in writing, so until now, I only have a outline of an

25   idea about what they're going to produce and what they're

4

1    not going to produce and obviously have not had time to

2    digest this letter, which was just handed to me.

3          THE COURT: Well, what is -- what is this Document

4    94?  Hold on.  This is Dillon's Status Report.  Okay.  And

5    I'm just curious, when was this thing filed?  You're kidding

6    me.  You guys filed this today at 1:58 this afternoon, two

7    minutes before this hearing was supposed to start?

8          MR. EVANS: We did, Your Honor.  We were in

9    discussions with the Kroger corporate office up until

10   literally the very last minute and ironing out the

11   particulars of the response.

12         THE COURT: I know, but how am I supposed to

13   process this in any meaningful way if it's two minutes

14   before?  I mean, my staff wasn't even aware -- I suspect

15   they still aren't aware that this thing was filed, so you

16   want me to sit here now and have everybody cool their heels

17   while I sit here and read this?

18         MR. EVANS: Well, you know, I -- I don't -- I'll

19   tell the Court --

20         THE COURT: I mean, that's really not the best use

21   of the Court's time, don't you think?

22         MR. EVANS: Of course, not, and I -- I wouldn't,

23   you know, be so bold as to -- to advise the Court how to

24   spend its time, but I would be humble enough to advise the

25   Court that this, again, was done at the last minute.  There

5

1    was a lot of discussion back and forth, and we weren't

2    authorized to even file this until the very last moment, and

3    did once we were -- were given the authorization.  But there

4    was a lot of thought and debate that was put into the

5    document, and we apologize to the Court for the last-minute

6    nature.

7            THE COURT: Well, I've got to tell you, this is --

8    this -- this is the sort of thing that's going to kill

9    Dillon.  I mean, I want to try to be sympathetic to Dillon's

10   cause, but this is actually work -- to give me this two

11   minutes -- and I understand you didn't have the

12   authorization to do it, but this makes me decidedly

13   unsympathetic to Dillon's cause.  Dillon has, for all

14   intents and purposes, potentially shot itself in the foot.

15           MR. EVANS: Your Honor, I think that that -- I

16   understand what you're saying.  I guess the alternative

17   would be to not file anything.

18           THE COURT: No, the -- no, the alternative would

19   tell your client that there's a certain time sensitivity to

20   this.  I got -- I got their second Status Report on August

21   1st.  Their second Status Report says -- is that, "The only

22   information that Dillon has provided as of the filing of

23   this report is that it is hopeful they will be prepared to

24   meet during the week of August 6 to discuss Dillon's

25   comprehensive responses."  Now, was there some meeting the

1    week of August 6th?

2              MR. EVANS: No, the meeting we had -- the -- the

3    second meeting we had took place yesterday afternoon.

4              THE COURT: See, the fact --

5              MR. EVANS: And, again, that --

6              THE COURT: -- of the matter is, I -- this may be

7    seethingly burdensome for Dillon, but I can't allow Dillon

8    to impose on the Court by dragging its feet.  And if Dillon

9    wants to drag its feet, I can solve that problem by simply

10   telling Dillon, Life is easy.  Give them everything.

11             The whole purpose of this exercise, when we were

12   together back on July 16th, was to try to give you folks an

13   opportunity to work together.  Now, 30 days after I gave you

14   that opportunity, two minutes before this status conference,

15   Dillon tells me in writing something that quite candidly

16   they should've told me weeks ago.

17             Delay is not a litigation strategy that's a

18   winning strategy.  Delay is a terrible strategy, and foot

19   dragging in the face of the Court's efforts to try to help

20   Dillon is an absolutely terrible strategy.  Talk about

21   biting the hand that feeds you.

22             And I realize, Counsel, it's not you.  I realize

23   that you have a client and at the end of the day, your

24   client gives you direction, but your client's not giving you

25   directions that are benefitting your client.  And so my

1    criticism isn't by -- it is absolutely not directed at you,

2    but this was not a good strategy for Dillon to follow.

3    Because we're going to bring this to the end, and you've

4    really tied my hands.  So --

5              MR. EVANS: May I --

6              THE COURT: -- these are the ten categories, okay?

7    So one of the categories is, "All contract documents between

8    Dillon and Suncor that relate to Dillon's purchase of fuel

9    from Suncor or sale at retail and were effective before June

10    1, 2011."  Just so I understand, going how far back?   I

11    mean, so anything that was effective before June '11 would

12    literally go to, you know --

13              MR. BENNINGTON:   I can answer that.   The

14    contractual relationship started in 2009.

15              THE COURT: Okay.  So it's basically 2009 to 2011.

16              MR. BENNINGTON:   That's right.  In addition, we

17    gave them -- as you requested, we gave them a list of what

18    we do have, and some of them are not signed or are

19    incomplete, so we said, Please, fill in the gaps to the

20    extent you can, and my quick reading of the response just

21    now indicates that that's what's happened.

22              THE COURT: Right.   And when is that going to

23    happen?

24              MR. BENNINGTON: Well, I think it's attached -- I

25    -- I'm looking at a letter with some attachments to it that

8

1       probably aren't part of your pleading.   It appears like

2       there's a stack of -- not a stack, but there are several

3       pages of contracts.

4              THE COURT: Okay.   So No. 2, "For the pertinent

5       time frame, January 1, 2008, through December 31, 2011, in

6       geographic area Colorado, all emails between Dillon and

7       Suncor referring or relating to any discount."

8              "If Western agrees to pay all expenses related to

9       the search, either internal time to search or expenses

10      related to bringing in a vendor, Dillon will agree to look

11      for and produce relevant emails between the four Dillon

12      custodians for this case and Suncor referring to or relating

13      to any discount.   Dillon will only search the email of the

14      four custodians in its fuel department who" -- "whom may

15      have information relating to this case, not all email for

16      the entire company."

17             Well, let me -- let me get Western's response in

18      terms of the limitation to the four custodians.

19             MR. BENNINGTON:  I have no way of verifying that,

20      other than I do have some Kroger-related emails that were

21      produced by Suncor.  And I find four custodians -- I mean,

22      sorry, four people in these chains and three emails which

23      tend to corroborate what he's telling me.

24             THE COURT: Okay.

25             MR. BENNINGTON:  But that's all.

1          THE COURT: All right.  Well, first of all, I'm not

2     going to make Western agree to pay in advance because right

3     now I have no information from which I could discern that

4     cost shifting is appropriate.  Produce the emails for the --

5     no, produce the -- you produce and keep records of what it

6     costs you, and then I will allow you to file a motion

7     seeking to recover those costs, and I may or may not grant

8     it.  But we're not going to slow this process down while we

9     fight about cost shifting.

10          Respond to the emails for these four custodians,

11     and then Dillon is free to file a motion.  But we're not

12     going to do it in reverse order.  We're not going to fight

13     about fees and costs and then after we spend all that time

14     and energy, we produce.  Produce and then file your motion.

15          "For the pertinent time frame, January 1, 2008,

16     and later, all communications between you and Suncor

17     relating to Western Convenience Stores."  Same caveat.

18     Again, we're not going to deal with cost shifting up front.

19     You -- Dillon can file a motion.

20          The reason I'm doing that, gentlemen, is, to be

21     perfectly honest with you, if I tell you up front we're

22     going to shift costs, then that's just a license to spend

23     money.  What I would much rather have you do is embark on a

24     cost-efficient search, not knowing whether or not you'll get

25     those monies back, so you're in a much stronger position if

1    you  approach  the  search  in  the  most  cost-effective,

2    efficient manner possible and then come back and say, Judge,

3    we were as efficient as we possibly could be. We moved this

4    process  as  cost  effectively  as  possible,  yet  here  is  how

5    much we spent.  It creates an incentive for your client to

6    be cost-effective too.

7              But   what   I   don't   understand   is,   "All

8    communications between you and Suncor relating to Western

9    Convenience Stores" -- the difficulty is that may or may not

10   -- see, the four custodians dealt with the discount.  Those

11   are the custodians that relate to discounts.  I don't know

12   that communications between Dillon and Suncor referring to

13   or  relating  to  Western  would  be  limited  to  those  four

14   custodians.  There could be other people involved.

15             MR. EVANS: Your Honor, my understanding is that it

16   will be that those four custodians actually encompass the,

17   quote, unquote, fuel department of Kroger and -- and handle

18   all of those business matters for Kroger.  So it is those

19   four.

20             THE COURT: Okay.  Well, what I would suggest is --

21   and I -- I think at a minimum you should start with those

22   four.  Produce responsive to those four.  If you believe

23   based on real concrete facts that we need to go beyond those

24   four, I'll entertain that request, but I'm going to require

25   production certainly starting with those four custodians.

1       I don't know that I'll allow more than that, but certainly

2       with respect to those custodians.

3               No. 4, "Dillon's retail fuel sites in Colorado and

4       parts of Nebraska that were open between January 1, 2009,

5       which are not identified or incorrectly identified on a list

6       provided by Western."   "Dillon is producing lists of its

7       retail fuel locations" -- okay.  So apparently that's not an

8       issue.

9               MR. BENNINGTON: I appear to have that in my --

10              THE COURT: Okay.  No. 5, "The bill of lading" --

11      "The bill of lading or the Suncor invoice for each truckload

12      of fuel purchased by Dillon from Suncor before June 1, 2011,

13      plus ESI to identify the net price paid, any discounts and

14      the retail site to which fuel was transported."

15              "The requested documents that are maintained by

16      Kroger are largely in hard copy and would be extremely

17      difficult to locate.  Invoices: Kroger estimated it will

18      take 400 hours to locate what invoices can be found.  At $50

19      an hour, this would cost the requesting party $2,000" --

20      "$20,000. The search would take several months, possibly

21      over a year to search the records within Kroger's

22      possession.  There's no guarantee as to what Kroger will be

23      able to find.  Bills of lading: Kroger estimates that it

24      will take 800 hours to locate what bills of lading can be

25      found.  At $50 an hour," blah, blah, blah, blah, blah.

1            Where -- where, physically, are these documents

2     located?   How does -- how does Dillon or slash Kroger

3     maintain these records?  Where are they physically?

4            MR. EVANS: Your Honor, I'm not sure.  To answer

5     this question, though, I do have one of the Kroger attorneys

6     on call.  We can call her.  She's the one who's assisted us

7     through this process and has -- has participated with -- for

8     Kroger with other litigation matters -- discovery litigation

9     matters, and she, you know, offered her assistance if -- if

10    we had questions -- if there were questions that we couldn't

11    answer during the hearing.

12            THE COURT: Well, I mean, I -- but see, here's the

13    problem you've got, folks.   And -- and this is what's

14    killing you.  Under 26(b)(2)(b), a party is not required to

15    produce if they demonstrate -- factually demonstrate that

16    discovery of those not reasonably accessible documents would

17    create an unreasonable burden or expense.   But that's

18    Kroger's burden of persuasion.

19            And so when I get something from Kroger that

20    basically says, Kroger estimated it will take 400 hours, but

21    counsel can't tell me where the documents are or how the

22    documents are maintained, I can't really put a lot of weight

23    on this estimate.   I would've expected an affidavit from

24    this attorney saying, "Based upon the search that we've

25    undertaken in the 30 days since you were before Judge

1    Shaffer last, this is where we" -- "this is how Kroger

2    maintains these records.  This is our central repository.

3    It's all in boxes.  We index every box.  We have a master

4    index of every box."  But for some Kroger attorney to simply

5    say, "We estimate it will take 400 hours," without giving me

6    any facts to support that estimate, it's of really no value.

7            MR. EVANS: And everything that you just stated,

8    Your Honor, was -- was discussed amongst, you know, the

9    attorneys in Denver and those in Cincinnati, and asked if

10   that's how the records are maintained.

11           THE COURT: Then --

12           MR. EVANS: What, in fact, was done was the

13   responses were -- were paired down because they -- we were

14   told that, you know, it was too much information, it was a

15   little wordy, but in essence, the way that you described it

16   is -- is -- is what is occurring.  The records are

17   maintained in Cincinnati at corporate headquarters in boxes,

18   indexed, and -- and we discussed that fully.  In hard

19   copy --

20           THE COURT: Okay.

21           MR. EVANS: And they -- they elected to give a

22   very, you know, abbreviated response.

23           THE COURT: I know, but -- but -- and your -- your

24   -- your clients, unfortunately, are leaving you hanging.

25           MR. EVANS: Well --

1          THE COURT: Because at the end of the day, it's
2     their burden of persuasion.
3          MR. EVANS: Absolutely.  And they're available.
4     They're --
5          THE COURT: No.  This was the hearing.  So you want
6     me to call them up and -- and why aren't they here?  I mean,
7     if they really wanted to persuade the Court that this stuff
8     is not reasonably accessible, it would've been worth their
9     time and energy to physically be here so they could explain
10    to me face to face.
11         MR. EVANS: Well, I -- I think that what they're
12    trying to do is -- is explain to you telephonically.  I
13    mean, I -- I don't know -- they -- they're still willing to
14    talk with you and would like to talk with you or answer any
15    questions you may have.
16         THE COURT: I know, but -- but -- but this -- this
17    -- this is -- this is not a good strategy for Dillon.  If
18    Dillon really wanted to persuade the Court that this stuff
19    is not reasonably accessible, they would've come here.  And
20    here's the irony -- they don't want to produce this stuff
21    because it's unreasonably burdensome to produce, but they
22    couldn't bother to spend the time and money to tell me that
23    directly.  They want me to pick up the phone and reach out
24    to them.  That's backwards.  I mean, it truly is -- it's a
25    backwards approach to this problem.

1          What they're suggesting is it's not a matter of

2     being unreasonably burdensome, it's just they can't be

3     bothered.  They couldn't even be bothered  to come here to

4     tell me it's unreasonably burdensome.  It's a -- it's not a

5     strong -- I mean, if -- if we're talking about just we want

6     -- we want to make the strongest showing possible, to me,

7     the strongest possible showing would be for Dillon to come

8     and say, You know, Judge, this is so important to us, we

9     feel like the record is so strong for us that we took the

10    time to spend the money to send a lawyer to physically be in

11    your courtroom so that that lawyer could answer any

12    questions you had, look you in the eye.  It's not a -- it

13    doesn't -- it's not a strong position to take.

14          And this recitation -- I mean, there's no

15    explanation.  For instance, they're looking for bills of

16    lading or Suncor invoices.  Now, I would've expected an

17    affidavit to say, This is how we store Suncor invoices.  We

18    have boxes and in those boxes are file folders on a monthly

19    basis of all the invoices. So we can go to identifiable

20    boxes in our warehouse, we can pull those file folders, we

21    can send those invoices out to Kinko, and you're done.

22          Or is it a matter of they've got to go to every

23    store in their system?  But they don't tell me how they

24    store these bills of lading or these invoices.  And so it --

25    it's -- I -- I don't know how -- I don't know -- for

1   instance, there's nothing in this affidavit that would

2   indicate electronically stored information. You're telling

3   me that it's largely in hard copy, so the ESI is a non-

4   issue.

5            MR. EVANS: That's correct.

6            THE COURT: So all we're talking about is going and

7   looking at some boxes and pulling invoices? I mean, I'm old

8   enough to remember when that was the norm.

9            MR. BENNINGTON: If I may, I -- the fact -- I don't

10  think we should stop with the assertion that ESI is not

11  available. Kroger advertises on its web page -- on its

12  website how they're an ESI company and all the vendors have

13  to be hooked into their ESI system. And -- and the -- the

14  Suncor people have testified in a 30(b)(6) that everything

15  is done electronically. They don't ship paper back and

16  forth to their customers. And what we don't have, as you

17  point out, is an affidavit or a witness to say, We don't

18  have this in ESI. You gotta spend a gillion bucks looking

19  at this on paper. Frankly, Judge, I accept what Mr. Evans

20  says, but I don't accept the inferential assertion from --

21  from Kroger that they don't have ESI.

22           THE COURT: No, and -- and I'm going to make it --

23  again, just so it's clear, so there's no confusion. I'm not

24  critical of Mr. Evans in the slightest.

25           MR. BENNINGTON: Yeah.

1       THE COURT:  I think he's a fine attorney, and it's

2  a pleasure to have him here.  I think he's been left hanging

3  by his client.

4       MR. BENNINGTON: Well, and I --

5       THE COURT: And for that he has my sincere

6  sympathy.

7       MR. BENNINGTON: And I was trying to say the same

8  thing.  But it doesn't seem credible, based on the objective

9  facts that we do know, that Kroger operates with boxes of

10  paper.

11       THE COURT: Well, and the problem I've got is,

12  again, I -- I can't speak to whether they have ESI or not,

13  but the problem that I've got is if I accept this

14  representation from the Kroger in-house counsel, who I'm

15  assuming is the author of this information or the source of

16  this information, if I accept that representation at face

17  value, that all they've got is paper copy, and if I accept

18  Mr. Evans' representation that they have these things in

19  boxes and the boxes are indexed, then I'm hard-pressed to

20  understand this representation it's going to take 400 hours

21  to locate the invoices and 800 hours to locate bills of

22  lading.

23       And so I've got to find, based upon this

24  representation, that -- that Kroger's in-house counsel have

25  not sustained their burden under 26(b)(2)(b).  They have not

1    demonstrated -- factually demonstrated that it's -- a search

2    of this material would be unreasonably burdensome or

3    expensive.  There's nothing here to suggest that this is

4    unreasonably accessible.  In fact, quite the opposite.  If

5    I accept their representation that it's all on paper -- you

6    know, Rule 26(b)(2)(b) was put in place to deal with

7    electronically-stored information.  And so if -- if what

8    they're telling me is true, it's all paper, then they

9    haven't sustained their burden as far as I'm concerned.

10        No. 6, "ESI or other documents that would identify

11   any discounts Dillon received from Suncor before June 1,

12   2011, which are not identified in response to category 5."

13   Well, I mean, Kroger's only -- only obligated to produce

14   documents that they actually have. They're not required to

15   produce anything, so I will accept the representation,

16   assuming, of course, that Kroger's undertaken a reasonable

17   good faith search.  If they haven't undertaken a reasonable

18   good faith search, then their representation in No. 6 is --

19   is -- you know, take it, I guess, with a grain of salt.  But

20   if they tell me -- you know, if they tell me, Everything --

21   We don't have anything in response to 6 which isn't

22   encompassed by 5, then I can't make them do any more than

23   they do.

24        "ESI that will identify the zip code and last four

25   digits of the credit or debit card number of the customer

1    responsible for each credit or debit card purchase of fuel

2    between January 1, 2007, and present at 135 of Dillon's

3    retail" --

4              "Dillon is not willing to produce this information

5    because it's a trade secret.  Western has not demonstrated

6    this information is necessary and relevant as required by

7    applicable law.  In any event, the credit card information

8    is only available for the preceding 18 months, after which

9    the information is stored exclusively by the third party

10   vendor.  In order to retrieve this information, archived

11   databases would have to be restored, and a parallel system

12   would have to be built so the data could be accessed.

13   Retrieving similar historical information for a single

14   customer has been a six-month process.  Even if the data

15   requested by this category were not a trade secret, Dillon

16   would not be willing to produce it because of the time and

17   expense involved.  While Dillon is unable to estimate the

18   time and expense involved in retrieving data for millions of

19   transactions for hundreds of thousands of customers, it has

20   requested that its third-party vendor provide such an

21   estimate."  When did Dillon make that request?

22              MR. EVANS: Approximately three weeks ago.

23              THE COURT: And apparently it hasn't heard back

24   from its vendor?

25              MR. EVANS: That's correct.


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

1           THE COURT: So basically, if I understand this
2   response, Dillon has credit card information for the
3   preceding 18 months, but anything out beyond 18 months is
4   stored by a third-party vendor.  Is the third-party vendor
5   in your custody -- I mean, do you have -- even though it's
6   stored by a third-party vendor, do you have possession,
7   custody or control -- specifically, control?  It's -- Rule
8   34 is written in the disjunctive.  If you have control, then
9   you have to produce it unless I find that there are some
10  considerations that militate against production.

11          MR. EVANS: We cannot access it on our own.

12          THE COURT: But, I mean, you -- but -- but you can
13  go to the vendor because you control the vendor.  It's still
14  your data, you just are -- the data is -- is stored in this
15  third-party location?

16          MR. EVANS: Yes, Your Honor.

17          THE COURT: Okay.  So you have control over the
18  data?

19          MR. EVANS: Yes, Your Honor.

20          THE COURT: Okay.  Well, I mean, this is one of
21  those areas where I will tell you honestly, I -- I have had
22  problems with this request since day one, and I continue to
23  have problems with this request.  I think it -- I think it
24  sweeps too broadly, and -- and my sense is the burdens of
25  producing five years worth of credit card transactions for

1    135 stores is excessive and unduly burdensome on its face.

2    Absolutely on its face.  Particularly when you're telling me

3    that these folks didn't start a relationship with Suncor

4    until 2009.  You want to start on January 1, 2007.

5               MR. BENNINGTON: I agree.  Our date should be 2009,

6    and I'm looking at the pleading that was sent to you talking

7    about the compromise we offered, and it doesn't contain that

8    date, and it should've.  What we did do is, as it was

9    initially drafted, it didn't have a list of stores embedded

10   in it as a -- as a control.  We did that, gave them the list

11   that we had, and then add -- add to it whatever other people

12   aren't on their list -- on our list.  But it shouldn't be

13   before they entered into the contract relationship.

14              THE COURT: I'm still struggling with -- even if I

15   start at January 1, 2009, to present, we're basically

16   talking about three years worth of information on 135

17   stores.

18              MR. BENNINGTON: Well, not the present because our

19   relationship with Suncor ended in May of 2011.  Once again,

20   I don't think I made that clear, and --

21              THE COURT: Okay.  So now January 1, 2009, to May

22   2011 --

23              MR. BENNINGTON: That's --

24              THE COURT: -- so it's now 28 months.

25              MR. BENNINGTON: That's correct.

1          THE COURT: And 135 stores.  That still seems
2     excessive for you to prove what you want to prove.  And what
3     you're trying to prove is that Suncor gave Dillon unfair or
4     anti-competitive, from your client's perspective, price
5     discounts.
6          MR. BENNINGTON: What we're trying to prove and
7     what we'll have statistical experts look at is by looking in
8     that -- at that data, compared with our own credit card
9     data, and we see peop -- individual people shifting from our
10    stores to their stores --
11         THE COURT: Right, and so --
12         MR. BENNINGTON: -- and then we relate that to
13    price.
14         THE COURT: Right, and so what I would be doing --
15    I think a -- a narrower request would be -- I don't know how
16    many stores that Western Convenience has.  But if Western
17    Conv -- in other words, if the premise of this argument is,
18    We want to figure out to what extent customers that
19    previously were Western Convenience customers are shifting
20    to Dillon, then I would be saying, at least as a first cut,
21    we will come up with 20 Dillon stores that reflect our -- in
22    other words, how many stores does your client have?
23         MR. BENNINGTON: 144.  But actually I did that --
24    I forgot to tell you that. That is in the pleading.  We gave
25    them a list of all of the stores of theirs that we knew of

1    that are within 25 miles of our stores.

2           THE COURT: Okay.

3           MR. BENNINGTON: So that --

4           MR. BLEDSOE: It's 44 stores, not 144.

5           THE COURT: So --

6           MR. BENNINGTON: Oh, excuse me.  Did I say 144?

7           MR. BLEDSOE: Yeah.

8           MR. BENNINGTON: I'm sure Mr. Taraghi would like to

9    have that.

10          THE COURT: Right.  Maybe, but the discovery

11    burdens he would probably find overwhelming.

12          MR. BENNINGTON: Yeah.

13          THE COURT: So, in other words, it's 44 stores.

14          MR. BENNINGTON: Yes.

15          THE COURT: So what -- what -- I mean, in other

16    words, this is the sort of thing, guys, you should be

17    talking about.  In other words, if there's -- if Mr. Taraghi

18    has 44 stores within -- what I would be doing is I would be

19    saying, Let's identify, for those 44 stores, all

20    Dillon/Kroger stores within 15 miles and give us those

21    credit cards.

22          MR. BENNINGTON: I did that.  I just did 25 miles.

23          THE COURT: Okay.  So -- but --

24          MR. BENNINGTON: And he has that list.

25          THE COURT: But here's my problem, guys.  In other

1    words, I'm looking at the -- and this is what I can't

2    answer.  I'm looking at the request as you propounded it,

3    and Dillon is saying it's unwilling to produce this

4    information because it's a trade secret.  I don't much care

5    because 26(b)(1) says that a party is entitled to conduct

6    discovery of any non-privileged information.  Trade secrets

7    are not a privilege.  To the extent there's a protective

8    order in place, and I realize plaintiff isn't real wild

9    about the terms and conditions of the protective order, but

10   Dillon cannot get away by simply saying it's not willing to

11   produce this information because it's a trade secret.  It's

12   discoverable even if it's a trade secret.

13          So then the question is, under 26(b)(2)(c), does

14   the Court need to put safeguards in place because production

15   would create an undue burden in terms of time and expense or

16   production would be oppressive.  So I'm not persuaded by the

17   first sentence.

18          And then the question is, Western has not

19   demonstrated this information is necessary.  That's not the

20   legal standard under 26(b)(1).  The word "necessary" doesn't

21   appear anywhere in 26(b)(1), so that's not a persuasive

22   argument.

23          Is it relevant?  It's potentially relevant or

24   could lead to the discovery of admissible evidence, so

25   that's not persuasive.

1           Then you say, "In any event, credit card
2      information is only available for the preceding 18 months.
3      In order to retrieve this information after 18 months,
4      archived databases" -- "Even if the data requested by this
5      category were not a trade secret, Dillon would not be
6      willing to produce it because of the time and expense
7      involved."
8           The disconnect, though, is I can't tell when --
9      when Dillon objects on the basis of time and expense, is
10     Dillon objecting on the basis of time and expense in how the
11     request was originally drafted, or is it objecting to the
12     time and expense in producing responsive data as the request
13     has now been substantially narrowed?  I don't know the
14     answer to that question.
15          So when -- when -- when in-house counsel came up
16     with this response, what were they responding to?  The
17     original version, or the new updated -- the new and improved
18     version?
19          MR. EVANS: Well, they were responding to the --
20     the version in print before us right now, the original --
21     original version, Your Honor.
22          THE COURT: Okay.  But -- but Counsel tells me --
23     when -- when did you offer to narrow the request?
24          MR. BENNINGTON: On -- two days after we were in
25     front of you last, at that meeting you said we should have.

1           THE COURT:  So --

2           MR. BENNINGTON:   And it's in this pleading that

3    I'm referring to that Ms. Craigmile's status report restates

4    our compromises on each of these --

5           THE COURT:  Yeah, see -- see, the problem I've got

6    is -- is to some extent, in-house counsel for Dillon is --

7    is whipsawing me.   They're objecting to -- to a version

8    that's no longer in effect.   And they haven't given me any

9    information  that  would  speak  to  the  time  and  expense

10   involved  in  retrieving  the  substantially  narrower  set  of

11   information.

12          In other words, if they came to me and said, Look,

13   Judge, we don't have data going back more than 18 months,

14   but for the 44 stores in question, and the time that we have

15   active data -- which by my calculation should be at least

16   about -- about a year -- Judge, this is what we can do to

17   retrieve responsive data off our active system.   What we're

18   proposing is we will produce information off our active

19   system for the time period and the 44 stores, we'll allow

20   plaintiff to review that data.   If plaintiff wants us to do

21   anything more, then we'll talk about what that is going to

22   cost in terms of time and expense.

23          The problem that I've got, again, is that the case

24   law on the rule is very clear.   To the extent that the

25   responding party wishes to invoke 26(b)(2)(b), which is what

1   Dillon seems to want to do, it's Dillon's burden of

2   persuasion to come forward and establish it's not reasonably

3   accessible on the basis of undue burden and expense.   And

4   I've got nothing before me that speaks to that.   I'm stuck.

5   So -- and -- and we're going to decide today.

6          So I will require Dillon to produce responsive

7   data -- that is, data responsive to No. 7.   I'll require to

8   provide the zip code and the last four digits for the period

9   January 1, 2009, and May 2011.   I'll require Dillon to

10  produce responsive information off their active system.   At

11  this point, I'm not going to require them to go beyond, and

12  I don't -- I -- again, I don't have a clear sense.   I'll

13  require Dillon to produce responsive data off their active

14  system.   But let me also say, just so there's no confusion,

15  these requests went to Dillon when?   When did you serve the

16  subpoena on Dillon?

17          MR. BENNINGTON: May 18th.

18          THE COURT: 5/18, and so --

19          MR. BENNINGTON: Well, that's the date it was

20  stamped by the clerk.

21          THE COURT: That's fine.   5/18/2012, and they keep

22  data for 18 months on their active system, and I've got to

23  assume that Dillon would not have moved stuff off an active

24  system as long as these discovery requests were still

25  pending because the case law -- in fact, I've written

1   decisions which say, If you take something that's reasonably

2   accessible and you deliberately make it unreasonably

3   accessible, that's not consistent with the spirit.  So I

4   would expect, at a minimum, Dillon's ability to go back to

5   18 months would be 18 months from May 18, 2012, because I

6   would hate to think they purged their active system during

7   the pendency of this discovery dispute.

8           But I'll require Dillon to produce responsive

9   information off their active system.  The responsive

10  information will be the zip code and our last digits of the

11  credit or debit card number of customers purchasing fuel at

12  -- tell me again, it was 44 stores within what distance of

13  Western Convenience Stores?

14          MR. BENNINGTON: Mr. Evans has a list.

15          THE COURT: Okay.

16          MR. BENNINGTON: It's retail sites within 25 miles

17  of any Western Store.

18          THE COURT: Okay.  That's what I'm going to

19  require.  Now, again, I don't know what that's going to

20  cost.  I don't know what the burdens are, so I'm going to

21  require production of that information.  And again, Dillon

22  is free to file a motion -- Dillon is free to file a motion

23  asking me to consider cost shifting.  But I want the

24  information produced.

25          No. 8, "ESI or documents that will identify the

1     daily pump price between January" —- I'm assuming that's

2     January 2009 -- "and May 2011 at 135" -- and I'm assuming

3     that now that's 44.

4                "Only daily average prices are available.  Dillon

5     is willing to provide this information only if Western is

6     willing to pay for retrieval.  Dillon estimates" -- well,

7     I'm -- again, I'm sorry to have to say this, but whatever

8     Dillon is or isn't willing to do, I think I can safely say,

9     Dillon has not complied with its burden of persuasion under

10    26(b)(2)(b), and since Dillon hasn't met its burden of

11    persuasion, I'll require responsive documents to be

12    produced.  I'm not requiring Dillon to create documents, but

13    to the extent that Dillon has responsive ESI or documents

14    for that time period and for the 44 stores, that will have

15    to be produced.  Again, Dillon is free to file a motion

16    seeking to shift fees and costs, but for now, I'm going to

17    require that the information be produced.

18                "Surveys of prices between January 1" -- and,

19    well, again -- whoa, Nellie.  I'm not even sure what this

20    means.  "Surveys of prices from January 1, 2007, to present

21    around Dillon's 135 retail fuel sites identified by

22    Western."  I don't understand the phrase "survey of prices

23    around the stores."

24                MR. BENNINGTON: In the -- in the industry, if I

25    can use that term, what happens is -- Suncor does the same

1    thing, Western does the same thing for their stores that

2    Suncor controls, and in Western's case, all of their stores.

3    They have their store manager every day look around some

4    pre-defined area, they have to see what the competition is

5    charging for gas.  And that's how they decide how to set

6    their own prices.  And -- and it -- so that's one element of

7    it.

8           The other element of it is that that also then

9    helps you define -- it will help Judge Krieger eventually

10   define the competitive area around each store by -- by -- by

11   virtue of what the players themselves think is the

12   competitive area.  That's why we're looking for that

13   information.  It's -- my understanding is that the response

14   isn't that it doesn't exist or that it's too hard to get.

15   That it's a trade secret and they just won't produce it.

16           THE COURT:  Yeah, I know, but that's,

17   unfortunately, not going to fly.

18           MR. BENNINGTON: No.

19           THE COURT:  So again, subject to the same

20   limitations, the same time frame, the same stores, I'll

21   require production in response to No. 9.

22           No. 10, "Research performed" -- well, they say

23   they haven't conducted any research, so I can't force them

24   to produce what they don't have.  So that's a non-starter.

25           But -- I mean, here's the problem I've got, folks.

1    We've got to move past this.  You know, at some point, we're
2    going to get so bogged down that -- that we're stuck.  So I
3    will, to the extent that Dillon filed on May 18, 2012, a
4    Motion to Quash or Modify Subpoena, I'm -- I'm going to deny
5    Document 57 to the extent that it seeks to quash the
6    subpoena.

7          I will find that the Motion to Modify Subpoena is
8    to some extent moot because the subpoena has been modified
9    through negotiations with Western Convenience.  I will re --
10   so I'm going to deny Document 57.  I will require that
11   Dillon Stores or the Dillon Company, Inc. -- Companies,
12   Inc., respond to the subpoena and produce the documents as
13   narrowed by Western Convenience.  I'll require that these
14   documents be produced.

15         Any documents produced will be subject to the
16   terms and conditions of the protective order.  I will
17   respect Dillon Companies' right to invoke the protective
18   order.  And all the limitations that currently exist in the
19   protective order will -- will apply to these documents.

20         I will also allow Dillon Companies, Inc., once the
21   documents have been produced, to the extent that the Dillon
22   Companies believe that they can file a factual, legally
23   supported motion to shift costs, they're certainly free to
24   file that motion.  I'm not suggesting that they can't.  I
25   will reserve judgment on the merits of that motion until I

1     see the motion if the motion is filed and after I see a

2     response.

3             Let me state, though, that, you know, there are a

4     whole bunch of things that have been filed lately in the

5     last couple years about e-discovery.  And there's a whole

6     bunch of cases, reported decisions about e-discovery, and

7     the Sedona Conference, of which I'm a member, has certainly

8     drafted a number of things.

9             One of the things that I'm struck by is the

10    e-discovery model order that was prepared by the Federal

11    Circuit, and specifically Judge Rader.  In Judge Rader's

12    model order, he says -- he writes, "3, Costs will be shifted

13    for disproportionate ESI production requests pursuant to

14    Federal Rule of Civil Procedure 26.  Likewise, a party's

15    non-responsive or dilatory discovery tactics will be cost

16    shifting considerations.  Further, a party's meaningful

17    compliance with this order and efforts to promote efficiency

18    and reduce costs will be considered in cost shifting

19    determinations."

20            So please understand, in this -- I don't

21    necessarily agree with everything in Judge Rader's model

22    order, but this is a philosophy that I do think is valid.

23    I am not suggesting for a second that Dillon, a non-party to

24    this litigation, should be subjected to unreasonable burdens

25    and expense.  So in that regard, I'm sympathetic to Dillon.

1     But I also am somewhat sympathetic to the
2  plaintiff's position when the plaintiff has taken strides to
3  narrow the request, largely at my instigation, and then I
4  get a response from Dillon Companies' in-house counsel which
5  is singularly uninformative and notably belated.  And so I
6  certainly want to respect the Dillon Companies' right to
7  file a motion, but the Dillon Company -- and, Mr. Evans,
8  I'll ask you to pass on to them, if you wouldn't mind --
9  they need to understand that if they file a motion to shift
10  costs, I will certainly consider that motion, but I will not
11  consider that motion in a vacuum.
12     I will look at all the attendant circumstances,
13  and based upon all the attendant circumstances decide
14  whether or not this is a case where cost shifting is
15  appropriate.  But Dillon Companies should understand before
16  they ask you to file that motion it may not be as simple and
17  straightforward as they would like.
18     MR. EVANS: Understood.  Thank you.
19     THE COURT: So I will go ahead and deny Document
20  57.  And I guess that leaves only the question of how long
21  is it going to take to get the stuff, which I think was your
22  next question.
23     MR. BENNINGTON: Yes.
24     THE COURT: I have limited powers of clair-
25  voyance --

1          MR. BENNINGTON: Yeah.

2          THE COURT: -- but that one was an easy one to

3     spot.

4          MR. BENNINGTON: You nailed that one right on the

5     head.

6          THE COURT: This is why I don't go to the track.

7     I mean, it's -- what do you -- and I realize, Mr. Evans,

8     you're at a -- this puts you in an incredible bind because

9     if I credit the affidavit provided by in-house counsel, it

10    could be decades.

11         MR. EVANS: Not necessarily decades, but maybe

12    several months, according to their estimates.   My

13    understanding is that --

14         THE COURT: I know, but their estimates -- the

15    problem is the estimates that are reflected on this piece of

16    paper are shooting at a target that's no longer in play.  So

17    I don't know that you or I can put much credence into these

18    estimates, so here's what I'm going to do: I will require

19    that the Dillon stores provide this information within 30

20    days because, again, I don't know how long it's going to

21    take.  I'll require the Dillon stores to produce responsive

22    information within 30 days.

23         If the Dillon stores cannot produce this

24    information within 30 days, I'll require the Dillon stores

25    to provide me with a written status report within ten

 1    calendar days of today's date, and I'll require a Dillon

 2    representative to be fit to provide an affidavit explaining

 3    why.  I will set this matter for a hearing and that affiant

 4    will have to be physically here to explain.

 5         So, again, I -- I am not so presumptuous as to

 6    know how Dillon maintains records, but I -- you can

 7    appreciate my dilemma, Mr. Evans.  I can't work with what

 8    they've given you and me, and if they're going to come back

 9    and tell me they need more than 30 days, I'm going to need

10    a very detailed comprehensive explanation as to why and the

11    Dillon representative who provides that affidavit probably

12    should presume I'm going to want to have a hearing.

13         Counsel, does that answer your --

14         MR. BENNINGTON: Thank you.

15         THE COURT: Okay.  So that takes care of that

16    motion.  And the only other thing I've got is Document 90,

17    which is a Joint Motion to Enlarge the Remaining Deadlines

18    in the Scheduling Order.  Specifically what you want to do

19    is push the affirmative expert disclosures back to December

20    10, the discovery cutoff to December 31, dispositive motions

21    to January 7 and rebuttal expert reports to January 24.

22         Is that a typo?  I mean, you've got affirmative

23    experts on December 10, the discovery cutoff of December 31,

24    and then 24 days after the discovery cutoff, you're going to

25    provide rebuttal expert disclosures.  You're going to

1    provide rebuttal expert disclosures something on the order

2    of 17 days after the dispositive motion deadline.  I mean,

3    that seems  -- I mean, if that's what you want, I -- I'm

4    just struggling with the -- the --

5            MR. BENNINGTON:  That's not necessarily what we

6    want.  It's what we think we can get away with with you,

7    Judge.

8            THE COURT: Oh, that's -- there -- there's a term

9    you generally -- there's a term you generally don't hear in

10   court.

11           MR. BENNINGTON:  Yeah.

12           THE COURT: It's certainly -- maybe in the criminal

13   docket, but generally don't --

14           MR. BENNINGTON:  We've had experience with --

15           THE COURT:  -- what we can get away with.

16           MR. BENNINGTON:  -- suggesting dates to you that

17   you have other thoughts about, so we were trying our best to

18   stay within what we understood was your view of the schedule

19   of this case.

20           THE COURT: Well, I mean -- I mean, here's the

21   problem, guys, and I'll be honest with you.  I'm not

22   emotionally invested -- appearances notwithstanding, I'm not

23   emotionally invested in any of these dates.  The problem

24   I've got is -- or, more specifically, the problem you've got

25   is that the way Judge Krieger runs her cases, the longer we

1    push things out, the longer you're going to wait for trial.

2    I mean, that's the reality.  I mean, this case -- if -- if

3    I accepted your approach, I -- well, I guess my first

4    question is: To what extent will rebuttal expert disclosures

5    drive dispositive motions?

6         I mean, here's my problem.  If you file -- let's

7    say, for instance, defendant -- I'm assuming, and I may be

8    wrong.  I'm assuming that the only party that's going to

9    file a summary judgment motion is the defendant because it's

10   an autonomic reflex.  You can't prevent yourself from doing

11   it.  It's kind of like breathing.

12        So you file a -- a dispositive motion on January

13   7.  To what extent are your rebuttal experts going to be an

14   integral part of that motion practice?

15        MR. SHAHEEN: Well, Your Honor, I guess our

16   thinking is this.  If there's an issue between the

17   affirmative expert that we -- there's an issue of fact, for

18   example, you -- you heard a lot from us about like kind and

19   quality, granted versus ungranted.  If they've got an expert

20   that says, Such and such, unless we've got a Daubert

21   challenge, then we may be hosed, we just can't file it.  Our

22   thinking is there's going to be some clear stuff that we can

23   file a motion on.

24        THE COURT: I don't -- I don't mean to laugh but in

25   a case involving petroleum and gas, to say that you're hosed

1      is an interesting choice of words.  But go ahead.

2              MR. SHAHEEN: No, I mean, that -- that -- that's

3      the issue.  I mean, if -- we're not that -- we're not that

4      stupid, I don't think, that we know this is a battle of

5      experts.  Unless we've got a really good Daubert challenge,

6      or they've got a really good Daubert challenge, no one's

7      going to succeed.  So again, our thinking is, our hope is,

8      our expectation is on certain issues, at the end of the day,

9      there should be a -- it should be very clear.

10             We -- again, we are realistic enough to know, the

11     dates were picked because we really are trying to shoe-horn

12     ourselves into the window of opportunity that you explained

13     to us given Judge Krieger -- Krieger's schedule.  And as

14     much as I would like to argue it should be shorter, this is

15     Ken and I working together and what we came up with.

16             THE COURT: Yeah.  I mean, no, I -- listen, I mean,

17     if you wanted my honest opinion, seriously, I would -- I

18     would forego summary judgment motions completely because

19     I've got to assume if you've got an expert that says A, they

20     will find an expert that says B.  It's just the nature of

21     the process.  And I know how Judge Krieger deals with

22     Daubert motions, and she generally doesn't grant them.  And

23     so if it were me, I would simply forego those expenses.

24             At the end of the day, I think fundamentally this

25     is a case that probably is going to have to be tried.  And

1    I don't think it's going to get better with time.  But my --
2    when I look at these deadlines, I mean, the only -- the only
3    thing that struck me was if they have affirmative experts on
4    December 10, I'm assuming that you're going to want to
5    depose those experts before you designate your own.
6         MR. SHAHEEN: Under the way you've structured the
7    order when we were here last time, we can't do that.
8         THE COURT: Oh, good.
9         MR. SHAHEEN: We talked about the expert reports,
10   they've got to be sufficient --
11        THE COURT: Right.  Right.
12        MR. SHAHEEN: -- such that the --
13        THE COURT: Right.  So I -- I guess my sense is
14   this: If you file -- if you file a dispositive motion,
15   aren't you going to provide affidavits from your expert to
16   support the summary judgment motion?  And if you're going to
17   provide affidavits, why not just do the disclosure on or
18   contemporaneous  before  the  date  you  file  dispositive
19   motions?  Because if you provide affidavits to support your
20   summary judgment motion, why are we pushing the disclosures
21   back to January 24?  And if you don't have affidavits to  --
22   to contest theirs -- experts, then on what basis are you
23   going to move for summary judgment?
24        MR. SHAHEEN: Right, that -- again, that's the
25   thinking.  If -- if there's a contested issue, again, I

1     won't use my other word "hosed," but we have a problem.

2     Again, this is all driven -- and you were lecturing

3     everybody about clients.  A lot of this is client driven,

4     Your Honor.

5              THE COURT: I understand that, but --

6              MR. SHAHEEN: And so -- and so we're -- we're

7     trying to put ourselves within Judge Krieger's -- the way

8     that you told us.  If we're not on board with a fully

9     briefed summary judgment by March 31, we don't get tee'd up

10    until almost a year later because we're not on the September

11    31 --

12             THE COURT: Right.

13             MR. SHAHEEN: -- train (inaudible.)  And that's

14    what -- when Ken and I were negotiating and trying to work

15    our way through this, Judge, this is what we came up with

16    that would sort of accommodate both of us.

17             THE COURT: Yeah, but see -- but, no.  What I'm

18    telling you, folks, is if -- if you're trying to avoid the

19    six-month motion implications, and I think that's a

20    legitimate concern, briefing on a summary judgment motion is

21    only going to take 35 days.  So I could say, for in -- if I

22    said, for instance, the motion has to be fully briefed by

23    March 31, so I could give you a dispositive motion deadline

24    of, say, February 10th.  So what that would do is it would

25    allow you to provide rebuttal disclosures.  Based upon the

1   rebuttal disclosures, you're then in a position to figure

2   out whether you've got a motion or not.

3               MR. SHAHEEN: Your Honor, that would be -- that

4   would be fine from my perspective, and I'm going to sort of

5   shoot myself in the foot along with Dillon Companies, I

6   guess, and say, as long as we all agree there'll be no

7   requests for extensions of time because we've got to get on

8   that March 31 train.  So the dispositive motion deadline is

9   this date.  Once it's triggered --

10              THE COURT: You're the only one that's going to

11  file.

12              MR. SHAHEEN: Well, I know, but the -- but the

13  problem's going to be the response.  And I'm not suggesting

14  Ken would do this, I'm just saying once that -- the trigger

15  is once it's pulled --

16              THE COURT: Yeah, but -- but the funny thing,

17  though, Counsel, is think about it.  You file a summary

18  judgment motion on February 10.  If they come back and say,

19  We need an extension of 20 days, your position is going to

20  be great.  They've just shot themselves in the foot because

21  now they're off track.  If anybody has an incentive to file

22  -- avoid filing a motion for extension of time it's these

23  guys, not you.

24              MR. SHAHEEN: No, I know that.

25              THE COURT: Right.


                    AVERY/WOODS REPORTING SERVICE, INC.
            455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
                 303-825-6119      FAX 303-893-8305

1          MR. SHAHEEN: No, I'm not quite certain.  Everyone

2     knows our goal -- or whoever files the motion, that party's

3     goal is to get on that train.

4          THE COURT: Right.

5          MR. SHAHEEN: And if --

6          THE COURT: Yeah, but see --

7          MR. SHAHEEN:  -- if Ken were to file his motion

8     and then I need an extension of time and more time, we -- we

9     get very close to the March 31 deadline.  That's my only

10    point.

11         THE COURT: Yeah, but see, the -- the problem

12    though is this: That's still not a problem for you.  They're

13    -- they would be unwittingly playing into your hands because

14    Judge Krieger -- it's not just the fact that she deals with

15    motions on a six-month list.  She will not set this case for

16    a final pretrial conference until all dispositive motions

17    are decided.  She won't give them a trial date until she has

18    a final pretrial conference.

19         If anybody has a desire and incentive to get their

20    response in in 21 days, it's them.  Then they've got to

21    worry about you filing a motion for extension of time to get

22    your reply in.  And apparently you would not oppose me

23    denying that motion.

24         MR. SHAHEEN: No, I wouldn't.  I -- I --

25         THE COURT: So it sounds like we've got a plan.

1          MR. SHAHEEN: That March 31 date is --

2          THE COURT: No, I -- listen, I agree with you. But

3     it -- it's -- my point is this: I don't want you to

4     reflexively file a motion for summary judgment and then 18

5     days later crank up expert disclosures which eliminate the

6     need for the motion.  I would rather have you do your expert

7     rebuttal disclosures and then have some time with your

8     client to evaluate whether or not a motion makes sense at

9     all.  See my point?

10          MR. SHAHEEN: I do.  But I -- I guess the thinking,

11    Your Honor, is when we see the -- showing -- proving like

12    (inaudible)and qual -- like (inaudible) and quality -- or

13    and kind is -- is part of their burden.  And so we see their

14    expert report.  If we think we've got the position to file

15    a motion for summary judgment based on the inadequacy of

16    their expert report, we'll proceed.  We don't need our

17    rebuttal expert.

18          If we've got a battle of experts, we're not going

19    to win summary judgment.  So it's got to be -- once we see

20    what they've got the burden on, we're going to know whether

21    or not we're in a position to file for summary judgment or

22    not.  Because if we're fighting experts, we know we lose.

23          THE COURT: Yeah, but the -- the only -- under your

24    scenario, the -- and I'm -- you're losing me, and I

25    apologize.  It's -- it's my fault.

1          MR. SHAHEEN: No, it's my fault, I'm sure.

2          THE COURT: No, it's my fault.  It's not yours, but

3    my thought is, what you just said is, if they get an expert

4    report, and their expert comes up with an opinion on like

5    quantity, whatever, quality, et cetera, et cetera, and your

6    client, Suncor, believes that their expert's methodology is

7    flawed for purposes of 702, then what you're telling me is

8    you would file a motion for summary judgment.  Well, the

9    only way that you could establish that their expert's

10   methodology is flawed is to have a rebuttal expert who

11   explains on what basis the methodology is flawed, which

12   means you'd have to disclose your expert.  See my problem?

13         MR. SHAHEEN: Yeah -- yes, I do.

14         THE COURT: So -- so it -- it's -- it -- the

15   premise of your position seems to be, if it's that flawed,

16   we'll move for summary judgment.  I think it makes my point.

17   The only way you can effectively move for summary judgment

18   is to have an expert who's so dazzling that Judge Krieger's

19   inclined under 702 to strike their expert.

20         MR. SHAHEEN: If -- if you found such an expert,

21   could you tell me?

22         THE COURT: Well, I mean, I -- I wasn't planning on

23   searching.  But, you know -- but see my point?

24         MR. SHAHEEN: I do, and -- I do.  I understand your

25   point.

1            THE COURT: So I guess --

2            MR. SHAHEEN: It would be a Daubert challenge -- if

3       they've got an expert that says -- that gives an opinion on

4       that, it would be a Daubert challenge to methodology.

5            THE COURT: Yeah.

6            MR.  SHAHEEN:  And  we  would  move  to  strike  the

7       expert and then proceed on summary judgment.

8            THE COURT: Right. And then -- and then -- the

9       difficulty you're going to run in there is if -- if -- if

10      you file -- if you file -- and I'm sorry to have to be the

11      bearer of bad news, but if you file the Daubert challenge,

12      a 702 challenge on or about January 7, briefing on that

13      motion would not be completed until 35 days, that would get

14      you to February 7, and that would probably be February 12.

15      I have no reason to think Judge Krieger would decide your

16      702 motion before March 31.

17           MR. SHAHEEN: No, but --

18           THE COURT: And then if you don't file your motion

19      for summary judgment until you get a ruling on 702, you've

20      backed yourself into the same problem.  So just tell Dillon

21      -- I mean, tell Suncor, I'm sorry -- tell Suncor

22           MR. SHAHEEN: I'll tell them.

23           THE  COURT:  Tell  Suncor  to  just,  pardon  the

24      expression, suck it up and go to trial.

25           MR. SHAHEEN: Okay.

1          THE COURT: It's actually -- and I'll tell them.

2          MR. SHAHEEN: Then I would agree. I've got it

3      written there.  It's in quotes, Judge.

4          THE COURT: No, seriously -- yeah, but I mean, I

5      guess -- I mean, I'm -- listen, folks, don't misunderstand

6      me.  I am happy to grant the extensions that you've got

7      here.  I don't think it's going to get you where you want to

8      go, but I'm happy to sign off on these.  So you just tell me

9      what -- what makes sense, given your respective litigation

10     strategies, and I will rubber stamp whatever you want to do.

11     I -- I'm not invested in anybody's, you know, dates.  If

12     these work for you, I'm fine.  I don't understand the logic,

13     I don't think they're necessarily going to help you, but I'm

14     happy to sign off on them.

15         MR. SHAHEEN: Well, without talking to Ken, I'd be

16     happy, then, to change the dispositive motion deadline,

17     based on what you've said, to February 10 and keep

18     everything else the same, except changing the dispositive

19     motion deadline.

20         THE COURT: Well --

21         MR. SHAHEEN: So we have rebuttal experts in the

22     intervening period.

23         THE COURT: Here's what I would suggest.  Let's try

24     this.  Affirmative experts, those must be disclosed by

25     12/10.  Let's say that rebuttal experts have to be disclosed

1   no later than January 11.  Let's say that the discovery

2   cutoff is January 22, and then let's say that the

3   dispositive motion deadline is February 8.  That means all

4   briefing will be finished on any summary judgment motion in

5   advance of March 31, even if I give somebody a little wiggle

6   room, it gives you a reasonable opportunity to evaluate the

7   affirmative experts and decide to what extent Suncor wants

8   to enlist the assistance of a rebuttal expert.

9           It then gives Suncor an opportunity to assimilate

10   all of the expert opinions and decide whether or not it

11   wants to draft a summary judgment motion, and it still gets

12   everything done by March 31.  I just think those dates give

13   you a little more -- right now, I'm frankly interested in

14   giving you as much latitude as I possibly can.

15           MR. BENNINGTON:  All of that is fine with me,

16   except what worries me the most is -- of course, as you're

17   -- I care not about dispositive motions, I wish they

18   wouldn't happen.  But I am exceedingly concerned about the

19   December 10th affirmative expert disclosure deadline and

20   have always been.  But once again, Tony and I were trying

21   our best to make this fit.  With the three-month delay we've

22   had with the Kroger -- well, it'll be four months by the

23   time we get it -- with the Kroger data, it makes me even

24   more concerned.  So without having had a chance to think

25   through the ramifications, I would like to add another --

1    well, we can't make it 15 days because that's Christmas.

2    But another ten days to the affirmative expert disclosure

3    deadline.

4              THE COURT: So you'd make that December 20?

5              MR. BENNINGTON: Right.

6              THE COURT: Well, the problem, though, is -- again,

7    it's -- it's -- it's just -- it's a -- it's a cascading

8    effect.  If I give you an additional twenty days -- and,

9    again, I'm not opposed to that, but in fairness, I think

10   I've got to give, then, Suncor a reasonable opportunity to

11   evaluate your reports, get those reports to their experts,

12   give their experts an opportunity to form meaningful

13   rebuttal opinions.

14             And right now, if I push your date back to 20, and

15   I factor in the confusion of the holiday season, I would be

16   basically giving them, excluding holiday dates, something on

17   the order of 14 days to formulate what could be an

18   exhaustive rebuttal report.  That's my problem.

19             MR. BENNINGTON: I see.

20             THE COURT: Now, I can solve that problem by

21   pushing everything back, but then we run into that March 31

22   conundrum.

23             MR. BLEDSOE: Your Honor, I think even if you did

24   20 and moved the rebuttal expert to January 21, and I -- I

25   don't know what day that is, that still gives them two weeks

1    between the end of the rebuttal issue and the

2    determination --

3              THE COURT: I mean, as long as -- I can do that, as

4    long as you are willing to allow me to run the rebuttal

5    expert disclosure date and the discovery cutoff coterminous.

6              MR. BLEDSOE: Oh, those --

7              THE COURT: If both of them end on the same day, I

8    can do that.

9              MR. SHAHEEN: Well, I don't think that's a problem

10   since -- I don't think that's a problem at all, Your Honor.

11             THE COURT: I could do that.

12             MR. BENNINGTON: That would be the ill I would

13   rather live with than all of the others.

14             THE COURT: Sure.  Then that's fine.  I'll say --

15   and I'm assuming Suncor doesn't have a problem.  So we'll

16   say that affirmative experts are due 12/20, that rebuttal

17   experts are due 1/22, and the discovery cutoff is also 1/22.

18   And I'll keep the dispositive motion deadline where I just

19   had it, and that's February 8th.  Is that going to work for

20   everybody?

21             MR. SHAHEEN: Yes.

22             THE COURT: Okay.

23             MR. BLEDSOE: We're going to go with that, Your

24   Honor.

25             THE COURT: All right.  Then based upon that

50

1    revision, Robin, we'll go ahead, and I'll grant the Joint

2    Motion.  Now, my only request is this -- and -- and, Robin,

3    the minutes should reflect this -- it appears that the

4    likelihood of filing a dispositive motion is still somewhat

5    up in the air.  I will require -- the minutes should reflect

6    that the parties will either have to file dispositive

7    motions on or before February 8 or they will be required to

8    file a status report indicating that no one intends and no

9    one will be filing.  Because the problem I've got is this:

10    Once -- once we get to the end of discovery, folks, I'm --

11    I don't really have any other involvement in this case

12    because Judge Krieger does her own final pretrial.  And so

13    I will stop monitoring this unless she happens to refer a

14    specific motion to me.

15          And what worries me, if you don't file a

16    dispositive motion, and if her staff isn't tracking this,

17    significant times could go by because they'll be waiting for

18    you to do something.  So I'm going to simply require that

19    you either file a summary judgment motion by February 8, or

20    file a joint status report advising Judge Krieger that no

21    dispositive motion will be filed and, therefore, you're

22    asking her to set the matter for a final pretrial

23    conference.  Otherwise I think you're just going to get

24    lost in the shuffle, and that's not fair to you.  Okay?

25          MR. SHAHEEN: Yes.  Very good.

1          THE COURT: All right.  Anything else we can talk

2     about?

3          MR.  BENNINGTON:  No.   We've  about  completed

4     discovery between Western and Suncor.   Tony is giving me

5     stuff today or Monday, and we're all set.

6          THE COURT: Okay.  Well, I appreciate everybody

7     coming in on a Friday, and -- and, again, Mr. Evans, please

8     -- please -- I want you to leave here with a correct

9     understanding.  None of my comments were intended --

10          MR. EVANS: I understand.

11          THE COURT: -- to be critical in any way to you.

12          MR. EVANS: I understand, and I appreciate that.

13          THE COURT: I -- I've been in your situation.

14          MR. EVANS:  Your Honor, may I approach the bench

15     on a separate matter?

16          THE COURT: Sure.  Absolutely.

17          MR. EVANS: Thank you.

18          (Whereupon,  the  within  hearing  was  then  in

19     conclusion at 3:17 p.m. on August 17, 2012.)

20          I  certify  that  the  foregoing  is  a  correct

21     transcript, to the best of my knowledge and belief, from the

22     record of proceedings in the above-entitled matter.

23

24     /s/ William Woods                    August 29, 2012

25     Signature of Transcriber                    Date


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305