1

1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF COLORADO

3    Case No. 11-cv-01611-MSK-CBS

4    _____

5    WESTERN CONVENIENCE STORES, INC., et al.,

6        Plaintiffs/Counter Defendants,

7    vs.

8    SUNCOR ENERGY (USA), INC.,

9        Defendant/Counter Claimant.

10   _____

11          Proceedings before CRAIG B. SHAFFER, United States

12   Magistrate  Judge,  United  States  District  Court  for  the

13   District  of  Colorado,  commencing  at  1:39  p.m.,  July  16,

14   2012, in the United States Courthouse, Denver, Colorado.

15   _____

16          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   _____

19                    APPEARANCES

20          KATHLEEN   CRAIGMILE   and   KENNETH   BENNINGTON,

21   Attorneys  at  Law,  appearing  for  the  plaintiff/counter

22   defendants.

23          ANDREW SMITH and SCOTT EVANS, Attorneys at Law,

24   _____

25                   MOTION HEARING


AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305

```
 1                    APPEARANCES (continued)
 2    Attorneys at Law, appearing for the interested party.
 3                   P R O C E E D I N G S
 4              (Whereupon, the within electronically recorded
 5    proceedings are herein transcribed, pursuant to order of
 6    counsel.)
 7              THE CLERK: All rise.  Court is in session.
 8              THE COURT: Have a seat, everyone, have a seat.
 9              All right, this is 11-cv-1611, Western Convenience
10    Stores, et al., versus Suncor Energy, I'll take appearances
11    of counsel.
12              MR.  BENNINGTON:  Good  afternoon.     Kenneth
13    Bennington and Kathleen Craigmile for Western Convenience
14    Stores.
15              THE COURT: Okay.
16              MR. EVANS: Good afternoon, Your Honor.  Scott
17    Evans and Andrew Smith for Dillon Companies.
18              THE  COURT:  Okay.   You're  here  in  a  purely
19    spectator capacity?
20              MR. SHAHEEN: I am, Your Honor.  Thank you.
21              THE COURT: Well, you're counsel of record, you're
22    entitled to sit up here.
23              MR. SHAHEEN: I'd just interfere with those guys.
24    I'm happy back here.  Thank you.
25              THE COURT: Well, only if you agree with plaintiff
```

1     would you interfere with them.

2             MR. SHAHEEN: You know I won't, Your Honor.

3             THE COURT: All right.  Sort of working backwards.

4     There's two motions that we need to address, there's

5     Document 57, which is the Dillon Companies' Motion to Quash

6     or Modify Subpoena.  And then the other motion is Document

7     86, which is the Plaintiffs' Unopposed Motion to Restrict

8     Access to Certain Exhibits Attached to Plaintiffs' Reply in

9     Support of Motion to Compel.  Well, and let's start with

10    Document 86 because it's problematic.

11            The caption refers to Plaintiffs' Reply in Support

12    of Motion to Compel.  The problem I've got is that when you

13    filed the exhibits that you now want to restrict access to,

14    you didn't file those exhibits as restricted documents.  In

15    other words, the Local Rule says that if you're going to

16    move to restrict, you've got to file that motion within 14

17    days of the documents being submitted, but you still have to

18    submit the documents originally in restricted form, and when

19    my staff pulled up these exhibits attached to your reply,

20    they're all in the public domain and have been in the public

21    domain since they were filed.

22            And so I've got this -- and the reason why I

23    didn't grant your motion is I've got an anomalous situation

24    that the documents you now want me to restrict access to

25    have been in the public domain since June 20 when they were

1    originally filed because they were not filed on a restricted

2    basis.

3              MS. CRAIGMILE: Your Honor, I'm certain that that

4    was out of inadvertence.

5              THE COURT: No, I'm sure it was, I'm just -- I

6    mean, the problem I've got is one of the -- and this is --

7    I don't want to mislead anybody, because to some extent

8    you're -- when I -- you're asking me now to restrict this

9    thing, you're asking me to, in effect, unring a bell.  These

10   things have been in the public domain since June 20.

11             MS. CRAIGMILE: Can they --

12             THE COURT: And I can't -- I mean, I can't issue an

13   order saying -- you know, it's sort of like giving an

14   instruction to a jury, disregard the testimony you've just

15   heard.

16             MS. CRAIGMILE: Can they be restricted at this

17   point?

18             THE COURT: I mean, I can, but I don't want to

19   mislead you.  If somebody has gone on the Internet and

20   pulled these things up, they've got them, and I can't claw

21   them back.

22             MS. CRAIGMILE: Well, certainly, that is what we

23   would request happen, and I would assume that Mr. Shaheen

24   would request that it would happen at that time as well.  Or

25   at this time.

5

1          MR. SHAHEEN: I agree.  It sounds like that's the

2     only solution.

3          THE COURT: I mean, I'm happy to grant this motion,

4     but I just don't want anybody to be caught off guard or be

5     surprised based on future developments, because, as a

6     practical matter, these things have been in the public

7     domain since June 20th, and I can seal them now, but if

8     somebody's gone on the Internet, if somebody's gone on our

9     court website and pulled them off, they've got them.  And I

10    don't know who's done that, if anybody's done that, but

11    that's where you are.

12         Because what you should have done is when these

13    things were filed, you go into the CM system --

14         MS. CRAIGMILE: Sure.

15         THE COURT: -- and you click a button that says

16    restricted.  What -- so when you click that button saying

17    these are restricted, they are restricted, they're sealed.

18    You then have 14 days to file a motion supporting the

19    request to restrict.  If you don't file the motion within 14

20    days, then they are unrestricted.  But here, we've got just

21    the converse, you're asking me to restrict something that

22    has literally been accessible to the world.

23         MS. CRAIGMILE: I understand.  I think -- and we

24    have been filing as restricted.  I think that this must have

25    just have been an issue with our office, and I apologize.

6

1          THE COURT: No, it may be.  Yes, it may be.

2          Okay, but I'll go ahead and grant 86.  I just

3    don't know how much relief I'm actually giving you, but

4    we'll go ahead and grant that.

5          Which brings us to the more substantive, or, I

6    suppose, challenging issue, and that is Document 57, which

7    is the Motion to Quash, and I will -- this is Dillon

8    Companies' motion, so I'll certainly allow Dillon to go

9    first.

10          MR. EVANS: Do I come to the podium?

11          THE COURT: It doesn't matter to me.

12          MR. EVANS: Okay.

13          THE COURT: I mean, you're welcome -- just move the

14    microphone closer --

15          MR. EVANS: Okay.

16          THE COURT: -- if you want to sit down and just

17    speak from there.

18          MR. EVANS: Thank you, Your Honor.

19          THE COURT: Sure.  Go ahead.

20          MR. EVANS: Thank you.

21          Your Honor, as the Court is I'm sure aware, on

22    April 26th of this year the plaintiff in this matter,

23    Western Convenience Stores, this matter which Dillon is not

24    a part of, was served a subpoena asking for it -- to submit

25    to them voluminous amounts of documents and information,

7

1    where we will start out by just painting broad strokes and
2    say that they are all, one through ten requests, overly
3    burdensome.    There are many requests that address trade
4    secrets of Dillon which should not be released.    There is
5    what we believe to be an empty, so to speak, promise of a
6    protective order, which will not protect Dillon, and we also
7    believe that because Dillon is a direct competitor of
8    Western Convenience, there's a different burden or a higher
9    threshold that Western may have to meet before they're
10   allowed these documents.    We are not prepared -- or even,
11   more strongly, do not want to provide these documents for
12   those reasons.
13           If I can get more specifically now -- more
14   specific now, and I can go by the -- go by each request one
15   by one.   Again, there are ten categories of documents or
16   information that was requested by Western from its
17   competitor, Dillon, and the first is, for the pertinent time
18   frame and geographic area, all contract documents between
19   you and Suncor.   In reading this, the first thing that comes
20   to mind is these are documents that could be easily obtained
21   from the other party in this case, Suncor, and there's no
22   need to burden us with this task.   They should be readily
23   available.   They may have, in fact, already been disclosed
24   by Suncor, and we should not be tasked with that.
25           Number two, for the pertinent time frame and

1    geographic area, all communications between you and Suncor

2    referring or relating to any discount.   Again, that is

3    information that should be obtained from the party in this

4    case, Suncor.   It should be readily available, it should

5    have already been disclosed, and we should not have been

6    burdened with this.

7            Third, for the pertinent time frame, all

8    communications between you and Suncor relating to all

9    communications, all communications between you and Suncor

10   relating to Western Convenience stores.   Again, this --

11   these documents, we think, would be overly burdensome.   To

12   do a thorough search, there would have to be an agreed upon

13   list of search topics.   It would result in mountains of data

14   and documents, and then each piece of paper or each screen

15   would have to be reviewed for responsiveness.   It's an

16   overly burdensome request, and much of it would probably

17   result in irrelevant materials.

18           The fourth, for the pertinent time frame and

19   geographic area, any such ESI and other documents as will

20   identify all retail stores, locations and outlets where you

21   sold fuel at retail.   And this, we believe, is not only

22   overly burdensome, but there's a real question about

23   relevancy.   This question in no -- in no way mentions

24   Western or the nexus between what this information and nexus

25   would achieve.

9

```
 1          So these are, one through four, all arguments of
 2    just overly burdensome.  We support this by an affidavit
 3    that we obtained from the Kroger corporate counsel.  Dillon
 4    is a subsidiary of Kroger.  The Kroger corporate counsel
 5    oversees this.  As we would -- as we know very well in our
 6    law firm, because we act as general counsel for several
 7    different corporations and companies, we know that if
 8    there's a request that is, in fact, granted for such a
 9    document request like this, it's corporate counsel that
10    leads this, it's corporate counsel that spearheads it, it's
11    corporate counsel that knows what needs to be done, and by
12    experience, it's corporate counsel that knows what kind of
13    documents would come about as a part of that.
14          I'm saying this all to say --
15          THE COURT: Well, I guess my question, though, is
16    does corporate counsel have some idea, because I will tell
17    you, I've seen a lot of affidavits by corporate counsel that
18    don't know up from down when it comes to IT issues in terms
19    of how documents are maintained, what's legacy data, what's
20    archive data, to what extent the data that they've got is
21    searchable.  There's nothing in the corporate counsel's
22    affidavit that speak to that, he just makes a sweeping
23    statement:  Dillon would be forced to undertake a search of
24    millions of documents in thousands of different locations.
25    Well, I would suggest that means, presumably, hard copy
```

1     documents.  I don't see anything in here which talks about

2     electronically stored information and how Dillon Companies

3     stores  electronic  information  and  to  what  extent  the

4     electronic information is searchable.  In that regard, the

5     affidavit is not particularly helpful at all.

6            MR. EVANS: I think it's helpful in terms of,

7     again --

8            THE COURT: Well, I'm the one that has to -- I

9     mean, it's got to be helpful to me, it doesn't really much

10    matter if it's helpful to you, does it?

11           MR. EVANS: Well --

12           THE COURT: If I've got a problem, isn't that

13    ultimately what you've got to be worried about?

14           MR. EVANS: And I'm trying to make it more helpful

15    to you.

16           THE COURT: Okay.

17           MR. EVANS: Okay.  I think that what it does

18    provide is a snapshot of the time and effort that will go

19    into producing these kinds of requests, or compliant with

20    these kinds of requests.

21           THE COURT: But the --

22           MR. EVANS: It's not --

23           THE COURT: -- but the affidavit doesn't speak to

24    electronically stored information at all.  In fact, I've got

25    to assume that general counsel, like a good attorney, was

1    trying to be responsive, and I would note that the subpoena

2    has as a defined term "document" or "documents."  The

3    subpoena  also has as a defined term "ESI."  So, for

4    example, when I'm looking at number four, it says for the

5    pertinent time frame and geographic area, such ESI or other

6    documents. Now, that's somewhat of a misnomer, because the

7    subpoena defines documents and ESI differently, so I don't

8    understand the phrase "or other documents."

9         But when I'm -- Mr. Brown, the affiant,

10   specifically talks about in paragraph two, to comply with

11   the subpoena, Dillon would be forced to undertake a search

12   of millions of documents.  That paragraph doesn't speak to

13   ESI at all.

14        MR. EVANS: Well, I think that in talking with Mr.

15   Brown personally, I think that he was -- he was painting in

16   broad strokes himself, and that he was encompassing ESI,

17   because when you talk about undertaking a search of millions

18   of documents, I think that it would be only obtainable

19   through some type of electronic search.

20        THE COURT: I can't assume that, and the affidavit

21   -- in other words, you told me, you prefaced this section of

22   your argument by saying, Judge, as you know, my firm deals

23   with these matters and we deal with corporations all the

24   time, and we always know that general counsel is the guy we

25   should get an affidavit from.  I'm telling you, this

1    affidavit is less than complete.

2           Because -- I mean, and it comes up in the context

3    of number four.  You're saying number four, to answer number

4    four  would  be  unduly  burdensome,  but  number  four

5    distinguishes between ESI and documents, and Mr. Brown's

6    affidavit doesn't even use the phrase "electronically stored

7    information" anywhere, so in that respect it's not helpful.

8    Because I know that there's lots of ways that companies

9    store information electronically, and I know that there's a

10   fairly  sophisticated  line  of  vendors  out  there  that  can

11   retrieve electronically stored information depending upon

12   what's sought in the relevant time period.

13          So,  for  instance,  it  might  be  incredibly

14   burdensome to go back to 2007 and pull up electronically

15   stored information.  I don't know how relatively burdensome

16   it would be to go back and pull up one year's worth of

17   information, because that might be on active systems which

18   are readily searchable.  And I suspect Mr. Brown doesn't

19   know either.   If he did, he would have stuck it in the

20   affidavit.

21          MR. EVANS: Well, I don't know if that's entirely

22   -- entirely reflective of what happened.  I think this was

23   a situation where the affidavit was prepared in an effort to

24   -- to get something by the -- by the responsive date, and

25   I'll admit to the Court, you know, that it maybe was not as

1    specific as it should have been --

2              THE COURT: Well --

3              MR. EVANS: -- but again, I think he was talking in

4    generalities and --

5              THE COURT: I know, but the problem -- but the

6    problem is, in order -- in order to -- in other words,

7    basically what you're saying in this motion you are seeking

8    protection under Rule 45(c) and, by inference, Rule 26(c).

9    What you're arguing is the burdens are unreasonable.  But

10   fundamentally, as the moving party under 45(c) and 26(c),

11   it's your client's burden of persuasion, and a broad

12   sweeping statement is probably not sufficient to sustain

13   your burden.

14             To the extent you're arguing that it's unduly

15   burdensome, it seems to me it's incumbent upon the Dillon

16   company to come forward with specific facts, not conclusory

17   statements, specific facts to support the claim of undue

18   burden.  And I appreciate the fact that Mr. Brown has

19   provided sort of this overview, but fundamentally, when you

20   get right down to it, these are more in the nature of

21   conclusory statements than they are specific articulation of

22   the type and nature of the burden, particularly when it

23   relates to electronically stored information.

24             Because, as I say, the phrase "ESI" or

25   "electronically stored information" doesn't appear anywhere

1    in Mr. Brown's affidavit.  In fact, I've got to assume he

2    used the phrase "documents" intentionally because the

3    subpoena that he's seeking to quash distinguishes between

4    documents and ESI.  And the specific request, number four,

5    that you're directing my attention to specifically refers to

6    both, suggesting there's a difference.

7              MR. EVANS: And if I -- if I take that one step

8    further, then is it safe to say that the Court may very well

9    agree that in terms of hard copy documents it may, in fact,

10   be burdensome?

11             THE COURT: It may be, but that doesn't get you

12   very far if your company stores most of its information

13   electronically.

14             MR. EVANS: But we don't know that.

15             THE COURT: I know, but you just made my point for

16   me.  If you don't know it, you haven't sustained your burden

17   under 26(c) with respect to electronically stored

18   information.

19             MR. EVANS: No.

20             THE COURT: You just said we don't know it.

21             MR. EVANS: No, what I'm -- what I'm saying is --

22   what I'm saying is, is that if the Court, in fact, says

23   that, well, we hold that one through four are not overly

24   burdensome and to produce those documents, we hold that the

25   Court could conceivably say we hold that as to ESI

1     production it's not overly burdensome, but in terms of the

2     millions of documents that may be present in hard copy, that

3     it could, in fact, be overly burdensome --

4              THE COURT: Counsel --

5              MR. EVANS: -- as to those documents.

6              THE COURT: -- that kind of -- that kind of

7     distinction doesn't get you where you want, because I'm

8     betting -- you got to understand.  I mean, I deal with ESI

9     all the time.  In fact, I've got to go down to Santa Fe next

10    week to discuss it and to teach on this.  Ninety-eight

11    percent of all documents -- ninety-eight percent of all

12    information is generated initially and originally in

13    electronic form.  The number of originally produced hard

14    copy documents that a company prepares is probably less than

15    one percent or two percent of all their stuff.  So telling

16    me, Judge, you should -- you should at least rule our way in

17    terms of documents, I suspect that that's not what your

18    client wants you to argue, because your client is going to

19    fight like hell to protect ESI.  They're probably not going

20    to really care too much about hard copy documents, because

21    most of the stuff they generate, they generate in electronic

22    form, or as an original production.  You haven't helped

23    them.

24             MR. EVANS: Okay.  And I understand your argument

25    and your position, and I appreciate it, and I understand

16

1     what you're telling me, Judge.

2          But another thing that I mentioned to you in going

3     over these, one through four, was that these were, in large

4     part, especially the first three, things that could be

5     gotten directly from --

6          THE COURT: And I think -- and I think frankly

7     that's a legitimate argument, and we'll talk about that, but

8     I think number four is sort of a different situation,

9     because -- well, why don't you give me the rest of the -- I

10    mean, there is a problem with that, but let's keep going.

11        MR. EVANS: Okay.  And again, if we look at the

12    subpoena, number paragraph five and those sections A through

13    H.  Again, this is --

14        THE COURT: See -- see, here's the bizarre thing,

15    and this is where, you know, the subpoena is not real good.

16    But, you know, one of the interesting things is you're

17    probably misreading number four and, therefore, your

18    burdensomeness argument is probably misplaced.  If you read

19    number four literally, it does not use the word "all."

20    You're reading that into the request.  What's interesting is

21    number four says, for the pertinent time frame and

22    geographic area, such ESI or other documents that will

23    identify all retail sales locations and outlets.

24        So, strictly speaking, if you've got ten outlets,

25    you only have to produce ten documents, guys.  You don't

1    have to -- they're not asking you to produce all documents

2    for every outlet, they're simply providing such ESI or other

3    documents that will identify all retail sites.   So if your

4    client knows, I got 115 retail outlets, you provide -- and

5    let's say, for instance, they're store leases, just provide

6    a copy of the store lease, that would identify literally 115

7    locations, and that's all you'd have to do.   Number four is

8    not asking you to produce sales information, it's not asking

9    you to produce the amount of -- the amount of gasoline

10   ordered for each location, it simply says such ESI or other

11   documents that will identify each location.   That's one

12   document per location will identify.   How is that, number

13   four, unduly burdensome, if you read it reasonably?

14           MR. EVANS: We'll accept the Court's interpretation

15   to number four, Your Honor.

16           THE COURT: And that's the problem.   I mean, guys,

17   to some extent your claim of undue burden is based upon an

18   interpretation that isn't even well-founded, because number

19   four is not asking for anything more than one document per

20   location the way it was drafted.   Now, I don't know if it

21   was drafted that way intentionally or inadvertently, but

22   that's all it asks for is one document per location.   That

23   can not be burdensome.   Is it?

24           MR. EVANS: No, sir.

25           THE COURT: I didn't think so.   So number four, we

1          don't really have anything to fight about.

2                    So let's talk about number five.

3                    MR. EVANS: I'll just read it in to the record.  It

4          says, for the pertinent time frame and geographic area, such

5          ESI or other documents as will identify the net price for

6          each delivery of fuel purchased by you from Suncor.

7                    THE COURT: And that one might be problematic.  I

8          mean, I readily concede that that's different from number

9          four, because here they're talking about each delivery of

10         fuel.  And they're talking about not only each delivery of

11         fuel, but the net price for each delivery of fuel.  And then

12         they say, in responding to this request, include such ESI or

13         other documents as will identify the contract documents, the

14         bill of lading, the date of the delivery, the net price paid

15         per gallon, all discounts received, the fuel type, the

16         retail sites at which the fuel was delivered, and the net

17         and gross quantity.

18                   I mean, that, I would suggest, is probably a bit

19         of a problem.  But again, I just have to observe that this

20         request is defined in terms of ESI or other documents, and

21         Mr. Brown's affidavit doesn't speak to ESI, so I don't

22         really know how much burden it would be.

23                   MR. EVANS:  I also think that much of it is

24         information that could be obtained from Suncor.

25                   THE COURT: Well, not necessarily, because -- well,

1     I mean, it depends on who Dillon uses as its delivery

2     company.  In other words, if Dillon had its own trucks, that

3     might be one thing, but, I mean, I don't know that this --

4     the argument you can get it just as easy from Suncor is

5     effective in number five, but, I mean it's an argument

6     you're certainly free to make.

7               Let's talk about number six.

8               MR. EVANS: For the pertinent time frame and

9     geographic area, such ESI or other documents as will as

10    identify all discounts received by you from Suncor relating

11    in any way to fuel purchased by you for sale at retail.

12              Again this --

13              THE COURT: Yeah, but my question is this:  I mean,

14    I've looked at this and the first question that I came up

15    with is, again, who wrote this thing?  Because number five

16    asks for -- included, among other things for each, for each

17    delivery of fuel, it talks about all discounts received.

18    That's a specific component of number five.  Given that,

19    specific subsection number five, what does number six get

20    you?   I mean, how many different ways can they provide

21    information by discounts?  And if you're asking them to

22    produce the same information twice, to some extent

23    (inaudible) be emblematic of undue burden.  So are we just

24    asking for the same stuff two different ways?

25              And then if you -- and I look at number five and

1    one of the subsections for number five is the net price paid

2    per gallon, and I'm assuming that's the net price paid per

3    gallon by Dillon to Suncor.  And then number eight is the

4    net price that Dillon charges to its customers.  Is that the

5    way you mean it to read?

6            And I guess how is -- why is that necessary?  In

7    other words, your client's theory is that Dillon was getting

8    a discount.  Why would -- why would it be relevant as to

9    what Dillon is charging its customers?  Because at the end

10   of the day, the issue here is whether or not Dillon got a

11   discount that your client didn't get.

12           Well, I mean, but the fact of the matter is

13   whether Dillon passes -- I mean, your client's argument is

14   it's an anti-competitive effect based upon the wholesale

15   price.

16           MR. BENNINGTON: Your Honor, may I respond?

17           THE COURT: Sure.

18           MR. BENNINGTON: We have to establish an injury to

19   competition.

20           THE COURT: Okay.

21           MR. BENNINGTON: When the elements of doing that

22   may be, will likely be people switching from Western to

23   Kroger/Dillon.  And one of the defenses is, well, you may

24   have been injured, but it wasn't anything to do with price

25   discrimination or the price.  We have to know what the price

1    was, what -- what Dillon was charging to know whether the

2    switching  of  customers  was  caused  by  that,  by  the

3    discriminatory price, or by something else.  It's both the

4    plaintiff and the defendant are going to be interested in

5    this kind of information.

6           THE COURT: Well, get back to my question.  How is

7    number  six  different  than  --  how  is  the  information

8    responsive to six not encompassed within number five?

9           MR. BENNINGTON: Well, number five asks for all

10   discounts received for each delivery of fuel.

11          THE COURT: Right.

12          MR.  BENNINGTON:  Number  six  was  done  by  me

13   intentionally  to  catch  any  discount  that  Kroger/Dillon

14   considered they got but wasn't related to a specific fuel

15   delivery.  In other words --

16          THE COURT: Well, except the problem -- well --

17          MR. BENNINGTON: Well, and I would have expected

18   that Kroger could say we've identified all the discounts we

19   got in response to number five, that happens all the time,

20   I accept that response and we move on, but number six is, if

21   you  haven't  identified  all  the  discounts  yet,  here's  a

22   question that will make you identify all of them.

23          THE COURT: I know.  But see, the problem is, I got

24   to tell you, you're playing into their hands.

25          I mean, this -- my gut tells me this is not --

1    there's lots of stuff in this that I find objectionable.   I

2    truly do.   And I think, to some extent, that their claim of

3    undue burden is a legitimate one, and I don't think that

4    this was drafted in a particularly precise way.   And to the

5    extent that it's drafted in a less than precise way, to the

6    extent that there are arguable issues under 45(c), you're

7    not putting yourself in a particularly strong or compelling

8    position.

9            MR. BENNINGTON: I'll be happy to respond point by

10   point to what --

11           THE COURT: Well, let me -- let me finish with --

12           MR. BENNINGTON: -- counsel is raising.

13           THE COURT: Go ahead, Counsel.

14           MR. EVANS: I believe we're on request seven for

15   pertinent --

16           THE COURT: Right.

17           MR. EVANS: -- for the pertinent time frame and

18   geographic area, such ESI as will identify by ZIP code and

19   the last four digits of the credit or debit card number each

20   customer on each credit or debit card purchase of fuel from

21   you at retail.

22           Again, we -- we would rely on an overly burdensome

23   argument in this --

24           THE COURT: But you can't, because your affidavit

25   doesn't speak to ESI, and this request is limited ESI.

1          MR. EVANS: I understand.   That's not the only

2     thing I'm going to say, Your Honor.

3          THE COURT: I know, but -- yeah, I realize you

4     can't say much more with that, but it's your burden under

5     45(c) and 26(c), and when a request specifically alludes to

6     ESI and your affidavit makes no mention of ESI, how can I

7     find you sustained your burden of persuasion?

8          MR. EVANS: Well, Your Honor, again, that's but one

9     thing that I wanted to present to the Court, and the other

10    thing I wanted to say is that even though that these -- this

11    is customer information which -- which the company believes

12    is -- is confidential, is -- the way that it's gathered, the

13    way it's maintained, and the way that it's compilated is, in

14    fact, now -- it now becomes a trade secret.   And there's

15    case law that says --

16         THE COURT: It's a trade secret.   So customer Smith

17    went in 2008 and bought ten gallons of gas from a particular

18    Dillon store.   2008, Smith buys ten gallons of gas.   How is

19    that a trade secret?   And that's -- because that's all

20    they're asking for.

21         MR. EVANS:   That's a -- that's a great question,

22    and I would say that that the information is that on its

23    face, but when you get it -- when you look deeper into it,

24    there's much more to it.   How often does John Smith come and

25    buy gasoline?   Does he use -- what credit card does he use?

1   Does he use his King Soopers discount card?

2           THE COURT: But those aren't trade -- those aren't

3   trade secrets.

4           MR. EVANS: Those are trade secrets --

5           THE COURT: How?

6           THE COURT: -- because it will -- it will enable us

7   to figure out how we want to market to John Smith, the ebb

8   and flow of the fuel that we're going to buy.  It's going to

9   talk --

10          THE COURT: No, it may --

11          MR. EVANS: -- it's going to enable us whether --

12          THE COURT: -- it may reflect the ebb and flow of

13  the fuel that Smith wants to buy, but it doesn't -- I mean,

14  all this says is --

15          MR. EVANS: Well, demand, you're talking about John

16  Smith, and we're talking about a million John Smiths, so

17  it's going to affect demand, it's going to talk -- it's

18  going to affect --

19          THE COURT: But if these are -- if these are

20  purchases that go -- I mean, and again, that may be itself

21  a problem, but if we're talking about purchases that took

22  place in 2007, five years ago, how would purchases in 2007

23  be a trade secret as to the fuel that Dillon is going to buy

24  in 2013?

25          MR. EVANS: Because --

```
 1                THE COURT: That's what I'm struggling with.

 2                MR. EVANS: And that's not -- that's not the proper

 3        question.   The proper question is why is this a trade

 4        secret, and it's a trade secret because we use that

 5        information to develop various strategies, marketing

 6        strategies, purchasing strategies, different things like

 7        that, and you're asking us to give away the information that

 8        we use to develop those types of strategies to our

 9        competitor.

10                THE COURT: Well, certainly --

11                MR. EVANS: And that information --

12                THE COURT: -- you may be required to produce it to

13        your competitor's lawyer.

14                MR. EVANS: I'm sorry, I didn't -- well -- well, to

15        my competitor's lawyer, who then can disseminate it to some

16        very key individuals --

17                THE COURT: Not if I don't --

18                MR. EVANS: -- if they have --

19                THE COURT: -- not if I don't let them, Counsel,

20        and you should not presume necessarily -- in fact, counsel

21        will tell you, the last time we had a hearing in this case,

22        I was not particularly receptive to Mr. Taraghi's request --

23                MR. EVANS: But all I can --

24                THE COURT: -- to have access to this.

25                MR. EVANS: -- all I can comment on is what the
```

1     protective order says and not what you've done in the

2     past, and --

3           THE COURT: I understand, but --

4           MR. EVANS: -- and the protective order says, with

5     all due respect, all you have to do is say that this guy is

6     going to testify at trial, or he has to prepare for his

7     deposition, and then you have some -- some key corporate

8     member that has access to our --

9           THE COURT: No, Counsel --

10          MR. EVANS: -- strategic trade secrets.

11          THE COURT: -- Counsel, Counsel, Counsel, no,

12     that's not true. I'm not going to allow you to adopt a

13     Chicken Little, the sky is falling argument. If I impose

14     restrictions -- first of all, the fact that there's a

15     protective order in place between these two parties,

16     plaintiff and defendant, does not mean that I am precluded

17     from imposing a more stringent protective order with respect

18     to this information. And the premise of your argument that

19     somehow, one, I can only be as creative as the protective

20     order already in place is wrong. Two, to the extent your

21     argument is premised on the notion that somebody would

22     violate a protective order I enter, that's not my experience

23     of 12 years on the bench.

24          I can tell you, in 12 years on the bench I've

25     never had a lawyer violate a protective order, and so if I'm

1     going to make a presumption in any direction, based upon my

2     experience and the high caliber of the lawyers in this case,

3     why shouldn't I feel more comfortable in presuming that they

4     will, in fact, do what I tell them to do?

5               MR. EVANS: I would hope that that would be the

6     case, Your Honor.

7               THE COURT: I would, too, so let's -- let's assume

8     that that's the case.

9               MR. EVANS: But I should also say that our

10    presumption -- our presumption in terms of whether or not

11    the existing protective order addressed our situation as

12    well I think was well-founded, because that was the

13    protective order that plaintiffs were always relying on in

14    their argument --

15              THE COURT: I understand, but, Counsel --

16              MR. EVANS: -- so that's what I had to address was

17    that.

18              THE COURT: -- Counsel, you're not constrained by

19    that.  You could say, one, these are protected, these are

20    trade secrets, and they shouldn't be produced at all.  But,

21    if they are produced at all, given the fact that they are

22    trade secrets, Judge, as a minimum, you should build in --

23    you could impose a separate protective order that builds in

24    these additional safeguards, but your argument -- and I read

25    through this over the weekend -- your argument, for

1    instance, on page one of your reply you say:  In reality,

2    the protective order would allow disclosure of any Kroger

3    trade secrets and information to plaintiffs' principals.

4    That's not necessarily a correct statement, but more

5    importantly, nothing prevents Dillon from asking me to

6    impose a more stringent protective order.

7            But the truth of the matter is, if Dillon's

8    argument is, Judge, no protective order will be adequate,

9    because you should just automatically assume that lawyers

10   will violate the protective order, then, as a practical

11   matter, that's more a reflection of the current state of

12   litigation in the legal profession than it is a reflection

13   of Rule 26(c), and I'm not prepared to paint the legal

14   profession in those kinds of dark terms.

15           MR. EVANS: And I don't think that we are even

16   coming close to saying that.  I think that what we are

17   saying as --

18           THE COURT: Well, sure you are, because on the next

19   page you say plaintiffs can offer no assurance of attorney's

20   eyes only protection.

21           MR. EVANS: Exactly.

22           THE COURT: But for all intents and purposes, you

23   are.  You're saying, Judge, there's no protection you can

24   impose because you shouldn't trust them when they tell you

25   they will follow the rules.

1          MR. EVANS: But the rules enable other people than

2     the attorney to view our information.

3          THE COURT: But, Counsel --

4          MR. EVANS: And that's the only thing that we're

5     alluding to.

6          THE COURT: -- Counsel, if I --

7          MR. EVANS: We're not --

8          THE COURT: -- if I say that this information can

9     only be disclosed to plaintiffs' attorneys and plaintiffs'

10    experts, then plaintiffs' experts have to sign the agreement

11    to be bound by the same protective order provisions,

12    including contempt authority.

13         MR. EVANS: That would be perfect, but that's not

14    what the protective order says now.

15         THE COURT: But, Counsel, nothing -- in other

16    words, what you're doing is you're creating a straw man.

17    You're saying, Judge, because the protective order in place

18    we believe is inadequate, don't let them have anything.  A

19    better position would have been to say, Judge, we don't

20    think they should get this stuff in any event, but if you

21    give it to them, it should be given subject to even

22    stronger, more stringent conditions than exist in the

23    current protective order.

24         MR. EVANS: And, Your Honor, what we are doing

25    here, with all due respect, is in the response from the

1    plaintiffs, they referenced the protective order.

2                    THE COURT: Sure.

3                    MR.  EVANS:  You  responded  to  that  specific

4    protective order saying that it was -- it was inadequate,

5    and that's all we were doing.

6                    THE COURT: I guess, but then you missed -- you

7    miss an opportunity, because I'm -- the fact of the matter

8    is, is that I'm not constrained by the existing protective

9    order if I think that that protective order is inadequate to

10   properly reflect and protect the interests of Dillon.  But,

11   I  mean,  you  guys  both  expended  an  awful  lot  of  pages

12   fighting  about  a  presumption  that  is  probably  not  well-

13   founded.

14                   What I would have done is I would have said, look,

15   Judge,  you  know,  this  current  protective  order  is

16   inadequate, we will submit -- we are attaching as an exhibit

17   a protective order that we think, albeit reluctantly, is the

18   bear minimum to protect the interests of Dillon.  That's

19   what I would have done.

20                   But  this  notion  that  somehow  --  see,  in  other

21   words, basically what your argument, reduced to its simplest

22   form is, is this:  It's, Judge, we think this stuff is

23   unduly burdensome and, therefore, we shouldn't produce it.

24   Judge, we think that the current protective order is wholly

25   inadequate based upon our speculation of future events and,

1     therefore, Judge, we are giving you what is essentially a

2     zero sum proposition.  You either have to give it to them

3     under the terms of the protective order, which we find

4     inadequate, or you can't give it to them at all.   That

5     binary response is not correct, because it leaves out the

6     possibility that I can impose a protective order that's

7     uniquely directed to the interests and concerns of Dillon.

8          MR. EVANS: I think that perhaps we may have stated

9     too strongly what you -- what you indicated was a, you know,

10    a binary proposal, but it was our intention to come today

11    and provide to the Court, you know, our position, and has

12    been the case in the past, the Court will decide, you know,

13    what it thinks, you know, may be disclosed or provided or

14    not, and that was our -- or my thought of what would happen

15    today, and not a zero or all proposition before the Court,

16    that's dangerous, and I understand that.

17          THE COURT: Okay, number eight.  I mean, we sort of

18    talked about this.

19          MR. EVANS: We kind of talked about number eight,

20    which --

21          THE COURT: Number nine.

22          MR. EVANS: Okay.  For the pertinent time frame and

23    geographic area, such ESI and other documents as will

24    disclose the results of all retail fuel price surveys done

25    by you or on your behalf on which you rely.  I don't see

1      that it's relevant to that underlying case.  I don't think

2      that this is any -- it's absolutely a trade secret of Kroger

3      -- or Dillon -- and again, I don't see it serving any

4      purpose for Western in this matter.  There are a multitude

5      of different factors that could go into -- or that we could

6      have obtained from the -- from the surveys.  It's

7      essentially, to use one of our terms, it's work product that

8      we've used, that Kroger has used for its benefit, and

9      Western is trying --

10             THE COURT: But it can't be work product, because

11     it's only work -- if you're using the phrase "work product"

12     in its legal sense, work product is a document prepared in

13     anticipation of litigation.

14             MR. EVANS: I --

15             THE COURT: If you're telling me it's work product,

16     you have to tell me what the litigation you anticipated.

17             MR. EVANS: I was using that in its non-legal form,

18     and I shouldn't have, Your Honor.

19             THE COURT: Okay.

20             MR. EVANS: I was not trying to use it as we do.

21             But it's -- these are surveys that are done,

22     again, by Dillon, and the results of which should not just

23     be readily turned over to its competitor.  They've showed no

24     reason to get this, and when we talk about information of

25     this nature to a competitor, again, they have a higher

1    burden or a higher threshold to obtain this, and it's just

2    not -- not there.

3            THE COURT: And I guess my question now -- and this

4    is directed to plaintiffs' counsel.  I'm looking at number

5    nine, and I realize I didn't write nine and I didn't write

6    ten, but when I looked at nine and ten, I mean, number nine

7    asks for fuel price surveys and number ten asks for all

8    reports and research studies, examinations, investigations,

9    surveys.  So at least at first blush to the uninitiated,

10   number nine would seem to be subsumed by ten.

11           MR. BENNINGTON: Well, if it is, I would have

12   expected a discovery response or a phone call or something

13   saying you've asked for it twice, we don't have it in either

14   sense.  However, I didn't get that.

15           THE COURT: I mean, does your client, does Dillon

16   -- I mean, I will tell you, fuel price surveys, as a jurist,

17   that's not something that I have any familiarity.  Is that

18   -- I mean, is that something that is customarily produced by

19   Dillon?  If you went to Dillon and called on the general

20   counsel and said do you have a document called a retail fuel

21   price survey, do you know what your client would say?

22           MR. EVANS: No.

23           THE COURT: Okay.  So it might be we're just

24   fighting about a document that doesn't exist?

25           MR. EVANS: I don't know if it would be called

1     specifically what you just said, but I'm sure that there's

2     something like this that is done.

3               THE COURT: All right, let me hear from -- let me

4     hear from plaintiff.

5               MR. BENNINGTON: First of all, Your Honor, let's --

6     I'd like to, if you don't mind, I'd like to go to the top,

7     contract documents.  There was no objection stated in the

8     pleadings to that, in that -- in the motion to quash.  So

9     it's not -- that, in a sense, has been confessed.  And --

10              THE COURT: No, nothing's being confessed, but he's

11    objecting to number one, not on the grounds that you used

12    the phrase "contract documents."   What he is saying is,

13    read literally, it says all contract documents between you

14    and Suncor to the extent that it's a contract document

15    (inaudible) Suncor and Dillon, he said get it from Suncor.

16              I mean, you're not asking for all documents that

17    relate to contract documents, you're saying all contract

18    documents between you and Suncor.

19              MR. BENNINGTON: And that is --

20              THE COURT: And the word "contract documents" means

21    written agreements and understandings.

22              MR. BENNINGTON: Right.

23              THE COURT: So if it's a written agreement, or if

24    it's a written understanding between Suncor and Dillon, why

25    not get it from Suncor?

1          MR. BENNINGTON: I've asked for it from Suncor,

2     but, frankly, Mr. Shaheen and I -- and this is no complaint

3     about him, we've had trouble gathering --

4          THE COURT: Well, that may --

5          MR. BENNINGTON: You would think it would be easy,

6     but it hasn't been.

7          THE COURT: That may be, but unless and until I'm

8     satisfied that you and opposing counsel work it out, why

9     should I inflict this problem on Dillon?

10          MR. BENNINGTON: Because –

11          THE COURT: Particularly if you're telling me you

12     and defense counsel are still trying to work it out.  Until

13     -- until and -- unless and until, I should say, I'm

14     satisfied that you've fully exhausted those efforts, why

15     should I inflict this on Dillon?

16          MR. BENNINGTON: Because the Covey case that we

17     cited in our brief from the Tenth Circuit, among other

18     things, giving due respect to your discretion, I have to say

19     the fact that it might be contained at least in -- or

20     obtained at least in part from others has no pertinence,

21     because a person may not avoid a subpoena by saying that the

22     evidence sought from him is obtainable from another.  That

23     was a price discrimination case, Your Honor.

24          THE COURT: It may be, but I'm not persuaded by

25     that for the following reasons:  First of all, 45(c) says

1    that you cannot seek documents from a non-party unless

2    you've made reasonable efforts to reduce the burden.

3    26(b)(2)(C) says that I can restrict the frequency and

4    extent of discovery to the extent that information can be

5    obtained from other sources that are less burdensome.   So

6    I don't care what the Tenth Circuit says,  because it is

7    ultimately my discretion.   And I'm not bound by some Tenth

8    Circuit judge who doesn't know what the real world of trials

9    is like.

10          Now, if you come back to me and you tell me that

11    you and Mr. Shaheen have exhausted your efforts, and now you

12    have no choice but to go to Dillon, that may be one thing,

13    but I'm hard-pressed to say to Dillon, jump through a bunch

14    of hoops when you tell me you and defense counsel are still

15    in the talking stages to see what you can work out.

16          MR. BENNINGTON: May I?

17          THE COURT: Sure.

18          MR. BENNINGTON: First of all, where in the law

19    does it say I have to ask, rhetorically, why do I have to

20    rely on Suncor to find out all the documents?

21          THE COURT: You don't have to, but I have to.  Rule

22    26(b)(2)(C), Counsel, is written in mandatory terms.   It

23    says I must limit discovery based upon a range of factors.

24    I must.  You don't have to do anything if you don't want to,

25    but I am required to do it.  And if I find that you and

 1       defense counsel have not exhausted your reasonable ability

 2       to obtain these documents, I'm not inclined to inflict this

 3       problem on Dillon, and that is wholly within my discretion.

 4               MR. BENNINGTON: Let me add that they did not

 5       object to this.

 6               THE COURT: I'm objecting, Counsel. 26(b)(2)(C) is

 7       written in mandatory -- it's an independent obligation

 8       imposed upon me.

 9               MR. BENNINGTON: They file a motion to quash, they

10       don't object to this, it's not, apparently, particularly

11       hard for them --

12               THE COURT: I don't care, Counsel.  Counsel --

13               MR. BENNINGTON: -- to produce it.  Why is it --

14       why are you talking about it?

15               THE COURT: Counsel, I'm offended by it, and Rule

16       26(b) is directed to me.  That's why.

17               And he specifically said here in argument, they're

18       objecting to number one because you could obtain the same

19       documents from Suncor.  So he has made the argument, and

20       it's a good argument.

21               MR. BENNINGTON: They've not claimed that that is

22       overly burdensome.  They made no showing.  That's all --

23       I've made my record, obviously.  We know where we're headed

24       on that one.

25               THE COURT: Right.


                  AVERY/WOODS REPORTING SERVICE, INC.
           455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
                 303-825-6119       FAX 303-893-8305

1          MR. BENNINGTON: Number two, discounts, we already

2     talked about that.  We're asking for documents relating to

3     discounts.  The nature of this business -- I mean, we don't

4     have to put it in that way.  What's relevant in this case

5     are discounts given by Suncor to Kroger, Suncor to Western

6     or anybody else.  And we have already learned that there's

7     a fair amount of interchange amongst employees at the

8     various companies talking about discounts, rebates, and

9     those sorts of things.  So that is why we have asked for all

10     documents or ESI relating to discounts.

11          Same thing with respect to Western Convenience

12     Stores.  If Suncor is talking to Dillon about Western

13     Convenience Stores at the threshold, I suggest that is

14     highly, highly relevant, or could be.  It's certainly within

15     the scope of discovery of this case, calculated to lead to

16     the discovery of admissible evidence.  And it's an -- in

17     this day and age, we all know it's an e-mail problem, an ESI

18     problem, a keyword search problem, and Kroger has made no

19     effort at all to talk to me about how to do that, to discuss

20     how we might limit that, or what we -- what are we really

21     looking for, or the dates that have come -- that might be

22     relevant to this.

23          THE COURT: So what you're telling me -- help me to

24     understand.  So what you're telling me is that if they came

25     to you and said we want to negotiate something that's more

1    workable, you would do that?

2           MR. BENNINGTON: Of course.  I'd be ethically

3    obligated to do that.

4           THE COURT: Sure.

5           MR. BENNINGTON: I tried to do that, that's in the

6    pleadings.

7           THE COURT: But here's my point, and this is where

8    it becomes difficult and frustrating for me as a judge.

9    What you're telling me is, Judge, you should deny their

10   Motion to Quash because they didn't sit down and talk to us

11   about negotiating some reasonable compromise.  Well, to be

12   perfectly candid, reasonableness is required at all stages

13   of the process.

14         Now, what you drafted is you said for the

15   pertinent time period and geographical area you want all

16   communications referring or relating to any discount.  I

17   will tell you, on its face that appears to be an

18   inordinately broad request, and it's particularly

19   troublesome to me when you say, look, Judge, if they had

20   called us and talked about narrowing it, we would be happy

21   to talk to them.  I would have expected the narrowing to

22   occur at the front end.  I don't -- here's the problem,

23   folks, and this is what I'm struggling with both legally and

24   philosophically.

25         If I look at Rule 45(c), Rule 45(c) specifically

1    says that a party serving a subpoena is responsible for

2    issuing and serving a subpoena must take reasonable steps to

3    avoid imposing undue burden or expense.  Now, a logical

4    reading of 45(c) would suggest that the reasonable attempt

5    or reasonable steps to avoid imposing undue burden should

6    occur at the front end before the subpoena is served.

7          This is not unique to this case or these lawyers,

8    I see this all the time.  It is becoming the norm among

9    lawyers, particularly in complex litigation.  Lawyers tell

10   me, well, Judge, I cranked out something that was facially

11   broad, patently overbroad, because I was expecting this to

12   be an overture and a start of negotiations to something that

13   was reasonable, but that's not what Rule 45(c) contemplates.

14   Rule 45(c) contemplates that you'll take the steps at the

15   front end to reduce the burden, and now what you're telling

16   me is, Judge, deny their motion because they wouldn't talk

17   to me about reducing the burden.

18         MR. BENNINGTON: That is not what I'm saying.

19         THE COURT: It turns the rule on its face.

20         MR. BENNINGTON: No, no.

21         THE COURT: That's exactly what you just said.

22         MR. BENNINGTON: No, I was willing to talk to them

23   about how to produce the ESI in a way that would be the

24   least burden on their computer people, on the general

25   counsel he's describing who has to deal with this.  I will

1    not backtrack on asking for all e-mails, for instance,
2    regarding Western Convenience Stores, their competitor, with
3    Suncor. I will not backtrack on asking for all e-mails
4    regarding discounts.
5        THE COURT: Okay, I'm not requiring it.  If you
6    don't get it, you don't get -- I'm not asking you to
7    backtrack, if you don't get it, you don't get it.
8        MR. BENNINGTON: Well, but my point is, I am
9    satisfied that those were reasonable requests.  I didn't say
10   give me all documents relating to your business.  Those were
11   narrowed to what is relevant to my case.  That is, if you're
12   talking about Western Convenience Stores, I think that's
13   within the scope of discovery, and I'm entitled to those.
14       THE COURT: See, I -- no.  See, I would have
15   drafted -- I would figured out -- if I'm Western
16   Convenience, I would have come up with a list of all the
17   Dillon stores within ten to 15 miles of Western Convenience
18   Stores, and I would have said, for the following Dillon
19   stores within a 15-mile radius of the Western Convenience
20   Stores, give me this stuff.
21       But if I've got a Western -- in other words,
22   you've defined the geographical area as Colorado and the
23   area of Nebraska within a 25-mile radius of the towns of
24   Sidney, Ogallala, and Hershey.  Well, if I've got a Dillon
25   store in Steamboat Springs and there is not a Western

1    Convenience store within 75 miles of Steamboat Springs, how
2    would that Dillon store's information be relevant relative
3    to the burdens of producing it?
4              MR. BENNINGTON: That Dillon store isn't going to
5    have any of the information I want.
6              THE COURT: But the problem is, it's subsumed
7    within your request, because you're saying the --
8              MR. BENNINGTON: It won't exist.
9              THE COURT: Pardon?
10             MR. BENNINGTON: I'm suggesting it won't exist.
11   The discussion of rebates -- I'm sorry, discounts as we've
12   defined it, is going to be an interchange at the corporate
13   headquarters having nothing to do with the individual
14   stores, and certainly discussion of Western Convenience
15   Stores has got nothing to do with individual Suncor stores.
16   I'm sorry, individual Kroger stores.
17             THE COURT: But what I'm telling you is, if I were
18   really intent under Ruler 45(c) in reducing the burdens,
19   that's the step that I would have taken, and you would have
20   been in a much stronger position to get what you want.  But
21   when you're saying, basically, for all stores in Colorado,
22   whether they compete with my client or not, I want you to
23   identify all of this information.  So, for instance,
24   Counsel, if I've got -- if Dillon has got a store in
25   Steamboat and your client doesn't have a competing store

1   within 75 miles, providing by ZIP code and the last four
2   digits of a credit or debit card number every person who
3   purchased fuel at that Dillon store in Steamboat seems
4   unduly burdensome relative to the benefits in this case.

5          MR. BENNINGTON: I suggest the opposite is true.
6   If I had done that, that creates far more burdens for them
7   to try to separate all of this out, and, in any event, they
8   haven't raised that.

9          THE COURT: But then, tactically, Counsel, you --
10          MR. BENNINGTON: They haven't raised it.

11          THE COURT: Counsel, you would be in a stronger
12   position.  If you had come back to that -- if you had come
13   to me and said, look, Judge, I drafted these requests as
14   narrowly, as surgically precisely as possible, and they're
15   saying notwithstanding my efforts, Judge, I don't get
16   anything, I would have probably said to Dillon, Dillon,
17   you're out of luck.  And you would have been in a stronger
18   position because you could seize the high moral ground and
19   say, Judge, I bent over backwards to reduce these things.
20   I took every step possible to narrow them in terms of scope,
21   time, geographic area.  I also specifically narrowed them to
22   types of communications and types of information, but when
23   you tell me you want all credit card numbers for every
24   Dillon store in Colorado, and a significant portion of
25   Nebraska, even for stores that your clients doesn't compete

1    with.   I mean, I realize that you're an advocate, and I

2    realize you're representing your client, but as the only

3    person in this discussion who doesn't labor under those

4    constraints, I find this request overbroad.

5         MR. BENNINGTON: Well, Your Honor, don't you --

6    don't you accept, at least as a possibility, that if I had

7    done it your way the response sitting over here would have

8    been -- we're supposed to go through every store and every

9    ZIP code that they give us the list of and try to separate

10   all this stuff out.

11        THE COURT: Sure, because then I would have been

12   aware of the case law, and the case law says, basically, if

13   it's relevant information, you can't interpose your record

14   system as a way to frustrate it.   Yeah, I would have,

15   because then I would have said to Dillon, look, Dillon, they

16   have -- plaintiff has made an effort to narrow this request.

17   You're saying it's too cumbersome to go through the trouble

18   of paying for this narrowing request.   Well, so what you're

19   telling me, Dillon, is they get nothing, and that's

20   unacceptable.

21        But, yeah, you're not -- in other words, in an ESI

22   world now, folks, no lawyer, no client, no litigant can

23   afford to crank this stuff out, you're going to lose.   And

24   all you have to do is read the relevant ESI case law.

25   Either that or your client is going to be paying the costs

1      for all of this.

2              MR. BENNINGTON: I did read your ESI case law, I

3      did narrow it, and that's why I used the terms "discount"

4      and "WCS," and that's all the documents that I asked for.

5              THE COURT: Well, I look at number five, and it

6      doesn't seem to be a particularly limited request.  I look

7      at number ten, and it seems to go on ad nauseam.  Where are

8      the -- the fact that you've -- Counsel, in number ten you

9      have asked for one, two, three, four, five, six, seven,

10     eight, nine, ten, eleven, twelve, thirteen, fourteen,

11     fifteen, sixteen, seventeen discrete pieces of information

12     for -- and what's interesting is, is that number ten doesn't

13     even use the phrase "pertinent time frame," and doesn't even

14     use the phrase "pertinent geographic area."

15             Literally, there is no word of limitation in ten

16     at all.  So number ten, read literally, would be nationwide,

17     since the day Dillon started selling fuel.

18             MR. BENNINGTON: And it's intended that way.

19             THE COURT: Then it's offensive.

20             MR. BENNINGTON: And here, I've given you however

21     many it was, A through Q, specifics which you objected --

22     or remonstrated to me before not being specific.  Here, I've

23     been very specific.

24             THE COURT: But it's -- yeah, on the one hand

25     you're specific as to types, but it's absolutely unlimited

1    with respect to time frame and geographical area.  So you're

2    not doing them any favors.  Literally, Counsel, literally,

3    if they are selling fuel in Connecticut --

4              MR.  BENNINGTON:  They  don't  sell  fuel  in

5    Connecticut.

6              THE COURT: It doesn't matter.  Do they sell fuel

7    in places besides Colorado and Nebraska?  If they do, you're

8    asking for that information.  Because there is no limitation

9    at all in terms of geographical scope or time in number ten.

10   Now, that may be an inadvertent omission on your part, but,

11   literally,  literally,  there  is  no  limitation  in  time  or

12   geographical scope in number ten, and how can I find that

13   it's not overbroad?  And to the extent that's overbroad, it

14   is presumptively unduly burdensome.

15             MR. BENNINGTON: Well, the suggestion behind that

16   is that economic studies, economic data done by somebody

17   anywhere is not relevant to this case.

18             THE COURT: I haven't made that assumption, and

19   don't put words in my mouth.

20             MR. BENNINGTON: Well, you are by saying it has to

21   be limited to the time frame in Colorado.

22             THE COURT: No.

23             MR. BENNINGTON: But if I had studied --

24             THE COURT: No, what I'm saying --

25             MR. BENNINGTON: -- exactly the same phenomenon --

1            THE COURT: What I'm saying is, Rule 45(c) puts the

2       obligation  on  you  to  draft  a  subpoena,  which,  to  the

3       greatest extent possible, avoids imposing undue burden, and

4       there -- I do not believe number ten is consistent with that

5       objective  standard  imposed  under  45(c).   And  it's  your

6       burden, it's not theirs and it's not mine.   It's not my job

7       to  construe  your  requests  in  a  way  to  save  them  from

8       challenge,  and  I  look  at  number  ten,  it  is,  in  many

9       respects, absolutely unlimited.

10            I  don't  know  how  long  Dillon  has  been  selling

11      fuel, but if Dillon was selling fuel before Mr. Taraghi was

12      in the Western Convenience business, you clearly are asking

13      for irrelevant information.   Your lawsuit is constrained by

14      the  time  frame  2007,  number  ten  doesn't  bear  that

15      limitation.

16            MR. BENNINGTON: Respectfully, I suggest that's not

17      the case.   They did an economic study.

18            THE  COURT:  Tell  --  look  at  number  ten,  look  at

19      number ten.   If they did an economic study in 2000, how is

20      that relevant to Mr. Taraghi's situation in 2007?

21            MR.  BENNINGTON:  That  is  within  the  scope  of

22      discovery for use by experts in establishing, for

23      instance --

24            THE COURT: No, Counsel, the case law says that at

25      some point I have to balance the relative burdens against

1    what could very well be tangential relevance.  Now, if they

2    did a study in 2000, and I don't know when Mr. Taraghi

3    started his business, but your lawsuit specifically starts

4    the relevant time period at 2000.  That's the competitive

5    area -- or that's the competitive time period that you are

6    addressing.

7              MR. BENNINGTON: Actually, it's 2007 to the

8    present.

9              THE COURT: Right.  But there's no comparable

10   limitation in number ten.  And I'm assuming -- if

11   somebody --

12             MR. BENNINGTON: It's not --

13             THE COURT: -- if somebody omitted that language,

14   I'm sorry, but if somebody left it out intentionally, then

15   I have a hard time finding that this complies with 45(c).

16             MR. BENNINGTON: Even despite -- even with the lack

17   of an objection --

18             THE COURT: Counsel --

19             MR. BENNINGTON: -- stating that burden from the --

20             THE COURT: Counsel, they have objected to

21   everything on the grounds of undue burden.

22             MR. BENNINGTON: But as you have said, they haven't

23   backed it up with anything other than the --

24             THE COURT: Counsel, Counsel, don't -- don't --

25   Counsel, at the end of the day, what I'm telling you is, is

1    that I never -- and I think I said this before, I never

2    evaluate any discovery motion in isolation.  I don't deal

3    with these motions with blinders on.   And while I am

4    critical of some of their positions, my criticism of their

5    response does not immunize your requests to the extent that

6    they are objectionable.  And Rule 45 and Rule 26(b)(2)(C)

7    impose an independent obligation on me, and I can't change

8    that, nor would I change it.

9         Because if I simply just, you know, rubber stamp

10   a bad discovery request, it becomes impossible for me to

11   manage the pretrial process.   And it gives license to

12   lawyers to just be excessive, and I'm not going to do that.

13        In fact, if you look at (c), again, continuing to

14   read:  The issuing court must enforce the duty and impose an

15   appropriate sanction.  45(c), like 26(b)(2)(C), is written

16   in mandatory terms, I must make everybody play by the rules.

17   That's what the rule says.  And so the fact that they didn't

18   raise it in no way constrains me from properly applying the

19   rule.

20        Now, I will say, in fairness to the plaintiff,

21   some of this information, I think, is relevant, and so I'm

22   not inclined -- simply because Dillon says that it's a trade

23   secret and, therefore, it's out of bounds, I don't think

24   that's a correct statement of the law.   Because trade

25   secrets are not privileges, and Rule 45(b)(1) says that a

1    party is entitled to conduct discovery of non-privileged

2    information relevant to a claim or defense, and there is no

3    federal case law that I'm aware of that establishes trade

4    secrets or proprietary information as a privilege.

5              And so simply for Dillon to say it's a trade

6    secret, therefore, they don't get it, that's not a correct

7    statement of the law.  Now, they may get it under narrow

8    constraints, but that is not a bar to discovery simply to

9    say it's a trade secret.

10             Now, the challenge for you folks is to figure out

11   a way to narrow these requests in a way that allows

12   discovery to go forward efficiently.  The problem that I've

13   got, near as I can tell, is you've asked for stuff that I

14   think is too broad.  You've raised objections that are not

15   factually supported.  Neither of you have held out the

16   possibility that I can impose an independent protective

17   order that allows relevant discovery to be produced and

18   respects the trade secrets and proprietary interests of

19   Dillon.  And so the problem I've got, folks, is you're not

20   helping me, and to the extent that you're not helping me,

21   you are absolutely not helping yourselves.

22             Now, my question is:  How can we identify this, or

23   how can we approach this discovery in a way that moves this

24   process forward, that focuses on what you really need, and

25   gets you that stuff in some phased way?  It's the same

1    problem that I had when these issues came up with Suncor,

2    and I would have thought you all would have learned from

3    that experience.  So I don't think you folks are thinking

4    about this in a particularly creative way, and I am troubled

5    by the fact that you are continuing to, shall we say, run

6    head first into a wall, and I would have thought by now you

7    would have realized the only end result of that discovery

8    strategy is a headache, for you or me or for both of us.

9            So stop thinking like advocates, stop thinking as

10   adversaries and start helping me to figure out a way that I

11   can move this case forward, because that's ultimately my

12   only objective.  So I'm open to suggestions.  And the

13   problem is, you're not in a position to provide much help

14   because you don't have a clue how your client maintains

15   electronically stored information and the searchability of

16   that information.  And you can't help me because once you

17   know how they search for information, you might very well be

18   in a position to say, okay, Judge, now I can narrow some of

19   these requests to thereby minimize the burden.

20           So, for instance, in order for you to determine

21   whether or not there is some course of conduct that supports

22   your theory of this case, do we absolutely need to go and

23   get five or six years' worth of information for all of these

24   myriad categories?  For instance, can we say, with respect

25   to these ten items, in the best of all possible worlds, we'd

1    love to get all ten, but if we had to come up with some

2    phased approach that would allow everybody to proceed in

3    some measured basis, here are the ones that we'd like to

4    focus on first and foremost, and let's see what we get with

5    those.

6              So, for instance, if you were trying to figure out

7    -- in other words, relative to some of these other requests,

8    like, for instance -- and I realize to some extent this is

9    -- this is a difficult question, and so I go into it with

10   that in mind.   Relative to all of these other requests,

11   where would you place number seven on your hierarchy of wish

12   list?

13             MR. BENNINGTON: Well, it's not at the bottom, it's

14   not at the top.

15             THE COURT: Well, I understand that, but that's --

16             MR. BENNINGTON: In other words, I'm not willing to

17   throw it away.

18             THE COURT: I'm not suggesting, but if you were

19   to --

20             MR. BENNINGTON: I can limit it by ZIP code.

21             THE COURT: If we were going to phase this -- but

22   what I'm saying, though, is if we were going to phase the

23   discovery --

24             MR. BENNINGTON: Yeah.

25             THE COURT: -- would that be in your necessary

1    phase one, or would it be in phase two, or be in phase

2    three?  I understand in the best of all possible worlds

3    you'd like everything, but what I'm telling you is that may

4    not be the world we operate in, Counsel.

5              MR. BENNINGTON: But phases take time, and --

6              THE COURT: That may be, but --

7              MR. BENNINGTON: -- you have set deadlines for us

8    that worry me very much.

9              THE COURT: -- that may be, but, Counsel, how much

10   time have you saved so far with this fight?

11             MR. BENNINGTON: I'm not going there.

12             THE COURT: I would think, but let's put it this

13   way.  As I understand it, you served this subpoena on April

14   26, it's now July 16.  How much of this stuff have you

15   gotten so far over the last three months?  You're not saving

16   any time under your strategy.

17             MR. BENNINGTON: When I have somebody respond to

18   me, with all due respect, we're not interested in talking,

19   we want you to withdraw your subpoena, I'm not sure what I

20   can do.

21             THE COURT: Well, what I would have done is I would

22   have said, look, here's what I'm prepared to do, and here's

23   what I'm -- here's how I'm prepared to phase things.  But

24   look, at the end of the day, I understand that you're going

25   to get pushed back, I mean, that' inevitable, so my

1    objective, if it were me, thinking like an advocate, what I

2    would have been doing before I ever cranked anything out, I

3    would have said let me -- let me play advocate here, let me

4    anticipate that no matter what I do they're going to scream

5    foul, that we'll ultimately have to get to the magistrate

6    judge.   How can I -- how can I approach this issue to

7    maximize my leverage for the inevitable fight we're going to

8    have?   How can I position myself to be most effective and

9    most persuasive at the earliest possible moment, and that's

10   the bizarre thing.   And this is not unique to this case,

11   what's happening is lawyers are cranking out overbroad stuff

12   with the idea that we'll negotiate from there, but this

13   makes the point.   You drafted very broad stuff, three months

14   go by and we're still struggling with the problem.   Your

15   strategy was not productive.

16         I would have taken a more -- I would have thought

17   of like this as a chess match, and I would have said what

18   moves can I make now, anticipating two or three moves ahead

19   so that I box my opponent into a position where their pieces

20   literally cannot move.

21         MR. EVANS: Your Honor, may I --

22         THE COURT: Think of this as a chess match, you

23   basically are playing with pawns.

24         Yes?

25         MR. EVANS: Your Honor, I'm just feel like I'm

1      forced to respond --

2                  THE COURT: Really?

3                  MR. EVANS: -- and I'll be very brief.

4                  For my sake, on May 15th, as part of an e-mail, I

5      wrote in short:  Unless you're willing to consider wholesale

6      modification of your subpoena by, for example, withdrawing

7      in whole or in part categories one through three and five

8      through ten, we believe it is necessary to seek judicial

9      relief.  So it's not as if I just shut the door, I indicated

10     back in May that there needed to be wholesale modifications

11     to it.

12                 THE COURT: But see, the problem is --

13                 MR. EVANS: And that's just in response, we're just

14     going back and forth.

15                 THE COURT: Yeah, but see, what I would have done

16     is this:  Again, you guys got to -- you got to think

17     tactically, you're jockeying for position.  What I would

18     have done is I would have gotten back to him, and I would

19     have said, look, I suggest that you and I get together, I'll

20     buy you a cup of coffee, let me explain to you how Dillon

21     maintains its ESI.  In fact, I'll bring the ESI with me, and

22     I'll explain to you how cumbersome and difficult this

23     process is in the hopes that when you know the technical

24     hoops that we have to jump through in response to this

25     request you'll agree with me that modification is necessary.

1    But what you said was, this is unduly burdensome, you better

2    dump one through three and five through ten, so apparently

3    you weren't willing to fight about four.

4            MR. EVANS: I said modify it, not dump it.

5            THE COURT: But the problem is, until you tell him

6    how modification eliminates the problems, you haven't --

7    you've just presented him with an ultimatum, that's not a

8    confer.  You've basically said, as drafted, these are a

9    problem, you either modify them, or we're going to fight

10   you.  A cooperative approach to discovery would have said

11   and it's a problem for the following reasons, because this

12   is how we maintain our data.  This is -- most of this stuff

13   you want is on archive systems that we can't search.  Then

14   you would have given him a basis of knowledge by which he

15   could go back and say, okay, yeah, I understand now.

16           But the truth of the matter is this, and, you

17   know, at the risk of being cynical, the bottom line is it

18   didn't matter what he modified, because your client's

19   position was (inaudible) a trade secret.  We could have this

20   stuff sitting on a desk at the home office already sorted by

21   these categories, and we wouldn't give it to you because we

22   think it's a trade secret and it's proprietary.

23           So to some extent, I understand your client is

24   making this undue burden, but honestly, if he had bent over

25   backwards to draft these things in a way to eliminate any

1    burden, you'd still be fighting on a trade secret basis.

2          MR. EVANS: The trade secret argument was not for

3    all of the categories, it was -- it was just for a few of

4    them and not for most of them.

5          THE COURT: Which are the specific categories for

6    which you're asserting trade secrets only?

7          MR. EVANS: Seven -

8          THE COURT: I guess maybe -- which are the

9    categories, one through ten, are you not asserting trade

10   secrets?

11         MR. EVANS: One through six.

12         THE COURT: So one through six, none of these are

13   trade secrets.

14         MR. EVANS: Correct.

15         THE COURT: Well, then I'm confused.  Because you

16   didn't want to give me the names of people who bought gas in

17   2007 because that would have market strategy implications,

18   but there wouldn't be market strategy implications in

19   talking about discounts received in 2011?

20         MR. EVANS: Well, I think --

21         THE COURT: I mean, if you want to say that -- I

22   mean, I don't think counsel's going to object if you're now

23   saying there's no trade secret problem with respect to one

24   through six.  I'm sure he's willing to live with that.

25         MR. EVANS: I think that a lot of it -- that the

1    argument that we were making is that those were materials

2    that could be obtained by Suncor.  If we received a discount

3    from Suncor, Suncor has record of that and would then be

4    able to easily provide that to Western.

5         THE COURT:  Well, but see, the problem, though,

6    is -- see, the difficulty I've got is -- I mean, for

7    instance, look at number five, the retail sites to which the

8    fuel was delivered.  If Dillon Stores is using a third party

9    to deliver their fuel, how would Suncor know what store it's

10   going to?  Once it leaves the refinery, how is Suncor going

11   to know and, more particularly, why would Suncor care,

12   Suncor care what stores the fuel goes to?  I mean, Suncor

13   could say you could pour it into Sand Creek.  Oh, no, I'm

14   sorry, they wouldn't say that.

15        And I don't understand the difference between the

16   net and gross quantity of fuel delivered.  I mean, does it

17   evaporate in the tank?

18        MR. BENNINGTON:  No, no, it's all to do with

19   temperature.  It -- the industry understands that.

20        THE COURT:  Okay, well, but then, again, how would

21   -- how would Suncor know the net weight of the fuel when it

22   was delivered to a store?

23        MR. BENNINGTON:  Well, I have to confess, Suncor

24   would know the net and gross quantities as put in the truck

25   at the rack.

1          THE COURT: Sure, but the problem is, I don't know

2     what the phrase "delivered" means.   Does the phrase -- when

3     you use the word "delivered," does it mean delivered to a

4     net store or delivered to the truck?

5          And I guess my question is, what is the bill of

6     lading number?   Why do you need the bill of lading number

7     for?

8          MR.  BENNINGTON:  To  trace  that  back  through

9     Suncor's  records,  to  see  if  it  matches  up  with  Suncor's

10    records.

11         THE COURT: Have you gotten Suncor's records yet?

12         MR. BENNINGTON: Yes.

13         THE COURT: So you've gotten Suncor's records?

14         MR. BENNINGTON: Yes.

15         THE COURT: So if you've got Suncor's records and

16    you know the date of delivery and the bill of lading, why do

17    you need Dillon's numbers?   Why do you need that date?

18         THE COURT: To see if it matches up, and as you

19    said -- and Suncor says this, they don't know where the fuel

20    goes once it leaves their rack.

21         THE COURT: So one through six, these are not trade

22    secrets, you don't care about these?

23         MR. EVANS: No, I did --

24         THE COURT: From a trade secret standpoint, they're

25    just unduly burdensome.   And all the rest of these things

1    are trade secrets.  And I guess my question is, number eight

2    -- and I'm just -- again, I'm just asking questions.  Number

3    eight, for the pertinent time frame and geographic area,

4    such ESI and other documents as will disclose the daily pump

5    price.   First  of  all,  again,  this  is  an  interesting

6    formulation.  You're telling me that number eight is unduly

7    burdensome,  all  they're  asking  for  is  a  document  that

8    discloses the daily fuel price.  They're not asking for all

9    documents that relate to a daily pump price, they're simply

10   -- such documents as disclosed.

11        So I don't know how burdensome that actually would

12   be, but how is a daily price -- how is a document that shows

13   the daily price in 2007, which is apparently shown on the

14   pump itself -- I mean, it's disclosed for all the world to

15   see.  I drive up to that pump, I'm going to know I'm paying

16   -- I guess in those days a buck eighty-five for gas.  How is

17   that -- I mean, it's publicly available information.  People

18   may not recall the price, but that was publicly available

19   information.

20        MR. EVANS: Well, I think it's just that, you know,

21   there's probably no one but Kroger that kept record of it,

22   number  one.   Number  two,  there's  a  lot  that  goes  into

23   setting the pump price.

24        THE  COURT: But  it  doesn't  matter  what  --  all

25   they're saying is what was the net pump price, and that's

1     what's reflected on the pump itself, isn't it?

2              MR. EVANS: Sure.

3              THE COURT: And that's a pub -- that's -- it's sort

4     of like -- you know, if this were -- if this were attorney-

5     client issue, and they say give me all communications

6     between lawyer A and client B from 2007 to 2011, if there

7     was a third party who's privy to a conversation in 2007,

8     that party may no longer recall -- that non-party may no

9     longer recall the conversation, but to the extent that a

10    non-party was privy to that conversation, it ceased to be

11    protective.

12             MR. EVANS: Well --

13             THE COURT: To some extent, all of these prices

14    were in the public domain.  How can they be trade secrets?

15             MR. EVANS: Well, we're relying on what happens

16    with that data once it's with Kroger.  We're relying on case

17    law that says that even though it may be in the public

18    domain, if it's organized in a unique way, or compiled in a

19    different way, there's a --

20             THE COURT: But, Counsel --

21             MR. EVANS: -- there's a competitive advantage.

22             THE COURT: -- but see, they're not asking you to

23    -- they're simply saying give us a document that shows the

24    daily fuel price.  They're not asking you to compile

25    anything.  They're simply saying such ESI or other documents

1       as will disclose the daily price, so that's one document.

2       They're not asking you to compile a list, they're not asking

3       you to do a survey or an analysis, and they're certainly not

4       asking for all documents.  So I'm trying to figure out how

5       that, you know, is problematic, and Brown's affidavit

6       doesn't really help me.

7                   MR. EVANS: As you read it, it may not be, but I'm

8       not --

9                   THE COURT: Well, I'm just giving --

10                  MR. EVANS: -- but I'm not necessarily --

11                  THE COURT: Counsel, Counsel, you can't -- you

12      can't move to quash based upon a strained reading.

13                  MR. EVANS: Based upon what?

14                  THE COURT: A strained reading.  Your obligation as

15      the responding entity is to reasonably construe this request

16      and either produce or object, but you can't object based

17      upon a strained reading of the request.

18                  MR. EVANS: Well, not a strained reading, but the

19      fact that, as we said here this afternoon, there's at least

20      two interpretations of most of these requests, if not three,

21      and they are, as the Court kind of alluded to earlier, not

22      necessarily well written, a bit ambiguous, and it's going to

23      -- it's difficult for us to understand.

24                  THE COURT: No, but --

25                  MR. EVANS: There are -- we've heard --

1           THE COURT: I agree that some of these -- I would

2       agree with you (inaudible), but number eight isn't, number

3       eight isn't hard or tricky at all.  It just basically says

4       such ESI as will disclose the daily pump price.  So I don't

5       know how your client records information.

6           MR. EVANS: But is it as will disclose the pump

7       price that is on the pump itself?  Or is it that is used

8       into -- what is used -- what documents, ESI, et cetera, is

9       used to arrive at that amount?

10          THE COURT: But then -- but then what you do -- no,

11      no, it says such as will disclose the daily pump price.  So

12      what you would have done, what I would have done, and what's

13      contemplated by the rules, all of the Federal Rules of

14      Discovery include basically the same language.  You produce

15      to the extent that the request is not objectionable, and you

16      object to the rest.  So what I would have done is I would

17      have said a reasonable interpretation of this request --

18      under a reasonable interpretation of this request, we will

19      give you a document which discloses the daily pump price,

20      which we are construing as the price that was listed on the

21      pump.  I would have given them that, and then, essentially,

22      dare them to ask for more.  And then you would have said,

23      Judge, they can't ask for more, because we gave them -- we

24      reasonably construed this request and we gave them exactly

25      what they asked for.  Their motion to compel is unfounded

1    and, therefore, Judge, you should deny it and award us fees

2    and costs because we're the prevailing party and their

3    position is not substantially justified, but instead, you

4    did nothing.  It's not a strong position if you're thinking

5    about this tactically.

6          MR. EVANS: We did not do nothing, we asked them to

7    rewrite these.

8          THE COURT: No, but the -- Counsel, when they

9    didn't rewrite them, you still had an independent obligation

10   to answer them reasonably.  If they say we are not rewriting

11   it, that doesn't absolve you of any responsibility for

12   answering.

13         MR. EVANS: We didn't have a reasonable

14   interpretation of the question.

15         THE COURT: Counsel, Counsel, listen, I'm not the

16   smartest guy in this room, but it didn't take me any time at

17   all to come up with a reasonable interpretation, anymore

18   than I had to particularly struggle with number four.  I

19   mean, you objected to number four under the same theory, and

20   all it asked for is an identify of stores.  Don't you have

21   a store directory?  Does your client have a store directory?

22   If it has a store directory, then just produce that, that

23   would have identified every store.  Or, I mean, did you guys

24   just have stores out there that you've lost track of?  I

25   can't imagine that.

1           MR. EVANS: Or someone can --

2           THE COURT: I mean, the irony is number four --

3           MR. EVANS: -- or someone could get online and not

4    unnecessarily burden us and locate the stores themselves.

5           THE COURT: How burdensome would it be to come up

6    with a list of all the stores that sell -- all the Dillon

7    stores that sell gas in Colorado?  Dillon must know how many

8    stores it has and where they are.   It must know to the

9    extent those stores also sell gas.  How much burden would it

10   be to come up with a list of those stores?

11          MR. EVANS: No more than it would have been for the

12   plaintiff who's a party to this matter and who is trying to

13   push off onto a non-party an extreme amount of work --

14          THE COURT: Counsel, Counsel --

15          MR. EVANS: -- and this is but one part of it --

16          THE COURT: -- Counsel, Counsel, Counsel --

17          MR. EVANS: -- and we have to look at it

18   globally --

19          THE COURT: Counsel, no, you answer each of these

20   requests  separately.    And  the  fact  that  some  are

21   objectionable doesn't make them all objectionable.  And it

22   does not pass the straight-face test for the general counsel

23   of Dillon Stores to say it's unduly burdensome for me to

24   find a document that identifies all the stores in Colorado

25   that sell gas.  If it is unduly burdensome, then I  would

1    suggest he's got the problem, not me.  Because he's lost

2    track of his business.  Yet, you objected to number four on

3    the grounds that it's unduly burdensome, and I don't see how

4    -- I don't see how your general counsel's claim of undue

5    burden with respect to four makes any sense, so I am forced

6    to conclude that his objection, much like their request, was

7    not well thought out.

8         And the fact of the matter, folks, is if you -- if

9    you look at the case law, 26(g) imposes on both of you a

10   stop-and-think requirement.  And if you didn't stop and

11   think, then, technically, you're both in violation of 26(g)

12   and, technically, I should impose sanctions, and I don't

13   want to do that.  I want to work with you to try to

14   extricate you from this problem.

15        So my question is still the same:  If, in fact, we

16   were going to try to establish a priority list for one

17   through ten, it would certainly help the Court, and I think

18   it would ultimately help both of you if I had a sense of

19   what those priorities were, and to the extent that we could

20   narrow these requests even more than they've been narrowed

21   so far.  Because I'm not -- see, there's two issues here

22   that Dillon's objection goes to.  To the extent that Dillon

23   is objecting to something on the grounds of undue burden, I

24   can solve that problem to a very great extent by shifting

25   the costs, and I'll say if Mr. Taraghi wants this stuff,

1    it's coming forward, I think it's going to happen on his

2    nickle, and that could be very expensive.

3            So to the extent that there's an objection about

4    undue burden, I can solve that problem by either narrowing

5    the request, to the extent that they can be narrowed, I can

6    solve that problem by imposing some sort of phased approach

7    so that we don't jump into the deep end of the pool

8    unnecessarily, or I can shift costs.  So I've got three

9    solutions to the undue burden problem.  To the extent that

10   it's a trade secret, I can go a long way to ameliorating

11   Dillon's concerns by imposing a very stringent protective

12   order, but the problem, folks, is neither of you have really

13   explored, in my view, any of those possible alternatives.

14   You have presented me, each of you in your own way, with a

15   zero sum option.  Give me what I want, unfettered by any

16   constraints, or don't let him have a darn thing, and I don't

17   find either of those solutions very palatable.

18           MR.  BENNINGTON:  We  can  certainly,  with  the

19   guidance you've given us today, get together and do this

20   without taking any more of your time.  Give us a week, give

21   us ten days, we'll figure it out.  If there's still

22   something left over to fight about, we'll get back to you.

23   My priority would be the card numbers, then the pump prices.

24           MR. EVANS: What numbers are card numbers?

25           THE COURT: And help me to -- the card numbers, you

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119        FAX 303-893-8305

1    basically want to know what people -- I guess -- here's my

2    question.

3              MR. BENNINGTON: I'll also limit that by ZIP code,

4    too. If that would help them in gathering the ESI, I'd be

5    happy to do it.

6              THE COURT: Well, okay.  And I understand -- I

7    understand, I guess, that plaintiffs argued relevance to

8    make its case about unfair competition.  Do you need five

9    years' worth of information, or, for instance -- in other

10   words, if you went to them and said, look, give us -- in

11   other words, Mr. Taraghi stopped getting fuel in what year?

12   It was 2011, I think, in May.

13             MR. BENNINGTON: But there's one fact we know that

14   you don't, I'm sorry.  They didn't become a Suncor customer

15   until 2009.

16             THE COURT: Okay, so then why are we going back

17   to --

18             MR. BENNINGTON: So we have an automatic

19   (inaudible) there.

20             THE COURT: So why -- but then why did you ask for

21   2007?  If they didn't become a Suncor customer till 2009,

22   why would you say the relevant time period is 2007?

23             MR. BENNINGTON: Because we didn't know that --

24   well, no, that's not true.  We knew that when we drafted the

25   subpoena, but if they're talking about Western Convenience

1    Stores -- all right, fair enough.  You're right --

2                 THE COURT: See, and that's --

3                 MR. BENNINGTON: -- pump prices after 2000 --

4                 THE  COURT:  See,  and  that's  why  I  run  into  a

5    problem with 45(c).  You can't tell me that you knew that

6    Dillon  didn't  start  buying  fuel  from  Suncor  until  2009,

7    which means that there was a period of some two years where

8    Dillon was buying fuel from somebody else, and whether they

9    gave discounts or not had no bearing on Mr. Taraghi.  And

10   so,  guys,  you're  killing  yourself,  because  you're  suing

11   Suncor  for  anti-competitive  behavior,  you're  not  suing

12   Dillon,  you're  not  suing  somebody  else,  and  so  if  Dillon

13   didn't  start  buying  fuel  from  Suncor  until  2009,  that,  at  a

14   minimum, would be the start of the relevant time period, and

15   so my feeling is if they started buying fuel in 2009 and Mr.

16   Taraghi was cutoff from Suncor in May of 2011, it would seem

17   to me, at a minimum, that's where you would want to start

18   your data collection.

19                 Because  if  you  can't  find  --  if  you  can't

20   demonstrate an unfair anti-competitive position during hat

21   time period, you don't have a case.  Because you're not

22   going  to  be  able  to  make  a  price-fixing  case  based  upon

23   sales that took place in June of 2012, because Mr. Taraghi

24   wasn't buying fuel from Suncor, and so, yes, everybody has

25   got to go and do a lot more thinking in this regard.

1          I think you've got to narrow these requests, and

2     the other thing, too, is that while I am -- I am aware of

3     the case law which says that a party isn't -- in other

4     words, if you can get the same information from multiple

5     sources, the requesting party, to some extent, has the

6     discretion to decide, but it's not unfettered discretion.

7     I would be in a much more amenable state of mind to impose

8     on Dillon the obligation of going back and looking for all

9     communications if you told me that you and counsel for

10    Suncor had completed your quote-unquote negotiations and

11    Suncor has produced everything its got.

12         But see, one of the things that I'm -- you know,

13    it's sort of a chicken-and-egg situation.   Suncor, for

14    better for worse, is a party to this lawsuit.   Before I'm

15    inclined to make Dillon start plowing through lots of stuff,

16    I would like to think that you've exhausted the resources of

17    Suncor, and I don't know that that's the case.   But -- and

18    I understand that there's sort of this -- this, you know,

19    you're looking for backup data, but I'm somewhat persuaded

20    by Dillon's position, if you've gotten the same data from

21    Suncor, if Suncor's data says A, B, and C, then getting the

22    same documentation from Dillon to prove A, B, and C seems

23    unduly burdensome on Dillon.

24         Now, if you go to Suncor and Suncor says we don't

25    have it, we can't find it, we can't help you, then you might

1    be able to go and say, Dillon, what do you got?  But if --

2    I mean, one of the things you're asking for is all contracts

3    -- I mean, to the extent you're saying you want all

4    communications between you and Suncor referring or relating

5    to any discount, those communications would presumably be

6    contracts, or include contracts.  Now, if Suncor has given

7    you a signed contract, signed by Suncor and by Dillon, why

8    would you make Dillon give you their copy of the same

9    contract?

10                 MR. BENNINGTON: I don't need a copy of the same

11   contract, but I need copies of the confirmations of whatever

12   interchange goes on between them that I haven't gotten --

13                 THE COURT: Okay.

14                 MR. BENNINGTON: -- that I don't even know exists.

15                 THE COURT: And that -- and that might very well be

16   a viable category, but you asked for, number one, all

17   contract documents between you and Suncor.  Now, if you're

18   telling me that Suncor has produced everything they have and

19   there are still gaps in the contract documents, and I'm only

20   going -- in other words, if you -- if you came to me and

21   said, Judge, we asked for all the contract documents between

22   Dillon and Suncor, and we've served a request for production

23   on Suncor, and let's say there's ten contracts and Suncor

24   says we found contract documents for one, two, three, four,

25   five, eight, nine, but we don't have six, we don't have

1     seven, and we don't have ten, then you could have served a

2     subpoena on Dillon saying give us the contract for six, give

3     us the contract for seven, and give us the contract for ten,

4     and you'd be able to come to me and say, Judge, we have

5     demonstrated a need because Suncor doesn't have them.  But

6     if Suncor has one through ten signed by Dillon, you don't

7     really need request number one.

8                MR. BENNINGTON: I disagree.  What -- what if

9     there's 1A, 2B, 3C, which the business people at Suncor --

10    I'm not saying -- certainly Mr. Shaheen would produce it,

11    but the business people at Suncor would say, well, they

12    don't need that, or whatever.

13               THE COURT: But then you -- but then you move --

14               MR. BENNINGTON: Why do I have to trust them?

15               THE COURT: But see, but then the difference is

16    what you do is -- no, because that's an easy scenario.  You

17    say give me those, and Suncor says you don't need them.

18    Well, that's not Suncor's right to say.  So then you move to

19    compel, and I force Mr. Shaheen to produce them.  But you

20    don't say because Suncor stiffed us and Suncor won't give

21    them to us, even though we think they're relevant, we're

22    going to go drag in Dillon and make Dillon give them to us.

23               MR. BENNINGTON: That's not what I'm saying.  I'm

24    saying Suncor isn't telling me or him all the contract

25    documents, and the only way I can be sure that we've gotten

1       the entire universe is to make sure I've got it from him,

2       from counsel for Kroger.  It's --

3                   THE COURT: But see --

4                   MR. BENNINGTON: -- it's an investigation, Your

5       Honor.

6                   THE COURT: -- but here's the problem you've got.

7       I mean, have you taken a 30(b)(6) deposition of Suncor?

8                   MR. BENNINGTON: Yes.

9                   THE COURT: Okay.  Now, was there a situation

10      during the 30(b)(6) deposition where Suncor says we don't

11      have them, or you don't need them, and we're not giving them

12      to you?

13                  MR. BENNINGTON: No.

14                  THE COURT: Okay.  So what you're basically saying

15      is you're just speculating that the possibility that you've

16      been stiffed by Suncor, and you have no facts that would

17      suggest you've been stiffed, and so now you're inflicting

18      this on Dillon?

19                  MR. BENNINGTON: I have 30 years of experience that

20      discovery tells me that every time I ask one party for some

21      category of things, I double-check it with another sort of

22      discovery tool --

23                  THE COURT: And --

24                  MR. BENNINGTON: -- to make sure that I'm getting

25      honest and complete responses.

1          THE COURT: -- and there is some validity to that
2      if you then also fully discharge your obligations under
3      45(c), but if you ask for stuff that's too broad and your
4      rationale for violating 45(c) is, Judge, 30 years of
5      cynicism, you're not in a strong position relative to 45(c).
6          MR. BENNINGTON: But with respect to contract
7      documents, Your Honor, I just -- I just can't get my head
8      around how our request violates 45(c), because it asks for
9      things in writing.  They have a file, they have files of
10     contract things, either electronically or on paper, it's not
11     a big deal for them to have gone and dug it out and given it
12     to me.
13         THE COURT: Counsel, Counsel, it potentially
14     violates 45(c), and it also violates Rule 26(b)(2)(C),
15     because Rule 26(b)(2)(C) says that I must limit discovery to
16     the extent that you've had other opportunities to obtain the
17     information through less burdensome means, and the notion of
18     less burdensome suggests that if there is a burden to be
19     imposed, it should be imposed on a party, not a non-party.
20     And if what you're telling me is, I have no reason to think
21     that Suncor has withheld anything, I have no reason to think
22     that Suncor has failed to discharge their obligations, I'm
23     simply asking Dillon for this stuff as a double-check, that
24     raises 26(b)(2)(C) problems.
25         MR. BENNINGTON: If the burden, however, is zero,

1    and what I'm asking for is somewhat redundant, I suggest

2    that 26(b)(2)(C) allows me to ask that question.  It's not

3    a big deal to copy the contract file.

4              THE COURT: Counsel, they've moved to quash, so

5    apparently it is a big deal.

6              MR. BENNINGTON: Well, in --

7              THE COURT: It's not a big deal to you to ask --

8              MR. BENNINGTON: Your Honor, in their pleadings --

9              THE COURT: -- I agree with that.

10             MR. BENNINGTON: -- they didn't raise that, it came

11   up today.

12             THE  COURT:  They've  objected  to  everything,

13   Counsel, as unduly burdensome.

14             MR. BENNINGTON: Well, in the written Motion to

15   Quash, which is all I had to respond to, they didn't raise

16   an objection with respect to the contract documents.  They

17   had raised an objection with respect to communications

18   regarding Western and regarding discounts, but category one,

19   specification one, was not objected to.

20             I really hope I'm right on that, because I know

21   you're looking at it.

22             THE COURT: Well, I'm looking at it, and they

23   basically say, you know, counsel for plaintiffs served a

24   subpoena issued by this court on Dillon that, among other

25   things, demands all inquiries, discussions, letters,

1    correspondence, notes and similar communications relating to

2    fuel purchases.  I mean, I think it doesn't take a stretch

3    to conclude that contract documents are subsumed within a

4    communication about a fuel purchase.

5          MR. BENNINGTON: Well, contract documents is a

6    defined term.  They didn't ask for communications, they

7    asked for the contracts themselves.

8          My point is that I understand your obligation, and

9    I understand the obligations of Rule 45, but when the other

10    side doesn't see it as a monster problem, or a problem

11    worthy of raising to the Court, specifically, in a

12    affidavit, then it seems to me somewhat inappropriate to

13    have it raised here out of nowhere.

14          THE COURT: Well, I don't know necessarily that

15    it's inappropriate, because -- I mean, I think it's

16    problematic.  But, Counsel, I mean, he's right.  I mean, I'm

17    looking at your initial motion, I don't see any reference to

18    -- a challenge to one, two, or three.  I see nine, ten,

19    seven, eight.  I see seven, eight, nine, and ten.  Then

20    there's this page eight, the subpoena must be quashed

21    because it seeks an extraordinary quantity of documents

22    subjecting Dillon to undue burden, and I guess that covers

23    everything, Counsel.

24          I mean, I think read fairly, when -- they

25    basically said seven, eight, nine, and ten raise trade

1   secret problems, but their undue burden is directed to
2   everything.

3          MR. BENNINGTON: That's the same as a conclusory
4   statement in an affidavit, I would suggest.  You can't just
5   have a blanket "in case I forgot anything, I'm going to say
6   everything's unduly burdensome."   And by the way, the
7   affidavit doesn't cover the contract documents either, I
8   don't believe.

9          THE COURT: No, they just basically say it's a
10  million dollars.  In other words, the point of the matter,
11  guys, is, honestly, if I were dealing with this motion, you
12  both would be in serious trouble, and both be paying the
13  court, because I don't think either side has properly
14  discharged your discovery obligations.   Your discovery
15  requests are too broad by your own admission, albeit
16  reluctantly.

17         And your affidavit is wholly deficient with
18  respect to ESI, and it doesn't, strictly speaking, pass
19  muster under 26(c) because Mr. Brown makes no reference to
20  electronically stored information or the challenges
21  associated with producing electronically stored information.

22         So the bottom line is for me to -- for me to grant
23  the Motion to Compel would essentially require me to
24  overlook all the shortcomings inherent in the motion, and
25  for me to deny the Motion to Compel would require me to

1    overlook the transparent and admittedly overbroad requests,

2    and so I'm struggling to figure out how I can help either

3    one of you.  So what I'm going to tell you to do is go back

4    and do what you should have done, which is don't hurl

5    ultimatums back and forth.  I will require you, within 48

6    hours of this hearing, to meet physically in the same room.

7    Don't do it by phone, don't do it by e-mail, meet physically

8    in the same room, and I suggest you do it over lunch,

9    because it's a lot harder to be mean and nasty when you're

10    eating with somebody.  Hence the name family dinner.

11    Sit down, figure out a way that you can get past this

12    hurdle.   Give me some alterative, short of zero sum

13    solutions, that are the implicit position that you've

14    advocated in these papers.  To the extent that defendant

15    believes -- or Dillon believes that there's some

16    shortcomings in the protective order, I'm happy to talk

17    about ways to tighten it up to meet the unique challenges or

18    needs of Dillon.  To the extent that plaintiff believes that

19    it can narrow these requests to get stuff that it believes

20    is relevant, then I think plaintiff should have an

21    opportunity to do that.

22    But fundamentally, you're going to have to start

23    to cooperate, and I will require that cooperation to begin

24    within 48 hours of today's date.  So that's by 5 o'clock on

25    Wednesday.  You got to start putting your heads together and

1    figure out how you're going to get past this problem.  Okay?

2              MR. BENNINGTON: Very well.

3              MR. EVANS: So after we meet --

4              THE COURT: Pardon?

5              MR. EVANS: After we meet, then we shall come to

6    you when?

7              THE COURT: Well, it depends on if you meet -- my

8    hope is that if you meet you're going to come up with a

9    solution, and then you'll file a joint status report saying,

10   Judge, based upon our discussions, this is what we've agreed

11   to do and, based upon our agreement, we are moving to

12   withdraw the Motion to Quash.  If -- I mean, that would be

13   the ideal solution.

14             Now, if you can't achieve the ideal, then what I

15   think you're going to do is you'll probably come back to me

16   and you'll say, here's our status report, Judge, we've

17   narrowed the range of disputes, we've taken care of these

18   problems, we're still left with this residual component of

19   problems, and we would like to get on your calendar so we

20   can work it out, because we're going to jumpstart this

21   process.  I'm not going to let this get -- we're already

22   bogged down with respect to this, and I want to minimize

23   that to the greatest extent possible, so I would anticipate

24   either a status report saying the problem has gone away, or

25   I would expect a status report saying the problem has been

1    substantially narrowed but we still have some difficulties

2    and we'd like your assistance, and as soon as I get that

3    status report, we'll get everybody in here, and we will

4    resolve the problems once and for all.  Okay?

5              MR. EVANS: Okay.

6              THE COURT: Thank you, folks.

7              MR. BENNINGTON: Thanks.

8              THE COURT: We'll be in recess.

9              THE CLERK: All rise.

10

11             (Whereupon, the within hearing was then in

12   conclusion at 3:33 p.m. on July 16, 2012.)

13

14             I certify that the foregoing is a correct

15   transcript, to the best of my knowledge and belief, from the

16   record of proceedings in the above-entitled matter.

17

18        /s/ Bonnie Nikolas              September 04, 2012

19        Signature of Transcriber                Date

20

21

22

23

24

25

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119      FAX 303-893-8305