1               IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
2
    Case No. 11-CV-01611-MSK-CBS
3   ────────────────────────────────────────────────────────

4   WESTERN CONVENIENCE STORES, INC.
    *a Colorado corporation,*
5
    WESTERN TRUCK ONE, LLC,
6   *a Colorado limited liability company,*

7       Plaintiffs,

8   vs.

9   SUNCOR ENERGY, (U.S.A.), INC.,
    *a Delaware corporation,*
10
        Defendants.
11  ────────────────────────────────────────────────────────

12          Proceedings before CRAIG B. SHAFFER, United
    States Magistrate Judge, United States District Court
13  for the District of Colorado, commencing at 1:31 p.m.,
    June 25, 2012, in the United States Courthouse, Denver,
14  Colorado.

15  ────────────────────────────────────────────────────────
            WHEREUPON, THE ELECTRONICALLY RECORDED
16  PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

17  ────────────────────────────────────────────────────────
                          APPEARANCES
18
            MR. KENNETH R. BENNINGTON, ESQ., and
19            MS. KATHLEEN E. CRAIGMILE, ESQ.,
                 MR. PHILIP BLEDSOE, ESQ.,
20        Appearing on behalf of the Plaintiffs.

21            MR. ANTHONY J. SHAHEEN, ESQ.,
                MR. MICHAEL KORENBLAT, ESQ.,
22        Appearing on behalf of the Defendants.

23  ────────────────────────────────────────────────────────

24

25                    MOTIONS HEARING

```
 1                 P R O C E E D I N G S

 2            (Whereupon, within the electronically recorded

 3    proceedings are herein transcribed, pursuant to order of

 4    counsel.)

 5            THE COURTROOM DEPUTY:  All rise.  Court is in

 6    session.

 7            THE COURT:  Have a seat, everyone.  Have a

 8    seat.  All right.  This is Western Convenience Stores,

 9    Inc., et al versus Suncor, 11-CV-1611.  I'll take

10    appearances of counsel.

11            MR. BENNINGTON:  Good afternoon.  Kenneth

12    Bennington and Kathleen Craigmile for Western

13    Convenience Stores.  Also Philip Bledsoe.  He recently

14    entered his appearance.  I'll let him introduce himself.

15            MR. BLEDSOE:  Good afternoon, Your Honor.

16    Philip Bledsoe of Polsinelli, Shughart.

17            THE COURT:  Okay.

18            MR. BENNINGTON:  Also at the table with us is

19    Mr. Taraghi, who you've --

20            THE COURT:  Right.

21            MR. BENNINGTON:  -- met before.

22            MR. SHAHEEN:  Your Honor, Tony Shaheen and

23    Mike Korenblat on behalf of Suncor.

24            THE COURT:  All right.  There are a number of

25    motions we need to take up and taking them up in no
```

1    apparent logical order.  Maybe some of these we can

2    resolve pretty quickly.

3              I've got Document 65 and Document 79.  Each of

4    these is a motion filed by plaintiff to restrict access

5    to certain materials.  As far as I can tell these

6    motions are not opposed.  And so in the absence of

7    opposition I'll just go ahead and grant 65 and 79,

8    Robin.

9              Now, that leaves us with two more substantive

10   motions.  Document 52, which is plaintiff's motion to

11   compel, and Document 59, which is plaintiff's motion

12   challenging designation of certain documents as highly

13   confidential.  And I suppose we should take these up in

14   the order in which they were filed starting with

15   Document 52.  It's plaintiff's motion so I'll hear

16   further argument.

17             MS. CRAIGMILE:  Thank you, Your Honor.  Good

18   afternoon.  We're here on the motion to compel and the

19   other motion that you briefly described.  This is a

20   price discrimination case under the Robinson-Patman Act.

21   The very basic issue in this case is were there price

22   differentials for sales of like grade and quality

23   products; in this case, gasoline and diesel fuel that

24   was ultimately sold to retail consumers in the states of

25   Colorado and Nebraska.

1          To date, Suncor has provided pricing

2     spreadsheets for 2008 to 2011 for Western Convenience

3     Stores; for Kroger, which encompasses King Soopers; and

4     Minimart, which is also known as Loaf & Jug, for -- and

5     for 2000, only for 19 branded customers.  These pricing

6     spreadsheets show what Suncor's accounting records state

7     to be the price per day, the standard discount off the

8     price, totals for different products of gas sold to

9     these customers.

10          The e-mails that were attached to the motion

11     to compel revealed the existence of substantial

12     discounts, rebates, off-invoice credits, or other

13     concessions to customers for the purchase of gas from

14     Suncor.  Suncor has only produced these e-mails and

15     other discrete documents for 2011 only.

16          Notably, in its discovery responses Suncor

17     stated that certain customers were branded -- certain

18     branded customers, those that were selling Suncor

19     produced Shell and Phillips 66 gasoline, received

20     discounts in 2000 only as part of a special group

21     branded rebate program.  I can't describe that in more

22     detail because that program is designated as highly

23     confidential by Suncor.  That Suncor provided certain

24     other discounts to branded customers in 2011 for the

25     purposes of meeting competition, and that Suncor

1    provided no discounts to unbranded customers from

2    January 2011, to June 2011 when the relationship with

3    Western Convenience Stores ended.

4         Notably, the deposition of Steve Moss,

5    Suncor's former unbranded sales manager which took place

6    on May 25th, revealed not only that there were these

7    discounts to the branded customers, but there were in

8    fact discounts to unbranded customers.  And that the

9    discounts to unbranded customers, although he originally

10   asserted were given across the board to all unbranded

11   customers equally, were given to only certain unbranded

12   customers such as those named in the e-mail.

13        The documents used in Mr. Moss's deposition

14   also include -- or excuse me, revealed that despite his

15   testimony the standard rebates for Suncor fuel sold to

16   all of its customers -- its unbranded customers were the

17   same from 2008 to 2011 that, in fact, they differed

18   between the customers sometimes widely, sometimes not

19   widely.  But there were substantial differences, meaning

20   that Suncor's testimony in its interrogatory responses

21   on these issues were incorrect.

22        In a price discrimination case a plaintiff is

23   entitled to discover accounting records to show the

24   existence of price differentials.  That's all we've

25   requested.  Here, there's substantial evidence showing

1    that there were in fact discounts given to customers

2    other than Western Convenience Stores, and as a result

3    Western Convenience Stores can't prosecute this case

4    effectively unless it has access to those accounting

5    records.

6         There are several categories of records

7    requested.  And Suncor has sort of separated the

8    requests into the requests that they indicate are very

9    burdensome, and there are requests they indicate are

10   only somewhat burdensome.  Requests 3, 4, 6, 7 and 10

11   seek basic financial records such as financial

12   statements, auditors' reports referring to price

13   discounts or prices charged to customers, trial

14   balances, general ledgers, charts of accounts.  As set

15   forth in the affidavit of Ms. Betzer attached to the

16   reply in support of the motion to compel, these are all

17   very basic accounting records.

18        Although Suncor objected to producing these

19   records as unduly burdensome, among other things, the

20   affidavit of Mr. Connor attached to the response

21   indicates that these records were never burdensome to

22   produce and that Suncor could have produced them in a

23   week at a cost of $4000 or less.

24        Because those records have not been produced,

25   any of them, our accounting expert Ms. Betzer is not in

1    a position to tell what would be in the other accounting

2    records, can't narrow any of her requests, and can't

3    discover any of the information regarding the pricing to

4    the -- to Western and to the other customers.  So, the

5    fact that Suncor has withheld all of these documents,

6    really without basis, has substantially delayed the

7    case.

8         Suncor argues that three requests, Request 5,

9    8 and 9 are unduly burdensome because according to the

10   affidavit of Mr. Connor it would require Suncor to hire

11   a contractor or contractors to come into the company and

12   apparently create systems to pull these documents.

13        Again, according to the affidavit of

14   Ms. Betzer that we submitted in support of the reply

15   these are also very basic accounting records which any

16   -- any sophisticated system should have accessible.

17        THE COURT:  Well, except, counsel, in

18   fairness, records might be accessible for, for instance,

19   the years 2011 and 2012.  But I don't know how they

20   maintain electronic records, and the ability to retrieve

21   documents going back to 2007 could be substantially

22   different.  So, I -- the fact that an uneducated, non IT

23   person says they're easy and they're standard documents

24   I don't know how much weight I can give on those

25   opinions.

1            MS. CRAIGMILE:  One of the issues --

2            THE COURT:  And I guess depending upon how

3    Suncor stores records it could be incredibly time

4    consuming.

5            MS. CRAIGMILE:  I think there are two

6    responses to that issue, and that's -- it's what I asked

7    myself when I read the response.  The first response

8    is -- excuse me, I lost my train of thought.

9            The first response is that the fact that

10   Suncor didn't produce any of the accounting records,

11   meaning the chart of accounts which is a very basic

12   record, means that we can't have an opportunity to even

13   question these issues to say, All right, we need these

14   accounts.

15           THE COURT:  My response was only directed to

16   how much weight I should give to the, perhaps,

17   uneducated opinion of your expert when she says, "well,

18   these are standard accounting documents that are very

19   easy to retrieve."  I don't know that that's necessarily

20   true.

21           MS. CRAIGMILE:  Well, we do have an expert

22   actually here today that has worked with an SAP system

23   that we could speak to, Mr. Tatose, who is in the back

24   of the room.  He has some experience with SAP accounting

25   systems in the context of a Robinson-Patman case and has

1   some understanding about how those systems work in terms

2   of the scheme offer data, how it's kept in the system,

3   the fact that the data is --

4           THE COURT:  Why not just take a deposition of

5   somebody at Suncor?  Why do we need to hear from an

6   expert?  The fact that you've paid this guy to come into

7   court today -- the best evidence of how accessible the

8   information would be, would be depose somebody from

9   Suncor, right?

10          MS. CRAIGMILE:  Well, we would be -- we

11  couldn't do that unless we had the underlying documents

12  that are the subject of the first half of the --

13          THE COURT:  No.  No.

14          MS. CRAIGMILE:  -- motion to compel.

15          THE COURT:  To find out how accessible or

16  inaccessible, that's just a function of whether or not

17  it's not reasonably accessible based on burden and cost.

18          MS. CRAIGMILE:  Well, I think we've met our

19  burden of showing that the documents are relevant and I

20  don't think that the --

21          THE COURT:  No, I'm not --

22          MS. CRAIGMILE:  -- Suncor.

23          THE COURT:  I'm not necessarily prepared to

24  agree with that either.

25          MS. CRAIGMILE:  Well, I would answer that two

1    ways.

2              THE COURT:  We'll talk about that in a moment.

3    Go ahead.

4              MS. CRAIGMILE:  The Suncor affidavit doesn't

5    provide a reasonable basis.

6              THE COURT:  I know.  I'm not wild about

7    Suncor's position either.

8              MS. CRAIGMILE:  All right.  I'll give you one

9    concrete argument on this issue.

10             THE COURT:  That would be good.

11             MS. CRAIGMILE:  Suncor argues with respect to

12   the motion, the second motion which is the motion

13   related to the designation of highly confidential

14   documents.

15             THE COURT:  No.  Let's just talk about the

16   motion --

17             MS. CRAIGMILE:  Well, I know.  I'm just

18   referring to an exhibit to that document.  The key

19   exhibit to that -- their response in that motion is the

20   master purchase and sale agreement between Suncor and

21   all of its customers.  It's a standard document.

22   Western had one.  As far as we know all of the unbranded

23   customers had one.  We think that all of the branded

24   customers have essentially the same form.

25             That document provides, among other things, a

1   recordkeeping and audit provision that's binding on both

2   parties.  It states, Each party -- and this is for the

3   purpose of determining whether purchase into sales

4   transactions are accurately maintained.  "Each party

5   agrees to maintain all records created in the course of

6   such party's performance under this agreement for a

7   period of three years and shall continue to maintain

8   such records for a period of two years after the

9   expiration of this agreement."

10          "Each party shall have the right to inspect

11   and audit the other party's books and records at the

12   initiating party's sole cost and expense upon written

13   notice."

14          THE COURT:  Okay.  So -- so apparently under

15   that agreement you wouldn't have any objection to cost

16   shifting.

17          MS. CRAIGMILE:  Well, we would want to make

18   sure that any cost shifting that you would consider,

19   Your Honor, would be reasonable, and that our experts

20   would have a chance to work with Suncor to determine the

21   most effective and cost effective way to get at the

22   materials.

23          But they haven't -- they've told their

24   customers we're keeping these records.  All we have is

25   an affidavit that says, We can't get the information

1    that you want, because although these are very basic

2    accepted accounting records, it would cost blank to

3    retrieve this information because our experts -- we

4    would have to hire outside persons to search the data,

5    sort the data and cull the data.  That's all the

6    information we have about the burdensomeness of these

7    requests.

8         Frankly, we've been pursuing this issue for

9    three months and we don't even have the basic records

10    that would allow us to take the deposition that you

11    suggested.

12         THE COURT:  Well, no.  I don't know that you

13    would need to take records -- I don't know that you

14    would need records to take a 30(b)(6) deposition of a

15    records person at Suncor to say, Tell me how you

16    maintain these records; do you maintain them in hard

17    copy, which means a manual review, or are these

18    accounting records searchable and retrievable in

19    electronic form.  You don't need to have the underlying

20    documents themselves to ask those questions, do you?

21         MS. CRAIGMILE:  If we got a chart of accounts,

22    which is one of the key documents we requested, or the

23    financial statements, those types of documents, we would

24    see what types of accounts are in the system.  We would

25    see if there was --

```
 1              THE COURT:  Well, no, you could just ask that
 2    question.  What sort of -- "How do you maintain account
 3    information within your system?"
 4              MS. CRAIGMILE:  We would be doing that, Your
 5    Honor, respectfully, in a vacuum.  If we didn't have the
 6    chart of accounts we wouldn't know whether -- how, even
 7    structurally, Suncor accounts for discounts.  We
 8    wouldn't be able to say, all right, for this credit
 9    transaction --
10              THE COURT:  No, but you could certainly --
11              MS. CRAIGMILE:  -- where is your --
12              THE COURT:  You could ask that question in an
13    interrogatory:  "To the extent that Suncor maintains
14    pricing information, how do you do it?"
15              MS. CRAIGMILE:  We've asked those questions.
16    And we've asked --
17              THE COURT:  And you asked that in an
18    interrogatory?  I missed that one.
19              MS. CRAIGMILE:  We've asked -- we've taken a
20    basic 30(b)(6) deposition about Suncor systems and asked
21    the underlying questions about the SAP system.
22              THE COURT:  Okay.
23              MS. CRAIGMILE:  Asked the accounting request
24    for production as a follow-up to that.
25              THE COURT:  Okay.  Let me hear from these
```

1   guys.  Because I, frankly, think, folks, you're missing

2   the forest through the trees.  Both sides.

3           MR. SHAHEEN:  Your Honor, thank you.  You beat

4   me to it.  I was going to say they took a lengthy

5   Rule 30(b)(6) deposition, and what they're looking for

6   here could easily be resolved by doing that.  In fact --

7           THE COURT:  How --

8           MR. SHAHEEN:  I offered --

9           THE COURT:  A 30(b)(6) deposition isn't going

10  to get them the documents they want.

11          MR. SHAHEEN:  It will give them the

12  information.  What they're looking for is how is your

13  system set up.  And the underlying and most basic --

14          THE COURT:  The request for production tells

15  you what they're looking for.

16          MR. SHAHEEN:  It doesn't tell us --

17          THE COURT:  I could figure out what they're

18  looking for.

19          MR. SHAHEEN:  Yes.  And, Your Honor, in the

20  response in the affidavit we told them that contrary to

21  the assumption of people that have not looked at

22  Suncor's SAP system, the system is not formatted, it is

23  not set up to produce documents in the journal entry

24  format requested by Request 5, 8 and 9.  And so when

25  Mr. Connor says it has to be -- he goes through the

1    steps, what he is saying is it has to be built.

2              And that's why it costs $162,000, because they

3    need an IT programmer or an analyst to come in and build

4    a capability that the system doesn't have, and it

5    doesn't have it because it doesn't need it.  They don't

6    keep documents in the journal entry format that they're

7    requesting because they don't use them or need them in

8    the ordinary course of business.  They don't need them

9    for audits.  They don't need them for when

10   Pricewaterhouse comes in.

11             So they're asking us, if you -- they say,

12   Request 5 and 8 asked for journal entry reports.  Our

13   response is our system is not formatted.  And the

14   affidavit from Ms. Betzer, she admits, she has not seen

15   our system.  She's talking about a typical system.  And

16   she gives a definition at page 3 at footnote 1 of her

17   affidavit in further support of the motion to compel,

18   and she talks about, "I use the term *standard reports*."

19   And she says, "All of this is standard reports to

20   indicate pro forma reports already formatted within the

21   accounting system software package."  Our system is not

22   already formatted to produce journal entry reports.  And

23   that's what's being requested by 5 and 8, Your Honor.

24   And for that, that's where 162,000 of the 165 comes out.

25             THE COURT:  Okay.  So that's your response to

1   5 and 8.  What about everything else?

2          MR. SHAHEEN:  The others, Your Honor, is --

3   our position is this is irrelevant.  These are high

4   level documents that if you got these -- assuming for a

5   moment you were entitled to them, and we disagree with

6   that, they're not going to give you the answer to

7   whether or not there were discounts.

8          If -- I think -- if we had 5 and 8 formatted

9   the way she wants it, that might give her what she's

10  looking for.  But what she's asked for in the remainder,

11  Your Honor, will not by itself let her answer the

12  question are there hidden discounts.

13         And what's important about this, besides the

14  cost, Your Honor, is this.  What you heard from

15  Ms. Craigmile was she's talking about e-mails and

16  documents we've produced.  Okay.  So they want to -- the

17  underlying assumption here is this.  You produce some

18  documents with respect to discounts, and that's the

19  basis for this motion, but there must be others you're

20  lying about or hiding.

21         If they had walked into this courtroom, Your

22  Honor, saying, We got our subpoena honored from Sapp

23  Brothers, for example.  And Sapp Brothers is indicating

24  in their documents that there are discounts that do not

25  show up for the year 2011 in your e-mails or your

1    documents, something funny is going on here, this would

2    be a different case.  But they're not.  They're taking

3    our own documents and saying, see, there are some

4    discounts in here.  We need to go look at your

5    financials to see if there are more discounts that

6    you're not disclosing to us.  There's no basis for that.

7    And certainly no basis for the cost involved.

8              THE COURT:  Well, I guess what I'm trying to

9    understand is you've already produced some information

10   for some entities that Suncor sells fuel to.

11             MR. SHAHEEN:  That's right, Your Honor.

12             THE COURT:  See, one of the difficulties that

13   I have, I'm not real wild about these discovery

14   requests.  I think they're broad.  And I'm not

15   particularly impressed with the case law that plaintiff

16   relies upon because, interesting, every case they cite

17   predates the 1983 amendments to the Federal Rules of

18   Civil Procedure which imposed a proportionality

19   requirement.

20             So, you're citing old cases that, frankly,

21   don't support your position.  Because when you tell me

22   there's expansive discovery and you cite a decision from

23   1954, all you've got to do is look at 1983.  In 1983

24   Rule 26(b) was amended to impose a proportionality

25   requirement.

1         So, your requests themselves I think are

2    overbroad.  To be perfectly honest with you, I think

3    they're overbroad and the cases you're citing aren't

4    persuasive.

5         The problem that I've got with defendant's

6    position is the defendant seems to want to have it both

7    ways.  Looking at defendant's response -- I think this

8    was attached.  I don't understand the highlighting, but

9    setting that aside.  Defendant says, "Assuming arguendo

10   that WCS as a seller of under-branded gasoline even

11   competes with the branded Shell and Phillips 66

12   stations, Suncor should only be required to produce

13   information on those marketers who provided branded

14   gasoline to Shell or Phillips 66 branded stations within

15   a two-mile radius of a WCS store.

16        Well, the fact that Suncor decides that

17   competitors are located within 1.2 I don't find that

18   position particularly -- you don't have the right --

19   that's my job to decide what's relevant.  It's not your

20   job.

21        MR. SHAHEEN:  Your Honor.

22        THE COURT:  And so when you just arbitrarily

23   say, We're not going outside a two-mile radius I think

24   you probably violated your discovery obligations.  But

25   having said that there is some relevance even inside a

 1    two-mile radius, I then look at defendant's responses to

 2    the request for production, and you don't produce

 3    anything.

 4            Well, all you have to do is look at Rule 34.

 5    Rule 34 says that you produce to the extent that

 6    requests are overbroad or -- you produce to the extent

 7    that it's not objectionable and then you object to the

 8    rest.  Well, you haven't produced anything.  You simply

 9    decided that as far as you're concerned it's not

10    relevant, it's not likely to lead to the discovery of

11    admissible evidence and so, therefore, you stonewalled

12    them for each and every one of these requests.

13            MR. SHAHEEN:  Your Honor, if you're talking

14    about the -- the search for financial information,

15    that's correct.  But if you're talking about discovery

16    generally that's not correct.

17            THE COURT:  But counsel, what I'm telling you

18    is, practically speaking, you don't have the right to

19    withhold discovery because you unilaterally decide that

20    it's not relevant, because then you've effectively taken

21    my job.  And, frankly, if you took my job I'd have

22    literally nothing to do.  So you can appreciate how

23    concerned I am about justifying my continued existence.

24            MR. SHAHEEN:  And I could not do your job half

25    as well, but Your Honor --

```
 1              THE COURT:  Well, that remains to be seen, I
 2     suppose.  But --
 3              MR. SHAHEEN:  But, Your Honor, may I say
 4     something?
 5              THE COURT:  Sure.
 6              MR. SHAHEEN:  Two points.  As you remember in
 7     April we were here in front of you --
 8              THE COURT:  Right.
 9              MR. SHAHEEN:  -- in an informal conference.
10              THE COURT:  Right.
11              MR. SHAHEEN:  In the proposal at that time we
12     were discussing, Mr. Bennington and I, about they
13     wanting to reach back to 2007, because we had given them
14     for 2011.  And we produced the pricing spreadsheets for
15     2011 for the 19 branded marketers and, you know,
16     thousands and thousands of documents.  And the
17     compromise that you proposed was, Why don't you guys get
18     together and work out some customers.  And you suggested
19     three.  You suggested you get -- pick one or two search
20     terms, find a counterparty.  You suggested discount, I
21     think, in pricing or something like that.
22              Mr. Bennington and I have been trying to work
23     out that issue.  But the motion to compel is not
24     directed to us not producing documents prior to 2007.
25     We're still trying to work -- pardon me, prior to 2011.
```

1    We're still trying to work that issue out.  And this

2    motion is just directed to the financials.  So, they're

3    not here complaining that we unilaterally determined

4    this.

5         And I would say, Your Honor, we asked a

6    discover response which was -- and their motion talks

7    about producing stuff with respect to all other

8    competitors.  One of our discovery responses was, "Tell

9    us all the stores that you contend compete with a

10   Western Convenience Store."  We got a spreadsheet, Your

11   Honor, which lists 940 stores that they contend are

12   competitors of Western convenience and to whom they

13   contend we supply gas.  But that's just a larger

14   picture.  The picture and the issue you raise, we're

15   still trying to work out.  And where we are with that --

16   and Ken can correct me if I'm wrong -- they've given us

17   eight companies.  I've said to Ken that's too many, the

18   judge suggested we narrow it.  I said, The more

19   important thing is the search terms.  And where --

20        THE COURT:  Guys, listen, I'm sorry to have to

21   say, I can't trust you to get any of this done in a

22   timely manner.  I'm not going to let you spend month

23   after month trying to negotiate some standard of

24   reasonableness.  I've lost confidence in your ability to

25   do that, to be perfectly honest with you.

1           People of -- people of goodwill, acting

2    reasonably and rationally, should have been able to

3    resolve this a long time ago.  And so unless there is

4    some clearly identified epiphany that you can point to

5    to suggesting that rationale and reasonable people will

6    suddenly materialize, I'm not going to wait any longer.

7    I'm just going to draconianly impose standards on

8    everybody, and nobody is going to particularly like it

9    and you'll just spend a lot of money.  I'm not going to

10   wait any more for you folks to be reasonable.

11          MR. SHAHEEN:  Your Honor, I think if you

12   turned to Mr. Bennington, he would agree with me that

13   Ken and I have worked together diligently.

14          THE COURT:  Guys, this is what you -- yes.

15   You told me when we were together last you were

16   working --

17          MR. SHAHEEN:  But, Your Honor --

18          THE COURT:  But the proof is in the pudding.

19          MR. SHAHEEN:  No, Your Honor, this is --

20          THE COURT:  Your ability to work together is

21   measured by the results that you achieve.

22          MR. SHAHEEN:  Your Honor, we're only here on

23   one issue and that's the financials.  Everything else in

24   terms of discovery, Ken and I have tried to work out.

25          THE COURT:  But -- but the financials to some

1    extent bear on this question.  It's a circular question,

2    counsel.  I'm not going to carve out -- in other words,

3    to the extent that there is relevant information about

4    sales to WCS competitors, we've got to get passed that.

5    So to say, judge, we're only here on a narrow issue

6    about financials, yes, that's true in one sense, but

7    they're financials that bear upon sales to competitors.

8    So we keep coming back to the same fundamental question.

9           So, don't tell me, Judge, this is a narrow

10   issue and we're continuing to work together on the other

11   stuff.  You can't carve it out that precisely.  The

12   question is what can I do in lieu of you two working

13   together productively to move this case forward.

14   Because, truly, I don't want this case to languish the

15   way it appears to be languishing.

16          And my problem is this.  My familiarity with

17   the Federal Rules of Civil Procedure do not allow any

18   party, plaintiff or defendant, to do what you

19   effectively did.  You produced nothing in response to

20   the challenged motion -- request.  You simply said, We

21   disagree with you and, therefore, we're giving you

22   nothing.  You don't have that right.

23          Now, if you had said, We think it is overbroad

24   to cover all of Colorado and all of Nebraska -- and I

25   think to some extent there's some justification for that

```
 1    position -- and so we will give you data for sales

 2    within 10 miles of WCS stores.  If you would just have

 3    arbitrarily said, We believe this much is reasonable and

 4    the remainder is unreasonable, and consistent with that

 5    understanding we will give you some stuff, that would

 6    have been a defensible position under the rules.

 7              MR. SHAHEEN:  Your Honor, the burden and the

 8    cost of all this is in the gathering.  It is not in the

 9    sorting.  That's expensive, but that's not the driver.

10              THE COURT:  But, counsel -- counsel,

11    Rule 26(c) says I can afford protection for undue

12    burden.  And to some extent the definition or the

13    measure of undue burden is a function of what is the

14    overall value of the case.

15              Now, if this case is potentially tens of

16    millions of dollars I will tell you, honestly -- I mean,

17    it's more than I make, but $168,000 in a case where

18    there's $17 million at stake doesn't seem to be

19    particularly disproportionate.

20              MR. SHAHEEN:  I'm not sure where you're

21    getting that figure, Your Honor.  I don't think this

22    case is worth anywhere near that.

23              THE COURT:  Well, I understand.

24              MR. SHAHEEN:  We disagree with that.

25              THE COURT:  I understand.  Then your position
```

 1   is highly circular because you say to me, Judge, they

 2   have a lousy case, we're ultimately going to win under

 3   that theory.  Spending $10 would be disproportionate.

 4         MR. SHAHEEN:  No, I'm not saying that at all,

 5   Your Honor.  What I'm saying is, in terms of the benefit

 6   of this information that they're requesting, the easy

 7   stuff, if you will, the stuff that had would cost 3600

 8   bucks, our position is it's not going to get you where

 9   you want to be.

10         THE COURT:  But, counsel, and you may

11   ultimately prove to be right, but the case law is very

12   clear.  You don't have a right to refuse to produce

13   information just because you as an advocate believe the

14   information will ultimately prove to be unhelpful to the

15   other side.  Because if that's all it took to avoid

16   discovery obligations, every party would always say

17   that.  And you and I both know that's not the standard.

18         MR. SHAHEEN:  I understand that, Your Honor.

19   But, again, as I said a moment ago the only basis for

20   them wanting the financials is a suspicion that we are

21   hiding discounts.  But there's no evidence to support

22   that.

23         THE COURT:  But, again, that becomes highly

24   circular.  What you're saying now is, not only do we

25   think that this is a dry hole, but we think they should

1    trust us when we tell them it's a dry hole.

2              MR. SHAHEEN:  No, Your Honor, I'm not saying

3    that at all.

4              THE COURT:  Well, no.  That's my frame --

5    no --

6              MR. SHAHEEN:  What I'm saying is --

7              THE COURT:  -- I wouldn't want to put words in

8    your mouth.

9              MR. SHAHEEN:  No.  As I -- Your Honor, as I

10   said a moment ago if they're coming in here saying we

11   have got evidence from third parties that there were

12   discounts you haven't disclosed to us, they're using our

13   own documents saying you've disclosed these discounts,

14   therefore there must be other discounts.  The logic --

15   that logic doesn't follow.  In fact, you're damned if

16   you do, damned if you don't.

17             THE COURT:  Well, no.  Basically what it means

18   is they asked for some information.  In response to

19   those requests you provided information.  Those

20   information -- the material that you provided they are

21   interpreting as suggesting that the word *discount*

22   subsumes a great deal of alternative methodologies to

23   achieve the same result.  That is, the purchase of fuel

24   at less than market price.

25             Now, whether you call it a rebate, or you call

1    it an often invoice discount, or you call it whatever

2    you want, what they're saying is the e-mails that you

3    produced suggest to them -- and I'm not making any

4    qualitative decision -- but suggests to them that this

5    was a practice more expansive than they originally

6    thought and they want to plum the depths of that theory.

7    And they are entitled under 26(b)(1) to conduct

8    discovery to obtain non-privileged information relevant

9    to a claim or defense, or they are entitled to discover

10   and obtain information that could lead to the discovery

11   of admissible evidence.

12          If you read the Advisory Committee Notes to

13   the 2006 amendment to 26(b)(1), the Advisory Committee

14   says, "subsumed within the scope of relevant information

15   is evidence that would fall under 404(b), other acts."

16   They are -- if you read the Advisory Committee Notes it

17   also suggests that "subsumed within the scope of

18   relevant information" is information that could go to

19   the credibility of a witness or witnesses.

20          And so what they are saying is, Judge, we

21   believe, 1) it is inappropriate to unilaterally limit

22   the discovery of information to 2011; 2) we believe that

23   this was a much broader practice than we originally

24   thought, and we want to conduct discovery to that

25   effect.

1          Now, see, you would have been -- or your

2    client would have been in a much stronger position if it

3    had said in response to, 3, 4, 5, 6, 7, 8, 9, We have

4    problems with 5 and 8 because that will require us to

5    reprogram our software, or reconfigure our software at

6    an expense of $168,000-plus.  We believe, therefore, 5

7    and 8 are disproportionately burdensome.  But as a

8    demonstration of our good faith, and consistent with our

9    obligations under Rule 33 and Rule 26, we will provide

10   responsive information as to 3, 4, 6, 7 and 9.

11         See, then your position with respect to 5 and

12   8 would be much stronger because then you would have

13   come to the court and you would have said, Judge, we in

14   a spirit of compliance with the rules tried to hue a

15   very clear line between information which was accessible

16   at minimal cost versus information which required

17   substantial IT investment.  And consistent with that

18   distinction we produced some, but we're objecting to the

19   two.  You didn't do that.  You simply said, virtually

20   with the same language, no, no, no.  That's not what the

21   rule contemplates.

22         And the difficulty that you've got is to some

23   extent the case law is very clear.  A boilerplate

24   objection is the functional equivalent of not objecting

25   -- is not answering at all.  That's what Rule 37(a)

1    says.  "An incomplete or evasive response is the

2    equivalent of not responding at all."  So what am I

3    supposed to do?

4             MR. SHAHEEN:  Well, in this case it's because

5    the same objection, overly broad, burdensome, and not

6    reasonably --

7             THE COURT:  But see the problem is --

8             MR. SHAHEEN:  It applies to every one of

9    those.

10            THE COURT:  But counsel, here's the difficulty

11   that you've got.  And all it takes is a little logic to

12   understand this one.  When you -- not you personally,

13   but when a lawyer objects to a discovery request as

14   overbroad, if you take off your adversary hat and just

15   think about it logically, when you object to something

16   as overbroad what you are implicitly saying, simply by

17   using the term *overbroad*, you are saying subsumed within

18   that overbroad request is a kernel of information which

19   is directly relevant.  Overbroad means covering more

20   than necessary.

21            Well, the flip side of an overbroad objection

22   is an implicit concession that some portion is relevant

23   and some portion is discoverable.  And that's why the

24   rule says you object to the extent it's objectionable

25   and you produce to the extent that it's not

1    objectionable.  The problem is you never got past

2    overbroad.

3            MR. SHAHEEN:  Well, yes, we got through the

4    unduly burdensome.  The problem is --

5            THE COURT:  But the problem is -- but, see,

6    the difficulty, counsel, is even there you've got a

7    problem.  Because what you're doing is you keep using

8    the same formulation, *unduly burdensome*.  But you

9    yourself have told me that it's only 5 and 8 that would

10   require 168,000-plus to be expended.  Three, 4, 6, 7,

11   and 9 aren't going to require 170 -- 168,000, but you've

12   used this same formulation for every one of these

13   responses.  You can't have it both ways.  Don't tell me

14   you can produce for something like $3400 and then try to

15   equate that with the expense of 168,000.

16           MR. SHAHEEN:  I'm not trying to do that.  What

17   I'm saying is what they want for 3,000, which we'll give

18   them --

19           THE COURT:  Don't say that because you should

20   have given it to them.  They shouldn't have had to move

21   to compel.

22           MR. SHAHEEN:  Well, Your Honor, when we met

23   and conferred this sort of dividing up the pie never was

24   discussed.

25           THE COURT:  But, guys --

1          MR. SHAHEEN:  It was all or nothing.

2          THE COURT:  -- it's not supposed to be.

3     You're both wrong.  And what's interesting is nobody in

4     any of the briefing pointed out your obligation, the

5     requesting party's obligation and the responding party's

6     obligations under 26(g).  Under 26(g) the party serving

7     discovery is certifying to the best of their knowledge,

8     information and believe after reasonable inquiry that

9     the discovery requests are consistent with the Federal

10    Rules of Civil Procedure and are proportionate to the

11    needs of the case.  That's what they're certifying.  And

12    I have some problems with their discovery.  But the

13    responding party is certifying in the exact same way.

14          You are certifying that your responses are

15    consistent with the rule.  You are certifying that your

16    responses are not intended to harass or delay.  And the

17    problem is is that every response you gave to the

18    request for production in dispute are undifferentiated

19    regurgitations of boilerplate.  How does that comply

20    with 26(g), counsel?  It doesn't.

21          MR. SHAHEEN:  Because the same objection

22    applied to every one of those, Your Honor.

23          THE COURT:  No, it doesn't because --

24          MR. SHAHEEN:  My mistake was --

25          THE COURT:  -- spending $3400 -- with all due

1    respect, spending $3400 to produce responsive discovery

2    does not bear any resemblance to spending $168,000.  And

3    nobody could plausibly argue otherwise.

4              MR. SHAHEEN:  I agree with that.  I agree with

5    that.

6              THE COURT:  So your protestation of undue

7    burden you've just admitted is unfounded for some of

8    these responses.

9              MR. SHAHEEN:  No, I'm not admitting that.  I'm

10   saying --

11             THE COURT:  Well, no.  Not in so many words,

12   but for all intensive purpose.

13             MR. SHAHEEN:  No.  Artfully done, but I'm not

14   admitting that, Your Honor.

15             THE COURT:  Well, at some point sometimes the

16   best thing to do is to make a tactical retreat.

17   Continuing to fight about something that's indefensible

18   is not a winning strategy in any board game I know or in

19   court.  You cannot tell me that it's unduly burdensome

20   if production is going to cost something on the order of

21   $3400.  Because the irony is -- I don't know how much

22   money your client has spent briefing these issues in

23   terms of attorney's fees, I don't know how much money

24   your client is going to spend to fly somebody out for

25   this oral argument, but I'll bet you when all is said

1    and done it's probably going to be more than $3400.

2              So, the irony is it may ultimately prove that

3    litigating this motion was more unduly burdensome than

4    anything else, certainly from the court's perspective.

5              Folks, both sides, you're missing the boat.

6    You are fighting about stuff that doesn't justify

7    fighting.  And you are putting the court in a very

8    difficult position.  Because if you continue to play

9    this way I'm going to have to impose draconian standards

10   that nobody is going to like.  And it's just going to

11   push you farther and farther down a path that doesn't

12   benefit anybody.

13             That's what I tried to convey the last time we

14   were together.  And apparently, my comments fell on deaf

15   ears on both sides of the courtroom.  This motion and

16   these responses and these discovery requests do not give

17   me much confidence that anybody is litigating in a

18   thoughtful, rational, pragmatic way.  And again, I'm not

19   wild about these discovery requests, but I'm certainly

20   not wild about the responses either.

21             I mean, counsel, have a seat.  And let's just

22   walk through this stuff in some rational order.  I've

23   got Request for Production 3, 4, 5, 6, 7, 8 and 9.  Now,

24   these to a very great extent seem to be duplicative.

25   So, tell me in a simple way how, for instance, 3 is

```
 1    different from 4, 4 is different from 5?  Why do we need
 2    all of these?  And don't tell me -- please do not tell
 3    me, "because I don't know what they have."  That's not a
 4    justification under 26(g), so you're going to have to do
 5    better than that.
 6             MS. CRAIGMILE:  Can I go to the podium on
 7    (unintelligible).
 8             THE COURT:  Sure.  Sure.
 9             MS. CRAIGMILE:  All right, Your Honor.  I can
10    certainly go through these in order.  Request No. 3
11    seeks the basic financial statements of the company.
12    Whether -- the audited financial statements if they
13    exist.  Financial statements were --
14             THE COURT:  Yeah, but -- but here's my
15    question.  You say, "produce all Suncor financial
16    statements with pertinent timeframe, including but not
17    limited to."  That's a terrible formulation.  I mean, I
18    don't know how Suncor maintains financial statements.  I
19    don't know if they do consolidated financial statements
20    for a number of entities or if they do financial
21    statements for a specific refinery.  But when you say
22    "produce all Suncor financial statements going back to
23    2007, including but not limited to, financial statements
24    referring to or containing data regarding Suncor's fuel
25    sales in Colorado and Nebraska to WCS" that's overbroad.
```

1          MS. CRAIGMILE:  We defined financial

2     statements, Your Honor, under definition 10 as monthly,

3     quarterly or annual financial statements.  Suncor in

4     Mr. Connors' affidavit indicated, I believe, that there

5     are only audit -- unaudited annual financial statements,

6     so that would be five financial statements; all balance

7     sheets, profit and loss statements and cash flow

8     statements.  That was defined.  He's indicated --

9          THE COURT:  But for an entire corporation.

10     How is that going to show fuel sales to Phillips in 2008

11     on a general corporate balance sheet, folks?

12          MS. CRAIGMILE:  What that can show to

13     Ms. Betzer when she has accounting documents, whether

14     accounts add up.  Those are the basic statements --

15          THE COURT:  But counsel --

16          MS. CRAIGMILE:  -- she needs to as a --

17          THE COURT:  No.

18          MS. CRAIGMILE:  -- check and balance.

19          THE COURT:  What she claims she needs as an

20     expert is not binding on me.

21          MS. CRAIGMILE:  I understand.

22          THE COURT:  Well, I don't know that you do.

23     I've looked at her affidavit.  I didn't find her

24     affidavit particularly helpful at all from the standard

25     of proportionality under the Federal Rules of Civil

1    Procedure.  The fact that she as an accountant would

2    love to see this stuff is of no moment to me.

3          MS. CRAIGMILE:  In response to your argument

4    about proportionality, and it is well taken, the

5    accounting statements that we are seeking have been

6    limited.  We've sought basic accounting statements for

7    all of the Suncor USA operations to the extent they

8    exist, to the extent we've defined them.  The others are

9    listed -- limited by customers that they identified in

10   response to their Interrogatory No. 1.

11         Why we believe that we're doing this in the

12   perspective required by the federal rules is that we've

13   got, now, a growing pile of discrete e-mail documents.

14   And Mr. Shaheen has talked about doing keyword requests

15   where we can search for earlier years of e-mails and

16   other documents that refer to discounts and rebates.

17   What the accounting documents will do, Your Honor, is

18   create perspective in this case, because they can

19   aggregate the economic effect of discounts, price

20   rebates, in addition to disclosing whether they occur.

21   Nobody is going to be in good shape if we go to trial in

22   front of Judge Krieger with a growing pile of e-mails

23   and hand e-mails to witnesses where we --

24         THE COURT:  But, counsel, when you -- I mean,

25   I don't know how Suncor does it's financials.  I don't

1    know if they do consolidated for the entire corporation.

2    But when you say, Produce all Suncor financial

3    statements going back to 2000 -- that is patently

4    overbroad.  It is absolutely overbroad.  And Rule

5    26(g) -- if you read the Advisory Committee Notes to

6    26(g), 26(g) requires lawyers to stop and think before

7    they serve discovery requests.  I don't see any evidence

8    of stopping and thinking when you say, I want all Suncor

9    financial statements going back to 2007.

10            MS. CRAIGMILE:  I --

11            THE COURT:  Because that would include

12    financial statements for sales by Suncor in states other

13    than Colorado and Nebraska, and those are wholly

14    irrelevant.

15            MS. CRAIGMILE:  Well, Your Honor, if the

16    company doesn't keep financial statements that are

17    reflective of individual customers we have to start out

18    with the basic documents so -- to --

19            THE COURT:  No, no.  Counsel, no.  What you do

20    is you serve an interrogatory and you say, "What

21    documents do you maintain that reflect sales to the

22    following entities and the following states?"  You ask

23    them to identify those types of documents, then you

24    serve a request for production that says, "Having

25    identified those types of documents, now produce them."

 1          Now, the advantage of that is, 1) it complies

 2     with your obligations under 26(g) to frame proper

 3     discovery requests and, more importantly, once you know

 4     what they keep and what they call them it minimizes

 5     their ability to object.  But, truly, when you say --

 6     when you say "produce all Suncor financial statements"

 7     you've got to know somebody would have immediately

 8     realized this is overbroad, and it is a formulation

 9     which is inviting an objection.  This is tantamount to

10     shooting a flare in the sky and saying, Please object.

11     Why would you set yourself up for that?  This is clearly

12     a self-inflicted wound.

13          MS. CRAIGMILE:  Well, one possible response is

14     we have a limited number of interrogatories and a

15     limited number of document requests.

16          THE COURT:  I would -- and I -- the problem is

17     I only have a limited number of years left in my life.

18     I don't really want to wrestle with this.

19          MS. CRAIGMILE:  I think that we wanted to get

20     the issues resolved in an --

21          THE COURT:  I mean, if the choice of me living

22     a meaningful life or giving you more interrogatories, I

23     will give you more interrogatories at the drop of a hat.

24     I'm not going live long enough to resolve some of these

25     discovery disputes.

1    MS. CRAIGMILE:  But our issue is whether

2  Suncor -- Suncor -- can we go on to chart of accounts.

3    THE COURT:  Sure.  Yeah, we've exhausted --

4    MS. CRAIGMILE:  It's not a burdensome

5  document.

6    THE COURT:  -- all the fun on this one.  Go

7  ahead.

8    MS. CRAIGMILE:  It's a -- chart of accounts is

9  a very basic document that reflects how Suncor does its

10  accounting.  They've not asserted any burden associated

11  with that.  That's a document that can generally be

12  printed out of --

13    THE COURT:  Sure, they did.  I'm looking at

14  it.  Suncor --

15    MS. CRAIGMILE:  Well --

16    THE COURT:  -- objects to this request as

17  overly broad and unduly burdensome.

18    MS. CRAIGMILE:  I misspoke.  They didn't

19  assert any burden in response to the motion to compel.

20  They conceded that there was no burden associated with

21  that request.

22    THE COURT:  Well -- but I guess my sense

23  though is, again, if -- the only charts of account that

24  could remotely be relevant are charts of accounts

25  dealing with Colorado and Nebraska.  That's not what you

1    asked for.  You said, "Please produce all charts of

2    account used by Suncor during the pertinent time

3    period," geographic limitations of no moment.  Don't do

4    that if you want the court to give serious consideration

5    to a motion to compel.  Because the reality, folks, is,

6    if you move to compel I cannot look at their responses

7    in isolation.  When you move to compel you are moving to

8    compel answers to the request for production as they

9    were drafted.

10             MS. CRAIGMILE:  I understand, Your Honor.  And

11   I can represent to you --

12             THE COURT:  And some of these are

13   indefensible.

14             MS. CRAIGMILE:  I can represent to you that

15   Mr. Bennington and I and Mr. Aldridge sat down with

16   Ms. Betzer before these were served and purposefully

17   narrowed them to this point.

18             THE COURT:  How is this narrowed?  Because,

19   see, the problem is -- counsel, don't tell me you

20   narrowed this when No. 4 says, "Produce all charts of

21   account used by Suncor during the pertinent timeframe,

22   including but not limited to..."  That's -- there's no

23   word of limitation in there at all.  Don't tell me you

24   limited this when the phrase is *including but not*

25   *limited to*.

1          MR. BENNINGTON:  May I, Your Honor?

2          THE COURT:  Sure.

3          MR. BENNINGTON:  The chart of accounts is a --

4     is a catalog.  It is a dictionary.  And we would have

5     inflicted more work on them if we'd have said limit it

6     this way and this way and this way.  We were choosing

7     the easy way out, telling them you don't have to sort

8     through the damn thing to figure out what you have to

9     produce and what you don't.  I'll take that burden on

10    and leave -- and just let me step in.

11          THE COURT:  But see my point though is, again,

12    folks you've got to think about this tactically.  You

13    would have actually been better off if you had drafted

14    it the way I'm proposing.  If you had said, Give us the

15    charts of accounts for the following customers and

16    states, then if they screamed bloody murder you would

17    have said, judge, this is absolutely relevant.  We

18    drafted it this way to seek only relevant stuff.  And if

19    they're complaining because it's too much trouble to

20    parse through to identify particular states, then you,

21    judge, make them give us everything.

22          MS. CRAIGMILE:  Your Honor, we can't --

23          THE COURT:  The irony is, that approach,

24    Mr. Bennington, would have actually put them in a box.

25          MS. CRAIGMILE:  In some ways we can't do that

1    because the accounts, as Ms. Betzer has explained to us

2    and attempted to explain in her affidavit, there could

3    be an account for a customer.  There could be an account

4    for discount.  There could be accounts for rebates.  And

5    we need that -- to see the chart of accounts to even

6    ask --

7              THE COURT:  But -- then --

8              MS. CRAIGMILE:  -- to narrow the requests.

9              THE COURT:  Then, frankly, I would have done

10   this in a completely different way.  I would have served

11   interrogatories or I would have taken a 30(b)(6)

12   deposition.  But I, frankly, do not find your expert's

13   affidavit to be particularly persuasive.  Because a

14   fishing expedition or an undifferentiated wish list is

15   no less of a wish list because it's sought by an expert.

16             The fact that you are seeking information --

17   we don't have a separate set of discovery rules for what

18   experts would like.  I don't have a separate Rule

19   26(b)(1) for experts.  26(b)(1) says that you're

20   entitled to relevant, non-privileged information.

21   You -- not your expert -- you are bound by 26(g) and I'm

22   independently bound by 26(b)(2)(C).  And I cannot

23   advocate my responsibilities just because your expert

24   says, Gee, I really would like to see it.  It's not the

25   way it works.  It's just not the way it works.  And

1   these are overbroad.

2          MS. CRAIGMILE:  Are there particular requests

3   that you'd like to discuss?

4          THE COURT:  Well, I don't know that there are

5   any that I would like to discuss.  I mean, the problem

6   that I've got is if you came to me and said, Look,

7   judge, we think with, you know, the requests that we are

8   seeking in 4 and 5, or 6 and 8 would let us -- in other

9   words, if we get the stuff we want that's responsive to

10  5 and 7, that may be all that we need.

11          Now, we're not pro -- we're not precluding the

12  possibility of coming back, but rather than just asking

13  for a whole bunch of stuff, we intend to pursue

14  discovery in a measured, phased, rational way.  That's

15  what I have consistently tried to get the parties to do.

16  And you can appreciate my frustration when I'm trying to

17  get everybody to focus on measured, reasonable

18  discovery, and then I get a motion to compel that

19  involves three, four, five, six, seven, eight, nine --

20  seven different requests seeking seven different types

21  of financial records, all with the same basic

22  formulation, "produce all, including but not limited

23  to."

24          It doesn't suggest that anybody is approaching

25  discovery in a particularly thoughtful manner in terms

1    of requesting stuff.  And then I see their boilerplate

2    responses and I conclude that they're being equally

3    unthoughtful in their responses.  And so I'm trying to

4    figure out how I can save you folks from yourselves.

5             MR. BENNINGTON:  Again, may I, Your Honor.

6    Look at 5.  Produced all -- "produce all adjusting,

7    reversing and closing journal entries during the

8    pertinent timeframe referring to or --

9             THE COURT:  Right.

10            MR. BENNINGTON:  -- data regarding."

11            THE COURT:  Right.

12            MR. BENNINGTON:  They didn't respond.

13            THE COURT:  No, they didn't.  Because that's

14   the one that they say it's going to cost them $168,000

15   to do the software fix so they can pull the information

16   from their system.  But you would have been much -- see,

17   in other words, here's the problem, folks, that you --

18   you're killing yourselves.  In other words, you're

19   saying, Judge, look at 5.  You would be in a much

20   stronger position with respect to 5 if you hadn't asked

21   for the other stuff.  Because one way that I can solve

22   this problem is I grant their motion -- I deny your

23   motion with respect to 5 and 8, and you get the others.

24            Well, if you tell me, you know, judge, I don't

25   really care about 3 and 4, it's 5 I really want, you'd

1    have been in a much stronger position if you'd simply

2    come in and said, judge, we need 5.  But to some extent

3    you're killing yourself.  Because one way that I can

4    solve this problem is I could say, you -- I'm not going

5    to require them to produce 5.  I'm not going to require

6    them to respond to 8.  You get the other stuff.  The

7    very nature of how you drafted these requests may prove

8    to be in your own doing.

9              MR. BENNINGTON:  Am I not -- am I mistaken to

10   say as to 3 and 4, financial statements and charts of

11   accounts in their responsive pleading, they have

12   conceded they could produce that?

13             THE COURT:  That's my impression.  I mean,

14   they basically --

15             MR. BENNINGTON:  All right.

16             MS. CRAIGMILE:  As well as 6, 7 and 10.

17             MR. BENNINGTON:  My point is, apparently those

18   weren't drafted that badly because they, having looked

19   at it and realizing they had to come in here and have a

20   happy afternoon with you, decided, well, maybe we better

21   concede on those.

22             THE COURT:  Okay.  So what if I just grant

23   your motion with respect to 3, 4, 6, 7 and 9?

24             MR. BENNINGTON:  It won't do us any good

25   because we can't get into the real stuff, which is

1    buried in whatever they won't produce in 5.

2           THE COURT:  So the bottom line is -- but if

3    you get everything you want with respect to 5, do you

4    need the others?

5           MR. BENNINGTON:  I --

6           THE COURT:  And don't tell me this is what

7    your expert would like.  I've already told you I don't

8    take any solace in what --

9           MR. BENNINGTON:  I'm not telling you that.

10          THE COURT:  -- your expert would like.

11          MR. BENNINGTON:  I promise you, I'm not going

12   to say that.

13          THE COURT:  Good.

14          MR. BENNINGTON:  I'm calling on my old college

15   accounting.

16          THE COURT:  Oh, I don't -- didn't even have

17   college accounting.

18          MR. BENNINGTON:  And some since then, and I

19   know that you can't look at adjusting, reversing, and

20   closing journal entries without having a chart of

21   accounts to see what the numbers mean.  Because the

22   computer system, like SAP, it's all in code.  It's

23   numbers.  You can't tell -- for instance, if you find a

24   Code No. 123, you don't know if that's a Kroger code and

25   if Kroger is set up in their books as a vendor and

 1    suddenly money is traveling back to Kroger.  That's what

 2    we're looking for.  And you've got to have the chart of

 3    accounts and you have to have the basic accounting

 4    information in 5 to figure that out.

 5            MS. CRAIGMILE:  Your Honor, I'd add that

 6    Ms. Betzer has also agreed that she could narrow the

 7    responsive information to Request for Production No. 8

 8    if necessary to only an initial review of all detailed

 9    transactions posted to the accounts receivable and

10    accounts payable journals for the selected customers as

11    opposed to all journals -- and those are generally very

12    basic journals -- would likely provide her with the

13    information that she needs.  Presuming that she could

14    also see the other accounts, she could see how those

15    transactions were handled on both a credit and debit

16    basis.

17            THE COURT:  Let me ask somebody with Suncor.

18    With respect to No. 5 when you tell me it's going to

19    cost you $168,000, walk me through what that would

20    entail.

21            MR. SHAHEEN:  Your Honor, I would be much more

22    comfortable -- I have Mr. Connor right here, to have him

23    answer that for you as opposed to me perhaps bollixing

24    it up.  But what I understand he has to do -- and

25    Mr. Connor built the system that they use there today,

1    in addition to building three other systems.  What he

2    says is I would have to build this.  I would have to get

3    an IT analyst to come in -- a processor and an analyst.

4    The analyst would tell the processor what to do -- if I

5    got this right -- they have to extract all the data and

6    put it into a format that they can print it out in a

7    journal entry.  Do I have that right, Mark?

8              MR. CONNOR:  That is correct.

9              THE COURT:  Well, what if -- but my question

10   is what if I simply said data regarding, for instance,

11   W -- if I limit it to WCS, Kroger, Phillips, Shell would

12   that still cost $168,000?

13             MR. SHAHEEN:  The problem, as I understand

14   it -- and, again, Mark's right there, Your Honor -- is

15   it is not -- while it's burdensome -- it's more

16   expensive to have to go -- you know, the more companies.

17   The big dollar ticket is not the identifying the

18   companies it's gathering the universe of data in the

19   first place and then doing the sort.  Do I have that

20   right?

21             MR. CONNOR:  You do.

22             THE COURT:  I've got to tell --

23             MR. SHAHEEN:  That's what the issue is.

24             THE COURT:  -- you guys, $168,000 isn't -- in

25   this day and age of electronically stored information, I

1    have firsthand information and experience with far worse

2    cases.

3              MR. SHAHEEN:  And, Your Honor, that's not --

4    162 is for 5 and 8.  It's not just for 5.  So you can --

5              THE COURT:  Okay.

6              MR. SHAHEEN:  You can divide that in half for

7    5 to be fair.  I mean, that's -- because he allocated --

8    what he figured out -- as he said in his report or his

9    affidavit/declaration was it would take 30 business

10   days, eight-hour days, two people working five days a

11   week to do -- to create the system, build a system to

12   respond to 5.  It would take 30 more business days to

13   rebuild a system to respond to 8.  And then for 9 it

14   would only take 15 because we have some of that data

15   already.  We'd only have to build half of the system.

16             And where he gets the prices from, Your Honor,

17   is in terms of when they built the system in the first

18   place they used -- they had to do it this way, they had

19   processors and analysts.  So he's got a rough

20   understanding of what the cost is if he can find these

21   people here in the United States.

22             And the other problem we've got is the current

23   SAP system only goes back to 2008.  2007, as I've told

24   them before, is on an older system, a legacy system.

25   They would have to rebuild that system to extract the

1    data.

2            THE COURT:  And that's why I have a problem

3    philosophically with going back to 2007.  Because the

4    fact of the matter is, if Suncor was inappropriately

5    playing with prices, if you can demonstrate that they

6    were engaged in this pricing behavior in 2009, 2010,

7    2011.

8            MR. BENNINGTON:  We agree.

9            THE COURT:  As a practical matter, that --

10   that evidence establishes a pattern and practice.

11           MR. BENNINGTON:  We've had that conversation.

12   I'm not -- we're not seeking to push back to 2007.  We

13   understand --

14           THE COURT:  Well, then why did you draft

15   discovery requests that include it.

16           MR. BENNINGTON:  Well, we found out

17   afterwards.

18           THE COURT:  (Unintelligible.)

19           MR. BENNINGTON:  But, we -- Tony and I are

20   clear that 2007 is not the issue.

21           THE COURT:  I wouldn't even say 2008.  It

22   seems to me if you -- if you can't demonstrate

23   inappropriate pricing behavior for a period of, say,

24   three years back, you don't have a case.

25           MR. BENNINGTON:  Okay.  That's '11, '10, and

1    '9.

2              THE COURT:  Right.

3              MR. BENNINGTON:  And so we're talking about --

4              THE COURT:  So how much is it --

5              MR. BENNINGTON:  -- one more year.

6              THE COURT:  How much is it going to cost you

7    to go back three years?  See, the problem, guys, is -- I

8    mean, here's the reality.  I will tell you, I -- I tend

9    to view these cost estimates with a fair degree of

10   scepticism.  And so, when somebody tells me, judge, it's

11   going to take me 30 days to do this at a cost of

12   $168,000, I'm not always convinced.  Now, if we go back

13   and we say, pull up data going back three years in

14   response to No. 5, what's that likely going to cost?

15   Three years, No. 5.

16             MR. CONNOR:  It would not change it

17   materially, but again the issue is is the format.

18             MR. SHAHEEN:  You probably heard him, Your

19   Honor.  What he said was it wouldn't change it

20   materially, the issue is the format.  The gathering of

21   the -- is that right?

22             MR. CONNOR:  Yes, it is.

23             THE COURT:  Yeah, I will tell you, to be

24   perfectly honest with you, I -- I think the discovery

25   requests are overbroad.  My sense is for me to say,

1    categorically, this information is not discoverable

2    simply because it may cost money to retrieve it, that's

3    not a reason to deny discovery.  Now, that may be a

4    justification to shift costs.  It's not a reason to deny

5    discovery.  And it is certainly -- the fact that you

6    have to retrieve information or do a software fix with

7    respect to 5 and 8 was never a justification for not

8    responding to the others.  That's just not an acceptable

9    way to deal with discovery.

10          And what you're telling me with respect to

11   some of these requests, you could have produced the

12   information.  You might not believe that it's relevant.

13   You might ultimately find or prove that it's not much to

14   do about anything.  But to simply say in response to

15   No. 3 it's overly broad, it's unduly burdensome, and now

16   I find out it's not particularly unduly burdensome,

17   fundamentally what it seems to me your position with

18   respect to some of these requests is, Judge, we just

19   don't think it's relevant and, therefore, we shouldn't

20   have to produce.  That is not consistent with the

21   Federal Rules of Civil Procedure.

22          And you -- the cost that you're going to spend

23   to deal with 5 you can't bootstrap those costs to

24   protect, for instance, 3 and 4.  What's it going to cost

25   to produce the documents relevant to No. 3 or responsive

1    to No. 3?

2              MR. SHAHEEN:  Your Honor, I couldn't say, but

3    we know this.  It's going to be less than $4,000 to

4    produce all of them except for 5, 8, and 9.  It was

5    $3600 was the estimate.  So if the big ticket numbers

6    were 5, 8 and 9, Your Honor, that came into the 75

7    business days; that got to the 165,000.  I think -- I'm

8    speaking from memory, but I know I'm close, the

9    remainder was 3690.  Something like that.

10             THE COURT:  But Mr. -- honestly, though,

11   here's -- this is -- this is where I become frustrated.

12   You're discovery responses were served on or about

13   April 2nd.  If you're telling me that the only expense

14   really related to 5 and 8, it is now June 25.  We are

15   getting close to two months after these discovery

16   responses.  And it now appears, at least with respect to

17   a number of these categories, it's not unduly burdensome

18   at all.  I mean, I -- I don't see how that's a

19   defensible position under the Federal Rules of Civil

20   Procedure and the applicable case law.  I don't see how,

21   for instance, the response to 3, 4, 6, 7 and 9 is

22   defensible if you're telling me there really is no undue

23   burden.

24             MR. SHAHEEN:  And, Your Honor, I accept that.

25   I'm not going to argue that point any further.  But the

 1    point that shouldn't be lost is when you ask, Would you

 2    be willing to accept just those?  The answer was, No, we

 3    need -- still need 5 and 8.  So we'd still be back here

 4    fighting about these --

 5            THE COURT:  That may be, but you'd be in a

 6    much stronger -- because --

 7            MR. SHAHEEN:  I understand that, Your Honor.

 8            THE COURT:  See, the problem -- the problem is

 9    to some extent, counsel, here's where I'm in a bind.

10    Because the same parties who claim that responding to 3

11    and 4 would be unduly burdensome are now telling me,

12    Trust us, judge, when we say that responding to No. 5 is

13    going to cost us $168,000.  Given your client's approach

14    to discovery, you can appreciate my degree of trust is

15    really not there.

16            So in other words, what you're telling me is,

17    Judge, now that you've demonstrated that our response to

18    a number of these requests was not consistent with the

19    Federal Rules of Civil Procedure, trust me when I tell

20    you it's going to cost $168,000.  You haven't given me

21    much of a track record on which to base that trust.

22            MR. SHAHEEN:  No, Your Honor, but I can give

23    you an alternative, I think.  And that was the

24    alternative Mr. Bennington suggested, I believe in the

25    reply.  And that was, Okay, let Mr. Horowitz supervise

1     the building, and make sure the expenses and the time

2     are legitimate.  So, when we're talking about, perhaps,

3     shifting costs, and I emphasize the word perhaps, so if

4     there's a concern that our estimate is too high then I

5     accept the solution that Ken composed.  Let Mr. Horowitz

6     make sure and monitor --

7               THE COURT:  No, it seems to me --

8               MR. SHAHEEN:   -- the building.

9               THE COURT:  No.  I think the better course of

10    action is me ordering you to produce.  Once you produce

11    and once you have invoices demonstrating the degree of

12    burden, then you're certainly free to file a motion

13    asking me to shift costs.  But I don't -- because the

14    problem I've got is given the track record I don't want

15    to be in a situation where I issue any order that

16    requires you all to cooperate.  My attitude would be you

17    produce.  Once you produce and establish whatever costs

18    they are then you're free, consistent with prevailing

19    case law, to file a motion seeking to shift costs.  And

20    if your motion is well-founded I will not hesitate to

21    grant it.

22               But right now I want to get this process

23    going.  I don't want to be in a situation where I do

24    anything to slow this process down.  And if I enter an

25    order saying a plaintiffs' representative will

1    collaborate with a defense representative to put all

2    this together, I'm just creating the basis for the next

3    motion to fight.

4              So I'm going to tell you, get it done.  Spend

5    whatever to have to spend.  And to the extent that you

6    believe that the costs are disproportionate to the needs

7    of the case, certainly under Rule 26(c) and/or

8    26(b)(2)(c) you are free to file a motion seeking a

9    shifting of costs.

10             But, guys, I'm not going to slow this process

11   down.  And honestly, given how you responded to some of

12   these discovery requests, I am loathe to adopt a ruling

13   which depends upon any of degree of trust.  Because

14   you're not in a strong position, not when it turns out

15   that some of these requests are not unduly burdensome at

16   all.

17             So, the problem that I've got though is still,

18   I'm really not inclined -- and you've got to help me,

19   here.  No. 3, a request to produce all Suncor financial

20   statements.  I don't see -- I think that is patently

21   overbroad.  Because Suncor financial statements will

22   include a raft of information that is not germane to

23   this lawsuit in any shape, fashion or form.  It will

24   include personnel costs.  It will include depreciation.

25   It will include you-name-it, and none of that is

1    relevant.  But that's what you would have me order them

2    to produce.  I'm not going to do that.  Your expert's

3    wish list notwithstanding.

4           MR. BENNINGTON:  Even though they conceded

5    they're ready to produce it for 3,000 --

6           THE COURT:  I have an independent -- counsel,

7    you had an obligation to draft proper requests.  I have

8    an independent obligation under 26(b)(2)(C) to limit

9    discovery.  The rule says I must limit discovery to the

10   extent that the discovery is disproportionate to the

11   needs of the case.

12          MR. BENNINGTON:  And is that true though if --

13   if fine tuning this, making it more specific creates a

14   greater burden?  Because that's what it does.  What

15   we're talking about are financial statements and reports

16   that any -- a large corporation is going to have in the

17   can.  And by picking and choosing I'm making it tougher

18   on them.  That's why we did it this way, judge.  It

19   wasn't a blind, well, we'll just ask for all it.

20          And another thing, we all know that we're only

21   asking for Colorado operations, and the Nebraska --

22          THE COURT:  But that's not what --

23          MR. BENNINGTON:  -- panhandle.

24          THE COURT:  That's not true.  That is patently

25   not true.  If you had said, Please produce all financial

1    statements for Colorado operation -- but don't tell me,

2    judge, all we're asking for is Colorado stuff, that's

3    not what these requests say.

4           MR. BENNINGTON:  I suggest Mr. -- Mr. Shaheen

5    will concede that that's what we've been assuming,

6    working on.  Fair enough.  It's not properly drafted in

7    that sense, but the parties know better.  We know what

8    we're looking for is Colorado and the Nebraska

9    panhandle.  Nothing else.  And frankly, that is

10   virtually all of Suncor USA's business.

11          THE COURT:  I guess.  But, guys, this is not a

12   good use of the court's time.  And my honest assessment

13   is I should impose sanctions against both sides under

14   26(g).  This is not a good use of this court's time to

15   parse through discovery requests that are overbroad and

16   discovery responses which are patently deficient, and

17   then somebody tell me, Well, judge, Mr. Shaheen and I

18   know what we really want.

19          Because if you really knew what you wanted, if

20   you were really prepared to act in that fashion, there

21   would be no need for this motion.  And so the fact of

22   the -- the fact that it was drafted this way, and the

23   fact that the responses were drafted this way suggest

24   that you're not doing a particularly good job of

25   communicating what you both understand you both really

1    want.  And the court is at the mercy of what now appears

2    to be inappropriate litigation behavior.

3              MR. BENNINGTON:  I suggest when you -- when

4    you make that decision on sanctions you take into

5    account that they conceded that those requests were

6    not --

7              THE COURT:  I'm not -- I will tell you, folks,

8    I'm not imposing sanctions.  Because for me to impose

9    sanctions against them requires me to split hairs that

10   I'm not prepared to do.  For me to impose sanctions on

11   them I am implicitly endorsing these discovery requests.

12             MR. BENNINGTON:  I'm talking about the

13   sanctions on me.

14             THE COURT:  And I will not do that.

15             MR. BENNINGTON:  That's what I was talking

16   about.  Not --

17             THE COURT:  Well, I know, but for me --

18             MR. BENNINGTON:  -- trying to save them.

19             THE COURT:  I'm not going to impose sanctions

20   on you because that implicitly accepts their

21   inappropriate behavior.  I'm inclined to sanction both

22   of you on the grounds that the court is aggrieved.

23   Because I'm the only person in this room, folks, that's

24   not billing on an hourly basis.  And I have spent the

25   lyon's share of several hours parsing through all of

1     this.

2            So, here's what I'm going to do.  I am going

3     to grant motion -- plaintiff's motion to compel, 52.  I

4     am granting Document 52 in part and I am denying it in

5     part.  I am granting the motion, and I will require

6     defendant to produce responses or produce responsive

7     documents to Request for Production 3, 4, 6, 7 and 9.

8     Those documents must be produced within two weeks of

9     today's date.  I am granting the motion with respect to

10    documents responsive to 5 and 8.  Those documents must

11    be produced within 45 days of today's date.

12            With respect to responsive documents, and the

13    costs incurred in finding responsive documents to 5 and

14    8, I'm granting the motion without prejudice to Suncor's

15    right to file a motion under 26(b)(2)(C) seeking a

16    shifting of costs incurred in producing those responsive

17    documents.  I will not entertain a cost-shifting motion

18    for anything save 5 and 8.  But I will allow -- and I'm

19    not saying I'm going to grant cost shifting, so I don't

20    want to leave anybody with that impression, but I will

21    allow Suncor to file a motion at least raising the issue

22    of the cost shifting as it relates to 5 and 8.

23            Now, I am not going to require that Suncor

24    produce any documents going back any earlier than

25    January 1, 2009, because if you guys can't make your

1    price discrimination theory based upon that relevant

2    time period you're whistling through a graveyard.

3            So, I am -- finally, I am not granting the

4    motion to compel to the extent that it seeks an award of

5    sanctions for the reasons stated.  Because I do believe

6    these discovery requests are overbroad, and I believe

7    the discovery responses were patently deficient.  I do

8    not find that either the requests or the responses fully

9    complied with counsel's obligations under 26(g).  And

10   for me to award sanctions under 37(a)(5) I would

11   implicitly be endorsing discovery practices that I don't

12   believe are consistent with the rules.  And so for that

13   reason I will leave the parties where I find them in

14   terms of costs.  But I will go ahead and grant

15   Document 52, subject to those limitations.

16           Now, that brings us to the next motion, which

17   is Document 59.  This is plaintiff's motion challenging

18   defendant's designation of certain documents and data as

19   highly confidential.  I've read this motion and the

20   response and the reply, and I will entertain any

21   additional argument that anybody wants to make.

22           MR. BLEDSOE:  Thank you, Your Honor.  I think

23   sometimes it's easy to maybe overly complicate things in

24   the discovery process.

25           THE COURT:  Okay.

1              MR. BLEDSOE:  And I think this issue here is,

2    perhaps, one example of that.  So if we would step back

3    and look at a couple of the basics in terms of what's at

4    stake here, we have a category of documents of the,

5    approximately, 5,000 that have been produced to date.  I

6    believe something in the range of 800 have been marked

7    as highly confidential, attorneys' eyes only under the

8    existing protective order.

9              We are -- we have challenged that designation

10   in terms of the appropriateness of highly confidential,

11   attorneys' eyes only as to Mr. Taraghi, one employee of

12   the plaintiff here and the principal of the plaintiff in

13   this case.  There isn't any dispute that the material

14   that's been designated to date is relevant, and so,

15   therefore, unless it comes under the -- the definition

16   under the protective order here, there shouldn't be any

17   basis for it to be considered highly confidential.  We

18   don't have a dispute about confidential in -- in

19   particular.  There's been an undertaking for any

20   document designated as confidential.  The issue here is

21   a restricted access that prevents only a single

22   representative of the client, the plaintiff in this

23   case, from reviewing this material.

24             The experts, outside counsel, myself,

25   everybody can review it except one person.  And the

1    basis for that, theoretically, under their

2    designation -- and they have the burden for the

3    designation in the first place under the protective

4    order, Your Honor -- is that it is supposedly so highly,

5    extremely sensitive information, which the disclosure

6    could cause a substantial competitive or business

7    injury.

8            Now, frankly, there's not an awful lot of

9    difference between the definition for *highly*

10   *confidential* and *confidential* in the protective order

11   here.  But I think it's important to note a couple of

12   things.  First, this is historical data because we are

13   not seeking data that is any more current under this

14   particular challenge to the designation than June of

15   '11, June 30th of '11 -- or actually May 30, June 1 of

16   '11.  So over a year old.

17           And the information here, of course, does

18   restrict or does deal with pricing spreadsheets, price

19   discounts, pricing and discounts, purchase and sale

20   confirmations that we believe are plainly relevant here

21   and really not disputed as relevant.  And the only issue

22   is, is there some substantial likelihood of harm that

23   will come if Mr. Taraghi has the opportunity to assist

24   his counsel in the prosecution of this claim.  We don't

25   believe that they've met that burden, which is their

1   burden in the first instance to show that there is any

2   likelihood of -- of a burden.

3          Now, if you read their -- which I know the

4   court has -- as you read the affidavit or declaration

5   that's been provided in their -- in their discussion of

6   this potential harm there's really nothing specific

7   that's articulated at all other than this generalized

8   notion that there could be a competitive disadvantage

9   that would occur based on this pricing information.  But

10  since this information, since this date that we've

11  talked about, June 1st, 2011, there have been 365-plus

12  pricing decisions made by Suncor at its rack in terms of

13  the gasoline and/or diesel fuel that it sells from that

14  refinery.  So this is dated information.

15         And there's never been any articulated real

16  reason about why it could legitimately be considered to

17  be potentially, substantially harmful to Suncor because

18  there is, in fact, a confidentiality requirement already

19  that Mr. Taraghi has undertaken in terms of the

20  designation of confidential data in this case.  And

21  that's all we're asking it to be returned to is to be

22  considered *confidential* not *highly confidential*, and

23  that we believe that that standard is well met.

24         And there is, we believe, a case cited to the

25  court that is very much on point and that's *Arvco*

1    *Container versus Weyerhaeuser*, a Robinson-Patman case

2    from 2009, I believe.  So it is of relatively recent --

3    February of 2009, it's cited in the case.  And in that

4    particular case it was some of the very same points that

5    had been raised were rejected by the district court in

6    that case.  Specifically, there was some suggestion that

7    because they were a competitor, the plaintiff was a

8    competitor of the defendant, that it would be

9    inappropriate to share this information.  That was

10   actually rejected in that particular case.

11        And here the rationale is even stronger in

12   favor of the position for the plaintiffs here because

13   this material is dated.  It is a year old, and the

14   pricing volatility of -- in the gasoline market over the

15   last year, I'm not sure -- I'd ask you to take judicial

16   notice of it, but I think you might be able to, Your

17   Honor.

18        And so, I think those are two of the things

19   that are of critical import in analyzing our request to

20   declassify or limited declassification in this

21   particular case.

22        I also think it is very important to -- to

23   note and to remind the court that it is the clients'

24   case here.  It's not the lawyers' cases.  It's not the

25   experts' case.  It's the clients' case.  And while we do

 1    know that corporations are people, or at least I've

 2    heard that.

 3              THE COURT:  Yeah.

 4              MR. BLEDSOE:  We also do know that

 5    corporations only act through people.  And one of the

 6    people we want this corporation, this plaintiff to act

 7    through is its principal, Mr. Taraghi, and that's why we

 8    ask for the relief requested in our motion here.  And

 9    I'd just be happy to answer any other questions of --

10              THE COURT:  No.  No.

11              MR. BLEDSOE:  -- that the court has on this.

12              THE COURT:  Let me hear from Suncor.  And help

13    me -- maybe we can start with this question.  Because

14    I've looked at the January 17, 2007, master purchase

15    agreement and that agreement says, quote, Suncor and

16    Western Convenience each agrees to hold in the strictest

17    confidence the terms of this agreement and any

18    information containing any of the terms of agreement

19    including pricing information.

20              Now, I'm assuming that Suncor entered into

21    that agreement with Mr. Taraghi because it felt that

22    that was some enforceable provision.  And the court --

23    and Suncor felt that getting -- extracting those

24    promises from Mr. Taraghi was sufficient to justify

25    giving Mr. Taraghi pricing information.

1           Now, I guess my question is if Suncor believed

2      that the existence of this master purchase agreement was

3      sufficient to satisfy its concerns about

4      confidentiality, why should the court be any less

5      willing to rely on a protective order that can be

6      enforced through contempt citation.

7           MR. SHAHEEN:  Well, because, Your Honor, what

8      Mr. Taraghi is asking for is he's asking for information

9      dealing with, for example, Dillon's prices.

10          THE COURT:  Right.

11          MR. SHAHEEN:  And the master purchase and sale

12     agreement limits very, very particularly and very, very

13     carefully to whom disclosure can be made outside the

14     immediate two companies.

15          THE COURT:  No.  But, see, the -- no.  I

16     understand that.  But here's where I think the logic

17     breaks down to some extent.  What you're saying is,

18     Judge, we were willing to give Mr. Taraghi pricing

19     information, which gives us -- gives him some

20     information about how we conduct our business.  But we

21     feel confident in relying upon Mr. Taraghi's good faith

22     compliance with the master purchase agreement.  Why --

23          MR. SHAHEEN:  Right.

24          THE COURT:  -- shouldn't I rely to the same

25     degree on his good faith compliance.

1          MR. SHAHEEN:  I'm not -- I'm not quarrelling

2     with Mr. Taraghi's good faith.  What I'm saying is we're

3     giving him -- the master purchase and sale agreement

4     deals with our prices to him.  What he wants access to

5     is the same information with respect to Dillon and

6     everybody else who has the same master purchase products

7     agreement that has the same restrictions on disclosure.

8          And if I might make a point, Your Honor.  You

9     know, what we're fighting about is the Dillon Companies.

10    The spreadsheet that's attached --

11         THE COURT:  Uh-huh.

12         MR. SHAHEEN:  --is the Dillon Companies.

13    And -- and as you know they filed -- Dillon filed a

14    motion to quash the subpoena served.

15         THE COURT:  Right.

16         MR. SHAHEEN:  And the documents requested are

17    -- involve, amongst many things, all the contracts, all

18    the communications between you and Suncor, all the

19    communication between you and Suncor relating to Western

20    Convenience, net pricing, pricing information.  And

21    Dillon's come in and said we need -- we move to quash

22    this.  This is the response that was filed by Western

23    Convenience, Your Honor.  And I want to tell you

24    something, because here, what they're asking this court

25    to do is to make available Dillon's information that we

1    have.  And this is what they've said to the court with

2    respect to Dillon's motion to quash.  I'm reading from

3    page 4 of their brief.

4            "Dillon has flat-out refused to produce any of

5    the requested discovery materials, notwithstanding the

6    provisions of the protective order.  Dillon's position

7    ignores the plain language of the protective order and

8    the law from this district and others."  "The protective

9    order states' -- and I'm still quoting -- 'that' quote,

10   'any party to this action or any nonparty may designate

11   any discovery material produced by it as confidential

12   information or highly confidential information.  A

13   highly confidential designation prevents the plaintiffs

14   from disclosing any of Dillon's materials to plaintiffs'

15   corporate representatives.'"

16           So what they're saying in respect to the

17   motion to quash is, wait a minute, we've got a

18   protective order, Dillon, that prevents us from

19   disclosing any of your highly confidential information

20   to anybody on behalf of Western Convenience.  That's

21   what they're telling Dillon with respect to the motion

22   to quash.  They're coming into this courtroom now saying

23   we want it through the back door to get access to Dillon

24   's pricing and volumes; the very same stuff they told

25   Dillon is protected under the protective order for

1    highly confidential information.

2         Your Honor, with all due respect, you can't

3    have it both ways.  You can't tell Dillon calm down,

4    don't worry, and then come in here and say, Give us

5    Dillon's stuff.  The very same stuff Dillon's objecting

6    to.  And that's what's going on here.  And while it's

7    true some of the stuff is older, Mr. -- Mr. Ewing in his

8    affidavit talked about how prices don't change that

9    much.  And this is a business where --

10         THE COURT:  Well, then --

11         MR. SHAHEEN:  -- we're talking fractions.

12         THE COURT:  Then that raises an interesting

13   question.  Because I distinctly recall back in 2011 I

14   was paying substantially less than $3.54 a gallon.  If

15   prices don't change that much I've obviously got to

16   start buying gas at a different place.

17         MR. SHAHEEN:  Well, under the contracts, Your

18   Honor what I've seen and you've seen what they've

19   produced we're talking fractions of a cent.  And while

20   -- and Mr. Taraghi isn't just anybody.  He's the owner

21   of the company.  He testified at the preliminary

22   injunction hearing.  He's got 30 years of experience.

23   It's he, at least, who said something funny is going on

24   here.  I've been checking prices.  These stores can't be

25   selling gas without selling it below casts -- costs,

1    pardon me.  He's savvy.

2             Of all the people at Western Convenience, he

3    is -- he is the brains of Western Convenience.  But you

4    can't have it both ways, judge.  You can't tell Dillon

5    in respect to a motion to quash, Calm down, don't worry.

6    You've got the highly confidential designation, that

7    protects your stuff, and then come in here and say,

8    Court, give Mr. Taraghi access to the very same stuff

9    we're telling Dillon he's not going to get access to.

10            THE COURT:  Mr. Bledsoe, what do you say?

11            MR. BLEDSOE:  Well, Your Honor, I think it is

12   important -- make sure my records are correct here.  I

13   think it's very important to note this time issue and --

14   the timing issue here, in terms of excusing Mr. Taraghi

15   from the highly confidential, we've made it plain in a

16   motion here it's data from June 1, 2011, and before.

17            THE COURT:  No, but --

18            MR. BLEDSOE:  All right.

19            THE COURT:  Mr. Shaheen's position is you're

20   telling Dillon their motion to quash is unnecessary or

21   unfounded because you get the benefit of a protective

22   order.

23            MR. BLEDSOE:  And, Your Honor, they would get

24   the same benefit of the protective order, and they would

25   have the same burden about demonstrating anything being

```
 1    highly confidential, and if there was an issue about

 2    that.

 3              THE COURT:  That's like telling a passenger in

 4    steerage they get the same benefit as the first-class

 5    passenger on the Titanic.

 6              MR. BLEDSOE:  Well, they --

 7              THE COURT:  They're both going to get wet.

 8              MR. BLEDSOE:  They did get the same benefit in

 9    terms of --

10              THE COURT:  Well, actually they didn't.

11              MR. BLEDSOE:  -- in terms of their speed

12    anyway.  Right.

13              THE COURT:  Actually they didn't.

14              MR. BLEDSOE:  No, Your Honor.  I don't

15    think -- I don't think that's having it both ways.  I do

16    think that to the extent that there is legitimately

17    highly confidential material of pricing information

18    prior to June 1, 2011, then they would have the

19    opportunity to make that argument.  I don't see how

20    there can be any real argument that pricing information

21    prior to June 1, 2011, could be -- can meet the

22    definition of highly confidential.  And that's -- and

23    that is that's going to cause a serious -- a risk of

24    serious harm because it is extremely sensitive

25    information.
```

1           This is not a circumstance, I would remind the

2    court, where Western continues to buy fuel from Suncor.

3    So we don't have that kind of directly competitive

4    situation.  That might in some circumstance merit the

5    protection of contemporaneous price information, but we

6    don't have that circumstance here.  Western is not a

7    customer of Suncor right now.  And so, that's not -- it

8    doesn't present the circumstance, the limited

9    circumstances really, where highly confidential,

10   attorneys' eyes only data ought to be granted.

11          So, I don't believe those positions are

12   inconsistent.  Certainly, they're not intended to be

13   inconsistent, Your Honor, and I don't believe that it

14   presents that issue here.

15          THE COURT:  Well, I mean, I think they are

16   inconsistent when what you're saying is -- you're saying

17   to Dillon there is a qualitative difference between

18   *confidential* and *highly confidential*, and it is a

19   difference that should give Dillon some comfort.  But

20   now you're basically saying that, in your view, this

21   pricing information is not highly confidential.  Because

22   -- well, first of all, as a practical matter, I suppose

23   if they have to produce pricing information for Dillon

24   do you still even want the Dillon stuff?

25          MR. BLEDSOE:  Well, I think -- I think we do,

1   Your Honor, for a variety of reasons not the least of

2   which is to assure the correctness of the production

3   from the defendant in this case.

4          THE COURT:  Well, but, see, the problem I've

5   got is then under your scenario it creates anomalous

6   information.  Information dealing with Dillon prices

7   that you get from Suncor is confidential, but I suppose

8   you would still say that the same information in the

9   possession of Dillon would be highly confidential.  I

10  don't understand that.

11         MR. BLEDSOE:  No, Your Honor.  I'm not

12  trying --

13         THE COURT:  So basically what you're telling

14  Dillon is, don't take any comfort in the protective

15  order because once it's confidential -- to the extent

16  that Suncor is the source of the information, you're

17  arguing that should be confidential.  To the extent that

18  Dillon is the source of the exact same information,

19  would you tell me that that should be -- the Dillon

20  information should be highly confidential?

21         MR. BLEDSOE:  No, Your Honor, not as to the

22  exact information at all.  That is not what our position

23  is.  Our position is that the issue about highly

24  confidential vis-a-vis pricing information is driven

25  by -- by it's timing and whether it's contemporaneous

1    and not historical.

2            THE COURT:  Yeah, but the Dillon information

3    would be the same.  So, for all intensive purposes, what

4    you're saying is whether it involves Dillon or Suncor

5    your position is historic pricing information derived

6    from any source would not be highly confidential.

7            MR. BLEDSOE:  That is -- that is our position,

8    Your Honor.  I agree with that a hundred percent.

9            THE COURT:  So you might want to send -- you

10   might want to send a new letter to Dillon.

11           MR. BLEDSOE:  And we will correct any

12   misapprehension about that, Your Honor.  But --

13           THE COURT:  Well, it's not a misapprehension

14   of mine, but it might be on the part of Dillon.

15           MR. BLEDSOE:  Yeah.  But that is our position,

16   Your Honor.  And, again, remember we are also talking

17   about here limited relief from even the notion of highly

18   confidential in terms of that designation, because we

19   have in our papers restricted it to Mr. Taraghi.  Yeah,

20   he's smart.  He's also the CEO of the company and he is

21   the principal person that we are working with,

22   obviously, in representing the plaintiff.  But it's not

23   like it's going to be a wholesale dissemination of even

24   that information within --

25           THE COURT:  Well, it would be wholesale

1    pricing, but --

2              MR. BLEDSOE:  Well, wholesale pricing.

3              THE COURT:  -- not wholesale dissemination.

4              MR. BLEDSOE:  And there are, as you've noted,

5    Your Honor, there is plainly, already, teeth to a

6    protective order that has a confidentiality provision

7    that this court, I'm confident, would not hesitate to

8    enforce if needed.

9              MR. SHAHEEN:  Your Honor, again, the -- the

10   pleading they filed, and we have Rule 11 issues, of

11   course, a highly confidential designation prevents the

12   plaintiffs from disclosing any -- there's no

13   qualification -- any of Dillon's materials.  There's

14   no -- we're hearing qualifications now, but they're

15   not --

16             THE COURT:  No.

17             MR. SHAHEEN:  -- in this pleading.

18             THE COURT:  No.  At the end of the day --

19   whether you drag in Dillon or not, at the end of the day

20   the question is under the terms of this protective order

21   -- now, I mean, I'm not focusing on what the protective

22   order means vis-a-vis Dillon, I'm focusing on whether or

23   not there is a factual basis for me to determine that

24   pricing information predating 2011 or sometime in 2011,

25   is highly confidential, such that it would cause

1    *substantial*, italic, "competitive or business injury to

2    the designating party, or which would give a competitor

3    or a customer a competitive advantage over other

4    competitors or customers of the designating party."  And

5    that's where I'm struggling with historical pricing

6    information.

7              MR. SHAHEEN:  Your Honor, some of the --

8    there's no clear cleavage that says 2011 or earlier it's

9    historical.  A lot of the contracts are two years.  The

10   pricing didn't change on a lot of these contracts, as

11   Mr. Ewing said in his affidavit.  Mr. Ewing showed you

12   how you can -- knowing how the market works -- and

13   certainly we learned in that PI hearing that Mr. Taraghi

14   is a student of the market, knowing how the market

15   works, knowing what his own prices were -- I mean, he

16   can look at his own contracts, Your Honor, up until May

17   of this year -- or last year, pardon me, he was a

18   customer.  He could see how his prices changed with us.

19   You can make all kinds of conclusions from that.

20              The thing they haven't shown you is why is it

21   that Mr. Taraghi needs to know the specific customer,

22   the specific volume, and the specific price.  They've

23   drafted some hypotheticals -- and we're not saying you

24   can't tell Mr. Taraghi that your experts have concluded

25   you've been damaged in the amount of whatever the

1    numbers were.  We're not saying that.  We're saying you

2    just can't disclose to Mr. Taraghi the specific

3    customer, the specific volume, and the specific price.

4    And they have not come up with anything that says not

5    knowing that prevents Mr. Taraghi from participating in

6    this litigation or -- nor have they said why does he, as

7    opposed to his five experts, need to know the specific

8    and precise volumes, prices, and customers.  And --

9    thank you.

10          THE COURT:  I guess my question at this

11   juncture, Mr. Bledsoe, is it's still not completely

12   clear to me, and it's the same problem I had the last

13   time we discussed this question.  You are asking me to

14   modify this protective order now.  And I guess what I'm

15   struggling with is right now we're still in the throws

16   of generating the basic underlying documents.  And your

17   experts haven't gotten the basic underlying documents,

18   so they haven't performed any analysis at all.

19          Now, I agree.  I think there is a legitimate

20   argument to be made that one of the purposes of

21   discovery is to allow a meaningful assessment of the

22   risks of the litigation and a meaningful opportunity to

23   evaluate the merits of settlement.  But until the

24   experts complete their work and until you generate some

25   reports, aren't we getting ahead of ourselves?

1          And let me say it in this respect.  Based upon

2     the current schedule that we have -- and unless the

3     schedule has changed, and it may very well have changed

4     -- right now you have a discovery deadline of

5     October 30, 2012, and a dispositive motion deadline of

6     December 1, 2012.  Expert reports are due -- under the

7     scheduling order expert reports are due starting on

8     August 1.  It would seem to me -- I think at some point

9     Mr. Taraghi on behalf of his companies has to be in a

10    position to make some meaningful decisions.  But, he's

11    not going to make a meaningful decision until his

12    experts really complete their reports.  And practically

13    speaking, you're not even in a position, probably, to

14    make a meaningful risk assessment until you get the

15    rebuttal reports.  And so I guess my sense is I think

16    we're getting ahead of ourselves.

17          MR. BLEDSOE:  Well, Your Honor -- and I can

18    appreciate that timing might matter in the court's

19    consideration here, but plainly I think one of the

20    things that I would point out here is -- is -- and I

21    heard this from the defendants here, that, well, he's

22    got lawyers, and he's got them, and he's got experts and

23    he's got them, and that ought to be enough.  But it

24    certainly takes a certain amount of hootspa, I think, to

25    suggest that the defendant gets to determine how the

1    plaintiff, acting through its CEO, gets to work with the

2    experts in this case, gets to play a role in the

3    litigation.

4              THE COURT:  Well --

5              MR. BLEDSOE:  Gets informed about that.

6              THE COURT:  -- I don't know that it's hootspa

7    so much as Rule 26(c).  26(c) says is that I have the

8    right to enter any order that justice requires to

9    protect a party from undue oppression.

10             Now, I agree with you, oppression to some

11   extent cuts both ways.  The premature disclosure of

12   pricing information to Mr. Taraghi might translate to

13   some degree of oppression as to Suncor.  Telling

14   Mr. Taraghi for all time he may not have his pricing

15   information such that he can't make informed decisions

16   about his case could create some oppression vis-a-vis

17   the plaintiff.

18             But, one of the things that's interesting

19   about 26(c) -- and I don't know that you'd ever find a

20   case that stands for this proposition, but I think it's

21   just a logical application of the rule, the court's

22   analysis under 26(c) and the determination of oppression

23   relative to the greater interest of each party evolves

24   as the case evolves.

25             So what might be oppressive to Suncor, if I

1    required them to produce pricing information to

2    Mr. Taraghi now given the current status of discovery,

3    might make sense, but if I impose the same constraints

4    on Mr. Taraghi when we come to a crossroads in the

5    litigation where Mr. Taraghi has to make some meaningful

6    decisions, then I think Suncor is probably in a weaker

7    position.

8              But right now to base -- until your experts

9    start crunching numbers -- in fact until you even get

10   the data to crunch the numbers you seem to be getting

11   way ahead of yourselves.

12             MR. BLEDSOE:  Well, Your Honor --

13             THE COURT:  And one could argue that the pace

14   this thing is proceeding, assuming nobody files a motion

15   for extension of time which is unlikely, I'm betting

16   that somebody is probably going to file a motion for

17   extension of time, which means that by the time I have

18   to wrestle with this question next it's going to be even

19   older data which endures to the benefit of the plaintiff

20   in saying there's no substantial hardship.

21             MR. BLEDSOE:  Well, and I appreciate the

22   court's concern about that.  But the other thing that

23   I -- and we do point this out in our papers as well, is

24   there's plenty of opportunity for mischief if we've got

25   overdesignation of highly confidential material as we go

1    forward.  And the court has ordered today the disclosure

2    of material that's plainly confidential, and nobody is

3    going to quibble about that.  But if there's -- if we

4    have a circumstance where we have excessive designation

5    then --

6              THE COURT:  I mean, I'm not going to modify a

7    protective order in advance based upon the specter of

8    potential mischievous conduct.

9              MR. BLEDSOE:  Well, and I'm not asking the

10   court to modify that.

11             THE COURT:  Well, you really are.

12             MR. BLEDSOE:  And we're not even asking for

13   the court to modify the protective order.  What we're

14   asking for is a -- is the court's ruling that they

15   didn't properly designate historic pricing information

16   that's --

17             THE COURT:  Well, see, the problem is --

18             MR. BLEDSOE:  -- highly confidential.

19             THE COURT:  -- is that right now -- I will

20   tell you, if -- if I were forced to make a decision

21   today given the current posture of the case today, I

22   would probably be inclined to err on the side of caution

23   and say that the pricing information is entitled to

24   *highly confidential*.  But I don't want to mislead

25   Suncor.

```
 1              I don't expect Judge Blackburn to close this
 2    trial.  I think Suncor would be erring on the side of
 3    undue optimism to think that this is going to be
 4    anything but a public trial.  And so Suncor should just
 5    accept the reality that if this case goes to trial the
 6    pricing information will be public.  And so at some
 7    point -- I mean, I think that, to use a military
 8    metaphor, Suncor is simply fighting a delaying action.
 9    You will at some point have to give this information up.
10              Now, I also believe that at some point
11    Mr. Taraghi as the principal person in charge of the
12    plaintiff enterprises is entitled to have enough
13    information so that he can make an informed decision.
14    And I don't think necessarily that means that he is
15    wholly dependent upon his lawyers or his experts.
16              I mean, the decision whether or not to settle
17    a case -- I mean, the case law is pretty clear.  It is
18    the lawyers' obligation and the lawyers' right to make
19    tactical decisions, but the decision whether or not to
20    settle a lawsuit is one that reposes in the client.  And
21    in order for the client to make an informed decision I
22    think the client is entitled to have the information
23    upon which to predicate that informed decision.
24              And so my sense right now -- Mr. Bledsoe,
25    particularly since we're still fighting about the
```

1    production of documents, my sense right now is that I'm

2    inclined to deny the motion without prejudice.  But I do

3    want to tell Suncor, I think there is going to be a

4    point in time, and prior to trial, when Mr. Taraghi will

5    get this information.  Because I think he's entitled to

6    make an informed decision.  And in that respect I'm

7    inclined to agree with plaintiffs' counsel.

8            I don't think it's fundamentally right that

9    plaintiffs' counsel is left to go to Mr. Taraghi and say

10   I can't tell you why, but I'm here to tell you that we

11   think you should settle.  Or I think -- I can't tell you

12   why, but I don't think we should settle.  I think the

13   client is entitled to understand the basis for a

14   lawyer's recommendation.  And that may ultimately mean

15   that Mr. Taraghi gets access to this information.  And I

16   would note that the protective order talks about

17   substantial, substantial competitive business injury.

18           And I will take notice of the fact that,

19   certainly at the retail level, the price of gasoline in

20   the last year has fluctuated wildly.  So, when Suncor

21   tells me that there's been very, very small price

22   changes during the relevant time period, I don't know

23   where the money's going.

24           MR. SHAHEEN:  Well, that's because the way the

25   pricing is taken into account it's rack minus something

1    or it's OPUS minus something.  So it's the "minus

2    something" you need to know.  So the if the rack --

3              THE COURT:  But the "something" changes over

4    time.

5              MR. SHAHEEN:  I understand.  No, but what

6    we're saying, Your Honor, if the discount -- the

7    discount in this case is used two different ways.

8              THE COURT:  Uh-huh.

9              MR. SHAHEEN:  They use discount when they talk

10   about the price.  And that is, the price is set.  It's

11   racked.  That's the Suncor --

12             THE COURT:  Right.  Right.

13             MR. SHAHEEN:  -- posted price minus something.

14   That's one use of the word *discount*.  The other discount

15   is how we would use discount.

16             THE COURT:  Sure.

17             MR. SHAHEEN:  Like and you I in normal

18   conversation.

19             THE COURT:  Right.

20             MR. SHAHEEN:  The discount -- what's important

21   to know is the discount.  So, in the various contracts

22   we've seen 3.5, 3.25, whatever it is.  But the -- in

23   terms of the fluctuation of the price that's taken into

24   account in the rack price or the OPUS price.  But that's

25   -- that's what it's based on, then you apply the

1    discounts.  So that's what we're talking about in terms

2    of, so it's been a wild fluctuation, yes, we understand

3    that but that's taken into account in the rack.  And the

4    OPUS piece of this, what's important is and what they're

5    fighting about of course, is what are the differences in

6    the contracts?  Why is somebody getting two and a half

7    cents we're only getting 2.25.

8              THE COURT:  Right.  And your argument is

9    because they're not the same product.  It's not a like

10   or similar product.

11             MR. SHAHEEN:  In -- with respect to our

12   branded customers --

13             THE COURT:  Right.

14             MR. SHAHEEN:  -- that's correct, Your Honor.

15             THE COURT:  Sure.

16             MR. SHAHEEN:  We have other arguments with

17   respect to earlier stages of Mr. Taraghi's career.  But,

18   yes, that's --

19             THE COURT:  Yeah, but, see --

20             MR. SHAHEEN:  -- that's the branded

21   (unintelligible) rate.

22             THE COURT:  -- what I'm saying is, guys,

23   whether or not this information should be disclosed is

24   going to hinge on a number of issues that are all

25   interrelated.  Because if you -- in other words, if --

1    if you guys do discovery, and you make a compelling

2    argument that essentially this lawsuit seeks to compare

3    apples and oranges; there is no antitrust violation

4    because it's not a like or similar product, and you move

5    for summary motion on that question, well, then that

6    raises an interesting issue.  If there is no liability

7    because these are not like and similar products, then

8    that court might take that into consideration as to

9    whether or not this pricing information should be

10   disclosed.  But right now I'm inclined to keep the

11   protective order where it is.  I'm inclined to deny the

12   motion.

13         But in fairness to Suncor, I do not want

14   Suncor to believe that having made this decision my

15   ruling is cast in stone.  Because this case, and the

16   pretrial process of this case will continue to evolve.

17   And as the case evolves Mr. Taraghi's right or need to

18   have this information will similarly evolve.  And I

19   don't -- I cannot discount the possibility at some point

20   he will have a right to this information.

21         And so I guess what I'm trying to say is, you

22   know, Suncor is -- is going to have to accept the

23   reality that sooner or later this pricing information

24   will be -- will come into the public domain.  Because I

25   don't believe that Judge Blackburn is going to seal the

 1    courtroom for this trial.  And so if Mr. -- if

 2    Mr. Taraghi comes to court every day and sits there and

 3    listens to the testimony every day, he's going to learn

 4    all your prices.  So, it really is -- it is, at best, a

 5    delaying action.  That's my sense.  I know how Judge

 6    Blackburn feels about sealing a courtroom.  He is not a

 7    proponent of that in any shape, fashion or form.

 8              MR. BENNINGTON:  Judge, have we been

 9    reassigned?

10              THE COURT:  These prices will become public.

11              MR. BLEDSOE:  Have we been reassigned, Your

12    Honor?

13              MR. BENNINGTON:  We thought we were in front

14    of Judge Krieger.

15              THE COURT:  Oh, I'm sorry.  Well, even more

16    so.

17              MR. BENNINGTON:  Yeah.

18              THE COURT:  Yeah.  I'm sorry.  Yeah, I

19    thought --

20              MR. BLEDSOE:  I'm mindful of --

21              THE COURT:  Oh, yeah.  Even more so.  Whoa

22    Nellie.

23              MR. BLEDSOE:  Your Honor, I'm mindful of -- of

24    your position, and I just wanted to add one --

25              THE COURT:  Sure.

1          MR. BLEDSOE:  -- one final thought to that

2     point.  And that is the information is plainly pertinent

3     and for the reasons you've articulated.

4          THE COURT:  Right.

5          MR. BLEDSOE:  It probably is simply a matter

6     of time.  But the protective order has meaning in terms

7     of this court's ability to enforce it.  And the

8     plaintiff seems unlikely that they want to run astray of

9     the judiciary as they are approaching their case by

10     violating and producing, or somehow improperly

11     publishing information.  So it would be my thought and

12     suggestion to the court that -- that the existence of

13     the teeth is sufficient for that matter of time to be

14     now given -- given the over one-year-old information.

15     Thank you, Your Honor.

16          THE COURT:  Well, I -- yes and no.  I mean,

17     I -- I always believe, or certainly would like to

18     believe that everybody is going to comply with court

19     orders.  But I also know that these kinds of cases come

20     with a fairly significant emotional element.  And

21     sometimes in the heat of -- of litigation people for no

22     malicious intent tend to, you know, lose track of where

23     things should be.

24          Again, I -- I have no doubt that if I -- if I

25     modify this order Mr. Taraghi will comply.  I have no

1    reason to think he won't comply.  But the thrust of the

2    motion is is that Mr. Taraghi needs the information

3    right now to assist his counsel, and I'm not necessarily

4    convinced of that.  Because we're -- I mean, we're still

5    fighting about getting the underlying data.  We're still

6    expecting the experts to crunch some numbers.

7         And as I told you before, folks, as you

8    correctly pointed out, I mean, the dispositive motion

9    deadline is December 1, 2012.  And Judge Krieger is not

10   going to give you a trial date until she has a final

11   pretrial.  And she's not going to have a final pretrial

12   until all dispositive motions are decided.  So my honest

13   assessment is this case, even under the best of

14   circumstances is not going to trial until, best case

15   scenario, very late in 2013.  And I suspect that there

16   will be times -- there will be a point in time where

17   Mr. Taraghi has to make some informed decisions.  I

18   don't know necessarily we're at that point quite yet.

19        So, I'm going to deny the motion that is

20   Document 59.  I am denying the motion challenging

21   defendant's designation of certain documents and data as

22   highly confidential pursuant to the protective order.

23   However, I want to indicate in the strongest possible

24   terms that I'm denying this motion without prejudice,

25   and I am not foreclosing the possibility that there will

1    come a point in time when Mr. Taraghi does get access to

2    this pricing information.  And I would be unfair to

3    Suncor if I -- if I left them with any other impression.

4           So, I realize that I'm sewing the seeds for

5    the next fight, when is the appropriate time, but we'll

6    cross that bridge when and if we get to it.

7           Now, there was one other motion and I missed

8    this one.  This is Document 55, which is a motion to

9    restrict access and this apparently was unopposed too.

10   So, I will go ahead and grant that motion as well,

11   Document 55.  So have you got them all, Robin?

12          THE COURTROOM DEPUTY:  Yes, judge.

13          THE COURT:  All right.  Do we have anything

14   else to talk about, folks?

15          MR. BLEDSOE:  Nothing further.  Thank you,

16   Your Honor.

17          THE COURT:  So.

18          MR. SHAHEEN:  No, thank you.

19          THE COURT:  Okay.  Again, with respect to the

20   motion to compel, I will require production of some

21   materials within two weeks of today's date; that is,

22   Documents responsive to 3, 4, 6, 7 and 9.  I will

23   require documents responsive to 5 and 8 to be produced

24   within 45 days of today's date.

25          MR. SHAHEEN:  Yes, Your Honor.

1          THE COURT:  All right.  Thank you all.

2          MR. BENNINGTON:  Thank you, Your Honor.

3          THE COURTROOM DEPUTY:  All rise.  Court is in

4     recess.

5          (Whereupon, the within hearing was then in

6     conclusion at 3:32 p.m. on this date.)

7          I certify that the foregoing is a correct

8     transcript, to the best of my knowledge and belief

9     (pursuant to the quality of the recording) from the

10    record of proceedings in the above-entitled matter.

11

12

13

14    /s/ Kelly Mair                    August 15, 2012

15    Signature of Transcriber          Date

16

17

18

19

20

21

22

23

24

25