1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLORADO

3    Case No. 11-cv-01611-MSK-CBS

4    ────────────────────────────────────────────────────

5    WESTERN CONVENIENCE STORES, INC., et al.,

6    Plaintiffs/Counter Defendants/Third Party Defendants,

7    vs.

8    SUNCOR ENERGY (U.S.A) INC.,

9    Defendant/Counter Claimant/Third Party Plaintiff,

10   DILLON COMPANIES, INC.,

11   Interested Party.

12   ────────────────────────────────────────────────────

13   Proceedings before CRAIG B. SHAFFER, United States

14   Magistrate Judge, United States District Court for the

15   District of Colorado, commencing at 8:34 a.m., September 14,

16   2012, in the United States Courthouse, Denver, Colorado.

17   ────────────────────────────────────────────────────

18   WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

19   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

20   ────────────────────────────────────────────────────

21   APPEARANCES

22   KENNETH BENNINGTON, PHILIP W. BLEDSOE and KATHLEEN

23   CRAIGMILE, Attorneys at Law, appearing for the Plaintiff.

24   ────────────────────────────────────────────────────

25   STATUS CONFERENCE

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO   80203
303-825-6119      FAX 303-893-8305

1

2                  APPEARANCES: (Cont'd.)

3          ANTHONY J. SHAHEEN, Attorney at Law, appearing for

4     the Defendant, Suncor Energy.

5          CHRISTOPHER  TARAVELLA  and  MICHAEL  McCORMICK,

6     Attorneys at Law, appearing for the Interested Party, Dillon

7     Companies.

8

9                  P R O C E E D I N G S

10         (Whereupon,  the  within  electronically  recorded

11    proceedings  are  herein  transcribed,  pursuant  to  order  of

12    counsel.)

13         THE CLERK: All rise.  Court is in session.

14         THE COURT: Have a seat, everyone.  Have a seat.

15    All right.  This is Western Convenience Stores, Inc., vs.

16    Suncor Energy.  I will take appearances of counsel in

17    11-cv-1611.

18         MR. BENNINGTON: Good morning.  Kenneth Bennington

19    and Kathleen Craigmile for the plaintiffs.

20         MR. BLEDSOE: And Philip Bledsoe, Your Honor.

21         THE COURT: Thank you.

22         MR. SHAHEEN: Tony Shaheen on behalf of Suncor.

23         THE  COURT:  Okay.   I set this for a status

24    conference.  Somebody bring me up to speed on what's going

25    on.

1          MR. BLEDSOE: Let me try, Your Honor.

2          THE COURT: Okay.

3          MR. BLEDSOE: As the Court will recall, the last

4    time we were here on the Dillon Kroger subpoenas, you issued

5    a number of -- of orders for -- for the bench.  Since that

6    time, Dillon has replaced counsel.  We have had a number of

7    conversations, some additional status reports have been

8    filed, including yesterday.  I think a total of a half a

9    dozen different declarations have been filed.  There was

10   follow-up discussion yesterday with counsel for Dillon and

11   Kroger.  And, frankly, we're not getting anywhere, in our

12   view.

13          And one of the reasons we're not getting anywhere

14   and, frankly, one of the reasons it's difficult for the

15   plaintiff to fully respond here is we're not getting the

16   same story time after time.  And I -- I'm not going to

17   attribute, you know, fault or blame or -- or any intent to

18   that, but we heard last time we were here from prior counsel

19   about 400 boxes and about credit card data and -- and the

20   time frame it was available and how far back it went.

21          And as we've had follow-on discussions, we're not

22   even hearing the same story about where -- where those 400

23   boxes are or about what they are.  The credit card data that

24   they've talked about having is actually for the time period

25   that's after the -- the defined time period that we've --

1      that we've talked to.

2              And so we've -- we've sat down and prepared here

3      -- "we" -- the royal "we" -- Ms. Craigmile has prepared,

4      frankly, a -- a -- kind of a running documentary commentary

5      -- and it does have a little commentary in it so if -- if we

6      would share it with everybody, that would be fine -- that

7      says where we think everything is.  And I'm going to make a

8      suggestion, Your Honor.

9              THE COURT: Okay.

10             MR. BLEDSOE: And I don't know what the folks from

11     Kroger have to say, and I've not -- we've not raised this

12     with Kroger, so this may be news to them, but --

13             THE COURT: Are all of these Kroger people who just

14     walked in?  Or maybe they're here for my next case.  I've

15     lost track.

16             MR. BLEDSOE: I -- I do not know.  Are they --

17             THE COURT: Do I have anybody here representing --

18             MR. BLEDSOE: I'm told -- I'm told they are from

19     Kroger, Your Honor.

20             THE COURT: Okay.  Do you folks want to enter your

21     appearance, or do you want to just --

22             MR. TARAVELLA: Yes, Your Honor.

23             THE COURT: Okay.

24             MR. TARAVELLA: Christopher A. Taravella and

25     Michael McCormick, Montgomery, Little & Soran, and we

1    represent the interested party, Dillon.  Good morning, sir.

2                THE COURT: Good morning.  I'm sorry.  Go ahead.

3                MR. BLEDSOE: And -- and my suggestion is this, is

4    that -- it appears to me that Ms. Giannola who provided a

5    declaration is the head person for fuel at Kroger.  And

6    she's provided a declaration.  Frankly, a couple of things

7    she's had to say in that declaration are not entirely

8    consistent with some correspondence that we've gotten from

9    -- from counsel.

10               And what we would suggest, Your Honor, is that we

11   take her deposition here in short order, and we try to get

12   an under oath actual official understanding from some live

13   human being at Kroger about where everything is and where --

14   and what they are.

15               We have a document here that we -- we're happy to

16   share with opposing counsel and the Court about where we

17   think we are, and it shows how all this shifting has been.

18   But it -- it's been a lot.  This first deposition occurred

19   -- or first subpoena was in April.  There's been some effort

20   to get some documents produced, and we've gotten some --

21   we've gotten some -- I guess it was Wednesday afternoon late

22   when we got the CD.

23               MS. CRAIGMILE: That's right.

24               MR. BLEDSOE: Yeah.  And so we've not reviewed it

25   en -- entirely, but -- so there's been some -- some effort,

6

1    and I don't want to suggest for a moment that there hasn't

2    been, but with -- with five different or six different

3    declarants, the vast amount of stuff we do, and some of it

4    I am confident is simply a matter of new counsel scrambling

5    to try to figure out how to address this.  I'm confident

6    that's what's occurred.

7           But I think if we can get Ms. Giannola prepared,

8    we'll go take her whenever we need to get her done, we can

9    do it any time next week.  And get this squared away and

10   come back here with a consistent record to this Court so

11   that some decision can be made.

12          Needless to say, we're diametrically opposed to

13   any notion of a stay on your prior order on this continued

14   reference to trade secrets.  This Court's made it abundantly

15   clear that that's going to be handled under a protective

16   order.  The law in this -- a couple of cases directly

17   pertinent in this District make it plain that a stay only

18   applies in the extremest of circumstances because as the --

19   Judge Krieger might consider any objection and/or appeal, if

20   you will, from your prior order, your -- your decisions are

21   going to be given the -- the widest discretion possible, and

22   they're -- they've got a compelling case to make.  The time

23   for our response on that stay isn't -- isn't -- isn't here

24   yet, although we're prepared to discuss it if the Court

25   wants to hear more argument on it.

1          That's -- that's an expression of our frustration,

2     and we offer that maybe as a way to quit losing stuff in

3     translation between counsel and get to the head person at

4     the fuel department at Kroger and get an answer.

5          THE COURT: All right.  Let me -- let me hear from

6     somebody from Dillon.  What's your perspective on all of

7     this?    I  would  note  that  this  is,  I  think,  by  my

8     calculation,  the  third  hearing  that  I've  had  where  the

9     defendant,  the  named  party,  Suncor,  is  pleasantly  able  to

10    just sit on the sidelines and watch everything else unfold.

11    I don't know how you worked this out, but as a --

12          MR. TARAVELLA: An enviable pos --

13          THE COURT: -- as a tactical maneuver, it's -- it's

14    beyond reproach.  Go ahead.

15          MR. TARAVELLA: An enviable position, Your Honor,

16    although Mr. Shaheen was so kind as to offer me a place at

17    counsel table, so I -- it's Christopher Taravella, and I

18    have -- I have four or five things I'd like to address and

19    then talk about what Mr. Bled -- Bledsoe said, but I -- I

20    will admit we're in a scramble mode.  But -- but I'm a

21    pretty good scrambler, and we're catching up rapidly and

22    peddling as fast as we can to do so.

23          Your  Honor,  I  read  the  transcripts  of  the

24    hearings, and I appreciate the Court's patience.  And I know

25    the Court's patience is -- is limited, and I understand why,

1    having read the transcript.

2              THE COURT: And my life span may be limited.

3              MR. TARAVELLA: Yes.  Well, all of ours are.

4              THE COURT: My patience is almost infinite.

5              MR. TARAVELLA: Mine -- I know, Your Honor.  And

6    you -- you've been patient.  But -- but -- okay.  So I

7    learned four or five things from reading the transcripts.

8    Quickly.  Number one is confer.  Well, the Court shouldn't

9    have had to have told us to confer.  The rules require it,

10   and by the way, your idea of, Well, why don't you buy me a

11   cup of coffee and let's talk about the -- the subpoena, do

12   horse trading, that's what you said in one of the hearings,

13   Yeah.  Why not?  Why not confer?  We have now, as Mr.

14   Bledsoe said, three times.  Ms. Craigmile's been very, very

15   gracious about allowing me  to try to get -- scramble and

16   catch up to speed, so I want to thank them for that.

17             Second  is  produce.    Well,  that  was  an

18   understatement when Mr. Bledsoe said, We've done some

19   production.  We've produced, since the first production of

20   25 pages, 23,779 pages, Your Honor.

21             THE COURT: Right.  I saw that.

22             MR. TARAVELLA: 23,779.  And that's continuing.

23   We're not done.  It's continuing as we speak, so -- so on

24   production, when you say, Produce documents, I get it.  I

25   understand it, and I'm in a giddy-up mode.  We're in a

1    giddy-up mode to produce documents, okay?  And we're doing

2    that.  So that's an understatement.  We have made much

3    progress.

4           Three, witnesses.  Your Honor said, Well, if it's

5    so important to Dillon, where are your witnesses?  Good

6    point.  We have three here today.

7           THE COURT: I know, but I didn't set -- I set this

8    for a status conference.

9           MR. TARAVELLA: Well --

10          THE COURT: If you guys were planning on calling

11    witnesses, I wish you'd told me, because I -- your seats are

12    going to be occupied by other people at 10 o'clock.

13          MR. TARAVELLA: And -- and, Your Honor, I -- I

14    didn't know what the Court's requirement was.  I read that

15    -- that you might require us to bring witnesses to back up

16    the declarations, and I wasn't sure.  In abundance of

17    caution, we have them here because we want to demonstrate to

18    you what you asked.  You said, If it's important to Dillon,

19    where are the witnesses?  They're here today, sir.  They're

20    ready to testify, and I apologize for not apprising the

21    Court --

22          THE COURT: No, that's okay.

23          MR. TARAVELLA:  -- that they would be.

24          THE COURT: That's okay.

25          MR. TARAVELLA: And -- and -- and the next thing is

1    this: This is a moving target.  And, yes, Mr. Bledsoe's

2    right.  We probably have done some things wrong, made some

3    mistakes, made some misrep -- misrepresentations.  But I

4    come from a big company.  Chrysler, 150,000 employees,

5    $150 billion company.  And I was the general counsel of its

6    finance company, 95 billion.  It's a big company.  And

7    Dillon's a big company.  And it's not -- you just -- it's

8    not that easy to say, Well, this person knows this, or This

9    persons knows that.

10         So what I've learned, I got a lot of gray hair to

11   back that up, is that when you make a mistake, you fix it.

12   Yeah, we've made some mistakes, and we're trying to fix

13   them, and we're in a fix -- fix-up mode.  I'd do rather that

14   and own it than, obviously, just, oh, bury it and hope it

15   goes away because it's not going to go away.  So -- so we're

16   in the -- the mode of, yeah, we made some mistakes, made

17   some -- some things we want to correct, and we're fixing

18   them.

19         So with respect to Giannola and taking her

20   deposition, I -- we have -- it is not true that she's

21   necessarily the head of -- of that department.  She has a

22   counterpart -- there are two districts -- in her capacity.

23   There are two districts, and her counterpart is here and

24   ready to testify if we need to.  But we're not convinced

25   that we need to take her deposition, number one.

1           Two is, if we need to take any deposition at all,

2    can we do a deposition upon written questions?  If that's

3    what the Court is inclined to do.  Three is, we have her

4    counterpart here, Mr. Caldwell.

5           THE COURT: Help me -- help me --

6           MR. TARAVELLA: And he is prepared to testify if

7    you want to take testimony.

8           THE COURT: Okay.  Slow -- slow -- slow.  Help me

9    to understand the greater efficiency that could be achieved

10   by deposition on written question.

11          MR. TARAVELLA: Well, Your Honor, it --

12          THE COURT: Because, I mean, it would seem to me to

13   be inherently inefficient in a -- in an area like this

14   because the process would be plaintiff's counsel propounds

15   questions, they send them to you, and they send them to

16   Suncor.  Suncor and you then propound your own questions,

17   and then the deponent shows up and the court reporter swears

18   her in, and the court reporter reads the questions and she

19   answers.  There is no possibility of any follow-up at all.

20          In an area that is -- that is potentially

21   challenging from a technical perspective, given the, shall

22   we say, somewhat tortured history to date, I would think if

23   there was ever a topic and ever -- ever a subject that was

24   ripe for follow-up questions, it would be this.  Deposition

25   on written question provides no opportunity for that.

1           MR. TARAVELLA: Indeed, it doesn't, but let me
2      address one thing you just touched on, the technical aspect
3      and the expert.   You -- you talked about in one of your
4      hearings   the   importance   of   electronically   stored
5      information, and we know this Court is -- is very, very up
6      on that, one of the foremost experts in Colorado probably.
7      So we know that, and we have an IT person here to talk --
8           THE COURT: Okay.  Well --
9           MR. TARAVELLA: -- if you want -- if you want to
10     hear that, but having -- having said that, deposition on
11     written questions I think is more efficient in a big company
12     because what you're going to do is have somebody like
13     Giannola say, "I don't know, I don't know, I don't know."
14     And we can backstop all of her answers --
15           THE COURT: Yeah, but we could --
16           MR. TARAVELLA: -- and make sure --
17           THE COURT: Yeah, but we could solve --
18           MR. TARAVELLA:   -- that they're right the first
19     time.
20           THE COURT: We could solve that problem by simply
21     they're propound -- they will propound a 30(b)(6) notice.
22     You pick who you want to talk about.  That person has to get
23     fully up to speed. That would still be a far more efficient
24     process than deposition on written questions.
25           MR. TARAVELLA: If -- I -- if that's necessary, and

1    we need to go down that road, sure, we could -- we could do

2    a 30(b)(6) and designate people for each area if -- if you

3    want to do that, if the Court -- but -- but in -- in view of

4    the progress that we've made with respect to each area, we

5    think that would be unnecessary at this point, Your Honor.

6          THE COURT: Well, but -- but here's -- help me

7    maybe -- maybe we need to take a step back because I'm a

8    little confused because you seem -- your client seems to be

9    fighting this war on multiple fronts.  On the one hand

10   you're telling me that you've done a lot, and I think you

11   probably have done a lot. And you are still searching, and

12   you're still producing.

13         At the same time, you filed a Motion to Stay and

14   a Motion for Reconsideration.  Now which of those three

15   steps do you want me to focus on first?  Do you want me to

16   focus on the Motion for Reconsideration?  And I could

17   certainly set that for a hearing after the plaintiff has had

18   a chance to file a response.  Do you want me to set a motion

19   (sic) on the stay?  And I'm happy to do that after they file

20   a response.  But in the meantime are you going to continue

21   to search and produce?

22         MR. TARAVELLA: Your -- Your Honor, I'm not sure

23   how to --

24         THE COURT: Because if you continue to search --

25         MR. TARAVELLA: Right.

1        THE COURT: -- and you continue to produce, to some
2    extent, doesn't that eliminate any need for a stay?
3        MR. TARAVELLA: It -- it does, indeed, provided
4    that, Your Honor -- that the Jan -- the September 17th date
5    -- we wanted to talk to you a little bit about that.  As we
6    find out more -- more and more documents and meeting that
7    date, but I don't know -- I'm not sure how to
8    straightforward answer your question.
9        Here's what we wanted to do.  We filed the
10   objection to preserve the appeal, but we want to take it up
11   in front of you, demonstrate our good faith, demonstrate
12   progress and -- and continue to produce.  So we'd like you
13   to, in particular portions of --
14       THE COURT: Yeah, but -- well -- let's back up.
15   Back up.  I mean, I -- I hear what you're saying, but -- but
16   you seem to be either creating more questions or skipping
17   over intermediate steps.  You've filed a motion asking me to
18   reconsider.  You're asking me to reconsider my ruling on the
19   Motion to Quash.  Now, if I reconsider the Motion to Quash,
20   and you are successful, then you would be undoing all of the
21   hard work that you apparently are telling me you're --
22   you're undertaking.
23       Now, the other question is -- is it would seem to
24   me that -- there would seem -- I'm -- I'm intrigued by the
25   strategy that says, on the one hand, you want me to

1  reconsider.   At   the   same   time   --   so   you   want   me   to

2  reconsider my previous decision.   At the same time, you're

3  objecting  to  my  previous  decision  and  at  the  same  time,

4  you're asking me to stay partially the effect of my previous

5  decision.  I mean, I -- I understand the notion of pleading

6  in the alternative, but this could best be described as a

7  scatter shot approach to litigation.

8          Which -- which of these particular pellets are you

9  hoping will hit first?

10          MR.   TARAVELLA:   Your   Honor,   we   were   hoping   to

11  actually  fire  rifle  --  rifle  shots  instead  of  shotgun

12  approach, and in that -- for that reason --

13          THE COURT: Well, this is the -- you're past a shot

14  -- I mean, you're now --

15          MR. TARAVELLA: Yes, sir.

16          THE COURT: -- talking probably howitzer.

17          MR. TARAVELLA: Yes, sir.  I understand that, sir.

18  Let  me  --  if  I  could  just  expand  a  little  bit.   The

19  objection by -- by rifle shots, what I'm -- what I'm saying

20  is we objected to 5(h), 8, 9, and portions of 10 that looked

21  frankly like an antitrust -- it looks like somebody lifted

22  an antitrust case interrogatory, and boom, flipped it.   10

23  looks like that.

24          So we filed those rifle shots as to the objection.

25  And that's all we're objecting to.  I don't think -- we're

1    not burying our head in the sand and hope this just goes
2    away and just quash the whole thing.  So -- so with all due
3    respect, Your Honor --
4              THE  COURT:  Well,  isn't  that  --  isn't  that
5    essentially  what  you're  hoping  with  the  Motion  to
6    Reconsider?
7              MR. TARAVELLA: It -- well -- well --
8              THE COURT: I mean, because that was your motion.
9    Your motion was to make the whole thing go away, so, in
10   fact,  your  statement  isn't  correct.   By  moving  to
11   reconsider, you truly are hoping to make it all go away.
12             MR. TARAVELLA: We can refine that if you'd like
13   because -- because --
14             THE COURT: No, I --
15             MR.  TARAVELLA:   -- because we're objecting to
16   5(h), 8, 9, 10 for different reasons, some of which are
17   trade secret.  So --
18             THE COURT: But -- but --
19             MR. TARAVELLA:  -- and some of which -- but --
20   but  --
21             THE COURT: -- Mr. Bledsoe's correct.  The fact
22   that  it's  a  trade  secret  does  not  mean  it's  not
23   discoverable.  It can be discovered under conditions.  They
24   can be very stringent conditions.  But a simple reading of
25   Rule 26(b)(1) resolves the question.   20(b) -- 26(b)(1)

1    says, A party can conduct discovery of any relevant non-
2    privileged information.  I'm not aware of any case in any
3    jurisdiction in any federal court that has held that trade
4    secrets are privileged.  They may be worthy of protection,
5    but they're not privileged.  And so for you to tell me it's
6    a trade secret and so -- so presumptively undiscoverable,
7    you and I both know that's simply not supported by the law.
8              MR. TARAVELLA: Your -- Your Honor, I think there's
9    a different standard that we cited coming out of two
10   magistrate judges from this -- Judge Tafoya and Schlatter
11   that -- that basically take a -- Echo Star is one of the
12   cases we cited, and -- and it's a -- it's a non-party, a
13   different standard.  Also, there's -- there's a line of
14   cases that basically say, Once a -- the cat's out of the
15   bag, you can't put it in the bag -- can't put her back in
16   the bag.  And -- and so --
17             THE COURT: Actually, this case would probably be
18   a lot easier if we were simply dealing with cats.
19             MR. TARAVELLA: Well, yeah.  And, you know -- and
20   so, Your Honor, I respectfully would -- would -- would
21   submit to you that a protective order doesn't adequately
22   protect a trade secret in this case.
23             THE COURT: How?
24             MR. TARAVELLA: And we have a non-party here --
25             THE COURT: If it all -- if it's only seen by

1    lawyers?

2              MR. TARAVELLA:  -- and we have -- pardon me?

3              THE COURT: If those -- if that information is only

4    seen by lawyers, aren't you presumptively saying that

5    lawyers can't be trusted --

6              MR. TARAVELLA: I -- I'm not.

7              THE COURT: -- to comply with a Court order?

8              MR. TARAVELLA: I'm not, and I read the transcript

9    where you went down that road.  No.

10             THE COURT: Okay.

11             MR. TARAVELLA: No.  I'm absolutely not saying

12   that.  But -- but, Your Honor, what about the experts?  And

13   -- and I -- and it's not a question of trusting the experts.

14   Experts deal in different areas with different clients from

15   time to time.

16             THE COURT: Right.

17             MR. TARAVELLA: You're going to have to sooner or

18   later expose them to that.  We're not comfortable with it.

19   And that's why we're asking the Court to look at that in the

20   breadth -- look at that in the breadth of 10, for example.

21   Okay?  And I'm asking, Why -- and -- and Your Honor

22   anticipated something I'd looked at right from the start and

23   said, Why do you need retail fuel prices in a Robinson

24   Patman case?

25             THE COURT: Right.

1           MR. TARAVELLA: You asked that question.

2           THE COURT: Right.  No, I understand.

3           MR. TARAVELLA: Okay.  And they said they had to

4    show anti-competitive effect.  Well, there's an FTC case out

5    there, after Morton Salt, that basically says, No, there's

6    a presumptive injury at that level, and you don't go down to

7    retail  fuel  prices  unless  they're  trying  to  make  an

8    antitrust case against Dillon.

9           THE COURT: Right.  And here --

10          MR. TARAVELLA: Okay?

11          THE COURT: And here's -- let me just pose this

12   question to you.  I am not -- I think it's important that we

13   understand, I'm not making any determinations as to what

14   evidence will ultimately be admissible.  I'm certainly not

15   in a position, nor would I even be inclined to try to

16   presuppose what Judge Krieger will or will not consider,

17   either on dispositive motions or if the case gets to trial,

18   what she'll allow the jury to hear or see.

19          But the Federal Rules of Evidence -- the Federal

20   Rules of Civil Procedure, 26(b)(1), make it absolutely clear

21   that there is no direct linkage between admissibility for

22   purposes -- or relevance for purposes of discovery and

23   admissibility for purposes of trial.

24          Now, I don't want to mislead anybody.  I still

25   believe, to some extent, that the discovery propounded by

1    Western Convenience is over-broad.  I -- and I don't want to

2    suggest that I am oblivious to the issues that Dillon is

3    raising.   But what I'm struggling with is the following

4    dilemma: Because I can't anticipate what Judge Krieger will

5    or will not consider, and because I think I have a

6    responsibility under Rule 26 and Rule 16 to move this case

7    forward efficiently, I can't let this case languish

8    interminably while we fight about what may happen or may not

9    happen at trial.

10          And it would seem to me, what I have put in place

11    is an imminently reasonable approach that protects

12    everyone's interest.  And I think what I'm proposing is --

13    is entirely consistent with Rule 26(b)(2)(c).   What I'm

14    saying is that Dillon should produce information as narrowed

15    in the various colloquys that we've had over the course of

16    the last couple of months.

17          I am not precluding for a second the Dillon stores

18    from filing a Motion to Shift Costs because I think this

19    discovery will be expensive, and I'm not oblivious to that.

20    And I don't think it's fundamentally fair to simply say that

21    Dillon should, without restraint, just assume all of these

22    costs.   And it may very well be that at some point in the

23    not distant future, Western Convenience is going to be

24    writing to Dillon stores a very significant check to cover

25    all or some portion of this discovery.   That's a very real

1    possibility.

2           The fact, however, that I am ordering production

3    at this point and restricting the access to that production

4    to the lawyers does not in any way preclude the Dillon

5    stores from coming back and saying, Now, Judge, armed with

6    this information, we think that the evidence is so

7    tangential, we think it is so unlikely that it will have any

8    bearing, now we are asking you to enter an order saying,

9    Western Convenience's experts don't see it.  And then it

10   would be incumbent upon Western Convenience to explain why

11   this information is relevant and -- and important for their

12   experts.

13          All I'm trying to do is to avoid getting bogged

14   down in decisions that don't have to be made now.  And I

15   would hate for Dillon to say, Judge, let's bring this to a

16   stop, or let's slow this down, or let's expend a lot of

17   unnecessary briefing now to wrestle with issues that don't

18   have to be addressed now.

19          The point is to move this process along because as

20   concerned as I am and -- and I don't want my previous ruling

21   to suggest a lack of concern for Dillon's situation, and I

22   don't want my previous ruling to suggest a lack of some

23   sympathy for Dillon's position.  But at the end of the day,

24   the litigants in this case are entitled to get their dispute

25   resolved.  And I can't get to the point and I'm not going to

1    get to the point where the tail is wagging the dog because

2    that's fundamentally inconsistent with the premise

3    underlying the civil justice system, which is that cases and

4    decisions and disputes should be resolved sooner rather than

5    later and in the most efficient manner possible. That's all

6    I'm trying to achieve.

7              And I don't think, in trying to pursue that

8    strategy or that line of analysis, I'm doing Dillon any

9    disservice at all. And if I am, I'm -- certainly want to

10   be, you know, educated in that regard.

11             MR. TARAVELLA: Well, certainly Dillon does not

12   believe that Your Honor's doing any disservice, and we

13   appreciate your patience. I think the record demonstrates,

14   what I've read, that you've been more than patient and

15   understanding.

16             Having said that, when you said, Let's defer

17   decisions that don't have to be made now, I -- I

18   respectfully disagree that the protective order's one we

19   need to make now and -- and the trade secret, because our

20   position, Your Honor, is a -- a protective order is not

21   going to adequately protect the trade secret once it's out.

22             THE COURT: But --

23             MR. TARAVELLA: Even if we just give it to counsel,

24   because I know what coun -- counsel, without giving it to an

25   expert, you know, is -- is -- what are they going to do with

 1    it?

 2              THE COURT: Well, hopefully --

 3              MR. TARAVELLA: So -- so --

 4              THE COURT: Hopefully, they'll just stick it on a

 5    shelf.  But if I -- I mean, understand the very slippery

 6    slope you're suggesting.  Fundamentally, underlying your

 7    argument is the notion that if this Court issues an order to

 8    a lawyer, I should presume that the lawyer will not follow

 9    my instructions.

10              MR. TARAVELLA: Not at all.  You went down that

11    path in the prior hearing.

12              THE COURT: Right.  And if I -- if I --

13              MR. TARAVELLA: I'm not saying we can't trust the

14    lawyers --

15              THE COURT: -- if I order -- if I said --

16              MR. TARAVELLA:  -- I'm saying the lawyers will --

17    are going to ask that the protective order allow the experts

18    to --

19              THE COURT: And --

20              MR. TARAVELLA: They're going to -- they're going

21    to follow the protective order.  These are honorable people.

22              THE COURT: Sure.  Right.

23              MR. TARAVELLA:  We're not talking about their

24    ethics at all, so I'm not going down that path.

25              THE COURT: And -- and the fact that they --

1             MR. TARAVELLA: And --

2             THE COURT: Listen, the fact -- if Dillon's

3     experience is any indication, asking is no indication of

4     getting.  So the fact that the lawyers at some point down

5     the road may say, Now, Judge, we want you to loosen the

6     constraints so that we can show this material to our

7     experts, I'm not suggesting right now -- I'm not even in a

8     position to know right now how I would respond to that

9     request.  And so I -- I think the problem is -- is now it's

10    -- what you're telling me is, Judge, you should change the

11    protective order because your powers of clairvoyance are

12    better than mine.

13            MR. TARAVELLA: I'm not.

14            THE COURT: Yeah, sure --

15            MR. TARAVELLA: I -- no, because -- because --

16            THE COURT: -- because you just basically said,

17    Judge, I anticipate they're going to ask you to modify your

18    protective order, and you're going to grant it.

19            MR. TARAVELLA: No.  I'm saying the slippery slope

20    is opening the door and giving it to anyone.  That opens the

21    door of pandora's box, the slippery slope, we start going

22    down -- well, let's give it to the lawyers, and they'll

23    follow the protective order.

24            THE COURT: Uh-huh.

25            MR. TARAVELLA: And then in -- then we're going to

1   open the door, we've gone past that, and the cat's out of

2   the bag.  It's a cat's-out-of-the-bag thing.  It's gone.

3   And that's why I don't want to go down that path.  I believe

4   it's a slippery slope, and we -- we'd like the Court to rule

5   on protective order now --

6             THE COURT: Well, what I'm tell --

7             MR. TARAVELLA:  -- rather than later.

8             THE COURT: -- what I'm telling you is is that

9   here's the reality.  And -- and I just -- I'm -- I'm happy,

10  don't misunderstand me, I'm not going to slow the discovery

11  process down.  You will continue to search.

12            MR. TARAVELLA: And we are, yes.

13            THE COURT: And they will --

14            MR. TARAVELLA: And produce --

15            THE COURT: And briefing on your motion will take

16  35 days, and some will be unhappy, and it'll go to Judge

17  Krieger.  And that briefing will take 28 days.  So at the

18  end of the day, you're certainly free to -- to pursue this

19  line of attack.  I'm not suggesting for a second you can't.

20  I am not -- let me make it clear, I am not allowing Dillon

21  to stop or slow down.  So what I --

22            MR. TARAVELLA: Right.  Right.

23            THE COURT: In -- in -- in essence, you and I are

24  going to arrive at the same place.

25            MR. TARAVELLA: But -- and nor have we.

1            THE COURT: We're just going to do it two different

2    ways --

3            MR. TARAVELLA: Nor have we.

4            THE COURT: -- but I don't care.

5            MR. TARAVELLA: Notwithstanding the Motion to Stay,

6    we haven't stopped for one second.

7            THE COURT: Right.  Right.

8            MR. TARAVELLA: Okay?  We are cranking.

9            THE COURT: Good.

10           MR. TARAVELLA:  And like I said, we're peddling as

11   fast as we can.  And we want to convince the Court of that,

12   and I brought three witnesses.  If you don't believe that,

13   Your Honor, we can do that.

14           THE COURT: No, no, no, I -- no.

15           MR.  TARAVELLA:  We  can  call  them.   So  we're

16   cranking ahead.

17           THE COURT: Okay.

18           MR. TARAVELLA: Full speed ahead.

19           THE COURT: Okay.

20           MR.  TARAVELLA:  And  we  --  and  the  --  notwith-

21   standing  the  Motion  to  Stay.   And  I  understand  --  Your

22   Honor,  we're  trying  to  just  protect  every  level.   If  you

23   asked  me,  What  is  the  thrust  of  everything  we've  filed,

24   here's what we're asking: We want to persuade this Court,

25   this Magistrate Judge, that we're proceeding and producing

1     documents in good faith.

2              THE COURT: Okay.

3              MR. TARAVELLA: We also want to -- to persuade

4     this Magistrate Judge that certain things should not be

5     produced to anyone, even Attorneys' Eyes Only.

6              THE COURT: Right.

7              MR. TARAVELLA: Okay? And it's not because I don't

8     think they're going to follow the protective order.

9              THE COURT: Uh-huh.

10             MR. TARAVELLA: It's not a trust or ethics issue.

11    It's because it's the slippery slope you talked about, but

12    a different one.  I don't want to open that door and go down

13    that road.

14             THE COURT: Well, I --

15             MR. TARAVELLA: So that's -- that's what we're

16    asking.  And we're cranking full speed ahead.  Now --

17             THE COURT: Okay.

18             MR. TARAVELLA:   -- the -- the September 17th

19    deadline, we have in our possession -- with respect to items

20    2 and 3 of the subpoena, we have a ton of emails, and we're

21    screening them now.  The problem we ran into, reading the

22    prior transcript, you remember the reference to four fuel

23    custodians?

24             THE COURT: Uh-huh.

25             MR. TARAVELLA: We learned not until August 29th

1     from the plaintiffs there are eight.

2           THE COURT: Okay.

3           MR. TARAVELLA: And that's where we're cranking

4     down.  So it's a lot bigger than we thought.  One of the

5     names was wrong.  You want to talk --

6           THE COURT: Yeah, I saw that.

7           MR. TARAVELLA:  -- about misinformation --

8           THE COURT: No, I saw that.

9           MR. TARAVELLA: One of the names, Stuckey

10    (phonetic), was wrong.  We thought that Stuckey was gone.

11    Different spelling.  We found Stuckey.  We found it -- we

12    found Stuckey.  So I'm having problems in some respects

13    meeting that date, but that's not to say we stopped.  We're

14    proceeding, and I anticipate doing -- producing some of

15    those documents under 2 and 3 by the 17th.

16           THE COURT: Okay.  So --

17           MR. TARAVELLA: So --

18           THE COURT: So -- so -- so what -- what I -- what

19    I think you're telling me is, is that my mandate for you to

20    complete the production by the 17th is not workable.  If so,

21    what would you believe would be a still stringent but more

22    workable deadline?

23           MR. TARAVELLA: We anticipate producing some things

24    by the 17th.  I'm being told October 1st.  And I'll tell you

25    where they are.  We have them in our law firm right now.

1          THE COURT: Okay.

2          MR. TARAVELLA: We're -- we're screening them,

3     Bates numbering them.  So it'll be a rolling production, but

4     Dillon's given them to us, so my firm has to take the hit,

5     and we're -- we're a small firm, but we're -- like I said,

6     we're peddling fast.  So maybe October 1st?

7          THE COURT: So if I -- if I say that you will

8     continue to produce on a rolling basis, and I expect all

9     production to be completed by October 1st?

10          MR. TARAVELLA: That -- that's on 2 and 3 I'm

11     talking about.

12          THE COURT: Okay.

13          MR. TARAVELLA: So -- so -- so other things, there

14     are other issues involved, and -- and we'd have to go

15     through it item by item and see where -- where -- where they

16     are.  I haven't seen -- I heard Mr. Bledsoe refer to some

17     kind of chart I haven't seen, where he thinks they are, but

18     we have conferred three times so --

19          THE COURT: Well, here --

20          MR. TARAVELLA:  -- I would hope that where they

21     think they are and where we think they are are the same, but

22     I'm not sure.  I can't represent that to you.

23          THE COURT: Okay.  Well, here -- here's an

24     observation, because I -- I really do have some people

25     calling in at 9:15 on another matter, and then I've got

1    something at 10, and then I've got some people coming at

2    10:30.  But I realize that you got a bunch of folks here,

3    and I want to try to be as efficient as I possibly can.

4            Robin, I don't think I have anything this

5    afternoon.

6            COURTROOM DEPUTY: No, Judge.

7            THE COURT: All right.  Here's my proposal, folks,

8    because I -- I -- I want to use your time efficiently.  If

9    you would like, we can reconvene at 1:30, and you can con --

10   we can continue this discussion.  You can give me a more

11   comprehensive report.  I'm certainly free to hear -- I'm

12   willing to hear whatever information you want to give me.

13   I will say I'm really not inclined to have a -- what would

14   effectively become a deposition under the guise of a

15   hearing.  That's not the best use of my time.

16           And so I'm -- I'm certainly happy to hear whatever

17   information you had.  My concern is if you put a witness on

18   the stand, it's going to become almost immediately a

19   deposition.

20           MR. TARAVELLA: And it's going to take a long time.

21           THE COURT: Yeah.

22           MR. TARAVELLA: Yes, sir.  That's true.

23           MR. BENNINGTON: May I, Your Honor, on that --

24           THE COURT: Sure.

25           MR. BENNINGTON: -- on that issue?

1           THE COURT: Sure.

2           MR. BENNINGTON: There were two systems that we now

3     know about (inaudible) a PDIRNS system, which have -- it's

4     got evidence -- that was the 400 boxes of documents.  It's

5     now some manner of ESI, and the representation is that

6     they're going to have to buy three other -- three servers,

7     and it will take nine months.

8           Then there's another system supporting the go-to

9     market strategy, as -- as they call it, and that system's --

10    you might help me here is a --

11          MS. CRAIGMILE: I believe it's the quick sales

12    or --

13          MR. BLEDSOE: Quick sales.

14          MR. BENNINGTON: Quick sales.  It strikes me that

15    until we know what those systems have and what can

16    reasonably be produced, we can't efficiently use your time

17    at 1:30, and that we'd be better off having a 30(b)(6)

18    deposition with an expert helping us draft it and then an

19    expert at the deposition, that is, our ESI expert, to make

20    sure we're doing it right.  So then we can come back here

21    with an -- with what we really need from what the systems

22    are that we just learned about.  And do that in a short

23    amount of time.

24          We offered to have our ESI guys with them, what,

25    three, four times, and they've never taken us up on it.  So

1    having him in a deposition with Ms. Giannola or whomever

2    will allow us to figure out what's actually subject to being

3    produced.   Because they have said they're not going to

4    produce.   In effect, they can't produce something without

5    buying three servers and taking nine months.  So they're not

6    continuing to produce.

7         And the -- the thrust of what -- what they're

8    talking about with the quick sale system and the go-to

9    market strategy is they think it's a secret, and I -- I

10   suggest that that's not being gathered together and produced

11   either.  So we need a deposition to lay out what's in those

12   systems, what can be pulled out of those systems at an

13   economical cost, and then we can have -- wrap this up with

14   you.

15        MR. TARAVELLA: My -- my suggestion, Your Honor,

16   would be if we set this for status conference the first week

17   in October and see what we've produced.  See what more we've

18   produced --

19        THE COURT: But to the --

20        MR. TARAVELLA:  -- by then, and then -- then see

21   what else they think they need because they may say, That's

22   all we need.  I'll -- I'll give you an example.

23        THE COURT: Sure.

24        MR. TARAVELLA:  Credit card info -- info.   We

25   produced like 20,000 documents.  We can't link them to zip

1    code, and I have a witness here to explain why if you need

2    -- if you need us to explain that.  If we want to go down

3    that rabbit hole.  But -- but the bottom line is, on credit

4    card information, it's linked to a store, last four, but not

5    a zip code.  Okay?  Basically the long -- long and short of

6    it is, you go to the fuel pump at Kroger, boom, put in your

7    credit card, a package goes to the authorizer through a

8    vendor, comes back, that package is authorized, and that

9    data is lost.  We don't store the zip code.  And -- and we

10   have an expert in systems that can tell us that.

11          So -- so that's what happened on credit cards, and

12   that's what we produced.  We produced -- they can still link

13   the credit card info, the last four, to a store, can't link

14   -- link it to a zip code.  It's just not there.

15          THE COURT: They can't link to the zip code of the

16   customer or --

17          MR. TARAVELLA: Of the customer, yes, sir.  Yes,

18   sir. We -- we link it to a store.  So customer, your last

19   four, you go to -- to a Kroger, we can tell you last four

20   credit card, boom, we've got that information stored.

21          THE COURT: Well, I guess -- I mean, here's my

22   concern.  What you're basically telling me, and -- and --

23   and I -- you're saying, Look, Judge, let us continue down

24   the path we're on.  October 1st rolls around, we will

25   produce.  They can look at that information, and then they

1   can determine whether or not they want more.   What I'm

2   afraid is they're going to come back to me on October 1st

3   and say, Judge, until we know how their systems work, until

4   we know what information, what data their systems collect

5   and -- and maintain, we don't know what more we want.

6           MR. TARAVELLA: Yes, sir, but at the same time,

7   they're saying they want to take Giannola's deposition.   She

8   has nothing to do with systems.

9           THE COURT: No, no, what -- what they're --

10          MR. TARAVELLA: She's a trade secret person.

11          THE COURT: What they're saying -- no, I think what

12   they're saying is they're -- they're sort of picking up on

13   my comment and saying, Look, we don't care who it is, we

14   want to simply depose a knowledgeable person, and we can

15   identify that person by simply issuing a 30(b)(6) notice,

16   and then Dillon can pick who the knowledgeable person is.

17          MR. TARAVELLA: Your Honor, I thought I heard Mr.

18   Bledsoe say he wanted to take Ms. Giannola's deposition,

19   which --

20          MR. BLEDSOE: I -- I -- made a specific --

21          THE COURT: No, I think --

22          MR. TARAVELLA:   -- which --

23          MR. BLEDSOE: I made a specific reference to the

24   director of the department, but if somebody else is better

25   on a 30(b)(6), then we'll go that way.   That's fine.   That's

1       fine.

2               THE COURT: But -- but I mean, here's the problem

3       that I've got, is -- is that -- and -- and it's one of the

4       concerns that -- that I think has plagued this process

5       almost from the very beginning.  And I don't think I'm being

6       unfair to anyone when I say that the discovery requests

7       initially propounded on Dillon were too broad.  I encouraged

8       Dillon's counsel and plaintiff's counsel to get together and

9       see to the greatest extent possible how they could narrow

10      this.

11              Now, the irony is, is that would have been a

12      perfect opportunity for the IT people and lawyers for Dillon

13      and plaintiff to sit down and informally discuss.  That was

14      a missed opportunity.  For whatever reason, common sense did

15      not prevail.  At some point there was some further

16      discussion, and plaintiff's counsel narrowed their requests,

17      and I still think they were too broad.  And that was the

18      subject of another hearing.

19              Dillon then cranked out -- and I'm saying Dillon

20      because I -- I think it's fundamentally unfair to suggest it

21      was outside counsel.  Dillon prepared what can best be

22      described as a woefully inadequate affidavit.  And I think

23      to the extent that Dillon is suffering the consequences of

24      that woefully deficient affidavit, Dillon has no one to

25      blame but itself.  It should not blame outside counsel.  It

1    should not blame plaintiff's counsel.  Dillon had a perfect

2    opportunity to have raised these facts in a timely manner,

3    and they clearly did not.  And having failed in that regard,

4    Dillon's protestations to some extent are a day late and a

5    dollar short.

6            But the fact that we have stumbled our way to this

7    point should not suggest that we can't start moving forward

8    efficiently.   I  would  strongly  encourage  Dillon  and

9    plaintiff's counsel and their IT people to get together. I

10   am not convinced that you need a 30(b)(6) deposition to

11   resolve some of these questions.  And -- and I do not for a

12   second want to suggest by my comments that I'm endorsing

13   that course of action.

14           The irony is, is that if you look at this -- in

15   one respect, Dillon's interests and plaintiff's interests

16   are perfectly aligned.  Perfectly aligned.  Dillon doesn't

17   want to produce anything more than is absolutely necessary.

18   And plaintiff's don't want to read and potentially pay for

19   anything that's not absolutely necessary.  The problem is

20   you folks can't put your heads together and get your IT

21   people together to figure out how you can efficiently and

22   cost-effectively identify that more limited universe.

23           Now, if you could do it informally, that would be

24   great.  If you can't, I'm not necessarily going to say that

25   plaintiffs  need  to  simply  sit  by  with  their  level  of

```
1    uncertainty and lack of knowledge and wait to see what comes
2    across their threshold on October 1st.  Because, ironically,
3    come October 1st, they're going to still come back to me and
4    claim the same lack of knowledge.  And so we're not gaining
5    anything.  We're not saving any time.  And I don't -- I just
6    don't understand a theory which says, having made a lot of
7    procedural mistakes up till now, let's continue to make
8    those procedural mistakes in hopes at some point, we come
9    out at the back end.  I just don't understand that theory.
10           MR. TARAVELLA: Well, Your Honor, there have been
11   a few stumbles, if -- and maybe that's mild -- mild --
12           THE COURT: I don't think they're stumbles --
13           MR. TARAVELLA:  -- description.
14           THE COURT: I -- I would probably more accurately
15   characterize them as ill-advised decisions.
16           MR. TARAVELLA: Yes, sir.  And we're -- and as I
17   said, there have been some mistakes.  We're trying to fix
18   it.  Now, what if we were to continue -- and we haven't
19   stopped, like I said.  Notwithstanding the -- this Motion to
20   Stay, we haven't stopped. We're -- we're proceeding.
21           THE COURT: Okay.
22           MR. TARAVELLA: Because that's what we have in
23   front of us, an order.  And we -- we intend, in every
24   respect, to comply with it, okay?  Notwithstanding what's
25   happened in the past, we're -- we're peddling fast.  Having
```

1     said that, what if we set this for status the -- the first

2     or second week of October, and we agree -- I think I can

3     persuade the client to have the IT people talk to them --

4     talk to each other, so --

5          THE COURT: And here I'm -- and to the extent that

6     there are Dillon people here, I'm going to apologize and

7     talk over your head.

8          MR. TARAVELLA: Yes, sir.

9          THE COURT: If I were Dillon, and I were a decision

10    maker for Dillon, here's the -- the calculus that I would go

11    through.  I've already indicated that I'm going to require

12    that the discovery go forward.  I have also indicated that

13    I am not precluding the possibility at some point of cost

14    shifting.

15         If I were Dillon, and I was trying to make the

16    strongest possible record as quickly as possible to support

17    a potential cost shifting motion, I would not be resisting

18    a   30(b)(6)   deposition,   I   would   be   embracing   it

19    wholeheartedly on the theory that one of the factors --

20    there are multiple factors that I have to consider in a

21    cost-shifting analysis.

22         One of those is the relevance of the information

23    relative to the burdens and expense.  If I were Dillon, I

24    would say, I'll get my IT person at a 30(b)(6) deposition

25    next   week   because   I   believe   that   my   IT   person   will

1    demonstrate to plaintiff's counsel that they are going in

2    exactly the wrong direction.  And if, notwithstanding that

3    clear  signal,  and  the  factual  record  presented  at  the

4    30(b)(6) deposition, plaintiff's counsel continues to run

5    head long into that wall, I am potentially making my cost

6    shifting motion even stronger.

7              If  you  wait  until  October  1st,  after  you've

8    generated all this information, after they've repeatedly

9    asked  to  confer  with  you,  and  after  you've  repeatedly

10   rebuffed them, one might argue you're actually in a weaker

11   position to advocate cost shifting.  And so I gotta question

12   the strategy that Dillon is employing.

13             MR. TARAVELLA: Well, what did you -- Your Honor,

14   may  I  ask,  what  did  you  mean  by  repeatedly  rebuffing

15   conferrals?  We've had three since we've been --

16             THE COURT: No, as I under --

17             MR. TARAVELLA: -- since I've been on board.

18             THE  COURT: As  I  understand  it,  there  have  been

19   times when plaintiff's counsel has said, Let's let my IT

20   guys get together with your IT guys, and let's let the IT

21   people chat.

22             MR. TARAVELLA: Okay.

23             THE COURT: I mean, here's one of the interesting

24   things, folks.  I can't begin to give you an absolute count,

25   but I know, just from my own experience, the number of local

1    rules -- the number of District Courts that have adopted

2    local rules on ediscovery.  The number of Districts who have

3    said, As part of our local rules, we are now going to

4    require the parties to designate an ediscovery liaison.  We

5    want the parties to have ediscovery specialists who can work

6    with each other.  So when I say "rebuff," that's what I'm

7    referring to.

8              MR. TARAVELLA: Okay.

9              THE COURT: If they've said --

10             MR. TARAVELLA: Understood.

11             THE COURT: -- let's let the IT people explain to

12   each other what's going on, that's a perfect opportunity.

13             MR. TARAVELLA: Understood.  And I'm going to

14   recommend that to the client.  So -- but one thing -- one

15   caveat is I don't think it's going to be an IT person.

16   Given the complexity of this company, I think it's going to

17   be more than one.

18             THE COURT: That's fine.

19             MR. TARAVELLA: I don't know how many.

20             THE COURT: That's fine.  I mean, get the --

21             MR. TARAVELLA: But -- but I think it's going to be

22   -- it's going to be quite a few.

23             THE COURT: -- get the intelligent people together.

24             MR. TARAVELLA: And -- and that's fine.  I'm going

25   to recommend that to the client.  I -- I'd ask to set it for

1      a status conference the first or second week of October.

2      We'll have given them a ton more stuff, a ton of more stuff.

3      And I'd ask that -- that we have that opportunity to have

4      the IT people, and they have -- Ms. Craigmile had suggested

5      that, indeed, as you -- as you said.  And I think we should

6      do it.  And -- and we're not stopping on production, Your

7      Honor.

8                  THE COURT: I guess, but --

9                  MR. TARAVELLA: We're not.

10                 THE COURT: -- but --

11                 MR. BLEDSOE: Your Honor, we don't -- we don't need

12     to wait till October.  If -- if we need to have a follow-up

13     status conference, can we have it in another week or so

14     here?  Because that's the only --

15                 THE COURT: Well, I can't -- no, I -- no,

16     ironically, no.

17                 MR. BLEDSOE: As much as I know you love to see us,

18     Your Honor.

19                 THE COURT: No, no, no, no, no, that's not an

20     issue.  No, I was -- what I'm chuckling about is -- is for

21     the last several years, I have been a faculty member at

22     programs put together by the Federal Judicial Conference --

23     or Federal Judicial Center, teaching federal judges about

24     e-discovery, and so --

25                 MR. BLEDSOE: Are you going to be talking about us

1      in this case?

2              THE COURT: -- I'm -- I'm going to be in Baltimore

3      most of next week teaching federal judges things they need

4      to know about e-discovery, so I don't know which audience

5      would be more attentive, this audience or that audience, but

6      next week they get first dibs.

7              MR. BLEDSOE: Well, then, the week -- then the last

8      week of September because we've got this stay issue here.

9      I mean, there's survey data that they have, that they can

10     produce, they're standing right now on their so-called trade

11     secret argument.  That can be produced.  If -- you know, if

12     the stay issue is out there, I want to get that decided by

13     this Court, and -- and -- and --

14             THE COURT: But it's not -- but the truth of the

15     matter is it probably isn't going to be stayed by this Court

16     because what I'm telling you --

17             MR. BLEDSOE: Well, that's what I think.  That's

18     why I want to get a definitive answer.

19             THE COURT: What I -- what I'm telling you is is --

20     and that's what I'm fearful of.  I -- I absolutely respect

21     Dillon's rights to file these motions.  I'm -- I'm not

22     questioning that for a second.  But I'm not going to allow

23     the motion practice to become an alternative means for

24     delay.  And that's why the discovery's going to go forward.

25     I will certainly entertain any arguments about a protective

1      order. And -- and I certainly respect Dillon's right to ask
2      me to reconsider the scope of the protective order.  But I
3      -- I'm not going to allow the discovery process to slow
4      down.

5              And I do not believe -- again, the fact that
6      plaintiff's counsel have this stuff subject to restrictions
7      that I impose is not a justification to withhold it.  And so
8      I'm simply telling Dillon, if Dillon -- if Dillon decides to
9      -- you know, we're not -- we've found it, we've got it, we
10     could produce it, but we're not going to produce it
11     notwithstanding the Court's order because we want the Court
12     to reconsider some restriction on whether plaintiff's
13     counsel and plaintiff's counsel alone, I think that would be
14     a serious mistake on the part of Dillon.

15             But I certainly respect any party or any lawyer's
16     right to make as many bad decisions as possible. The last
17     thing I want to do is -- is get in anybody's way, to the
18     extent that they are inclined or pre -- predisposed to make
19     bad decisions, I absolutely respect a party's make -- right
20     to make bad decisions.  In fact, if you think about it, if
21     you didn't have a right to make bad decisions, we wouldn't
22     need Rule 37, which allows the Court to impose sanctions.

23             But I think at some point -- I guess what I would
24     suggest, both to the parties, and to the non-parties who
25     find themselves embroiled in this process, there is still a

44

1     real advantage to focusing on the shortest distance between

2     two points.  A meandering journey does not get you anywhere

3     faster.  It just racks up travel costs.  And if we are doing

4     anything in this case, we are meandering.  And given the

5     price of gas, why would you want to do that?

6                So what would you like me to set next?  I -- I

7     mean, I -- I can do one of two things.  I can set this

8     matter for a status conference.  I've got criminal duty,

9     that's a bit of a problem.  And it's a problem only in this

10    respect, when I have criminal duty from 10 o'clock till

11    about 3:30, I can't do anything in my civil docket.  And so

12    -- and I have criminal duty the weeks of September 24 and

13    October 1st, so if you want to do something the week of

14    October 1st, we will either have to set it for 8 o'clock,

15    and we'll have to stop after two hours, or we can set it for

16    3:30 and we can go till 6.

17               MR. BLEDSOE: Your Honor, may I suggest --

18               THE COURT: Sure.

19               MR.  BLEDSOE:   -- that we set something on

20    September 25th for -- for status and ruling on any pending

21    motions before you?

22               THE COURT: Yeah, but the pending motions won't be

23    fully briefed.  I mean, right now --

24               MR. BLEDSOE: I think you can --

25               THE COURT: -- if I'm -- if I'm not -

1          MR. BLEDSOE: I think you can order that they will
2     be, Your Honor.   We're prepared to get them -- we're
3     prepared to get ours filed early next week.   Monday,
4     probably, or Tuesday -- yeah, Tuesday -- thank you, Kay.
5          THE COURT: Well, I -- I mean, I --
6          MR. BLEDSOE: I mean, you can order them fully
7     briefed.
8          THE COURT: I mean, I -- I appreciate you -- you
9     signing me up for that, but it's really not practical --
10         MR. BLEDSOE: Yeah.
11         THE COURT: -- because to the extent that you file
12    something next week, I'm not going to be here.   If you file
13    something promptly, they're going to file a reply.   They've
14    got -- under the local rules -- I mean, I'm assuming you're
15    going to take full advantage of your 21 days.   When do you
16    plan -- I mean, they filed these two motions on August 31.
17    Under the local rules, you get 21 days to respond.   When
18    were you planning on filing your response?
19         MR. BLEDSOE: Well, we were planning on beating
20    that, probably Tuesday is what we were planning on, Your
21    Honor.
22         THE COURT: Okay.   So Tuesday would --
23         MR. BLEDSOE: That's the 18th.
24         THE COURT: -- get us to the 18th.
25         MR. BLEDSOE: Yeah.

1          THE COURT: So you shaved three days off.  So if I
2     tell them they need to shave three days off their 14-day
3     reply, you can see that the September 25th date really isn't
4     workable.   And  the  fact  of  the  matter  is  --  look,  the
5     discovery is going to continue.  So I don't understand the
6     --  the  --  the  necessity  for  wrestling  with  a  protective
7     order issue.   I mean, at the end of the day, I've ordered
8     this stuff to be produced.

9          If, for some reason, Dillon says, Notwithstanding
10    that production, notwithstanding the constraints that have
11    been  imposed  as  an  interim  step  on  that  production,  we're
12    simply not going to do it, that is tantamount to a violation
13    of a discovery order under Rule 37(b).  And there's no other
14    way  to  construe  it  because  I  have  not  reconsidered  my
15    ruling, and I am not staying my ruling, and so -- I mean,
16    again, Dillon is certainly free to proceed in any manner
17    that it seems appropriate.  But in the absence of -- of a
18    reconsideration, in the absence of any further modification,
19    a failure to produce on October 1st would be tantamount to
20    a  violation  of  the  Court's  discovery   order.   And  37(b)
21    would require that I impose sanctions.

22         MR. TARAVELLA: So -- so did I hear Your Honor say,
23    you're -- you -- you've ruled on our Motion to Stay?  And --
24         THE COURT: No, I --
25         MR. TARAVELLA:  -- and our Motion to Reconsider --

1           THE COURT: -- I'm basically right now --

2           MR. TARAVELLA:  -- and our --

3           THE COURT: No, I'm not -- basically, I'm not.

4           MR. TARAVELLA: Oh, okay.

5           THE COURT: Right now there's a Motion to Stay.

6           MR. TARAVELLA: Right.

7           THE COURT: Briefing hasn't been done.

8           MR. TARAVELLA: Okay.  Okay.  That's what I

9      understood.  Okay.

10          THE COURT:  And in the absence of a ruling on the

11     Motion to Stay, for all intents and purposes, things go

12     forward.

13          MR. TARAVELLA: Right.  Right.  And that's what

14     we're -- we're doing.

15          THE COURT: Right.  And so -- but -- but as I

16     understand it, it's going forward in a limited fashion

17     because, if I understand plaintiff's counsel, some material

18     has been identified and could be produced, but is --

19     notwithstanding that reality is going to be withheld because

20     you have decided that the protective order that I've put in

21     place for that protection is inadequate, and therefore,

22     you're simply not going to produce.

23          MR. TARAVELLA: And -- and that, of course, would

24     be subject to -- to the Motion to -- to Stay and to

25     Reconsideration, so --

1          THE COURT: I know, but --

2          MR. TARAVELLA:  -- so -- but -- but we're -- we're

3    pressing full speed ahead in -- in -- in the areas where we

4    have documents that we think we can, other than that trade

5    secret area for now.

6          MR. BLEDSOE: Well, Your Honor, I'm hearing him say

7    that they're going to refuse to produce it.

8          THE COURT: And -- and if they do, and if -- if --

9    if they refuse to produce, and if, in fact, they don't

10   prevail on their legal arguments, they will be in violation

11   of 37(b).

12         MR. TARAVELLA: Assuming you deny --

13         THE COURT: Yeah.

14         MR. TARAVELLA:  -- assuming you deny the motions,

15   which the Court's not ruling on at this point.

16         THE COURT: No, but -- what I'm telling you guys is

17   -- is, again, I -- I -- I -- I can't speak for Dillon, but

18   I don't necessarily understand the rationale for Dillon's

19   position, and maybe it will become clear.   And maybe it

20   might even be persuasive.  But if -- if it's not clear and

21   if it's not persuasive, it seems to me to be an exceedingly

22   high stakes gamble to no useful end because you, Counsel,

23   have just told me -- and this is -- this is where I find

24   Dillon's position absolutely unfathomable.

25         Dillon's counsel has stood up in this court, and

1     I appreciate his candor, I sincerely appreciate his candor.

2     Dillon's counsel has stood up in this court and said he

3     absolutely trusts plaintiff's counsel to engage in nothing

4     but the highest professional standards.  Notwithstanding

5     that representation, which I think is a fair and accurate

6     representation, Dillon, the client, is saying, We're simply

7     not going to do it.

8           And it would seem to me, as a practical matter,

9     when Dillon's counsel says, Plaintiff's counsel can be

10    trusted to adhere to the Court's order, and the Court's

11    order says that it's not going to be seen by anybody but

12    plaintiff's counsel, I think Dillon is going to find itself

13    in a very difficult position trying to justify its decision

14    not to adhere to the order and produce it to plaintiff's

15    counsel.

16          I think Dillon has got itself in a real serious

17    bind.  Because I think your representation, Counsel, is --

18    is to your credit, and I think it is a completely fair

19    representation. And in light of that representation, for

20    Dillon to say, notwithstanding the Court's safeguards,

21    notwithstanding our own lawyer's acknowledgment, we're

22    simply not going to do it, I think it's a -- to use your

23    phrase, a very slippery slope and a very steep incline.

24         MR. BLEDSOE: Your Honor --

25         THE COURT: And it may very well be, to follow that

1    metaphor to its logical conclusion, Dillon is on a glide

2    path to disaster.

3                MR. TARAVELLA: At -- at this point, assuming

4    arguendo, and we're not admitting that a protective order is

5    adequate protection, there's no Attorneys' Eyes Only

6    designation anyway in that protective order.  So we're not

7    protected.

8                THE COURT: Counsel --

9                MR. TARAVELLA: We're not protected.

10               THE COURT: Counsel, I can modify that protective

11   order any way I want.

12               MR. TARAVELLA: Understood, but it's not there,

13   Your Honor.

14               THE COURT: Then -- then -- but --

15               MR. TARAVELLA: It's -- the protection is not there

16   to produce it.

17               THE COURT: -- but -- but, Counsel --

18               MR. TARAVELLA: Okay?

19               THE COURT: Counsel --

20               MR. TARAVELLA:  It's not in the protective order.

21               THE COURT: Counsel, I -- no, I'm not going to let

22   you go down that road.  I -- I am not going to allow you to

23   stand up in court and say, We can trust counsel, but, Judge,

24   we can't trust counsel because you haven't modified the

25   protective order.   I'm more than happy to modify the

1    protective order right now, and I think -- and I'd have to
2    go back and read the transcript, I suspect in the transcript
3    I probably said that it's only going to be seen by
4    plaintiff's counsel.
5           MR. TARAVELLA: And -- and what does that mean?
6           MR. BENNINGTON: (Inaudible) now.  I think the
7    protective order accomplishes that.
8           MR. TARAVELLA: No.
9           THE COURT: Yeah.
10          MR. BENNINGTON: We can stipulate to that right
11   now.
12          MR. TARAVELLA: No, it doesn't accomplish that,
13   with all due respect, number one.  Two is, is Attorneys'
14   Eyes Only -- did your -- did the Court contemplate outside
15   counsel only or -- and do -- do they have -- I understand
16   they don't have inside counsel.
17          THE COURT: I'm happy to modify --
18          MR. TARAVELLA: They don't have inside --
19          THE COURT: Listen, I'm happy -- I'm happy to
20   insist that until otherwise instructed, the only people who
21   can see the stuff is counsel of record, and they can only
22   see it in a room where the lights are completely turned off.
23          MR. TARAVELLA: And they have to burn -- burn it
24   before reading?
25          THE COURT: And I don't know what more protection

1       you would need.

2               MR. TARAVELLA: How about if they have to burn it

3       before they read it, Your Honor?

4               THE COURT: Pardon?

5               MR. TARAVELLA: I'm -- I'm just -- I'm just --

6               THE COURT: I mean -- I mean, don't --

7               MR. TARAVELLA: So I understand it, so counsel of

8       record.  I get it.

9               THE COURT: Listen, you know, again, the more this

10      plays out, the more tenuous Dillon's position becomes.  And

11      at some point, it almost defies logic.  In other words,

12      Dillon -- I have not ever suggested an unwillingness to

13      consider any restrictions.  And the problem I've got is is

14      now it seems every time I'm trying to move this forward --

15      this process forward, Dillon poses a new obstacle.  I think

16      at some point Dillon's got to decide, do they want to

17      continue to be an obstacle, or do they want to be a partner

18      of the Court and -- and assisting the Court in advancing

19      everyone's interest.

20              MR. TARAVELLA: Your Honor, I think Dillon came in

21      and said, We couldn't produce.  They objected to the whole

22      subpoena.  So since that time, we have fired rifle shots

23      that I mentioned to you, under 5, 8, 9, 10, I believe, and

24      -- and we've produced 20,000 documents.

25              THE COURT: I know, but --

1        MR. TARAVELLA: So --

2        THE COURT: -- but -- I mean, as perfect -- but,

3    Counsel, this is a perfect example.  Truly, I can impose any

4    restrictions -- I've already told you that my objective in

5    the  near  term  is  to  protect  Dillon's  trade  secrets,

6    certainly on an interim basis, and consistent with that, I

7    can  impose  any  restrictions  on  access  that  allow  the

8    discovery process to move forward, that allow the completion

9    of the production, and limit access.

10       And the difficulty is is that -- that, you know,

11   every time I suggest a new rationale or a new opportunity

12   for Dillon and plaintiffs to work together to protect their

13   interests, I -- I'm getting, Well, Judge, we can't do that

14   because there's no Attorneys' Eyes language.  Well, to some

15   extent I find that remarkable because you and I both know,

16   I could do that at the drop of a hat.  And so to suggest

17   that  somehow  the  protective  order  is  deficient  and,

18   therefore, nothing should happen is not a strong litigation

19   position to be advancing.

20       MR.  TARAVELLA:  Well,  I  --  I  said  assuming

21   arguendo, we produce it.  I -- I -- you know, right now --

22       THE COURT: Well, let's -- let's not argue --

23       MR. TARAVELLA:  -- so --

24       THE  COURT:  We're  --  if  this  case  has  been

25   characterized by anything, it's too much arguendo.  Let's

1    cut down on the arguendo.

2           MR. BLEDSOE: Your Honor, can --

3           THE COURT: Let's -- I don't know that the Latin

4    version of cooperation is, but we've got too much arguendo,

5    and not enough cooperation.

6           MR. TARAVELLA: I -- I think we made a lot of

7    progress, with all due respect.   Three conferrals, Your

8    Honor, I'm -- we're peddling fast, so -- so I think there's

9    been less argument, but -- but that's my -- just my opinion.

10    The Court's opinion matters more than my opinion, obviously.

11           MR. BLEDSOE: Your Honor, could we set something

12    October 3rd?

13           THE COURT: Yeah, as long as you're willing to do

14    it at 8 o'clock or at 3:30.

15           MR. BLEDSOE: Absolutely, Your Honor.

16           MR. TARAVELLA: May I take out my cell phone --

17           THE COURT: Sure.

18           MR. TARAVELLA:  -- Your Honor?

19           THE COURT: Absolutely.

20           MR. TARAVELLA: What date are we looking at?

21    October 3rd?

22           MR. BLEDSOE: That's a Wednesday.

23           THE COURT: Actually, I've got something at -- I've

24    got a final pre-trial conference, so if we do it on a

25    Wednesday, it's going to have to be at 3:30.

1           MR. BLEDSOE: 3:30 is fine, Your Honor.

2           THE COURT: And at 6 o'clock, you all will have to

3   leave because the building will be locked down.

4           MR. BLEDSOE: Yeah.  But that will be -- that's

5   fine, Your Honor.

6           THE COURT: All right.

7           MR. TARAVELLA: October 3rd at what time?

8           THE COURT: 3:30.

9           MR. TARAVELLA: Hold on a second, please.

10          THE COURT: And I will certainly -- I will be

11  certainly happy to consider at any time between now and

12  October 30 (sic) a joint motion filed by Dillon and Suncor

13  and plaintiffs to modify the protective order.  I would be

14  more than happy to consider that motion to the extent that

15  we stop arguendoing.

16          MR. TARAVELLA: More cooperation, right, Your

17  Honor?

18          THE COURT: Yeah.

19          MR. TARAVELLA: All right.

20          THE COURT: Certainly more communication.

21          MR. TARAVELLA: Yes, sir.  I think we're making

22  progress, but --

23          THE COURT: Okay.

24          MR. TARAVELLA: October 3rd.

25          THE COURT: October 3rd at 3:30.

1                MR. TARAVELLA: I'm sorry, I had to boot this up.

2       It was off --

3                THE COURT: That's okay.

4                MR. TARAVELLA:  -- in accordance with the Court's

5       order.  October 3rd --

6                THE COURT: Yeah, you guys -- I -- phones go off

7       all the time, I don't care.  As long as it's not for me.

8                MR. TARAVELLA: I just don't want to end up in jail

9       when the phone goes off, Your Honor, so --

10               THE COURT: No, I mean, there -- there are some

11      judges that would --

12               MR. TARAVELLA:  -- so -- I know.

13               THE COURT: I mean, as long as I don't have to

14      answer it, I don't care if they go off.

15               MR. TARAVELLA: Your Honor, so are -- are we -- is

16      this a witness hearing, or just a status conference, because

17      I -- I have no idea if I -- if witnesses are available,

18      so --

19               THE COURT: I -- I don't -- I don't know at this

20      point -- I mean, here's the reality.  There's -- and, again,

21      there's no reason for me to hear from the witnesses until I

22      know that you have reached a point where there is no return.

23      In other words, I don't need to hear a witness, to have a

24      witness tell me that we're continuing to work.  I assume

25      you're continuing to work.

1           Now, there may be at some point where we're
2      fighting about -- or you're fighting about the sufficiency
3      of the production or the -- the necessity for cost shifting,
4      but, I mean, here's the problem that I've got.  If I have a
5      hearing on October 3, and I've told you to produce
6      everything on October 1, at that point, the hearing is much
7      to-do about nothing.  You've either produced and complied or
8      you haven't.  Now, if you haven't, I'm assuming plaintiff
9      will move to compel.  If plaintiff moves to compel, you'll
10     file a response, and to the extent that I think an
11     evidentiary hearing in connection with the motion to compel
12     is necessary, I will certainly set one.
13          To the extent that you fully produce, but then you
14     say, Okay, now we want to recover some of those costs,
15     you'll file that motion, and I'll have to have a hearing,
16     but I guess my sense is, I -- it's not clear to me what
17     evidence or what fact finding would happen on October 3rd.
18     You've either produced or you haven't.  And then they'll
19     file a motion or you will.
20          MR. TARAVELLA: So one thing I want to clarify is
21     the server thing.  We -- we pointed out that we need to get
22     three servers.  The Court more than once in prior hearings
23     said, I'm not going to talk about cost shifting.  And we've
24     talked about it here today.  I -- I'm not clear -- so it
25     sounds to me like to the extent we don't go ahead and buy

1    the three servers, download the information and produce it,

2    we do so at our own peril.

3              MR. BLEDSOE: That's why the IT --

4              MR. TARAVELLA: Right?  I mean --

5              MR. BLEDSOE: I'm -- I'm sorry to interrupt,

6    Counsel, but that's why the IT guys need to get together.

7    And, Your Honor, what -- what I've -- trying to accomplish

8    on this October 3rd thing is to get on the Court's calendar

9    so if we need the Court's attention, we can figure out what

10   we're going to do.  Today's the 13th of September.  We're

11   offering again to get our IT people here.  We've gone

12   through the trouble of identifying where the shortages are

13   at this point.  We'll confer up one side and down the other,

14   and what we need to do is have that discussion IT to IT and

15   address this server issue, and find out what's bogus or

16   what's not bogus.  I can't make them produce documents they

17   don't have.  If there's --

18             THE COURT: But see -- and again, folks --

19             MR. BLEDSOE: -- an insurmountable thing, we can do

20   that.

21             THE COURT: This is -- I -- in this day and age,

22   given the quality of the lawyers involved in this case, it

23   shouldn't be -- it shouldn't be incumbent upon me to set a

24   hearing to get the IT people talking to each other.  I -- I

25   just don't see the logic in that.  If you're telling me that

1    producing that category of information is extremely

2    burdensome, in the first instance, persuade them.  They are

3    saying, Talk to us.  And more importantly, Talk to our IT

4    people.

5            Now, if you do that, and you sort of provide, in

6    the spirit of candor, your IT people so that there is this

7    meaningful discussion, and then there's still a problem,

8    then at that point, it's useful -- there's something for me

9    to inject myself into.

10           MR. TARAVELLA: Well, we conferred with them after

11   we pointed out --

12           THE COURT: Get the I --

13           MR. TARAVELLA:  -- three servers --

14           THE COURT: Counsel --

15           MR. TARAVELLA:   -- three servers needed to be

16   purchased.

17           THE COURT: -- get the IT people together.  It's --

18   really.  Because, I mean, I'm not -- listen, I'm certainly

19   not in a position today to make any informed decisions.  I

20   don't know what sampling protocols are possible.  I don't

21   know if there's some phase discovery.  It may very well be.

22   I'm not prepared to presume that you simply willy-nilly have

23   to go through and produce three servers worth of

24   information.

25           But if I were Dillon, I'd be sitting down with my

1    creative -- with my IT people, and I would say, Look, let's

2    come up with some creative approaches that we can then

3    present to plaintiff's counsel, either in the form of

4    sampling or some phase production.  But right now, all I'm

5    hearing is you guys are saying, There's three servers, it's

6    going to cost nine months, and it's going to cost a lot of

7    money.  That's not a creative solution.

8           And what I'm inviting you folks to do is to

9    explore creative solutions.  And the fact of the matter is,

10   if all Dillon gives -- Dillon has misplayed this from day

11   one.  And if Dillon comes and says, Look, Judge, it's just

12   going to cost lots and lots of money, and therefore, in the

13   absence of any creative solutions or any creative

14   alternatives, we want you to just make an absolute ruling,

15   that is not a position of strength for Dillon to be taking.

16          If I were Dillon, I would be trying to come up

17   with creative alternatives.  Present me -- here's the

18   problem in a nutshell, and then I'm going to throw you folks

19   out because I'm already behind schedule.  And -- and this is

20   a pitch that I make at CLE after CLE, and it apparently

21   falls on deaf ears.  Part of the problem that you've got

22   here, folks, and part of the problem we had at the last

23   hearing is Dillon is making the fundamental mistake of

24   approaching these issues from an adversarial perspective.

25          Dillon would be much better off if they approached

1     these issues from an educational perspective.  Our job isn't

2     to  fight  with  the  Court,  our  job  isn't  to  fight  with

3     plaintiff's counsel, our job is to educate them on what we

4     can do and what we can't do and creative options that are

5     available to us and the cost of those creative options.  If

6     Dillon would stop approaching these issues adversarially and

7     start  approaching  them  cooperatively  and  educationally,

8     Dillon would be much farther along in this path.  In fact,

9     may very well have reached a -- a desirable destination.

10            And that's what I'm suggesting.  And so I will

11    leave it up to you, folks.  At some point -- and I want to

12    be helpful, and I want to move this process along, but I

13    can't get to the point where my desire to be helpful becomes

14    itself a vehicle for delay.  And that's where I think we're

15    becoming.  I have -- this is -- I -- by my calculation, the

16    third time I have wrestled with and devoted hearing time to

17    deal with the subpoena served on Dillon.  And what I'm

18    fearful of is that if I have another, quote, unquote,

19    hearing on October 3, my desire to be helpful is being

20    turned upside down and is becoming now antithetical to the

21    objectives underlying that desire to be helpful.

22            So between now and October 3, I urge you all to

23    make intelligent decisions.  I urge you all to work as

24    cooperatively as possible.  And I will see whatever cards

25    you present on October 3, and we will play the cards that

1      you give me.

2              MR. TARAVELLA: How long was that hearing for --

3      did you set that for, Your Honor?

4              THE COURT: We'll start at 3:30, and I -- my

5      security people are going to lock the door at 6.

6              MR. TARAVELLA: Okay.

7              THE COURT: But we'll give you all that time.

8      Okay?

9              MR. BLEDSOE: Thank you, Your Honor.

10             THE COURT: Thank you.

11             MR. TARAVELLA: Thank you.

12             THE COURT: You got it.

13             THE CLERK: All rise.  Court is in recess.

14

15             (Whereupon, the within hearing was then in

16     conclusion at 9:46 a.m. on September 14, 2012.)

17

18             I certify that the foregoing is a correct

19     transcript, to the best of my knowledge and belief, from the

20     record of proceedings in the above-entitled matter.

21

22     /s/ William Woods                  September 24, 2012

23     Signature of Transcriber                Date

24

25