1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3    Case No. 11-cv-01611-MSK-CBS
       _____

4    WESTERN CONVENIENCE STORES, INC., et al.,
          Plaintiffs,

5    vs.

6    SUNCOR ENERGY (U.S.A.) INC.
          Defendant.

7
    DILLON COMPANIES, INC.

8          Interested Party.
       _____

9            Proceedings before CRAIG B. SHAFFER, United States

10   Magistrate Judge, United States District Court for the

11   District of Colorado, commencing at 3:31 p.m., October 3,

12   2012, in the United States Courthouse, Denver, Colorado.

13   _____

14          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

15   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

16   _____

17                  APPEARANCES

18          KENNETH BENNINGTON, KATHLEEN CRAIGMILE and PHILIP

19   BLEDSOE, Attorneys at Law, appearing for the plaintiffs.

20          ANTHONY SHAHEEN, Attorney at Law, appearing for

21   the defendant.

22          CHRISTOPHER TARAVELLA and MICHAEL McCORMICK,

23   Attorneys at Law, appearing for the interested party.

24   _____

25                 STATUS CONFERENCE

```
 1                    P R O C E E D I N G S
 2      (Whereupon, the within electronically recorded proceedings
 3      are herein transcribed, pursuant to order of counsel.)
 4      (NOTE FROM TRANSCRIPTIONIST -- There are a number of
 5      "Inaudibles" appearing in this transcript due to the fact
 6      counsel were not at a microphone while speaking.)
 7                THE CLERK:  All rise.
 8                THE COURT:  We are on the record in 11-cv-1611,
 9      Western Convenience Stores, et al. vs. Suncor Energy, et al.
10                I will take appearances of counsel.
11                MR. BENNINGTON:  Kenneth Bennington and Kathleen
12      Craigmile for the plaintiffs.
13                THE COURT:  Okay.
14                MR. BLEDSOE:  And Phil Bledsoe for (inaudible).
15                THE COURT:  Okay.
16                MR. SHAHEEN:  Tony Shaheen on behalf of Suncor.
17                THE COURT:  Anybody from Dillon want to step up to
18      the plate?
19                MR. TARAVELLA:  Yes.  Christopher A. Taravella and
20      Michael McCormick, Montgomery Little Soran, for interested
21      party Dillon.
22                THE COURT:  Come on up here, guys.  You've
23      certainly earned your right to sit in the soft seats.
24                MR. TARAVELLA:  Very well.  We'll join Mr.
25      Shaheen.
```

1            THE COURT:  All right.  I set this matter for a

2     status conference.  I have received a status report from

3     plaintiffs, it was filed yesterday, and I've reviewed that.

4            Somebody fill me in.  What's the latest?

5            MR. BENNINGTON:  Well, the latest is, Your Honor,

6     we've -- as the status report reflects, we met, and there are

7     still a number of outstanding issues.  Primarily those issues

8     relate to documents and information which Kroger or Dillon

9     alleges -- or asserts, I should say, is subject to a trade

10     secret sort of privilege, and notwithstanding the last

11     hearing we had in front of you, or last appearance in front

12     of you, that data has still not been produced.

13            We have talked about a new protective order, I've

14     sent over a draft -- I'm sorry, the Word version of the

15     existing one yesterday, and my impression -- I'm sorry, it

16     was Monday -- my impression from our conversation Monday was

17     that Dillon had not thoroughly yet reviewed the protective

18     order that's in place and was uncertain as to whether it

19     would need to be red-lined or a new one crafted, and we have

20     not heard on that either way.

21            The matters that are still outstanding that have

22     been claimed to be trade secrets and therefore not subject to

23     production are some 45 pages of contracts, that is, contracts

24     between Dillon and Suncor, 45 to 50 e-mails from a gentleman

25     named David Wilson as to which there is --

```
 1              THE COURT:  David Wilson is who?
 2              MR. BENNINGTON:  He is a Kroger executive, or
 3    Dillon executive.  My understanding is that the assertion is
 4    that those would be trade secrets as to Suncor.
 5              THE COURT:  And these are e-mails between
 6    Mr. Wilson and whom?
 7              MR. BENNINGTON:  We don't know, but within the
 8    scope of the key words which we long ago have pared down and
 9    were part of the subpoena.  In addition --
10              THE COURT:  These are 45 to 50 e-mails from David
11    Wilson --
12              MR. BENNINGTON:  I may be wrong and it may be
13    pages, Your Honor.  Anyway --
14              THE COURT:  Well, there's no point in talking --
15              MR. BENNINGTON:  -- a number.
16              THE COURT:  -- about pages.  When we're talking
17    about ESI, "pages" is a meaningless term.
18              MR. BENNINGTON:  Yeah.
19              THE COURT:  It's documents.  Because you could
20    have multi-page documents or you could have --
21              MR. BENNINGTON:  Right.
22              THE COURT:  -- a single paragraph.
23              So it's 45 to 50 e-mails.  You know that they
24    either involve Mr. Wilson as the sender or the recipient, but
25    if I understand correctly, your search term was simply David
```

1      Wilson.

2              MR. BENNINGTON:  No, our search term was for words

3      such as --

4              (To Ms. Craigmile) Do you have those search terms

5      handy?

6              -- words such as "discount."

7              MS. CRAIGMILE:  It's under request 2 and 3.

8              THE COURT:  Right.

9              MS. CRAIGMILE:  Would be rebates, discounts, off

10     invoice kickbacks, credits, allowances.  That was request 2

11     that relates to discount.  And then the sort of variance of

12     Western Convenience Stores (inaudible).

13             THE COURT:  But my point though is to the extent

14     that these are e-mails to or from Mr. Wilson, they are still

15     connected to a transaction between Dillon and Suncor.

16             MR. BENNINGTON:  Apparently.

17             THE COURT:  So there's that nexus.  Okay.

18             MR. BENNINGTON:  Next is 5-H.

19             THE COURT:  Yeah, I have a question about 5-H.

20     Has your discovery to date determined who delivers fuel for

21     Dillon to these Dillon stores, because I'm assuming what you

22     want is the net and gross quantity of fuel delivered to each

23     store.

24             MR. BENNINGTON:  That's right.  Dillon --

25             THE COURT:  And I'm going to show my ignorance,

1    but is there really -- I mean, you put the fuel in the truck,

2    and you drive the truck, and then you pump the fuel into the

3    ground.  The reference to net and gross quantities, do you

4    leave some in the truck?

5              MR. BENNINGTON:  Well, there are two purposes.

6    The main purpose for that is as a check against other data

7    that we have of uncertain accuracy that would -- from Suncor.

8              THE COURT:  You've got --

9              MR. BENNINGTON:  From Suncor.

10             THE COURT:  You've got uncertain data from whom?

11             MR. BENNINGTON:  From Suncor.  We're trying to --

12             THE COURT:  In what way do you think it's

13   uncertain?

14             MR. BENNINGTON:  Because we have found, and I

15   think Mr. -- Mr. Shaheen would confirm with me, that over the

16   course of this --

17             THE COURT:  Mr. Shaheen is hoping he gets through

18   this --

19             MR. BENNINGTON:  Yeah.

20             THE COURT:  -- entire hearing without ever opening

21   his mouth.

22             MR. BENNINGTON:  Right.

23             We found drop-outs and inconsistencies going both

24   directions.  And he has called me up and said can you explain

25   this, could you provide this, we're missing that, and I have

1    made the same requests of them, and they've always been

2    fulfilled.

3              THE COURT:  Okay.

4              MR. BENNINGTON:  So --

5              THE COURT:  Do you know who delivers the fuel to

6    these Dillon --

7              MR. BENNINGTON:  I don't know the name of the

8    trucking company, but it is a trucking company contracted by

9    Dillon to do that.  Our fuel of course is delivered by WTO,

10   another -- a plaintiff.

11             THE COURT:  Okay.  So if I understand correctly,

12   the reason why you want the information about these store

13   deliveries is because you are uncertain as to the accuracy of

14   the Suncor documentation you've gotten.

15             MR. BENNINGTON:  Well, and also -- we also wanted

16   to check, double-check, against -- using the quantity, you

17   can back in to the discounts, the --

18             THE COURT:  Well, no, but my point is this, folks.

19   Look, I've said this multiple times, apparently and not

20   everyone's listening.  I think some of this information is

21   relevant, but the case law is absolutely clear that I cannot

22   be oblivious to the burdens imposed on a non-party.  And the

23   case law, one of the things the case law says is in

24   evaluating burdens you should determine to what extent you

25   can get comparable information from one of the named parties,

1    and so what I'm trying to understand is to what extent have

2    you thoroughly exhausted the information available through

3    Suncor, because if you haven't thoroughly investigated or

4    flung to the depths of the information available through

5    Suncor, I may still have a burden issue.

6              MR. BENNINGTON:  Let me give you two responses to

7    that.  First of all, Suncor does not have data that tells me

8    to which store the fuel went.

9              THE COURT:  All right.

10             MR. BENNINGTON:  Number two --

11             THE COURT:  No, but in other words I guess my

12   question is --

13             MR. BENNINGTON:  Escaped my mind.

14             THE COURT:  -- this.  Suncor certainly has data

15   that would show the dates that the fuel was picked up for

16   delivery to Dillon.

17             MR. BENNINGTON:  That's right.

18             THE COURT:  Okay.

19             MR. BENNINGTON:  But we don't know to what store

20   it went.

21             THE COURT:  Right.  And so it's theoretically

22   possible, I suppose, that you could have one tanker truck

23   delivering lots of fuel to various stores.

24             MR. BENNINGTON:  In fact that's what happens with

25   WTO.

1               THE COURT:  Okay.

2               MR. BENNINGTON:  Oh, the other point I was going

3      to make is at least in the summary I've got before me and to

4      tap any of my recollection, there's been no objection as to

5      the burdensomeness of producing this number; the objection is

6      that it's a trade secret.

7               THE COURT:  No, I understand, and we'll -- I'm

8      going to certainly give Dillon an opportunity to make --

9               MR. BENNINGTON:  Yes.

10              THE COURT:  -- whatever arguments they want to

11     make.

12              MR. BENNINGTON:  Okay.

13              THE COURT:  I just -- that was more in the nature

14     of clarification.

15              MR. BENNINGTON:  The next data is the daily pump

16     price at each of the retail sites.  That --

17              THE COURT:  What discovery request is that?

18              MR. BENNINGTON:  That's number 8.

19              THE COURT:  Okay.

20              MR. BENNINGTON:  And the response has been that

21     constitutes trade secrets, and none of it has been produced,

22     even though at some point of course it's publicly available

23     information because you can drive down the street and see it.

24     The compilation of that is asserted to be a trade secret, and

25     Dillon has not produced any.

1           THE COURT:  The compilation of the data.  So, in
2     other words, the records that show going back in time how
3     much each day's price was.
4           MR. BENNINGTON:  Exactly.
5           THE COURT:  So Dillon is assuming that the public
6     has a very short memory.
7           MR. BENNINGTON:  The next issue is number 9, which
8     is price surveys.  Again Dillon has asserted that this is
9     a -- constitutes a trade secret.
10          THE COURT:  Okay.  And tell me what the price
11    surveys consist of.
12          MR. BENNINGTON:  Well, I can --
13          THE COURT:  And I know you haven't seen any
14    because they're trade secrets --
15          MR. BENNINGTON:  Right.
16          THE COURT:  -- but --
17          MR. BENNINGTON:  Both --
18          THE COURT:  -- you asked for, quote, Fuel Price,
19    caps, surveys, so when you used that term, what did you
20    envision would be subsumed by that?
21          MR. BENNINGTON:  I can describe it this way.  Both
22    Suncor and for its owned, company-owned stores, and Western
23    Convenience have personnel who on a store by store basis
24    survey a given set of stores around them each day to
25    determine what the competition is charging, and based on that

1    they make decisions on their own pricing.  And the reason

2    that this is important to us is that it defines the

3    competitive market for each of our stores.  We know what our

4    store managers think is the competitive market, we at least

5    to some extent know what Suncor thinks is a competitive

6    around a -- for instance, a Shell store that happens to be

7    near a Western Convenience store.  And we have requested the

8    price survey information done by Kroger, Dillon, and for the

9    reason I just stated.  And, again, I'm not aware of an

10   objection based on burdensomeness but rather on it being a

11   trade secret.

12          THE COURT:  Okay.

13          MR. BENNINGTON:  The last thing is number 10,

14   research material, a long list of possible -- of suspects for

15   that sort of thing.  We do not know whether there even is

16   anything that falls into that category.  It has been

17   suggested that even if it does, it constitutes a trade

18   secret.  But Mr. Taravella candidly told me Monday, told me

19   and Ms. Craigmile, that they have people working on finding

20   out whether that sort of information exists.

21          And the reason we need that is -- it depends on

22   what it is, but if for instance Kroger went -- did some sort

23   of Colorado study on Western Convenience Stores and how to

24   compete with them or what price do we need from Suncor in

25   order to do something, that would be directly relevant,

1    certainly within the scope of discovery in this case.  If

2    it's some survey for a store in New England, of course we

3    don't want it, and we've conceded that can be taken out of

4    the mix.  And if it's very old, pre-2008, depending on what

5    it is, it probably is out of the mix as well.  And if it's

6    something created in 2012, perhaps it's out of the mix.

7            But we don't know what it is, and we suspect based

8    on what we've been told that whatever it is is likely to be

9    subject to a trade secret argument, which takes us back to

10   we've got a protective order.  And there's no point in

11   repeating it.  We've always believed and the Court has

12   suggested and stated unequivocally that this can be

13   protected.

14           THE COURT:  Okay.  Let me hear from Dillon.

15           And I suppose what we should do is sort of go

16   through this request number 1, this question about contract

17   documents.  These are contracts between, as I understand it,

18   Dillon and Suncor.

19           So I guess my first question is -- and let me ask

20   plaintiffs' counsel before I ask -- to the extent that

21   there's 45 additional contracts between Dillon and Suncor,

22   why haven't you gotten those from Suncor?

23           MR. BENNINGTON:  We gave Sun -- I'm sorry, Kroger,

24   previous counsel actually, and I'm sure Mr. Taravella has it,

25   a list of the contract documents we have, and obviously said

1    exclude anything we've already got.  So our understanding is

2    by inference that there are 45 pages of documents that aren't

3    on that list, are being withheld on an assertion of trade

4    secret.

5             THE COURT:  And the basis for that assumption is

6    again?

7             MR. BENNINGTON:  Have been told that.  We have

8    been told that by Mr. Taravella.

9             THE COURT:  Okay.  And when you -- I'm assuming

10   you served a request for production on Suncor, and Suncor

11   said they gave you everything they had.

12            MR. BENNINGTON:  They have.  And in conversations

13   with Mr. Shaheen we -- you know, I verified that as best as

14   we can, and I accept what he's told me.

15            THE COURT:  Okay.  Mr. Taravella, what can you

16   say?

17            MR. TARAVELLA:  Yes, thank you.  Christopher A.

18   Taravella, Montgomery Little.  Good afternoon, Your Honor.

19   May it please the Court.

20            THE COURT:  Well, that remains to be seen.

21            MR. TARAVELLA:  Your Honor, I have to tell you

22   that I came hat in hand last time with a lot of mea culpas.

23   Right now I'm a little perturbed and more than perturbed with

24   the lack -- with some things that should have been brought to

25   the Court's attention that weren't in the last hearing that

```
 1      we've discovered since then.

 2                  THE COURT:  Okay.

 3                  MR. TARAVELLA:  So, Your Honor, at that last

 4      hearing we heard you loud and clear that to the extent that

 5      there's an outstanding order and Dillon does not obey it that

 6      we're going to face sanctions.  You don't have a right to

 7      make bad -- "if you didn't have a right to make bad

 8      decisions, we wouldn't need Rule 37 which allows the Court to

 9      impose sanctions."

10                  THE COURT:  You're reading from -- that's

11      something I said.

12                  MR. TARAVELLA:  That's something you said.

13                  THE COURT:  That's fine.

14                  MR. TARAVELLA:  "But in the absence of

15      reconsideration, in the absence of any further modification,

16      a failure to produce on October 1st would be tantamount to a

17      violation of the Court's discovery order and 37(b) would

18      require that I impose sanctions.

19                  Mr. Bledsoe:  Well, Your Honor, I'm hearing them

20      say that they're going to refuse to produce it.

21                  The Court:  And if they do and if they refuse to

22      produce and if in fact they don't prevail on their legal

23      arguments, they'll be in violation of 37(b)."

24                  Now, there were three counsel at the table, same

25      counsel here today, listening to all of that, and Mr. Shaheen
```

```
 1    was there, as was Mr. McCormick and I.  At this point, Your
 2    Honor, I think we're on the bus to Abilene.  Have you heard
 3    this story about the bus to Abilene?
 4              THE COURT:  No, but --
 5              MR. TARAVELLA:  I'll be brief.
 6              THE COURT:  -- I guess you probably need to --
 7    where did you get the (inaudible) --
 8              MR. TARAVELLA:  Don't hold -- don't hold the --
 9              THE COURT:  Did you get that from Suncor?
10              MR. TARAVELLA:  Don't hold -- no, I got it from
11    the Harvard Business School.  Don't hold that against us.
12              THE COURT:  (Inaudible).
13              MR. TARAVELLA:  I know it doesn't count much in
14    Denver.  But the story is why do executives go get on a hot
15    bus, not air conditioned, in the middle of the Texas heat,
16    110 degrees weather, not conditioned, windows open, no
17    bathroom, and they get to Abilene, and they say what are we
18    doing here, I didn't want to come here in the first place,
19    and on the way there they had an opportunity to say that.
20              We're on the bus to Abilene, and we're in the
21    twilight zone at this point.  And the reason we are is
22    because Dillon is complying -- as the Court said, Court
23    warned us -- is complying with an order, but the order is
24    outdated because the target keeps moving.  We're in the
25    process of complying with a Court order that requires Dillon
```

```
 1    to produce documents that the plaintiffs do not even want

 2    anymore.

 3             THE COURT:  Which documents --

 4             MR. TARAVELLA:  They do not want those anymore.

 5             7.

 6             THE COURT:  Which documents?

 7             MR. TARAVELLA:  Item 7.  1 million records of --

 8             THE COURT:  No, this is --

 9             MR. TARAVELLA:  -- 27 million --

10             THE COURT:  Whoa, whoa, whoa, whoa, whoa.  I mean,

11    I, with all due respect, am not on the bus to Abilene, and I

12    am here to tell you I want to get off the bus to Abilene.  I

13    don't want to be on a bus going anywhere, but I feel like

14    whatever vehicle I'm on is going in circles.  So let's you

15    and I, let's stop the bus, let's sit on the side of the road,

16    and let's walk through this problem logically starting with

17    number 1 and the question of contracts.

18             MR. TARAVELLA:  Your Honor, we can go through them

19    systematically --

20             THE COURT:  That would be the easiest thing.

21             MR. TARAVELLA:  -- if you want, but here's the

22    bottom line.

23             THE COURT:  No, no, no.  No.  I would much prefer

24    that we go through this systematically.

25             MR. TARAVELLA:  All right.  So -- so item 1.
```

1                  THE COURT:  Tell me about the 45 contracts.

2                  MR. TARAVELLA:  So on item 1, we were given --

3        Mr. Bennington gave me the order, the protective order, in

4        Word yesterday.  I red-lined it and forwarded it to the

5        client, talked to the client today, we should have clients

6        from the -- comments from the client this afternoon or

7        tomorrow, and I'll submit a red-line order --

8                  THE COURT:  I guess my --

9                  MR. TARAVELLA:  -- a revised --

10                 THE COURT:  I guess my --

11                 MR. TARAVELLA:  -- red-lined protective order that

12       when that was drafted, Your Honor, it was not focused on

13       third parties --

14                 THE COURT:  I know, but here's my frustration.

15       Listen.  I understand at the time that order was drafted it

16       was not directed to third parties, it was directed generally

17       to discovery, but I suppose you could take a very narrow

18       interpretation of that protective order.  But we were

19       together last in this case on September 14th, and I thought

20       I'd made myself rather clear when I said that I thought that

21       the protective order would be adequate.

22                 Now my frustration -- to the extent that you're

23       frustrated, it doesn't begin to reach my level of

24       frustration.  And I'm frustrated because I, frankly, expect

25       lawyers to work together in a cooperative and a professional

1    manner.  Now, if Dillon felt that the protective order

2    currently in place was inadequate, I do not see how Dillon

3    would then have sat back and done nothing for approximately

4    18 or 19 days.  If Dillon felt that the existing protective

5    order was inadequate, I would have expected cooperative,

6    professional lawyers to have sat down and said, look, here

7    are the concerns that we have, this is what we need to see in

8    a protective order, we -- these are our concerns, we will

9    draft you a protective order and we will get it to you

10   immediately.

11          And I don't understand why -- in other words, I

12   appreciate the fact that Dillon, somebody back in the home

13   office is doing a red-line version.  I, frankly, would have

14   expected that to have taken place days or weeks ago.  I don't

15   see why the deadline of October 1st was missed and documents

16   were withheld, ostensibly over a protective order.  That's

17   unacceptable.  If Dillon felt they needed more protection,

18   then I think it was incumbent upon Dillon, and the case law I

19   think makes it clear, it's incumbent upon Dillon to act in a

20   timely manner.  And that generally means that the protective

21   order should have been in place before the documents were due

22   to be produced.

23          So I will tell you with all due respect, you have

24   no right, at least on this question, to be perturbed.  You

25   have no right to be frustrated.  And there is no in my

1    opinion acceptable explanation why Dillon didn't take the

2    initiative and propose to and get to plaintiffs' counsel a

3    protective order well before today.

4          So why don't you explain to me why that wasn't

5    done.  Why didn't your firm or somebody at Dillon take the

6    initiative to draft a protective order that you felt was

7    going to be better than the one that was currently in place?

8    As long as we're speaking about frustration, tell me why I

9    shouldn't be frustrated.

10          MR. TARAVELLA:  Your Honor, I -- you know what?

11    You know what I'm going to say, I'm going to say no excuse,

12    sir.  Okay?  So --

13          THE COURT:  Then you don't have the right --

14          MR. TARAVELLA:  So --

15          THE COURT:  Then don't tell me --

16          MR. TARAVELLA:  So --

17          THE COURT:  Then don't tell me you're

18    frustrated --

19          MR. TARAVELLA:  So -- well --

20          THE COURT:  -- because you've lost that right.

21          MR. TARAVELLA:  Well, Your Honor, has implied, or

22    if not said, that we haven't done anything since the last

23    hearing.  In fact we produced 50,000 pages of documents.

24          THE COURT:  Counsel, counsel, counsel --

25          MR. TARAVELLA:  So --

1          THE COURT:  Counsel, I'm going to -- I'm going to

2     force you and I to remain on focus.  The fight is not about

3     what you've produced.  There's nothing in the status report

4     that takes exception to what you've produced.  We are here

5     today to talk about what you haven't produced.  And you

6     started this discussion by telling me that you had sent to

7     your client, I guess a matter of a couple of days ago, a

8     proposed protective order and that they were supposedly going

9     to red-line it and send it back to you tomorrow.  That's

10    wholly unacceptable.

11         MR. TARAVELLA:  I've red-lined it.

12         THE COURT:  Wholly unacceptable.

13         MR. TARAVELLA:  I've red-lined it, yes.

14         THE COURT:  And the problem -- it doesn't matter

15    who red-lined it.

16         MR. TARAVELLA:  No.

17         THE COURT:  You could get a third-grader from the

18    nearby elementary school to red-line it.  The protective

19    order that you felt was necessary should have been in place

20    long before October 1st.  And given the caliber of lawyers

21    involved in this case, it should not take two-plus weeks to

22    draft a protective order.  There is just no excuse for that.

23         And the difficulty that Dillon continually has in

24    this matter is that Dillon, for better or for worse, fairly

25    or unfairly, seems to have a propensity for what could best

1    be described as foot dragging.  And every time Dillon drags

2    its feet or makes an incomplete or inadequate explanation,

3    all it's doing is losing credibility and makes it harder for

4    me to fashion some sort of compromise.  Dillon is exhausting

5    its ability to obfuscate, to put it quite bluntly.  And at

6    some point Dillon may very well find that basically it has

7    shot itself in the foot, and I think we're very close if not

8    there already.

9            So tell me about the 45 contracts.

10           MR. TARAVELLA:  Your Honor, in the interim what

11   happened is we ordered the transcript, because we thought our

12   client should see the Court's views, of how the Court viewed

13   where we were, and it took --

14           THE COURT:  I'm sorry.  Correct --

15           MR. TARAVELLA:  It took us two --

16           THE COURT:  -- me if I'm wrong.  Again, I

17   apologize for interrupting, but my distinct recollection is

18   when I had a hearing on September 14, there were Dillon

19   representatives sitting in the back of the room, and I think

20   at least one of those folks was a lawyer.  Why would you need

21   to buy a transcript so that the lawyer who was sitting in my

22   room could read what she heard?

23           MR. TARAVELLA:  None were lawyers, Your Honor.

24   They were witnesses.  And in my experience, coming from a big

25   company myself, the lower you get to -- down the company

 1    chain, the more knowledge they have.  So --

 2              THE COURT:  Well, then here's what I'm going to

 3    do --

 4              MR. TARAVELLA:  -- they were not --

 5              THE COURT:  Here's what we'll do, counsel.

 6              MR. TARAVELLA:  There was no lawyer there.

 7              THE COURT:  Here's what I'm going to do, because

 8    I'm going to make your life infinitely easier.  I will say

 9    that henceforth every hearing that I have that involves

10    Dillon I will require the chief executive officer and the

11    general counsel of Dillon to be physically present.  You will

12    not have to buy any more transcripts.

13              MR. TARAVELLA:  Can we ask that --

14              THE COURT:  Then we won't have any reason to delay

15    16 or 17 days to buy a transcript, because your general

16    counsel, the person who hired you, will be physically present

17    and he or she can hear for themselves.

18              How else can I help you?

19              MR. TARAVELLA:  Your Honor, could we ask you to --

20    to reconsider that?  Is that -- is that a Court order,

21    that -- that the --

22              THE COURT:  It may very well be --

23              MR. TARAVELLA:  Okay.

24              THE COURT:  -- because as I told you, if I'm going

25    to be on the bus to Abilene, I think the general counsel for

1    Dillon should be in the front seat with me.

2         MR. TARAVELLA:  Would you -- would Your Honor like

3    more of an explanation of what happened since the last

4    hearing to the -- to the --

5         THE COURT:  I want to know about the 45 --

6         MR. TARAVELLA:  What -- I'm not sure --

7         THE COURT:  Tell me about the 45 --

8         MR. TARAVELLA:  -- where -- what you want me to --

9         THE COURT:  Tell me about the 45 --

10        MR. TARAVELLA:  -- respond to now, Your Honor?

11        THE COURT:  Let's focus.  Tell me about the 45

12   contracts and why they haven't been produced.

13        MR. TARAVELLA:  The 45 contracts, we have them

14   ready to go.

15        THE COURT:  Okay.

16        MR. TARAVELLA:  We introduced a new -- a new

17   category called Secret, which limits it -- basically takes

18   out the outside counsel.

19        We also tailored the protective order to protect a

20   non-party.

21        THE COURT:  Wait.  Whoa, whoa, whoa, whoa.  Slow

22   down.  Slow down.  I mean, we've got to wait here till at

23   least 5 o'clock when they shut the roads down.  I mean, you

24   can't leave any sooner than 5.

25        You want to modify the protective order to prevent

1     who from seeing what?

2              MR. TARAVELLA:  The -- it raises one -- right now

3     there's Confidential and Highly Confidential categories of

4     information.  We introduced another one called Secret.

5              THE COURT:  Okay.

6              MR. TARAVELLA:  And that one would not allow

7     in-house lawyers to see it.  And it also provides for

8     additional protection in the event that a party intends to

9     use a designating party's information at deposition or give

10    it to an expert, it introduces additional protection.

11             THE COURT:  Okay.  And I will tell you in my 12

12    years serving on the bench and my 32 years of practicing law,

13    I have seen such protective orders innumerable times.

14    There's nothing particularly new or unique about that.  And I

15    suspect that they're sufficiently interested in the materials

16    that they probably wouldn't balk at that at all.

17             MR. TARAVELLA:  I don't think there's anything in

18    the red-line protective order that they will object to, but I

19    can't speak for them, Your Honor, and they haven't seen it.

20             THE COURT:  Well, I understand.  But they

21    should --

22             MR. TARAVELLA:  And I apologize for the delay.

23             THE COURT:  They should have seen it -- they

24    should have seen it -- because that's not a novel approach

25    under Rule 26(c).  That didn't require 18 or 19 days to

1    craft.  I could probably find a third-year law student at DU

2    where I teach and I could probably tell them to go to a form

3    book and find something very similar, and they could crank it

4    out in no time at all.

5              So what you're telling me is once you get that

6    protective order in place, you'll produce the 45 contracts.

7              MR. TARAVELLA:  They will be -- they will be

8    designated -- if they buy off on that designation, yes, sir.

9    They'll be designated Secret and we'll produce them.

10             THE COURT:  Okay.

11             MR. TARAVELLA:  And also we'd like to redesignate

12   the contracts that were already produced without any

13   designation before our involvement.

14             THE COURT:  Wait a minute.  So -- so hold on.  So

15   you produced three contracts without any designation at all

16   under the current protective order.

17             MR. TARAVELLA:  There were --

18             THE COURT:  So --

19             MR. TARAVELLA:  I don't know how many were

20   produced without a designation.

21             THE COURT:  Well, I've got --

22             MR. TARAVELLA:  I'm not sure.

23             THE COURT:  I've got them right here.  They're

24   Dillon -- I'm assuming they were generated by you -- I've got

25   Dillon Bates number 1 through Dillon Bates number 7, I've got

```
1      Dillon Bates number 8 through Dillon Bates number 14, and

2      Dillon 15 through 16.

3                MR. TARAVELLA:  That's right, 1 through 16.

4                THE COURT:  I'm assuming somebody on behalf of

5      Dillon Bate stamped those.  And they weren't stamped

6      anything.  They were just produced.

7                MR. TARAVELLA:  And we'd like to -- to -- because

8      they have -- I believe they have pricing information, but I

9      don't have them in front of me.  We'd like to --

10               THE COURT:  Okay, but, guys --

11               MR. TARAVELLA:  -- just redesignate them.

12               THE COURT:  Guys, this is -- this is where,

13     frankly -- this is very troubling to me.  And let me try to

14     explain why.  When were these -- these three contracts were

15     produced when?  If you guys --

16               MR. TARAVELLA:  On --

17               THE COURT:  -- produced them, when were they

18     produced?

19               MR. TARAVELLA:  On August 17th, 2012 and

20     September 12, 2012.

21               (To Mr. McCormick):  Right?  Those three?

22               THE COURT:  Okay.  So these were produced on

23     September 12.  9-12.

24               MR. TARAVELLA:  And August 17th, Your Honor.

25               THE COURT:  All right.  Now, when they were
```

1    produced, they were disclosed to the other side and they

2    weren't stamped anything.

3              MR. TARAVELLA:  Mr. McCormick would like to say

4    something, Your Honor.

5              THE COURT:  Sure.

6              MR. TARAVELLA:  He's probably closer to it.

7              THE COURT:  Sure.

8              MR. McCORMICK:  Yeah, Your Honor.  I just thought

9    I'd step in for a second just because I've been dealing with

10   the documents themselves.

11             THE COURT:  Okay.

12             MR. McCORMICK:  So the first -- two of the

13   contracts were not designated, and I believe one was

14   designated Confidential.

15             THE COURT:  Okay.  But, see, here's the problem

16   that Dillon has, guys.  At some point this doesn't pass the

17   straight face test.  You produced two contracts, you claim

18   that these things are, quote-unquote, trade secrets, you

19   produce two of these without any invocation of any protection

20   at all.  Then you stamp the third one Confidential.  And now

21   you're telling me that we need a completely distinct special

22   protective order that is going to designate these contracts

23   Secret.  I mean, at some point, guys, you're hard-pressed to

24   claim super secret status when two of these things you just

25   produced willy-nilly without any designation at all.

1            See, that's the problem I've got, and this is why

2    ultimately Dillon is up against it.  If you want protection

3    of the magnitude that you're suggesting, then simple logic

4    suggests that you have to be consistent in how you approach

5    this issue.  You cannot tell me these contracts are super

6    secret, cannot be disclosed to anybody because they're trade

7    secrets, and then you produced two without any stamp at all.

8            So the irony is, truly the irony is, you're

9    sitting here and telling me, Judge, you can't issue a

10   protective order because plaintiffs' counsel cannot be

11   trusted to disclose these to its client, yet you produced two

12   contracts for which there was no designation for which

13   plaintiffs' counsel could have legitimately said to

14   Mr. Taraghi, look what we just got across our threshold.

15   You're killing yourselves, guys.  And at some point I cannot

16   allow you to simply backtrack.  And that's basically what

17   you're doing.

18           Now, to the extent that plaintiffs' counsel aren't

19   objecting, I'm not necessarily opposed to what you're doing,

20   but what I'm telling you, your credibility is almost

21   exhausted.  Truly it is.  And so I think you need to contact

22   Dillon and say that at some point Dillon has created such a

23   mess for itself Dillon will have to live with the

24   consequences of that very mess.  This is a perfect example of

25   what I'm talking about.

```
 1              But I will require, I will require, by 5 o'clock
 2       on Friday -- I have already gotten a representation from
 3       plaintiffs' counsel that they are willing -- you can stamp
 4       this thing double secret probation a la Animal House, I don't
 5       really much care.  I have already stipulated, I think I made
 6       it abundantly clear on September 14, that at least at this
 7       point I will not allow Dillon's documents to be seen by
 8       anybody but counsel of record and the employees of their law
 9       firm, that they are not allowed to show those materials to
10       anybody with -- anybody employed by -- hold on, I know what
11       you're about to say so calm down -- they are not allowed to
12       show these materials to anybody employed by Western
13       Convenience.
14              Now, I understand that he's about to jump up and
15       say, well, wait a minute, Judge, our expert needs to see
16       these.  I'm not opposed to that, because I'll require their
17       expert to sign an attestation that the expert is bound by the
18       protective order and the expert acknowledges that he or she
19       is subject to the contempt authority of this Court.  I have
20       never heard plaintiffs' counsel oppose those safeguards, and
21       I thought those safeguards were well established by
22       September 14.
23              See, it doesn't -- they don't really care what you
24       stamp this thing.  They truly don't.  I have never heard
25       plaintiffs' counsel from September 14 or even before
```

```
 1    September 14 give a tinker's damn about what you stamp
 2    something.  They simply want it.
 3            And so now what you're telling me is it's
 4    October 3, they still haven't gotten this stuff because your
 5    client is tied up in knots about what they're going to stamp
 6    something, yet two of the contracts were sent out without
 7    being stamped anything.  Guys, you're killing yourselves.
 8            So let's talk about the next fight seems to be
 9    request number 5 --
10            MR. TARAVELLA:  5-H.
11            THE COURT:  5-H.  The net and gross quantity of
12    fuel delivered.
13            Now, as far as I can tell -- well, let me ask this
14    question so that it is absolutely clear.  Does Dillon have
15    responsive documents or responsive information that is data
16    responsive to subsection H?  I simply need a simple yes or
17    no.
18            MR. TARAVELLA:  To 5-H?
19            THE COURT:  5-H.  All I'm looking for at least at
20    this threshold is a simple yes or no.  Because if you have
21    it, then we talk about under what terms it's being produced.
22    If you don't have it, then this is much ado about nothing.
23    And I assuming that you have it, otherwise you wouldn't have
24    any basis to call it a trade secret.
25            MR. TARAVELLA:  Your Honor, it looks like the
```

```
 1   answer to your question appears to be yes --

 2            THE COURT:  Okay.

 3            MR. TARAVELLA:  -- we have it.

 4            THE COURT:  So what do you want -- what do you

 5   want to call this stuff?  Is Secret going to be --

 6            MR. TARAVELLA:  Well --

 7            THE COURT:  -- good enough or we've got to come up

 8   with another term?

 9            MR. TARAVELLA:  Well, if I may ask, interject a

10   question --

11            THE COURT:  Sure.

12            MR. TARAVELLA:  -- outside the scope of what the

13   Court is asking, I'm not sure why we have to produce

14   information that was already given to the plaintiffs by

15   Suncor.

16            THE COURT:  Because --

17            MR. TARAVELLA:  I have here a spreadsheet in front

18   of me that addresses net and gross quantities delivered that

19   was produced by Suncor.

20            THE COURT:  But it -- but the problem, and this is

21   why -- I anticipated this question, that's why I specifically

22   asked the question.  What Suncor's records I think show is

23   the total fuel leaving the terminal.  Unless Suncor's records

24   specifically show to what stores the fuel was delivered and

25   how much fuel was delivered to each store, I don't think
```

1    Suncor's records are responsive to the request.

2              MR. TARAVELLA:  The headings on a sheet that I'm

3    looking at that is not Bate stamped say --

4              THE COURT:  I mean, who --

5              MR. TARAVELLA:  They say Sold To Name, Sold To

6    Party, Shipped To Customer, with numbers under that, Shipped

7    To Customer Name, Destination Region, Plant, Plant Name,

8    Contract Number, Pricing Date, Price Time, Extension Billing

9    Something Number, E-X-T Billing Number, Billing Document,

10   Material, Material Description, Billed Quantity, Price/SUOM

11   Discount, Discount SU, Sales Unit, Billing Date, Billing

12   Quantity and SKU, Net Quantity, Gross Quantity UGL, Fed Ex

13   Ice Packs and Net.

14             THE COURT:  But, see, here's the problem that I've

15   got.  Now, have you -- does that -- does that list show all

16   of the Dillon stores?  Does it specifically reference

17   specific stores?

18             MR. TARAVELLA:  Your Honor, I --

19             THE COURT:  If it doesn't, it's not particularly

20   helpful.

21             MR. TARAVELLA:  Your Honor, as a non-party, I

22   didn't even know at the last hearing it had been given --

23             THE COURT:  No, but --

24             MR. TARAVELLA:  -- to the plaintiffs --

25             THE COURT:  Because --

1          MR. TARAVELLA:  -- by Suncor, so I can't answer

2     the question.

3          THE COURT:  Whatever you're look -- my question --

4          MR. TARAVELLA:  I can't answer.

5          THE COURT:  -- is whatever you just read from,

6     does it list specific Dillon stores?

7          MR. TARAVELLA:  I can't address what those columns

8     mean.  It appears to.  It appears to under the column Sold To

9     Party, and it's got numbers, and then to Shipped To Customer

10    and it has different numbers.  That to me says that it

11    probably would list the store.  But I can't represent

12    something I don't know.  As a non-party we --

13         THE COURT:  Well, then --

14         MR. TARAVELLA:  -- didn't --

15         THE COURT:  But then --

16         MR. TARAVELLA:  -- get this.  We weren't even --

17         THE COURT:  But then --

18         MR. TARAVELLA:  -- served with this.

19         THE COURT:  -- the problem is you can't tell me

20    with certainty, you can't tell me with certainty it's

21    duplicative, and this is where we -- this is why we

22    emphasized and why I've repeatedly required the parties to

23    meet and confer.

24         Now, I've got a situation where, yes, I don't know

25    what all those numbers mean, I have no way of knowing what

```
 1    those numbers mean, but I would have expected lawyers who are

 2    trying to save their clients money to be able to sit down and

 3    work this out.  If in fact -- see, here's the problem that

 4    I've got.  It's a catch 22.  On the one hand you're telling

 5    me you're not going to provide this information because it's

 6    trade secret.  But then you're telling me you don't need to

 7    provide it because they've already got it.  Now, if they've

 8    already got it, then I agree, you shouldn't be required to

 9    spin your wheels.  But if they've already got it, it's not a

10    trade secret.  And if they don't have it such that you still

11    want to assert a trade secret protection, then I don't really

12    much care what the Sun document, but this is what I would

13    have expected lawyers to work out.

14            I would have said here's a document -- when did

15    you get that document?  When did you get that document that

16    you're just referring to?  The date?

17            MR. TARAVELLA:  When did we get this --

18            THE COURT:  When did you get that?

19            MR. TARAVELLA:  -- from Suncor?

20            I don't have that in front of me.

21            THE COURT:  Maybe your colleague --

22            MR. TARAVELLA:  But it was -- it was -- it was

23    since the hearing.

24            THE COURT:  Since the 14th.

25            MR. TARAVELLA:  Yes.
```

```
 1                    THE COURT:  But you can't tell me when.
 2                    MR. TARAVELLA:  I can't right now.  I think we
 3      could reconstruct that --
 4                    THE COURT:  Can your colleague help you?
 5                    MR. TARAVELLA:  -- if we need to.  It came from --
 6                    THE COURT:  I mean, you --
 7                    MR. TARAVELLA:  It came from Mr. Shaheen, it was
 8      in an e-mail, so we could reconstruct that, Your Honor.
 9                    THE COURT:  Okay.  Okay.  Guys.  Guys.
10                    MR. TARAVELLA:  And we did confer about that, by
11      the way.  On Monday you said you expected counsel to talk
12      about it.  We did confer about it.  They did not deny that
13      they had it.  Mr. Bennington's response to me was, as he said
14      here in the hearing today, they needed to check and
15      double-check and cross-check information given to them by
16      Suncor.
17                    THE COURT:  Well, and I --
18                    MR. TARAVELLA:  That to me says it's duplicative.
19                    THE COURT:  And I -- well, it may or it may not
20      be, but I'm not in a position to say whether it is or isn't
21      duplicative, but I can certainly say that you all have not
22      done a particularly good job of helping the Court to resolve
23      this dispute.
24                    I would have expected somebody to sit down with
25      Mr. Shaheen or somebody from Suncor and say what do these
```

 1    numbers represent?  Are they code numbers?  If they are, are

 2    they code numbers for specific stores?  And, if so, what are

 3    the stores?

 4           See, the problem that I've got, counsel, is I --

 5    Suncor may simply get an invoice listing a bunch of numbers.

 6    They may not know what those stores are.  So unless somebody

 7    can explain the form, then to some extent I can appreciate

 8    why plaintiffs want the numbers from Dillon.  But you can't

 9    come and tell me that this is unnecessary and then when I ask

10    hard questions, everybody says, well, gee, I don't really

11    know.

12           MR. TARAVELLA:  We conferred on it Monday, and

13    what I heard is it was provided by Suncor and it was to

14    check --

15           THE COURT:  Who did you --

16           MR. TARAVELLA:  -- and double-check.

17           THE COURT:  Who did you -- who did you confer

18    with?

19           MR. TARAVELLA:  Conferred with Ms. Craigmile and

20    their office.  On Monday.  I participated personally in that

21    conferral.  You would have thought they would have said that.

22    That, no, it's not what we're looking for.  They didn't.

23    They said we're going to double-check and check that

24    information.  Which is what Mr. Bennington just said as well.

25           MR. BENNINGTON:  Your Honor --

1        MR. TARAVELLA:  That led me to believe that 5-H

2    was already provided, to me.

3        MR. BENNINGTON:  I'll represent to the Court, and

4    it's in a Rule 30(b)(6) deposition of Suncor, that they don't

5    know where each delivery goes, period, and what the titles

6    are on the columns tells us nothing, and I --

7        THE COURT:  Yeah, but my point is this.  Here's my

8    point.  If I understand correctly, plaintiff is saying Dillon

9    has never produced any responsive data that includes

10   information responsive to subsection H, claiming that that

11   information constitutes Dillon trade secrets.  Now, let me

12   shift the focus here because we've already -- I've already

13   told you, you can stamp this stuff anything you want.  I

14   don't really much care, and I don't think plaintiffs'

15   counsel.  So the stamping of this stuff is immaterial.

16       So my question is what's described for me since

17   September 14, what steps Dillon and its employees have

18   undertaken to find the data responsive to subsection H.

19       MR. TARAVELLA:  I think we haven't, Your Honor.

20       THE COURT:  So you haven't.

21       MR. TARAVELLA:  I think we haven't, yes.  And

22   given the Court's admonition about trade secrets with the

23   protective order in place, we're not going to violate the

24   Court's order.  We're not going to breach it.

25       THE COURT:  Well --

1            MR. TARAVELLA:  So -- so --

2            THE COURT:  Whoa, whoa, whoa, whoa, whoa.  Stop.

3    Because I thought I entered an order on September 14.  So

4    you're not going to violate any more of my orders.

5            MR. TARAVELLA:  I'm not sure of an order entered

6    on the 14th.

7            THE COURT:  I thought I told you to produce this

8    stuff on October 1st.

9            MR. TARAVELLA:  Oh, you -- well --

10           THE COURT:  And so you didn't.  So what you're

11   really telling me is you're not going to violate any of my

12   orders going forward.

13           MR. TARAVELLA:  Well, that -- that wasn't --

14           THE COURT:  Which I take comfort in.  Don't

15   misunderstand me here --

16           MR. TARAVELLA:  That wasn't the intention.

17           THE COURT:  -- I appreciate that, but --

18           MR. TARAVELLA:  No, Your Honor, that wasn't --

19           THE COURT:  -- don't tell me you don't intend to

20   violate my orders, because you violated at least one.

21           MR. TARAVELLA:  I --

22           THE COURT:  Because if you -- if you had this

23   material, if you have found this material, you've pulled this

24   material, and you're ready to produce it subject to a

25   protective order, and I told you to produce it on October 1,

1    then as far as I'm concerned, you violated my order.

2             MR. TARAVELLA:  Your Honor, I -- I'm sorry if I

3    misunderstood what you wanted in the September 14th hearing.

4    What I understood is that there be a continuing rolling

5    production to meet -- to meet all the Court's requirements.

6             THE COURT:  I'm sorry, I --

7             MR. TARAVELLA:  And -- and -- and -- and that's

8    what we're doing.

9             THE COURT:  No.  They --

10            MR. TARAVELLA:  We're continuing to do that.

11            THE COURT:  Basically my minute order, if

12   plaintiffs' status report is correct, my minute order said

13   that I required rolling production concluding with final

14   production on October 1st.  And if you've pulled this stuff

15   and if you have it available to produce and you've only

16   withheld it because you are waiting to get a protective order

17   that met your specifications, yet you made no attempt to

18   initiate the drafting of such a protective order before

19   October 1st, then honestly, counsel, you did violate my

20   order.

21            MR. TARAVELLA:  There was no intention to violate

22   the Court's order.

23            THE COURT:  It's a general intent offense.  And

24   then now I've got to wrestle with Rule 37(b), which says that

25   if a party fails to comply with a discovery order they should

1    be sanctioned.

2           It's just -- I don't know how you could boot this

3    around so bad.  I mean, I don't know what marching orders you

4    guys have gotten, but your client is hanging you out to dry,

5    much like your predecessors apparently.

6           MR. TARAVELLA:  I'll take responsibility for that,

7    Your Honor, not the client.  I'll take full responsibility.

8    That's why I'm here for.

9           THE COURT:  I know, but the client got the

10    subpoena.  And that's --

11           MR. TARAVELLA:  Your Honor, at this point we're

12    providing stuff in compliance with the Court order that they

13    don't even want.

14           THE COURT:  No, I think they still want 5-H.

15           MR. TARAVELLA:  Item 7 they don't want, for

16    example.

17           MR. BENNINGTON:  That's not true.

18           THE COURT:  That may be, but we're still talking

19    about -- let's not -- let's not --

20           MR. TARAVELLA:  Okay.

21           THE COURT:  -- shift focus.

22           MR. TARAVELLA:  Okay.  5-H --

23           THE COURT:  They want 5-H.

24           MR. TARAVELLA:  Okay.  So 5-H, notwithstanding

25    what's been produced already --

1            THE COURT:  Right.  Absolutely.  Because --

2            MR. TARAVELLA:  -- by Suncor.

3            THE COURT:  Sure.  Because, again, this is where

4    Dillon creates its own problems.  You can't -- I'm not going

5    to allow Dillon to hide behind hyper-technicalities.  All

6    they've gotten from Suncor, they meaning plaintiff, is a

7    spreadsheet with a list of numbers.  I am not prepared to say

8    categorically that Dillon's numbers are duplicative.  And

9    because I'm not prepared to say they're duplicative and

10   because counsel tells me that when they deposed the Sun

11   representative, the Suncor representative didn't know what

12   those numbers were, produce your data.

13           And that is an order, so there's no further

14   confusion.  Produce that data by 5 o'clock on Friday, the

15   same way you're going to produce the contracts by 5 o'clock

16   on Friday.

17           MR. TARAVELLA:  Your Honor, I'm not sure about the

18   volume on 5-H.  We can produce the contracts --

19           THE COURT:  You already told me --

20           MR. TARAVELLA:  -- for sure.  Can --

21           THE COURT:  Wait a minute.  You already told me

22   you've pulled all this stuff.

23           MR. TARAVELLA:  I have -- I have a report -- I

24   don't know if it's Bates numbered.  I have --

25           THE COURT:  Well, counsel --

```
 1                    MR. TARAVELLA:  -- a report --

 2                    THE COURT:  Counsel.

 3                    MR. TARAVELLA:  We can do it.

 4                    THE COURT:  Perfect.

 5                    MR. TARAVELLA:  We can do it.

 6                    THE COURT:  Okay.  So we've taken care of 1, we've

 7       taken care of 5-H.

 8                    Now we'll move on to number 7, which is what you

 9       tell me they don't want anymore.

10                    MR. BENNINGTON:  You skipped 2 and 3, if you want

11       to stay in order.  I hate to...

12                    THE COURT:  I'm sorry.  I was working off page 2,

13       which is the request that required the most attention.

14                    MR. BENNINGTON:  Okay.

15                    MR. TARAVELLA:  Which was 5-H, 8, 9 and 10, I

16       think.

17                    THE COURT:  That's why I was working off these.

18       So if -- if you now want me to backtrack and talk about 2 and

19       3, I can do that, but I -- 2, 3 and 4, but --

20                    MR. BENNINGTON:  That was -- those are the e-mails

21       from David Wilson as well as there are e-mails we haven't

22       gotten --

23                    THE COURT:  Oh, 2 and 3 are the David Wilson

24       e-mails?

25                    MR. BENNINGTON:  Well, 2 is.  3 is any e-mail
```

1    referencing Western or any appearing of its name.  We've

2    gotten none and no statement as to whether any exist.

3              MR. TARAVELLA:  2 and 3, approximately 25 pages of

4    documents have not been produced.  They're draft contracts,

5    requests for proposals and proposals.  So it's not voluminous

6    what we do have and we were --

7              THE COURT:  Well, what did you --

8              MR. TARAVELLA:  -- hoping to designate that.

9              THE COURT:  Basically if I'm looking at page 4,

10   the second to last bullet point on that page 4, it says --

11             MR. TARAVELLA:  Page 4 of what are you on?

12             THE COURT:  Page 4 of their -- I'm looking at

13   plaintiffs' status report.

14             It says on -- during the October 1, 2012 call,

15   Dillon's counsel stated that Dillon has found approximately

16   40 to 50 pages of e-mail documents relating to Suncor's

17   proposals to Dillon for fuel sales which have not yet been

18   produced.  According to its counsel, Dillon contends that

19   these additional responsive e-mails will not be produced

20   until the Court enters a protective order satisfactory to

21   Dillon.

22             Well, I guess it's really more a matter of a

23   protective order satisfactory to me, but skipping over that

24   technicality.

25             Dillon has not yet produced e-mails responsive to

1    request 3.  Dillon has not confirmed whether any e-mails

2    responsive to request 3 exist.

3                 MR. TARAVELLA:  There are none for 3, Your Honor.

4                 THE COURT:  Okay.  Well, I can't order them to

5    produce what they don't have.

6                 So let's talk about the 40 to 50 pages of e-mails

7    that you're not going to produce until the Court enters a

8    satisfactory protective order.

9                 MR. TARAVELLA:  The information that I have is

10   that it's 14 documents or 25 pages.  If you total 1 and item

11   2, it would be 34 pages is all.

12                THE COURT:  Okay, but --

13                MR. TARAVELLA:  That's all we have.

14                THE COURT:  But -- okay.  And I'll accept that

15   representation.  But the bottom line is they're ready to go,

16   and I can order that those be produced by 5 o'clock on Friday

17   as well.

18                MR. TARAVELLA:  Yes.  Yes, sir.

19                THE COURT:  Okay.  So that's not a problem.

20                MR. TARAVELLA:  And thank you for the Court's

21   indulgence.

22                THE COURT:  So we've taken care of 2 and 3.  1, 2

23   and 3.

24                Yes?

25                MS. CRAIGMILE:  One issue that remains with

```
 1      respect to 2 is that they produced a lot of the attachments
 2      (inaudible) attached (inaudible) with redactions, including
 3      all of the price and the quantities.  Those attachments are
 4      essentially (inaudible).
 5               MR. TARAVELLA:  We're removing the redactions.
 6               THE COURT:  Okay.
 7               MR. TARAVELLA:  They were redacted because --
 8               THE COURT:  I know.  We were waiting for -- yeah,
 9      I know, I know.
10               MR. TARAVELLA:  You know -- you know the answer.
11      You know why they were redacted.
12               THE COURT:  Protective order, I know.  It's
13      becoming a real problem.
14               MR. TARAVELLA:  And that's 2 and 3.
15               What else, Your Honor?
16               THE COURT:  Apparently we've got something to talk
17      about on 4.
18               MR. TARAVELLA:  We've produced everything on 4.
19      I'd like to hear that from them though.
20               MS. CRAIGMILE:  I don't think that 4 remains an
21      issue.  They've produced a corrected list.
22               THE COURT:  Okay, that's fine.
23               And we've dealt with 5-H.
24               MS. CRAIGMILE:  With the exception of the data
25      that they've been producing with respect to 5 has been in
```

1     PDF's and our experts can't deal with (inaudible).

2          THE COURT:  Well, okay, but this is my question

3     though, is what did your subpoena say in terms of format?

4          MS. CRAIGMILE:  ESI.

5          THE COURT:  ESI is not a format.  It's a category.

6     When we talk about format, we're talking about native, we're

7     talking about PDF, we're talking about load files.  ESI is

8     just a description of electronically stored information.

9     That's not a format.

10         MS. CRAIGMILE:  (Inaudible).

11         THE COURT:  Well, then you've got a problem,

12    because under Rule -- Rule 45 is a mirror of Rule -- and I

13    just happen to know this because that's what my law school

14    class covered last week.  If you look at Rule 34, Rule 34

15    says the requesting party can request that electronically

16    stored information be produced in a particular format.  That

17    same approach is reflected in Rule 45.  If you don't request

18    a format, then the defendant is simply required to produce it

19    in the manner in which it's ordinarily maintained or in a

20    reasonably usable form.  But they don't necessarily know what

21    you're going to do with it, so it's a bit of a problem.

22         MS. CRAIGMILE:  Well, I think it's clear from the

23    data that it was regularly maintained as ESI, because that's

24    how it looks to us.  It's --

25         THE COURT:  You guys, stop using the phrase ESI.

1          MS. CRAIGMILE:  All right.  In electronically

2    stored -- it looks like an Excel spreadsheet but has been

3    converted to a PDF.

4          THE COURT:  Well, see, the problem though is if

5    it's an Excel spreadsheet, then you almost have to get it in

6    native format, because if you don't have it in native format,

7    it's of very little value to you.

8          A PDF is -- I mean, truly, if I want to know what

9    an Excel spreadsheet says, I've got to have the meta data

10   because I've got to figure out what all the various cells

11   are, I have to know what the formulas are that reflect the

12   spreadsheet.

13         So if you produce spreadsheets in a PDF format,

14   they are not readily usable, and the case law on that is

15   probably crystal clear, guys.  Because --

16         MR. TARAVELLA:  So we have to reproduce that

17   information?  The Court's ordering that?

18         THE COURT:  Well, I've got to tell you right now,

19   you haven't produced it under Rule 45 in a reasonably usable

20   format.  I mean, a PDF doesn't really tell them, for

21   instance, what's behind the spreadsheet.

22         MR. TARAVELLA:  I thought 45 says that -- and

23   34 -- Rule 34 and 45 say that it has to be produced in the

24   manner in which it's kept.

25         THE COURT:  Or it has to be --

```
1              MR. TARAVELLA:  Or in the format --

2              THE COURT:  -- usable but --

3              MR. TARAVELLA:  -- specified.

4              THE COURT:  -- you can't produce it -- you can't

5    produce -- look, if your client has data that they put in

6    Excel, I would be absolutely shocked -- if I had a deposition

7    of a Dillon IT person and I showed them a PDF of a

8    spreadsheet and I asked the IT person is this how Dillon

9    maintains this data, I would be absolutely flabbergasted,

10   unless you -- now, again, I don't know the Dillon IT system,

11   but a spreadsheet without meta data is of no value to an

12   expert in doing any kind of analysis.  It really isn't.  And

13   the case law in that respect is absolutely clear.  I mean,

14   all you've got to do is look at the case law and you'll know

15   that you've got a problem.

16             MR. TARAVELLA:  I have no idea, Your Honor.  Of

17   course we will comply with whatever the Court orders.  I have

18   no idea what that undertaking involves.

19             THE COURT:  See, the problem is, is that -- all

20   I'm looking at -- I'm looking at Rule 45(d).  I mean, it says

21   it -- 45(d)(1).  If the subpoena does not specify a form for

22   producing electronically stored information, the person

23   responding must produce it in a form or forms in which it is

24   ordinarily maintained or in a reasonably usable form or

25   forms.
```

```
 1              And so the difficulty that I've got is I would
 2       just be absolutely flabbergasted if Dillon maintains pricing
 3       information on a PDF spreadsheet.
 4              MR. TARAVELLA:  On the other hand, I don't know
 5       what form that they -- that they have it in.  It says in a
 6       form or forms which is ordinarily maintained.  I have no
 7       idea --
 8              THE COURT:  Or reasonably usable.
 9              MR. TARAVELLA:  -- what is maintained.
10              THE COURT:  But at the end of the day, counsel,
11       all you've got to do is look at the case law under Rule 34
12       and 45.  The ultimate objective is to get the information in
13       the hands of the requesting party so the requesting party can
14       make some meaningful use of it.
15              And if -- if they -- and, again, this is the
16       problem that I've got.  Dillon's position is literally a
17       moving target.  If in fact Dillon has the information in
18       some -- if they maintain this information in some form other
19       than PDF, I mean, somebody -- I'm betting -- because all a
20       PDF is, it's essentially a static image of a computer monitor
21       screen.  That's all a PDF is.  And nobody is going to work
22       with a spreadsheet that way, because a spreadsheet involves
23       inputting data based upon whatever formulas are built into
24       the spreadsheet.  So I would be absolutely shocked if you
25       could find a Dillon person who could sit in that witness
```

1    stand under oath and say Dillon maintains that pricing

2    information in the ordinary course of business on a PDF.  If

3    you can find that person, I would love to have them come in

4    and talk to me, because it would seem to run counter to

5    everything that I know about ESI over the last six years

6    working for the Sedona Conference.  And I may be wrong.

7              MR. TARAVELLA:  So with respect to 5-H, I'm not

8    clear but I want to be clear on what the Court is -- is the

9    Court for the first time ordering it be produced in the

10   format in which it is kept or in Excel format or --

11             THE COURT:  Well, I guess --

12             MR. TARAVELLA:  -- or either one?  I'm not clear

13   on what is --

14             THE COURT:  -- to some --

15             MR. TARAVELLA:  -- expected --

16             THE COURT:  Well, and that's a fair question.

17             MR. TARAVELLA:  -- of Dillon at this point.

18             THE COURT:  To some extent I need to know what

19   you're going to do with this data, because if all you're

20   looking for is a list of stores and a list of quantities,

21   because that's all 5-H talks about, quantities, what is your

22   expert going to do with this data?

23             MR. BENNINGTON:  This data isn't something that we

24   would utilize alone.  It's in the context of these A through

25   G.

```
 1              THE COURT:  Well, I understand that, but my
 2   question is -- see, the difficulty is now you guys,
 3   unfortunately, didn't do a particularly effective job.  You
 4   should have requested a specific format.  And the case law is
 5   also clear that if you don't request -- you're not
 6   necessarily entitled to a do-over, because 45 is like 34.  It
 7   says you only have to produce the data in one format.  You
 8   don't have to produce it in multiple formats.  And if you did
 9   not request a specific format, if you didn't do that, and
10   if -- see, the problem is --
11              Let me ask this question.  You didn't ask for any
12   specific format for anything, including -- all you asked for
13   is TIFF or PDF documents?
14              MR. BENNINGTON:  No.
15              MS. CRAIGMILE:  No.
16              THE COURT:  Or you just simply said give us ESI?
17              MR. BENNINGTON:  We were relying on the rule that
18   you have just cited.
19              THE COURT:  The rule -- the problem though,
20   counsel, the problem is, the problem is the rule
21   contemplates, the rule contemplates that you will request, if
22   you don't request, then to some extent whether or not they
23   produce it in a reasonably usable manner is a function of
24   what you're going to do with it, and I don't know what you're
25   going to do with it, and you haven't provided me with the
```

52

```
 1    information.  So right now I'm not inclined, without more, to
 2    make them redo.
 3          Now, if they have not -- so what I understand, if
 4    I understand correctly, they've provided PDF's, and you want
 5    them to reproduce all of the stuff that they gave you in
 6    PDF's?  What do you want?
 7          MR. BENNINGTON:  We just don't want it in PDF as
 8    opposed to any other format.  That's --
 9          THE COURT:  But, counsel --
10          MR. BENNINGTON:  They haven't provided it at all.
11          THE COURT:  Counsel, how much -- but, guys -- oh
12    my lord.
13          Help me to understand.  You did not request in
14    your subpoena any format.  How many pages or how many --
15    yeah, how many documents have they now produced to you as
16    PDF's or static images that you now want them to go back and
17    redo?  Holy smokes.
18          MS. CRAIGMILE:  They've only produced a handful of
19    these PDF's that are -- were derived from electronically
20    stored data.
21          THE COURT:  I mean, guys, they've -- they have --
22    you've told me for instance -- I'm looking at what you're
23    telling me.  I'm looking at your status report.  Your status
24    report tells me on page 9, starting at the bottom of page 9,
25    set forth below is a table identifying all of the
```

53

1    documents/data Dillon has produced to date.  And by my

2    calculation it looks like it's something on the order of

3    about 38,000-plus pages.  So when you tell me you don't like

4    the format in which you've gotten stuff, are you suggesting

5    that they should reproduce 38,000 pages --

6              MR. BENNINGTON:  No.

7              THE COURT:  -- worth of stuff?

8              MR. BENNINGTON:  No.

9              THE COURT:  Then what is it that you want them to

10   reproduce?

11             MR. BENNINGTON:  We want them to give us the

12   volumes, not in PDF but in an Excel spreadsheet.  That's all.

13             THE COURT:  So all -- well, see -- okay.  So right

14   now what you're saying is you want -- with respect to request

15   5-H for which they've given you nothing, you're now saying

16   when they give it to you, you want it in I guess, what,

17   native format?

18             MR. BENNINGTON:  Excel spreadsheet.  Or some other

19   usable form.

20             THE COURT:  I don't think you guys really

21   understand the terminology, but that's okay.

22             What you want them to give you is those

23   spreadsheets in native format.  You want the documents and

24   the meta data so you can analyze them.  That's what you want.

25             MR. BLEDSOE:  We want the native (inaudible).

1          THE COURT:  Right.  You want it as it's generated

2     in their software.

3          MS. CRAIGMILE:  Right.  They've produced a

4     spreadsheet --

5          THE COURT:  Yeah.  Now --

6          MS. CRAIGMILE:  -- with four or five columns --

7          THE COURT:  Right.  You want -- you want those --

8     you want that data produced to you in native format so that

9     you can look behind the spreadsheets, you can understand the

10    formulas, and you can use the data itself.

11         MS. CRAIGMILE:  Not necessarily look at the

12    formulas but manipulate the data with other data.

13         THE COURT:  It's the same -- it's the same thing.

14         MS. CRAIGMILE:  Right.

15         THE COURT:  You want it in native format.

16         MS. CRAIGMILE:  Well --

17         THE COURT:  And since you guys haven't produced it

18    at all, what's the problem if you produce the net and gross

19    quantity social security of fuel delivered, if you produce

20    that information in native format?

21         MR. TARAVELLA:  Does that mean in -- in the form

22    it's ordinarily maintained?

23         THE COURT:  Right.

24         MR. TARAVELLA:  Because I don't know if it's in

25    Excel.  I think they're assuming it's in Excel format --

1          THE COURT:  However --

2          MR. TARAVELLA:  -- the ESI is in that format.

3          THE COURT:  However it is ordinarily -- I want

4    it -- I want that information in the manner in which it's

5    ordinarily maintained.

6          MR. TARAVELLA:  Ordinarily maintained, okay.

7          THE COURT:  Right.

8          MR. TARAVELLA:  All right.  And, Your Honor, if --

9          THE COURT:  Now, here's what I want you to do.

10   Here's what I want you to do.  I want you to contact --

11   listen, guys, carefully, I want your full and undivided

12   attention.

13         I want you to contact plaintiff's counsel by noon

14   tomorrow.  I want you to tell Ms. Craigmile -- and I would

15   suggest you get your IT person on the phone so there's no

16   miscommunication -- I want you or somebody from Dillon to

17   tell Ms. Craigmile and her IT person in clear, unequivocal

18   terms how this data is ordinarily maintained.

19         Now, basically I understand what Ms. Craigmile

20   wants to do.  Tell her how, tell her how it's ordinarily

21   maintained.  Based upon what she wants to do with the data,

22   you will work cooperatively to figure out whether or not its

23   normal format will allow Ms. Craigmile to do what she wants.

24   If it doesn't, I will allow Ms. Craigmile to designate a

25   format and I'll require it to be produced in that format.

1     We're not going to go around this one more time.

2             Does everybody understand the ground rules?  I

3     want format issues to be resolved by noon, and I want the 5-H

4     data to be produced by 5 o'clock on Friday.

5             So --

6             MR. TARAVELLA:  The 5-H data?  I thought it was

7     the -- sorry, 1 and 2.

8             THE COURT:  No, 5-H is all they want.  The only

9     thing -- right now -- they want the contracts and they don't

10    need anything for those, they just want --

11            The contracts you want in PDF, right?

12            MS. CRAIGMILE:  Yes.

13            THE COURT:  Right.  All -- all they want is to the

14    extent that there is data that shows net and gross quantity

15    of fuel delivered, they want that information in native

16    format, as I understand it.  And they're nodding their heads

17    affirmatively.

18            MR. TARAVELLA:  Well, Your Honor -- okay, just so

19    I'm clear.  I thought that the Court has ordered by 17:00

20    hours on Friday we produce 1 and 2 --

21            THE COURT:  I want -- yeah, I want --

22            MR. TARAVELLA:  -- right?

23            THE COURT:  -- every -- no, guys.  Listen.

24            MR. TARAVELLA:  5-H too?

25            THE COURT:  I want everything produced.  I want

1     everything produced by 5 o'clock on Friday.

2             MR. TARAVELLA:  I have no idea what 5-H entails in

3     terms of --

4             THE COURT:  Then I think you might -- as soon as

5     we're done here, you might want to get on the phone and find

6     out.

7             MR. TARAVELLA:  I'm told we can do it, Your Honor.

8             THE COURT:  All right.

9             MR. TARAVELLA:  Okay?

10            THE COURT:  Okay.  So we're now up to 6.  What's

11    left to fight about with 6?

12            MR. TARAVELLA:  There are no issues regarding 6.

13            THE COURT:  There's two sides to every story.  Let

14    me hear from plaintiffs' counsel.

15            MR. TARAVELLA:  I can only go with what they told

16    me on Monday, Your Honor.

17            MS. CRAIGMILE:  With respect to request 6,

18    Dillon's counsel has represented that there are no additional

19    documents related to discounts.  We don't have (inaudible) --

20            THE COURT:  Okay.

21            MS. CRAIGMILE:  -- information (inaudible) not

22    that -- they've represented that there are no additional

23    (inaudible).

24            THE COURT:  I have to accept that representation.

25    So 6 is resolved.

1          MR. TARAVELLA:  Your Honor?

2          THE COURT:  Yes.

3          MR. TARAVELLA:  On 5-H, it's come -- and maybe

4     Mr. McCormick can address this.  The same issue on the

5     computer servers and having to download that information, the

6     $105,000 that we mentioned for 8 -- in McClenahan's paragraph

7     8 of her declaration is there, so we have to -- to download

8     that and produce it because of the volume, it can't be

9     downloaded to one server and produced, so we need the three

10    servers and we need to invest the 105,000 that I asked about

11    in the last hearing when I asked the Court and plaintiff's

12    counsel do you want us to go buy the servers.  And that

13    question was not answered so I didn't understand the Court's

14    orders to go purchase the servers.

15         THE COURT:  Well, see, maybe I'm -- I'm confused

16    then.  I thought, I thought when we were talking about

17    document 5-H, that you had that stuff and you simply were not

18    producing it because there was a protective order.

19         MR. TARAVELLA:  Dillon has it.  Dillon has it.

20         THE COURT:  Okay.

21         MR. TARAVELLA:  But to grab it and to get it in

22    producible format, we have to do the -- we have the same

23    issue on the servers that we mentioned earlier in

24    McClenahan's.  And it's only for these dates Mr. McCormick is

25    telling me, January 1st, 2009 through March 23rd, 2011.

1          Do you want to address the Court --

2          MR. McCORMICK:  Sure.

3          MR. TARAVELLA:  -- on this?

4          MR. McCORMICK:  Your Honor, just to clarify.  So

5    we do have it for grocery stores, but for convenience stores

6    for the -- we only have it for limited dates where it's

7    readily available, from March 24th, 2011 to May 31st, 2011.

8    For the data from January 1st, 2009 through March 23rd,

9    2011 -- and this is just for the Loaf 'N Jug, the convenience

10   stores -- that's where we have the issue that we would have

11   to purchase the servers and build a database.

12          THE COURT:  Well, so -- so walk me through.  So to

13   the extent that there are grocery stores that also sell

14   fuel --

15          MR. McCORMICK:  Yes.

16          THE COURT:  -- you don't need servers to do those.

17          MR. McCORMICK:  Correct, Your Honor.

18          THE COURT:  And how many stores is that?

19          MR. McCORMICK:  I'm not sure of the exact number

20   offhand.

21          THE COURT:  I'll take a rough estimate.

22          MR. McCORMICK:  I'd estimate maybe 40 stores.

23          THE COURT:  Okay.  40 stores.  Covering the period

24   January 2009 to January 2011.  There's 40 stores for which

25   you could readily obtain these fuel quantity numbers.

1          MR. McCORMICK:  Yes.

2          THE COURT:  Without having to undergo any sort of

3    extraordinary efforts.

4          MR. McCORMICK:  Correct.

5          THE COURT:  Now, with respect to the Loaf 'N Jug

6    stores, those you're telling me you would need servers why?

7          MR. McCORMICK:  Because my understanding is that

8    the information is not in a database that's readily

9    available.  It's in archived data.  And -- or you might say

10   legacy format.

11         THE COURT:  Sure.

12         MR. McCORMICK:  And so -- they would have to

13   actually -- they would have to build a database and they'd

14   have -- they'd have to use these servers to pull these

15   archived data so that it can be -- get into -- back into a

16   format where it's a database that can be produced.

17         THE COURT:  All right.  Let me -- here's what I'm

18   going to do, because the problem that I've got, and I'm going

19   to be candid with you, the case law is very clear, and I've

20   got the cases, when you're talking about -- if plaintiffs are

21   saying we want database information, the case law is very

22   clear companies maintain data in a wide range of databases,

23   and when you ask somebody to pull database information, it

24   becomes exceedingly problematic, because once you start

25   pulling database information, if you don't have the right

1    software, you couldn't do anything with that information if

2    you wanted to.  And Courts generally are saying when you come

3    to somebody and say I want you to pull database information,

4    particularly database information going back two years, then

5    the Court has to carefully evaluate the relative burdens.

6           Now, here's what I'm saying seems to be the most

7    prudent course of action.  What I would suggest as a

8    reasonable solution is I think what you need to do is get the

9    information for the 40 stores that is immediately available.

10   Then -- because that will give you an immediate body of

11   information your experts can use.  Then what I would be doing

12   is I would be exhausting every effort to find out what those

13   code numbers are on the information that you got from Suncor,

14   because I've got to tell you, I'm not going to make Dillon

15   build three servers unless I am absolutely convinced that is

16   the only course of action, and I'm not there.

17          MR. BLEDSOE:  Your Honor, I thought we had that

18   conversation back on the 14th and that what we were expecting

19   was what was immediately readily available.

20          THE COURT:  Right.

21          MR. BENNINGTON:  That's correct.

22          MR. BLEDSOE:  We can't do any --

23          THE COURT:  Yeah, I'm not --

24          MR. BLEDSOE:  -- (inaudible).

25          THE COURT:  I will tell you right now I expect

1    Dillon to produce the quantity numbers for the stores that

2    they've got that they can retrieve from an active system, and

3    it sounds like they can retrieve that information off an

4    active system.  I am not going to require at this point

5    Dillon undergo the expense of recapturing legacy data.  I am

6    not -- I don't want to mislead anyone.  I'm not necessarily

7    foreclosing that might be an option, but I'm not going to

8    require Dillon to incur those expenses at least at this

9    juncture because I'm not satisfied that plaintiffs have made

10   an adequate showing.  But I will require you to produce the

11   quantity number information for the 40 stores for which that

12   is readily available.

13        I will require the parties to make further efforts

14   to take advantage of the information produced by Suncor.  I

15   expect you to thoroughly exhaust your ability to make use of

16   those numbers, whether that's through a 30(b)(6) deposition

17   of Dillon, whether it's another 30(b)(6) deposition of

18   Suncor, however you want to do it, but I would think

19   particularly it should be possible to use the Suncor records

20   plus the information for the 40 stores and start to draw some

21   conclusions from that.

22        MS. CRAIGMILE:  Our expert who does analyze the

23   data is sitting here, and he has confirmed that from the

24   Suncor data produced he cannot determine what store --

25        THE COURT:  But what I'm saying is I'm not

1      convinced that you've plumbed the depths of that information.

2      In other words, what I would be doing is I -- if you've got a

3      deposition of a Suncor employee, I would have asked the

4      Suncor employee, where did you get these numbers?  Somebody

5      at Suncor must have put those numbers on that form.  I would

6      have asked the Suncor employee who put the numbers on the

7      form, where did you get the numbers to put on the form.  Now,

8      if the Suncor employee says we got those numbers from Dillon,

9      then I would take a 30(b)(6) deposition of the Dillon

10     employee and say what do these numbers represent.  Because

11     once you know what the store numbers are, then it may very

12     well be possible to make more value.  But I am not, I am not

13     at this juncture going to make Dillon capture information

14     from legacy data unless and until I'm satisfied that that's

15     the only recourse, and you haven't made that showing.  And

16     that is really your showing to make.

17          MR. BENNINGTON:  And we agreed to that previously.

18     We're willing to accept that.

19          THE COURT:  Okay.  Can we move past 5-H?

20          MR. TARAVELLA:  That's -- so the 40 stores by

21     17:00 Friday?

22          THE COURT:  Right.  So we're taken care of 6.  So

23     now we're up to 7.

24          Now, as I understand it, the problem is that

25     Dillon has produced information showing the last four digits

1   of credit card numbers but they don't have the zip code

2   information.  Is that the crux of the problem?

3           MR. BENNINGTON:  That's part of the problem.  The

4   other part of the problem is with respect to the City Market,

5   that is the grocery stores, we were told the credit card

6   transactions don't differentiate between gasoline and

7   groceries.  We accept that and we have said that the data

8   that they do have doesn't seem responsive and on its face we

9   apparently can't use it, but Mr. Taravella has produced some

10  of it for us to see the kind of format it's in.  And --

11          THE COURT:  Well, what I'm trying to figure out,

12  what's the fight about?

13          MR. TARAVELLA:  We produced 1 million of 27 --

14          MR. BENNINGTON:  That's --

15          MR. TARAVELLA:  We produced 1 million of 27

16  million records to them, and plaintiffs would now like to

17  change the scope of the subpoena.

18          MR. BENNINGTON:  No.

19          MR. TARAVELLA:  And -- well, we have a request

20  from the plaintiffs to change the scope of the subpoena, and

21  a letter dated September 25th from Ms. Craigmile.

22          The issue here is amending the scope of the

23  subpoena.  Right now we're under Court order to comply with 7

24  as it is, and that's what I was --

25          THE COURT:  Well, okay.  Tell me --

```
1              MR. TARAVELLA:  -- relating to the Court at the
2     beginning --
3              THE COURT:  Tell me what you think plaintiff is
4     now looking for.
5              MR. TARAVELLA:  It's in their letter of
6     September 25th so --
7              MR. BENNINGTON:  Ms. Craigmile can tell you
8     exactly what --
9              THE COURT:  Sure.
10              MR. TARAVELLA:  It's here.  It's, quote,
11     identification of the receipts for fuel sales by station, by
12     day, by fuel grade, by volume, by number of customers
13     purchasing gas that day from January 1st, 2009 through
14     May 31st, 2011.
15              THE COURT:  I'm looking at request --
16              MR. TARAVELLA:  That's a quote from her letter.
17              THE COURT:  I'm looking at request number 7, and
18     that doesn't appear to be in request number 7.
19              MR. BENNINGTON:  It's not.  What happened was --
20              MR. TARAVELLA:  It's changed.
21              MR. BENNINGTON:  -- we had -- we had two or three
22     iterations of the response to this from counsel as to what
23     was available.  Then as a -- as a solution we offered, well,
24     rather than try to force you to produce data that apparently
25     isn't going to be responsive, we have an alternate
```

1    suggestion, which is produce this data.

2         It wasn't changing the rules of the game, it

3    wasn't moving the target.  It was offering them a solution in

4    a cooperative manner as to, all right, give us this data.

5    That's all it was.  And we could crank out an amended

6    subpoena if somebody really wants that, but we didn't think

7    procedurally that made much sense; it certainly wouldn't save

8    any time.

9         THE COURT:  Well, but as I understand it, they

10   have given you some information in response to number 7, but

11   they're telling you we can't give you anything more than

12   we've already given you, and so now you're saying in lieu of

13   giving us what you can't give us, we now have -- we've talked

14   to our expert and our expert says, well, if they can't give

15   me credit card numbers and zip codes, then here's an

16   alternative database that I can work with.

17        MS. CRAIGMILE:  Right.  We requested credit cards

18   with zip codes linked for each of the purchases.  Until after

19   the last hearing I believe Dillon said we have this data,

20   we're collecting it from our vendor.  Then we heard we do not

21   have it available without (sic) the zip code.  So they do not

22   have apparently now after four months of telling us they had

23   the data, they're just not producing, they now said we don't

24   have the data in the form you've requested it.  So we went to

25   our experts and came up with an alternative that would

```
 1    satisfy some of their needs, because apparently the data
 2    doesn't exist.  But now they have produced the zip -- or
 3    excuse me, the last four digits of the credit card number
 4    without the zip codes, and that's not responsive.
 5              THE COURT:  Okay.  Let me hear from -- what --
 6    what is it that you have?  You.  Dillon.
 7              MR. TARAVELLA:  Well, we produced 1 million
 8    records to them.
 9              THE COURT:  No, but --
10              MR. TARAVELLA:  Oh.  Credit card data without zip
11    codes.
12              THE COURT:  Okay.  But --
13              MR. TARAVELLA:  Last four.
14              THE COURT:  And you don't have -- your vendor --
15    who is your vendor that maintains all this?
16              MR. TARAVELLA:  I have -- I can't represent that
17    to the Court.  I don't know.  I don't know, Your Honor.
18    So --
19              THE COURT:  So some --
20              MR. TARAVELLA:  -- there's like 27 million
21    records, and we've produced a million to show them what -- it
22    takes about 5 hours for each million package.  So I said,
23    okay, let's get it to them and test it and see if that's what
24    they want.  And it is not in fact of any use to them, and so
25    I stopped at the other 26 million because although we're
```

1      under Court order to produce number 7, it didn't make sense

2      to us to continue when they don't really want it.  So they --

3      so then they proposed the amended language that --

4                THE COURT:  Okay.  So --

5                MR. TARAVELLA:  -- Ms. Craigmile --

6                THE COURT:  So --

7                MR. TARAVELLA:  -- submitted to us.

8                THE COURT:  So -- and, Ms. Craigmile, you proposed

9      this alternative language to them when?

10                MR. TARAVELLA:  September 25th.

11                MS. CRAIGMILE:  We had a conference call

12      immediately, probably within two days after the last hearing

13      we had, where we had Mr. Tatos (phonetic) available, and

14      Dillon had its in-house attorney and Mr. Pryor, who

15      apparently has some knowledge of the data that's available,

16      and during that call we explored the issues with respect to

17      the zip codes.  They said no, we won't have it.  We said, all

18      right, we thought you had it until this point.  We discussed

19      with Mr. Tatos an alternative, presented it there, and then

20      it was formalized in the letter I sent on the 25th.

21                THE COURT:  Okay.  So you guys got the letter on

22      September 25th.  Have you gone to the IT department at Dillon

23      or have you gone to Dillon's vendor to find out if Dillon

24      maintains that data in a way that is retrievable?

25                MR. TARAVELLA:  The short answer is we don't know

1    if it is, not yet, no.

2              THE COURT:  I mean, I would have thought that

3    would just have happened as a matter of course.

4              MR. TARAVELLA:  Your Honor, we were trying to

5    comply with the Court order --

6              THE COURT:  I know, but guys --

7              MR. TARAVELLA:  -- as it's ordered and --

8              THE COURT:  Guys, guys, guys --

9              MR. TARAVELLA:  -- and it's like building a house

10   when you're asked how long will it take and how much will it

11   cost --

12             THE COURT:  Right.  Here's --

13             MR. TARAVELLA:  -- there's an initial --

14             THE COURT:  I'm entering -- I'm entering a new

15   order, on top of all the other orders that I've entered that

16   apparently aren't being complied with.

17             I'm entering an order that henceforth in this case

18   I will require counsel to work together cooperatively,

19   professionally and with a high degree of common sense,

20   because that seems to be perilously lacking here.

21             If I -- if I -- it doesn't take -- to me it

22   doesn't -- shouldn't take a genius to say, okay, this is what

23   they asked for, we can't give them what they asked for.  They

24   then got on the phone and say in lieu of that, this is the

25   data that we would accept or envision would be a suitable

1    alternative.  If I were representing Dillon, I would have

2    immediately gotten in touch with the appropriate people at

3    Dillon and say, look, I know I'm going to meet Shaffer on the

4    3rd, he's a pain in the neck, he's going to ask me with

5    absolute certainty did we follow up on this alternative form

6    of data, and I want to be able to answer Shaffer in the most

7    forthright, comprehensive way possible.  That's what I would

8    have expected a lawyer with a modicum of common sense to do.

9          Because -- I mean, in other words, guys, if you

10   tell me -- here's what -- if you came to me and said, you

11   know, Judge, we've gone back to the IT people, and the

12   alternative formulation that they're proposing is equally

13   unworkable, we cannot do that, then maybe you'd have a basis

14   for a discussion.  But we're here at a status conference to

15   try to move past some of these issues, and you can't tell me

16   whether or not this alternative formulation is any more

17   workable.  We've missed an opportunity here.

18         But, seriously, I will tell you in all honesty,

19   one of the problems that I've got -- and it's a snowball of

20   problems -- you served a subpoena which was, frankly, too

21   broad, way too broad.  You served a subpoena based on certain

22   assumptions about the data they did or didn't have and the

23   ready accessibility of that information.  You simply cranked

24   out a very, very expansive subpoena.  If you had sat down and

25   had a 30(b)(6) deposition with the Dillon people and simply

1 said I want to know how you maintain data of the following

2 types and I want to know how readily accessible that stuff

3 is, then you would have been able to draft a subpoena that

4 forestalled their ability to raise a number of these issues.

5    So I will say as frustrated as I am with Dillon,

6 and I suspect as frustrated as plaintiffs' counsel is with

7 Dillon, to some extent, counsel, this is a self-inflicted

8 wound.  You are setting yourself up or you set yourself up

9 for the very problem you're now wrestling with.  And anybody

10 who deals in ESI or electronic discovery with any familiarity

11 could have anticipated these issues.  Truly.

12    And now I'm trying to figure out how -- a way to

13 extricate all of you from what can only be described as a

14 mess.  So here's what I want you to do.  Again by 5 o'clock

15 on Friday -- you know the alternative formulation they would

16 like.  I will require you to touch base with the IT people at

17 Dillon.  I'll require you to contact Ms. Craigmile by noon

18 tomorrow and tell her to what extent the information she

19 wants is readily accessible without undue burden or expense

20 and tell her how much time it would take you to retrieve that

21 information.

22    I mean, I am not suggesting that Dillon should

23 walk away from its rights under Rule 45 and Rule 34 and

24 Rule 26(b)(2)(B), but right now I don't have a clue how

25 difficult it is to get this stuff, and so it's difficult for

1        me to get my hands around this problem.

2                But get in touch with Ms. Craigmile by noon

3        tomorrow, give her an update as to the availability of this

4        information.  If in fact, if in fact Dillon wants to stand on

5        formality and say if it's not in request number 7 we don't

6        have a duty to produce it, I will allow Ms. Craigmile to

7        crank another subpoena.  And be on the lookout because it's

8        coming at you.  If you want to avoid that hassle, you guys

9        could, again, consistent with common sense, professionalism,

10       cooperation, work through the problems.  But one way or the

11       other we're going to get to the bottom of this.

12               So I guess with respect to number 7 we can simply

13       await future events.

14               With respect to number 8, as drafted it was all

15       ESI and other documents as will disclose the daily pump price

16       at each of your retail sites for each fuel type, and it says

17       Dillon -- according to Dillon's filings, Dillon has this data

18       which it considers to constitute trade secrets and to date

19       Dillon has not produced any documents or data.

20               Is this one of the server issues or is this just a

21       straightforward trade secret issue?

22               MR. TARAVELLA:  There's no short answer, I'm

23       sorry, and I'll try to be short though --

24               THE COURT:  That's okay.

25               MR. TARAVELLA:  -- and brief.

1          So with respect to the C -- so the dates in

2     question are January 1st, 2009 through May 31st, 2011, if I

3     understand the scope of the subpoena.  So for C stores, my

4     understanding is that from January 20th, 2011 through

5     March 31st, 2011 we do have it.  Before -- so we have to --

6     the database building comes to the legacy system for dates

7     from the beginning of that time frame, January 1st, 2009

8     through March 23rd, 2011.

9          (To Mr. McCormick):  Did I get that right?

10         My co-counsel is saying I got that right.  So --

11    so we have the database building issue for a portion of the

12    time frame, and for a short portion of the time frame,

13    January 20, 2011 through March 31st, 2011, there's not a

14    database building issue.

15         (To Mr. McCormick):  Right?

16         The requested date -- I'm sorry, the requested

17    date is May 31st, 2011.  But -- well, okay.

18         THE COURT:  So you only have daily pricing

19    information for March, April and May of 2011.  That's --

20    that's on some active system that you can retrieve.

21         MR. TARAVELLA:  For C stores --

22         THE COURT:  I don't know what a C store is.

23         MR. TARAVELLA:  -- January 20th, 2011 --

24         THE COURT:  What's a C store?

25         MR. TARAVELLA:  Convenience stores.

```
 1                    THE COURT:  Okay.

 2                    MR. TARAVELLA:  Through May 31st, 2011.

 3                    THE COURT:  So for the convenience stores you've

 4      got basically three months worth of data.  More or less.  Or

 5      three months for the period --

 6                    MR. TARAVELLA:  Four, right.

 7                    THE COURT:  Four months in 2011 for the

 8      convenience stores.

 9                    MR. TARAVELLA:  Yes, sir.

10                    THE COURT:  What other data do you have?

11                    MR. TARAVELLA:  For SPG's we have --

12                    THE COURT:  And I don't know what -- what's an

13      SBG?

14                    MR. TARAVELLA:  The grocery store.  They're the

15      petrol group's --

16                    THE COURT:  So those are grocery stores --

17                    MR. TARAVELLA:  So it's the grocery stores --

18                    THE COURT:  -- with gas stations.

19                    MR. TARAVELLA:  -- that had the gas stations.

20                    THE COURT:  Okay.  What's -- what time period do

21      you have for them?

22                    MR. TARAVELLA:  For the whole time frame.

23                    THE COURT:  So you've got those for the whole time

24      period.

25                    MR. TARAVELLA:  Yes.
```

```
 1            THE COURT:  And that's the same 40 some odd
 2   stores?
 3            MR. TARAVELLA:  Yes.
 4            THE COURT:  And help me to understand.  The
 5   convenience stores, the convenience stores for which you have
 6   data for March, April and May of 2011 -- let me pose this
 7   question because I'm just curious, getting back to the Suncor
 8   records, because it -- I mean, I -- with a modicum of
 9   detective work, most of this stuff I think is starting to
10   make sense.  I'm going to assume, just because it seems
11   logical, that the Suncor list of all those deliveries that
12   has nothing but numbers, it doesn't have store identifiers,
13   I'm assuming that those numbers were probably provided to
14   Suncor from Dillon, because Suncor wouldn't know what the
15   store numbers were.  So if you've got convenience store
16   information for three or four months in 2011, I'm betting
17   that that convenience store information for those months
18   would also provide store numbers, because I'm betting Dillon
19   probably has identifying numbers for stores.  So it wouldn't
20   take a genius to figure out if you produce the information
21   for four months in 2011 that had store numbers and you've got
22   all two years worth of data, price data, for the grocery
23   stores with gas stations, and those probably all have store
24   numbers too, it wouldn't take a genius to say, okay, I'm
25   going to take some of these store numbers, because those
```

1   store numbers will now allow me to make some sense of the

2   data that I got from Suncor.

3           MR. BENNINGTON:  Your Honor --

4           THE COURT:  But you guys have got to stop telling

5   me you don't know.

6           MR. BENNINGTON:  I've done that.

7           THE COURT:  You're supposed to know.

8           MR. BENNINGTON:  I've done that, Your Honor.

9   There isn't a (inaudible) correlation, and the guy giving the

10  30(b)(6) deposition told me that.

11          THE COURT:  Forget the Suncor guy.  Forget -- you

12  should have taken a 30(b)(6) deposition of a Dillon person.

13          MR. BENNINGTON:  I know, but your question in

14  your -- the assumption is that somewhere in the Suncor data

15  is store level information for Dillon.  It's not there.

16  We've done our due diligence.

17          THE COURT:  Well, but my point is I'm still -- one

18  of the things that I have to wrestle with, folks, is I am

19  not -- I am not going to make Dillon expend time and money

20  unnecessarily.  You have -- I know you -- I know you think

21  that the Suncor information is inadequate because you can't

22  understand what some of the numbers mean, but I don't think

23  you've done an adequate job of trying to flesh out some of

24  those subjects.

25          MR. BENNINGTON:  We have.  I'm happy at this point

1     based on what I know with the spreadsheets Tony Shaheen has

2     provided to me and with his 30(b)(6) deponent's explanation

3     of what's in there.

4          THE COURT:  Well, here's what I'm going to do.  I

5     mean, because the problem that I've got from your perspective

6     or the problem you've created for yourselves from your

7     perspective, you've got an affidavit where this Dillon guy is

8     telling you, oh my God, we've got to build all these servers

9     and -- much like Chicken Little, the sky is falling.  The

10    problem is, is that Rule 34 and Rule 45 are basically

11    governed by the same notion.  You produce to the extent that

12    it's not objectionable and you object to the rest.  So I'm

13    really not -- when you come to me and say, Judge, we're going

14    to have to build three servers to produce all of this stuff,

15    and then you tell me you've got at least three or four months

16    in 2011 for the convenience stores that aren't going to

17    require servers because it's on some sort of active system,

18    and you've got two years worth of grocery stores and daily

19    pricing information on an active system, at a minimum that

20    should have already been produced.  Then you could come back

21    to me and say, look, Judge, before you make us spend all of

22    this time and energy to capture information from a legacy

23    system, we should put the onus on the plaintiff to

24    demonstrate why the data we have produced is inadequate.  But

25    you're not -- you're not helping yourselves because you just

1    give me an affidavit that sort of makes this dire prediction

2    of having to basically build three servers.

3            MR. TARAVELLA:  I thought that's the approach we

4    tried on number 7 and apparently that didn't work.

5            THE COURT:  No, the problem --

6            MR. TARAVELLA:  That's what we tried on number 7.

7            THE COURT:  -- you have with number 7 --

8            MR. TARAVELLA:  We did exactly that --

9            THE COURT:  No, the --

10           MR. TARAVELLA:  -- and stopped and fired for

11   effect --

12           THE COURT:  No.

13           MR. TARAVELLA:  -- to no effect because we missed

14   the target.

15           THE COURT:  No, the problem --

16           MR. TARAVELLA:  So that's what we did.

17           THE COURT:  No.  Second is you didn't have the

18   data with the social security numbers (sic) and the zip codes

19   combined.

20           MR. TARAVELLA:  The --

21           THE COURT:  This is something different.  What

22   you're telling me is you have -- number 8 says they want you

23   to disclose daily pump prices for every one of your retail

24   outlets.  You've got on an active system daily pricing

25   information for, as I understand it, all the convenience

1    stores for three or four months in 2011 and 40 some odd

2    grocery stores for the entire two-year period.  If you have

3    that and if it's not going to require extraordinary efforts

4    to produce, that should have already been produced.  Then you

5    come back to me and say, Judge, we've given them all the

6    stuff that's reasonably accessible without undue burden and

7    expense, a la 26(b)(2)(B), now, Judge, the onus should be on

8    the plaintiff to explain why we should have to undertake

9    extraordinary efforts to build three servers to capture

10   everything else.  The irony is, if you had done that, you

11   would have been in a much stronger position to come back and

12   say, Judge, trust us, trust us when we tell you this is

13   what's going on.

14           MR. TARAVELLA:  Your Honor, I think for 8 and 9,

15   these are -- the issues here are very similar to 5-H, so I

16   would assume that the Court would want to extend its order on

17   8 and 9 to also produce what we have in our active systems

18   subject to the amended protective order, and then I think the

19   issues are very, very similar.  So the -- when we're talking

20   about what we have in our active systems versus having to

21   build three servers --

22           THE COURT:  Okay.  Well, let's not skip ahead.

23           MR. TARAVELLA:  Okay.

24           THE COURT:  Because that's what gets us in

25   trouble.

1                What I'm telling you is --

2                MR. TARAVELLA:  Yes --

3                THE COURT:  -- with respect to number 8 --

4                MR. TARAVELLA:  Yes.

5                THE COURT:  We've already taken care of the

6        protective order.  You guys just have to draft it and sign

7        it.

8                MR. TARAVELLA:  Yes.

9                THE COURT:  With respect to number 8 and subject

10       to the protective order --

11               MR. TARAVELLA:  Yes.

12               THE COURT:  -- that will be in place --

13               MR. TARAVELLA:  Yes.

14               THE COURT:  -- if -- if Dillon has got daily price

15       information --

16               MR. TARAVELLA:  Yes.

17               THE COURT:  -- for any stores, and if that daily

18       pricing information is lodged on an active system --

19               MR. TARAVELLA:  Yes.

20               THE COURT:  -- I expect it to be produced by 5

21       o'clock on Friday.

22               MR. TARAVELLA:  Yes.

23               THE COURT:  I will then require you to contact --

24       and the same, by 5 o'clock on Friday -- contact plaintiffs'

25       counsel and explain to them what data is not on an active

1    system, what data would be required -- would require

2    exceptional efforts to capture.

3              MR. TARAVELLA:  Yes.

4              THE COURT:  Then plaintiff can come -- then

5    plaintiff can make an informed decision with its expert, is

6    the data that we're going to get or will that data allow our

7    expert to formulate reasonable opinions based upon a reliable

8    methodology.  If the expert says yes, then you may be in a

9    much stronger position to resist having to do the servers.

10   If the expert says no, I've got to have it all, soup to nuts,

11   then I will probably in all likelihood tell plaintiff's

12   counsel get Mr. Taraghi's checkbook out because you're going

13   to write a very big number.  Because at that point I then

14   have to question whether or not the -- whether the data is

15   reasonably accessible.

16             And the case law is very clear, folks, when you

17   start talking about database information and you're talking

18   about database information from an inactive system, the case

19   law seems to suggest that by definition that is not

20   reasonably accessible.  And then I have the right to shift

21   those costs to you.  And my inclination would be to do that.

22   Because one of the things that's interesting is the case

23   law -- the case law says, is that -- there's some Courts that

24   have said the danger with shifting costs is that relieves the

25   requesting party of any responsibility to frame reasonable

1   requests.  It's just, well, Judge, if we're paying for it, we

2   get it all.  And you still don't get to engage in a fishing

3   expedition.

4          So I would tell you look at what you're going to

5   get off the active systems, consult with your expert, and you

6   and your client and your expert can decide how much your

7   client wants to spend and how long they want to drag this

8   process out.  But I don't want to mislead you.  Even if

9   Mr. Taraghi says I will spend whatever it takes, I am not

10  going to guarantee that you're going to get it.  So take a

11  look at what you get, figure out how to use that

12  meaningfully, and then we'll reserve any further discussions

13  for somewhere down the road.

14         Understand what you've got to do by Friday?

15         MR. TARAVELLA:  Yes, Your Honor.

16         THE COURT:  All right.  So that takes care of

17  number 8.

18         Number 9.  Number 9 says you want the results of

19  all retail fuel price surveys.  So the first question is,

20  does Dillon in fact have, quote, retail fuel price surveys?

21         MR. TARAVELLA:  Yes, Your Honor.

22         THE COURT:  They have it.

23         MR. TARAVELLA:  Yes.

24         THE COURT:  Okay.  Now, to what extent is that

25  information contained on an active system?  Is it the same

1    thing?

2           MR. TARAVELLA:  It's the same as for the

3    convenience stores.  That would be from February 2nd, 2011 to

4    May 31st, 2011.  For the other dates for convenience stores

5    would require building the three servers.

6           THE COURT:  Well, but see -- but here's the

7    situation where honestly here I think there's a real key

8    distinction between 8 and 9, case understand the plaintiffs'

9    sort of theory.  Plaintiff says we want the retail fuel price

10   surveys because that will give us a sense of how Dillon uses

11   competitors, what's the competitive area.  Well, practically

12   speaking, if you've got information for the grocery stores

13   for two years and you've got information for all the

14   convenience stores for three or four months, my inclination

15   is that should probably give you a sense of where they saw

16   the competitive market.

17          MR. BENNINGTON:  And we agree.

18          THE COURT:  So I will tell you give them what you

19   have on the active system.  Number 9 I think would be a real

20   stretch for anybody to make a persuasive argument you need to

21   go beyond the active system data.  But the same caveat

22   applies.  Produce what you got off the active system, tell

23   them what you can't produce and why you can produce it, and

24   then we'll revisit number 9 again down the road.

25          Number 10, whoa Nelly.  All reports and research,

1     studies, examinations, investigations, surveys or analysis --

2     that includes everything except Ouija boards -- done by

3     Dillon or on Dillon's behalf relating to the characteristics

4     of consumer demand for fuel or competition at the retail

5     level, such as -- I've got to tell you, number 10 beats the

6     band in terms of overbroad.  I don't know who drafted this,

7     but if I had gotten this and I were Dillon, I probably would

8     have told you to pound sand too.

9           So tell me what we're really fighting about here,

10    because that -- I mean, number 10 doesn't honestly even pass

11    the straight face test.  I don't -- if I were drafting number

12    10, I would have had to worry, substantially worry, about

13    sanctions under 26(g), because you're only entitled to

14    discovery that is relevant to the case and proportions to

15    needs of the case, and literally number 10 is almost

16    limitless.  Number 10 probably should be sanctionable, if you

17    want my honest opinion.

18          MR. BENNINGTON:  The definition that -- number 10

19    has a defined term, which is Fuel, capital F, has a defined

20    term relating to fuel purchased by Dillon from Suncor for

21    sale at retail.  So this has a limitation.

22          And, beyond that, we've had numerous discussions

23    with present counsel as well as previous counsel that what

24    we're looking for is any sort of analysis or studies done for

25    the Colorado market during the relevant time period or

1    addressing the relevant time period.  So we have by

2    cooperative and professional meetings and in exchange with

3    each other limited this and agreed to what it is, what we

4    want.  And Mr. Taravella on Monday told me we are still in

5    the process of determining whether there is anything.  And

6    before it was if we have anything it's a trade secret.

7            I'm willing to accept a representation that there

8    isn't anything, but so far the response is this is too broad,

9    we can't possibly process it.  The response has been after

10   all the discussions we've had and the fact that it's relating

11   to Colorado fuel sales we don't know if we've got anything.

12   So --

13           THE COURT:  What's up?

14           MR. BLEDSOE:  Your Honor, also, in the material

15   submitted for our last hearing, there was an affidavit or

16   declaration from Ms. Giannola that suggested there was

17   some -- such responsive data that was being withheld with

18   trade secrets, so presumably whatever she was referencing in

19   her declaration, she would know what that was and

20   (inaudible).

21           THE COURT:  Well, what -- what does Dillon have

22   that's responsive to this request as narrowed?

23           MR. TARAVELLA:  Your Honor, we didn't intend to

24   have the Giannola declaration address whether or not it was

25   there, we just intended to have her address if it was trade

```
1    secret information.  That's all we were trying to do.

2             What we were struggling with 10 in part, because

3    we don't understand it, the relationship of ancillary

4    merchandise sales to fuel purchases to me means do you relate

5    the loaf of bread sale and milk sale to fuel, and the scope

6    is Colorado, Nebraska, Sidney, Ogallala and Hershey.  I don't

7    even know where Hershey is but --

8             THE COURT:  I know, but at the end of the day --

9             MR. TARAVELLA:  But --

10            THE COURT:  At the end of the day, all it asks for

11   are reports, studies, examinations, investigations.  Now, if

12   they want to depose somebody and ask that Dillon

13   representative in a deposition, I suppose they can, and we'll

14   fight that on another day.  All they're asking for is do you

15   have any reports, tangible things, electronically produced or

16   otherwise, that address these things.  And if you don't, you

17   don't.  You can't produce what you don't have.

18            See, this is -- what's interesting here is they're

19   not asking you to pull up database information and then do

20   something with it.  They're simply saying do you have in your

21   files any reports or examinations or studies that address

22   these points.

23            MR. TARAVELLA:  We --

24            THE COURT:  They're not asking you to manipulate

25   any data at all.
```

1           MR. TARAVELLA:  We have asked that question, but

2     the question that comes back is -- is what does it mean,

3     and -- and again, like -- they talk about reports that relate

4     the sale of groceries to fuel.  So if we have a --

5           THE COURT:  Well, okay, but --

6           MR. TARAVELLA:  -- a grocery --

7           THE COURT:  -- again, counsel --

8           MR. TARAVELLA:  -- store --

9           THE COURT:  Again, I can't allow Dillon to do what

10    it apparently is doing.  The fact -- you make reference to J,

11    relationship of ancillary merchandise sales to fuel

12    purchases, and I suppose, you know, that raises an

13    interesting question: Can you conclusively establish a causal

14    connection between buying gas and a cup of coffee.  But the

15    fact that you have questions about J does not in any way

16    relieve Dillon from answering the ones for which they don't

17    have questions.

18          MR. TARAVELLA:  Understood.  And most --

19          THE COURT:  I can't let this --

20          MR. TARAVELLA:  Most of them --

21          THE COURT:  -- (inaudible).

22          MR. TARAVELLA:  -- it's clear we don't.

23          For example, price elasticity, demand elasticity,

24    they don't even know what we're talking about, so -- so it's

25    clear like A, B and C, no.  Some of those it's --

1             THE COURT:  Okay.  So --

2             MR. TARAVELLA:  It's --

3             THE COURT:  -- where have you sent them a letter?

4    I mean, I've got A through Q.  Have you sent them a letter

5    saying, with respect to A we do not have any examinations,

6    studies, reports, et cetera, et cetera, responsive to 10-A?

7             MR. TARAVELLA:  I don't know if that's in a status

8    report or -- I don't know.

9             THE COURT:  If you haven't done that, guys, then

10   again --

11            MR. TARAVELLA:  We've conferred extensively about

12   10.

13            THE COURT:  I mean --

14            MR. TARAVELLA:  But --

15            THE COURT:  -- it's one thing to confer, but if

16   you don't put it in writing, you're giving them wiggle room.

17            So here's what I'm going to require you to do.

18   I'm going to require you by noon tomorrow to give them a

19   definitive statement as to each of the subparts in 10.  You

20   either have it or you don't.

21            Then in addition to a definitive statement as to

22   whether you have it or not, tell them if you have it,

23   indicate whether you're going to produce it subject to

24   protective order.  If you're not going to produce it subject

25   to protective order, explain why you won't.  And then we'll

1    thrash that out.  If you -- if you don't have it, you can't

2    produce it.

3           So you've got -- basically you've got two options

4    as a threshold.  You either have it or you don't.  If you

5    don't have it, you can't produce it.  If you do have it, then

6    you have to say I'm either producing it notwithstanding the

7    fact that it's a trade secret but I'm producing it under the

8    protective order, or I have it but it's not on an active

9    system and I can't capture it without extraordinary expense.

10   But that should have been done a long time ago.

11          Mr. Bledsoe?

12          MR. BLEDSOE:  Ms. Giannola's declaration, Your

13   Honor, makes reference to actual material.

14          THE COURT:  Well, and it may be, but, Mr. Bledsoe,

15   that's not helpful to me, because I've just told them what I

16   want them to do.

17          MR. BLEDSOE:  And if they do that, they're going

18   to -- and unless Ms. Giannola was not being truthful, there's

19   going to be stuff.

20          THE COURT:  I'm not going to presume.  I'm not

21   going to make any presumptions about the truthfulness of

22   anyone.  I'm less interested in truthfulness and more

23   interested in thoroughness, because the jury will ultimately

24   decide questions of credibility.

25          But what I'm going to require you to do by noon

```
 1    tomorrow with respect to 10 and each of the subsections in

 2    10, either tell them it doesn't exist and therefore you

 3    cannot produce it, or tell them it does exist.  If it exists

 4    on an active system, then it should be produced subject to

 5    the protective order.  If it cannot be produced without undue

 6    burden and expense, explain why it cannot be produced without

 7    undue burden and expense, and then we'll have to decide

 8    whether or not the Court is going to impose some

 9    cost-shifting mechanism to get around those burdens.  But

10    until you guys have that discussion and until you give them

11    that information in a definitive way, I mean, you're asking

12    me to wrestle with a constantly shifting target, and I can't

13    do that.

14              MR. TARAVELLA:  So everything A through K on 10,

15    right?

16              THE COURT:  No.  I'm talking A through Q.

17              MR. TARAVELLA:  I mean A through Q.

18              THE COURT:  Right.

19              MR. TARAVELLA:  On 10, right?

20              THE COURT:  Right.

21              Okay.  Now, that gets me through the status report

22    items.

23              I don't want anybody to have any confusion.  Does

24    everybody understand where we're going from here?  Any

25    confusion at all?
```

1          MR. BENNINGTON:  No, Your Honor.  We're -- we

2     understand.

3          THE COURT:  Okay.  Now, here's the next thing that

4     I'm going to require, because you guys just aren't playing

5     well together at all, and much like my colleague in the

6     District of Columbia, Magistrate Judge Facciola, who had an

7     antitrust case and he finally threw up his hands in

8     frustration, I'm going to do exactly what John did.  I'm

9     going to require in this case that we will have a telephone

10     status conference, nobody's got to come down here, but we're

11     going to have a telephone status conference every Friday in

12     this case -- not this Friday but starting on October 12 we're

13     going to have a telephone status conference at 1:30 every

14     Friday.  Unless I issue an order vacating that status

15     conference, we will have a mandatory telephone status

16     conference every Friday at 1:30 Denver time, and you will

17     tell me what you've accomplished, what new problems have

18     surfaced, when we're going to come to what will hopefully be

19     a finish line.  Understand?

20          MR. BENNINGTON:  Understood.

21          THE COURT:  And what I expect is going to happen

22     is that because you're going to be talking to me on Friday at

23     1:30, my hope is that you will talk to each other sometime

24     prior to Friday at 1:30 so that you can come to me and say,

25     you know, Judge, believe it or not, we don't have anything to

1      talk about.  That would be our goal.  Okay?

2                Anything else we've got to talk about today?

3                MR. BENNINGTON:  Not for the plaintiffs, Your

4      Honor.

5                THE COURT:  Anything from anybody?

6                MR. BENNINGTON:  Mr. Shaheen, you must have

7      something.

8                MR. SHAHEEN:  I managed to avoid talking this

9      whole hearing.

10                THE COURT:  This is -- this is --

11                MR. SHAHEEN:  I have nothing.  Thank you, Your

12      Honor.

13                THE COURT:  Thank you.

14                Gentlemen?

15                MR. TARAVELLA:  We have nothing further.

16                THE COURT:  All right.  Have a safe drive home.

17                MR. BENNINGTON:  Thank you.

18                MS. CRAIGMILE:  Thank you.

19                THE COURT:  We'll be in recess.

20                THE CLERK:  All rise.

21

22                (Whereupon, the within hearing was then in

23      conclusion at 5:23 p.m. this date.)

24

25                I certify that the foregoing is a correct

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

1    transcript, to the best of my knowledge and belief (pursuant

2    to the quality of the recording) from the record of

3    proceedings in the above-entitled matter.

4

5    /s/ Patty Wrede                October 08, 2012
     Signature of Transcriber             Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305