# EXHIBIT 1

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

　　　　Plaintiffs and Counterclaim Defendant,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

　　　　Defendant, Counterclaimant, Third-Party Plaintiff,

HOSSEIN and DEBRA LYNN TARAGHI,

　　　　Third-Party Defendants.

## DECLARATION OF STEVEN EWING

Pursuant to 28 U.S.C. §1746, Steven Ewing states as follows:

1.　　I am the Director of Rack Forward Sales for Suncor Energy (U.S.A.) Inc. ("Suncor") and have been since approximately September 2010. Prior to assuming the position of Director, I was Manager of Rack Forward Sales. Before that, I was Manager of Retail Sales for the company-owned retail gas stations of Suncor's subsidiary, Suncor Energy Sales Inc. I make this Affidavit based on my personal knowledge.

2.　　"Rack forward" is a Canadian term and it refers to petroleum products that leave the refinery sales rack going forward. For purposes of this litigation, that would include gasoline and diesel fuel.

3.　　I was deposed in this case as a Rule 30(b)(6) deponent so I have a good understanding of the issues involved. I also reviewed "Plaintiffs' Motion Challenging Defendant's Designation of Certain Documents and Data as 'Highly Confidential' Pursuant to the Protective Order" ("Motion") and the exhibits attached to it.

4.　　As Director and Manager of Rack Forward Sales, I have the responsibility of negotiating and approving contracts for the sale of gasoline and diesel fuel. As a result, I have become very familiar with pricing and the highly competitive nature of gasoline and diesel fuel sales, both at the supply level where Suncor operates and at the retail level where Western Convenience Stores ("WCS") operate. Indeed, "meeting competition" was one of the topics on

which I was deposed. This is a business in which everyone is trying to get an edge or an advantage over its competitor.

5. Plaintiffs have attached as Exhibit A to their Motion the first five pages of a pricing spreadsheet for the Dillon Companies, Inc., d/b/a King Soopers and City Market ("Dillon"), which, among other matters, sets forth prices and volumes for January 2009. They have also attached as Exhibit B a "Confirmation of Purchase/Sale Agreement" for February 1, 2010 through January 31, 2011 for Mini Mart, Inc., d/b/a Loaf N Jug ("Mini Mart"), and a transaction summary for Mini Mart from February 1, 2010 through January 31, 2011 which set forth prices and volume requirements (collectively, "Confirmations").

6. The pricing and volume information in Exhibits A and B is regarded in the industry as highly confidential, with disclosure severely limited and tightly controlled. Mr. Taraghi knows that. In the January 17, 2007 Master Product Purchase and Sale Agreement between Suncor and WCS, which Mr. Taraghi signed, he agreed to keep such information strictly confidential and not to disclose it to third parties.

7. The January 17, 2007 Master Product Purchase and Sale with WCS provides in Section 23 ("Confidentiality") that "Suncor and [WCS] each agrees to hold in the **strictest confidence** the terms of this Agreement or any information containing any of the terms of this Agreement, **including pricing and volume information**." *See* Master Product Purchase and Sale Agreement, Dep. Exh. 2, at p. A-4 attached hereto (emphasis added) and also at p. 2, ¶6.

8. The confidentiality requirement in the Master Product Purchase and Sale Agreement is so strict that neither Suncor nor WCS may disclose the terms of the Agreement or the pricing and volume information "to any third party without the prior written consent of the other Party, unless required by law or government." The only exception being that each may make such disclosure "to its attorneys, tax advisors, and its employees, provided that prior to any such disclosure, such persons agree to be bound by the terms of this Section [23]."

9. In addition, Section 24 of the Master Product Purchase and Sale Agreement provides that if either Suncor or WCS "receives a subpoena or other legal process ... relating to [the] Agreement," it shall notify the other party.

10. All of Suncor's Master Product Purchase and Sale Agreements with its customers have the same confidentiality provisions as in WCS's Agreement, including those with Dillon and Mini Mart. Based on my experience, such provisions are standard in the industry and are necessary because of the highly competitive nature of gasoline and diesel fuel sales. Based on my experience in negotiating and approving those agreements with other Suncor customers, Suncor's customers require and rely on those confidentiality provisions.

11. Disclosure of pricing sheets similar to the one attached as Exhibit A and Confirmations similar to those attached as Exhibit B to the Motion would cause substantial business or competitive injury to Suncor and its customers because of the pricing and volumetric information they contain. That information, if disclosed to Mr. Taraghi or any of Suncor's current or past customers, would give that customer an unfair competitive advantage that could be exploited in the marketplace. I contrast that with the email attached as Exhibit C which, while

confidential, could be disclosed to Mr. Taraghi because it is a one-time discount and does not contain any volume or pricing information.

12. Although I am referring specifically to Mr. Taraghi, my concerns are not personal or limited to him. Contrary to the assertions in the Motion, my concerns are not based on "some inherent dislike or distrust of Mr. Taraghi and his company." *See* Motion, ¶13 at p. 8. They would apply to any of Suncor's past or current customers.

13. I will now address the specific substantial competitive harm that disclosure would cause Suncor. Then I will address the substantial competitive harm that disclosure would cause Suncor's customers.

14. Suncor's major competitors for gasoline and diesel sales are Holly Frontier, Sinclair, ConocoPhillips (now Phillips 66), and Valero. I am reasonably certain that WCS buys gas from one or more of those suppliers. If Mr. Taraghi or any other competitor knows the price at which Suncor is selling gas to a big customer such as Dillon, Mr. Taraghi could use that information as leverage, directly or indirectly, in negotiating with the Holly Frontier, for example.

15. I am not suggesting that Mr. Taraghi would intentionally violate the Protective Order. But in any negotiations, it would be all too easy for Mr. Taraghi to suggest or imply the prices at which Suncor is selling gas to King Soopers or Loaf N Jug or to say things in such a way which would enable Holly Frontier, for example, to determine that. In fact, it would be likely unavoidable in any such negotiations.

16. Mr. Taraghi's information would not just be limited to Dillon (King Soopers and City Market) or Mini Mart (Loaf N Jug). He also wants access to all the other spreadsheets and Confirmations similar to those in Exhibits A and B that Suncor has produced in this case. That would include spreadsheets for, among others, Offen Petroleum, Inc., which buys gas and diesel fuel from Suncor for re-sale to Safeway, and for Dats Trucking and Truman Arnold Companies, which buy gasoline and diesel fuel from Suncor for re-sale to Costco and Sam's Club. Those companies' sales to Safeway, Costco and Sam's Club are the result of a bid process. Suncor's sales to Offen, Dats and Truman Arnold are also the result of a bid process. It is very likely that, in addition to approaching Suncor, these customers have also approached Holly Frontier, Sinclair, Phillips 66, and Valero and asked them to bid on supplying them with the gasoline and diesel fuel so they could fulfill their contracts with Safeway, Costco and Sam's Club.

17. If Holly Frontier, Sinclair, Phillips 66 or Valero had information which could enable them to form an educated idea (as opposed to a guess) of the price at which Suncor was selling gasoline or diesel fuel to Offen, Dats or Truman Arnold, that would be "intelligence" which would allow them to underbid Suncor in subsequent bids to supply those companies with fuel to meet their contracts. They would have pricing information that Suncor would not have, putting Suncor at a huge competitive disadvantage. To put it differently, if the positions were reversed and I had the information in Exhibits A and B for Phillips 66, Holly Frontier, Sinclair, or Valero, I could use that information to derive the price at which they were selling gas. It would give me a substantial competitive advantage in any bid process and would enable me to approximate very closely their bids, thereby underbidding them.

18. In sum, the pricing and volume data in Exhibits A and B would provide information sufficient to allow Suncor's competitors to formulate an educated idea with respect to Suncor's prices. That is true even though the information may be for 2008 and 2009. The pricing does not change very much from year to year. Suncor entered into new two year contracts with both Dillon and Mini Mart in June 2011. The pricing did not change significantly, so that if Mr. Taraghi had access to Exhibits A and B, he would be able to approximate very closely the current pricing. WCS is incorrect when it suggests otherwise. *See* Motion, ¶12 at p. 8.

19. WCS is incorrect when it asserts that pricing information for January 2007 through May 2011 is "historical" and no longer "highly sensitive" or highly confidential. *See* Motion at ¶2 at pages 2-3 and ¶12 at p. 8. The Master Product Purchase and Sale Agreement recognizes that the confidential nature of the pricing and volume information does not expire in one or two or even five years after a given sale. The Master Product Purchase and Sale Agreement requires that pricing, volumes and other information be kept in the "strictest confidence" for two years after the *end* of the buyer-seller relationship.

20. Specifically, Section 23 of the Master Product Purchase and Sale Agreement provides that: "This Section shall survive any termination, expiration, or non-renewal of this Agreement for a period of two (2) years." Thus, both WCS and Suncor are required to keep all WCS's pricing and volumes "in the strictest confidence" for two years after the relationship has ended. That same obligation applies to all of Suncor's other customers.

21. Disclosure would also cause substantial competitive harm to Suncor's customers. WCS characterizes itself as a "discounter' in the retail fuel sales business. *See* Amended Complaint, ¶7. The pricing, volume and other information contained in Exhibits A and B (and similar spreadsheets and Confirmations) would enable WCS to approximate very closely Dillon's and Mini Mart's costs, as well as the costs for other companies for which similar documents have been provided. This would give WCS a substantial competitive advantage in pricing its gasoline *vis a vis* its competitors. Knowing its competitors costs would allow WCS to determine the "tipping point" for a competitor—that is, the lowest price at which that competitor would be willing to sell its gasoline or below which it could not go. Gasoline retail pricing is similar in many respects to a poker game. With the information in Exhibits A and B, WCS would know its competitor's "hole card."

22. In addition, barring some unforeseen circumstances, a retail gasoline station's volume of business does not change significantly from year to year. You can develop a general idea of a station's volume of business based on the number of pumps it has. However, the volume information in Exhibits A and B would enable WCS to back into and estimate the business that a given retail stores does with greater precision. With that knowledge, WCS could determine better the volume of "inside sales" (the convenience store side of the business) that a given station does. That would give WCS a very significant competitive advantage in its own "inside sales" pricing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 13, 2012.

*Steven Ewing* (signature)

Steven Ewing

5630405_1.DOCX