# EXHIBIT 2

EXHIBIT 2

STEVEN EWING-DECEMBER 14, 2012

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation, WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

Defendant.

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,

Third-Party Defendants.
------------------------------------------------------------

DEPOSITION OF STEVEN EWING
December 14, 2012

------------------------------------------------------------

                     Deposition location:
                     370 17th Street, Suite 3500
                     Denver, Colorado

APPEARANCES:

        KENNETH R. BENNINGTON, ESQ.
        KATHLEEN E. CRAIGMILE, ESQ.
        JEFFREY H. McCLELLAND, ESQ.
        BENNINGTON JOHNSON BIERMANN &
        CRAIGMILE, LLC
        370-17th Street, Suite 3500
        Denver, Colorado 80202

            and

### Page 34

1  to the big box operations. Then you mentioned the
2  last one was a commercial account, and I think you
3  even said like Kroger.
4      A.  Kroger is in that category, yes.
5      Q.  Who else is in that category?
6      A.  During the time period that's the only
7  company that's in that category.
8      Q.  What is it that defines a commercial
9  account let's say over somebody who's on the
10 identical sort of contract? In other words, a
11 two-year very ratable contract. What makes it
12 commercial or not?
13     A.  For me the Kroger contract I would put
14 that in the commercial, and that's my term for it,
15 because that's a ratable customer that helps the
16 foundation of the refinery and the production. Takes
17 out the seasonality of the business.
18     Q.  So would any customer who buys as much
19 as Kroger buys and is ratable and takes out the
20 seasonality, would you then put them into a
21 commercial category?
22     A.  Not necessarily. Depends on those
23 factors we went over. Are they reliable, do they pay
24 their bills on time, the ratability, the credit, the
25 relationship, the trust. You start stacking those

### Page 35

1  factors in and look at those factors, it all merges
2  together. Kroger is the one in that during the time
3  period.
4      Q.  When did you start considering Kroger
5  as a commercial, in a sub category of commercial
6  customers?
7      A.  I would say when we re-signed their
8  deal for close to a two-year deal. I knew about
9  Kroger but really understood what they meant to the
10 business, so it's...
11     Q.  This would be -- you re-signed them to
12 that two-year deal when?
13     A.  Early 2011 I believe. Or -- yeah --
14 yeah, early 2011. I can't remember the exact date.
15     Q.  It's the presently existing contract.
16     A.  It is. It is.
17     Q.  I want to diverge a bit --
18     A.  Okay.
19     Q.  -- on that but on the subject of
20 Kroger.
21         As we talked about earlier, one of the
22 issues we're dealing with is designation of
23 information as Highly Confidential. As I'm sure you
24 know, Suncor has produced in discovery to Western
25 Convenience Stores, the plaintiffs, pricing data

### Page 36

1  which includes volume, prices, chosen rack price and
2  other factors, data, for the period May 2011 going
3  back.
4      A.  Okay.
5      Q.  So the oldest data is right at the
6  moment around 18 months old.
7          MS. CRAIGMILE: Newest data.
8      Q.  (BY MR. BENNINGTON) I'm sorry, the
9  newest data is right at the moment around 18 months
10 old. Do you understand me?
11     A.  Yes.
12     Q.  All right. And it is my understanding
13 that Suncor has taken the position that that cannot
14 be disclosed for competitive reasons to Western. Is
15 that consistent with your understanding?
16     A.  Yes.
17     Q.  Have you been part of that
18 decision-making process?
19     A.  I've given some input on that.
20     Q.  I'm not going to ask you --
21     A.  From a Suncor perspective.
22     Q.  All right. From a what?
23     A.  Suncor perspective, obviously.
24     Q.  All right. What is your perspective?
25 What is your input? I'm not asking for the

### Page 37

1  conversations with your attorney, but I'm asking what
2  is it that you know that suggests that this data
3  cannot be disclosed to Western?
4      A.  We have some contractual obligations to
5  our customers that we won't disclose, pricing
6  information, but it extends farther than that. It's
7  all about credibility with each customer. As I would
8  not give anybody Western Convenience pricing, I
9  certainly wouldn't give out Kroger's pricing. And
10 when you move and give out a competitor's pricing and
11 Mr. Taraghi understands what the pricing was 18
12 months ago, he's going to be in the ball park, and he
13 may use that to his competitive advantage, to price
14 his stores, understanding maybe what the ball park is
15 on the street. And in turn that will then possibly
16 cause me at the refinery to lose sales because it
17 causes the Kroger company to lose sales.
18         If it was that open and Mr. Taraghi
19 needed to see Kroger's pricing, then why doesn't he
20 post his own cost on his stores? Right? You don't
21 give out competitors pricing.
22     Q.  You understand we're not talking about
23 giving it out. We're talking about it being
24 subpoenaed, being part of discovery in a lawsuit.
25 We're not talking about posting it on signs. You

Page 38

1 understand that, don't you?
2    A.  I understand that, but I'm also --
3 you're asking me should Mr. Taraghi receive one of
4 our customers' pricing, and the answer to that is no.
5    Q.  Back in May 2011 Mr. Taraghi told you
6 that he understood that Kroger was getting better
7 pricing than him, correct?
8    A.  He was getting a different price.
9 Kroger's getting a different price.
10   Q.  You don't recall he or -- Mr. Taraghi
11 or Chris Wehrle or somebody in that conversation
12 suggesting it wasn't Kroger -- they wouldn't have
13 cared if Kroger was getting a different price, they
14 only care if Kroger is getting a better price, and
15 they told you their understanding that Kroger was
16 getting a better price, correct?
17   A.  No, I don't remember that.  The only
18 part of any type of pricing I would -- can recall is
19 a brief conversation that Hossein was upset that the
20 branded was getting a 10 cent discount.
21   Q.  So your testimony is you don't remember
22 any conversation regarding Kroger.
23   A.  I don't remember any conversation
24 regarding Hossein being upset about a Kroger price.
25   Q.  If Kroger were to -- let me back up.

Page 39

1       Have you had any conversations with
2 anybody with Kroger about this issue of disclosing
3 this old data?
4    A.  No.
5    Q.  If Kroger were to concede or otherwise
6 suggest to you it's okay to disclose it, would you
7 then approve the disclosure?  At least in the
8 business point of view.  I'm not talking about what
9 the lawyers have to say.
10   A.  I'd probably still be opposed to that.
11   Q.  Even if Kroger didn't object.
12   A.  I would be opposed to that.  I'd still
13 have some heartburn on that.
14   Q.  Why?  Why would you have heartburn?
15   A.  Because you're still releasing a price
16 that lets now my competitors, Holly Frontier,
17 Sinclair, understand what that Kroger deal was, and
18 that affects my negotiations moving forward, and once
19 you have market knowledge, whether it's confidential
20 or not, it's going to be used in the future.  Not
21 with ill intent.
22   Q.  But if you were to -- if you understood
23 that the disclosure of this old Kroger data to
24 Western Convenience Stores would stop there, that
25 they would have a contractual -- well, it would be

Page 40

1 backed up by a court order in federal district court
2 that it couldn't be disclosed to Holly Frontier,
3 Conoco or anybody else, does that still give you
4 heartburn?
5    A.  Sure.  Absolutely.
6    Q.  And what --
7    A.  If you have -- if you're competitive,
8 it's going to give you heartburn.
9    Q.  At what point does the data become so
10 old it just doesn't matter?
11   A.  I don't think it ever becomes so old,
12 because the industry is so -- it's such a business
13 that's so close in pricing, it's never really going
14 to be outdated.  If you can get in the ball park and
15 understand what a price marker is, you're going to
16 have a competitive advantage.
17       But the -- Kroger knows kind of what
18 their business demands and what they should get, so
19 it's -- it's -- again, it's not about pricing.  It's
20 not about the price marker for them.
21   Q.  You keep using the word "price marker,"
22 and I'm still not sure I understand what you mean by
23 that.
24   A.  Well, I think you assume that contracts
25 are negotiated on one contract, and that's not --

Page 41

1    Q.  On what?
2    A.  One contract, one marker.
3       There's a lot of different markers
4 people try to use.
5    Q.  What's a marker?  That's what I'm
6 trying to understand.  What's a marker?
7    A.  Okay.  So a marker is what Hossein has.
8 He had a marker on the spot contract that said Suncor
9 unbranded minus 4-1/2 and 4 cents, that's a marker
10 that we'd use, because that marker would be posted on
11 the OPIS report that comes out every day, so he could
12 go and he could see what his cost was.
13      Another marker may be an OPIS rack
14 average.  Another marker may be OPIS rack average
15 less prior week average for diesel.  So those are
16 different -- you know people come in and use
17 different markers.
18      So does that help?
19   Q.  Yeah.  Let me make sure I understand.
20 So marker means the rack price, the contract rack
21 price that you agree to with somebody.
22   A.  For that particular marker.  But it
23 doesn't mean -- it's going to fluctuate, right?  It
24 doesn't mean that it's -- it's --
25   Q.  What's going to fluctuate?