1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
2
      Case No. 11-CV-01611-MSK-CBS
3    _____

4    WESTERN CONVENIENCE STORES, INC.
      *a Colorado corporation,*
5
      WESTERN TRUCK ONE, LLC
6     *a Colorado limited liability company,*

7        Plaintiffs,

8     vs.

9     SUNCOR ENERGY, (U.S.A.), INC.,
      *a Delaware corporation,*
10
         Defendants.
11
      Dillon Companies, Inc.,
12       Interested Party.

13   _____

            Proceedings before CRAIG B. SHAFFER, United
14    States Magistrate Judge, United States District Court
      for the District of Colorado, commencing at 1:30 p.m.,
15    January 28, 2013, in the United States Courthouse,
      Denver, Colorado.
16   _____

17        WHEREUPON, THE ELECTRONICALLY RECORDED
      PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...
18   _____

19                          APPEARANCES

20            MR. KENNETH R. BENNINGTON, ESQ.,
              MS. KATHLEEN E. CRAIGMILE, ESQ.,
21             MR. PHILIP W. BLEDSOE, ESQ.
              Appearing on behalf of the Plaintiffs.
22            MR. ANTHONY J. SHAHEEN, ESQ.,
              Appearing on behalf of the Defendants.
23          MR. CHRISTOPHER A. TARAVELLA, ESQ.,
              MR. MICHAEL R. MCCORMICK, ESQ.
24        Appearing on behalf of the Interested Party.

25   _____

                       MOTIONS HEARING

```
 1                    P R O C E E D I N G S
 2              (Whereupon, within the electronically recorded
 3    proceedings are herein transcribed, pursuant to order of
 4    counsel.)
 5              THE COURTROOM DEPUTY:  All rise.  Court is in
 6    session.
 7              THE COURT:  Have a seat.  All right.  We are
 8    on the record.  This is Western Convenience Stores,
 9    Inc., et al, versus Suncor Energy, et al., 11-CV-1611.
10    I'll take appearances of counsel.
11              MS. CRAIGMILE:  Good afternoon, Your Honor.
12    Kathleen Craigmile and Kenneth Bennington from
13    Bennington, Johnson, Biermann & Craigmile on behalf of
14    the plaintiffs.
15              THE COURT:  Okay.
16              MR. BLEDSOE:  And also on behalf of the
17    plaintiffs, Philip Bledsoe from Polsinelli, Shughart.
18              THE COURT:  All right.
19              MR. SHAHEEN:  Tony Shaheen on behalf of
20    Suncor, Your Honor.
21              THE COURT:  Okay.  Somebody from Dillon want
22    to sit up here?
23              MR. TARAVELLA:  Yes, Your Honor.  Christopher
24    A. Taravella and Michael McCormick, Montgomery, Little &
25    Soran on behalf of interested party, Dillon.
```

 1              THE COURT:  All right.  We're here -- there

 2    are two motions that are pending.  One appears to be

 3    fully briefed, I think.  That's Document 153, plaintiffs

 4    renewed motion challenging defendant Suncor and

 5    interested party Dillon's designation of certain

 6    documents and data as, quote, highly confidential,

 7    unquote, and, quote, secret, unquote, pursuant to the

 8    supplemental protective order.

 9              I've also got something that I'm, frankly, not

10    clear about.  I've got a motion by interested party

11    Dillon Companies, Inc. to quash or modify Kroger and

12    Wilson subpoenas.  This was filed on January 3, 2013.

13    When I looked at the docket sheet I couldn't really

14    discern whether there's been any briefing on this

15    motion.  So why don't we start with that one.

16              And let me also say, folks, we've got to wrap

17    this up at 3:30.  So you're going to have to use time

18    efficiently.  So let's -- quick, give me a status of

19    this motion to quash or modify.

20              MR. BLEDSOE:  Your Honor, it's not my motion,

21    and I'll let the interested parties speak for

22    themselves, but a joint status report was filed at the

23    end of last week which I think indicates that there's

24    really not any dispute for the court to decide at this

25    point following some pretty extensive consultation on

 1    the 30(b)(6) depositions and the Wilson deposition.

 2            THE COURT:  Okay.  Well, I guess then -- and I

 3    certainly want to hear from Dillon, but I guess that

 4    raises the interesting question, could I reasonably

 5    presume that the motion to quash was filed prematurely

 6    and without fully exhausting Rule 26(a) -- I mean,

 7    Rule 7.1 meet-and-confer opportunities?

 8            MR. TARAVELLA:  Your Honor, Christopher A.

 9    Taravella.  We extensively conferred and have continued

10    to confer with the plaintiffs.  We had to file the

11    motion to quash because of the return date, which was

12    not coordinated with us.

13            My understanding under the rules we needed to

14    do that before the January 3rd date.  But before that

15    time, during that time, and since that time we have

16    extensively conferred.  And I'm not sure what makes it

17    easier for the court, whether the court would just like

18    to leave it in abeyance pending the 30(b)(6) depositions

19    or whatever.  We just thought -- we do not know how the

20    30(b)(6) depositions will come out, what will be asked

21    exactly.  Based on our conferral we do not anticipate

22    any an issues.

23            THE COURT:  Well, I think probably the most

24    efficient -- rather than dealing with this, which is

25    drafted in terms of something that will prospectively

1    happen, you're now telling me that whatever disputes I

2    have to wrestle with will occur after the fact.  So it

3    would seem the logical thing to do, since you're not

4    asking me at this point to quash or modify, and since

5    the depositions will go forward pursuant to whatever

6    understandings you all have arrived at, this motion

7    would seem to be either moot or premature.

8              MR. TARAVELLA:  And whatever is easier for the

9    judge.  I will take your guidance.  If you want to leave

10   it open.  What I want to avoid is if there's a --

11             THE COURT:  I'm trying to hint that -- I'm

12   trying to hint at leaving it open is I don't see

13   beneficial to anybody.

14             MR. TARAVELLA:  Well, only this.  Only this.

15   That should something come up at the 30(b)(6) dep that

16   we do not anticipate, then if we're calling you, if we

17   call you on the phone, and hate to interrupt you, but

18   ask for the court's guidance, I just don't want you --

19             THE COURT:  No.  No, you're always --

20             MR. TARAVELLA:  -- to be surprised.

21             THE COURT:  You're always free to call.

22   You're always free to call.

23             MR. TARAVELLA:  Yeah.  I just didn't want you

24   to be surprised.

25             THE COURT:  No.  No.

    1            MR. TARAVELLA:  So, whatever is easier for the
    2    court.  If you want to hold it moot or hold it in
    3    abeyance.
    4            THE COURT:  No.
    5            MR. TARAVELLA:  I just didn't want to have to
    6    move again based on those issues --
    7            THE COURT:  Well --
    8            MR. TARAVELLA:  -- if they come up in a
    9    30(b)(6).  That's all.
   10            THE COURT:  I'm going to go ahead and deny
   11    this motion as moot.  And obviously the parties have
   12    leave to pursue in the future whatever remedies they
   13    think are warranted by the case law and the rules, but
   14    we'll go ahead and deny Document 159, at least at this
   15    juncture, as moot.
   16            Now, that takes us to the more pressing issue,
   17    I suppose, 153.  Now, I've read everything you folks
   18    sent me.  I've looked at your case law and my own
   19    research.  I mean, I think I have a fairly good grasp of
   20    everybody's position.  I recall seeing in passing some
   21    reference or suggestion that one or more of you might
   22    want to call live witnesses.  I don't know that that's
   23    really necessary, but I'm certainly not going to
   24    preclude you from calling live witnesses.  I wouldn't
   25    think it's necessary to call a live witness to rehash

1    what's in an affidavit.  But, that's just an

2    observation.

3           But I would like to raise one question at the

4    outset so I have a better understanding of the universe

5    of this fight.  I understand the documents are the

6    materials that have been stamped "highly confidential"

7    or "secret."  There does seem to be some question, at

8    least in my mind, as to the scope of the supplemental

9    protective order.  And how you all are interpreting the

10   language in this.

11          The language that you all, I would point out,

12   agreed to basically says in sum and substance that

13   something that's stamped "highly confidential" or

14   something that's stamped "secret" to use the

15   formulation, Counsel for a receiving party or counsel

16   for a designating party may not disclose highly

17   confidential discovery material, and/or any information

18   derived from such highly confidential discovery material

19   to the officers, directors, owners, shareholders,

20   principals, or employees of the receiving party.  And

21   the same formulation is applied to secret material.

22          I'm trying to get a better understanding of

23   how I should construe the phrase "any information

24   derived from."  What do you all think that means?

25   Because I'm not sure you have a common understanding of

 1     that phrase.

 2              MS. CRAIGMILE:  Your Honor, we're challenged

 3     by that language as well, the interpretation of it.

 4              THE COURT:  Then why did -- then why did you

 5     sign it?

 6              MS. CRAIGMILE:  We're challenged by the way

 7     the case has played out in light of the fact that we all

 8     in good faith agreed to that language.  Derivatives of

 9     the data are, we believe, captured in the expert

10     reports, of our expert designated expert witnesses

11     Mr. Tatos and Mr. Glick.  That's the key report we're

12     now focusing on.  That's the report that identifies the

13     fact that there is a price differential and identifies

14     the amount, and identifies -- at least as known as of

15     this date by the experts -- the extent of the antitrust

16     injury.

17              Their report is based on the data that was

18     produced either by Suncor as highly confidential or

19     Kroger as secret.  And so where we are now is the

20     experts very much would like and need to share that

21     data, or the derivatives of that data as embodied in

22     their report, with Mr. Taraghi to ensure that their

23     conclusions are accurate, to perhaps amplify their

24     conclusions if that becomes necessary.  But they do

25     believe that there are derivatives of that data in the

1    report.  The report is based on the data produced by all

2    three parties at some level of confidentiality going up

3    to secret.

4              THE COURT:  Mr. Shaheen, what does that phrase

5    mean?

6              MR. SHAHEEN:  Your Honor, the way I -- the way

7    we view the phrase is you can't disclose the numbers,

8    the prices and the volumes, and you can't disclose the

9    calculations based on the numbers and the prices and the

10   volumes.  But you can talk, at least in my -- from my

11   perspective, you can talk about, for example, the amount

12   of damages that you found.  You can talk about the

13   competitive nature --

14             THE COURT:  Well --

15             MR. SHAHEEN:  -- of the marketplace.

16             THE COURT:  -- let's be more specific.  And,

17   again, I realize all of this stuff is -- and I've almost

18   lost track of what's sealed or not sealed.  But let's

19   take a look.  For instance, if you have Mr. Tatos's

20   report.

21             MR. SHAHEEN:  I do, Your Honor.

22             THE COURT:  All right.  So take a look at his

23   opinion No. 1.  Is that opinion derived from --

24             MR. SHAHEEN:  I'm sorry, let me get his

25   report.

 1            THE COURT:  Sure.

 2            MR. SHAHEEN:  What I was looking at, Your

 3     Honor, was his declaration.

 4            THE COURT:  No, I'm looking at his report.

 5            MR. SHAHEEN:  Yes, I understand.  And,

 6     again -- yes, Your Honor.  Your question, I'm sorry?

 7            THE COURT:  His Opinion 1, just read

 8     literally, that single statement, is that derived from

 9     either highly confidential or secret information in your

10     opinion?

11            MR. SHAHEEN:  No, not in my view because it

12     doesn't disclose the pricing, the specific pricing or

13     the volumes.  It gives his opinion that there's been --

14     I have got to be careful because I don't know what's

15     been shown or not.  And had I been asked by

16     Mr. Bennington or Kate or Ken -- and we've cooperated

17     back and forth talking about it -- I would have said,

18     no, of course you can tell him that.

19            THE COURT:  And what about the tables on

20     page 8?

21            MR. SHAHEEN:  Yes.  I would think the tables

22     on page 8 are confidential -- highly confidential

23     because they are directly derived from the numbers.

24            THE COURT:  Okay.  Now, what about the

25     materials on page 10?  I'm assuming that you also

1    believe that Mr. Taraghi should not see that material.

2    Maybe you --

3              MR. SHAHEEN:  My position would be as long as

4    it's not specific and doesn't talk about the prices,

5    that table can be shown to Mr. Taraghi.

6              THE COURT:  Okay.  So this table that just

7    simply shows that --

8              MR. SHAHEEN:  Yeah, I've got to be careful

9    what we talk about because Mr. Taraghi is here.

10             THE COURT:  Oh, I understand.

11             MR. SHAHEEN:  I feel a catch-22.

12             THE COURT:  Let me talk about Opinion No. 2,

13   that statement on page 11.  Would you consider that to

14   be derived from?

15             MR. SHAHEEN:  No.  No, Your Honor.  Not from

16   -- not from the prices or volumes or other information

17   that Kroger has given.  But in terms of what we

18   produced, I would not consider that highly confidential.

19             THE COURT:  And I'm assuming the tables that

20   appear on 12 and 13 also would not be, in your view,

21   subject to a supplemental protective order?

22             MR. SHAHEEN:  Correct, Your Honor.  They would

23   not be.

24             THE COURT:  Now, Opinion No. 3 that's

25   expressed on page 14, do you believe that to be derived

1    from?

2            MR. SHAHEEN:  No, I don't.

3            THE COURT:  Okay.  So -- and that Opinion 4

4    you've already indicated you don't see any problem with

5    that, since that's just simply a damages calculation.

6            MR. SHAHEEN:  Yeah.  Now, Kroger might

7    disagree with that, Your Honor, but at least my position

8    would be, yes.  As long as you can tell them the total

9    number, as long as it's not broken down in a way that he

10   could derive the prices --

11           THE COURT:  Okay.

12           MR. SHAHEEN:  -- for the volumes.

13           THE COURT:  Okay.  Are there any other tables

14   other than the ones that we've discussed?  So, for

15   instance, there are tables on -- I mean, the calculation

16   is simply the formula, the regression analysis on

17   page 17.  I don't think there's anything price specific

18   there.  Assuming you are smarter than I am and can even

19   figure out what the heck that means.

20           MR. SHAHEEN:  Your Honor, you beat me to it.

21   If Mr. Taraghi wants to look at that hypothetical and

22   those numbers and the regression, I have no problem with

23   that.

24           THE COURT:  Okay.  What about page 18?

25           MR. SHAHEEN:  Sorry, I skipped to 19.

1           THE COURT:  18 just seems to be based almost

2     on a hypothetical.

3           MR. SHAHEEN:  Yes.  Yes, I have no problem

4     with that.

5           THE COURT:  Pages 19 or 20?

6           MR. SHAHEEN:  I think I would need to know

7     more about 19 because of the specificity of the damage

8     calculation, and I'd need to understand that one a

9     little bit better.  So, that's the only one I would need

10    to talk to them about.

11          THE COURT:  Okay.  Let me hear from Dillon.

12    How do you -- how do you interpret the phrase "derived

13    from"?

14          MR. TARAVELLA:  Your Honor, we believe that

15    the expert report had to be derived from information we

16    gave them, at least in part.  But I can't really answer

17    the question because we've asked for the expert report

18    and it has been refused, so --

19          THE COURT:  I know, but I think we need to

20    understand.  What I'm trying to -- my point is,

21    literally almost anything that happens at trial could be

22    quote/unquote, derived from.  At some point I've got to

23    apply Rule 26(c) in a common sense way.  And I would

24    argue, or I would suggest that you might anticipate an

25    argument, that at some point Dillon takes a position

1    which strains common sense to the point that it works

2    against your interest.

3             You would be far better off coming up with

4    some rationale other than simply saying, Because it

5    might be derived directly or however tangentially from,

6    it is deserving of protection.

7             MR. TARAVELLA:  Your Honor, I appreciate that.

8    It's hard to respond because I feel like I'm shooting in

9    the dark without the report.  And it may very well be

10   with the report I could go through it item by item and

11   say no problem here and there's a problem here.  If I

12   could back up for a second.

13            THE COURT:  Sure.

14            MR. TARAVELLA:  At a prior hearing, Your

15   Honor, the court had asked where -- if it was so

16   important to Dillon, where are its witnesses.  And we

17   are prepared to call witnesses, but I agree with you I

18   see no need to.

19            THE COURT:  Right.

20            MR. TARAVELLA:  Because the declarants are

21   here in the courtroom.

22            THE COURT:  Right.

23            MR. TARAVELLA:  One from Hutchinson, Kansas

24   flown in at Dillon's expense.  So, we're prepared to

25   answer any questions the court may have.  But the

1    designation is extremely confidential.  It's trade

2    secret in most instances.  The declarants are here to

3    tell you about it, and they deal with that business

4    every day.

5                Having said that -- I don't mean to dodge your

6    question.  I know I'm not answering it.  But it's real

7    hard to -- Your Honor, to address it without the report.

8    And if we could see the report, which we've requested, I

9    might be able to sit here with the client and --

10               THE COURT:  Ms. Craigmile --

11               Mr. TARAVELL:  -- get rid of some of the

12   problems and issues.

13               THE COURT:  -- why can't Dillon see the

14   report?

15               MS. CRAIGMILE:  Your Honor, because it

16   contains confidential data of Western and confidential

17   data of Suncor.  It's an issue that we all have.  And

18   Mr. Shaheen and I have actually discussed in kind of an

19   overall issue with filing documents with Dillon as an

20   interested party.  It's not that we're trying to hide

21   the ball, but it contains competitive data of Western as

22   well.

23               THE COURT:  Well, I understand.  But as a

24   practical matter don't I have to be scrupulously fair?

25   If you are concerned that somehow Western Convenience's

1    proprietary trade secrets might be divulged to Dillon,

2    and thereby adversely affect your clients' competitive

3    position, why shouldn't I be just as respectful of

4    Dillon's concerns?

5           MS. CRAIGMILE:  If allowing Dillon's counsel

6    to see the report would assist in reaching a resolution

7    on this issue that would allow Mr. Taraghi to see the

8    report --

9           THE COURT:  No.  No.  No.  Folks -- folks --

10   folks, I mean, I'm -- I'm not running a game show here.

11          MS. CRAIGMILE:  Sure.

12          THE COURT:  But it would seem to me that it

13   would not run afoul of anyone's interest, and it

14   certainly wouldn't run afoul of the supplemental

15   protective order for you to have stamped this expert

16   report "secret," allowed counsel for Dillon to see it,

17   so he could make some sort of informed position.

18          MS. CRAIGMILE:  One of the ways that we read

19   the supplemental protective order is that Suncor has

20   designated data as highly confidential and so under the

21   supplemental protective order we can't turn over to

22   Dillon information that Suncor has marked as highly

23   confidential.  And it's --

24          THE COURT:  Oh, my God, folks.

25          MS. CRAIGMILE:  -- a practical challenge.

```
 1            THE COURT:  I -- this is -- this is almost
 2    bordering on ludicrous.  Truly, it is.  The number of
 3    lawyers that are in my courtroom right now relative to
 4    what appears to me to be a complete failure to exercise
 5    any modicum of common sense, I find baffling.  Because,
 6    truly, I think I could probably get a troop of Boy
 7    Scouts who could sit down and work this one out.
 8            MS. CRAIGMILE:  The key issue under the expert
 9    report that our experts need to discuss with Mr. Taraghi
10    is the extent and magnitude of the price differential.
11    That necessarily involves knowing on particular dates or
12    blocks of dates the cents-per-gallon difference, which
13    is a derivative of both the Western data --
14            THE COURT:  Okay.  Well, then you just --
15            MS. CRAIGMILE:  -- and the Kroger data.
16            THE COURT:  It seems to me you just made their
17    argument for them, and we don't have much to talk about.
18    If you want me to be as protective of Mr. Taraghi's
19    information as you suggest, I'm more than happy to do
20    that.  But I will leave the parties where I find them.
21    And I think that's wholly consistent with case law.
22            I am not going to allow you to force you --
23    I'm not going to allow you to take the position, judge,
24    Dillon has not demonstrated any need for protection, yet
25    at the same time pounding the table strenuously saying I
```

1    have to bend over backwards to protect Mr. Taraghi and

2    Western Convenience.  I cannot reconcile those two

3    positions.

4              MS. CRAIGMILE:  If I can confer with my

5    counsel --

6              THE COURT:  Sure.

7              MS. CRAIGMILE:  -- co-counsel briefly.

8              THE COURT:  That would be fine.

9              MS. CRAIGMILE:  I think we can resolve that

10   issue and then we have the issue with --

11             THE COURT:  That would be fine.  Sure.

12             MS. CRAIGMILE:  -- Suncor.

13             (Whereupon, there was a pause in the

14   proceedings at this time.)

15             MS. CRAIGMILE:  Plaintiffs are certainly

16   willing to produce the report under the terms of the

17   protective order to Dillon's counsel.

18             THE COURT:  Okay.  And I'm more than happy to

19   have you stamp it.  But in view of that, how much

20   headway can we make today?  I mean, honestly, this is --

21             MS. CRAIGMILE:  Okay.

22             THE COURT:  -- frankly, a concession that

23   should have been made weeks ago so that everybody could

24   come here fully prepared.  It's really not an efficient

25   use of my time to take a recess so that counsel for

 1    Dillon can now confer with his folks.

 2            MS. CRAIGMILE:  I apologize.

 3            THE COURT:  But I'm happy to do that if you

 4    think it would work out.  But let me make a couple of

 5    observations, folks, and then you tell me what you want

 6    me to do.

 7            As I said, I have read all of the cases that

 8    you cited to me in this latest round of briefing, and

 9    I've done my own research.  Now, I will state for the

10    record that Western Convenience, in its most recent

11    motion, quotes at length Magistrate Judge Mix's decision

12    in the *Innovatier versus CardXX* case.  That's found at

13    2008 Westlaw 4889867.  A decision in 2008.

14            Judge Mix, like most judges writing in this

15    area, correctly notes, "The decision to grant a

16    protective order is vested in the court's discretion."

17            Now, what's interesting is that in the

18    *Innovatier* case Judge Mix, in a relatively short

19    opinion, went to great lengths to make some

20    observations.  First of all, I should note that Judge

21    Mix accepted a proposed protective order; that is the

22    protective order proposed by defendant.  In reaching

23    that conclusion she noted, specifically on page 2, that

24    defendant disputes that it's in direct competition with

25    plaintiff.  That is a factually distinguishable

1    circumstance.  In this case everybody agrees that they

2    are competitors with everybody.  So, in that respect

3    Judge Mix's analysis is somewhat diminished at its

4    impact.

5            The second fact that I think is

6    distinguishable in the *Innovatier* case, Judge Mix wrote

7    as follows:  The only way CardXX can properly prove --

8    CardXX being the defendant -- the only way CardXX can

9    properly prove its assertions regarding misappropriation

10   of its technology by Innovatier is for its in-house

11   designees, dash, individuals, who were present and/or

12   intimately familiar with the information Innovatier

13   learned from CardXX during the license period to be able

14   to review Innovatier's alleged proprietary research,

15   development, and technical information relating to the

16   claims at issue.

17           Outside counsel and outside consultants, while

18   helpful in this endeavor, were not present when the

19   sensitive information was exchanged between CardXX,

20   Singleton and Innovatier.  Consequently, outside counsel

21   and outside consultants are not equipped to decipher the

22   subtleties between the plaintiffs' technologies to the

23   degree that the CardXX in-house designees are.  Indeed,

24   for CardXX, its in-house designees are the only people

25   who can adequately evaluate and determine whether the

1    parties' technologies are, in fact, different.

2              That is a significant factual distinction.

3    This is a case where in-house folks for each side were

4    meeting, and at that meeting exchanged very specific

5    information.  So this is an anomaly that the very person

6    or group the defendant wanted to share this information

7    with are the people who are present at the meeting in

8    the first instance.

9              So here, in this particular instance, what the

10   defendant was saying is if we can't share this

11   information with the percipient witnesses, no one can

12   speak to the question.  And that's not what we have

13   here.  It really is not.

14             Pricing information is raw data.  It's

15   factually different from a conversation in a meeting or

16   conversations that took place in a meeting where there

17   may be no recollection of the conversations, save by the

18   people who were physically present and heard what was

19   being said.  So, that is a significant distinguishing

20   factor.

21             What I found to be, frankly, the more

22   persuasive case -- and I wouldn't expect you guys to

23   have found it because it was decided or published on

24   December 11, 2012.  It's *Stanislaus Food Products*

25   *Company versus USS-Posco*, P-O-S-C-O, *Industries*.  It's

1   found at 2012 Westlaw 6160468, a decision by the Eastern

2   District of California.  Again, decided December 11,

3   2012.

4           In this case -- and I'll read from the salient

5   portions.  On October 17, 2012, plaintiff moved to

6   re-designate discovery materials produced subject to an

7   attorney's-eyes-only designation.  Specifically,

8   plaintiffs challenged defendants designations of the

9   following categories of documents:  U.S. Steel's and

10  UPI'S historical transactional data; eight-year-old

11  communications concerning Tin Mill Product pricing

12  strategies; UPI management committee minutes;

13  three-year-old communications regarding historical

14  information; U.S. Steel's reports in the Tin Mill

15  Product market; communications regarding U.S. Steel's

16  Tin Mill Product pricing; and communications regarding

17  U.S. Steel's and UPI's respected negotiations with

18  Silgan.

19          Now, what's interesting, plaintiff argued that

20  its executives needed to review the information, quote,

21  so they may evaluate this case and the prospects for

22  settlement, unquote.  Plaintiff also argued that the

23  information would not risk competitive harm to

24  defendants or nonparties because the information was

25  stale, quote/unquote, and because plaintiff did not

1    directly compete with any of these entities.

2            Defendants and nonparties argued that if

3    plaintiffs' executives were apprised of this information

4    plaintiff would gain significant negotiating leverage at

5    future endeavors which, in turn, could seriously harm

6    defendant's relationships with its customers such as the

7    objecting nonparties.

8            The court went on to correctly acknowledge, I

9    think, that as the party seeking protection defendants

10   bore the initial burden of demonstrating good cause to

11   maintain the confidentiality designations.  The court

12   wrote here:  There is good cause to continue protection

13   of the designated materials.  These discovery documents

14   detail defendant's business and pricing strategies, how

15   defendants intend to compete in the tin mill market.

16   This trade secret and other confidential information

17   would provide plaintiff the significant negotiating

18   leverage against current and potential suppliers, as

19   well as place strain on the relationship between

20   defendants and their third-party customers.

21           This information is not stale because even to

22   the extent it does not provide direct insight into

23   current business strategies, the information can be

24   extrapolated to predict future strategies and practices,

25   and is still relevant today.

1          The court went on to write:  Once good cause

2    is shown, the burden shifts back to plaintiff to

3    demonstrate nondisclosure would prejudice plaintiffs'

4    ability to litigate the case and that this prejudice

5    outweighs the risk of disclosure to competitors.

6          Now, the reason I started my question by

7    asking what does the phrase "derived from" mean is

8    because I could envision a situation where if any and

9    all opinions expressed by Mr. Taraghi's experts must be

10   withheld by Mr. -- withheld from Mr. Taraghi and Western

11   Convenience, then I think there is a problem.  Because

12   while counsel -- while the Model Code of Professional

13   Conduct contemplates that counsel should have the

14   significant discretion to decide how to approach

15   discovery, and what motions to file, the decision

16   whether or not to settle a case is uniquely in the

17   custody, and uniquely belongs to the client.  And I'm

18   struggling to understand how Mr. Taraghi can exercise

19   that unique right if he is not able to have any

20   information derived by his experts from this

21   information.

22          I will tell you, and I realize you folks

23   haven't read the *Stanislaus* decision.  I'm not trying to

24   catch anybody off guard, but there is case law -- there

25   is ample case law that covers this area.  And I readily

     1    concede that there are cases that go both ways.  I'm not
     2    discounting the fact that cases go both ways.  But I
     3    will tell you I found the analysis in the *Stanislaus*
     4    decision remarkably similar, and raises many of the same
     5    issues raised in plaintiffs' most recent motion.  And I,
     6    frankly, found the analysis by the court in the
     7    *Stanislaus* decision quite persuasive.
     8            So, I think everybody needs to take a step
     9    back.  I think everybody has to perhaps be more
    10    pragmatic.  If it were me, what I would be doing is I
    11    would be showing -- and apparently you're willing to do
    12    this.  I would be showing the Dillon counsel a copy of
    13    the Tatos' report marked attorney's eyes only.  I would
    14    then allow the Dillon counsel and Suncor to give you at
    15    least their views on what portions can properly be
    16    redacted and still allow Mr. Taraghi the benefit of
    17    seeing the conclusions that his experts have reached.
    18            Because if Dillon says that that report cannot
    19    be shown to Mr. Taraghi in any form, I think Dillon is
    20    shooting itself in the foot.  Because that sweeping
    21    statement, I think is difficult to reconcile with
    22    Rule 26(c).  And Rule 26 fundamentally requires me to
    23    make some sort of balancing analysis.  And if Dillon
    24    were to present me with an all-or-nothing position, then
    25    Dillon's advocacy, in my opinion, would be as flawed as

1    Western Convenience's.

2           So I think, folks, you need to basically start

3    understanding that when I have to apply Rule 26(c) no

4    one is in an advantageous position by drafting an

5    argument that is written in all-or-nothing terms.  You

6    are almost guaranteed to lose that argument based on any

7    reasonable application of Rule 26(c).  So, what I would

8    suggest is you take a few minutes, consider whether

9    cooler heads can prevail, and then I'll come back and

10   you can tell me to what extent hope springs eternal.

11          We'll be in recess.

12          THE COURTROOM DEPUTY:  All rise.

13          (Whereupon, there was a break taken from

14   2:03 p.m. to 2:34 p.m.)

15          MR. BENNINGTON:  Your Honor, this started out,

16   the court may recall, with a telephone conference

17   several weeks ago on which we, on behalf of Western,

18   raised again the question --

19          THE COURT:  Uh-huh.

20          MR. BENNINGTON:  -- of whether 21 -- at that

21   point, eighteen-month-old data was so stale it shouldn't

22   be subject to the protections requested or demanded by

23   Kroger.  At that point we filed -- you told us your

24   inclination, which we appreciated, and made it clear

25   that the next step if we wanted to raise this with Judge

1    Krieger was we had to have a hearing so that there would

2    be a record that could be sent up to her.  So we filed

3    our pleading -- our renewed motion well before the

4    expert report was even prepared.

5           And the point is, here, we're not here today

6    to talk about, necessarily -- although it's a corollary,

7    a part of it, we're not here to talk about disclosure of

8    the expert report.  What we're here to talk about is the

9    data; that is, the daily pricing data that Kroger

10   charges its customers, which is public actually, but

11   more importantly the daily pricing data of their prices

12   from Suncor going back to January of 2010 -- no --

13   January of 2010 through May, 2011.  And if Kroger will

14   not allow disclosure of that, there's nothing we can do.

15          There's no point to disclose, for instance,

16   the expert report to Kroger because Mr. Taravella has

17   made it very clear to me, candidly, that he can't agree

18   to disclosure of that old data.  And the chart on page 8

19   is exactly what we're talking about.  Without that data,

20   Mr. Taraghi cannot answer a number of the experts'

21   questions with respect to what happened on this day at

22   this time, this season; why did you do this; why did you

23   do that.

24          THE COURT:  No, but, see -- but that's where I

25   think your logic breaks down.  Whatever decisions

1    Mr. Taraghi made on those days in the past, the

2    rationale for his decisions had nothing to do with the

3    pricing data that you now don't have.  He made those

4    decisions based upon information that was available to

5    him.

6              Now, if the experts went back and said had you

7    known X, Y and Z what you would have done, but that's

8    not the position you've taken.  You're saying we need --

9    the experts say we need to talk to Mr. Taraghi to

10   understand what his thought process was; to understand

11   the factors that caused him to make the decisions he

12   did.  He did not have that pricing information.  Guys,

13   it's a weak argument.  It's a weak argument for several

14   reasons.

15             MR. BENNINGTON:  But it goes into damages.

16   And you can't calculate damages without the Kroger price

17   and --

18             THE COURT:  But Mr. Taraghi is not going to

19   calculate the damages because he wouldn't be qualified

20   as an expert to do it.

21             MR. BENNINGTON:  But the experts are going to

22   be cross-examined on the assumptions and what happened

23   back then.

24             THE COURT:  And the -- guys, it's a weak

25   argument.  Let me explain to you why.  First of all, I

1   know you're calling it a renewed motion.  For all

2   intensive purposes it's a motion for reconsideration.  I

3   went back -- it is.  It is absolutely.  And what's

4   ironic is -- I haven't compared word for word, but your

5   motion, the most recent motion you filed is virtually

6   identical, both in terms of arguments and in terms of

7   authorities cited to your Document 59.

8          Now, the interesting thing is if I were to

9   apply the applicable legal standard for dealing with a

10  motion for reconsideration you'd lose.  You haven't met

11  the standards for reconsideration.

12         MR. BENNINGTON:  May I?

13         THE COURT:  And more importantly, if the

14  information was stale now it was stale back when you

15  filed 59.  The other thing that I think I want to point

16  out, because I think this is really remarkable to me.

17  I've been sitting here reading the transcripts.  Now, I

18  haven't read them word for word.  I've only skimmed them

19  and I've done word searches.

20         But what's really interesting is I went back

21  and looked at the transcript from the hearing on

22  September 14, 2012.  And at that hearing counsel for

23  Dillon was arguing in the most vociferous terms.

24  Unpersuasively I might add, but arguing vociferously

25  nevertheless.  He said, judge, I can guarantee you

1      what's going to happen.  As soon as I agree to a

2      designation attorneys' eyes only they're going to come

3      back in here and say now you've got to give up more.  He

4      said, in sum and substance, judge, I've got to tow the

5      line here because once I give up anything, plaintiffs'

6      counsel is going to come back here and say now you've

7      got to give up more.  And I told them, no, that would

8      never happen.  I told them, Mr. Taraghi, you can count

9      on the fact that we're going to negotiate a protective

10     order that's responsive to the concerns of everybody.  I

11     basically gave his prognostication of future events a

12     rather short shrift.  And I almost feel like I have to

13     apologize.  He was more clairvoyant than I am.

14              MR. BENNINGTON:  If I may, Your Honor.

15              THE COURT:  And the other thing I find

16     remarkable is that going back again through the

17     transcript there was a hearing -- and I'm looking at the

18     transcript of the hearing of October 11, 2012.  Now, at

19     that hearing there was argument by you, Mr. Bennington.

20     You argued that we've got this new -- we are proposing a

21     new supplemental protective order that will take care of

22     everybody's concerns.  The only remaining fight we've

23     got -- and you at that point knew about the pricing

24     information.  At least as I skim through this right now,

25     the only things that you seem to be fighting about in

1    terms of attorneys' eyes only were some contracts.

2            And again, I haven't read the entire

3    transcript, so I don't want to suggest that I can

4    eliminate the possibility that you raised pricing.  But

5    as I'm going through this transcript everybody was

6    willing, you were perfectly willing to operate on the

7    attorneys'-eyes-only basis.  The only fight seemed to be

8    with respect to some contracts.

9            So, to some extent I feel like, you know, no

10   good deed goes unpunished.  And I am not persuaded.

11   Honestly, I didn't find your experts' affidavit to be

12   particularly persuasive.

13           I think, and what I'm going to order --

14   whether Dillon likes it or not -- I'm going to give you

15   an opportunity to have your expert provide what we might

16   call a redacted or an executive summary.  I do believe

17   that Mr. Taraghi is entitled to know what opinions --

18   what opinions have been formulated by the experts in

19   this case.  Now, does Mr. Taraghi need to know the data?

20   No.  But I think Mr. Taraghi is entitled to know the

21   opinions that his experts have reached.  And to the

22   extent that Dillon is arguing that the phrase "derived

23   from" is so expansive as to exclude Mr. Taraghi from any

24   access to any portion of his experts' opinion, I think

25   that sweeps too broadly.

1           But, I honestly have not heard persuasive

2    argument, and I have not found case law that I -- that

3    would cause me -- that would cause me to reconsider my

4    earlier decision.  I think this pricing information is a

5    trade secret, and I do not believe that Western

6    Convenience has come forward with a cogent argument that

7    would suggest that your ability to represent your client

8    is so drastically impaired that Dillon must give up this

9    trade secret information to Mr. Taraghi.  And that's

10   fundamentally the analysis that I have to apply.

11          And in that regard, just to give you a few

12   more cases, I found -- I found also persuasive a

13   decision by the District of Kansas in *Layne Christensen*

14   *Company versus Pure Light Company,* found at 271 Federal

15   Rule Decision 240.  A decision by the District of Kansas

16   on July 28, 2010.

17          There, the court wrote:  Once the party

18   requesting that its trade secrets only be revealed in a

19   specified way, has met its initial burden.  I believe

20   the defendant, Suncor and Dillon, have met that burden.

21   The burden then shifts to the party seeking unrestricted

22   disclosure to establish that such disclosure is relevant

23   and necessary to the action.  To establish necessity

24   some courts have considered whether the proposed

25   limitation on disclosure to certain individuals would

1    impair the ability of the party seeking full disclosure

2    to proceed effectively with the litigation.

3            Finally, the court must balance the need of

4    the party seeking discovery of the trade secrets and

5    confidential information against the opposing parties

6    claim of injury resulting from the disclosure.

7            Right now, frankly, all I've got is

8    Mr. Tatos's conclusory statements.  This is what I would

9    like to discuss with Mr. Taraghi.  I don't think his

10   wishes necessarily establish need that would trump

11   Dillon's trade secrets.

12           Now, if Mr. Tatos wants to present me and say

13   here are the following questions which I need

14   answered -- but I haven't got that.  All I've got is

15   something that reads more like I would like to do it.  I

16   haven't gotten a definitive argument that demonstrates

17   necessity.  And that's the legal standard that I now

18   have to apply.  Because I do believe these are trade

19   secrets and, in fact, Dillon has always taken the

20   position they are trade secrets.

21           And you most recently took the position they

22   were trade secrets.  You did as much in submitting your

23   supplemental protective order.  I've got your motion.

24   Your motion for supplemental protective order

25   specifically says -- this was filed on October 16, 2012,

1  Document 139.  You basically say Plaintiffs, Western
2  Convenience and Western Truck, and Suncor and interested
3  party Dillon move for entry of the attached supplemental
4  protective order.  Essentially, Dillon has further
5  alleged the protective order does not sufficiently
6  protect its alleged trade secrets.  While Dillon is
7  stipulating to the supplemental protective order, it is
8  hereby -- it is not hereby admitting...
9          I basically gave you folks the order you asked
10 for, and I don't think you've established the necessity
11 for me to now effectively reconsider my prior
12 designation.  Because nothing has really changed.
13 Truly, nothing has changed.  The data hasn't changed.
14 The trade secret quality of the data hasn't changed.
15 The only thing that's changed is I've got an affidavit
16 from your expert saying, gee, I'd really like to discuss
17 this with Mr. Taraghi.  I think the case law
18 demonstrates that you've got to do more than demonstrate
19 a wish to do something.  And I'm afraid that's all
20 you've given me.
21         And I would further note, again, the decision
22 -- if you need another decision, *S2 Automation, LLC*
23 *versus Micron Technology*, a decision by the District of
24 New Mexico dated July 23, 2012, found at 283 Federal
25 Rule Decision 671.

1          There, Judge Browning wrote:  Permitting

2    attorneys'-eyes-only restrictions as a general matter is

3    appropriate.  Again, this is not an uncommon feature in

4    protective orders in modern, complex commercial

5    litigation.  I think this case would clearly fall under

6    that general category.

7          These provisions are as much a protection for

8    the party receiving the documents as for the party

9    producing the documents.  Such a mechanism highlights

10   for everyone the most sensitive documents and assures

11   that leaks by the receiving sides are rare, and if they

12   occur can more easily be traced to the source.

13   Provisions such as these can prevent litigation over

14   improper use of information disclosed under protective

15   order by clarifying the most sensitive information that

16   the parties disclose.

17         The receiving party is rarely in a competitive

18   position with the producing party and is unlikely to

19   have an incentive to use the information or otherwise

20   disclose it -- receiving attorney.  Clients already at

21   war with the opposing party may not feel as limited by

22   the professional standards of an attorney who has

23   separate obligations to the court system and to society

24   to obey court orders.

25         Gentlemen, at the end of the day this is a

```
 1    matter uniquely reserved for the court's discretion.
 2    This is the third time that I've raised this issue.  I'm
 3    really not hearing anything new.  As a practical matter,
 4    I'm not really hearing anything new.  And the standards
 5    for a motion for reconsideration you either have to
 6    demonstrate a clear error of law, you have to show that
 7    the facts are changed, or you have to demonstrate I made
 8    some erroneous determination about the facts.  Nothing
 9    has changed here.  We're just going around in circles.
10              MR. BENNINGTON:  Your Honor, you some time ago
11    told the parties that this was going to come out at
12    trial.
13              THE COURT:  Right.
14              MR. BENNINGTON:  And some time ago when you
15    first ruled on this issue you made it clear to us that
16    it was without prejudice to file another motion after
17    time had passed on the same issue.  So --
18              THE COURT:  No, I understand.
19    Mr. Bennington --
20              MR. BENNINGTON:  -- I --
21              THE COURT:  -- I don't disagree with any of
22    those statements.  And time has passed.
23              MR. BENNINGTON:  And two things have happened.
24              THE COURT:  The operative facts have not.  The
25    passage -- under that theory Mr. Craigmile [sic] you
```

1    could file the same motion next month -- I mean,

2    Mr. Bennington, I apologize.  I mean, the only fact that

3    has changed is the passage of time.  The data hasn't

4    changed.  The time period encompassed by the data hasn't

5    changed.

6           MR. BENNINGTON:  I -- I -- respectfully, Your

7    Honor, something has changed.  And we've got experts who

8    have suggested there's a million dollars in damages who

9    can't talk to our client about it.  And when do they

10   find out about it?  At trial?

11          THE COURT:  No.  No.

12          MR. BENNINGTON:  Is that when Mr. Taraghi gets

13   to find out?

14          THE COURT:  What I'm -- that's why -- what I

15   said was -- you're not listening to me.  You're caught

16   up in the moment.  What I've said is, I do believe that

17   Mr. Taraghi is entitled to receive a redacted version.

18   I do not believe that Dillon Company can stretch the

19   protective order to such an extent that any and all

20   information contained in that report is out of bounds.

21   And I refuse to apply Rule 26(c) in that way.

22          And what -- if it were me, what I would be

23   doing is I would basically be proposing -- and I would

24   provide to Dillon and Suncor what you believe is a

25   report that meets the spirit of the protection I'm

1    giving to the pricing information.  I do not believe

2    that Dillon is right.  I do believe that Mr. Taraghi is

3    entitled to see substantial portions of that report.  He

4    is certainly entitled to know his experts' bottom line.

5           So, if it were me, what I would have done is I

6    would have prepared -- whether you call it a redacted

7    version or an executive summary.  I don't care what you

8    label it.  I would have prepared one of those.  I would

9    have submitted it to Dillon.  I would have then called

10   Dillon's bluff.  I would have said, Dillon, you can't

11   have it all.  You either come up with a reasonable

12   interpretation of the protective order in 26(c) or I

13   will come back and I will submit to the court my

14   proposed redacted version, and I will demonstrate how

15   irresponsible your absolutist position is.  Then you

16   would have been in a much stronger position to fight

17   what's really worth fighting about.

18          But the fact of the matter is, I believe they

19   have made a compelling showing that this information,

20   yes, it goes back some time.  But, when Dillon says they

21   incorporate that information in their pricing decisions

22   I don't find that that's an unreasonable position to

23   take.  I don't find that at all.

24          So what you've got to do -- since I believe

25   they have met their burden of showing that this is a

1    trade secret as the case law says, the burden now shifts

2    to you to demonstrate necessity.  And you really haven't

3    done that in any targeted or strategic way.  You're

4    simply saying we don't like this.  That's different from

5    showing necessity.  And that's your problem in a

6    nutshell.

7            This is not a strong motion to take to Judge

8    Krieger.  You're free to do it, but you're only going to

9    be able to play this card one more time, folks.  And

10   your hold card right now isn't a really good one.

11           MR. BENNINGTON:  The problem is, Your Honor,

12   showing Mr. Taraghi the excerpted or redacted report

13   doesn't satisfy his needs.

14           THE COURT:  I don't --

15           MR. BENNINGTON:  It doesn't --

16           THE COURT:  Counsel, I don't know that and I'm

17   not convinced by that conclusory statement because I

18   haven't seen how you've redacted it.  Again, this is

19   what I've got.  What I've got are generalized,

20   conclusory statements that this isn't working.  But

21   Rule 26(c), in virtually every case that construes

22   Rule 26(c), says a parties burden under Rule 26(c)

23   cannot be carried by simply making conclusory statements

24   or boilerplate pronouncements.  And that's all you're

25   giving me.

1            As I say, I don't know specifically what

2    questions your experts would ask Mr. Taraghi.  I don't

3    know, for instance, whether the questions or information

4    they would like for Mr. Taraghi is data that's stored in

5    the information databases of Western Convenience.  They

6    haven't persuasively explained to me -- to the extent

7    they say we want -- and let me -- let me read it

8    specifically because I highlighted it.

9            The affidavit from Mr. Tatos says, There are

10   issues we -- and I'm reading now from paragraph 7.

11   There are issues we need to discuss with Mr. Taraghi to

12   ensure that certain aspects of our conclusions are

13   correct, or to determine whether certain aspects of our

14   report should be qualified or amplified.  Specifically,

15   we need to be able to discuss with Mr. Taraghi each of

16   the 26 competing sets of WCS/Kroger stores to understand

17   such things as the effect on WCS's business during the

18   periods when the competing Kroger stores purchased at a

19   lower fuel.

20           Well, the effect on the business is going to

21   be reflected in the data.  Profits, sales, volumes, all

22   of that is hard data.  Effect is an objective tangible

23   thing.  So I don't understand why you need to

24   specifically talk to Mr. Taraghi to get that objective

25   information.

 1          Next.  How Western responded in terms of its

 2     own pricing to particular changes in retail fuel prices

 3     by Kroger.  You don't need -- you can simply say,

 4     Mr. Taraghi, as prices changed at the Loaf 'N Jug stores

 5     on these days, how or why did you respond.  You don't

 6     need to specifically tell Mr. Taraghi that that Loaf 'N

 7     Jug got a discount on X, because all he responded to was

 8     the price differential that was on the sign outside the

 9     store.  That's what he was responding to.

10          Then there's the question, And whether there

11     were additional factors relating to business at each of

12     the 26 stores that would explain or partially explain

13     fuel pricing decisions for those stores.  Well, the

14     factors that influence or explain those pricing

15     decisions were factors based upon what Mr. Taraghi knew

16     at the time the pricing decisions were made.  He didn't

17     know the discounts that Dillon was getting at that time.

18     So, to give him those pricing informations would give

19     him data that he didn't have in the first instance when

20     he made, quote, those fuel pricing decisions.

21          So that's -- the problem is -- I understand

22     your experts would love to show this data to

23     Mr. Taraghi.  And I have no doubt, I am absolutely

24     convinced after this being the third go around, that

25     Mr. Taraghi would desperately love to see the data, but

1   you haven't demonstrated a need.

2            MR. BENNINGTON:  The --

3            THE COURT:  And the three examples that the

4   experts point out, frankly, fall woefully short of that

5   need demonstration.

6            MR. BENNINGTON:  The effect on Western's

7   business, the Supreme Court made it clear in *J. Truett*

8   *Payne*.

9            THE COURT:  Right.

10           MR. BENNINGTON:  And then emphasized in

11  *Hasbrouck* that automatic damages are not allowed.  You

12  cannot multiply volume times discount and come to a

13  damages number.

14           THE COURT:  I understand that.

15           MR. BENNINGTON:  You have to show lost

16  profits.

17           THE COURT:  I understand that too.

18           MR. BENNINGTON:  And in order to discuss the

19  loss of -- and partially the loss of profits are

20  calculated on the but-for price; that is, the price that

21  Western would have gotten had it not been discriminated

22  against by Suncor.  And in order to discuss that but-for

23  price and to calculate that difference they have to talk

24  about the Suncor price to Kroger.  So, our damages are

25  based on the Suncor price to Kroger.

 1            And to put it another way, our experts could

 2    not come to court with any kind of a damages calculation

 3    that doesn't take into account the differential or --

 4    put it another way -- the price to Kroger.

 5            THE COURT:  Sure.  And if in fact -- if in

 6    fact -- and that's what I'm saying.  The problem I've

 7    got is that I am responding to your timing and your

 8    motions.  I can't make the tactical calls for you, and

 9    it would be inappropriate, grossly inappropriate for me

10    to do that.

11            Now, if in fact they depose your expert and

12    they say to your expert, how can you -- consistent with

13    prevailing case law -- come up with these numbers.  Or,

14    we question the validity or the methodology.  Then I

15    would argue, potentially, Suncor has opened the door for

16    you to now to say, judge, they can't have it both ways.

17    Much like the attorney-client privilege cannot be used

18    as a sword and a shield.  You cannot prevent us from

19    talking to Mr. Taraghi and then move to exclude our

20    experts' opinions based on some flawed methodology.

21            UNKNOWN SPEAKER:  Your Honor, I have another

22    hearing in front of Magistrate Boland.

23            THE COURT:  I understand.

24            UNKNOWN SPEAKER:  I didn't want the court to

25    think I was just running out.

```
 1            THE COURT:  No, that's all right.
 2            UNKNOWN SPEAKER:  Thank you.
 3            THE COURT:  That's all right.
 4            Alternatively, if there comes a point where
 5    they've -- so at a deposition if they raise this, then I
 6    think you've got a very -- you've got a stronger
 7    argument to say they can't have it both ways.  If they
 8    file a motion under Rule 702 in front of Judge Krieger
 9    and say that plaintiffs' methodology is so flawed and so
10    contrary to the weight of case law that you should
11    exclude the experts, then I think you would have a very
12    strong argument to come in and say, judge, now -- now,
13    their own motion under Rule 72 has demonstrated
14    necessity.
15            But you're not there.  All you've given us --
16    all you've given me is an argument that literally
17    recycles points that I've considered as recently as June
18    and July.  And nothing has really changed.  The data
19    hasn't gotten any staler in practical terms.  The case
20    law hasn't changed in any meaningful way.  The only
21    thing that's changed since July is Mr. Taraghi's level
22    of desire as far as I can tell.
23            MR. BENNINGTON:  No.  The additional fact is
24    the experts need.  And that is not just Mr. Taraghi's
25    desire.  But --
```

```
 1                THE COURT:  But, see, what's interesting --
 2                MR. BENNINGTON:  -- the scary part of waiting
 3    until they're taking their depositions and discovery is
 4    closed and so forth is --
 5                THE COURT:  Counsel, I can always --
 6                MR. BENNINGTON:  -- pretty clear.
 7                THE COURT:  -- reopen discovery.  But what's
 8    interesting to me is I've got the expert reports.  I've
 9    got the expert report.
10                MR. BENNINGTON:  Yes.
11                THE COURT:  And it formulates a damage
12    calculation.  It specifically calculates damages.
13                MR. BENNINGTON:  Yes.
14                THE COURT:  And what's interesting is, your
15    experts have clearly spoken to Mr. Taraghi.
16                MR. BENNINGTON:  Of course.
17                THE COURT:  Of course.
18                MR. BENNINGTON:  But without --
19                THE COURT:  So --
20                MR. BENNINGTON:  But without talking about the
21    differential that comes down to damages.  He does not
22    know that differential that gives him 900 and some odd
23    thousand dollars in damages.
24                THE COURT:  I agree.  I agree.  But you
25    haven't demonstrated a necessity for him to know the
```

1    differential.  And that's the problem.  It's your burden

2    to show necessity.  It's not -- it's not their burden

3    anymore.  They have sustained their burden under

4    Rule 26(c).  The case law clearly demonstrates it's your

5    burden now, and I don't think you've sustained it.

6              MR. BENNINGTON:  Until these two declarations

7    were filed they had sustained no burden.  So we were

8    here partially, if not fully, to see if Kroger would and

9    could sustain --

10             THE COURT:  Right.

11             MR. BENNINGTON:  -- a burden on being a trade

12   secret.  I, frankly, didn't think they would, but they

13   did.

14             THE COURT:  Right.

15             MR. BENNINGTON:  And that's why we supplied --

16             THE COURT:  See --

17             MR. BENNINGTON:  -- the affidavit.

18             THE COURT:  See, here's -- but, I mean, here's

19   my problem, folks.  I'm looking, for instance, at

20   Opinion No. 3.  And since you don't want Dillon to see

21   the opinion I won't read it.

22             MR. BENNINGTON:  Go ahead.  We -- you can read

23   it.

24             THE COURT:  Well, I don't want to -- you tell

25   me.  It's your call.

1           MR. BENNINGTON:  I just did.  Go ahead.

2           THE COURT:  Okay.  Opinion No. 3:  The price

3    discrimination resulted in WCS's earning lower margins

4    on gasoline sold and/or selling lower volumes of

5    gasoline.  According to WCS, when Kroger lowers its

6    retail prices -- retail prices -- circle that word

7    "retail prices" -- in response to lower wholesale

8    prices, WCS will typically, but not always, try to match

9    the Kroger price reduction.  Footnote 24:  That

10   statement is based upon discussions with Mr. Taraghi.

11          So, your experts have discussed with

12   Mr. Taraghi how pricing at the retail level impacts his

13   business decisions.

14          MR. BENNINGTON:  That's true.

15          THE COURT:  Right.

16          MR. BENNINGTON:  On a general basis, but not

17   on a store-by-store, matching particular prices, and how

18   does it affect your bottom line profit for purposes of

19   meeting the *Hasbrouck* and *J. Truett Payne* test.

20          THE COURT:  But -- but, see, my point, though,

21   is -- I -- your experts haven't really done a good job

22   of demonstrating necessity, Mr. Bennington.  I'm sorry.

23   And I know we keep going around and around, but that's

24   the bottom line.

25          MR. BENNINGTON:  Well, all right.  And as I

 1    said, regardless of -- you point on how well we've done

 2    this, part of the -- part of the purpose for this going

 3    through this exercise after our telephone conference

 4    with you was to get to the point of an order that could

 5    be appealed to Judge Krieger.

 6              THE COURT:  Right.

 7              MR. BENNINGTON:  We now have an -- or --

 8              THE COURT:  Right.

 9              MR. BENNINGTON:  -- we will have an order

10    and -- regardless of the wisdom of doing that, we

11    understand what you've told us and we'll take it into

12    consideration.  But we're at that point.

13              THE COURT:  Right.  And I know that, folks,

14    you want to get moving on this and so I am prepared to

15    rule from the bench.

16              My findings are as follows:  I am finding that

17    the current motion, that is Document 153, is to a great

18    extent -- although it's styled as a renewed motion, for

19    all intensive purposes I'm treating this as a motion for

20    reconsideration because the circumstances have not, in

21    my view, materially changed.

22              For all intensive purposes Western Convenience

23    is simply asking the court to reconsider its earlier

24    decision, and -- or its earlier decision to respect the

25    supplemental protective order negotiated by the parties

1    and to give due consideration to the designation, the

2    "highly confidential" and/or "secret" designation of

3    this particular pricing information.

4         Let me state for the record I have reviewed

5    all of the cases cited by the parties.  For the most

6    part, plaintiffs' renewed motion simply cites me to the

7    exact same cases that were cited before.  Plaintiffs'

8    renewed motion, much like plaintiffs' original motion,

9    relies heavily on Magistrate Judge Mix's decision in the

10   *Innovatier*.  And I have the greatest respect for

11   Magistrate Judge Mix, and I know -- I absolutely know

12   she gave her decision in the *Innovatier* very careful

13   consideration.  But I would also note that Judge Mix

14   clearly reached the decision she did in *Innovatier* based

15   upon the particular circumstances and particular facts

16   of that case.

17        I also wholeheartedly agree with Judge Mix's

18   decision or comment in the *Innovatier* that ultimately

19   under Rule 26(c), the court has considerable discretion

20   to impose what it believes is an appropriate protective

21   order to protect a party or a nonparty from oppression,

22   undue burden, or expense.

23        Now, as I indicated before, there are as many

24   cases holding in favor of the plaintiff as there are

25   holding in favor of the defendant.  However, I am

1    persuaded by more recent cases including -- and I think

2    you folks have got it, I don't know that I've got it

3    back, but -- thank you.  I am particularly persuaded by

4    the court's analysis in *Stanislaus Food Products Company*

5    *versus USS-Posco Industries* found at 2012 Westlaw

6    6160468, a decision by the Eastern District of

7    California, dated December 11, 2012.

8            The *Stanislaus* decision, in my view, clearly

9    indicates who has the burden of persuasion and who has,

10   ultimately -- and whether that burden of persuasion

11   shifts.  I am also persuaded by, as I say, a decision by

12   the District of Kansas in *Layne Christiansen Company*

13   *versus the Pure Light Company*, found at 271 Federal Rule

14   Decision 240, a decision dated July 28, 2010, as well as

15   *S2 Automation, LLC versus Micron Technology, Inc.,* found

16   at 283 Federal Rule Decision 671.  A decision on

17   July 23, 2012.  I find that those three decisions

18   support my ruling in this case.

19           I would also note in passing, for what it's

20   worth, I found interesting the Tenth Circuit decision in

21   *Covey Oil Company versus Continental Oil Company,* found

22   at 340 F.2d 993, a Tenth Circuit decision in 1965

23   involving claims brought under the Sherman Act and

24   Robinson-Patman.

25           In that case, Continental -- who, again, was

1    the plaintiff -- caused *subpoena duces tecum* to be

2    served on the appellants and a number of other nonparty

3    witnesses who are independent oil marketeers.  The

4    appellants moved to quash the subpoena.

5            The Tenth Circuit first addressed whether or

6    not some of this information, specifically pricing

7    information, was relevant to a Sherman Act

8    Robinson-Patman case.  The Tenth Circuit found that the

9    evidence was relevant and, therefore, was properly

10   discoverable.

11           For instance the subpoena, as limited by the

12   trial court, required production of documents showing

13   actual purchase price of all gasoline purchased; actual

14   sales price of all gasoline sold other than at retail;

15   volume in gallons of gasoline sold each month segregated

16   according to particular factors; number and location of

17   service stations owned, operated and leased.  The Tenth

18   Circuit found all of that information was relevant and

19   discoverable for purposes of a Robinson-Patman claim.

20           Reading from the *Covey* decision, the Tenth

21   Circuit wrote:  In the case at bar, the trial court

22   reasonably concluded that the interest of justice

23   require the enforcement of the subpoenas.  With great

24   care it imposed conditions designed to protect

25   appellants.  The documents were made available only to

1    counsel and independent certified public accountants,

2    and only for the purpose of the case.

3         The Tenth Circuit went on to write:  In our

4    opinion, the actions of the trial court display a sound

5    exercise of discretion.  The need for the information is

6    held paramount, but reasonable protective measures are

7    supplied to minimize the effect on the appellants.  In

8    that case, the source of the information.

9         So, while I respect the plaintiffs' position,

10   I do not find, one, the plaintiffs have come forward

11   with an adequate basis to warrant reconsideration of my

12   prior order.  I further note that even if the affidavits

13   from plaintiffs' experts were new evidence that was

14   previously not available to me, I do not believe that

15   those affidavits establish the necessity for the

16   requested disclosure or establish good grounds to change

17   the designation of this pricing information.

18        The standard is not desirable or desirability

19   of (unintelligible), the standard is necessity.  And

20   without specific showing as to what questions they would

21   like to ask Mr. Taraghi, without some specific showing

22   that this information is not otherwise available in the

23   records of Western Convenience, or through public

24   sources, all I've got is an affidavit which reduced to

25   its simplest terms are, we'd really like to ask

1      Mr. Taraghi.  That's not necessity.

2              So, for that -- on those grounds I am denying

3      Document 153.  And I will not change the designation nor

4      will I require, based on the showing set forth in

5      Document 153, that Dillon or Suncor change those

6      designations.

7              Now, having said that, I do want, again, to

8      make it absolutely clear.  I believe that Dillon's

9      interpretation of the phrase in the supplemental

10     protective order "information derived from" is too

11     broad.  To the extent that Dillon is arguing or intends

12     to argue in the future that Mr. Taraghi is not entitled

13     to see any version of his experts' reports in redacted,

14     however, whatever term you want to use, I am not

15     convinced, if that is in fact Dillon's position, that

16     that position is well-founded.  Because I do believe

17     that it should be possible to redact that report to

18     allow Mr. Taraghi to have some sense, some -- something

19     more than just a passing inkling of what his experts

20     might have concluded.

21             To that end, I would certainly encourage -- I

22     can't order it, but I would certainly encourage

23     plaintiffs counsel to prepare a redacted version, a

24     version of the supplemental -- a version of the reports

25     that meets the literal intent and the spirit underlying

1    the supplemental protective order.

2         I would propose -- or I would recommend that

3    plaintiffs counsel provide such a redacted report, send

4    that redacted report to counsel for Suncor and counsel

5    for Dillon.  Then, here's what I would do.  I would have

6    a meet-and-confer.  And then if Dillon continues to take

7    the position that either no redactions are possible or

8    that redactions are so expansive as to negate

9    Mr. Taraghi's ability to understand in substance, if not

10   in detail, his experts' opinions then, in my view,

11   plaintiff would be in a stronger position to seek more

12   precise relief from the court.  Either in the form of a

13   motion -- because then there is a change of

14   circumstance.  A new motion.  Or alternatively, I

15   suppose strictly speaking -- well, a show cause hearing

16   would effectively be the same.

17        But right now, I just don't think you folks

18   are on a particularly strong footing.  That's not to say

19   you can't be or won't be in a stronger footing in the

20   future, but I can only deal with this motion based upon

21   the circumstances that confront me today.  And those

22   circumstances do not, in my opinion, justify the

23   requested relief.

24        So, on that basis the motion will be denied.

25   I have made my findings.  I am making my ruling from the

1    bench.  To the extent that someone wishes to file an

2    objection -- and I get a clear inkling that that is

3    what's going to happen, and I absolutely respect -- I

4    can't emphasize this in strong enough terms.  I

5    absolutely respect Western Convenience's right to

6    disagree with me.  And I would not criticize Western

7    Convenience for a second for disagreeing with me because

8    it is fundamentally a discretionary call, and I don't

9    profess to get it right every time.  And Rule 72 is

10   designed to provide a mechanism to correct me when I get

11   it wrong.  But to the extent that you wish to follow

12   that remedy or pursue that remedy, your 14 days will

13   start to run from today.

14          Now, those are the only two motions on my

15   docket, folks.  Is there anything else we need to

16   discuss?

17          MR. BENNINGTON:  Not for Western.

18          MR. SHAHEEN:  No, thank you, Your Honor.

19          MR. TARAVELLA:  No, Your Honor.

20          THE COURT:  All right.  We'll be in recess.

21   Thank you.

22          THE COURTROOM DEPUTY:  All rise.

23          (Whereupon, the within hearing was then in

24   conclusion at 3:18 p.m. on this date.)

25          I certify that the foregoing is a correct

1   transcript, to the best of my knowledge and belief

2   (pursuant to the quality of the recording) from the

3   record of proceedings in the above-entitled matter.

4

5

6       /s/ Kelly Mair                    February 4, 2013

7   Signature of Transcriber            Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25