IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation; WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant,

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,

    Third Party Defendants.

## SUNCOR'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF

Pursuant to Fed. R. Civ. P. 56, Suncor Energy (U.S.A.) Inc. ("Suncor") moves for summary judgment on the Second, Third, Fourth and Fifth Claims for Relief asserted by Plaintiffs Western Convenience Stores, Inc. ("WCS") and Western Truck One, LLC ("WTO") in their Amended Complaint (the "Complaint") (Dkt. #43).[1]  Suncor has filed a separate motion seeking summary judgment on WCS's First and Sixth Claims for Relief.

For the reasons explained below, WCS and WTO cannot prevail on their breach of contract claims (the Second and Third Claims for Relief) or their tortious interference claims (the Fourth and Fifth Claims for Relief).  The undisputed facts show that Suncor fully performed

---

[1]  As recommended by the Court's practice standards, undersigned counsel conferred with counsel for Plaintiffs on February 7, 2013, who confirmed that Plaintiffs oppose this Motion.

under its agreements with WCS and WTO, and Suncor's appropriate exercise of an unfettered contractual right cannot constitute either a breach of the contracts or tortious interference as a matter of law.

## CLAIMS UPON WHICH JUDGMENT IS SOUGHT

**A.   Suncor is entitled to summary judgment on WCS's Second Claim for Relief (Breach of Contract).**

### 1.   Burden of proof and elements.

WCS bears the burden of proving its claim against Suncor for breach of contract. Under Colorado law, WCS must prove (1) the existence of a contract; (2) WCS performed under the contract; (3) Suncor failed to perform under the contract; and (4) damages resulting from Suncor's failure to perform. *Conagra Trade Group, Inc. v. Fuel Exploration, LLC*, 636 F. Supp. 2d 1166, 1171 (D. Colo. 2009); *Saturn Sys. Inc. v. Militare*, 252 P.3d 516, 529 (Colo. App. 2011).

### 2.   First element that cannot be proven by WCS: WCS cannot prove that it performed under the contract.

A.   Suncor and WCS are parties to a Master Product Purchase and Sale Agreement ("Master PSA") for the sale of petroleum products, including gasoline and diesel fuel ("Fuel"). *See* Amended Complaint (the "Complaint") (Dkt. #43), ¶¶6, 8; Answer (Dkt. #45), ¶¶6, 8; Counterclaim (Dkt. #31), ¶7; Reply (Dkt. #36), ¶4; *see also* Master PSA, attached as **Exhibit A**; Deposition of Steven Ewing, attached as **Exhibit B**, at 23:18-23 (authenticating Master PSA). WCS admits that the Master PSA "govern[s] all transactions … for the purchase and sale of fuel" from Suncor. *See* Complaint, ¶8.

B.   The Master PSA sets forth WCS's payment obligations and gives Suncor certain express rights. *See* Counterclaim, ¶7; Reply, ¶ 4; Master PSA, **Exh. A**.

C. Section 5 ("Payment") of Exhibit A to the Master PSA sets forth WCS's payment obligations. *See* **Exh. A** at A-1, ¶5. WCS agreed that "Suncor shall furnish [WCS] with invoices for all Product sold and delivered to [WCS] … and [WCS] shall, upon receipt of each invoice, make payment to Suncor *immediately* in accordance with the terms of payment provisions of this Agreement *without any deduction or set-off*" (emphasis added). *Id.*

D. In Section 5, WCS agreed that if it "*fails or ceases* to make payment to Suncor pursuant to the manner and method set forth above, Suncor shall have the right to *immediately cease supplying or selling* Product" to it. *See* **Exh. A** at A-1, ¶5 (emphasis added).

E. In Section 17 of Exhibit A to the Master PSA, WCS agreed that:

> If Suncor, *in its sole discretion*, believes that it has *grounds for insecurity* regarding the performance of any obligation under this Agreement by Counterparty [WCS]…(including without limitation, the occurrence of a Material Change in the creditworthiness of the Counterparty, [or] Counterparty's *failure to timely pay any invoice*…), Suncor *shall have the right* to do one or more of the following: (a) *without notice, suspend indefinitely any and all sales of Product* to Counterparty, (b) *without notice, suspend, withdraw, alter, or terminate any credit or line of credit* previously extended to Counterparty, and (c) make Performance Assurance (as defined below) a condition precedent to the further supply of Product and/or extension of credit to Counterparty, which Counterparty shall provide and maintain during the term of the Agreement or any extension thereof or until such requirement is waived by Suncor.

*Id.* at A-3, ¶17 (emphasis added). "Performance Assurance" is defined to include prepayment for Fuel. *Id.*

F. On May 16, 2011, as required by the Master PSA, Suncor and WCS entered into an Electronic Funds Transfer Agreement ("EFTA") by which WCS authorized Suncor to debit funds electronically from WCS's bank account at Vectra Bank to pay for Fuel WCS purchased

3

from Suncor.  *See* Counterclaim, ¶9 (with EFTA attached there and hereto as **Exhibit C**); Reply, ¶6; Affidavit of Steven J. Ewing, attached as **Exhibit D**, at ¶¶2-3 (authenticating EFTA).

   G. WCS purchased Fuel on credit extended by Suncor, with payment by electronic funds transfer ("EFT") due ten days after WCS obtained the Fuel.  *See* Complaint, ¶16; Transcript of Injunction Hearing (9/28/2011), attached as **Exhibit E**, at 59:6-23.  Suncor extended credit "at its sole and absolute discretion."  *See* Master PSA, **Exh. A** at A-3, ¶16; Counterclaim, ¶¶8-10; Reply, ¶¶ 5-6.

   H. From approximately May 9, 2011 through May 25, 2011, WCS purchased and received delivery of Fuel from Suncor.  *See* Counterclaim, ¶¶12-37; Reply, ¶8.  Those purchases are described by invoice number in paragraphs 12-37 of the Counterclaim.  *See* **Exh. D**, at ¶3 (authenticating invoices).  WCS admits it "received fuel from [Suncor]."  *See* Reply, ¶8.

   J. On May 4, 2011, the Department of Justice and the Environmental Protection Agency announced that WCS, Rocky Mountain Pipeline System, LLC and Offen Petroleum, Inc. had entered into a consent decree by which WCS was jointly and severally liable to pay $2.5 million for violating the Clean Air Act ("Consent Decree").  *See* **Exh. F**; *see also* **Exh. E** at 43:18-44:14.

   K. After learning about the Consent Decree, Suncor initiated a review of WCS's credit.  *See* Deposition of Diane Kriskovich*,* attached as **Exhibit G**, at 27:5-9.  Suncor requested and received from WCS certain financial information.  *See id.* at 27:14-28:8.  Suncor then evaluated WCS's creditworthiness in light of that financial information, specifically, by

4

evaluating WCS's earnings in 2010 (*i.e.*, whether it posted a net gain or loss), its equity position, its long-term debt, and its cash balance. *See id.* at 76:6-77:22, 79:16-80:13.[2]

L.      On May 20, 2011, Suncor completed its review and determined, based on the objective credit model it used, that WCS was not creditworthy. *See* **Exh. G** at 81:8-17, 82:21-83:11.

M.      That same day, Suncor informed WCS that its credit was withdrawn and that it would have to prepay any purchases after May 24, 2011. *See* Complaint, ¶22; **Exh. G** at 82:3-5, 86:4-18; *see also* letter to WCS and WTO (5/25/2011), attached as **Exhibit H**, at p. 2 (describing May 24 notification). Under the Master PSA, Suncor could have suspended all sales and credit without notice, but it did not. *See* **Exh. A** at A-3, ¶17 (emphasis added).

N.      Beginning on May 18, 2011, pursuant to the EFTA, Suncor originated eleven draw requests to WCS's bank for the invoices described in paragraphs 12-37 of the Counterclaim. *See* Counterclaim, ¶38; Reply, ¶9 (admitting the draw requests for the invoices). WCS, however, "refused to pay the draw requests." *See* Reply, ¶¶8, 10, 12; *see also* **Exh. E** at 88:14-89:1.

O.      On May 23, Suncor's bank, Wells Fargo, notified Suncor that the May 18 draw request for $436,710.80 had been dishonored because WCS had *insufficient funds*. *See* Notice from Wells Fargo Bank (5/23/2011), attached as **Exhibit I**; *see also* **Exh. D** at ¶3 (authenticating Notice).

P.      Thereupon, Suncor notified WCS that it was suspending all sales of Fuel to WCS. *See* Complaint, ¶¶22-23. Suncor sent copies of the notices of nonpayment it received for each of

---

[2]   In order to avoid submitting this deposition transcript under Restricted Access, Suncor has redacted the confidential portions of both the underlying data and the specific conclusions based on that data from the attached **Exhibit G**.

5

the eleven draw requests to WCS.  *See* Counterclaim ¶40; Reply, ¶11 (admitting receipt of notices).

      Q.      In its Reply to Suncor's Counterclaim, WCS conceded that it "refused to pay the draw requests," and asserted that its refusal rested on "Defendant's repudiation of the Master Agreement by terminating the sale of fuel on terms that existed for several years, and by unlawfully terminating WTO's Terminal Access Agreement for loading fuel at Suncor's terminals."  *See* Reply, ¶¶8, 10, 12.  WCS offers no legally sufficient basis for its failure to perform under the Master PSA.

      R.      *First*, Suncor's exercise of its rights under the Master PSA provides no basis for WCS's refusal to pay.  *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995); *Soderlun v. Pub. Serv. Co.,* 944 P.2d 616, 623 (Colo. App. 1997).  A legal contract right "may be exercised without liability regardless of motivation."  *Radiology Prof. Corp. v. Trinidad Area Health Assoc., Inc.,* 565 P.2d 952, 954 (Colo. App. 1977), *aff'd*, 577 P.2d 748 (Colo. 1978); *Int'l Assoc. of Machinists v. Southard,* 459 P.2d 570, 572 (Colo. 1969) (no liability for breach caused by exercise of absolute right).

      S.      *Second*, WCS's claim that Suncor "repudiat[ed]" the Master PSA is incorrect as a matter of contract law.  Reply, ¶¶8, 10, 12, 18 and Defense No. 3.  "[R]epudiation is a manifestation by one party to the other that the first cannot or will not perform at least some part of its obligations under the contract."  *Interbank Investments, L.L.C. v. Vail Valley Consolidated Water Dist.*, 12 P.3d 1224, 1231 (Colo. App. 2000) (internal quotations omitted).  Suncor performed its obligations and simply exercised its legal rights under the Master PSA.  Indeed, WCS's complaint is not that Suncor lacked a contractual right to suspend fuel deliveries or withdraw credit but, instead, that Suncor actually exercised those rights.

6

T.     *Third*, WCS asserts that Suncor's claims are subject to setoff for "unlawful price discrimination."  *See* Reply (Separate Answers and Defenses) ¶6.  Price discrimination is not a defense to a breach of contract claim for money due and owing.  *Bruce's Juices v. American Can Co.*, 330 U.S. 743, 755 (1947).  "The [Robinson-Patman Act] prescribes sanctions, and it does not make uncollectibility of the purchase price one of them."  *Id.* at 750; *see also id. at* 754-56.  WCS's defense also fails under the governing terms of the Master PSA, which expressly requires WCS to "make payment to Suncor immediately in accordance with the terms of payment provisions of this Agreement *without any deduction or set-off*."  *See* **Exh. A** at A-1, ¶5 (emphasis added).  "Set-off" therefore is not a valid defense.  *E.g., Fox v. I-10, Ltd.,* 957 P.2d 1018, 1022 (Colo. 1998) ("[W]here a contract is clear and unambiguous, courts must give effect to the plain and ordinary meaning of its terms."); *Broken Heart Venture, L.P. v. A & F Restaurant Corp.*, 859 S.W.2d 282, 285 (Mo. App. 1993) (holding set-off claim insufficient to defeat summary judgment where agreement expressly precluded set-off).

U.     WCS's undisputed failure to perform under the Master PSA precludes WCS's claim for breach of contract.

### 3.     <u>Second element that cannot be proven by WCS</u>: WCS cannot prove that Suncor failed to perform under the contract.

A.     WCS contends that Suncor failed to perform under the Master PSA by suspending WCS's purchases of fuel.  Complaint ¶42.

B.      Suncor had the express contractual right to: (1) suspend sales to WCS  "*in its sole discretion*" if it believed "that it ha[d] *grounds for insecurity* regarding the performance of any obligation under this Agreement" by WCS, (2) "*without notice,* suspend, withdraw, alter, or *terminate any credit or line of credit* previously extended to" WCS, and (3) to make prepayment "a condition precedent to the further supply of Product[.]"  **Exh. A** at A-3, ¶17 (emphasis added).

7

C.      On May 4, 2011, the Department of Justice and the Environmental Protection Agency announced that WCS, Rocky Mountain Pipeline System, LLC and Offen Petroleum, Inc. had entered into a consent decree by which WCS was jointly and severally liable to pay $2.5 million for violating the Clean Air Act ("Consent Decree").  *See* **Exh. F**; *see also* **Exh. E** at 43:18-44:14.

D.      After learning about the Consent Decree, Suncor initiated a review of WCS's credit.  *See* **Exh. G**, at 27:5-9.  Suncor requested and received from WCS certain financial information.  *See id.* at 27:14-28:8.  Suncor then evaluated WCS's creditworthiness in light of that financial information, specifically, by evaluating WCS's earnings in 2010 (*i.e.*, whether it posted a net gain or loss), its equity position, its long-term debt, and its cash balance.  *See id.* at 76:6-77:22, 79:16-80:13.

E.      On May 20, 2011, Suncor completed its review and determined, based on the objective credit model it used, that WCS was not creditworthy.  *See* **Exh. G** at 81:8-17, 82:21-83:11.

F.      That same day, Suncor informed WCS that its credit was withdrawn and that it would have to prepay any purchases after May 24, 2011.  *See* Complaint, ¶22; **Exh. G** at 82:3-5, 86:4-18; **Exh. H**, at p. 2.

G.      WCS claims that Suncor failed to perform under the Master PSA by withdrawing its line of credit.  Complaint ¶¶45-46.  Suncor had the absolute right to withdraw the line of credit at its sole discretion.  **Exh. A** at A-3, ¶17.  Again, Suncor's exercise of its rights under the Master PSA cannot excuse WCS's refusal to pay.  *Amoco Oil Co.,* 908 P.2d at 498;  *Soderlun,* 944 P.2d at 623.  Under black-letter Colorado law, a party has no liability for breach of contract

8

caused by the exercise of an absolute contractual right.  *See Int'l Assoc. of Machinists,* 459 P.2d at 572.

H.      WCS also claims that Suncor's "setting of price terms in a manner that discriminated against WCS…constituted a breach of Suncor's implied covenant of good faith and fair dealing and Suncor's obligation to set such price in good faith pursuant to C.R.S. § 4-2-305(2)." Complaint ¶43.

I.      To demonstrate a breach of the implied covenant of good faith and fair dealing, WCS must show that Suncor exercised discretion under a contract to act dishonestly or outside of accepted commercial practices to deprive WCS of the benefit of the contract.  *See ADT Security Serv., Inc. v. Premier Home Protection, Inc.*, 181 P.3d 288, 293 (Colo. App. 2007), *cert. denied*, 2008 WL 1777402 (Colo. 2008) (applying implied covenant).

J.      As for its related allegation of violation of C.R.S. § 4-2-305(2), WCS must show that Suncor's posted price was commercially unreasonable or that the method used to derive the price was commercially unreasonable.  *See* C.R.S. § 4-2-305; U.C.C. § 2-305, cmt. 3 (1977); *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 434 (Tex. 2004) (collecting and discussing cases applying Section 2-305).

K.      The undisputed material facts demonstrate that WCS cannot prevail on its claim for breach of the implied covenant of good faith and fair dealing, or its claim for violation of C.R.S. § 4-2-305, because *WCS concedes that the prices for Fuel set by Suncor were reasonable.* The fuel manager for WCS, Christopher Wehrle, was responsible for negotiating contracts for the purchase of Fuel from Suncor.  *See* Deposition of Christopher Wehrle, attached as **Exhibit J**, at 6:3-13.  As part of his job, Wehrle was aware of prices offered for Fuel in the marketplace. *See id.* at 21:15-22:2.  Wehrle would compare Suncor's posted price against prices from other

9

sellers. *See id.* at 15:20-17:2.  These other sellers, typically "middlemen," would set their prices using Suncor's rack price.  *See id.* at 15:2-7.  "In most instances," according to Wehrle, their prices would be higher than Suncor's.  *Id.* 18:17-19.  In fact, Wehrle would use Suncor's posted price to negotiate with these sellers in an attempt to reduce their asking price for Fuel.  *See* Wehrle e-mails, attached as **Exhibit K**, at PLA032674, PLA025487, PLA027979.

   L. Wehrle had no recollection that Suncor's prices were out of line with those charged by other sellers in the marketplace.  *See* Wehrle Dep., **Exh. J**, at 42:4-8.  Indeed, when asked expressly whether Suncor's posted prices were unreasonable during the time period relevant to this dispute, Wehrle responded, "I don't recall anything about their prices at that time that I want to go on the record as saying."  *Id.* at 42:9-14.  He elaborated, "Everyone complains about – I'd say maybe there's complaints about prices *but not Suncor.  In general, no.*"  *Id.* at 42:16-18.  While Wehrle acknowledged that WCS complained about prices offered by Suncor's competitors, "I'm not singling out… Suncor."  *Id.* at 42:24-43:1.

   M. WCS's owner, Hossein Taraghi, agrees with Wehrle that Suncor's posted prices were reasonable.  At his deposition, Taraghi was asked expressly whether he was "okay with the contract price." set by Suncor.  Deposition of Hossein Taraghi, attached as **Exh. L**, at 161:7-10.  He replied unequivocally, "Yes, I was."  *Id.* at 161:11.  Taraghi confirmed that he "didn't have a problem" with the price he received, and that he was "happy with what [he] reasonably negotiated from Suncor in 2009."  *Id.* at 162:1 and 164:14-17.  By his own admission, Taraghi acknowledges that the price for Fuel offered by Suncor to WCS was reasonable.

   N. The undisputed facts further reveal that Suncor's method for calculating its posted price for Fuel was commercially reasonable and, therefore, complied with both the implied covenant of good faith and fair dealing and C.R.S. § 4-2-305.  *See ADT Sec. Servs.,* 181 P.3d at

10

293 (holding exercise of contractual discretion is in good faith if commercially reasonable); *Shell Oil Co.*, 144 S.W.3d at 434 (holding refiner acted consistent with Section 2-305 by using reasonable pricing methodology). Suncor's posted, or "rack," pricing of Fuel is based strictly on market conditions, and has nothing to do with either discounts offered to specific buyers or the demand of specific buyers for Fuel. *See* Deposition of James Piscatelli, attached as **Exhibit M**, at 28:22-29:8, 54:1-4, 55:6-24. Rack pricing is based on demand only on a "macro" level and an analysis of prevailing market conditions, not the demand of a specific customer for a specific volume of Fuel. *See id.* at 55:6-24, 56:14-57:3. Suncor's posted price was often used by other sellers to set their prices. *See* Wehrle Depo., **Exh. J**, at 15:2-7.

O.    Indeed, Suncor's rack pricing is deliberately separated from the group responsible for negotiating price discounts (known as the "rack forward group") in order to avoid any conflict of interest. *See id.* at 30:1-20. Rack pricing is concerned only with market conditions, and therefore cannot influence the price offered to purchasers like WCS or Kroger under their specific contracts. *See id.* at 30:11-20, 31:21-32:7. The rack forward group is walled off from the rack pricing group, and therefore has no influence on Suncor's rack price. *See id.* at 49:13-20. The rack pricing group is similarly walled off, and has no knowledge of discounts or other terms agreed to by the rack forward group. *See id.* at 132:14-23, 134:8-14.

P.    Suncor's pricing methodology is reasonable and therefore consistent with C.R.S. § 4-2-305. Suncor set WCS's posted prices based on aggregate market conditions, without knowledge of any discounts or other terms negotiated separately with WCS by Suncor's rack forward group. *See* **Exh. M** at 28:22-29:8, 56:14-57:3, 132:14-23. As a result, WCS concedes that Suncor's posted prices were reasonable in light of prices offered by other sellers in the market. *See* **Exh. J** at 42:9-18; **Exh. K** at 161:7-11, 164:14-17. Suncor therefore is entitled to

11

summary judgment on WCS's claim for breach of the implied covenant of good faith and fair dealing and violation of C.R.S. § 4-2-305.  *See ADT Sec. Servs.,* 181 P.3d at 293; *Shell Oil Co.*, 144 S.W.3d at 434.

**B.     Suncor is entitled to summary judgment on WTO's Third Claim for Relief (Breach of Contract).**

      **1.     Burden of proof and elements.**

WTO bears the burden of proving its claim for breach of contract, which is rooted in the covenant of good faith and fair dealing.  *See Bayou Land Co. v. Talley*, 924 P.2d 136, 155 (Colo. 1996).  Under Colorado law, WTO must allege (1) the existence of a valid contract with Suncor; and (2) that Suncor breached the implied covenant by exercising its discretion to act dishonestly or outside of accepted commercial practices to deprive WCS of the benefit of the contract.  *See ADT Sec. Servs.,* 181 P.3d at 293.

      **2.     Elements that cannot be proven by plaintiffs:  WTO cannot prove the second element of its claim.  By exercising its contractual rights, Suncor did not act dishonestly or outside of accepted commercial practices.**

      A.     WTO and Suncor are parties to a Terminal Access Agreement, entered into in May 2006, by which Suncor permitted WTO to access Suncor's terminals.  *See* Terminal Access Agreement, attached as **Exhibit N**; *see also* **Exh. D** at ¶3 (authenticating Terminal Access Agreement).  WTO admits that its "access to Suncor's terminals [is] governed" by this Agreement.  *See* Complaint, ¶10.

      B.     In paragraph 4 of the Terminal Access Agreement, WTO agreed that "any permission of access granted by Suncor … may be revoked *immediately* by Suncor, *without cause*, as a matter of right."  *See* Terminal Access Agreement, attached as **Exhibit N**, ¶4 (emphasis added).

C. On May 24 and 25, 2011, Suncor's bank, Wells Fargo, notified Suncor that two draw requests had been denied because WCS had stopped payment. *See* Notices, attached as **Exhibit O**.

D. On May 25, 2011, Suncor notified WTO that, based on the failure of WCS to pay for Fuel provided by Suncor, it was revoking WTO's access to Suncor's terminals. *See* **Exh. H**.

E. In its Third Claim for Relief, WTO alleges that Suncor breached the covenant of good faith and fair dealing implicit in the Terminal Access Agreement by "suspending WTO from loading fuel at Suncor terminals." *See* Complaint, ¶49.

F. The implied covenant of good faith and fair dealing cannot change the existing terms of a contract. *Amoco*, 908 P.2d at 498; *Soderlun*, 944 P.2d at 623. The duty "will not contradict terms or conditions for which a party has bargained." *Amoco*, 908 P.2d at 498. A plaintiff cannot "rely on the implied duty of good faith and fair dealing to circumvent terms" bargained for in the contract. *See Lutfi v. Brighton Comm. Hosp. Ass'n.*, 40 P.3d 51, 59 (Colo. App. 2001); *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc*, 872 P.2d 1359, 1363 (Colo. App. 1994).

G. Suncor had the legal right to revoke WTO's access to Suncor's terminals without cause. *See* **Exh. N**, ¶4. WTO's claim for breach of the duty of good faith and fair dealing therefore fails as a matter of law. *E.g.*, *Lutfi*, 40 P.3d at 59.

**C.  Suncor is entitled to summary judgment on WCS's Fourth Claim for Relief for tortious interference.**

**1.  Burden of proof and elements.**

WCS has the burden of proving its tortious interference claim. *See Lutfi*, 40 P.3d at 58 (holding plaintiff failed to prove improper interference with contract). Under Colorado law, WCS must prove (1) the existence of a contract between WCS and third parties; (2) Suncor's

13

knowledge of the contracts or facts leading it to inquire as to the existence of the contract; (3) intent by Suncor to induce breach of the contract; (4) improper action by Suncor which induced a breach of the contract; and (5) damages to WCS. *Carman v. Heber*, 601 P.2d 646, 647 (Colo. App. 1979); *see also Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1118 (Colo. 1990) ("[L]iability does not attach unless the court concludes that the actor's conduct is also improper.") (internal citation omitted); *Mem. Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984) (same).

> 2. **Elements that cannot be proven by WCS:** **WCS cannot prove the fourth element of its claim. Suncor did not improperly interfere with a contract between WCS and a third party.**

A.  WCS alleges that Suncor "by its words and conduct, intentionally interfered with Plaintiffs' performance of their agreements and relationships with middlemen" from which it obtained additional Fuel. Complaint, ¶53; *see also id.*, ¶¶11-13 (describing relationship with "middlemen").

B.  WCS does not identify Suncor's "words and conduct" that allegedly resulted in tortious interference, other than to incorporate its previous allegations by reference. *See id.* at ¶51. Those allegations concern Suncor's refusal to sell Fuel to WCS and refusal to grant WTO access to Suncor terminals to take delivery of the Fuel. *See, e.g.*, *id.* at ¶¶41-46, 48-50. Moreover, when asked specifically to identify any contract with which Suncor interfered, Mr. Taraghi (the owner of WCS) could not identify one. *See* **Exh. L**, at 228:11-236:3.

C.  As discussed above, Suncor had the contractual right to refuse to sell Fuel to WCS and to revoke access to WTO. *See* Sect. B.2.B & D and Sect. C.2.B; *See Grossman v. Columbine Medical Group*, 12 P.3d 269, 271 (Colo. App. 1999). A legal contract right "may be exercised without liability regardless of motivation." *Radiology*, 565 P.2d at 954; *see also Westfield Dev. Co.*, 786 P.2d at 1118 ("[L]iability does not attach unless the court concludes that

the actor's conduct is also improper."); *Int'l Assoc. of Machinists*, 459 P.2d at 572 (no liability for breach caused by exercise of absolute right).

   D.  As a matter of Colorado law, the exercise of a contractual right cannot be an improper interference with a contract. *Int'l Assoc. of Machinists*, 459 P.2d at 572. Suncor therefore is entitled to summary judgment against WCS on its claim for tortious interference.

   E.  Independently, WCS's claim fails because it cannot identify any contract with which Suncor allegedly interfered. *See* **Exh. L** at 228:11-236:3. WCS's failure to identify any interference is fatal to its Fourth Claim for Relief. *See, e.g.*, *Shell v. Am. Family Rights Ass'n*, -- F. Supp. 2d ---, 2012 WL 4476641, *16 (D. Colo. Sept. 28, 2012) (dismissing tortious interference claim where plaintiff unable to identify existing contract with third-party with which defendant interfered); *Wasalco, Inc. v. El Paso County*, 689 P.2d 730, 732 (Colo. App. 1984) (affirming summary judgment on tortious interference claim where no evidence of underlying contract subject to interference).

**D. Suncor is entitled to summary judgment on WTO's Fifth Claim for Relief for tortious interference.**

   **1. <u>Burden of proof and elements.</u>**

WTO has the burden of proving its tortious interference claim. *See Lutfi*, 40 P.3d at 58 (holding that plaintiff failed to prove improper interference with contract). Under Colorado law, WTO must prove (1) the existence of a contract between WTO and third parties; (2) Suncor's knowledge of the contracts or facts leading it to inquire as to the existence of the contract; (3) intent by Suncor to induce breach of the contract; (4) improper action by Suncor which induced a breach of the contract; and (5) damages to WTO. *Carman*, 601 P.2d at 647; *see also Westfield Dev. Co.*, 786 P.2d at 1118 ("[L]iability does not attached unless the court concludes that the actor's conduct is also improper."); *Mem. Gardens, Inc.*, 690 P.2d at 210 (Colo. 1984) (same).

> 2. **Elements that cannot be proven by WTO:  WTO cannot prove that Suncor improperly interfered with a contract between WTO and a third party.**

A. WTO alleges that Suncor "by its words and conduct, intentionally interfered with performance of the transport agreements among middlemen, WTO and WCS." Complaint, ¶58.

B. WTO does not identify Suncor's "words and conduct" that allegedly resulted in tortious interference, other than to incorporate its previous allegations by reference. *See id.* at ¶56. Those allegations concern Suncor's refusal to sell Fuel to WCS and refusal to grant WTO access to Suncor terminals to take delivery of the Fuel. *See, e.g.*, *id.* at ¶¶41-46, 48-50. Moreover, when asked specifically to identify any contract with which Suncor interfered, Mr. Taraghi (the owner of WTO) could not identify one. *See* **Exh. L** at 228:11-236:3.

C. Under the terms of the Terminal Access Agreement between Suncor and WTO, Suncor had the absolute right to revoke WTO's access to Suncor's terminals without cause. *See* **Exh. N**, ¶4.

D. A legal contract right "may be exercised without liability regardless of motivation." *Radiology*, 565 P.2d at 954; *see also Westfield Dev. Co.*, 786 P.2d at 1118 ("[L]iability does not attach unless the court concludes that the actor's conduct is also improper."); *Int'l Assoc. of Machinists,* 459 P.2d at 572 (no liability for breach caused by exercise of absolute right).

E. As a matter of Colorado law, the exercise of a contractual right cannot be an improper interference with a contract. *Int'l Assoc. of Machinists*, 459 P.2d at 572. Suncor therefore is entitled to summary judgment against WTO on its claim for tortious interference.

F. Independently, WTO's claim fails because it cannot identify any contract with which Suncor allegedly interfered. *See* **Exh. L** at 228:11-236:3. WTO's failure to identify any interference is fatal to its Fifth Claim for Relief. *See, e.g.*, *Shell*, -- F. Supp. 2d ---, 2012 WL

16

4476641 at *16 (dismissing tortious interference claim where plaintiff unable to identify existing contract with third-party with which defendant interfered); *Wasalco*, 689 P.2d at 732 (affirming summary judgment on tortious interference claim where no evidence of underlying contract subject to interference).

## **CONCLUSION**

For the reasons discussed above, Suncor is entitled to summary judgment on Plaintiffs' Second, Third, Fourth and Fifth Claim for Relief.

Dated:  February 8, 2013.

Respectfully submitted,

*s/ Anthony J. Shaheen*
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO  80201-8749
Telephone: 303-295-8054
Fax: 303-291-9126
E-Mail:  ajshaheen@hollandhart.com

*s/ William L. Monts III*
J. Robert Robertson
William L. Monts III
HOGAN LOVELLS LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Telephone:  202-637-5600
Fax:  202-637-5910
E-Mail:  robby.robertson@hoganlovells.com
              william.monts@hoganlovells.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2013, I served the foregoing **SUNCOR's MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH, AND FIFTH CLAIMS FOR RELIEF**, by causing the foregoing to be presented to the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following email addresses:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON BIERMANN  & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
krb@benningtonjohnson.com
kec@benningtonjohnson.com
afa@benningtonjohnson.com

Philip W. Bledsoe
POLSINELLI SHUGHART, P.C.
1515 Wynkoop Street, Suite 600
Denver, CO 80202
pbledsoe@polsinelli.com


                                        s/ Susanne Johnson

5960012_1