MOTION HEARING - SEPTEMBER 28, 2011

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 11-CV-1611-MSK-CBS

WESTERN CONVENIENCE STORES, INC.
a Colorado corporation,

WESTERN TRUCK ONE, LLC
a Colorado limited liability company,
    Plaintiffs,
vs.
SUNCOR ENERGY, (U.S.A.), INC.,
a Delaware corporation,

    Defendants.

Proceedings before CRAIG B. SHAFFER, United States Magistrate Judge, United States District Court for the District of Colorado, commencing at 9:13 a.m., September 28, 2011, in the United States Courthouse, Denver, Colorado.

WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

APPEARANCES

MR. KENNETH R. BENNINGTON, ESQ., and
MS. KATHLEEN E. CRAIGMILE, ESQ.
Appearing on behalf of the Plaintiffs.

MR. JOHN R. ROBERTSON, ESQ., MR. WILLIAM L. MONTS, ESQ.,
and MR. ANTHONY J. SHAHEEN, ESQ.
Appearing on behalf of the Defendants.

MOTION HEARING

Page 2

1           PROCEEDINGS
2       (Whereupon, within the electronically recorded
3   proceedings are herein transcribed, pursuant to order of
4   counsel.)
5       THE COURTROOM DEPUTY: All rise.
6       THE COURT: Please, everybody have a seat.
7   All right. We're on the record in Western Convenience
8   Stores, Inc. versus Suncor Energy, 11-CV-1611. I'll
9   take appearances of counsel.
10      MR. BENNINGTON: Good morning, Your Honor.
11  Kenneth Bennington and Kathleen Craigmile for the
12  plaintiffs.
13      MS. CRAIGMILE: Good morning, Your Honor.
14      THE COURT: Okay. Good morning.
15      MR. ROBERTSON: Good morning, Your Honor.
16  Robby Robertson. I also have with me Anthony Shaheen
17  and Mr. William Monts. We represent the defendant.
18      THE COURT: All right. This poses a threshold
19  issue. I need to ask you, what do you all envision as
20  the scope of my role in light of Judge Krieger's order
21  of reference? How much or how little do you want me to
22  do? Because she gave you the chance to consent to me
23  deciding this motion or, alternatively, I can simply
24  write a recommendation which would almost guarantee that
25  you build in more time and money. What would you like

Page 3

1   to do?
2       MR. BENNINGTON: I have been proceeding in the
3   assumption that you will rule, Your Honor.
4       THE COURT: Okay. What's Suncor's view?
5       MR. ROBERTSON: Your Honor, plaintiff wants to
6   put on its case and we're here to defend it.
7       THE COURT: No.
8       MR. ROBERTSON: I mean --
9       THE COURT: But the -- the order of reference
10  was is that you could either consent to me deciding the
11  motion, or under 636(c) --
12      MR. ROBERTSON: I see. Could I confer with --
13      THE COURT: Sure. Absolutely. You can have
14  just a mass conferral.
15      MR. ROBERTSON: And, Your Honor, since --
16  actually, my client hasn't -- isn't here and the last
17  word he gave us was to go ahead and ask Your Honor
18  respectfully to give a recommendation.
19      THE COURT: Okay. I'm happy to do that.
20      MR. ROBERTSON: I apologize, I can't change --
21  I don't -- that's the last word I got.
22      THE COURT: No, and your client absolutely has
23  the right to decide it. I don't necessarily see the
24  economic efficiency of that, but that's fine.
25      MR. ROBERTSON: And I agree, but I just don't

Page 4

1   have the authority to change my mind, so --
2       THE COURT: No, I understand. Okay. I have
3   reviewed the motion, the response and the reply. I have
4   read the exhibits that you tendered and I have read the
5   cases you cited and I have done my own research. But I
6   will turn the matter over to you. It's plaintiff's
7   motion, so please.
8       MR. BENNINGTON: You want an opening, Your
9   Honor or should we proceed direct to --
10      THE COURT: I mean, I've read everything and I
11  suspect your opening is simply going to tell me what's
12  in your motion.
13      MR. BENNINGTON: It is. I'm happy to proceed.
14      THE COURT: Well, suffice to say that having
15  read your motion, there's really not much surprise left.
16  So, why don't --
17      MR. BENNINGTON: Yeah.
18      THE COURT: -- you just go ahead and begin.
19      MR. BENNINGTON: Very good.
20      THE COURT: Sir, come on up. Sir, what I'd
21  ask you to do is have a seat. That chair does not roll
22  so --
23      MR. TARAGHI: Okay.
24      THE COURT: Now, once you get yourself
25  comfortably positioned, please raise your right hand.

1 (Pages 1 to 4)

MOTION HEARING - SEPTEMBER 28, 2011

Page 41

1 A   We tried to just clear the things out. Try to see
2 if he can come up with better terms, better
3 understanding that make it easy. Most of the time -- I
4 mean, you know they had some issues with credit we
5 talked about and then we had issue with the delivery of
6 the product we were going to talk about, try to come up
7 with some agreement that we can ease off the situation.
8 Q   All right. Let's first talk about who was there.
9 In addition to you and Mr. Ewing was there anybody
10 there -- who else was there from Western Convenience
11 Stores?
12 A   Chris Wehrle.
13 Q   And what is Chris Wehrle's job?
14 A   He's the fuel buyer.
15 Q   And what does that mean? What's that job in your
16 business, in your company?
17 A   He buys all the fuel for Western Convenience
18 Stores.
19 Q   And who is there in addition to Mr. Ewing for
20 Suncor?
21 A   It was -- I apologize, I don't know his last name
22 but his first name was Doug.
23 Q   Yes. Who else?
24 A   And Diana.
25 Q   Diana Kriskovich we already talked about?

Page 42

1 A   Diana, and also Steve Ewing and Steve Moss.
2 Q   Steve Moss, again, is your rep?
3 A   He was my rep, right.
4 Q   And Ewing is his boss?
5 A   Pardon me?
6 Q   And Ewing is his boss?
7 A   Yes.
8 Q   Well, let's -- let's go through the things that
9 came up in that meeting. Was there any discussion about
10 what kind of year both Suncor and Western were having
11 financially?
12 A   We brought that 10 cents out and he admit to it,
13 and also I said I'm having a really hard time making
14 money and I need that 10 cents. And he said, I
15 understand, but we can't offer it to you.
16 Q   Did he tell you why he couldn't offer it to you?
17 A   He didn't give me any explanation. He says you
18 don't get it.
19 Q   At that point what else was talked about?
20 A   And he also mentioned that even with that 10 their
21 stores are not making money.
22 Q   The other stores being who?
23 A   Suncor. Suncor retail. They have about 40 or some
24 stores around Colorado.
25 Q   I want to make sure I understand. Even with the

Page 43

1 10 -- 10-cent break over what you were getting they were
2 not making money?
3 A   They weren't making money.
4 Q   Did he tell you why? Did he have any explanation
5 that he gave you as to why this was going on?
6 A   He did not.
7 Q   Now, did the subject of your involvement with EPA
8 come up at that meeting?
9 A   Yes, it did.
10 Q   All right. Was that a big deal -- we'll get to it,
11 but was that something that Ewing regarded as important
12 to talk about, as far as you could tell?
13 A   It came to me it was, but -- but I explain it to
14 him --
15 Q   All right.
16 A   -- exactly what it was and they don't have to worry
17 about it.
18 Q   Before we explain -- we go to what it was that you
19 explained to Mr. Ewing, tell us in general what was
20 going on involving Western and EPA.
21 A   I said there were three of us involved in that EPA,
22 and it's two --
23 Q   Three of us, meaning who? Three what?
24 A   Do you want me to say the names of them?
25 Q   Yes.

Page 44

1 A   Okay. It's Rocky Mountain Pipeline, and Offen
2 Petroleum.
3 Q   And Western Convenience.
4 A   And Western Convenience Stores.
5 Q   All right. You're in -- go ahead?
6 A   And we have $2.5 million fine, and Rocky Mountain
7 told us that they are going to go ahead and pay EPA and
8 then they will settle it with us. And I said we're
9 going to settle it together, because we have a relation
10 with Rocky Mountain, and then we did settle it. It's
11 all settled. What exactly I told Ewing at the -- Steve
12 Ewing at that time is exactly happened today. It's all
13 settled. They paid it. They came to us, we settled it,
14 it's all done.
15 Q   Very briefly, what was the problem with EPA? What
16 were they -- what were they upset about?
17 A   We were blending natural gasoline and that's a
18 blend -- blendstock into our gasoline and they want to
19 go through stuff, they just find some procedurals that
20 they thought we didn't follow, but --
21 Q   Is it illegal by itself to blend natural gas with
22 gasoline?
23 A   No, it's not.
24 Q   Do other branded and unbranded retailers sell
25 gasoline blended with natural gas?

11 (Pages 41 to 44)

MOTION HEARING - SEPTEMBER 28, 2011

Page 57

1  A  No.
2      MR. ROBERTSON: Objection, leading. He can
3  just say what he heard on the voicemail without having
4  counsel tell him what's there.
5      THE COURT: Counsel, in fairness there have
6  been a whole slough of leading questions. If you were
7  really concerned about leading questions you're about,
8  by my calculation, maybe 45 minutes late. And I'll
9  sustain that objection. That is a leading question.
10     MR. ROBERTSON: Thank you, Your Honor. I'm
11 trying not to interrupt. I want to keep things moving
12 as much as I can.
13     THE COURT: Okay.
14 Q  (By Mr. Bennington) What, if anything, did he say
15 about price differential that you had been complaining
16 about in that voicemail?
17 A  Nothing.
18 Q  What did you do in response to that -- that
19 message?
20 A  I had Chris call Steve Moss and go detail with him.
21 He probably will tell you that.
22 Q  All right. But as a result of that conversation,
23 which Mr. Wehrle will tell us about, did anything
24 change?
25 A  No.

Page 58

1  Q  What did you do then knowing that your credit had
2  been cut off?
3  A  Nothing I can do. I mean --
4  Q  All right. At that point were there ACH
5  transactions --
6  A  Yes.
7  Q  -- coming through?
8  A  Yes.
9  Q  Did Western pay those ACH transactions?
10 A  I reject them all.
11 Q  When you say "I reject them all" what do you mean?
12 A  Everything came through, I reject them.
13 Q  This is the positive pay system you were telling us
14 about earlier, correct?
15 A  Pardon me?
16 Q  Is it the positive pay system that --
17 A  Right.
18 Q  -- the bank has?
19 A  Right. Electronic system, yeah.
20 Q  You have to approve each transaction?
21 A  That's correct.
22 Q  So what happened then with respect to the pending
23 transactions on Friday the 20th? Did you reject them or
24 accept them?
25 A  Reject them.

Page 59

1  Q  Why?
2  A  Because I felt they owe me money. I'm going to --
3  I mean -- they owe me more money than I owe them.
4      THE COURT: Okay. Hold on.
5  A  That's why I reject them.
6      THE COURT: Hold on for a second. Help me
7  again to understand the transaction process. In the
8  abstract, as I understand it you would send a Western
9  truck to pick up fuel. Your Western truck would pick up
10 the fuel and bring it to one of your stores?
11     THE WITNESS: Correct.
12     THE COURT: Once the fuel was picked up at a
13 Suncor facility, then Suncor under this line of credit
14 would send a request for payment?
15     THE WITNESS: Correct.
16     THE COURT: Now, was it always the case that
17 by the time Suncor put in the request for payment your
18 truck had already picked up the fuel?
19     THE WITNESS: Correct.
20     THE COURT: So you had their product in your
21 truck, and then they go to seek payment for the product
22 that you already had?
23     THE WITNESS: Correct.
24     THE COURT: And how did they owe you money?
25     THE WITNESS: Because --

Page 60

1      THE COURT: You just told me that you thought
2  they owed you more than you owed them. How -- what part
3  of this process under which did they owe you money?
4      THE WITNESS: Because --
5      THE COURT: Because you had their product.
6      THE WITNESS: It is their product.
7      THE COURT: Well, not anymore.
8      THE WITNESS: Okay. Now, this is a question.
9  We had an agreement. We had an agreement how this
10 agreement has to be implemented. They cut me off every
11 time they want to. They didn't give me product. They
12 were hurting me. They make me to the point -- now, what
13 their motivation was I'm trying to find out right now
14 from the court, and if -- if tomorrow the court decides
15 that I owe them the money, they will get it right away.
16 I don't think I owe them money because they took my
17 money from me by not giving me -- by cutting me off with
18 no reason, which we had an agreement.
19     THE COURT: So here's --
20     THE WITNESS: Why you not giving me that 10
21 cents --
22     THE COURT: Here's what I understand what
23 you're saying is, is that you had picked up product at
24 their facility and they sent you a bill, essentially,
25 seeking electronic payment for that transaction.

15 (Pages 57 to 60)

AVERY/WOODS REPORTING SERVICE, INC.
(303) 825-6119

Page 85

1  court this, you had no intention of paying?
2  A  It's not -- I have a whole intention to pay.
3  Q  Sir --
4  A  I don't owe, sir, to anybody. I have all intention
5  to pay. I said, you owe me money. We'll -- court
6  decide that. I'm just telling you I have all intention
7  to pay anybody. I don't owe nobody. I have paid my
8  bills up to today.
9  Q  Sir, on the 18th when you made this decision I'm
10 not going to honor ACH payments --
11 A  Because I was cut off.
12 Q  -- you did not call my client and tell them that
13 you were not going to make payment on any gasoline that
14 you were going to go pick up over the next few days; did
15 you, sir? Yes or no?
16 A  Answer the -- go ahead and ask that question one
17 more time, because I want to know what the exact
18 question is.
19 Q  When you made the decision to not make payments on
20 gasoline that your company was going to buy over the
21 next few days, after that date you made the decision,
22 did you tell my client that you were not going to pay
23 for the gasoline that your trucks picked up? Yes or no?
24 A  Answer is no.
25 Q  Now, if I go in to one of your gasoline stations,

Page 86

1  sir, which I have, and I fill my tank up in my car and I
2  just drive off and don't pay, do you instruct your
3  people to call the police?
4  A  Yes, I do.
5  Q  Now, we're going to have your financial officer up
6  here in a few moments, but as president of -- of Western
7  Convenience Stores, since May to present, in this fiscal
8  year -- because your fiscal year ends in -- when, sir?
9  End of March?
10 A  You're talking too fast. I can't understand what
11 you're saying, sir.
12 Q  Well, let me start very simply. Your fiscal year
13 ends at the end of March; is that correct?
14 A  Yes.
15 Q  Since 1 April to today, Western Convenience Stores
16 is profitable, isn't it?
17 A  It's profitable, yeah.
18 Q  Now, when you --
19    MR. ROBERTSON: And by the way, Your Honor, I
20 do want to move in as we're doing this now, Exhibit
21 No. 1 into evidence.
22    MR. BENNINGTON: No objection.
23    THE COURT: Without objection the court will
24 accept Exhibit No. 1.
25    (Whereupon, Exhibit No. 1 was admitted into

Page 87

1  evidence.)
2  Q  (By Mr. Robertson) Now, if you can turn, sir,
3  please, in your tab to Tab No. 2. This is what you
4  talked about with counsel, this master product and
5  purchase and sale agreement. You there, sir?
6  A  Yes, I am.
7  Q  And you do know -- and we can go line by line, but
8  you know that the company, my client, Suncor, retained
9  the right to cut off your credit if you didn't pay your
10 bills? Do you know that, sir?
11 A  It says in here. It is there.
12 Q  Okay. And that's what you agreed to; right, sir?
13 A  As I said, it's here.
14 Q  And that's what you agreed to; right, sir?
15 A  Okay.
16 Q  Is that correct?
17 A  Correct.
18 Q  Now, just to be clear if we go to page A-5 of the
19 agreement?
20 A  What page?
21 Q  It's A-5 at the bottom. It's the last physical
22 page of Tab 2. When you're there, sir, just let me
23 know.
24 A  Okay.
25 Q  You there, sir?

Page 88

1  A  Yeah.
2  Q  Now, look at paragraph 31. You understand, sir,
3  that this agreement -- that there are no other person or
4  party that is a third-party beneficiary under this
5  agreement. Do you know that, sir?
6  A  Yes, I see that.
7  Q  And the fact is, this agreement has nothing to do
8  with Western Truck One; isn't that correct?
9  A  Correct.
10 Q  Now, if you turn to the first page of Exhibit A,
11 which is A-1. So just go back two pages, and we're on
12 paragraph five. Are you there, sir?
13 A  Yes, I am.
14 Q  Okay. Do you see in the first sentence towards the
15 end it says, Upon receipt of each invoice, make payment
16 to Suncor immediately in accordance with the terms of
17 payment provisions of this agreement without any
18 deduction or setoff. Do you see that, sir?
19 A  Yep.
20 Q  And that's what you agreed to with my client;
21 right, sir? Not to setoff or deduct any payments that
22 you owe; right, sir?
23 A  Right.
24 Q  But you did it anyway. You just decided not to
25 pay; right, sir?

MOTION HEARING - SEPTEMBER 28, 2011

Page 89

1  A  Right.
2  Q  Once my client found out that you were not paying
3     for the gasoline that you were picking up and taking out
4     to your gas stations, do you understand why they don't
5     want to offer you any credit, sir?
6  A  I didn't ask for credit.
7  Q  Do you understand why they don't want to give you
8     gasoline that you're not going to pay for?
9  A  I didn't ask for it.
10 Q  You are here though, aren't you?
11    THE COURT: Counsel.
12 A  I'm asking for access.
13    THE COURT: Counsel. Counsel.
14 A  I'm asking for access.
15    THE COURT: What you're asking this witness to
16    do is to agree with the philosophy or mindset of your
17    client. That question isn't related to anybody's
18    interest. If you want -- if you want -- the parties may
19    disagree about this. It's not going to facilitate my
20    analysis at all.
21    MR. ROBERTSON: Yes, sir. Yes, Your Honor.
22    THE COURT: Go ahead. I mean, I think we're
23    losing sight of the fact that there is no jury here,
24    we're not toting up points. Your job is to present the
25    facts that I need to make a recommendation to decide

Page 90

1     this motion.
2     MR. ROBERTSON: Yes, Your Honor.
3     THE COURT: Let's focus on that objective.
4     MR. ROBERTSON: Yes, Your Honor.
5  Q  (By Mr. Robertson) You mentioned that if your
6     trucks go into my client's facility that there's no harm
7     to my client. That's what you said?
8  A  I will be the same as other trucks going in there.
9  Q  That's what you want this court to authorize is to
10    allow Western Truck One to go onto my client's property
11    and pick up gasoline; correct, sir?
12 A  Correct.
13 Q  And what you want this court to do is to make my
14    client go into its computer system and give access so
15    your trucks can get in the gate; right, sir?
16 A  Correct.
17 Q  Right now they can't even get in the gate, right?
18 A  Correct.
19 Q  And then they have to then on all of the equipment
20    and all the pumps actually pump gasoline into your
21    trucks; right, sir?
22 A  Correct.
23 Q  And then if your trucks do what they did back after
24    the 18th of May, which is pick up for somebody who
25    doesn't pay, my client's got a problem; don't they, sir?

Page 91

1  A  No, he doesn't -- they have -- there's no way I can
2     pull product from them on my account. I do it from
3     third party. Third party charges for it.
4  Q  Are you the only one who doesn't pay?
5  A  Pardon me?
6  Q  Are you the only one out there who doesn't pay?
7  A  I always pay.
8  Q  No, sir, you just told us you didn't pay this time.
9  A  I pay. That's your question. My counsel ask me
10    question, I can clear those up for you.
11 Q  Do you know what the term overfill is, sir? Or
12    overdraw? Ever heard of that?
13 A  Overdraw?
14 Q  Yes, sir.
15 A  Yes, I do.
16 Q  And, in fact, if your trucks pick up more than
17    they're supposed to then my client has to go get the
18    money from your trucks, right?
19 A  No, they don't.
20 Q  They have to go back to the -- the name of the
21    company your truck driver put into the machine, that may
22    or may not think they're liable for that amount of
23    money, right?
24 A  That's not correct.
25 Q  All right. Now, as of now, in terms of how Suncor

Page 92

1     sets the prices for your gasoline, right now you don't
2     have any agreement; right, sir? (Unintelligible) with
3     my client?
4  A  We don't -- we don't do business right now.
5  Q  Okay. And back at the time when all this came up,
6     at the end of April when you were complaining you said,
7     if you look in Tab 2 -- and your counsel was trying to
8     get you to look at this. If you look at paragraph 2, do
9     you know what a confirmation procedure is?
10 A  Where is it?
11 Q  Tab 2, page 1.
12 A  Okay.
13 Q  Do you see in paragraph 2 it talks about a
14    confirmation procedure for the sale of petroleum
15    products pursuant to the terms set forth in a
16    transaction or agreement confirmation. Do you know,
17    sir, what that's talking about?
18 A  What is your question?
19 Q  Do you know what a confirmation is?
20 A  Just ask me a question, I can answer a question.
21    THE COURT: I think that is the question. Do
22    you know what a confirmation is?
23 A  Okay. Yes.
24 Q  (By Mr. Robertson) You do know what a confirmation
25    is; right, sir?

23 (Pages 89 to 92)