**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation; WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant-Third Party Plaintiff,

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,

    Third Party Defendants.

## SUNCOR'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM AGAINST WESTERN CONVENIENCE STORES, INC. AND THIRD-PARTY CLAIM AGAINST HOSSEIN AND DEBRA LYNN TARAGHI

Pursuant to Fed. R. Civ. P. 56, Suncor Energy (U.S.A.) Inc. ("Suncor") moves for summary judgment on its counterclaim (Dkt. #31) against Plaintiff Western Convenience Stores, Inc. ("WCS"), and its third-party claim (Dkt. #37) against Hossein and Debra Lynn Taraghi (the "Taraghis").[1]  *See* Counterclaim, ¶¶44-49; Third-Party Complaint ("TPC"), ¶¶19-28.

WCS admits it has not paid for, and refuses to pay for, the petroleum products it purchased from Suncor.  *See* Plaintiffs' Reply to Counterclaim (Dkt. #36), ¶¶8, 10, 12, 18; *see also* Transcript of Injunction Hearing (9/28/2011), attached as **Exhibit A**, at 88:14-89:1.  As explained below, WCS has no defense for its admitted failure to pay, and the Robinson-Patman

---

[1] As recommended in the Court's practice standards, undersigned counsel discussed this Motion with Plaintiffs' counsel on February 7, 2013, who confirmed that Plaintiffs oppose it.

Act claim pursued by WCS in this case affords no excuse for refusing to pay Suncor.  *See Bruce's Juices v. American Can Co.*, 330 U.S. 743, 754-56 (1947).  Under the underlying contract between the parties, Suncor is entitled to recover full payment, with interest, as well as its reasonable costs and attorneys' fees in pursuing its counterclaim.

Suncor also is entitled to summary judgment on its third-party claim against the Taraghis.  The undisputed facts demonstrate that the Taraghis have failed to pay Suncor under their personal guaranty for unpaid amounts owed by WCS.  Like WCS, the Taraghis have no legal defense for their failure to pay.

## CLAIMS UPON WHICH JUDGMENT IS SOUGHT

**A.    Suncor is entitled to summary judgment on its counterclaim against WCS.**

   **1.    Burden of proof and elements.**

Suncor bears the burden of proving its counterclaim against WCS for breach of contract.  Under Colorado law, Suncor must prove (1) the existence of a contract; (2) Suncor performed under the contract; (3) WCS failed to perform under the contract; and (4) damages resulting from WCS's failure to perform.  *See Conagra Trade Group, Inc. v. Fuel Exploration, LLC*, 636 F. Supp. 2d 1166, 1171 (D. Colo. 2009); *Saturn Sys. Inc. v. Militare*, 252 P.3d 516, 529 (Colo. App. 2011).

   **2.    Suncor can prove all of the elements of breach of contract.**

   **Element 1:    Suncor and WCS had a valid and enforceable contract.**

   A.    Suncor and WCS are parties to a Master Product Purchase and Sale Agreement ("Master PSA") for the sale of petroleum products, including gasoline and diesel fuel ("Fuel").  *See* Amended Complaint (the "Complaint") (Dkt. #43), ¶¶6, 8; Answer (Dkt. #45), ¶¶6, 8; Counterclaim, ¶7; Reply, ¶4; *see also* Master PSA, attached as **Exhibit B**; Deposition of Steven Ewing, attached as **Exhibit C**, at 23:18-23 (authenticating Master PSA).  WCS admits that the

2

Master PSA "govern[s] all transactions … for the purchase and sale of fuel" from Suncor. *See* Complaint, ¶8.

  B.  The Master PSA sets forth WCS's payment obligations and gives Suncor certain express rights. *See* Counterclaim, ¶7; Reply, ¶4; Master PSA, **Exh. B**.

  C.  Section 5 ("Payment") of Exhibit A to the Master PSA sets forth WCS's payment obligations. *See* **Exh. B** at A-1, ¶5. WCS agreed that "Suncor shall furnish [WCS] with invoices for all Product sold and delivered to [WCS] … and [WCS] shall, upon receipt of each invoice, make payment to Suncor *immediately* in accordance with the terms of payment provisions of this Agreement *without any deduction or set-off.*" *Id.* (emphasis added).

  D.  In Section 5, WCS also agreed that if it "*fails or ceases* to make payment to Suncor pursuant to the manner and method set forth above, Suncor shall have the right to *immediately cease supplying or selling* Product" to it. *See* **Exh. B** at A-1, ¶5 (emphasis added).

  E.  In Section 17 of Exhibit A to the Master PSA, WCS agreed that:

> If Suncor, *in its sole discretion*, believes that it has *grounds for insecurity* regarding the performance of any obligation under this Agreement by Counterparty [WCS]…(including without limitation, the occurrence of a Material Change in the creditworthiness of the Counterparty, [or] Counterparty's *failure to timely pay any invoice*…), Suncor *shall have the right* to do one or more of the following: (a) *without notice, suspend indefinitely any and all sales of Product* to Counterparty, (b) *without notice,* suspend, withdraw, alter, or *terminate any credit or line of credit* previously extended to Counterparty, and (c) make Performance Assurance (as defined below) a condition precedent to the further supply of Product and/or extension of credit to Counterparty, which Counterparty shall provide and maintain during the term of the Agreement or any extension thereof or until such requirement is waived by Suncor.

*Id.* at A-3, ¶17 (emphasis added). "Performance Assurance" is defined to include prepayment for Fuel. *Id.*

3

F. On May 16, 2011, as required by the Master PSA, Suncor and WCS entered into an Electronic Funds Transfer Agreement ("EFTA") by which WCS authorized Suncor to debit funds electronically from WCS's bank account at Vectra Bank to pay for Fuel WCS purchased from Suncor. *See* Counterclaim, ¶9 (with EFTA attached there and hereto as **Exhibit D**); Reply, ¶6; Affidavit of Stephen J. Ewing, attached as **Exhibit E**, at ¶¶2-3 (authenticating EFTA).

**Element 2:** **Suncor performed under the contract.**

A. WCS purchased Fuel on credit extended by Suncor, with payment by electronic funds transfer ("EFT") due ten days after WCS obtained the Fuel. *See* Complaint, ¶16; **Exh. A** at 59:6-23. Suncor extended credit "at its sole and absolute discretion." *See* Master PSA, **Exh. B** at A-3, ¶16; Counterclaim, ¶¶8-10; Reply, ¶¶5-6.

B. From approximately May 9, 2011 through May 25, 2011, WCS purchased and received delivery of Fuel from Suncor. *See* Counterclaim, ¶¶12-37; Reply, ¶8. Those purchases are described by invoice number in paragraphs 12-37 of the Counterclaim. WCS admits it "received fuel from [Suncor]," *see* Reply, ¶8, and has not disputed any of the volumes shown on the invoices or the amounts owing on them. *See* **Exh. A** at 88:14-89:1.

C. On May 4, 2011, the Department of Justice and the Environmental Protection Agency announced that WCS, Rocky Mountain Pipeline System, LLC and Offen Petroleum, Inc. had entered into a consent decree by which WCS was jointly and severally liable to pay $2.5 million for violating the Clean Air Act ("Consent Decree"). *See* **Exhibit F**; *see also* **Exh. A** at 43:18-44:14.

D. After learning about the Consent Decree, Suncor initiated a review of WCS's credit. *See* Deposition of Diane Kriskovich, attached as **Exhibit G**, at 27:5-9. Suncor requested and received from WCS certain financial information. *See id.* at 27:14-28:8. Suncor then evaluated WCS's creditworthiness in light of that financial information, specifically, by

4

evaluating WCS's earnings in 2010 (*i.e.*, whether it posted a net gain or loss), its equity position, its long-term debt, and its cash balance. *See id.* at 76:6-77:22, 79:16-80:13.[2]

      E.      On May 20, 2011, Suncor completed its review and determined, based on the objective credit model it used, that WCS was not creditworthy. *See* **Exh. G** at 81:8-17, 82:21-83:11.

      F.      That same day, Suncor notified WCS that Suncor was withdrawing WCS's credit effective May 24, 2011, and that WCS would have to prepay for any purchases after that date. *See* Complaint, ¶22; **Exh. G** at 86:4-18; *see also* letter to WCS (5/25/2011), attached as **Exhibit H**, at p. 2 (describing May 20, 2011 notification). Under the Master PSA, Suncor could have suspended all sales and credit without notice, but it did not. *See* **Exh. B** at A-3, ¶17.

      **Element 3:**    **WCS failed to perform under the contract.**

      A.      Beginning on May 18, 2011, pursuant to the EFTA, Suncor originated eleven draw requests to WCS's bank for the invoices described in paragraphs 12-37 of the Counterclaim. *See* Counterclaim, ¶38; Reply, ¶9 (admitting the draw requests for the invoices). WCS, however, "refused to pay the draw requests." *See* Reply, ¶¶8, 10, 12; *see also* **Exh. A** at 88:14-89:1.

      B.      On May 23, Suncor's bank, Wells Fargo, notified Suncor that the May 18 draw request for $436,710.80 had been dishonored because WCS had *insufficient funds*. *See* Notice from Wells Fargo Bank (5/23/2011), attached as **Exhibit I**; *see also* **Exh. E** at ¶3 (authenticating Notice).

      C.      Thereupon, Suncor notified WCS that it was suspending all sales of Fuel to WCS. *See* Complaint, ¶¶22-23. Suncor sent copies of the notices of nonpayment it received for each of

---

[2]     In order to avoid submitting this deposition transcript under Restricted Access, Suncor has redacted the confidential portions of both the underlying data and the specific conclusions based on that data from the attached **Exhibit G**.

5

the eleven draw requests to WCS.  *See* Counterclaim ¶40; Reply, ¶11 (admitting receipt of notices).

D. In its Reply to Suncor's Counterclaim, WCS conceded that it "refused to pay the draw requests due," and asserted that its refusal rested on "Defendant's repudiation of the Master Agreement by terminating the sale of fuel on terms that existed for several years, and by unlawfully terminating WTO's Terminal Access Agreement for loading fuel at Suncor's terminals." *See* Reply, ¶¶8, 10, 12.  WCS offers no legally sufficient basis for its failure to perform under the Master PSA.

E. *First*, Suncor's exercise of its rights under the Master PSA provides no basis for WCS's refusal to pay.  *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 498 (Colo. 1995); *Soderlun v. Pub. Serv. Co.,* 944 P.2d 616, 623 (Colo. App. 1997).  A legal contract right "may be exercised without liability regardless of motivation."  *Radiology Prof. Corp. v. Trinidad Area Health Assoc., Inc.,* 565 P.2d 952, 954 (Colo. App. 1977), *aff'd*, 577 P.2d 748 (Colo. 1978); *Int'l Assoc. of Machinists v. Southard,* 459 P.2d 570, 572 (Colo. 1969) (no liability for breach caused by exercise of absolute right).

F. *Second*, WCS's claim that Suncor "repudiat[ed]" the Master PSA is incorrect as a matter of contract law.  Reply, ¶¶8, 10, 12, 18 and Defense No. 3.  "[R]epudiation is a manifestation by one party to the other that the first cannot or will not perform at least some part of its obligations under the contract."  *Interbank Investments, L.L.C. v. Vail Valley Consolidated Water Dist.*, 12 P.3d 1224, 1231 (Colo. App. 2000) (internal quotations omitted).  Suncor performed its obligations and simply exercised its legal rights under the Master PSA.  Indeed, WCS's complaint is not that Suncor failed to perform under the contract but, instead, that Suncor actually exercised express contractual rights.

6

G.   *Third*, WCS asserts that Suncor's claims are subject to setoff for "unlawful price discrimination."  *See* Reply (Separate Answers and Defenses) ¶6.  Price discrimination is not a defense to a breach of contract claim for money due and owing.  *Bruce's Juices v. American Can Co.*, 330 U.S. 743, 755 (1947).  "The [Robinson-Patman Act] prescribes sanctions, and it does not make uncollectibility of the purchase price one of them."  *Id.* at 750; *see also id. at* 754-56.  WCS's defense also fails under the governing terms of the Master PSA, which expressly requires WCS to "make payment to Suncor immediately in accordance with the terms of payment provisions of this Agreement *without any deduction or set-off*."  *See* **Exh. B** at A-1, ¶5 (emphasis added).  "Setoff" therefore is not a valid defense.  *E.g., Fox v. I-10, Ltd.,* 957 P.2d 1018, 1022 (Colo. 1998) ("[W]here a contract is clear and unambiguous, courts must give effect to the plain and ordinary meaning of its terms."); *Broken Heart Venture, L.P. v. A & F Restaurant Corp.*, 859 S.W.2d 282, 285 (Mo. App. 1993) (holding set-off claim insufficient to defeat summary judgment where agreement expressly precluded set-off).

H.   *Fourth*, WCS contends that Suncor's claims are "subject in whole or in part to setoff" by an unspecified "breach of the parties' contracts."  Reply (Separate Answers and Defenses) ¶6.  Presumably, this is a reference to WCS's allegation that Suncor breached its "obligation to set" the daily posted price for Fuel sold under the Master PSA "in good faith pursuant to C.R.S. § 4-2-305(2)."  Complaint, ¶43.

I.   Like its price discrimination defense, WCS cannot claim a "setoff" for the alleged violation of C.R.S. § 4-2-305(2), because the Master PSA expressly states that WCS will "make payment to Suncor immediately in accordance with the terms of payment provisions of this Agreement *without any deduction or set-off*."  *See* **Exh. B** at A-1, ¶5 (emphasis added).  This language is unequivocal and defeats WCS's demand for a "setoff."  *See Fox v. I-10, Ltd.,* 957

7

P.2d at 1022 (holding unambiguous contract enforced as written ); *Broken Heart Venture, L.P*, 859 S.W.2d at 285 (rejecting setoff defense where contract expressly disallowed such defense).

J.     On its merits, the undisputed facts reveal that WCS cannot sustain a defense based on C.R.S. § 4-2-305(2). Section 2-305 provides that parties "can conclude a contract for sale even though the price is not settled," so long as the price set by the seller is done so "in good faith." C.R.S. § 4-2-305(1) & (2). Comment 3 to Section 2-305 of the UCC defines "good faith" for purposes of the seller's price as "observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant." U.C.C. § 2-305, cmt. 3 (1977); *see also Board of County Comm'rs of County of Park v. Park County Sportsmen's Ranch, LLP*, 271 P.3d 562, 568 (Colo. App. 2011) (noting persuasive effect of official comments to UCC).

K.    As Comment 3 indicates, this "safe harbor" for posted prices is available so long as such prices are offered "in the normal case." U.C.C. § 2-305, cmt. 3 (1977). The crucial issue for purposes of Section 2-305 is whether the actual price set is "commercially in line with that charged" by other sellers in the industry. *Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 435 (Tex. 2004) (collecting and discussing cases). In *Shell Oil*, the court found that the seller, a gas refiner, priced its product in good faith because it was consistent with the price range set by other refiners for the same product. *See id.*

L.    The undisputed material facts demonstrate that WCS cannot prevail on its claim for breach of the implied covenant of good faith and fair dealing, or its claim for violation of C.R.S. § 4-2-305, because *WCS concedes that the prices for Fuel set by Suncor were reasonable.* The fuel manager for WCS, Christopher Wehrle, was responsible for negotiating contracts for the purchase of Fuel from Suncor. *See* Deposition of Christopher Wehrle, attached as **Exhibit J**, at 6:3-13. As part of his job, Wehrle was aware of prices offered for Fuel in the marketplace.

*See id.* at 21:15-22:2.  Wehrle would compare Suncor's posted price against prices from other sellers.  *See id.* at 15:20-17:2.  These other sellers, typically "middlemen," would set their prices using Suncor's rack price.  *See id.* at 15:2-7.  "In most instances," according to Wehrle, their prices would be higher than Suncor's.  *Id.* 18:17-19.  In fact, Wehrle would use Suncor's posted price to negotiate with these sellers in an attempt to reduce their asking price for Fuel.  *See* Wehrle e-mails, attached as **Exhibit K**, at PLA032674, PLA025487, PLA027979.

M.   The undisputed material facts demonstrate that WCS cannot sustain its defense of "setoff" under C.R.S. § 4-2-305, because *WCS concedes that Suncor's prices were reasonable.* The fuel manager for WCS, Christopher Wehrle, was responsible for negotiating contracts for the purchase of Fuel from Suncor.  *See* **Exh. J** at 6:3-13.  As part of his job, Wehrle was aware of prices offered for Fuel in the marketplace.  *See id.* at 21:15-22:2.  Wehrle had no recollection that Suncor's posted prices were out of line with those charged by other sellers in the marketplace.  *See id.* at 42:4-8.  Indeed, when asked expressly whether Suncor's posted prices were unreasonable during the time period relevant to this dispute, Wehrle responded, "I don't recall anything about their prices at that time that I want to go on the record as saying."  *Id.* at 42:9-14.  He elaborated, "Everyone complains about – I'd say maybe there's complaints about prices *but not Suncor.  In general, no.*"  *Id.* at 42:16-18 (emphasis added).  While Wehrle acknowledged that WCS complained about prices offered by Suncor's competitors, "I'm not singling out… Suncor."  *Id.* at 42:24-43:1.

N.   WCS's owner, Hossein Taraghi, agrees with Wehrle that Suncor's prices were reasonable.  At his deposition, Taraghi was asked expressly whether he was "okay with the contract price" set by Suncor.  Deposition of Hossein Taraghi, attached as **Exhibit L**, at 161:7-10.  He replied unequivocally, "Yes, I was."  *Id.* at 161:11.  Taraghi confirmed that he "didn't

9

have [a] problem" with the price he received, and that he was "happy with what [he] reasonably negotiated from Suncor in 2009." *Id.* at 162:1 and 164:14-17. By his own admission, Taraghi acknowledges that the price for Fuel offered by Suncor to WCS was reasonable.

      O.      The undisputed facts further reveal that Suncor's method for calculating its posted price for Fuel was commercially reasonable and, therefore, complied with C.R.S. § 4-2-305. *See Shell Oil Co.*, 144 S.W.3d at 434-35 (holding refiner acted consistent with Section 2-305 by using reasonable pricing methodology). Suncor's posted, or "rack," pricing of Fuel is based strictly on market conditions, and has nothing to do with either discounts offered to specific buyers or the demand of specific buyers for Fuel. *See* Deposition of James Piscatelli, attached as **Exhibit M**, at 28:22-29:8, 54:1-4, 55:6-24. Rack pricing is based on demand only on a "macro" level and an analysis of prevailing market conditions, not the demand of a specific customer for a specific volume of Fuel. *See id.* at 55:6-24, 56:14-57:3. Suncor's posted price was often used by other sellers to set their prices. *See* **Exh. J** at 15:2-7.

      P.      Indeed, Suncor's rack pricing is deliberately separated from the group responsible for negotiating price discounts (known as the "rack forward group") in order to avoid any conflict of interest. *See id.* at 30:1-20. Rack pricing is concerned only with market conditions, and therefore cannot influence the price offered to purchasers like WCS or Kroger under their specific contracts. *See id.* at 30:11-20, 31:21-32:7. The rack forward group is walled off from the rack pricing group, and therefore has no influence on Suncor's rack price. *See id.* at 49:13-20. The rack pricing group is similarly walled off, and has no knowledge of discounts or other terms agreed to by the rack forward group. *See id.* at 132:14-23, 134:8-14.

      Q.      Suncor's pricing methodology is reasonable and therefore consistent with C.R.S. § 4-2-305. Suncor set its posted prices based on aggregate market conditions, without

10

knowledge of any discounts or other terms negotiated separately with WCS by Suncor's rack forward group. *See* **Exh. M** at 28:22-29:8, 56:14-57:3, 132:14-23. As a result, WCS concedes that Suncor's posted prices were reasonable in light of prices offered by other sellers in the market. *See* **Exh. J** at 42:9-18; **Exh. L** at 161:7-11, 164:14-17.

R. The undisputed facts demonstrate that Suncor complied with C.R.S. § 4-2-305, and therefore WCS has no excuse for its breach of contract as a matter of law. *See Shell Oil Co.*, 144 S.W.3d at 434-35.

**Element 4:** **Suncor suffered damages as a result of WCS's failure to perform.**

A. Suncor has been damaged by WCS's breach. *See* Counterclaim, ¶49. The total amount due and owing is $4,506,170.35, which includes $3,755,141.95 in unpaid principal and $751,028.40 in contractual interest through January 31, 2013, accruing at 12% per annum. *See* Master PSA, **Exh. B** at A-4, ¶20; Affidavit of Mark Conner, attached as **Exhibit N**, at ¶¶3-6 (confirming amount owed).

B. In addition, the Master PSA entitles Suncor to recover its costs and attorneys' fees associated with recovering the unpaid balance owed by WCS. *See* Master PSA, **Exh. B** at A-4, ¶20 ("Counterparty shall pay all of Suncor's costs and expenses (including reasonable attorney's fees, court costs, and all other legal expenses) of collecting past due payments."). If the Court grants this Motion, Suncor will submit an affidavit detailing the attorneys' fees and costs it has incurred in connection with recovering the unpaid amounts owed by WCS.

**B.** **Suncor is entitled to summary judgment on its third-party claim against the Taraghis.**

**1.** **Burden of proof and elements.**

Suncor bears the burden of proving its third-party claim against the Taraghis for breach of their personal guaranty. Under Colorado law, Suncor must prove (1) the existence of a

11

contract; (2) Suncor performed under the contract; (3) the Taraghis failed to perform under the contract; and (4) damages resulting from the Taraghis' failure to perform. *See Conagra Trade Group, Inc.*, 636 F. Supp. 2d at 1171; *Saturn Sys. Inc.*, 252 P.3d at 529.

### 2. **Suncor can prove all of the elements of breach of the Taraghis' Personal Guaranty.**

**Element 1:** **Suncor and the Taraghis had a valid and enforceable contract.**

A. Suncor and the Taraghis are parties to a contract titled "Personal Guaranty." *See* TPC, ¶8; Taraghis' Answer, ¶2; *see also* Personal Guaranty, attached hereto as **Exhibit O**.

B. Pursuant to the terms of the Personal Guaranty, the Taraghis agreed to be jointly and severally liable if WCS failed to pay or perform a "Guaranteed Obligation," as defined in the Personal Guaranty. *See* **Exh. O** ¶¶1(a), 1(b), 1(d).

C. A "Guaranteed Obligation" was defined to include "all obligations" of WCS. *Id.* ¶1(a).

D. Within 15 days after receipt of written notice from Suncor, the Taraghis were obligated to: (1) cause the Guaranteed Obligation to be promptly paid or performed, or (2) pay or perform the Guaranteed Obligation, limited to amounts owed by WCS up to $3,000,000. *See* **Exh. O** ¶¶1(a), 1(b).

E. In addition, the Personal Guaranty entitles Suncor to recover its costs and attorneys' fees associated with recovering the unpaid balance owed by the Taraghis. *See id.* at ¶15.

**Element 2:** **Suncor performed under the Personal Guaranty.**

A. On June 9 and June 30, 2011, Suncor provided written notice to the Taraghis that WCS had failed to pay $3,755,141.95 owed under the Master PSA and demanded payment under

12

the Personal Guaranty up to the maximum guaranteed amount of $3,000,000, plus interest. *See* notices, attached as **Exhibit P**; *see also* TPC, ¶15.

      B.      The Taraghis admit they received Suncor's notices. *See* Taraghis' Answer, ¶7.

**Element 3:**    **The Taraghis have failed to perform under the Personal Guaranty.**

      A.      The Taraghis refused to pay the maximum guaranteed amount to Suncor under the Personal Guaranty. *See* TPC, ¶22; Taraghis' Answer, ¶13

      B.      In their Answer, the Taraghis claim that they are entitled to avoid their obligations under the Personal Guaranty because of Suncor's alleged "repudiation" of the Master PSA by "terminating the sale of fuel" and "unlawfully terminating WTO's Terminal Access Agreement." Taraghis' Answer, ¶13. As explained above in connection with WCS's breach of contract, Suncor fully performed under the Master PSA and the Terminal Access Agreement, and lawfully exercised its contractual right by refusing to continue selling Fuel to WCS without prepayment. *See Radiology Prof. Corp.,* 565 P.2d 952 at 954; *Int'l Assoc. of Machinists,* 459 P.2d at 572. As a matter of law, Suncor exercised its rights under the Master PSA and Terminal Access Agreement; it did not repudiate them. *See Interbank Investments, L.L.C.*, 12 P.3d at 1231.

      C.      The Taraghis also assert that they are entitled to a set-off under the Personal Guaranty "in the amount of damages suffered by Plaintiff by reason of [Suncor's] unlawful price discrimination" and "repudiation and breach of the parties' contracts." Taraghis' Answer, Affirmative Defense ¶7. Again, as explained above, price discrimination does not excuse failure to pay amounts owed under a contract. *Bruce's Juices*, 330 U.S. at 750, 755. The Taraghis also are not entitled to claim a set-off pursuant to the express terms of the Personal Guaranty, which provides that "[t]he obligations of [the Taraghis] hereunder shall not be in any way limited or affected by… (vi) any setoff, counterclaim, recoupment, deduction, defense or other right that

Guarantors may have against Suncor[.]" **Exh. O** at ¶2(f); *see also id.* at ¶1(c) ("Guarantors guarantee that the Guaranteed Obligations will be paid and performed strictly… regardless of any law, regulation or order now or hereafter in effect… affecting any of such terms or the rights of… Suncor."). The Taraghis, therefore, cannot claim a "set-off." *See Fox v. I-10, Ltd.*, 957 P.2d at 1022 ("[W]here a contract is clear and unambiguous, courts must give effect to the plain and ordinary meaning of its terms."); *Broken Heart Venture, L.P.*, 859 S.W.2d at 285 (holding set-off claim insufficient to defeat summary judgment where agreement expressly precluded set-off).

D. Like WCS, the Taraghis have no right to a set-off for the alleged violation of C.R.S. § 4-2-305(2). Taraghis' Answer, Affirmative Defense ¶7 (claiming right to setoff for supposed breach of conract); Complaint, ¶43 (alleging violation of C.R.S. § 4-2-305(2)). As explained on pages 7-11 above, the undisputed facts demonstrate that Suncor fully complied with C.R.S. § 4-2-305(2) because its methodology for calculating the price of Fuel sold under the Master PSA was commercially reasonable, and WCS admits that Suncor's price was reasonable. *See* **Exh. J** at 42:9-18; **Exh. L** at 161:7-11, 164:14-17. The Taraghis cannot avoid their obligation under the Personal Guaranty by relying on C.R.S. § 4-2-305(2).

E. The Taraghis have no valid defense for their failure to pay Suncor under the Personal Guaranty, and Suncor therefore is entitled to summary judgment on its third-party claim. *See Conagra Trade Group, Inc.*, 636 F. Supp. 2d at 1175-76 (granting summary judgment where undisputed facts entitled party to summary judgment for breach of contract).

### Element 4: Suncor suffered damages as a result of the Taraghis' failure to perform under the Personal Guaranty.

A. Suncor has been damaged by Taraghis' breach of the personal guaranty. *See* TPC, ¶¶22, 25-26. The total amount due and owing is $4,506,170.35, which includes

14

$3,755,141.95 in unpaid principal and $751.028.40 in contractual interest through January 31, 2013, accruing at 12% per annum.  *See* Master PSA, **Exh. B** at A-4, ¶20; **Exh. N**, at ¶¶3-6 (confirming amount owed).  The Taraghis, therefore, owe Suncor the maximum guaranteed amount under the Personal Guaranty of $3,000,000.  *See* **Exh. O**, ¶1(a).

B.    In addition, the Personal Guaranty entitles Suncor to recover its costs and attorneys' fees associated with recovering the unpaid balance owed by the Taraghis.  *See* **Exh. O** at ¶15 ("If any action or proceeding is commenced to enforce or interpret this Guaranty, the prevailing party shall be entitled to recover from the non-prevailing party the reasonable out-of-pocket costs and expenses of maintaining such action or proceeding, including reasonable attorneys' fees and disbursements incurred before such action or proceeding is commenced….").  If the Court grants this Motion, Suncor will submit an affidavit detailing the attorneys' fees and costs it has incurred in connection with recovering the unpaid amounts owed by the Taraghis.

## CONCLUSION

For the reasons discussed above, Suncor is entitled to summary judgment in its favor on its Counterclaim against Plaintiff WCS, as well as its third-party claim against Hossein and Debra Lynn Taraghi.  Suncor requests that the Court enter judgment in its favor and against WCS in the amount of $4,506,170.35, reflecting unpaid principal and interest accruing on the debt as of January 31, 2013, as well as to enter judgment in Suncor's favor on interest accruing after January 31, 2013.  Suncor further requests that the Court enter judgment in its favor and against the Taraghis in the amount of $3,000,000.  Suncor further requests that the Court enter judgment in its favor and against WCS and the Taraghis, jointly and severally, for attorneys' fees, costs and all other legal expenses incurred by Suncor.

15

Dated:  February 8, 2013.

    Respectfully submitted,

    *s/ Anthony J. Shaheen*
    HOLLAND & HART LLP
    Post Office Box 8749
    Denver, CO  80201-8749
    Telephone: 303-295-8054
    Fax: 303-291-9126
    E-Mail:  ajshaheen@hollandhart.com

    *s/ William L. Monts III*
    J. Robert Robertson
    William L. Monts III
    HOGAN LOVELLS LLP
    555 Thirteenth Street, N.W.
    Washington, D.C.  20004-1109
    Telephone:  202-637-5600
    Fax:  202-637-5910
    E-Mail:  robby.robertson@hoganlovells.com
           william.monts@hoganlovells.com

    **ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2013, I served the foregoing **SUNCOR's MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM AGAINST WESTERN CONVENIENCE STORES, INC. AND THIRD-PARTY CLAIM AGAINST HOSSEIN AND DEBRA LYNN TARAGHI**, by causing the foregoing to be presented to the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following email addresses:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON BIERMANN & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
krb@benningtonjohnson.com
kec@benningtonjohnson.com
afa@benningtonjohnson.com

Philip W. Bledsoe
POLSINELLI SHUGHART, P.C.
1515 Wynkoop Street, Suite 600
Denver, CO 80202
pbledsoe@polsinelli.com


s/ Susanne Johnson

5960007_1