DIANE KRISKOVICH - FEBRUARY 7, 2012

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado
corporation, WESTERN TRUCK ONE, LLC, a Colorado limited
liability company,

Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

Defendant.

----------------------------------------------------------------
DEPOSITION OF DIANE KRISKOVICH
February 7, 2012
----------------------------------------------------------------

Deposition location:   370 17th Street, Suite 3500
                       Denver, Colorado 80202

APPEARANCES:

    KENNETH R. BENNINGTON, ESQ.
    ADAM F. ALDRICH, ESQ.
    BENNINGTON JOHNSON BIERMANN & CRAIGMILE
    370 17th Street
    Suite 3500
    Denver, Colorado 80202
    Phone: (303) 629-5200
  For Plaintiffs

    ANTHONY J. SHAHEEN, ESQ.
    HOLLAND & HART LLP
    555 Seventeenth Street
    Suite 3200
    Denver, Colorado 80202
    Phone: (303) 295-8054
  For Defendant

Also present: Michael E. Korenblat, Esq.

EXHIBIT G

DIANE KRISKOVICH - FEBRUARY 7, 2012

Page 26

[redacted]
24    MR. BENNINGTON: Hi, Michael. Welcome.
25    MR. KORENBLAT: Sorry. I've got one of

Page 27

1  your peppermints in my mouth. Good to see you.
2      Q. (BY MR. BENNINGTON) By the way, there's
3  water behind you, Diane, too.
4      A. Thank you.
5      Q. So at the time Mr. Ewing mentioned this
6  EPA action I take it the instructions were to -- to you
7  were to let's start looking into their
8  creditworthiness?
9      A. That's correct.
10     Q. And at that point in time there wasn't a
11 person out there who had the job you have now?
12     A. He was there. He was still with Suncor.
13 He was taking a different position within the company.
14     Q. I see. So in any event, you were asked
15 to look into this. What did you do?
16     A. The first thing I did, not knowing
17 anyone at Western Convenience, I just picked up the
18 phone and called, and somehow or another I was -- I
19 reached    Mr. Wehrle and introduced myself, told him
20 why I was calling. And he suggested that I speak with
21 Mr. Dowden, Charlie Dowden, the controller. In
22 subsequent conversations with Mr. Dowden and e-mails, I
23 requested the most current annual financials on Western
24 Convenience because we didn't have them in the drawer.
25     Q. Okay. Tell me what -- what's in the

Page 28

1  drawer? What is the drawer?
2      A. Okay. The credit file.
3      Q. That's a paper file?
4      A. It's a paper file that includes a credit
5  application, including the agreement to draft the
6  account for payments. It includes a W-9. It includes
7  basic information for setting up a new account, and
8  then going forward the financials.
9      Q. Is that file something that is now in
10 your custody in your current position?
11     A. Yes, it is.
12     Q. So the file you have was essentially the
13 credit file on Western since it began?
14     A. Correct.
15     Q. Let me ask you some general questions
16 about how you work. We've established there's a drawer
17 with paper contracts in them. You've told me you have
18 a credit file, a paper file. At your desk do you have
19 a work station on which you can save documents?
20     A. Yes.
21     Q. And do you -- do you in addition have
22 access to servers -- server or servers there out
23 beyond -- on the network beyond your work station?
24     A. I have access to Dun and Bradstreet.
25     Q. That's not quite what I'm getting at,

Page 29

1  but I'm not being clear in what I want to know. If you
2  want to save a document that you're working on -- let's
3  keep -- leaving aside e-mail, because that's a whole
4  different system, do you save the documents -- if you
5  were to type up a memo, say, on Western Convenience
6  Stores, would you save that on your work station, or
7  would there be someplace out on the network where you
8  would save documents relating to Western Convenience
9  Stores?
10     A. Saved on my Suncor-provided laptop.
11     Q. Okay. Is there so far as you know out
12 on the network a folder or an electronic file of
13 Western Convenience Stores' documents?
14     A. There is not.
15     Q. So as far as you know, everything in
16 terms of documentation -- that's too broad. The
17 documentation you know of is either on your laptop or
18 in the paper files that you're responsible for keeping?
19     A. That's correct.
20     Q. Do you have access to the company's
21 accounting system to see, for instance, history on a
22 particular customer?
23     A. There's history there, but it's somewhat
24 limited. And that would just be relative to the actual
25 purchases and payments.

DIANE KRISKOVICH - FEBRUARY 7, 2012

Page 74

reason I did not include the IRS refund. That's kind of hearsay. It's not included in the financial documents for 2010. This all came later, and it would not have been fair to anybody.

Q. Had Mr. Ewing asked you to take that into account?

A. He did.

Q. But you explained to him that's not how --

A. It's not the way we do it.

Q. And he didn't fight you on that?

A. No, he didn't. Mr. Ewing is -- he respects me and my decisions and recommendations.

Q. Flip to the next page. I'm not sure you've got what I've got. Yeah, you've got -- this is a -- what we have in the next page are financials -- the financial statements that were sent to you by Charlie Dowden?

A. Yes.

Q. And it's these numbers that you plugged into your model?

A. Yes.

Q. Go to Exhibit 10, please. Is this the -- is this an output of the model that you've been --

Page 75

A. Yes.

Q. -- testifying about?

A. Yes.

Q. Now, it says data was added May 20th, 2010.

A. Correct. I just went back and confirmed my entries and made sure I didn't make any errors. The first pass-through is quite fast. And just for my own piece of mind that's what I did.

Q. But this says 2010. You weren't there then.

A. That's my typo. That's a typo.

Q. Okay. It occurred to me that perhaps that was kind of a knuckleheaded system referring to the fiscal year.

A. No, no.

Q. That's a typo?

A. That's my entry date, and that's my error.

Q. But what we're talking about is year ending March 31st, 2011?

A. Correct.

Q. Is this the standard format that your model puts out, or was this put together for the hearing?

Page 76

A. No. It's a standard model that I've always used and still do.

Q. But the output, the printout, is this the standard printout?

A. Yes.

Q. Okay. Tell me -- I'm not going to put you through or us through trying to understand all this, but tell me from your point of view what's salient? What's important? What do you focus on in making a decision?

A. Can I go back to Exhibit 5?

Q. Yeah.

A. That would be the financial statements. We can start with the balance sheets. It's where I wrote real estate up on the header on the left side.

Q. All right.

A. On the left side is specific to Western Convenience Stores, and those are the numbers that I put in the model. Now, what stands out at me here is -- I'm starting with assets -- they're in a negative cash position right here.

Q. Are we looking at the financial -- Charlie Dowden's financials of your model?

A. Yes, yes, his financials, negative cash position. Working my way down -- this is kind of hard

Page 77

to read.

Q. Which column do we look at?

A. The very left third.

Q. All right.

A. Do you see assets right under the date?

Q. Yes.

A. That's where we are. The date should be 3/30/2011.

Q. 385,000, that's a negative number?

A. Negative, correct. Then I look at accounts receivable, which is looking like 5 something million. Relative accounts payable, which is listed under liabilities midway down, the payables are almost double the receivables, which kind of explains the negative cash flow.

And then working our way down, I look at -- I look to see if there's long-term debt. I just look at -- I look at liabilities, period. And then getting to the stockholder's equity, this is where I raised a concern because here on the balance sheet there's just under $12,000 worth of stockholders' equity in the business.

Q. Yes.

A. Now, any and every credit professional knows that when you look at this stockholders' equity

20 (Pages 74 to 77)

AVERY WOODS REPORTING SERVICE, INC. 303-825-6119

b85881ef-845b-47e0-9e2e-43150e0fcb23

Page 78

1  number, you go back up to assets. Is there anything
2  there listed that would be considered intangible? And
3  yes, under other assets, second item down says, "Fees,
4  costs, and goodwill."
5     Q.  Yeah.

[remainder of page redacted]

Page 79

[lines 1-14 redacted]
15     Q.  Yes.
16     A.  And just working the first -- the first
17  top third section is called a profit and loss
18  statement, [remainder redacted]

Page 80

1     Accounts receivable, [redacted]
2  [redacted]
3  [redacted] But just reading across
4  looking at trending, we look at trending. And that's
5  why we always do a two-year analysis. [remainder redacted]
6-13 [redacted]
14     Q.  After you did this, did you call
15  Mr. Dowden up and say, "Here's what I see. Explain it
16  to me. What's going on?" Did you have any
17  conversation with him?
18     A.  No, I didn't. I didn't talk to him
19  directly because I knew the situation was that the
20  discussions would take place between Mr. Ewing and
21  Mr. Taraghi.
22     Q.  Did you have any sense from Mr. Ewing
23  that he was looking for this kind of answer, he was
24  looking for a reason to reduce their credit?
25     A.  Oh, no. If anything, we're always

Page 81

1  hoping for the opposite.
2     Q.  So whatever discussion may or may not --
3  may have occurred regarding what you found, you weren't
4  a party to. And if they happened, it would have been
5  between Ewing and Taraghi or somebody?
6     A.  I wasn't involved in any conversations
7  except for the meeting.
8     Q.  What's the response? How did you
9  formulate a -- I shouldn't say that. How did you
10  convey a response based on Ewing to you? Did you send
11  him this model or did you call him up, have a meeting?
12  What do you remember?
13     A.  We work -- the environment logistically
14  we're pretty close together. So I just went down to
15  talk to him. And I said, "The results are not good.
16  They showed Western Convenience is no longer credit
17  worthy."
18     Q.  Do you know whether Western had ever
19  been in this kind of a position, that is, this credit
20  picture, in its history before with Suncor?
21     A.  I never looked.
22     Q.  So you don't know?
23     A.  I don't know. I try to be objective and
24  as fair as I can be.
25     Q.  I'm sure you do. I'm not suggesting

DIANE KRISKOVICH - FEBRUARY 7, 2012

Page 82

1  that you're not. I'm just trying to understand what
2  happened.
3       Let's go to Exhibit 20. Exhibit 20 is
4  an e-mail from Mr. Ewing to Mr. Taraghi. It's dated
5  May 12th. Again, Mr. Ewing seems to work at night a
6  lot?
7       A. He does, he does.
8       Q. So I'm not misunderstanding it, I see
9  all these p.m.s, and I'm thinking the date is wrong on
10 his computer.
11      A. No. They're correct.
12      Q. And you're on the cc list. Correct?
13      A. Yes.
14      Q. It says, "As a follow up to recent
15 communications with respect to a potential sale by
16 Suncor of 60" -- tell me what BPM means to you.
17      A. It's barrels per something, and I don't
18 know what the M is.
19      Q. All right. I didn't either.
20      A. It might be month, but I'm speculating.
21      Q. All right. By May 12th -- remember you
22 had gotten the financials from Dowden on the 10th. So
23 by May 12th Ewing is writing this e-mail to
24 Mr. Taraghi. Do you know if you had had the
25 conversations with Mr. Ewing by the evening of the

Page 83

1  12th telling him it did not -- to use your words, did
2  not look good?
3       A. Do you mind if I just review this before
4  I answer?
5       Q. Not at all. Take your time.
6       A. I would have had discussions with him
7  prior to this. When he mentions Suncor's credit
8  limit -- excuse me, Suncor's credit department is
9  unable to extend any credit to Western Convenience, WC
10 in this case. Yes, we would have had the discussion by
11 then.
12      Q. All right. Did anybody talk to you
13 after you conveyed the analysis that you did? Did
14 anybody ask you to do any analysis as to whether there
15 were -- there were any terms under which Suncor could
16 keep selling to someone who had bought fuel from it for
17 years at high volumes?
18      A. No.
19      Q. Does that happen from time to time that
20 you decide somebody doesn't qualify for the big one,
21 3 million in ten days?
22      A. Uh-huh.
23      Q. But you go back and see can we get them
24 qualified for something less?
25      A. Not in this case. This is just so

Page 84

1  abundantly clear here that it would just not be good
2  sense to take the risk.
3       Q. Did you even wonder if this was the
4  accurate picture, if there was some explanation you
5  were missing --
6       A. No.
7       Q. -- that things weren't as bad?
8       A. They furnished the financials. That's
9  all I have to go on.
10      Q. And I think you testified you didn't
11 call Dowden back and say, "What am I missing," or
12 anything like that?
13      A. No, I did not.
14      Q. Did you ever get the audited financials?
15      A. No.
16      Q. Was it part of your recommendations to
17 say cut them off?
18           MR. SHAHEEN: I'm sorry. I think that
19 mischaracterizes what the records show so far.
20           MR. BENNINGTON: That's what I'm asking.
21      Q. (BY MR. BENNINGTON) Was it -- did you
22 say something to the effect of cut them off?
23      A. I never used the word, "cut off,"
24 unh-unh.
25      Q. Anything like that, different words?

Page 85

1       A. The consensus was that we could
2  continue -- Suncor could continue to sell to Western
3  Convenience on a prepay status, not cut them off.
4       Q. How was that consensus reached?
5       A. Based on the financials, they're not
6  credit worthy.
7       Q. I'm sorry. That question wasn't very
8  clear. What was the process? Standing in the hallway?
9  You said had a small environment. Did you have a
10 meeting? What happened?
11      A. It was a discussion. What option do we
12 have left?
13      Q. And who was involved in that discussion?
14      A. Mr. Ewing and I.
15      Q. All right. Was -- so not Moss or --
16      A. No.
17      Q. -- Vejnar or anybody else?
18      A. No.
19      Q. Just the two of you?
20      A. Correct.
21      Q. Did you get the sense in discussing this
22 with Mr. Ewing there's any other dispute going on
23 between him and the people at Western?
24      A. I was not aware of any, no.
25      Q. So you discuss what else can we do. And

22 (Pages 82 to 85)

DIANE KRISKOVICH - FEBRUARY 7, 2012

Page 86

1  the conclusion was, well, if we're going to sell to
2  them, it can only be on a COD basis?
3      A. Correct.
4      Q. He says in -- I'm going back to
5  Exhibit 20. He says, "As a result" -- you see it's a
6  sentence that begins about two-thirds of the way down
7  in the middle, "As a result, both conditions" -- are
8  you with me?
9      A. Two-thirds of the way down?
10     Q. Yeah, go up one, two, three --
11     A. Am I on 20?
12     Q. Exhibit 20, four lines up from the
13 bottom.
14     A. There it is, got it.
15     Q. "As a result, both conditions have not
16 been satisfied. At this time due to concerns with WC's
17 credit, Suncor cannot entertain further product sales
18 to WC."
19     A. Uh-huh.
20     Q. He does not say -- it does not say here,
21 does it, except on a COD basis?
22     A. Just in the next line when he explained
23 or made it a little bit more clear.
24     Q. "I'm open to prepay"? Is that what that
25 means?

Page 87

1      A. Correct.
2      Q. "And will not shut off product on
3  Friday, Saturday." What do you take that to mean, "I
4  will not shut off product Friday, Saturday"?
5      A. Because that puts the customer in a
6  really -- in a bind. If they don't have product, they
7  may have yellow bags on the pumps, ran out at their
8  retail sites. So Mr. Ewing I think was quite -- I
9  don't want to use the word "generous." But I think he
10 was quite empathetic in this situation and didn't feel
11 it was fair to cut Western Convenience off for the
12 weekend.
13     Q. Now, finally he says, "That being said,
14 we're still under allocations, and total loads may
15 decrease."
16     A. Correct.
17     Q. Do you have an understanding of what
18 that means?
19     A. In this situation here I don't have the
20 facts and the actual numbers in front of me. But what
21 that might mean is if they're already at their credit
22 limit, be aware your allocations will be decreased
23 substantially.
24     Q. You didn't discuss that in particular
25 with Mr. Ewing, I take it?

Page 88

1      A. No, no.
2      Q. Let's go to Exhibit 21.
3      A. Twenty-one?
4      Q. Twenty-one. Okay. Exhibit 21 is an
5  e-mail from you this time to Saunders -- well, just to
6  Audrey Saunders?
7      A. Yes.
8      Q. This is June 9th of 2011?
9      A. Correct.
10     Q. At this point Audrey Saunders' job was
11 what?
12     A. Ms. Saunders is the one that was
13 responsible for watching the drafts, customer payments
14 that came in, and making sure that they were applied
15 correctly in the system. So that would include wires,
16 check payments, all of the above.
17     Q. And at this point had your job changed?
18     A. No. I was still the manager of rack
19 forward sales force.
20     Q. She reported --
21     A. She reported to me.
22     Q. So she had apparently asked for a
23 spreadsheet from you. Correct?
24     A. More than likely the request came from
25 Mr. Korenblat. And we were just working in

Page 89

1  conjunction, Ms. Saunders and I.
2      Q. Tell me -- let's try to decode it. The
3  first line, "Date notified May 17th; date of draft,
4  May 18th."
5      A. Uh-huh.
6      Q. Date of draft is the day Bellco Credit
7  Union has sent the notice to pay -- or sent a draft?
8      A. That's the actual date that the draft
9  takes place.
10     Q. I see.
11     A. The customer's always notified, the far
12 left column. The customer is always notified the day
13 prior how much the draft will be.
14     Q. And the amount of money, 259,000 and
15 change --
16     A. Correct.
17     Q. -- is listed under the column
18 successful?
19     A. Correct.
20     Q. And then the comments are,
21 "Unsuccessful. Account closed. Western wired this
22 amount."
23     A. Correct.
24     Q. I take that to mean that although the
25 draft was not successful, someone in your organization

23 (Pages 86 to 89)