# EXHIBIT 1

EXHIBIT 1

1

1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
     Case No. 11-CV-01611-MSK-CBS
3    _____

4    WESTERN CONVENIENCE STORES, INC.
     a Colorado corporation,
5
     WESTERN TRUCK ONE, LLC
6    a Colorado limited liability company,

7        Plaintiffs,

8    vs.

9    SUNCOR ENERGY, (U.S.A.), INC.,
     a Delaware corporation,
10
         Defendants.
11
     Dillon Companies, Inc.,
12       Interested Party.

13   _____

14           Proceedings before CRAIG B. SHAFFER, United
     States Magistrate Judge, United States District Court
     for the District of Colorado, commencing at 1:30 p.m.,
15   January 28, 2013, in the United States Courthouse,
     Denver, Colorado.
16   _____

17           WHEREUPON, THE ELECTRONICALLY RECORDED
     PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...
18   _____

19                          APPEARANCES

20               MR. KENNETH R. BENNINGTON, ESQ.,
                 MS. KATHLEEN E. CRAIGMILE, ESQ.,
21                 MR. PHILIP W. BLEDSOE, ESQ.
               Appearing on behalf of the Plaintiffs.
22               MR. ANTHONY J. SHAHEEN, ESQ.,
               Appearing on behalf of the Defendants.
23             MR. CHRISTOPHER A. TARAVELLA, ESQ.,
                 MR. MICHAEL R. MCCORMICK, ESQ.
24           Appearing on behalf of the Interested Party.

25   _____

                         MOTIONS HEARING

1    Krieger was we had to have a hearing so that there would

2    be a record that could be sent up to her.  So we filed

3    our pleading -- our renewed motion well before the

4    expert report was even prepared.

5              And the point is, here, we're not here today

6    to talk about, necessarily -- although it's a corollary,

7    a part of it, we're not here to talk about disclosure of

8    the expert report.  What we're here to talk about is the

9    data; that is, the daily pricing data that Kroger

10   charges its customers, which is public actually, but

11   more importantly the daily pricing data of their prices

12   from Suncor going back to January of 2010 -- no --

13   January of 2010 through May, 2011.  And if Kroger will

14   not allow disclosure of that, there's nothing we can do.

15             There's no point to disclose, for instance,

16   the expert report to Kroger because Mr. Taravella has

17   made it very clear to me, candidly, that he can't agree

18   to disclosure of that old data.  And the chart on page 8

19   is exactly what we're talking about.  Without that data,

20   Mr. Taraghi cannot answer a number of the experts'

21   questions with respect to what happened on this day at

22   this time, this season; why did you do this; why did you

23   do that.

24             THE COURT:  No, but, see -- but that's where I

25   think your logic breaks down.  Whatever decisions

1    Mr. Taraghi made on those days in the past, the

2    rationale for his decisions had nothing to do with the

3    pricing data that you now don't have.  He made those

4    decisions based upon information that was available to

5    him.

6              Now, if the experts went back and said had you

7    known X, Y and Z what you would have done, but that's

8    not the position you've taken.  You're saying we need --

9    the experts say we need to talk to Mr. Taraghi to

10   understand what his thought process was; to understand

11   the factors that caused him to make the decisions he

12   did.  He did not have that pricing information.  Guys,

13   it's a weak argument.  It's a weak argument for several

14   reasons.

15             MR. BENNINGTON:  But it goes into damages.

16   And you can't calculate damages without the Kroger price

17   and --

18             THE COURT:  But Mr. Taraghi is not going to

19   calculate the damages because he wouldn't be qualified

20   as an expert to do it.

21             MR. BENNINGTON:  But the experts are going to

22   be cross-examined on the assumptions and what happened

23   back then.

24             THE COURT:  And the -- guys, it's a weak

25   argument.  Let me explain to you why.  First of all, I

1    know you're calling it a renewed motion.  For all

2    intensive purposes it's a motion for reconsideration.  I

3    went back -- it is.  It is absolutely.  And what's

4    ironic is -- I haven't compared word for word, but your

5    motion, the most recent motion you filed is virtually

6    identical, both in terms of arguments and in terms of

7    authorities cited to your Document 59.

8         Now, the interesting thing is if I were to

9    apply the applicable legal standard for dealing with a

10   motion for reconsideration you'd lose.  You haven't met

11   the standards for reconsideration.

12        MR. BENNINGTON:  May I?

13        THE COURT:  And more importantly, if the

14   information was stale now it was stale back when you

15   filed 59.  The other thing that I think I want to point

16   out, because I think this is really remarkable to me.

17   I've been sitting here reading the transcripts.  Now, I

18   haven't read them word for word.  I've only skimmed them

19   and I've done word searches.

20        But what's really interesting is I went back

21   and looked at the transcript from the hearing on

22   September 14, 2012.  And at that hearing counsel for

23   Dillon was arguing in the most vociferous terms.

24   Unpersuasively I might add, but arguing vociferously

25   nevertheless.  He said, judge, I can guarantee you

30

1   what's going to happen.  As soon as I agree to a

2   designation attorneys' eyes only they're going to come

3   back in here and say now you've got to give up more.  He

4   said, in sum and substance, judge, I've got to tow the

5   line here because once I give up anything, plaintiffs'

6   counsel is going to come back here and say now you've

7   got to give up more.  And I told them, no, that would

8   never happen.  I told them, Mr. Taraghi, you can count

9   on the fact that we're going to negotiate a protective

10   order that's responsive to the concerns of everybody.  I

11   basically gave his prognostication of future events a

12   rather short shrift.  And I almost feel like I have to

13   apologize.  He was more clairvoyant than I am.

14           MR. BENNINGTON:  If I may, Your Honor.

15           THE COURT:  And the other thing I find

16   remarkable is that going back again through the

17   transcript there was a hearing -- and I'm looking at the

18   transcript of the hearing of October 11, 2012.  Now, at

19   that hearing there was argument by you, Mr. Bennington.

20   You argued that we've got this new -- we are proposing a

21   new supplemental protective order that will take care of

22   everybody's concerns.  The only remaining fight we've

23   got -- and you at that point knew about the pricing

24   information.  At least as I skim through this right now,

25   the only things that you seem to be fighting about in

31

1    terms of attorneys' eyes only were some contracts.

2                    And again, I haven't read the entire

3    transcript, so I don't want to suggest that I can

4    eliminate the possibility that you raised pricing.  But

5    as I'm going through this transcript everybody was

6    willing, you were perfectly willing to operate on the

7    attorneys'-eyes-only basis.  The only fight seemed to be

8    with respect to some contracts.

9                    So, to some extent I feel like, you know, no

10   good deed goes unpunished.  And I am not persuaded.

11   Honestly, I didn't find your experts' affidavit to be

12   particularly persuasive.

13                   I think, and what I'm going to order --

14   whether Dillon likes it or not -- I'm going to give you

15   an opportunity to have your expert provide what we might

16   call a redacted or an executive summary.  I do believe

17   that Mr. Taraghi is entitled to know what opinions --

18   what opinions have been formulated by the experts in

19   this case.  Now, does Mr. Taraghi need to know the data?

20   No.  But I think Mr. Taraghi is entitled to know the

21   opinions that his experts have reached.  And to the

22   extent that Dillon is arguing that the phrase "derived

23   from" is so expansive as to exclude Mr. Taraghi from any

24   access to any portion of his experts' opinion, I think

25   that sweeps too broadly.

32

```
 1          But, I honestly have not heard persuasive

 2     argument, and I have not found case law that I -- that

 3     would cause me -- that would cause me to reconsider my

 4     earlier decision.  I think this pricing information is a

 5     trade secret, and I do not believe that Western

 6     Convenience has come forward with a cogent argument that

 7     would suggest that your ability to represent your client

 8     is so drastically impaired that Dillon must give up this

 9     trade secret information to Mr. Taraghi.  And that's

10     fundamentally the analysis that I have to apply.

11          And in that regard, just to give you a few

12     more cases, I found -- I found also persuasive a

13     decision by the District of Kansas in *Layne Christensen*

14     *Company versus Pure Light Company*, found at 271 Federal

15     Rule Decision 240.  A decision by the District of Kansas

16     on July 28, 2010.

17          There, the court wrote:  Once the party

18     requesting that its trade secrets only be revealed in a

19     specified way, has met its initial burden.  I believe

20     the defendant, Suncor and Dillon, have met that burden.

21     The burden then shifts to the party seeking unrestricted

22     disclosure to establish that such disclosure is relevant

23     and necessary to the action.  To establish necessity

24     some courts have considered whether the proposed

25     limitation on disclosure to certain individuals would
```

1    impair the ability of the party seeking full disclosure

2    to proceed effectively with the litigation.

3                Finally, the court must balance the need of

4    the party seeking discovery of the trade secrets and

5    confidential information against the opposing parties

6    claim of injury resulting from the disclosure.

7                Right now, frankly, all I've got is

8    Mr. Tatos's conclusory statements.  This is what I would

9    like to discuss with Mr. Taraghi.  I don't think his

10   wishes necessarily establish need that would trump

11   Dillon's trade secrets.

12               Now, if Mr. Tatos wants to present me and say

13   here are the following questions which I need

14   answered -- but I haven't got that.  All I've got is

15   something that reads more like I would like to do it.  I

16   haven't gotten a definitive argument that demonstrates

17   necessity.  And that's the legal standard that I now

18   have to apply.  Because I do believe these are trade

19   secrets and, in fact, Dillon has always taken the

20   position they are trade secrets.

21               And you most recently took the position they

22   were trade secrets.  You did as much in submitting your

23   supplemental protective order.  I've got your motion.

24   Your motion for supplemental protective order

25   specifically says -- this was filed on October 16, 2012,

34

1     Document 139.  You basically say Plaintiffs, Western

2     Convenience and Western Truck, and Suncor and interested

3     party Dillon move for entry of the attached supplemental

4     protective order.  Essentially, Dillon has further

5     alleged the protective order does not sufficiently

6     protect its alleged trade secrets.  While Dillon is

7     stipulating to the supplemental protective order, it is

8     hereby -- it is not hereby admitting...

9              I basically gave you folks the order you asked

10    for, and I don't think you've established the necessity

11    for me to now effectively reconsider my prior

12    designation.  Because nothing has really changed.

13    Truly, nothing has changed.  The data hasn't changed.

14    The trade secret quality of the data hasn't changed.

15    The only thing that's changed is I've got an affidavit

16    from your expert saying, gee, I'd really like to discuss

17    this with Mr. Taraghi.  I think the case law

18    demonstrates that you've got to do more than demonstrate

19    a wish to do something.  And I'm afraid that's all

20    you've given me.

21             And I would further note, again, the decision

22    -- if you need another decision, *S2 Automation, LLC*

23    *versus Micron Technology*, a decision by the District of

24    New Mexico dated July 23, 2012, found at 283 Federal

25    Rule Decision 671.

36

```
 1    matter uniquely reserved for the court's discretion.
 2    This is the third time that I've raised this issue.  I'm
 3    really not hearing anything new.  As a practical matter,
 4    I'm not really hearing anything new.  And the standards
 5    for a motion for reconsideration you either have to
 6    demonstrate a clear error of law, you have to show that
 7    the facts are changed, or you have to demonstrate I made
 8    some erroneous determination about the facts.  Nothing
 9    has changed here.  We're just going around in circles.
10          MR. BENNINGTON:  Your Honor, you some time ago
11    told the parties that this was going to come out at
12    trial.
13          THE COURT:  Right.
14          MR. BENNINGTON:  And some time ago when you
15    first ruled on this issue you made it clear to us that
16    it was without prejudice to file another motion after
17    time had passed on the same issue.  So --
18          THE COURT:  No, I understand.
19    Mr. Bennington --
20          MR. BENNINGTON:  -- I --
21          THE COURT:  -- I don't disagree with any of
22    those statements.  And time has passed.
23          MR. BENNINGTON:  And two things have happened.
24          THE COURT:  The operative facts have not.  The
25    passage -- under that theory Mr. Craigmile [sic] you
```

1    giving to the pricing information.  I do not believe

2    that Dillon is right.  I do believe that Mr. Taraghi is

3    entitled to see substantial portions of that report.  He

4    is certainly entitled to know his experts' bottom line.

5         So, if it were me, what I would have done is I

6    would have prepared -- whether you call it a redacted

7    version or an executive summary.  I don't care what you

8    label it.  I would have prepared one of those.  I would

9    have submitted it to Dillon.  I would have then called

10   Dillon's bluff.  I would have said, Dillon, you can't

11   have it all.  You either come up with a reasonable

12   interpretation of the protective order in 26(c) or I

13   will come back and I will submit to the court my

14   proposed redacted version, and I will demonstrate how

15   irresponsible your absolutist position is.  Then you

16   would have been in a much stronger position to fight

17   what's really worth fighting about.

18        But the fact of the matter is, I believe they

19   have made a compelling showing that this information,

20   yes, it goes back some time.  But, when Dillon says they

21   incorporate that information in their pricing decisions

22   I don't find that that's an unreasonable position to

23   take.  I don't find that at all.

24        So what you've got to do -- since I believe

25   they have met their burden of showing that this is a

39

1   trade secret as the case law says, the burden now shifts

2   to you to demonstrate necessity.  And you really haven't

3   done that in any targeted or strategic way.  You're

4   simply saying we don't like this.  That's different from

5   showing necessity.  And that's your problem in a

6   nutshell.

7           This is not a strong motion to take to Judge

8   Krieger.  You're free to do it, but you're only going to

9   be able to play this card one more time, folks.  And

10  your hold card right now isn't a really good one.

11          MR. BENNINGTON:  The problem is, Your Honor,

12  showing Mr. Taraghi the excerpted or redacted report

13  doesn't satisfy his needs.

14          THE COURT:  I don't --

15          MR. BENNINGTON:  It doesn't --

16          THE COURT:  Counsel, I don't know that and I'm

17  not convinced by that conclusory statement because I

18  haven't seen how you've redacted it.  Again, this is

19  what I've got.  What I've got are generalized,

20  conclusory statements that this isn't working.  But

21  Rule 26(c), in virtually every case that construes

22  Rule 26(c), says a parties burden under Rule 26(c)

23  cannot be carried by simply making conclusory statements

24  or boilerplate pronouncements.  And that's all you're

25  giving me.

41

```
 1              Next.  How Western responded in terms of its
 2     own pricing to particular changes in retail fuel prices
 3     by Kroger.  You don't need -- you can simply say,
 4     Mr. Taraghi, as prices changed at the Loaf 'N Jug stores
 5     on these days, how or why did you respond.  You don't
 6     need to specifically tell Mr. Taraghi that that Loaf 'N
 7     Jug got a discount on X, because all he responded to was
 8     the price differential that was on the sign outside the
 9     store.  That's what he was responding to.
10              Then there's the question, And whether there
11     were additional factors relating to business at each of
12     the 26 stores that would explain or partially explain
13     fuel pricing decisions for those stores.  Well, the
14     factors that influence or explain those pricing
15     decisions were factors based upon what Mr. Taraghi knew
16     at the time the pricing decisions were made.  He didn't
17     know the discounts that Dillon was getting at that time.
18     So, to give him those pricing informations would give
19     him data that he didn't have in the first instance when
20     he made, quote, those fuel pricing decisions.
21              So that's -- the problem is -- I understand
22     your experts would love to show this data to
23     Mr. Taraghi.  And I have no doubt, I am absolutely
24     convinced after this being the third go around, that
25     Mr. Taraghi would desperately love to see the data, but
```

42

1    you haven't demonstrated a need.

2              MR. BENNINGTON:  The --

3              THE COURT:  And the three examples that the

4    experts point out, frankly, fall woefully short of that

5    need demonstration.

6              MR. BENNINGTON:  The effect on Western's

7    business, the Supreme Court made it clear in *J. Truett*

8    *Payne.*

9              THE COURT:  Right.

10             MR. BENNINGTON:  And then emphasized in

11   *Hasbrouck* that automatic damages are not allowed.  You

12   cannot multiply volume times discount and come to a

13   damages number.

14             THE COURT:  I understand that.

15             MR. BENNINGTON:  You have to show lost

16   profits.

17             THE COURT:  I understand that too.

18             MR. BENNINGTON:  And in order to discuss the

19   loss of -- and partially the loss of profits are

20   calculated on the but-for price; that is, the price that

21   Western would have gotten had it not been discriminated

22   against by Suncor.  And in order to discuss that but-for

23   price and to calculate that difference they have to talk

24   about the Suncor price to Kroger.  So, our damages are

25   based on the Suncor price to Kroger.

1           THE COURT:  No, that's all right.

2           UNKNOWN SPEAKER:  Thank you.

3           THE COURT:  That's all right.

4           Alternatively, if there comes a point where

5     they've -- so at a deposition if they raise this, then I

6     think you've got a very -- you've got a stronger

7     argument to say they can't have it both ways.  If they

8     file a motion under Rule 702 in front of Judge Krieger

9     and say that plaintiffs' methodology is so flawed and so

10    contrary to the weight of case law that you should

11    exclude the experts, then I think you would have a very

12    strong argument to come in and say, judge, now -- now,

13    their own motion under Rule 72 has demonstrated

14    necessity.

15           But you're not there.  All you've given us --

16    all you've given me is an argument that literally

17    recycles points that I've considered as recently as June

18    and July.  And nothing has really changed.  The data

19    hasn't gotten any staler in practical terms.  The case

20    law hasn't changed in any meaningful way.  The only

21    thing that's changed since July is Mr. Taraghi's level

22    of desire as far as I can tell.

23           MR. BENNINGTON:  No.  The additional fact is

24    the experts need.  And that is not just Mr. Taraghi's

25    desire.  But --

45

```
 1               THE COURT:  But, see, what's interesting --
 2               MR. BENNINGTON:  -- the scary part of waiting
 3      until they're taking their depositions and discovery is
 4      closed and so forth is --
 5               THE COURT:  Counsel, I can always --
 6               MR. BENNINGTON:  -- pretty clear.
 7               THE COURT:  -- reopen discovery.  But what's
 8      interesting to me is I've got the expert reports.  I've
 9      got the expert report.
10               MR. BENNINGTON:  Yes.
11               THE COURT:  And it formulates a damage
12      calculation.  It specifically calculates damages.
13               MR. BENNINGTON:  Yes.
14               THE COURT:  And what's interesting is, your
15      experts have clearly spoken to Mr. Taraghi.
16               MR. BENNINGTON:  Of course.
17               THE COURT:  Of course.
18               MR. BENNINGTON:  But without --
19               THE COURT:  So --
20               MR. BENNINGTON:  But without talking about the
21      differential that comes down to damages.  He does not
22      know that differential that gives him 900 and some odd
23      thousand dollars in damages.
24               THE COURT:  I agree.  I agree.  But you
25      haven't demonstrated a necessity for him to know the
```

1    differential.  And that's the problem.  It's your burden

2    to show necessity.  It's not -- it's not their burden

3    anymore.  They have sustained their burden under

4    Rule 26(c).  The case law clearly demonstrates it's your

5    burden now, and I don't think you've sustained it.

6                    MR. BENNINGTON:  Until these two declarations

7    were filed they had sustained no burden.  So we were

8    here partially, if not fully, to see if Kroger would and

9    could sustain --

10                   THE COURT:  Right.

11                   MR. BENNINGTON:  -- a burden on being a trade

12   secret.  I, frankly, didn't think they would, but they

13   did.

14                   THE COURT:  Right.

15                   MR. BENNINGTON:  And that's why we supplied --

16                   THE COURT:  See --

17                   MR. BENNINGTON:  -- the affidavit.

18                   THE COURT:  See, here's -- but, I mean, here's

19   my problem, folks.  I'm looking, for instance, at

20   Opinion No. 3.  And since you don't want Dillon to see

21   the opinion I won't read it.

22                   MR. BENNINGTON:  Go ahead.  We -- you can read

23   it.

24                   THE COURT:  Well, I don't want to -- you tell

25   me.  It's your call.

47

1          MR. BENNINGTON:  I just did.  Go ahead.

2          THE COURT:  Okay.  Opinion No. 3:  The price

3   discrimination resulted in WCS's earning lower margins

4   on gasoline sold and/or selling lower volumes of

5   gasoline.  According to WCS, when Kroger lowers its

6   retail prices -- retail prices -- circle that word

7   "retail prices" -- in response to lower wholesale

8   prices, WCS will typically, but not always, try to match

9   the Kroger price reduction.  Footnote 24:  That

10   statement is based upon discussions with Mr. Taraghi.

11          So, your experts have discussed with

12   Mr. Taraghi how pricing at the retail level impacts his

13   business decisions.

14          MR. BENNINGTON:  That's true.

15          THE COURT:  Right.

16          MR. BENNINGTON:  On a general basis, but not

17   on a store-by-store, matching particular prices, and how

18   does it affect your bottom line profit for purposes of

19   meeting the *Hasbrouck* and *J. Truett Payne* test.

20          THE COURT:  But -- but, see, my point, though,

21   is -- I -- your experts haven't really done a good job

22   of demonstrating necessity, Mr. Bennington.  I'm sorry.

23   And I know we keep going around and around, but that's

24   the bottom line.

25          MR. BENNINGTON:  Well, all right.  And as I

52

1    counsel and independent certified public accountants,

2    and only for the purpose of the case.

3            The Tenth Circuit went on to write:  In our

4    opinion, the actions of the trial court display a sound

5    exercise of discretion.  The need for the information is

6    held paramount, but reasonable protective measures are

7    supplied to minimize the effect on the appellants.  In

8    that case, the source of the information.

9            So, while I respect the plaintiffs' position,

10   I do not find, one, the plaintiffs have come forward

11   with an adequate basis to warrant reconsideration of my

12   prior order.  I further note that even if the affidavits

13   from plaintiffs' experts were new evidence that was

14   previously not available to me, I do not believe that

15   those affidavits establish the necessity for the

16   requested disclosure or establish good grounds to change

17   the designation of this pricing information.

18           The standard is not desirable or desirability

19   of (unintelligible), the standard is necessity.  And

20   without specific showing as to what questions they would

21   like to ask Mr. Taraghi, without some specific showing

22   that this information is not otherwise available in the

23   records of Western Convenience, or through public

24   sources, all I've got is an affidavit which reduced to

25   its simplest terms are, we'd really like to ask

53

1        Mr. Taraghi.  That's not necessity.

2            So, for that -- on those grounds I am denying

3    Document 153.  And I will not change the designation nor

4    will I require, based on the showing set forth in

5    Document 153, that Dillon or Suncor change those

6    designations.

7            Now, having said that, I do want, again, to

8    make it absolutely clear.  I believe that Dillon's

9    interpretation of the phrase in the supplemental

10   protective order "information derived from" is too

11   broad.  To the extent that Dillon is arguing or intends

12   to argue in the future that Mr. Taraghi is not entitled

13   to see any version of his experts' reports in redacted,

14   however, whatever term you want to use, I am not

15   convinced, if that is in fact Dillon's position, that

16   that position is well-founded.  Because I do believe

17   that it should be possible to redact that report to

18   allow Mr. Taraghi to have some sense, some -- something

19   more than just a passing inkling of what his experts

20   might have concluded.

21           To that end, I would certainly encourage -- I

22   can't order it, but I would certainly encourage

23   plaintiffs counsel to prepare a redacted version, a

24   version of the supplemental -- a version of the reports

25   that meets the literal intent and the spirit underlying

55

```
 1    bench.  To the extent that someone wishes to file an
 2    objection -- and I get a clear inkling that that is
 3    what's going to happen, and I absolutely respect -- I
 4    can't emphasize this in strong enough terms.  I
 5    absolutely respect Western Convenience's right to
 6    disagree with me.  And I would not criticize Western
 7    Convenience for a second for disagreeing with me because
 8    it is fundamentally a discretionary call, and I don't
 9    profess to get it right every time.  And Rule 72 is
10    designed to provide a mechanism to correct me when I get
11    it wrong.  But to the extent that you wish to follow
12    that remedy or pursue that remedy, your 14 days will
13    start to run from today.
14         Now, those are the only two motions on my
15    docket, folks.  Is there anything else we need to
16    discuss?
17              MR. BENNINGTON:  Not for Western.
18              MR. SHAHEEN:  No, thank you, Your Honor.
19              MR. TARAVELLA:  No, Your Honor.
20              THE COURT:  All right.  We'll be in recess.
21    Thank you.
22              THE COURTROOM DEPUTY:  All rise.
23              (Whereupon, the within hearing was then in
24    conclusion at 3:18 p.m. on this date.)
25              I certify that the foregoing is a correct
```

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305