IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

      Plaintiffs and Counterclaim Defendant,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

      Defendant, Counterclaimant, Third-Party Plaintiff,

HOSSEIN and DEBRA LYNN TARAGHI,

      Third-Party Defendants.

---

**SUNCOR'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

---

Suncor Energy (U.S.A.) Inc. ("Suncor") replies to Plaintiffs' Response to Defendant's Motion for Summary Judgment on Plaintiffs' Second, Third, Fourth and Fifth Claims for Relief ("Response"). Plaintiffs assert there are material issues of fact which preclude summary judgment. *E.g.,* Resp. at 2. There are no genuine issues of material fact. Plaintiffs have not "present[ed] sufficient, competent, contradictory evidence to establish a genuine factual dispute." *Alfaro v. General Motors Corp.*, 2006 WL 2982849, at *1 (D. Colo. Oct. 17, 2006) (Krieger, J.). Plaintiffs' purported factual disputes fail because they are (i) unsupported arguments of counsel, (ii) contrary to the law and/or the record, (iii) speculation, or (iv) "inconsequential" such that they are not sufficiently probative to defeat summary judgment. *E.g., Mosier v. Maynard*, 937 F.2d 1521, 1525 (10th Cir. 1991) *cert. denied,* 510 U.S. 895 (factual statements of counsel are

1

not evidence); *Am. Family Mut. Ins. Co. v. Gustafson*, 2011 WL 782574, at *6 (D. Colo. Feb. 25, 2011) (Krieger, J.) (must offer affirmative evidence, not speculation, "strongly refuting all plausible alternative explanations"); *Brown v. Cooke*, 2009 WL 641301, at *14 (D. Colo. March 9, 2009) (Krieger, J.) ("Evidence that is not significantly probative and immaterial factual disputes will not defeat a motion for summary judgment."); *Brown v. Conagra Food Ingredients Co.*, 2008 WL 5101731, at *7 (D. Colo. Dec. 1, 2008) (Krieger, J.) ("inconsequential" disputes do not defeat summary judgment).

### A.  PLAINTIFFS' SECOND CLAIM: BREACH OF CONTRACT (MASTER AGREEMENT).

1. Burden of proof and elements; and
2. Element of Claim Challenged – Performance by Plaintiff Under the Contract or Justification for Non-Performance.

A.      Plaintiffs discuss the "Burden of proof and elements" and the "Element of Claim Challenged" here in paragraph A of their Response at pages 3-4. Plaintiffs assert that Suncor's Motion should be denied because "Suncor does not establish the absence of a genuine issue as to whether Western's non-performance was justified." Resp. at 4. This argument makes no sense. WCS's "non-performance" is irrelevant. Suncor did not assert as a defense in its Answer [Dkt. #45] that Western Convenience Stores, Inc. ("WCS") had failed to perform under the Master Product Purchase and Sale Agreement ("Master PSA" or "Master Agreement"), nor did it argue that in its Motion for Summary Judgment [Dkt. #181]. The basis for Suncor's Motion is that *Suncor* fully performed under the contracts and that its "appropriate exercise of an unfettered contractual right cannot constitute either a breach of the contracts or tortious interference as a matter of law." Suncor's Mot. at 1-2.

B.      WCS argues in this paragraph that its "non-payment was justified" because of Suncor's alleged price discrimination and "practice of inequitably allocating supply." Resp. at 4.

Those arguments are irrelevant for the reasons in paragraph A, above.  Suncor's Motion is

directed to WCS's claims against Suncor, not Suncor's counterclaim against WCS and its third-

party claim against the Taraghis for money due and owing.  Those are the subject of a separate

Motion [Dkt. #182] to which WCS and the Taraghis responded separately [Dkt. #201].

      C.      Here, in paragraph C, no. 1, WCS argues that Suncor's alleged price

discrimination against WCS was a breach of the duty of good faith and fair dealing.  Resp. at 2,

4.

      *First*, as a preliminary matter, in its "Summary of Response" at page 2, WCS asserts, but

does not address later in its Response, that "there is a genuine issue of fact as to whether Suncor

*improperly retaliated against Plaintiffs for filing this lawsuit* by terminating their access to

Suncor's terminals." (emphasis added).  This assertion typifies Plaintiffs' approach in the

Response.  It is nothing but argument and is factually wrong and contrary to the record.  In

paragraph 23 of both the Complaint and the Amended Complaint [Dkt. #43] Plaintiffs allege that

Suncor terminated access on May 25, 2011.  The Complaint was filed on June 20, 2011—nearly

*a month after* Suncor terminated access.  The termination of access forms the basis, at least in

part, for Plaintiffs' Third (¶49) and Fourth (¶¶53-54) Claims for Relief in the Amended

Complaint.  Thus, Suncor could not have retaliated "against Plaintiffs' filing this lawsuit."  The

lawsuit was filed *after* the termination.[1]

      *Second*, Plaintiffs assert that Suncor's alleged price discrimination is a breach of the

covenant of good faith and fair dealing.  Resp. at 4.  They have no authority for that assertion.

Plaintiffs cite *Venta, Inc. v. Frontier Oil & Refining Co.*, 827 F. Supp. 1526, 1529-31 (D. Colo.

---

[1]     So too was the Complaint Plaintiffs filed in Denver District Court, No. 11CV3860, on May 27, 2011, which alleges in paragraph 11 that the termination occurred on May 25, 2011.  As here, the termination forms the basis for part of Plaintiffs' claims in paragraphs 19, 23, and 27-28 of that Complaint.  *See* State Court Complaint, attached hereto as Exhibit P.

1993) "generally" as authority. *Id.* But it is not authority, as they are forced to admit: "[B]reach of the covenant of good faith and fair dealing ... *appears* to have been premised on price discrimination." Resp. at 4-5 (emphasis added). In *Venta*, the court merely permitted discovery to proceed on a breach of the covenant of good faith and fair dealing claim. *Venta*, 827 F. Supp. at 1530-31. The court never addressed, let alone decided, that price discrimination is, or could be, a breach of that covenant. Plaintiffs also cite and quote from *Ervin v. Amoco Oil Co.,* 885 P.2d 246, 250 (Colo. App. 1994), *aff'd in part and rev'd in part, Amoco Oil Co. v. Ervin,* 908 P.2d 493 (Colo. 1995), for a series of general propositions, none of which deals with price discrimination. Resp. at 5.

Contrary to Plaintiffs' argument, price discrimination does not constitute a breach of the covenant of good faith and fair dealing. The Master Agreement does not provide that Suncor will give the same price to all its customers. Thus, Plaintiffs are unilaterally trying to impose a new term into the Agreement. Courts, however, will not permit the covenant of good faith and fair dealing to expand the bargained-for duties in a contract or to impose a new obligation. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (covenant of good faith and fair dealing does not change the existing terms of a contract); *ADT Security Servs., Inc. v. Premier Home Protection, Inc.*, 181 P.3d 288, 293 (Colo. App. 2007) *cert. denied,* 2008 WL 1777402 (implied covenant "does not obligate a party... to assume obligations that vary or contradict the contract's express provisions, nor does it permit a party to inject substantive terms into the contract."); *see also Chroma Lighting v. GTE Prods. Corp.*, 1997 WL 175062, at *4 (9th Cir. April 10, 1997) *cert. denied,* 522 U.S. 943 (applying California law to bar breach of covenant claim based on price discrimination because it would imply a new term into the contract); *Coca-Cola N.A. v. Crawley Juice, Inc.*, 2011 WL 1882845, at **9-10 (E.D.N.Y. May 17, 2011) (dismissing breach

of covenant claim based on price discrimination because it "would create new, unbargained-for obligations"); *Ashland, Inc. v. Windward Petroleum, Inc.*, 2006 WL 1913364, at *10 (E.D. Ky. July 11, 2006) (granting summary judgment on breach of the covenant because there is no "provision in the contracts … that would preclude [defendant] from charging disparate prices to different customers").

While WCS quotes language in *Ervin* dealing with an "open price term," WCS has not proffered any evidence that the price Suncor charged for fuel was unreasonable. Resp. at 5. Indeed, as WCS admits, Suncor's prices were "okay," "not out of line" and were typically lower than the prices charged by WCS's other suppliers. Taraghi Dep., Exh. L to Suncor's Mot., at 161:7-11, 162:1 and 164:14-17; Wehrle Dep., Exh. J to Suncor's Mot., at 6:3-13, 15:2-7, 15:20-17:2, 18:17-19, 21:15-22:2, 42:4-43:1; Suncor's Mot., at pp. 10-11. WCS's complaint is that it did not get the same allegedly discriminatory price that Kroger received. Resp. at 5. However, as a matter of law, WCS is not entitled to that price. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561 (1981) (rejecting "'automatic damages,' under which mere proof of discrimination establishes the fact and amount of injury"); *Enter. Indus. v. Texas Co.*, 240 F.2d 457, 458 (2d Cir.), *cert. denied,* 353 U.S. 965 (1957).

D.      In paragraph D, WCS argues that Suncor breached the Master Agreement because of its "inequitable allocation of supply." Resp. at 6. WCS concedes that Suncor had the right to allocate supply, so the only issue is whether the allocation was "inequitable." Resp. at 6, no. 2.[2]

As a plaintiff alleging Suncor breached the covenants of good faith and fair dealing and opposing summary judgment, WCS "may not rest on assertions of fact made in [its] brief; [but]

---

[2]      Western also concedes that Suncor had the right "to suspend sales in its sole discretion if it believe[d] it had 'grounds for insecurity'." Resp. at 6, no. 2. Suncor also had the right to suspend sales because of Western's "failure to timely pay any invoice." Master Agreement, Exh. A to Suncor's Mot., ¶17 p. A-3.

must support each assertion with citation to evidentiary material that *establishes* that fact."
*Kenfield v. Colo. Dept. of Public Health & Env't.*, 837 F. Supp. 2d 1232, 1239 (D. Colo. Sept. 6,
2011) (Krieger, J.) (emphasis added); *Witt v. Condominiums at Boulders Ass'n*, 2007 WL
840509, at *7 (D. Colo. March 19, 2007) (Krieger, J.) ("[p]laintiff may not simply rely on
unsupported assertions but must point to specific evidence establishing a contention"). WCS has
not done that. Rather, in subsections nos. 3-7, WCS asserts numerous "facts,"[3] none of which
"establishes" that Suncor's allocation was "inequitable" or done in bad faith. Resp. at 6-10.
Plaintiffs' purported "facts" do not defeat summary judgment. *Gonzales v. Comcast of Colorado
IX, LLC*, 2010 WL 4156521, at *7 (D. Colo. Oct. 18, 2010) (disregarding plaintiff's "red-
herring" argument where the evidence did not support the "implicit assumption"). They are
"highly ambiguous," do not "refut[e] all plausible alternative explanations," are "devoid of
context," and are nothing more than conjecture. *Kenfield*, 837 F. Supp. 2d at 1242, 1247; *Am.
Family Mut. Ins. Co.*, 2011 WL 782574 at **6-7.

   *First*, in no. 3 at page 7, WCS asserts that its "purchasing needs never decreased, and it
continued to want to purchase as much of its Fuel supply as possible from Suncor," that Kroger
"supplanted Western as Suncor's largest unbranded customer[ ]," and it implies, without any
evidence whatsoever,[4] that Suncor "started cutting Western back" because of Kroger. Assuming
*arguendo* and for purposes of this Reply only that these assertions are true (which they are not),
these assertions are not evidence that Suncor's allocations were inequitable. To the extent these

---

[3]   Suncor disputes many of these purported "facts," but for purposes of summary judgment
only, Suncor will accept them as true. Even if accepted as true, they do not establish a genuine
issue of material fact precluding summary judgment.

[4]   The citations are to Taraghi's self-serving affidavit which states that Suncor started
cutting Western back, and to Wehrle's deposition in which Wehrle says Western was put on
tighter allocations. Neither mentions Kroger. A self-serving affidavit does not create an issue of
fact. *Akeney v. Creany*, 2011 WL 7094380, at *4 (D. Colo. June 30, 2011).

assertions suggest anything at all, at most they suggest what no one disputes—there were allocations. But they do not suggest that any allocations were "inequitable' or done in bad faith. For example, WCS does not present any evidence of the reasons for the allocations or how its allocations compared to Suncor's other unbranded customers. Without such evidence, one is left to speculate. *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *6. Indeed, the explanation for any decrease in WCS's purchases may be as simple as WCS decided to buy from another supplier because the price was better. *Id.* (must present "evidence strongly refuting all plausible alternative explanations"); *Int'l House of Pancakes, Inc. v. Albarghouthi*, 2007 WL 2669117, at *12 n.17 (D. Colo. Sept. 6, 2007) (Krieger, J.) (the court will not draw an inference in the absence of evidence suggesting an impermissible motive "as opposed to any one of a variety of neutral factors, was the deciding factor").

*Second,* in no. 4 at page 7, Plaintiffs' attorneys assert that Kendall Carbone and Steve Ewing, Suncor employees, "engaged in a course of inequitable allocation of Fuel to Western and a general disregard of the contract between the parties, *apparently* because they did not care for Hossein Taraghi and his 'operating philosophy.'" (emphasis added). But Plaintiffs' attorneys are not sure of that because they use the word "apparently," leaving the Court to guess. *Abeyta v. Progressive Specialty Ins. Co.*, 2008 WL 170535, at *6 (D. Colo. Jan. 16, 2008) (Krieger, J.) ("uncertain and ambiguous testimony … is insufficient to raise a genuine issue of fact").

Their uncertainty aside, the example that Plaintiffs' attorneys offer does not support the argument that Carbone and Ewing "engaged in a course of inequitable allocation." Resp. at 7 ("For example"). The attorneys quote Carbone telling Moss "*in early March*" that she would prefer to sell to Sinclair "and just avoid selling to them [WCS] *at all this month.*" Resp. at 7-8 (emphasis added). Although it is not clear, presumably, Plaintiffs' attorneys are using this quote

as evidence that Suncor "inequitably allocated." If that were the case (and it is not), then in *March*, the month Carbone specifically named, WCS would not have received its contract volumes—it would have been "shorted," to use WCS's word. Resp. at 8. But as Plaintiffs' own table on page 8 demonstrates, in March, when WCS should have been "shorted" if Plaintiffs' attorneys' argument were correct, WCS took 1,360,706 *more* gallons of fuel than Suncor was obligated to sell to it! *Id.* That is, WCS was "over-lifting"—the very thing WCS accuses Kroger of doing. Resp. at 9, no. 6. Plaintiffs' own example not only does not prove Suncor inequitably allocated, it contradicts that argument.

*Third*, WCS's arguments in no. 5 at pages 8-9 suffer from the same problem as its arguments in no. 3. *See* discussion at page 6-7, above. For the reasons discussed above, the fact that WCS may have been "short" fuel is not evidence that Suncor allocated inequitably or even that Suncor allocated. The Court is left to speculate. *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *6.

*Fourth*, Plaintiffs' attorneys' arguments in no. 6 at page 9 about Kroger's "over-lifting" are not evidence that Suncor allocated inequitably or unfairly favored Kroger. WCS "over-lifted," for example, in December 2009 and March 2010, according to WCS's own table of selected months. Resp. at 8. Moreover, WCS's attempt to create the inference that Suncor unfairly favored Kroger fails because WCS only quotes part of the Carbone email it relies upon. Resp. at 9, n.2; *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *9 (a "single statement, devoid of context, is insufficient to carry [respondent's] burden"). WCS stops short, leaving out the part that defeats its argument. In the part that follows right after WCS's quote, Carbone addresses the Kroger contract: "I did not see anything in the file that talked about seasonality, I only found an e-mail where the guy asked you for +/- 10% on the contract. Even if I added in an extra 10%

8

over the 213,000 barrels, it seems to me like we *could limit* [Kroger] *to about 35-40,000 barrels less than what they have been lifting.*" Exh. 4 to Resp. (emphasis added). Taken in context, Carbone's email shows she disapproved of Kroger's "over-lifting" and suggested limiting Kroger. WCS's quotations, taken out of context, prove nothing. *Cartinelle v. Napolitano*, 2011 WL 2607102, at *7 (D. Colo. Apr. 6, 2011) (Krieger, J.) (taking email out of context does not create issue of fact); *Watershed LLC v. Columbus Life Ins. Co.*, 2011 WL 4048779, at *5 (D. Colo. Sept. 10, 2011) (Krieger, J.) (mischaracterizations of actual testimony do not create issue of fact).

*Fifth*, no. 7 at pages 9-10 is nothing but arguments of counsel which do not defeat summary judgment. *Mosier*, 937 F.2d at 1525. There is no evidence in the record, and WCS has not come forward with any in its Response, that "Carbone, and then Ewing, oversaw a *pattern of inequitable treatment* that favored other Suncor customers over Western, and generally ignored the fact that a contract even existed between them." Resp. at 10 (emphasis added). WCS's attorneys provide two isolated examples which do not support the claim that there was "a pattern of inequitable treatment." *Id.* Exhibit 4 is an email in which Carbone discusses alternatives, but there is absolutely nothing in that email or in Plaintiffs' reference to Carbone's deposition that supports the assertion that "Carbone lifted the allocation for everyone but Western." *Id.*; *Kenfield*, 837 F. Supp. 2d at 1239 ("may not rest on assertions of fact…[but] must support each assertion with citation to evidentiary material that establishes that fact"). But even if Suncor did lift the allocations for everyone but WCS (which it did not), that would not prove "a pattern of inequitable treatment" or even inequitable treatment. There could have been legitimate reasons for not lifting the restrictions, assuming, *arguendo* for purposes of this Reply, that they were not lifted. *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *6 (must present "evidence strongly

9

refuting all plausible alternative explanations"); *Int'l House of Pancakes*, 2007 WL 2669117 at

*12 (must present evidence of impermissible motive as opposed to variety of possible neutral

deciding factors).

WCS also quotes from an April 2011 email from Ewing to Moss in which Ewing says

"Western Convenience can be shut off due to no contract." Resp. at 10. This email is not

probative of "inequitable allocation" because there is no evidence that WCS was "shut off" or

assuming, *arguendo,* it was shut off, why it was shut off. *Gonzales*, 2010 WL 4156521 at *7

(disregarding "red-herring" arguments where the evidence did not support plaintiff's "implicit

assumptions"); *Vassos v. Dolce Int'l/Aspen, Inc.*, 2006 WL 893601, at *5 (D. Colo. March 31,

2006) (allegations in response failed to establish factual issue where they either did not respond

to the motion for summary judgment, or responded in "non-sequitur").

      E.      In paragraph E beginning on page 10 of the Response, Plaintiffs assert that Suncor

violated the Colorado Unfair Trade Practices Act, specifically, C.R.S. § 6-2-108, which forbids

"[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts" to

the injury of a competitor and that tends to destroy competition. Resp. at 10-11 (relying on

C.R.S. § 6-2-108). Once again, WCS confuses its defense of its breach of contract claim *against*

*Suncor* with its defense against Suncor's breach of contract counterclaim *against WCS*. The two

issues are different, and it is unclear how C.R.S. § 6-2-108 relates to WCS's claim for breach of

contract against Suncor, which is the issue at the heart of Suncor's Motion. As a matter of law, it

does not.

      *First*, in paragraph E, no. 1 on pages 10-11, Plaintiffs contend that "[t]here is no dispute

that the discriminatory pricing existed and that it was kept secret from the Plaintiffs." Resp. at

10-11. Plaintiffs offer no support for this assertion, but simply refer to facts and argument in a

separate brief.  This violates the Court's Standards and forces Suncor to reply to arguments WCS

has not made in this Response.  *Brown*, 2008 WL 5101731 at *5, n.5 (court will not consider

unsupported assertions); *Kenfield*, 837 F. Supp. 2d at 1246 (court will not construct arguments

for party).  In addition, Plaintiffs fail to explain how a price discrimination claim fits under

C.R.S. § 6-2-108, which concerns secret rebates and discounts, and never uses the term "price."

"Discount" should not be interpreted to include "price" because the Colorado Unfair Trade

Practices Act contains a different provision, C.R.S. § 6-2-103, that specifically forbids anti-

competitive price discrimination.  *See Dunlap v. Colo. Springs Cablevision, Inc.*, 855 P.2d 6, 7

(Colo. App. 1992) (recognizing C.R.S. § 6-2-103 "prohibits certain anticompetitive

discriminatory pricing structures").  Section 6-2-103 is inapplicable here, because it applies only

to price discrimination "inten[ded] to drive out competition *in one geographic area*." *Id.* at 8

(emphasis added).  Interpreting C.R.S. § 6-2-108 as a price discrimination statute would defeat

the express limitation of the Colorado Unfair Trade Practices Act to only *geographic* price

discrimination.  *See Dunlap*, 855 P.2d at 8; *see also Fincher ex rel. Fincher v. Prudential

Property and Cas. Ins. Co.*, 2008 WL 901534, at *2 (D. Colo. Mar. 31, 2008) (interpreting

Colorado statute "in a way that best effectuates the purpose of the legislative scheme").

   *Second*, in paragraph E, no. 2, on page 11, Plaintiffs claim that "any contract made in

violation of" C.R.S. § 6-2-108 "is an illegal contract," and "illegal contracts are void." Resp. at

10 (citing C.R.S. § 6-2-109).  WCS does not claim that *its* contract with Suncor, the Master PSA,

was "made… in violation" of C.R.S. § 6-2-108.  It does not because it cannot.  Suncor and WCS

entered into the Master Agreement on January 17, 2007—two years and nine months *before*

Suncor entered into the first contract with the Dillon Companies in October 2009 to sell fuel at a

price which WCS claims violates the Robinson-Patman Act.  *See* Moss Dep., attached hereto as

11

Exhibit Q, at 278:3-279:5; 280:18-281:21.  WCS does not claim there is anything illegal about

any term or provision of the Master PSA.  Therefore, it could not have been "made" in violation

of the statute.  Since the Master PSA was not "made" in violation of the statute, it cannot be

illegal under the statute.  C.R.S. § 6-2-109.  Even assuming, *arguendo* and for purposes of this

Reply only, that Suncor provided "secret, unearned discounts," as WCS alleges, that does not

convert Suncor's perfectly legal contract with WCS into an illegal and unenforceable contract.

The statute does not say that.  No case says that.

Plaintiffs also argue in paragraph E, no. 2, that Suncor's "unfair practices could amount

to a justification or an excuse for Western's non-performance on its affirmative breach of

contract claim."  Resp. at 11.  Suncor has never claimed that WCS's "non-performance"

precludes it from asserting its breach of contract claim against Suncor.  WCS then changes the

subject entirely, asserting that "Western may have a defense to recover *on Defendant's breach of*

*contract claim* by showing that the contract at issue violates § 6-2-108."  *Id.*  This argument is

directed to Suncor's counterclaim against WCS; it gives no support to WCS's breach of contract

claim against Suncor.

*Third*, in paragraph E, no. 3, on pages 11-12, WCS concedes that it is at once asserting a

breach of contract claim against Suncor, and yet challenging the validity of that same contract:

"Plaintiffs acknowledge that there would then be a question of law as to whether they could

recover for a breach of this same contract."  Resp. at 11.  The Court need not untangle WCS's

contorted argument, since it fails as a matter of law.  Section 6-2-109 provides that certain

contracts in violation of the Colorado Unfair Trade Practices Act are "illegal."  Specifically, the

statute states that "*[a]ny contract… made* by any person, firm or corporation in violation of any

of the provisions of sections 6-2-103 to 6-2-108 is an illegal contract."  C.R.S. § 6-2-109

(emphasis added).  As explained above, the Master Agreement is not an "illegal" contract.  *Cf.*

*Bruce's Juices v. American Can Co.*, 330 U.S. 743, 754-56 (1947) (noting that price

discrimination claim under Robinson-Patman Act does not alter contractual obligations);

*Chroma Lighting*, 1997 WL 175062, at *4 (noting price discrimination does not support claim

for breach of contract).

   Not only does WCS's argument fail as a matter of law, it also fails as a matter of judicial

estoppel, which "prohibit[s] parties from deliberately changing positions according to the

exigencies of the moment." *Bradford v. Wiggins*, 516 F.3d 1189, 1194 (10th Cir. 2008).  From

the beginning of this action, WCS has asserted a breach of contract claim and acknowledged that

the Master PSA is valid and enforceable.  *See* Amended Compl. at ¶6 (acknowledging binding

provisions of Master PSA); *id.* at ¶8 (stating Master PSA "purports to govern all transactions or

agreements" between the parties); *id.* at ¶¶40-46 (asserting breach of Master PSA).  WCS should

not be permitted to change its position now to avoid summary judgment.  *See Bradford*, 516 F.3d

at 1194.

### B.   PLAINTIFFS' THIRD CLAIM FOR RELIEF: BREACH OF CONTRACT (WESTERN TRUCK ONE ACCESS AGREEMENT).

   1.  Burden of proof and elements; and
   2.  Elements challenged by Plaintiffs.

   Plaintiffs argue that Suncor breached the Access Agreement with Western Truck One,

LLC ("WTO") by its alleged discriminatory pricing and inequitable allocation.  Resp. at 12.

Plaintiffs attempt to import Suncor's alleged breach of the *Master Agreement with WCS* into

Suncor's separate *Access Agreement with WTO*.  This is a contrived argument designed to defeat

summary judgment, as WTO's own pleadings make clear.  It fails as a matter of law.

A.    In paragraph A on page 12 of the Response, Plaintiffs contend that the duty of good faith and fair dealing "contemplates giving effect to the parties' intentions and a 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" Resp. at 12 (quoting *ADT*, 181 P.3d at 293).  But Plaintiffs ignore the conclusion reached by the court in *ADT* based on the duty's purpose: "[t]hus, the implied covenant of good faith and fair dealing is breached when a party uses discretion conferred by the contract *to act dishonestly or to act outside of accepted commercial practices* to deprive the other party of the benefit of the contract." *Id.* (emphasis added) (citation omitted).  *ADT* also notes that "the duty of good faith cannot be used to contradict terms or conditions for which a party has bargained," "does not obligate a party… to assume obligations that vary or contradict the contract's express provisions," and does not "permit a party to inject substantive terms into the contract." *Id.* (citation omitted).  Plaintiffs disregard all of these principles when insisting WTO has a claim for breach of the Access Agreement's duty of good faith and fair dealing.  Applying these principles compels summary judgment.

*First*, in paragraph A, no. 1 on page 12, Plaintiffs claim that Suncor breached the Access Agreement's duty of good faith and fair dealing when it "gave a discriminatory price to *Western [Convenience Stores]'s* arch competitor, Kroger," and when "it failed to equitably allocate supply generally and as required by the contract." Resp. at 12 (emphasis added).  WTO therefore attempts to bootstrap its claim for breach of the Access Agreement by using *WCS's* allegations against Suncor for breach of the *Master PSA*, ignoring the fact that breach of one agreement does not constitute breach of a *separate* agreement. *See, e.g., Chancellor v. OneWest Bank*, 2012 WL 3834951, at *8 (N.D. Cal. Sept. 4, 2012) (holding breach of one agreement did not constitute breach of covenant of good faith and fair dealing in separate contract); *TransFirst*

14

*Holdings, Inc. v. Phillips*, 2007 WL 631276, at **9-10 (N.D. Tex. Mar. 1, 2007) (same); *H & R Block Tax Servs., Inc. v. Clevenger*, 2005 WL 2874959, at *3 (N.D. Miss. Oct. 31, 2005) (same). As explained in *H & R Block*, it is "basic contract law" that "the breach of one contract does not constitute breach of the other." 2005 WL 2874959 at *3.

By Plaintiffs' own admission in their Amended Complaint, WCS and WTO are separate companies. Amended Compl. at ¶¶1-2 (alleging that WCS "is a Colorado corporation" and that WTO is "a Colorado limited liability company"). Plaintiffs further admit in their Amended Complaint that the Access Agreement and the Master Agreement are separate contracts with these separate parties. *See id.* at ¶8 (noting Master PSA "purport[s] to govern all transactions or agreements… *between WCS and Suncor*") (emphasis added); *id.* at ¶10 ("WTO's access to Suncor terminals has been governed by a May 10, 2006 Terminal Access Agreement… and predecessor agreements *between WTO and Suncor* as well as oral agreements between the parties.") (emphasis added).

*Second*, in paragraph A, no. 2, on pages 12-13, Plaintiffs claim that "there is a genuine issue of material fact as to whether Suncor's action in terminating access to its terminals was tied not to an independent wish to terminate access, but rather to its abuse of its exercise of discretion in setting prices and allocating supply." Resp. at 12-13. Again, Plaintiffs confuse the two contracts, and they cannot identify a breach of any term of the *Access Agreement*, express or implied. Plaintiffs fail to identify any express provision of the Access Agreement that references the allocation of fuel supply. Resp. at 13-14 (offering argument but no evidence). There is no such provision. Access Agreement, Exh. N to Suncor's Mot. It is an access agreement, not a purchase and sale agreement. *See id.* at ¶2 (stating the Access Agreement "shall govern [WTO]'s rights, obligations, and liabilities *in connection with its access to… Suncor's*

*terminals*") (emphasis added). There is no reference to the quantity of fuel that *WCS* would receive pursuant to the transactions entered into under the separate *Master PSA*. Master PSA, Exh. A to Suncor's Mot., ¶9 p. A-2 (referencing allocation). The Access Agreement also makes no reference at all to price, nor is price part of "an agreed common purpose" or the "justified expectations" of the Access Agreement. *ADT Security Servs.*, 181 P.3d at 293. The Access Agreement granted WTO permission to access Suncor's terminals—it had nothing to do with the price *WCS* paid for fuel purchased from Suncor. Access Agreement, Exh. N to Suncor's Mot., ¶2.

    *Third*, in paragraph A, nos. 3-4, on pages 13-14, Plaintiffs claim that Suncor's termination of the Access Agreement prevented Plaintiffs from acquiring fuel from middlemen at Suncor's terminals. Resp. at 13-14. Plaintiffs conclude from this that there is "genuine issue of material fact as to whether Suncor's *punitive* termination of access... was yet another example of breach of the covenant of good faith and fair dealing." *Id*. WTO offers no citation to the record to support its assertion, which alone is fatal to its claim. *See Mosier*, 937 F.2d at 1525 (factual statements of counsel are not evidence).

    More importantly, however, the implied covenant cannot be used to alter express contractual terms. *ADT*, 181 P.3d at 293. The express terms of the Access Agreement provide that "any permission of access granted by Suncor... may be revoked *immediately* by Suncor, *without cause*, as a matter of right." Access Agreement, Exh. N to Suncor's Mot., ¶4 (emphasis added). WTO fails to address this provision at all in its Response. WTO also ignores the fact that, by its express terms, "the *sole purpose*" of the Access Agreement was for:

> loading and offloading petroleum products and other products *as agreed between the Parties*... into the transport vehicles owned, leased, controlled, or otherwise used by [WTO] and driving such vehicles into and away from the applicable Suncor terminal

> during such times and in such manner *as established or agreed by*
> *Suncor.*

Access Agreement, Exh. N to Suncor's Mot., ¶3 (emphasis added).  Suncor terminated this

Access Agreement at the same time its "sole purpose" was no longer necessary, that is, at the

same time it suspended all sales of petroleum products to WCS under the Master PSA.  Suncor's

May 25, 2011 Letter, Exh. H to Suncor's Mot., p. 1 (suspending fuel sales to WCS and revoking

WTO's access to terminals).  WTO's allegation of "*punitive* termination" not only lacks any

factual support, but it fails to "strongly refute" this "plausible alternative explanation[ ]." *Am.*

*Family Mut. Ins. Co.*, 2011 WL 782574 at *8 (Krieger, J.).

     *Fourth*, in paragraph A, no. 5, Plaintiffs concede that contractual rights cannot be limited

"unless there is an express or implied promise, *independent of the covenant of good faith itself*,

restricting that right." Resp. at 14 (quoting *Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616,

623 (Colo. App. 1997)).  In other words, the implied covenant of good faith cannot be used to

restrict the exercise of a contractual right.  *Id.*; *see also ADT*, 181 P.3d at 293 (holding implied

covenant cannot alter or add terms to agreement).

     *Fifth*, in paragraph A, no. 6, Plaintiffs claim that "there are genuine issues of material fact

as to whether an explicit promise that was breached (equitable allocation) and whether there was

an implicit promise not to favor one customer over another (price discrimination)." Resp. at 14.

WCS's claim of an "explicit promise" does not make it so. *Mosier*, 937 F.2d at 1525 (factual

statements of counsel are not evidence).  Plaintiffs fail to identify any express promise in the

Access Agreement concerning allocation of supply.  Moreover, contrary to Plaintiffs' assertion,

the Access Agreement also does not contain any "implicit promise not to favor one customer

over another." Resp. at 14.  Indeed, not even the Master PSA contains such an "implicit

promise" as a matter of law.  *See Chroma Lighting*, 1997 WL 175062 at *4 (noting price

discrimination does not support claim for breach of implied covenant of good faith and fair

dealing); *Coca-Cola*, 2011 WL 1882845 at **9-10 (refusing to find implicit promise not to favor

other customers under implied duty of good faith and fair dealing).  WTO's Access Agreement

with Suncor certainly contains no such implicit promise, since pricing has nothing to do with "an

agreed common purpose" or the "justified expectations" of the Access Agreement.  *ADT*, 181

P.3d. at 293.  The Access Agreement merely granted WTO permission to access Suncor's

terminals.  Access Agreement, Exh. N to Suncor's Mot, ¶2.

WTO has failed to demonstrate "sufficient, competent, contradictory evidence to

establish a genuine factual dispute," and the Court should grant summary judgment on its claim

for breach of the Access Agreement.  *Alfaro*, 2006 WL 2982849 at *1.

### B.[5]   PLAINTIFFS' FOURTH AND FIFTH CLAIMS FOR RELIEF: TORTIOUS INTERFERENCE (WESTERN'S CONTRACTS AND RELATIONSHIPS WITH THIRD PARTIES).

1. Burden of proof and elements; and
2. Element of Claim Challenged by Plaintiff: Improper Interference

A.      In paragraph A on page 15 of their Response, Plaintiffs assert that Suncor

"interfered with Plaintiffs' performance of agreements and relationships with middlemen and

interfered with Western's agreement and relationship with Western Truck One." Resp at 15.

But Plaintiffs offer no relevant evidence to support this assertion.  *Kenfield*, 837 F. Supp. at 1239

("A party opposing summary judgment may not rest on assertions of fact made in a brief….").

In fact, as explained in Suncor's Motion, WCS and WTO fail to identify or produce in discovery

a single contract or transaction with a third party with which Suncor improperly interfered.

Suncor's Mot. at pp. 14, 16 (noting failure to identify third-party contract).  Plaintiffs' Response

neither attaches nor identifies *any* contract or transaction with a third-party middleman with

---

[5]      The Response has two paragraphs lettered "B."

which Suncor interfered.  Resp. at 15 (offering argument but no actual evidence of a third-party

contract).  This alone is sufficient grounds to grant summary judgment.  *Wasalco, Inc. v. El Paso*

*County*, 689 P.2d 730, 732 (Colo. App. 1984) (affirming summary judgment where plaintiff

failed to identify contract with which defendant allegedly interfered).

     *First*, in paragraph A, no. 1, on page 15, Plaintiffs attempt to rehabilitate Mr. Taraghi,

who could not identify at his deposition any third-party contract with which Suncor interfered.

Resp. at 15.  Mr. Taraghi was asked a series of questions about the allegations of tortious

interference against Suncor in the Complaint.  Taraghi Dep., Exh. L to Suncor's Mot., at 228:11-

229:10.  Taraghi admitted he had read the Amended Complaint, and that he previously had filed

a Declaration verifying that the allegations were accurate.  *Id.* at 233:8-25; *see also* Declaration

of Hossein Taraghi (7/5/2011), attached hereto as Exhibit R, ¶2.  Taraghi acknowledged that, in

the Amended Complaint, Plaintiffs were claiming "that Suncor intentionally interfered with

plaintiff's performance of their agreements and relationships with middlemen," and that these

middlemen "would be like Offen and DATS… [and Sapp Brothers]."  *Id.* at 229:11-19.  Taraghi

then was asked to identify the agreements:

> Q.    So tell me what agreements that Western Convenience had with any
> middlemen that Suncor interfered with.
>
> A.    You mean what did Suncor do to them or caused it?  What do you mean?
>
> Q.    It says that Suncor did something to interfere with Western Convenience's
> performance of their agreements with middlemen.
>
> A.    Okay.
>
> Q.    I'm asking you, what agreements did Suncor interfere with in terms of
> agreements between Western Convenience and middlemen, such as Offen,
> DATS?
>
> A.    Suncor, it did tremendous interference.  Not just interference, tremendous.

> Q.   Okay.
>
> A.   And with everybody that I was dealing with, refineries, middlemen, anybody, as soon as I went to this litigation with Suncor, they all turn on me.

Taraghi Dep., Exh. L to Suncor's Mot., at 229:20-230:14.  Taraghi had the clear opportunity to identify both a contract and the alleged interference, but he failed to do so.  He did not identify any contract or transaction with which Suncor interfered, nor did he identify the nature of the alleged tortious interference.  Failure to do so defeats his claim.  *See, e.g.*, *Wasalco, Inc.*, 689 P.2d at 732 (lack of factual support for tortious interference claim warranted summary judgment).  Indeed, to the extent Taraghi makes any reference to the interference, it stemmed from the lawsuit against Suncor *that his companies commenced*.  Taraghi Dep., Exh. L to Suncor's Mot., at 230:4-14.  When asked, "what did Suncor do to cause them to turn on you negatively?," Taraghi responded, "Because by doing wrongful and cut off on me and causing all this litigation."  *Id.* at 230:18-21.  The lawsuit, of course, was filed by WCS and WTO, not Suncor.  *See* Amended Complaint at p. 1.

After the colloquy quoted above, Taraghi was asked again about the tortious interference claim, specifically, "Are you aware of any transportation agreements or transport agreements that Suncor interfered with?"  Taraghi Dep., Exh. L to Suncor's Mot., at 233:20-22.  Taraghi responded:

> A.   Yeah, WTO.  That's one of them.  And then I cannot right now – see, WTO had nothing to do – wait a second.  What am I doing here.
>
> Q.   Take your time.
>
> A.   I guess I'm still having a hard time understanding your question.

Q.      Well, the allegation is that Suncor intentionally interfered with performance of the transport agreements among middlemen, WTO and WCS.

A.      Okay.  Let me see if I understand that.  It's saying I could not send my transport to Suncor buy from middlemen?  [*sic*]  Does that make sense?  Is that what you're saying?

Q.      No, I'm asking you –

A.      I'm trying to understand this.

Taraghi Dep., Exh. L to Suncor's Mot., at 233:23-234:12.  After a continued back and forth concerning Mr. Taraghi's confusion over the question "Are you aware of any transportation agreements or transport agreements that Suncor interfered with?," Mr. Taraghi eventually said, "I'm not understanding." *Id.* at 235:25.  In the nine pages of deposition testimony, Mr. Taraghi never identified a contract with a middleman with which Suncor allegedly interfered. *Id.* at 228:11-236:2.

Plaintiffs claim in paragraph A., no. 1, that Mr. Taraghi's testimony requires "context," namely, that "[i]n the context it is plain that" Mr. Taraghi believed Suncor interfered with WCS's contracts with Offen Petroleum and DATS Trucking, Inc.  Resp. at 15.  In reality, Mr. Taraghi never identified any contract, whether with these middlemen or any other, with which Suncor interfered.  Taraghi Dep., Exh. L to Suncor's Mot., at 229:20-234:12.  Moreover, when asked to identify the interference, Mr. Taraghi pointed exclusively to the alleged fallout resulting from his litigation against Suncor. *Id.* at 231:9-14.

Plaintiffs submit a new Declaration from Mr. Taraghi that supposedly "makes [his] assertions clear" that Suncor interfered with contracts with middlemen.  Resp. at 15.  This new Declaration is attached as Exhibit 1 to Plaintiffs' Response [Dkt. #198] to Suncor's Motion for Summary Judgment on their Antitrust Claims [Dkt. #185].  In his new Declaration, Taraghi

states that "[r]evocation of access to the Suncor terminals" prevented Plaintiffs from "taking delivery of fuel… from middlemen marketers such as Offen Petroleum, Inc., Sapp Bros., Inc. and DATS Trucking, Inc.." Taraghi Declaration at ¶14.  But importantly, Taraghi does not identify an existing *contract* with which Suncor interfered between Plaintiffs and these middlemen.  *Id.* at ¶¶14-15.  Even in the context of his self-serving declaration, Taraghi never identifies or even asserts that Suncor interfered with a contract.  *See Wasalco, Inc.*, 689 P.2d at 732 (holding plaintiff presented no evidence of underlying contract or improper interference "[a]side from the conclusory but factually unsupported statements in [an] affidavit").

The record reveals why Mr. Taraghi could not identify any contracts with middlemen, either at his deposition or in his new Declaration: WCS does not have any contracts with them. Wehrle Dep., attached hereto as Exhibit S, at 9:15-18, 10:1-20.  WCS's fuel manager, Christopher Wehrle, testified at his deposition that WCS had "no guaranteed supply agreements" with middlemen; its purchases were "day to day." *Id.* at 87:1-7.  "I could go buy a load at [a] price and they would bill me," but WCS "had no obligation… there wasn't any agreement that we were supposed to be there to get, that they just made it available if we so happened to want to put a truck in there and get some [fuel]." *Id.* at 13:14-19.

In paragraph A, no. 1, Plaintiffs argue that Suncor interfered with a contract *between WCS and WTO*. Resp. at 15-16.  Mr. Taraghi attempts to support this allegation in his new Declaration, stating that "[r]evocation of access to the Suncor terminals prevented WTO from fulfilling its agreements with Western as its sole transporter of fuel to Western Convenience Stores." Taraghi Declaration at ¶14.  Plaintiffs have presented no evidence of any contract or agreement between WCS and WTO, or the terms of that agreement with which Suncor supposedly interfered.  Plaintiffs also have not shown any harm arising from Suncor's alleged

interference.  Resp. at 15-16 (failing to assert with factual support any harm arising from

interference of agreement between WCS and WTO).  In fact, WCS's fuel manager refutes the

notion that WCS was harmed because it could not access fuel from middlemen.  Wehrle testified

that there was no change at all in how WCS acquired fuel from middlemen after Suncor

terminated WTO's access to its terminals:

> Q.    So in terms of how you're buying from these middlemen, it's the same
>       way you were buying from them before the dispute, you're just buying
>       more?
>
> A.    Yes.

Wehrle Dep., Exh. S, at 87:3-7.  The lack of showing of harm defeats their tortious interference

claim as a matter of law.  *See Carman v. Heber*, 601 P.2d 646, 647 (Colo. App. 1979) (noting

damages are element to tortious interference claim).

 *Second*, in paragraph A, no. 2, on pages 15-16, Plaintiffs claim that tortious interference

"depends on the facts and circumstances of a particular case," thereby making summary

judgment improper.  Resp. at 15-16.  Plaintiffs ignore, however, the basic legal principles

governing tortious interference claims.  One such principle is that a party asserting tortious

interference must present evidence both of a contract and the defendant's improper interference

with that contract.  *See Wasalco, Inc.*, 689 P.2d at 732.  Another such principle is that "[t]he

exercise of a contractual right cannot be the basis for a claim of tortious interference." *Shaklee*

*U.S., Inc. v. Giddens*, 1991 WL 90003, at *3 (9th Cir. May 30, 1991) *cert. denied,* 502 U.S.

1033.  Applying these principles, courts routinely grant (or affirm the granting) of summary

judgment on tortious interference claims.  *See id.* (affirming summary judgment on tortious

interference claim where defendant had contractual right to terminate distributorship and plaintiff

only offered "bare allegations" of improper motive); *Computer Place, Inc. v. Hewlett-Packard*

*Co.*, 607 F. Supp. 822, 835 (N.D. Cal. 1984) (same); *Lufti v. Brighton Cmty. Hosp. Ass'n*, 40 P.3d 51, 58 (Colo. App. 2001) (affirming summary judgment where no evidence of improper interference); *Wasalso, Inc.*, 689 P.2d at 732 (affirming summary judgment where plaintiff failed to produce evidence of contract or improper interference).

*Third*, in paragraph A, no. 3, Plaintiffs claim that Suncor terminated WTO's access to Suncor's terminals "without any legitimate reason for doing so" and in retaliation for "Plaintiffs' complaint of price discrimination." Resp. at 16. Plaintiffs simply cite to Mr. Taraghi's new Declaration, which merely offers his own, unsupported assertions of Suncor's supposed bad faith. *See id.* (citing without quoting or explaining Taraghi Declaration ¶14). Taraghi's self-serving Declaration is insufficient both to survive F.R.C.P. 56 and to create a triable issue under Colorado law. *Jordan v. Wiley*, 2009 WL 2982851, at *12 (D. Colo. Sept. 16, 2009) (Krieger, J.) (holding issue of fact cannot be created with affidavit contradicting the record); *Wasalco, Inc.*, 689 P.2d at 732) (rejecting attempt to create triable issue on tortious interference claim through self-serving, unsupported affidavit). Undaunted, Plaintiffs go even further than Taraghi's Declaration in their Response, claiming through counsel's argument that "[t]he logical inference is that Suncor interfered with Plaintiffs' middlemen relationships as a direct result of the complaints and in furtherance of its actions relating to price discrimination." Resp. at 16. Mr. Taraghi's testimony, however, offers no support for this "logical inference." *Jones v. Prudential Ins. Co. of Am.*, 2012 WL 3868888, at *3 (D. Colo. Sept. 6, 2012) (Krieger, J.) (plaintiff's "belief," without evidence, is insufficient to defeat summary judgment); *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *8 (must offer affirmative evidence, not speculation, "strongly refuting all plausible alternative explanations"); *Gonzales*, 2010 WL 4156521 at *7 (disregarding "implicit assumption" when the evidence did not support the conclusion urged by plaintiff).

Equally plausible, if not more so, Suncor could have terminated access because WCS failed to pay nearly $3.76 million for the fuel it had already taken but not paid for and Suncor did not want to run any further risks with an affiliated company.  May 25, 2011 letter, Exh. H to Suncor's Mot., at pp. 2-3.  Suncor, of course, had the contractual right to terminate access "without cause, as a matter of right."  Access Agreement, Exh. N to Suncor's Mot., ¶4. Exercising this right cannot be the basis for a claim of tortious interference.  *Shaklee U.S., Inc.*, 1991 WL 90003, at *3; *Computer Place, Inc.*, 607 F. Supp. at 835; *accord Lufti*, 40 P.3d at 58 (granting summary judgment on tortious interference claim where defendant simply exercised contractual right).  Thus Taraghi's self-serving claim in paragraph 15 of his Declaration, that "[t]here was no reason for Suncor to terminate our access other than to punish Western or to eliminate competition," is contradicted by the record, and fails to refute an equally plausible, if not more plausible, explanation demonstrated by Exhibit H.  *See Am. Family Mut. Ins. Co.*, 2011 WL 782574, at *8; *Jordan*, 2009 WL 2982851 at *12 (rejecting "sham affidavit" that "disputes facts that are clearly established by otherwise reliable evidence in the record").

*Fourth*, in paragraph A, no. 4 on pages 16-17, Plaintiffs assert that, unlike the defendant in *Lufti*, Suncor had an improper motive in the exercise of its right to terminate WTO's access to its terminals.  Resp. at 17.  Plaintiffs contend without support that "there are allegations" of Suncor's improper motive "relating to motives or conduct involving the unlawful restraint of trade."  *Id.*  Plaintiffs offer no citation to the record to support these supposed "allegations" and, without more, Plaintiffs' allegations are wholly insufficient to withstand summary judgment. *Witt*, 2007 WL 840509 at *7 ("[P]laintiff may not simply rely on unsupported assertions but must point to specific evidence establishing a contention.").  Moreover, as explained on pages 24-25 of this Reply, Suncor's May 25, 2011 letter sets forth its reason for terminating access:

WCS took nearly $3.76 million worth of fuel from Suncor and refused to pay for it.  Suncor's May 25, 2011 Letter, Exh. H to Suncor's Mot., at pp. 2-3.  Plaintiffs' inferences and unsupported assertions, therefore, are baseless.  *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *6; *Jordan*, 2009 WL 2982851 at *12.

Plaintiffs have failed to present sufficient facts to create a triable issue on their tortious interference claims.  The Court should grant summary judgment to Suncor on Plaintiffs' Fourth and Fifth Claims for Relief.

Dated:  March 29, 2013

Respectfully submitted,

*s/Anthony J. Shaheen*
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO  80201-8749
Phone: 303-295-8054
Fax: 303-291-9126
AJShaheen@hollandhart.com

J. Robert Robertson
William L. Monts III
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
robby.robertson@hoganlovells.com
william.monts@hoganlovells.com
**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 29, 2013, I served the foregoing **SUNCOR'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**, by causing the foregoing to be presented to the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following email addresses:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON BIERMANN  & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
krb@benningtonjohnson.com
kec@benningtonjohnson.com
afa@benningtonjohnson.com

Philip W. Bledsoe
POLSINELLI SHUGHART, P.C.
1515 Wynkoop Street, Suite 600
Denver, CO 80202
pbledsoe@polsinelli.com

_____ s/Anthony Shaheen ___

6109064_1