**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

      Western/Counter Defendants,

v.

SUNCOR ENERGY (U.S.A.), INC. a Delaware corporation,

      Defendant/Counter Claimant/Third-Party Plaintiff,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

      Third-Party Defendants.

_____

**MOTION FOR FEES AND COSTS**
**BY INTERESTED NON-PARTY DILLON COMPANIES, INC.**
_____

      Dillon Companies, Inc. ("Dillon"), by and through its attorneys, Montgomery Little & Soran, P.C., respectfully submits this Motion for Fees and Costs incurred by Dillon for (A) Dillon's responding to four subpoenas submitted to Dillon and a former Dillon employee by Plaintiffs Western Convenience Stores, Inc. and Western Truck One, LLC (collectively "Western"); (B) Dillon's responding to Western's motions to re-designate or provide public access to documents containing Dillon's trade secrets that Dillon produced in reliance upon the Supplemental Protective Order (Doc. #140); and (C) filing

1

motions to restrict public access to documents designated as "secret" under the Supplemental Protective Order and containing Dillon's trade secrets that Western filed with the Court with no restrictions on public access in violation of the Supplemental Protective Order.

## CERTIFICATE OF CONFERRAL

Pursuant to D.C. Colo. L. Civ. R. 7.1(A), counsel for Dillon certifies that he conferred with counsel for Western regarding this motion.  Western objects to the relief requested in this motion.

## INTRODUCTION

This motion seeks $122,202.50 in attorney fees and $26,547.32 in costs for Dillon's production of voluminous documents and information in response to four subpoenas issued by Western to Dillon and a former Dillon employee over a period of eight months for a case in which Dillon is not a party and has no interest in the outcome. The Magistrate Judge, during a hearing on October 3, 2012, stated: ""I've got to tell you, [request] number 10 [in Western's first subpoena] beats the band in terms of overbroad. . . . Number 10 probably should be sanctionable."  Transcript of October 3, 2012 Hearing (Doc. #136), p. 84, lines 5-17.

Dillon extensively conferred with Western regarding what information was available in response to Western's subpoenas and tried to minimize fees, costs, and expenses for production.  Dillon produced over 90,000 pages of documents and sixteen Dillon employees (including two in-house counsel) lost valuable work time responding to

Western's subpoenas.  In response to, *inter alia*, the Court's comments during hearings on August 17, 2012 and December 12, 2012 regarding the need for Dillon witnesses (see Doc. #120, p. 14, lines 17-19 and Doc. #197 pages 21-22), Dillon brought six employees to two Court hearings.  Dillon also produced four employees for depositions. Dillon incurred travel expenses for two of these employees because they had to travel to Denver from Hutchinson, Kansas.  Dillon responded to Western's follow up requests and allowed Western to conduct telephonic interviews of Dillon's employees.  Dillon complied with Western's subpoenas in good faith throughout this matter.

In addition, Dillon incurred additional attorney fees to defend against motions by Western seeking to provide Dillon's trade secrets to Western's principal Mr. Taraghi (and even the public at large) in violation of the Supplemental Protective Order, which was agreed to by the parties and approved by the Court.  Further, Western filed documents, designated by Dillon as "Secret" under the Supplemental Protective Order, without any restrictions on public access.  After being notified of the documents that were filed in violation of the Supplemental Protective Order, Western refused to correct their mistakes thereby forcing Dillon to incur additional attorney fees to file motions to restrict public access to the documents.

Dillon now respectfully requests the Court to require Western to reimburse Dillon for attorney fees and costs Dillon incurred due to same.

**BACKGROUND**

1.      In this case, Western alleges that Defendant Suncor Energy (U.S.A.), Inc. ("Suncor") violated the Robinson-Patman Act, 15 U.S.C. § 13(a).  Specifically, Western claims that Suncor sold petroleum products to a number of Western's competitors, including Dillon, at prices lower than the prices Western paid Suncor for petroleum products of like grade and quality.  *See Generally*, Amended Complaint (Doc. #4).

*First Subpoena*

2.      Dillon is not a party to this action.  Dillon became an interested party in this case on April 26, 2012, when Western served Dillon, a direct competitor, with a Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises ("First Subpoena") (Doc. #57-1).

3.      On May 18, 2012, Dillon filed a Motion to Quash or Modify the First Subpoena (Doc. # 57).

4.      On July 16, 2012, the Court held a hearing concerning, among other things, Dillon's Motion to Quash or Modify the First Subpoena. (Courtroom Minutes/Minute Order, Doc. #88).  During the hearing, the Court stated: "To the extent that Dillon is objecting to something on the grounds of undue burden, I can solve that problem to a very great extent by shifting the costs, and I'll say if Mr. Taraghi wants this stuff, it's coming forward, I think it's going to happen on his nickle, and that could be very expensive."  Transcript of Motion Hearing Held on July 16, 2012 (Doc. #121), page 66 line 22 – page 67 line 2.

4

5.      On August 17, 2012, the Court held a second hearing concerning, among other things, Dillon's Motion to Quash or Modify the First Subpoena.  (Court Minutes/Minute Order, Doc. # 95) ("August 17, 2012 Order).  During the hearing, the Court found that Dillon's motion to quash or modify the First Subpoena was partially moot because Western had modified the requests in the First Subpoena.  The Court therefore denied Dillon's motion and ordered Dillon to comply with Western' modified requests.  During the hearing on August 17, 2012, the Court instructed Dillon to produce documents responsive to the First Subpoena and afterwards file a motion for its fees and costs for producing same.  *See* Transcript of August 17, 2012 Hearing (Doc. #120), page 8 line 4 – page 10, line 6; page 29 lines 15-17; page 32, line 20 – page 33, line 17.

6.      During the August 17, 2012 hearing, the Court further stated: "I will require that the Dillon stores provide this information [in response to the First Subpoena] within 30 days because, again, I don't know how long it's going to take. . . . If the Dillon stores cannot produce this information within 30 days, I'll require the Dillon stores to provide me with a written status report within ten calendar days of today's date, and I'll require a Dillon representative to be fit to provide an affidavit explaining why.  I will set this matter for a hearing and that affiant will have to be physically here to explain."  Transcript p. 34, line 23 – p. 35, line 4 (Doc. #120).

7.      On August 27, 2012, in compliance with the Court's Order, Dillon filed a Status Report with the Court regarding what documents were available in response to the First Subpoena and what documents could be produced within 30 days of the

Court's Order.  (Doc. #99).  The status report included sworn declarations from two Dillon employees in support thereof.

8.      On August 31, 2012, Dillon filed an Objection to the August 17, 2012 Order (Doc. #107).  Dillon also filed a brief in support of this Objection on September 12, 2012 (Doc. #115).

9.      Also on August 31, 2012, Dillon filed a Motion to Stay the August 17, 2012 Order (Doc. #109) and a Motion to Reconsider the August 17, 2012 Order (Doc. #110). The Court subsequently denied these motions without prejudice on November 16, 2012. (Doc. #149).

10.      On September 14, 2012, the Court held a Status Conference concerning, among other things, the First Subpoena.  Per the Court's request on August 17, 2012, Dillon brought three Dillon employees to the September 14, 2012 hearing to testify regarding what documents were available in response to the First Subpoena and what documents could be produced within 30 days of the Court's August 17, 2012 Order. *See* Transcript of September 14, 2012 Hearing (Doc. #129), p. 9, lines 4-21; p. 26, lines 10-13.  One of these employees traveled from Hutchinson, Kansas.

11.      During the September 14, 2012 hearing, the Court stated: "I am not precluding for a second the Dillon stores from filing a Motion to Shift Costs because I think this discovery will be expensive, and I'm not oblivious to that. And I don't think it's fundamentally fair to simply say that Dillon should, without restraint, just assume all of these costs. And it may very well be that at some point in the not distant future, Western

6

Convenience is going to be writing to Dillon stores a very significant check to cover all or some portion of this discovery. That's a very real possibility."  Transcript of September 14, 2012 Hearing, p. 20, line 17 – p. 21, line 1.

12.     On September 17, 2012, Dillon produced 22,310 pages of documents to respond to Request No. 7 in the April 26, 2013 Subpoena.  On September 25, 2012, counsel for Western sent Dillon a letter modifying Request No. 7 in the First Subpoena to request: "An identification of the receipts for fuel sales by station, by day, by fuel grade, by volume, and by number of customers purchasing gas that day from January 1, 2009 to May 31,2011." Exhibit Y, letter dated September 25, 2012.

13.     On October 3, 2012, the Court held a status conference regarding Dillon's production of documents under the First Subpoena.  During this hearing the Court stated: "I've got to tell you, number 10 [in the First Subpoena] beats the band in terms of overbroad. . . . Number 10 probably should be sanctionable."  Transcript of October 3, 2012 Hearing (Doc. #136), p. 84, lines 5-17.  Nevertheless, the Court required Dillon to produce documents for request number 10 in response to the First Subpoena.

14.     During the October 3, 2012 status conference, Western complained that its experts could not use the spreadsheets Dillon had produced in pdf format and requested Dillon to reproduce them in Microsoft Excel format.  Transcript of October 3, 2012 Hearing (Doc. #136), pp. 45-56.  The Court noted that the First Subpoena did not specify a format for production and ordered the parties to confer regarding the issue. *See Id.*  Western's experts and counsel thereafter conferred via telephone with Dillon's

7

counsel and Kroger's Manager of Fuel Technology, regarding this and other issues.  On October 5, 2013, Dillon reproduced the spreadsheets to Western in Microsoft Excel format.

15.     Dillon filed with the Court the following documents regarding: (A) what documents were available in response to the First Subpoena; (B) what documents Dillon had produced or would produce in response to the First Subpoena; (C) why several of the requests in the First Subpoena sought Dillon's trade secrets; and (D) Dillon's objections to the First Subpoena, including several declarations from Dillon's employees regarding same.  These documents were:

      a.  Status Report dated August 17, 2012 (Doc. # 94);

      b.  Status Report dated August 27, 2012 (Doc. #99);

      c.  Reply in Support of Status Report dated August 31, 2012 (Doc. #108);

      d.  Supplement to Status Report dated September 13, 2012 (Doc. #116);

      e.  Second Supplement to Status Report dated September 13, 2012 (Doc. #117);

      f.  Third Status Report (Doc. #137);

      g.  Fourth Status Report (Doc. #142); and

      h.  Fifth Status Report (Doc. #143).

*Western's Motion to Re-Designate Documents*

16.     During a status conference on December 12, 2012, Western discussed filing a renewed motion[1] to re-classify certain documents that Dillon produced in response to the First Subpoena, designated as "Secret" under the Supplemental Protective Order (Doc. #140), to a lower designation so that Mr. Hossein Taraghi ("Mr. Taraghi") could view them.  Western claimed that the data contained in the documents Western sought to re-designate was "stale", of little proprietary value, and no longer a trade secret.

17.     The Court stated that if Western filed a renewed motion, then the Court would probably hold an evidentiary hearing and require Dillon to present witness testimony concerning why pricing information from 2010 impacts pricing decisions that Dillon makes today.  *See* Transcript of December 12, 2012 Hearing, pages 21-22 (Doc. #197).  The Court also questioned whether Western's filing a renewed motion would be money well spent.  *Id.* at page 24, line 21.

---

[1] On May 21, 2012, Western filed a Motion Challenging Defendant's Designation of Certain Documents and Data as "Highly Confidential" Pursuant to the Protective Order ("Western's Original Motion to Re-Designate") (Doc. #59).  The Court denied Western's Original Motion to Re-Designate on June 25, 2012. Doc. #84.  This is the first of several attempts by Western to have Mr. Taraghi view restricted documents without authorization under the Original Protective Order (Doc. #49) and the Supplemental Protective Order (Doc. #140).  *See Also* Western's Renewed Motion to Re-Designate (Doc. #153) and Western's Response to Suncor's Unopposed Motion to Restrict Access (Doc. #193).

9

18.     On December 18, 2012, Western filed its Renewed Motion Challenging Designation of Certain Documents and Data (Doc. #153) (the "Renewed Motion to Re-Designate")[2].

19.     On January 11, 2013, Dillon filed a response (Doc. #165) to Western's Renewed Motion to Re-Designate (Doc. #153).  The response included declarations from three Dillon employees concerning why the documents should remain classified as "Secret" under the Supplemental Protective Order (Doc. #140).

20.     On January 28, 2013, the Court held a hearing concerning, among other things, Western's Renewed Motion to Re-Designate.  *See* Hearing Transcript (Doc. #180).  Per the Court's request on December 12, 2012, Dillon brought three Dillon employees to the January 28, 2013 hearing to testify concerning why the documents Western sought to re-designate should maintain their designations under the Original and Supplemental Protective Orders.  *See* Hearing Transcript (Doc. #180), page 14, line 14 – page 15, line 4.  Dillon's counsel pointed out that three Dillon employees were available to testify and answer any questions the Court might have.  *See Id.*  One of these employees traveled from Hutchinson, Kansas.  At the conclusion of the hearing, the Court denied Western's Renewed Motion to Re-Designate.  *See* Transcript of

---

[2] This was the second attempt by Western to have Mr. Taraghi access restricted documents that he was not authorized to view under the Original and Supplemental Protective Orders (Doc. #49 and Doc. #140). *See Also* Western's Original Motion to Re-Designate (Doc. #59) and Western's Response to Suncor's Unopposed Motion to Restrict Access (Doc. #193).

January 28, 2013 Hearing (Doc. #180) and Minute Entry dated January 28, 2013 (Doc. #179).

*Second and Third Subpoenas*

21.     On December 18, 2012, Western served The Kroger Co. with: (A) Subpoena to Testify at a Deposition in a Civil Action dated December 17, 2012 ("Second Subpoena") (Doc. # 159-1); and (B) Western's Rule 30(b)(6) Notice of Deposition of the Kroger Company and Affiliates (Doc. #159-1, page 3) ("Kroger Notice of Deposition").  The Kroger Notice of Deposition directed Dillon to designate a person or persons to testify regarding a list of eighteen topics ("Topics").  The Kroger Notice of Deposition scheduled a deposition for January 3, 2013.  Western's counsel did not attempt to coordinate this date with office for Dillon's counsel before issuing the Kroger Subpoena. *See* D.C. COLO.LCivR 30.1 (reasonable notice, scheduling).

22.     On Wednesday December 19, 2012, Western served David Wilson with a subpoena (Doc. #159-2) ("Third Subpoena").  On Friday December 27, 2012, Western served Dillon with a Notice of Deposition of David Wilson.  (Doc. #159-2, page 3).

23.     From December 18, 2012 until January 2, 2013, counsel for Dillon extensively conferred with counsel for Western concerning the Second and Third Subpoenas regarding scheduling the depositions, locations of the depositions, designation of witnesses, and the topics for which information was sought.

24.     On January 2, 2013, Dillon served Western with an objection (Doc. # 159-5) to the Second and Third Subpoenas, out of an abundance of caution, to comply with F.R.C.P. 45(c)(2)(B), to the extent that it may apply to subpoenas *ad testificandum*.

25.     On January 3, 2013, Dillon filed a motion to quash or modify the Second and Third Subpoenas (Doc. #159).

26.     On January 14, 2013, Dillon sent Western a letter to designate Dillon employees to testify under F.R.C.P. 30(b)(6) regarding the list of eighteen topics in Western's Second Subpoena and Notice of Deposition.  Exhibit Z, letter dated January 14, 2013 (exhibits thereto omitted).

27.     On January 24, 2013, after counsel for Dillon conferred with counsel for Western, Dillon and Western filed a Joint Status Report (Doc. #167) [3] concerning Dillon's motion to quash or modify the Second and Third Subpoenas.  Page 2 of the Joint Status Report provided, *inter alia*, that: "Plaintiffs and Dillon have agreed that Plaintiffs will not seek the identity of Dillon's suppliers besides Suncor, but instead that Dillon will provide spreadsheets with certain information regarding purchases and deliveries for a limited number of stores without identifying the suppliers."  Doc. #167, page 2.  Page 3 of the Joint Status Report stated: "Plaintiffs have agreed not to seek the

---

[3] This Joint Status Report (Doc. #167) set forth, *inter alia*, the "running rules" going forward for the depositions under the Second and Third Subpoenas.  Notwithstanding this agreement, Dillon's counsel was forced to object to questions from counsel from Western seeking the identity of Dillon's suppliers in breach of this agreement and instruct the witnesses not to answer.  *See* Paragraph 32 of this motion below.

identity of [Dillon's] Potential Suppliers or any information that would indirectly disclosed [sic] their identity."  Doc. #167, page 3.

28.     On January 28, 2013, during the hearing referred to in paragraph 20 of this motion above, Dillon's counsel suggested that the Court defer ruling upon Dillon's motion to quash or modify the Second and Third Subpoenas pending Western's depositions pursuant to same.  *See* transcript of hearing on January 28, 2013 (Doc. #180), pp. 3-6.   The Court issued an Order denying the motion to quash or modify as moot.  Order, Doc. #179.   On February 11, 2013, Dillon filed an objection to the Court's Order denying Dillon's motion to quash or modify.  (Doc. #187).

29.     Western took the depositions of the following persons on the following dates pursuant to the Second and Third Subpoenas:

>    a.  January 31, 2013: Susan Giannola, Director of Supermarket Petroleum Operations for The Kroger Co.;
>
>    b.  February 5, 2013: David Wilson, former Senior Manager of Petroleum Procurement for The Kroger Co.;
>
>    c.  February 7, 2013: Chad Thiessen, Assistant Manager of Petroleum Procurement for The Kroger Co.;

      d.   February 19, 2013: David Parker, Manager of Real Estate, Loaf N' Jung, Inc.; and[4]

      e.   February 19, 2013: Edward Sharpe, Director of Petroleum for Loaf 'N Jug, Inc.

30.     Counsel for Dillon appeared at these depositions on behalf of Dillon and Mr. Wilson.

31.     During the depositions of Mr. Wilson, Mr. Thiessen and Mr. Sharpe, Western breached the agreement reached in the Joint Status Report (Doc. #167) by seeking the identity of Dillon's suppliers as follows, without limitation:

      a.   *Deposition of David Wilson.*  "Q. We know from other evidence in this case that Kroger was buying supply from [Alleged Supplier X (name withheld)] . . . .  Do you recall having any dealings with [Alleged Supplier X (name withheld)]?" (Excerpt from transcript of Deposition of David Wilson ("Wilson Transcript") pp. 13-14); and "Q.  Do you recall, Mr. Wilson . . . whether or not Kroger was acquiring supply from [Alleged Supplier Y (name withheld)]?" (Wilson Transcript p. 60);

_____

[4] Dillon designated Mr. Parker to testify solely with regard to Topic No. 17 of the December 17, 2012 Subpoena, which states: "Description of consideration, efforts and negotiations by Kroger to acquire WCS or any WCS stores, including the steps taken and persons involved therein." (Doc. #159-1, p. 6).  This topic had nothing to do with Western's claims against Suncor.  It involved matters well outside of the scope and Pertinent Timeframe (as defined in the First Subpoena and thereafter modified) of the First Subpoena.

b.  *Deposition of Chad Thiessen.*  "Q.  . . . [W]ho were the other suppliers involved in responding to the grocery store RFP in 2009?"  Transcript of deposition of Chad Thiessen ("Thiessen Transcript") dated February 7, 2013, page 53, lines 13-15; and

c.  *Deposition of Ed Sharpe.*  "Q. Wasn't there a point in time when Loaf N' Jug was acquiring supply from [Alleged Supplier X (name withheld)]?" Transcript of deposition of Ed Sharpe ("Sharpe Transcript") dated February 19, 2013, page 81 lines 8-9.

32.     Dillon's counsel objected to these questions and instructed the witnesses not to answer.  Wilson Transcript, p. 12, line 23 – p. 13, lines 11-15; Wilson Transcript p. 57, lines 7-16; Thiessen Transcript, p. 53, line 16 – p. 54, line 19 , Sharpe Transcript, p. 81, line 10 - p. 84, line 16.

*Fourth Subpoena (Pricing Strategies)*

33.     On February 5, 2013, counsel for Western sent counsel for Dillon an e-mail stating that Dillon needed to produce more documents under the First Subpoena regarding pricing strategies.  ("February 5, 2013 E-mail") (Exhibit AA) (exhibits thereto omitted).  The February 5, 2013 E-mail states in part: "To date we are aware of no such documents produced by Kroger.  Please supplement the Kroger document production on this subject.  I also suggest that Kroger be reminded that it is obligated to produce every document it has that mentions WCS or Hossein Taraghi. Scrupulous adherence

by Kroger to the [First Subpoena] would have produced the documents referring to a policy specific to WCS."  Exhibit AA.

34.     Topic No. 3 of the First Subpoena states: "For the Pertinent Timeframe, all Communications between You and Suncor relating to Western Convenience Stores."  Doc. #57-1, p. 3.  Plaintiffs' Status Report dated July 25, 2012 states in part: "Plaintiffs have agreed that Dillon may initially limit its response to email in the form of ESI between Dillon and Suncor dated  created [sic] after January 1, 2008 containing any of the following search terms: *Western Convenience Stores, Western Convenience, Western, WCS, Hossein, Taraghi, Wehrle.*"  Doc. #89, page 3 (emphasis in original).  Accordingly, this modified request was limited to a search of Dillon e-mails between Dillon and Suncor including these search terms and did not include "every document [Dillon] has that mentions WCS or Hossein Taraghi" as stated by the February 5, 2013 E-mail.  Exhibit AA.  Counsel for Dillon thereafter consulted with counsel for Western from February 8, 2013 until February 14, 2013 regarding this issue.

35.     On February 14, 2013, counsel for Western conceded that the First Subpoena did not require Dillon to produce additional documents regarding pricing strategies as alleged in the February 5, 2013 E-mail.  Rather, Western intended to issue Dillon a fourth subpoena.

36.     On February 15, 2013 counsel for Western served Dillon with a Subpoena to Produce Documents, Information or Objection or to Permit Inspection of Premises in

a Civil Action (Exhibit BB) ("Fourth Subpoena").  The return date for the Fourth

Subpoena, February 22, 2013, did not provide Dillon with a reasonable amount of time

to respond.

37.     On February 20, 2013, counsel for Dillon conferred with counsel for

Western via a telephone conference regarding, among other things, the return date,

scope, and what documents were available that might be responsive to the Fourth

Subpoena.  Dillon's in-house counsel also participated in this conference to answer

counsel for Western's questions regarding what documents were available in response

to the Fourth Subpoena.

38.     On February 21, 2013, Dillon served Western with an objection to the

Fourth Subpoena under F.R.C.P. 45(c)(2)(B) (Exhibit CC, exhibits thereto omitted).

Subject to its objection under F.R.C.P. 45(c)(2)(B), on February 21, 2013 Dillon

produced thirteen (13) pages of documents in response to the Fourth Subpoena

including the information Dillon had available pertinent to Western's requests.  Dillon

redacted and withheld information outside of the Pertinent Time Frame and Pertinent

Geographic Area (as defined in the Fourth Subpoena) from these documents, including

without limitation, portions of a pricing strategy handbook.

39.     Later on the same day, February 21, 2013, in response to counsel for

Western's concerns about the redactions Dillon made to the documents Dillon produced

in response to the Fourth Subpoena, Dillon permitted Western's counsel to inspect the

un-redacted documents, including the entire pricing strategy handbook, in the office of

17

Dillon's counsel.  The next day, Dillon made its in-house counsel available to Western's counsel via telephone to answer counsel for Western's follow-up questions regarding the documents.

*Summary of Documents Produced*

40.    From August 17, 2012 until April 11, 2013, Dillon produced 98,437 pages of documents in response to the First Subpoena and the Fourth Subpoena.  *See* Exhibit S, chart of document Dillon produced.

*Western's Requests For Public Access to Dillon's Trade Secrets*

41.    On February 8, 2013, Suncor filed a Motion for Summary Judgment on Plaintiff Western Convenience Stores' First and Sixth Claims for Relief and Suncor's Third Affirmative Defense (Doc. #184) and exhibits thereto (Doc. #185) (collectively "Suncor MSJ").  Suncor filed the Suncor MSJ as a Level 2 Restricted Document, i.e. the Suncor MSJ is not publically accessible via the Court's PACER system.  On February 12, 2013, Suncor filed an Unopposed Motion to Restrict Access to the Suncor MSJ (Doc. #188) as required by the rules.

42.    On March 6, 2013, Western filed a Response to Suncor's Unopposed Motion to Restrict Access to the Suncor MSJ (Doc. #193).  Western's response stated that although Western initially did not oppose Suncor's motion to restrict access, Western reconsidered and decided to oppose same.  *See* Response (Doc. #193), p. 2.

43.    Despite the Court's prior denials of Western's Original Motion to Re-Designate") (Doc. #59) (denied on June 25, 2012 (Doc. #84)) and Western's Renewed Motion to Re-Designate (Doc. #153) (denied on January 28, 2013 (Doc. #179)) and the

provisions of the Supplemental Protective Order (Doc. #140), Western again asked to
provide Dillon's trade secret information to Mr. Taraghi[5], or alternatively to provide the
public with access to the Suncor MSJ.

44.     After receiving Western's Response (Doc. #193), Dillon promptly prepared
a redacted version of Suncor's MSJ (Doc. #208) which could be produced to Mr.
Taraghi, much as the parties had previously conferred and prepared the redacted Tatos
Expert Report (Doc. #207).  *See* Dillon's Response to Suncor's Motion to Restrict
Access, Doc. #220, pp. 2-5, paragraphs 2-13.  Western refused to agree to a redacted
version of the Suncor MSJ and continues to seek public access to an un-redacted
version of same.  *See* Doc. #193 and Doc. #220-3.  On March 27, 2013, Dillon filed a
response to the public access/re-designation issues raised by Western (Doc. # 206-1)
(re-filed as Doc. #220 per the Court's Order).

45.     Western also filed two documents with the Court including Dillon's trade
secrets without restricting public access to same.  Notwithstanding the fact that it was
incumbent upon Western to abide by the Supplemental Protective Order, Western
thereafter insisted that Dillon file motions with the Court to restrict public access to the
documents even though Western filed them with the Court.   On February 25, 2013,
Western filed the first document with the Court: an e-mail from Steve Moss to David

_____

[5] This was the third attempt by Western to have Mr. Taraghi view restricted documents for which he lacks
authorization under the Original and Supplemental Protective Orders (Doc. #49 and Doc. #140).  *See*
Western's Original Motion to Re-Designate") (Doc. #59) and Western's Renewed Motion to Re-Designate
(Doc. #153).

19

Wilson dated May 16, 2008 ("Moss E-mail") (Doc. #192-1) that Dillon had previously designated as "Secret" under the Supplemental Protective Order.  Upon information and belief, Western inadvertently filed the Moss E-mail (containing Dillon's trade secrets) as a "restricted attachment" in the ECF system instead of as a "restricted level 1 document".  Because Western filed the Moss E-mail with no actual restrictions, counsel for Dillon requested that Western file a motion to change the Moss E-mail to a restricted document in the PACER system.  Counsel for Western declined.  *See* Exhibit EE, p. 2. In light of Western's refusal to meet its obligations and comply with the Supplemental Protective Order, Dillon was forced to file a motion to restrict access to a document that Dillon had designated as "Secret" under the Supplemental Protective Order, even though it was Western that filed the document with the Court.  Dillon thereby incurred additional attorney fees.

46.     On March 13, 2013, Western filed a second document, Western's Response to Suncor's Motion for Summary Judgment on Plaintiffs Second, Third, Fourth and Fifth Claims for Relief (breach of contract and tortious interference) (Doc. #200) without restricting public access and including information derived from Dillon's trade secrets that Dillon had previously produced and designated as "Secret", subject to the Supplemental Protective Order (Doc. #140).  Counsel for Western indicated to counsel for Dillon that Western inadvertently included this information without filing it as a restricted document.  However, Western again refused to correct its own error and

forced Dillon to incur additional attorney fees by filing a motion to restrict access to Doc. #200.  *See* Doc. #211, Dillon's motion to restrict access to Doc. #200.

47.     Counsel for Western also required Dillon to file a motion to restrict access to Western's response (Doc. #198) to the Suncor MSJ, which included Dillon's trade secrets, even though Western filed the response and exhibits thereto with the Court. *See* Exhibit EE, p. 1; Doc. #209 (Dillon's motion to restrict access to Doc. #198).

*Attorney Fees Sought by Dillon - $122,202.50*

*48.*     Dillon incurred $182,728.50 for its attorney fees in this matter[6].  *See* Exhibit U, chart of attorney fees.  Dillon, at this time and without waiver, requests the Court to award only $122,202.50 of this amount  for the following services rendered by Montgomery, Little & Soran, P.C. ("MLS") without limitation:

a.  *First Subpoena*

i.   Negotiating and drafting the Supplemental Protective Order (Doc. #140);

ii.  Assisting Dillon in ascertaining what documents were responsive to the First Subpoena;

iii. Consulting with Western's counsel regarding the scope and meaning of the First Subpoena and what documents Dillon had available in response to the First Subpoena;

---

[6] This motion includes as Exhibits C-I invoices through March 15, 2013.  Montgomery, Little & Soran, PC ("MLS") also has work in progress pending that has not been invoiced yet and Dillon anticipates supplementing this motion with future MLS invoices.

iv.  Preparing, bates numbering, and producing documents and compact discs in response to the First Subpoena;

v.  Redacting information outside of the Pertinent Time Frame and Pertinent Geographic Area (as defined in the First Subpoena) from documents to be produced in response to the First Subpoena[7];

vi.  Assisting Dillon with designating documents as "Confidential", "Highly Confidential" or "Secret" under the Original Protective Order (Doc. #49) and the Supplemental Protective Order (Doc. #140);

vii.  Composing letters to Western's counsel regarding documents and CDs being produced to Western in response to the First Subpoena;

viii.  Preparing and filing status reports and related documents, including without limitation declarations from Dillon employees, with the Court concerning: (A) what documents were available in response to the First Subpoena; and (B) what documents Dillon had produced or would produce in response to the First Subpoena; (C) why several of the requests in the First Subpoena sought Dillon's trade secrets; and (D) Dillon's objections to the First Subpoena;

---

[7] After Dillon produced the redacted studies to Western in response to Request No. 10 of the First Subpoena, Western's counsel complained that the redactions, among other things, were multiple, significant, arbitrary and made with no explanation for the basis of the redactions.  Dillon offered to allow counsel for Western to inspect the un-redacted studies in the offices of counsel for Dillon, but counsel for Western declined to do so.

b. *Western's Motion to Re-Designate and Restricting Public Access*

    i. Responding to Western's motion to re-designate documents Dillon produced in response to the First Subpoena to a lower designation under the Supplemental Protective Order (Doc. #140);

    ii. Preparing and submitting declarations from Dillon's employees concerning why the documents Dillon produced should not be changed to a lower designation;

    iii. Preparing witnesses to testify at the hearing on January 28, 2013 concerning Western's motion to re-designate documents.  See Transcript of January 28, 2013 Hearing (Doc. #180) and Minute Entry dated January 28, 2013 (Doc. #179);

    iv. Negotiating with Western's counsel concerning redactions to Western's expert report to permit Mr. Taraghi to view the redacted expert report;

    v. Preventing public access to documents filed with the Court by Western and upholding the Supplemental Protective Order;

    vi. Filing motions to restrict public access to documents filed with the Court by Western;

c. *Second and Third Subpoenas*

    i. Assisting Dillon with designating witnesses to testify regarding the list of eighteen topics in Western's Second Subpoena under

F.R.C.P. 30(b)(6).  See Exhibit Z, letter of designation dated January 14, 2013 (exhibits thereto omitted);

ii.  Negotiating, preparing and filing the Joint Status Report (Doc. #167) concerning Dillon's motion to quash or modify the Second and Third Subpoenas.  (Doc. #167);

iii.  Preparing for, traveling to and appearing during the depositions of Susan Giannola, David Wilson, Chad Thiessen, David Parker and Edward Sharpe taken pursuant to the Second and Third Subpoenas;

iv.  Obtaining and designating deposition transcripts and exhibits for Susan Giannola, David Wilson, Chad Thiessen, David Parker and Edward Sharpe as "Confidential", "Highly Confidential" or "Secret" under the Supplemental Protective Order (Doc. #140).

d.  *Fourth Subpoena (Pricing Strategies)*

i.  Responding to, and negotiations concerning, counsel for Western's e-mail dated February 5, 2013 (Exhibit AA) stating that Dillon needed to produce more documents under the First Subpoena regarding pricing strategies;

ii.  Assisting Dillon in ascertaining what documents were available in response to the Fourth Subpoena;

iii.  Preparing, bates numbering, and producing documents in response to the Fourth Subpoena;

iv.  Redacting information outside of the Pertinent Geographic Area from documents to be produced in response to the Fourth Subpoena; and

v.  Assisting Dillon with designating documents responsive to the Fourth Subpoena as "Confidential", "Highly Confidential" or "Secret" under the Supplemental Protective Order (Doc. #140).

*See* Exhibit B, Declaration of Michael R. McCormick Pursuant to 28 U.S.C. § 1746 ("McCormick Declaration"); Exhibits C-I, MLS Invoices[8]; Exhibit T, Chart With MLS Hours and Fees by Timekeeper; Exhibit U, Chart With Summary of MLS Fees.

49.    The entries for the above services are highlighted on the MLS invoices attached as Exhibits C-I.

50.    For the reasons stated herein and in the McCormick Declaration, the attorney fees of $122,202.50 incurred by Dillon for the above services are reasonable and necessary.

---

[8] MLS redacted attorney-client privileged communications and work product from the invoices.

*Attorney Fees Not Sought by Dillon - $60,526*

51.     Of the $182,728.50 in attorney fees that Dillon incurred, Dillon at this time and without waiver does not ask the Court to award $60,526[9] in attorney fees for the following services rendered by MLS:

     a.  *First Subpoena*

         i.  Advising Dillon concerning the First Subpoena and related legal issues;

         ii.  Preparing and filing motions and objections regarding the First Subpoena;

         iii.  Appearing at status conferences and other hearings regarding the First Subpoena;

     b.  *Western's Motion to Re-Designate and Restricting Public Access*

         i.  Appearing at status conferences and other hearings regarding Western's motion to re-designate documents Dillon produced in response to the First Subpoena to a lower designation under the Supplemental Protective Order (Doc. #140);

         ii.  Preparing and filing motions to restrict access to confidential documents that Dillon filed with the Court;

---

[9] Dillon does not hereby waive its right to seek these attorney fees from the Court at a later time.

    c.  *Second and Third Subpoenas*

       i.  Preparing an objection under F.R.C.P. 45(c)(2)(b) to the Second and Third Subpoenas (Doc. #159-5);

       ii.  Preparing and filing a motion to quash or modify the Second and Third Subpoenas (Doc. #159);

       iii.  Filing an objection to the Court's Order denying Dillon's motion to quash or modify the Second and Third Subpoenas (Doc. #187);

    d.  *Other Services*

       i.  Initial file investigation and studying hearing transcripts;

       ii.  Organizing and maintaining files;

       iii.  Scheduling and logistical issues; and

       iv.  Preparing and filing this motion for fees and costs.

52.     Entries for these services are not highlighted on Exhibits C-I.

*MLS Costs Sought by Dillon - $2,076.76*

53.     Dillon incurred for $8,148.42 in costs from August 22, 2012 until March 15, 2013.  *See* Exhibits C-I, MLS Invoices and receipts; Exhibit V, Summary of MLS Costs (Per Invoice).  Dillon at this time and without waiver seeks $2,076.76[10] of this amount for costs for the following:

---

[10] Dillon does not hereby waive its right to seek the remaining $6,071.66 in costs from the Court at a later time.

a.  Preparing and producing documents and compact discs in response to the First Subpoena:

    i.  Couriers to BJBC (Counsel for Western): $271.63;

    ii.  Couriers from Kroger, Denver Office: $62.68;

    iii.  Federal Express Charges to Cincinnati Ohio: $344.54;

b.  Consulting with Western's counsel regarding the scope and meaning of the First Subpoena and what documents Dillon had available in response to the First Subpoena:

    i.  Parking - Meeting with Plaintiff's Counsel: $10;

c.  Preparing for, traveling to and appearing during the depositions of Susan Giannola, David Wilson, Chad Thiessen, David Parker and Edward Sharpe taken pursuant to the Second and Third Subpoenas:

    i.  Federal Express Charges to Loaf N' Jug, Pueblo: $51.48;

    ii.  Meals for/with client: $39.99;

    iii.  Mileage for travel to & from depositions (Pueblo, CO): $155.94;

    iv.  Parking – Depositions: $72.50;

d.  Obtaining and designating deposition transcripts and exhibits for Susan Giannola, David Wilson, Chad Thiessen, David Parker and Edward Sharpe as "Confidential", "Highly Confidential" or "Secret" under the Supplemental Protective Order (Doc. #140):

    i.  Transcript Costs (depositions): $1,068.

e.  Total: $2,076.76.

54.     *See* McCormick Declaration, Paragraph 59; Exhibit W, summary of MLS costs per item; Exhibits C-I, MLS Invoices & Receipts.

55.     For the reasons stated herein and in the McCormick Declaration, the above costs of $2,076.76 incurred by Dillon are reasonable and necessary.

*Other Costs Incurred and Sought by Dillon - $24,470.56*

56.     Dillon also incurred and seeks an additional $24,470.56 in costs related to this matter as detailed in the Declaration by Sara Sudkamp, Exhibit A, and Exhibits J-N. These costs were for: (A) Dillon's employee time for responding to Western's discovery requests and for related matters (*See* Exhibit J – chart of Dillon Employee time); (B) copying and labeling documents in response to request no. 10 of the First Subpoena (Exhibit K, RICOH invoice); (C) conducting a search of employee e-mails (Exhibit L, Invoice from Dinsmore & Shohl, LLP); and (D) travel expenses for two Dillon employees to travel to Court hearings from Hutchinson, Kansas (Exhibits M & N[11]).  For the reasons stated in the Sudkamp Declaration, the costs of $24,470.56 incurred by Dillon are reasonable and necessary.

57.     Dillon continues to incur attorney fees and costs as of the date and time of this filing.  Accordingly, Dillon will supplement this motion with additional invoices, exhibits and supplemental declarations as needed.

_____

[11] Dillon is obtaining receipts for Mr. Thiessen's travel expenses (Exhibit N) and anticipates filing with the Court a supplement to this motion including same.

*Summary of Fees and Costs Sought by Dillon*

58.    In sum, at this time and without waiver, Dillon seeks the following fees and costs:

| Item | Amount | Exhibit Reference (Summary) |
|---|---|---|
| Attorney Fees - Montgomery Little & Soran, P.C. | $122,202.50 | U |
| Costs - Montgomery Little & Soran, P.C. | $2,076.76 | V & W |
| Other Costs Incurred by Dillon | $24,470.56 | X |
| **TOTAL** | **$148,749.82** | |

## LEGAL AUTHORITIES

59.    Fed. R. Civ. P. 45 governs the issuance of subpoenas to non-parties, and provides the following:

"(c) Protecting a Person Subject to a Subpoena.

(1) *Avoiding Undue Burden or Expense; Sanctions.*  A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply.

* * *

(3) *Quashing or Modifying a Subpoena.*

(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:

> (i) fails to allow a reasonable time to comply;

> (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person--except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

> (iv) subjects a person to undue burden.

(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

> (i) disclosing a trade secret or other confidential research, development, or commercial information;

* * *

(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated."

60.     *See Also* F.R.C.P. 45(c)(2)(B) (procedure regarding order compelling production or inspection when objection is served; order compelling production must protect person who is neither a party nor a party's officer from significant expense resulting from compliance).

61.     Rule 45 thus imposes an obligation first on the party issuing a subpoena, and where there is an objection, the Court must ensure that a person commanded to respond to a subpoena is not subjected to an undue burden or expense as a result of complying with the subpoena.  *In Re: Michael Wilson & Partners, Ltd.*, 2012 U.S. Dist. 72961 at *7-8 (D. Colo., May 24, 2012) (United States District Judge Marcia S. Krieger). This may be achieved by quashing the subpoena, narrowing its scope, or by requiring that the incurred costs be borne by the requesting party.  *Id.*; citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 669 F.2d 620, 623 (10th Cir. 1982) (no abuse of discretion in requiring a non-party's compliance with a subpoena to be conditioned on payment of the costs and noting that in responding to the subpoena the non-party was performing work that did not inure to its own benefit; rather, benefit went to the discovering party).  As interpreted by the Court of Appeals for the D.C. Circuit, "the questions before the district court are whether the subpoena imposes expenses on the non-party, and whether those expenses are 'significant.'  If

they are, the court must protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder 'non-significant.'" *Wilson*, 2012 U.S. Dist. 72961 at *8; *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182, 346 U.S. App. D.C. 117 (D.C.Cir. 2001). However, this does not necessarily mean that the requesting party must bear the entire cost of compliance. *Id.*

62.     A three-part test is often used in determining whether, and to what extent, attorney's fees and costs should be shifted from a person responding to a subpoena to the party seeking the discovery: (1) whether the non-party actually has an interest in the outcome of the case, (2) whether the non-party can more readily bear the costs than the requesting party, and (3) whether the litigation is of public importance. *Wilson*, 2012 U.S. Dist. 72961 at *8-9; *citing In re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C. 1992); *see also Crandall v. City & County of Denver*, Colorado, 2007 U.S. Dist. LEXIS 96770, 2007 WL 162743 (D. Colo. 2007) (adopting same factors).  Other factors that courts have considered include the scope of the discovery, the invasiveness of the request, the extent to which the producing party must separate responsive information from privileged or irrelevant material, and the reasonableness of the costs of production. *Wilson*, 2012 U.S. Dist. 72961 at *9; *citing Sound Sec., Inc. v. Sonitrol Corp.*, 2009 U.S. Dist. LEXIS 59630, 2009 WL 1835653, *2 (W.D. Wash. 2009), *quoting U.S. v. Columbia Broadcasting System, Inc.*, 666 F.2d 364, 372 (9th Cir. 1982).

*F.R.C.P. 26*

63.     F.R.C.P. 26(b)(1): "Discovery Scope and Limits. (1) Scope in General. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense-including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b) (2) (C)."

64.     F.R.C.P. 26(b)(2)(C): "When Required. On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

65.     F.R.C.P. 26(c)(1) states in part: The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . (B) specifying terms, including time and place for the disclosure or discovery. . . [and] (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way . . . ."

66.     Courts also consider the burden imposed on the producing party, the relevance of the request, the requesting party's need for the documents, the breadth of the document request, and the time period covered by the request.  *Echostar Communications Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 396 (D. Colo. 1998).

## ARGUMENT

### A.  Dillon Has No Interest in the Outcome of this Case.

67.     This is a dispute between Western and Suncor in which Western alleges that Suncor improperly charged Western higher prices than Dillon.  In return, Suncor alleges, *inter alia*, that Western failed to pay for gas supplied by Suncor.  Dillon is not a party to this action and there are no claims against Dillon.  Dillon has no interest concerning whether Western or Suncor prevail in these claims.  Dillon has no financial interest in the outcome of this case.

### B.  Western is Able to Bear the Costs of Production.

68.     According to the Complaint, "[Plaintiff Western Truck One, LLC] operates 10 trucks, 24 hours per day, every day, in a virtually non-stop delivery operation of 8 to

10 million gallons of fuel per month to 42 [of Plaintiff Western Convenience Stores, Inc.'s] stores located in Colorado and Nebraska."]  Complaint (Doc. #1), Paragraph 9. The assets Western allegedly owns and the size of Western's alleged business operations indicate Western's ability to bear the fees and costs for its discovery requests.

69.     Western has retained at least two experts and three attorneys to litigate this matter.  This also indicates that Western has more than adequate resources to bear the fees and costs for its discovery requests. Further, Western was warned throughout the case by the Court that Western may bear some or all of Dillon's fees or costs but continued to proceed without modifying its discovery requests to Dillon.  Western has demonstrated that it can adequately bear the expenses for its discovery in this matter.

### C.  This Litigation Has Little or No Public Importance.

70.     Substantial public interest in a case is a factor that may require a non-party to absorb its own costs.   *See e.g. Mount Sinai Med. Ctr. v. Port Auth. of N.Y. & N.J., Inc. (In re World Trade Ctr. Disaster Site Litig.)*, 2010 U.S. Dist. LEXIS 96819, 56-57 (S.D.N.Y. Sept. 13, 2010).  Although this is a price discrimination case under the Robinson-Patman Act, Western has, at most, alleged that Suncor provided lower prices to Dillon than Western thereby allegedly injuring Western.  However, Western has not demonstrated any injury to the public caused by any alleged price differences between Western and Dillon.  *See Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 559-560 (U.S. 1990) (reiterating the longstanding principal that suppliers are not liable for the independent

pricing decisions of their buyers).  This matter is essentially a private commercial dispute between Western and Suncor.  There is little or no benefit to the public regarding this case.

**D.  The Scope of Discovery Sought by Western Was Overly Broad and Unduly Burdensome.**

71.     Western did not follow the Court's or Dillon's repeated invitations to narrow the discovery to what was actually needed for its case against Suncor.  Instead, Western propounded several discovery requests that were overly burdensome and totally unrelated to this litigation, including without limitation:

    a.  First Subpoena, Request No. 7 ("such ESI as will identify by zip code and the last 4 digits of the credit or debit card number, each customer on each credit or debit card purchase of Fuel from You at retail.") (Doc. #57-1);

    b.  First Subpoena, Modified Request No. 7 ("An identification of the receipts for fuel sales by station, by day, by fuel grade, by volume, and by number of customers purchasing gas that day from January 1, 2009 to May 31,2011.") (Exhibit Y, letter from Western's counsel dated September 25, 2012);

    c.  First Subpoena, Request No. 8 (daily pump price for each retail site) (Doc. #57-1);

    d.  First Subpoena, Request No. 9 (retail fuel price surveys) (Doc. #57-1);

    e.  First Subpoena, Request No. 10 (All reports and research, studies, examinations, investigations, surveys or analysis·('Research') done by

37

You or on Your behalf relating to the characteristics of consumer demand for Fuel, or competition at the retail level, such as: a. price elasticity, b. demand elasticity, c. factors effecting demand elasticity for Fuel . . . [etc.]" (Doc. #57-1)[12];

f.   Second Subpoena, Topic Nos. 1 & 2 (description of process used by Dillon for setting daily pump price) (Doc. # 159-1);

g.   Second Subpoena, Topic No. 3 (description of how prices paid by Dillon to Suncor affects daily pump price) (Doc. # 159-1);

h.   Second Subpoena, Topic No. 12 (description of Dillon's purposes and uses of daily fuel survey data); (Doc. # 159-1)

i.   Second Subpoena, Topic Nos. 13 & 14 (description of Dillon's purchase of fuel from suppliers other than Suncor, identification of other suppliers to Dillon, sites to which fuel from other suppliers was delivered, etc.) (Doc. # 159-1);

j.   Second Subpoena, Topic No. 15 (description of the processes for setting of daily pump prices for all grades of fuel for the King Soopers' store on Northern Avenue and Loaf 'N Jug Store No. 52 (both in Pueblo)) (Doc. # 159-1);

_____

[12] As previously noted by the Court, this request was so overbroad that it "probably should be sanctionable."  Transcript of October 3, 2012 Hearing (Doc. #136), p. 84, lines 5-17.

k. Second Subpoena, Topic No. 17 (Description of consideration, efforts and negotiations by Kroger to acquire WCS or any WCS stores, including the steps taken and persons involved therein) (Doc. # 159-1); and

l. Second Subpoena, Topic No. 18 (studies produced by Dillon pursuant to Request No. 10 in the First Subpoena) (Doc. # 159-1).

72.     Western argued to Dillon and the Court throughout this matter that these requests were somehow relevant to their case, but never provided sufficient legal authorities, facts, or arguments to explain how they were reasonably calculated to lead to the discovery of admissible evidence.[13]

73.     Western apparently limited its expert report to examining certain Dillon stores that were allegedly in competition with Western's stores.  *See* Western's expert report (Doc. #169), pp. 12-13.  Western did not limit its discovery requests to these stores but rather included every Dillon store in the Pertinent Geographical Area.

74.     In sum, Western failed to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" as required by F.R.C.P. 45(c)(1).  According, the Court "must enforce this duty and impose an appropriate sanction--which may include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply."  *Id.*

---

[13] Please see Dillon's reply in support of objection to Magistrate Judge's Order dated January 28, 2012 (Doc. #195), pages 4-7, regarding how the declaration by Western's expert Mark A. Glick (Doc. #71-4) is inadequate to explain why Western needed the information it requested in the First Subpoena.

**E.  Western's Discovery Requests Were Invasive.**

75.     Western's discovery requests required Dillon to disclose its trade secrets

to a direct competitor.  *See, e.g.*, Declaration of Susan Giannola dated August 31, 2012

(Doc. #107-6); Supplemental Declaration of Susan Giannola dated January 11, 2013

(Doc. #165-1); Declaration of Chad Thiessen dated January 11, 2013 (Doc. #165-2);

and Declaration of Ed Sharpe dated January 25, 2013 (Doc. #174).  These trade

secrets included Dillon's pricing and marketing strategies.  *See Id.*

**F.  Western's Discovery Requests Required Dillon to Redact Extensive
       Amounts of Material.**

76.     Several of the marketing studies that Dillon was required to produce in

response to Request No. 10 were nationwide in geographic scope.  Dillon had to

extensively redact information that was outside of the Pertinent Geographical Area (as

defined in the First Subpoena).  Western refused to withdraw this request, even though

Dillon repeatedly told Western it would have to make such redactions.

**G.  The Fees and Costs Dillon Seeks Are Reasonable.**

77.     Dillon complied with Western's discovery requests for eight months by

producing documents and information in a case in which Dillon has no interest in the

outcome.  Dillon has had to produce numerous documents including Dillon's trade

secrets to a direct competitor, albeit under a Supplemental Protective Order which

Western now seeks to undo.  Western also filed documents containing Dillon's trade

secrets with the Court without restricting public access to them in violation of the

Supplemental Protective Order and subsequently refused to fix their mistakes.  Even if

the Court awarded Dillon all of the fees and costs it seeks in this motion, Dillon would not be made fully whole.

78.     The magnitude of production in this matter was considerable.  Dillon's sixteen employees lost valuable work time, Dillon produced over 90,000 pages of documents, Dillon incurred $182,728.50 in attorney fees and $32,618.98 in costs[14], and Dillon prepared and produced four employees for depositions to respond to Western's requests.

79.     Dillon took steps throughout this matter to minimize fees and expenses. For example and without limitation: (A) Dillon obtained a very low cost for the e-mail search for its employees ($1,000); (B) Dillon's hourly rate for employee time ($50/hour) is very low, especially considering that two of the employees are in-house counsel; (C) the hourly rate provided by MLS to Dillon is a preferred client rate below its normal hourly rates; (D) Dillon's counsel engaged in extensive conferral with Western's counsel to try to minimize Dillon's fees and costs; and (E) Dillon seeks at this time and without waiver attorney fees of only $122,202.50 and costs of only $26,547.32 as opposed to the full amount of attorney fees and costs that it incurred in this matter.  Dillon's fees and costs sought are much lower than they could have been and are reasonable.

80.     Further, Dillon's fees and costs are reasonable because of the over breadth of Western's subpoenas and related discovery requests, numerous warnings to

---

[14] However, at this time and without waiver, Dillon seeks only $122,202.50 for attorney fees and $26,547.32 in costs via this motion.  See above at page 30.

Western that they would have to bear the fees and costs of production, and Western's failure to limit the scope of their requests.

81.     Dillon should not have to finance a lawsuit by a direct competitor against its supplier.

### H. Dillon Is Incurring Additional Fees and Costs For Western's Seeking to Undo the Provisions of the Supplemental Protective Order.

82.     During the October 3, 2013 hearing, Western's counsel stated: " . . . [W]hatever [is in the studies responsive to Request No. 10 of the First Subpoena] is likely to be subject to a trade secret argument, which takes us back to we've got a protective order.  And there's no point in repeating it.  We've always believed and the Court has suggested and stated unequivocally that this can be protected." Transcript of October 3, 2012 Hearing (Doc. #136), p. 12, lines 7-13.

83.     Subsequently, Western negotiated and agreed to the Supplemental Protective Order (Doc. #140) dated October 17, 2012 which included an "attorneys eyes only" provision withholding documents designated "Highly Confidential" and "Secret" from Mr. Taraghi.  Western insisted to the Court and to Dillon that the provisions of the Supplemental Protective Order were sufficient protection for Dillon's trade secrets and that it would comply with same.

84.     Only two months later, after Dillon had produced hundreds of pages of documents including Dillon's trade secrets to Western subject to the Supplemental Protective Order, Western sought to undo the very same protections upon which Dillon relied starting with Western's Renewed Motion to Re-Designate (Doc. #153) and most

recently with Western's Response to Suncor's Motion to Restrict Access (Doc. #193). Further, Western made Dillon incur additional fees and costs by forcing Dillon to file motions to restrict access to protected documents under the Supplemental Protective Order because Western refused to do so.  *See* Paragraphs 45-47 of this motion above. Western should be required to reimburse Dillon for these fees and costs.

WHEREFORE, Dillon respectfully requests that the Court enter a judgment in favor of Dillon and against Western requiring Western, jointly and severally, to pay Dillon $122,202.50 for its attorney fees and $26,547.32 for its costs for a total of $148,749.82 within thirty (30) days of the date that the Court enters an order granting same.

Dated:  April 26, 2013.

s/*Michael R. McCormick*
Christopher A. Taravella, #7790
Michael R. McCormick, #33682
Montgomery Little & Soran, P.C.
5445 DTC Parkway, Suite 800
Greenwood Village, Colorado 80111
Phone Number: (303) 773-8100
Fax Number: (303) 220-0412
E-mail:  ctaravella@montgomerylittle.com
          mmccormick@montgomerylittle.com
*Attorney for Dillon Companies, Inc.*
*Interested Non-Party*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2013 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
Bennington Johnson Biermann &
Craigmile, LLC
370 17th Street, Suite 3500
Denver, CO 80202

Philip Wayne Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart LLP
1515 Wynkoop Street, Suite 600
Denver, CO  80202

Michael Korenblat
Suncor Energy Services, Inc.
717 17th Street, Suite 2900
Denver, CO  80202

William LeitzseyMonts, III
John Robert Robertson
Hogan Lovells US LLP-DC
555 13th Street NW
Columbia Square #1300
Washington DC 20004-1109

Anthony Shaheen
Keeya M. Jeffrey
Holland & Hart LLP-D enver
555 17th Street, Suite 3200
Denver, CO  80201

s/ *Michael R. McCormick*
Montgomery Little & Soran, P.C.