**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation,
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

      Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,
      Defendant,
v.

HOSSEIN AND DEBRA LYNN TARAGHI,
      Third-Party Defendants.

---

**PLAINTIFFS' RESPONSE TO MOTION FOR FEES AND COSTS BY INTERESTED
PARTY DILLON COMPANIES, INC. (DOC. 226)**

---

      Plaintiffs Western Convenience Stores ("Western") and Western Truck One, LLC, by

and through their attorneys, respond as follows to the Motion for Fees and Costs by Interested

Party Dillon Companies, Inc. ("Motion") (Doc. 226).

## I.  SUMMARY OF RESPONSE

      In its Motion, Dillon[1] seeks $5,409.82 in hard costs, $21,137.50 in internal Dillon

"employee time" and $122,202.50 in outside attorney fees it asserts were incurred in responding

to an initial and one follow-up document subpoena, a Rule 30(b)(6) deposition subpoena, and a

---

[1]      "Dillon" refers to Dillon Companies, Inc. and Mini-Mart (the two entities which
purchased fuel from Suncor for sale at the King Soopers and Loaf N Jug fuel centers that
compete with Western) as well as to The Kroger Company, the parent entity whose employees
were involved in opposing and later responding to the subpoena.

deposition subpoena to David Wilson, the former Dillon employee who negotiated all of the pertinent contracts with Suncor.  Plaintiffs respectfully request that Dillon's Motion be denied because Dillon has not met its Rule 45 burden for cost or fee shifting and because any costs or fees to which Dillon could conceivably be entitled should be offset by the very substantial expense incurred by Plaintiffs as a result of Dillon's efforts to avoid and delay production.

Under Rule 45 and cases construing it, a nonparty is entitled to reimbursement of costs, or under limited circumstances fees, where it has established that a subpoena has subjected the party to an undue burden.  As set forth in this Response, Dillon has not established undue burden as to any of Plaintiffs' subpoenas.  Moreover, after two hearings necessitated by Dillon's refusal to produce any responsive information, the Court determined that Dillon had not established that the principal subpoena, as Plaintiffs had voluntarily narrowed it, was unduly burdensome. Nothing has changed since that determination to warrant a significant costs award or the enormous amount of outside counsel fees that Dillon seeks in its Motion.

Plaintiffs acknowledge that, as a general rule, non-parties are entitled to reimbursement of reasonable hard costs associated with production of documents pursuant to subpoena. Accordingly, as they have done with respect to every subpoena served in this litigation, Plaintiffs advised Dillon when serving the initial subpoena that they would reimburse Dillon for reasonable costs associated with production.  However, unlike every other subpoena recipient[2], Dillon refused to produce any responsive documents, refused to engage in meaningful discussions regarding the scope of the subpoena requests, made contradictory representations regarding availability of responsive documents and ESI, and delayed any production at all for

_____

[2]       DATS Trucking, Inc., Pilot Travel Centers, LLC, Sapp Bros., Inc. and Truman Arnold Companies.

more than four months until the Court denied its motion to quash.  Notably, Dillon implicitly concedes that this initial delay was unwarranted by not seeking any reimbursement for fees or costs during this lengthy period in which Plaintiffs spent tens of thousands of dollars in attempting to obtain even minimal production from Dillon.  However, even after the Court denied Dillon's motion to quash, Dillon caused additional unnecessary expense and detriment to Plaintiffs by filing and refusing to withdraw additional motions and objections which were entirely or largely moot, by unnecessarily redacting documents which were already protected to the highest extent possible by the Supplemental Protective Order, by delaying for months in producing certain responsive documents, and by continuing to assert that trade secrets should be exempt from disclosure long after the issue had been decided by the Court.  As a result, Plaintiffs incurred far more in unnecessary expense than Dillon incurred in costs or fees that could properly be construed as recoverable.

Even if the Court were to determine in retrospect that portions of Plaintiffs' subpoenas were unduly burdensome to Dillon, most of  what Dillon now seeks is not recoverable in any event:

*First*, the majority of fees for which Dillon seeks reimbursement relate not to Dillon's efforts to produce information responsive to the subpoenas, but rather to its efforts to challenge or prevent production of responsive information or to protect Dillon's asserted trade secrets. Courts have held that cost-shifting is appropriate only for efforts to comply with a subpoena, not to avoid compliance, and that protection of asserted trade secrets is a cost of doing business that is not properly shifted in the subpoena context.

*Second*, without making any effort to specify how the time was spent, Dillon seeks reimbursement at $50 per hour for more than 400 hours it asserts Dillon employees worked in connection with Plaintiffs' subpoenas.  Motion Ex. J.  As is the case with protection of trade secrets, courts have found internal employee time responding to subpoenas, when the company does not suffer any loss as a result, to be a cost of doing business not subject to shifting.  In any event, Dillon has provided the Court no means at all of determining what, if any, of this time was reasonably incurred in producing documents or information responsive to the subpoena requests versus time that was spent in connection with Dillon's attempts to quash the subpoena, to avoid production, or to perform other activities described in this Response for which reimbursement would be improper.  Dillon has not met its burden of establishing that any of these alleged costs should be shifted.

*Third*, Dillon seeks reimbursement from Plaintiffs for attorneys' fees incurred in responding to questions from Suncor's experts or otherwise assisting Suncor in defending this case, for attempting to negotiate with Plaintiffs a covenant not to sue in exchange for discovery cooperation, and for preparing Dillon witnesses to protect Dillon from potential liability under the Robinson-Patman Act and corollary Colorado antitrust statutes.  There is no basis whatsoever for Plaintiffs to pay for Dillon's efforts to defend against its own potential liability or to help Suncor out in this litigation.  Moreover, the very fact that Dillon has undertaken these activities demonstrates that Dillon has a material interest in the outcome of this litigation.  Courts have held that where a non-party has a strong involvement in facts underlying a litigation or an actual interest in its outcome, that is the key factor that supports a determination that cost or fee shifting should be limited or denied.

Finally, to the extent Dillon attempts to characterize Plaintiffs as bad actors in connection with any of the subpoenas, those characterizations are unfounded and misleading.  Plaintiffs attempted to confer and cooperate with Dillon for many months without any meaningful reciprocation and have complied with the terms and spirit of the Protective Order and Supplemental Protective Order.  None of Plaintiffs' actions were in bad faith, and all were in the proper interest of establishing the price discrimination that has now been conceded to exist and to establish an injury to competition and injury in fact in connection with Plaintiffs' claims.

For all of the reasons set forth above and in this Response, Plaintiffs request that the Court deny Dillon's motion and determine that no fee or cost-shifting should occur.

## II. STRUCTURE OF RESPONSE

This Response is structured as follows:  Section III contains a chronology of background facts relevant to Dillon's Motion; Section IV (p. 15) contains a summary of fees and costs sought by Dillon; Section V (p. 18)  contains a summary of the relevant law regarding fee and cost-shifting under Rule 45 and argument regarding Dillon's entitlement to the fees or costs sought; Section VI (p. 25) responds to Dillon's suggestions of improper conduct by Plaintiffs; and Section VII (p. 31) contains Plaintiffs' request that any cost or fee award be set off by amounts unnecessarily incurred by Plaintiffs in connection with their principal subpoena.

## III.  CHRONOLOGY OF FACTS RELEVANT TO RESPONSE

1.      In this antitrust action, Plaintiffs allege that Defendant Suncor engaged in sustained Robinson-Patman Act (RPA) violations by selling fuel products to favored retailers at prices below the prices at which it sold fuel to Plaintiff Western.  Plaintiffs' original and amended complaints specifically identified Dillon Companies, Inc. as a Favored Retailer to

which Suncor sold fuel at a discriminatory price.  Complaint (Doc. 1) ¶ 25; Amended Complaint

(Doc. 43) ¶ 25.  Discovery has confirmed Western's price discrimination allegations, revealing

that Suncor charged Dillon substantially lower prices for the same grades of fuel products for a

period of 20 months, from October 2009 through May 2011, when Suncor unilaterally

terminated all fuel sales to Western.  *See* Doc. 198, Plaintiffs' Response to Motion for Summary

Judgment on First and Sixth Claims and Third Affirmative Defense, at 7, 10-11.

       2.      As reflected in Suncor's summary judgment motion (Doc. 185) and expert report

(Doc. 198-27), Suncor concedes that the price discrimination in Dillon's favor occurred over the

20-month period, but challenges Western's Robinson-Patman claim by arguing its discriminatory

sales did not sufficiently impact interstate commerce, did not result in an injury to competition,

and are excused by the RPA's "meeting competition" defense.  Doc. 185 at 1-2.  In reaching

their opinions in this case, both Plaintiffs' experts and Suncor's expert extensively relied on data

that was ultimately obtained via the document and deposition subpoenas that are the subject of

the Motion.

## A.      APRIL 26, 2012 (SERVICE OF PRINCIPAL SUBPOENA) TO AUGUST 17, 2012 (DILLON'S FIRST PRODUCTION OF ANY DOCUMENTS).

       3.      In April 2012, Plaintiffs served their initial subpoena on Dillon seeking

documents and ESI relating to Dillon's relationship with Suncor, its fuel purchases from Suncor

and prices paid therefor, the prices Dillon charged to consumers for such fuel in a defined

pertinent timeframe and geographic area, and documents reflecting research on the

characteristics of consumer demand for fuel or competition at the retail level.  Doc. 57-1.

Discovery obtained from Suncor before the subpoena was served showed that Dillon knew that

the prices offered to it by Suncor were "by far Suncor's best pricing offered in the market" and

that Suncor ultimately further reduced that "best pricing" to obtain the Dillon business.  MSJ

Exhibit N (Doc. 185-15); Dep. Ex. 74.  With their subpoena, Plaintiffs provided Dillon a copy of

the existing Protective Order which permitted nonparties as well as parties to produce any

proprietary or trade secret information as "Confidential Information" or even as "Highly

Confidential Information," the disclosure of which would be limited solely to outside counsel of

record and identified independent experts who executed an acknowledgement to be bound by the

Protective Order's terms.  Doc. 49 at ¶¶ 2, 9.

   4.  Although Plaintiffs' counsel communicated on multiple occasions their

willingness to meet personally and confer regarding each request that Dillon deemed

objectionable (Doc. 71-2), Dillon refused to produce any responsive documents on or before the

subpoena return date and moved to quash the subpoena in its entirety (Doc. 57).  After Dillon

moved to continue the originally scheduled hearing date, the first motion to quash hearing

occurred on July 16, 2012, almost three months after Western served the subpoena.  *See* Doc. 88.

Although Dillon's motion to quash itself reflected there were multiple subpoena requests that

were not objectionable even under Dillon's restrictive view (Doc. 57; Doc. 121, 7/16/2012

Hearing Transcript at 75:14-76:19), Dillon did not produce a single document in advance of the

hearing.  Moreover, Dillon based its motion to quash solely on an affidavit of in-house counsel

that the Court ultimately concluded mischaracterized several of the subpoena requests, ignored

entirely the existence of ESI that had been specifically requested in the subpoena, and failed to

show that complying with the subpoena as written would cause undue burden.  *See* Doc. 57-2;

Doc. 121 at 9:15-10:5, 10:23-11:13, 12:2-20, 13:5-14:18, 16:16-17:24, 22:14-23:7.

5.      At the close of the July 16 hearing, the Court ordered counsel to meet in person to discuss each request, to attempt to reach compromises on the positions presented in their motion to quash filings, and to file a status report if the parties' efforts did not lead to the motion to quash being withdrawn. *Id.* at 77:9-80:4. The Court also advised Dillon during the hearing that any legitimate concerns it had regarding protection of its confidential or trade secret information could be addressed by an appropriate protective order and that if Dillon did not believe the existing Protective Order was sufficient to protect its interests it should submit a proposed protective order that would. *Id.* at 26:3-28:14; 30:6-19. Dillon conceded at the hearing that any asserted trade secrets could be adequately protected by a protective order permitting disclosure only to Plaintiffs' attorneys and experts, so long as the experts consented to be bound by the protective order's terms including any contempt authority. *Id.* at 29:8-13.

6.      On July 18, 2012, Plaintiffs' counsel met with Dillon's counsel as directed. Plaintiffs agreed to significantly narrow their subpoena requests as reflected in the Status Report they filed on July 25, 2012 (Doc. 89). Although Dillon had committed to provide its position regarding the narrowed requests within a week (*id.* at p. 6), as reflected in a second Status Report Plaintiffs were required to file, Dillon produced no documents responsive to any of Plaintiffs' ten subpoena requests (as narrowed), no commitment to produce any responsive documents, nor any substantive information as to Dillon's position regarding any of the  ten requests (again as narrowed). Doc. 92 at p. 2. Accordingly, the Court set, and Plaintiffs were required to prepare for, a second hearing for August 17, 2012.

7.      Two minutes before the August 17, 2012 hearing, Dillon submitted a Status Report claiming: (a) that it would have to engage a vendor at an approximate cost of $10,000 to

produce emails responsive to two of Plaintiffs' requests and would not produce the information if Plaintiffs did not pay for the search (requests 2 and 3); (b) that it would take 1400 person-hours and possibly more than a year for Dillon to respond to two additional requests (requests 5 and 8); (c) that Dillon remained unwilling to provide responsive information at all to two other requests because the information sought "is a trade secret" (requests 7 and 9); and (d) that it had no information responsive to subpoena request 10 regarding market characteristics because "Dillon has not conducted any such research." Doc. 94-1; Doc. 120, 8/17/2012 Hearing Transcript at 4:3-6:16. Dillon proposed no protective order as previously requested by the Court but, at the August 17 hearing, produced for the first time to Plaintiffs any documents that were responsive to the subpoena. That production consisted of 25 pages comprised of three contract documents between Dillon and Suncor (only one of which was responsive to Subpoena request 1, as narrowed) and lists of Dillon stores located in Colorado or within a 25-mile radius of Western's three stores located in Nebraska (request 4). Doc. 154-2.

8.      At the August 17, 2012 hearing, the Court found that Dillon had not sustained its Rule 26(b)(2)(b) burden of establishing that the Subpoena imposed an unreasonable burden or expense and denied Dillon's motion to quash. Doc. 120 at 12:12-18:9; 31:3-14. It ordered production of the documents responsive to the subpoena, as narrowed by Plaintiffs' agreements, by September 17, 2012 or, if Dillon was unable to produce particular categories of responsive documents by that date, the filing of a status report by August 27, 2012 describing exactly why Dillon could not comply with the order. *See id.* at 31:1-35:12. The Court also indicated that, once documents had been produced, Dillon could file a motion to shift costs. *Id.* at 31:20-32:2. In addressing the possible costs motion, the Court indicated that it would "not consider that

motion in a vacuum" because, among other things, Western had narrowed the subpoena requests at the Court's instigation and Dillon's response to those efforts was "singularly uninformative and notably belated." *Id.* at 31:20-32:2; 33:1-17.

9.      After the August 17, 2012 hearing, Dillon replaced its original counsel with its current counsel from Montgomery Little and Soran, P.C.  Dillon's Motion seeks no fees or costs related to matters occurring prior to August 22, 2012, when the counsel change apparently occurred (see Motion Ex. 4 at p. 2), but on the other hand fails to recognize the expense and delay to Plaintiffs in the four months after the subpoena was served.  In fact, by the end of the August 17, 2012 hearing – with only 25 pages of documents to show for their efforts -- Plaintiffs had incurred more than $16,000 in attorneys' fees in dealing with Dillon's motion to quash, in attempting to confer and in preparing for and attending the two hearings.  Exhibit 1, Bennington Declaration ¶ 5; Exhibit 2, Bledsoe Declaration ¶ 3.

**B.      AUGUST 17, 2012 (HEARING NO. 2) TO SEPTEMBER 14, 2012 (HEARING NO. 3).**

10.     On August 27, 2012, Dillon filed a Status Report claiming it would be unable to produce by September 17, 2012 most categories of the documents/ESI requested in the subpoena, as narrowed, and again stating that it considered multiple categories of the requested documents/ESI to constitute Dillon trade secrets.  *See* Doc. 99.  On August 31, 2012, it filed not only a Rule 72 objection to the Court's order (Doc. 107) but also motions for partial stay and for reconsideration of the Court's August 17, 2012 Order (Docs. 109, 110).  Dillon attached to its filings declarations from Dillon employees claiming it would be exorbitantly expensive for Dillon to respond to the subpoena requests (Docs. 107-1, 107-2, 107-5, 107-6).  As detailed in Plaintiffs' responses to the motions, the declarations of the Dillon employees were substantially

inconsistent with each other and with Dillon's previous representations to the Court.  *See* Plaintiffs' Response to Motion for Reconsideration, Doc. 125 at ¶¶12-13.

11.     On September 14, 2012, the Court held a status conference on the Dillon production issues.  *See* Doc. 129.  At the September 14 conference, Dillon asserted that production under the subpoena could not be completed by the September 17 deadline.  *See* Doc. 119, 9/14/2012 Courtroom Minutes/Minute Order at 2.  Dillon, through its new counsel, essentially conceded at that conference that it had failed to properly confer with respect to the subpoena and motion to quash and likely had made misstatements or even misrepresentations regarding information responsive to Plaintiffs' subpoena.  Doc. 129, 9/14/2012 Hearing Transcript at 8:5-16; 9:25-10:18.  With respect to Dillon's continued assertions regarding trade secret protection for responsive data, the Court again expressed its frustration that, rather than attempting to determine how to produce the relevant responsive data under an appropriate protective order, Dillon was using the trade secret argument to avoid production altogether.  *Id.* at 50:3-53:19.  In response to the Court's statements, Dillon committed to produce documents responsive to the subpoena on a rolling basis concluding with final production on October 1, 2012.  Doc. 119 at 2.

## C.   OCTOBER 1, 2012 DEADLINE ON COURT ORDER COMPELLING PRODUCTION UNDER SUBPOENA AND OCTOBER 3, 2012 HEARING (HEARING NO. 4)

12.     The Court held a fourth hearing on October 3, 2012.  Despite the Court's orders and Dillon's admissions that responsive documents and data existed, and despite Dillon's commitment to produce them on or before October 1, 2012, Dillon: (a) failed to produce any documents responsive to three of the narrowed subpoena requests (8, 9 and 10); (b) produced

documents responsive to other requests with requested data missing or with unjustified redactions; (c) refused to produce critical information regarding the quantities of fuel purchased from Suncor; and (d) continued to refuse to produce documents on trade secret grounds without providing the Court or Plaintiffs a form of protective order that would satisfy Dillon's trade secret concerns.  *See* Doc. 128, Plaintiffs' Status Report, copy attached as Exhibit 3.

13.     With respect to the protective order issue, the Court admonished that it had previously made clear its belief that the original protective order was adequate to protect Dillon's needs, that Dillon's failure to propose a more appropriate protective order by this point was causing the Court to reach a very high "level of frustration" and that Dillon's withholding of documents on the October 1 court ordered deadline "obstensibly over a protective order" was "unacceptable."  Doc. 136, 10/3/2012 Hearing Transcript at 17:14-18.  Dillon responded that it had "no excuse" for that failure.  *Id.* at 19:4-12.

14.     At the October 3, 2012 hearing, the Court ordered that, on or before 5:00 p.m. October 5, 2012, Dillon produce the withheld documents and data, with the exception of data for the Loaf N Jug convenience stores that Dillon represented was available only in an archive that would require the purchase of three servers at a cost of $105,000 to be retrieved.  Doc. 136 at 58:3-62:12.  At the conclusion of the October 3 hearing, the Court ordered the parties to participate in a mandatory telephone status conference every Friday afternoon thereafter.  *Id.* at 91:8-14.  In summarizing Dillon's behavior to date at the October 3 hearing, the Court stated:

> And the difficulty that Dillon continually has in this matter is that Dillon, for better or for worse, fairly or unfairly, seems to have a propensity for what could best be described as foot dragging.  And every time Dillon drags its feet or makes an incomplete or inadequate explanation, all it's doing is losing credibility and mak[ing] it harder for me to fashion some sort of compromise.  Dillon is exhausting its ability to obfuscate, to put it quite bluntly.  And, at some point

> Dillon may very well find that basically it has shot itself in the foot, and I think we're very close if not there already.

*Id.* at 20:23-21:8.  Between August 17, 2012 and the end of the October 3, 2012 hearing, Plaintiffs incurred more than $33,000 in attorneys' fees in continuing to deal with Dillon's motion to quash, in attempting to confer and in preparing for and attending the two additional hearings.  *See* Exhibit 1, ¶ 5; Exhibit 2, ¶ 3.  As reflected in Exhibits 1 and 2, for their total efforts in dealing with the Dillon subpoena (more than six months and nearly $40,000 altogether), Plaintiffs had obtained three contract documents, two store lists, approximately 37 email strings with redacted attachments, and no or materially incomplete production under five subpoena requests seeking relevant ESI.  Exhibit 3 at 2-6, 9-10.

## D.   PRODUCTION UNDER ORIGINAL DOCUMENT SUBPOENA FROM OCTOBER 5, 2012 TO THE PRESENT.

15.     In light of the Court's October 3, 2012 orders, Dillon finally began producing in good faith documents and data under the subpoena that Plaintiffs had served on April 26, 2012. While most of the document and data production issues were finally resolved by the October 3 ruling, Dillon continued to delay in producing documents responsive to Plaintiffs' subpoena request 10, which sought studies, surveys and other research regarding to consumer demand for Fuel as that term was defined.  In response to multiple follow up requests from Plaintiffs, Dillon finally began producing those documents at the end of November 2012 and, in response to further requests, produced additional responsive research at the end of January 2013.  Even though Dillon designated each of the studies as "SECRET" (the highest level designation Dillon required in the Supplemental Protective Order), Dillon continued to produce them in a highly redacted form such that some of them were, for all practical purposes, unreadable.  *See, e.g.,*

Exhibit 4 (filed with Level 1 restriction).

16.     As the facts have now unfolded, it is even clearer that Dillon's motion to quash and other filings in this case substantially overstated the anticipated effort or cost to respond to requests subject to the Court's order.  For example, in seeking reconsideration of the Court's original order denying its motion to quash, Dillon described an elaborate process by which Dillon would need to retain a third party contractor to search for email files responsive to Plaintiffs' subpoena requests 2 and 3 (Doc. 108-2 ¶ 7).  As noted above, it had previously suggested to the Court and Plaintiffs that such a search would cost $10,000 (Doc. 94-1) and later indicated that Dillon had in fact retained such an outside contractor but did not know the associated expense (Doc. 116 at 3-4).  As reflected in Exhibit L to Dillon's Motion (Doc. 226-13), the actual expense of the outside contractor amounted only to $1,000.00.

## E.     PLAINTIFFS' DEPOSITION SUBPOENAS.

17.     In mid-December 2012, Plaintiffs served two deposition subpoenas involving Dillon: a Rule 30(b)(6) notice and subpoena directly to Dillon, and a subpoena to David Wilson, the former Dillon employee who handled Dillon's Fuel procurement and negotiated each of the relevant contracts with Suncor.  In January 2013, Dillon moved to quash both of these subpoenas on the same grounds previously rejected by the Court, principally that the depositions would be burdensome and would implicate information that Dillon asserted to be trade secrets.  Doc. 159 at 11-15.  Thereafter, Plaintiffs voluntarily narrowed the scope of the Rule 30(b)(6) notice as reflected in a joint status report (Doc. 167), and the Court denied the motion to quash as moot (Doc. 179 at 2).

18.     Plaintiffs deposed Dillon's 30(b)(6)-designee employees on January 31, 2013 (Giannola); February 7, 2013 (Thiessen); February 19, 2013 (Parker); and February 19, 2013 (Sharpe).  In total, all four components of the Rule 30(b)(6) deposition took less than nine hours, including breaks.  Plaintiffs deposed David Wilson, the former Dillon employee, on February 5, 2013.  That deposition lasted an hour and 39 minutes.  Suncor relied substantially on the Dillon and Wilson depositions in its RPA summary judgment motion (*see* Doc. 185 at 6-7, 17) and Plaintiffs cited the depositions in their RPA summary judgment response (*see* Doc. 198 at 8, 35-36).

## IV.  DILLON'S FEE AND COST APPLICATION

19.     Of the $148,749.82  Dillon seeks, a total of $5,409.82 is costs, including $2,076.76 of costs itemized on Montgomery Little & Soran ("ML&S") invoices, costs incurred directly by Dillon for copying, the email search ($1,000) and travel for two witnesses to attend hearings on September 14, 2012 and January 28, 2013 (neither testified).  Motion Exhibit X. With the exception of the hearing travel costs ($2,021.27) which supported Dillon's efforts to avoid production under the subpoena rather than comply with it, Plaintiffs do not challenge the hard costs Dillon seeks as being reasonably incurred in compliance with Plaintiffs' subpoenas. The amount of reasonable costs incurred as detailed by Dillon is $3,388.55.

20.     Dillon also seeks as "costs" $24,470.56 for 422.75 hours of internal Dillon and Kroger employee time allegedly spent in this matter.  Dillon makes no effort to itemize how any of this time was spent other than by Exhibit J, which contains gross numbers of hours asserted to have been worked by particular employees with no detail at all as to what any of these employees were doing in the hours identified:

| | First Subp. | Second Subp. | Mtn. Redesign. | Fourth Subp. | Total Hrs | Cost/Hour | Total Cost |
|---|---|---|---|---|---|---|---|
| Nathan Brown, Esq. | 4 | 0 | 0 | 0 | 4 | $50 | $200.00 |
| Chad Cunningham | 16 | 0 | 0 | 0 | 16 | $50 | $800.00 |
| Dax Daisley | 0.75 | 0 | 0 | 0 | 0.75 | $50 | $37.50 |
| Sue Giannola & Office | 80 | 16 | 3 | 8 | 107 | $50 | $5,350.00 |
| Steve Edwards | 2 | 0 | 0 | 0 | 2 | $50 | $100.00 |
| Danny High | 3 | 0 | 0 | 0 | 3 | $50 | $150.00 |
| Jason Lazor | 0.5 | 0 | 0 | 0 | 0.5 | $50 | $25.00 |
| Jenny McClenahan & Office | 15 | 10 | 0 | 0 | 25 | $50 | $1,250.00 |
| David Parker | 0 | 1.5 | 0 | 0 | 1.5 | $50 | $75.00 |
| Ron Prior | 24 | 0 | 0 | 0 | 24 | $50 | $1,200.00 |
| Amanda Randel | 4 | 4 | 0 | 0 | 8 | $50 | $400.00 |
| Ed Sharpe | 0 | 2 | 7 | 0 | 9 | $50 | $450.00 |
| Sara Sudkamp, Esq. | 100 | 40 | 10 | 10 | 160 | $50 | $8,000.00 |
| Chad Thiessen | 4 | 23 | 30 | 0 | 57 | $50 | $2,850.00 |
| Venessa Wickline | 3 | 0 | 0 | 0 | 3 | $50 | $150.00 |
| Melanie Williams | 2 | 0 | 0 | 0 | 2 | $50 | $100.00 |
| **TOTAL** | 258.25 | 96.5 | 50 | 18 | 422.75 | | **$21,137.50** |

(Doc. 226-11).  Notably, the largest time entry is for Dillon's in-house attorney who is asserted to have spent 160 hours in connection with responding to the subpoenas and unspecified "related matters." *Id.;* Motion Exhibit A, Sudkamp Declaration ¶¶ 2-3.

21.     Finally, Dillon seeks an order requiring Plaintiffs to pay $122,202.50 in fees billed by its outside attorneys at ML&S from August 22, 2012 to the present.  Dillon has attached to its Motion seven months worth of highlighted invoices (Motion Exhibits C-I), but has provided the Court no means to identify which of the entries (or which portions of specific entries) were for fees incurred by Dillon in actually complying with the subject subpoenas versus those incurred in the "foot-dragging" recognized by the Court versus those which advanced Dillon's own or even Suncor's substantive interests.  The following are representative examples of  attorneys' fees entries for which Dillon seeks reimbursement from Plaintiffs:

- Entries for fees incurred in responding to questions from Suncor experts;[3]

- Entries for fees incurred in researching and preparing witnesses regarding the substance of the Robinson-Patman Act, the Colorado below-cost sale statute (C.R.S. § 6-2-113, which is not even at issue in the case) or other issues relating to the merits of Plaintiffs' claims;[4]

- Entries for fees incurred in attempting to negotiate a covenant by Plaintiffs not to sue Dillon in exchange for discovery cooperation (Section 2(f) of the RPA imposes liability on a buyer which knowingly induces or receives an unlawful discriminatory price, 15 U.S.C. §13(f));[5]

- Entries for fees incurred in preparing objections, declarations or other documents to challenge rather than comply with a subpoena;[6]

---

[3]    *E.g.*, Motion Ex. G, 12/7/2 MRM entry: "…phone calls with Ms. Sudkamp and Shaheen to discuss WCS request to view HCI materials and Suncor expert's questions regarding information produced by Kroger"; Motion Ex. I, 02/01/13 MRM entry: "Study email from Suncor's counsel regarding Suncor's expert's question, phone call with Suncor's counsel regarding same, phone call with Ms. Sudkamp regarding same"; 02/22/13 MRM entry: "… study isses regarding price surveys to respond to Suncor's expert"; 02/26/13 MRM entry: "…phone call with counsel for Suncor re: Giannola transcript and issues in Suncor expert report."

[4]    *E.g.*, Motion Ex. C, 09/13/12 CAT entry: "Studied more Robinson/Patman law and Hart/Scott/Rodino"; Motion Ex. H: 01/11/13 ALT entry, 01/29/13 ALT entry, 01/30/13 ALT entry, 01/30/13 MRM entry; Motion Ex. J: 02/06/13 CB entry.

[5]    *E.g.,* Motion Ex. F, 11/07/12 MRM entry: "Work on revised covenant not to sue, improve scope of covenant, payment of costs before and after effective date, no admission of liability, representations and warranties, other contract provisions." *See also* Motion Ex. E, 10/30/12 MRM entry; Motion Ex. F, 11/02/12 MRM entry, , 11/08/12 MRM entry, 11/09/12 MRM entry, 11/13/12 MRM entry, 11/14/12 MRM entry, 11/15/12 CAT entry, 11/26/12 CAT entry, 11/26/12 MRM entry, 11/27/12 MRM entry, 11/29/12 CAT entry, 11/29/12 MRM entry.

[6]    *E.g.,* Motion Ex. C, 08/26/12 MRM entry, 08/27/12 MRM entry, 09/12/12 CAT entry, 09/12/12 MRM entry, 09/13/12 CAT entry;  Motion Ex. E. 10/01/12 MRM entry (partial),

- Entries for fees incurred in redacting documents that were already afforded "SECRET" or "HIGHLY CONFIDENTIAL" protection under the Stipulated Protective Order;[7] and

- Entries that are themselves so significantly redacted that it is impossible to determine the work performed;[8]

22.    If for no other reason, the failure to perform even the simplest analysis of the ML&S invoices justifies denial of any award of ML&S fees.  In effect, Dillon's attorneys have made an all-or-nothing request.  As neither the Plaintiffs nor the Court is in a position to do the necessary accounting, nothing can properly be awarded.

## V.  ARGUMENT AND AUTHORITY

### A.    DILLON HAS NOT MET ITS BURDEN FOR EXPENSE SHIFTING UNDER RULE 45.

23.    Under Rule 45, the party moving for reimbursement of fees or costs bears "the burden of establishing the existence and reasonableness of the costs or fees incurred, and that

---

10/5/12 MRM entry.

[7]    *E.g.,* Motion Ex. C, 09/30/12 DJH entry: "Change footer to Highly Confidential Information and begin redacting more information on invoices…." .  *See also, e.g.,* Ex. C. 09/11/12 DJH entry, 09/12/12 DJH entry, 09/13/12 DJH entry, 09/14/12 DJH entry, 09/17/12 DJH entry; Motion Ex. H, 01/17/13 CSS entry, 01/21/13 MRM entry.

[8]    *E.g.,* Motion Ex. H:

| 01/16/13 ALT | E-mail and telephone correspondence with Susan Giannola regarding | 2.80 | 518.00 |

E-mail and telephone correspondence with Ed Sharpe regarding

; Draft declaration of Ed Sharpe: E-mail correspondence with Ed Sharpe regarding

.

those expenses should be shifted back to [the requesting party]." *In re Michael Wilson & Partners, Ltd.*, No. 06–cv–02575–MSK–KMT, 2012 WL 1901217, at *4 (D. Colo. May 24, 2012) (citing *Klesch & Co. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003)); *see also Teamsters v. Frontier Airlines, Inc.*, No. 11-cv-02007-MSK-KLM, 2012 WL 1801979, at *7 (D. Colo. May 16, 2012) (citing same) (the person objecting to a subpoena "bears the burden to show that responding to the discovery requests at issue would be unduly burdensome").  In determining whether a subpoena imposes an undue burden, a court is to exclude "the burdens associated with guarding protected information."  *See Mount Hope Church v. Bash Back!*, 705 F.3d 418, 427 (9th Cir. 2012) (rejecting the non-party's argument "to read the 'undue burden' language in Rule 45(c)(1) as including the burdens associated with guarding protected information").

24.     If compliance with the subpoena does not impose an undue burden, a court may order production and deny the producing party reimbursement of necessary costs of production. *See Mgmt. Compensation Grp. Lee, Inc. v. Okla. State Univ.*, No. CIV-11-967-D, 2011 WL 5326262, at *4-5 (W.D. Okla. Nov. 3, 2011) (ordering subpoena compliance and finding that costs of $1,761.24 and 55 hours of in-house counsel time for complying with a modified subpoena did not impose an undue burden).  Only where the moving party has successfully shown that it is subject to an undue burden must the court determine "(1) if compliance with the subpoena imposes an expense on the nonparty, and (2) if so, whether that expense is significant." *United States v. Blue Cross Blue Shield of Mich.*, No. 10-CV-14155, 2012 WL 4838987, at *2 (E.D. Mich. Oct. 11, 2012) (citing *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001)).

25.     In this case, Dillon has never shown that the subject subpoenas, particularly as narrowed by Plaintiffs' agreements, subjected Dillon to undue burden.  With respect to Plaintiffs' document subpoena, the chronology shows that: (a) for months Dillon claimed it could not or would not produce the requested information; (b) Dillon's assertions of burden contradicted themselves and changed from hearing to hearing; (c) when the Court made very clear in October 2012 that further "foot dragging" would not be tolerated, Dillon did not have trouble responding to Plaintiffs' narrowed requests; and (d) the hard costs ultimately incurred by Dillon were modest and many times less than the amounts Dillon initially claimed would be incurred.  With respect to Plaintiffs' deposition subpoenas, Dillon prepared and produced four corporate witnesses for a single Rule 30(b)(6) deposition and chose to attend and defend the individual deposition of a former employee.  All of the depositions were completed in less than 11 hours.  Dillon has failed to establish that any of Plaintiffs' subpoenas imposed an undue burden on Dillon.  For that reason alone, Dillon's present Motion should be denied.

**B.     DILLON HAS NOT SHOWN IT IS ENTITLED TO ANY AWARD OF OUTSIDE ATTORNEY FEES, MUCH LESS THE EXORBITANT OUTSIDE FEE AWARD SOUGHT.**

26.     More than four-fifths of the nearly $150,000 burden-shifting award is for attorneys' fees of Dillon's outside counsel at ML&S.  Multiple courts have found that shifting of outside attorneys' fees under Rule 45 is improper.  *See, e.g., Tessera Inc. v. Micron Tech. Inc.*, No. C06-80024MISC-JW(PVT, 2006 WL 733498, at *10 (N.D. Cal. Mar. 22, 2006) (citing William W. Schwarzer, A. Wallace Tashima, James M. Wagstaffe, Federal Civil Procedure Before Trial, 11:2308-2309 ("[g]enerally, attorneys' fees . . . are not permitted."); *United States v. CBS, Inc.*, 103 F.R.D. 365, 374-75 (C.D. Cal. 1984).  As the *CBS* court noted in the context of

antitrust litigation:

> The rationale behind the American Rule is that persons ought not to be discouraged from bringing or defending suits on the ground that if they lose they will have to pay the opposing party's counsel fees. *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967). **Although this rationale applies to parties, an equally compelling rationale in limiting attorneys' fees reimbursement is that [a plaintiff] should not be forced to bear the risk of losing an antitrust action because the penalty for seeking the information [it needs to prosecute its claims] includes the fees of the responding party in seeking outside counsel.**

103 F.R.D. at 374-75 (emphasis added).  Notably, the attorneys' fees for which the non-parties in *CBS* sought reimbursement were for "outside counsel to represent them in reviewing their documents for privilege, confidentiality and otherwise, to represent deponents at depositions, to negotiate protective orders and other matters with counsel for defendants, and to otherwise protect the Nonparty Witnesses' interests." *Id.* at 374.  The *CBS* court denied the request for these fees in part because the party serving the subject subpoenas did not benefit from the work of the nonparty's outside counsel.  *Id.* at 375 (citing *In re Coordinated Pretrial Proceedings*, 669 F.2d 620, 624 n.3 (10th Cir. 1982)).

27.     Here, Dillon has not established that any of the fees sought were for tasks that benefitted Plaintiffs.  Rather, as reflected in the chronology above (in particular Paragraph 21) and Motion Exhibits C-I, the fees were incurred to protect Dillon's own substantive interests, to avoid production and, in some cases, to affirmatively assist Suncor's defense of this case.  Even if Dillon had done something other than its all-or-nothing approach to accounting for the ML&S fees, those fees cannot properly be shifted to Plaintiffs.

## C.     APPLICATION OF THE BURDEN-SHIFTING FACTORS SUPPORTS DENIAL OF THE MOTION.

28.     As Dillon recognizes, courts often look at three factors in making a cost of fee-

shifting determination:  "(1) whether the non-party actually has an interest in the outcome of the case, (2) whether the non-party can more readily bear the costs than the requesting party, and (3) whether the litigation is of public importance."  Motion at 33, (citing *Michael Wilson*, 2012 WL 1901217, at *3; *In re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C. 1992); *Crandall v. City & Cnty. of Denver, Colo.*, 2008 WL 162473 (D. Colo. Jan. 17, 2007).  Contrary to Dillon's assertions, these factors support Plaintiffs' position against shifting rather than Dillon's assertion that it is entitled to recoup nearly $150,000 in attorneys' fees and costs from Plaintiffs.

29.     Courts have regularly held that the first factor, i.e., whether the non-party is "'interested' in the outcome of the litigation" is the most important factor.  *See United States v. Colum. Broad. Sys., Inc*. 666 F.2d 364, 372 (9th Cir. 1982) (noting that the non-parties' interest in the suit has particular relevance); *see also In re First Am. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998) ("Such interest is sufficient to demand that [the non-party] absorb a portion of the costs for which it seeks reimbursement from [the requesting party].").  "If the nonparty was 'substantially involved in the underlying transaction and could have anticipated that [the transaction would] reasonably spawn some litigation, expenses should not be awarded.'"  *Blue Cross*, 2012 WL 4838987, at *3 (alteration in original) (quoting *In re First Am. Corp.*, 184 F.R.D. at 242); *see also Sound Sec. Inc. v. Sonitrol Corp.,* No. 3:08–cv–05350–RBL, 2009 WL 1835653, at *3 (W.D. Wash. June 26, 2009).

30.     Dillon claims it has no interest in the outcome of this case, yet has styled itself as "Interested Non-Party Dillon Companies, Inc."  Its newly asserted disinterest is belied, of course, by the fact that the categories of fees sought by Dillon include fees associated with conferring with Suncor, with responding to questions from Suncor's experts, and with attempting to

negotiate a covenant by Plaintiffs not to sue. Even absent these matters, Dillon's assertion

ignores the fact that Suncor's discriminatory sales to Dillon over a period of almost two years are

the very basis for this Robinson-Patman Act case. Amended Complaint (Doc. 43) ¶ 25; MSJ.

As the party "substantially involved" in the underlying discriminatory transactions, Dillon could

have reasonably anticipated that litigation would arise. Therefore, particularly because Dillon

has failed to establish that Plaintiffs' subpoenas were unduly burdensome, any fee or cost-

shifting would be inappropriate here.

31.     With respect to the second factor, when the non-party is a large organization

whose financial resources substantially exceed those of the requesting party, courts have required

the non-party to bear some of its own costs. *See, e.g., Crandall*, 2007 WL 162743, at *1

(requiring two individual plaintiffs who subpoenaed United Air Lines and another corporation to

pay only half the costs of production). Plaintiffs' opposition to Dillon's Motion certainly is not

dependent on analysis of this factor; however, to the extent that the second factor should be

considered, it weighs in Plaintiffs' favor.

32.     With respect to the third factor, while courts generally find that lawsuits about

"purely private business interests of the litigating parties and the [non-party]" do not involve a

matter of public importance (*see, e.g., Michael Wilson*, 2012 WL 1901217, at *5), certain cases,

including those involving antitrust claims, are of public importance. *See, e.g., Behrend v.

Comcast Corp.*, 248 F.R.D. 84, 87 (D. Mass. 2008) (class action lawsuit alleging violations of

Sherman Act that "customers of Comcast have been forced to pay higher prices for cable

television due to Comcast's unlawful behavior" was of public importance); *Blue Cross*, 2012

WL 4838987, at *4 (suit alleging that "Defendant violated antitrust laws in a manner that led to

higher health-care costs to citizens throughout the State of Michigan" was of public importance);

*United States v. IBM*, 62 F.R.D. 526, 529 (S.D.N.Y. 1974).  To the extent that the third factor

weighs in favor of either party in connection with the Dillon Motion, it weighs in Plaintiffs'

favor.

### D.  DILLON HAS FAILED TO ESTABLISH THAT THE ATTORNEY FEES OR INTERNAL EMPLOYEE COSTS SOUGHT WERE REASONABLE OR NECESSARY.

33.     Finally, even if Dillon were able to establish that any of Plaintiffs' subpoenas

imposed an undue burden, to meet its burden for fee or cost-shifting under Rule 45, it was

required to show in detail that any costs of production were reasonable in amount and necessary

for compliance with the subpoena.  *See, e.g., Michael Wilson,* 2012 WL 1901217, at *6-8.  In

*Michael Wilson*, the court denied any award of attorneys' fees to the non-party because "in the

absence of any explanation or showing regarding what these efforts were or how they related to

the subpoenas, the Court has no basis to make a reasoned determination as to what, if any,

portion of those fees should be reimbursed."  *Id.* at *6.  The *Michael Wilson* court also rejected

multiple costs requests because the movant failed to show specific amounts that were reasonably

or necessarily incurred in responding to the discovery requests and requested reimbursement for

items such as hearing transcripts that "appear to be for the convenience of Respondents'

attorneys rather than a cost necessarily incurred as a result of the subpoenas."  *Id.* at *7-8.

Further, even when a requesting party can show that internal employee time is reasonable and

necessary for production, that time is not recoverable as a cost if the party does not suffer a loss

as a result.  *See Oklahoma State*, 2011 WL 5326262, at *4 (internal counsel's time not

recoverable because his work did not "materially impact its operations or prevent him from

providing necessary legal services to OSU"); *cf. CBS*, 103 F.R.D. at 370-71 (awarding reimbursement when "the Nonparty Witnesses lost the normal services of these employees as a direct result of the document production").

34.     Here, Dillon seeks more than $21,000 in "internal employee" costs, but has submitted a one-page chart containing no information at all as to how any of the alleged 422.75 employee hours were spent.  Motion Exhibit J.  As was the case with the attorney fees sought in *Michael Wilson,* Dillon's chart provides the Court no basis to determine which, if any, of the requested costs could be reimbursed.  With respect to the more than $122,000 in outside counsel fees sought, Dillon has made no effort to segregate fees incurred in actually complying with the subpoenas (*i.e.*, those fees that could be construed as benefitting Plaintiffs) from the fees spent in challenging the subpoena, in supporting Dillon's own interests, or in assisting Suncor and its experts in defense of Plaintiffs' claims.  Thus, it has failed to show that the outside attorneys' fees were "necessarily incurred as a result of the subpoenas."  For this fundamental reason (and all of those detailed above), its Motion as directed to attorney fees or internal employee time should be denied.

## VI.  RESPONSE TO DILLON'S ALLEGATIONS OF UNTOWARD CONDUCT BY  PLAINTIFFS

35.     Dillon peppers its Motion with assertions of allegedly bad conduct by Plaintiffs or their counsel and "respectfully requests the Court to require Western to reimburse Dillon for attorney fees and costs Dillon incurred to same."  *E.g.*, Motion at 2-3.  Dillon's rhetoric is insufficient to justify any award of fees or costs, and is simply a play for a fee-shifting award that is not warranted by law or Dillon's own conduct.  Plaintiffs respond to Dillon's allegatons of misconduct below.

36.   <u>Restriction of Documents</u>.  D.C.COLO.LCivR 7.2.D provides that a document which is the subject of a restriction may be filed without an accompanying motion to restrict access.  If a document is filed without such a motion it will retain a Level 1 restriction (access limited to the parties and the court) for 14 days, and "(i)f no motion to restrict access is filed within such time period, the access restriction will expire and the document will be open to public inspection."  *Id.*  Accordingly, when Plaintiffs filed a document marked Highly Confidential or Secret, they were obligated to file it with a Level 1 restriction.  Plaintiffs  were not, as Dillon now urges, obligated to file their own motion to restrict access.  Rather, if Dillon wished to continue the Level 1 restriction, it had 14 days to file a motion to maintain the restriction.  Indeed, Dillon was in the best position to do so as it was the only party that could articulate the interest to be protected by restriction, why such interest outweighs the presumption of public access, and the "clearly defined and serious injury that would result if access is not restricted" as required by D.C.COLO.LCivR 7.2.B.2 and .3.  Plaintiffs were hardly in a position to do so, having steadfastly asserted that the bulk of the documents produced by Dillon were either not as secret as Dillon asserted or at least subject to review by Mr. Taraghi.

37.   Consistent with that approach, for example, on March 11, 2013 Plaintiffs' counsel notified Dillon counsel that a document had been filed with a Level 1 restriction:

> On February 25, 2013, we filed the Plaintiffs' Response to Objection of Interested Party Dillon Companies, Inc. to Magistrate Judge's Order Dated January 28, 2013 (Doc. 192) with Exhibit 1 (Doc. 192-1) as Level 1 restricted access. A copy of that exhibit is attached to this email. I wanted to let you know that we do not intend to file anything further in the nature of a motion to restrict access to this document.

Motion Exhibit EE.  Apparently counsel for Dillon found this to be fair notice and a sensible approach.  No objection was stated, and Dillon filed its motion to restrict (Doc. 194) stating that:

> While Western does not oppose the relief requested in this motion (i.e. restricting Doc. #192-1 from public access) Western does not hereby waive their arguments that the documents at issue in Defendant Suncor Energy (U.S.A.) Inc.'s ("Suncor") Motion to Restrict Access (Doc. #188) should be accessible to the public.

A virtually identical exchange occurred when Dillon pointed out two footnotes in Plaintiffs' response to Suncor's summary judgment motion on contract claims (*see* Doc. 211, Dillon Motion to Restrict Access to Plaintiff's Response to Suncor's Motion for Summary Judgment). Again, an inadvertent omission to restrict data was remedied by the parties without controversy.

38.    A few instances of inadvertence in failing to restrict something were hardly a bombshell in this litigation.  It was not until the present Motion for fees and costs that Dillon complained about this procedure.  Indeed, as recently as May 14, 2013, Dillon found itself filing a late motion to restrict a document after its inadvertent failure to apply the Level 1 restriction in one of its own filings.  *See* Doc. 232.[9]  It is disingenuous for Dillon to now complain about a process it adopted for its own omission and about which it failed to complain at the relevant time.

39.    <u>WCS Motions to Reclassify</u>.  Dillon makes the equally specious accusation that Plaintiffs have violated the Supplemental Protective Order (Doc. 140) by following the procedure (which Dillon drafted and approved) for challenging the restriction of a document. The Supplemental Protective Order provides:

---

[9]    Dillon, as had Plaintiffs, candidly admitted counsel's omission: "(i)n the Original Motion, counsel for Dillon asked the Court to restrict access to Doc. #200 (i.e. the Response) but inadvertently did not ask the Court to restrict access to Doc. #200-4 (i.e. Exhibit 4 to the Response).  Dillon respectfully files this revised motion seeking to restrict access to both Doc. #200 and Doc. #200-4."  Doc. 232, p. 3, ¶ 4.

17. A Party that is a Receiving Party who wants to challenge a "Confidential," "Highly Confidential," or "Secret" Discovery Material designation must do so no later than 50 days before the discovery cut-off (or if the disclosure is made within 50 days of the discovery cut-off, then thirty days after the disclosure) and must (a) first meet and confer with the Designating Party and explain the basis for the challenge and (b) give the Designating Party an opportunity to explain the basis for the designation and a reasonable opportunity (not to exceed three (3) business days) to change the designation.

a. Thereafter, the Receiving Party may file a motion with the Court in which it identifies the challenged material and sets forth the basis for the challenge. The burden of proof on any such challenge shall be on the Designating Party. Until the Court rules on the challenge, all Parties and third parties shall continue to afford the Discovery Material in question the level of protection to which it is entitled under the Designating Party's designation.

*Id.*

40.     It is one thing for Dillon to complain that it had to respond to Plaintiffs' motions to reclassify documents, but to assert that by invoking the procedure for doing so Plaintiffs violated the Supplemental Protective Order is plainly frivolous.  Dillon asserts that "Dillon incurred additional attorney fees to defend against motions by Western seeking to provide Dillon's trade secrets to Western's principal Mr. Taraghi (and even the public at large) in violation of the Supplemental Protective Order, which was agreed to by the parties and approved by the Court."  There is no question that Plaintiffs have always asserted that Mr. Taraghi has been prejudiced by his inability to see all the evidence in this case and that, according to the previous rulings of Judge Krieger[10], by filing motions for summary judgment Suncor exposed the summary judgment record to public scrutiny.  However, the contention that by seeking access he has violated the Supplemental Protective Order is not grounded in good faith.

---

[10]     *See* Plaintiffs' Response to Suncor's Motion to Restrict Access (regarding dispositive motion documents), Doc. 193.

41.   <u>Identity of other Suppliers</u>.  The stipulation entered by the parties regarding other

Dillon suppliers was this:

> The identity of Dillon's fuel suppliers other than Suncor is an issue of particular
> concern to Dillon as Dillon has non-disclosure agreements with each such
> supplier and both parties to the agreements take steps to prevent the disclosure of
> this information to the market. Plaintiffs have agreed not to seek the identity of
> the Potential Suppliers or any information that would indirectly disclosed their
> identity.
>
> Plaintiffs have agreed to limit their requests for information regarding Dillon's
> Actual Suppliers to those Actual Suppliers from which Dillon purchased
> significant (i.e., more than *de minimis*) volumes of fuel for delivery to a list of 35
> stores ("List of Stores") (Exhibit A). Dillon's initial investigation indicates that
> there are two Actual Suppliers from whom Dillon purchased significant (i.e. more
> than *de minimis*) volumes of fuel for the List of Stores from January 1, 2009 to
> May 31, 2011. Plaintiffs have limited their request to spreadsheets for each of
> these two Actual Suppliers (labeled "Supplier A" and "Supplier B") ….
>
> …. Plaintiffs will be permitted to ask questions of Dillon's Rule 30(b)(6)
> designated witness regarding the spreadsheets to understand the data or the nature
> and extent of the fuel deliveries without seeking information that would disclose
> the supplier's identity.

Doc. 167, Joint Status Report, January 24, 2013, pp. 3 – 5.

42.   At the depositions of current and former Dillon employees, Plaintiffs' counsel

asked questions unrelated to the spreadsheets that were the subject of the Joint Status Report

stipulation but related to the identity of other Dillon suppliers who had been identified by Suncor

in discovery.  Dillon's counsel allowed one witness (former Dillon Employee David Wilson) to

answer, but he did not know.  Exhibit 5, Wilson Deposition Excerpt, 13:23-14:19, 60:14-61:23.

In the next deposition Dillon's counsel allowed the witness (Dillon employee, Chad Thiessen) to

answer but he did not know either.  Exhibit 6, Thiessen Deposition Excerpt, 53:12-54:23.

Finally, at the deposition of Ed Sharpe (also a Dillon employee) Dillon's counsel directed the

witness not to answer but specifically allowed as he (Dillon's counsel Mr. Taravella) attributed

"no bad motives" to the questioning.  Exhibit 7, Sharpe Deposition Excerpt, 81:8-82:25.

43.     Accordingly, the facts behind the contrived allegation that Western breached the agreement reached in the Joint Status Report (Doc. 167) reflect that: (a) two of the witnesses were allowed to answer the questions about another supplier but did not know anything; (b) one witness, contrary to the practice in the two previous depositions, was directed not to answer; (c) Dillon's counsel confirmed at the time that he attributed no bad motive to such questioning, and (d) in any event, no information was disclosed that even arguably could have violated the Joint Status Report.  Once again, as with the designation of Level 1 documents, nothing about this issue was worth complaining about until it was cooked up for purposes of the present Motion.

44.     <u>Subpoena Request No. 10</u>.  The Motion again feigns drama by leading off with a quote of the Court (shamefully out of context) that Plaintiffs' subpoena request relating to studies and reports "beats the band in terms of overbroad… and probably should be sanctionable." Motion ¶ 13, quoting Doc. 136 at 45-56.  In truth, however: (a) the Court found the request *not* to be sanctionable after it was explained in the hearing in which the issue came up[11]; (b) counsel for Plaintiffs and Dillon came to an agreement on the scope of Request 10 after being directed to meet and confer, and (c) Dillon eventually responded to the request (after prodding from Plaintiffs over a period of months).  Again, Dillon counsel has not just insinuated, but directly asserted, bad conduct on the part of Plaintiffs and their counsel where the facts plainly do not support it.

---

[11]     *See* Doc. 136 at 83:25-90:18.  Specifically, at page 84:18-21, Mr. Bennington explained in response to the Court's statement that Request No. 10 was limited in scope to "to fuel purchased by Dillon from Suncor for sale at retail" and was not an unlimited request for every study ever done by Kroger as apparently was the Court's initial impression of the request.

45.  <u>Setting the Wilson Deposition</u>.  Dillon's assertion that Plaintiffs' counsel did not try to coordinate the date and time for Dillon 30(b)(6) deposition has no merit at all.  On November 15, 2012, WCS notified Dillon of its intent to conduct a 30(b)(6) deposition and provided a draft notice of the deposition.  Exhibit 8, 11/15/2012 Bennington email to McCormick.  Plaintiffs' counsel reiterated that intention in ensuing conference calls in early December, 2012.  Finally, Plaintiffs'counsel made it clear that the date of the Wilson deposition would be set to a date convenient for Dillon.  Exhibit 9, 12/19/2012 Bennington email to Taravella.  In fact, Dillon depositions were conducted by agreement of the parties beginning February 5, 2013.

## VII.   PLAINTIFFS' REQUEST FOR SETOFF

46.  Plaintiffs submit that Dillon's conduct with respect to Plaintiffs' initial subpoena duces tecum entitles Plaintiffs to a setoff of any amounts the Court determines are subject to shifting under Dillon's Motion.  As described above, the issue before the court should not simply one of examining the fees incurred by Dillon. That is only half of the equation.  The other half involves an examination of the fees incurred by WCS in connection with the failure of Dillon and its attorneys to follow the instructions of this Court, the rules of civil procedure and applicable case law, not to mention common sense.  As set forth in great detail above, they failed on all three counts.

47.  WCS fully understands that not all of its attorneys' fees were attributable to some failure on the part of Dillon and its attorneys.  For example, preparation of the subpoenas and 30(b)(6) notices, and time spent preparing for and conducting depositions are plainly not to be on the side of the ledger attributable to Dillon misconduct.

48.     However, as set forth in the Declarations of WCS counsel (Exs. 1 and 2), an enormous amount of WCS attorney time was spent on work that would not have been necessary but for the failures, recalcitrance and misrepresentations of Dillon and its attorneys.  In total, including the work on this Response, approximately $84,394 in fees have been incurred by Western in dealing with those issues. Plaintiffs therefore request that, to the extent that the Court is inclined to find any fee or cost shifting in Dillon's favor, it enter a full offset of those amounts as a result of Dillon's own wrongful conduct in connection with the subpoenas.

Dated:  June 11, 2013.                              *s/ Kenneth R. Bennington*

_____

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON
BIERMANN & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202

Philip W. Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart PC
1225 Seventeenth Street, 29th Floor
Denver, CO  80202-5529
Telephone:  (303) 572-9300
*Attorneys for Plaintiffs and Third-
Party Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on June 11, 2013, copies of the foregoing **PLAINTIFFS' RESPONSE TO MOTION FOR FEES AND COSTS BY INTERESTED PARTY DILLON COMPANIES, INC. (DOC. 226)** was served on the following parties via the CM/ECF filing system:

Anthony J. Shaheen
Keeya M. Jeffrey
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80201-8749
AJShaheen@hollandhart.com
KMJeffrey@hollandhart.com

J. Robert Robertson
William L. Monts III
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
robby.robertson@hoganlovells.com
william.monts@hoganlovells.com

Philip W. Bledsoe
Joseph T. VanLandingham
Polsinelli PC
1225 Seventeenth Street, 29th Floor
Denver, CO  80202-5529
pbledsoe@polsinelli.com
jvanlandingham@polsinelli.com

Christopher A. Taravella
Michael R. McCormick
Montgomery Little & Soran, P.C.
5445 DTC Parkway, Suite 800
Greenwood Village, CO 80111
ctaravella@montgomerylittle.com
mmccormick@montgomerylittle.com

*s/ Marie Newberger*

_____