**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

      Western/Counter Defendants,

v.

SUNCOR ENERGY (U.S.A.), INC. a Delaware corporation,

      Defendant/Counter Claimant/Third-Party Plaintiff,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

      Third-Party Defendants.

_____

**REPLY IN SUPPORT OF MOTION FOR FEES AND COSTS
BY INTERESTED NON-PARTY DILLON COMPANIES, INC.**
_____

      Dillon Companies, Inc. ("Dillon"), by and through its attorneys, Montgomery Little & Soran, P.C., respectfully submits this Reply in Support of Dillon's Motion for Fees and Costs (Doc. #226).

**<u>INTRODUCTION</u>**

      1.     Western's response ("Response") (Doc. #239) to Dillon's Motion for Fees and Costs ignores the magnitude and scope of the subpoenas and Dillon's corresponding production.  The information Western sought resided in nine (9) different

Dillon departments (Supermarket Petroleum Operations, Petroleum Procurement, Accounting Services, Collaboration Services, Store Systems, Customer Analytics, Consumer Research, Fuel Technology and Loaf 'N Jug Petroleum Operations) in four different cities (Cincinnati, Ohio; Hutchinson, Kansas; Denver, Colorado and Pueblo, Colorado).    King Soopers and Loaf 'N Jug are separate and distinct divisions with separate IT systems.  Production also required the coordination and involvement of the Law Department.  Sixteen (16) of Dillon's employees were involved in locating and preparing this information.  Dillon's information and accounting personnel spent significant amounts of time preparing and formatting this data to comply with Western's specific requirements.   The production was massive in scope and volume.  Dillon produced 98,437 pages of documents in response to the subpoenas.  This production was extraordinarily burdensome, time consuming and expensive for Dillon.

2.     Western's conduct aggravated the burden and expense to Dillon. Western brazenly admits in its Response that it breached the Joint Status Report (Doc. #167) by seeking the identities of Dillon's suppliers during depositions, despite Western's written agreement not to do so.  Dillon also seeks its attorney fees for having to litigate against Western's motions to repudiate the very same protective order that Western said it would comply with.  Western made repeated attempts to provide access to Mr. Taraghi to documents which he had no right to access.  Dillon also had to file motions to restrict access to documents Western filed with the Court that should have been accompanied by a motion to restrict access.

3.      Notwithstanding the Court's admonition that "[request] number 10 [in Western's first subpoena] beats the band in terms of overbroad. . . . Number 10 probably should be sanctionable", Western's Response includes no attempts to explain why it needed the massive amount of information requested in its subpoenas for its case against Suncor.  Transcript of October 3, 2012 Hearing (Doc. #136), p. 84, lines 5-17.  Western acted like it had a blank check to require Dillon to produce any information Western desired no matter what the cost.  Western even admitted during a hearing that it already had some of the information.  *See* Transcript of October 3, 2013 Hearing (Doc. #136), p. 6, lines 5-7.

4.      Despite warnings from the Court and Dillon, Western refused to significantly narrow the scope and burden of its subpoenas.  For example, the marketing studies Western sought in Request No. 10 were extremely broad and nationwide in geographic scope.  Dillon's attorneys had to redact extensive information that was outside of the geographic area relevant to Western's case.  Western knew this but refused to modify their subpoenas.  Further, after Western complained about Dillon's redactions being too extensive, Dillon offered to allow Western's counsel to inspect the un-redacted studies.  Western's counsel never took up this offer.  This is evidence that Western never really needed these studies in the first place.

5.      Western's Response ignores the invasiveness of their requests, and in fact does not even directly address this issue.  Western sought highly sensitive trade secret information from a direct competitor.  Dillon's counsel had to take special care in

negotiating an additional protective order that would help protect Dillon from its competitor.  Dillon also had to make sure that the information produced was properly designated under the protective order.  Immediately after Dillon produced the information, Western sought to undo the provisions of the very same protective order that Dillon relied on and try to expose Dillon's sensitive trade secret information to Mr. Tarraghi, and even the world.

6.      Dillon has no interest in the outcome of this case.  Dillon was never served with any complaint, counterclaim or cross-claim.  Dillon is not a party to any related litigation, and there is none to Dillon's knowledge. The only interests Dillon had were in protecting Dillon's trade secrets, responding to Western's subpoenas, and seeking compensation for same.  Dillon should not have to bear the fees and costs of a competitor's litigation against its supplier.

7.      Western wants to aggrandize this case as a public endeavor to protect the public from antitrust price discrimination.  Viewed more soberly, this case is primarily about Suncor's counterclaim for $3,755,141.95 in gas that Western allegedly took and refused to pay for.  *See* Suncor Answer and Counterclaim (Doc. #31).  Western beat Suncor to the Court and filed its price discrimination claims first.  Even if the Court views this primarily as an antitrust case, which it should not, then Western has not shown any benefit to the public that would result from this case.  Western does not allege that it had to charge a higher price to the public because of Suncor's allegedly higher prices. Instead, Western is alleging that Western, not the public, should recoup the profits that

Western allegedly lost for having to pay more for gas to Suncor.  This is a private commercial dispute between Western and Suncor with no public benefit whatsoever.

8.     Western complains that Dillon seeks all of its attorney fees as an "all or nothing" proposition.  In fact, of the $182,728.50 in attorney fees that Dillon incurred[1], Dillon at this time and without waiver does not ask the Court to award $60,526 in attorney fees for such items as preparing for and attending hearings.  *See* Paragraphs 48-52 of Dillon's Motion for Fees and Costs (Doc. #226).  There are more than ample legal authorities to support the Court awarding Dillon the attorney fees it seeks and it is proper to do so.

9.     Western complains about the lack of detail in the chart showing the time spent by Dillon's employees (Exhibit J).  Dillon respectfully submits herewith as Exhibit HH a detailed description of each task performed by each Dillon employee.

10.     The Court should not indulge Western's complaints that it is too poor to pay Dillon's fees and costs.  Western is not a single family owned "mom and pop" gas station.  Western has forty two locations and a multimillion dollar operation.  Western is a very large company with significant assets.   Western initiated this litigation, hired a team of attorneys, and a team of experts.  Western's team of attorneys charge a

---

[1] Dillon also incurred additional attorney fees.  These include attorney fees paid to predecessor counsel Messner & Reeves, LLC, and an invoice from Montgomery, Little & Soran, P.C. dated May 28, 2013. These additional fees total $56,965.10.  Accordingly, the total amount of attorney fees Dillon incurred is $239,693.60 ($182,728.50 + $56,965.10 = $239,693.60).

5

combined $1,510 per hour for each hearing.[2]   Upon information and belief, Western hired a team of three experts billing at $390, $275, and $225 per hour.  Western can more than amply bear the fees and costs sought in Dillon's motion.

11.     At the same time that it complains about Dillon's attorney fees request, Western ironically seeks a setoff for its own attorney fees for tasks such as preparing for and attending hearings and motions practice.  Western ignores the caselaw in its own Response stating that attorney fees are not awarded for such matters.  Further, the declarations Western submits in support of its requests are grossly deficient because they lack any detail concerning the services rendered as required by the rules.  However, if the Court were inclined to allow Western to setoff its attorney fees, which it should not, then any setoff of Western's fees of $84,394 for attending hearings should be set off against the full amount[3] of Dillon's attorney fees which include these same types of tasks.

12.     In sum, Dillon engaged in a massive six month production of 98,437 pages of documents for Western's benefit.   Dillon incurred several hundred thousand dollars in attorney fees and costs and lost hundreds of hours of employee time in this

---

[2] Calculated as follows: Mr. Bennington ($350 per hour), Ms. Craigmile ($350 per hour), Mr. Aldrich ($225 per hour), Mr. McClelland ($185 per hour) and Mr. Bledsoe ($400 per hour).  See Response, Exhibit 1, Bennington Declaration, p. 3 and Response, Exhibit 2, Bledsoe Declaration, p. 2.  Total: $1,510 per hour.

[3] Per footnote 1 above, the full amount of attorney fees Dillon incurred is $239,693.60.  Any setoff should take this full amount into consideration.  This would result in an award to Dillon of $155,299.60 ($239,693.60 minus $84,394 equals $155,299.60).  $155,299.60 is greater than the amount of attorney fees that Dillon seeks in its original Motion for Fees and Costs ($122,202.50).

effort.  To date, Dillon has had to solely bear this burden.  The time has come for Western to pay its fair share of the bill.

A.   **Western Caused Undue Burden and Enormous Expense to Dillon.**

13.   Western argues that Dillon failed to show undue burden and expense. Western ignores the overwhelming evidence submitted with Dillon's Motion for Fees and Costs and supporting exhibits.   The information Western sought involved ten different departments in four different cities.  *See Supra* at Paragraph 1; *See Also* Declarations from Dillon's employees Jennifer McClenahan, Susan Giannola, Ron Prior, Chad Thiessen and Ed Sharpe (Doc. #107-5); (Doc. #107-6); (Doc. #117); (Doc. #165-1); (Doc. #165-2) and (Doc. #174).  Sixteen (16) of Dillon's employees were involved in locating and preparing this information.  *See Id.*; Exhibit J, Chart of Dillon Employee Time Spent; Exhibit HH, Tasks Performed By Dillon's Employees.  Western's unsupported allegations have no merit when compared to these facts.  Instead of bickering over collateral issues, the time has come to address Western's payment for Dillon's production of information and documents in response to Western's voluminous requests.

14.   Western argues that the Subpoena to Testify at a Deposition in a Civil Action dated December 17, 2012 ("Second Subpoena") did not impose an undue burden because Dillon choose to prepare and produce four corporate witnesses for a single Rule 30(b)(6) deposition.  Response, p. 25.  The Second Subpoena included 18 separate topics.  Doc. #159-1, pp. 3-7.  Dillon had no control over what topics to

7

include, the scope of information Western sought, or whence Western sought it.  The Second Subpoena sought information from four different departments in three separate cities.  *See* Second Subpoena (Doc. #159-1) and Exhibit Z to Dillon's Motion for Fees and Costs (Dillon's letter of designation).  Western does not demonstrate how this could have been avoided, except of course by Western's meaningfully narrowing the scope of the Second Subpoena to limit it to information that Western actually needed, which Western refused to do.

15.     The information Western sought had to be produced in very specific formats (i.e. custom made Excel spreadsheets with specific columns of data in each spreadsheet).  *See e.g.*, Doc. #136 (October 3, 2012 transcript) p. 45, line 24 – p. 56, line 4.  Dillon's information and accounting personnel spent significant amounts of time preparing and formatting the data to Western's exacting needs.   *See, e.g.*, Doc. #132 and chart on pages 3-12 thereof.  Dillon produced 98,437 pages of documents in response to the subpoenas.  Exhibit S.  In sum, this production was extraordinarily and unduly burdensome, time consuming and expensive for Dillon.

> i.        Western Did Not Need the Information It Sought.

16.     Western admitted it already had some of the information it sought from Dillon.  On October 3, 2013, counsel for Western represented to the Court that Western needed the pricing data in response to Request No. 5 of the Subpoena to Produce Documents, Information or Objects or to Permit Inspection of Premises ("First Subpoena") (Doc. #57-1) "as a check against other data that we have of uncertain

accuracy that would - - [sic] from Suncor."  Transcript of October 3, 2013 Hearing (Doc. #136), p. 6, lines 5-7.  Counsel for Western said that Western believed the data they had already received from Suncor was uncertain because: "We found drop-outs and inconsistencies going both directions."  *Id.* at p. 6, lines 23-24.  In response to the Court's concerns regarding undue burden,  Western's counsel stated that "Suncor does not have data that tells me to which store the fuel went."  *Id.* at p. 8, lines 1-8.

17.     Western could have asked Suncor to specify what deliveries were made to each individual store.  Further, if Western really did only need to corroborate the data already provided by Suncor, then Western could have minimized the burden to Dillon by asking Dillon to produce representative samples instead of requiring extremely detailed, custom made spreadsheets.

18.     As discussed in Paragraph 4, *supra*, after Western complained about the redactions to the marketing studies that Dillon produced in response to Request No. 10, Western's counsel declined to inspect the un-redacted studies.  It was apparent from this exchange that Western did not really need these studies for its case, but rather had some other purpose in mind, such as unsuccessfully trying to build an antitrust case against Dillon.  *See* Plaintiffs' Response to Dillon Status Report, Doc. #100: "Dillon's implacable delay and obfuscation raises the inference that it has something to hide and that, rather than being an innocent bystander, it may have played an actionable role in anticompetitive conduct aimed at its competitor, Plaintiff Western Convenience Stores . . . . "

19.     To date, Western has not documented to the Court that Western actually needed a single page of the 98,437 pages of documents that Western forced Dillon to produce purportedly to benefit Western's case.

        ii.      <u>Western Aggravated The Undue Burden And Significant Expense to Dillon By Seeking to Undo the Provisions of the Supplemental Protective Order.</u>

20.     Western's tries to pass off its motions to undo the Supplemental Protective Order as mere motions to "re-classify documents", i.e. to change Dillon's designations to a lower designation.  Rather, Western's motions were an attempt to undercut the very essence of the Supplemental Protective Order.  Western initially agreed to withhold documents designated as "Secret" from Mr. Taraghi.  Western insisted to the Court and to Dillon that the provisions of the Supplemental Protective Order were sufficient protection for Dillon's trade secrets and that it would comply with same.  Only two months later, after Dillon had produced hundreds of pages of documents including Dillon's trade secrets, Western sought to undo the very same protections upon which Dillon relied starting with Western's Renewed Motion to Re-Designate (Doc. #153).  On March 6, 2013, despite the Court's two prior denials of Western's attempts (see Doc. #84 and Doc. #179), Western asked a third time to provide Dillon's trade secret information to Mr. Taraghi or alternatively to provide the public with access.  Doc. #193.  This was not just an attempt to challenge the designation of one or two documents.  This was an attempt to completely eviscerate the Supplemental Protective Order that

Dillon relied on in producing extremely sensitive, trade secret documents to a direct competitor.

        iii.    <u>Western Failed to File Motions to Restrict Access To Protected Documents That Should Have Been Accompanied By Motions to Restrict Access.</u>

21.    Western argues that after Western filed documents with the Court with level one restricted access, Western was not under any obligation to file a motion to restrict access under D.C.COLO.LCivR 7.2D.

22.    Paragraph 15 of the Supplemental Protect Order (Doc. #140) states: ". . . 'Secret' Discovery Material and documents containing same (regardless of who made the designation), shall not be filed with the Court, except by filing the Discovery Material as a 'restricted document' and filing a Motion to Restrict Access pursuant to D.C. Colo.Civ. R 7.2.  Accordingly, by filing documents designated as "Secret" with the Court, Western was obligated under the terms of the Supplemental Protective Order to file a motion to restrict access under D.C. Colo.Civ. R 7.2.

23.    Further, Western's arguments are contradicted by its own conduct.  Before Western changed its position on March 6, 2013, Western filed no less than seven motions to restrict access to documents designated as "Highly Confidential" or "Secret" that Western filed with the Court.  Doc. #55, Doc. #65, Doc. #79, Doc. #86, Doc. #130, Doc. #158, Doc. #170.  Western clearly believed that it was obligated to file these motions until it decided to change its position.  *See* Doc. #193.  Then, on March 6, 2013, Western filed a brief arguing that the restricted documents should be exposed to

11

not just Mr. Taraghi, but also the public at large (Doc. #193).  Thereafter, Western asserted that Dillon, not Western, had to file motions to restrict access to protected documents that Western filed with the Court.  *See* Response, Paragraph 37.

24.     Western alleges that Dillon did not object to Dillon having to file motions to restrict access.  Response, Paragraph 37.  On March 18, 2013, Dillon sent Western a letter including a draft of Dillon's Motion for Fees and Costs.  Paragraph 44 of the draft motion stated in part: "[E]ven though Western filed these documents, and despite the Court's Supplemental Protective Order, Western will require Dillon to file a motion to restrict access to [Western's Response to Suncor's Motion for Summary Judgment and the exhibits thereto]."  Paragraph 78 of the draft motion stated: "Further, Western is making Dillon incur additional fees and costs by having to file motions to restrict access to protected documents under the Supplemental Protective Order because Western is now refusing to do same.  . . . Western should be required to reimburse Dillon for these fees and costs."  Western had more than adequate notice that Dillon objected and would seek its fees and costs for filing motions to restrict access.

25.     Dillon also renewed these objections in writing on June 21, 2013.  See Exhibit JJ, E-mails dated June 21, 2013.

iv.     <u>Western Breached the Joint Status Report By Seeking The Identity of Dillon's Other Suppliers.</u>

26.     Western's Response concedes that Western executed a Joint Status Report in which Western agreed not to seek the identity of Dillon's potential suppliers.  Response, Paragraph 41.  Western also concedes that it asked multiple questions

during the depositions of Dillon's witnesses requesting the identity of Dillon's other suppliers in breach of the Joint Status Report.  Response, Paragraph 42.  Western argues that: "nothing about this issue was worth complaining about until it was cooked up for purposes of the present Motion."  Response, Paragraph 43.  In sum, Western is telling the Court that it breached the agreement in the Joint Status Report, but then asks, "Why does it matter?"

27.     Obviously the agreement in the Joint Status Report did not matter much to Western, but it certainly mattered to Dillon.  Protecting the identity of Dillon's other suppliers was an issue of grave concern to Dillon.  Dillon spent significant attorney fees negotiating the Joint Status Report in good faith to try to resolve Dillon's motion to quash or modify the Second Subpoena and the subpoena dated December 19, 2012 (Doc. #159-2) ("Third Subpoena") and conserve judicial resources.  The Court denied Dillon's motion, rather than leave it in abeyance, despite counsel for Dillon's concerns that issues might arise during the depositions.  *See* Transcript of January 28, 2013 Hearing (Doc. #180) 4, line 13 - p. 6, line 15.  Western caused Dillon to incur additional attorney fees by having to resist Western's efforts to discover the identity of Dillon's suppliers in violation of the Joint Status Report during these depositions.

          v.     Western Failed to Consult Regarding Scheduling Depositions

28.     Western argues that it consulted with Dillon to schedule the depositions on November 15, 2012.  *See* Western's Response, Exhibit 8.  However, Exhibit 8 does not mention scheduling a deposition of Dillon or Mr. Wilson or any proposed date regarding

same. *See Id.* On December 18, 2012, Western unilaterally scheduled the depositions for January 3, 2013 and January 9, 2013. *See* Doc. #159-1 and Doc. #159-2. Afterward, Western's counsel stated he would try to clear counsel for Dillon's calendar. *See* Exhibit 9 to Response, E-mail from Mr. Bennington dated December 19, 2012. Dillon incurred attorney fees for filing a motion to quash the Second and Third Subpoenas because, *inter alia*, the return date was not coordinated with counsel for Dillon. *See* Transcript of January 28, 2013 Hearing (Doc. #180) p. 4, lines 8-12.

      vi.   <u>Dillon Had to Make Extensive Redactions to the Marketing Studies.</u>

    29.   Western argues that the fees and costs Dillon seeks for redacting material from the marketing studies are improper because the studies were already afforded protection under the Protective Order such that they did not need to be redacted. Response, Paragraph 15. The marketing studies Western sought were nationwide in geographic scope and included extensive information outside of the Pertinent Geographical Area as defined in the First Subpoena. Given Western's continued penchance for wanting to undo the provisions of the Supplemental Protective Order and expose Dillon's trade secret information to the world, Dillon's due care in making these redactions was justified.

      vii.   <u>The Legal Authorities Western Relies On Regarding Undue Burden are Inapplicable to This Case.</u>

    30.   Western argues that pursuant to *Mount Hope Church v. Bash Back!*, 705, F.3d 418, 427 (9th Cir. 2012), the Court should not read the "undue burden" language in F.R.C.P. 45(c)(1) to include the burdens associated with guarding protected information

14

such as trade secrets. Response, p. 19.  However, Western misconstrues the holding in the *Mount Hope Church* case.  The issue before the *Mount Hope Church* court was whether it was proper to award a non-party attorney fees as a sanction because the subpoenaing party lost a motion to compel based on unpersuasive legal arguments.  *Id.* at 425.  The case involved protected information under the First Amendment, not trade secrets.  *Id.* at 423.  The subpoena did not place any logistical burden on the non-party. *Id.*  There were no aggravating factors.  *Id.*  The case did not involve negotiating any protective order or actual production of documents.  *Id.*

31.     Western argues that in *Mgmt. Compensation Grp. Lee, Inc. v. Okla. State Univ.*, No. CIV-11-967-D, 2011 U.S. Dist. LEXIS 127693 (W.D. Okla. Nov. 3, 2011) the court denied recovery of costs of $1,761.24 and 55 hours of in-house counsel time to a non-party.  In that case, the court denied fees and costs because the non-party had a close relationship with a party to the litigation and a financial interest in the outcome of related litigation. *Id.* at *13. Notably, the court indicated that under different circumstances, the court may have awarded those costs.  *Id.* at *12-13.  This case does not apply because, *inter alia*, Dillon has no interest in the outcome of this case.  *See* Paragraphs 45-50, *infra*.

**B.     Western's Discovery Requests Were Overly Broad.**

32.     Paragraph 71 of Dillon's Motion for Fees and Costs includes an explanation of how requests 7, 8, 9 of the First Subpoena and Topic Nos. 1, 2, 3, 12, 13, 14, 15, 17 and 18 of the Second Subpoena were overly broad and unneeded for

15

Western's case against Suncor.  Western's Response does not address the overbreadth or need for these requests and these issues should be deemed confessed.

33.     Western argues that the Court's statement that "I've got to tell you, [request] number 10 [in Western's first subpoena] beats the band in terms of overbroad. . . . Number 10 probably should be sanctionable" is taken "shamefully out of context" by Dillon.  Response, Paragraph 44, *citing* Transcript of October 3, 2012 Hearing (Doc. #136), p. 84, lines 5-17.   Western alleges the Court found the request not to be sanctionable because of the limitations applicable to Request No. 10 of the First Subpoena: i.e. the definition of "Fuel",  the Pertinent Timeframe, and the Pertinent Geographic Area.  *See* Transcript, Doc. #136, p. 84 line 18 to p. 85, line 6; *See Also* First Subpoena (Doc. #57-1).

34.     There is nothing out of context about the Court's statement.  The Court did not retract its statement.   Further, the limitations Western's counsel discussed regarding Request No.10 during the hearing are evident from the face of the First Subpoena.  Dillon did not concede that Subpoena Request No. 10 was not overbroad. Dillon explicitly made, or incorporated by reference, this objection in each and every document filed with the Court and in all of Dillon's correspondence with Western regarding this request.

35.     Dillon produced 4054 pages of marketing studies in response to Request No. 10.  *See* Exhibit S (chart of documents produced).  Western does not explain why it needed Dillon's marketing studies related to "price elasticity", "demand elasticity",

16

"factors affecting demand elasticity for Fuel", *etc.* Western does not explain how it used these studies in any manner whatsoever. This request was a fishing expedition conducted at enormous expense to Dillon. *See* Paragraph 18, *supra*.

> **C.   Western Failed to Narrow the Scope of the Subpoenas.**

36.   Despite numerous warnings from the Court and Dillon, Western categorically refused to significantly narrow the scope of any of their subpoenas or discovery requests. *See The Sedona Principles: Second Edition* (June 2007), Comment 13c: "In light of the potentially enormous burdens involved with non-party discovery involving electronically stored information, parties seeking information from non-parties have a substantial interest in narrowly tailoring requests in light of a greater likelihood that a court may impose cost-sharing or cost-shifting." Western gave lip service to "narrowing" the subpoenas by limiting them to the Pertinent Time Frame and Pertinent Geographical Area as defined in the First Subpoena, but these limitations were already evident on the face of the First Subpoena itself.

> **D.   Western Confessed That The Discovery Requests Were Invasive.**

37.   Western's Response does not refute that the subpoenas were invasive. The word "invasive" does not even appear in Western's Response. This element should be deemed confessed to the Court.

38.   Even if the Court deems this element has not been confessed by Western, which it should not, then Western's requests were extremely invasive because Western sought highly sensitive trade secret information from a direct competitor. Dillon's counsel had to take special care in negotiating a protective order that would protect

17

Dillon from its competitors, which Western almost immediately sought to undo.  *See* Paragraph 20, *supra.*

### E.   The Only "Interests" Dillon Had Were To Protect Dillon's Trade Secrets, Comply With The Requirements Set Forth by the Court, Respond to the Subpoenas, and Be Compensated for Same.

39.   Western asserts that Dillon has an interest in the outcome of this case because Dillon styled itself as an "interested non-party."  Response (Doc. #239), Paragraph 30.  According to the PACER system, Dillon was added as an "interested party" on May 18, 2012, when Dillon filed its Motion to Quash or Modify Subpoena (Doc. #57).  The "interested party" designation is commonly used by the Court to designate a non-party that has filed a motion to quash a subpoena.  *See e.g.*, *Handy v. Diggins*, 2012 U.S. Dist. LEXIS 98024 (D. Colo. July 16, 2012); *United States v. Santisteven*, 2011 U.S. Dist. LEXIS 82227 (D. Colo. July 27, 2011); *Faconnable USA Corp. v. Doe*, 799 F. Supp. 2d 1202 (D. Colo. 2011); *United States v. Neal*, 2011 U.S. Dist. LEXIS 117740 (D. Colo. Oct. 12, 2011); *Oracle, USA, Inc. v. SAP AG*, 2009 U.S. Dist. LEXIS 31677 (D. Colo. Apr. 14, 2009); *Covelo Clothing, Inc. v. Atlandia Imports, Inc.*, 2007 U.S. Dist. LEXIS 92098 (D. Colo. Dec. 5, 2007); *Friedland v. The Indus. Co.*, 2006 U.S. Dist. LEXIS 66613 (D. Colo. Sept. 5, 2006); *See Also*, United States District Court – District of Colorado, Electronic Case Filing User Manual, page 17, Frame 5-4b ("Only Court personnel can add new parties.")  This administrative "interested party" designation has no bearing regarding the test used by the Court concerning whether to award costs for responding to a non-party for responding to a subpoena, namely

whether the "interested party" actually has a stake in the outcome of the underlying litigation beyond merely responding to the subpoena.  *See In Re: Michael Wilson & Partners, Ltd.*, 2012 U.S. Dist. 72961 at *11 (D. Colo., May 24, 2012) (United States District Judge Marcia S. Krieger).

40.     Dillon has not been sued in this Court, or any other, with respect to the allegations by and between Western and Suncor.  This case is far different from cases in which the courts do not award costs because the non-party has a stake in the outcome of the litigation.  *See In Re First Am. Corp.*, 184 F.R.D. 234 (non-party was party to litigation against the non-party's clients in other forums; non-party had to absorb a portion of the costs for responding to the subpoena); S*ound Sec. Inc. v. Sonitrol Corp.*, 2009 U.S. Dist. LEXIS 59630 at 3, 10 (W.D. Wash. June 26, 2009) (non-party was a franchisee association of a party).

41.     Western alleges that Dillon has an interest in this case because Dillon seeks fees associated with conferring with counsel for Suncor regarding questions from Suncor's experts.  Response, Page 22, Paragraph 30.   Dillon provided follow-up information to both Western's and Suncor's attorneys regarding the information Dillon produced because the rules require conferral concerning discovery issues.  *See, e.g.* F.R.C.P. 37(a)(5)(i).   Accordingly, consulting with Suncor's counsel was a natural by-product of Dillon's producing the information.

42.     Western asserts that Dillon has an interest in the outcome of this litigation because Dillon tried to negotiate a covenant for Western not to sue Dillon.  Response,

Page 22, Paragraph 30.  Dillon did not initiate the proposed covenant not to sue with Western.  Western initiated the proposed covenant.

43.      Western argues that Dillon is interested in the outcome of the litigation because, "Suncor's discriminatory sales to Dillon over a period of almost two years are the very basis for this Robinson-Patman Act case."  Response, p. 23.  Western's Response states: "As the party 'substantially involved' in the underlying discriminatory transactions, Dillon could have reasonably anticipated that litigation would arise."  Response, p. 23.  However, notably absent from the record is a single shred of evidence that Dillon had any idea what price Western, or for that matter any other Dillon competitor, was paying Suncor for fuel.[4]  Dillon had no reason whatsoever to believe that Suncor was allegedly discriminating against Western or that Dillon's buying gasoline from Suncor would result in litigation between Suncor and Western.  Dillon is an innocent non-party.

44.      In sum, "Third parties should not be required to subsidize litigation in which they have no stake in the outcome." *The Sedona Conference Commentary on Non-Party Production & Rule 45 Subpoenas*, p.2 (Apr. 2008)

---

[4] Western's only attempt to show Dillon had such knowledge is an e-mail from Suncor's representative to Dillon's representative stating, "After further review, [this price] is the best pricing we can do, this reflects the current market and is by far Suncor's best pricing offered in the market." Western's Response, Paragraph 3, Pages 6-7, quoting Motion for Summary Judgment Exhibit N (Doc. #185-15).  This type of marketing statement made by Suncor during sales negotiations is hardly evidence that Dillon had any actual knowledge concerning what price any other competitors, including Western, were paying for fuel.

**F.     This Litigation Has No Public Benefit.**

45.     Western argues that this is an antitrust case of public importance.

Response, p. 23.  On June 20, 2011, Western filed its Complaint including claims for

price discrimination and breach of contract.  Doc. #1.   Paragraph 23 of the Complaint

alleges that Suncor revoked Western's access to Suncor's terminals on or about May

25, 2011.  On December 2, 2011, Suncor filed a counterclaim alleging that between

May 7, 2011 and May 24, 2011, Western allegedly took $3,755,141.95 in gas that

Western refused to pay for.  *See* Suncor Answer and Counterclaim (Doc. #31).  This is

a very large counterclaim involving the same alleged transaction and occurrence as

Western's alleged price discrimination claims.  Viewed more objectively, this case is not

primarily about alleged price discrimination or the antitrust statutes.  Rather Western's

price discrimination claims are an attempt to seek a setoff against Suncor's large

counterclaims for money allegedly owed to Suncor prior to the initiation of this litigation.

46.     In the cases Western cites in support of its public benefit arguments, the

courts made specific findings that the public was charged higher prices.  *Behrend v.*

*Comcast Corp.*, 248 F.R.D. 84, *10 ("If [defendant] is found in violation of the Sherman

Act, then customers of [defendant] have been forced to pay higher prices for cable

television due to [defendant]'s unlawful behavior."); *U.S. v. Blue Cross*, 2012 U.S. Dist.

LEXIS 146403 (E.D. Mich. Oct. 11, 2012) (" . . . Plaintiff brings this suit on behalf of the

public at large and alleges that Defendant violated antitrust laws in a manner that led to

higher health-care costs to citizens throughout the State of Michigan. . . . The Court

finds that this is a matter of public importance that could impact every citizen in the State of Michigan."); *United States v. IBM*, 62 F.R.D. 526 at 528-529 ("the proper resolution of this action, . . . has been characterized as one of the most important and complex antitrust cases in history. . . . This is not an action between private litigants seeking to resolve personal grievances. It is a major antitrust suit brought on behalf of all the people.")

47.    In contrast to the cases in Western's Response, Western does not allege that the public paid higher prices because of the higher prices Western charged to Suncor. Instead, Western is alleging that Western, not the public, should recoup the profits Western lost for allegedly having to pay more for fuel. In sum, this is a private commercial dispute between Western and Suncor with no benefit to the public.

**G.    The Attorney Fees and Costs Dillon Seeks Are Reasonable**

i.    <u>An Award of Attorney Fees to a Non-Party Is Proper.</u>

48.    Western argues that "Multiple courts have found that shifting of outside attorneys' fees under Rule 45 is improper." Response, Paragraph 26. As will be shown, Western is relying on a few older California cases and a brief statement in a treatise that do not accord with more recent authorities from this Court and the Tenth Circuit.

49.    In support of Western's proposition, Western cites a 2006 case from the United States District Court for the Northern District of California, *Tessera, Inc. v. Micron Technology, Inc.*, 2006 U.S. Dist. LEXIS 25114 (N.D. Cal. March 22, 2006). In the

*Tessera* case, the court cites a treatise on federal civil procedure for the proposition that "Generally, attorney fees and overhead costs are not permitted."  William W. Schwarzer, A. Wallace Tashima, James M. Wagstaffe, Federal Civil Procedure Before Trial, 11:2308-2309.  However, the *Tessera* court did not expound on this rule because a motion for fees and costs was not actually before the court.  *Tessera*, 2006 U.S. Dist. LEXIS 25114 at *33.  Therefore, these statements are dicta.

50.     The *Schwarzer* treatise cited by *Tessera* offers no authority for the above proposition besides a 1984 decision by the United Stated District Court for the Central District of California, *U.S. v. C.B.S., Inc.*, 103 F.R.D. 365 (C.D. Cal. 1984).[5]   Western heavily relies upon this *C.B.S.* decision in Paragraph 26 of its Response.  In the *C.B.S.* decision, 103 F.R.D. 365, the court cited the American Rule prohibiting the award of attorneys' fees.   *Id.* at 374-375.  This decision was decided well before the 1991 amendments to F.R.C.P. 45.  The *C.B.S.* court also stated that the defendants in that case should not be forced to bear the risk of losing an antitrust action because the penalty for seeking the information they needed to defend against the antitrust claims brought by the United States would include the fees of the responding party in seeking outside counsel.  *Id.* at 375; *See Also* Western's Response at Paragraph 26 citing this decision.

_____

[5] U.S. v. C.B.S., Inc., 103 F.R.D. 365 was decided after remand by the Ninth Circuit in *U.S. v. Columbia Broadcasting System, Inc.*, 666 F.2d 364 (9th Cir. 1982).

51.     A cursory reading of the *C.B.S.* case would indicate that the court was stating that attorney fees should not be awarded to non-parties for responding to subpoenas in anti-trust cases.  However, a closer examination of the facts and the holding shows that the case does not stand for that proposition.  In the *C.B.S.* case, the plaintiff United States filed antitrust complaints against the defendant networks, ABC, CBS and NBC.  *Id.* at 366-367.  The defendants issued subpoenas to five non-party motion picture studios.  *Id.* at 368.  The studios were parties in related litigation, several of them having dismissed their own antitrust suits against the defendant networks once the United States commenced antitrust actions against the networks.  *Id.* at 370.  The *C.B.S.* court found that the burden on the defendant networks to pay the studio's outside attorney fees would have been too great because it would be in addition to the risk of losing the antitrust action.  *Id.* at 375.  The court also indicated that fees of outside counsel could be awarded if "the defendant directly benefitted from the work of the plaintiff's attorneys. . . . Such is not the case here."  *Id.*

52.     With this review of the facts, Western's citation of the *C.B.S.* decision is brought into focus.  In *C.B.S.*, the court was stating that the attorney fees incurred by the nonparties for responding to the defendants' subpoenas should not be added to the already significant burden on the defendant networks due to the antitrust case brought by the United States.  The court was not making any broad policy statement that antitrust plaintiffs should be protected from attorney fees resulting from issuing subpoenas to non-parties.  The only way that Western's argument might make sense is

24

if the United States (i.e. the party bringing the antitrust case) had issued the subpoenas to a non-party, not the defendants.[6]  That did not happen.  In contrast, Western is the plaintiff in this case, Western is making the antitrust claims (not defending against them), and Western is not facing any huge antitrust claim brought against it by the United States.  Further, Dillon is not involved in related litigation and has no interest in the outcome of this case.  The statement made by the court in *C.B.S.* has no application here and does not merit the Court's consideration.

53.    Moreover, Western's heavy reliance on the 1984 *C.B.S.* decision is not in accord with more recent legal authorities, including current law in the Tenth Circuit.  In a recent decision, the Tenth Circuit affirmed this Court's *Wilson* decision concerning the award of fees and costs.  *In Re Michael Wilson*, 2013 U.S. App. LEXIS 7112 (10th Cir. April 9, 2013) (Unpublished).  Although Rule 45(c)(2)(B)(ii) protects a nonparty subpoena respondent from "significant expense," expenses, including attorney's fees, must be reasonable. *In Re Michael Wilson*, 2013 U.S. App. LEXIS 7112, *Citing United States v. Columbia Broadcasting Sys., Inc.*, 666 F.2d 364, 371 n.9 (9th Cir. 1982) (listing "reasonableness of the costs of production" among the factors a court can consider when deciding whether to award a nonparty its costs in responding to subpoena); *Also Citing Georgia-Pacific LLC v. Am. Int'l Specialty Lines Ins. Co.*, 278

---

[6] Western substituted the word "defendants" in its quotation of the *C.B.S.* decision with the bracketed words, "[a plaintiff]". Response, p. 21, Paragraph 26.   However, the text of *C.B.S.* opinion uses the term "defendants."  *C.B.S.*, 103 F.R.D. at 375.  The defendant studios issued the subpoenas, not the plaintiff. C.B.S., 103 F.R.D. at 368.  The defendants were not the ones making antitrust claims but rather defending against them.

F.R.D. 187, 190 (S.D. Ohio 2010)  (explaining that nonparty's legal fees are considered a reimbursable expense under Rule 45(c)(2)(B)).  Although the Tenth Circuit made it clear that attorney fees are awardable, the Tenth Circuit found it significant that Magistrate Judge Hegarty denied attorney fees because the non-parties in that case were participating in litigation in foreign proceedings and had an obvious interest in the outcome of those proceedings.  *In Re Wilson*, 2013 U.S. App. LEXIS 7112 at *8; *See Also, In Re Wilson*, 2012 U.S. Dist. LEXIS 72963 at *7 (March 19, 2012).  Further, United States District Court Judge Marcia S. Krieger provided an independent reason to decline to award fees.  *In Re Wilson*, 2013 U.S. App. LEXIS 7112 at *8.  The non-parties provided no specific argument or evidence that any of the fees were reasonable. *Id.*  Instead, the nonparties provided broad categories of fees incurred and relied solely on evidence showing that such amounts were billed and paid.  *In Re Wilson*, 2013 U.S. App. LEXIS 7112 at *8-9.  The few invoices for attorney's fees that the non-parties did submit stated lump sums for periodic legal services without any itemization.  *Id.* at 11. Instead, one who seeks attorney's fees must submit meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks.  *Id.* (internal citation omitted).

54.    *See Also Prescient Acquisition Group, Inc. v. MJ Publ'g Trust*, 2006 U.S. Dist. LEXIS 75383 (S.D.N.Y. Oct. 13, 2006) (court awarded 50% of the actual attorney fees and 100% of the actual costs incurred in responding to subpoena).

55.     Here, Dillon is not a party in any related litigation and has no interest in the outcome of this case.  Further, Dillon has submitted detailed time records for each MLS lawyer for whom fees were sought, all hours for which compensation is requested, and how those hours were allotted to specific tasks.  Exhibits C-I, O-R, and T-W.  Dillon seeks attorney fees in accord with these legal authorities.  *See* highlighted entries on MLS Invoices, Exhibits C-I, and Motion for Fees and Costs Paragraphs 48-52.

ii.     <u>Dillon Did Not Seek All of Its Attorney Fees as An "All or Nothing" Proposition.</u>

56.     Western argues that Dillon did not segregate attorney fees incurred in complying with the subpoenas versus supporting Dillon's own interests.  Response, Paragraph 34.  Western's response ignores the categories set forth in Dillon's Motion for Fees and Costs that Dillon seeks versus those it does not.  *See* Motion for Fees and Costs Paragraphs 48-52.  For example and without limitation, Dillon, at this time and without waiver, seeks reimbursement for attorney fees incurred for tasks such as: (1) assisting Dillon in ascertaining what documents were responsive to the First Subpoena; and (2) preparing, bates numbering, and producing documents and compact discs in response to the First Subpoena.  *See* Dillon's Motion for Fees and Costs, Paragraph 47 (a)(ii) and Paragraph 47 (a)(iv).  These type of tasks had obvious benefit to Western and were necessarily incurred by Dillon.  On the other hand, Dillon, at this time and without waiver, does not seek attorney fees for such items as: (1) advising Dillon concerning the First Subpoena and related legal issues; (2) preparing and filing motions and objections regarding the First Subpoena; and (3) appearing at status conferences

27

and other hearings regarding the First Subpoena.  *See* Dillon's Motion for Fees and Costs, Paragraphs 51(a)(i) – (iii).

57.     Western challenges individual entries on the MLS invoices for attorney fees sought by Dillon.  Response, Paragraph 21.  Dillon attaches hereto an Appendix responding to each individual allegation by Western.

**H.     The Costs Dillon Seeks are Reasonable.**

58.     Paragraph 19 of Western's response states that Western does not challenge $3,388.55 of costs incurred by Dillon.  Accordingly, the Court should deem Western obligated to pay at least $3,388.55 to Dillon for Dillon's costs.

59.     Western complains that the chart of employee time spent by Dillon (Exhibit J) does not have sufficient information concerning how the hours were spent.  Dillon respectfully submits herewith an amended and restated declaration of Sara Sudkamp pursuant to 28 U.S. C. § 1746 (Exhibit GG) ("Amended Sudkamp Declaration") and a detailed description of each task performed by each Dillon employee. (Exhibit HH).[7] Exhibit FF is a copy of the Amended Sudkamp Declaration with the changes from her original declaration (Exhibit A) redlined.

60.     Western argues that the Court should deny the costs for Dillon's witnesses to travel to two hearings because: (A) the witnesses did not testify; and (B) these costs supported Dillon's efforts to avoid production under the First Subpoena rather than comply with it.  Response, Paragraph 19.  Western brought the first witness, Jennifer

---

[7] Dillon also submits herewith an amended Exhibit II – costs incurred by Chad Thiessen.

McClenahan, from Dillon's fuel accounting department in Hutchinson, Kansas in response to the Court's comments regarding the need for a Dillon witness to testify concerning the availability, format, and substance of information available in response to the First Subpoena (see Doc. #120, p. 14, lines 17-19).  Western brought the second witness, Chad Thiessen, from Dillon's petroleum procurement department in Hutchinson, Kansas in response to the Court's comments regarding the need for a Dillon witness to testify regarding why the pricing information Western sought to re-designate impacted current pricing decisions and remained a trade secret.  *See* Doc. #197 pages 21-22).  Accordingly, these travel costs were incurred as a result of the Court's requests and as a result of Dillon's producing the information and should be awarded.

## I.      Western Can Adequately Bear the Costs of Production.

61.      Western has 41 locations selling fuel in Colorado and Nebraska.  Order dated October 21, 2011, pp. 1-2 (Doc. #22); Declaration of Hossein Taraghi, Paragraph 3 (Doc. #5-11).  Western operates ten fuel delivery trucks.  Complaint (Doc. #1), Paragraph 9.  Western delivers eight to ten 10 million gallons of fuel per month. Complaint (Doc. #1), Paragraph 9; Taraghi Declaration, Paragraph 3 (Doc. #5-11). Western has been in operation since 1990. Complaint (Doc. #1), Paragraph 7.  Western previously had a $3 million dollar line of credit from Suncor, with payment due ten days after Western loaded the fuel.  Order dated October 21, 2011, p.2 (Doc. #22); Complaint (Doc. #1), Paragraph 16.  Since April 1, 2011, WCS has met consumers' demand and

been profitable.  Order dated October 21, 2011, p. 8 (Doc. #22).  No WCS stores have closed and WCS continues to sell as much fuel as customers demand.  *Id.*

62.     Western cites the *Crandall* decision to argue that "when a non-party is a large organization whose financial resources substantially exceed those of the requesting party, courts have required the non-party to bear some of its own costs." Response, Page 23, citing *Crandall v. City and County of Denver*, 2007 U.S. Dist. LEXIS 96770 at *4 (D.C. Colo. Jan. 17, 2007).  However, *Crandall* involved two individual employee plaintiffs who were employed at Denver International Airport in litigation against the City and County of Denver.  These two lone employees stand in stark contrast to Western's multi-million dollar operation.

**J.     The Court Should Not Award Any Setoff to Western.**

63.     Western submits a setoff of $84,394 should be awarded to Western Western submits no legal authorities in support of its request and it should be denied on this basis alone.

64.     In support of its request, Western, submits declarations from Mr. Bennington and Mr. Bledsoe.  Doc. # 239-1 and 239-2 (collectively, the "Declarations"). While Western complains of the lack of detail in Dillon's supporting exhibits, ironically the Declarations are completely lacking in any detail concerning the services rendered and do not include any actual invoices.  The Declarations also do not include a summary of counsel's relevant qualifications and experience.  Accordingly, the Declarations do not meet the express requirements of D.C.COLO.LCivR 54.3.  *See Also*

*In Re Wilson*, 2013 U.S. App. LEXIS 7112 at *8-9 (Court denied application for attorney

fees where applicants submitted invoices for attorney's fees that were summary in

nature, stating lump sums for periodic legal services without any itemization).

65.     Further, the details that are provided in the Declarations indicate that they

are for such tasks as appearing at hearings and motions practice.  *See, e.g.* declaration

of Mr. Bledsoe ("The time set out in the chart above includes time <u>only</u> for the following

categories of work: time responding to the various filings of Kroger in connection with

their Motion to Quash, and time spent in preparation for and attendance at numerous

Status Conferences with the Court.")  Doc. #239-2, page. 2 (emphasis in original).

Recovery for these types of services is not permitted under the legal authorities cited

above.

66.     Per footnote 1 above, the full amount of attorney fees Dillon incurred is

$239,693.60.  If the Court is inclined to award a setoff, which it should not, then any

setoff should take the full amount of Dillon's fees into consideration.  This would result in

an award to Dillon of $155,299.60 ($239,693.60 fees incurred by Dillon minus $84,394

in fees allegedly incurred by Western equals $155,299.60).  $155,299.60 is greater than

the amount of attorney fees that Dillon seeks in its original Motion for Fees and Costs

($122,202.50).

WHEREFORE, Dillon respectfully requests that the Court enter a judgment in

favor of Dillon and against Western requiring Western, jointly and severally, to pay

Dillon $122,202.50 for its attorney fees and $26,547.32 for its costs for a total of

$148,749.82 within thirty (30) days of the date that the Court enters an order granting

same.

       Dated:  July 12, 2013.


                    s/*Michael R. McCormick*
                    Christopher A. Taravella, #7790
                    Michael R. McCormick, #33682
                    Montgomery Little & Soran, P.C.
                    5445 DTC Parkway, Suite 800
                    Greenwood Village, Colorado 80111
                    Phone Number: (303) 773-8100
                    Fax Number: (303) 220-0412
                    E-mail:  ctaravella@montgomerylittle.com
                             mmccormick@montgomerylittle.com
                    *Attorney for Dillon Companies, Inc.*
                    *Interested Non-Party*

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2013 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following persons:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
Bennington Johnson Biermann &
Craigmile, LLC
370 17th Street, Suite 3500
Denver, CO 80202

Michael Korenblat
Suncor Energy Services, Inc.
717 17th Street, Suite 2900
Denver, CO  80202

Anthony Shaheen
Keeya M. Jeffrey
Holland & Hart LLP-D enver
555 17th Street, Suite 3200
Denver, CO  80201

Philip Wayne Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart LLP
1515 Wynkoop Street, Suite 600
Denver, CO  80202

William LeitzseyMonts, III
John Robert Robertson
Hogan Lovells US LLP-DC
555 13th Street NW
Columbia Square #1300
Washington DC 20004-1109

s/ *Michael R. McCormick*
Montgomery Little & Soran, P.C.

33