1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3    Case No. 11-cv-01611-MSK-CBS

4    _____

5    WESTERN CONVENIENCE STORES, INC., et al.,

6         Plaintiffs,

7    vs.

8    SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

9         Defendants.

10   _____

11           Proceedings before CRAIG B. SHAFFER, United States

12   Magistrate Judge, United States District Court for the

13   District of Colorado, commencing at 1:31 p.m., July 22, 2013,

14   in the United States Courthouse, Denver, Colorado.

15   _____

16           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

17   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

18   _____

19                     APPEARANCES

20           KENNETH R. BENNINGTON, Attorney at Law, appearing

21   for the plaintiffs.

22           CHRISTOPHER A. TARAVELLA, Attorney at Law,

23   appearing for the defendants.

24   _____

25                    MOTION HEARING

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

```
 1                    APPEARANCES (Cont'd)
 2              KATHLEEN E. CRAIGMILE and PHILIP W. BLEDSOE,
 3    Attorneys at Law, appearing for the plaintiffs.
 4              MICHAEL R. McCORMICK and ANTHONY J. SHAHEEN,
 5    Attorneys at Law, appearing for the defendants.
 6                    P R O C E E D I N G S
 7              (Whereupon, the within electronically recorded
 8    proceedings are herein transcribed, pursuant to order of
 9    counsel.)
10              THE COURT:  All right.  We are on the record.
11    This is Western Convenience Stores, Inc., versus Suncor
12    Energy, 11-cv-1611.  I'll take appearances of counsel.
13              MR. BENNINGTON:  Good afternoon, Your Honor.
14    Kenneth Bennington and Kathleen Craigmile for the plaintiffs.
15              THE COURT:  Okay.
16              MR. BLEDSOE:  And also, Your Honor, Philip Bledsoe
17    on behalf of the plaintiffs.
18              THE COURT:  All right.
19              MR. SHAHEEN:  Anthony Shaheen, Your Honor, for
20    Suncor.
21              MR. TARAVELLA:  Good afternoon, Your Honor.
22    Christopher A. Taravella and Michael McCormick (inaudible).
23              THE COURT:  Gentlemen, you might as well sit up
24    here.  It's your motion.  All right.  I have in front of
25    me -- first of all, let me state for the record that I've got
```

1    a pending motion Document 246.  This is a Motion by

2    Interested Nonparties Dillon Companies to Restrict Access to

3    Various Documents.  Is this motion opposed or unopposed?

4              MR. BENNINGTON:  It's not opposed, Your Honor.

5              THE COURT:  All right.  Then I'll go ahead and

6    grant that motion.  So Document 246 is granted.  And that

7    leaves us with the Motion for Fees and Costs.  It's Dillon's

8    motion so I'll certainly allow Dillon to go first.

9              MR. TARAVELLA:  Thank you, Your Honor.  May it

10   please the Court.  Your Honor, I do have some prepared

11   remarks, but I -- I might just start out by asking my

12   experience with this Court is you've read all the briefs.

13             THE COURT:  I have.

14             MR. TARAVELLA:  So is there something that in

15   particular you would like me --

16             THE COURT:  I have and I -- I will say it brought

17   back all sorts of painful memories --

18             MR. TARAVELLA:  Yes.  Yes.  Yes, Your Honor.

19   Indeed.

20             THE COURT:  -- but --

21             MR. TARAVELLA:  Do you have questions you want me

22   to address or shall I proceed, Your Honor?

23             THE COURT:  No.  Let me tell -- I -- folks, as a

24   practical matter I'm not going to rule from the bench.  I

25   don't want anybody to suggest or think that I'm going to.

```
 1    First of all, I think that the issue is important enough and
 2    there is not much case law out there so I'm going to write
 3    something.  And the only open question in my mind is whether
 4    or not I can issue an order or whether I have to issue a
 5    recommendation.  So I certainly want to hear what each side
 6    has to say, but I don't want anyone to think that they're
 7    going to leave here with a decision because that would --
 8    that would be misleading.  So please, go ahead, counsel.
 9             MR. TARAVELLA:  Very well.  Certainly.  Please the
10    Court.  Your Honor, as you indicated it's been a long road
11    and we appreciate the Court's help and interest and
12    participation in this long road.  And from -- there's been
13    much at stake for Dillon, perhaps foremost the protection of
14    Dillon's trade secrets.  And in this long road there's been
15    four subpoenas issued.  They are voluminous and complex, much
16    of it involving electronically stored information which I
17    know this Court has a lot of experience with, in fact, wrote
18    some of the articles on it.  Some of this was legacy.  Some
19    of it was after the acquisition of Loaf'N Jug which in -- in
20    essence really almost involved two different companies,
21    albeit one because of the different systems that were
22    involved.  It touched 16 Dillon employees, four depositions
23    of Dillon employees, Giannola, Thiessen, Parker and Sharpe,
24    10 departments, four cities, 98,000 documents, and one former
25    Dillon employee Wilson.  It's been an eight-month process as
```

```
 1      I said.  And while Dillon has been criticized for producing

 2      four witnesses for the 30(b)(6) depositions really we didn't

 3      know how else to respond because in essence when the topics

 4      are chosen we're required by the rules, as Your Honor knows,

 5      to designate those who are most knowledgeable about those

 6      topics and that's what we did and we couldn't avoid, but --

 7      but to appoint four witnesses who knew most about those

 8      topics.

 9              The Court has invited Dillon to submit attorney's

10      fees and costs after production and we are doing so.  The

11      Court did that in the August 17, 2013 hearing, in the

12      July 16th hearing, and September 14th, 2012 hearing.  And

13      we've -- while we couldn't find anything by this Magistrate

14      Judge awarding attorney's fees, costs in exactly the same

15      instance we know that you have in albeit Rule 37 type

16      scenarios.  We found Freeman v. White, Stone Deegle

17      (phonetics) Peregrine.  They were more -- more often than not

18      Motions to Compel.  One of them involved the untimely expert

19      report which I'm sure the Court's familiar with, and we did

20      find that there is more than adequate precedence for awarding

21      attorney's fees and costs.

22              Similarly the Wilson case which I think is

23      instructive that came out of this circuit starting with

24      Magistrate Judge Tafoya is instructive in that it also talks

25      about attorney's fees and costs.  During the course of this
```

1    -- this long sojourn Dillon repeatedly warned Western that

2    fees and costs that Dillon was incurring in responding to the

3    subpoena were large, mounting, and growing.  And all

4    applicable law that we found allows for the payment of

5    attorney's fees and costs including that of in-house counsel

6    fees and employee time and expense.

7         We deferred, Your Honor -- and although Dillon

8    incurred $180,000 in attorney's fees and costs not including

9    the most recent invoices for an additional 60,000, we're only

10   requesting 122,000 because our reading of the law, and to

11   enhance hopefully our credibility with this Court, we didn't

12   think we could request the additional 60.  So, again, Your

13   Honor, we want to reserve that and we did it without

14   prejudice because I see that -- that the plaintiffs are

15   asking for some sort of offset in which case we would like to

16   come back and say well, Your Honor, we'd like to apply for

17   the first 60,000 -- additional 60,000 or actually 57 Messner

18   & Reeves invoices for our predecessor counsel and also the

19   latest invoice from May 2013.

20        So we believe, Your Honor, with all due respect

21   that Dillon was forced to incur fees and costs without any

22   apparent consideration by Western of what it was asking for.

23   In essence at times we felt that Western felt they had a

24   blank check and did not exercise appropriate restraint.  Now,

25   I hesitate to throw stones because as the Court intimated

1   there's a lot of stones to be thrown and you shouldn't throw

2   stones if you're in a glass house, so I understand that.  But

3   on the other hand I'm reminded of a bad golf shot.  You start

4   with the drive, shoot -- shoot a bad drive into the woods,

5   you can either take your -- your licking there or you -- you

6   can compound it, and arguably from the start in some cases

7   maybe we did.  And I'm very well aware of what happened in

8   the first two transcripts.  I've read the hearings of those

9   -- the transcript hearings before I -- I came here so I'm

10  aware of that.  But on the other hand, that bad golf shot

11  often starts, in this case as the Court started, with the

12  initial hearing with the subpoena itself.  And the rules

13  requires the Court warned Western.  The rules require them to

14  tailor a subpoena especially to a nonparty that is pinpointed

15  and is a rifle shot, not a shotgun.  And so I submit to you

16  that while we're not entirely clean here we tried to clean it

17  up.  We tried to do it quickly and we tried to respond and

18  it's been a very, very long process.

19          So we feel -- we appreciate the Court's having

20  granted a supplemental protective order.  We feel that more

21  often than not, Your Honor, the Court's protective order and

22  supplemental protective order were challenged, if not

23  disregarded, in that, for example, Western filed restricted

24  documents and disregarded the supplemental protective order.

25  They knew better because seven times before they filed with

1    the appropriate Motion to Restrict Access.  Five times, the

2    most recent times, they filed restricted documents without

3    the appropriate Motion to Restrict Access.  So Dillon is a

4    part -- a nonparty, has been in effect bearing the cost of

5    subsidizing the litigation contrary to the Sedona Rules which

6    you're well-acquainted with, if not an author of some of

7    them.  And I was going to come back to those in a second.

8         In addition, while it is permitted to seek

9    reclassification of restricted documents under the

10   supplemental protective order, Western did this not once, not

11   twice, but three times.  Western's original Motion to

12   Redesignate the Documents was filed May 21st, 2010, Document

13   Number 59.  Western's Renewed Motion to Redesignate was filed

14   December 18th, 2012, Document 153, and the Response to

15   Suncor's Unopposed Motion to Restrict Access, Document Number

16   193.  In that document Western asked to show the documents

17   not just to Mr. Taraghi, but to the whole world.  This, of

18   course, concerned Dillon.

19        From -- you know, Your Honor, there's -- there's

20   in my experience reality and then there's the word -- the

21   legal world.  And we appreciate the supplemental protective

22   order the Court helped us with.  It's -- it's hard to tell a

23   client on the other hand -- and I know you've been on both

24   sides of this.  You've been an advocate.  It's hard to tell a

25   client that you have to tell them secrets when they are a

```
1      competitor and we -- we will trust them not to betray those.
2      And in defense of Mr. Bennington, I have to honor him and
3      Miss Craigmile because rather than just disclosing them they
4      came back to the Court and kept asking for those, but on the
5      other hand we had to respond to their Motion to Redesignate
6      three times.
7              THE COURT:  Well, but help -- let me ask this
8      question.  I -- I think I understand your -- your position
9      that you incurred fees and costs because they kept revisiting
10     the question of whether or not Mr. Taraghi would get access.
11     I guess my question to you is at what point have we
12     progressed beyond Rule 45(c)?  Rule 45(c) says that the Court
13     can award fees to the extent that a party has not properly
14     narrowed the scope of the subpoena.  Now, I addressed that
15     question and I addressed it in the context of a protective
16     order.  Now, at some point -- at what point is the nexus
17     between the production of the documents and the subsequent
18     use of the documents become so attenuated that it's really no
19     longer a 45(c) issue?  45(c) says you have to narrow the
20     scope of the subpoena to eliminate unreasonable burden or
21     expense.  Now, what you're saying -- what you seem to be
22     saying seems to be more akin to some other discovery
23     violation, a violation, for instance, of 1927 to the extent
24     that counsel has a vexatious thing, unreasonably reached the
25     cost of litigation.  I -- it just -- some of these costs
```

1    don't seem at least at first blush to comfortably fall under

2    45(c) and the purpose of 45(c).

3           MR. TARAVELLA:  I -- I hear you, Your Honor, and I

4    have 45(c) in front of me and I think the interaction with 26

5    -- Rule 26 to the extent some of it applies to nonparties is

6    quite fascinating and interesting as well.  But as I look at

7    45(c) I believe that with all due respect to Western I

8    believe they're reading out of -- of the rule the undue

9    expense part of it.  Now, the Court in its wisdom decided not

10   to rule on expenses up-front, and -- and my hear -- my

11   reading of the transcript before we were involved in the case

12   I think there was some wisdom to that in that basically had

13   you said okay, Western, everything that Dillon does, Western,

14   you will pay for, that there would have been no incentive for

15   Dillon to do it in a cost-effective fashion.

16          THE COURT:  Yeah.  But -- but, I mean, I -- I

17   understand the rule talks about undue and expense, but it

18   talks about you award sanctions on a party who fails to

19   comply with limiting the scope of the subpoena to avoid undue

20   burden or expense.  We're no long -- at least with respect to

21   Mr. Taraghi we're not fighting about the scope of the

22   subpoena.  We're talking about their intent on constantly

23   revisiting the same question which is should Mr. Taraghi

24   personally have access?  We're not talking -- I mean, they're

25   not -- I decided that you had to produce these documents.

```
 1   That's the issue of undue burden and expense.  It's in
 2   complying with the subpoena.  You complied with the subpoena
 3   when you physically produced.  That's it seems to me removed
 4   from the question of what they're allowed to do with the
 5   document once they properly have it.  Isn't that really a
 6   separate question?
 7            MR. TARAVELLA:  Indeed.  I think it is.  I think
 8   it's --
 9            THE COURT:  So how do I fold it under 45(c)(1)?
10            MR. TARAVELLA:  So I think that the question there
11   is -- under 45(c)(1) is why were these documents necessary?
12   They were requested.  And how were they used, if at all?  And
13   the Court in the transcript of August 17th, 2013 hearing said
14   okay, well, I mean, this is one of those areas -- this is
15   with respect to topic 7 of the Subpoena 1.  Well, I mean,
16   this is one of those areas where I will tell you honestly I
17   have had problems with this request since day one.  I
18   continue to have problems with this request.  And then a
19   dialog ensues between you and Mr. Bennington in which we were
20   talking at one time 135 stores.  And then also
21   Mr. Bennington --
22            THE COURT:  No, no, counsel.  I agree with you.  I
23   think their subpoena was too broad and when we finally --
24   through much wrangling and -- and cooperation or discussion
25   at some point the subpoena narrowed.  And I said that the
```

1    documents responsive to the subpoena as narrowed must be

2    produced.  Dillon said well, we're concerned that this

3    information may get into the hands of a competitor,

4    specifically Mr. Taraghi.  I said I can take care of that

5    problem.  We can enter into a productive order and we had a

6    protective order that both sides agreed to.  Once the

7    document was -- were produced we -- once the document was

8    produced, yes, I said that the cost of producing that

9    document might be recoverable.  Then we had a separate series

10   of fights about what they could do or, i.e., who could see

11   because -- I mean, this notion about relevance, under the

12   terms of the protective order Dillon agreed that the

13   plaintiffs' experts could see the document.  And so it seems

14   to me to some extent isn't that a tassive (phonetics)

15   concession that the documents themselves contain relevant

16   information?

17            MR. TARAVELLA:  Well, they -- they may contain

18   relevant information, but Wright (phonetics) Miller would say

19   that necessarily it may -- it could involve -- it could be

20   reasonably calculated to lead to the discovery of admissible

21   evidence, but at the same time be undue burden or expense.

22   Wright Miller says that as well, so --

23            THE COURT:  Yeah.  But -- but -- but the burden or

24   expense of producing the documents began and ended once --

25   see, essentially what your -- your argument seems to be that

1    any -- I guess maybe to -- to hearken back to everybody's

2    recollection of first year law school, with respect to your

3    request for fees related to Mr. Taraghi's desire to see the

4    documents you seem to be -- you seem to be applying not a

5    proximate cause analysis.  You seem to be applying a but for

6    analysis.  But for the fact they served the subpoena and but

7    for the fact we produced the documents in some form we never

8    would have thought about whether Mr. Taraghi should see them.

9    So it's -- it's not a proximate cause.  You're not saying

10   that these additional costs were incurred as a proximate

11   result of the subpoena.  You're saying they were incurred as

12   a but for cause.  But for the subpoena we wouldn't have ever

13   known about Mr. Taraghi and, therefore, we wouldn't have

14   cared whether Mr. Taraghi saw the documents or not.

15            MR. TARAVELLA:  Yeah.  I --

16            THE COURT:  Doesn't that at some point get -- the

17   but for standard get a bit attenuated?

18            MR. TARAVELLA:  I -- so I'm not doing a good job

19   really of responding.  I think the Court's question is what

20   does -- does them asking for reclassification have to do with

21   45(c)?

22            THE COURT:  Right.

23            MR. TARAVELLA:  Okay.  Let me try it this way.

24            THE COURT:  Okay.

25            MR. TARAVELLA:  We believed that responding to the

1     reclassification involves two things, Number 1, whether the

2     documents were trade secrets at all, and the Court has a lot

3     of discretion on as you know -- I mean, you know the rules

4     better I'm sure than I do.  One thing the Court can do is say

5     no.  The other thing the Court can do is restrict it --

6                THE COURT:  Right.

7                MR. TARAVELLA:  -- restrict access or -- or it's

8     not an all or nothing -- so you have a lot of flexibility in

9     doing that.  So I think that that -- it goes to that, Number

10    1, and, second, that the question is what was caused -- okay.

11    These were caused by the subpoena and Western's conduct

12    related to the subpoena --

13               THE COURT:  Sure.  You're applying what I said.

14               MR. TARAVELLA:  -- and that's -- that's what I'm

15    arguing --

16               THE COURT:  You're applying a but for test.

17               MR. TARAVELLA:  -- a test run.  That's what I'm

18    arguing.

19               THE COURT:  But for the fact that they've served a

20    subpoena we never would have incurred the cost to determine

21    if Mr. Taraghi as an individual would have access.

22               MR. TARAVELLA:  Not -- not having served the

23    subpoena, but -- but for the fact that they kept trying to

24    reclassify documents that Dillon had -- had classified as

25    restricted.

1            THE COURT:  That's -- that's -- that's a separate

2     issue.

3            MR. TARAVELLA:  Right.  Right.

4            THE COURT:  Honestly I think that it's -- it's --

5     at some point that's too attenuated.  Now, I'm not suggesting

6     there might not be another rule or another theory under which

7     you could recover those costs, but Rule 45(c)(1) basically

8     says a party serving a subpoena has an obligation to take

9     reasonable steps to avoid undue burden as a result of the act

10    of complying with the subpoena.  Now, once you complied with

11    the subpoena you are certainly entitled, as I indicated, to

12    petition for recovery of fees and costs incurred in

13    connection with the production of documents in response to

14    the subpoena.  Where you and I may have a -- not a

15    disagreement, but where we may take different positions is I

16    think at some point the -- the nex -- there has to be a

17    fairly direct nexus between the fees you're trying to recover

18    and the function of Rule 45(c) which is to minimize undue

19    burden or expense in the production of the documents in

20    response to the subpoena.

21           We had fights about Mr. -- or not we, not you and

22    I, but you and Western Convenience fought about the scope of

23    the productive -- production or the scope of the productive

24    order long after the documents had been produced.  I mean,

25    that -- that -- that process I think logically had come to an

1    end.  They then reopened the question of whether or not

2    Mr. Taraghi as an individual, as a party to this case had a

3    right to personally review the documents.  That was no longer

4    an issue of the expense of production because under that

5    theory literally you could continue to incur costs.

6              MR. TARAVELLA:  All of the factors we cite, Your

7    Honor, I think that -- that one in -- in -- in the -- the

8    case law that we found particularly in this District involves

9    the invasiveness of the request and -- and in deciding

10   whether or not --

11             THE COURT:  And that goes to undue burden.

12             MR. TARAVELLA:  -- attorney's fees and costs

13   should be awarded.

14             THE COURT:  That goes to undue burden.

15             MR. TARAVELLA:  Okay.  So that's -- that's I think

16   the nexus.  That's probably the best way I could -- could --

17             THE COURT:  Well, let me ask this:

18             MR. TARAVELLA:  -- try to connect that.

19             THE COURT:  If -- if I -- if I take your position

20   to its logical extreme -- and if I'm pushing it too far you

21   let me know.  But if I take your argument to its logical

22   extreme Dillon could retain your firm to come to Court every

23   day of the trial in this case, assuming it gets to trial.

24   Every day of trial they could send a lawyer from your firm to

25   sit in the Court and observe how these documents were being

1    used and you would say that those are costs being incurred as

2    a result of the subpoena.  Are you suggesting that Rule 45(c)

3    could be taken to the point where you could just hire a

4    lawyer to sit here and try to stay awake?

5            MR. TARAVELLA:  You know, good question.  I -- I

6    -- I --

7            THE COURT:  I mean, I'm not suggesting that you

8    should go back to your partners --

9            MR. TARAVELLA:  No.

10           THE COURT:  -- and try to sell this windfall.

11           MR. TARAVELLA:  Right.

12           THE COURT:  But logically -- because the argument

13    would be if they hadn't served the subpoena they wouldn't

14    have our documents, we wouldn't be concerned about our trade

15    secrets, and to manifest our concern we've brought a lawyer

16    to Court every day.

17           MR. TARAVELLA:  I hesitate to -- to let go of that

18    snowball down the mountain because it could result in an

19    AVALANCHE and it's a good question.

20           THE COURT:  Or a -- or a tremendous amount of

21    billable hours.

22           MR. TARAVELLA:  Right.  I'm sure the trial would

23    be interesting watching Mr. Shaheen in action for a change

24    instead of me.

25           THE COURT:  Well, I think Mr. Shaheen would be

1    more than happy to have you carry the water.

2              MR. TARAVELLA:  Yeah.

3              THE COURT:  I mean, I think he's -- he's dreading

4    the day that he has to reclaim center stage.

5              MR. TARAVELLA:  Yeah.  Your Honor, you know, I

6    don't know.  I don't know the answer to that.  But -- but you

7    know what you reminded me of is I wanted to talk to you about

8    attending the subpoena -- the depositions which is -- which

9    is maybe related, I don't know, or the Court views that

10   differently, but -- but --

11             THE COURT:  Well --

12             MR. TARAVELLA:  -- but I do want to point out that

13   we believe that -- that on your proximate cause or but for

14   causation argument one question that we'd ask the Court to

15   respectfully consider is whether the conduct or whether what

16   was going to happen was foreseeable.  And you may recall

17   before the depositions started we had a Motion to Quash.  And

18   the Court asked why did you move to quash and I said because

19   we had to because of the return date on the subpoena which

20   wasn't coordinated with us.  So we go down this road.  We're

21   going into -- to depositions and I said can you leave open

22   the Motion to Quash?  And the Court asked why and I said I

23   was concerned what would happen at those depositions.  Well,

24   what happened indeed is in those depositions, and part of

25   it's in the brief.  More -- I think that it's adequately

```
 1    briefed by -- by Western as well.  With respect to Thiessen,
 2    Wilson and Sharpe, they -- the deposing attorney asked the
 3    attorney -- asked the witness about the identity of the
 4    suppliers --
 5              THE COURT:  Okay.
 6              MR. TARAVELLA:  -- and that was in contradiction
 7    to the joint status report.  So had I not been there I
 8    wouldn't --
 9              THE COURT:  Well, but then why did -- but
10    theoretically you could have at that point under Rule 30
11    suspended the deposition to file a Motion for Protection.
12              MR. TARAVELLA:  Well, I didn't -- I didn't need to
13    because I instructed the witness not to answer.  The ball was
14    in their Court to call you --
15              THE COURT:  Okay.
16              MR. TARAVELLA:  -- and say Judge --
17              THE COURT:  Okay.
18              MR. TARAVELLA:  -- they're instructing him not to
19    answer --
20              THE COURT:  So there was one --
21              MR. TARAVELLA:  -- and get guidance from the
22    Court.
23              THE COURT:  -- so there was one -- there was one
24    question at a deposition where you instructed the witness not
25    to answer.
```

1           MR. TARAVELLA:  But it -- it went to the very

2       heart of what we're doing.

3           THE COURT:  I understand, but -- but I guess my

4       question though is --

5           MR. TARAVELLA:  It went to the very heart of trade

6       secrets.

7           THE COURT:  -- and for that particular deposition

8       you have to help me because I -- I haven't -- I've read the

9       briefs.  I haven't read in that kind of detail.  With respect

10      to those particular depositions what fees and costs are you

11      seeking to recover?  You're telling me there was one question

12      that you thought was inappropriate.  You instructed the

13      deponent not to answer.  So help me to understand the

14      rationale for recovering those fees and costs.

15          MR. TARAVELLA:  Because had I not been there then

16      the -- there would have been irreparable harm to Dillon.

17      What happened -- the last time this happened in 1999 when the

18      identity of a supplier was --

19          THE COURT:  Well, counsel, how many questions did

20      the deponent answer?

21          MR. TARAVELLA:  A lot.  But --

22          THE COURT:  I mean, how long did each deposition

23      last?

24          MR. TARAVELLA:  -- but, Your Honor, it's not

25      volume.  It's quality.  This went to the heart of the trade

1    secret --

2              THE COURT:  I know, but -- but, counsel --

3              MR. TARAVELLA:  -- we're talking about.  There was

4    the identity of the supplier.

5              THE COURT:  -- counsel, counsel, be aware that

6    Rule 45(c)(1) says you're entitled to recover reasonable

7    attorney's fees.  Their -- their conduct is clearly held to a

8    standard of reasonableness, but any award of fees and costs

9    is also measured by reasonableness.  Now, if you told me that

10   your billable hours -- your hourly rate is $500 an hour and

11   you spent a half hour at a deposition wrangling about the

12   propriety of a question, and then you said and that's $250

13   that my client should not have incurred if they hadn't -- I

14   mean, we never would have incurred that money if they hadn't

15   asked that question.  We spent 25 or 30 minutes fighting

16   about that specific question, therefore, I'm seeking to

17   recover $250.  But if you're telling me I was at a seven-hour

18   deposition and my hourly rate is $500 and, therefore, I want

19   $3500, not including travel and prep time, because we spent

20   five minutes fighting about a question how do I reconcile

21   that request with the reasonableness standard under 45(c)(1)?

22             MR. TARAVELLA:  Well, I hear you, but we really

23   didn't know --

24             THE COURT:  See -- because, see, one of the things

25   that's interesting -- and I've read the cases.  I've read the

1    cases you folks have cited.  I've read the cases that you

2    didn't cite.  You know, one of the interesting areas in this

3    -- this whole subject and the reason why I'm going to write

4    something is I -- I am taking the view or I'm coming to

5    acquire the view that 45(c)(1) is an important rule.  I

6    really think it's an important rule.  And I think it's

7    potentially going to become more important in the context of

8    Rule 40 and in the context of -- of e-discovery.  The problem

9    with this rule is it does not on its face have a meet and

10   confer requirement which I think is a sure (inaudible).

11   Another problem that I have with Rule 45(c) is that it

12   doesn't really incorporate the requirements of Rule 26(g).

13   Rule 26(g) has I think been properly described as a stop and

14   think rule.  It requires not only the propounding party, but

15   the responding party to stop and think about what they're

16   doing and to maintain some perspective, to -- to hold

17   themselves to a standard of reasonableness and not to -- to

18   conduct discovery in a reflexive manner.

19         Now, the problem that I've got is I personally

20   think that the stop and think requirement should be

21   incorporated in 45, and I think that's really where the

22   parties have missed the boat in this particular case.  There

23   hasn't been enough calm reflection about what they're doing

24   and I think that typified the situation from the very first

25   day.  And while there has been some attempt on the part of

1    the parties to cooperate and confer I'm not sure that every

2    opportunity has been properly seized.  So when you tell me

3    that you went to a deposition and they asked a question that

4    was inappropriate, if you're telling me you're seeking to

5    recover fees and costs for your entire attendance at that

6    deposition of seven hours how is that reasonable if you only

7    instructed the witness not to answer one question?

8            MR. TARAVELLA:  Your Honor, part of this is the

9    foreseeability issue that -- I would submit to you and that

10   is it reminds me of the auto industry.  We used to say if you

11   tell me where the collision will be I will tell you where to

12   put the fuel tank.  So I had no way of being able to foresee

13   what questions would be asked.  I think that in -- in

14   retrospect, even with 20/20 hindsight I had to be there.  So

15   -- so -- and --

16           THE COURT:  I'm not -- no.  I'm not -- no, don't

17   misunderstand me.  I'm not suggesting that you didn't have to

18   be there.  I would have expected you to be there.  If they

19   were deposing your client it would have been remiss if you

20   hadn't been there.  That's not the issue.  The issue is not

21   whether or not you should have been there.  The question is

22   whether or not they should pay for you to be there.

23           MR. TARAVELLA:  Understood, but --

24           THE COURT:  That -- let's focus on the -- the -- I

25   am not questioning for a second your decision to attend the

1    deposition.  This motion, however, says because I was there

2    and because they were asking the deponent questions about

3    documents they got under Rule 45 they should necessarily be

4    required to pay for me to be there as well.

5         MR. TARAVELLA:  I -- I hear you.  My -- my thought

6    on that is that it was foreseeable what might occur.  I had

7    to be there for the whole thing.  And -- and to take one

8    minute or two minutes out of a three-hour dep or whatever the

9    dep was -- they were short.  It's in -- it's in the brief

10   here.  I can't remember what the total hours are.  But to

11   take that and to -- to cross charge that would really not --

12   not be any -- any impediment or a deterrent to doing what

13   happened here, so --

14        THE COURT:  But -- but they served a subpoena.  It

15   was overbroad.  Through the Court's intervention and the

16   parties own interaction the scope of the subpoena was

17   reduced.  They then got that information.  They got the

18   documents in response to the subpoena and then decided that

19   they wanted to depose one or more Dillon representatives to

20   get a better understanding of what the documents meant.  Now,

21   how is that, the decision to take a deposition based upon the

22   documents that were produced -- again, counsel, there's a --

23   there's a fundamental issue here which really is a -- is a --

24   your interpretation literally leaves any causation aspect out

25   of this rule.  It simply says once they make the decision to

```
 1    serve a subpoena on my client and if that subpoena is broad,
 2    then any -- any -- any interaction between the -- the
 3    requesting party and the nonparty thereafter, any interaction
 4    however attenuated should be the basis for an award of fees
 5    and costs.  Doesn't that leave the reasonableness element out
 6    of it?
 7             MR. TARAVELLA:  I respectfully disagree because
 8    our interpretation of the rules, Your Honor, we shaved 60,000
 9    out of 240,000 --
10             THE COURT:  Well, no, but -- but, counsel --
11             MR. TARAVELLA:  -- or 180 out -- out of the
12    request.
13             THE COURT:  -- that's -- that's -- that's
14    essentially saying, Judge, reward me because I decided not to
15    shoot myself in the foot twice.
16             MR. TARAVELLA:  That --
17             THE COURT:  I mean, I can't necessarily commend
18    you having demonstrated poor aim in the first instance --
19             MR. TARAVELLA:  Yes, sir.
20             THE COURT:  -- telling me now you're exercising
21    caution, but not shooting yourself again.
22             MR. TARAVELLA:  Your Honor, I heard the Court say
23    that the subpoena was narrowed.  How is paragraph 10 narrow,
24    with all due respect?  I don't see any narrowing.  What we
25    did is redact.  We were criticized for that.  We said come
```

1     look at the redactions.

2            THE COURT:  Right.

3            MR. TARAVELLA:  They didn't and that's responsive

4     to the subpoena.

5            THE COURT:  And I understand, and you -- and I --

6     counsel, don't try to deflect my questions about the

7     deposition by --

8            MR. TARAVELLA:  Well --

9            THE COURT:  -- by now saying but that may be a

10    poor argument, but let's go to a stronger argument.

11           MR. TARAVELLA:  Yeah.  Well -- well --

12           THE COURT:  You kicked this horse.  I just want to

13    see how far you're prepared to ride it.

14           MR. TARAVELLA:  -- but, Your Honor -- well, yeah.

15    Okay.  Your Honor, I just heard you say it was narrowed and I

16    just wanted to take that up.  Look, if -- I don't think it's

17    reasonable really to say well, you know what?  You were there

18    and you protected the heart of the trade secret that Dillon

19    has.  And there were a lot of them, pricing --

20           THE COURT:  Right.

21           MR. TARAVELLA:  -- what -- what gas stations

22    compete, how did he determine what -- what's the mile radius.

23    All those things go to the heart of what a competitor would

24    know.  If this information were exchanged out there in the

25    real world we'd be in this courtroom for federal antitrust

1    criminal violations.  Okay.  That's what we'd be in here for.

2    So it really went to the heart -- it went to the heart of

3    what we were doing.  So we felt there was a lot at stake

4    going into the depositions.  And I don't think you can -- you

5    can look at that, Your Honor, with all due respect with 20/20

6    hindsight and what happened and because we spent two or

7    three minutes on something I instructed him not to answer --

8              THE COURT:  I know, but --

9              MR. TARAVELLA:  -- therefore, we shouldn't pay

10   anything for that.

11             THE COURT:  -- counsel, let me -- let me -- I

12   mean, again, are you suggesting that if they hadn't served

13   the subpoena, if they had -- if they hadn't served a Request

14   for Production of Documents, they had simply served a

15   30(b)(6) deposition notice on Dillon and said without any

16   documents just we want to ask questions of a Dillon

17   witness --

18             MR. TARAVELLA:  Without topics?

19             THE COURT:  Just, no, they sent -- they sent a

20   30(b)(6) notice to Dillon and said we haven't gotten any

21   documents from Dillon.  We don't have any idea what the

22   Dillon witness is going to say.  We want to depose under Rule

23   30(b)(6) a Dillon representative on the following topics.

24   They fully complied, properly complied with 30(b)(6).  You're

25   not suggesting you could recover fees and costs for that

1     deposition?

2              MR. TARAVELLA:  I don't know why I couldn't.  I

3     don't now any case law that says I --

4              THE COURT:  Under what rule?  Under what -- under

5     what rule?

6              MR. TARAVELLA:  Your Honor, the -- the factors

7     that are articulated in the Wilson progeny all the way

8     through the Tenth Circuit, all -- all the case law that we

9     cite in our -- in our case, the C.B.S. case that they cited.

10    Under -- under all of those rules I don't see any reason why

11    we could not recover, right, under 30(b)(6) without a

12    subpoena defending those depositions, representing them with

13    trade secrets at stake, sure.

14             THE COURT:  Well, and see -- and --

15             MR. TARAVELLA:  45(c)(3)(B)(C) --

16             THE COURT:  -- I -- listen, but here's the

17    concern.  I will tell you honestly here's the concern that I

18    have.  I -- I -- I hear your position and -- and I am not

19    prepared to discount the possibility that Dillon recovers

20    some fees and costs.  But that's why I come back to -- I

21    think the rule -- to be applied properly the rule has to hold

22    both sides to a standard of reasonableness.  And what -- what

23    I fear your argument does is that to a very great extent

24    would write any standard of reasonableness out of the rule as

25    it relates to the responding party.  The responding party

1     could be as contentious -- or the producing party should --

2     could be as contentious as it wants to be, could be as

3     irresponsible as it wants to be, and then say any cost we

4     incur as long as we satisfy a but for test we get to recover.

5           MR. TARAVELLA:  Let me -- let me say something

6     obvious.  I think there's -- that the Court has a lot of

7     discretion here.  First of all, I think that's obvious.  And

8     what does the Court feel about 45(c) --

9           THE COURT:  Right --

10          MR. TARAVELLA:  -- (c)(3) -- (c)(3)(C) Romanette

11    (ii)?  45, where it says specifying conditions is an

12    alternative that allows the subpoenaed person to be

13    reasonably compensated.

14          THE COURT:  Right.  And that's what we're

15    debating.

16          MR. TARAVELLA:  Might that -- might that fit?

17          THE COURT:  Sure.  But I -- the difference is I'm

18    focused on the word reasonable.

19          MR. TARAVELLA:  Well, all right.  All right.  Your

20    Honor --

21          THE COURT:  I mean, I'm not discounting that that

22    rule applies.

23          MR. TARAVELLA:  Your Honor --

24          THE COURT:  What we're fighting about is whether

25    or not it's reasonable to have your firm compensated to

1    attend a seven-hour deposition where there's only one

2    question you directed the witness not to answer because you

3    felt the question ran afoul of the understanding you had with

4    Western Convenience.

5              MR. TARAVELLA:  I'm going to pose a question that

6    I don't have the answer to and the -- and maybe you've

7    wrestled with it.  Is it -- is it foresight and

8    foreseeability or is it 20/20 hindsight?  If we had spent two

9    hours in a dep and -- and we wrangled for two hours about the

10   trade secret we probably wouldn't be having the discussion.

11   As it turned out -- and I didn't know how long we would spend

12   on that.  As it turned out we -- you're right.  We spent

13   three minutes.

14             THE COURT:  No.  What -- no, no.

15             MR. TARAVELLA:  I don't know.  Maybe -- maybe a

16   recess, five minutes, you know, so --

17             THE COURT:  No.  The simple solution would be

18   this:  What would have happened is this:  I wouldn't have had

19   anybody spend any time wrangling with it.  What I would have

20   done is exactly what you would have -- what you did was you

21   said look, I'm instructing the witness not to answer for the

22   following reasons.  Now, technically that was a violation of

23   Rule 30 to put it bluntly.  You're not allowed to tell a

24   witness not to answer unless it's to protect the privilege or

25   it's for purposes of suspending the deposition so you can

```
 1      file a motion.  Now, this was not a privilege.  Trade secrets
 2      isn't a privilege.  It may be a confidential piece of
 3      information.  It's not a privilege.  So ironically enough
 4      you're saying I want to be compensated for seven hours worth
 5      of deposition notwithstanding the fact that I violated Rule
 6      30 because Rule 30 is clear on its face.  If you instruct the
 7      witness not to answer you have to immediately suspend the
 8      deposition so that you can file a motion.  Now, what happened
 9      was is you told the witness not to answer and counsel for
10      Western Convenience didn't call your bluff.  So ironically
11      enough you may very well have saved yourself money because if
12      you had suspended the deposition and I said you were wrong I
13      would have reordered the deposition at Dillon's expense.
14      That's what the rule actually does contemplate.
15              MR. TARAVELLA:  I -- there are practicalities
16      involved, Your Honor, and I felt I had no -- no alternative.
17      I didn't ask the question.
18              THE COURT:  No.  You -- you --
19              MR. TARAVELLA:  Okay.  And we had agreed that
20      question wouldn't have been -- been asked.
21              THE COURT:  You -- you -- well, you did have an
22      alternative.  Again, this is much ado about nothing because
23      they didn't challenge your improper instruction.  What you
24      should have done is you should have said look, I think the
25      question is improper.  Unless you're willing to withdraw the
```

1    question I have only two choices.  I can either suspend the

2    deposition and file a motion which would not be productive

3    for anybody or we can pick up the phone and call Magistrate

4    Judge Shaffer and ask him what he thinks we should do.  Now,

5    you didn't follow either one of those courses of action, but

6    it's much ado about nothing because they didn't force your

7    hand.  But you -- it's -- it's not correct to say you didn't

8    have any other choices because you clearly did.

9              MR. TARAVELLA:  Right.  We could have called you,

10   but --

11             THE COURT:  Sure.

12             MR. TARAVELLA:  -- so -- I'm not sure if there's

13   -- should I continue?  Was there a pending question --

14             THE COURT:  No.  No.  Go ahead.

15             MR. TARAVELLA:  -- that I am dodging?

16             THE COURT:  No.  No.  No.  Go ahead.

17             MR. TARAVELLA:  Okay.

18             THE COURT:  Go ahead.

19             MR. TARAVELLA:  Okay.  So -- so I'm doing the best

20   I can answer.  They're good questions and I obviously don't

21   have the answers to all of them, so --

22             THE COURT:  That's what makes them good questions.

23             MR. TARAVELLA:  Yes, sir.  In some instances we

24   believe that Western already had documents from Suncor that

25   they requested.  Questions -- counsel admitted they already

1    had the pricing information from Sunscor (sic) -- Suncor in

2    the transcript of the October 3rd, 2013 hearing,

3    Document 136.  Mr. Bennington said at -- at Page 6, line 5

4    through 7 Well, there are two purposes.  The main purpose for

5    that is as a check against other data that we have of

6    uncertain accuracy that would come from -- that would from

7    Suncor.

8             Now, that's not for all of it.  I'm not saying

9    they have all of 1 through 10, but they had some.  And the

10   Court in -- in one of the hearing transcripts I read where I

11   wasn't involved in it said you have the obligation to try to

12   go get it elsewhere, in particular, from Suncor, from Mr.

13   Shaheen.

14            So I believe, Your Honor, kind of just summarizing

15   the factors, my reading of the case law, the factors form a

16   common theme in the case law.  And in -- you're right.  There

17   isn't a lot of case law, but we have some Tenth Circuit law

18   from -- from magistrate judges here and from the District

19   Court Judge Krieger and for the Tenth Circuit.

20            The first factor is do we have an interest in the

21   outcome of the case?  Dillon was a nonparty with no interest

22   or stake in the outcome of the case and Western is a Dillon

23   competitor.  The Sedona Principles which I know you know, and

24   just stop me in the middle if I need to --

25            THE COURT:  No.  No.  Go ahead.

1          MR. TARAVELLA:  -- stop.  The Second Edition, Best

2     Practices Recommendations and Principles for Addressing

3     Electronic Document Production dated June 2007, Comment 13c.

4     You probably have it memorized.  Since 1991 -- and by the

5     way, the C.B.S. case was before the 1991 rules.

6          THE COURT:  Right.  I know.

7          MR. TARAVELLA:  Okay.  Rule 45 of the Federal

8     Rules has required persons issuing subpoenas to take

9     reasonable steps to avoid imposing undue burdens or expense

10    on the requested party and, if objection is made, any order

11    to compel production shall protect the requested party from a

12    significant expense.  As important, the Committee Notes the

13    1991 amendments state a nonparty required to produce

14    documents or material is protected against significant

15    expense resulting from involuntary assistance to the Court.

16    In column third -- I mean, Comment 13c continues.  Parties

17    seeking information from nonparties have a substantial

18    interest in narrowly tailor -- tailoring requests in light of

19    a greater likelihood that a Court may impose cost-sharing or

20    cost-shifting.  And the analogous -- the Sedona conference

21    commentary on nonparty production and Rule 45 subpoena,

22    April 2008, Page 2, one sentence.  Third parties should not

23    be required to subsidize litigation which they have no stake

24    in the outcome.

25          The covenant not to sue is really a red herring.

1     They raised it in their brief.  We were approached by them.

2     The issue is not because we had an interest in the stake in

3     the outcome of the case.  We were concerned about antitrust.

4     The issue that broke down the -- the negotiations was

5     shifting, cost-shifting, and who was going to pay for this?

6             So the -- another factor is can a nonparty bear a

7     portion of the fees and costs?  Well, I suppose you could say

8     Dillon could, but we argue that so could Western, at least

9     they could bear a portion of it.  And I don't think it's an

10    all or nothing at all proposition, Your Honor.  I think some

11    were north of zero and some were south of what we requested I

12    submit to you.

13            Public importance.  Is the -- this is a dispute we

14    submit to you between parties regarding -- regarding

15    nonpayment to Suncor of about $3.7 million in delivered but

16    unpaid appeal.

17            How invasive is the request?  We've talked about

18    that.  But, you know, I submit to Your Honor there's a common

19    sense factor that really is not articulated or at least that

20    I'm aware of, and I know the Court has common sense so I

21    don't want to offend your intelligence.  But I believe --

22            THE COURT:  Talk to my wife.

23            MR. TARAVELLA:  -- I believe that factor is how

24    important is what you need and can you get it from someone

25    else?  Can you get it from someone else?  In this case Suncor

1     which we've talked about.

2              So, Your Honor, in summation I appreciate the

3     Court's time, patience throughout this long ordeal.  I know

4     it's been difficult and it's been difficult for all of us,

5     but I appreciate that and I'm sure happy to answer any

6     questions you may have.

7              THE COURT:  Absolutely.  No.

8              MR. TARAVELLA:  Thank you.

9              THE COURT:  Let me -- let me hear from plaintiffs'

10    counsel at this point.

11             MR. BENNINGTON:  Thank you, Your Honor.  At the

12    risk of piling on we have struggled with Rule 45(c) and

13    precisely what is the relevance of the complaints about the

14    Motions to Restrict Access?  The reattempts at reclassifying

15    documents so Mr. Taraghi could see them.  The deposition

16    scheduling, other vendors and things like that.  The truth of

17    that is those are things that were not complained of at the

18    time, were not the subject of a motion for any kind of

19    sanctions, but were saved up or at least gathered up to

20    present at this time.  And I suggest that as your questions

21    point out and the lack of good answers that they don't have

22    anything to do with Rule 45(c).  There may be other

23    complaints, and in our brief we explain all of them and I

24    suggest they're complaints that are completely invalid and

25    cooked up for this proceeding, but nonetheless they have --

```
1    they have very little, if anything, to do with what's going

2    on or the decision you have to make today.

3              THE COURT:  How many -- how many -- how many

4    separate times -- how many separate motions have been filed

5    seeking leave for Mr. Taraghi to have access to these

6    documents?  I honestly don't recall the actual number.  How

7    many times?

8              MS. CRAIGMILE:  There was two, Your Honor.  There

9    was --

10             THE COURT:  And as to this date has Mr. Taraghi

11   still -- has he seen these?

12             MS. CRAIGMILE:  He has not.  There was two

13   separate motions.  One was filed.  Robert (inaudible) was

14   involved.  The second was filed after the (inaudible) and the

15   first request was really a response to Mr. Shaheen's motion

16   filed in -- for Summary Judgment filings facing some law that

17   Judge --

18             THE COURT:  So -- but the issue has been raised by

19   Western Convenience three separate times.

20             MS. CRAIGMILE:  Three separate times.

21             THE COURT:  And you've lost each time.

22             MS. CRAIGMILE:  We lost twice.  The third issue on

23   Summary Judgment raised (inaudible) law that Judge Krieger

24   has on the issue of whether documents used on Summary

25   Judgment should be kept confidential (inaudible).  It was
```

1    really a response to Mr. Shaheen's motion and Judge Krieger

2    has not ruled on that motion.

3            THE COURT:  Okay.  I don't necessarily -- I'm not

4    prepared to decide, but at first blush I don't necessarily

5    see a Rule 45(c)(1) issue, but I -- I can appreciate to some

6    extent Dillon's frustration when fees and expenses are

7    incurred repeatedly to plow over what could best be described

8    as -- as barren soil.  At what point does a litigation

9    posture become so vexatious that -- that you pursue that

10   position at your client's peril and expense?  I mean, that's

11   -- and -- and -- and to be perfectly honest with you, I

12   haven't looked at it, but I know that Rule 26(c) says that if

13   a party seeks protection and that motion is unsuccessful fees

14   and costs can be awarded, and 26(c) also provides I think

15   that if a party moves successfully for protection fees and

16   costs can be awarded.

17           MR. BLEDSOE:  Your Honor, just -- just for -- so I

18   can be clear, Dillon was not involved (inaudible).

19           THE COURT:  But -- but I was.

20           MR. BENNINGTON:  You're seeking fees and costs.

21           THE COURT:  And -- and -- and so whether --

22   whether it was Dillon or Mr. Shaheen or anybody else, the one

23   common denominator through all this thing has been me.

24           MR. BENNINGTON:  Yes.

25           THE COURT:  And -- and, you know, it -- so in

1    other words, your argument seems to be because somebody else

2    kept -- since -- since it was raised different times to the

3    same judge we can raise it time and time again with absolute

4    immunity?

5            MR. BLEDSOE:  Absolute -- no, Your Honor.  That's

6    certainly not our argument.  But their -- I take your

7    question to be for any (inaudible) from the first one, of

8    course, because Dillon wasn't involved in that.  And we're

9    here on their fee request after all.

10           MR. BENNINGTON:  And I want to just remind the

11   Court and remind myself that the last time this came up was

12   after Motions for Summary Judgment had been filed.  And Judge

13   Krieger has in her -- in her previous rulings indicated that

14   -- a policy, if not a finding or statement of law, that once

15   a Motion for Summary Judgment is filed you've made it a

16   public proceeding.  Well, our client -- we explained this law

17   to our client and it's now a public proceeding according to

18   Judge Krieger.  We can't --

19           THE COURT:  It's always been -- it's always been a

20   public proceeding.

21           MR. BENNINGTON:  Well --

22           THE COURT:  But our local rule --

23           MR. BENNINGTON:  -- as far as the documents --

24           THE COURT:  -- 7.2 does recognize that exhibits to

25   a Motion for Summary Judgment can be restricted as long as

1    the Court -- what the public is entitled to know is the

2    Court's conclusion and the Court's reasoning.  And if Judge

3    Krieger can articulate her reasoning and decide the motion

4    and still protect a nonparty's trade secret I don't think

5    those two objectives are irreconcilable particularly because

6    the motion's granted.

7              MR. BENNINGTON:  And that's still in play, so --

8              THE COURT:  I understand.

9              MR. BENNINGTON:  -- it's -- it's disingenuous for

10   Kroger/Dillon to suggest there's something improper about

11   taking a position that is consistent with her previous

12   rulings on what's the --

13             THE COURT:  But -- but to the extent that there

14   were -- there have been at least -- this issue has come up at

15   least twice with me not in the Summary Judgment context.  And

16   I'm looking at Rule 26(c).  Rule 26(c) -- and this is -- this

17   is a 26(c) issue is a Motion for Protective Order.  I entered

18   a protective order.  26(c) says -- and I'll get the exact

19   language.  26(c) says -- 26(c)(3), Rule 37(a)(5) applies to

20   the award of expenses.

21             Now, I haven't thought about this, say, for

22   30 seconds ago, but I suppose it's an interesting issue.  If

23   I enter an order for protective order and a protective order

24   is put in place, a party then chooses to challenge that

25   protective order and asks the Court to reconsider the

1    protective order, to the extent that the party who has the

2    protective order has the benefit of the protective order, is

3    able to successfully defend its protective order, and the

4    party seeking modification loses, to what extent does

5    37(a)(5) come in to play?  Because then there is a moving

6    party.  The moving party was unsuccessful.  Then under

7    37(a)(5) a party who's unsuccessful unless their position is

8    substantially justified or unless I find that the

9    circumstances or otherwise don't warrant an award fees and

10   costs can be incurred by the non-prevailing party.  And

11   clearly a protective order was in place.  Western Convenience

12   challenged that protective order.  That challenge was

13   defeated.  The Court kept the protective order in place.  You

14   lost.  To what extent are fees and costs recoverable under

15   37(a)(5)?  I don't necessarily think they're recoverable

16   under 45(c)(1), but I'm not prepared to say that they're not

17   recoverable at all.

18          Now, is it the Court's responsibility to redraft

19   the motion for the moving party?  No.  I don't think it is.

20   But, you know, we -- we've already heard one reference to the

21   miracle of dodging a bullet.

22          MR. BENNINGTON:  I -- I wouldn't be -- wouldn't

23   have the --

24          THE COURT:  Dodging a bullet is no guarantee

25   you're going to be immune from the ricochet.

1          MR. BENNINGTON:  I wouldn't have the temerity to

2     suggest that you don't have the power to grant -- to award

3     fees in that situation on a pro motion and perhaps even on

4     your own motion, but that wasn't the way it was raised.  It

5     hasn't been the way it's teed up.  Now, we're not talking

6     about hundreds of -- or even tens of thousands of dollars

7     here.  We're talking about a few hours.  And I don't have

8     sufficient command of the Montgomery firm's time slips or

9     time sheets to know whether there was even a request or --

10    I'm sorry, whether the hours for those hearings is part of

11    the request because there were hearings at which

12    Mr. Taravella and -- and Mr. McCormick appeared that they

13    didn't -- that aren't part of their request.  They're not

14    highlighted in yellow to be perfectly, you know, frank about

15    how they did it.  So if there are any amounts that we're

16    talking about it's relatively small by comparison to the

17    $122,000 claim.  And, again, I repeat, there's no motion

18    before the Court on that.

19         THE COURT:  Yeah, except the problem is is that,

20    strictly speaking, I'm not sure there needs to be a motion.

21         MR. BENNINGTON:  Well --

22         THE COURT:  What applies is --

23         MR. BENNINGTON:  -- and I concede that.

24         THE COURT:  -- yeah, because I'm looking at

25    37(a)(5)(D).  It says if the motion is denied -- it was your

```
1    motion to modify the protective order.  If the motion is

2    denied the Court may issue any protective order authorized

3    under Rule 26(c) and must be given an -- or an opportunity to

4    be heard, require the movant, the attorney filing the motion

5    or both to file the party -- to pay the party or deponent who

6    opposes the motion reasonable fees and expenses.

7            So technically the rule says that I must award

8    fees and costs having given you an opportunity to be heard.

9    Now, I don't think the opportunity to be heard translates

10   into an opportunity to be ambushed --

11           MR. BENNINGTON:  Now, let me suggest filing --

12           THE COURT:  -- but if we continue to talk about it

13   I suppose at some point we've satisfied the rule.

14           MR. BENNINGTON:  If we were so out of line when we

15   raised that, say, the second time I -- I have a feeling you

16   would have hammered us then.

17           THE COURT:  I kind of thought I had.

18           MR. BENNINGTON:  And let me suggest that at the

19   point we -- where you denied it --

20           THE COURT:  I -- I thought at least I was -- I was

21   fairly vocal.

22           MR. BENNINGTON:  No -- no doubt you denied it, but

23   I -- I imagine there's been times where you've gone a step

24   further.  But remember at the time this was raised this data

25   that's in play here was getting older and older and older.
```

1        And you didn't buy that argument at the time and I'm not

2    going to try to suggest it again.  But it wasn't just out of

3    the blue that we kept coming back.  The clock was running on

4    this data and, frankly, if we didn't -- if we didn't have

5    this teed up in front of Judge Krieger at the moment that

6    most -- at the moment based on Summary Judgment it might be

7    ripe to raise again, but we're not going to I assure you.

8    There --

9              THE COURT:  Okay.

10             MR. BENNINGTON:  -- there is no doubt we don't --

11   that you have the discretion to make the award here, but what

12   is also there no -- there is no doubt as to is that the

13   burden is on Dillon to show not only unreasonable or undue

14   burden, but unreasonable -- or the reasonableness of what

15   they're seeking.  And Judge Krieger in the Wilson case and

16   many other authorities make it clear that there are factors

17   to be considered and Mr. Taravella addressed them.

18             First is the interest of Dillon in the underlying

19   transaction.  Dillon tries to portray itself as having no

20   interest in this transaction and that is just facially

21   implausible and incredible.  First of all, they induced a

22   price for multimillion gallons and dollars worth of fuel

23   which they were told was the best price available.  The

24   record is clear that they got the best price available and

25   that they knew they were getting the best price available.

```
 1    In addition, not only going into the transaction were they
 2    interested in what was going on, as it turned out in the
 3    context of this case that that interest is underscored by the
 4    fact that in their own time slips they -- they ask for
 5    recovery for conferring with the Suncor experts.  Now, I
 6    suggest to you there's no reason to be conferring with
 7    Suncor's experts unless they see themselves as having an
 8    interest in how this case turns out, namely, against Western
 9    Convenience stores.
10         THE COURT:  Well, I mean, that's one possible
11    explanation.  Another possible explanation is they could have
12    conferred with Suncor because they're saying, look, we've
13    moved to quash the subpoena.  We've moved to quash the
14    subpoena because it seeks documents which Suncor you
15    presumably have, you've presumably produced.  We're
16    conferring with them to get a better sense of whether or not
17    you have properly reduced and limited to the greatest extent
18    possible your burden on them.
19         MR. BENNINGTON:  That -- that may be --
20         THE COURT:  Tell us -- tell us what's been going
21    on in discovery.  Tell us what you've produced, what you
22    haven't produced.
23         MR. BENNINGTON:  The distinction though is that's
24    not a conversation with Mr. Shaheen over here.  What I'm
25    referring to is time slips where they're talking to
```

1    Mr. Shaheen's experts.  His experts aren't involved in

2    figuring out whether the subpoena is broad or overbroad or

3    anything like that.  His experts are involved in trying to

4    disprove the impact on competition, trying to disprove that

5    there's any damages, trying to disprove -- disprove a whole

6    universe of elements that we have to prove in a

7    Robinson-Patman case.  And I'm suggesting that there's no

8    reason for Dillon to be having those conversations unless

9    they have an interest in the outcome of the case.

10          THE COURT:  Well, I guess my question is -- and I

11   may have this wrong and so I -- I -- I say this and I'm

12   apologizing in advance if I've got it wrong.  But I have a

13   vague recollection at some point there was discussions

14   between Western Convenience's counsel and Dillon's counsel

15   along the lines of well, we won't fight about the subpoena if

16   you agree that you won't sue us or you agree that you won't

17   take action against us or that somehow we'll be insulated

18   from any further exposure.  Do I have that in any way

19   correct?

20          MR. BENNINGTON:  You've got that correct.  It's in

21   the briefing both ways.

22          THE COURT:  Right.  I would suggest that if they

23   truly weren't an interested party that's not a concession

24   they would feel even compelled or interested in pursuing.

25          MR. BENNINGTON:  If they -- if they were not an

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119        FAX 303-893-8305

1    interested party when we raised the idea of a covenant not to

2    sue they'd say take a hike.  We don't need to talk to you

3    about that at all, but they did and it was lengthy.  There

4    were -- there were 25 entries in the time slips from

5    Mr. Taravella's firm where they're talking about drafting and

6    negotiating the covenant not to sue.  It wasn't a small, a

7    small deal.  It was a big deal.  Dillon was -- and, in fact

8    -- well, Dillon expressed concern, and I'm not able to cite

9    this so I'm relying on my memory and I'll caveat it that way,

10   in a hearing here that some of this discovery was calculated

11   to see if we could fish around for a case against them which

12   we weren't doing, but that, again, suggests they have grave

13   concern about being interested in the outcome of this case.

14          Now, the second element under Wilson -- this --

15   this -- that's really the most important one.  But the next

16   one is the ability to bear the expense.  And these are both

17   big companies and big boys, but it's hard to say either

18   company doesn't have the ability to bear the expense.  That

19   really probably doesn't merit much discussion other than to

20   say Dillon certainly is not being hurt in a financial way

21   that's going to hurt its business and its ability to succeed

22   in the marketplace by the $122,000 of Mr. Taravella's fees.

23   So it's a toss-up at the very least and I suggest you can't

24   tip that one either way.

25          The other -- the next -- the next element is the

```
 1    public importance of the litigation.  Dillon suggested this
 2    is -- has no public importance at all, but my response to
 3    that is that this is a case brought under the antitrust laws,
 4    the Clayton Act and the Robinson-Patman Act is an amendment
 5    to it.  Congress apparently thought and the -- the case law
 6    makes it very clear that Robinson-Patman cases, antitrust
 7    cases, are supremely important to the public.  That is why
 8    there's a treble -- treble damages -- treble damages
 9    provision contained in the statute and why -- that's why
10    there's also an attorney's fees provision.  I suggest that --
11    that any contention that this doesn't have any public
12    importance is just defeated entirely by the -- by the statute
13    itself.  And beyond that we're talking about what -- what is
14    going on with Western which is everyone contends and
15    Mr. Taraghi admits that he's a discounter.  That he is the
16    low guy on -- on his street, on his corner.  That I suggest
17    is -- makes it of public importance that he survive, that if
18    the Robinson-Patman Act can be -- can be proven, if a
19    Robinson-Patman violation can be proven which is admittedly
20    still in play here that that is a matter of public
21    importance.
22              THE COURT:  Yeah.  And I will tell you I -- I -- I
23    read Judge Krieger's decision in Wilson.  I've read some of
24    the other, Tesera (phonetics).  I understand there's multiple
25    factors.  I don't discount the multiplicity of them.  You
```

1    know, you get three judges involved in case and you'll get at

2    least 12 factors on any (inaudible).  I think the one concern

3    that I have and -- and the reason why I intend to write

4    something is the one factor that seems to be missing in all

5    of these cases is the conduct of counsel, and -- and I think

6    that should be the preeminent factor because the difficulty

7    is if -- you know, if you -- if you focus on those three

8    factors as Judge Krieger did do the parties have the

9    financial wherewithal to fight?  I think both parties in this

10   case clearly have a financial wherewithal.  But if I focus on

11   that factor it -- it becomes a disincentive for anybody to

12   act reasonable.  If -- if party A has relatively deep

13   pockets, and I will assume that party A does have reasonably

14   deep pockets, and party B has reasonably deep pockets it --

15   it -- frankly, it becomes a situation where everybody says

16   well, that factor is neutralized, it doesn't much matter, or

17   we both have deep pockets and we'll just fight.  And

18   similarly if -- if a party says well, there's a significant

19   public interest and because there's a significant public

20   interest I don't have to act reasonably, I don't have to

21   draft good discovery requests, I can just ask for everything

22   under the sun, that's exactly the wrong message that you want

23   to send to people.  So the difficulty with the three factors

24   that Judge Krieger articulates, they're legitimate factors,

25   but the problem is is that those factors I think miss the

1    essential critical point.  Every other discovery rule has as

2    an element we want lawyers to think before they do it.  Rule

3    45(c) has that included.  It says you have to make reasonable

4    efforts to reduce the burden.  The difficulty is those three

5    factors to some extent -- and this is a perfect example.

6    Those three factors play out in such a way as to negate any

7    way to be reasonable.  Both sides have both deep pockets.

8    This is of strong public interest.  They're an interested

9    party.  The difficulty is you're saying because those three

10   factors weigh in our favor we're absolved of any

11   responsibility to be reasonable.

12           MR. BENNINGTON:  I'm not, Your Honor.  I -- I'm

13   trying to go through the factors as Judge Krieger laid them

14   out.  But --

15           THE COURT:  Yeah, I know, and I think she's missed

16   one.

17           MR. BENNINGTON:  -- let me -- let me tie this in

18   to what you're saying.  You're -- without a doubt the stop

19   and think rule is -- if it's not written in the rule we all

20   know it's written into the rule when we come into your

21   courtroom.

22           THE COURT:  Right.

23           MR. BENNINGTON:  And what we -- what happened here

24   is that we filed this subpoena or served this subpoena in

25   April of 2012 and we have the first hearing in which

1    Mr. Evans shows up --

2              THE COURT:  Right.

3              MR. BENNINGTON:  -- and is totally unequipped by

4    his client to respond.

5              THE COURT:  Right.

6              MR. BENNINGTON:  So a month later he shows up

7    again still completely unequipped --

8              THE COURT:  The affidavit is of no value.

9              MR. BENNINGTON:  -- to respond.

10             THE COURT:  Right.  I think --

11             MR. BENNINGTON:  And at that point --

12             THE COURT:  -- Dillon left him hanging in the

13   wind.

14             MR. BENNINGTON:  -- the Motion to Quash is denied

15   by you.

16             THE COURT:  Right.

17             MR. BENNINGTON:  So the third hearing between

18   those --

19             THE COURT:  Although but in fairness -- because

20   I've gone back and I've read both of those transcripts.  And

21   you're right as far as you took it.  But what I also said at

22   those hearings was -- and I think I said it very specifically

23   at the first hearing.  I said the subpoena seems excessively

24   overbroad --

25             MR. BENNINGTON:  It's broad.  Yes.

1           THE COURT:  -- and I think with -- I think with

2    respect to Number 10 you said well, you're right.  Upon

3    further reflection, we've asked to go back to 2007, but

4    Dillon wasn't even buying fuel from Suncor until 2009.  It

5    was an overbroad request.

6           MR. BENNINGTON:  May I correct you there?  Because

7    that's the one where you famously said this one beats the

8    band --

9           THE COURT:  Right.

10          MR. BENNINGTON:  -- in terms of overbroad.

11          THE COURT:  Right.

12          MR. BENNINGTON:  But I pointed out that it had the

13   word fuel with a capital F in it as one of the key words and

14   it, therefore, related only to fuel sold by Suncor to

15   Kroger/Dillon.  So it didn't really go back to 2007.  Now I

16   wish I had drafted it more clearly so I wouldn't have had

17   that quick reaction to it, but it wasn't narrowed.  And where

18   I'm headed with this is that while you did deny the Motion to

19   Cross -- Motion to Quash, I remember being here several times

20   taking a beating over the -- over the breadth of the

21   subpoena.

22          THE COURT:  Right.

23          MR. BENNINGTON:  But at each step of the way we

24   narrowed the subpoena, sometimes having been, you know,

25   forced into it by you and sometimes in voluntary discussions

```
 1   between me and Mr. Taravella.  So the --

 2             THE COURT:  No.  It -- listen, I -- I -- I remain

 3   of the view that the subpoena should have been drafted more

 4   precisely and -- and I still remain of that view.  But I have

 5   gone back and I've read the transcripts and I have to, again,

 6   reiterate that to the extent that Dillon is seeking sanctions

 7   under Rule 45(c)(1) I can't be oblivious to the fact that

 8   Dillon at virtually every turn after this thing evolved

 9   misplayed it.  And I'm not -- I'm not -- my criticism is not

10   directed to Dillon's current counsel.  My criticism is not

11   directed to Dillon's former counsel.  But the perfect

12   illustration -- and I was reminded of this when I went back

13   and read the transcripts.  We had a hearing.  I explained to

14   Dillon's counsel that -- that I wasn't getting the

15   information I needed.  We then have a hearing.  And I had

16   forgotten this until I read the transcript.  You know,

17   Western Convenience files a status report several days before

18   that hearing.  Dillon files a status report something on the

19   -- a response something like an hour beforehand, and Dillon's

20   counsel comes in and says well, I -- I still don't really

21   know anything.  And it -- the -- see, Dillon would have been

22   in such a stronger position to argue that Western

23   Convenience's subpoena was unreasonably burdensome if Dillon

24   had come in from day one and demonstrated the burden, but to

25   some extent the burden of this process -- I'm not absolving
```

1    Western Convenience of any and all responsibility, but my

2    sense has been that Dillon's approach to this compounded the

3    burden it now seeks relief from.  I mean, I will tell you

4    honestly, and I'd have to go back and this may be a bit of an

5    overstatement, but my recollection is Mr. Evans came in the

6    first time and said, you know, producing these documents is

7    going to cost us hundreds of hours, hundreds of hours, and

8    cost us thousands and thousands and thousands of dollars, and

9    I was frankly a little surprised when the entire document

10   production was, like, $20,000.  I -- I really -- to be honest

11   with you I was somewhat surprised when the request for fees

12   and costs was $20,000 and change to produce and $122,000 for

13   legal fees.  I mean, to some extent if -- if it really was

14   truly unduly burdensome I would have expected those dollar

15   allocations to be different because, I mean, it becomes a

16   tricky issue and I'm -- I want to emphasize I haven't made

17   any decision.  But at what point is the burden of an

18   overbroad subpoena compounded by overlawyering on the part of

19   the party who got the subpoena?  And that's -- that's

20   fundamentally what I have to struggle with because -- and I

21   can't -- I can't ignore one to the exclusion of the other

22   because if I say I'm going to be oblivious to the costs of

23   overlawyering then I'm essentially sending an invitation to

24   the recipient of the subpoena to fight like hell, fight at

25   every turn, don't give any ground at all, plow over old

1    ground because then that becomes the vehicle to say it's

2    unduly burdensome.  I -- I -- 45(c) says that the party

3    serving the subpoena has to act in a responsible manner, but

4    I don't know that it gives the responding party carte blanche

5    to be unreasonable itself other -- because if that's the

6    interpretation of 45(c) it turns the rule upside down and I

7    don't know that I want to buy into that theory.  That's my

8    problem.

9           MR. BENNINGTON:  If I may then I'd like to address

10   one other element of what is being sought and that is just

11   the failure to meet the burden of proof.

12          First of all, in the case decision, the Tenth

13   Circuit case, it's -- it's clear that block billing is

14   disfavored and that there has to be some detail.  The --

15   Mr. Taravella's time slips and Mr. McCormick's time slips

16   which compose the bulk of -- of the time slips are all block

17   billing.  It's almost impossible, if not -- I suggest the

18   Court shouldn't have to take its time trying to figure out

19   from there -- from those block bill time slips or time

20   entries I should say what's in and what's out.  For instance,

21   as I said, there's 26 entries regarding the covenant not to

22   sue --

23          THE COURT:  Yeah.  I -- I --

24          MR. BENNINGTON:  -- but you can't --

25          THE COURT:  -- I'm well aware of the --

1          MR. BENNINGTON:  -- you can't separate those out.

2          THE COURT:  -- I'm well aware of the case law and

3     the case law says that if, in fact, a party provides block

4     billing and doesn't provide itemized billing the Court has

5     the discretion to reduce that amount --

6          MR. BENNINGTON:  Yeah.

7          THE COURT:  -- on some proportionate basis.  The

8     fact that they block bill is not -- does not preclude any

9     award of fees.  It's just one factor that I have to consider

10     in determining what's an appropriate fee.

11          MR. BENNINGTON:  And one factor regarding block

12     billing is that there are 110 entries in those invoices for

13     redaction, the word redaction.  And if the Court will

14     remember, you had to admonish Dillon over and over again that

15     trade secrets were not a basis to fail to comply with the

16     subpoena, yet every step of the way we heard trade secrets as

17     the excuse or the reason not to do things.  And one good

18     example is these reports, the request Number 10 reports that

19     were highly contested, but eventually that was produced, but

20     it was produced in a highly redacted form and the redactions

21     weren't privileged.  They didn't go to anything privileged.

22     They went to trade secret information.  These are reports

23     that were also already protected by two existing protective

24     orders and were marked double dog secret.  They couldn't --

25     they had the maximum protection allowable, yet --

1            THE COURT:  As long as I kept denying your request

2       to let Mr. Taraghi see these.

3            MR. BENNINGTON:  Exactly.  But what --

4            THE COURT:  So at some point they were assuming

5       that I would be able to be resistant to your overtures to --

6       to --

7            MR. BENNINGTON:  But even --

8            THE COURT:  -- and you can appreciate in hindsight

9       their concern might have been well-founded.

10           MR. BENNINGTON:  Well, once again though to

11      respond to that there was -- there was a provision in the

12      protective order.  We didn't cook this up.  The protective

13      order, both of them, provided a way to seek reclassification.

14      We just triggered that.  We didn't go out to try to, you

15      know, publish this stuff on the internet.  We wanted one

16      person to be able to see it, the guy who's sitting here who

17      still doesn't know the information on which his damages claim

18      is based.  I'm not going to go down that road.

19           THE COURT:  Right.  The guy that's hired -- the

20      guy that's hired experts to calculate that amount for him.

21           MR. BENNINGTON:  Yeah.  Yeah.  Yeah.  Going back

22      to these reports though.  After they heavily redacted and for

23      which we are now asked to pay they invited Mr. Bledsoe out to

24      look at those, and then after the pricing information

25      disclosed for the first time in Ms. Giannola's deposition was

```
1    produced they invited Mr. Bledsoe to come out and look at it.
2    He went out and looked at it.  Apparently it wasn't so
3    secret, but they couldn't let us look at the unredacted
4    documents.  So the idea that we should have to pay anything
5    for protecting trade secrets in the sense of -- other than
6    complying -- or, I'm sorry, drafting and negotiating the
7    protective order just doesn't hold water.  And there are
8    numerous, numerous instances, well, 110 at least where we're
9    being asked to pay for somebody at Mr. Taravella's firm to do
10   redactions and there is no -- there is virtually no
11   indication of privilege redactions.  It's virtually all --
12   not all, but virtually all with respect to trade secrets.
13           Last thing I want to raise with you is this:
14   Around, what is it, 20 -- $21,000 is sought for internal time
15   at Kroger/Dillon for employees to prepare or to respond to
16   the subpoenas apparently, but what we have is not time
17   sheets, not any sort of detail.  We have even more block than
18   block billing.
19           And what would it -- the last thing that's missing
20   with respect to that is in Miss Sudkamp's declaration she
21   doesn't give us any indication, give the Court any indication
22   as to how all these tasks might have been reasonably
23   necessary to comply with the subpoena.  The attitude and the
24   -- and the -- the -- the pitch from Dillon is in order to
25   supply with the -- in order to comply with the subpoena we
```

1   did all these things, therefore, Western should have to pay

2   for it.  They haven't met the burden of proof.  They haven't

3   shown by any probative evidence how that internal time

4   related to anything in particular and for that reason alone

5   we suggest that the request for $20,000 and -- and change of

6   internal time at Dillon simply has to be denied.  There's not

7   enough there.  Western concedes and we are willing to pay the

8   hard costs that you just pointed out and that's fair.  And

9   interestingly enough at some point in these hearings Dillon

10   said to pull all this e-mail together was going to cost

11   $10,000 and it ended up costing $1,000.  We're happy to pay

12   $1,000 to have that e-mail pulled together.  That's fair.

13   And I suggest to the Court that what would be reasonable is

14   those hard costs and the very few hours to negotiate -- to

15   negotiate and execute the protective order.  After that

16   Dillon was wasting everybody's time, was overlawyering this

17   and delaying this and trying to hide behind trade secrets as

18   a means not to have to produce documents.

19            THE COURT:  Mr. Taravella.

20            MR. TARAVELLA:  Just very briefly, Your Honor.

21            Your Honor, I want to address that first factor

22   that Mr. Bennington spent some time on, the interest and the

23   outcome in the litigation and in the transaction.  So this

24   whole deal about the best price available, I think

25   Mr. Bledsoe -- or, I'm sorry, Mr. Bennington, is referring to

1      Document 185-15 that says, quote, "After further review this

2      price is the best pricing we can do.  This reflects the

3      current market and is by far Suncor's best pricing offered in

4      the market", unquote.  To imply that that statement means

5      that we somehow induced or participated in an antitrust

6      violation is by -- is at least a stretch, if not just totally

7      disingenuous.  I can't tell you how many times that Chrysler

8      asked for most-favored-nations clause saying I want the best

9      price you -- you charge anyone else.  So, in other words, if

10     you charge GM that give Chrysler that.  If you charge Ford

11     that we want the same price.  That's hardly collusion.

12     That's hardly pricing.  All they're saying -- nothing in

13     that, by the way, says that -- so Dillon had no idea what

14     price Western or for that matter any other Dillon competitor

15     was paying Suncor for fuel.  You can't go from demanding the

16     best price out there to collusion somehow in the market and

17     concern about an antitrust violation.  It just doesn't get

18     you there.  So conferring with the experts --

19              THE COURT:  Well, how -- how you deal with the

20     issue -- apparently, if I understand correctly, there was at

21     some point negotiations between Dillon and Western about a

22     covenant not to sue.

23              MR. TARAVELLA:  Right.  I'm coming to that.  So

24     the covenant not to sue, as I indicated, it was raised by

25     Western in exchange for certain things that they wanted from

1    Dillon.  And the hang-up on it was not any concern by Dillon

2    about being -- getting sued for antitrust violations.  The --

3    the hang-up was sharing or -- or participating in the

4    extensive fees and costs that were incurred at that time and

5    would be incurred in anticipation in the future.  That's --

6    that's -- it wasn't -- it wasn't raised by Dillon saying how

7    about if you agree not to sue us because we're really

8    concerned about antitrust violations, how about if we get

9    certain things in return you give us certain things in

10   return.  It wasn't raised by us because we weren't concerned

11   about it and are not concerned about it presently.

12           The conferring with experts, Your Honor -- did I

13   answer the Court's question?

14           THE COURT:  Mm-hmm.

15           MR. BENNINGTON:  Okay.  So conferring with

16   experts, Mr. McCormick's here and he can correct me if I'm

17   wrong so jump in here, Michael, if you want.  The conferring

18   with experts, we did not directly confer with Suncor's

19   experts.  We conferred with Mr. Shaheen in response to

20   questions by Suncor's experts, but we did the same thing for

21   Western.  Did -- did I get that right?  Okay.  And those are

22   billed -- well, right?  We asked for costs for both of those?

23           MR. McCORMICK:  Correct.

24           MR. TARAVELLA:  Okay.  So -- so just to be fair --

25           THE COURT:  So -- so Mr. Shaheen contacted you

1    guys and you answered his questions?

2             MR. TARAVELLA:  And -- and then in turn with

3    respect to Western's counsel's expert's questions we were

4    just trying to coordinate and confer.  And one thing we

5    learned early on in this process is it's very important to do

6    that.

7             THE COURT:  Exact -- I mean, who -- gentlemen; is

8    that right?  That you guys reached out to Dillon and asked

9    questions that your experts have?

10            MR. BENNINGTON:  I think that's probably accurate.

11   Yes.

12            MR. TARAVELLA:  So we're just trying to be fair,

13   Your Honor, and that's what we did, and we billed both ways

14   just trying to be fair and stay out of this fight because --

15            THE COURT:  I know, but, Mr. Bennington --

16            MR. TARAVELLA:  -- we thought we didn't have a dog

17   in the fight.

18            THE COURT:  -- you argued that somehow those

19   billing records showing conferring with Mr. Shaheen shows

20   that Dillon's an interested party.

21            MR. BENNINGTON:  I do and I stand by that.  I

22   think if you read that billing statement it's not as -- as

23   sort of plain vanilla as Mr. Taravella's suggestion.

24            THE COURT:  Well, but I -- in other words, so --

25   so if they had simply billed the same amount to consult with

1    you guys that would negate this argument.

2              MR. BENNINGTON:  No.

3              THE COURT:  As long as they charge you the same

4    amount they're charging Mr. Shaheen you -- you -- they're no

5    longer an interested party?

6              MR. BENNINGTON:  No.  It's --

7              THE COURT:  So, in other words, they want -- you

8    want them to go back and supplement their billing.  I'm just

9    trying to -- in other words, you're suggesting that somehow

10   there was some nefarious involvement because they're

11   consulting with Mr. Shaheen.  As they describe it Mr. Shaheen

12   passed on questions that his experts had, much like counsel

13   for Western Convenience passed on questions which is

14   understandable.  I can understand --

15             MR. BENNINGTON:  Right.

16             THE COURT:  -- a situation where I'm not familiar

17   with Dillon's records.  I want to get a better sense of what

18   these records say and what they mean.  I pick up the phone

19   and say look, I see on Page X, Y, Z there's an entry and my

20   experts are scratching their heads.  What does that mean?

21   It's not a particularly unusual question.  I don't see any

22   nefarious intent.  I don't infer from that that Dillon is an

23   interested party.

24             MR. BENNINGTON:  I didn't -- I wasn't suggesting

25   anything nefarious.  I'm suggesting that the time effort, the

1    way it's written suggests that they were working with the

2    experts, not merely answering questions.

3              THE COURT:  Well, I --

4              MR. BENNINGTON:  And I can also represent to the

5    Court that after the Summary Judgment motions were filed, and

6    this is during the process of expert reports, too, suddenly

7    we get corrected data from Dillon.

8              THE COURT:  Okay.

9              MR. BENNINGTON:  And I didn't argue it.  I

10   probably -- I'll have to say I can't prove it, but it looked

11   like those came up, those problems came up in consultation

12   with the experts, that is, the Suncor experts, and that

13   produced a whole bunch of corrected data.  I'm not saying

14   this is nefarious.  I'm saying it shows that they're --

15   they're interested in what's going on in this case.

16             MS. CRAIGMILE:  Your Honor, just for timing

17   purposes this request for the admission occurred and

18   spontaneously produced extra data came right after the

19   Summary Judgment briefing was done.  We hadn't requested it.

20   We get corrected data and yet we didn't get the March invoice

21   that showed the time records with that.

22             THE COURT:  Well, listen, again, folks, what this

23   probably means more demonstrates anything else is I think

24   that Dillon is overreaching to the extent that it is seeking

25   $120,000 in attorney's fees.  I think one of the difficulties

1    that I have when I read through all the papers, it's one of

2    the difficulties that I still have, is -- is Dillon I think

3    is stretching 45(c)(1) beyond any connection with its

4    underlying intent.  And, truly, there -- there is -- Dillon

5    is asking me to adopt what I've described before as a but for

6    standard.  But for the original subpoena Dillon wouldn't have

7    spent any of this money and so, therefore, it's all

8    collectible.  And the difficulty is under that analysis

9    Dillon would effectively get a pass for overlawyering and I

10   don't think that's what 45(c)(1) contemplates.  I don't think

11   that that's what 40 -- I don't think that -- that that's

12   contemplated by the other provision you cited to me,

13   45(c)(1)(iii).  That's my problem.  I mean, I understand that

14   Dillon doesn't like to pay attorney's fees.  I don't know any

15   client that likes to pay attorney's fees.  I'm sure

16   Mr. Taraghi would prefer not to pay attorney's fees, but I

17   don't think the subpoenaed party is entitled to be reasonably

18   compensated when the subpoenaed party is acting unreasonable

19   and a but for test I think starts to flirt with that

20   possibility.

21            MR. TARAVELLA:  Your Honor, I hear you and

22   appreciate that.  While it may not be the full 122,000, I

23   certainly hope it's more than the zero on the other hand as I

24   indicated.  I assume it's somewhere in that spectrum I hope.

25            The last thing if I've addressed everything else

1    unless the Court has other questions is this whole thing

2    about fishing around for a case against -- against Dillon.

3           THE COURT:  Well, tell -- tell me -- tell me --

4    Mr. Bennington makes the argument both here today and in his

5    papers that -- that at some point having redacted all this

6    information Mr. Bledsoe came and actually physically saw the

7    underlying previously redacted data; is that correct?

8           MR. TARAVELLA:  He only saw the -- what was it --

9           MR. McCORMICK:  Let me -- let me correct the

10   record on that.

11          MR. TARAVELLA:  Yeah.  Right.

12          THE COURT:  Sure.  Yeah.

13          MR. TARAVELLA:  Thank you.

14          MR. McCORMICK:  Not that (inaudible).

15          THE COURT:  No, no, no.  That's fine.

16          MR. McCORMICK:  You'll remember Item Number 10,

17   one of them has been near and dear to my heart, all the

18   reports.  They additionally said they didn't have any of

19   those studies.  Later we found that they did have studies.  A

20   number of them were produced after our back and forth and

21   they were produced heavily redacted.  We've given an example.

22          THE COURT:  Right.  Right.

23          MR. McCORMICK:  All of that redaction cost is

24   included in this request today.  After we got the redacted

25   copy we complained about it.  The day before Miss Giannola's

```
 1    deposition -- she was the person that identified --
 2    testified.  The day before they said well, why don't you come
 3    all the way out here to our office and look at the
 4    unredacted?  I declined the day before because I was actually
 5    preparing for the deposition.  Later when we were taking Miss
 6    Giannola's deposition yet other non-produced pricing
 7    documentation or pricing strategy documentation identified
 8    (inaudible) stuff that was plainly covered, it should have
 9    been produced.  In that circumstance we consulted with not
10    only outside counsel, but directly with one of the inside
11    lawyers for Kroger and came up with the interlay (phonetics)
12    reasonable provision which I then undertook to go out to
13    their office, look at what they had not previously
14    (inaudible).  I reviewed that, was satisfied, took a look at
15    a couple of cases with information about the Johnson and the
16    (inaudible).
17            I think the Court's central point about measuring
18    the reasonableness of counsel shows -- shows why the
19    redaction before the offer is unreasonable and why when we
20    have a circumstance where we can't stall, but what we can do
21    then -- and I'm the guy that asked the improper question,
22    too, so I'd like to be able to respond to that or the
23    so-called improper question.  It's included in the Court's
24    exhibits.  There was a reference about a particular supplier,
25    Valero.  They're one of the refiners that at the time in the
```

1    past produced gasoline into this marketplace.  There had been

2    a question about Valero.  I asked a question about a prior --

3    about historic acquisition by Loaf'N Jug from Valero.  That

4    was the question that they were instructed not to answer.

5    The Court's analysis is exactly correct.  Strictly under Rule

6    30 shouldn't have done it that way, but you have to be

7    reasonable and so you don't necessarily make a mountain out

8    of every molehill.  We just -- we agreed to disagree whether

9    or not that was or wasn't improper because that very question

10   I might add had been asked without objection to at least two

11   other witnesses.  Now, conveniently they didn't know the

12   answer, but this witness did know the answer.  But the fact

13   that -- you know, that's another example I think of what the

14   Court's concerned about about being reasonable.  I could have

15   -- I could have complained he violated Rule 30.  I think that

16   would have been unreasonable for me to do that under that

17   limited circumstance in that case.  And so, you know, I don't

18   know what else to do when you try to be reasonable, you know,

19   even if it's not 100 percent in perfect compliance with the

20   rules that ought to be rewarded and not punished in any way.

21            THE COURT:  Counsel, please, go ahead.

22            MR. TARAVELLA:  Your Honor, Mr. Bledsoe came over

23   and looked at the pricing handbook.  Under paragraph 10 it

24   was unredacted.  The unredacted studies under paragraph 10

25   because it was so broad, it covered studies throughout the

1    nation well beyond the geographic scope of the subpoena and

2    the temporal scope of the subpoena, that's what was redacted.

3    And we offered to have that looked at, too, which was never

4    looked at.  He looked at the pricing handbook unredacted.  So

5    unless the Court --

6                THE COURT:  But -- but my point though is you

7    redacted it and then you told him he could come and look at

8    it.

9                MR. TARAVELLA:  The unredacted just to show --

10   well, Your Honor, we were getting questions of why are you

11   taking all this out?  And I said because it's beyond the

12   geographic and temporal scope.  If you don't believe me come.

13   You know, Your Honor, we're supposed to confer.  I'm trying

14   to be reasonable, too.  And although respective counsel may

15   not always agree that each of us is reasonable at times I

16   have to tag and say it's been an honor and pleasure working

17   with these -- this -- these ladies and gentlemen on the other

18   side.  And that's what we're trying to do, say look at it

19   unredacted.  If you question our good faith and redactions

20   and then if you really need this let's talk about it.  If you

21   think there's something there that involves Delaware or -- or

22   New Jersey or Virginia pricing tell me why, convince me and

23   maybe I can convince my client to turn it over.  That's all

24   that was about.

25                THE COURT:  Okay.  Go ahead.

1          MR. TARAVELLA:  That's all I have unless the Court

2     has any other questions.

3          THE COURT:  No.  I -- as I say, I -- this is an

4     interesting issue and it's one that I think deserves some

5     careful consideration and I will write something.  I -- I

6     just -- when I read through the briefs and I started going

7     through the exhibits, I mean, I was struck again by my

8     abiding sense that this is a fight that never had to happen.

9     And I -- you know, the funny thing is, and I mean funny, not

10    ha-ha funny, meaning unfortunate.  You know, the bizarre

11    thing is Rule 45(c)(1) is designed to restrict the burdens on

12    the party receiving the subpoena.  And I can't help observing

13    that as a result of the process that Western Convenience has

14    followed, the process that Dillon has followed, you all may

15    ultimately resolve your burdens by somebody paying or not

16    paying money.  Lost in this discussion completely is the

17    burdens that you have imposed upon the Court because I'm now

18    going to have to plow through all of this stuff.  I'm going

19    to have to write a recommendation and/or opinion that

20    includes findings of fact, conclusions of law because you're

21    going to want me to do a thorough job and you deserve for me

22    to do a thorough job.  But every minute that I spend doing

23    all of those things is a minute that I could be spending on

24    another case or cases for parties who have not subjected

25    themselves to this sort of avoidable mess.  And the bizarre

 1    thing is is that the rules are written to reduce the burden

 2    on you all and by not following the rules you're imposing a

 3    burden on the Court and I find that just absolutely

 4    remarkable.  Dillon is coming into Court today and saying we

 5    have spent $140,000 unnecessarily.  It would have been nice

 6    if I saw something in Dillon's papers that acknowledged the

 7    burden it's imposed upon the Court.  Western Convenience has

 8    come in and said we deserve a setoff for all the time and

 9    money we've spent sending four lawyers to Court.  Nowhere in

10    Dillon's response does it say unfortunately we recognize that

11    we imposed burdens on the Court that will now distract it

12    from all of the other lawsuits that are just as worthy of its

13    time and attention.  So my thought, folks, is next time you

14    file these briefs at least drop a footnote and acknowledge

15    the real victim in this.  It's not you.  It's not

16    Mr. Taraghi.  It's not Mr. Dillon.  It's the other 220 cases

17    that I've got who will now have to sit and languish while I

18    wrestle with this.  There's something wrong with it.

19          But I appreciate everybody's arguments.  As

20    always, it's been a pleasure.  Thank you all.

21

22          (Whereupon, the within hearing was then in

23    conclusion at 3:09 p.m., on July 22, 2013.)

24

25          I certify that the foregoing is a correct

AVERY WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
303-825-6119          FAX 303-893-8305

1     transcript, to the best of my knowledge and believe (pursuant

2     to the quality of the recording) from the record of

3     proceedings in the above-entitled matter.

4

5

6

7        /s/ Laurel Tubbs                    August 7, 2013

8     Signature of Transcriber                    Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25