**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 11-cv-01611-MSK-CBS

**WESTERN CONVENIENCE STORES, INC., and
WESTERN TRUCK ONE, LLC,**

      **Plaintiffs/Counterclaim Defendants,**

**v.**

**SUNCOR ENERGY (U.S.A.) INC.,**

      **Defendant /Counterclaim Plaintiff,**

**and**

**SUNCOR ENERGY (U.S.A.) INC.,**

      **Third-party Plaintiff,**

**v.**

**HOSSEIN TARAGHI, and
DEBRA LYNN TARAGHI,**

      **Third-Party Defendants.**

_____

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTIONS FOR SUMMARY JUDGMENT**
_____

      **THIS MATTER** comes before the Court pursuant to Defendant Suncor Energy (U.S.A.),

Inc.'s ("Suncor") Motions for Summary Judgment (**# 181, 185**) on all claims for relief by the

Plaintiffs, the Plaintiffs' responses (**# 198, 200**), and Suncor's replies (**# 217, 219**); Suncor's

Motion for Summary Judgment (**# 182**) on certain of its counterclaims, the Plaintiffs' response

(**#201**), and Suncor's reply (**# 216**); and several motions (**# 188, 194, 209-211, 218, 232, 249**) by

various parties to restrict access to certain filings.  Also pending are Objections **(# 107)** by

Interested Party The Dillon Companies, Inc. ("Dillon") to an August 17, 2012 Minute Order

**(#95)** by the Magistrate Judge, the Plaintiffs' response **(# 123)**, and Dillon's reply **(# 127)**; and

Dillon's Objections **(# 187)** to a January 28, 2013 Minute Order **(# 179)** by the Magistrate Judge,

the Plaintiffs' response **(# 192)**, and Dillon's reply **(# 195)**.

## FACTS

The Court provides a brief sketch of the pertinent facts here, elaborating as necessary in

its analysis.  Plaintiff Western Convenience Stores, Inc. ("WCS") supplies gasoline and diesel

fuel to various retailers in Colorado and Nebraska.  It purchases the fuel from various suppliers,

including Suncor.  WCS' business with Suncor was conducted pursuant to both written and oral

contracts.

In April and May 2011, Suncor began refusing to supply fuel to WCS, ostensibly due to

issues regarding WCS' promptness of payment.  (As noted below, WCS disputes certain aspects

of this assertion.)  On May 20, 2011, Suncor informed WCS that it was now requiring pre-

payment for shipments of fuel.  WCS, contending that this was a violation of the parties'

agreements, instructed its bank not to honor draw requests made by Suncor on a WCS account.

In response, Suncor suspended all subsequent fuel sales to WCS.  At some point in time, WCS

also concluded that Suncor had been offering the same gasoline products to Dillon, WCS'

competitor, at more favorable prices than Suncor was offering to WCS.

During the same time period, Suncor operated a terminal through which it distributed its

both its own fuel products and fuel products delivered by other suppliers.  Pursuant to what the

Amended Complaint describes as a "verbal and implied promise, confirmed by the parties'

custom and practice," Plaintiff Western Truck One, LLC ("WTO"), an affiliate of WCS,

sometimes received delivery of fuel purchased from third-party sellers via Suncor's terminal. Shortly after Suncor suspended its own fuel shipments to WCS in May 2011, it advised WTO that WTO's access to Suncor's terminal to receive fuel purchased from third-party suppliers was revoked.

The Plaintiffs commenced this instant action against Suncor. The Amended Complaint (**# 43**) contains six claims: (i) violation of the Robinson-Patman Act, 15 U.S.C. § 13, in that Suncor engaged in price discrimination by selling its fuel on more favorable terms to "favored retailers" (such as Dillon) than it did to WCS; (ii) common-law breach of contract, under Colorado law, in that Suncor breached the "Master Agreement" between itself and WCS by, among other things, suspending WCS' purchasing ability without cause, engaging in price discrimination, and withdrawing credit terms to WCS without cause; (iii) common-law breach of contract, in that Suncor breached the "Access Agreement" between itself and WTO by revoking WTO's ability to receive fuel from third-party sellers through Suncor's terminal; (iv) common-law tortious interference with contract, in that Suncor's revocation of terminal access to WTO improperly interfered with the Plaintiffs' "performance of their agreements and relationships with middlemen"; (v) common-law tortious interference with contract, in that Suncor's revocation of terminal access to WTO interfered with a contract between WTO and WCS; and (vi) violation of C.R.S. § 6-2-108, in that Suncor engaged in an unlawful restraint of trade by offering secret rebates or refunds to favored purchasers but not offering those same terms to the Plaintiffs.

Suncor answered (**# 31**) and asserted a counterclaim[1] against WCS for common-law breach of contract, alleging that WCS has failed to pay invoices for fuel Suncor delivered to it.  It also filed a Third-Party Complaint (**# 37**) against Hossein Taraghi and Debra Lynn Taraghi, alleging a claim for breach of contract in that the Taraghis failed to honor a personal guaranty they had given of WCS' payment of its contractual obligations to Suncor.

Suncor has filed two motions for summary judgment directed at the Plaintiffs' claims: one (**# 185**) is directed that the statutory (Robinson-Patman and Colorado restraint of trade) claims (and is subject to motions seeking to restrict public access to the motion papers and accompanying exhibits, as discussed below), and the other (**# 181**) is directed at the Plaintiffs' common-law claims.  Suncor has also moved for summary judgment in its favor on its own counterclaim and third-party claim (**# 182**).  Rather than summarize here the arguments made in those motions, the Court will simply address them as part of its analysis.  Separately, Dillon has filed Objections (**# 107, 187**) to certain rulings by the Magistrate Judge regarding a discovery subpoena served on Dillon.

**A.  Suncor's Motions**

1. <u>Standard of review</u>

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs

---

[1]       Suncor did not reassert its counterclaim when answering (**# 45**) the Plaintiffs' Amended Complaint (**# 43**), but it is clear that it still intends to pursue it.  The Plaintiffs' response to Suncor's summary judgment motion on the counterclaim concedes that the Plaintiffs are not prejudiced by Suncor's failure to reassert the counterclaim in its Answer to the Amended Complaint.  Thus, the Court deems Suncor's Answer to the Amended Complaint to be amended to include the counterclaim asserted by Suncor in its initial Answer.

what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and  enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.  If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

      2.  <u>Motion directed at Plaintiffs' statutory claims</u>

Because the resolution of the Plaintiffs' statutory claims could bear on the remaining common-law claims, the Court turns to Suncor's motion directed at the statutory claims first.

      A.  <u>Robinson-Patman Act claim</u>

The Robinson-Patman Act, 15 U.S.C. § 13(a), makes it unlawful "to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in [interstate] commerce, . . . where the effect of such discrimination may be substantially to lessen competition . . . or prevent competition with any person who grants or knowingly receives the benefit of such discrimination."

To establish a Robinson-Patman Act claim, WCS must first make a *prima facie* showing that: (i) two or more contemporaneous sales by the same seller to different buyers at different prices; (ii) of commodities of like grade and quality; (iii) at least one of the sales was made in interstate commerce; (iv) the discrimination had the requisite effect on competition generally; and (v) the discrimination caused injury to WCS.  *Volvo Trucks of North America, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176-77 (2006); *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 677 (9th Cir. 1975).  If WCS carries its burden of demonstrating these elements, Suncor may avail itself of an affirmative defense by showing that its price discrimination "was made in good faith to meet an equally low price of a competitor."  15 U.S.C. § 13(b).

Suncor alleges that WCS cannot establish two of the required elements – a sale occurring in interstate commerce, and an effect on competition – and that it cannot defeat Suncor's "meeting competition" affirmative defense.  The Court will address each issue in turn.

(i) sale in interstate commerce

The Supreme Court has held that the use of the phrase "in commerce" in the Robinson-Patman Act is not intended to reach the full extent of Congress' power to regulate interstate activities; rather, it addresses only "the generation of goods and services for interstate markets and their transport and distribution to the consumer."  *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974).  Thus, it is not sufficient to show merely that the alleged price discrimination "affect[s] commerce" or that the seller is engaged in interstate activities.  Instead, WCS must show that Suncor's discriminatory sales "occur in the course of its interstate activities" – in other words, that some of the sales of fuel products it made to WCS or WCS' competitors occurred across state lines.[2]  *Id.*; *Belliston v. Texaco, Inc.* 455 F.2d 175, 178 (10th Cir. 1972).

The focus of the "in commerce" inquiry is on the product being sold at a discriminatory price.  The fact that the product may be derived from component goods that themselves traveled in interstate commerce is irrelevant if the seller has "transformed in a material way" the raw materials or goods that had previously moved in commerce. *Able*, 406 F.3d at 63.  *Belliston* aptly illustrates this proposition.  There, Texaco sold gasoline in Utah to the plaintiffs, owners of service stations, and offered the same gasoline to Flinco, a distributor who owned a chain of

---

[2]     In *Able Sales Co. v. Compania de Azucarde Puerto Rico*, 406 F.3d 56, 62 (1st Cir. 2005), the court explained that this distinction is because "the recognized purpose of the Robinson-Patman Act is to reach the operations of large interstate businesses in competition with small local concerns," in order to prevent "predatory pricing by defendants who engaged in interstate commerce, not by those who acted purely locally."

service stations (that bore Texaco's brand), at a lower price than the plaintiffs received.  Texaco obtained the gasoline in question from a refinery in Utah, owned by a company called American; American, in turn, produced the gasoline from crude oil that it had purchased from Texaco in Colorado and shipped to Utah via American's pipeline.  455 F.2d at 178.  The 10th Circuit found that, under these circumstances, the plaintiffs could not demonstrate the "in commerce" element of their claim. It observed that "all of the discriminatory sales [to the plaintiffs and to Flinco] took place in the Salt Lake City area," and rejected the trial court's conclusion that "the gasoline was the same 'stuff' . . . that Texaco produced in Colorado" because "Texaco did not import the crude oil into Utah."  *Id.* at 178-79.

*Belliston* drew a distinction between its facts and those of *Standard Oil Co. v. Federal Trade Commission*, 340 U.S. 231 (1951), where the "in commerce" element was satisfied by the fact that the seller "shipped the gasoline to itself across a state line [but] the product was never altered"; in such circumstances, the very product being sold had moved in the "flow of commerce."  455 F.2d at 180.  It also highlighted the difference between *Dean Milk Company v. Federal Trade Commission*, 395 F.2d 696 (7th Cir. 1968) ("in commerce" element satisfied where "raw milk which was produced out of state retained its essential identity and underwent only minimal changes during processing and it was ultimately sold as milk") and *Central Ice Cream Company v. Golden Rod Ice Cream Company*, 287 F.2d 265 (7th Cir. 1961) ("when out-of-state butterfat and other ingredients are combined [into ice cream] in Illinois, a new product is created" and the "in commerce" element is not satisfied by purely intrastate ice cream sale).  455 F.2d at 180-81.

From these cases, the Court can derive several general rules concerning the "in commerce" element.  The product being sold at differing prices must travel across state lines,

either by virtue of the sale itself (*i.e.* it is shipped to an out-of-state buyer), or by the seller having imported the product from out of state (*i.e. Standard Oil*'s "flow of commerce" doctrine).  If the interstate nexus turns on the seller's importation of the product, the Court must consider whether the product being sold is in essentially the same form and of the same character as the product that was imported (in which case the commerce element is satisfied) or whether the seller has materially transformed the imported substance into something sufficiently distinct as to "interrupt the flow of commerce."  *See Able*, 406 F.3d at 63 n. 8.

Turning to the facts of this case, WCS purchased fuel from Suncor in Colorado.  WCS does not contend that delivery was made by Suncor to WCS in any other state.  Thus, to the extent WCS can establish the "in commerce" element, it must do so through the "flow of commerce doctrine" – that is, that Suncor obtained fuel outside of Colorado and that Suncor materially transformed the fuel it bought before selling it to WCS.  It is undisputed that Suncor operates a own refinery in Colorado, and that some (perhaps even "much") of the fuel products it sells to buyers such as WCS (and Dillon) are produced entirely in Colorado.  However, it is also undisputed that, on at least some occasions during the relevant timeframe, Suncor purchased quantities of gasoline from suppliers outside of Colorado.

WCS argues that this "foreign" gasoline is comingled with the same product produced by Suncor's Colorado refinery, such that it becomes impossible to state that a particular delivery of fuel is either "local" or "foreign."  Suncor argues that showing that its product consists of "comingled" local and foreign gasoline is not sufficient to satisfy the "in commerce" requirement, and that WCS "bears the burden of identifying the specific goods that traveled in commerce, citing *Chawla v. Shell Oil Co.*, 75 F.Supp.2d 626, 646 (S.D.Tx. 1999), *S&M Matieras v. S.Stone Co.*, 612 F.2d 198, 200 (5th Cir. 1980),  *Roorda v. American Oil Co.*, 446

F.Supp. 939, 945 (W.D.N.Y. 1978), and *McGoffin v. Sun Oil Co.*, 539 F.2d 1245, 1248 (10th Cir.

1976).  Having reviewed each of the foregoing case, the Court finds that none support the

proposition for which they are cited. For example, *Chawla*, *S&M*, and *McGoffin* make no

mention, directly or indirectly, of the concept of local and foreign products being comingled, and

thus, provide neither factual nor legal support to Suncor's argument.

The reasoning in *Roorda*, on the other hand, is opposite to Suncor's contention.  *Roorda*

involved a New York buyer of gasoline and a seller that refined some gasoline in New York and

some gasoline from a refinery in Texas.  446 F.Supp at 945 n. 2.  Although the opinion does not

expressly state, it is reasonable to conclude that the supplies of gasoline were thereafter

comingled by the seller.  *Id.* ("approximately 20% of the regular gasoline stored at [the] terminal

facility was refined in Texas," and this Court will assume that, as in the instant case, the terminal

facility did not continue to segregate the local and foreign gasoline).  In denying the seller's

motion for summary judgment, the court noted that "with respect to the gasoline allegedly

refined refined in [Texas], and purchased and sold by [the defendant] in New York, the flow of

commerce theory may be invoked by plaintiffs" and that the plaintiffs should be given the

opportunity to "prove at trial that [defendant's] sales within New York of gasoline refined

outside the state were within the practical, economic continuity of the prior interstate transaction

so that subsequent intrastate sales retained their interstate character."  *Id.*  at 945.  Thus, if

anything *Roorda* stands for the proposition that a showing of comingled local and foreign-

produced gasoline is enough to permit a Robinson-Patman claim to survive summary judgment

on the "in commerce" element and proceed to trial.

Suncor also argues that although it derives some of its gasoline from outside of Colorado,

it materially transforms that gasoline into a different product by means of "blending different

grades of gasoline" and including additives (such as quantities of ethanol) to produce various products of specific grades and composition.  It argues that the finished product "is a completely different product from the one acquired by Suncor from a refinery outside of Colorado," such that the "flow of commerce" doctrine would not apply.

WCS has produced the affidavit of John Mayes, who states that the process of blending and including additives "is not complex" and merely involves pumping the additives into the buyer's truck as the gasoline is added, according to a specified formula.  The process described by Mr. Mayes bears some similarity to *Dean Milk*, insofar as Suncor's "blending" of local and foreign gasoline and the inclusion of small amounts of additives is akin to the "minimal changes" that occurred when foreign-produced raw milk was simply pasteurized and/or homogenized and then sold to buyers.  It did not result in a "physically different product" in the sense that *Central Ice Cream* involved the conversion of one product – butterfat – into an entirely different one – ice cream.  Suncor argues that its processing of the foreign gasoline is akin to the conversion of foreign raw milk to skim- or low-fat milk that *Red Apple Supermarkets, Inc. v. Deltown Foods, Inc.*, 419 F.Supp. 1256, 1258-59 (S.D.N.Y. 1976), found sufficient to break the flow of commerce.  However, Suncor has not described the process that it engages in to blend and supplement the gasoline in any particular detail, much less demonstrated that the process is as transformative as the "considerabl[e] processing" at issue in *Red Apple*.  Thus, the Court finds that there is at least a genuine dispute of fact as to whether the foreign gasoline obtained by Suncor simply passed, via the "flow of commerce" to buyers such as WCS and Dillon, such that WCS' claim can proceed to trial.

(ii) <u>effect on competition</u>

The Court understands WCS to assert a "secondary line" injury – that is, that Suncor's price discrimination "injures competition among the discriminating seller's customers" by creating "favored purchasers" (*e.g.* Dillon) and "disfavored purchasers" (*e.g.* WCS).  *Volvo Trucks*, 546 U.S. at 176.  Thus, WCS must show that "the effect of [Suncor's] discrimination may be to injure, destroy, or prevent competition to the advantage of [Dillon]."  *Id.* at 176-77.  WCS might attempt to demonstrate such injury by, for example, showing an actual diversion of patronage from its own fuel stores to those of Dillon, or it may attempt to show such injury by inference, drawing simply from the fact that Dillon "received a significant price reduction over a substantial period of time."  *Id* at 177, *citing FTC v. Morton Salt, Inc.*, 334 U.S. 37, 49-51 (1948) (the "*Morton Salt* inference"); *see also Chroma Lighting v. GTA Products Corp.*, 111 F.3d 653, 654 (9th Cir. 1997) (*Morton Salt* inference  allows "the factfinder to **infer** injury to competition from evidence of a substantial price difference over time, because such a price difference may harm the competitive opportunities of individual merchants, and thus create a 'reasonable possibility' that competition itself may be harmed") (emphasis in original).

Although WCS contends that it can satisfy either approach to proving competitive injury, the Court need only address the *Morton Salt* inference.  The question of how long a period of price discrimination is "substantial" and how much of a price discount is "significant" are questions that are inherently fact-driven, and not subject to general rules of thumb.  However, it is recognized that smaller price differentials may become significant in business "where profit margins were low and competition was keen," and such differentials become more significant if they are continuous.  *Coastal Fuels of Puerto Rico, Inc. v. Carribean Petroleum Corp.*, 79 F.3d 182, 193 (1st Cir. 1996); *see also J.F. Feeser, Inc. v. Serv-a-Portion, Inc,.* 909 F.2d 1524, 1538

(3d Cir. 1990) (inference more appropriate where differential is, among other things, "substantial enough to influence a disfavored customer's resale prices").  *Coastal Fuels* suggests that an 18-month period of continuous discrimination, at a differential "that witnesses testified was competitively significant", in a highly competitive, low-margin business, was sufficient to warrant a *Morton Salt* inference.

Here, the record indicates that WCS paid more for fuel from Suncor than Dillon did between late September 2009 and late May 2011, a period of approximately 20 months.  Fuel was priced on a daily basis, and there are occasions within that 20-month period that Dillon and WCS paid the same amount for fuel, and even a some days in which WCS received a more favorable price than Dillon did.  However, depending on various factors (grade of fuel purchased, location of purchase, Dillon entity involved, etc.), charts included in the report of Mark Glick and Ted Tatos reflect that of the 616 days in the period, WCS and Dillon made purchases on the same day on 439 of those days, and of those 439 days, Dillon received more favorable pricing on 350 of them; in other words, on days when both companies purchased that specific grade from Suncor, Dillon received more favorable pricing 80% of the time.  Another chart, reflecting a different Dillon entity as the purchaser, shows Dillion receiving the more favorable price on 250 of the 316 days that Dillon and WCS both purchased fuel – a similar 80% swing in favor of Dillon.  Suncor argues in reply that "there is no consistency to the pricing pattern," and that "periods in which [Dillon's] prices were generally lower are regularly interrupted by periods in which WCS' prices were lower," and that there are "lengthy gaps . . . where there are no comparable transactions."  Admittedly, the record reveals that Suncor's favor to Dillon was entirely consistent, but the Court is satisfied that a showing that both companies made simultaneous purchases on more than 70% of the days in the 20-month period, and that of

those head-to-head purchases, Dillon received more favorable terms 80% of the time is a sufficient showing of predominant and continuous favoring of Dillon over WCS by Suncor.

Moreover, Mr. Glick and Mr. Tatos' report estimates that, on average, Suncor's pricing for fuel purchases in Commerce City (where the head-to-head sales discussed above occurred) favored Dillon by anywhere from 1.6 cents per gallon to 3.9 cents per gallon, reflecting approximately 25% of WCS' profit margin on the fuel.[3]  It is undisputed that fuel sales are an extremely competitive and price-sensitive business with relatively narrow margins available to retailers.

Suncor argues that the Court should reject Mr. Glick and Mr. Tatos' opinions and conclusions because they "mixed and matched" data in a selective, result-oriented way. However, the Court notes that Suncor has not challenged Mr. Glick and Mr. Tatos' conclusions under Fed. R. Evid. 702, thus conceding that those opinions are sufficiently reliable to be admitted at trial.  Thus the question for the factfinder is what weight to give those opinions (particularly as contrasted against Suncor's own experts' opinions), a task that is inappropriate at the summary judgment stage.  The Court is required to view the evidence and draw all reasonable inferences in the light most favorable to WCS, which, in turn, requires the Court to assume that full weight will be given to Mr. Glick and Mr. Tatos' opinions.

---

[3]     Suncor argues, without citation, that the Court can only consider price favoritism in those sales that occurred "in commerce," not to all intrastate sales by Suncor to WCS and Dillon.  The Court does not read the various cases interpreting the Act to limit the analysis in that way.  The "in commerce" element is a jurisdictional one, ensuring that federal power is not levied against purely intrastate actors.  However, once an actor has engaged in at least one interstate sale with discriminatory pricing, the Act permits the Court to examine the whole of that actor's allegedly discriminatory sales, both inter- and intra-state.  Notably, the Act's text itself states that it applies "where . . . any of the purchases involved in such discrimination are in commerce."  15 U.S.C. § 13(a) (emphasis added).

Thus, the Court is satisfied that WCS has shown both a significant price differential and a lengthy period in which such differential predominated, thus, demonstrating facts entitling it to a *Morton Salt* inference of injury to competition (at least for purposes of summary judgment consideration).

(iii) Suncor's "meeting competition" defense

Suncor argues that, even assuming WCS can establish a *prima facie* price discrimination claim, Suncor is entitled to summary judgment on its invocation of the "meeting competition" affirmative defense of 15 U.S.C. § 13(b).  That portion of the Act provides that "nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor."

To establish a "meeting competition" defense, Suncor must show "facts which would lead a reasonable and prudent person to believe that the granting of a lower price [to Dillon] would in fact meet the equally low price of [one of Suncor's competitors for Dillon's business]." *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 438 (1983).  To do so, it must show that it was reasonable for Suncor to believe that it's favorable price (or a lower price) "was available to [Dillon] from [Suncor's] competitors." *Id.*  It is not sufficient for Suncor to show simply that the market to supply fuel is competitive; it must "establish that the prices it was meeting were available to [Dillon] from another source."  *See R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 699 (7th Cir. 2006).

A necessary element of the "meeting competition" defense is the seller's good-faith belief that the reduced price is necessary to meet competition.  The seller's "absolute certainty that a price concession is being offered" by a competitor is not necessary, but something more than a

mere hunch or uncorroborated reports from buyers is not enough. *Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 489 (5ᵗʰ Cir. 2006). *Water Craft* lists several factors that may be indicative of a seller's good faith belief in the need to meet a competitor's price: (i) whether the seller had received reports from other customers of similar discounts offered by the competitor; (ii) whether the seller was threatened with a termination of purchases if the discount was not met; (iii) whether the seller made efforts to corroborate the reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data; and (iv) whether the seller had past experience with the particular buyer in question. *Id., citing United States Gypsum Co*., 438 U.S. 422, 451-59 (1978).

Suncor states that Dillon entered into contracts to purchase fuel from suppliers on an annual basis, via a process by which Dillon would state its fuel needs and suppliers would offer their price bids to meet those needs. Suncor was aware that Dillon was soliciting bids not only from it, but from its competitors, such as Valero and Frontier. It is not necessary to recite, in detail, Suncor's explanation for its lower pricing bid to Dillon in 2009 (the beginning of the time period at issue here); it is sufficient to note that the decision was largely driven by two facts: Suncor's decision to aggressively pursue Dillon's business, and the fact that Suncor's 2008 bid for Dillon's business – a discount of {6.8} cents[4] per gallon off of standard rates, had not been sufficient to win Dillon's business. Thus, in 2009, Suncor bid a discount of {8.75} cents per gallon. The record is not particularly specific as to how Suncor derived that bid price; Suncor cites only to the deposition testimony of its employee Stephen Moss, who stated that:

---

[4]       In the interests of avoiding the unnecessary disclosure of Dillon's prices, which both Dillon and Suncor contend constitute confidential information whose disclosure would affect the parties' competitive position in the fuel market, the Court has fictionalized the precise numbers that denote Dillon's prices. Numbers affected by this policy are set off with curled braces: { }. The Court has made every effort to ensure that ranges, percentages, and other figures derived from Dillon's actual prices are fictionalized proportionally to those actual prices.

2008 to 2009 there was a lot of changes in our business.  The pricing, the market value.  Plus the 2008 contract – bid proposal I did not get.  I was not the winner of that bid.  One of my competitors got that business.

. . .

As you can see on the 2009 we actually won the business. Suncor's business model had changed, and the difference between 2008 and 2009 is we really wanted [Dillon's] business.  We were going to chase it.  And the {8.75} cents pricing here pretty much reflects the change in the market on what we felt we needed to do to win this business based on the fact that I knew I didn't – {6.8}. cents did not get me the business the previous year.

The Court finds that this evidence is insufficient to entitle Suncor to summary judgment on its "meeting competition" affirmative defense.  Most significantly, Mr. Moss' testimony makes clear that Suncor priced its bid "to win" Dillon's business, not merely to match the discount that he believed competitors were offering.  As the Supreme Court explained in *Falls City*, a seller who is "meeting competition" "must be defensive, in the sense that the lower price must be calculated and offered in good faith to 'meet not beat' the competitor's low price."  460 U.S. at 446.  Mr. Moss' testimony that Suncor "really wanted" Dillon's business, was prepared to "chase it," and to offer "what we needed to do to win" can be construed to imply that Suncor was determined to "beat, not meet" its competitors' bids.   Notably, Mr. Moss never testified that he believed a {8.75} cent discount was needed to <u>match</u> his competitors' bids, but rather, that the {8.75} cents was necessary "to win this business" – that is, to <u>exceed</u> the discounts that the competitors would be offering.

Moreover, Suncor's only explanation for bidding a {8.75} cent per gallon discount is that its {6.8} cent bid the year before was insufficient.  It does not represent that it sought to determine the discount that its competitor had offered to Dillon by, for example, consulting with other buyers regarding the discounts the competitor had offered or consulting market data to

ascertain what the competitor's discount rate might have been.  (Indeed, Mr. Moss testified that

he did not even know who Dillon's 2009 supplier was, although he had "inclinations" from

"what I'd seen in the market and who I know was lifting [receiving fuel deliveries at the

terminal].  It was kind of one of those follow a truck and I'm like, oh, they must be selling to

[Dillon].")  Rather, Mr. Moss' testimony appears to be that he simply concluded that because

"{6.8} cents didn't get me the business the previous year," {8.75} cents was the appropriate

discount to bid in 2009.  This is not sufficient to establish, as a matter of law, the type of good-

faith belief required by the "meeting competition" defense.  Although Suncor is not required to

show an "absolute certainty" that another competitor was offering a {8.75} cent discount, Mr.

Moss' testimony reflects little more than a "mere hunch" that a discount of {8.75} cents was

necessary to be competitive in the 2009 bidding, that "hunch" being based on little more than the

fact that {6.8} cents had not been enough the year before.

Accordingly, Suncor has not shown that it is entitled to summary judgment on its

"meeting competition" defense.   It may present this defense at trial, and may even prevail on it,

but the record before the Court is insufficient to permit a finding that, as a matter of law, Suncor

has established that defense.

### B.  Colorado Unfair Trade Practices Act claim

Suncor also seeks summary judgment on WCS' claim under Colorado's Unfair Trade

Practices Act, C.R.S. § 6-2-108.  That statute states that "the secret payment or allowance of

rebates, refunds, commissions, or unearned discounts . . .not extended to all purchasers upon like

terms and conditions, to the injury of a competitor and where such payment or allowance tends

to destroy competition, is an unfair trade practice."  Suncor argues that it is entitled to summary

judgment on this claim for several reasons.

(i) <u>private right of action</u>

Suncor first argues that the statute creates no private right of action.  Suncor points out that the statute provides that "any person  . . . resorting to such unfair trade practice is guilty of a misdemeanor" and subject to criminal penalties.  *Id.*  Suncor argues that, as a criminal statute, the Act must be strictly construed.

This argument is without merit for several reasons.  First, without necessarily addressing the assumption that the statute is "criminal" in nature and thus subject to strict construction, the Court notes that C.R.S. § 6-2-102 expressly provides that the entire Unfair Trade Practices Act "shall be <u>liberally</u> construed so that its beneficial purposes may be subserved."  (Emphasis added.)   The Court is bound by the legislative directive to construe the statute broadly.  *See Dunlap v. Colorado Springs Cablevision, Inc.*, 829 P.2d 1286, 1292 (Colo. 1992) (". . . encouraging consumer enforcement of the Unfair Practices Act").

Second, the Court notes that C.R.S. § 6-2-111(1) creates a private civil right of action based on "any act in violation of sections 6-2-103 to 6-2-108."  Suncor argues that because this provision reads "<u>to</u> 6-2-108" and not "<u>through</u> 6-2-108," the Court should assume that the legislature did not intend to create a private right of action for violations of section 6-2-108. Suncor derives this argument from *Q-T Markets, Inc. v. Fleming Companies, Inc.*, 394 F.Supp. 1102, 1107 (D. Colo. 1975), in which the court held that because C.R.S. § 6-2-109 -- which deems contracts illegal if they violate "the provisions of sections 6-2-103 to 6-2-108," -- "inapplicable to secret rebates or refunds" prohibited by C.R.S. § 6-2-108, "[s]ince the reference is 'to' 108."  *Q-T Markets* cites no authority for the unusual proposition that the designation of statutory ranges using the phrase "to" should be understood to be exclusive of the cited terminus. Such a construction is inconsistent with formal definitions of the word "to," *see e.g.* Oxford

English Dictionary, www.oed.com (definition 13b, "indicating the <u>final point</u> or second limit of a series," *e.g.* "they are rowed with from 16 . . . to 24 oars"), Merriam Webster Collegiate Dictionary at 1234 (definition 1d, "used as a function word to indicate the place or point that is the far limit"), as well as the common use of the word (a child told to "recite the numbers 1 to 10" is not typically expected to stop at 9; a trip from "the Earth to the Moon" would not be understood to be complete if stopped just short of the Moon).[5]   Moreover, Colorado law expressly provides that the use of the construction "[statutory section] to [second statutory section]" in a statute "includes both sections whose numbers are given and all intervening sections."   Thus, this Court finds neither *Q-T Markets* nor Suncor's argument to be persuasive.

(ii) <u>"secret . . . discount"</u>

C.R.S. § 6-2-108 prohibits "the secret payment or allowance of rebates, refunds, commissions, or unearned discounts . . . ."  Suncor argues that its agreement with Dillon reflects neither a "discount," nor that any such discount would be "secret" for purposes of the statute. (Suncor does not address the statutory term "unearned," and the Court will assume, for purposes of this motion, that WCS can show that any discount Suncor offered Dillon met that requirement).

Suncor states that its standard pricing policy for <u>all</u> customers is the announced fixed "rack price," and to then negotiate, on a customer-by-customer basis, a "differential" or reduction off of the rack price.  Suncor's motion makes a somewhat undeveloped argument that the differential does not constitute a "discount" because "the resulting price represents the full value of the Fuel purchased from Suncor," although it does not elaborate or cite to evidence in

---

[5]      The Court notes, with some irony, that WCS itself uses the preposition "to" in this common way in its own briefing.  *See e.g.* Docket # 200 at 8 ("as illustrated in the table below, from September 2009 <u>to</u> May 2010, Suncor was obligated to deliver" certain fuel quantities, with the table including May 2010, rather than ending at April 2010) (emphasis added).

the record explaining the meaning of the phrase "full value."  Suncor's reply brief offers some slight clarification, suggesting that, in this context, the Court should understand Suncor's actual "price" to any given customer is the [rack price-minus-negotiated differential] figure in Suncor's contract with that customer; thus, a "discount" for purposes of the statute would be Suncor offering fuel to that buyer at a price <u>below that contractual rate</u>.

Suncor's reply brief refutes its initial argument.  It states that WCS' witnesses "uniformly agree that, in the industry, 'discount' is a term of art that means either the cents-per-gallon adjustment to the rack price, or an additional 'off-contract' discount."  For example, Suncor states that WCS employee Angelia Reay testified that "rack-minus [differential] pricing 'is what we call a discount' in the industry, but that this was different from an off-contract, actual discount off the negotiated contractual price."  Thus, the record reflects that the term "discount," in the fuel industry, has two different meanings – it can mean the differential off the rack price that produces the per-gallon cost actually written into a contract, or it can mean the situation in which Suncor might offer a customer a price even lower than that found in its contract with the customer.  Although it is undisputed that there is no evidence of Suncor offering the latter type of "discount," is is also undisputed that it routinely offered a "discount" in the form of a rack price differential to different customers at different levels.

Thus, on the factual record, there is support for WCS' proposition that Suncor offered a more favorable differential from the rack price – one type of "discount" as that term is used in the fuel industry – to Dillon than it did to WCS.  Although Suncor believes that the statute contemplates only the other type of "discount," it cites to no authority for that proposition.  Accordingly, the Court cannot say that Suncor is entitled to summary judgment on WCS' state

statutory claim on the grounds that the differential off the rack price does not satisfy the statutory term "discount."

Suncor also argues that any "discount" (*i.e.* rack price differential) it gave Dillon was not secret," insofar as it is standard policy for Suncor to negotiate with its offer its competitors <u>some</u> discount off the rack price (just as WCS also received).  Suncor contends that Dillon simply managed to negotiate a greater discount than WCS did.   As such, Suncor argues that the <u>fact</u> that Dillon received a discount off the rack price was not "secret" (although it apparently concedes that the <u>amount</u> of Dillon's discount was kept secret from Suncor's other customers), making the statute inapplicable.

This argument is unavailing.  There is no authority from Colorado interpreting the statutory reference to "secret" discounts.  Similar statutory language is found in many states' laws and the parties agree that this Court should consider those states' interpretations of the law. In *Eddins v. Redstone*, 35 Cal.Rptr.3d 863, 901 (Cal.App. 2005), the court explained that "if the essential terms of a rebate or unearned discount are known to the plaintiffs and the public, the secrecy element cannot be met."  However, in that case, the court concluded that although the seller (several movie studios) and the favored customer (a large video rental chain) had entered into an agreement whose terms were publicly known (trade papers reported that the deal entitled the rental chain to obtain videotapes at between $0 and $7 upfront, and to retain 60% of rental income from the tapes), several other key details of the agreement ("guarantee fee, splits, [certain provisions relating to the sale of previously-viewed tapes], minimum pricing, and . . . the number of copies required to be purchased") were not publicly-known (and indeed, such terms were "subject to a protective order and filed under seal").  *Id.*

Suncor's argument is that a "discount" is not "secret" if its existence or the rough mechanic by which it operates is publicly-known, even if the actual terms of it are not. *Eddins* makes clear that this argument is untenable.  There, it was clear that the disfavored customers had their own arrangement with the supplier, but that without knowledge of the undisclosed terms of the favored buyer's deal, they "had no idea whether the deal [they] had with [one studio] was at all comparable to the deal [the studio] had with [the favored customer]." *Id.* Likewise, here, WCS might very well have been aware that Dillon was receiving some type of rack price-minus-differential "discount" from Suncor, but there is no evidence that it knew of the particular differential that Dillon was receiving, such that it could compare "its deal" with "Dillon's deal."  Under such circumstances, *Eddins* indicates that Suncor's discount to Dillon would be considered "secret" under the statute.  *See also ABC International Traders, Inc. v. Matsushita Electric Corp. of America*, 931 P.2d 290 (Cal. 1997) (explaining that "these discounts . . . were frequently kept secret so that the buyer's competitors would not demand the same treatment").

Accordingly, the Court finds that there is a triable dispute of fact as to whether Suncor's pricing arrangement with Dillon constituted a "secret . . . discount" prohibited by C.R.S. § 6-2-108.

(iii) <u>secondary line claims</u>

Suncor argues that the Colorado statute should be construed to apply only to primary-line competition (that is, where Suncor's favoritism operated to injure <u>Suncor</u>'s competitors), rather than secondary-line competition (where Suncor's favoritism operates to injure one of Suncor's <u>customers</u> in competing with another one of Suncor's customers).

23

Suncor concedes that the California Supreme Court rejected this very argument in *ABC International*, 931 P.2d at 302 ("the language, context, purposes and history of [the statute] all point to the conclusion its protection extends to competition in the secondary line), but argues that "Colorado courts are unlikely to follow the *ABC* majority opinion" because "courts will not add or subtract words from a statute" -- is premised on the notion that the statute's prohibition of giving secret discounts "to the injury of a competitor" necessarily means "a competitor <u>of the seller</u>." This Court disagrees. *ABC International* construes precisely the same language as the Colorado statute here, and does so with a careful, thorough, and persuasive analysis. It properly construes the indefinite article "a" in the phrase "injury to <u>a</u> competitor" to mean "any competitor," not merely "competitors of the seller giving the secret discount."

Suncor also relies on *Venta, Inc. v. Frontier Oil and Refining Co.*, 827 F.Supp. 1526, 1529 (D. Colo. 1993), suggesting that, there, "the court . . . interpreted similar language to hold that C.R.S. § 6-2-103 was limited to primary-line claims." The suggestion that C.R.S. § 6-2-103 contains "similar language" to C.R.S. § 6-2-108 is curious, insofar as the key phrase in question in C.R.S. § 6-2-108, "injury to a competitor," is not even remotely present in C.R.S. § 6-2-103. That statute makes it unlawful for a seller, "with the intent to destroy the competitor of any regular established dealer in such commodity . . . or to prevent the competition of any person . . . that in good faith intends to become a dealer," to engage in locality-based pricing differentials.

Accordingly, the Court agrees with *ABC International* that C.R.S. § 6-2-108 applies to injuries to secondary-line competitors.

(iv)  <u>intent/tendency to destroy competition</u>

Suncor's final argument with regard to C.R.S. § 6-2-108 is that WCS cannot show that Suncor acted "with the intent to destroy competition."

Although the statute requires only that a secret discount "tends to destroy competition" to be prohibited, Suncor argues that *Beneficial Finance Co. v. Sullivan*, 534 P.2d 1226, 1229 (Colo.App. 1975), requires that WCS demonstrate actual bad intent on Suncor's part.  There, the defendant was a retailer who entered into finance contracts with customers who sought to purchase his goods.  He then contracted with Beneficial, who agreed to purchase the finance contracts.  Although the focus of the claims between the parties addressed other issues, the decision makes a passing reference to a contention by the retailer that Beneficial gave another entity "more favorable credit terms than they gave to him."  It is not clear whether the retailer was asserting a claim under C.R.S. § 6-2-103 or § 6-2-108, but the court affirmed the trial court's "dismissal" of that claim after a bench trial.  It noted that "assuming such difference in credit terms do exist and that defendant and [the favored entity] were of the same class, no intent to destroy competition was shown and thus, no violation of either § 6-2-013 or § 6-2-108 was shown."  *Id.* at 1229.

This Court is not persuaded that *Beneficial Finance* supports Suncor's contention that "intent to destroy competition" is an element of a claim under C.R.S. § 6-2-108.  This Court notes that bad intent is clearly an element under the text of § 6-2-103 – "it is unlawful for any person . . . with the intent to destroy [ ] competition . . .  to discriminate" in pricing (emphasis added) – but the text of § 6-2-108 does not contain any such requirement.  However, § 6-2-108 provides only that a secret discount is prohibited "where [it] tends to destroy competition" (emphasis added).   The statutory language is unambiguous: a showing of intent is necessary under § 103, but liability lies under § 108 focuses on the effect on competition of giving a secret discount, regardless of the seller's intent.  *Beneficial Finance* offers no analysis or explanation for what would appear to be a remarkable interpretation of the statutory text of § 108.  Thus, in

turn, suggests that the "rule" being announced in that case is merely the result of poor drafting. The decision mentions both sections in the same breath (perhaps suggesting that the retailer himself did not meaningfully distinguish between them at trial), but clearly, its finding of a lack of intent to injure competition was fatal to the claim under § 103. The trial court's rejection of a claim under § 108 was not dependent on the absence of an intent to destroy competition, as the court had previously affirmed the trial court's finding that "[the favored entity] was not in competition with [the retailer]," making any actual interference with competition impossible. *Id.* at 1229.

This Court is particularly reluctant to read the cursory *Beneficial Finance* decision as requiring evidence of a subjective intent to destroy competition in a claim under § 6-2-108 because other courts have expressly rejected such a notion in more thorough discussions.  In *Diesel Electric Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 20 Cal.Rptr.2d 62, 69 (Cal.App. 1993), the California courts, interpreting the identical statutory language, explained:

> Marco also contends the third element of a section 17045 violation (i.e., tendency to destroy competition) requires an "intent" on its behalf to destroy competition. The express terms of section 17045 contain no such requirement, and we decline to add such a requirement by implication. Section 17045 must be interpreted liberally in order to foster and encourage competition by prohibiting unfair and discriminatory practices. (§§ 17001, 17002.) In liberally interpreting section 17045 to discourage secret allowances of unearned discounts, we should not increase the plaintiff's burden by requiring proof of additional factors which the express terms of section 17045 do not require. Thus, we conclude section 17045 does not require a proof of an "intent" to destroy competition, but only that the secret, unearned discount had a *tendency* to destroy competition.  (Emphasis in original.)

Similarly, in *Jefferson Ice & Fuel Co. v. Grocers Ice & Cold Storage Co.*, 286 S.W.2d 80, 83 (Ky. 1956) the Kentucky Supreme Court, again interpreting precisely the same statutory language, explained that "it is enough if the rebate is secretly made to the injury of a competitor

and tends to destroy competition. Under that section of the act intention is not required."  This Court finds *Diesel Electric*'s and *Jefferson Ice*'s direct statement and analysis of the issue to be more persuasive than *Beneficial Finance*'s tacit and oblique approach to the question.

Finally, Suncor makes a perfunctory argument that its pricing model cannot possibly have an injurious effect on competition, as it "is based strictly on market conditions" and has nothing to do with either discounts offered to specific buyers or the demand of specific buyers for product."  This argument is unpersuasive for several reasons.  First, Suncor appears to be addressing only its setting of a rack price; it is not addressing "discounts offered to specific buyers," such as the differential discount from the rack price that is the very discount at issue here.  Second, the contention that its pricing is "based strictly on market conditions" is somewhat at odds with the reasonable inference, discussed above, that Suncor purposefully and aggressively sought to curry Dillon's fuel business in 2009 after failing to achieve it in 2008. Suncor was not simply reacting to or matching market conditions; it was attempting to ensure that it prevailed in the fight for Dillon's business.  Third, cases such as *Western Pacific Kraft, Inc. v. Duro Bag Mfg.*, 794 F.Supp.2d 1087, 1090-91 (C.D.Ca. 2011), appear to suggest that the same *Morton Salt* inference of an injury to competition is sufficient to satisfy the "tends to destroy competition" under the "secret discounts" statute here.  There, the court found that "[W]here one competitor is given a major pricing advantage over another competitor, such pricing discrimination has an inherent tendency to destroy competition."  *Id.*

Accordingly, the Court denies Suncor' summary judgment motion directed at WCS' statutory claims in its entirety.

2.  <u>Common-law claims</u>

Having concluded that the WCS has adequately established triable statutory claims for price discrimination in violation of federal and state law, the Court now turns to Suncor's motion seeking summary judgment on WCS and WTC's common-law claims.

A.  <u>Breach of contract (Master Agreement)</u>

The Court understands WCS' breach of contract claim premised on the Master Agreement to allege that Suncor's decision to withdraw credit terms and suspend fuel shipments to WCS was a breach of the agreement. To establish a claim for breach of contract under Colorado law, WCS must show: (i) the existence of an enforceable contract; (ii) that it rendered the performance that was required by the contract or that it was excused from such performance; (iii) that Suncor failed to substantially perform its obligations under the contract; and (iv) resultant damages. *Western Distributing Co. v. Diodosio*, 841 P.2d 10523, 1058 (Colo. 1992).

The parties agree that the Master Agreement constitutes a binding contract between them. Suncor first argues that WCS cannot show that it performed its own obligations under the contract – namely, paying for the fuel it received (and providing sufficient evidence of creditworthiness for future shipments).[6]  WCS does not dispute that it did not pay for certain fuel shipments, but alleges that its obligation to do so was excused by Suncor's prior material breaches of the Master Agreement, including its engaging in unlawful price discrimination and its inequitably "allocating" (that is, providing less fuel than WCS requested at times when Suncor lacked the supplies to meet all of its customers' requests) fuel supplies to WCS.

---

[6]     Somewhat confusingly, Suncor's reply brief argues that "Suncor did not assert . . . that [WCS] had failed to perform under the [Master Agreement] . . . in its Motion for Summary Judgment."  However, page 2 of Suncor's motion lists, as the first element that cannot be proven: "WCS cannot prove that it performed under the contract."

The Master Agreement itself is little more than an agreement that certain terms and conditions will apply to future agreements that the parties reach regarding purchases made by WCS from Suncor.  The Master Agreement seems to contemplate that the parties will separately enter into some oral or written agreement regarding deliveries by Suncor to WCS.  It appears from the Master Agreement and the record that these contracts are referred to as "Confirmations," and are entered into an on annual basis.  Each Confirmation specified quantities of each type of fuel that Suncor will deliver, the price, and payment and credit terms.  WCS takes the position that a list of "Terms and Conditions" attached as an appendix to the Master Agreement provides additional provisions which supplement the terms of the parties' Confirmations, and Suncor does not appear to dispute that contention.

Two of the provisions in the Terms and Conditions are relevant here: the "Allocation" provision and the "Rules and Regulations: Compliance With Laws" provision.  The Court will address each in turn.

Among the Terms and Conditions section is Paragraph 9, entitled "Allocation."  It provides that "the amount of Products to be supplied to [WCS] shall be subject to any good faith allocation program which Suncor may find necessary to effect for any reason, including but not limited to shortage of Products or government regulation.  Suncor may equitably allocate its available Products to its customers (including [WCS].)"  WCS alleges that Suncor breached this provision by placing WCS "on allocation" and supplying it less fuel than requested, while simultaneously allowing Dillon to "overlift" – that is, to buy more fuel than its contract with Suncor provided for that month.

Neither party has provided the Court with any standards by which Suncor's obligation to "equitably" allocate fuel should be measured, nor the particular means by which the Court could

ascertain whether a given allocation was pursuant to a "good faith allocation program."  What may seem "equitable" to Suncor (*e.g.* to ensure that customers of highest volume, most reliable payment, or highest price might receive priority in allocation) may not necessarily be what seems "equitable" to WCS (*e.g.* that customers receive allocation proportionate to the amount contracted for – say, everyone receives 85% of the amount pledged to them in Confirmations, regardless of any other factors).  The record does not reveal any mutual intent that the parties might have had regarding the term "equitable," nor does the record disclose any discussions by the parties about their own respective interpretations of that term.  This makes it difficult for the Court to conclude that Suncor's conduct, whatever it may have been, ran afoul of the Allocation provision.

  The record is also relatively unclear as to precisely when Suncor imposed allocation and what occurred when that happened.  WCS' brief includes a chart showing quantities promised to WCS in Confirmations and quantities actually delivered to it, over a time span from September 2009 to May 2010, showing a net "underdelivery" of approximately 15%.  It is not clear from the record whether Suncor was purporting to be in allocation status throughout this timeframe, or whether allocation occurred on a more sporadic basis (and if so, which particular weeks or days it occurred).  If one assumes that WCS is claiming that it was in allocation status the entire time (which is the most natural inference to draw from the lack of qualification on the chart), the record nevertheless reflects that, despite being on allocation status, WCS sometimes received <u>more</u> fuel than it was promised – more than a million gallons in December 2009 and March 2010.

  Moreover, the record does not reflect, with any degree of specificity, what other customers were allocated in that same time frame.  For example, WCS alleges that Dillon was

"overlifting" – receiving more than its contractual level of fuel – but is not specific as to the time frame in which this occurred.  WCS cites to a May 12, 2010 e-mail between Suncor officials that noted that "[Dillon] appears to be overlifting their contract by quite a lot [for] the past couple of months."  As noted above, it is unclear whether either Dillon or WCS (or anyone) was on allocation at this time.   Even if they were, it is unclear whether there is any causal connection between WCS being on allocation and Dillon being allowed to overlift.  Indeed, the record reflects that two months earlier, in March 2010, WCS itself overlifted by nearly 100% of its contracted amount, notwithstanding the fact that Dillon was allegedly overlifting as well.

Simply put, then, the record simply fails to clearly establish the extent to which WCS was on allocation status, the degree to which such status affected WCS' ability to obtain the contracted amount of fuel, the extent to which Suncor placed other customers on allocation status at the same time, and the degree to which that status affected other customers' ability to obtain their contracted amount of fuel.[7]  Without such evidence, the Court cannot say that WCS has demonstrated a triable issue of fact as to whether Suncor's allocation program was "inequitable," much less that it was administered in something other than good faith, such that the Court could conclude that Suncor had violated the Master Agreement.  Without a conclusion that Suncor violated the Master Agreement, WCS cannot demonstrate that it was relieved of its own performance obligations under the contract.

The Court then turns to WCS' contention that Suncor's price discrimination breached Paragraph 7 of the Master Agreement's Terms and Conditions states "All of the terms and provisions of this Agreement shall be subject to the applicable laws . . . of all governmental

---

[7]      WCS has cited to various additional e-mails among Suncor officials, discussing allocation and/or WCS.  Although the Court has reviewed all of the materials cited by WCS, they fail to clarify the situation in any meaningful way.

authorities, and each Party agrees to comply with all such laws . . .  during the term of this Agreement."  WCS' argument on this point is somewhat tenuous.  It contends that Suncor's violation of C.R.S. § 6-2-108 is sufficient to active the provisions of C.R.S. § 6-2-109, which deems any contract made in violation of the state Unfair Trade Practices Act to be illegal and uneforceable.  But WCS acknowledges that if the Court were to adopt this argument – that the Master Agreement (and presumably the Confirmations as well) is illegal and thus unenforceable against WCS – it would have to adopt the argument's logical corollary: that WCS is also unable to enforce the terms of the illegal contract against Suncor under a breach of contract theory.  WCS' brief decides not to grapple with this question, suggesting simply that "since the Court will not make this finding [as to whether WCS could recover for a breach of the same contract] until some future date, it is premature to brief that issue."

The Court declines WCS' invitation to kick this particular can down the road.  It finds WCS' recognition of the dilemma it faces to be sound: if the contract is illegal by operation of C.R.S. § 6-2-109, "no recovery thereon shall be had" on it, by either party.   If, on the other hand, the contract is not rendered illegal by operation of C.R.S. § 6-2-109 – and WCS' brief offers no other argument as to why Paragraph 7 (or any other provision) would operate to relieve it of its own duty to perform – then WCS' breach of contract claim fails due to WCS' own admitted nonperformance.[8]  Thus, it appears that WCS' breach of contract claim premised on the Master Agreement is doomed in either event.  Accordingly, the Court finds that Suncor is entitled to summary judgment on WCS' breach of contract claim premised on the Master Agreement.

---

[8]     In any event, to the extent that the claim is premised solely on the fact that Suncor breached the Master Agreement by engaging in price discrimination, it is difficult for the Court to see how the breach of contract claim is not essentially subsumed by the statutory price discrimination claims.

B.  <u>Breach of contract (Access Agreement)</u>

This claim is brought by WTO, alleging that Suncor breached the terms of the Access Agreement that allowed WTO to receive fuel deliveries from third parties at Suncor's terminal.

The Access Agreement granted WTO the right "to enter an access [the] Suncor terminals . . . for the sole purpose of loading and offloading petroleum products."  The Agreement provided, however, that "any permission of access granted by Suncor . . . may be revoked immediately by Suncor, without cause, as a matter of right . . . in its entirety upon notice" to WTO.  On May 25, 2011, Suncor invoked that right, in writing, revoking WTO's access to the terminal.

WTO argues that the implied covenant of good faith and fair dealing requires Suncor to exercise its discretion to further the parties' common expectations, and that the revocation of terminal access was unreasonable and a bad faith attempt to harm WTO/WCS.

This is not a close call.  It is well-settled that the implied covenant of good faith and fair dealing "will not contradict terms or conditions for which a party has bargained."  *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).  Here, Suncor apparently bargained for and received WTO's agreement that Suncor could revoke terminal access at any time and "without cause." Thus, the parties essentially agreed that Suncor did not  have to articulate any reason to justify its decision to revoke access; it could do so for a good reason, a bad reason, or no reason whatsoever, without the implied covenant of good faith and fair dealing interfering.  *See Soderlun v. Public Serv. Co. of Colo.*, 944 P.2d 616, 623 (Colo.App. 1997) ("Such a covenant, therefore, cannot limit an employer's right to discharge without cause, unless there is an express or implied promise, independent of the covenant of good faith itself, restricting that right").  WTO had no contractual reason to believe that Suncor would only invoke that right in certain

33

circumstances or that it would limit itself to doing so only for good cause, and thus, regardless of Suncor's reason for terminating access, WTO is without recourse under the express terms of the contract.   Suncor is thus entitled to summary judgment on WTO's claim for breach of contract.

C. <u>Tortious interference with contract</u>

As articulated in the Plaintiffs' response brief, the two tortious interference claims are predicated on Suncor's revocation of WTO's access to the Suncor terminal.  This, the Plaintiffs alleged, tortiously interfered with WCS' contracts with middlemen (*i.e.* to take delivery of the middlemen's fuel at the Suncor terminal) and interfered with WCS' own contract with WTO.

The Court need not belabor this analysis.  A claim of tortious interference with contract requires a showing that the defendant interfered with a contract "between another and a third person by inducing or otherwise causing <u>the third person</u> not to perform the contract." *Memorial Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984) (emphasis added).  The tort is cognizable only if Suncor induced the <u>middlemen</u> or <u>WCS</u> to fail to perform their agreements with WTO, not where Suncor's actions prevented <u>WTO</u> from carrying out its own contractual obligations.  WTO's theory here merely recasts its own breach of contract claim – that Suncor failed to honor a promise to WTO that, in turn caused WTO to suffer damage.[9]

Accordingly, Suncor is entitled to summary judgment on all of the Plaintiffs' common-law claims.

---

[9]    Although the Plaintiffs do not make particularly clear who the party asserting this claim is, it may be that <u>WCS</u>, not WTO is the plaintiff asserting the claim.  That is, WCS is alleging that Suncor purposefully caused WTO not to continue an existing contract to perform services for WCS.  However, this claim fails as well, as WCS' contract with WTO was necessarily subject to WTO's own ability to retain terminal access, and that access was subject to Suncor's unfettered discretion to terminate it.  There can be no "improper" interference with another's contract when a party lawfully invokes a contractual right it possesses, even if it does so for improper reasons.  *Omedelena v. Denver Options, Inc.*, 60 P.3d 717, 821 (Colo.App. 2002).

### 3. Motion for summary judgment on counterclaim

Suncor also moves for summary judgment in its favor on its own counterclaim for breach of contract, asserted against both WCS and the Taraghis.  Specifically, Suncor alleges that it made deliveries of fuel to WCS for which WCS failed to remit payment and the Taraghis failed to honor their personal guaranty of WCS' payment.

Specifically, Suncor's counterclaim alleges that between May 9 and May 25, 2011, it made deliveries of fuel to WCS, subject to an agreement that WCS would pay for the fuel via electronic funds transfer within the ten-day period following each delivery.  On May 20, 2011, following a review of WCS' creditworthiness, Suncor notified WCS that it was no longer willing to deliver fuel on credit and stated that further deliveries would have to be paid for in advance by WCS.  On May 23, 2011, Suncor was notified by WCS' bank that an electronic transfer request for payment of an invoice had been denied because WCS had insufficient funds to pay it.  Suncor then informed WCS that it was no longer willing to make any further sales of fuel to it.  Suncor states that the total of the unpaid invoices for these fuel deliveries is $ 3,755,141.95, plus accruing interest.  Suncor further states that the Taraghis entered into a personal guaranty of WCS' debts to Suncor in 2006, up to the amount of $ 3,000,000.  Suncor has made demand on the Taraghis to honor their guaranty of WCS' unpaid invoices, and the Taraghis have refused.

WCS and the Taraghis' response does not dispute any of the foregoing facts.  Rather, they contend that the they are not liable to Suncor for three primary reasons: (i) Suncor materially breached Paragraph 7 of the Master Agreement by engaging in unlawful price discrimination under federal law; (ii) Suncor's engaging in price discrimination in violation of state law renders the Master Agreement (and its related Confirmations) illegal and unenforceable under C.R.S. § 6-2-109; and (iii) Suncor materially breached the Master Agreement by engaging

in inequitable allocation of fuel.  WCS and the Taraghis do not tender additional evidence on any of these points, relying on the record that the Court has previously addressed on each point.

For the reasons stated above, the Court finds that WCS and the Taraghis have failed to come forward with sufficient evidence to demonstrate a triable issue of fact as to whether Suncor breached the Allocation provision of the Master Agreement.  The record does not reflect any mutually-agreed upon standards by which the equity of any allocation decisions by Suncor would be measured, and the record is insufficient to demonstrate any particular disparities in specific allocation decisions made by Suncor.  Accordingly, the Court finds that WCS and the Taraghis have failed to show that summary judgment should be denied to Suncor on this ground.

However, as discussed above, the Court finds a triable issue of fact as to whether Suncor has engaged in prohibited price discrimination under both federal and state law.  The question presented, then, is whether either of these alleged violations constitutes a material breach of Suncor's contract with WCS for payment of fuel delivered.

Turning first to the Robinson-Patman Act claim, Suncor points out that the Supreme Court has expressly refused to hold that unlawful price discrimination under the Robinson-Patman Act does not render the underlying contractual sales void, nor relieve the buyer of the obligation to pay for products it has received; the buyer's sole remedy is a suit for damages under the Act itself.  *Bruce's Juices v. American Can Co.*, 330 U.S. 743, 756-57 (1947) ("The defendant's claim to be freed of the obligation to pay his promissory note because the payee, as vendor of cans, made sales to others that when compared with sales to itself may be held unlawfully discriminatory, cannot be supported as resting on any congressional word or policy").

However, to the extent WCS can show that Suncor did indeed engage in unlawful price discrimination, it may be that such conduct violated Paragraph 7 of the Master Agreement,

through which Suncor promised that it would "comply with all . . . laws . . . during the term of this agreement."  If Suncor's price discrimination is indeed a breach of the Master Agreement, the question of whether that breach was sufficiently material to relieve WCS of its burden to perform is generally a question of fact  *See Blood v. Qwest Services Corp.*, 224 P.3d 301, 324 (Colo.App. 2009).  It may be that the parties' agreement that Suncor will comply with all applicable laws did not go to the essence of the parties' agreement that Suncor would supply WCS with fuel and WCS would pay for it, such that Suncor's alleged breach was not material, but this is a matter that is appropriate for consideration by the facfinder, based on a complete record regarding the parties' expectations at the time of contract formation and other factors.  *Id.*, *citing Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005).  Thus, the Court declines to grant summary judgment to Suncor on its counterclaim.

The same result is dictated by operation of C.R.S. § 6-2-109.  That statute provides that "any contract . . . made by any person . . . in violation of [the state price discrimination statute] is an illegal contract, and no recovery thereon shall be had."  The "contract," in this sense, is either the Master Agreement or the particular Confirmation through which Suncor agreed to sell fuel to WCS at a discriminatory price.  The Court understands WCS to contend that such discriminatory pricing continued through May 2011, such that the fuel purchases for which WCS has not rendered payment may fall within § 6-2-109.  In such circumstances, neither WCS nor Suncor may seek recovery on that contract.

That being said, the Court finds that WCS and the Taraghis have not disputed the basic facts underlying Suncor's counterclaim.  Pursuant to Fed. R. Civ. P. 56(g), the Court therefore finds that the following facts are established in this matter and require no further proof: (i) Suncor made deliveries of fuel to WCS in May 2011, pursuant to a contractual agreement with

WCS; (ii) WCS accepted and took possession of that fuel; (ii) WCS failed to make payment to Suncor for that fuel as required by the parties' agreement; (iv) the value of the fuel for which WCS has not made payment is $ 3,755,141.95; and (v) the Taraghis are parties, jointly and severally, to a personal guaranty of WCS' debts in favor of Suncor, up to the amount of $ 3 million.  Should the factfinder ultimately conclude that WCS has not proven its claims of statutory price discrimination under federal or state law, the Court will enter judgment in favor of Suncor and against WCS and the Taraghis on Suncor's counterclaim, consistent with these undisputed facts.

### B. Dillon's Objections

During discovery, the Plaintiffs served a third-party discovery subpoena on Dillon, seeking information about Dillon's own fuel purchases from Suncor and its sales of fuel to consumers.  Stating that it was a direct competitor to WCS with regard to fuel sales and that some of the information requested in the subpoena sought Dillon's trade secrets or proprietary information, Dillon moved to quash (**# 57**) the subpoena in certain respects.  On August 17, 2012, the Magistrate Judge denied (**# 95**) Dillon's motion upon oral findings (**# 120**).  Greatly summarized, the Magistrate Judge found that some of the Plaintiffs' requests (as narrowed by discussions between the Plaintiffs and Dillon) were burdensome, but Dillon had presented only vague and incomplete information about the precise nature of those burdens, such that the Magistrate Judge could not conclude that the burden of responding to the subpoena was undue.

Dillon filed timely Objections (**# 107**) to the Magistrate Judge's ruling under Fed. R. Civ. P. 72(a), but stated that it was doing so solely to "preserve the issue."  It noted that, following the Magistrate Judge's ruling, it continued discussions with the Plaintiffs' counsel concerning the subpoena and that such discussions were continuing.  Thus, Dillon requested that this Court "stay

any ruling concerning this Objection until after the Magistrate Judge" had the opportunity to revisit the issue in the ensuing months.  It remains unclear to the Court, on the instant record, the extent to which the issues raised in Dillon's Objections were resolved in subsequent proceedings or discussions.

On January 3, 2013, Dillon moved (# 159) to quash what appears to be a new (or possibly revised version of the earlier) discovery subpoena.  Raising many of the same concerns addressed previously – trade secret concerns, burdensomeness, etc. – Dillon's motion notes that it is itself prophylactic, as the parties "continue to have ongoing productive negotiations concerning" the subpoena and its scope.  At a January 28, 2013 hearing on the motion, the Magistrate Judge heard from both counsel: the Plaintiffs' counsel represented that "there's really not any dispute for the court to decide at this point following some pretty extensive consultation" between the parties.  Dillon's counsel essentially concurred, suggesting that "the court . . . leave it in abeyance pending the 30(b)(6) depositions [that had been scheduled] . . . Based on our conferral we do not anticipate any issues."  As a result, the Magistrate Judge denied (# 179) Dillon's motion as moot.

Dillon filed timely Objections (# 187) to the Magistrate Judge's ruling under Rule 72(a).  The Objections stated that they are made "out of an abundance of caution and to preserve its rights to appeal this matter."  The Objections address the Magistrate Judge's mootness finding in a single paragraph, arguing that the motion is not moot because "Plaintiffs breached [a] Joint Status Report" during the course of an ensuring Rule 30(b)(6) deposition, that "Dillon is subject to ongoing prejudice for having to produce its trade secret information," and that "Dillon has continued to preserve its [prior] Objections."

Pursuant to Fed. R. Civ. P. 72(a), the Court reviews the objected-to portions of the Magistrate Judge's Orders under the "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996). Accordingly, Dillons' Objections will be overruled unless the Court finds that the Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left with a "definite and firm conviction that a mistake has been made." *Ariza*, 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988).

The Court finds that neither of Dillon's Objections meet that standard. Dillon's Objections to the Magistrate Judge's August 2012 Order indicate that the parties anticipated resolving the issue via further proceedings, and Dillon never indicated to the Court that it required a formal ruling on its Objections. Thus, it appears to the Court that Dillon has essentially abandoned those Objections. Moreover, it appears from the record that any Objections to the August 2012 Order were superseded by the subsequent subpoena and the Magistrate Judge's January 2013 Order. With regard to that Order, the Magistrate Judge did not abuse his discretion in denying Dillon's motion for a protective order as moot, insofar as Dillon's own counsel conceded at the hearing that Dillon believed that all "issues" had been resolved (or would be resolved once a Rule 30(b)(6) deposition could be taken). Although Dillon believes that those issues might have resurfaced after the deposition, Dillon's remedy was not to revive a motion that it had previously conceded, but rather, to file a new motion that properly addressed the new developments. Accordingly, both of Dillons' Objections are overruled and the Magistrate Judge's rulings are affirmed.

**C.  Motions to restrict access**

Finally, the Court turns to several motions  (**# 188, 194, 209-211, 218, 232, 249**) by various parties (including Dillon), seeking to restrict public access to certain filings pursuant to D.C. Colo. L. Civ. R. 7.2.

For ease of reference, the Court summarizes those motions as follows:

| Motion | Movant | Document(s) sought to be restricted | Requested restriction level[10] | Stated grounds |
|---|---|---|---|---|
| **188** | Suncor | Suncor's Motion for Summary Judgment on statutory claims (**# 185**) and all accompanying exhibits | 2 | "The motion contains data or derivatives of data that are designated as 'Confidential'  . . . by [the parties, including Dillon]." |
| **194** | Dillon | Exhibit 1 (**# 192-1**) to WCS' response to Dillon's Objections | 1 | The document "includes communications relating to bidding between Dillon and Suncor," and such information "constitute[s] sensitive proprietary information [demonstrating] Dillon's internal business strategies." |
| **209** | Dillon | Plaintiffs' response (**# 198**) to Suncor's Motion for Summary Judgment on statutory claims and all accompanying exhibits | 1 | "It includes information derived from documents and information Dillon had previously produced and designated as 'Secret'," including "details regarding Dillon's fuel purchases from suppliers [which] could allow any and all of Dillon's competitors to access this private information." |
| **210** | Dillon | Plaintiffs' Errata (**# 203**) to its summary judgment | 1 | Same reasons as # 209 |

---

[10]      See D.C. Colo. L. Civ. R. 7.2(B)(5): level 1 means "access limited to the parties and the Court"; level 2 means "access limited to the filing party and the Court"; level 3 means "access limited to the Court."

The Court reflexively denies Suncor's requests that its filings be restricted at Level 2. Such restrictions permit access to the document only by the filing party and the Court, preventing the opposing party from viewing the document.  Suncor offers no explanation why a Level 2 restriction is warranted for its filings; indeed, it is clear that Suncor itself served copies of its filings on its opponents, given that they have responded.  Thus, to the extent that Suncor's motions are granted, the Court will only restrict those documents at a Level 1 restriction.

| | | | | |
|---|---|---|---|---|
| | | response and accompanying exhibit | | |
| **211** | Dillon | Plaintiffs' response (**# 200**) to Suncor's Motion for summary judgment on common law claims | 1 | "Footnotes 2 and 3 and the last sentence of Paragraph 6 on Page 9 of the response include monthly volumes of gasoline that Dillon purportedly purchased from Suncor."  Such information could be used by Dillon's competitors. |
| **218** | Suncor | Suncor's reply (**# 217**) to its motion for summary judgment on statutory claims and accompanying exhibits | 2 | "The reply contains data or derivatives of data that are designated as 'Confidential' . . . by [the parties]." |
| **232** | Dillon | Exhibit 4 to Plaintiffs' response (**# 200-4**) to summary judgment motion on common law claims. | 1 | Same reasons as # 211. |
| **249** | Dillon | Temporary restriction of Docket # 192-1 pursuant to Order at Docket # 196; temporary restriction of Docket # 200 and 200-4 pending review of corresponding motions | 1 | Same reasons given in prior motions to restrict access |

The Supreme Court acknowledged a common-law right of access to judicial records in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978).  This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system.  *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002).  Judges have a responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society."  *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996).  There is a presumption that documents essential to the judicial process are to be available to the public, but access to them may be restricted when the public's right of access is outweighed by interests which favor nondisclosure.  *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997).

Documents filed with the Court are presumptively available to the public, and the burden is on the party seeking restriction to justify such relief.  D.C.Colo. L. Civ. R. 7.2(A).  A showing of compelling reasons for restriction of public access is necessary, as it critical that the public be able to review the factual basis of this Court's decisions and evaluate the Court's rationale so that it may be confident that the Court is functioning as a neutral arbiter.  *Cf. McVeigh*, 119 F.3d at 814.  A party seeking to restrict access must make a multi-part showing.  It must: (1) identify the specific document for which restriction is sought; (2) it must identify the interest to be protected and the reasons why that interest outweighs the presumption of public access; (3) it must identify a clear injury that would result if access is not restricted; and (4) it must explain why alternatives to restricted access – such as redaction, summarization, stipulation, or partial restriction – are not adequate.  Local Rule 7.2(B)(1)-(4).

The Court makes several general observation regarding the parties' motions.

First, it notes that no party has adequately complied with subsections (2) and (4) of Local Rule 7.2(B).  With regard to subsection (2), although the parties have (sometimes) identified the particular information in the document that is claimed to be private, none of the motions devote any attention to balancing the claimed privacy interests against the strong public interest in access to the filings.  Moreover, and perhaps more significantly, the motions either overlook subsection (4) entirely, or offer only a perfunctory assertion that alternatives to restricted access are insufficient.

These failures are especially significant with regard to motions that seek to restrict access to the entirety of a party's motion, response, or reply, including all of the tendered exhibits.  The wholesale restriction of an entire set of moving papers deprives the public of <u>any</u> understanding of the relief being requested in the motion and the grounds stated therefor.  Without any access

whatsoever to the moving papers, the public is utterly deprived of its important right to review the materials considered by the Court and independently evaluate the soundness of the Court's decision.

It is for this reason that the Local Rule requires the parties to specifically identify the material that implicates privacy concerns.  (Suncor's motions, which indicate only generally that the document contains unspecified "data or derivatives of data" subject to a protective order are particularly deficient in this respect.)  Dillon's motions make clear that the only clearly private material disclosed in the various documents to be restricted is data showing specific prices quoted to and the specific quantities of fuel purchased by Dillon.  Given that these matters comprise only a relatively small portion of the materials in question and are easily addressed by simple solutions such as redaction or substitution, the Court finds that wholesale restrictions of access to the documents in question are unwarranted.

Thus, the Court grants in part and denies in part all of the motions to restrict access listed above.  The Court agrees with Dillon that, as a non-party, it should not be forced to expose data that could conceivably compromise its competitive position with its suppliers or competitors, and the Court is satisfied that disclosure of specific prices charged to Dillon or quantities of fuel purchased poses a significant risk in that regard.  The Court further notes that although the public has a strong interest in reviewing the arguments and evidence presented to the Court, the precise prices charged to Dillon or the specific quantities of fuel sold to it are of relatively little significance in evaluating the Court's reasoning here.  The Court has been able to sufficiently explain its reasoning through fictionalized numbers or general statements of quantities or ranges, and the public can obtain an adequate appreciation of the issues and evidence herein without those precise numbers.  The public interest in general access and the private interests – and only

Dillon has sufficiently articulated a private interest and potential injury here – can be readily accommodated by the parties' filing of redacted motion papers and exhibits that can be made available for public review, but which conceal specific numerical indications of Dillon's prices or purchase quantities.[11]

Accordingly, the Court will direct that for each document for which restriction is sought in the motions listed above, the filer of each document shall produce and file a redacted version of the filing (including, if necessary, redacted exhibits) that conceal any reference to specific prices charged to Dillon or specific quantities of fuel purchased by Dillon, as set forth above. The Court will direct that the filing of all redacted versions of the subject filings be completed within **30 days** of this Order. The unredacted documents, currently filed under restriction, may remain for purposes of ensuring a complete and unrestricted record is available for further court review.

The Court is cognizant of the fact that, often times, the filer of a given document is not the person asserting the privacy interest and has little interest in undertaking extensive redaction or other efforts necessary to render the document suitable for public disclosure. Nevertheless, because those parties have invoked a third-party's private information in this dispute, such

---

[11]    It is the Court's intention that only specific numeric indications or their functional equivalents be excised – *e.g.* "Dillon purchased 1,320,000 gallons of fuel" in a specified month, or "Dillon's discount was 133% of that offered to WCS" or "Dillon purchased more than double the amount of WCS in a month" if WCS' precise purchase quantities are also supplied. The redaction shall cover only the specific number or the minimal amount of verbal equivalent (*e.g.* "more than double," "half of") necessary to conceal the specific amount, and shall not conceal entire sentences unless absolutely necessary. The parties shall not redact statements that describe Dillon's purchases or prices in non-specific or relative terms (*e.g.* "Dillon's purchases were far higher than WCS" or "Dillon was offered a price well below WCS").

Redaction shall only address Dillon's data, as neither Suncor nor WCS has articulated its own privacy interests or potential injuries that could result from disclosure of their own specific data.

parties have assumed the responsibility to minimize the public disclosure of that private information while simultaneously ensuring the maximum public access to their filings.  To ensure that each filer undertakes a thorough and good-faith review of their filing, they shall provide Dillon with a copy of any proposed redacted filing and confer with Dillon as to whether additional redactions are necessary to fully comply with the Court's Order.  To the extent the parties cannot agree as to whether a specific number, word, or phrase should be redacted according to this Order, the parties may file a joint motion (itself under a Level 1 restriction) seeking a determination by the Court as the propriety of the contemplated redaction, specifying the precise document number, page, line, and text found in the record.   No final redacted version shall be filed by a filer without first obtaining Dillon's agreement that all necessary redactions have been made.

## <u>CONCLUSION</u>

For the foregoing reasons, Suncor's Motion for Summary Judgment on WCS' statutory claims (Robinson-Patman Act and C.R.S. § 6-2-108) **(# 185)** is **DENIED**, and those claims will proceed to trial.  Suncor's Motion for Summary Judgment on the Plaintiffs' common-law claims **(# 181)** is **GRANTED**, and Suncor is entitled to judgment on the Plaintiffs' claims for breach of contract and tortious interference with contract.  There being no viable claims asserted on behalf of Plaintiff Western Truck One, LLC, the caption is **DEEMED AMENDED** to remove reference to that party.  Suncor's Motion for Summary Judgment on its own counterclaims **(# 182)** is **DENIED**, subject to the Court having made certain findings of established fact pursuant to Fed. R. Civ. P. 56(g).  The various motions to restrict access **(# 188, 194, 209-211, 218, 232, 249)** are **GRANTED IN PART** and **DENIED IN PART** and the filers of each of the subject documents shall file redacted versions, on the terms set forth herein, within **30 days** of the date

of this Order.  The documents current under restricted access shall retain those restrictions.

Dillon's Objections **(# 107, 187)** are **OVERRULED** and the Magistrate Judge's Orders **(# 95, 179)** are **AFFIRMED**.  Because there are claims proceeding to trial, the parties shall promptly prepare a Proposed Pretrial Order in conformance with the requirements of the Trial Preparation Order **(# 29)** and shall jointly contact chambers to schedule a Pretrial Conference.

Dated this 5th day of September, 2013.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge