**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation,

      Plaintiff,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

      Defendant,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

      Third-Party Defendants.

---

**FINAL PRETRIAL ORDER – EXHIBIT 1
STATEMENT OF CLAIMS AND AFFIRMATIVE DEFENSES**

---

      The Parties set forth the following statement of claims and affirmative defenses as directed by the Court's Trial Preparation Order-Civil. In some instances, a party disagrees with the elements of proof or the significance of certain factual allegations identified by the other party. Those disagreements, together with the disagreeing party's citation of authority and the other party's responsive position, are set forth in the endnotes to this Exhibit 1.

**I.     WESTERN'S ROBINSON-PATMAN ACT CLAIM**

     A.    **Burden and Standard of Proof:**  Western has the burden of proof by a preponderance of the evidence except for the assertions in Section I.B.4.f., .g and .h below (rebuttal of the *Morton Salt* inference of competitive injury), for which Suncor has the burden of proof by the preponderance of the evidence.

B.   **Elements:**

1.   **Two or more contemporaneous sales by the same seller to different buyers at different prices.[i]**

   a.   Western's factual allegation:  The subject sales to Western and to the Dillon Companies, d/b/a King Soopers/City Markets ("King Soopers"), and to Mini Mart, Inc., d/b/a Loaf 'N Jug (Loaf 'N Jug") (collectively, "Kroger") were reasonably contemporaneous.

      i.   Witnesses:   Glick, Tatos, Moss, Carbone, Mayes.

      ii.  Exhibits:  1, 2, 3, 400, 403, 404, 405, 500-525,559, 561, 563.

   b.   Western's factual allegation:  The subject sales to Western and to Kroger were at different prices.

      i.   Witnesses:  Glick, Tatos, Moss, Carbone, Ewing.

      ii.  Exhibits:  1, 2, 3, 115, 130, 174, 177, 202, 203, 221, 400, 403, 404, 405, 500-525, 559, 561, 563.

   c.   Western's factual allegation:  Suncor's discriminatory prices to Kroger were not the result of a functional discount.

      i.   Witnesses:  Mayes, Moss, Ewing, Carbone, Sharpe, Giannola.

      ii.  Exhibits:  1, 2, 3.

2.   **The discriminatory sales were of commodities of like grade and quality.**

   a.   Western's factual allegation:  The unbranded regular gasoline sold at the same terminals to Kroger and Western on the same days was of like grade and quality; the unbranded premium gasoline sold at the same terminals to Kroger and Western on the same days was of like grade and quality; and the unbranded diesel fuel sold at the same terminals to Kroger and Western on the same days was of like grade and quality.

      i.   Witnesses:   Mayes, Glick, Taraghi, Tatos, Moss, Carbone, Ewing, Kopp.

      ii.  Exhibits:  1, 2, 3, 128, 129, 174, 237, 400, 402, 403, 404, 405, 407, 500-525.

3.      **At least one of the discriminatory sales was made in interstate commerce.**[ii]

    a.   Western's factual allegation:  Suncor was engaged in interstate commerce.[iii]

       i.   Witnesses:  Mayes, Piscatelli, Ewing, Moss, Pappstein.

       ii.  Exhibits: 169, 253, 307, 308, 402, 504, 507, 508.

    b.   Western's factual allegation:  The discriminatory sales included sales by Suncor to Kroger and/or Western of fuel that was imported into Colorado and remained within the "flow of commerce," *i.e.,* was not materially changed, was not stored for substantial periods of time, was imported for WCS's particular order or for existing customers' anticipated needs, or did not undergo considerable processing prior to sale.

       i.   Witnesses:   Mayes; Moss; Piscatelli; Kopp; Pappstein; Thonen (possibly).

       ii.  Exhibits:   117, 119, 123, 126, 127, 132, 145, 146, 153, 158, 189, 236, 240, 245, 300-306, 307, 308, 402, 407, 501, 504, 505.

    c.   Western's factual allegation: The discriminatory sales included sales by Suncor of fuel that was exported without material change by Western and/or Kroger for sale outside of Colorado.[iv]

       i.   Witnesses:  Taraghi, Wehrle, Sharpe, Giannola, Moss.

       ii.  Exhibits:  142.

4.      **The discrimination had an effect on competition generally, *i.e*, competitive injury and antitrust injury.**

    a.   Western's factual allegation:  Western and Dillon compete with each other for the sale of fuel.

       i.   Witnesses:   Taraghi, Van Meter, Giannola, Sharpe, Glick, Tatos, Mayes.

       ii.  Exhibits:  234, 400, 405, 500-525.

    b.   Western's factual allegation:  26 Western stores compete with one or more Kroger stores.

       i.   Witnesses:  Taraghi, Van Meter, Giannola, Sharpe, Glick, Tatos, Mayes.

      ii.  Exhibits:  400, 404, 405, 500-525.

c.  Western's factual allegation:  Kroger received a significantly lower price over a substantial period of time as compared to Western.

       i.   Witnesses:  Glick, Tatos, Taraghi, Mayes, Carbone.

      ii.  Exhibits:  1, 2, 3, 115, 130, 174, 177, 202, 203, 221, 400, 403, 404, 405, 500-525, 559, 561, 563.

d.  Western's factual allegation:  The retail fuel sale business in which Western and Kroger were engaged is one in which there are low profit margins and intense competition.

       i.   Witnesses:  Taraghi, Giannola, Sharpe, Glick, Tatos.

      ii.  Exhibits:  117, 119, 400, 402, 530.

e.  Western's factual allegation:  Kroger passed through wholesale price changes to retail prices.

       i.   Witnesses:  Sharpe, Glick, Tatos, Mayes.

      ii.  Exhibits:  400, 404, 405, 500-525, 539.

f.  Western's factual allegation:  The price discrimination reduced Western profits and affected Kroger prices.

       i.   Witnesses:  Glick, Tatos, Leffler, Griffin.

      ii.  Exhibits:  400, 404, 405, 500-525.

g.  Suncor's factual allegation:  Any price discrimination was not substantial and/or was short lived or sporadic so the *Morton Salt* inference, *FTC v. Morton Salt,* 334 U.S. 3 (1948), does not apply.

       i.   Witnesses:  Taraghi, Griffin, Glick, Moss, Ewing.

      ii.  Exhibits:  400, 404, 405, 403, 408, 600-628.

h.  Suncor's factual allegation:  The causal connection between any price discrimination and any alleged lost sales or profits by Western for purposes of the *Morton Salt* inference never existed or  has been

broken such that there is no competitive injury within the meaning of the Robinson-Patman Act.

    i.  Witnesses:  Taraghi, Griffin, Glick, Moss, Ewing, Giannola, Sharpe.

    ii.  Exhibits:  190, 400, 404, 405, 403, 408, 555, 600-628.

i.  Suncor's factual allegation:  In addition, there was no competitive injury in the marketplace generally and Western has continued to prosper financially, thus further rebutting the *Morton Salt* inference.

    i.  Witnesses:  Taraghi, Griffin, Glick, Moss, Ewing, Giannola, Sharpe.

    ii.  Exhibits:  190, 400, 404, 405, 403, 408, 555, 600-628.

j.  Western factual allegation: The price discrimination results in some damages in certain gasoline markets.

    i.  Witnesses:  Glick, Tatos, Leffler, Griffin.

    ii.  Exhibits:  400, 401, 403, 404, 405, 406, 408, 500-525.

k.  Western's factual allegation:  Unfavorable discriminatory wholesale prices are expected to lead in the retail fuel sales industry, and by Kroger and Western specifically, to competitive harm.

    i.  Witnesses: Mayes, Taraghi, Sharpe.

l.  Western's factual allegation:  There was an actual diversion of patronage from Western's own fuel stores to those of Kroger.

    i.  Witnesses:  Taraghi, Glick, Tatos, Giannola, Sharpe.

5.    **Western suffered a measurable quantity of damages**.

a.  Western's factual allegation:   Western lost profits resulting from Suncor's price discrimination and was damaged by the amount of lost profits.

    i.  Witnesses:  Taraghi, Glick, Tatos, Leffler, Griffin.

    ii.  Exhibits:  400, 401, 404, 405, 406, 408, 500-525.

## II.     SUNCOR'S AFFIRMATIVE DEFENSE TO ROBINSON-PATMAN CLAIM - MEETING COMPETITION DEFENSE

A.     **Burden and Standard of Proof:**   Suncor has the burden of proof by a preponderance of the evidence.

B.     **Elements:**

1.     The lower prices Suncor gave to Kroger were made in the good faith belief that they would meet an equally low price of a Suncor competitor even if Suncor unknowingly made a bid that beat its competition.[v]

   a.     Suncor's factual allegation:  As outlined in Suncor's Motion for Summary Judgment on Plaintiff Western Convenience Stores' First and Sixth Claims for Relief and Suncor's Third Affirmative Defense, the prices that Suncor offered Kroger were the result of a competitive bid process in which Kroger sent RFPs to Suncor and others or otherwise contacted Suncor to bid on selling fuel to Kroger and Suncor responded in an effort to meet the equally low price of its competitors.

      i.     Witnesses:  Moss, Ewing, Wilson, Thiessen.

      ii.     Exhibits:  Nos. 4, 105, 110-115, 121, 125, 134, 138, 167.

   b.     Suncor's factual allegation:  Suncor bid to provide fuel to Kroger after surveying the market and considering the competition.

      i.     Witnesses:  Moss, Ewing, Thiessen and Wilson.

      ii.     Exhibits:  Nos. 4, 105, 110-115, 121, 125, 134, 138, 167.

   c.     Suncor's factual allegation:  Suncor believed in good faith that the prices it offered to Kroger were necessary to obtain or continue Kroger's business.

      i.     Witnesses:  Moss, Ewing, Thiessen and Wilson.

      ii.     Exhibits:  Nos. 4, 105, 110-115, 121, 125, 134, 138, 167.

## III.     WESTERN'S COLORADO UNFAIR TRADE PRACTICES ACT CLAIM

A.     **Burden and Standard of Proof:**   Western has the burden of proof by a preponderance of the evidence except for the assertions in Section III.B.3.f., .g and .h below (rebuttal of the inference of competitive injury), for which Suncor has the burden of proof by the preponderance of the evidence.

B.   **Elements:**

   1.   **Suncor gave a secret unearned discount not extended to all purchasers on like terms and conditions**.

      a.   Western's factual allegation:   Suncor gave a discount to Kroger which resulted in a better contract price (and net price) to Kroger that was not extended to other purchasers, including Western.

         i.   Witnesses:  Glick, Tatos, Moss, Carbone, Ewing.

         ii.   Exhibits:  1, 2, 3, 115, 130, 174, 177, 202, 203, 221, 400, 403, 404, 405, 500-525, 559, 561, 563.

      b.   Western's factual allegation:  The discounts given to Kroger were not known to the public or to Western.

         i.   Witnesses:   Moss, Carbone, Ewing, Giannola, Sharpe, Wilson.

         ii.   Exhibits:   2, 3, 233, 239.

      c.   Western's factual allegation:   The discounts and other favorable terms of Suncor's agreements with Kroger were designated as "Highly Confidential" or "Secret" pursuant to a protective order and filed under seal.

         i.   Witnesses:   Giannola, Sharpe, Taraghi.

         ii.   Exhibits:  2, 3.

      d.   Western's factual allegation:  Kroger did not perform any marketing function on behalf of Suncor to "earn" the discount.

         i.   Witnesses: Mayes, Moss, Ewing, Carbone, Sharpe, Giannola.

         ii.   Exhibits:  1, 2, 3.

   2.   **Western was injured by Suncor's granting of the secret discounts to Kroger**.

      a.   Western's factual allegation:  Western lost profits resulting from Suncor's price discrimination and was damaged by the amount of lost profits.

         i.   Witnesses:  Taraghi, Glick, Tatos, Leffler, Griffin.

        ii.  Exhibits:  400, 401, 403, 404, 405, 406, 408.

   b.  Western's factual allegation:  There was an actual diversion of patronage from Western's own fuel stores to those of Kroger.

        i.  Witnesses:  Taraghi, Van Meter, Glick, Tatos, Giannola, Sharpe.

3.      **The secret discounts granted by Suncor to Kroger had the tendency to destroy competition.**

   a.   Western's factual allegation:  Western and Kroger compete against each other for the sale of fuel.

        i.  Witnesses:  Taraghi, Van Meter, Giannola, Sharpe, Glick, Tatos, Mayes.

        ii.  Exhibits:  234, 400, 405.

   b.  Western's factual allegation:  Kroger received a significant price reduction over a substantial period of time.

        i.  Witnesses:  Glick, Tatos, Taraghi, Mayes, Carbone

        ii.  Exhibits:  1, 2, 3, 115, 130, 174, 177, 202, 203, 221, 400, 403, 404, 405, 500-525, 559, 561, 563.

   c.  Western's factual allegation:  The retail fuel sale business in which Western and Kroger were engaged is one in which there are low profit margins and intense competition.

        i.  Witnesses:  Taraghi, Giannola, Sharpe, Glick, Tatos.

        ii.  Exhibits:  117, 119, 400, 402, 504.

   d.  Western's factual allegation:  Kroger passed through wholesale price changes to retail prices.

        i.  Witnesses:  Sharpe, Glick, Tatos, Mayes.

        ii.  Exhibits:  400, 404, 405, 500-525, 539.

   e.  Western's factual allegation:  The price discrimination reduced Western profits and affected Kroger prices.

        i.  Witnesses:  Glick, Tatos, Leffler, Griffin.

ii. Exhibits:  400, 404, 405, 500-525.

f.  Suncor's factual allegation:  Any price discrimination was not substantial and/or was short lived or sporadic so the *Morton Salt* inference, *FTC v. Morton Salt,* 334 U.S. 3 (1948), does not apply.

i.  Witnesses:  Taraghi, Griffin, Glick, Moss, Ewing.

ii. Exhibits:  400, 404, 405, 403, 408, 600-628.

g.  Suncor's factual allegation:  The causal connection between any price discrimination and any alleged lost sales or profits by Western for purposes of the *Morton Salt* inference never existed or has been broken such that there is no competitive injury within the meaning of the Robinson-Patman Act.

i.  Witnesses:  Taraghi, Griffin, Glick, Moss, Ewing, Giannola, Sharpe.

ii. Exhibits:  190, 400, 404, 405, 403, 408, 555, 600-628.

h.  Suncor's factual allegation:  In addition, there was no competitive injury in the marketplace generally and Western has continued to prosper financially, thus further rebutting the *Morton Salt* inference.

i.  Witnesses:  Taraghi, Griffin, Glick, Moss, Ewing, Giannola, Sharpe.

ii. Exhibits:  190, 400, 404, 405, 403, 408, 555, 600-628.

i.  Western factual allegation:  The price discrimination results in some damages in certain gasoline markets.

i.  Witnesses:  Glick, Tatos, Leffler, Griffin.

ii. Exhibits:  400, 401, 403, 404, 405, 406, 408, 500-525.

j.  Western's factual allegation:  Unfavorable discriminatory wholesale prices are expected to lead in the retail fuel sales industry, and by Kroger and Western specifically, to competitive harm.

i.  Witnesses:  Mayes, Taraghi, Sharpe.

k.  Western's factual allegation:  There was an actual diversion of patronage from Western's own fuel stores to those of Kroger.

i. Witnesses:  Taraghi, Glick, Tatos, Giannola, Sharpe.

4. **Western suffered a measurable quantity of damages**.

  a. Western's factual allegation:  Western lost profits resulting from Suncor's price discrimination and was damaged by the amount of lost profits.

  i. Witnesses:  Taraghi, Glick, Tatos, Leffler, Griffin.

  ii. Exhibits:  400, 401, 404, 405, 406, 408, 500-525.

## IV.   SUNCOR'S AFFIRMATIVE DEFENSE TO UNFAIR TRADE PRACTICES CLAIM – MEETING COMPETITION[vi]

  A. **Burden and Standard of Proof:**  Suncor has the burden of proof by a preponderance of the evidence.

  B. **Elements:  Suncor incorporates by reference its meeting competition defense to the Robinson-Patman Act claim as set forth above in Section II.[v]**

## V.   SUNCOR'S COUNTERCLAIM – BREACH OF AGREEMENT TO PAY FOR FUEL

  A. In the Court's Opinion and Order Granting in Part and Denying in Part Motions for Summary Judgment at pages 37-38, the Court found certain facts established and requiring no further proof.  The Court, however, denied Suncor summary judgment on Suncor's counterclaim pending determination of certain factual issues at trial: (i) whether Suncor's violations of the Robinson-Patman Act and/or Unfair Practice Act (assuming violations are proven) were sufficiently material to constitute a violation of Paragraph 7 of the Parties' Master Purchase and Sale Agreement ("Master Agreement") so as to relieve WCS of its obligation to pay for fuel taken but not paid for; and (ii) whether the contract asserted by Suncor to have been breached was in violation of C.R.S. § 6-2-108.  Order at 37.[vii]

## VI.   WESTERN'S AFFIRMATIVE DEFENSE TO COUNTERCLAIM – MATERIAL BREACH OF PARAGRAPH 7 OF MASTER AGREEMENT

  A. **Burden and Standard of Proof:**  Western has the burden of proof by a preponderance of the evidence.

  B. **Elements:**

  1. **Suncor violated the Robinson-Patman Act and/or the Colorado Uniform Practices Act.**

     a.  Western incorporates by reference the factual allegations and supporting witnesses/exhibits as set forth in Sections I and III above.

2.    **Suncor's violation of the Robinson-Patman Act and/or the Colorado Uniform Practices Act was a material breach of the Master Agreement.**

    a.  Western's factual allegation:  The price paid for fuel was a material, if not the most material, term of the Master Agreement.

        i.  Witnesses:  Taraghi, Mayes, Moss, Mayes.

        ii.  Exhibits:  1.

    b.  Western's factual allegation:  Suncor's price discrimination in violation of federal and/or state law went to the heart of the parties' agreement for the purchase and sale of fuel.

        i.  Witnesses:  Taraghi, Mayes, Moss.

        ii.  Exhibits:  1.

    c.  Western's factual allegation:  Suncor's price discrimination was significant in amount and extended for a substantial period of time, including during the time of the fuel sales that are the subject of Suncor's counterclaim.

        i.  Witnesses:  Glick, Tatos, Taraghi, Mayes, Carbone, Ewing.

        ii.  Exhibits:  1, 2, 3, 115, 130, 174, 177, 202, 203, 221, 400, 403, 404, 405, 500-524, 559, 561, 563.

## VII.   WESTERN'S AFFIRMATIVE DEFENSE TO COUNTERCLAIM – CONTRACT RENDERED ILLEGAL BY VIOLATION OF UPA

A.    **Burden and Standard of Proof:**  Western has the burden of proof by a preponderance of the evidence.

B.    **Elements:**

1.    **Suncor violated the Colorado Uniform Practices Act, C.R.S. § 6-2-108.**

    a.  Western incorporates by reference the factual allegations and supporting witnesses/exhibits as set forth in Section III above.

**VIII.   SUNCOR'S RESPONSE TO WESTERN'S AFFIRMATIVE DEFENSE ON SUNCOR'S COUNTERCLAIM THAT THE ALLEGED PRICE DISCRIMINATION WAS A BREACH OF THE MASTER PRODUCT PURCHASE AND SALE AGREEMENT THEREBY RELIEVING WESTERN OF ITS OBLIGATION TO PAY FOR THE FUEL IT TOOK.[viii]**

A.   **Burden and Standard of Proof:**  Western has the burden of proof by a preponderance of the evidence that Suncor breached the Master Product Purchase and Sale Agreement.[ix]  Suncor bears the burden of producing evidence on its response.

B.     **Elements:**

1.     **Western had a choice if it believed that Suncor was in material breach of the Master Product Purchase and Sale Agreement.  It could have terminated the Agreement or sought rescission; alternatively, it could have elected to affirm the Agreement and continued both its and Suncor's performance obligations.**

a.   Suncor's factual allegation:  Western was given the choice and elected to have its pricing based on the Suncor rack price less a differential and not on OPIS rack average less a differential.

i.     Witnesses:  Taraghi, Moss, Spillman.

ii.     Exhibits:  108, 109.

b.   Suncor's factual allegation:  Western elected to continue to purchase and take fuel from Suncor after it knew that Suncor was giving other customers discounts that Western was not being given.

i.   Witnesses:  Taraghi, Wehrle, Moss, Ewing.

ii.   Exhibits:  Nos. 191-195, 198-200, 204-219, 224, 226-228.

c.   Suncor's factual allegation:  Western purchased and took fuel from Suncor at a third party terminal in Fountain, Colorado, on May 24, 2011 and again on May 25, 2011 after being told on May 23, 2011 that Suncor was immediately suspending all sales of fuel to Western.

iii.  Witnesses:  Taraghi, Wehrle, Moss, Ewing.

iv.  Exhibits:  Nos. 220, 222, 223, 225, 228, 229.

        d.  Suncor's factual allegation:  Western purchased Suncor fuel from third party middlemen at higher prices both before and after Suncor suspended sales to Western.

            i.  Witnesses:     Taraghi, Wehrle, Moss, Ewing.

           ii.  Exhibits: 162, 176, 183, 185, 191, 193, 226, 227.

---

[i]    **Suncor's position:**  It is Suncor's position that Western must also show that the "discriminatory sales" or transactions were reasonably comparable and that the buyers were "similarly situated." *Chicago Sugar Co. v. American Sugar Refining Co.,*  176 F.2d 1, 8 (7th Cir. 1949) (discrimination can arise only from pricing disparities in reasonably comparable transaction under "similar circumstances"); *In re Bayshore Ford Trucks Sales, Inc.,*  471 F.3d 1233, 1238, n.8 (11th Cir. 2006) ("The Robinson-Patman Act ,…, prohibits price discrimination on sales of goods to similarly-situated distributors  when the effect of such price discrimination is to reduce or eliminate competition, or to create a monopoly").  **Western's position:**  Western asserts that there is no requirement under the Robinson-Patman Act to establish "similarly situated" buyers or "reasonably comparable" sales.  The statements quoted from both cases are dicta.  To the extent it could be suggested that the Seventh Circuit's 1949 decision in *Chicago Sugar* was intended to establish "similar circumstances" as an additional element to an RPA claim, neither the Supreme Court nor the Tenth Circuit has ever adopted such an element in analyzing claims under the Act.   Other cases refute the notion that the favored and disfavored purchasers must be "similarly situated." *See, e.g., Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.,* 79 F.3d 182, 187 n. 1 (1st Cir. 1996) (failure to offer disfavored customer the same terms and conditions does not negate price discrimination claim).

Finally, Suncor has not articulated any legal standard by which it contends the Court should determine whether Western and Kroger are  "similarly situated."  In any event, Western and Kroger *are* similarly situated in any sense that is required under the RPA as they buy the same fuel products, which they resell to the same consumers over whom they compete for sales. *See, e.g., Texaco v. Hasbrouck*, 496 U.S. 543, 547 (1990) (upholding treble damage award for Robinson-Patman Act claim to a group of plaintiffs who owned retail gasoline stations that competed with other retail stations in Spokane, Washington who bought their gasoline from the favored distributors); *cf. Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177-78 (2006) (Robinson-Patman Act does not apply when the plaintiff does not compete for customers with the favored purchaser).

[ii]    **Suncor's position:**  It is Suncor's position that Western must show that, for each paired transaction involving an allegedly discriminatory price, one of the sales complained of "was made in interstate commerce"; that is, that "'at least one of the two transactions which, when compared, generate a discrimination… cross[ed] a state line.'" *Belliston v. Texaco, Inc.*, 455 F.2d 175, 178 (10th Cir. 1972) (quoting *Hiram Walker Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 8-9 (5th Cir. 1969)); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d

182, 189 (1st Cir. 1996) ("*For a transaction to qualify*, the product at issue must physically cross a state boundary in either the sale to the favored buyer or the sale to the buyer allegedly discriminated against" (emphasis added)).  **Western's position:**  The Court addressed and correctly rejected this argument in its Summary Judgment Order (Doc. 251) ("The Court does not read the various cases interpreting the Act to limit the analysis [as Suncor asserts]…. [O]nce an actor has engaged in at least one interstate sale with discriminatory pricing, the Act permits the Court to examine the whole of that actor's allegedly discriminatory sales, both inter- and intra-state.  Notably, the Act's text itself states that it applies "where … <u>any</u> of the purchases involved in such discrimination are in commerce."  *Id.* at 14, n. 3, quoting 15 U.S.C. § 13(a) (emphasis added).

iii      **Suncor's position:**  It is Suncor's position that it is not sufficient for Western to show that Suncor "was engaged in interstate commerce." *Belliston*, 455 F.2d at 178 ("*Borden* holds that it is not enough to show that a defendant is engaged in interstate commerce; rather, it must be established that the sale complained of was one occurring in interstate commerce."). **Western's position:**  Western does not assert that showing that Suncor was engaged in interstate commerce is sufficient, by itself, to establish the "in commerce" element of an RPA claim; rather, it is one sub-element.  *See* 15 U.S.C. 13(a).  Western's factual allegations supporting the other sub-elements are contained in Sections I.B.3.b. and .c.

iv      **Suncor's position:**  It is Suncor's position that the relevant sales that must cross a state line are the sales *by* Suncor *to* Western and Kroger, *not* the subsequent resale of the gasoline. *McCallum v. City of Athens*, 976 F.2d 649, 658 (11th Cir. 1992) (rejecting "proposition that allegations of a consumer's interstate resale of a product purchased in strictly intrastate commerce is sufficient to state a Robinson-Patman claim against the initial intrastate seller"). **Western's position:**  Again, Suncor relies on dicta and cases that are distinguishable from the facts involved here.  Two of Suncor's cases are irrelevant on the facts because the involved product was not actually sold in interstate commerce.  *McCallum*, 976 F.2d at 658 (frozen chickens exported that were packed in ice, which in turn was made from the complained-of municipal water); *Santiago-Ramos*, 2012 WL 4321325, at *7 (financing bonds sold in interstate commerce but the complained-of product was electricity).  Suncor's other two cases arguably support Western's position that Suncor's interstate purchases of sub-grade refined gasoline (*i.e.* gasoline without ethanol or government-required additives) remained in the flow of commerce and therefore satisfy the interstate commerce element.  *Cf. Cliff Food Stores, Inc.*, 417 F.2d at 210 (flow of commerce stopped when goods were stocked on grocery store shelves); *Luzerne*, 855 F. Supp. at 85-86 (plaintiff failed to show that any sales remained in the flow of commerce).  Other cases indicate that a purchaser's subsequent resale of the product across state lines *is* sufficient to satisfy the jurisdictional element. *See L & L Oil Co., Inc. v. Murphy Oil Corp.,* 674 F.2d 1113, 1116 (5th Cir. 1982) ("the 'in commerce' requirement covers 'persons or activities within the flow of interstate commerce … (defined as) the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Id.* (quoting *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 195 (1974).

v       **Western's Position:**  It is Western's position that the language "even if Suncor unknowingly made a bid that beat its competition" is not properly characterized as an "element" of the meeting competition defense.  Western agrees that a party is not *precluded* from asserting a meeting competition defense if it unknowingly made a bid that beat, rather than simply, met its competition.  *See Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 83 (1979).

vi      **Western's Position:**  It is Western's position that there is no meeting competition defense to Western's UPA claim.  The meeting competition defense is isolated to, and explicit in the text of, the Robinson-Patman Act.  *See* 15 U.S.C. § 13(b).  The UPA contains no such defense.  *See Diesel Elec. Sales & Svc., Inc. v. Marco Marine San Diego, Inc.,* 16 Cal. App. 4th 202, 217-18 (Cal. App. 1993); *see also Eddins v. Redstone*, 35 Cal. Rptr. 3d 863, 904 (Cal. Ct. App. ) (citing *Diesel*, 16 Cal. App. 4th at 218, that meeting competition is not an affirmative defense to a California UPA claim).

vii     The Parties disagree as to whether a finding that Suncor was in violation of C.R.S. § 6-2-108 would render the Master Agreement illegal under C.R.S. § 6-2-109 such that recovery on that contract would be precluded.

viii    **Western's Position:**  Western does not read the Court's Trial Preparation Order-Civil to require the parties to include in the Statement of Claims and Affirmative Defenses a recitation of their factual allegations unless that party bears the burden of proof for a particular element.  Western has included relevant factual allegations only where it bears the burden of proof as to an element of a claim or affirmative defense.

ix      **Suncor's Position:**  It is Suncor's position that Western's claim that Suncor breached the Master Product Purchase and Sale Agreement is an affirmative defense and that Western bears the burden of showing the breach and its materiality.  *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058-59 (Colo. 1992). It is also Suncor's position that even if a breach occurred, the sole remedy for Western would be the difference between the price Western paid for fuel and the price Western would have paid absent the alleged price discrimination.  Since Suncor paid nothing for the fuel that is the subject of the counterclaim, Western must still pay Suncor damages.  **Western's position:**  Western agrees that it has the burden of proving its affirmative defenses.  Western disagrees with Suncor's position on damages.  If a violation of the UPA is found, no recovery by Suncor is permitted.  *Mason v. Orthodontic Ctrs. Of Colo.*, 516 F. Supp. 2d 1205, 1215 (D. Colo. 2007) (citing *Equitex v. Ungar*, 60 P.3d 746, 750 (Colo. App. 2002)) ("Although Colorado courts have refused to invoke equitable doctrines to substitute for enforcement of an agreement that is void as against public policy, it is clear this limitation only applies to prevent a *wrongdoer* from recovery.")  *See Potter v. Stewart*, 184 P.2d 149, 151-52 (Colo. 1947) (refusal to enforce illegal contract); *Metro. Life Ins. Co., v. Roma*, 50 P.2d 1142, 1143 (Colo. 1935) (citation omitted) ("courts will have nothing to do with [illegal contracts]"); *Equitex*, 60 P.3d at 750 (citing *Menzel v. Niles Co.*, 281 P. 364, 365 (Colo. 1929) ("equitable doctrines such as promissory estoppel may not be used to enforce an agreement in favor of a wrongdoer").