# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation,
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

    Third-Party Defendants.

---

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT ON FIRST AND SIXTH CLAIMS FOR RELIEF
## AND THIRD AFFIRMATIVE DEFENSE (DOC. 185)

---

Plaintiffs Western Convenience Stores, Inc. ("Western") and Western Truck One, LLC

("Western Truck One"), by and through their undersigned counsel of Bennington Johnson

Biermann & Craigmile LLC and Polsinelli Shugart, LLC, respond as follows to *Suncor's Motion*

*for Summary Judgment on Plaintiff Western Convenience Stores' First and Sixth Claims for*

*Relief and Suncor's Third Affirmative Defense* filed February 8, 2013 (Doc. 185, "Motion").[1]

---

[1]     This Response is structured as follows:  Section I contains a brief summary of Western's responsive arguments; Section II (commencing at page 4) contains a fact statement contemplated by MSK Civ. Practice Standard V.I.3. n. 1 including background facts relevant to all of Suncor's summary judgment motions; Section III (commencing at page 12) contains the relevant text and background of the Robinson-Patman Act, 13 U.S.C. § 15, the statute pursuant to which subject

# I. SUMMARY OF RESPONSE

In this Motion, Suncor seeks summary judgment on Western's claims for price discrimination under the Robinson-Patman Act, 15 U.S.C. § 13 ("RPA") and the Colorado Unfair Practices Act section prohibiting secret discriminatory discounts, Colo. Rev. Stat. § 6-2-108.

On Western's RPA claim, Suncor does not dispute that it charged affiliates of grocery conglomerate Kroger substantially less than it charged Western for identical grades of gasoline and diesel fuel products for a period extending more than a year and a half.  Nor does it dispute that the Kroger affiliates and Western are direct competitors in a price sensitive business with low profit margins.  Suncor instead argues that, as a matter of law: (a) it prevails on the RPA's "meeting competition" defense; (b) Western cannot establish an injury to competition;  and (c) the Fuel sales at issue were not "in commerce" as contemplated by the RPA.

Suncor's Motion fails to address the text or legislative history of the Robinson-Patman Act and, in several instances, misstates Supreme Court precedent and other key cases.  Relevant language from the RPA and cases explaining its purpose and requirements are set forth in Section II, pages 4-12 below.  If Suncor's arguments were accepted, they would render the Robinson-Patman Act virtually meaningless.  The RPA was enacted to prohibit the very factual situation presented here, the sale of identical products to two competitors with a significantly

---

matter jurisdiction is conferred; Section IV and its subsections (pages 15-66) contain Plaintiffs' statements of the burden of proof, statements of elements for which there are material facts or disputed material facts with citations as required by MSK Civ. Practice Standard V.I.3.2; Section V contains a brief conclusion.  Citations to exhibits to the Motion are referenced as "Motion Ex. __ (Doc. _) at __."  Citations to exhibits to this Response are referenced as "Ex. 1, Ex. 2, etc.).

lower price to one competitor because it is bigger. According to Suncor's Motion, even the classic price discrimination situation that the RPA was meant to prevent would be immune from antitrust scrutiny.

Suncor argues it has an absolute defense to Western's RPA claim because it gave Kroger the lower price in the context of a Kroger request for bid. This is not the law. Suncor must show a "good faith" belief that its prices given to Kroger were necessary "to meet an equally low price of a competitor." Not only is this an issue of fact that cannot be resolved on summary judgment, but in this case, the undisputed facts show that Suncor made no effort at all to determine the pricing its competitors were offering for fuel. Indeed, Suncor intended to give Kroger a price so low that it would soundly beat, rather than meet, its competitor's bids and gave Kroger discriminatory pricing even when there was no bid involved.

Suncor's injury to competition argument fails, particularly on summary judgment. Suncor concedes that Kroger and Western gas stations are close competitors, sometimes directly across the street from each other, and does not dispute that gasoline sales are highly price sensitive. Yet Suncor contends that no reasonable fact finder could find that 20 months of significant wholesale price differences could impact Western profits. Western has come forward with undisputed evidence both that it is entitled to the *Morton Salt* inference of competitive injury and that Western lost profits to Kroger as a direct result of the price discrimination. Suncor has not rebutted this evidence and, thus, summary judgment on this ground should be denied.

Suncor's "in commerce" argument fails because, under the language of the Robinson-Patman Act, "either or any of the purchases involved" in the discriminatory sales involving the

Kroger and Western were "in commerce." 15 U.S.C. §13(a). Suncor fails to address the "flow of commerce theory" recognized in multiple Supreme Court decisions for satisfying the in commerce element. Because there are genuine fact issues as to whether Suncor's discriminatory sales to Kroger and Western were in the "flow of commerce" or otherwise "in commerce," summary judgment should be denied on this element as well.

Suncor's Colorado Unfair Practices Act argument fails for several reasons, including that the cases it relies on were statutorily overturned or are otherwise inapposite and that there are genuine issues as to each challenged element.

## II.  FACT STATEMENT

### A.  BACKGROUND FACTS

The following background facts provide context for this Motion and Suncor's summary judgment motions as to the common law claims in this case, including breach of contract and alleged breach of guaranty. All of the claims in this action involve the same time period, 2009 to the end of May 2011, when Suncor terminated Western's fuel purchases.

Plaintiff Western Convenience Stores, Inc. ("Western") operates convenience stores which sell as their principal products gasoline and diesel fuel (collectively, "Fuel"). Ex. 1, Hossein Taraghi Declaration, ¶ 3. Western was founded by Hossein Taraghi, who built the Company from a single store in 1989 to the 42 stores it operates in Colorado and Nebraska today. *Id.,* Ex. 2, Excerpts of Hossein Taraghi Deposition, at 6:4-8:25; 12:16-18. Western is known in the industry as a "discounter" and sells millions of gallons of Fuel every month to consumers at prices generally at or below prices offered by other retailers. Ex. 1 ¶ 8. Plaintiff Western Truck One ("WTO") is a trucking company affiliated with Western which transports Fuel 24 hours per day, 7 days per week

from Fuel supply terminals to Western's retail stores. *Id.* ¶ 3.

Defendant Suncor Energy (U.S.A.), Inc. ("Suncor") is a refiner and supplier of Fuel that is based in Colorado and is a subsidiary of Suncor, Inc., a Canadian entity. Ex. 1 ¶ 4; Ex. 3, Excerpts of Steve Moss Deposition, at 12:9-13:2, 316:20; Ex. 4, Excerpts of Suncor 30(b)(6) Deposition (Steve Ewing), at 12:4-13:3. Suncor operates the only Fuel refineries in Colorado, an "east plant" and "west plant" on either side of Brighton Boulevard in Commerce City which Suncor purchased from ConocoPhillips and Valero in 2003 and 2005, respectively. Ex. 1 ¶ 4; Ex. 3 at 10:11-17, 338:19-339:20. Suncor sells Fuel to customers in multiple states, not only from its own terminals located on its refinery sites (referred to as the Denver terminals), but also from a third-party terminal in Grand Junction, from terminals operated by Rocky Mountain Pipeline System in Dupont, Colorado and Fountain Colorado, and from additional terminals served by pipeline outside the state. Ex. 1 ¶ 4; Ex. 5, Excerpts of Deposition of Diane Kriskovich, at 7:21-8:1; Ex. 3 at 73:10-22. Suncor sells not only its own refined Fuel products, but also Fuel refined outside of Colorado by multiple third-party refiners, including Valero (fuel refined in McKee, Texas), ConocoPhillips (fuel refined in Borger, Texas), Exxon/Mobil (fuel refined in Billings, Montana) and Holly Frontier (fuel refined in El Dorado, Kansas and Cheyenne, Wyoming). Ex. 6, Excerpts of James Piscatelli Deposition, at 60:1-61:7, 61:25-62:9, 79:11-82:23, 125:17-126:25, 175:9-178:24; Motion Ex. Z (Doc. 185-29), J. Mayes Expert Report (Doc. 185-29) at 12. Suncor sells Fuel 24 hours per day and 7 days a week to customers who resell the Fuel either to consumers or retailers on a daily basis. Ex. 1 ¶ 4.

Suncor refines and sells both unbranded Fuel products (also referred to as generic Fuel or "G" Fuel) which contain additives required to meet minimum government specifications, and

branded Fuel products (specifically, Shell® and Phillips66® gasoline), which contain in addition

to the government requirements certain proprietary additives specified by Shell or Phillips for

marketing and other purposes. Ex. 1 ¶ 5; Ex. 3 at 20:23-21:16; Ex. 7, Excerpts of Suncor 30(b)(6)

Deposition (Vance Kopp) at 12:4-7. At primary issue in this action is unbranded Fuel, which

accounted for nearly 50% of Suncor's gasoline production and nearly 75% of its diesel fuel

production during the period relevant to this action. Motion Ex. Z (Doc. 185-29) at 8, Ex. 27

(Dep. Ex. 97) at 63. At Suncor, the individual responsible for all unbranded Fuel sales and

relationships with the unbranded Fuel customers throughout that period was Steve Moss, the

Manager of Unbranded Sales.[2]

In the petroleum industry, unbranded Fuel is a fungible commodity, meaning there is no

commercial difference between the gasoline or diesel of particular grades as sold by different

refiners (such as Suncor and the other refiners identified above) or as sold to different

purchasers. Motion Ex. Z (Doc. 185-29) at 7-8; Ex. 3 at 330:7-331:10, 335:1-11. As explained

by Mr. Moss, when two unbranded customers bought the same grade of product, they were

receiving the same fuel. *Id.* at 21:10-16.

In the Rocky Mountain market (and other markets), wholesale Fuel prices for a particular

grade of Fuel delivered at a particular terminal generally are based on the supplying refiner's

---

[2]      Mr. Moss was the Manager of Unbranded Sales from 2007 through his retirement in
September 2011, four months after Suncor terminated Western's Fuel purchases. Ex. 3 at 9:15-
17, 13:3-14. Moss was responsible for negotiating all contracts with all unbranded Fuel
customers. *Id.* at 98:22-99:17; 121:13-22; Ex. 4 at 8:12-17, 9:7-11, 13:8-10; Ex. 8, Excerpts of
Steven Ewing Individual Deposition, at 9:9-9:14. During the timeframes relevant to this action,
Moss's direct superiors were Don Smith (to October 2009), Kendall Carbone (October 2009 to
October 2010); and Steve Ewing (October 10 to the present). Ex. 4 at 19:18-20:13; Ex. 3 at
10:11-17.

"Rack" price or an Industry average price such as the OPIS (Oil Price Information Service) Denver average for a particular date less a stated cents per gallon (cpg) differential.  Ex. 1 ¶ 16.[3] The retail market for Fuel has always been highly competitive, with a significant portion of consumers making purchasing decisions based on small differences, *i.e.,* one to two cents per gallon, in the retail prices for Fuel.  Ex. 1 ¶ 7; Ex. 2, HT Dep. 10:16-21; Motion Ex. Z (Doc. 185-29) at 6.  By the same token, small fluctuations in the wholesale price ultimately have an effect on its retail price.  *Id.* at 6-7.  Therefore, even very slight differences in a refiner/wholesaler's per-gallon price to different purchasers (*i.e.,* .25 to .5 cents) are considered to be substantial.  *Id.* at 7.

Western was a long-time purchaser of Fuel from Suncor until May 2011, when Suncor unilaterally cut off supplying Plaintiffs with Fuel.  Ex. 1 ¶ 4.  In 2008 and 2009, Western had been Suncor's largest volume buyer of unbranded Fuel, purchasing more than 130 million gallons of Fuel over that two-year period.  Ex. 3 at 126:12-25, Ex. 10 (Dep. Ex. 30).  In 2010 and 2011, Western's Fuel purchasing needs never decreased, and it continued to want to purchase as much as possible of its Fuel supply from Suncor.  Ex. 1, HT Decl. ¶ 12; Ex. 11, Excerpts of Chris Wehrle Deposition, at 18:20-19:4.  However, in those years, two subsidiaries of supermarket conglomerate Kroger (Dillon Companies d/b/a King Soopers and City Market and Mini-Mart, Inc. d/b/a Loaf 'N Jug) supplanted Western as Suncor's largest unbranded customers.  Ex. 10; Ex. 3 at 361:6-361:17.  As the Kroger affiliates became increasingly substantial Suncor

---

[3] *E.g.,* "Denver Terminal E-10 Suncor U[nbranded] Rack Less 4.5 CPG" or "Fountain Terminal E-10 OPIS Gross Rack Average Less 5 CPG."  Both the Suncor Rack prices and the OPIS Average prices change daily based on market factors such as the price of crude oil.  Ex. 6 at 12:21-16:17, 18:24-19:17.

customers, Suncor started cutting Western back to lesser volumes and "allocating" Western to Fuel purchase amounts less than provided in the Western contracts.  Ex. 1 ¶ 12; Ex. 11 at 43:2-44:7; 45:24-46:24; 48:21-24.

While Suncor also sold significant quantities of unbranded Fuel to "middleman" marketers whose business was to resell Fuel to retailers, Suncor's two largest customers who sold gasoline directly at retail remained Kroger and Western.  Ex. 4 at 14:9-16:3.  Suncor does not dispute, and it is a fact, that Western and the Kroger entities compete against each other.  Ex. 1 ¶ 11; Motion Ex. W (Doc. 185-26), Excerpts of Kroger 30(b)(6) Deposition (Susan Giannola) at 31:12-32:8; Ex. 12, Excerpts of Kroger Rule 30(b)(6) Deposition (Edward Sharpe) at 41:7-25. Indeed, 26 of Western's retail sites compete directly with a King Soopers, City Market or Loaf 'N Jug store.  Motion Ex. A (Doc. 185-2), Mark Glick/Ted Tatos Report, at 11-13.  In some cases a Western store competes with multiple Kroger retail sites, and in some cases the competing Kroger entity is directly across the street from a Western store.  *Id.;* Ex. 1 ¶ 11.

As a general rule, Western's retail Fuel pricing philosophy has been to be equal to or lower than its competitors for a particular store.  Ex. 1 ¶ 8; Ex. 2 at 27:3-28:13.  Given the competitive nature of the industry, his long history in the business, and his observations of his competitor's pricing behavior, Mr. Taraghi could occasionally sense when his competitors were purchasing Fuel at lower prices than Western.  Ex. 1 ¶ 10.  Up until 2010, when this occurred and Mr. Taraghi "called Suncor on it," Suncor gave him a discount to bring him in line with some of the other purchasers.  Ex. 1 ¶ 10; Ex. 2 at 151:14-152:14.  For example, when he contacted Mr. Moss's first Suncor manager, Don Smith, to request the same discount he sensed that a competitor was receiving, Smith told him the reason Western had not previously been

given the discount was that Mr. Taraghi had not called to ask for it, and that "now that you've
called, you can have it."  Ex. 1 ¶ 10; Ex. 2 at 34:14-35:5.

In 2011, Mr. Taraghi again could sense based on street pricing that competitors
(including Shell and Kroger) were getting a discount that he wasn't receiving and complained to
Moss and his then-manager Steve Ewing. Ex. 1 ¶ 10.  Although Moss and Ewing confirmed a 10
cent per gallon discount for the branded Fuel, they never disclosed the pricing to the direct
unbranded competitor Kroger and never reduced the prices they were charging Western for
unbranded Fuel.  *Id.*  Throughout late 2010 and 2011, Suncor also began arbitrarily reducing the
amounts of Fuel it was selling to Western and cutting Western off from Fuel purchases on
Fridays for weekend sales, even though it was obligated to sell Western particular volumes each
month.  *Id. ¶* 12.

This action was commenced in June 2011, shortly after Suncor rescinded its $3,000,000
credit line and Net-10 sales terms to Western and abruptly terminated the supply of Fuel to
Western. Ex. 1 ¶ 13.  Suncor's stated bases for terminating Western's Fuel supply were "poor
credit" and "differences in operating philosophy."  Ex. 14 (Dep. Ex. 170).  Contrary to the
assertion of "poor credit," Mr. Moss testified that he "didn't think [Western] had a [credit]
problem," and Suncor's internal documents reflected that Western (unlike other Suncor
customers including Kroger entities Dillon and Mini-Mart) was consistently under its credit
limits. Ex. 3 at 373:21-374:10; Exs. 15-18.  On the issue of "differences in operating
philosophy," Moss did not know what that referenced and was not aware of any operating
philosophy difference that was sufficient to cause Suncor to cancel its contract with Western.
Ex. 3 at 374:11-376:18.  In immediately revoking all credit and payment terms to Western rather

than gradually reducing them, Suncor knew it would be impossible for Western to prepay for Fuel or for Western to pay for the deliveries immediately prior to the cutoff. Ex. 1, HT Decl. ¶ 14. Moreover, not only did Suncor terminate the Fuel supply to Western, it rescinded all access by Western through its affiliate Western Truck One to any Suncor fuel terminal, preventing Western from taking delivery of Fuel not only from Suncor but also Fuel purchased from middleman marketers. Ex. 1 ¶¶ 14-15.

## B.   WESTERN'S PRICE DISCRIMINATION CLAIMS

In this action, Western alleges that: (a) for a period of more than a year and a half (between October 1, 2009 and April 30, 2011), Western was charged a higher wholesale price than Kroger entities King Soopers and City Market for identical Fuel, lifted[4] on the same day, at the same terminal. Motion Ex. A (Doc. 185-2) at 5.

During this period, Western had contracts with Suncor at which, as Moss described, Suncor gave Western the same "standard deal" it purportedly gave to unbranded Fuel customers: Suncor rack price less 4.5 cpg for E-10 (10% ethanol) Fuel; Suncor rack price less 3.5 cpg for regular unleaded Fuel; and Suncor rack price less 3.5 cpg for ULSD2 (ultra-low sulfur diesel #2) Fuel. Ex. 3 at 129:8-130:12; *see e.g.*, Ex. 18, Western/Suncor Purchase Confirmation. Beginning in October 2009, Suncor entered into contracts with the Kroger entities at which it sold them the same grades of Fuel at the same terminals on the same days at substantially lower prices than it charged Western. *See, e.g.,* Motion Exs. P (Doc. 185-17), R-1 (Doc. 185-20), R-2 (Doc. 185-21). For example, in 2010, when Suncor was charging Western the Suncor Rack price

---

[4]    In this business, "lifting fuel" and "pulling fuel" are synonymous with taking delivery of fuel at the terminal.

less 4.5 cpg for E-10 gasoline lifted at the Suncor Commerce City terminal, it was at the same time charging the Kroger entities the OPIS Denver Rack Average less ▮▮▮ cpg for E-10 gasoline picked up at the same terminal. Motion Ex. A (Doc. 185-2) at 7. Over the course of the relevant time periods, Suncor charged Western an average of ▮▮ cents per gallon more than it charged the Kroger entities for Fuel purchases, a wholesale price differential that is "highly significant," and "almost unheard of," in the petroleum industry. *Id.* at 9; Motion Ex. Z (Doc. 185-29) at 7. In its Motion, Suncor appears to concede that Kroger received significantly preferential pricing. That fact was admitted by Kendall Carbone, Moss's Manager from late 2009 through most of 2010 who was responsible for approving favorable contracts with Dillon and Mini-Mart. Exhibit 19, Carbone, 75:11-13, 81:9-15; 175:6-8 ("Q. . . . Kroger got the lowest price of anybody. A. Correct.")

Suncor's asserted rationale for giving the Kroger entities the preferential pricing is that those entities were "bid" customers, meaning that Dillon and Mini-Mart issued a Request for Proposal (RFP) to multiple parties for the supply of Fuel, and Suncor won the bids. Motion at 6-10. Although it had done limited sales to Kroger in the past, in 2009 Suncor drastically reduced its bid prices to Kroger because Kroger was a big "national" company and it decided it wanted to "chase" the King Soopers business. Ex. 3, Moss at 280:11-282:25.

When participating in the Kroger bid process, Moss never asked or attempted to find out what any other competitor was bidding:

> (Counsel) [D]id you have an inkling about the other suppliers that were bidding for the Kroger business or just the other suppliers that were ultimately selected for the Kroger business?

> (Mr. Moss)  No, I had no inclination as to what they were bidding
> or who was bidding on the – on the business.

Ex. 3, at 311:19-25; see also Ex. 3 at 267:17-268:2.  As Moss testified during his deposition,

Suncor's intention was not to meet the price of its competitors; rather, Suncor's intention was to

"come up with its own price and hope it [was] *the best one.*"  *Id.* Moss at 43:17-44:12 (emphasis

added).

Additional facts relevant to the Robinson-Patman Act and Colorado Unfair Practices Act

claims are set forth within Section IV below in compliance with MSK Civ. Practice Standard

V.I.3.2.

### III. THE ROBINSON-PATMAN ACT

The federal antitrust laws are principally composed of the Sherman Act, 15 U.S.C. § 1-7

(which prohibits monopolization and unreasonable restraints of trade), the Clayton Act, 15

U.S.C. §§  12-27, 29 U.S.C. §§ 52-53 (which addresses certain anti-competitive practices not

covered by the Sherman Act and authorizes private parties to sue for Sherman Act and Clayton

Act violations), and the Robinson-Patman Act (15 U.S.C. § 13), an amendment to the Clayton

Act which prohibits price discrimination in the sale of like goods or services.  *Federal Trade*

*Commission Guide to Antitrust Laws,* http://www.ftc.gov/bc/antitrust/antitrust_laws.shtm.

With the exception of a single phrase at Motion page 12, Suncor quotes none of the text

of the Robinson-Patman Act in its Motion.  Its pertinent language is below:

> It shall be unlawful for any person engaged in commerce, in the course of such
> commerce, either directly or indirectly, to discriminate in price between different
> purchasers of commodities of like grade and quality, where either or any of the
> purchases involved in such discrimination are in commerce, where such
> commodities are sold for use, consumption, or resale within the United States…
> and where the effect of such discrimination may be substantially to lessen

> competition or tend to create a monopoly in any line of commerce, or to injure,
> destroy, or prevent competition with any person who either grants or knowingly
> receives the benefit of such discrimination, or with customers of either of them . .
> .

15 U.S.C. § 13(a).

> Upon proof being made, at any hearing on a complaint under this section, that
> there has been discrimination in price or services or facilities furnished, the
> burden of rebutting the prima-facie case thus made by showing justification shall
> be upon the person charged with a violation of this section . . .  Provided,
> however, That nothing herein contained shall prevent a seller rebutting the prima-
> facie case thus made by showing that his lower price or the furnishing of services
> or facilities to any purchaser or purchasers was made in good faith to meet an
> equally low price of a competitor…..

15 U.S.C. § 13(b).  Pursuant to Section 4 of the Clayton Act, private parties injured by violations

of the antitrust laws may recover treble actual damages and costs of suit, including reasonable

attorneys' fees.  15 U.S.C. § 15.

Congress's very purpose in enacting the Robinson-Patman Act was to prevent large

buyers from "secur[ing] a competitive advantage over [small buyers] solely because of the large

buyer[s'] quantity purchasing ability."  *FTC v. Morton Salt Co.,* 334 U.S. 37, 43 (1948).  More

specifically:

> The Robinson-Patman Act was enacted into law in 1936. It amended the Clayton
> Act's regulation of price discrimination by making its scope more inclusive and its
> standards much tougher. The RPA's enactment was motivated by concerns for
> small, independent distributors, which in the 1930's were threatened by the arrival
> of chain stores. It marked "the high-water mark of the anti-chain-store
> movement." *R. Posner, The Robinson-Patman Act: Federal Regulation of Price
> Differences* 26 (1976). Although the Clayton Act had prohibited certain price
> discriminations, it was seen as ineffective in stopping the discriminatory prices
> granted chain stores by virtue of their size. *See H.R.Rep. No.* 2287, 74th Cong., 2d
> Sess. 7 (1936); *FTC v. Morton Salt Co.,* 334 U.S. 37, 43, 68 S.Ct. 822, 827, 92
> L.Ed. 1196 (1948). So far as purchasing was concerned, this discrimination put
> the more normal "mom and pop" merchants of the day at a competitive
> disadvantage. Congress sought to alleviate the disadvantage by putting the new

> age retailing behemoths on a level "playing-field" with small independent
> merchants and businessmen. *See FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 349, 88
> S.Ct. 904, 908-09, 19 L.Ed.2d 1222 (1967); *FTC v. Henry Broch & Co.,* 363 U.S.
> 166, 168, 80 S.Ct. 1158, 1160, 4 L.Ed.2d 1124 (1960). The RPA was Congress's
> tool for doing so, for leveling competition between these types of competitors.
>
> As is obvious from this brief summary of the RPA's history, "it is fairness, as
> Congress perceives it, that Robinson-Patman is all about." *Boise Cascade Corp. v.
> FTC,* 837 F.2d 1127, 1146-47 (D.C.Cir.1988). The Act's goal is to abolish
> unwarranted favoritism among all functional competitors, big or small. Its
> objective is to assure "that businessmen at the same functional level ... start on
> equal competitive footing so far as price is concerned"; *FTC v. Sun Oil Co.,* 371
> U.S. 505, 520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963); "to assure that all sellers
> regardless of size, competing directly for the same customers ... receive
> evenhanded treatment from their suppliers"; *Fred Meyer, supra,* 390 U.S. at 356,
> 88 S.Ct. at 912.

*Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414, 1422 (11th Cir. 1990) (footnote

omitted).  In other words, Congress sought to prevent large competitors such as Kroger from

obtaining discounts not available to its smaller competitors like Western.  The facts of this case

are the classic discriminatory situation Congress meant to remedy.[5]

The Supreme Court has described "three categories of competitive injury that may give

rise to a Robinson–Patman Act claim: primary line, secondary line, and tertiary line."  *Volvo*

*Trucks N.A., Inc., v. Reeder-Simco GMC, Inc.,* 546 U.S. 164, 176 (2006).  Primary-line cases

involve conduct that injures competition "at the level of the discriminating seller and its direct

competitors"—such as predatory pricing.  *Id.*  Secondary-line cases "involve price discrimination

---

[5]     The Supreme Court has reaffirmed the purpose and breadth of the Robinson-Patman in
multiple cases.  *See, e.g., Jefferson Cnty. Pharm. Ass'n, Inc. v. Abbott Labs.*, 460 U.S. 150,
159 (1983) (recognizing that the RPA "in particular" is "to be construed liberally," that its
exceptions "are to be construed strictly," and that because the RPA is remedial, "it is to be
construed broadly to effectuate its purposes," specifically, prohibiting "all devices by which
large buyers gain[] discriminatory preferences over smaller ones by virtue of their greater
purchasing power." (quoting *Abbott Labs. v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1,
11-12 (1976)).

that injures competition among the discriminating seller's customers," *e.g.,* favored and

disfavored purchasers.  *Id.*  "Tertiary-line cases involve injury to competition at the level of the

purchaser's customers."  *Id.*  This is a secondary-line case as Suncor's price discrimination

injured competition among Suncor customer, i.e., Western and the Kroger retailers King

Soopers, City Market and Loaf 'N Jug.

## IV.  CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

**A.**    **SUNCOR'S THIRD AFFIRMATIVE DEFENSE – MEETING COMPETITION DEFENSE TO CLAIM I – PRICE DISCRIMINATION UNDER THE ROBINSON-PATMAN ACT (15 U.S.C. § 13).**

1.    Burden of proof and elements.  Western agrees with Suncor's recitation of the

burden of proof on this defense.  Western disagrees with Suncor's recitation of the elements of

this defense as incomplete.  In particular, under Suncor's abridged version of the meeting

competition defense, any large buyer and seller could easily obtain immunity for price

discrimination by structuring their deal as an "RFP."  This was not the intent of Congress, nor

is it controlling Supreme Court law.  In *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 451

(1978), cited at Motion p. 3, the Supreme Court stated that Section 13(b) "*at least* requires the

seller, who has knowingly discriminated in price, to show the existence of facts which would

lead a reasonable and prudent person to believe that the granting of a lower price would in fact

meet the equally low price of a competitor." (quoting *FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746,

759-60 (1945)).  Moreover,

> [o]n its face, § 2(b) requires *more* than a showing of facts that would have led a
> reasonable person to believe that a lower price was available to the favored
> purchaser from a competitor. The showing required is that the "lower price ... was
> made in good faith *to meet*" the competitor's low price. 15 U.S.C. § 13(b)
> (emphasis added). Thus, the defense requires that the seller offer the lower price

in good faith *for the purpose of meeting the competitor's price*, that is, the lower price must actually have been a good faith response to that competing low price. . . . In most situations, a showing of facts giving rise to a *reasonable belief that equally low prices were available to the favored purchaser from a competitor will be sufficient to establish that the seller's lower price was offered in good faith to meet that price.* In others, however, despite the availability from other sellers of a low price, it may be apparent that the defendant's low offer was not a good faith response.

*Falls Cities Indus., Inc. v. Vanco Beverage, Inc.,* 438 U.S. 422, 439 (1978) (emphasis added)

(citations omitted). Section 2(b) "'places emphasis on individual competitive situations, rather than upon a general system of competition.'" *Hoover Color Corp. v. Bayer Corp.,* 199 F.3d 160, 165 (4th Cir. 1999) (quoting *A.E. Staley,* 324 U.S. at 753 (1945)). Because establishing the meeting competition defense involves an analysis of a party's good faith, granting summary judgment in favor of the defendant under § 2(b) is rarely warranted. *Id.* at 164 (citing *Alan's of Atlanta, Inc. v. Minolta,* 903 F.2 at 1425-26 ("issues of credibility are inherently bound up with a decision on the section 2(b) defense and in a summary judgment proceeding, of course, issues of credibility are beyond a judge's ken")).

2.      Elements of defense challenged by Plaintiffs.  The following material factual disputes preclude summary judgment on this defense:

A.      Suncor's communications with purchasers for unbranded Fuel sales were handled exclusively by Moss. Ex. 3 at  98:22-99:17, 121:13-22; Ex. 4 at 8:12-17, 9:7-11, 13:8-10; Ex. 8  at 9:9-9:14, 201:9-202:9;  Ex. 20 at 14:14-15:22.  As Suncor admits, neither Moss nor anyone else at Suncor discussed or even attempted to discuss with the Kroger entities the nature of the bids by any other supplier.  Ex. 3 at 267:17-268:2; Motion at 7 ("Suncor never discussed with Kroger the nature of the other suppliers' bids – either before or after the bid process.").  In

responding to Kroger's requests for proposal, Moss had no inclination at all as to what Suncor's competitors were bidding for the Kroger business or who was bidding for that business. Ex. 3 at 311:19-25. In fact, while Moss had some "inklings" as to which competitors were already supplying Kroger, he did not discuss those with his superiors (whose approval was necessary for the Kroger contracts) because "that didn't matter to [him]" – it was solely a matter of what Moss thought "it was going to take to win that business." Ex. 3 at 312:1-313:11; see also Ex. 19, Excerpts of Deposition of Kendall Carbone, at 91:14-21. In bidding on the Kroger business, Moss's intention was not to meet the price of Suncor's competitors. Rather, it was to "come up with" Suncor's "own price" and hope that Suncor's price was "the best one." Ex. 3 at 44:4-12. Notably, Moss never offered Western the same prices it was offering Kroger because, as a "national" chain, Kroger was "a totally different company." *Id.* at 282:2-25.

B. Suncor has and publicly promotes competition policies, including specific policies relating to price discrimination and meeting competition. See Ex. 21, Suncor Competition Policy Guidance and Standards effective August 1, 2009 at 14, 17 (current materially unchanged policy at http://www.suncor.com/pdf/Competition_PGS_Jan2013.pdf ). On the issue of price discrimination, Suncor's policies state:

> **Price Discrimination and Pricing Below Cost.** The state and federal antitrust laws prohibit charging competing buyers different prices unless certain conditions are met. Most significantly, price differentials may be justified to meet competitive conditions. If the Company has the good faith belief that the lower price is necessary to respond to a price quoted by a competitor, then the differential generally would be lawful…
> * * *
> **Documentation.** Careful documentation of the proper justification for Suncor's competitive activities is extremely helpful. While documentation will not make unlawful conduct legal, it will document an activity and avoid inappropriate

mischaracterization or inferences.

* * *

*Id.* at 14, 16.  The Competition policy sets forth a specific format to be used to document the

basis for a price differential to a customer when the differential is offered to meet competition.

> When competitive forces require you to give a discount to obtain or retain
> business, put a note in the file along the lines of:
>
> > On [date] I offered [customer] the discounted price of [$].  I offered this
> > price based upon my belief that this price is necessary to [obtain or keep]
> > the [customer's] business.  It is my understanding from [the customer]
> > that [competitor] has offered them a price of [$], and unless we meet
> > that price we will not make the sale.

*Id.* at 17.

   C. Moss testified that, approximately once a year, Suncor's employees who dealt

with customers got a "spiel" about antitrust laws from Suncor's legal department.  Ex. 3, Moss

110:21-111:9.  Although Moss attended the yearly meetings, he did not ever reference the

available antitrust policies in connection with his work or address antitrust issues relating to

any of his customers.  *Id.* at 112:10-113:21.  Notably, Suncor has never produced the

documentation required by its own competition policy nor any other documentation evidencing

or even suggesting that Suncor gave Kroger the substantially favorable pricing to meet the

price of any competitor.

   D. As Suncor notes, courts consider certain factors when determining whether the

meeting competition defense has been met: "(1) the credibility of the competing price

information; (2) the seller's past relationship with the buyer; (3) the significance of the loss if

the seller failed to meet the competing price; and (4) the seller's efforts to corroborate or

evaluate the competing price."  Motion at 5, *citing U.S. Gypsum Co.,* 438 U.S. at 454-55.

Applying these factors disproves Suncor's meeting competition defense and, at the very least,

demonstrates that summary judgment is inappropriate:

      1.     **Credibility of competing price information.**  Suncor did not obtain or make

any attempt to obtain any competing price information.  To the contrary, Moss had no idea

what other competitors were offering and testified that what other customers were or had been

doing *vis a vis* Kroger "didn't matter" to Suncor's decision to offer Kroger the discriminatory

prices.  Ex. 3 at 311:7-313:11.  To the extent that Moss or anyone else at Suncor vaguely

considered certain market factors to reach a "guesstimate" as to what prices Suncor should bid

to Kroger (see Motion at 9 ¶ Q, citing Motion Ex. B (Doc. 185-3) at 280:18-281:10, 281:16-

282:3; Motion at 10 ¶ U, citing *id.* at 313:20-314:24), these factors related to competition and

the market *in general* as opposed to any individual competitive situations.  That consideration

is insufficient to establish a meeting competition defense.  *See Bayer*, 199 F.3d at 165 ("[I]f §

2(b) of the Robinson-Patman Act provided a defense to every seller who could document a good

faith attempt to meet general competition in the market place, then the defense would …

virtually obliterate the protection Congress sought to provide buyers in § 2(a) of the Act.").

      2.     **Suncor's past relationship with Kroger.**  There was nothing in Suncor's past

relationship with Kroger showing or suggesting that Suncor offered the discriminatory pricing

to meet the equally low price of a competitor.  To the contrary  (as Suncor recognizes at

Motion p. 7 ¶ K), each Request for Proposal issued by Kroger specified that Kroger considered

both price and non-price considerations in awarding Fuel contracts and that it was looking for a

"competitively priced" proposal rather than a low bid.  Motion Ex. I (Doc. 185-10) at 2,

Motion Ex. L (Doc. 185-13) at 2.  Moreover, in the Fuel industry, very small differences in wholesale prices are considered to be significant, and a 0.25 to 0.5 cent difference in a wholesale per-gallon price is considered to be substantial.  Motion Ex. Z (Doc. 185-29) at 7; Ex. 1 ¶ 7.  In 2009, without any request from Kroger (or any consideration of what any other competitor might be offering), Suncor reduced the price it had offered to Kroger in 2008 by a full 1.5 cents per gallon to win the Kroger business.  Ex. 3 at 280:18-282:3.  That Suncor determined it "really wanted the business" of a large "national company" and was "going to chase it"  by offering considerably lower prices than it charged other customers (*id.* at 281:20-25, 282:12-14)—and without considering at all what competitors were offering (*id.* at 311:19-25)— illustrates  that Suncor's conduct was the type of conduct that the RPA was enacted to prohibit, *not* the type of conduct the § 2(b) meeting competition defense was designed to protect.

3.  **Significance of loss if Suncor failed to meet the competing price.** As Suncor concedes, it was unaware of any competing price and made no effort to determine the competing price.  As Western continued to want to purchase as much of its Fuel supply as possible from Suncor (Ex. 1 ¶ 12; Ex. 11 at 18:20-19:4), Suncor has not established, particularly for purposes of summary judgment, that there would have been any loss to Suncor had it lost the relevant Kroger business.

4.  **Suncor's efforts to corroborate or evaluate the competing price.**  There is no evidence that Suncor did anything to corroborate or evaluate the competing price.  Moss (i) was content having no inkling as to whom Suncor was competing against or what pricing those competitors were offering or had offered to Kroger in the past (Ex. 3 at 311:19-313:11); and (ii) ignored Suncor's Competition policies requiring documentation of both the basis for any price

differences as well as the fact that the favorable pricing was given to meet competition (*id.* at 112:10-113:21). Had there been any effort to corroborate or evaluate competing prices, it must be presumed that Suncor would have followed its own published policies on that subject.

      E.    The evidence cited above establishes genuine issues of material fact as to the meeting competition defense. However, certain of Suncor's factual assertions are simply wrong, lending further basis for denial of Suncor's Motion. For example, Suncor asserts that "[a]ll of Suncor's business with Kroger was done through the bid process." Motion at 6 ¶ I. That is not true, nor is the suggestion that all of Suncor's pricing to Kroger entities Dillon and Loaf 'N Jug was in response to a blind competitive bid. As the Motion later reveals, although Suncor, effective October 2009, executed a year-long contract with Dillon/King Soopers via the RFP process (at which it agreed to sell nearly ▉ million gallons of gas per month at rack average price less ▉▉ cents per gallon (Motion Ex. P (Doc. 185-17)), three months later, Suncor spontaneously lowered the contracted price to Dillon to give Dillon the same price it had then agreed to give Loaf N Jug (Motion Exs. R-1 (Doc. 185-20) and R-2 (Doc. 185-21). See Motion at 9-10 ("Suncor won the [Loaf 'N Jug] bid and entered into a one year contract starting February 1, 2010 and ending January 31, 2011. . . . Afterwards, Suncor and Kroger amended the King Soopers contract . . . increasing the discount from $▉ to $▉▉, so as to put the King Soopers and Loaf 'N Jug contracts on the same pricing mechanism.") *Id.* (citing Motion Ex. B (Doc. 185-3); *see also* Ex. 3 at 298:8-301:5)). Suncor was not "meeting competition," it was simply giving one Kroger affiliate the even more discriminatory price it had determined to give another Kroger affiliate. Similarly, effective October 1, 2010, without any record of a Kroger Request for Proposal or Suncor bid, Suncor gave Dillon a new contract

(Ex. 22) in which it raised the price to Dillon for E-10 (from OPIS Average less ███ cpg to

OPIS Average less ███ cpg) but further lowered the price for Diesel (from OPIS Average less

███ cpg to OPIS Average less ███ cpg).  *Compare* Ex. 22 *with* Motion Ex. R-2 (Doc. 185-21).

Suncor's business with the Kroger affiliates was *not* all through the bid process – and these

facts illustrate that Suncor's discriminatory pricing to Dillon and Loaf 'N Jug was not intended

to meet competition.

   F. The first Supreme Court case which analyzed the meeting competition defense

(and remains good law today) illustrates why Suncor cannot establish the meeting competition

defense, particularly on summary judgment.  See *FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746

(1945).  In *Staley,* the Court recognized that § 2(b) does not require a seller to justify price

discrimination by showing that it in fact met a competitive price, "[b]ut it does place on the

seller the burden of showing that the price was made in good faith to meet a competitor's

[price]."  *Id.* At 759.  In that case, the FTC concluded (and the Supreme Court agreed) that seller

A.E. Staley had failed to prove its meeting competition defense where: (a) the discriminations in

price "were made in response to verbal information received from salesmen, brokers or intending

purchasers, without supporting evidence, to the effect that in each case one or more competitors

had granted or offered to grant like discriminations;" (b) A.E. Staley "believ[ed]" the reports "to

be true"; but (c) the record contain[ed] no statements by the persons making these reports and

discloses no efforts by respondents to investigate or verify them, and no evidence of

respondents' knowledge of their informants' character and reliability."  *Id.* at 758.  Here, Suncor

gave no consideration to finding out what its competitors were offering, even through verbal or

other informal investigation.  Thus, there is even more basis in this cases to reject the meeting competition defense than in *Staley*.

G.      Suncor cites several cases in support of its "meeting competition" summary judgment request.  Motion at 3-6 ¶¶ A-F.  These cases reflect why Suncor cannot prevail on the defense and demonstrate why Suncor's motion should be denied.

1.      Suncor relies on *Great Atlantic & Pacific Tea Co., Inc. v. FTC*, 440 U.S. 69 (1979), for the proposition that a seller can assert a meeting competition defense even where it unknowingly made a bid which beat, rather than simply met, the seller's competition.  Motion at 3-4 ¶ A, citing *Great Atlantic,* 440 U.S. at 83.  In *Great Atlantic,* the Court concluded that the seller, Borden, had established the defense in connection with offering lower prices to grocery conglomerate Great Atlantic & Pacific Tea (A&P) based on the following facts: (a) there was a long standing relationship between Borden and A&P (*id.* at 83); (b) the A&P buyer had told Borden's salesperson that Borden's initial bid was "so far out of line it is not even funny" and that Borden was "not even in the ball park" (*id.*); (c) the Borden salesperson had specifically asked the A&P buyer about the details of other bids, and A&P responded that "a $50,000 improvement in Borden's bid [on top of the existing bid's purported $420,000 savings to A&P] 'would not be a drop in the bucket'" (*id.*); (d) "Borden requested more information about the bid from [A&P], but this request was refused (*id.* at 84); and (e) "[f]aced with a substantial loss of business and unable to find out the precise details of the competing bid, Borden made another offer stating that it was doing so in order to meet competition" (*id.*).  Because of Borden's long-standing relationship with A&P, the Court concluded that Borden justifiably relied on the statements of the A&P buyer and justifiably determined that it was necessary to make another

bid "offering substantial concessions to avoid losing [the A&P] account. *Id.* The facts here are completely different than those involved in *Great Atlantic*. *First*, Suncor had a limited relationship with Kroger prior to Moss's tenure in which it supplied modest volumes of Fuel to the Kroger distribution center in Denver and for sale in Grand Junction (Motion Exs. G (Doc. 185-8), K (Doc. 185-12))[6]. *Second,* Moss and Kroger had a single recorded discussion of pricing in May 2008 (Motion Ex. N (Doc. 185-15); that communication occurred more than a year before the first Kroger RFP process at issue in Western's RPA claim and contained no mention or even allusion to any competitor's bid. *Third,* Suncor never made any request to Kroger (much less a follow up request like Borden made to A&P in *Great Atlantic*) to disclose the amount of competing bids or what Suncor might need to bid to secure Kroger's business. *Fourth,* unlike Borden, which specifically stated it was meeting competition when it made its lower winning bid to A&P, Suncor submitted the relevant bids to Suncor without any such statement (*see* Motion Exs. O (Doc. 185-16) and R (Doc. 185-19)) and without following its own policy for documenting a meeting competition defense.[7]

---

[6]     As reflected in Motion Exs. F (Doc. 185-7) and G (Doc. 185-8), in 2004, three years before Moss's tenure as Unbranded Sales Manager, Suncor was awarded a small portion of a Kroger RFP, *i.e.,* to supply Fuel to the Kroger Distribution Center in Denver. See *id.* The Distribution Center supply was not for Kroger retail outlets; it was for Kroger's fleet of trucks that delivered products to Kroger stores. Ex. 3 at 261:13-262:1. The Grand Junction contract Suncor had with Kroger in 2008 was to supply a total of ▓▓▓▓ gallons of Fuel per month. Motion Ex. K (Doc. 185-12). The 2009 contract with the Dillon Companies (the first contract Suncor/Kroger contract that is the subject of Western's RPA claim) was for more than twelve times that amount, or a total of ▓▓▓▓ gallons per month. Motion Ex. P (Doc. 185-17).

[7]     Suncor suggests the existence of a competitive bid situation in which a bidder is unaware of the specific amount of competitor bids compels a finding, as a matter of law, that the defense has been satisfied and, thus, there can be no liability for price discrimination. Motion at 4 ¶ A ("As long as the winning bidder does not *know* the exact bids that others made, the winning

2.      Suncor cites three cases in which the meeting competition defense was

proven, *Water Craft Management, LLC v. Mercury Marine,* 457 F.3d 484 (5th Cir. 2006),

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d. 37 (7th Cir. 1992), and

*Jones v. Borden Co.,* 430 F.2d 568 (5th Cir. 1970).  Motion at 4-5 ¶¶ B-C.  Each of these cases

involved sellers who both took affirmative steps to determine the relevant competitive price

and relied on specific market information to verify their beliefs as to that competitive price.

*See Water Craft,* 457 F.3d at 490 (defendant relied "on several different sources for [its]

approximation of [its competitor's] discounts," including two individuals with personal

knowledge of the competing bid and considered market information to attempt to corroborate

the information obtained); *Reserve Supply,* 971 F.2d at 44-46 (defendant had received a report

from a long-time customer that its competitor "was offering a 16 percent discount on insulation

products"; that discount amount was substantiated by reports in the insulation market, market

conditions and industry practice); *Jones,* 430 F.2d at 72-73 (among substantial other evidence

of a 5% offered discount in the market, the supplier specifically inquired of the buyer whether

its offered price was competitive, the buyer responded that it was "obvious" the price was not,

the supplier specifically asked whether a 5% discount would make supplier competitive with

the price the buyer was currently paying, and the buyer replied "that that would be about

right").  Here, Moss and Suncor had "no inclination as to what [Suncor's competitors] were

bidding" or "who was bidding . . . on the business" and came up with the "guesstimate" as to

what it would take to win Kroger's business by considering factors entirely unrelated to

_____

bidder is within the protection of the meeting competition defense …" [*Great Atlantic,* 440 U.S.
at 80]).  *Great Atlantic* says no such thing.

competitive bids. Ex. 3 at 311:19-25, 314:3-24. These cases from other circuits cited by Suncor are not binding here, but even if they were, they support Western's position that there is no viable meeting competition defense.[8,9]

**B.   PLAINTIFFS' CLAIM I – VIOLATION OF THE ROBINSON-PATMAN ACT 15 U.S.C § 13)**

1.   <u>Burden of proof and elements</u>.   Western agrees with Suncor's recitation of the burden of proof on this claim. Western generally agrees with Suncor's recitation of the elements on this claim.[10] As addressed below, however, Western asserts that Suncor has substantially misstated the standard of proof for the competitive injury element (§ IV.B.2) and has misstated certain requirements for establishing relevant sales in interstate commerce (§IV.B.3).

2.   <u>Element of Robinson-Patman claim challenged by Defendant – Injury to</u>

---

[8]     Suncor cites deposition testimony from Kroger witnesses Thiessen and Wilson regarding Kroger's internal considerations, fuel purchasing goals, and the range of fuel prices Suncor pays under non-Western contracts. Motion at 6-11 ¶¶ G-K, U. As the cases cited by Suncor illustrate, § 2(b) focuses on whether the seller itself had a "good faith" belief that it was offering a price necessary to meet the price of a competitor, *not* what the buyer knew in obtaining the discriminatory price.

[9]     Suncor also cites *FTC v. Standard Oil,* 355 U.S. 396 (1958). Motion at 6.F. In that case the Supreme Court declined to overturn or even analyze a factual determination that the meeting competition defense had been satisfied. *See id.* at 401. In any event, the record there disclosed that competing sellers had made "numerous attempts" over a five year period to "lure" jobber customers away from Standard Oil "with cut-rate prices, oftentimes much lower than the one-and-one-half cent reduction" Standard was giving them. *Id.* at 402-03. *Standard Oil* is inapposite for the same reasons as discussed with respect to the other cited cases.

[10]     Suncor asserts that "without antitrust injury, a private plaintiff has no antitrust claim." Motion at 16, *citing Atl. Richfield Co. v. USA Petroleum Corp.,* 490 U.S. 328, 334 (1990). This misstates *Atlantic Richfield* and the law. Without an antitrust injury, a private plaintiff may not recover damages under Section 4 of the Clayton Act. *Id.*

Competition.

A.    **Suncor incorrectly states the standard of proof of the competitive injury**

**element in a secondary-line Robinson-Patman case.**  Suncor hopelessly confuses the

competitive injury element to be satisfied in a secondary line Robinson-Patman Act case with

standards appropriate for primary line Robinson-Patman cases[11] and non-RPA antitrust claims.[12]

There is no dispute in this action that Western competes with Kroger in several markets

as both Kroger and Western agree that they are competitors.[13]  Once competition among the

favored and disfavored buyers is established, the settled law is that injury to competition can be

shown in either of two ways:  (1) the *Morton Salt* inference under which injury to competition is

established through proof of a "substantial price discrimination between competing purchases

---

[11]    For example, Suncor cites extensively to *Brooke Group Ltd v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993), a primary line Robinson-Patman Act case.  Motion at 12-13.  The First, Second, Third, and Ninth Circuits have rejected the view that the standard for competitive injury set forth in *Brooke Group* for a primary line case is applicable to a secondary line case.  *Coastal Fuels of P.R. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 191-93 (1st Cir.1996); *George Haug Co. v. Rolls Royce Motor Cars*, 148 F.3d 136, 143 (2d Cir. 1998); *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271-75 (3d Cir. 1995); *Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 658 (9th Cir. 1997).

[12]    Suncor argues Western cannot produce the requisite proof to satisfy the injury to competition element of its § 2(a) claim.  Yet it confuses this burden with the requirement to demonstrate antitrust injury for purposes of Section 4 of the Clayton Act.  The antitrust injury requirement is not at issue in Suncor's Motion.  At trial, Western will set forth its proof of antitrust injury under the Supreme Court's standard in *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981).

[13]    Kroger testified that it considers Western a "direct competitor" (Ex. 12 at 41:7-25), and Western considers Kroger to be its closest competitor (Ex. 1 ¶ 11).  Mr. Ewing (Moss's superior at Suncor) testified that Suncor and the industry believe gas stations compete when they are within 1.5 miles of each other (Ex. 8 at 60:1-24); many of the Western and Kroger stores are within that distance (Motion Ex. A (Doc. 185-2) at 12).

over time," *Falls City*, 460 U.S. at 435 (citing *FTC v. Morton Salt Co.*, 334 U.S. 37, 46 (1948));

or (2) "the diversion of sales or profits from a disfavored purchaser to a favored purchaser."

*Volvo Trucks*, 564 U.S. at 177 (2006).[14]   *See also* ABA Antitrust Section, Antitrust Law

Developments (Seventh) at 519 ("[o]nce the necessary competition between favored and

disfavored buyers is shown, injury to competition can be proved through direct evidence of lost

sales or profits caused by the discrimination . . . [or] the more common approach is to prove the

requisite competitive injury by inference."); ABA Antitrust Section, Sample Jury Instructions in

Civil Antitrust Cases, Robinson-Patman § 2(a), Instruction 10, Competitive Injury—Secondary

and Tertiary Line (1990 Ed.) (same); Julian O. von Kalinowski, *Antitrust Laws and Trade

Regulation* § 39.02 (2d ed. 1969, printed 2009) (same); *Stelwagon Mfg. Co. v. Tarmac Roofing

Sys., Inc.,* 63 F.3d 1267, 1272 (3d Cir. 1995 ("[o]nce the existence of a competitive relationship

has been established, '[i]njury to competition is usually shown in either of two ways:  proof of

lost sales or profits, or under the *Morton Salt* test, proof of a substantial price discrimination

between competitors over time'"); *Rose Confections, Inc. v. Ambrosia Chocolate Co., a Division

of W.R. Grace & Co.*, 816 F.2d 381, 385 (8th Cir. 1987) (same).  Western can satisfy its burden

of proof under both of these approaches.

      B.    **Western satisfies its burden of proof under the *Morton Salt* Inference.**  In

order to obtain an inference of injury to competition under *Morton Salt*, a plaintiff must show

that the price discrimination was substantial and occurred over a substantial period of time.

*See Falls City*, 460 U.S. at 435 (citing *Morton Salt*, 334 U.S. at 46, 50-51).

---

[14]    The actual threshold requirement is that the plaintiff establish "a reasonable possibility that a price difference may harm competition."  *Falls City,* 460 U.S. at 435.

Price differentials are "substantial" when they are "(1) substantial enough to influence a disfavored customer's resale prices, or (2) occur in a market with low profit margins and intensive competitive conditions." *J.S. Feeser, Inc. v. Serv-a-Portion, Inc.*, 909 F.2d 1524, 1538 (3d Cir. 1990 (citations omitted).[15]

        1.    *The price discrimination occurred over an extended, uninterrupted period of time.*

Suncor has not established (or attempted to establish) the absence of a genuine issue of fact as to either element of the *Morton Salt* inference. On the issue of duration, there are disputed issues of fact. Suncor's price discrimination occurred over 20 months, from the time Kroger received its October 2009 discriminatory contract for King Soopers and City Market (see Motion Ex. P (Doc. 185-17)) until May 2011 when Suncor refused altogether to sell Fuel to Western (Ex. 1 ¶ 4). Motion Ex. A (Doc. 185-2) at 5, 7-10. The Fuel purchases were not occasional during the 20 month discrimination period; rather, they were made on a near-continual basis as wholesale Fuel was trucked on a daily basis to retail outlets, quickly sold to consumers, and sometimes replenished and sold at particular retail outlets multiple times per day. See Ex. 1 ¶ 12. Under relevant cases, the price discrimination occurred for a substantial duration. *See, e.g., Coastal Fuels of P.R. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 193 (1st Cir. 1996) ("discrimination [that] lasted all 18 months that Coastal was in business" was substantial); *Foremost Dairies*, 348 F.2d at 679 (two-year period of discrimination was

---

[15]    Plaintiffs address the fact that the price discrimination impacts prices in Section C.1 below.

substantial); *Rose Confections, Inc.*, 816 F.2d at 387 ("jury could reasonably infer competitive injury" based on evidence of price discrimination from July 1981 to October 1983).[16]

 2. *The price discrimination itself was substantial.*

Similarly, there are disputed questions of fact as to whether the price discrimination itself was substantial. Suncor does not appear to dispute, and the evidence shows, that the unbranded gasoline markets at issue here involve intense competition and typically involve low profit margins. *See* Ex. 1 ¶ 9; Ex. 23, Glick/Tatos Aff. ¶ 3-4. In general, retail gasoline is a highly competitive business with low profit margins; Ex. 9 ¶ 4; Ex. 23, Glick/Tatos Aff. ¶ 4 (gross profit margins are less than 5% putting retail gasoline among the industries with the lowest profit margins in the United States). During the 20-month discrimination period, Western paid on average $2.382 per gallon of fuel, while Kroger paid $█████, equating to an average difference of █████ cents for every gallon purchased. Motion Ex. A (Doc. 185-2) at 9. Western's gross profit margin was between 10.7 and 12.4 cents. Ex. 23, Glick/Tatos Aff. ¶ 2. This means that the discriminatory cost differences were about 25 % of the profit margin, a very significant amount. Ex. 23, Glick/Tatos Aff. ¶ 4. On particular days, the differentials were significantly larger, as much as 18.7 cents per gallon. Ex. 23, Glick/Tatos Aff. ¶ 2; Motion Ex. A (Doc. 185-2) at 9.

---

[16]  For example, effective February 1, 2010, Suncor entered into contracts for both Loaf 'N Jug and King Soopers pursuant to which those entities collectively agreed to purchase, every month, a total of ███████ gallons of gasoline and ███████ gallons of diesel. Motion Ex. R-1 (Doc. 185-20) at 1; Motion Ex. R-2 (Doc. 185-21) at 1. At 8,500 gallons per truckload for gasoline and 7,500 gallons per truckload for diesel as specified in the Kroger RFPs (*e.g.*, Motion Ex. L (Doc. 185-13) at 2, Motion Ex. Q (Doc. 185-18) at 2), this equated to more than ████ truckloads of Fuel per month (or approximately ██ truckloads per day) sold at the discriminatory prices.

Consumers of retail gasoline are also very price sensitive. A one penny change in a retail price can have a significant impact on sales. Glick/Tatos Aff. ¶ 3. According to industry expert, John Mayes:

> It is accepted in the industry that a significant portion of consumers make purchasing decisions based on small differences (1 to 2 cents per gallon) in the retail prices for gasoline or diesel products. Similarly, small differences in the amounts charged by wholesalers (such as Suncor) to gasoline purchasers (such as Western or the Kroger entities) are significant. . . . [A] .25 to .5 cent difference in a refiner/wholesaler's per-gallon price to different customers is considered to be … substantial. I understand … that the average price difference in this case between the Suncor wholesale price charged to Western and its price charged to the Kroger entities is approximately ■ cents per gallon. That price differential is highly significant, and almost unheard of, in the petroleum industry.

Motion Ex. Z (Doc. 185-29) at 6. It is thus not surprising that courts have recognized retail gasoline to be a "highly competitive market" in which "customers are influenced by small price differences" including to support an inference of competitive injury. *Hasbrouck v. Texaco*, 634 F. Supp. 34, 39 (E.D. Wash. 1985), *judgment aff'd*, 496 U.S. 543 (1990); *see also Magnus Petroleum Co., Inc. v. Skelly Oil Co.*, 599 F.2d 196, 201 (7th Cir. 1979) ("by plaintiffs' own evidence the retail gasoline market [at issue] was highly competitive during the years in question, experiencing numerous 'price wars.'"). Summary judgment on the issue of competitive injury is not warranted as Western is entitled to the *Morton Salt* inference.

C. **Western has also shown lost profits resulting from the price discrimination.**

Western also directly demonstrated that the price discrimination at issue in this case harmed Western. Plaintiffs' experts conducted a statistical analysis which showed that during the damage period (Oct. 2009 to May 2011) there is a highly significant statistical relationship between the size of the daily price discrimination and Western profits at each of the 26 Western

stores that directly compete with a Kroger store.  Motion Ex. A (Doc. 185-2) at 14-16.[17]  After

the filing of the Motion, Suncor's economic experts submitted a rebuttal report to the

Glick/Tatos report.  Although Suncor's experts were critical of the Plaintiffs' damage analysis,

they apparently do not dispute the fact that the price discrimination is statistically related to

Western profits.  *See* Ex. 23, Glick/Tatos Aff. ¶ 6; Ex. 24, Griffin Report at 18.

Moreover, in support of Plaintiffs' showing on competitive injury, Kroger testified that if

it had received unfavorable discriminatory wholesale prices it would expect to be competitively

harmed.  Ex. 12, Sharpe Dep. at 46:7-47:25.    Thus, even if Western were not entitled to the

*Morton Salt* inference, it has marshaled evidence of a direct link between the Suncor price

discrimination in Kroger's favor and competitive injury. Summary judgment must be denied for

this reason as well.

D.    **Suncor does not rebut Western's prima facie case, particularly on summary**

**judgment.**  Under Supreme Court precedent, "[i]n the absence of direct evidence of displaced

sales, [the Morton Salt] inference may be overcome by evidence breaking the causal connection

between a price differential and lost sales or profits."  *Falls City*, 460 U.S. at 435.  Suncor's

Motion suggests it seeks to "break the casual connection" between the price discrimination and

Western's profits.  Motion at 20.  Suncor's argument, to the extent it can be deciphered, appears

to be the following:  First, Suncor argues there is no evidence that wholesale prices are passed on

to retail prices, so the price discrimination could not have impacted Kroger retail prices (Motion

---

[17]       After Suncor filed its Motion, Suncor's economic experts completed their rebuttal report
to the Glick/Tatos report.  Although Suncor's experts are critical of the Plaintiffs' damage
analysis they apparently do not dispute the fact that the price discrimination is related statistically
to WCS profits.  Ex. 23 Glick/Tatos Aff. ¶ 6.

at 18 ¶ Q; Motion at 20 ¶ T).  Second, Suncor contends that even if wholesale prices impacted

Kroger retail prices, Kroger almost never sets the lowest price in the market, and several more

aggressive discounters exist.  Thus, according to Suncor, it is impossible to claim that Western

lost profits by matching a lower price by Kroger due to the price discrimination.  (Motion at 15-

20, ¶¶ G, I, J, L, P, S, T.)  Stated another way, Suncor asserts that because Western always tries

to set the lowest price, and other discounters exist, any margins Western lost were due to

matching someone other than Kroger.  Third, Suncor argues that plaintiffs have not accounted

for other factors that would have impacted Western profits.  Motion at 17, 19, ¶¶ M, N, S.  Each

of Suncor's contentions runs counter to uncontroverted record evidence.

> 1.    *The price discrimination in wholesale prices impacts Western and Kroger*
>       *retail prices.*

Suncor's claim that Kroger's wholesale price advantages are not passed on to their retail

prices runs counter to significant contrary evidence.  First, Kroger's own 2011 annual report

states that wholesale fuel prices impact retail prices.  Ex. 23, Glick/Tatos Aff.  ¶ 6.  Second,

Suncor's own expert in a report filed after Suncor's Motion states that "there is a long-term

relationship between the OPIS average rack price and the Kroger retail price,"  *Id*.; Ex. 24 at 18.

Third, significant academic literature and industry commentary concurs with Suncor's expert's

finding.  Ex. 23 at ¶ 6.  Fourth, based on the data produced by Suncor and Kroger, Western's

experts also find that changes in wholesale costs impact Kroger's retail prices.  Ex. 23 ¶ 8-9.

Finally, Kroger itself testified that wholesale prices impact retail prices:

> (Counsel)  Generally speaking, when you move a price, what's it
> based on, during the day, within a day?

> (Kroger)  Number of factors.  It can be you see that the market has
> moved either up or down, or it could be based on a wholesale
> move that our buying price has gone up or down. …

Ex. 12, Kroger 30(b)(6) Sharpe at 8:3-9.

> (Counsel)  And as wholesale prices decline, retail prices decline.
>
> (Kroger)  Correct.

*Id.* at 9:18-20.  In contrast, Suncor has cited to no evidence to support its position that retail

gasoline prices are "independent" of wholesale gasoline prices.  Once this point is established (as

shown above), competitive injury follows as a matter of logic.  Since Suncor does not dispute

that it gave Kroger more favorable wholesale prices than Western and that Western and Kroger

compete, it must also concede that competitive injury occurred. Ex. 23, Glick/Tatos Aff. ¶ 10.

This is because if Kroger gets lower wholesale prices and these lower prices cause Kroger to

reduce its retail price, and Western competes on price with Kroger, Western inevitably must be

impacted.  *Id.*  Either Western must cut its margin to meet the lower Kroger price or, if it allows

the retail price differential to stand, it will lose some price-sensitive customers.  *Id.*  As a

consequence, once it is shown that a relationship between wholesale and retail gasoline prices

exist, Suncor's Motion on competitive injury grounds must fail.

> 2.    *Suncor's claim that "the Record Contains No Evidence That WCS Ever
> Cut Margins in Response to Prices Charged by Kroger" is untrue.*

Suncor claims that even if the price discrimination impacted Kroger retail prices, Kroger

prices could not impact Western because Western sets its price against the lowest competitor's

street price, and Kroger is never the lowest price competitor.  The vast majority of the time,

according to Suncor, "another competitor, not Kroger" had the lowest price.  Motion at 19.  Even

if Suncor were correct, that would not negate competitive injury. However, Suncor is not correct. Even if Suncor's factual claim were true (which it is not), as Kroger's prices fall it would gain some customers from Western. Ex. 23, Glick/Tatos Aff. ¶ 12. Moreover, the factual underpinnings of Suncor's argument are also incorrect. Western is not always the lowest price competitor, and Kroger is often the lowest. *Id.* ¶¶ 13-14. Indeed, in the majority of the days during the damage period Western and Kroger were the closest competitors in price. *Id.* ¶ 15.

Suncor's own documents classify Kroger and Western as "tier one lowest, most aggressive retail pricing structure," competitors in the Grand Junction market, and in the "Denver Market Area" Suncor lists only King Soopers and not Western in the tier one of aggressive pricing competitors. See Ex. 25, Excerpts of Suncor Integrated Supply-Market Analysis & Strategy Study, EAI, February 20, 2009 (slides 40, 57).

Kroger testified in its 30(b)(6) deposition that often Western responds to lower Kroger prices:

> (Counsel) And so plainly what's happened here is that Western has responded to Loaf N'Jug lowering its price, right?
>
> (Kroger) Yes, I would imagine so.
>
> (Counsel) Well, I mean that's nothing surprising.
>
> (Kroger) No.
>
> (Counsel) That happens all the time in the retail fuel business?
>
> (Kroger) That's correct.

Ex. 12 at 31:15-24.[18]  Kroger testified that sometimes Kroger is a price leader moving first, and

sometimes it is a price follower.  *Id.* at 31:25-32:6, 43:25-44:25, 54:21-55:1.  When Kroger

leads, Kroger believes Western often responds to Kroger.  Ex. 12 at 45:1-7.  In addition, Mr.

Taraghi, Western's owner, testified in his deposition that Western is not always the lowest price

competitor.  Ex. 2 at 27:11-28:1.

Suncor asserts that its experts counted the days Kroger had the lowest price.  Motion at

18-19 ¶ R.  The fundamental problem with Suncor's "count" of the number of times Kroger is

the low price seller is that it ignores the three cent discount Kroger gives to its loyalty card

customers.  Loyalty card customers are a large fraction of Kroger's customers.  Ex. 12 at 61:5-

24.  As a consequence, when Kroger "matches" a lower price Kroger means that it stays three

cents above that competitor's price because its customers receive an additional three cent

discount.  *Id.* at 18:3-15.

More importantly, Kroger and Western priced head to head with no competitor in

between 73% of the time.  Ex. 23, Glick/Tatos Aff. ¶ 15.  This is substantial evidence of

competitive injury because, on days where Kroger and Western are reacting to each other, the

price discrimination impacts Western.  Indeed, Plaintiffs show that Kroger was able to reduce its

---

[18]    In its Motion, Suncor largely relied on testimony of Susan Giannola, the first of four
witnesses produced in connection with Plaintiff's 30(b)(6) deposition of Kroger.  Motion at 17-
18 ¶¶ O-R.  Ms. Giannola is the Kroger "corporate fuel person" for the Eastern part of the United
States.  Motion Ex. W (Doc. 185-26) at 16:11-17:9.  Mr. Sharpe was the last witness Kroger
produced in connection with the deposition, after Suncor filed its Motion.  Mr. Sharpe is the
Director of Petroleum for Loaf 'N Jug, based in Pueblo, one of the specific markets that is the
subject of Western's claim, and has day-to-day responsibility for price setting and competitive
issues.  Ex. 12 at 2:11-12, 5:3-18; Ex. 26, Sharpe Decl. ¶ 3.  Mr. Sharpe's testimony contradicted
Ms. Giannola's in several material respects, including those raised in the Motion.

price relative to Western on average by 1.4 cents as a result of the price discrimination. Ex. 23 ¶ 16-17.

### 3.     *The impact of other causes is not a summary judgment issue.*

The plaintiff's burden is to show that the price discrimination was a material cause, not the sole cause of the injury. Consideration of other causes is a question for the trier of fact. *See Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042 (9th Cir. 1987) ("while a defendant may introduce evidence of alternative causes of the injury, such evidence constitutes only a part of the information the jury may consider in determining whether price discrimination was or was not a material cause."), *judgment aff'd*, 493 U.S. 543 (1990). Indeed, Suncor does not identify what other causes it believes impacted Western's profits during the Damage Period that could negate the impact of the price discrimination. Rather, it points only to the fact that Western stopped mixing wholesale gas in February 2009, eight months before the asserted price discrimination began. Motion at 17 ¶ L.

### E.     **The Tenth Circuit does not require additional proof of competitive injury.**

Suncor contends that the Tenth Circuit requires additional proof of competitive injury not required by other circuits. In its brief, Suncor quotes a passage from *Motive Parts Warehouse v. Facet Enterprises*, 774 F.2d 380, 395 (10th Cir. 1985) stating "the naked demonstration of injury to a specific competitor without more is not sufficient to show that a price discrimination 'may' substantially lessen competition; the test must always focus on injury to competition."[19] Motion

---

[19]     The quotation comes from *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983), which was overturned by *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1041 (9th Cir. 1987), *judgment aff'd*, 496 U.S. 543 (1990). *See also* discussion in *Chroma Lighting,* 111 F.3d at 657.

at 13.[20]  The suggestion is that in the Tenth Circuit a plaintiff in a secondary line Robinson

Patman case must show injury to consumers.[21]  Such an interpretation would put the Tenth

Circuit in conflict with congressional goals of the Robinson Patman Act.  Importantly, sixteen

years after the *Motive Parts* decision, the Supreme Court in *Volvo Trucks* reaffirmed that:

> A hallmark of the requisite competitive injury, our decisions indicate, is the
> diversion of sales or profits from a disfavored purchaser to a favored purchaser.

546 U.S. at 177.  Finally, the Tenth Circuit itself does not seem to have required the additional

proof Suncor claims is required in subsequent cases.  *See World of Sleep v. La-Z-Boy Chair Co.*,

756 F.2d 1467, 1480 (10th Cir. 1985) (citing *J. Truett Payne*, 451 U.S. at 564 n.4) (competitive

injury can be shown when the discrimination allowed the "favored purchaser to lower its prices

and thereby reduce a plaintiff's sales or profits"); *Huntsman Chem. Co. v. Holland Plastics Co.,*

208 F.3d 226, No. 98-4157, 2000 WL 228269, at *6-7 (10th Cir. Feb. 29, 2000) (unpublished) .

Even if an additional consumer injury proof requirement existed in the Tenth Circuit,

Western could clear that hurdle.  First, Suncor does not appear to recognize that its own theory

about competition demonstrates consumer injury.  According to Suncor, Kroger is a follower and

Western is a discounter.  Through its discriminatory practices, Suncor gave the discounter a

higher input price and the follower a lower input price.  The impact is that Western (who Suncor

claims is always the low price competitor) gave consumers higher prices than if no

---

[20]    Indeed, the statement makes no sense in light of the fact that the jury instruction at issue
in *Motive Parts* continued to endorse the *Morton Salt* presumption.  774 F.2d at 395 (citing *Falls
City*, 428 U.S. at 435).

[21]    It is revealing that Suncor does not present evidence of the lack of consumer injury which
it incorrectly states is the standard; instead it attempts to break the causal link between the price
discrimination and the injury to Western.

discrimination had occurred. That constitutes consumer injury. Moreover, Mr. Taraghi testified at length in his deposition that the unequal treatment by Suncor prevented him from opening new stores. See Ex. 2, Taraghi Dep. at 67:1-70:1. Thus, the discrimination reduced the number of gas stations selling at lower prices, also leading to consumer injury.

      3.      <u>Element of Robinson-Patman claim challenged by Defendant – Interstate Commerce</u>.

      A.      **The RPA's interstate commerce element is satisfied by showing that the products at issue were in the flow of commerce.** As with its failure to discuss the *Morton Salt* inference of competitive injury, Suncor fails to address a key concept of the RPA's "in commerce" element under well-established Supreme Court precedent: the flow (alternatively, the stream) of commerce theory.

      Under the RPA, the jurisdictional "in commerce" element is met where a party engaged in interstate commerce, during the course of that commerce discriminates in price between different purchasers of like commodities "where either or any of the purchases involved in such discrimination are in commerce" and where the commodities are sold for use, consumption or resale within the U.S. 15 U.S.C. § 13(a).

      In *Standard Oil Co. v. FTC*, the Supreme Court held that temporary storage of a product in the state does not disrupt the interstate flow. The Court favorably quoted this passage from the Seventh Circuit's appellate opinion in the case: "'Although the gasoline was not brought to River Rouge[, Michigan] pursuant to orders already taken, the demands of the Michigan territory were fairly constant, and the petitioner's customers' demands could be accurately estimated, so the ***flow of the stream of commerce*** kept surging from Whiting[,

Indiana] to Detroit.'" 340 U.S. 231, 237 (1951) (emphasis added) (quoting 173 F.2d 210, 213-

14). The Supreme Court held that wholesale sales of the gasoline shipped from Indiana to

Michigan to Standard Oil's customers:

> [were] well within the jurisdictional requirements of the Act. ***Any other
> conclusion would fall short of the recognized purpose of the Robinson-
> Patman Act to reach the operations of large interstate businesses in
> competition with small local concerns.*** Such temporary storage of the gasoline
> as occurs within the Detroit area does not deprive the gasoline of its interstate
> character.

*Id.* at 237-38 (emphasis added) (citations omitted). Thus, in *Standard Oil*, the Supreme Court

held that the RPA's interstate commerce element may be satisfied by showing that the goods

sold in either a favored or disfavored sale remained in the flow of commerce. *See Roorda v.*

*Am. Oil Co.*, 446 F. Supp. 939, 941 (W.D.N.Y. 1978) (stating that *Standard Oil* Court

"adopted a 'flow of commerce' test to determine whether intrastate discriminatory sales were

'in commerce' within the meaning of section 2(a) of the Clayton Act"). The Supreme Court

reaffirmed in *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186 (1974), that the flow of

commerce test applies to the interstate commerce element of the RPA. *Id.* at 198-99 (rejecting

respondents' argument to expand interpretation of the "in commerce" element of the RPA

beyond the "flow-of-commerce concept").

Goods also remain in the flow of commerce even though they undergo "rather

negligible processing, which [does] not change [their] character appreciably" after being

transported into the state where the sales are made. *Foremost Dairies, Inc. v. FTC*, 348 F.2d

674, 677-78 (5th Cir.), *cert. denied*, 382 U.S. 959 (1965) (footnote omitted). As the *Foremost*

*Dairies* court noted, "[t]he term "processing" as used in section 2(e), has been defined as 'a

mode of treatment of materials to be transformed or reduced to a different state or thing.'"  *Id.*
at 678 n.8 (quoting *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 744 (1945)).  In
*Foremost Dairies*, approximately 20% of the raw milk used to produce finished milk in New
Mexico for sale in that state came from dairies in Colorado.  *Id.* at 676.  The process to convert
raw milk into finished milk involved being "unloaded from the trucks, tested, standardized to a
uniform butterfat content by the addition of other milk of a predetermined butterfat ratio,
pasteurized, in some cases homogenized, and bottled."  *Id.*  The Fifth Circuit stated that the
milk processing "no more interrupts the flow of commerce than the temporary storage of the
gasoline in the Standard Oil case" and held that the interstate commerce element was satisfied.
*Id.* at 678 (footnote omitted).  The Fifth Circuit upheld the FTC's cease-and-desist order that
applied to all sales of milk in the Albuquerque market on the basis of importation of only a
20% portion of the raw milk processed and sold in that market.  *See id.* at 675-76, 681-82.

       In another case involving milk, the Seventh Circuit held that importation of a portion of
raw milk for processing and sale intrastate also meets the flow of commerce test for the in
commerce element of the RPA.  *See Dean Milk v. FTC*, 395 F.2d 696, 714-15 (7th Cir. 1968).
"[I]nvoices show[ed] that during at least four of the months between January 1958 and
September 1960, raw milk supplied to the Rochester, Indiana plant was produced in and
delivered from Wisconsin."  *Id.* at 715.  Dean's counsel also stated that the company purchased
raw milk for its Indiana plant from Wisconsin and Illinois.  *Id.*  The Seventh Circuit found this
evidence sufficient for the FTC "to conclude that a requisite amount of the milk purchased
from Dean by wholesalers in Terre Haute, [Indiana] during the period covered by this action
was 'in commerce.'"  *Id.*  Also, evidence showed that the dairy cooperative which supplied

nearly all the milk to Dean's Louisville, Kentucky plant obtained 25% of that milk from Indiana.  *Id.*  The Seventh Circuit stated that this milk processed in the Louisville plant "was passing in a continuous flow from Indiana farms," justifying the FTC's conclusion that the "in commerce" element was satisfied for all sales of milk in the Louisville, Kentucky market.  *Id.* (citing *Foremost Dairies*, 348 F.2d 674) (footnote omitted).

While coming to the opposite conclusion based on the facts, the Tenth Circuit's opinion in *Belliston v. Texaco, Inc.*, 455 F.2d 175 (10th Cir. 1972), is in line with *Foremost Dairies* and *Dean Milk*.  *Belliston* involved crude oil imported from Colorado that was then refined and sold in Utah.  *Id.* at 178.  The *Belliston* court described the refining process as "a highly technical achievement" and as "a highly complex process requiring expensive, precision equipment and skilled technicians."  *Id.* at 180.  The Tenth Circuit "conclude[d] that when crude oil is refined into gasoline, the character of these products is so changed that they cannot be equated as the 'same stuff' to satisfy the requirements of the 'flow of commerce' theory." *Id.*

In addition to establishing the flow of commerce (and hence interstate commerce) via discriminatory sales of products that have been imported into the state prior to the sales to the favored and disfavored purchaser, an RPA plaintiff may satisfy the interstate commerce requirement via its or the favored competitor's resale of the product at issue to customers outside of the state. *See L & L Oil Co., Inc. v. Murphy Oil Corp.*, 674 F.2d 1113, 1116 (5th Cir. 1982).  As the *L & L Oil* court explained, "the 'in commerce' requirement covers 'persons or activities within the flow of interstate commerce … (defined as) the practical, economic continuity in the generation of good and services for interstate markets and their transport and

distribution to the consumer."  *Id.* (quoting *Gulf Oil,* 419 U.S. at 195).

      B.    **The facts establish that Suncor's sales to the Kroger affiliates and Western were in the flow of commerce.**

      1.    **Suncor sold the Kroger entities and Western Fuel that was refined out of state and thus was in the flow of commerce.**  As set forth below, the facts illustrate: (a) as was the case in *Foremost Dairies* and *Dean Milk*, a substantial portion of the Fuel sold by Suncor to Kroger and Western at the discriminatory prices was a fungible product that was manufactured outside of the state and thus was in interstate commerce; and (b) unlike the circumstances in *Belliston,* such Fuel was *not* so changed as to render it different "stuff" sufficient to take the Fuel out of the flow of interstate commerce.

      2.    The unbranded or "generic" Fuel products at issue in this action are composed of refined gasoline and diesel Fuel combined with additives sufficient to comply with minimum standards established by the government.  Ex. 1 ¶¶ 17-18; Motion Ex. Z (Doc. 185-29) at 7, 13; Ex. 7 at 12:4-13:9.  Unbranded Fuel is a fungible commodity that is widely traded in the petroleum industry—there is no commercial difference between the gasoline or diesel of particular grades as sold by different refiners or as sold to different purchasers.  Ex. 3 at 330:7-331:10, 335:1-11; Motion Ex. Z (Doc. 185-29) at 7.  The use of fungible Fuel refined by multiple refiners substantially facilitates product terminal operations and substantially minimizes product inventories.  Motion Ex. Z (Doc. 185-29) at 7.

      3.    Suncor is the only refiner of finished gasoline and diesel fuel products in Colorado.  Ex. 8 at 205:11-4; Ex. 3 at 338:15-18.  Suncor operates its own Shell retail operations outside of Colorado and regularly sells its refined products to customers outside of Colorado and

for retail sale by others outside of Colorado.  Ex. 3 at 72:20-73:9, 73:13-22; 126:12-25, 130:13-132:1; 134:17-19; 135:10-21, 164:20-167:25.  Suncor distributes Fuel not only from its terminals in Commerce City (known as the Denver East and West Plant terminals) and Grand Junction, but also through terminals operated by Rocky Mountain Pipeline in Dupont and Fountain, Colorado.  Ex. 27 (Dep. Ex. 97) at 56; Ex. 1 ¶ 4.  The Rocky Mountain Pipeline system is an interstate transporter of petroleum products connecting multiple refiners and terminals located in Washington, Montana, Wyoming, Idaho, Utah, Colorado, North Dakota, South Dakota, Kansas, Texas, and New Mexico.  Ex. 27 (Dep. Ex. 97) at 57.

4.     Just as there are multiple distribution channels through which Suncor Fuel is exported from the state, there are multiple supply channels through which Fuel refined outside Colorado by others is imported into Colorado via pipelines to Suncor's terminals in Commerce City as well as the terminals operated by Rocky Mountain Pipeline in Fountain and Dupont.  Motion Ex. Z (Doc. 185-29) at 12-13; Ex. 27 (Dep. Ex. 97) at 56-62; Ex. 6 at 63:10-25, 64:18-65:16.  The major refiners who transport finished fuel products refined outside of the state into Colorado include Valero (products refined in McKee, Texas), ConocoPhillips (products refined at Borger, Texas), HollyFrontier (products refined at El Dorado, Kansas and Cheyenne, Wyoming), Sinclair (products refined at Casper, Wyoming); ExxonMobil (products refined at Billings, Montana) and Cenex (products refined at Laurel, Montana).  Motion Ex. Z (Doc. 185-29) at 12.

5.     The Suncor's contracts with Western and Kroger do not provide that the purchased Fuel be strictly Suncor-refined Fuel.  Rather, as Mr. Moss confirmed, Suncor simply contracted to sell Western and the Kroger affiliates fungible unbranded Fuel.  Ex. 3 at 329:9-

331:10; 331:15-332:12; Ex. 1 ¶¶ 5, 17.  In the relevant time frame, Western and the Kroger affiliates both contracted with Suncor to take delivery of Fuel purchases at multiple locations, principally the Suncor terminals in Commerce City (Denver) and the Rocky Mountain Pipeline terminals in Fountain and Dupont.  *E.g.,* Motion Exs. P (Doc. 185-17), R-1 (Doc. 185-20) and R-2 (Doc. 185-21); Motion Ex. A (Doc. 185-2) at 5, 7-11.

6.      It is a common, almost universal practice among gasoline refiners to enter into agreements with other refiners through which refined products are purchased, sold or otherwise transferred to meet the particular supply needs of the refiner/wholesaler or demands of the refiner/wholesaler's customers.  Motion Ex. Z (Doc. 185-29) at 13.  A refiner purchases Fuel manufactured by another refiner for a variety of reasons, such as a need for supply during refinery maintenance periods ("turnarounds"), demands for seasonal specifications that cannot be met by the refiner's own production, and sales to customers exceeding the refiner's own refining capacity.  *Id.*  Suncor regularly entered into purchase agreements with out-of-state refiners for these or similar reasons.  *Id.;* Ex. 3 at  331:15-332:20; Ex. 19  at 24:14-21; Ex. 6 at 11:13-12:20, 60:1-61:7, 62:16-63:6; 64:7-64:17;  111:3-126:25; 147:12-148:11, 149:7-149:20.  Suncor also regularly entered into "exchange" agreements where it simply exchanges barrels of Fuel refined and/or owned by Suncor for Fuel owned/refined by out-of-state entities.  Ex. 6 at 83:15-85:19.

7.      James Piscatelli, who is responsible for Suncor's purchase contracts with other refiners and ensuring Suncor's supply of Fuel, testified that when Suncor purchases Fuel manufactured by other refiners, Suncor commingles the purchased Fuel with its own products finished for sale in blending tanks.  Ex. 6 at 68:6-69:1; 85:12-86:6.  When this occurs, there is no means to separate the finished Fuel products once commingled, and Suncor makes no effort to

account for such products based on where the Fuel was refined.  Ex. 6, Piscatelli Dep. at 68:9-69:25; 71:1-21.  Thus, the Fuel Suncor supplies to customers via the terminals it operates is commingled Fuel comprised of Suncor fuel as well as fuel finished by other refiners all of which are located outside of Colorado.  *Id.; see also* Ex. 6 at 176:25-178:17.  Mr. Piscatelli concedes that it would be impossible to determine the source of the Fuel on a given day, even by percentages.  *Id.* at 69:13-25; Ex. 3 at 333:11-335:11.[22]

8.      As a rule, refiners do not stockpile inventories of finished Fuel products purchased from other refiners for a significant period of time.  Motion Ex. Z (Doc. 185-29) at 13.  Rather, the goal of a refiner almost always is to sell off any inventories of Fuel as fast as possible, generally within days.  *Id.*.[23]  Consistent with these industry practices, Suncor seeks to keep its refinery operating at maximum capacity and to minimize its inventories of stored Fuel.

---

[22]      Suncor argues that despite its production of contracts and transaction summaries for gasoline purchases from refineries outside the state, "WCS cannot demonstrate, and has not even attempted to demonstrate, which of the hundreds of Fuel sales over the 19-month Damage Period occurred in interstate commerce…." Motion at 21 ¶ E.  Suncor's own testimony confirms that it would be impossible for Western to establish exactly which Fuel sales were of Fuel refined outside Colorado because Suncor commingled that Fuel with its own Fuel and made no attempt to separate or account for the out of state Fuel in connection with its sales to Kroger, Western or other customers.

[23]      There are several reasons for this.  First, refiners want to operate at maximum refinery operating capacity to the greatest extent possible so as to maximize profits.  Motion Ex. Z (Doc. 185-29) at 13.  Refiners have limited storage capacity and usually cannot operate at maximum capacity when storing significant amounts of refined products.  *Id.* Second, Fuel formulation requirements change frequently, for example, seasonally.  A refiner that stockpiles purchased products for a significant period of time faces a risk that the stockpiled products would exceed seasonal vapor pressure requirements by the time of sale.  *Id.* Refiners typically sell purchased inventories of product as quickly as possible to eliminate these risks.  *Id.* Third, refiners typically purchase inventories of Fuel from other refiners only when they know that the purchased Fuel can be resold immediately at a margin above the purchase price.  *Id.*

Ex. 6 at 88:17-92:20.  Documents produced by Suncor show that Suncor carefully manages its

operations to ascertain and meet its customers' demands and, in fact turns over its inventory of

products multiple times each month.  An example is October 2010 (in the middle of the period of

discriminatory pricing) which reflects that Suncor turned its entire Fuel inventory 7.2 times, the

equivalent of approximately once every 4.3 days.  Motion Ex. Z (Doc. 185-29) at 13-14.  The

temporary storage of Fuel products imported from outside the state prior to Suncor's sale to

Western, Kroger or its other customers "does not deprive the gasoline of its interstate character."

*Standard Oil,* 340 U.S. at 238 (citations omitted).

       9.     As noted above, Suncor purchasers take delivery of Fuel not only from the

terminals located at the Suncor refinery sites in Commerce City, but also terminals operated by

Rocky Mountain Pipeline in Dupont and Fountain, Colorado.  *See*, *e.g.*, Ex. 6 at 64:7-64:17;

113:22-117:13; Ex. 3 at 330:16-25.  The Fuel purchased from these terminals is "definitely

fungible" because those terminals are not tied to any one producer.  Ex. 3 at 330:21-331:10.  At

Fountain and Dupont, Fuel purchased from Suncor is composed of Fuel refined by Suncor as

well as out of state refiners Frontier (a/k/a Holly Frontier), Sinclair, Exxon, Cenex and Conoco.

Ex. 6 at 175:18-176:20.  As is the case with Fuel purchased from the Suncor-owned terminals,

the Fuel purchased at these facilities is not segregated by the refiner of the finished Fuel; rather it

comes from large tanks supplied via pipeline from all of them.  Ex. 6 at 64:15-66:21; 115:14-

116:12; 175:20-176:24.  In this case, more than 30% of the total Fuel supplied to Western and

the Kroger entities during the relevant discriminatory pricing period was from the Rocky

Mountain Pipeline terminals at Fountain and Dupont rather than from the Suncor terminal

located at Suncor's refinery facilities in Commerce City.  Ex. 23 Glick/Tatos Aff. ¶ 22.

Moreover, more than 50% of the relevant Fuel purchases of Kroger's Mini-Mart, Inc. (d/b/a Loaf 'N Jug) and more than 20% of the relevant Fuel purchases by Western were from the Rocky Mountain Pipeline at Fountain, which is supplied principally by the out of state refiners and minimally by Suncor. *Id.* ¶ 23.

        10.    In seeking summary judgment in connection with the "in commerce" element, Suncor relies on the declaration of Angela Shields, a Suncor Fuels Quality Specialist. Ms. Shields addresses two topics: *first*, that she has been asked to explain the differences in conventional gasoline purchased by Western during the relevant time period and "how such gasoline can be changed into different products through blending and the use of fuel additives at the [Suncor] refinery," and *second,* that she has reviewed purchase transaction summaries produced by Suncor reflecting Suncor purchases of gasoline and diesel produced outside of Colorado and has determined that during most of the Damage Period, Suncor did not acquire relevant Fuel products produced outside of Colorado.  See Motion Ex. AA (Doc. 185-30).[24] Rather than establishing the absence of genuine issues of fact, Ms. Shields' declaration illustrates that genuine issues of fact exist.

        11.    With respect to the first topic, Ms. Shields states how the fungible gasoline (PUL, MUL and RUL) is purportedly "changed into different products through blending and the use of fuel additives at the [Suncor] refinery." *Id.* at ¶¶ 2, 2.a-2.f.  The government required additives for the unbranded Fuel are *not* blended with the finished refined

---

[24]     Ms. Shields was never identified pursuant to Rule 26(a)(1) as a potential witness or identified in any deposition or communication as someone who may have knowledge relevant to the action.  Motion Ex. AA (Doc. 185-30) was the first reference to Ms. Shields in any filing.

Fuel as part of the refinery operations. To the contrary, as confirmed by Suncor's Rule 30(b)(6) witness, Vance Kopp, the additives are simply "dosed" directly into a purchaser's truck when the purchaser takes delivery of the refined Fuel at the Fuel pickup bay at the given product terminal. Ex. 7 at 14:7-21; *see also* Ex. 1 ¶ 18; Ex. 9 ¶ 3. The additives dosed into the truck with the refined Fuel constitute a tiny fraction of the refined Fuel's volume. Ex. 1 ¶ 18; Ex. 9 ¶ 3; Ex. 7 at 14:7-21. According to Mr. Kopp of Suncor, the additive dosed at the truck is approximately 0.08 gallons of additive per 1,000 gallons of Fuel (Ex. 7 at 14:7-21*)*; this equates to approximately two-thirds of a gallon of additive in a typical 8,500 gallon truckload of Fuel. Moreover, there is no "refining" or even any blending of the gasoline with the additives by Suncor. Ex. 9 ¶ 3. Rather, since the gasoline and additives are separately dosed into the customer's truck, the blending of those components occurs only because they enter the customer's truck simultaneously. *Id.*

12.     In connection with the first topic, Ms. Shields focuses on the addition of ethanol to subpremium unleaded gasoline in Suncor's E-10 gasoline products to suggest that the generic fuel purchased from out of state refiners is substantially changed, *i.e.,* through an internal Suncor refining or blending process, prior to the sale of the E-10 products to customers such as Western and the Kroger companies. Motion Ex. AA (Doc. 185-30) at ¶¶ 2.b, 2.d, 2.f. Like the government minimum additives referenced above, ethanol for E-10 gasoline is simply dosed directly into the purchaser's truck when the purchaser takes delivery at the terminal. Ex. 3 at 340:5-341:7. Indeed, ethanol *cannot* be blended with gasoline and held in storage tanks prior to sale because ethanol acts as a solvent and would clean any scale or particulates from the sides of the storage tank and contaminate the gasoline. *Id.;* Ex. 9 ¶ 4. As is the case with the

additives referenced above, because the gasoline and ethanol are separately dosed into the customer's truck, the blending of those components occurs not through some purposeful activity by Suncor, but rather by the fact that they are simply put into the customer's truck at the same time. *Id.*; Ex. 3 at 340:5-341:7. Notably, Suncor admits that roughly one-third of the ethanol purchased by Suncor for dosing directly into the customer's delivery trucks is manufactured outside the state. Ex. 6 at 75:18-76:17.

13.     As illustrated by the *Belliston* and *Foremost Dairies* cases, Suncor's addition of trace amounts of additives and ethanol to the fungible Fuel by pumping them into a customer's truck at the same time the customer takes delivery of the Fuel is insufficient to take any of Suncor's Fuel sales out of the flow of commerce.[25] The circumstances here are unlike *Belliston* in which crude oil was imported from Colorado to Utah and then refined in Utah via a "highly technical," "highly complex" and "expensive" process sufficient to take the crude oil out of the flow of commerce. *Belliston,* 455 F.2d at 180. Rather, the circumstances here are much more akin to *Foremost Dairies,* where the court concluded that the testing, pasteurizing, homogenizing and standardizing of milk to a particular fat ratio by adding other milk neither took the 20% of milk imported from out of state out of the flow of commerce nor defeated the assertion of a RPA claim or its attendant remedies as to all of the manufacturer's milk sales in the relevant market. 348 F.2d at 678, 681-682. *See also* 15 U.S.C. § 13(a) (allowing claim "where either *or any* of the purchases involved in [the price discrimination] are in commerce"

---

[25]     Ms. Shields does not address in her declaration any purported transformation by Suncor of the fungible unbranded diesel fuel. Diesel fuel typically does not contain additives akin to those contained in gasoline, and there is no change (even dosing into a customer's truck) involved in the sale of that Fuel. Ex. 1, HT Decl. ¶ @; Ex. 9, Mayes Decl. ¶ @.

and the commodities "are sold for use, consumption or resale within the United States.") Genuine issues of material fact preclude summary judgment on the "in commerce" element.[26]

14.     On the second topic, Ms. Shields' assertion is that she reviewed purchase documents reflecting Suncor purchases of Fuel produced outside of Colorado and has determined that Suncor did not acquire Fuel products produced outside of Colorado (Motion Ex. AA (Doc. 185-30) ¶¶ 3.a.-3.d.).  That statement is entirely insufficient to satisfy Suncor's summary judgment burden.

First, Ms. Shields's statement that the documents referenced in her declaration ("Bates Nos. 43626-28; 43802-06; 43819-23; 43826, 43828; 43970; 44187-98, 44374; and 44386 ) "identify Suncor's purchases of gasoline that was (sic) produced outside of Colorado" is just not true.  As reflected by Exhibit 29, a summary of the out-of-state Fuel purchase

---

[26]     Suncor argues that "commingling" of imported Fuel with Fuel refined in Colorado cannot, as a matter of law, satisfy the RPA's "in commerce" element.  Motion at 21-22, Sections F-G.  One of the cases Suncor cites for support is *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626 (S.D. Tex. 1999).  The *Chawla* opinion does not mention the word "commingle."  The *Chawla* court rejected the plaintiffs' argument that the "in commerce" element was met because "the additives in Shell gasoline travel through interstate commerce prior to being blended into Defendants' gasoline."  *Id.* at 648 (footnote and citations omitted).  In this case, Western does not rely on the importation of additives, a minor component of finished Fuel, to satisfy the "in commerce" element.  Instead, Western relies on Suncor's importation of a significant percentage of the fungible finished Fuel itself to meet its "in commerce" element burden.  Suncor also cites *Red Apple Supermarkets, Inc. v. Deltown Foods, Inc.*, 419 F. Supp. 1256, 1258 (S.D.N.Y. 1976), to urge that the imported Fuel is changed into a different product, thus removing it from the flow of commerce.  Motion at 23, Section J.  In *Red Apple*, the court described the complex processing that the imported raw, whole milk underwent to be converted into the finished good in that case as factually distinguishable from *Foremost Dairies* and *Dean Milk* but analogous to the complex crude oil refining process in *Belliston*.  419 F. Supp. at 1259-60.  As explained above, the dosing of some additives along with the finished Fuel into a customer's truck is insufficient to take the Fuel out of the flow of commerce, particularly on summary judgment.

documents produced by Suncor, Ms. Shields did *not* review all of the relevant documents.  Ex.
28, Bennington Decl. ¶¶ 3-5; Ex. 29 (see five highlighted documents not reflected in Ms.
Shields' declaration.  Ms. Shield's declaration omits 8,225,532 gallons of a total of 71,918,910
gallons of Suncor out-of-state Fuel purchases indicated by Suncor's own records.[27]

Second, Ms. Shields concedes that there were relevant out of state purchases of
refined products in April 2011, which is during the price discrimination period.  Although Ms.
Shields does not quantify them, those purchases as reflected in the documents referenced by Ms.
Shields alone amount to at the very least 9,240,000 gallons of Fuel (see Ex. 29 lines 10 and 11)
and potentially as much as 45,654,000 gallons of Fuel (see *id.*, lines 10, 11, 12, 13, 15, 16, 22,
24, 26 and 27).

Third, Ms. Shields makes additional statements that are contradicted by the
documents that she did review, *e.g.*, her statement that the Suncor transaction summaries
"confirm that, from October 2009 through March 2011, Suncor did not acquire any" subPUL
or subRUL "that was produced outside of Colorado."  Motion Ex. AA (Doc. 185-30) at ¶¶ 3.a.
and 3.c.  The documents referenced at lines 18 and 20 of Exhibit 29 show that statement to be
untrue.   or subRUL "that was produced outside of Colorado."  Motion Ex. AA at ¶¶ 3.a. and
3.c.   The documents referenced at lines 18 and 20 of Ex. 31 show that statement to be untrue.
Those documents evidence nearly 4.1 million gallons of sub grade gasoline purchased from

---

[27]    As Ms. Shields was not previously disclosed as a potential witness and her declaration
raised issues never before asserted by Suncor and suggested that additional documents
responsive to Plaintiffs' previously served discovery requests exist, Plaintiffs have requested
supplementation pursuant to Fed. R. Civ. P. 26(e).  To the extent Suncor produces additional
documents demonstrating genuine issues as to the in commerce element, Plaintiffs will request to
supplement this Response.

Exxon (Billings, Montana) during the relevant period.

Fourth, Suncor has, in fact produced documents reflecting that specific Suncor Fuel purchased from non-Colorado refiners was in fact sold directly to Western during the relevant timeframe. *See, e.g.,* Ex. 19, Carbone at 147:12-148:11; Ex. 30 (Deposition Exhibit 81) (reflecting Suncor's sale to Western in  February 2010 of 20,000 barrels of gasoline purchased "from Exxon a few days earlier").  Ms. Shields's declaration ignores this transaction.

Fifth, Ms. Shields's declaration is conspicuously limited to Fuel purchases by Western (see Motion Ex. AA (Doc. 185-30) ¶¶ 3.a., 3.c, 3.d) at the "west plant" of the Suncor Commerce City refinery (see *id.* at ¶¶ 3.a., 3.d.).  It fails to address Fuel supplied to Kroger, any Fuel supplied to either Western or Kroger at the Suncor refinery "east plant," or any of the "definitely fungible" Fuel purchased by Western or Kroger at the Rocky Mountain Pipeline facilities in Dupont and Fountain (which are principally supplied by out-of-state refiners).  As reflected in the table below, 28% of the Fuel purchased by the Kroger affiliates and 8% of the Fuel purchased by Western from the Suncor Commerce City facility was picked up at the east plant rather than the west plant, and more than 30% of the total Fuel purchased by both Kroger and Western was picked up from the Rocky Mountain Pipeline terminals in Fountain and Dupont:

| Location | DILLON | MINI-MART | KROGER TOTAL | WESTERN |
|---|---|---|---|---|
| East Plant | | | | 5,247,286 |
| Fruita | | | | 903,609 |
| Grand Junction | | | | 2,119,929 |
| RMPL Dupont | | | | 5,846,013 |
| RMPL Fountain | | | | 14,275,427 |
| West Plant | | | | 36,822,824 |
| Grand Total | | | | 65,215,088 |
| | | | | |
| % DuPont | 0.00% | 0.30% | 0.20% | 9.00% |
| % Fountain | 15.80% | 50.60% | 31.50% | 21.90% |
| % East Plant | 44.18% | 9.14% | 28.36% | 8.05% |
| % West Plant | 21.15% | 39.91% | 29.62% | 56.46% |

Ex. 23, Glick/Tatos Aff. ¶¶ 22-23.[28]  Under the RPA, the "in commerce" element can be satisfied by showing any discriminatory sales to "either" the favored or unfavored purchaser that were in the flow of commerce.  15 U.S.C. § 13(a) ("It shall be unlawful … to discriminate in price between different purchasers … where *either or any of the purchases involved in such discrimination* are in commerce . . . ." *Id.* (emphasis added)).

      15.    **Suncor Fuel purchased by Western and Kroger was resold outside of Colorado and thus the Fuel remained within the flow of commerce.**  Both Western and Kroger transported Suncor Fuel out of the state for retail sale.  Western transported more than 3 million gallons of Suncor Fuel to its stores in Nebraska for immediate retail sale.  Ex. 1 ¶ 19;

---

[28]    In connection with both topics covered in her declaration, Ms. Shields refers to Midgrade Fuel products (i.e., MUL and MUL E-10) to suggest that those products are specially created by Suncor and to assert that "Suncor could not have acquired any MUL E-10 produced outside of Colorado" and "did not acquire any MUL produced outside of Colorado from October 2009 through April 2011."   With the exception of Western purchases for a single Western retail site (Western Store #122, located in 122), neither Western nor Kroger purchased significant amounts of mid-grade Fuel.  Approximately 1 % of the total Suncor Fuel purchases by Kroger affiliate Loaf 'N Jug were for Midgrade Fuel products, but it does not appear that any of this Fuel was delivered to Loaf 'N Jug retail sites that compete with Western stores.  Ex. 23, Glick/Tatos Aff. ¶ 24.  Mid-Grade fuel, for the most part, is simply blended at the retail pump using a mixture of regular and premium unleaded gas.  See Motion Ex. A (Doc. 185-2) at 7, n.12.

Ex. 23, Glick/Tatos Aff. ¶ 25.  During the same period Kroger transported approximately ▮ million gallons of Suncor Fuel to its stores outside the state.  *See Id.* ¶ 26 (table of gallons by grade by month for Kroger fuel with non-Colorado destinations).

## C.   PLAINTIFFS' CLAIM VI – VIOLATION OF COLORADO UNFAIR PRACTICES ACT, C.R.S. § 6-2-108

1.   Burden of proof and elements.  Western agrees with Suncor's recitation of the burden of proof on this claim.  Western disagrees with Suncor's recitation of the elements of this claim.

2.   Element of § 6-2-108 claim challenged by Defendant:  private right of action.

Western does not dispute that Colo. Rev. Stat. § 6-2-108, *standing alone*, does not provide private parties a right of action.  Much like the RPA, Colo. Rev. Stat. § 6-2-108 defines one type of illegal price discrimination under Colorado's Unfair Practices Act, Colo. Rev. Stat. § 6-2-101, *et seq.*  And just as Section 4 of the Clayton Act provides for a treble-damages right of action for violations of the RPA, Colo. Rev. Stat. § 6-2-111(1) provides:

> Any person, firm, private corporation . . . may maintain an action to enjoin a continuance of any act in violation of sections 6-2-103 to 6-2-108 . . . and, if injured thereby, for recovery of damages. . . .  [T]he plaintiff in said action shall be entitled to recover from the defendant three times the amount of the actual damages, if any, sustained.

To support its argument that Section 111(1) does not include violations of Section 108 under the private right of action, Suncor relies on the holding in *Q-T Markets, Inc. v. Fleming Cos., Inc.*, 394 F. Supp. 1102, 1107 (D. Colo. 1975).  The court in *Q-T Markets* held that the use of the word "to" in the phrase "in violation of sections 6-2-103 to 6-2-108" in Colo. Rev. Stat. § 6-2-109 excludes violations of Section 108 from Section 109's definition of illegal

contracts under the Unfair Practices Act. *Id.* This opinion was issued on April 30, 1975. *Id.* at 1102. On July 16, 1975 the Colorado Legislature statutorily overruled this holding of *Q-T Markets*: "Wherever in the statutes of this state a reference is made to several sections and the section numbers given in the reference are connected by the word "to," the reference includes both sections whose numbers are given and all intervening sections." Colo. Rev. Stat. § 2-4-113. (2013) (section effective July 16, 1975).[29]

Because the statutory language of Colo. Rev. Stat. § 6-2-111(1) states that a plaintiff has a private right of action for violations of "sections 6-2-103 to 6-2-108," violations of Section 108 fall within the scope of Section 111(1). Thus, as a matter of law, Western has a private right of action for injunctive relief and treble damages.

3.      Element of § 6-2-108 claim challenged by Defendant: "secret …unearned discount."

Western asserts that Suncor's discriminatory pricing given to Kroger, via the substantially larger cents-per-gallon-discount, does constitute a secret allowance of an unearned discount, in violation of § 6-2-108. Suncor does not challenge that it did not disclose the discounted pricing it was giving to Kroger to its other customers, including Western. To the contrary, Suncor never discussed that information with Western and, according to Mr.

---

[29]      In addition to the clear and unambiguous language of Colo. Rev. Stat. § 2-4-113 that statutorily overrules the *Q-T Markets* holding, Judge Matsch—who issued the *Q-T Markets* opinion—seems to have recognized this overruling in *Medtronic Navigation, Inc. v. Brainlab Medizinische Computersystems Gmbh*, No. 98-CV-1072-RPM, 2005 WL 1661081, at *3-4 (D. Colo. July 14, 2005). Judge Matsch ruled that the plaintiff's assertion of a claim under Colo. Rev. Stat. § 6-2-111(1) for violation of § 6-2-108 was barred as untimely, without mentioning that such a claim would be unrecognized under *Q-T Markets*. *Id.*

Moss, would not have disclosed it to Western.  Ex. 3 at 282:4-283:21; Ex. 1 ¶ 21.  Moreover,

Suncor has steadfastly asserted in this case that its pricing to any customer, including in

particular Kroger, is and always has been secret information that may not be disclosed to

anyone other than Suncor and the recipient of the pricing:

> Plaintiffs have attached … to their Motion the first five pages of a pricing
> spreadsheet for the Dillon Companies, Inc., d/b/a King Soopers and City Market
> ("Dillon"), which, among other matters, set forth prices and volumes for January
> 2009.  They have also attached a "Confirmation of Purchase/Sale Agreement for
> February 1, 2010 through January 31, 2011 for Mini Mart, Inc., d/b/b Loaf N
> Jug ("Mini Mart") and a transaction summary for Mini Mart from February 1,
> 2010 through January 31, 2011 which set forth prices and volume requirements.
>
> Th[is] pricing and volume information … is regarded in the industry as highly
> confidential, with disclosure severely limited and tightly controlled.  Mr.
> Taraghi knows that.  In the January 17, 2007 Master Product Purchase and Sale
> Agreement between Suncor and WCS, which Mr. Taraghi signed, he agreed to
> keep such information strictly confidential and not disclose it to third parties.
>                                          * * *
> The confidentiality requirement in the Master Product Purchase and Sale
> Agreement is so strict that neither Suncor nor WCS may disclose the terms of
> the agreement or the pricing and volume information "to any third party without
> the prior written consent of the other Party, unless required by law or
> government."…
>                                          * * *
> All of Suncor's Master Product Purchase and Sale Agreements with its
> customers have the same confidentiality provisions as in WCS's Agreement,
> including those with Dillon and Mini Mart.

Ex. 31, Declaration of Steven Ewing dated June 13, 2012 (Doc. 72-1) ¶¶ 5-10. Notably,

Kroger also agrees that the pricing and pricing differentials it received from Suncor

were secret and has requested and obtained in this case a protective order under which

it has identified all information regarding the Suncor/Kroger contracts, including the

Fuel prices and cents per gallon discounts, as "SECRET."  *See, e.g.,* Doc. 136,

10/3/2012 Hearing Tr. at 23:11-24:10, 25:5-10; Doc. 140, Supplemental Protective Order.

Suncor correctly notes that no Colorado court has defined what type of discount violates Section 108 (this holds true for all elements of Section 108). Several courts have issued opinions on claims made under California's Unfair Practices Act, whose "secret discount" statute reads nearly exactly the same as the substantive sentence of Colorado's. *Compare* Cal. Bus. & Prof. Code § 17045 *with* Colo. Rev. Stat. § 6-2-108. These cases show that there is a genuine issue of material fact as to whether Defendant provided Kroger with secret, unearned discounts.

Courts interpreting California's secret discount statute have held that "if the essential terms of a rebate or unearned discount are known to the plaintiffs and the public, the secrecy element cannot be met." *Eddins v. Redstone*, 35 Cal. Rptr. 3d 863, 901 (Cal. Ct. App. 2005). *See also W. Pac. Kraft, Inc. v. Duro Bag Mfg. Co.*, 794 F. Supp. 2d 1087, 1090 (C.D. Cal. 2011) (quoting *id.*). The *Eddins* court held that the trial court's conclusion as a matter of law that the defendant did not offer a secret discount was erroneous because some of the key terms of the contracts in question were secret, as evidenced by the fact that "the terms of those deals are subject to a protective order and filed under seal in this court." 35 Cal. Rptr. 3d at 902. Similarly, the *Duro Bag* court held that the plaintiff's complaint did adequately plead a "secret" discount because it alleged that the "rebates were never disclosed to [the plaintiff], the general public, or the industry in general." 794 F. Supp. 2d at 1090.

*Diesel Electric Sales & Services v. Marco Marine San Diego, Inc.* involves a similar factual situation to what is involved here. 16 Cal. App. 4th 202 (Cal. Ct. App. 1993). In that

case, the prices for the products in question sold to both the plaintiff and the defendant were based on published list price schedules as well as published discounts off of the list prices. *Id.* at 208. The trial court had declared judgment as a matter of law in favor of the defendant that there was no "secret" discount. *See id.* at 209. The *Diesel Electric* court reversed because it found that evidence that the plaintiff was "unaware that [the defendant] received the maximum volume discount even though its orders were insufficient for it to ordinarily qualify for such discount" "could be construed as a 'secret' allowance." *Id.* at 212.

Western can prove the "secret discount" element of its Unfair Practices Act claim. Under the instructive case law interpreting California's secret discount statute, the fact that Western did not know the amount of the discounts that Suncor gave to Kroger in the Dillon and Mini-Mart contracts shows that these discounts were in fact "secret." See Ex. 3 at 282:4-283:21; Ex. 1 ¶ 21. As in *Diesel Electric*, the mere fact that Western had knowledge that Suncor commonly offered a discount off the base, rack price does not mean that all "essential terms" of the discount were known. The exact amount of the discount off of rack price is an essential term of the contracts at issue, and Western had no knowledge of the exact (or even approximate) amount of any discount in the Dillon or Mini-Mart contracts. Ex. 1 ¶ 21. Moreover, as in *Eddins*, the "Secret" protective order indicates the obvious: Western can show that Suncor offered Kroger "secret" discounts under the Unfair Practices Act.

4.  Element of § 6-2-108 claim challenged by Defendant: injury to a competitor

Western can show this requisite injury element, as explained *supra* in Section IV.B.2. Again, since no Colorado court has issued an opinion relevant to this element, Western cites case law interpreting California's law. In *ABC International Traders, Inc. v. Matsushita*

*Electric Corp.*, 14 Cal. 4th 1247, 1268 (1997), the California Supreme Court held that California's Unfair Practices Act statute on secret discounts applied to secondary-line discrimination claims. Contrary to Defendant's assertion that the *ABC* court relied solely on specific statutory language for its holding, the *ABC* court stated that "the language, context, purposes and history of section 17045 [the secret discount statute] all point to the conclusion its protection extends to competition in the secondary line." *Id.*

In beginning a thorough examination of the history of the enactment of the Unfair Practices Act and section 17045, the *ABC* court noted that:

> the statute's prohibitions on secret discriminatory prices and rebates appear to have been intended mainly to restrain the quickly growing chain stores from certain well-documented abuses of their buying power, abuses that, together with other factors, were thought to have a highly destructive effect on wholesale and retail competition in the food industry and other trades.

*Id.* at 1258. Near the end of its examination, the court stated that "the provision that became section 17045 was almost certainly designed to prohibit and protect against the practice of granting to chains and other large distributors, as a result of their much greater bargaining power, secret rebates, unearned discounts and other unearned allowances not granted to smaller, independent merchants." *Id.* at 1261.

The California Supreme Court's detailed analysis which led to its holding in *ABC* that California's secret discount statute primarily applies to secondary-line discrimination suggests that Colorado's Supreme Court would also rule this way. The statutory language in Colo. Rev. Stat. § 6-2-108 reads very similarly to California's section 17045. Further, the Colorado Supreme Court has noted that California's Unfair Practices Act served as a model for other states' acts. *See Olin Mathieson Chem. Corp. v. Francis*, 301 P.2d 139, 142-43 (Colo. 1956)

(explaining development of California's minimum resale price statute after the Great Depression and other states modeling their statutes on California's).

Suncor cites *Venta, Inc. v. Frontier Oil & Refining Co.*, 827 F. Supp. 1526, 1529 (D. Colo. 1993), as standing for the proposition that Section 108 of the Unfair Practices Act, because it is worded differently than the Robinson-Patman Act, does not apply to secondary-line claims. Motion at 31-32 ¶ C. *Venta* involved a claim made under the geographic price discrimination statute, § 6-2-103(1), of the Unfair Practices Act, which is different than the Robinson-Patman Act. *Id.* at 1528-29. *See also Dunlap v. Colo. Springs Cablevision, Inc.*, 829 P.2d 1286, 1295-96 (Colo. 1992) (agreeing with the defendant that the statutory language of Section 103(1) of "competition of any regular established dealer" limits Section 103(1) to claims for primary-line discrimination). Section 108 contains no comparable language about "dealers" so *Venta* is inapposite here.

In *Diesel Electric*, the court held that the plaintiff had shown the requisite "injury of a competitor" through evidence of its lost sales and profits as a result of the secret discount. 16 Cal. App. 4th at 213. This appears to be the same standard that the United States Supreme Court stated for competitive injury in *Volvo Trucks*. 546 U.S. at 177 (hallmark of secondary-line competitive injury is lost sales or profits).

As Western has shown this form of competitive injury for its Robinson-Patman Act claim (*supra* § IV.B.2.C, pages 31-32), this showing also should satisfy this element of its claim under Colo. Rev. Stat. § 6-2-108 through the private right of action under §6-2-111(1).

Courts interpreting California's statute have also held that the competitive injury element requires, in addition to injury to a competitor, a showing of "a tendency 'to destroy

competition.'"  *ABC*, 14 Cal. 4th at 1262.  "[W]here one competitor is given a major pricing

advantage over another competitor, such pricing discrimination has an inherent tendency to

destroy competition."  *Diesel Electric*, 16 Cal. App. 4th at 213-14.

     If the Court finds that showing a tendency to destroy competition would be required

under Colorado's statute, Western also has shown sufficient facts to satisfy this element.

Western's showing of competitive injury under the Robinson-Patman Act included facts that

Suncor gave Kroger a substantial price advantage over Western, a direct competitor in the

highly competitive retail gasoline market.  *Supra,* § IV.B.2.B.2 page 30.  Thus, Western can

show injury to competition.

     5.    Element of § 6-2-108 claim challenged by Defendant:  intent to destroy

competition.

     Western disputes Suncor's assertion that there is an intent element to prove a violation

of Colo. Rev. Stat. § 6-2-108.  Western found only one case, which Suncor cited, which held

that intent is a required element under Section 108, *Beneficial Finance Co. of Arvada v.*

*Sullivan*, 534 P.2d 1226 (Colo. App. 1975).  As this is a Colorado Court of Appeals opinion, it

is not binding precedent on this Court.  *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1354 (10th

Cir. 2008) (citing *Pompa v. State Farm Mut. Auto. Ins. Co.*, 520 F.3d 1139, 1142 (10th Cir.

2008)) (decisions of Colorado Court of Appeals not binding on Tenth Circuit when applying

state law); *Clark v. State Farm Mut. Auto. Ins. Co.*, 433 F.3d 703, 709 (10th Cir. 2005)

(quoting *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1492 n.10 (10th Cir. 1995)) ("'decisions of a

state's intermediate appellate courts are some evidence of how the state supreme court would

decide the issue, and we can consider them as such, even if they are not the binding precedent

under state law.'"). In any event, examination of the *Beneficial Finance* holding shows that this Court should find that the Colorado Supreme Court would not interpret Section 108 as having an intent element.

The *Beneficial Finance* court stated that intent is a required element <u>in general</u> under the Unfair Practices Act. 534 P.2d at 1228 (citing *Olin Mathieson Chem. Corp. v. Francis*, 301 P.2d 139 (Colo. 1956); *Perkins v. King Soopers, Inc.*, 221 P.2d 343 (Colo. 1950)). From this general proposition, the *Beneficial Finance* court then stated that intent is required under both § 6-2-103 and § 6-2-108. *Id.* at 1229. Grouping these two statutes together as both requiring an intent element is not supported by Colorado Supreme Court opinions or by express statutory language.

Certain statutes of the Unfair Practices Act do require intent to be shown. One of the statutes that requires intent is the below-cost sale statute that was at issue in *Perkins*. The *Perkins* court held that intent could not be presumed from the fact that sale was made below cost to satisfy the statutory intent element under Section 3 of the Unfair Practices Act (currently codified at Colo. Rev. Stat. § 6-2-105). 221 P.2d at 345. The below-cost sale statute at that time read, in pertinent part, "for the purpose of injuring competitors and destroying competition." 221 P.2d at 344.[30]

Another statute whose express language includes an intent element is Colo. Rev. Stat. § 6-2-103(1), the geographic price discrimination statute. *Id.* ("with the intent to destroy the competition . . . to discriminate between [different geographical locations]"). *See also Dunlap*,

---

[30] § 6-2-105 currently reads, in pertinent part, "with the intent to both injure competitors and destroy competition."

829 P.2d at 1296 (limiting geographic price discrimination statute to "conduct *intended* to destroy or prevent primary-line competition" (emphasis added)).

Thus, the *Beneficial Finance* court, without analysis, treated Sections 103(1) and 108 the same in stating that both statutes required a showing of intent.  534 P.2d at 1229 ("Again, however, even assuming such difference in credit terms do exist and that defendant and CHS were of the same class, no intent to destroy competition was shown, and thus no violation of either s 6-2-103, or s 6-2-108, C.R.S.1973, was shown.").  As is clear from reading both statutes, however, Section 103(1) by its express terms contains an intent element, whereas Section 108 does not.  Since the Colorado Supreme Court's holding in *Perkins* that intent was a required element under the below-cost sale statute was based on the statutory language, *Perkins* supports the proposition that there is no intent element under § 6-2-108.

In fact, the *Diesel Electric* court rejected the argument that intent is required under the "tendency to destroy competition" element under California's secret discount statute.  16 Cal. App. 4th at 215.  The court stated, "[t]he express terms of section 17045 contain no such requirement, and we decline to add such a requirement by implication."  *Id.*

Thus, the Court should not follow the holding of the Colorado Court of Appeals in *Beneficial Finance* that intent is a required element under § 6-2-108 given that it has no basis in the express statutory language, which is what the Colorado Supreme Court has relied on in *Perkins* and *Dunlap* to find an intent element under other Unfair Practices Act statutes.  Instead, Western asserts that the Colorado Supreme Court would, like the *Diesel Electric* court, hold that the express statutory language of § 6-2-108 does not include an intent element and that one would not be read into the statute.

To the extent the Court finds that intent by Suncor to harm competition is required, intent is an issue of fact that rarely can be determined on summary judgment. *See In re Dittmar*, 618 F.3d 1199, 1207 (10th Cir. 2010) (citation omitted) ("We agree with the BAP dissent that summary judgment is usually not an appropriate vehicle for determining the parties' intent about contract formation."); *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1279 n.1 (10th Cir. 2004) (citations omitted) ("Summary judgment in antitrust cases should be used sparingly because motive and intent play leading roles in the analysis."). In any event, the only evidence that Suncor cites to show that Suncor had no intent to harm competition by its discriminatory prices in Kroger's favor is deposition testimony by Steve Moss that he was not going to give Kroger prices so low that Suncor would lose money (Motion at 33, citing Motion Ex. B (Doc. 185-3)) and testimony from Mr. Piscatelli that Suncor keeps its Suncor rack pricing process separate from the group responsible for negotiating specific price discounts for particular customers (Motion at 33, citing Motion Ex. Y (Doc. 185-28)). None of this testimony establishes the absence of an issue of fact as to Suncor's intent to harm competition. Moreover: (a) Suncor operated its own Shell and Phillips66 retail stores, some of which compete directly with Western (Ex. 4 at 16:10-17; Ex. 1 ¶ 5); (b) Mr. Ewing, who had direct responsibility both for those stores and for sales to other Fuel retailers testified that, in fact, Suncor's largest volume purchasers of Fuel for retail sale were Kroger, Western and Suncor's own retail stores (Ex. 4 at 15:8-16:7); and (c) the evidence cited above establishes that Suncor knowingly and secretly gave Kroger a wholesale price differential so significant it is "almost unheard of" in the industry (*see* Motion Ex. Z (Doc. 185-29) at 7). Just as Kroger testified that if it had received unfavorable discriminatory wholesale prices it would expect to be competitively harmed (Ex. 12 at 46:7-

47:25), Suncor knew or should have known that giving Kroger a substantially lower wholesale price would harm competition in general and competition with Western in particular. To the extent any showing of intent is required, that is an issue of fact for trial, not an issue that can be determined on summary judgment.

## V. CONCLUSION

Suncor has not established the absence of genuine fact issues on the claim elements it challenges and, thus, summary judgment is improper on Plaintiffs' Robinson-Patman claim and their claim under the Colorado Unfair Practices Act. Moreover, all of the Plaintiffs' six claims (as well as Suncor's counterclaim) involve the time frame between 2009 and May 21, 2011, when Suncor stopped selling Fuel to Western. There is no basis for granting summary judgment on any claim, but even if there were, it would not result in a partial judgment that could be certified in accordance with Rule 54(b) and would not, in any sense, reduce the scope of evidence to be presented at trial. Therefore, Suncor's three summary judgment motions should be denied in their entirety.

Dated: March 13, 2013.

s/ Kenneth R. Bennington

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON
BIERMANN & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202

Philip W. Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart PC
1225 Seventeenth Street, 29th Floor
Denver, CO  80202-5529
Telephone:  (303) 572-9300

*Attorneys for Plaintiffs and Third-Party Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 13, 2013, the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON FIRST AND SIXTH CLAIMS FOR RELIEF AND THIRD AFFIRMATIVE DEFENSE (DOC. 185)** was served on the following parties via CM/ECF:

Anthony J. Shaheen
Keeya M. Jeffrey
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80201-8749
AJShaheen@hollandhart.com
KMJeffrey@hollandhart.com

Philip W. Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart PC
1225 Seventeenth Street, 29th Floor
Denver, CO  80202-5529
pbledsoe@polsinelli.com
jvanlandingham@polsinelli.com

J. Robert Robertson
William L. Monts III
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
robby.robertson@hoganlovells.com
william.monts@hoganlovells.com

Christopher A. Taravella
Michael R. McCormick
Montgomery Little & Soran, P.C.
5445 DTC Parkway, Suite 800
Greenwood Village, CO 80111
ctaravella@montgomerylittle.com
mmccormick@montgomerylittle.com

*s/ Marie Newberger*

_____