STEVEN EWING-DECEMBER 14, 2012

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Case No. 11-cv-01611-MSK-CBS
WESTERN CONVENIENCE STORES, INC., a Colorado
corporation, WESTERN TRUCK ONE, LLC, a Colorado
limited liability company,
Plaintiffs,
vs.
SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,
Defendant.
vs.
HOSSEIN AND DEBRA LYNN TARAGHI,
Third-Party Defendants.
--------------------------------------------------

DEPOSITION OF STEVEN EWING
December 14, 2012
--------------------------------------------------

Deposition location:
370 17th Street, Suite 3500
Denver, Colorado

APPEARANCES:
KENNETH R. BENNINGTON, ESQ.
KATHLEEN E. CRAIGMILE, ESQ.
JEFFREY H. McCLELLAND, ESQ.
BENNINGTON JOHNSON BIERMANN &
CRAIGMILE, LLC
370-17th Street, Suite 3500
Denver, Colorado 80202
and

### Page 2

1  PHILIP W. BLEDSOE, ESQ.
   POLSINELLI SHUGHART, P.C.
2  1515 Wynkoop Street
   Suite 600
3  Denver, Colorado 80202
4       For the Plaintiffs.
5  ANTHONY J. SHAHEEN, ESQ.
   HOLLAND & HART, LLP
6  555-17th Street
   Suite 3200
7  Denver, Colorado 80202
8       For the Defendant.
9  ALSO PRESENT: HOSSEIN TARAGHI
              MICHAEL KORENBLAT, ESQ.
10
11     The deposition of STEVEN EWING, called
12  for examination by the Plaintiffs, was taken in the
13  offices of BENNINGTON JOHNSON BIERMANN & CRAIGMILE,
14  LLC, 370 17th Street, Suite 3500, Denver, Colorado,
15  commencing at 8:10 a.m. on December 14, 2012, before
16  Patricia M. Wrede of Avery/Woods Reporting Service,
17  Inc., 455 Sherman Street, Suite 250, Denver, Colorado
18  80203, a Registered Professional Reporter and a
19  Notary Public in and for the State of Colorado,
20  pursuant to the Federal Rules of Civil Procedure.
21           ***************

### Page 3

INDEX OF EXAMINATION
                                         PAGE
EXAMINATION BY MR. BENNINGTON              5

INDEX OF EXHIBITS REFERENCED
EXHIBIT NO.                          PAGE NO.
Deposition Exhibit No. 4                 146
  (5-8-11 E-Mail, Ewing to
   Kriskovich and Saunders)
Deposition Exhibit No. 5                 148
  (Dowden E-Mail with 3-31-11 Financials)
Deposition Exhibit No. 10                156
  (Credit Scoring, Year Ending 3-31-11)
Deposition Exhibit No. 13                108
  (April 2011 E-Mail String)
Deposition Exhibit No. 17                123
  (May 2011 E-Mail String)
Deposition Exhibit No. 19                116
  (Ewing E-Mail re EPA)
Deposition Exhibit No. 20                170
  (5-12-11 E-Mail, Ewing to Taraghi)
Deposition Exhibit No. 22                107
  (June 2011 E-Mail String)
Deposition Exhibit No. 30                210
  (Customer List)
Deposition Exhibit No. 31                 65
  (Western Contracts)
Deposition Exhibit No. 32                219
  (December Summary for Unbranded)
Deposition Exhibit No. 37                222
  (1-5-11 E-Mail, Ewing to Moss)
Deposition Exhibit No. 38                102
  (January 2011 E-Mail String)
Deposition Exhibit No. 41                183
  (Offen Petroleum E-Mails)
Deposition Exhibit No. 86                 92
  (September 2010 E-Mail String)
Deposition Exhibit No. 91                223
  (10-17-10 E-Mail, Cross to Moss, et al.)
Deposition Exhibit No. 114                96
  (November 2010 E-Mail String)

### Page 4

Deposition Exhibit No. 115               100
  (November 2010 E-Mail String)
Deposition Exhibit No. 116                91
  (1-4-11 E-Mail, Moss to Ewing)
Deposition Exhibit No. 117                62
  (5-2-11 E-Mail, Moss to Vejner re
   Proposed contract)
Deposition Exhibit No. 118               140
  (May 2011 E-Mail String)
Deposition Exhibit No. 119               150
  (May 2011 E-Mail String)
Deposition Exhibit No. 120               155
  (April 2011 E-Mail String)
Deposition Exhibit No. 121               130
  (May 2011 E-Mail String)
Deposition Exhibit No. 122               137
  (May 2011 E-Mail String)
Deposition Exhibit No. 123               175
  (Rack Forward 2010-2011)
Deposition Exhibit No. 124               227
  (SEUSA RF Review)
Deposition Exhibit No. 125               231
  (2-22-11 E-Mail, Ewing to Moss)
Deposition Exhibit No. 126               233
  (4-13-11 Ewing E-Mail)
Deposition Exhibit No. 127               237
  (April 2011 E-Mail String)
Deposition Exhibit No. 128               239
  (April 2011 E-Mail String)
Deposition Exhibit No. 129               241
  (April 2011 E-Mail String)
Deposition Exhibit No. 130               242
  (April 2011 E-Mail String)
Deposition Exhibit No. 131               245
  (April 2011 E-Mail String)
Deposition Exhibit No. 132               249
  (May 2011 E-Mail String)
Deposition Exhibit No. 133               256
  (Trading Summary/Proposed Contract
   Re Costco Supply)
Deposition Exhibit No. 134               260
  (Trading Transaction Summary)
Deposition Exhibit No. 135               261
  (June 2011 E-Mail String)

**Exhibit 8**

Page 9

1      (Whereupon, there was discussion
2  outside the record.)
3      Q.   My understanding of the current
4  organization, I just want to make sure I'm right in
5  this, Nancy Thonen is sort of parallel with you in
6  the organizational structure?
7      A.   That's correct.
8      Q.   And James Piscatelli, the guy who sets
9  rack sales and does trading, reports to her?
10     A.   Yes, James sets rack prices.
11     Q.   Do you understand that he also does
12 trading, in other words --
13     A.   He does some trading too but, yes, he's
14 not typically responsible for what we call that rack
15 sales, coming off the rack.  He does --
16     Q.   Right, but he is responsible for
17 trading --
18     A.   You got it.
19     Q.   -- in the sense of procuring whatever
20 petroleum products on the market.
21     A.   Yes.  Yes.
22     Q.   And you both, that is, you and
23 Ms. Thonen, report to Mel Broten in Canada?
24     A.   No, I --
25     Q.   That's changed?

Page 10

1      A.   -- report to Mel Broten, and Nancy
2  reports to Miriam Levasseur, is her name, in Canada.
3      Q.   Before you took over as director of
4  rack forward sales -- well, you succeeded Kendall
5  Carbone?
6      A.   I did.
7      Q.   And she succeeded a gentleman named Don
8  Smith, correct?
9      A.   Correct.
10     Q.   Is Don Smith still with the company?
11     A.   He is.
12     Q.   He is located where?
13     A.   In Canada.  Mississauga.
14     Q.   Is that close to Calgary?
15     A.   No, it's on the eastern -- it's close
16 to Toronto.
17     Q.   What is his position with the company
18 now?
19     A.   He's a director, and he's in the supply
20 group.  I don't know his official title.
21     Q.   Within the last, say, six months or so,
22 have you had any conversation with him regarding this
23 lawsuit?
24     A.   Just briefly.  I saw him last weekend
25 and said he may be called down to Colorado, but that

Page 11

1  was it.
2      Q.   You didn't discuss the substance of --
3      A.   No.
4      Q.   -- testimony or the lawsuit?
5      A.   No, absolutely not.
6      Q.   Now, there's another gentleman who
7  works for you, Doug Vejner?
8      A.   Vejner, yes.
9      Q.   And his job is what?
10     A.   At the time of the occurrence, his job,
11 he was the manager of wholesale.
12     Q.   And currently is what?
13     A.   He's a rack sales coordinator.
14     Q.   Tell me what that means.
15     A.   Doug is now responsible for the
16 budgeting and the capital and also some of the retail
17 assets that we have.  He'll do the maintenance of
18 that.  He also performs with the supply group as far
19 as sitting in and understanding the production and
20 demand.
21     Q.   That's a new position, is it not?
22     A.   Yes.
23          Well, I -- he was -- from this time
24 period we moved in, that's about a year old, I guess.
25     Q.   In May of 2011 what was his job?

Page 12

1      A.   He was the wholesale manager.  And
2  Steve Moss reported to him.
3      Q.   And does Rob Coulter now report to him?
4      A.   To?
5      Q.   To --
6      A.   Doug?
7      Q.   -- Vejner?
8      A.   No, reports to Steve Curtis, who is the
9  new wholesale team lead.
10     Q.   And how long has Steve Curtis been on
11 that job?
12     A.   November of 2011.
13     Q.   So the wholesale team has within it
14 branded and unbranded sales.  Do I have that right?
15     A.   That's correct.
16     Q.   And within the branded sales, is it
17 correct that on the one hand there are company-owned
18 Shell and ConocoPhillips -- or, no, Phillips 66
19 stations?
20     A.   That's correct.
21     Q.   And on the other hand there are branded
22 accounts which include Conoco and Phillips 66.
23     A.   There are --
24     Q.   I'm sorry, Shell and Phillips 66.
25     A.   Correct.

Page 57

1  yes.
2        Q.   (BY MR. BENNINGTON) Were you aware when
3  you took your job in October of 2010 that at times in
4  the past Western had been on long term contracts?
5        A.   When I took my job in 2010 I didn't
6  have any history on Western Convenience.
7        Q.   You didn't know a thing about them.
8        A.   I knew that they were an occasional
9  customer, but I didn't know any details.
10       Q.   Well, you had been the manager for
11 branded sales.  We've established that, right?
12       A.   Right.
13       Q.   Isn't it the fact though that your
14 branded customers are complaining to you all the time
15 about having to compete with Western Convenience
16 Stores?
17       A.   Branded customers and unbranded
18 customers will tend to complain a lot, just in
19 general.
20       Q.   Well, okay.
21       A.   So it wouldn't be anything unusual.
22       Q.   All right.
23       A.   It doesn't matter if they're branded or
24 unbranded.  There's usually some type of complaint.
25       Q.   But my question was more specific than

Page 58

1  that.  My question is, is it the fact that you
2  remember, managing branded sales, that Western
3  Convenience Stores was someone, a competitor, that
4  your customers were complaining about they had
5  trouble competing with?
6        A.   Well, when I was a brand manager I had
7  our retail sites, so that's -- I had our controlled
8  channel, so I wouldn't have heard any of those
9  comments that complained.
10       Q.   So you don't recall anybody in your
11 brand channel, your controlled sites as you say,
12 filling you in on their view of having to compete
13 with a discounter named Western Convenience Stores?
14       A.   No.  I mean, we would get price
15 surveys, but -- so I would understand what the
16 market's doing.  Again, it's just a -- you recognize
17 individual corporations for what they do and who they
18 are, and that was really about the extent of it from
19 the controlled sites.
20       Q.   But in your job for controlled sites
21 you were aware that one of the companies they were
22 having to compete against was Western Convenience
23 Stores?
24       A.   In certain markets, absolutely.  And we
25 actually removed Western Convenience off our price

Page 59

1  surveys.
2        Q.   When?
3        A.   Oh, the majority of them we moved off
4  probably a year and a half, two years ago.  Just they
5  didn't make sense.  We still have occasional
6  customers on there but it didn't make sense.
7        Q.   We're going to have to back up here.
8  The "we" and -- what area of the business are we
9  talking about removing Western from your price
10 surveys?
11       A.   We being Suncor Energy and our
12 controlled retail sites.
13       Q.   Okay.
14       A.   The ones that we own and operate.
15       Q.   So that occurred when you were
16 responsible for that group.
17       A.   Yes.
18       Q.   And you are now.
19       A.   Yeah.
20       Q.   But I want to understand -- okay.
21        Before or after you took over from
22 Kendall Carbone did this occur?
23       A.   I think that was actually a little bit
24 before that, before all the changes were made.
25       Q.   Tell me why.  Why did you take Western

Page 60

1  Convenience Stores off your price surveys?
2        A.   You know, it's -- it's the -- the
3  pricing on the street becomes somewhat erratic or
4  they were outside that mile to mile and a half
5  radius, and we just felt that was artificial volume
6  and we didn't want to price off that particular
7  location anymore.
8        Q.   Was that an across the board decision?
9  For instance, if there was a Western Convenience
10 store across the street, you still took them off the
11 survey?
12       A.   No, I think we would still survey them
13 if they were across the street.  But in general if we
14 had access to Western Convenience, it didn't make
15 sense and they were outside that parameter of a mile,
16 mile and a half, we eliminated them from our survey.
17 It wasn't -- that's -- we call that artificial
18 volume.
19       Q.   What's artificial about the volume?
20       A.   You're reaching out to touch somebody
21 or to price off of them just to drive business in.
22 It doesn't make sense.  It's not true volume.  The
23 industry would usually classify that as a mile, mile
24 and a half.
25       Q.   So you didn't really remove Western

STEVEN EWING-DECEMBER 14, 2012

Page 201

1  it's somewhat like e-Bay, you don't know what the
2  competing bids are and you just put one out and hope
3  you get it.
4      A.   You have a pretty good idea of what the
5  market drives.  Again, it's that market intelligence
6  and being in the business for X amount of years, you
7  understand what it's going to take to get that
8  business.
9      Q.   With the Kroger renewal that you did in
10 June 2011, was there any indication, well, Steve,
11 I've got another offer from somebody else?  Were they
12 playing anybody against you?
13     A.   I'm sure they were with Steve Moss, and
14 Steve Moss came back and said, you know, if we want
15 this deal, it's going to take ▇ cents, we can get
16 it for ▇ cents, and let's secure this deal.
17     Q.   There.  That's what I want to know.
18 Did he tell you -- how did he know --
19     A.   We didn't --
20     Q.   -- if we're going to get this deal it's
21 going to take ▇ cents?
22     A.   I assume that he's talking to the
23 Kroger representative so he's getting a feeling.
24 Probably not coming out and directly saying it, but
25 he's getting a feeling.

Page 202

1      Q.   Something to the effect of Kroger
2  saying, look, if you want this, it's got to be ▇?
3      A.   I wasn't there, so yeah.
4      Q.   Did you start out the negotiations at
5  ▇, or did they initially let's just renew the
6  contract under the existing price structure?
7      A.   I don't know the detail of that.  I --
8      Q.   Again that's Moss.
9      A.   Yeah, that's Moss.
10     Q.   When you're entering into long term
11 contracts, is it not true that you also -- you're
12 taking with that a risk, a credit risk?
13     A.   I'm relying on the credit department
14 for that, but specifically if you're speaking of
15 Kroger, we've got a perennial guarantee from the
16 company, it's golden.
17     Q.   You didn't think of that as much of a
18 risk.
19     A.   No.
20     Q.   But with smaller companies willing to
21 sign one of your contracts, do you take into account
22 that they might not be as solvent a year from now as
23 they are today?
24     A.   I think there's always a risk, yeah.
25     Q.   Do you consider that or do you just --

Page 203

1  do your credit people tell you you're okay now and so
2  you accept that and go forward?
3      A.   The credit people run the credit and
4  they give that output, they establish a credit line.
5  We manage those credit lines and ensure they don't go
6  over those credit lines, so in that part of the
7  business we manage that and I think that's...
8      Q.   Do you ever ask the credit people to go
9  in midterm and do a re-analysis of somebody's credit
10 rating or risk?
11     A.   If -- if certain items would pop up, I
12 certainly wouldn't have any question -- any concerns
13 about asking to have them take a look at it.
14     Q.   Do you recall, has that ever happened
15 while you were been at the helm?
16     A.   Yeah, I'm sure it has.  We have --
17 there's credit issues that we're dealing with, so
18 we're always communicating.
19     Q.   Do you have an understanding as to
20 whether your contracts -- I ask for a business
21 understanding, not his, but a business understanding
22 as to whether the contracts give you a right to
23 change the contract midstream or alter it because you
24 suddenly see a credit risk?
25     A.   I would check with legal on that, but I

Page 204

1  would -- I'm not going to go out on a limb.
2      Q.   I know you would.
3      A.   Yeah, but I would -- from a business
4  sense, if we have credit risk and it's -- people
5  haven't paid or they're up against their credit
6  limit, I would certainly take the corrective actions
7  with legal to see what the options were.
8      Q.   How do you in the big picture balance
9  supply with demand?
10     A.   Those are those LOOP meetings and
11 understanding.  You know, it's moving towards those
12 long term contracts to -- to get supply -- or, yeah,
13 supply commitments, and that matches with the
14 production commitments, and then they'll adjust the
15 refinery in accordance on crude rate.  So it's all
16 balanced together with three or four different
17 organizations.
18     Q.   At least before 2010 was it your
19 understanding that -- I believe it was in the
20 summer -- Suncor didn't produce enough premium to
21 cover demand?
22     A.   Oh, yeah, I'm sure that happened.  I
23 don't remember but it's not uncommon.
24     Q.   Well, I think Piscatelli told us that
25 in 2010 there was a change of policy, you stopped

Page 205

1  selling clear so you would have to --
2       A.   Okay, yeah.
3       Q.   -- so you could not bring in somebody
4  else's premium.
5       A.   Okay.  That's his world.  I've got my
6  own problems.
7       Q.   But do you understand that from time to
8  time Suncor in the past and presently has to buy fuel
9  in the market from whomever it's available?
10      A.   I agree with you, absolutely.
11      Q.   And by necessity some of that is coming
12 in -- well, it's coming in from out of state because
13 you're the only refiner in Colorado, right?
14      A.   That's right.
15      Q.   Is it part of your need to know where
16 fuel that's sold to your unbranded customer is
17 originating, who refined it?
18      A.   No.
19      Q.   So you generally know there could be
20 outside fuel coming in, but where it came from and
21 when it's there are just not something that's in your
22 area of need to know?
23      A.   No, I don't need to know.
24      Q.   I think you said that there were some
25 refinery issues before 2011, you had to ask Kroger to

Page 206

1  dial back.
2       A.   Right.
3       Q.   At that point in order to meet all of
4  your supply needs, was that an instance in which fuel
5  was being purchased from somebody else?
6       A.   I can't -- I don't know.  I really
7  don't know.  It could have been but -- if we're
8  having production issues, it's not like we can snap
9  our fingers, I do know this, and get stuff here
10 immediately.
11      Q.   And you said that in fact as part of
12 the marriage or relationship, at some point Kroger
13 needed fuel that you flat couldn't supply, they went
14 out of state to buy it and you paid the freight.
15      A.   Correct.
16      Q.   What else do you remember about that
17 particular instance?  Like when?
18      A.   Exact date?  I don't know.
19      Q.   No, not exact.
20      A.   I don't --
21      Q.   I'll take 2010 or --
22      A.   It had to be 2010.  I believe I was
23 just into the position.
24      Q.   Likely late in 2010?
25      A.   I wouldn't say that necessarily.  It

Page 207

1  seems like if we were going to have trouble it may
2  have been September -- not September, a little
3  earlier, maybe summer, but I don't know.
4       Q.   In any event could this have transpired
5  while Carbone had the job that you now have?
6       A.   She may have been just leaving.  I
7  would have had that kind of authorization as the
8  manager of rack forward sales.  So she could have
9  been -- you know, she could have been on vacation.  I
10 can't really remember.  It's a cluster.
11      Q.   Define that.
12           The point of it is, I take it, though,
13 that Kroger went out and made its own deals, bought
14 the fuel from whomever --
15      A.   Yeah, they had supply contacts.
16      Q.   All you did is pay the freight, the
17 extra freight?
18      A.   I paid the freight bill when it came
19 in, yeah, and they documented that.
20      Q.   So it was not fuel that you purchased
21 for them and then had delivered to them.
22      A.   No.
23      Q.   Have you ever done that?
24      A.   No.  Not -- no, not that I know.
25      Q.   When you're examining a contract, let's

Page 208

1  say -- let's leave it in the world of long term
2  contracts, a year or more.
3       A.   Okay.
4       Q.   -- does the volume have a direct
5  relationship or any kind of relationship to the
6  discount?
7       A.   It has some consideration, but it's
8  certainly not the main driver.
9       Q.   We talk about discount, and I learned
10 early on that there are two flavors of discount at
11 least.  One is the discount that Suncor gives on its
12 rack price, and then the other is an ethanol
13 discount.
14      A.   Okay.
15      Q.   It's a discount or a credit.  Are you
16 aware of this?
17      A.   Not -- yeah, the discount on ethanol is
18 gone.
19      Q.   Yeah, and that's what I was getting to.
20 When did that go away?
21      A.   Oh, probably right around 2010 I'm
22 going to guess.
23      Q.   So right now, let's say in 2011, is
24 Kroger getting any other discount or benefit,
25 anything of value, from Suncor other than what the