IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation,
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

    Third-Party Defendants.

---

## DECLARATION OF JOHN MAYES

---

John Mayes, pursuant to 28 U.S.C. Section 1746, states as follows:

1.     I am over the age of 18 and make this declaration based on my personal knowledge.

2.     I have been asked to address certain issues raised in the motion for summary judgment ("Motion") filed by the Defendant in the above case. This declaration supplements my report which was attached as Exhibit Z to the Motion.

3.     I have read the declaration of Angela Shields attached as Exhibit AA to the Motion. Ms. Shields states that fungible unleaded gasoline (PUL, MUL and RUL) is "changed

**Exhibit 9**

into different products through blending and the use of fuel additives at the [Suncor] refinery." The process of adding the referenced additives to gasoline does not involve refining of raw materials, is not complex, and is not something that requires particularly sophisticated or expensive equipment. The additives are not blended with the finished refined fuel as part of the refinery operations, and there is no refining or blending of the fuel with the additives as a separate combined product. Rather, the additives are simply added to a customer's or carrier's tanker truck at the same time the fuel is pumped into the truck at the terminal bay. (Mr. Kopp of Suncor referred to the pumping of the additives into the terminal truck bay as being "dosed." This is an accurate description as a predetermined "dose" of fuel and a predetermined "dose" of the additives are added to the truck at the same time). The blending of the fuel component and the additive component occurs only because the two components enter the customer's truck tank simultaneously. The volume of the government required additives for unbranded gasoline is a tiny fraction of the volume of the gasoline, typically well less than one-tenth of one percent.

4. Ms. Shields also focuses on the addition of ethanol to subpremium unleaded gasoline in Suncor's E-10 gasoline products to suggest that the generic fuel is substantially changed, *i.e.,* through an internal Suncor refining or blending process, prior to the sale of the E-10 products to Suncor customers. Like the government minimum additives referenced above, ethanol for E-10 gasoline is simply dosed directly into the purchaser's truck when the purchaser takes delivery at the terminal. Ethanol cannot be blended with gasoline and held in storage tanks prior to sale because ethanol acts as a solvent and would clean any scale or particulates from the sides of the storage tank and contaminate the gasoline. As is the case with

the additives referenced above, because the gasoline and ethanol are separately dosed into the customer's truck, the blending of those components occurs not through a complex or even purposeful activity by the refiner or other supplier. Rather, the blending of the components occurs by the fact that they are added into the customer's or its carrier's truck at the same time.

5. Ms. Shields does not address in her declaration any purported transformation by Suncor of the unbranded diesel fuel. Diesel fuel is considered to be entirely fungible.

6. I have read the affidavit of Mark Glick and Ted Tatos to be submitted in response to the Motion. Citing industry and other materials, Mr. Glick and Mr. Tatos state that retail gasoline is a highly competitive business with low profit margins. As set forth in my report, I have worked in the petroleum and petrochemical industries for 37 years, including as a Manager of Wholesale Marketing, General Manager of Wholesale Marketing, and Manager of Unbranded Sales with Ultramar, Inc., as Manager of Business Development with Alon USA and as a consultant in these industries. Based on my experience in these positions including, in particular, my experience with management of optimization of branded and unbranded petroleum product sales operations and evaluation and management of acquisitions and sales of gasoline and diesel retail operations, I agree with Mr. Glick's and Mr. Tatos's statements that the retail fuel business is highly competitive with low margins, particularly for the sale of fuel itself. (Retailers generally have higher margins on in-store sales, such as for snack foods and drinks). Additional detail on the competitive nature of the retail fuel business is addressed in Section V.B of my report.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March _13_ 2013

_____
John Mayes