Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Case No. 11-cv-01611-MSK-CBS
WESTERN CONVENIENCE STORES, INC., a Colorado corporation, WESTERN TRUCK ONE, LLC, a Colorado limited liability company,
Plaintiffs,
vs.
SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,
Defendant.
vs.
HOSSEIN AND DEBRA LYNN TARAGHI,
Third-Party Defendants.
--------------------------------------------------

DEPOSITION OF KENDALL CARBONE
November 2, 2012
--------------------------------------------------

Deposition location:
370 17th Street, Suite 3500
Denver, Colorado
APPEARANCES:
KENNETH R. BENNINGTON, ESQ.
ADAM F. ALDRICH, ESQ.
JEFFREY H. McCLELLAND, ESQ.
BENNINGTON JOHNSON BIERMANN &
CRAIGMILE, LLC
370-17th Street, Suite 3500
Denver, Colorado 80202
and

Page 2

1    PHILIP W. BLEDSOE, ESQ.
     POLSINELLI SHUGHART, P.C.
2    1515 Wynkoop Street
     Suite 600
3    Denver, Colorado 80202
4        For the Plaintiffs.
5    ANTHONY J. SHAHEEN, ESQ.
     HOLLAND & HART, LLP
6    555-17th Street
     Suite 3200
7    Denver, Colorado 80202
8        For the Defendant.
9    ALSO PRESENT: MARK GLICK
10       The deposition of KENDALL CARBONE,
11   called for examination by the Plaintiffs, was taken
12   in the offices of BENNINGTON JOHNSON BIERMANN &
13   CRAIGMILE, LLC, 370 17th Street, Suite 3500, Denver,
14   Colorado, commencing at 9:02 a.m. on November 2,
15   2012, before Patricia M. Wrede of Avery/Woods
16   Reporting Service, Inc., 455 Sherman Street, Suite
17   250, Denver, Colorado 80203, a Registered
18   Professional Reporter and a Notary Public in and for
19   the State of Colorado, pursuant to the Federal Rules
20   of Civil Procedure.
21          **************
22
23
24
25

Page 3

INDEX OF EXAMINATION
                                      PAGE
EXAMINATION BY MR. BENNINGTON           5

INDEX OF EXHIBITS REFERENCED
EXHIBIT NO.                        PAGE NO.
Deposition Exhibit No. 30             62
  (2008-2010 Customer Volumes)
Deposition Exhibit No. 31            119
  (2009 Western Contract)
Deposition Exhibit No. 32            170
  (December Summary for Unbranded)
Deposition Exhibit No. 46             96
  (10-7-09 Dillon Contract)
Deposition Exhibit No. 47             99
  (Unsigned Dillon Contract)
Deposition Exhibit No. 48            100
  (3-1-10 Dillon Contract)
Deposition Exhibit No. 49            172
  (6-10-10 Contract)
Deposition Exhibit No. 50            106
  (10-1-10 Dillon Contract)
Deposition Exhibit No. 53            101
  (1-18-10 Mini Mart Contract)
Deposition Exhibit No. 54            105
  (Mini Mart Contract)
Deposition Exhibit No. 58            119
  (Suncor Data - Dillon)
Deposition Exhibit No. 59            119
  (Suncor Data - Western)
Deposition Exhibit No. 68             13
  (LinkedIn Profile)
Deposition Exhibit No. 69             28
  (Reorg Document prepared by Carbone)
Deposition Exhibit No. 70            121
  (3-23-11 Suncor Invoice)
Deposition Exhibit No. 71            131
  (February 2008 Proposal)
Deposition Exhibit No. 72            132
  (March 2008 Proposal)
Deposition Exhibit No. 73            133
  (March 2008 Proposal)

Page 4

Deposition Exhibit No. 74            134
  (E-Mail, Moss to Wilson)
Deposition Exhibit No. 77            134
  (September 2009 E-Mail String)
Deposition Exhibit No. 78            138
  (October 2009 E-Mail String)
Deposition Exhibit No. 79            139
  (11-16-09 E-Mail, Carbone to Douglas)
Deposition Exhibit No. 80            144
  (E-Mails re Loaf 'N Jug Bid)
Deposition Exhibit No. 81            147
  (E-Mails with Trade Summaries Spreadsheet)
Deposition Exhibit No. 82            150
  (E-Mail, May 2010, Carbone to Piscatelli, et al.)
Deposition Exhibit No. 83            153
  (June 2010 E-Mail String)
Deposition Exhibit No. 84            155
  (Gibson E-Mail re Grocery Program)
Deposition Exhibit No. 85            157
  (Press Release)
Deposition Exhibit No. 86            158
  (September 2010 E-Mail String)
Deposition Exhibit No. 87            167
  (Wilson to Moss re Volumes)
Deposition Exhibit No. 88            167
  (RFP)
Deposition Exhibit No. 89            175
  (Kroger Billing to Suncor)
Deposition Exhibit No. 90            179
  (March 2007 re PTO)
Deposition Exhibit No. 91            183
  (10-17-10 E-Mail, Cross to Moss, et al.)
Deposition Exhibit No. 92            189
  (Daily Price Move)
Deposition Exhibit No. 93            189
  (Lunch and Learn Presentation)
Deposition Exhibit No. 94            192
  (2009 EAI Report)
Deposition Exhibit No. 95            194
  (July 2010 E-Mail, Suppes to Carbone, et al.)
Deposition Exhibit No. 96            194
  (2-20-09 Presentation)

**Exhibit 19**

KENDALL CARBONE - NOVEMBER 2, 2012

Page 21

1  Q. Your recollection is there's pipeline
2  from --
3  A. There's pipeline.
4  Q. -- from Commerce City?
5  A. M-hm.
6  Q. How about Grand Junction?
7  A. There's no pipeline. It's truck and
8  rail to Grand Junction.
9  Q. I see. So from time to time -- I
10 understand this is somewhat out of what you did, but
11 I still am trying to get a bigger picture.
12 A. Sure.
13 Q. From time to time then would -- to
14 serve terminals, let's say La Junta -- not La Junta,
15 Fountain or Grand Junction, would the fuel be
16 delivered via exchange agreements from other places?
17 A. I don't know if Fountain or Grand
18 Junction were on. The only customer Suncor ever had
19 an exchange was ConocoPhillips, and I don't recall
20 all the...
21 Q. I see. As far as you know is that
22 exchange agreement still in place?
23 A. I don't know.
24 Q. Are there other agreements that are
25 sort of like exchange agreements? Like borrowing

Page 22

1  agreements or something like that? I've seen that
2  term.
3  A. There were never any borrowing
4  agreements, but there were what we call offtake
5  agreements.
6  Q. All right. What does that mean?
7  A. Where it was a set volume of fuel at a
8  certain location that, say, ConocoPhillips or
9  Valero's -- those were the two that I was aware of at
10 the time -- customers could take during the month.
11 Q. Take from --
12 A. From Suncor's refinery. Or one of
13 Suncor's terminals. Like Grand Junction. Grand
14 Junction was definitely I know on the offtake.
15 Q. So somebody like Valero, for instance,
16 would have an agreement with Suncor --
17 A. M-hm.
18 Q. -- that they could take delivery of
19 fuel in Grand Junction --
20 A. M-hm.
21 Q. -- under whatever terms were in that
22 agreement.
23 A. Right. Correct.
24 Q. Did Suncor have similar agreements so
25 far as you know with Valero or Conoco or anybody else

Page 23

1  where Suncor could take offtake --
2  A. No.
3  Q. -- or take fuel?
4  A. No. Not that I was aware.
5  Q. At the Suncor terminal in Commerce
6  City, there are actually two racks, east and west,
7  correct?
8  A. M-hm.
9  Q. From time to time would those racks get
10 supplied by fuel that came from other refiners, say
11 if Suncor was shut down or there's some other
12 dislocation?
13 A. Potentially during a turnaround, but
14 the thing that I remember was there was an agreement
15 with Valero that Suncor couldn't make premium fuel
16 during certain months of the year, and I can't
17 remember whether it was the winter or summer, and so
18 they would pipe fuel up from one of Valero's
19 refineries down south that was premium fuel.
20 Q. From Texas.
21 A. Exactly. That's the only one I can
22 remember.
23 Q. Was the seasonal need related to the
24 varying types of RVP fuel?
25 A. No, I -- well, I believe it was

Page 24

1  Suncor's refinery -- and again I can -- could not
2  meet the specifications during that particular
3  season. Whether it was RVP or what, I'm the wrong
4  person to ask that.
5  Q. But what you do remember is that
6  seasonally --
7  A. Yes.
8  Q. -- premium fuel would --
9  A. Yes.
10 Q. -- have to come from Texas.
11 A. Correct.
12 Q. Valero.
13 A. Valero.
14 Q. And was that via an exchange agreement
15 or what?
16 A. I don't know. I wasn't involved. That
17 was --
18 Q. Not your world.
19 A. Not my world, hm-hm.
20 Q. Thonen's though.
21 A. Yes, correct.
22 Q. Let me back up a bit. Prior to the
23 time -- you remember Kate Craigmile, my partner,
24 called you up.
25 A. Correct.

KENDALL CARBONE - NOVEMBER 2, 2012

Page 73

1  the volumes you had. If you didn't want to open up
2  the floodgates and give it to everybody, if it was
3  just a finite. It was all supply and demand driven.
4      Q. And what customer -- apart from the
5  general, as you say, opening up the gates, apart from
6  that would it be essentially Moss's decision as to
7  who he would call --
8      A. Essentially.
9      Q. -- with this price?
10     A. I think he would know what was going on
11 with each of the customers and who might be more
12 willing or needing.
13     Q. Did you feel an obligation when you
14 were giving somebody an additional discount to make
15 sure that same discount was offered to other people,
16 for instance their competitors?
17     A. No.
18     Q. So whether a buyer in the market got a
19 favorable price that was better than his competitors
20 was sort of a matter of chance. It depended on who
21 Moss decided to call, right?
22         MR. SHAHEEN: I think that
23 mischaracterizes her testimony.
24         MR. BENNINGTON: Well, I asked her if
25 she agreed, so she can tell me.

Page 74

1      A. No, I think it was dependent on what he
2  knew was going on in the market.
3      Q. (BY MR. BENNINGTON) But it was -- and
4  then based on whatever factors of what he knew, it
5  was left on to him to pick somebody out and say I'm
6  calling them because I know I can move a million
7  gallons to these guys.
8      A. I mean, typically it was a very short
9  term one time thing when we gave these special
10 discounts. It wasn't long term. If we were going to
11 do a long term, everybody would get it because we
12 would have a lot to move typically.
13     Q. And the everybody would get it again,
14 what we're talking about is the special discounts,
15 not --
16     A. M-hm.
17     Q. We're not talking about contract
18 discounts.
19     A. No, no.
20     Q. When we were talking about the
21 stewardship report, you mentioned there were key
22 performance metrics. A total accounting term. Give
23 me some examples of what the key metrics were.
24     A. I'd have to look at it again. It's
25 been two years since I've seen it so I don't recall.

Page 75

1      Q. I'm sorry, I don't have one to show
2  you.
3         In any of your contracts that you are
4  aware of or can recall -- we're talking about the
5  unbranded side -- did anybody have what's
6  colloquially called a most favored nation clause? In
7  other words, I as your buyer am guaranteed by you
8  that I will always get the best price you offer to
9  anybody?
10     A. No.
11     Q. And it is accurate to say that some
12 unbranded customers had bigger discounts than others
13     A. That's accurate.
14     Q. And the amount of that discount flowed
15 back to the decision-making process that you were
16 talking about, that is, Moss makes a -- proposes a
17 deal and you and your little committee decide whether
18 or not based on the factors that you have learned
19 over time.
20     A. Correct.
21     Q. Were you ever given any educational
22 opportunities or requirements or instruction at all
23 on antitrust law, generally or specifically?
24     A. By Mike Kornblatt, yes, when I went
25 into that job.

Page 76

1      Q. I'm not going to ask what he told you
2  because he'll jump out of his seat, but --
3         MR. SHAHEEN: He does that just to keep
4  me awake.
5      Q. (BY MR. BENNINGTON) Was this a group
6  thing or --
7      A. We did an annual group thing but, you
8  know, I came in at an odd time so Mike did one on one
9  with me.
10     Q. So the company had an annual process of
11 the legal department --
12     A. Yeah.
13     Q. -- giving instruction on --
14     A. Correct.
15     Q. -- antitrust law?
16     A. M-hm.
17     Q. Probably HR and a bunch of other things
18 too?
19     A. Yeah.
20     Q. All right. In doing your job in that
21 one-year period, did you believe that you had -- let
22 me say this a different way.
23        In doing that job, what obligation did
24 you think you had, if any, to equalize prices among
25 your buyers?

KENDALL CARBONE - NOVEMBER 2, 2012

Page 81

1  discussion directly with any of the Kroger people
2  about what rack price they would use?
3       A.  No.
4       Q.  Do you have any knowledge as to why --
5  I think this is fully consistent -- why Western
6  Convenience Stores was always tied to Suncor rack
7  price as opposed to anything else?
8       A.  No.
9       Q.  Are you generally aware that the
10 pricing to Kroger was more favorable than the pricing
11 to Western Convenience Stores?
12      A.  Yes.
13          MR. SHAHEEN:  I'll object, but go
14 ahead.
15      A.  Yes, I recall it was lower.
16      Q.  (BY MR. BENNINGTON) Do you know why?
17      A.  Volume, ratability and I think
18 creditworthiness.
19      Q.  Well, in 2009, remember looking at
20 Exhibit 30, Western was your biggest buyer.  In 2009
21 when you started, was there some question that you
22 recall about Western's creditworthiness?
23      A.  I was aware, even in my prior finance
24 function, that we had ongoing issues with payment
25 collection.

Page 82

1       Q.  And how in that prior job as director
2  of finance, what about that job would make you aware
3  of such a circumstance?
4       A.  Because my group was responsible for
5  setting an allowance for doubtful accounts when
6  things went into the past due 90 days things, so I
7  had a person that although that -- with Robert's
8  group, the customer financial service, would actually
9  book an entry to -- so we were generally aware of
10 what was going -- just generally, but I, you know,
11 knew that there'd been late payments and payment
12 issues ongoing over a period of time.
13      Q.  I take it though nothing that rose to
14 the point while you were still with Suncor that rose
15 to the point of changing Western's terms.
16      A.  No.
17      Q.  To understand the difference between
18 the price to Western and the price to Kroger, do you
19 only have to look at the amount of the discount off
20 of rack?
21      A.  I don't know.
22      Q.  Were there any other discounts that you
23 were aware of?
24      A.  No.
25      Q.  Leaving aside these special one-time or

Page 83

1  occasional discounts, you're not aware of any
2  discounts that either of them got that the other
3  didn't get other than what's on the contract.  Is
4  that correct?
5       A.  That's correct.
6       Q.  Kroger had, for lack of a better word,
7  an RFP process.  Are you aware of that?
8       A.  Yes.
9       Q.  You know what an RFP is --
10      A.  Request for proposals.
11      Q.  -- request for proposals.
12      A.  M-hm.
13      Q.  Were you aware of a very first Kroger
14 RFP when you were still director of finance?
15      A.  Peripherally but not really.
16      Q.  Was Kroger somebody that Suncor had
17 been after, in other words courting or trying to get
18 the business?
19      A.  I was not aware of that.
20      Q.  When did you first become aware of the
21 RFP that resulted in a deal with Kroger?
22      A.  Probably when I came into that job.
23      Q.  And then as you told me, you learned
24 that a deal had been made.
25      A.  Yes.

Page 84

1       Q.  Did you as director of rack forward
2  sales ever have to respond to an additional or new
3  Kroger RFP?
4       A.  There was one for Mini Mart that came
5  out.  I can't remember the exact timing.  I want to
6  say it started in February maybe of 2010, but I'm not
7  positive on that timing.  And that was the one that I
8  was involved in making the decision should we go down
9  that path or not.
10      Q.  Well, then walk me through that in as
11 much detail as you can remember.  This is an
12 important part of this lawsuit, and so we're all
13 interested to know what you recall.
14          What do you recall of that process
15 starting with your first awareness of the RFP?
16      A.  You know, I don't recall a whole lot
17 because it's been a while, but I recall having
18 discussions on whether we wanted to, you know,
19 increase the volume to this group of customers.  And
20 I think we'd been favorably impressed with their
21 ratability on the Dillon contract and their ability
22 to pay their bills on time, and so we made the
23 decision to go ahead and move forward.  But I don't
24 recall a lot of details.
25      Q.  So do you recall whether you first

21 (Pages 81 to 84)

KENDALL CARBONE - NOVEMBER 2, 2012

Page 89

1  It wasn't like a letter of credit or a financial
2  guarantee.  That made me nervous.
3      Q.   Did Kroger supply anybody's personal
4  guarantee or letter of credit?
5      A.   No.
6      Q.   You didn't think that was necessary.
7      A.   No.
8      Q.   Because of their pockets.
9      A.   Yeah.
10     Q.   Did you have any -- in February 2010
11 did you have any, you know, economic resources,
12 accounting resources, any kind of resources that were
13 looking into the future saying in general we see
14 something in this crystal ball that you might want to
15 consider in who you make deals with?
16     A.   No.
17     Q.   So going back, Moss told you that it
18 was his belief that to get the Mini Mart deal you'd
19 have to match the Kroger deal.
20     A.   Correct.
21     Q.   And Kroger was a buyer at that point
22 for unbranded fuel.  So it was selling unbranded fuel
23 that is non-Shell branded fuel through grocery stores
24 I take it?
25     A.   Correct.

Page 90

1      Q.   So in your view did you have to respond
2  to an offer from Kroger, or did you make an offer to
3  Kroger through Moss saying, okay, here's our offer
4  for the Mini Mart deal?
5      A.   We made an offer.
6      Q.   And did you make more than one offer?
7  In other words, was there a back and forth?
8      A.   I don't recall that.
9      Q.   Can you tell me -- well, you don't
10 recall.
11          Is it possible that it was just, okay,
12 we'll match the existing contract?
13     A.   That's possible.
14     Q.   You don't recall if that was it.
15     A.   I don't remember.
16     Q.   All right.
17     A.   Moss would have been the one.
18     Q.   And I think you said this earlier.  You
19 didn't have any direct contact with any of the Kroger
20 people, correct?
21     A.   Correct.
22     Q.   Were there any other terms as you
23 recall that were in play so to speak?  I mean,
24 obviously the price was, but did you have to counter
25 propose or counteroffer on volume or anything else?

Page 91

1      A.   I don't remember any of that detail.
2      Q.   Payment terms?
3      A.   No.
4      Q.   Security?
5      A.   Not that I recall.
6      Q.   How about which rack?  Did you have to
7  negotiate where you can pick this stuff up?
8      A.   I don't recall that detail, sorry.
9          MR. BENNINGTON:  We're going to pull
10 out the contracts, and this is a good time to take a
11 break while we're doing that.
12         (Whereupon, there was a recess from
13 11:08 a.m. to 11:17 a.m.)
14     Q.   (BY MR. BENNINGTON) We're back on the
15 record.  I take it from what you told me about the
16 factors that went into setting or agreeing to a price
17 with Kroger for the Dillon business -- I'm sorry, for
18 the Mini Mart business, there wasn't any specific
19 price from some competitor that you were trying to
20 meet.  Isn't that correct?
21     A.   Yes.
22     Q.   Did you ever -- you said one of the
23 factors that as far as you were concerned dictated
24 that Western would get a less favorable price was
25 creditworthiness.  Did you ever or did you direct

Page 92

1  anybody to call Western up and say if you guys would
2  clean up your creditworthiness, you start paying on
3  time and so forth and do all the other things, you
4  can get a better price?
5      A.   I don't recall discussing the price,
6  but I know I discussed increasing the credit terms
7  with Mr. Taraghi probably the first time I met him,
8  increasing the credit limit.
9      Q.   Was that something he wanted, he was
10 asking for?
11     A.   Yes.
12     Q.   And what was the result of that
13 discussion?
14         Did that ever go anywhere?  Let's put
15 it that way.
16     A.   We had a lot of back and forth as I
17 recall culminating in them -- Western Convenience
18 providing us with a list of -- and I don't recall
19 whether it was two of their service stations as
20 collateral that was not sufficient for what we wanted
21 to increase the line.
22     Q.   But the discussions were around
23 increasing the line of credit, not on changing the
24 discount.
25     A.   No.  I don't recall discussing that.

23 (Pages 89 to 92)

Page 145

1  contract. Right?
2  A.  I definitely approved the parameters.
3  Q.  Okay.
4  A.  I don't recall ever seeing this piece
5  of paper.
6  Q.  But in terms of the ▮ million
7  gallons a month from Denver at the OPIS Denver rack
8  average list ▮, ▮ cents, that was something
9  that went through the process you've described.
10 A.  Yeah.
11 Q.  Subjective decision-making process.
12     And you approved it.
13 A.  Yes.
14 Q.  Now, it says: Suncor is willing to do
15 an evergreen clause.
16     Does that mean a clause that just means
17 the contract keeps renewing?
18 A.  Yeah.
19 Q.  Unless somebody does something?
20 A.  Right.
21 Q.  And then it says: Suncor is willing to
22 do a portion of the requested volume if so desired.
23     First of all, what do you understand
24 that to mean?
25 A.  My recollection is that Dillon had

Page 146

1  talked to Steve about maybe not wanting to put all
2  their eggs in one basket and might break the contract
3  into two pieces, so give half the volume to one and
4  half to another or something like that.
5  Q.  To a different refiner. Supplier
6  anyway.
7  A.  Different supplier.
8  Q.  So Suncor at least at the moment, at
9  the time of September 14th -- December 14th, 2009,
10 Suncor was willing to provide the entire volume.
11 A.  Correct.
12 Q.  Or some portion of it.
13 A.  Correct.
14 Q.  And if the portion of it -- if it
15 turned out to be a portion of it, the price was still
16 going to stay the same, like for E-10 ▮ cents per
17 gallon.
18 A.  Correct.
19 Q.  That was not tied directly to volume,
20 correct?
21 A.  Well, I think he had talked about maybe
22 half. I don't -- if it would have been 10 percent,
23 it certainly wouldn't have been the same.
24 Q.  In other words if it had been 10
25 percent of this ▮ million gallons, you would have

Page 147

1  viewed the deal differently --
2  A.  Potentially.
3  Q.  -- when it was brought to you.
4  A.  Potentially.
5  Q.  That may or may not have resulted in a
6  different discount.
7  A.  Right.
8  Q.  Is that right?
9  A.  That's right.
10     (Whereupon, Deposition Exhibit 81 was
11 marked for identification by the reporter.)
12 Q.  This is 81. Now, Exhibit 81 is an
13 e-mail from Piscatelli to you and Moss and others,
14 Nancy Thonen. It has an attachment -- it refers to
15 an attachment called Trade Summaries XLS. Obviously
16 an Excel spreadsheet.
17     Was Trade Summaries spreadsheet a
18 standard document that was produced by somebody in
19 your organization?
20 A.  I don't believe so.
21 Q.  Do you recall what it addressed?
22 A.  Based on reading this e-mail, I think
23 it addressed if we brought in product from a third
24 party and resold it did we make money on it, but I'm
25 not sure.

Page 148

1  Q.  Go down to the e-mail from you to
2  Mr. Piscatelli. You said: I did a very quick and
3  dirty analysis to ensure that we made money on the
4  recent PTO of 20,000 barrels of clear gasoline to
5  Western Convenience that we had to purchase from
6  Exxon.
7     First of all, what's PTO?
8  A.  I forget what it stands for. Product
9  trade something.
10 Q.  Would this be on an exchange agreement?
11 A.  No.
12 Q.  Was this the special purchase that you
13 were talking to me about earlier that you had
14 recalled that --
15 A.  No, because they didn't -- the special
16 purchase I recall they didn't take the volume. They
17 refused to take --
18 Q.  You're clear there was a purchase
19 that -- well, volume was ordered --
20 A.  We made a purchase and they never took
21 it. So there was no billing or...
22 Q.  All right. You say: I'm also curious
23 how you guys think we could get a good estimate of
24 what we sold the remaining 16,000 barrels that we
25 bought from Exxon for.

KENDALL CARBONE - NOVEMBER 2, 2012

Page 149

1 Once again is it possible that that
2 remaining 16,000 is what Western didn't -- wouldn't
3 buy?
4    A. I have no idea.
5    No, I mean, that was -- I think that
6 was a completely separate -- it was a full pipeline
7 move that they didn't buy. So this -- in my mind
8 when I read this, we must have bought 36,000 barrels
9 from Exxon of which Western took a PTO of 20 of it.
10    Q. All right.
11    A. So I'm wondering what did we sell the
12 other 16, did we make money on it.
13    Q. And by definition, if it came from
14 Exxon, it came from outside of Colorado.
15    A. Correct.
16    Q. Do you know what Exxon refinery?
17 They've got a few.
18    A. Billings potentially. But I'm not
19 positive. I think Billings is what goes into DuPont,
20 but I'm not positive.
21    Q. What do you understand the words -- the
22 term "clear gasoline" to mean as opposed to any other
23 type of gasoline?
24    A. Boy. I don't remember what I
25 understood it to mean at the time, to be honest with

Page 150

1 you.
2    Q. Do you recall whether this was a
3 special purchase made for the benefit of -- to
4 somehow satisfy some special requirement of Western
5 or --
6    A. I don't remember.
7    Q. -- was it just to satisfy a contract
8 that they had in place that you needed to supply out
9 of DuPont?
10    A. I don't remember.
11    Q. February of 2010, could this be --
12 forgive me, I can't remember when this seasonal
13 problem occurred with respect to Suncor's inability
14 to make enough premium. Is this an instance of that?
15    A. No.
16    (Whereupon, Deposition Exhibit 82 was
17 marked for identification by the reporter.)
18    Q. All right. This starts out as an
19 e-mail from you to Mr. Piscatelli and Moss and
20 Thonen, correct?
21    A. Yeah.
22    Q. May of 2010.
23    Then Piscatelli responds -- you send it
24 on Wednesday, he responds on Friday. But let's talk
25 about your e-mail to him. You said: We have been

Page 151

1 selling Western Convenience 50 to 65 thousand barrels
2 the past couple of months and we can easily cut them
3 back.
4    What was the point of that? Why cut
5 them back? I mean, they're paying you more than
6 Kroger. Why cut them back?
7    A. Because they were a month to month
8 agreement. I think we wanted something long term. I
9 think we had been approached to bid on additional
10 Shell volumes, the Circle K volumes, and we were
11 wondering did we have enough capacity to sell those
12 Circle K volumes. That's what Shell Phase 3 means.
13    Q. So essentially Piscatelli is telling
14 you it's moot because we are not going to bid on the
15 Phase 3 volume anyway.
16    A. Correct.
17    Q. Even at this early stage did you have
18 any belief as to whether the gasoline that might be
19 involved could be sold in the Shell Phase 3 volume
20 for a higher price than what it was going for to
21 Western?
22    A. The branded gasoline typically is
23 higher margin than unbranded, so yes, I had that
24 general belief.
25    Q. The next paragraph says: Another thing

Page 152

1 I note is Kroger appears to be overlifting.
2    Which means, I take it, they're taking
3 delivery of more fuel than their contract specified.
4    A. Correct.
5    Q. Is there no -- was there not a
6 constraint, a rack on that?
7    A. No.
8    Q. Did that change?
9    A. I don't know. Not when I was there.
10    Q. But at least while you were there, they
11 could show up and keep pulling volume regardless of
12 actually whether you had volume to sell. Yes?
13    A. That's correct.
14    Q. Was there any consideration given as to
15 whether if you made them stick to their volumes you
16 could have sold it to Western and customers like
17 Western at a higher price? Was that what you're
18 getting at? They're pulling --
19    A. I think that's what I'm getting at.
20    Q. All right. So your question was can we
21 limit them. And you didn't really get an answer back
22 on that one.
23    A. Hm-hm.
24    Q. Do you know whether a limit was imposed
25 on them?

38 (Pages 149 to 152)

KENDALL CARBONE - NOVEMBER 2, 2012

Page 157

1 station.
2  Q. Well, now I'm confused. I thought in
3 response to my question about whether Suncor was
4 participating in some way financially in the Shell
5 program, in the grocery program, you said yes, but --
6  **A. Oh, I see what you're saying. So if**
7 **we're -- okay, yeah, I guess Shell is Suncor. Kroger**
8 **pays a third, the marketer pays a third, and then**
9 **Shell, which would be Suncor, pays a third.**
10  Q. And this is all --
11  **A. I think.**
12  Q. -- something -- okay.
13     Would this all be something that was
14 settled up periodically based on actual volumes?
15  **A. Monthly.**
16  Q. But to be sure, there's nothing like
17 this that occurs on the unbranded side, right?
18  **A. Nothing. We have nothing to do with**
19 **what Dillon or Kroger do at Loaf 'N Jug or Mini Mart.**
20  Q. On the unbranded side there's no
21 settling up at the end of the month based on some --
22  **A. No.**
23  Q. -- variable that occurs.
24  **A. No.**
25  Q. And 85 is the press release that is

Page 158

1 issued under -- well, that quotes you with respect to
2 the grocery program, right?
3  **A. Right.**
4  Q. You helped draft that and approved it.
5 Yeah?
6  **A. Right.**
7     **(Whereupon, Deposition Exhibit 86 was**
8 **marked for identification by the reporter.)**
9  Q. I've handed you Exhibit 86. Now, if we
10 start at the -- let's start at the beginning of the
11 string, which is on the last page, and move up. I
12 just want to make sure I understand this.
13     Mr. Piscatelli is saying that after a
14 day of -- another day of selling less than 30,000
15 barrels, you must be -- he's concerned that you're
16 not selling enough.
17  **A. Right.**
18  Q. And when he says "We'll be full by the
19 end of the month," meaning your storage capacity is
20 going to fill up?
21  **A. Right.**
22  Q. And when that happens you've either got
23 to start selling or cut back the refinery?
24  **A. Correct.**
25  Q. So the price then as we work our way

Page 159

1 up, when he's talking about 4 and 5 cents per gallon
2 in price, he's talking about how to set the rack
3 price in order to deal with this problem?
4  **A. Correct.**
5  Q. So the next line up essentially he's
6 saying we ought to be -- we're high enough in
7 relation to other people, we're not going to get rid
8 of this volume unless we lower the price.
9  **A. Right.**
10  Q. Now, at the top of the back page is a
11 continuation of what was an e-mail from you to
12 Piscatelli and others dated September 14th, 2010.
13 You say: Yes, that is what I'm -- that is what I am
14 saying, is that I think they are offering off invoice
15 discounts as well, I'm just not certain that they are
16 the full 10 cents per gallon, but clearly none of our
17 unbranded guys are lifting from us, so I think this
18 has to be the price driven if they are not pulling
19 even with our 10 cents per gallon off invoice
20 discounts.
21     First of all, off invoice discounts
22 means what in the context of this message?
23  **A. A special discount.**
24  Q. This is what we've been talking about.
25  **A. Right.**

Page 160

1  Q. Special to move product.
2  **A. Right.**
3  Q. What does off invoice mean? I mean,
4 they're still going to get invoiced for it, whatever
5 they pay is the special deal.
6  **A. I don't know.**
7  Q. So it's not really off invoice?
8  **A. Not really.**
9  Q. It's going to appear on the invoice as
10 some price less than their contract price.
11  **A. Right.**
12  Q. And once again since we're talking
13 about off invoice, there isn't some other system
14 where somebody can be billed or money can be netted
15 out that doesn't reflect on the invoices, correct?
16  **A. No.**
17  Q. And you talk about 10 cents per gallon.
18 Where does that come from?
19  **A. What do you mean where does it come**
20 **from?**
21  Q. Well, "I'm just not certain that they
22 are the full 10 cent per gallon but clearly none of
23 our unbranded guys are lifting from us" and so forth.
24  **A. So I think from what this reads we were**
25 **giving all of our unbranded marketers a 10 cent per**

40 (Pages 157 to 160)

KENDALL CARBONE - NOVEMBER 2, 2012

Page 161

1  gallon discount to move product but that wasn't
2  working and they weren't moving.
3      Q.  Was that 10 cents off, 10 cents per
4  gallon discount, offered to Western as well?
5      A.  I couldn't tell.
6      Q.  Would there be some document or system,
7  electronic or paper, that you could go back in
8  history and see what were the special deals that were
9  offered and to whom they were offered?
10     A.  No.
11     Q.  So you would really depend on e-mail
12 traffic to figure that out?
13     A.  M-hm.
14     Q.  And you could, I suppose, back into it
15 by looking at invoices?
16     A.  Yeah.  SAP is going to have what got
17 off, but there may not be any background as to why,
18 just pure numbers.
19     Q.  And do you know would SAP on the
20 invoice show it as -- show the discount?
21     A.  I don't know.  I never looked at the
22 SAP invoices.
23     Q.  Oh, all right.
24         MR. SHAHEEN:  Okay.  We've been going
25 for an hour and a half.

Page 162

1          MR. BENNINGTON:  Let me finish with
2  this e-mail.
3          MR. SHAHEEN:  Fine.
4          MR. BENNINGTON:  I agree with you.
5  We'll stop at the end of this e-mail and take a
6  break.
7      Q.  (BY MR. BENNINGTON) So the point of
8  this is that whenever the price goes down, you're
9  going to be able to sell more product.  That is, your
10 buyers are going to be able to sell more product,
11 which means they're going to buy more product from
12 you.
13     A.  That's the theory.
14     Q.  As far as you're concerned, that's the
15 way it worked in reality, right?
16     A.  Well, obviously it's not working,
17 because we're giving a big price discount and we're
18 not moving the product.
19     Q.  But you said:  I guess we could throw
20 out an even bigger discount off invoice and get them
21 to lift to get our UB price, unbranded price, more in
22 line.
23         Did that happen?  Did you finally come
24 up with a discount that moved this stuff that you're
25 trying to move?

Page 163

1      A.  I don't remember.
2      Q.  Piscatelli's then last message to you
3  and others is Valero's liftings are back up today.
4          This is tied back to what we talked
5  about earlier, about their liftings were off after
6  they lost the Kroger deal and they're now starting to
7  come back up again?
8      A.  No, that was a long time ago.
9      Q.  Oh.
10     A.  Them losing the Kroger deal was in
11 2009.  This is a year later.
12     Q.  All right.  But in any event Valero is
13 starting to buy more.
14         And he asks:  Would dropping our
15 unbranded posting 5 cents more get it done?
16         Do you remember whether that was
17 done --
18     A.  I don't remember.
19     Q.  -- and what happened?
20     A.  Hm-hm.
21     Q.  All right.  Thanks.
22         MR. BENNINGTON:  Let's take a break.
23         (Whereupon, there was a recess from
24 2:41 p.m. to 2:56 p.m.)
25     Q.  (BY MR. BENNINGTON) I want to go back

Page 164

1  to 86 that we were talking about.  Again, this is --
2  well, this e-mail that I want to ask you about is
3  from you to Piscatelli and others, Moss, Ewing,
4  Thonen.  It says:  Steve Moss said Western
5  Convenience is looking for product, but I just hate
6  to open up that can of worms and sell to him again.
7  I guess if we get desperate enough we will have to...
8          Why did people dislike him, meaning
9  Mr. Taraghi, or Western Convenience so much?
10     A.  Because they were a difficult customer.
11     Q.  Was that because your branded customers
12 and other unbranded customers were complaining that
13 he undersold them all the time, he was hard to
14 compete with?
15     A.  No, no.  It was because he paid late
16 and complained about a lot of things, and I just
17 think he was difficult to deal with.  And I think we
18 had gotten to a point where we hadn't been doing much
19 or nearly as much business, so I was happy to keep it
20 that way.
21     Q.  Even though to the extent you provided
22 him with product you were going to sell it at a
23 better price than you were getting from Kroger so you
24 were going to make more money on it.
25     A.  But there were plenty of other

41 (Pages 161 to 164)

Page 165

1 customers I would have preferred to sell to that we
2 could have made more money.
3    Q.  Are you telling me that you never heard
4 of complaints by other Suncor sellers, either branded
5 or unbranded, about having to compete with Western
6 Convenience Stores?
7    A.  No, I heard of that.
8    Q.  You did hear of that?
9    A.  M-hm.
10    Q.  Was that something that you responded
11 to?
12    A.  No.
13    Q.  Well, you said "open up the can of
14 worms if we get desperate enough." Did you get
15 desperate enough?
16    A.  I don't remember.
17    Q.  Well, September 2010. I can tell you
18 that the relationship went on into 2011, until May
19 2011. That much is a given. We all know that.
20       Is that something you would have left
21 to Moss, whether to sell more, or was that really
22 your decision --
23    A.  No.
24    Q.  -- I'm not selling to --
25    A.  No, it was Moss.

Page 166

1    Q.  Did anybody call up Taraghi and say,
2 look, if you clean up your act, if you stop
3 complaining and you get your credit in order, we'll
4 sell you a hell of a lot more gasoline at a better
5 price?
6    A.  I know when I had first met him -- I
7 met him in person maybe one or two times, and we
8 talked about that, maybe not that specifically. I
9 don't recall talking about price with him. I recall
10 talking about more credit and maybe more volume.
11 They went over their credit limit frequently anyways,
12 which was why we talked about more credit, because
13 they lifted more than what they were supposed to lift
14 at times too like...
15    Q.  Like Kroger.
16    A.  Like Kroger, exactly.
17    Q.  But was any part of that conversation a
18 better deal would be available to you if you just do
19 X, Y and Z?
20    A.  No.
21    Q.  During this time period, that is, while
22 you're director of rack forward sales, Ewing is in
23 charge of retail, meaning he was in charge of the
24 Shell and Phillips 66 stores that are competing, to
25 the extent branded and unbranded compete, but he's in

Page 167

1 charge of the company's business that does compete --
2 did compete with Western Convenience Stores, right?
3    A.  Correct.
4    Q.  Did Ewing ever discuss with you his
5 outlets having to compete with Western and Western
6 always being a discounter or price cutter or anything
7 like that?
8    A.  I don't recall that.
9    Q.  Do you recall getting some
10 understanding from Ewing that he didn't really like
11 having to deal with or compete with Western?
12    A.  I don't recall.
13       (Whereupon, Deposition Exhibits 87 and
14 88 were marked for identification by the reporter.)
15    Q.  So you've got Exhibit 87 and 88.
16       Before I go to these two things, let me
17 ask you, one of the things -- something you said
18 about Western when I asked you, you know, why it was
19 a can of worms essentially was they complained a lot.
20 What were they complaining about? Can you remember
21 specifics?
22    A.  I mean, the big incident that jumps out
23 at me is that pipeline incident where I really felt
24 that was their product, we did that for them, they
25 should have taken the product. But I can remember --

Page 168

1 you know, I remember a lot of folks in Robert White's
2 group that had to deal with their folks complaining
3 to me that they were difficult. I can't remember
4 specific things. It's been too long. But just the
5 general feeling that they were not pleasant to deal
6 with.
7    Q.  So as far as what you know directly
8 that goes in the can of worms category is this
9 incident where they didn't buy product that you had
10 had shipped -- pipelined in for them.
11    A.  M-hm.
12    Q.  Everything else is what sense you got
13 from the rest of the organization?
14    A.  Yes.
15    Q.  Yes?
16       Was some of that what you heard about
17 the complaining, some of that complaining about
18 price?
19    A.  From them?
20    Q.  The discounts they were getting?
21       Yeah.
22    A.  No.
23    Q.  Did anybody ever tell you that Western
24 was complaining about having to pay more than Kroger
25 or Mini Mart?

KENDALL CARBONE - NOVEMBER 2, 2012

Page 173

1  everybody, how would you do that?
2      A.  I don't know.
3      Q.  Could we at least assume that if it's a
4  single price for everybody it would probably be the
5  same as the Kroger price because that was the lowest
6  price you could afford to give?
7          MR. SHAHEEN:  Let me object.  I think
8  the hypothetical, which you are allowed to give, is
9  incomplete and really calls for her to make all kinds
10 of assumptions --
11         MR. BENNINGTON:  Okay.
12         MR. SHAHEEN:  -- which are not
13 articulated, so it calls for her to speculate.
14         If you think you can answer, go ahead
15 and do it.
16     A.  No, I don't feel I can answer that.
17     Q.  (BY MR. BENNINGTON) Well, would you
18 agree that if you're going to impose a price on
19 everyone, it would have to be the Kroger price,
20 because if you imposed a higher price on Kroger you'd
21 be breaking their contract?
22         MR. SHAHEEN:  Same --
23         THE DEPONENT:  Yeah.
24         MR. SHAHEEN:  Same objection.
25     Q.  (BY MR. BENNINGTON) He can object, but

Page 174

1  you've got to answer.
2      A.  We wouldn't have to impose one price,
3  so I don't have an answer.  That's not the way the
4  business works.
5      Q.  Well, you agree you couldn't march in
6  and tell Kroger suddenly we're now going to charge
7  you -- we're now going to reduce your discount to
8  4-1/2 cents.
9      A.  Right.
10     Q.  You had a contract.
11         MR. SHAHEEN:  Same objection.
12         But you can answer.
13     A.  I would agree.
14     Q.  (BY MR. BENNINGTON) As an economic
15 matter, could Suncor have given all of its customers
16 the Kroger price?
17         MR. SHAHEEN:  Calls for speculation,
18 lack of foundation.
19         MR. BENNINGTON:  No, actually.  Let me
20 respond a bit.
21     Q.  (BY MR. BENNINGTON) You had to do a
22 stewardship report.  You had some sense of what you
23 could and could not do and not have the company lose
24 money and have everybody happy with the way you were
25 doing your job.  So do you have a sense of what was

Page 175

1  the lowest price you could give anybody and still --
2      A.  Not for all the volumes.  We had
3  volumes locked into certain channels so I -- yeah, I
4  never had that sense.
5      Q.  Well, given the volumes you had locked
6  in -- first of all, we've established that Kroger got
7  the lowest price of anybody, correct?
8      A.  Correct.
9      Q.  Given all the volumes you had locked
10 in, if you had -- if across the board everybody was
11 paying the Kroger price, would Suncor and your part
12 of Suncor been profitable?
13     A.  I don't know.
14         MR. SHAHEEN:  Calls for speculation.
15     Q.  (BY MR. BENNINGTON) You have no idea.
16     A.  I have no idea.
17         (Whereupon, Deposition Exhibit 89 was
18 marked for identification by the reporter.)
19     Q.  This is Exhibit 89.  This is a document
20 produced by Kroger.  It's dated September 30th, 2010,
21 so roughly a month before your tenure at Suncor
22 ended?
23     A.  No, about a week.
24     Q.  September 30th.
25     A.  I started at QEP on October 18th.  I

Page 176

1  had a week off in between.  I was maybe there till
2  October 8th.
3      Q.  I'm sorry.  For some reason I had it in
4  my head you left at the end of October.
5      A.  No.
6      Q.  I apologize.
7          All right.  Were you aware -- can you
8  see that Kroger -- it appears that Kroger is billing
9  Suncor for freight costs incurred when they pulled
10 product from other locations.
11         First of all my question to you is,
12 were you aware in any way that this was occurring at
13 any time during your tenure?
14     A.  What was occurring?
15     Q.  That Suncor was -- had to reimburse
16 Kroger for freight costs when Kroger had to go
17 outside -- go to someone else to pick up volume that
18 Kroger -- that Suncor should have been able to
19 provide?
20     A.  I don't know.
21         MR. SHAHEEN:  I'm going to object.  The
22 question is overly broad and assumes facts not in
23 evidence.
24         You're not talking about this specific
25 exhibit, right, Ken?