Current versions of approved documents are maintained online.  Printed copies are uncontrolled.          Page 1 of 17



| | |
|---|---|
| | ***POLICY GUIDANCE & STANDARDS*** |

**COMPETITION**                                                                                                        *Number : CO-051*

*Date Developed:  August 26, 1993*           *Revision Date:  August 1, 2009*           *Last Reviewed:  August 1, 2009*

*Document Owner:*   <u>General Counsel</u>

*Document Contact:*   <u>Vice President Legal Affairs, Corporate</u>

**SCOPE AND PURPOSE**

This policy guidance & standard (PG&S) applies to Suncor Energy Inc. and its subsidiaries world-wide (collectively "Suncor" or the "Company"). References in this document to "Suncor Personnel" include members of the board of directors, officers, employees, contract workers, consultants and agents of Suncor.   All Suncor Personnel must comply with this PG&S.

Suncor believes in the free enterprise system and in healthy and unhampered competition, which is a basic and essential element of that system.   Applicable laws respecting the restraint of trade and the preservation and promotion of competition ("Competition Law") are designed to protect our free enterprise system.  Compliance with Competition Law is an essential ingredient of responsible corporate citizenship in all countries where Suncor conducts business.  Competition Law should be complied with and supported, not only because it is the law but also because Suncor believes in the competitive principles that it represents.

This PG&S is subject to and forms part of Suncor's Standards of Business Conduct Code and Compliance Program.

**STANDARDS**

Suncor shall in the conduct of its business (a) avoid all practices and activities that are a violation of any provision of Competition Law, and (b) support and encourage the maintenance of a competitive economy.

Suncor must compete fairly and practices which are opposed to ethical business practices must be avoided, such as practices characterized by fraud, deception, bad faith or coercion.  (See also ***Trade Relations PG&S and Improper Payments PG&S***)

Any indication of conduct involving violations of the Competition Law will be promptly and thoroughly investigated.  In addition to liability under the applicable Competition Law, an individual who violates this PG&S is subject to disciplinary action, which may include immediate dismissal.

It is important to seek the advice of the legal department of your business unit if you have any questions concerning *Competition Law* as it may apply to existing or contemplated business situations or courses of action in which you are involved. Appendix A briefly summarizes the applicable Competition Law relating to activities within Canada. Appendix B briefly summarizes the applicable Competition Law relating to activities within the United States.  Suncor Personnel engaging in business activities in Canada are subject to Appendix A; Suncor Personnel engaging in business activities in the United States are subject to

Exhibit 21

Case 1:11-cv-01611-MSK-CBS Document 261-22 Filed 11/18/13 USDC Colorado Page 2 of 17

Current versions of approved documents are maintained online.  Printed copies are uncontrolled. Page 2 of 17

Appendix B.  Competition Law in a country in which Suncor carries on business (a "Host Country") generally governs acts carried on, in whole or in part, within the Host Country, or acts carried on in whole or in part outside the Host Country that could affect competition within the Host Country.

Appendix C sets forth some practical suggestions for all Suncor Personnel engaging in activities which may be impacted by Competition Laws.

Supervisors and managers are expected to promote a working environment consistent with this policy guidance and standard and assist Suncor Personnel within their supervision to understand and comply with this policy guidance and standard and abide by applicable Competition Law.

**EXCEPTIONS**
There are no exceptions to these standards

**REFERENCES TO RELATED DOCUMENTS**
*Business Conduct Policy Statement*
*Improper Payments PG&S*
*Trade Relations PG&S*
*Business Conduct Code and Compliance Program PG&S*

Case 1:11-cv-01611-MSK-CBS Document 261-22 Filed 11/18/13 USDC Colorado Page 3 of 17

Current versions of approved documents are maintained online. Printed copies are uncontrolled. Page 3 of 17

**APPENDIX A**                      **CANADA: THE COMPETITION ACT**

The *Competition Act* creates a complex set of rules governing competition practices in Canada. This policy guidance and standard highlights some of the more important principles of Canadian Competition Law, but it is not a comprehensive analysis of the law. The general objective of the *Competition Act* is to prohibit certain trade practices and arrangements that may operate to impede a competitive economy. The statutory language has left a wide discretion to the courts in interpreting and applying the provisions of the legislation. As a result, litigation and investigations arising from alleged violations of the *Competition Act* may be protracted, may involve extensive time of officers and employees of Suncor, and may be costly in terms of legal fees, preparation for trial and otherwise.

The *Competition Act* addresses a number of practices which may have an adverse effect on competition. These practices are characterized in the Act as either being criminal offences or reviewable practices. The remedies available for violation of these provisions vary according to whether the conduct is a criminal offence or a reviewable practice.

**A.**      **THE CRIMINAL OFFENCES**

The Act creates a number of criminal offences. The more important of these offences are summarized below. The *Competition Act* sets out fines and/or jail terms for those convicted of committing such criminal offences. In addition, injured parties may bring a civil lawsuit for damages for any harm suffered by them as a result of a violation of the criminal provisions of the *Competition Act* or an order of the Competition Tribunal or other court under the Act.

**Note: The Competition Act was amended in March 2009. The section below dealing with Conspiracy to Lessen Competition reflects amended provisions that will come into force in March 2010. For the relevant provisions in force until March 2010, see the August 1, 2008 version of this Policy.**

**1.**      **Conspiracy To Lessen Competition**

The *Competition Act* prohibits as a criminal offence certain agreements or conspiracies between competitors or potential competitors. . Such a relationship does not have to be recorded in writing and does not require the existence of an agreement within the generally accepted meaning of that term. A court may infer that an agreement exists based upon the course of conduct of two or more persons.

The essence of the offence is the conspiracy or agreement itself. The parties need to do nothing to carry it out. Once an agreement has been reached, the offence has been committed even if the parties change their minds and decide that the market-sharing conspiracy or price-fix, or whatever, is not a good idea.

The Act specifically prohibits, agreements or arrangements to:

     **(a)**     fix prices;

     **(b)**     allocate markets; or

     **(c)**     restrict output

Care must be taken to avoid any inference that illegal actions have been agreed upon between participants

of trade associations, technical societies and similar organizations at which competitors are present. While trade associations perform legitimate functions and serve lawful purposes, meeting with competitors can be viewed as affording an opportunity to discuss or reach agreement on price or other anti-competitive action.

Clearly, not all agreements between our Corporation and its competitors would lessen competition; employees of our Corporation must be prudent but need not develop paranoia about discussions and arrangements or understandings with competitors. If the agreement has nothing to do with competition it is permissible; it may relate to charitable matters, improving business image and ethics, and reducing pollution or mutual support and cooperation during labour difficulties common to one or more competitors.

The conspiracy provisions of the *Competition Act* are among the most vigorously enforced provisions under the statute, and conviction may result in fines of up to $25 million and 14years in prison.
In addition to the criminal conspiracy offence, the Commissioner of Competition can also seek orders from the Competition Tribunal prohibiting any agreement between competitors that would have the effect of substantially lessening competition, but there are no fines or penalties associated with this provision.

## 2. Bid Rigging

Bid-rigging is illegal under the *Competition Act*. The term "bid-rigging" generally describes a practice whereby companies or persons who are invited to tender for a contract secretly agree (that is, without the knowledge of the person calling for or requesting the bids or tenders) to set the terms under which they will tender. There are several variations of this practice; the conspirators may agree on the price to be submitted or arrange that, in consideration of future favours, one or other of them will not tender for the particular job at hand.

However, the Act does not prohibit "joint-venture bidding" where the nature of the bid is made known to the person requesting the bid.

There has been considerable enforcement activity and a number of convictions resulting in significant fines under this provision.

## 3. Misleading Advertising

Under the *Competition Act*, materially misleading or false statements in promoting a product or business can be pursued as either a criminal offence or as a non-criminal reviewable trade practice (in which case the available remedies include cease and desist orders and administrative monetary penalties). In addition, there are several other federal statutes which prohibit misleading advertising (for example, those dealing with packaging, labelling and truth in labelling) and there has been an increasing tendency on the part of the several provincial governments to pass legislation of similar application. In most cases, the provincial consumer protection acts and trade practices acts are of some relevance. Provincial laws may contain advertising restrictions and deal with warranties, merchantability and other related matters.

The *Competition Act* contains a general prohibition relating to misleading advertising and then goes on to list a series of practices, each of which involves a more specific instance of the general offence of misleading advertising. Misleading advertising takes place when a representation or statement is made to promote a product or business interest and that representation or statement is either misleading or false in

Case 1:11-cv-01611-MSK-CBS   Document 261-22   Filed 11/18/13   USDC Colorado   Page 5 of 17

Current versions of approved documents are maintained online.  Printed copies are uncontrolled.        Page 5 of 17

a material respect.  It is not necessary that the statement was intended to mislead or that in fact any one was actually misled by the statement.  In determining whether this provision has been violated, the court will consider both the literal wording of the statements and also the "general impression" given by them.

Virtually any type of statement or representation comes within this provision, including statements appearing on a product, its wrap or container, and statements on in-store or other point-of-purchase displays.

In addition to the general misleading advertising offence, other activities which are prohibited under the *Competition Act* include the following:

> **Performance Warranties:**  Statements about the performance, efficacy or length of life of a product may only be made where they are supported by adequate and proper tests.  In addition, statements concerning warranties or guarantees must not be made if they are materially misleading or there is any reasonable prospect that they will not be carried out.
>
> **Tests and Testimonials:**  Representations that a test as to the performance, efficacy or length of life of a product has been made and testimonials with respect to a product may only be used if the representation was previously made, previously published or before the representation is made, approval or permission to publish it is obtained.
>
> **Double Ticketing:**  Whenever two prices appear on a product, the product must be sold at the lower price.
>
> **Price Advertising and Bait and Switch Selling:**  The *Competition Act* contains several provisions relating to price advertising.  It is prohibited to advertise a product at a bargain price unless a reasonable supply of that product is available at that price having regard to the nature of the market, the nature and size of business carried on by the seller and the nature of the advertisement.  This provision does not outlaw advertising products at bargain prices, but our Corporation must have reasonable quantities of those products which are advertised as being on sale.  This provision attempts to prevent the practice of "bait and switch selling" whereby a potential customer is enticed into a store to purchase a product at a sale price, only to find out that the particular product is unavailable.  Having arrived in a buying mood, the customer is then sold something else, usually at a higher price.
>
> **Sale Above Advertised Price:**  Subject to certain exceptions the Act prohibits the selling of any product at a price which is higher than the price advertised for that product.
>
> **Misleading Promotional Contest:**  The Act establishes a number of criteria which must be satisfied by all promotional contests.  There are also provisions under the *Criminal Code of Canada*, as well as under certain provincial statutes which apply to contests and other types of promotions.  Failure to comply with certain of these requirements can be a criminal offence and may result in significant fines and imprisonment.

Case 1:11-cv-01611-MSK-CBS Document 261-22 Filed 11/18/13 USDC Colorado Page 6 of 17

Current versions of approved documents are maintained online.  Printed copies are uncontrolled. Page 6 of 17

**B.    REVIEWABLE PRACTICES**

The *Competition Act* also provides that in specifically defined circumstances, certain types of distribution practices including refusal to supply, consignment selling, exclusive dealing, tied selling and market resale restriction while not necessarily illegal, may be subject to review and (in respect of most of the practices) if it is determined that such practice lessens competition substantially then an order prohibiting their continuance will be issued.  The Reviewable Practices provisions also now include resale price maintenance, which was previously a criminal offence and certain agreements between competitors (referred to above). Violations of these provisions are tried before a tribunal, the Competition Tribunal, and not in a criminal court.  The Competition Tribunal has broad remedial powers and can prohibit particular practices or conduct, cancel contracts or take such other actions as it considers necessary to restore competition in the relevant market.

While these reviewable practices are not criminal offences, the Competition Tribunal may, after a hearing, judge them sufficiently anti-competitive to issue an order restraining them, and a violation of such order could be prosecuted by way of contempt proceedings. The Act permits applications by third parties to the Tribunal (with leave) to seek remedial action in respect of some of the reviewable practices (Refusal to Deal, Exclusive Dealing, Tied Selling, Market Restriction and Resale Price Maintenance).

The reviewable practices which are of primary concern to our Corporation are the following:

**1.    Refusal to Deal**

Refusal to deal occurs when a person or company is unable to obtain supply because of insufficient competition and that a potential customer is willing and able to meet usual trade terms and the product is in ample supply.  In that situation the Competition Tribunal may order one or more suppliers of a product to accept that person as a customer where the refusal to supply products to that customer has substantially affected that person.

Generally speaking, our Corporation may choose its customers and is not required to sell to all potential customers <u>as long as there are other sources of supply available</u>.  Refusal to supply only becomes a problem when there is no other source of supply available in a particular market or if our refusal to supply is due to the low pricing policy of the person seeking supply.

**2.    Price Maintenance**

Certain actions by a seller seeking to control the price at which his buyer disposes of a product may result in an order under the price maintenance provisions of the *Competition Act*.  Under the *Competition Act* it is a reviewable practice to attempt to influence upward, or to discourage the reduction of, the price at which any other person supplies or offers or advertises any product; or to establish a minimum price on the resale of any product. The practice can involve the making of agreements or the use of threats or promises or like means. It does not matter if the suggested price is not observed or followed.

It is also a reviewable practice to refuse to supply a product to another person or to discriminate against such person because of the low pricing policy of that person.  Any disciplining of a customer by refusal to supply or by otherwise discriminating (such as by charging higher prices) because of the low pricing policy of the customer could be reviewable practices.  It is not necessary to show that the refusal to supply arose from failure of that customer to resell the product at a specified price. To be the subject of an order, the practices under this section must be found to have an adverse effect on competition.

Case 1:11-cv-01611-MSK-CBS   Document 261-22   Filed 11/18/13   USDC Colorado   Page 7 of 17

Current versions of approved documents are maintained online.  Printed copies are uncontrolled.        Page 7 of 17

Under the Act, the suggestion of a resale price or a minimum resale price is deemed to be an attempt to influence price upward, unless the person making the suggestion clearly indicates that it need not be accepted and that failure to accept it would not bring about any reprisals.

In preparing suggested resale price lists, the following or similar wording should be used:

> The dealer is under no obligation to accept these suggested resale prices and may sell at any price he chooses.  If he chooses to sell at prices other than those suggested, he will not suffer in any way in his business relations with Suncor Energy Inc. or any other person over whom Suncor Energy Inc. has control or influence.

If our Corporation advertises a resale price for a product, this will be deemed to be an attempt to influence upward the price at which our dealers sell the product unless wording is added to the price suggestion that makes it clear that the product may be sold at a lower price.  For example, one could indicate that any such advertised suggested price was only a suggestion and that the product could be sold at lower prices.  One could also modify the suggested price by the words "or less".

### 3.    **Consignment Selling**

Consignment selling is the practice where a supplier makes his product available to a distributor or retailer who does not become the owner of that product but rather sells the product as agent for the original supplier. In other words, a sale does not take place to the distributor or retailer, but only when the product is sold to the next user.  Consignment selling is a reviewable practice _only_ when it is introduced by a supplier of a product who ordinarily sells the product for resale (and not on consignment) for one of the following purposes:
  i.   to control the price at which the dealer or distributor of the product supplies the product; or
  ii.  to discriminate between different consignees or to discriminate between consignees and dealers or distributors to whom the product is sold for resale.

Consignment selling is reviewable by the Competition Tribunal only if there has been a _practice_ of consignment selling.  A practice is a pattern of behaviour and not an isolated instance, such as temporary measures designed to meet competition or the like.

### 4.    **Exclusive Dealing**

Exclusive dealing describes the method of product distribution where, as a condition of supplying product to a customer, a supplier requires or induces a customer to deal only in the supplier's products or that the customer not deal in the products of any of the supplier's competitors.  One practice which may, in certain circumstances, amount to exclusive dealing is the use of a "requirements contract" in which the purchaser undertakes to purchase all of his requirements from a certain supplier.

To be able to issue an order with respect to this reviewable practice, the Competition Tribunal must make the following findings:

   **(a)**    that the practice of exclusive dealing is engaged in by a major supplier of a product or is widespread in the market;

Case 1:11-cv-01611-MSK-CBS   Document 261-22   Filed 11/18/13   USDC Colorado   Page 8 of 17

Current versions of approved documents are maintained online.  Printed copies are uncontrolled.                Page 8 of 17

**(b)** that the practice of exclusive dealing is likely to impede entry into or expansion of a firm in the market or to impede introduction of a product into or expansion of sales of a product in the market or to have any other exclusionary effect in the market; and

**(c)** that as a result thereof, competition is or is likely to be lessened substantially.

## 5. Market Restriction

Market restriction is the distribution practice whereby a supplier: (i) requires that its dealers or distributors sell only to certain persons or only in a restricted geographical area, or (ii) penalizes its dealers or distributors for selling outside a certain market.  This practice is prohibited if the market restriction is engaged in by a major supplier of a product or is widespread in relation to a product and as a result it is likely to lessen competition substantially in relation to that product.

## 6. Tied Selling

Tied selling occurs when a supplier engages in a practice whereby as a condition of supplying one product to a customer, the supplier requires the customer to also buy another product from him, or to refrain from using another brand not obtained from the supplier.  As was the case with exclusive dealing and market restriction, the Competition Tribunal may only make an order with respect to tied selling if that practice is engaged in by a major supplier or is widespread in the marketplace and impedes entry of new firms or products or services into a market or has other exclusionary consequences such that it substantially lessens competition.

## 7. Delivered Pricing

The Competition Tribunal may prohibit a supplier from engaging in a practice of refusing to permit customers to buy and take delivery of an article at any locality where the supplier makes deliveries to other customers on the same terms and conditions that are available to the customers whose business are found in the locality.  In general, this provision is directed at a supplier's practice of dividing a market into geographic zones and selling its products on a delivered price basis.  It may be that a buyer in one zone could save money by buying in another zone and paying its own transportation costs.

An order may only be made in respect of delivered pricing where it is engaged in by a major supplier or is widespread in a market with the result that the customer is denied an advantage which would otherwise be available to it.

## 8. Abuse of Dominant Position

Abuse of a dominant position (formerly described in the *Combines Investigation Act* as "monopoly") occurs when a company or group of companies which have substantial control of a class of business in an area engage in a practice or practices which may prevent or substantially lessen competition in a market. Some practices set out in the *Competition Act* as examples of such anti-competitive acts are the use of fighting brands, preemption of scarce resources required by a competitor for the operation of his business, buying of product to prevent the erosion of existing price levels and adoption of product standards designed to prevent or to limit competition.  While there are a number of other practices set out in the Act, the important point to remember is that the list is not exhaustive and that other unlisted practices might be found to give rise to a concern under the Act (for example, price discrimination if engaged in by a dominant firm could be potentially be an abuse if it resulted in a substantial lessening of competition.  If the Tribunal finds that an

anti-competitive practice is substantially lessening competition it can now impose administrative monetary penalties (up to $10 million for a first occurrence or up to $15 million for subsequent occurrences. The Tribunal can also prohibit the practice or make such other order, including divestiture of assets or shares, as it deems necessary to overcome the effects of the practice on the market.

### C. **MERGERS AND PRE-NOTIFICATION**

The *Competition Act* imposes mandatory merger pre-notification requirements in respect of all mergers exceeding certain thresholds. In addition, the Act provides for possible substantive review of any "merger", regardless of size, which involves the acquisition or establishment of control over or a significant interest in the business of a competitor or other person. A "merger" may occur by means of a share purchase, asset acquisition or amalgamation.

In very general terms, the thresholds for the pre-notification requirement are:

**(a)** In a share acquisition, notification is required if the aggregate value of the underlying assets acquired, or the gross revenues generated by those assets exceeds $70 million. However, this notification requirement only applies where as a result of the transaction, the acquirer will own at least 35% of the voting shares of a private company or 20% of the voting shares of a public company (or if these levels are already met, more than 50%);

**(b)** In an asset acquisition, notification is required if the aggregate value of the assets acquired, or the gross revenues generated by the assets, exceed $70 million; or

**(c)** In an amalgamation, notification is required if the amalgamated corporation has assets or sales of at least $70 million.

If a transaction exceeds one of these thresholds, and the parties to the transaction, together with their affiliates, have assets in Canada in excess of $400 million, then detailed information about the transaction and the companies involved must be submitted under the *Competition Act* before the transaction takes place.

The proposed merger will then be reviewed to determine whether the merger will substantially lessen competition. Mergers which may substantially lessen competition can then be referred to the Competition Tribunal which can, among other things, issue an order prohibiting the merger.
The *Competition Act* identifies certain transactions which are exempt from the merger pre-notification requirements, including the following:

**(a)** transactions with affiliated companies;

**(b)** acquisitions of Canadian resources properties pursuant to farm-in arrangements; or

**(c)** certain joint venture arrangements where there is no change in control of any of the parties to the arrangements and certain other requirements are satisfied.

Case 1:11-cv-01611-MSK-CBS Document 261-22 Filed 11/18/13 USDC Colorado Page 10 of 17

Current versions of approved documents are maintained online.  Printed copies are uncontrolled. Page 10 of 17

**APPENDIX B     UNITED STATES:  FEDERAL AND STATE ANTITRUST LAWS**

The American federal and state antitrust laws create a complex set of rules governing competition practices in the United States.  This policy guidance and standard highlights some of the more important principles of federal and state antirust laws, but it is not a comprehensive analysis of the law.  The general objective of the antitrust laws is to prohibit certain trade practices and arrangements that may operate to impede a competitive economy.  The statutory language leaves wide discretion to the courts in interpreting and applying the provisions of the legislation.  As a result, litigation and investigations arising from alleged violations of federal and state antitrust laws may be protracted, may involve extensive time of officers and employees of Suncor, and may be costly in terms of legal fees, preparation for trial and otherwise.

A.     **THE UNITED STATES FEDERAL AND STATE ANTITRUST STATUTES**

1.     **Federal Statutes.**  There are four main U.S. federal antitrust statutes.

The Sherman Act prohibits (1) concerted action in the form of agreements or conspiracies that unreasonably restrain trade, and (2) unilateral conduct where a company engages in anti-competitive conduct which creates or perpetuates a monopoly over a particular product or service, or threatens to do so, as described in section D (Monopolies) below.

The Clayton Act prohibits "exclusive dealing" or "tying" arrangements that substantially lessen competition.  Section 7 of the Clayton Act prohibits mergers or acquisitions that may substantially lessen competition in a market.

The Robinson-Patman Act generally prohibits the seller from charging similarly situated customers different prices, or favoring one customer over another with respect to promotional services or allowances.

The Federal Trade Commission Act prohibits unfair method of competition and unfair or deceptive acts or practices.  This statute is enforced by the Federal Trade Commission.

2.     **State Statutes.**  Colorado has a state antitrust statute that is patterned after the Sherman Act.

Colorado also has an unfair practices statute that has two important sections.  The first generally makes it unlawful to injure a competitor or destroy competition by discriminating in the price charged to buyers in different sections of a city or other geographic area unless the price difference is justified by cost or competitive factors.  A second provision specifically prohibits pricing below average total cost to injure a competitor or destroy competition.

Finally Colorado has a consumer protection statute that prohibits a wide variety of unfair or deceptive trade practices.

Most other states in which the Company conducts business have similar legislation.

Case 1:11-cv-01611-MSK-CBS   Document 261-22   Filed 11/18/13   USDC Colorado   Page 11 of 17

Current versions of approved documents are maintained online.  Printed copies are uncontrolled.         Page 11 of 17

**3.     Criminal Sanctions.**  Violation of the Sherman Act is a felony for which an individual may be imprisoned for up to three years and fined up to $350,000; a corporation may be fined up to $10 million (or even more in certain circumstances).  Felony prosecutions typically are reserved for hard-core violations such as price fixing and bid rigging schemes.  The U.S. Department of Justice is also authorized to bring actions for fines and injunctions.

Violations of the Colorado statute are Class 5 felonies punishable by fines and imprisonment.

**4.     Private Damage Actions.**  Private parties can sue under federal and state law for injunctive relief and triple damages; attorney's fees are also available under federal law.

**5.     Government Contracting Prohibitions.**  A company that violates state or federal antitrust law may be prohibited from contracting with the government if the violation involves the submission of bids to the government.

**B.     RELATIONS WITH COMPETITORS.**

Perhaps the most significant antitrust laws are the state and federal statutes that make it unlawful to enter into a contract or conspiracy in restraint of trade.  The statutes require concerted action:  some form of agreement or understanding among companies.  However, this does not mean there must be evidence of an express contract or explicit agreement.  It is sufficient to show a tacit understanding.  For example, if at a trade association meeting a representative of one company makes statements designed to influence the behavior of a competitor, the existence of a conspiracy may be inferred from the communications among the competitors and their subsequent actions.

For these reasons, employees of Suncor should avoid any contact with competitors unless it is clear from the circumstances that the contact has a lawful purpose.  In no event should there be any discussion of prices, terms and conditions of sale (including credit), cost information, or any other subject relating to the marketing and sale of competing products.  Suncor Personnel should consult with their business unit legal department for guidance if they are involved in trade or industry associations that include competitors.

That is not to say that all contact with competitors is inappropriate.  Certain trade association activities are fully proper, as are transactions with competitors who also are customers or suppliers.  In these instances, discussion should be limited to the terms of the transaction or, in the case of a trade association, a proper subject of trade association business as noted below.

**1.     Price Fixing and Bid Rigging.**  Price fixing includes any agreement between two or more competitors that directly or indirectly affects the price of their product or service.  Price fixing is unlawful -- and a criminal violation -- whether or not the companies have agreed on a specific price, price increase, or range of prices.

Agreements on the following subjects affecting price are considered price fixing:

-     Agreements to use a formula to calculate prices;

-     Agreements to use a common starting point for negotiation;

Case 1:11-cv-01611-MSK-CBS Document 261-22 Filed 11/18/13 USDC Colorado Page 12 of 17

Current versions of approved documents are maintained online.  Printed copies are uncontrolled.                Page 12 of 17

- Bid rigging, including agreements to submit complimentary bids or share jobs among bidders;

- Agreements to eliminate discounts or establish the same discount level;

- Agreements to establish standard credit terms;

- Agreements on the purchase price of raw materials;

- Agreements on delivery terms or charges; and

- Agreements on the effective date of price changes.

Of course, the normal forces of competition require companies to monitor their competitors' prices.  But to avoid even the appearance of collusion, it is unwise for competitors to exchange price data or other information that is sensitive from a competitive standpoint -- except, of course, when the competitors are buying and selling to each other.

Bid-rigging is a form of price fixing and is illegal.  The term "bid-rigging" generally describes a practice in which companies or persons who are invited to bid on a contract secretly agree (that is, without the knowledge of the person calling for the bids) to set the terms under which they will bid.  There are several variations of this practice:  the conspirators may agree on the price to be submitted or arrange that, in consideration of future favors, one or the other of them will not bid on the particular job at hand.

However, the Act does not prohibit "joint-venture bidding" where the nature of the bid is made known to the person requesting the bid.

Finally, it should be noted that it is perfectly appropriate and lawful for the Company unilaterally to meet a competitor's price or any other term or condition of sale.

**2.     Dividing Territories, Allocating Customers or Limiting Production.**  Any agreement among competitors to divide markets or limit production is illegal.  It would not be proper for two competitors to agree that one would sell only in the southern part of a metropolitan area, and the other the northern; or that one would refrain from submitting bids to one contractor if the other refuses to sell to a different contractor.

**3.     Group Boycotts or Concerted Refusals to Deal.**  It generally is unlawful for competitors to agree not to do business with another firm.  Examples of potentially unlawful group boycotts are agreements not to sell to price cutting dealers and agreements not to purchase from a supplier unless prices are reduced.

**4.     Trade Association Activities.**  Trade association activities are particularly sensitive from an antitrust standpoint because, by definition, trade association business involves contacts and communication among competitors.  Most trade associations are advised by lawyers with experience in the antitrust laws and most formal trade association activities are perfectly appropriate.  The greatest antitrust exposure and trade association activities lies not with the formal association projects, but with informal conversations and discussions that take place on the golf course, over a beer, or during a coffee break.

As indicated above, no matter when or where discussions might occur, participants in trade association activities should avoid discussing prices, terms and conditions of sale, and other issues relating to

competition.  It is also important to recognize that standard setting activities may raise antitrust concerns if standards are used to the competitive disadvantage of another firm.  Before you become involved in standard-setting activities, please consult with management and your business unit legal department.

If a competitor attempts to engage you in a discussion of an improper subject at a trade association meeting or at any other time, you should immediately and unequivocally state that you will not participate in the discussion and terminate the conversation.

**5.    Joint Ventures.**  Occasionally, it may be necessary for Suncor to join with a competitor in a joint venture, including joint bids or joint research projects.  No activities of this type should be undertaken without thorough discussion with management and consultation with your business unit legal department.

Not all agreements between Suncor and its competitors would lessen competition; Suncor Personnel must be prudent, but need not develop paranoia about discussions and arrangements or understandings with competitors.  If the agreement has nothing to do with competition it is permissible; it may relate to charitable matters, improving business image and ethics, and reducing pollution, or mutual support and cooperation during labor difficulties common to one or more competitors.

## C.    RELATIONS WITH CUSTOMERS

**1.    Resale Price Restrictions.**  It may be unlawful for a supplier to dictate the resale price charged by its customer.  Resale price maintenance or vertical price fixing occurs when the supplier and customer agree upon the price at which the customer will resell the product.  The law in this area is complex.  No effort should be made to set the price charged on resale by customers without a thorough discussion with management and your business unit legal department.

**2.    Territory and Customer Restrictions.**  Antitrust issues may also be raised if we attempt to restrict our customers to reselling our product in a particular geographic territory or to specify customers or classes of customers.  The legality of these arrangements depends upon a variety of complicated issues.  Once again, before imposing territory or customer restrictions, these arrangements should be discussed with management and your business unit legal department.

**3.    Customer Termination.**  While Suncor is free to select its own customers and suppliers, it must do so independently.  An understanding or agreement to do or refrain from doing business with a third party may be an illegal conspiracy to lessen competition.  For example, if we decide not to sell product to a distributor who has the reputation of price-cutting, it might be alleged that our decision to terminate sales to the distributor was the product of a conspiracy or agreement with other distributors.  Defending lawsuits is expensive, even when our defence has merit.  It is important to manage our relationship with our customers -- particularly when we decide not to sell to them -- to minimize the possibility of litigation.

**4.    Exclusive Dealing and Tying Arrangements.**  Exclusive dealing can raise antitrust problems when our decision to deal exclusively with a particular customer also requires that customer to refrain from selling competitive products.  Tying arrangements occur when a company sells one product only on the condition that the buyer also purchases another product or service.

Any proposed exclusive dealing or tying arrangement must be discussed with management and your business unit legal department before it is adopted.

**5.     Price Discrimination and Pricing Below Cost.**  The state and federal antitrust laws prohibit charging competing buyers different prices unless certain conditions are met.  Most significantly, price differentials may be justified to meet competitive conditions.  If the Company has the good faith belief that the lower price is necessary to respond to a price quoted by a competitor, then the differential generally would be lawful.  Similarly, when a demonstrable cost savings in sales to the favored customer justifies the price differential, the lower price is lawful.

The price discrimination statutes also apply to promotional allowances or services that must be made available to competing customers on proportionately equal terms.  On balance, the price discrimination statutes are complex and management and your business unit legal department should be consulted whenever a price differential is not clearly justified by competitive conditions.

In addition, the Colorado unfair practices statute makes it unlawful to sell below cost "for the purpose of injuring competitors and destroying competition."  Under the Colorado statute, "cost" is defined to include the cost of raw materials, labor and all overhead expenses -- which basically means average *total* cost.  The state statute is potentially more restrictive than the federal antitrust law.  As described below, the federal statute generally prohibits below cost pricing only when the seller prices below average variable cost and, due to its dominant position in the market, the seller has the ability to recoup losses by raising prices in the future.

Other states also frequently have similar price discrimination and unfair practices statutes.

### D.     MONOPOLIES

As indicated above, the federal and state antitrust laws also apply to companies acting alone but which have a dominant position in the marketplace.  In a nutshell, there are some kinds of competitive conduct that might be perfectly legal for a company with a small market share, but which create significant antitrust risks for a dominant firm.

Suncor is fortunate to have a strong market position in certain areas of its business.  In those markets, we must avoid competitive tactics that might be viewed as designed to exclude or injure present or potential competitors.  Examples of this kind of conduct include predatory pricing, lowering prices in a specified geographic area in order to harm local competition, acquiring previously independent suppliers or distributors, and so forth.  Predatory pricing is usually defined as pricing below average variable cost.  Nonetheless, in light of potentially more restrictive state antitrust statutes, our products should never be sold below average *total* cost without first obtaining the approval of management.

In fact, a good rule of thumb is that we should avoid competitive actions that cannot be justified by sound business considerations, including, fundamentally, competition on the basis of price, service and quality.

### E.     UNFAIR COMPETITION.

State and federal statutes prohibit "unfair methods of competition" or deceptive practices.  Of course, what is unfair or deceptive often rests with the eye of the beholder.  Nonetheless, the following practices raise questions and should be avoided:

-      Commercial bribery;

- Coercion of customers, competitors or suppliers;

- Offering special benefits to customers who agree not to purchase competing product lines;

- Acquiring trade secrets by unfair means;

- Making false or deceptive comparisons of competitors or their products;

- Misrepresenting the price or quality of a competing product; and

- Passing off one company's products as those of another by copying advertising or trademarks.

Current versions of approved documents are maintained online.  Printed copies are uncontrolled.    Page 16 of 17

**APPENDIX C**                    **PRACTICAL SUGGESTIONS**

**1.    Competitive Checklist.**  Are you doing or thinking about any of the following activities?  If so, you should understand the implications under antitrust and unfair competition laws and seek advice from your business unit legal department before you engage in them.

- Competitors:  are you planning to meet with any of your competitors?  Do you visit with them over the telephone?  Talk with them at trade association meetings?  Mail catalogs, price lists, or other items to them?

- Prices, promotion:  are you charging customers who compete with each other different prices for the same product?  Do you charge different prices for the same product in different geographic areas?  Do you expend different freight terms or credit terms to customers who compete with each other?  Do you give customers volume discounts?  Do you have promotional programs for some of your customers that are not available to or not used by other customers for the same product?

- Customers:  do you attempt to influence your customers about the prices that are charged when they resell your product, or the customers to whom or areas in which they resell?  Do you assign customers exclusive areas in which to resell your product?

- Two products:  do you require or expect your customers who wish to buy one product from you to also buy another product or service?  Do you package different products together and sell those products only in packaged form?

- Exclusive dealing:  do you require or expect that your customers will deal only with you?

- Reciprocal dealing:  do you expect or urge your suppliers also to buy from you the products you offer?

- Market power:  do you possess a substantial market share?  Do you ever sell below cost?

- Comparative advertising:  does your advertising comment on the quality, reliability, viability or pricing of your competitors or their products?

- Product claims:  can you substantiate the claims used in the advertising for your products?

**2.    Documentation.**  Careful documentation of the proper justification for Suncor's competitive activities is extremely helpful.  While documentation will not make unlawful conduct legal, it will document an activity and avoid inappropriate mischaracterization or inferences.

By the same token, however, careless language can give the wrong impression and be extremely harmful.  Keep in mind the following list of practical suggestions:

- Make a note of the source of the information when a customer gives you competitive pricing information.

COMPETITION                                                                                                    Last Reviewed on:  August 1, 2009

- When competitive forces require you to give a discount to obtain or retain business, put a note in the file along the lines of:

    On [date] I offered [customer] the discounted price of [$].  I offered this price based upon my belief that this price is necessary to [obtain or keep] the [customer's] business.  It is my understanding from [the customer] that [competitor] has offered them a price of [$], and unless we meet that price we will not make the sale.

- Avoid using words or phrases that suggest you feel guilty about what you are doing or writing, such as "please destroy after reading."

- Avoid exaggeration -- "this program will destroy the competition."

- Don't speculate about whether certain conduct is lawful or not.

- Don't describe competition as undesirable or unethical.  Avoid denigrating price-cutting and don't refer to lost customers as "stolen."

- When discussing competition prices, avoid giving the false impression that Suncor is not competing vigorously or that the Company's prices are based upon anything other than our own business judgment.

- Do not suggest that special treatment is being given to a particular customer or class of customers -- "for you alone."

- Do not disparage your competitors or their products.

- Don't use language that suggests that Suncor is acting pursuant to "industry agreement" or "industry policy" rather than as a matter of our own self-interest.