**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation,
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

    Plaintiffs,

v.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

    Defendant,

v.

HOSSEIN AND DEBRA LYNN TARAGHI,

    Third-Party Defendants.

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND,
THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF (DOC. 181)**

---

Plaintiffs Western Convenience Stores, Inc. ("Western") and Western Truck One, LLC ("Western Truck One"), by and through their undersigned counsel, respond as follows to Suncor's Motion for Summary Judgment on Plaintiffs' Second, Third, Fourth and Fifth Claims for Relief filed on February 8, 2013 (Doc. 181, "Motion").

### I.  SUMMARY OF RESPONSE

In the Motion, Suncor seeks summary judgment on Plaintiffs' two claims for breach of contract and two claims for tortious interference.

Suncor argues that it has established beyond any genuine issue of fact that Plaintiffs

cannot prevail on their breach of contract claims. Plaintiffs assert that there are genuine factual issues with respect to whether Suncor breached the contract. For Western's breach of contract claim, Plaintiffs assert that, as fully briefed in their Response to Defendants' Motion for Summary Judgment on First and Sixth Claims for Relief and Third Affirmative Defense ("Plaintiffs' Antitrust Response," Doc. 198), there is a genuine factual issue as to whether Suncor illegally discriminated in price against Western under both the Robinson-Patman Act and the Colorado Unfair Practices Act. Such price discrimination represents a breach of contract by Suncor by breaching its duty to set prices in good faith and deal fairly with Western. Also, Suncor inequitably and arbitrarily allocated Fuel to Western, breaching the express term of the contract to make any such allocations in good faith. Thus, there are genuine factual issues as to whether Western had an excuse for non-performance under the contract, precluding summary judgment on Plaintiffs' Second Claim for Relief. These same genuine factual issues, along with others, preclude summary judgment on Western Truck One's breach of contract claim because this contract is related to the contract at issue for Plaintiffs' Second Claim.

Plaintiffs also assert there is a genuine issue of fact as to whether Suncor improperly retaliated against Plaintiffs for filing this lawsuit by terminating their access to Suncor's terminals, which also terminated their ability to purchase Fuel from middlemen with whom they had contractual relationships. The multi-factor test for determining whether there is tortious interference under Colorado law, particularly in a case involving antitrust claims, shows that summary judgment is improper.

## II. FACT STATEMENT

All of the claims in this action involve the same facts occurring in the time period, 2009 to the end of May 2011, when Suncor terminated Western's supply of fuel. The background facts set forth in Plaintiffs' Antitrust Response provide the context for this response to Suncor's summary judgment motion as to Plaintiffs' common law claims. Accordingly, Western refers to Section II, Fact Statement of Plaintiffs' Antitrust Response for the background facts pertinent to this response. See Doc. 198 at 4-10.

## III. CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

### A. PLAINTIFFS' SECOND CLAIM FOR RELIEF: BREACH OF CONTRACT (MASTER AGREEMENT).

1. <u>Burden of proof and elements</u>. While the Plaintiffs agree with Suncor's recitation of the burden of proof, Plaintiffs disagree with its statement of the elements applicable to a claim for breach of contract as incomplete. Suncor fails to recite the entirety of the second element, namely, that the Plaintiff may show some justification for its own non-performance.[1]

2. <u>Element of Claim Challenged by Defendant - Performance by Plaintiff Under the Contract or Justification for Non-Performance</u>.

　　A.　Although the Plaintiffs have conceded that Western refused to pay after it had

---

[1] "It has long been the law in Colorado that a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.1992) (citations omitted); *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 529 (Colo. Ct. App. 2011) (quoting *id.*).

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

Page 3

been terminated, Western was substantially justified in its non-performance. Colorado law recognizes that a party's prior material and unexcused breach of a contract may relieve the other party of a duty to continue its performance. *Converse v. Zinke,* 635 P.2d 882, 887 (Colo. 1981). "Whether a breach of a contract is material, and therefore excuses further performance by the other party, is a question of fact." *Kaiser v. Mkt. Square Disc. Liquors, Inc.,* 992 P.2d 636, 640 (Colo. App. 1999). Suncor does not establish the absence of a genuine issue as to whether Western's non-performance was justified; for that reason alone, the Motion should be denied as to the second claim for relief.

B. In any event, there are genuine issues as to whether the refusal of Plaintiff Western to pay Suncor for fuel delivered on the eve of the supply cut-off was justified, and whether Defendant Suncor had materially breached the contract prior to that time, excusing performance. Western's non-payment was justified in that:

- Suncor's price discrimination in favor of Kroger was a breach of the covenant of good faith and fair dealing; and
- before cutting Western's supply off, Suncor engaged in a practice of inequitably allocating supply — an explicit violation of the Master Purchase Agreement.

C. **Suncor's price discrimination was a breach of the covenant of good faith and fair dealing**.

1. Suncor's price discrimination against Western and in favor of Kroger affiliates was a breach of that contract's implied covenant of good faith and fair dealing. *See generally Venta, Inc. v. Frontier Oil & Refining Co.*, 827 F. Supp. 1526, 1529-31 (D. Colo. 1993) (allowing a claim for breach of the covenant of good faith and fair dealing that appears to have

been premised on price discrimination under the Robinson-Patman Act). In Colorado, "every contract contains an implied duty of good faith and fair dealing." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (citing Colo. Rev. Stat. § 4-1-203). "The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time." *Id.* (citations omitted). This duty "is most commonly at issue . . . when a contract contains an open price term." *Ervin v. Amoco Oil Co.*, 885 P.2d 246, 250 (Colo. App. 1994), *aff'd on this point*, 908 P.2d at 499.

2. As set forth at length in Plaintiffs' Antitrust Response, although Suncor sold to both Western and Kroger millions of gallons of identical grades of unbranded Fuel, Suncor charged Western higher prices for that Fuel over a period totaling 20 months. *See, e.g.,* Defendant's Antitrust Motion Ex. A (Glick/Tatos Report, Doc. 185-2) at 5, Plaintiffs' Antitrust Response at 30-31. In the petroleum industry, a wholesale price differential of 0.25 to 0.5 cents per gallon is of Fuel considered to be substantial. Defendant's Antitrust Motion Ex. Z (Doc. 185-29) at 7. The Suncor wholesale price differential in Kroger's favor was many times those amounts, an "almost unheard of" price differential in the industry. *Id.*

3. The Master Product Purchase and Sale Agreement between Suncor and Western does not contain a price term, thus leaving the price term open. *See* Motion Ex. A (Doc. 181-1). Plaintiffs concede that if the price discrimination was justified under state and federal antitrust law, it would not amount to a breach of the covenant of good faith and fair dealing. If it was not justified, however, the issue of whether Suncor breached the covenant is one for trial. *See Amoco Oil*, 908 P.2d at 499 ("Whether a party acted in good faith is a question of fact which must be determined on a case by case basis."). Summary judgment on Plaintiffs'

contract claim may not be properly granted, owing to a genuine issue of material fact as to whether the Suncor itself breached the contract, *i.e.* failed to perform.

D. **Suncor's inequitable Allocation of Supply was a breach of the covenant of good faith and fair dealing**.

1. There is no dispute that the Master Agreement (Motion Ex. A, Doc. 181-1) was in effect during all times relevant to this action and has not been terminated. It contemplates "purchase and sale of petroleum products" both with and without written "Confirmations." *Id.* at 1, ¶ 2. Accordingly, sometimes products were delivered under written Confirmations and at other times under oral arrangements amounting to confirmations, regardless of whether confirmation was written or oral the terms of the Master Agreement always governed. *Id.*

2. The Master Agreement allowed Suncor to suspend sales in its sole discretion if it believes it had "grounds for insecurity." *Id.* at A-3, ¶ 17. Absent such a suspension, however, the amounts of products supplied to Suncor customers were subject to good faith allocation under which available products would be equitably allocated among Suncor's customers including Western. *Id.* at A-2, ¶ 9. In fact, as shown below, long before sales to Western were suspended, not only was equitable allocation ignored but so also was the existence of the contract.

3. Western was a long-time purchaser of Fuel from Suncor until May 2011, when Suncor unilaterally terminated Western's supply of Fuel. Plaintiffs' Antitrust Response Ex. 1, Declaration of Hossein Taraghi, ¶ 4. In 2008 and 2009, Western was Suncor's largest volume buyer of unbranded Fuel, purchasing more than 130 million gallons of Fuel over that two

11-cv-01611-MSK-CBS:  PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF

Page 6

year period.  Plaintiffs Antitrust Response Ex. 3, Excerpts of Steve Moss Deposition, at 126:12-25; Plaintiffs' Antitrust Response Ex. 10, Top Ten Purchasers.   In 2010 and 2011, Western's Fuel purchasing needs never decreased, and it continued to want to purchase as much of its Fuel supply as possible from Suncor.  Plaintiffs' Antitrust Response Ex. 1, Taraghi Declaration ¶ 12; Plaintiffs' Antitrust Response Ex. 11, Excerpts of Chris Wehrle Deposition, at 18:20-19:4. However, in those years, two subsidiaries of supermarket conglomerate Kroger (Dillon Companies d/b/a King Soopers and City Market and Mini-Mart, Inc. d/b/a Loaf 'N Jug) supplanted Western as Suncor's largest unbranded customers.   Plaintiffs' Antitrust Response Ex. 10; Plaintiffs' Antitrust Response Ex. 3 at 361:6-361:17.  As the Kroger affiliates became increasingly substantial Suncor customers, Suncor started cutting Western back to lesser volumes and "allocating" Western to Fuel purchase amounts less than provided in the Western contracts. Plaintiffs' Antitrust Response Ex. 1  at ¶ 12; Plaintiffs' Antitrust Response Ex. 11  at 43:2-44:7; 45:24-46:24; 48:21-24.

        4.     In addition to approving preferential pricing for Kroger, Suncor's Kendall Carbone and her successor, Steve Ewing, engaged in a course of inequitable allocation of Fuel to Western and a general disregard of the contract between the parties, apparently because they did not care for Hossein Taraghi and his "operating philosophy."  Plaintiffs' Antitrust Response Ex. 14 (Deposition Exhibit 170) at 2; Plaintiffs' Antitrust Response Ex. 3 at 374:11-376:18.  For example, four days after having told Mr. Taraghi she was "comfortable leaving your credit line at $3 million"  (Ex. 1 (Deposition Exhibit 166); Plaintiffs' Antitrust  Response Ex. 3 at 97:8 – 98:25), Ms. Carbone told Mr. Moss (the Western sales representative) in early March of 2010 "I would like to understand if we can sell this volume to Sinclair instead and at least make the same

**11-cv-01611-MSK-CBS:  PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

Page 7

amount of money and just avoid selling to them (Western) at all this month." Ex. 2 (Deposition Exhibit 167); Plaintiffs' Antitrust Response Ex. 3 at 104:17 – 107:17. The problem was that, as illustrated in the table below, from September 2009 to May 2010, Suncor was obligated to deliver 38,262,000 gallons of Fuel to Western under written Confirmations. Instead of the supply set out in those Confirmations, Western received 5,506,567 gallons less:

| Month | Confirmation Totals in Barrels from Ex. 3 | Confirmation Totals in Gallons (BBLS x 42) | Total Fuel in Gallons from Glick/Tatos Appendix 2 | "-/+" |
|---|---|---|---|---|
| Sep-09 | 115,000 | 4,830,000 | 95,320 | -4,734,680 |
| Oct-09 | 150,000 | 6,300,000 | 6,185,617 | -114,383 |
| Nov-09 | 160,000 | 6,720,000 | 6,361,980 | -358,020 |
| Dec-09 | 140,000 | 5,880,000 | 7,100,704 | 1,220,704 |
| Jan-10 | 146,000 | 6,132,000 | 6,047,063 | -84,937 |
| Feb-10 | 95,000 | 3,990,000 | 3,406,783 | -583,217 |
| Mar-10 | 35,000 | 1,470,000 | 2,830,706 | 1,360,706 |
| Apr-10 | 100,000 | 4,200,000 | 3,274,408 | -925,592 |
| May-10 | 85,000 | 3,570,000 | 2,282,852 | -1,287,148 |
| **Totals** | **1,026,000** | **38,262,000** | **37,585,433** | **-5,506,567** |

Being consistently shorted by Suncor was of grave concern to Hossein Taraghi, who was constantly pressing for more product from Suncor. Plaintiffs' Antitrust Response Ex. 1 ¶ 12; Plaintiffs' Antitrust Response Ex. 2, Excerpts of Hossein Taraghi Deposition at 68:4-69:16, 150:8-24.

5. Overall, despite the fact that Carbone was comfortable with leaving the Western credit line at $3 million, she nonetheless allowed (or caused) Suncor to continue shorting Western supply for which there were written Confirmations. Between October 2009

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

Page 8

and May 2010, Suncor had agreed in written Confirmations to supply 38.3 million gallons of gasoline to Western. Ex. 3 (Confirmations #13 - #21). However, during that period the deliveries to Western were 6.1 million gallons short, which was nearly 16% of Western's planned-for supply. *Id.*

      6.     Although no one at Western could know it at the time, one reason that Western was being shorted was the fact that Kroger, in addition to getting a favorable price, was "overlifting." In an email in May of 2010, after observing that Suncor could "easily cut them (Western) back," Ms. Carbone, observed that Kroger had been overlifting (meaning taking delivery of more fuel than their contract specified). Ex. 4 (Deposition Exhibit 82); Plaintiffs' Antitrust Response Ex. 19, Excerpt of Kendall Carbone Deposition at 150:16 – 152:13.[2] That month Suncor allowed Kroger to lift approximately 6.8 million gallons more than the Dillon and Mini Mart contracts contemplated.[3]

      7.     For the months of June 2010 through January 2011[4] Suncor sold to

---

[2] "I took a look at the UB (unbranded) sales for the first four months of the year as well as some of the contracts we have out there. We have been selling Western Convenience 50-65,000 barrels the past couple of months and can easily cut them back. We also appear to have a DATS contract for 50,000 barrels a month that expires 6/1/10- so if we don't renew that and cut back WC(S) then we are a good chunk of the way there. Steve - the other thing that I noted was that Kroger appears to be overlifting their contract by quite a lot. I show their volume is supposed to be around ▮▮▮▮▮▮ barrels per month and they have lifted around ▮▮▮▮▮▮ barrels of gasoline the past couple of months." Ex. 4; Plaintiffs' Antitrust Response Ex. 19 at 150:16 – 152:13.

[3] Suncor's contracts with Kroger attached to Suncor's summary judgment motion directed to Plaintiffs' antitrust claims, Doc 185-20 and Doc. 185-21, show that Kroger was entitled to lift ▮▮▮▮▮▮▮▮ gallons per month of gasoline (E-10, E-10 RUL and E-10 PUL). Plaintiffs' Antitrust Response Ex. 23, Appendix 3 shows that Kroger lifted ▮▮▮▮▮▮▮▮ gallons of gasoline in May of 2010.

[4] With one exception: a relatively small interstate pipeline amount of 2,500 bbl (105,000

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

Page 9

Western more than 18 million gallons of gasoline and 2.4 million gallons of diesel fuel (*See* Plaintiffs' Antitrust Response Ex. 23, App'x 2), although there are no written Confirmations of that supply. During that time Carbone, and then Ewing, oversaw a pattern of inequitable treatment that favored other Suncor customers over Western, and generally ignored the fact that a contract even existed between them. For example, on September 14, 2010 Carbone acknowledged the "need to remove all allocations" but stated "Western Convenience is looking for product but I just hate to open up that can of worms and sell to him again…. I guess if we get desperate enough we will have to…" Ex. 5 (Deposition Exhibit 86); Plaintiffs' Antitrust Response Exhibit 19 at 158:9 – 165:16. In other words, even though fuel was supposed to be equitably allocated among all customers, Carbone lifted the allocation for everyone but Western. Similarly, in April 2011 when another customer complained about short supply, Ewing wrote to Moss: "I agree with Dick. I know there is (sic) other ways to hit our target number. Western Convenience can be shut off due to no contract. Please open Dats (DATS Trucking) back up to our commitment." Exhibit 6 (Deposition Exhibit 130).

E. **Suncor's violation of the Colorado Unfair Trade Practices Act, C.R.S. § 6-2-108 ("UPA") precludes Suncor from asserting non-performance by Plaintiffs.**

1. As briefed in detail in Plaintiffs' Antitrust Response (Doc. 198 at 55-66), the UPA prohibits secret discriminatory discounts. Defendant Suncor's discriminatory pricing via the substantially larger cents-per-gallon discount given to Kroger constituted a secret allowance of an unearned discount, in violation of § 6-2-108. There is no dispute that the

---

gal.) at the Rocky Mountain Pipeline terminal. Ex. 7 (Deposition Ex. 31), No. 22.

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

Page 10

discriminatory pricing existed and that it was kept secret from the Plaintiffs. See Plaintiffs' Antitrust Response at 56-59.

      2.     UPA § 6-2-109 states that any contract made in violation of "sections 6-2-103 to 6-2-108 is an illegal contract, and no recovery thereon shall be had." Moreover, under Colorado law, illegal contracts are void. *Metro. Life Ins. Co. v. Roma*, 50 P.2d 1142, 1143 (Colo. 1935) ("If the contract whose enforcement is here sought is contrary to public policy, it is illegal and void and the courts will have nothing to do with it."). If a party against whom enforcement of a contract asserts that it is an illegal contract and therefore void, the claiming "'party to an illegal bargain generally can neither recover demages (sic) for breach thereof, nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value.'" *Bd. of Cnty. Comm'rs of Pitkin Cnty. v. Pfeifer*, 546 P.2d 946, (Colo. 1976) (quoting 14 S. Williston, *Law of Contracts*, § 1630A (3d ed. 1972)). Thus, Western may have a defense to recovery on Defendant's breach of contract claim by showing that the contract at issue violates § 6-2-108 and 109, thus rendering the contract void. To the extent that the Master Purchase Agreement is determined to be void as to enforcement by Suncor because of Suncor's practices in violation of the UPA, those unfair practices could amount to a justification or an excuse for Western's non-performance on its affirmative breach of contract claim.

      3.     If the Court ultimately finds that the Master Agreement is an illegal contract and void because it violates the Colorado Unfair Practices Act, Plaintiffs acknowledge that there would then be a question of law as to whether they could recover for a breach of this same contract. Since the Court will not make this finding until some future date, it is

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

premature to brief this issue.

## B. PLAINTIFFS' THIRD CLAIM FOR RELIEF: BREACH OF CONTRACT (WESTERN TRUCK ONE ACCESS AGREEMENT).

1. <u>Burden of proof and elements</u>. Plaintiffs agree with Defendant's recitation of the burden of proof, but they disagree as to the elements of a claim for good faith and fair dealing.

2. <u>Elements challenged by Plaintiffs</u>.

A. **Acting dishonestly and outside of accepted commercial practices is not a required element.** The case cited by Suncor, *ADT Security Services, Inc. v. Premier Home Protection, Inc.*, 181 P.3d 288, 293 (Colo. App. 2007) states that acting dishonestly or outside accepted commercial practice amounts to a breach of the covenant of good faith and fair dealing, but they are not the only means in which the covenant can be breached. The test is much broader. It contemplates giving effect to the parties' intentions and a "'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Id.* at 293 (quoting *Amoco Oil*, 908 P.2d at 498). To be sure, dishonesty can be a breach but that is not the only showing that will satisfy Western's burden here.

    1. As set forth in Section III.A.2 above, Suncor did two things which violated the test articulated in *ADT Security Services*. First, it gave a discriminatory price to Western's arch competitor, Kroger, and second, it failed to equitably allocate supply generally and as required by the contract. *Id.* Genuine issues of material fact have been established as to those elements of conduct on the part of Suncor.

    2. In addition, there is a genuine issue of material fact as to whether Suncor's action in terminating access to its terminals was tied not to an independent wish to terminate access,

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

Page 12

but rather to its abuse of its exercise of discretion in setting pricing and allocating supply. The Master Agreement (Motion Ex. A (Doc. 181-1)) provides that "this Agreement shall govern any and all transactions or agreements… for the purchase and sale of any petroleum products…." *Id.*, ¶ 1. Moreover, Suncor took pains to make clear that it was not terminating the Master Agreement nor was it terminating the Terminal Access Agreement. Motion Ex. H (Doc. 181- 8, pp. 2 - 3). Thus, the Suncor Terminal Access Agreement cannot be viewed in a vacuum independent of the Master Agreement and the covenants contained in it. Suncor had discretion over setting prices and allocating supply, and prior to terminating Western Truck One's right of access -- and thus Western's supply of Fuel from middlemen -- Suncor exercised that discretion in breach of the contract's duty of good faith and fair dealing.

    3. Yet another genuine issue of material fact regarding good faith and fair dealing emerges from the facts of this case. Until terminal access was cut off, Western Truck One used Suncor's terminals to load Fuel purchased from Suncor as well as Fuel purchased from third-parties (*i.e.*, middlemen) who purchase Suncor fuel and resell it to others via Suncor's terminals. Plaintiffs' Antitrust Response Ex. 1 ¶ 14. This access to Suncor Fuel via middlemen was of particular importance to Western as Suncor would impose allocations limiting the amount of Fuel that Western could purchase directly from Suncor. *Id.* When allocations occurred, Western could still obtain Fuel from middlemen to make up for consumer demand that Suncor would not supply directly. *Id.*

    4. When a middleman delivers Fuel to one of its customers at a Suncor terminal, the fee for using the terminal in that transaction is paid by that middleman, thus relieving Suncor from depending on the creditworthiness of the customer. Thus, there is a genuine issue of

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

Page 13

material fact as to whether Suncor's punitive termination of access, which only harmed Western and accomplished no economic advantage for Suncor, was yet another example of breach of the covenant of good faith and fair dealing. Plaintiffs' Antitrust Response Ex. 1 ¶¶ 14-15.

       5.    Suncor's assertion that the covenant of good faith and fair dealing cannot be invoked to abridge a specific right is only part of the legal principle involved. The covenant of good faith and fair dealing limits a contractual right when there is "an express or implied promise, independent of the covenant of good faith itself, restricting that right." *Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 623 (Colo. App. 1997). As the *Soderlun* court stated:

> The covenant of good faith and fair dealing, whether express or implied, does not inject new substantive terms into a contract or change its existing terms. *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo. 1995); *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359 (Colo. App. 1994). Such a covenant, therefore, cannot limit an employer's right to discharge without cause, unless there is an express or implied promise, independent of the covenant of good faith itself, restricting that right.

*Id.*

       6.    Western has shown that there are genuine issues of material fact as to whether there was an explicit promise that was breached (equitable allocation) and whether there was an implicit promise not to favor one customer over another (price discrimination).

### B. PLAINTIFFS' FOURTH AND FIFTH CLAIMS FOR RELIEF: TORTIOUS INTERFERENCE (WESTERN'S CONTRACTS AND RELATIONSHIPS WITH THIRD PARTIES).[5]

1.    <u>Burden of proof and elements</u>.  Plaintiffs agree with Defendant's recitation of the burden of proof, however, Plaintiffs challenge its statement of the elements of the claim.

---

[5] The Defendant's Motion moves separately (at sections C and D) for summary judgment on Western's tortious interference claims. As they are predicated on virtually identical genuine issues of material fact, they are combined in this response.

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

2. <u>Elements challenged by Plaintiffs</u>.

A. **Suncor improperly interfered with contracts between Western and third parties, as well as contracts between Western and Western Truck One.** Suncor's revocation of the Plaintiffs' access to its terminals precluded Western Truck One from loading fuel purchased from third-party middlemen, which interfered with Plaintiffs' performance of agreements and relationships with middlemen and interfered with Western's agreement and relationship with Western Truck One.

1. Suncor cites the deposition of Western's owner, Hossein Taraghi, claiming incorrectly that he could not identify the contracts with which Suncor interfered. (Motion at 14, ¶ 2 C and p. 16, ¶ 2 B, citing Motion Ex. L (Doc. 181-12). In fact, Mr. Taraghi did testify that contracts with middlemen and the contract with Western Truck One were interfered with by Suncor. Counsel for Suncor specifically asked about Offen (Offen Petroleum, Inc.) and DATS (DATS Trucking Inc.) and in response Mr. Taraghi affirmed both as middlemen. In the context it is plain that those were two examples of contracts he believed were interfered with. Motion Ex. L (Doc. 181-12) at 230:4 – 21. Thereafter, he affirmed that the Western Truck One agreement was also a transport agreement that Suncor interfered with. *Id.* at 233:17 – 23. In any event, the Taraghi Declaration makes these assertions clear. Ex. 1, Taraghi Declaration, ¶ 14, 15.

2. Suncor incorrectly asserts that to be actionable, alleged interference must be dishonest. That assertion does not accurately state the law on the issue. The Colorado Supreme Court instructs that:

"[i]n determining whether an actor's conduct in intentionally interfering with a

**11-cv-01611-MSK-CBS: PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF**

>   contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
>
>   (a) the nature of the actor's conduct;
>   (b) the actor's motive;
>   (c) the interests of the other with which the actor's conduct interferes,
>   (d) the interests sought to be advanced by the actor;
>   (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; and
>   (f) the relations between the parties."

*Amoco Oil*, 908 P.2d at 500 (quoting Restatement (Second) of Torts § 767 (1979) ("§ 767")). Application of these factors, determination of the appropriate weight for each factor, and determination of whether interference is improper, depends on the facts and circumstances of a particular case. *Amoco Oil,* 908 P.2d at 501 (citing § 767 cmt. a). Whether the interference results in an unlawful restraint of trade or competition is a key consideration in determining whether interference is improper. *Id.* at 501-502 (citing Restatement (Second) of Torts § 768).

   3. Within a week of Plaintiffs' complaint of price discrimination and without any legitimate reason for doing so, Suncor precluded Western Truck One from loading fuel from middlemen with whom Plaintiffs had contractual relationships. Plaintiffs' Antitrust Response Ex. 1 ¶ 14. The logical inference is that Suncor interfered with Plaintiffs' middlemen relationships as a direct result of the complaints and in furtherance of its actions relating to price discrimination. Plaintiffs have established genuine issues of material fact that give rise to a claim for tortious interference as described in *Amoco Oil v. Ervin.*

   4. Suncor relies on an opinion of the Colorado Court of Appeals for the argument that "the exercise of a legitimate contract right cannot constitute improper interference." Motion at 12 (citing *Lufti v. Brighton Cmty. Hosp. Ass'n,* 40 P.3d 51, 58 (Colo.

App. 2001)). The *Lufti* court did not hold that a party's exercise of a contract provision permitting termination as a matter of law insulates the party from any claim of tortious interference with a third party contract arising from termination. *See id.* Rather, it noted that the defendant's contract with the plaintiff in that case permitted termination and that the plaintiff did not present evidence of improper conduct. *Id.* In this action, there are allegations supporting a finding of interference based on the factors set forth by the Colorado Supreme Court in *Amoco Oil*, in particular, factors relating to motives or conduct involving the unlawful restraint of trade.

## IV. CONCLUSION

Suncor has not established the absence of genuine fact issues on the claim elements it challenges for all of Plaintiffs' claims on which it moves for summary judgment. Therefore, Suncor's Motion should be denied in its entirety.

Dated: March 13, 2013

*s/ Kenneth R. Bennington*

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON BIERMANN
& CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
Telephone: (303) 629-5200
Facsimile: (303) 629-5718
*kec@benningtonjohnson.com*
*krb@benningtonjonson.com*
*afa@benningtonjohnson.com*
*Attorneys for Plaintiffs and Third-Party Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 13, 2013, the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' SECOND, THIRD, FOURTH AND FIFTH CLAIMS FOR RELIEF** was served on the following parties via CM/ECF:

Anthony J. Shaheen
Keeya M. Jeffrey
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80201-8749
AJShaheen@hollandhart.com
KMJeffrey@hollandhart.com

J. Robert Robertson
William L. Monts III
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
robby.robertson@hoganlovells.com
william.monts@hoganlovells.com

Philip W. Bledsoe
Joseph T. VanLandingham
Polsinelli Shughart PC
1225 Seventeenth Street, 29th Floor
Denver, CO 80202-5529
pbledsoe@polsinelli.com
jvanlandingham@polsinelli.com

Christopher A. Taravella
Michael R. McCormick
Montgomery Little & Soran, P.C.
5445 DTC Parkway, Suite 800
Greenwood Village, CO 80111
ctaravella@montgomerylittle.com
mmcormick@montgomerylittle.com

*s/ Marie Newberger*