SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

# In The United States District Court
## For The District Of Colorado

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

        Plaintiffs and Counterclaim Defendant,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

        Defendant, Counterclaimant, Third-Party Plaintiff,

HOSSEIN and DEBRA LYNN TARAGHI,

        Third-Party Defendants.

---

## SUNCOR'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON FIRST AND SIXTH CLAIMS FOR RELIEF AND THIRD AFFIRMATIVE DEFENSE (DOC. 185)

---

Suncor Energy (U.S.A.) Inc. ("Suncor") replies to Plaintiffs' Response to Defendant's Motion for Summary Judgment on First and Sixth Claims for Relief and Third Affirmative Defense (Doc. 185) ("Resp.").

### INTRODUCTION

It is well-established that "to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute." *Anderson v. Cunningham*, 2008 WL 486488, at *3 (D. Colo. Feb. 18, 2008) (Krieger, J.). As Suncor will show, Plaintiffs have not done that. To be sure, Plaintiffs' Response is 66 pages long, chocked full of assertions of fact, giving the appearance that there must be a disputed issue of material fact somewhere. But there is not. That is because Plaintiffs' purported disputed facts violate the clear admonitions of this and other Courts. Among other matters, Plaintiffs make assertions of

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

fact without "citation to evidentiary material that establishes that fact," but instead are based on Plaintiffs' argument. *Kenfield v. Colo. Dept. of Public Health & Env't*, 837 F. Supp. 2d 1232, 1239 (D. Colo. 2011) (Krieger, J.). Throughout Plaintiffs have "overstated the significance" of witness statements and mischaracterized the witness's actual testimony by taking it out of context in order to induce the Court to draw an inference that is "flatly contradicted by [the witness's] own testimony." *Am. Family Mut. Ins. Co. v. Gustafson*, 2011 WL 782574, at *8 (D. Colo. Feb. 25, 2011) (Krieger, J.); *Watershed LLC v. Columbus Life Ins. Co.,* 2011 WL 4048779, at *5 (D. Colo. Sept. 10, 2011) (Krieger, J.).

These flaws permeate Plaintiff's Response to the four principal arguments set forth in Suncor's Motion:

*First*, Western Convenience Stores, Inc. ("WCS")[1] completely fails to satisfy its burden to demonstrate that the relevant fuel purchases took place in interstate commerce. Indeed, it makes no effort to identify the purchases that it claims involved finished products from outside of Colorado. The undisputed record demonstrates that, for a substantial portion of the sales in question, WCS could never satisfy this burden, because Suncor did not acquire any products from outside of Colorado. WCS's failure to meaningfully address these indisputable facts demonstrates its failure to satisfy the jurisdictional requirement with regard to *any* sales at *any* location for *any* time in the Damage Period.

*Second*, Plaintiffs attempt to avoid Suncor's "meeting competition" defense by misstating and overstating the record. The indisputable facts reveal that Suncor acted in good faith and to meet competition when offering prices to WCS's competitors.

---

[1]      Only WCS has a price discrimination claim; Western Truck One, LLC ("WTO") did not purchase fuel from Suncor. Because the Response is filed by both Plaintiffs, Suncor will refer to "WCS" and to "Plaintiffs."

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

*Third*, WCS cannot present any evidence of antitrust injury, nor has it presented sufficient facts to demonstrate an "inference" of such injury. Even if WCS were entitled to an inference of injury (and it is not), the record reveals a complete lack of causation between the alleged unlawful price discrimination and any competitive harm.

*Fourth*, Plaintiffs have no claim for violation of the Colorado Unfair Trade Practices Act. WCS conjures a private right of action that does not exist to a pursue a claim under a state statute (C.R.S. § 6-2-108) that is inapplicable.

Suncor is entitled to complete summary judgment on Plaintiffs' price discrimination and unfair trade practice claims.

## A.   THE FIRST ELEMENT OF CLAIM I THAT CANNOT BE PROVEN BY WCS: INTERSTATE COMMERCE.

"The Robinson-Patman Act has a stringent interstate commerce requirement." *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626, 645 (S.D. Tex. 1999). Plaintiffs bear the burden of showing that, in each and every instance where it contends that it received a less favorable price than its competitor, "[one] of the two transactions which evidence the alleged price discrimination crossed a state line." *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 189 (1st Cir. 1996); *accord Belliston v. Texaco, Inc.*, 455 F.2d 175, 178 (10th Cir.), *cert. denied*, 408 U.S. 928 (1972) ("*[A]t least one of the discriminatory sales complained of must be in commerce.*" (emphasis in original and internal citation omitted)).

Plaintiffs have made no such showing in their Response or through their experts. Instead, they attempt to change the relevant legal tests, and offer only general assertions that, from time to time, Suncor purchased and sold gasoline outside of Colorado. Resp. at 43-46. The thrust of Plaintiffs' argument is that, if given the chance, they might somehow be able to cobble together evidence to create an issue for trial. That is insufficient both to meet their jurisdictional burden

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

and to withstand summary judgment. *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (holding party "may not escape summary judgment in the mere hope that something will turn up at trial").

As explained below, Plaintiffs' attempt to satisfy the "in commerce" requirement fails as a matter of law, entitling Suncor to summary judgment for four reasons:

*First*, the fact that Suncor generally engages in some limited interstate commerce is irrelevant. *Contra* Resp. at 39-40. Plaintiffs must show that the *specific transactions with WCS or Kroger* for each day at each terminal that give rise to the alleged price discrimination were "in commerce" for purposes of the Robinson-Patman Act.

*Second*, Plaintiffs make no attempt to identify the gasoline that it or the Dillon Companies, d/b/a King Soopers/City Markets, or Mini Mart, Inc., d/b/a Loaf 'N Jug (collectively, "Kroger") purchased that allegedly was acquired in interstate commerce. Resp. at 50-53. This is fatal to Plaintiffs' claim because WCS must specifically identify one of two comparable transactions, occurring on the same day and at the same terminal, that crossed a state line. Plaintiffs have not presented any facts to even attempt to satisfy this burden. Instead, at a minimum, the indisputable facts demonstrate that Suncor did not acquire *any* gasoline or diesel fuel from outside Colorado for a substantial portion of the Damage Period that was sold at the west truck rack of Suncor's Commerce City refinery. Plaintiffs' failure to address these indisputable facts underscores their failure to identify *any* sales at *any* terminal that were "in commerce" for purposes of the Robinson-Patman Act.

*Third*, regardless of whether and when Suncor acquired conventional gasoline from outside of Colorado, Plaintiffs cannot avoid the indisputable fact that Suncor turned this gasoline into a different product *in Colorado* before it was sold to WCS and Kroger. Resp. at 48-50. The

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Robinson-Patman Act applies only to the interstate sale of *finished* products.  When a seller uses interstate products to create a new product that is sold within a state, that new product is not within the "flow of commerce" for purposes of a price discrimination claim.

*Fourth,* Plaintiffs contend that, even though Suncor sold WCS and Kroger gasoline only in Colorado, both WCS and Kroger later sold a small portion of this gasoline at retail stations outside of Colorado, thereby bringing all of *Suncor's* sales within interstate commerce.  Resp. at 54-55.  Plaintiffs never specifically identify these *de minimis* sales and do not allege any antitrust injury arising from them.  In any event, these sales do not convert Suncor's sales in Colorado to interstate sales subject to the Robinson-Patman Act.

### 1.   Plaintiffs Cannot Satisfy the "In Commerce" Requirement Simply by Showing that Suncor Is an Interstate Actor.

Plaintiffs contend that, so long as they prove Suncor operates in interstate commerce, Suncor's *intrastate* sales are within the "flow of commerce" for purposes of the Robinson-Patman Act.  Resp. at 39-40.  That is not the law.  In fact, federal courts have uniformly rejected the notion that interstate companies are *per se* subject to the Robinson-Patman Act.  *E.g.,* *Belliston*, 455 F.2d at 178 ("[I]t is not enough to show that a defendant is engaged in interstate commerce; rather, it must be established that the sale complained of was one occurring in interstate commerce."); *Borden v. FTC*, 339 F.2d 953, 955 (7th Cir. 1964) ("[E]stablishing jurisdiction cannot be discharged merely by showing that [seller] is an interstate concern or that it makes interstate sales not involved in the challenged discrimination.").  Plaintiffs' general reference to Suncor's sales to other parties, and Suncor's fuel exchanges with other refiners, is

5

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

completely irrelevant.[2] *Borden*, 339 F.2d at 955 ("The language and scheme of Section 2(a) make plain that not all transactions by interstate businesses are subject to the statute….").

**2.   It Is Now Undisputed that, for nearly all of the Damage Period, Suncor Could Not Have Sold Fuel to WCS or Kroger Produced Outside of Colorado.**

The Robinson-Patman Act's interstate commerce requirement is "stringent." *Chawla*, 75 F. Supp. 2d at 645. Plaintiffs must show that, in each instance where they contend that WCS received a less favorable price than its competitor, "[one] of the two transactions which evidence the alleged price discrimination crossed a state line." *Coastal Fuels of Puerto Rico*, 79 F.3d at 189; *accord Belliston*, 455 F.2d at 178. To satisfy this burden, courts consistently require the plaintiff to identify and match the individual transactions that give rise to the allegedly unlawful price discrimination. *Hanson v. Pittsburgh Plate Glass Indus., Inc.*, 482 F.2d 220, 224 (5th Cir. 1973), *cert. denied*, 414 U.S. 1136 (1974) (requiring plaintiff to identify and match each sale to favored and disfavored purchase to demonstrate discriminatory prices); *Food Basket, Inc. v. Albertson's, Inc.*, 383 F.2d 785, 788-89 (10th Cir. 1967) (examining individual transactions to determine if any were in interstate commerce for purposes of Robinson-Patman Act); *see also Cellar Door Prods., Inc. v. Kay*, 897 F.2d 1375, 1377-78 (6th Cir.), *cert. denied*, 498 U.S. 819 (1990) (noting each transaction involving allegedly discriminatory price is separate legal wrong and must satisfy elements of Robinson-Patman); *Precision Printing Co. v. Unisource Worldwide,*

---

[2]   Plaintiffs flatly contradict the record by contending that "Suncor… regularly entered into 'exchange' agreements where it simply exchanges barrels of Fuel refined and/or owned by Suncor for Fuel owned/refined by out-of-state entities." Resp. at 45. Suncor entered into *two* agreements during the Damage Period for the exchange of fuel with Sinclair and ConocoPhillips, whereby Suncor took possession of fuel in Casper, Wyoming and La Junta, Colorado. Piscatelli Dep., Exh. 6 to Resp., at 83:15-85:9. WCS did not purchase any gasoline from Suncor in Casper or La Junta.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

*Inc.*, 993 F. Supp. 338, 353 (W.D. Pa. 1998) (conducting interstate commerce analysis for each transaction involving alleged price discrimination).

Plaintiffs do not dispute that they bear this burden but, remarkably, they make no effort to satisfy it. They do not identify (a) the types of gasoline and diesel fuel that were acquired by Suncor from outside of Colorado, (b) when Suncor acquired this gasoline and diesel fuel from outside of Colorado, or (c) when, during the Damage Period, Suncor sold gasoline and diesel fuel to WCS or Kroger. Instead, Plaintiffs attempt to circumvent the requirement that they must specifically identify sales in interstate commerce by claiming that, on certain occasions, Suncor acquired gasoline and diesel fuel from outside of Colorado. Resp. at 43-45, 51-52 This is insufficient. *Hanson*, 482 F.2d at 224; *Food Basket, Inc.*, 383 F.2d at 788-89.

Not only have Plaintiffs failed to identify the days upon which WCS purchased specific products that were in interstate commerce, but they have failed to even show what *months* are at issue in the case. The undisputed record reveals that Suncor did not acquire product from outside Colorado for many months during the Damage Period, thus WCS and Kroger could not have purchased product that was within interstate commerce during those months. This is particularly true with respect to WCS's purchases of product at the west truck rack of Suncor's Commerce City refinery, as explained by Angela Shields, Suncor's Fuels Quality Specialist. Shields Declaration, Exh. AA to Suncor's Mot., ¶¶3(a)-(d). Plaintiffs purport to challenge Ms. Shields' Declaration (Resp. at 50-53), but their challenge simply reveals that nothing is genuinely disputed in this case.[3]

---

[3]     WCS overstates the record when it claims that "Suncor's own testimony confirms that it would be impossible for Western to establish exactly which Fuel sales were of Fuel refined outside Colorado…" Resp. at 46 n. 22. WCS relies solely on the deposition testimony of Suncor's product trader, James Piscatelli. *Id.* at 45-46. In fact, Piscatelli testified that *he* could not determine the source of fuel at the refinery ("I could not."), but made clear this was based on

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

As explained in Suncor's Motion (and not disputed by Plaintiffs), Suncor sold three principal different types of gasoline products to WCS during the Damage Period: "Premium E-10" gasoline, "Regular E-10" gasoline, and diesel fuel. Suncor's Mot. at 24-26; Glick/Tatos Report, Exh. A to Suncor's Mot., at 8 (identifying these three products as basis for damage calculations). "Premium E-10" is created by combining a separate product known as "subPUL" with ethanol, and "Regular E-10" is created by combining a separate product known as "subRUL" with ethanol. Suncor's Mot. at 24-25 (explaining process of creating "Premium E-10" and "Regular E-10"); Shields Declaration, Exh. AA to Suncor's Mot., ¶2 (same). While WCS's argument offers only generalizations, its conclusion is that it can satisfy the Robinson-Patman Act's "in commerce" requirement because *sometimes* Suncor acquired *some* subPUL, subRUL and diesel fuel from outside Colorado during the Damage Period, and that is good enough. Resp. at 44-47, 51-54. It is not.

As a legal matter, Plaintiffs' conclusion completely fails to satisfy the interstate commerce requirement, because Plaintiffs have neither identified nor matched the *individual transactions* that give rise to the allegedly unlawful price discrimination to determine if the product traveled in interstate commerce. *Hanson*, 482 F.2d at 224 (must identify and match each sale to favored and disfavored purchasers to demonstrate discriminatory prices); *Food Basket, Inc.*, 383 F.2d at 788-89 (applying jurisdictional requirement to individual transactions). As a factual matter, Plaintiffs' conclusion also fails based on the indisputable record. The following table illustrates this failure using the products acquired from outside of Colorado and delivered to the west plant of Suncor's Commerce City refinery, where Plaintiffs concede the overwhelming

his personal knowledge ("I have no idea how you would go about doing that or who could go about doing that."). Piscatelli Dep., Exh. 6 to Resp., at 70:17-72:-2. WCS has presented no evidence or testimony to support the notion that such a determination is "impossible," and WCS made no subsequent effort to ascertain the ability to trace the fuel inside the refinery.

8

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

amount of the sales to WCS took place.  Resp. at 53 (conceding sales at west plant of Commerce City).  The table shows the type of products that Suncor acquired from outside Colorado, and the months in which it acquired those products for sale at the Commerce City west plant, and whether Plaintiffs dispute these facts:

### Table 1

| DAMAGES MONTH | ACQUIRED FROM OUTSIDE COLORADO? | | |
|---|---|---|---|
| | subPUL | subRUL | Diesel |
| Oct-09 | NO | DISPUTED | NO |
| Nov-09 | NO | DISPUTED | NO |
| Dec-09 | NO | NO | NO |
| Jan-10 | NO | DISPUTED | NO |
| Feb-10 | NO | DISPUTED | NO |
| Mar-10 | NO | NO | NO |
| Apr-10 | NO | NO | NO |
| May-10 | NO | NO | NO |
| Jun-10 | NO | NO | NO |
| Jul-10 | NO | NO | NO |
| Aug-10 | NO | NO | NO |
| Sep-10 | NO | NO | NO |
| Oct-10 | NO | NO | NO |
| Nov-10 | NO | NO | NO |
| Dec-10 | NO | NO | NO |
| Jan-11 | NO | NO | YES |
| Feb-11 | NO | NO | YES |
| Mar-11 | NO | NO | YES |
| Apr-11 | YES | YES | YES |

Shields Declaration, Exh. AA to Suncor's Mot., ¶¶3(a)-(d) (establishing months in which Suncor did not acquire subPUL, subRUL and Diesel from outside of Colorado during the Damage Period); Resp. at 50-53 (challenging four of the months established by Ms. Shields).

Table 1 confirms that, for a substantial portion of the period at issue in this case, WCS and Kroger could not have acquired gasoline made with fuel acquired in interstate commerce, because Suncor did not acquire any such gasoline from outside of Colorado that was sold at the

9

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

west plant in Commerce City. It also refutes Plaintiffs' assertion, unsupported by any citation, that "a substantial portion of the Fuel sold by Suncor to Kroger and Western… was manufactured outside of the state…." Resp. at 43. Specifically, Table 1 reveals the following with respect to Suncor's Commerce City West plant sales:

- **Premium E-10:** It is undisputed that, from October 2009 through March 2011, Suncor did not acquire *any* subPUL from outside of Colorado. Shields Declaration, Exh. AA to Suncor's Mot., ¶3(a). Plaintiffs do not dispute this in their Response. Resp. at 51-53 (challenging Shields Declaration but not as to purchases of subPUL). Thus for all but one month in the Damage Period (April 2011), Suncor could not have sold any Premium E-10 or Midgrade E-10 that was created using subPUL that was in interstate commerce. *Accord* Shields Declaration, Exh. AA to Suncor's Mot., ¶3(a).

- **Regular E-10:** It is undisputed that, for December 2009 and from March 2010 through March 2011, Suncor did not acquire any subRUL from outside of Colorado. Shields Declaration, Exh. AA to Suncor's Mot., ¶3(c). Plaintiffs do not dispute these months in their Response. Resp. at 51-52 (alleging out-of-state subRUL purchases for October and November 2009, January and February 2010 and April 2011). Thus for all but five months of the Damage Period, Suncor could not have sold any Regular E-10 or Midgrade E-10 that was created using subRUL that was in interstate commerce. *Accord* Shields Declaration, Exh. AA to Suncor's Mot., ¶3(c).

- **Diesel Fuel:** It is undisputed that, for October 2009 through December 2010, Suncor did not acquire any diesel fuel from outside of Colorado. Shields Declaration, Exh. AA to Suncor's Mot., ¶3(d). Plaintiffs do not dispute this in their Response. Resp. at 51-53 (alleging out-of-state diesel purchases in September 2009 and 2011). Thus for all but the five months of 2011 in the Damage Period, Suncor could not have sold any diesel fuel that was in interstate commerce. *Accord* Shields Declaration, Exh. AA to Suncor's Mot., ¶3(d).

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

In their Response, Plaintiffs purport to challenge Ms. Shields' Declaration. Resp. at 51-53. This challenge, however, simply underscores the lack of disputed factual issues, as well as the lack of effort by Plaintiffs to identify the sales that took place in interstate commerce:

*First*, Plaintiffs claim that Ms. Shields omits five out-of-state purchases. Resp. at 51-52. Those purchases, identified on Exhibit 29 to Plaintiffs' Response, are as follows:

PLANTIFFS' EX. 29                                                                                     Page 1

| | Contract Date | Effective Date Start | Effective Date End | Trading Partner | Product (Grade) | Volume | Gallons/ Barrels | Total Gallons | Destination | Method of Transportation | FOB location | Bates No. | In Shields Declaration? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 4/9/2009 | 4/1/2009 | 9/30/2009 | Valero Marketing & Supply Company | PUL | 120,000 | bpm (1 mo.: Sept. 09) | 5,040,000 | gal | Suncor East Plant | Pipeline | Suncor Plant 2 | Suncor_WCS 00043629 | No |
| 2 | 5/28/2009 | 9/1/2009 | 9/30/2009 | Valero Marketing & Supply Company | Diesel | 10,000 | bbls | 420,000 | gal | Denver | Tank transfer | | Suncor_WCS 00043651 - Suncor_WCS 00043655 | No |
| 5 | 10/14/2009 | 10/1/2009 | 10/31/2009 | Valero Marketing & Supply Company | RUL (85 octane conv) | 10,846 | bbls | 455,532 | gal | Dupont & Fountain | Tank transfer | | Suncor_WCS 00043645 - Suncor_WCS 00043650 | No |
| 23 | 5/13/2011 | 5/12/2011 | 5/13/2011 | Frontier Oil & Refining Co. | Unl 82 | 5,000 | bbls | 210,000 | gal | Fountain RMPL | PTO | | Suncor_WCS 00043579 | No |
| 25 | 3/15/2011 | 3/15/2011 | 4/30/2011 | Shell Oil Products US | Diesel | 2,100,000 | Gal | 2,100,000 | gal | Aurora, CO - Magellan | truck | | Suncor_WCS 00043972 - Suncor_WCS 00043980 | No |

As revealed by Plaintiffs' own exhibit, *none* of these purchases concerns the delivery of subPUL, subRUL or diesel fuel to Suncor's Commerce City refinery during the Damage Period. Lines 1 and 2 identify deliveries of PUL (not subPUL) and diesel under contracts that ended in September 2009, outside the Damage Period that begins in October 2009. Exh. 29 to Resp. As for the RUL and diesel purchases identified on Lines 5, 23 and 25 of Exhibit 29, the column "Destination" clearly identifies the delivery points as terminals *other* than Commerce City (that is, other than its east or west plant). *Id.* Plaintiffs concede that Ms. Shields' declaration is limited to Suncor's Commerce City refinery. Resp. at 53. Her Declaration, therefore, is entirely accurate.

*Second*, Plaintiffs further claim that Ms. Shields ignores two out-of-state purchases of subRUL in October and November of 2009 and January and February 2010, identified on Exhibit 29 as follows:

11
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

PLAINTIFFS' EX. 29     Page 2

| 19 | 10/27/2009 | 10/22/2009 | 11/10/2009 | ExxonMobil Corp. | Sub 57 OCT | 22,000 | bbls | 924,000 | gal | Dupont | Pipeline | Dupont | Suncor_WCS 00044189 - Suncor_WCS 00044192 | Yes |
|----|-----------|-----------|-----------|------------------|-----------|--------|------|----------|-----|--------|----------|--------|---------------------------------------------|-----|
| 20 | 1/29/2010 | 2/1/2010 | 2/28/2010 | ExxonMobil Corp. | Sub 57 OCT | 75,000 | bbls | 3,150,000 | gal | RMPL Dupont Location | In Tank Transfer | RMPL Dupont terminal | Suncor_WCS 00044185 - Suncor_WCS 00044188 | Yes |

Resp. at 52.  Again, the delivery point for these purchases is clearly identified as Dupont, not Commerce City, and therefore Ms. Shields' Declaration is accurate.  *Id.* at 53 (conceding that Shields Declaration concerns only Commerce City sales at west truck rack); *accord* Shields Declaration, Exh. AA to Suncor's Mot., ¶¶3(c)-(d) (describing out-of-state purchases of subRUL and diesel delivered to Commerce City).

*Third*, in an unsuccessful effort to impeach Ms. Shields, Plaintiffs have laid bare the lack of evidence they have of gasoline traveling in interstate commerce.  As illustrated on Table 1 above, Plaintiffs at best have raised the hypothetical possibility of interstate sales in four additional months during the Damage Period and, even then, only with respect to Regular E-10 purchases.  But this does not satisfy Plaintiffs' burden to prove, in each instance of alleged price discrimination, that "[one] of the two transactions… crossed a state line."  *Coastal Fuels of Puerto Rico*, 79 F.3d at 189; *see also Hanson*, 482 F.2d at 224 (plaintiff must identify and match each sale); *Food Basket, Inc.*, 383 F.2d at 788-89 (examining individual transactions to determine if any were in interstate commerce).  Plaintiffs have not offered any affirmative evidence that would satisfy this burden with respect to sales at Commerce City or any other Suncor terminal.

Plaintiffs contend that Ms. Shields' Declaration is "conspicuously limited" to sales at the Commerce City west plant, and not at the Commerce City east plant or Dupont or Fountain terminals.  Resp. at 53.  As explained in Suncor's Motion, the purpose of Ms. Shields' Declaration was to illustrate Plaintiffs' complete failure to identify the relevant times when Suncor could have acquired product from outside of Colorado, and therefore their failure to

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

satisfy their burden of establishing sales of gasoline in interstate commerce.  Suncor's Mot. at
24-25.  In this respect, Suncor is following the lead of Plaintiffs' own damages experts, who
focused on Commerce City sales when illustrating price differences during the Damage Period.
Glick/Tatos Report, Exh. A to Suncor's Mot., at 10.  There is good reason to use Commerce City
as the principal example:  Plaintiffs concede that 70 percent of the fuel purchased by WCS and
Kroger was sold at Commerce City, and that the overwhelming amount of that fuel was
purchased at the west plant.  Resp. at 47, 53.

These sales reveal the abject failure of Plaintiffs to satisfy their burden of showing ***any***
sales to WCS and Kroger that were "in commerce" for purposes of the Robinson-Patman Act.
*Hanson*, 482 F.2d at 224 (requiring plaintiff to identify and match each sale to demonstrate
discriminatory prices).  Plaintiffs have come forward with nothing to identify which months, let
alone which days, WCS could have purchased gasoline that traveled "in commerce," whether at
Commerce City or at other terminals, including Dupont or Fountain.  Resp. at 53 (noting
purchases at terminals other than Commerce City, but failing to identify which of these
purchases involved gasoline in the flow of interstate commerce).  On this critical issue, Plaintiffs
are conspicuously silent, and this silence is fatal to WCS's Robinson-Patman Act claim.
*Hanson*, 482 F.2d at 224 (recognizing plaintiff must identify and match sales subject to
Robinson-Patman Act); *Food Basket, Inc.*, 383 F.2d at 788-89 (applying Robinson-Patman Act's
interstate commerce requirement to individual transactions).

Based on the undisputed facts, Plaintiffs have failed to satisfy their burden of proving
which sales in the relevant Damage Period took place in interstate commerce.  Plaintiffs have
failed to identify and match the relevant sales that were "in commerce," and the indisputable
facts reveal that Plaintiffs *cannot* identify any gasoline sold in Commerce City that was "in

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

commerce" for a substantial portion of the Damage Period. The Court therefore should grant summary judgment in favor of Suncor on all of Plaintiffs' Robinson-Patman Act claims. *McGoffin v. Sun Oil Co.*, 539 F.2d 1245, 1248 (10th Cir. 1976) (holding plaintiff bears burden of proving sales in commerce for purposes of Robinson-Patman Act); *Belliston*, 455 F.2d at 178 (rejecting price discrimination claim based on plaintiff's failure to establish sales in commerce). In the alternative, there is no dispute that, for the period identified in Tables 1, Suncor did not acquire gasoline from outside of Colorado that was used to create fuel sold in Commerce City at its west truck rack. The Court, at a minimum, should enter summary judgment in favor of Suncor on Plaintiffs' claims relating to those sales in those months. *Roorda v. Am. Oil Co.*, 446 F. Supp. 939, 945 (W.D.N.Y. 1978) (dismissing price discrimination claims directed to products manufactured and sold within the state, and limiting action to products acquired in interstate commerce).

### 3. It Is Undisputed that Suncor Sold WCS Products—Ethanolized Gasoline—that Were Created Entirely in Colorado.

The Robinson-Patman Act applies only "where *a finished product* is shipped into a state from elsewhere and is resold substantially unchanged within that state…." *Roorda*, 446 F. Supp. at 945. Thus where interstate products are used to create a new product sold entirely inside the state, those sales are not "in commerce" for purpose of the Robinson-Patman Act. *Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778, 781 (5th Cir. 1974) (holding mixture of interstate ingredients in state was "fatal" to Robinson-Patman Act claim); *Red Apple Supermarkets, Inc. v. Deltown Foods, Inc.*, 419 F. Supp. 1256, 1258 (S.D.N.Y. 1976) (limiting application of Robinson-Patman Act "to situations where a finished product is shipped into one state and is there resold in a substantially unchanged condition"). The touchstone, as explained by the Tenth Circuit, is whether "the character of these products is so changed that they cannot

14

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

be equated as the 'same stuff' to satisfy the requirements of the 'flow of commerce' theory." *Belliston*, 455 F.2d at 180.

Plaintiffs do not dispute that gasoline products *with* ethanol are not the same products as gasoline products *without* ethanol. Shields Declaration, Exh. AA to Suncor's Mot., ¶¶2(a)-(f) (describing differences in products); Resp. at 48-50 (challenging sufficiency of process for ethanolizing gas, but not disputing differences in products); *see also* Wehrle Dep., attached as Exhibit BB, at 74:2-21 (acknowledging difference in ethanolized and unethanolized gasoline, noting "[e]thanol brings [gasoline] up to an octane to sell it at a retail level"); Taraghi Dep., Exh. S to Suncor's Mot., at 102:25-103:8 (admitting lack of knowledge as to whether ethanolizing gasoline changes product).

Consequently, Plaintiffs do not (and cannot) dispute that Premium E-10, Midgrade E-10 and Regular E-10 are different products from subPUL or subRUL acquired by Suncor from outside of Colorado. Resp. at 48-52 (raising no challenge to differences in these products). Plaintiffs also concede that Suncor creates these E-10 gasoline products entirely inside Colorado. *Id.* at 48-49 (describing process for ethanolizing gasoline). These ethanolized gasoline products created in Colorado are not the "same stuff" as the gasoline products that Plaintiffs claim Suncor brought in from outside Colorado. *Belliston*, 455 F.2d at 180.

Rather than disputing the difference between ethanolized and unethanolized gasoline, Plaintiffs change the legal test. According to Plaintiffs, the issue is not whether the product has been changed but, instead, whether the process used to change the product is "highly technical," "highly complex," or "expensive." Resp. at 50. Plaintiffs contend that ethanol "is simply dosed directly into the purchaser's truck when the purchaser takes delivery at the terminal." *Id.* at 49.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Plaintiffs argue that adding ethanol "is insufficient to take any of Suncor's Fuel sales out of the flow of commerce," because the process is not technical, complex, or expensive. *Id.* at 50.

The process used to change the product is irrelevant. The relevant issue is whether "the character of these products is so changed that they cannot be equated as the 'same stuff.'" *Belliston*, 455 F.2d at 180. To be sure, the refining at issue in *Belliston* was complex. *Id.* (describing refining process). But there is nothing to suggest that the blending of butterfat and other ingredients to create ice cream was a complex process in *Central Ice Cream Co. v. Golden Rod Ice Cream Co.*, 287 F.2d 265, 266 (7th Cir.), *cert. denied*, 368 U.S. 829 (1961), or that the mixing of cement and aggregate to create concrete was highly technical or expensive in *Scranton Construction Co.*, 494 F.2d at 781, or that treating water with chlorine and fluoride was complicated in *McCallum v. City of Athens*, 976 F.2d 649, 656 (11th Cir. 1992). In each of these cases, however, the courts held that the use of materials acquired outside the state to create a finished product sold entirely inside the state was insufficient *as a matter of law* to satisfy the "in commerce" requirement of the Robinson-Patman Act. *McCallum*, 976 F.2d at 656 (adding chlorine and fluoride to water created a new product—treated water—that was not in flow of intestate commerce); *Scranton Constr. Co.*, 494 F.2d at 781 (applying same analysis to addition of concrete and aggregate to create cement); *Central Ice Cream Co.*, 287 F.3d at 266 (holding butterfat is not ice cream).

The reasoning of these opinions had nothing to do with the complex manufacturing, but instead turned on the fact that the finished products were not the "same stuff" as the out-of-state products: butterfat is not ice cream, cement is not concrete, untreated water is not treated water. In the same way, it is undisputed that subPUL is not Premium E-10, subRUL is not Regular E-

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

10, and neither subPUL nor subRUL is Midgrade E-10.  Shields Declaration, Exh. AA to Suncor's Mot., ¶¶2(a)-(f).

These opinions are consistent with the principal case relied upon by Plaintiffs, *Foremost Dairies, Inc. v. FTC*, 348 F.2d 674 (5th Cir.), *cert. denied*, 382 U.S. 959 (1965).[4]  Resp. at 50.  In *Foremost Dairies*, the Fifth Circuit found that testing, homogenizing and pasteurizing out-of-state raw milk did not interrupt the flow of commerce, because the milk "was not altered materially" by these processes—it remained milk.  348 F.2d at 677-78.  The Court noted, however, that processing the product into "a different state or thing" *would* break the flow of interstate commerce.  *Id.* at 678 n.8.  In contrast, the milk in *Red Apple* was processed in such a way as to turn whole milk into low-fat milk, which was sold as a different product.  419 F. Supp. at 1258.  The critical distinction in these dairy cases is not the complexity of the processing—it is whether processing results in a different product.  *Id.*

As shown above, Plaintiffs never dispute (and cannot dispute) that subPUL and subRUL are different products from Premium E-10, Midgrade E-10 and Regular E-10, which have different octane ratings and are governed by different regulations.  Shields Declaration, Exh. AA to Suncor's Mot., ¶2.  It is not the "same stuff."  For this reason, whether Suncor acquired subPUL or subRUL from outside of Colorado during the Damage Period is irrelevant—Suncor changed these products into different products (Premium E-10 and Regular E-10, respectively) by blending subPUL and subRUL with ethanol, a process that took place entirely in Colorado and therefore not "in commerce" for the purpose of the Robinson-Patman Act.  *Belliston*, 455 F.2d at 178-80; *Scranton Constr. Co.*, 494 F.2d at 781; *Red Apple*, 417 F. Supp. at 1258.  Therefore, the Court should grant summary judgment in favor of Suncor on all of WCS's

---

[4]    Plaintiffs also rely on *Dean Milk v. FTC*, 395 F.2d 696 (7th Cir. 1968), which simply adopted the analysis of *Foremost Dairies* without additional comment.

17
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Robinson-Patman Act claims relating to the purchase of Premium E-10, Midgrade E-10 and Regular E-10 products.

### 4.   Resales of Gasoline by WCS and Kroger Are Irrelevant.

In a last-ditch effort to save WCS's claims, Plaintiffs contend that resales of gasoline by WCS and Kroger at stores outside of Colorado somehow render *Suncor's* sales of gasoline "in commerce" for purposes of the Robinson-Patman Act. Resp. ¶15 at 54-55. Plaintiffs' argument fails for at least two reasons:

*First*, Plaintiffs have no claim for damages arising from these out-of-state sales by WCS and Kroger. *See* Glick/Tatos Report, Exh. A to Suncor's Mot., at 12-13. Plaintiffs' damages experts identify 26 WCS stores competing with Kroger, as well as the locations of those stores. *Id. All of the stores are in Colorado*, as indicated on the tables prepared by Plaintiffs' experts. *Id.* Plaintiffs' argument therefore is another strawman based on inconsequential facts intended to avoid summary judgment. *See Sterling Constr. Mgmt., LLC v. Steadfast Ins. Co.*, 2011 WL 3903074, at *9 (D. Colo. Sept. 6, 2011) (Krieger, J.) (rejecting summary judgment argument based on "red herrings").

*Second*, the law is plain that the relevant sales that must cross a state line are the sales *by* Suncor *to* WCS and Kroger, *not* the subsequent resale of the gasoline at locations unknown to Suncor. *McCallum*, 976 F.2d at 658 (rejecting "proposition that allegations of a consumer's interstate resale of a product purchased in strictly intrastate commerce is sufficient to state a Robinson-Patman claim against the initial intrastate seller"); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 209-10 (5th Cir. 1969) (same); *Santiago-Ramos v. Autoridad de Energia Electrica*, 2012 WL 4321325, at *7 (D. Puerto Rico Sept. 18, 2012) (same). Plaintiffs rely exclusively on *L & L Oil Co. v. Murphy Oil Corp.*, 674 F.2d 1113 (5th Cir. 1982), which found

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

the resale of gasoline outside of the state of its purchase qualified as within the "flow of commerce," but only because the purchaser acquired the fuel for resale to specific, pre-existing customers with pending orders. 674 F.2d at 1116. Plaintiffs have identified no such specific customers at its Nebraska gas stations awaiting gasoline purchased from Suncor. *Luzerne & Lackawanna Supply Co. v. Peerless Indus., Inc.*, 855 F. Supp. 81, 85-86 (M.D. Pa. 1994) (distinguishing *L & L Oil* by noting buyer "failed to show that it purchased" products from the seller for customers "at their specific requests, or for their specific or anticipated needs"); *see also Precision Printing Co.*, 993 F. Supp. at 347-48 (distinguishing purchases made to satisfy anticipated needs of pre-existing customers). Nor have Plaintiffs identified any of Kroger's specific customers buying Suncor's gas outside of Colorado. The resale of small quantities of gasoline by Kroger and WCS to unspecified customers outside Colorado during an undefined period does not defeat summary judgment. *Luzerne & Lackawanna Supply Co*, 855 F. Supp. at 85-86.

 *Third*, regardless of whether these resales were "in commerce," they were *de minimis*. Plaintiffs contend that WCS transported roughly 3 million gallons of gasoline purchased from Suncor for sale in Nebraska. Resp. at 54. As calculated by Plaintiffs' damages experts, 3 million gallons of gasoline is less than 5 percent of the over 65 million gallons of gasoline purchased by WCS over the Damage Period. *See* Glick/Tatos Affidavit, Exh. 23 to Resp., at App'x 2 (calculating total volume purchased by WCS). The same is true with respect to the ▮ million gallons Plaintiffs claim that Kroger sold outside of Colorado, which is less than 1 percent of the ▮ million gallons of gasoline purchased by Kroger from Suncor. Resp. at 55; Glick/Tatos Affidavit, Exh. 23 to Resp., at App'x 3 (calculating total volume of gasoline purchased by Kroger). The law is clear that *de minimis* interstate sales involving "relatively

19

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

miniscule quantities" are insufficient to establish jurisdiction under the Robinson-Patman Act. *Baldwin Hills Bldg. Material Co. v. Fibreboard Paper Prods. Corp.*, 283 F. Supp. 202, 204-05 (C. D. Cal. 1968) (granting summary judgment for seller on jurisdictional grounds); *see also Hanson*, 482 F.2d at 224 (holding Robinson-Patman Act claim based on *de minimis* sales inconsistent with statute's purpose); *Skinner v. U. S. Steel Corp.*, 233 F.2d 762, 764 (5th Cir. 1956) (same); *Uniroyal, Inc. v. Hoff & Thames, Inc.*, 511 F. Supp. 1060, 1068-69 (S.D. Miss. 1981) (granting summary judgment where Robinson-Patman Act claim based on *de minimis* sales); *Zoslaw v. Columbia Broadcasting Syst., Inc.*, 1976 WL 1384, at **4-5 (N.D. Cal. 1976) (same).

## B.   SUNCOR'S THIRD AFFIRMATIVE DEFENSE—MEETING COMPETITION DEFENSE TO CLAIM I—PRICE DISCRIMINATION UNDER THE ROBINSON-PATMAN ACT (15 U.S.C. ¶13).

### 1.   Burden of proof and elements.

Plaintiffs quarrel with Suncor's "recitation of the elements of this defense," but it is not clear what the issue is. Resp. at 15. Suncor cited *United States v. U.S. Gypsum* 438 U.S. 422, 451 (1978) which Plaintiffs also cite, for the elements. Resp. at 15; Suncor's Mot. at 3; *FTC v. A.E. Staley*, 324 U.S. 746, 759-60 (1945) (same elements). Plaintiffs argue that "under Suncor's abridged version of the meeting competition defense, any large buyer and seller could easily obtain immunity for price discrimination by structuring their deal as an 'RFP'," implying that Kroger and Suncor intentionally "structur[ed] their deal as an 'RFP'" to avoid the Robinson-Patman Act. Resp. at 15. There is not one shred of evidence, and Plaintiffs have not come forward with any, that Kroger or Suncor structured the RFP process in such a fashion. *See Kenfield*, 837 F. Supp. 2d at 1247 (plaintiff must come forward with more than "conjecture" to establish an issue of fact); *Witt v. Condominiums at Boulders Ass'n*, 2007 WL 840509, at *7 (D.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Colo. March 19, 2007) ("[p]laintiff may not simply rely on unsupported assertions, but must point to specific evidence establishing such a contention"). More importantly, as a legal matter, the "good faith" requirement would preclude the manipulation Plaintiffs conjure. *See Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 82-83 (1979); Suncor's Mot. at 3.

### 2.   Elements of defense challenged by Plaintiffs.

Plaintiffs assert that the "material factual disputes" in paragraphs A-E preclude summary judgment. Resp. at 16. They do not because the purported "facts" are not material and, in most cases, they are not even "facts." For example, Plaintiffs argue that "the undisputed facts show that Suncor made no effort at all to determine the pricing its competitors were offering for fuel. Indeed, *Suncor intended to give Kroger a price so low that it would soundly beat,* rather than meet, its competitor's bids and gave Kroger discriminatory pricing even when there was no bid involved." Resp. at 3 (emphasis added). These and other such assertions are "flatly contradicted by the …testimony" of Suncor's and Kroger's witnesses and, thus, do not create a material issue of fact. *Watershed,* 2011 WL 4048779 at *5.

### Purported "Facts" in Paragraph A:

**(i)      Assertions of fact:** No one "at Suncor discussed or even attempted to discuss with the Kroger entities the nature of the bids by any other suppliers." Resp. at 16. Literally, that is correct, but there is no requirement under any of the cases that a bidder discuss the nature of other bids. Indeed, to do so could stifle competition and run afoul of the purpose of the antitrust laws. *See Great Atl. & Pac. Tea Co.*, 440 U.S. at 83 (absolute certainty is not required); *U.S. Gypsum*, 438 U.S. at 453 ("nothing in the language of § 2(b) [of the Robinson-Patman Act] or the gloss on that language in *Staley* and *Corn Products* indicates that direct discussions of price between competitors are required"); *id.* at 454 ("good faith standard remains the benchmark

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

against which the seller's conduct is to be evaluated"); *Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 490 (5th Cir. 2006) (finding "sufficient basis" for seller's good faith where competing price corroborated through knowledge of marketplace and second-hand information); *Nat'l Dairy Products Corp. v. FTC*, 395 F.2d 517, 523 (7th Cir.), *cert. denied*, 393 U.S. 977 (1968) (agreeing with dissent in *In re Nat'l Dairy Products Corp.*, 70 F.T.C. 79, 99-100 (1966), that requiring a seller to show that its prices "were the same as, or no lower, than those of its competitors" places an "impossible burden" on the seller and "in a dilemma where they must run the risk of criminal prosecution under the Sherman Act in order to protect against a charge of violating the Robinson-Patman Act").

<u>The record</u>:  To the extent this "fact" is intended to suggest that Suncor bid without any understanding of its competitors or the market, it is contrary to the record, as Suncor will demonstrate in subparagraph (ii), immediately below.  *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *9 ("single statement, devoid of context, is insufficient to carry [plaintiff's] burden").

**(ii)**     <u>Assertions of fact</u>:  "Moss had no inclination at all as to what Suncor's competitors were bidding …or who was bidding."  Resp. at 17 (citing Moss Dep., Exh. 3 to Resp., at 311:19-25). In the very next sentence, Plaintiffs assert: "In fact, while Moss had some '*inklings*' as to which competitors were already supplying Kroger, he did not discuss those with his superiors … because 'that didn't matter to [him]'—it was *solely* a matter of what Moss thought 'it was going to take to win that business'."  *Id.* at 17 (emphasis added; citing Moss Dep., Exh. 3 to Resp., at 312:1-313:11).

<u>The record</u>:  The clear impression Plaintiffs try to create is that Moss bid "blind," without any regard for the competition.  But that is not what Moss did or said.  Plaintiffs have taken his testimony out of context and stop short of including his testimony, even within the

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

same series of questions and answers, which squarely contradicts the impression they try to create. That does not create an issue of fact. *Watershed*, 2011 WL 4048779 at *5.

The pertinent part of the colloquy between Moss and Plaintiffs' counsel begins at page 311:7 and concludes at page 314:24 of his deposition, all of which is included as part of Exhibit 3 to Plaintiffs' Response, but most of which is not cited.

*First*, Plaintiffs make a "big deal" out of the use of the word "inkling," but that is Plaintiffs' counsel's word, not Moss's word. Resp. at 17 (citing Moss Dep., Exh. 3 to Resp., at 312:1-313:11). He used the word "inclination." *Id.*

*Second*, by using the word "inklings," Plaintiffs imply that Moss only had "[a] vague idea or notion" about who was supplying fuel to Kroger. Resp. at 17; THE AMERICAN HERITAGE DICTIONARY, at 662 (2d coll. ed. 1985). That is not true. At page 312:1-313:3 of his deposition, in response to a question from Plaintiffs' counsel in which she used "inklings," Moss explained the deductive reasoning he used, "based on [his] knowledge of the market," to conclude that the "two most probable" suppliers were Frontier or Valero. Moss Dep., Exh. 3 to Resp., at 312:25-313:3. He ruled out Suncor because it "didn't have the business," and Conoco because "that wasn't part of their business model," leaving him with his "big competitors in this market … Valero, Sinclair and Frontier." *Id.* at 312:1-12. Having "narrowed it down to [his] major competitors," he concluded it was probably Frontier because he "knew Frontier's business model, and that was kind of their business model." *Id.* at 312:12-20. Moss thought it could also possibly be Valero "because they didn't have a lot of stations … and they were looking." *Id.* at 312:21-24. Moss also watched the market to see who was "lifting" fuel and where they were delivering it. Moss Dep., Exh. B to Suncor's Mot., at 289:20-23. And, most importantly, when Moss bid in early 2010 in response to an RFP to supply Loaf 'N Jug with fuel, he knew (because

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

he made the bid) that Suncor had won the bid in October 2009 to supply the Dillon Companies at a price of OPIS rack average minus ███ *Id.* at 278:3-279:5; 280:18-281:21.

*Third*, Plaintiffs assert Moss did not discuss his "inklings" with his superiors because it was "solely a matter of what Moss thought 'it was going to take to win that business'," citing pages 312:1-313:11 of Moss's deposition. Resp. at 17. Plaintiffs stop too soon. Starting in the very next line, Moss is asked a series of summarizing, follow-up questions. He explained the reason he did not discuss who might be supplying Kroger with his superiors was "because … I didn't have any proof really of who was doing it.… Or how much." Moss Dep., Exh. 3 to Resp., at 313:12-19. And in the very next line (line 20), Moss was asked, and Moss answered, a question which contradicts Plaintiffs' assertion that he was "solely" concerned with just what it would "take to win that business," implying he just bid low:

> Q.   So it seems like, and correct me if I am wrong, on Suncor's behalf you just bid as low as you felt Suncor could go without giving consideration to what others were bidding?
>
> A.   No-- [objection omitted]
>      No, that's incorrect. I wouldn't just put a low number out there. The way…I approached a bid was what … was my price, what was a competitive and fair price to offer for the business based on my other customers, … how did it match up, obviously knowing in this particular case what didn't get me the business so I knew the ███ [his losing bid in 2008 as explained below] was out. So I had to— I had to find the price that I thought would get me the business but was still fair for –or acceptable for Suncor. I mean, Suncor was in the business of making money, so obviously I wasn't just going to go so low that, you know, it was a non-profitable margin.
>
>      The other thing that I always did was look at what the market was. I'd go back and do trends, look at what the …market had done for the last two or three years, how the prices compared, and make –you know, make as best I could a professional or a guesstimate as to what I thought the market was going to do.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Moss Dep., Exh. 3 to Resp., at 313:20-314:24; Resp. at 17; *see also* Resp. at 3 ("Suncor intended to give Kroger a price so low that it would soundly beat, rather than meet, its competitor's bids") and 11-12 (trying to create the same impression).

Earlier in the deposition, Moss had been asked why he offered Kroger a lower price in 2009 compared to 2008.  Moss Dep., Exh. 3 to Resp., at 280:11-281:10.  He explained:

> A.   2008 to 2009 there was a lot of changes in our business.  The pricing, the market value.  Plus the 2008 contract— bid proposal I did not get.  I was not the winner of that bid.  One of my competitors got that business.
>
> ....
>
> And the █ cents pricing here pretty much reflects the change in the market on what we felt we needed to do to win this business based on the fact *I knew I didn't* –█ *cents did not get me the business the previous year.*

*Id.* at 281:14-282:3 (emphasis added).

**(iii)**   **Assertions of fact:**  Moss did not "inten[d] … to meet the price of Suncor's competitor's," but came up with his own price which he "hope[d] …was 'the best one'," citing to page 44:4-12 of Moss's deposition.  Resp. at 17.

**The record:**  The impression Plaintiffs try to create is that this is how Moss bid in response to Kroger's RFPs.  The discussion of the record above shows that is not correct.  Moss did not just pick a number "out of the air," so to speak, and hope for the best.  Plaintiffs have taken Moss's answer out of context and mischaracterized it.  *Watershed*, 2011 WL 4048779 at *5 (mischaracterization of testimony does not defeat summary judgment).  Rather than start at the beginning of the questioning to provide context, Plaintiffs just repeat the end, page 44:10-12.  Starting at the beginning, however, page 43:17, shows that Plaintiffs' counsel asked Moss some general questions about Kroger's RFPs, including whether the RFPs laid out a price, to which Moss responded, "[t]here's no price point."  Moss Dep., Exh. 3 to Resp., at 43:17-44:8.  And then he was asked:

25
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

> Q.      Okay.  And you come up—each company or each supplier comes up with its own price and hopes that it's the best one?
>
> A.      Correct.

*Id.* at 44:9-12.  Moss was responding to a general question about how all the companies bid.

**(iv)      Assertions of fact:**  Plaintiffs assert that Moss did not offer WCS the same pricing as Kroger because Kroger was a "'national' chain," "'a totally different company,'" implying that Suncor discriminated on the basis of size—"the classic discriminatory situation Congress meant to remedy."  Resp. at 17 and 14.  To support their argument, Plaintiffs cite to Moss's deposition, page 282:2-25, taking his answer out of context.  A single statement, devoid of context, does not create an issue of fact.  *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *9.

**The record:**  In response to a question, Moss said he did not offer the same prices to WCS that he offered to Kroger because Kroger "is a totally different company with regards to these prices and everything."  Moss Dep., Exh. 3 to Resp., at 282:4-11.  A small but important point:  Moss never referred to Kroger as a "chain," but as a "company."  *Id.* at 282:4-25.  When asked "[w]hy is Kroger a totally different company," Moss explained that "they only work on bids," "they're putting their business out," "once they give you these volumes, they lift them regardless," "[t]hey don't go to other companies," "[t]hey don't change their prices," "[t]hey only want to lift from you."  *Id.* at 282:14-22.  Moss acknowledged that Kroger was "a much bigger company" than WCS, but denied that Kroger's purchasing power had anything to do with the price—"volumes didn't play into [his] decision as to what the pricing was when [he] went after the business."  *Id.* at 282:23-283:9.

**Purported "Facts" in Paragraphs B and C:**

**(i)      Assertions of fact:**  Plaintiffs assert Suncor had a specific policy which "sets forth a specific format to be used to document the basis for a price differential," and that Suncor "never

26

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

produced the documentation *required* by its own competition policy," or "any other documentation …even suggesting" the price Suncor gave Kroger was to meet the price of a competitor. Resp. at 17-18 (emphasis added) (citing Exhibit 21 to the Resp.). Plaintiffs use this purported, "required" policy to argue: "Had there been any effort to corroborate or evaluate competing prices, it must be presumed that Suncor would have followed its own published policies on that subject." Resp. at 21. Plaintiffs are not entitled to such a presumption because it is contrary to the evidence and is speculation. *See Jones v. Prudential Ins. Co. of America,* 2012 WL 3868888, at *3 (D. Colo. Sept. 6, 2012) (Krieger, J.) ("belief" is not sufficient).

**The record:** Suncor's "Competition Policy Guidance and Standards" is Exhibit 21 to the Response. At pages 17-18 of the Response, Plaintiffs quote from the Policy. However, Plaintiffs have combined and confused two different parts of the Policy, completely mischaracterizing it. "Price Discrimination and Pricing Below Cost," quoted at page 17 of the Response, is part of Appendix B: "United States: Federal and State Antitrust Laws" to Exhibit 21. However, "Documentation," also quoted at page 17 of the Response and which Plaintiffs assert is "required," is from a wholly different section, Appendix C, entitled *"Practical Suggestions."* Suncor's Competition Policy Guidance and Standards, Exh. 21 to Resp. at 16 (emphasis added). The "specific format," which Plaintiffs argue, is *"to be used* to document the basis for a price differential," is also from Exhibit C, "Practical Suggestions." Resp. at 17 (emphasis added).

The Policy, on its face, defeats Plaintiffs' argument and demonstrates their gross mischaracterization of the record. At pages 1-2, the Policy provides that "Suncor Personnel engaging in business activities in the United States are subject to Appendix B." Suncor's Competition Policy Guidance and Standards, Exh. 21 to Resp., at 1-2. It then states, *"Appendix*

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

*C sets forth some practical suggestions.*" *Id.* at 2 (emphasis added).  Thus, far from mandatory or "required," the documentation and specific format which Plaintiffs argue Moss did not follow and, therefore, could not have been meeting competition when he bid, are nothing but "practical suggestions" and are so identified in the Policy.  *Abeyta v. Progressive Specialty Ins. Co.*, 2008 WL170535, at *5 (D. Colo. Jan. 16, 2008) ("factually misleading" arguments do not create issue of fact) (Krieger, J.); *Cartinelle v. Napolitano*, 2011 WL 2607102, at *7 (D. Colo. Apr. 6, 2011) (mischaracterizations of the evidence do not create issue of fact) (Boland, J.).

As for Plaintiffs' claim that Suncor "never produced …any … documentation evidencing or even suggesting," that Suncor's price was given to meet competition, that is also contrary to the record.  Resp. at 18.  For example, Suncor attached as exhibits to its Motion various RFPs sent by Kroger which on their face "invite [Suncor] to provide a bid" and state that Kroger's "goal … is to procure *competitively* priced quality service" (emphasis added).  See RFPs, Exhs. F, I, L and Q to Suncor's Motion.  At bottom, plaintiffs have done nothing to undermine Suncor's assertion that it bid on the Kroger RFP in good faith to obtain the business.  That is all that is necessary to sustain the meeting competition defense.  *U.S. Gypsum*, 438 U.S. 453-54 (noting that "it is the concept of good faith which lies at the core of the meeting competition defense" and citing numerous cases in which the defense was recognized even though the price concessions were under the competition).

### Plaintiffs' arguments in Paragraph D:

Plaintiffs' assertions of fact in Paragraphs A-C form the basis for most of their arguments in Section D.  Resp. at 18-21.  From time to time, however, in Paragraph D Plaintiffs inject some new assertion not raised in Paragraphs A-C which Suncor will address.  Contrary to Plaintiffs' arguments, these assertions do not create any genuine issue of material fact.  Resp. at 21.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

1.    "Credibility of competing price information."  Plaintiffs' argument in this subsection fails because it depends on the following mischaracterizations of the record:  "Moss had no idea what other competitors were offering," "what other customers were or had been doing *vis a vis* Kroger 'didn't matter,'" Moss "vaguely considered certain market factors," and the "factors [he considered] related to competition and the market *in general* as opposed to any individual competitive situations."  Resp. at 19 (emphasis in original).  As discussed above at pages 23-25, Moss knew (i) Frontier and Valero were the two most probable suppliers, (ii) he had not gotten the bid in 2008, (iii) one of his competitors had gotten the bid, (iv) a differential of ███ was not good enough, (v) there were changes in pricing and market value between 2008 and 2009, (vi) "what [he'd] seen in the market and who ...was lifting," (vii) ███ "pretty much reflect[ed] the change in the market," and (viii) the market trends for the last few years.  Moss Dep., Exh. B to Suncor's Mot., at 289:17-23; Moss Dep., Exh. 3 to Resp., at 281:1-282:3; 312:4-314:24.  And in 2010, he knew he had won the bid in 2009 by giving a price differential of ███.  *Id.* at 281:20-21.  This is more than sufficient to establish the meeting competition defense.  *See Falls City Indus. v. Vanco Beverage Co.*, 460 U.S. 428, 449-50 (1983) (no requirement that competitive situations be met on a customer-by-customer basis and noting that "[a] seller may have good reason to believe that a competitor or competitors are charging lower prices throughout a particular region").

2.    "Suncor's past relationship with Kroger."  Plaintiffs make four arguments here.  *First*, they assert "[t]here was nothing in Suncor's past relationship with Kroger showing or suggesting that Suncor offered the discriminatory pricing to meet the equally low price of a competitor."  *Second*, they assert that Kroger was not really interested in a "low bid."  *Third*, they assert that "without any request from Kroger (or any consideration of what any other

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

competitors might be offering), Suncor reduced the price it had offered in 2008 by a full 1.5 cents." *Fourth,* they assert that Suncor's alleged conduct of "offering considerably lower prices than it charged other customers …without considering *at all* what competitors were offering" is the "type of conduct that the RPA was enacted to prohibit." Resp. at 19-20 (emphasis added).

The record, however, contradicts each of these assertions. *See Watershed*, 2011 WL 4048779 at *5 (arguments contrary to record are not acceptable).

With respect to the "first, "third," and "fourth" arguments, Moss bid in response to an RFP. Exh. O to Suncor's Motion. As just discussed in the preceding subsection, when Moss bid in 2009, he had reduced the potential suppliers to two (Frontier and Valero), knew he had lost the bid in 2008, understood the changes in the market between 2008-09, believed the $██ reflected the changes in the market, and had reviewed the market trends. Moreover, Suncor's pricing differentials of $██, $████ and $██ were "in the range" of Kroger's contract prices with its other suppliers.

As for Plaintiffs' "second" argument, Kroger always received more than one bid in response to its RFPs, its goal was to "buy low," and the word on the street, as Hossein Taraghi, WCS's owner, knew was that Kroger was shopping prices, trying to get other suppliers to supply them. Suncor's Mot., at 6, 10-11, ¶¶I, T and V; Thiessen Dep., Exh. C to Suncor's Mot., at 19:4-8, 76:9-77:8, 83:14-17, 92:5-10; Wilson Dep., Exh. D to Suncor's Mot., at 39:13-19; Taraghi Dep., Exh. S to Suncor's Mot., at 162:2-163:1.

3.   "Significance of loss if Suncor failed to meet the competing price." The essential argument in this subsection is that Suncor had to know its competitors' bids for the meeting competition defense to apply. Resp. at 20. That is not the law. Suncor's Mot., at 3-5, ¶¶A-C (discussing the law). The meeting competition defense does not require that the seller have

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

"absolute certainty" as to its competitor's lower price. *Great Atl. & Pac. Tea Co.*, 440 U.S. at 82-83. As the Tenth Circuit explained, "[t]he test is not actual knowledge." *Covey Oil Co. v. Continental Oil Co.*, 340 F.2d 993, 998 (10th Cir.), *cert. denied*, 380 U.S. 964 (1965). "Good faith" does not require that a seller bid the exact bid as others so that the seller is not lower. *See Great Atl. & Pac. Tea Co.*, 440 U.S. at 83; *U.S. Gypsum*, 438 U.S. at 453; *Forster Mfg. Co. v. FTC*, 335 F.2d 47, 55-56 (1st Cir. 1964) (overturning FTC requirement that seller had to know the competitor's price and its identity); *Nat'l Dairy,* 395 F.2d at 523 (agreeing with dissent in *In re Nat'l Dairy Prods.*, 70 F.T.C. at 99-100, that requiring a seller to show that its prices "were the same as, or no lower, than those of its competitors" places an "impossible burden" on the seller and "in a dilemma where they must run the risk of criminal prosecution under the Sherman Act in order to protect against a charge of violating the Robinson-Patman Act").

The defense merely requires that the bid be made in the reasonable belief that the price bid was necessary to obtain the business. *Great Atl. & Pac. Tea Co.*, 440 U.S. at 83; *Covey Oil Co.*, 340 F.2d at 998 "[A] seller can assert the [meeting competition] defense even if it has unknowingly made a bid that in fact not only met but beat his competition." *Great Atl. & Pac. Tea Co.*, 440 U.S. at 83. Plaintiffs' assertion that Suncor "was unaware of any competing price" is contrary to the record. Moss knew he had to give a discount greater than ▮▮ because he had not won the bid at that price a year earlier and the market had changed. Moss Dep., Exh. 3 to Resp., at 281:14-282:3. And he knew what his winning bid was in 2009—▮▮. *Id.* at 281:20-21.

Plaintiffs argue that Suncor has not shown it would have suffered any loss. Resp. at 20. That is not correct. Prior to winning the Dillon bid in 2009, Suncor had only been supplying diesel for Kroger's fleet trucks and gasoline and diesel for City Markets in Grand Junction.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Resp. at 24, n.6; Suncor's Mot., at 3, 8, ¶¶M, O and P.  When Suncor won the Dillon bid, that was the first time Suncor had won a bid to supply fuel to Kroger stores outside Grand Junction. Suncor's Mot., at P, ¶P; Moss Dep., Exh. B to Suncor's Mot., at 118:5-13; 199:20-200:2; 210:24-211:4; 213:1-11; and 213:23-214:1.  When it won the bid to supply Loaf 'N Jug in 2010, that was the first time Suncor had won a bid to supply them.  Moss Dep., Exh. 3 to Resp., at 361:14-15.  The Loaf 'N Jug volumes "became very large in terms of Suncor's overall business," and Dillon and Loaf 'N Jug "supplanted Western as Suncor's largest unbranded customers."  *Id.* at 361:6-11; Exh. 10 to Resp.; Resp. at 7.  If Suncor had not won the Dillon and Loaf 'N Jug bids, it would not have received their business and would have suffered that loss in volumes and sales.  *Reserve Supply Corp.v. Owens Corning Fiberglass Corp.*, 971 F.2d 37, 48 (7th Cir. 1992) (rejecting argument similar to Plaintiffs' because seller would have suffered a loss of business, quoting from *Falls City.*, 460 U.S. at 428).

4.     "Suncor's efforts to corroborate or evaluate the competing price."  Plaintiffs' arguments here are a repeat of earlier arguments.  Resp. at 20-21.  It is a gross mischaracterization of the record to assert (i) Moss had "no inkling as to whom Suncor was competing against or what pricing those competitors were offering"—he knew the most probable suppliers were Frontier or Valero and that one of his competitors had won the bid in 2008 by giving a discount greater than ███, or (ii) that he ignored Suncor's Competition policies which, as previously shown, were not policies but "Practical Suggestions."  *See* pp. 23-25, above.

**Plaintiffs' arguments in Paragraph E:**

Plaintiffs use two amendments or extensions of Suncor's underlying contracts with the Dillon Companies and with Loaf 'N Jug to argue that not all of Suncor's business with Kroger was through the bid process and, therefore, "Suncor's discriminatory pricing to Dillon and Loaf

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

'N Jug was not intended to meet competition." Resp. at 21-22. This argument is based on conjecture and does not defeat summary judgment. *Kenfield*, 837 F. Supp. 2d at 1247; *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *6 (must offer more than speculation, "at the very least, evidence strongly refuting all plausible alternative explanations").

Plaintiffs assert that in February 2010, "Suncor *spontaneously* lowered the contracted price" with the Dillon Companies. Resp. at 21 (emphasis added). Plaintiffs' citations to the record contradict this assertion. *Witt*, 2007 WL 840509 at *7 ("[p]laintiff may not simply rely on unsupported assertions but must point to specific evidence establishing such a contention"); *Jones*, 2012 WL 3868888 at *3 ("belief" is not sufficient. Plaintiffs cite to Moss's deposition at pages 298:8-301:5, but at pages 300:25-301:1, Moss said he did not know if "we wanted to or whether [Kroger] wanted to" lower the price. Moss Dep., Exh. 3 to Resp., at 300:25-301:1. In any event, there was nothing "spontaneous" about it.

Plaintiffs do not dispute that in October 2009, Suncor won the bid to supply the Dillon Companies by being the successful bidder in response to an RFP, bidding a $█ discount off the OPIS rack average. Suncor's Mot. at 8-9, ¶P. Nor do they dispute that in February 2010, Suncor was the successful bidder in response to an RFP to supply Loaf 'n Jug with fuel, this time bidding a $█ discount off the OPIS rack average for gasoline. Suncor's Mot. at 9-10, ¶R. The mere fact that Suncor and the Dillon Companies agreed to increase the discount by $.025 (from $█ to $█ ), which is the only fact Plaintiffs have presented, does not mean that the underlying contract does not satisfy the meeting competition defense, nor does it follow that the $.025 increase was not the result of a competitive situation. *See Kenfield*, 837 F. Supp. 2d at 1242 ("highly ambiguous" evidence without more is insufficient to defeat summary judgment; court will not make a large "intuitive leap"). The only evidence in the record is that, as Moss

33
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

testified, either Dillon or Suncor wanted "to make all the contracts uniform." Moss Dep., Exh. 3

to Resp., at 300:11-301:5. The Kroger personnel involved do not recall. Wilson Dep., Exh. D to

Suncor's Mot., at 55:5-13; Thiessen Dep., Exh. C to Suncor's Mot., at 93:1-94:2.

The same analysis applies to the contract extension that Suncor and Dillon entered into in

October 2010 in which the discount on gasoline was reduced by \$.035 (from ███ to ███),

but the discount on diesel fuel increased by \$.025 (from ███ to ███). The mere change in

pricing, without more, does not mean the underlying contract does not satisfy the meeting

competition defense or that Suncor's pricing "was not intended to meet competition." *Contra*

Resp. at 22; *see Kenfield*, 837 F. Supp. 2d at 1242. The reduction in the discount was based on

Moss's understanding of how the market had changed. Moss Dep., attached as Exh. CC, at

318:10-16 and 321:18-20. In addition, in this contract, Suncor "lost" the Kroger business in

Colorado Springs to another supplier, demonstrating this contract was the result of a competitive

situation in which Suncor won and lost. *Id.* at 322:15-17.

### Plaintiffs' "legal" arguments in Paragraph F:

Plaintiffs discuss briefly *FTC v. A.E. Staley Mfg.*, 324 U.S. 746 (1945), in which the

Supreme Court agreed with the FTC that "good faith" is the test for the meeting competition

defense. Resp. at 22. Plaintiffs argue that "there is even more basis in this case[] to reject the

meeting competition defense than in *Staley*," but that argument fails because Plaintiffs have

mischaracterized the record. Contrary to Plaintiffs' suggestion, the Supreme Court used the facts

Plaintiffs listed to conclude that "[w]e cannot say that the Commission's inference [of a lack of

good faith] is not supported," but they were not the basis for denying the meeting competition

defense. *Staley*, 324 U.S. at 760; Resp. at 22. The FTC found the following facts dispositive: (i)

sellers' discriminatory prices occurred "in circumstances which strongly suggested that the

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

buyers' claims were without merit," (ii) sellers' "readiness to grant discriminatory prices without talking [sic] any steps to verify the existence of a lower price," and (iii) "the entire absence of any showing that [sellers] had taken any precaution to conduct their business in such manner as to prevent unwarranted discriminations in price." *Id.* at 759. The Supreme Court succinctly summarized the lesson of *Staley*: "[U]nsupported testimony from informants of uncertain character and reliability was insufficient to establish the [meeting competition] defense." *Great Atl. & Pac. & Tea Co.*, 440 U.S. at 84, n.17.

Here, unlike in *Staley*, there is no suggestion that Kroger lied about the prices or that Suncor did not attempt to verify the prices or that Suncor conducted its business without regard to the antitrust laws. As already shown from the record, Moss knew the most probable suppliers, knew that a differential of ▮▮▮▮ was not sufficient, knew what his winning bid was in 2009, understood the market, watched the market and surveyed market trends. Moss Dep., Exh. B to Suncor's Mot., at 289:20-23; Exh. 3 to Resp., at 312:4-313:3, 314:3-24; pp. 23-25, above. Thus, to assert, as Plaintiffs do, that "there is even more basis" here than in *Staley* to reject the meeting competition defense because "Suncor gave no consideration to finding out what its competitors were offering" is a gross mischaracterization of the record. Resp. at 23; *Watershed*, 2011 WL 4048779 at *5; Resp. at 22. And, finally, there is no evidence that Suncor conducted its business in disregard of the antitrust laws. The evidence is that Suncor held classes on antitrust law taught by the legal department for Moss and its other employees and had a published policy (Appendix B in Exhibit 21) to which its employees were "subject." Moss Dep., Exh. 3 to Resp., at 110:21-24, 111:22-24 and Exh. 21 to Resp., at 1-2.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

### Plaintiffs' legal arguments in paragraph G:

Plaintiffs discuss *Great Atlantic* and three cases Suncor cited, arguing that the facts here are different and, therefore, Suncor cannot satisfy the meeting competition defense. Resp. at 23-25. Plaintiffs' arguments apply to all four cases so Suncor will discuss them together.

*First*, as a matter of antitrust law, there is no checklist or template of facts that has to be established. The test is simply whether Suncor "acted in a reasonable and good-faith effort to meet its competition" and, if it did, it is "entitled to a meeting-competition defense." *Great Atl. & Pac. Tea Co.*, 440 U.S. at 84. Plaintiffs' arguments that the facts are distinguishable (and once again grossly mischaracterizing the record by calling Suncor's "practical suggestions" a "policy") do not defeat summary judgment. *Brown v. Cooke*, 2009 WL 641301, at **13-14 (D. Colo. March 9, 2009) (Krieger, J.) ("must come forward with specific facts showing that there is a genuine issue for trial;" "[e]vidence that is not significantly probative and immaterial factual disputes will not defeat a motion for summary judgment"); Resp. at 24.

*Second*, for purposes of the RFA process, Suncor did not have a "limited relationship" with Kroger. *Contra* Resp. at 24. Their relationship went back to at least 2004 and involved bids that Suncor won and bids Suncor lost. Suncor's Mot., ¶¶K and L. Plaintiffs argue that the volumes Suncor sold in the earlier years were small, but the volumes are irrelevant and immaterial. *Brown*, 2009 WL 641301 at *14; Resp. at 24, n.6. What is material is that Suncor had participated for at least five years in Kroger's RFP process before it won the bid in 2009 to supply the Dillon Companies in Colorado. Wilson Dep., Exh. D to Suncor's Mot., at 9:5-6, 15:7-14 and 27:8-13. In any event, Suncor need not have a relationship with a customer to meet competition. As long as Suncor had a good faith belief that a price concession was necessary to obtain the business in the first instance, it has established the meeting competition defense.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

*Sunshine Biscuits, Inc. v. FTC*, 306 F.2d 48, 52 (7th Cir. 1962) (rejecting argument that meeting competition defense is only available for retaining existing business).

*Third*, Suncor did not request that Kroger tell it the competing bid prices, but there is no legal requirement that Suncor make such a request and Kroger would not have told Suncor. Resp. at 24; Thiessen Dep., Exh. C to Suncor's Mot., at 93:1-94:2. It is unrealistic to assume that Kroger or any seller would divulge the other bids and courts do not require that. *E.g.*, *Forster*, 335 F.2d at 56 ("neither expects the other, or can be expected, to lay all his cards face up on the table"). Here, it is undisputed that Kroger issued RFPs regularly, others were bidding to supply Kroger with fuel and Kroger always received more than one bid in response to an RFP. Suncor's Mot., at 6, ¶I. Wilson Dep., Exh. D to Suncor's Mot., at 9:5-6, 15:12-14 and 27:8-13; Thiessen Dep., Exh. C to Suncor's Mot., at 92:5-10. Even Taraghi knew that Kroger was a price shopper, using the bid process "to get other suppliers." Suncor's Mot., at 11, ¶V.

*Fourth*, as they have done before, Plaintiffs mischaracterize Moss's testimony about what he knew and his so-called "guesstimate." Resp. at 25-26; *Watershed*, 2011 WL 4048779 at *5.

*Fifth*, in a footnote, Plaintiffs argue that the testimony of the Kroger witnesses is irrelevant and, by implication, should be disregarded. Resp. at 26, n. 8. But their testimony is very relevant. The Kroger testimony, particularly that Suncor's prices were "in the range" of Kroger's prices with its other suppliers, establishes that Moss's and Suncor's understanding of pricing, the market, and "what drives the market" was correct and confirms Suncor's "good faith" belief. Resp. at 25-26; Suncor's Mot., at 7 and 10, ¶¶J and T; Ewing Dep., Exh. E to Suncor's Mot., at 200:3-24; Thiessen Dep., Exh. C to Suncor's Mot., at 76:9-77:8.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

### C.   THE SECOND ELEMENT OF CLAIM I THAT CANNOT BE PROVEN BY WCS:INJURY TO COMPETITION.

#### 1.   Response to Paragraph A – Standard of Proof for Injury to Competition.

While Plaintiffs assert that Suncor has "hopelessly confuse[d]" the competitive injury requirement for secondary-line Robinson-Patman cases with that applicable to primary-line claims and non-Robinson-Patman claims, they never say how.  Resp. at 27.  The only thing Plaintiffs point to is Suncor's reliance on *Brooke Group. Ltd. v. Brown & Williamson Tobacco Co.*, 509 U.S. 209, 220 (1993).  Resp. at 27 n.11.  The United States Supreme Court, however, has relied on *Brooke Group* in numerous antitrust cases, including its most recent decision in a secondary line Robinson-Patman case, *Volvo Trucks N. A., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006).  *See also Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 440-41 (2009) (applying *Brooke Group* in claim challenging an alleged "price squeeze" under section 2 of the Sherman Act, 15 U.S.C. § 2); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 313 (2007) (adopting *Brooke Group* standard for "predatory buying" case under section 2 of the Sherman Act, 15 USC. § 2).

*Volvo Trucks* quotes the same passages from *Brooke Group* that Suncor cites for general Robinson-Patman law principles.  Suncor's Mot. at 12-13; *Volvo Trucks*, 546 U.S. at 176 Robinson-Patman Act only prohibits price differences that threaten injury to competition), at 181 Robinson-Patman Act is to be construed consistently with the broader principles of antitrust law), and at 168 (the antitrust laws protect competition, not individual competitors).  Thus, it is not clear what Plaintiffs' disagreement is.  In any event, it has no merit.[5]

---

[5]   Plaintiffs seem to be suggesting Suncor cites *Brooke Group* for the proposition that the decision overruled *FTC v. Morton Salt Co.*, 334 U.S. 37 (1948), because the cases they cite all discuss that issue.  Suncor did not take that position, and Plaintiffs cite nothing in Suncor's Motion making that argument.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Plaintiffs claim that they have adduced sufficient evidence to raise a triable issue of injury to competition because (i) they lost profits as a result of the price discrimination; and (ii) Suncor sold fuel to the Kroger entities at lower prices for a substantial period of time, thus triggering the inference of injury to competition recognized in *FTC v. Morton Salt Co.*, 334 U.S. 37, 46, 49-51 (1948). Neither is correct, for the reasons discussed below.

> **2.    Response to Paragraph B – Plaintiffs' Claim That the Evidence Raises a Triable Issue of Injury to Competition under the Inference Recognized in *Morton Salt*.**

**Legal Standard:**  As Plaintiffs note, the Supreme Court has recognized that a secondary-line Robinson-Patman plaintiff raises an inference of injury to competition by showing that the challenged price differentials were both substantial and persisted over a lengthy period of time. Resp. at 28; *Morton Salt*, 334 U.S. at 46, 49-51; *see also Falls City*, 460 U.S. at 435. Plaintiffs cannot satisfy either element. Suncor will address Plaintiffs' arguments in the order they made them.

### Purported "Facts" on Persistent Price Discrimination:

**Assertions of Fact:**  Plaintiffs claim that the challenged price discrimination occurred over a 20-month period and that comparable purchases made by WCS and Kroger occurred on a "near-continual basis." Resp. at 29. That argument is contrary to the record. *Kenfield*, 837 F. Supp. 2d at 1239 ("party must support each assertion with citation to evidentiary material that establishes that fact").

Plaintiffs also contend that Suncor "confuses" the requisite proof of injury to competition with the requirement to demonstrate antitrust injury. Resp. at 27 n.12. Again, Plaintiffs never identify what "confusion" exists. In any event, Suncor plainly noted the difference between injury to competition and antitrust injury in its Motion. Suncor's Mot. at 11-12 (drawing distinction between injury to competition and antitrust injury and citing the same case cited by Plaintiffs).

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

**The Record:**  As discussed at pages 3-20, above, Plaintiffs are only entitled to pursue Robinson-Patman claims on those purchases that are "in commerce;" that is, the fuel sold in a comparable transaction must have crossed state lines.  Glick/Tatos Report, Exh. A to Suncor's Mot. at 7-11.  Plaintiffs *have not made any attempt to identify those comparable transactions that actually satisfy the statute's "in commerce"* requirement.  *See S&M Materials Co. v. Southern Stone Co.*, 612 F.2d 198, 200 (5th Cir. 1980) ("in commerce" requirement delimits the type of transaction that can constitute a Robinson-Patman violation; "discrimination sought to be charged must...involve a transaction 'in commerce'").  Plaintiffs' failure to identify such transactions is fatal to their claim.  But even if they had done that, Plaintiffs still would not have a triable issue of persistent price discrimination.  The record facts do not support it.

Attached as Exhibits DD - GG are charts showing the days on which WCS and Kroger purchased the same product from Suncor from the same terminal.[6]  Red squares indicate days on which Kroger purchased the particular product at a lower price than WCS.  Green squares indicate days on which WCS purchased the particular product at a lower price than Kroger.  White squares show days on which there is no comparable transaction.  This pattern, which Plaintiffs' own experts have also found, refutes any claim that the alleged price discrimination persisted over time.  Exh. A to Suncor's Mot. at 9-10 (finding days when WCS paid more, Kroger paid more or they did not purchase on the same day).

The charts from Commerce City (referred to as "Suncor Denver" on Exhibit DD), where WCS made the vast bulk of its purchases from Suncor, illustrate the point.  With respect to diesel fuel, over the entire Damage Period, Kroger and WCS made purchases on the same day 312

---

[6]     The charts attached as Exhibits DD-GG are summaries taken from the Suncor sales data – the same data used by Plaintiffs' experts in preparing a similar, but abbreviated, chart at page 10 of their expert report, attached as Exhibit A to Suncor's Motion.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

times.  Of those, Kroger paid a lower price on 223 days and WCS paid a lower price on 89 days. In other words, out of 578 days in the Damage Period, Kroger and WCS bought diesel fuel on the same day only 53% of the time and WCS paid a lower price than Kroger on nearly 30% of those days.

As the charts reveal, there is no consistency to the pricing pattern.  Periods in which Kroger's prices were generally lower are regularly interrupted by periods in which WCS's prices were lower.  Moreover, there are lengthy gaps in the alleged damages period where there are *no* comparable transactions, meaning that there is no possibility that any price differentials could have harmed WCS's ability to compete with Kroger or any other third party for the sale of diesel fuel.

That same pattern substantially repeats itself for all products at all terminals throughout the putative Damage Period.  For some products at some terminals, such as E-10 gasoline at the Grand Junction terminal, as well as virtually all purchases made at the Dupont terminal, WCS consistently paid a *lower* price than Kroger.  Exhs. EE and GG, attached.  In all cases, there are significant periods in which there are no comparable transactions.  Far from demonstrating a durable, day-to-day price disadvantage for WCS, the undisputed price evidence, which Plaintiffs' own experts acknowledge, shows that Kroger sometimes bought at a lower price than WCS, WCS sometimes bought at a lower price than Kroger and, for extended periods, there were no comparable transactions at each terminal.  Exh. A to Suncor's Mot. at 9-10.

Such evidence falls far short of the persistent price differentials necessary to raise an inference of injury to competition under *Morton Salt*.  In fact, Plaintiffs' own cases undermine their argument.  In each of the cases they cite, there were significant, entrenched and uninterrupted price differentials favoring one buyer on all comparable purchases over sustained

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

periods. Resp. at 29-30. In *Coastal Fuels*, 79 F.3d at 193, for example, the court described the price differentials as "continuous" and "lasting all 18 months that [the plaintiff] was in business." Furthermore, the price differentials "always exceeded the five cents per barrel that witnesses testified was competitively significant." 79 F.3d at 193. In *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 387 (8th Cir. 1987), the price differentials persisted over a 27-month period with no evidence that the plaintiff ever received a more favorable price than the competing buyer. Finally, in *Foremost Diaries*, 348 F.2d at 679, the price differentials persisted over a two-year period. Again, nothing in the evidence recited in *Foremost Diaries* suggests that disfavored buyers ever received a better price than the favored buyer. 348 F.2d at 679 (noting that defendant "did not offer comparable price advantages to its independent customers"); *see also Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1272-73 (3d Cir. 1995) (price discrimination in effect for at least a three-year period with no evidence of interruption or sales to plaintiff at favored prices). By contrast, any price differentials favoring Kroger were comparatively sporadic and often interrupted by periods in which WCS received a favored price or in which there were no comparable transactions that could have possibly affected competition.

In short, the undisputed pricing evidence, relied on by Plaintiffs' own experts, refutes the notion that the alleged price discrimination persisted over a substantial period of time. That failure alone is sufficient to defeat Plaintiffs' claim of injury to competition under the *Morton Salt* inference.

**Purported "Facts" on Substantial Price Discrimination:**

**Assertions of Fact:** Plaintiffs claim that the alleged price discrimination over all purchases made by Plaintiffs and Kroger averaged ▮ cents per gallon of fuel throughout the entire Damage Period. On that basis, Plaintiffs claim that there is sufficient evidence to raise a

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

triable issue on the substantiality of the challenged price differentials.  Resp. at 31-32 (citing

Exh. A to Suncor's Mot. at 9; Exh. Z to Suncor's Mot. at 6; Exh. 1 to Resp. at ¶9; Exh. 23 to

Resp. at ¶¶ 2-4)

**The Record:**  In calculating the per-gallon average of the alleged price discrimination,

Plaintiffs have, once again, failed to identify which comparable transactions from each terminal

involved fuel that crossed a state line.  Instead of segregating those relevant sales, Plaintiffs

simply aggregated all the transactions over the entire Damage Period and then averaged the price

differences *for those days where WCS actually paid a higher price than Kroger*.[7]  Moreover, for

mid-grade gasoline, Plaintiffs' experts did not use an actual transaction price (because there were

so few) but created their own price by using weighted average prices for regular and premium

gasolines.  Exh. A to Suncor's Mot., at 7 n.12.  On that basis, WCS concludes that it paid an

average of ■ cents more for fuel, per gallon than Kroger for fuel making the price

discrimination "substantial" for purposes of the *Morton Salt* inference.  Resp. at 30-31; (Exh. Z

to Suncor's Mot. at 6; Exh. 23 to Resp. at ¶¶2-4)  It is not.  The Supreme Court rejected this kind

of results-oriented, manipulative mixing-and-matching of data in *Volvo Trucks*.  There, the

plaintiff alleged that Volvo had granted greater price concessions to some Volvo dealers than to

others.  The evidence at trial consisted of various price concessions on transactions that were not

comparable.  It was those non-comparable transactions that the plaintiff used to assert injury to

competition under *Morton Salt*.  The Supreme Court rejected that effort, declining "to permit an

---

[7]      As the report of Plaintiffs' experts concedes, on a number of occasions, WCS actually
paid a lower price for fuel than Kroger.  Rather than including those days in which WCS actually
had a price advantage in their calculations of the average prices to WCS and Kroger, Plaintiffs'
experts simply ignored them.  Glick/Tatos Report, Exh. A to Suncor's Mot., at 19 n. 30 ("We
have been asked to calculate what *additional* profits, if any, WCS would have received"
(emphasis added)).

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

inference of competitive injury from evidence of such a mix-and-match, manipulable quality." *Volvo Trucks*, 546 U.S. at 178.

Plaintiffs have done that here.  They have "mixed and matched."  In calculating the ▮ cents average price differential, Plaintiffs' experts have not systematically compared those transactions that they assert are comparable and determined the average price differences on those transactions.  They have not confined their calculations to transactions that are "in commerce."  And they have excluded comparable transactions when the price differential *favors* WCS.  Exh. A to Suncor's Mot. at 19 n. 30.  Such misuse of data does not raise an inference of competitive injury under *Morton Salt*.  *Volvo Trucks*, 546 U.S. at 179 (plaintiff's mix-and-match evidence fails to raise inference of competitive injury under *Morton Salt*).

      **3.**      **Response to Paragraph C – Plaintiffs' Claim That the Evidence Raises a Triable Issue of Injury to Competition Based on Lost Profits.**

**Assertions of Fact**:  Having failed to satisfy the *Morton Salt* inference, Plaintiffs claim that they have raised a triable issue of injury to competition because they have shown lost profits resulting from the price discrimination.  They base this assertion on their experts' damages calculation and on a snippet of deposition testimony from Ed Sharpe, the Director of Petroleum for Loaf 'N Jug, who, according to Plaintiffs, testified that Kroger would expect to be competitively injured if it had received unfavorable discriminatory wholesale prices.  Exh. A to Suncor's Mot.; Resp. at 32; and Exh. 12 to Resp. at 5:3-5.

**The Record**:  Although Suncor's principal disagreements with Plaintiffs on these points are primarily legal, one factual assertion must be corrected.  Once again, Plaintiffs' characterization of the evidence does not match what the record actually says.  Contrary to Plaintiffs' description, Mr. Sharpe said nothing about "discriminatory" wholesale prices or injuries flowing from them.  The full excerpt of the testimony Plaintiffs cite is as follows:

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Q.   And in terms of the inputs that you've mentioned and in particular wholesale pricing, if there's a situation where your wholesale prices keep going up, I mean, it's inevitable that your price is going to go up, right?

A.   That's what wholesale price means.

Q.   Right.

A.   If your wholesale goes up, your price goes up.

Q.   Right, okay.

A.   Your cost.

Q.   Your cost, right.  When we say the wholesale price –

A.   Cost.

Q.   – it's your cost.

A.   Right.

Q.   So when your costs are going up, you don't have a lot of alternative, recognizing a lag time, but to have your retail price follow.  Correct?

A.   Correct.

Q.   And if that wholesale price is a disadvantageous wholesale price, higher than your competitors', then you're at a competitive disadvantage, right?

A.   Yeah, I would assume, yes.

Sharpe Dep., Exh. 12 to Resp., at 46:7-47:6.  Mr. Sharpe said nothing about Kroger suffering an injury of the type actionable under the Robinson-Patman Act.  More important, he said nothing about lost profits that may have been *suffered by WCS*.  Much of the testimony does nothing more than repeat bromides that are virtually tautological – *e.g.*, when wholesale prices go up, the buyer's costs increase.  This testimony does not support the proposition for which Plaintiffs cite it and thus has no bearing on whether they have adduced evidence raising a triable issue of injury

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

to competition. *Am. Family Mut. Ins. Co.*, 2011 WL 782574 at *8 (cannot defeat summary judgment "overstat[ing] the significance" of witness statement).

Plaintiffs' characterization of the testimony aside, their lost profits argument fails for legal reasons. To show competitive injury flowing from lost profits, WCS must elicit *direct* evidence that it lowered its prices in response to lower retail prices offered by Kroger or that sales were diverted from WCS stores to Kroger stores as a result of the alleged price discrimination. *Rose Confections*, 816 F.2d at 385 ("plaintiff may introduce *direct* evidence that disfavored competitors lost sales or profits as a result of the discrimination") (emphasis added); *see also Falls City*, 460 U.S. at 437-38 (citing direct evidence of disfavored buyer's lost sales and profits). Direct evidence is evidence that requires no inference or presumption. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011) ("The term 'direct evidence,' properly understood, refers to a narrow category of 'evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'") (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007) (internal quotation marks omitted).

Aside from the Sharpe testimony, which has no bearing on whether WCS lost profits at any store, the only other evidence Plaintiffs cite in support of their position is the report of their experts, which purports to calculate the amount of damages suffered by WCS. Resp. at 31-32 (citing "a statistical analysis" done by Plaintiffs' experts purportedly showing a significant statistical relationship between the price discrimination and WCS's profits at 26 stores). That expert report is not *direct* evidence of any lost sales or profits. *McCleskey v. Kemp*, 753 F.2d 877, 888 (11th Cir. 1985) ("In evidentiary terms, statistical studies based on correlation are circumstantial evidence. They are not direct evidence."); *see also Brown v. Nucor Corp.*, 576

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

F.3d 149, 153, 156-57 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1720 (2010) (drawing distinction between statistical evidence and direct evidence).

On its face, the expert report does not purport to attempt to establish a causal connection between WCS's profits and the price discrimination. Plaintiffs' experts, in effect, disclaim any personal knowledge of WCS's business or pricing practices. They consistently lace their report with qualifiers making clear that they personally did not do anything to establish a causal connection between the alleged price differences and any injury to WCS, but instead relied on representation from WCS. *See, e.g.*, Glick/Tatos Report, Exh. A to Suncor's Mot., at 14 ("*According to WCS*," WCS typically attempts to follow a price reduction by Kroger) (emphasis added); *id.* at 15 ("*According to WCS*, at Store 135 WCS attempts to set a price equal to three cents below the street price") (emphasis added). Furthermore, WCS never identifies a single lost customer or single specific instance in which it lowered prices in response to a price reduction from Kroger. *Cf. Falls City*, 460 U.S. at 437-38 (identifying specific customers that lost sales or profits); *Rose Confections*, 816 F.2d at 385-86 (same). Plaintiffs' expert report, therefore, is not *direct* evidence of any lost sales or profits flowing from the putative price discrimination. Thus, Plaintiffs have not adduced evidence sufficient to raise a triable issue of injury to competition on this basis. Having failed either to satisfy either this test or to adduce evidence sufficient to trigger the *Morton Salt* inference, Plaintiffs necessarily have failed to raise a triable issue of injury to competition. Accordingly, Suncor is entitled to summary judgment on its Robinson-Patman claim.

### 4.    Response to Paragraphs D and E.

Finally, Paragraphs D and E of Plaintiffs' Response gloss over two additional problems with their competitive injury evidence. Plaintiffs spend much of Paragraph D conjuring arguments that Suncor did not make and then rebutting these strawmen. That discussion is

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

irrelevant.  Having failed to cite evidence sufficient to raise the *Morton Salt* in the first instance or any direct evidence of lost profits, Plaintiffs have not raised a triable issue of injury to competition.

Suncor's remaining point is straightforward – Plaintiffs have misconstrued the concept of injury to competition under the Robinson-Patman Act.  The entirety of Plaintiffs' argument and evidence on injury to competition relates solely to injuries supposedly suffered by WCS.  But as Suncor noted, "[t]he naked demonstration of injury to a specific competitor without more is not sufficient to show that a price discrimination 'may' substantially lessen competition; the test must always focus on injury to *competition.*"  *Motive Parts Warehouse v. Facet Enters.*, 774 F.2d 380, 395 (10th Cir. 1985) (emphasis in original); Suncor's Mot. at 12-13.

Plaintiffs' Response suggests that the Tenth Circuit does not mean what it says and that a reading of *Motive Parts Warehouse* requiring injury to competition generally – rather than injury to a specific competitor – would somehow be inconsistent with the congressional purpose underlying the Robinson-Patman Act.  Resp. at 38.  In fact, Plaintiffs hint that there is something irrational about the Tenth Circuit's holding in *Motive Parts Warehouse*, suggesting that the decision is inconsistent with the *Morton Salt* inference.  Resp. at 38 n.20.  But it is Plaintiffs' argument that misses the mark.  Contrary to their assertions, *Morton Salt* does not create any "presumption," but rather merely an *inference* that competition may be harmed by price discrimination.  *Id.*  That inference is rebuttable, *Falls City*, 460 U.S. at 435; *Boise Cascade Corp. v. FTC,* 837 F.2d 1127, 1144 (D.C. Cir. 1988) (holding that "a sustained and substantial price discrimination raises an inference, but it manifestly does not create an irrebuttable presumption of competitive injury" and a "[s]pecific, substantial evidence of absence of competitive injury is . . . sufficient to rebut what is, after all, only an inference") (internal

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

citations omitted), and may be unreasonable in light of other evidence put before a court. *Cf.*

*Matsushita Elec. Indus. Corp., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (in Sherman

Act context, noting that when an antitrust claim "makes no economic sense," a plaintiff must

adduce "more persuasive evidence...than would otherwise be necessary" to survive summary

judgment); *see also id.* at 588 (noting that substantive antitrust law limits the range of

permissible inferences that may be drawn from ambiguous evidence in cases under section 1 of

the Sherman Act, 15 U.S.C. § 1). Nothing in the holding in *Motive Parts Warehouse* is at odds

with *Morton Salt*.

The Supreme Court has recognized that, when competition in the marketplace as a whole

remains robust, even when there is some differential pricing, no inference of harm to competition

arises under the Robinson-Patman Act. *Volvo Trucks*, at 546 U.S. at 181 (noting that the Court

"would resist interpretation geared more to the protection of existing *competitors* than to the

stimulation of *competition*") (emphasis in original); *see also Boise Cascade*, 837 F.2d at 1144

(*Morton Salt* inference may be overcome "*by evidence showing an absence of competitive injury*

*within the meaning of Robinson-Patman*") (emphasis in original); *Richard Short Oil Co. v.*

*Texaco*, 799 F.2d 415, 420 (8th Cir. 1986) ("analysis of the injury to competition [under the

Robinson-Patman Act] focuses on whether there has been a substantial impairment to the vigor

or health of the contest for business, regardless of which competitor wins or loses").

Here, there is no doubt that competition in the retail sale of gasoline and diesel fuel is

robust. Plaintiffs not only concede the fact but affirmatively embrace it. Resp. at 7 ("The retail

market for Fuel has always been highly competitive, with a significant portion of consumers

making purchasing decision based on small differences, *i.e.*, one to two cents per gallon, in the

retail prices for Fuel."). As Taraghi testified, numerous retailers, including Bradley, Diamond

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Shamrock, 7-Eleven, Sam's Club, Safeway, and a host of others sell gasoline in competition with WCS stores. Taraghi Dep., Exh. S to Suncor's Mot., at 41:6-45-10, 123:17-25.   Every one of the 26 stores for which WCS claims damages competes with several retailers according to WCS's own pricing surveys.   Glick/Tatos Affidavit, Exh. 27 to Resp., ¶¶10, 14; *Richard Short Oil Co.*, 799 F.2d at 420 (inference of injury to competition overcome by evidence of multiple sellers in the market).   There is no evidence that the alleged price discrimination reduced output, raised prices to consumers or otherwise harmed the competitive process in any fashion.   There is no evidence that Kroger possesses market power.   *See Volvo Trucks*, 546 U.S. at 181 (noting that no favored buyer in the case "possesses market power").   Indeed, such a claim would be frivolous, for Kroger sells only 11% of the gasoline in the Denver metropolitan area and WCS sells even less.   Griffin Rep., Exh. 24 to Resp., ¶14; *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26-27 (1984) (market share of less than 30% does not raise inference of market power as a matter of law).   In short, there is no evidence that the price discrimination has had any deleterious effect on competition in any fashion.   WCS's case consists of entirely of a claim that it alone was injured by the alleged price discrimination.[8]   As the Tenth Circuit made clear in

---

[8]   Plaintiffs claim their experts were not required to account for competition from other sellers in making their damages calculations, contending that it only need show that the price discrimination was a "material cause" of its damages to recover. Resp. at 37.   This argument also misses the point. Plaintiffs' refusal to take competition into account in calculating damages manifests the incoherence of their case theory. On the one hand, this Court is told that the retail gasoline business is "highly competitive" and that small price differences can alter purchasing decisions. *Id.* at 7.   On the other, when it comes to quantifying WCS's supposed injuries, Plaintiffs erect a model that assumes that WCS *only* competes against Kroger and that no other seller in the marketplace have any impact on purchasing decisions or market prices. *See* Glick/Tatos Report, Exh. A to Suncor's Mot., at 17 (listing variables used in Plaintiffs' experts' regression analysis for calculating damages but including no variable for competition from third parties); Griffin Report, Exh. 24 to Resp., ¶¶10-18 (unrebutted opinion noting that, contrary to the undisputed facts, the Plaintiffs' damages calculation postulates a "binary world" in which Kroger and WCS are the only gasoline and diesel retailers).   The incongruence between

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

*Motive Parts Warehouse*, that evidence, even if credited, is not enough to establish competitive injury under the Robinson-Patman Act.

### D. PLAINTIFFS CANNOT PROVE THE ELEMENTS OF CLAIM VI (VIOLATION OF SECTION 6-2-108 OF THE COLORADO UNFAIR TRADE PRACTICES ACT).

As explained in Suncor's Motion, WCS has no claim for violation of C.R.S. § 6-2-108, which forbids "[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts" to the injury of a competitor and that tends to destroy competition. In its Response, Plaintiffs urge the Court to ignore Colorado law and instead adopt California law, specifically, the interpretation of California's "secret discount" statute by California courts. Resp. at 57-66. The Court should follow Colorado law—not California law—and grant Suncor summary judgment on Plaintiffs' Sixth Claim for Relief.

#### 1. Section 6-2-108 Does Not Apply to Suncor's Agreement with Kroger.

Plaintiffs bring a price discrimination claim under C.R.S. § 6-2-108, which is not a price discrimination statute. The term "price" is not used in Section 6-2-108, which concerns only "discounts." "Discount" generally means "[a] reduction from the full amount or value of something, esp. a price." Suncor's Mot. at 30 (quoting BLACK'S LAW DICTIONARY (9th ed. 2009)). The terms used by the General Assembly in C.R.S. § 6-2-108—"rebates," "refunds," "commissions," and "discounts"—are all reductions from a predetermined value. In light of these terms, "discount" cannot be read to include "price." *See Noyes Supervision, Inc. v. Canadian Indem Co.*, 487 F. Supp. 433, 437 (D. Colo. 1980) (interpreting statutory terms consistently under doctrine of *ejusdem generis*).

Plaintiffs' theory of competitive harm and their alleged antitrust injury is yet another reason to dismiss this case.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Moreover, "discount" should not be interpreted to include "price" because the Colorado Unfair Trade Practices Act contains a different provision, C.R.S. § 6-2-103, that specifically forbids anti-competitive price discrimination. *See Dunlap v. Colo. Springs Cablevision, Inc.*, 855 P.2d 6, 7 (Colo. App. 1992) (recognizing C.R.S. § 6-2-103 "prohibits certain anticompetitive discriminatory pricing structures"). Plaintiffs concede that C.R.S. § 6-2-103 does not apply in this case, since "it is intended to apply whenever a business charges different prices to purchasers based on geographic differences with an intent to drive out competition in one geographic area." *Id.* at 8; *see also* Resp. at 61-64 (conceding C.R.S. § 6-2-103 does not apply). Interpreting C.R.S. § 6-2-108 as a price discrimination statute would defeat the express limitation of the Colorado Unfair Trade Practices Act to only geographic price discrimination. *See Dunlap*, 855 P.2d at 7; *see also Fincher ex rel. Fincher v. Prudential Prop. & Cas. Ins. Co.*, 2008 WL 901534, at *2 (D. Colo. Mar. 31, 2008), *aff'd*, 374 Fed. App'x 833 (10th Cir. 2010) (interpreting Colorado statute "in a way that best effectuates the purpose of the legislative scheme").

This case is about different prices, not discounts. Kroger did not receive "rebates" or "discounts" from Suncor; instead, Suncor calculated Kroger's price in a contractually-negotiated manner that was different from the manner negotiated by WCS. *See* Moss Dep. Exh. B to Suncor's Mot., at 48:12-25. WCS's personnel uniformly agree that, in the industry, "discount" is a term of art that means either the cents-per-gallon adjustment to the rack price, or an additional "off-contract" discount. At his deposition, Taraghi agreed that "discount" was simply "the cents off [the rack price] that appears in the contract," as opposed to a "special discount or off contract discount," which constituted an independent reduction in the price. Taraghi Dep., Exh. 2 to Resp., at 5:19-6:3. WCS's fuel manager, Christopher Wehrle, likewise acknowledged that "discount" was the "rack minus something" agreed to in the contract, whereas an "off contract

52

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

discount" was "something special in addition." Wehrle Dep., Exh. BB, at 5:9-18. Angelia Reay, a former WCS employee responsible for negotiating with Suncor, agreed that the rack-minus pricing "is what we call a discount" in the industry, but that this was different from an off-contract, actual discount off the negotiated contractual price. Reay Dep., attached as Exh. HH, at 6:19-7:14. There is no evidence that Suncor gave Kroger an "off-contract" special discount—it simply calculated Kroger's price in a different way. *See* Moss Dep. Ex. B to Suncor's Mot., at 48:12-25.

None of the California cases relied upon by Plaintiffs involved a difference in price. Resp. at 59-61. Indeed, these cases confirm that a "discount" for purposes of the statute is a reduction to a set price or similar arrangement that was offered to one party but not another. *See, e.g., Western Pac. Kraft, Inc. v. Duro Bag Mfg. Co.*, 794 F. Supp. 2d 1087, 1090 (C.D. Cal. 2011) (seller lowered prices through alleged "secret rebates"); *ABC Int'l Traders, Inc. v. Matsushita Elec. Corp.*, 931 P.2d 290, 292 (Colo. 1997) (seller offered favored purchaser five percent discount); *Eddins v. Redstone*, 35 Cal. Rptr. 3d 863, 869-70 (Cal. Ct. App. 2005) (seller employed revenue-sharing system with favored purchaser); *Diesel Elec. Sales & Serv. v. Marco Marine San Diego, Inc.*, 16 Cal. App. 4th 202, 208-09 (Cal. Ct. App. 1993) (seller offered quantity discount to favored purchaser).

Plaintiffs have presented no legal authority and no evidence to support their contention that the different prices received by Kroger and WCS constituted a "secret discount" for purposes of C.R.S. § 6-2-108. The Court should enter summary judgment on Plaintiffs' claim.

## 2.     Section 6-2-108 Applies Only to Primary-Line Claims.

Plaintiffs ignore the plain language of C.R.S. § 6-2-108, which forbids secret rebates or discounts "*to the injury of a competitor.*" (Emphasis added). By its plain language, C.R.S. § 6-

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

2-108 applies to competitors of the *seller* offering the allegedly secret rebate or discount (*i.e.*, "primary-line claims"), not to competitors of the *purchaser* (*i.e.*, "secondary-line claims"). *See Echo Acceptance Corp. v. Household Retail Serv., Inc.*, 267 F.3d 1068, 1078 (10th Cir. 2001) (holding Colorado statutes must be interpreted reasonably based on plain language). The Court reached the same conclusion in *Venta, Inc. v. Frontier Oil & Refining Co.*, 827 F. Supp. 1526, 1529 (D. Colo. 1993), which interpreted similar language to hold that C.R.S. § 6-2-103 was limited to primary-line claims. *See also* Resp. at 61 (conceding *Venta* limited scope of C.R.S. § 6-2-103 to primary-line claims.).

To extend the scope of C.R.S. § 6-2-108, Plaintiffs urge the Court to adopt the reasoning of the California Supreme Court in *ABC International Traders*, 931 P.2d 290. In *ABC*, the court held that California's secret discount statute extended to secondary-line claims. *See* 931 P. 2d at 295. *ABC* acknowledged that its decision was contrary to "[j]udicial and academic writers" interpreting the secret discount statute. *See id.* at 293. Nevertheless, the court believed that the lack of "*further... restrictive language*" meant that the statute was not limited to primary-line claims. *Id.* at 294 (emphasis added).

The dissent in *ABC* harshly criticized this analysis: "Given the ordinary rules of English usage, this prohibition is implicated only by competitive injury to a competitor *of the one prohibited*." *Id.* at 305 (Brown, J., dissenting) (emphasis added). "By reading the language... as referring to competitors of those who *receive* prohibited price discounts, the majority introduces into the statute an ambiguity that is not present if the words are taken to mean what they say." *Id.* (emphasis in original). The dissent also challenged *ABC*'s dubious recitation of the purpose of the statute, noting that, with rare exception, no court in the sixty-year history of the statute had applied the secret discount statute to secondary-line claims. *Id.* at 305-306.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

Colorado courts are unlikely to follow the *ABC* majority opinion. In Colorado, as in the federal courts, statutes are interpreted based on their plain language, and courts will not add or subtract words from a statute. *See Dean v. United States*, 556 U.S. 568, 572, *cert. denied*, 129 S.Ct. 2155 (2009) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."); *Turbyne v. People*, 151 P.3d 563, 567 (Colo. 2007) ("When construing a statute… [w]e do not add words to the statute or subtract words from it."). Here, the plain language of C.R.S. § 6-2-108 is unambiguous: secret discounts are impermissible in order to protect competitors of the *seller*, not the *purchaser*, from anticompetitive injury. *See* C.R.S. § 6-2-108 (forbidding secret rebates or discounts "*to the injury of a competitor*" (emphasis added)). No Colorado court has either adopted *ABC* or suggested that its reasoning would apply to Section 6-2-108. The Court should follow the reasoning of *Venta*, not *ABC*, and hold that C.R.S. § 6-2-108 applies only to primary-line claims. On this basis, Suncor is entitled to summary judgment on WCS's Sixth Claim for Relief.

### 3.   Plaintiffs Must Demonstrate that WCS Intended to Destroy Competition.

Plaintiffs acknowledge that the Colorado Court of Appeals has held that a party suing under C.R.S. § 6-2-108 must show the seller's intent to destroy competition. *See* Resp. at 62 (citing *Beneficial Fin. Co. of Arvada v. Sullivan*, 534 P.2d 1226 (Colo. App. 1975)). Nevertheless, Plaintiffs urge the Court to reject Colorado law and instead apply California law. The Court should decline to do so.

*First*, while Plaintiffs claim that *Beneficial Finance* "is not binding precedent" (Resp. at 62), Plaintiffs cite to cases that faithfully considered and applied the holding or reasoning of the Colorado Court of Appeals. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1354 (10th Cir. 2008), *cert. denied*, 129 S.Ct. 1585 (2009) (following Colorado Court of Appeals' decision in light of

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

absence of contrary authority from Colorado Supreme Court); *Pompa v. State Farm Mut. Auto. Ins. Co.*, 520 F.3d 1139, 1145 (10th Cir. 2008) (noting lack of Colorado authority on point, but following Court of Appeals opinion); *Clark v. State Farm Mut. Auto. Ins. Co.*, 433 F.3d 703, 713-14 (10th Cir. 2005) (following Court of Appeals opinion); *see also Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1492 (10th Cir. 1995), *cert. denied*, 516 U.S. 1166 (1996) (following opinion of intermediate court). Contrary to Plaintiffs' assertion, the Tenth Circuit "will not disregard an intermediate state court's decision unless… convinced by other persuasive data that the highest court of the state would decided otherwise." *Grynberg*, 538 F.3d at 1354 (citation and internal quotation omitted).

*Second*, Plaintiffs offer no "persuasive data" suggesting that *Beneficial Finance* was decided incorrectly. Indeed, Plaintiffs acknowledge that "intent is a required element *in general* under the Unfair Practices Act." Resp. at 63 (emphasis in original). *Beneficial Finance* applied this general rule to C.R.S. § 6-2-108, concluding that intent is a necessary element to claims based on "secret discounts" in violation of the Act. While Plaintiffs downplay this holding as "without analysis," in fact *Beneficial Finance* cites to the Colorado Supreme Court's opinion in *Olin Mathieson Chemical Corp. v. Francis*, 301 P.2d 139 (Colo. 1956), which explains clearly why intent is critical. *Olin* was concerned that a rule of strict liability under the Unfair Trade Practices Act, without regard to whether the defendant intended to injure competition, would be contrary to the public welfare and even unconstitutional. *See Olin*, 301 P.2d at 174 (citing *Perkins v. King Soopers, Inc.*, 221 P.2d 343, 345 (Colo. 1950). Intent applies to C.R.S. § 6-2-108 with equal force: there is nothing *per se* invalid about a seller offering rebates or discounts. The harm comes from such rebates or discounts intending to destroy competition. *See id. Beneficial Finance*, therefore, is consistent with Colorado Supreme Court precedent.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

*Third*, there is no reason to reject *Beneficial Finance* in favor of following the opinion of the *California* Court of Appeals, as Plaintiffs urge.  Plaintiffs rely upon the holding in *Diesel Electric*, 16 Cal. App. 4th at 208-09, where the California Court of Appeals declined to apply an intent element to California's secret discount statute.  Plaintiffs ignore, however, the reasoning of *Beneficial Finance* and *Olin* that supports an intent requirement: the purpose of the Unfair Trade Practices Act is to deter anticompetitive conduct, not to fix prices or preclude discounts.  Consistent with this purpose, as well as the limits of the legislature's policy power, Colorado courts have required the showing of intent.  While California may take a different view (as evidenced by the Court's *ABC* opinion), that is not Colorado law.  *See Olin*, 306 P.3d at 179, *Perkins*, 221 P.2d at 345.

### 4.   Plaintiffs Offer Only Argument, Not Evidence, of Suncor's Supposed Intent to Destroy Competition.

Plaintiffs claim that they can present evidence of Suncor's intent to destroy competition sufficient to create a triable issue.  Resp. at 65-66.  In fact, Plaintiffs present only argument and inferences from the record, not evidence.  "Highly ambiguous" proof that requires an "intuitive leap" is insufficient to withstand summary judgment.  *Kenfield*, 837 F. Supp. 2d at 1242-47.

The only evidence that Plaintiffs offer of Suncor's intent to destroy competition is the fact that Suncor operates retail stores that compete with WCS.  Resp. at 65-66.  Plaintiffs ask that the Court infer from this that Suncor "knew or should have known that" its pricing "would harm competition in general and competition with Western in particular."  *Id.* at 66.

Not only is Plaintiffs' inference merely conjecture, but it is meritless.  Plaintiffs are claiming that Suncor purposefully assisted Kroger, a competitor in the retail gasoline market, by offering it a lower price than given to WCS, another competitor in the retail gasoline market, in order to benefit Suncor in the retail gasoline market.  Plaintiffs cannot explain how Suncor

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

intended to destroy one competitor by favoring another. In *Beneficial Finance*, the court affirmed the dismissal of claims under C.R.S. § 6-2-108 where the only evidence of intent was the fact that the plaintiff and defendant were competitors. *See* 534 P.2d at 1228-29. As in *Beneficial Finance*, the inference of intent is so unsupported that the Court should grant summary judgment on Plaintiffs' claim for violation of C.R.S. § 6-2-108 as a matter of law. *See id.*

### 5.   *Q-T Markets* Remains Good Law, and Plaintiffs Have No Private Right of Action Under C.R.S. § 6-2-108.

Plaintiffs concede that C.R.S. § 6-2-108 does not expressly provide parties a private right of action for violation of the statute. Resp. at 55. Plaintiffs also concede that the federal court in *Q-T Markets, Inc. v. Fleming Cos.*, 394 F. Supp. 1102 (D. Colo. 1975) unequivocally held that C.R.S. § 6-2-108 is not subject to C.R.S. § 6-2-109, which declares contracts in violation of "sections 6-2-103 *to* 6-2-108" to be illegal. Resp. at 55-56 (discussing *Q-T Markets*, 394 F. Supp. at 1107). As explained in *Q-T Markets*, the use of the word "to" in C.R.S. § 6-2-109 expressly excludes C.R.S. § 6-2-108. *See* 394 F. Supp. at 1107. Like Section 6-2-109, C.R.S. § 6-2-111 only recognizes a private right of action for violations of "section 6-2-103 *to* 6-2-108."

Sections 6-2-108, -109 and -111 have not been amended since 1975. Nevertheless, WCS contends that *Q-T Markets* was "statutorily overruled" when the Colorado General Assembly enacted a canon of construction expressing a different view of the use of the word "to" in statutes. Resp. at 55 (citing C.R.S. § 2-4-113). It is undisputed, however, that *Q-T Markets* interpreted a statutory language enacted *before* the legislature adopted its canon, and that C.R.S. § 6-2-111 also was enacted before the canon was codified. "Each General Assembly is a distinct entity… and therefore what a later General Assembly thinks a statute does or should mean says little, if anything, about what the General Assembly that enacted it intended it to mean."

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

*Francen v. Colo. Dept. of Revenue*, --- P.3d ----, 2012 WL 2581029, at *7 (Colo. App. July 5, 2012).

In the 35 years since *Q-T Markets* was decided, no Colorado federal or state court has expressed disapproval with its holding that there is no private right of action for violation of C.R.S. § 6-2-108. Even Plaintiffs concede that, in the sole case it cites, the district court granted summary judgment against the private party pursuing the claim. *See Medtronic Navigation, Inc. v. Brainlab Medizinische Computersystems GMBH*, 2005 WL 1661081 (D. Colo. July 14, 2005). Nothing in *Medtronic* states or even suggests that the court would have refused to apply the *Q-T Markets* opinion. *Q-T Markets* remains good law, and therefore Plaintiffs have no private right of action under C.R.S. § 6-2-108.

## CONCLUSION

The Court should grant Suncor summary judgment on Plaintiffs' First, Third and Sixth Claims for Relief and on Suncor's Third Affirmative Defense.

Dated: March 29, 2013

Respectfully submitted,

*s/Anthony J. Shaheen*
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO  80201-8749
Phone: 303-295-8054
Fax: 303-291-9126
AJShaheen@hollandhart.com

J. Robert Robertson
William L. Monts III
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
robby.robertson@hoganlovells.com
william.monts@hoganlovells.com
**ATTORNEYS FOR DEFENDANT**

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 219

### CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2013, I served the foregoing **SUNCOR'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON FIRST AND SIXTH CLAIMS FOR RELIEF AND THIRD AFFIRMATIVE DEFENSE (DOC. 185)**, by causing the foregoing to be presented to the Clerk of Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following email addresses:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON BIERMANN  & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
krb@benningtonjohnson.com
kec@benningtonjohnson.com
afa@benningtonjohnson.com

Philip W. Bledsoe
POLSINELLI SHUGHART, P.C.
1515 Wynkoop Street, Suite 600
Denver, CO 80202
pbledsoe@polsinelli.com

_____ s/Anthony Shaheen _____

6096244_5

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER