SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation;
WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

      Plaintiffs and Counterclaim Defendant,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

      Defendant, Counterclaimant, Third-Party Plaintiff,

HOSSEIN and DEBRA LYNN TARAGHI,

      Third-Party Defendants.

---

**SUNCOR's MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF WESTERN CONVENIENCE STORES' FIRST AND SIXTH CLAIMS FOR RELIEF AND SUNCOR's THIRD AFFIRMATIVE DEFENSE**

---

      Pursuant to Fed. R. Civ. P. 56, Suncor Energy (U.S.A.) Inc. ("Suncor") moves for summary judgment on the First and Sixth Claims for Relief asserted by Plaintiff Western Convenience Stores, Inc.[1] ("WCS") in its Amended Complaint ("AC") (Dkt. #43). Suncor also is entitled to summary judgment on its Third Affirmative Defense (Dkt. #31), directed to WCS's First Claim for Relief.

      For the reasons explained below, the undisputed material facts demonstrate that WCS cannot prevail on its First Claim for Relief (price discrimination in violation of the Robinson-Patman Act (15 U.S.C. § 13(a)). WCS cannot satisfy two necessary elements: (i) that Suncor's

---

[1] As recommended by the Court's practice standards, undersigned counsel conferred with counsel for Plaintiffs on February 7, 2013, who confirmed that Plaintiffs oppose this Motion. Western Truck One, LLC never purchased anything from Suncor, so it lacks standing to assert these claims.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

alleged discriminatory pricing injured competition and caused WCS to suffer an antitrust injury; and (ii) that the products in question (gasoline and diesel fuel) traveled in interstate commerce. In addition, WCS's Robinson-Patman Act claim is barred by Suncor's Third Affirmative Defense because Suncor reasonably believed in good faith that the alleged discriminatory prices were necessary to meet its competitors' prices in a competitive bid process.

WCS also cannot demonstrate sufficient facts to prevail on its Sixth Claim for Relief (violation of Colorado's Unfair Practices Act (C.R.S. § 6-2-108)) as a matter of law. WCS has no standing to pursue its claim under C.R.S. § 6-2-108 and, in any event, the undisputed facts demonstrate that Suncor did not violate the statute.

For economy to avoid unnecessary repetition, Suncor will address its Third Affirmative Defense first and then will address WCS's First and Sixth Claims and the elements WCS cannot satisfy.

## **INTRODUCTION**

The First Claim for Relief concerns Suncor's sale of gasoline and diesel fuel ("Fuel") to WCS and to the Dillon Companies d/b/a King Soopers, and Mini Mart, Inc., d/b/a Loaf 'N Jug (collectively, "Kroger") for nineteen months, from October 1, 2009 to April 30, 2011 (the "Damage Period"). *See* Report of Plaintiffs' Experts Mark Glick and Ted Tatos ("Glick/Tatos Report"), Exh. A at 5. Both WCS and Kroger own and operate retail gasoline stations in Colorado. WCS's experts claim that 26 WCS stations (out of a total of 39 stations in Colorado) compete with Kroger for retail gasoline sales and were injured by the alleged discriminatory pricing. WCS contends that, during the Damage Period, Suncor engaged in unlawful price discrimination by selling Fuel to Kroger at a lower price. *See* AC, ¶25; Glick/Tatos Report, Exh. A, at 5 (limiting alleged price discrimination claims to Kroger). For purposes of a Robinson-

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

Patman Act claim, Kroger is what is referred to as "the alleged favored buyer" and WCS is referred to as "the alleged disfavored buyer."

## CLAIMS UPON WHICH JUDGMENT IS SOUGHT

**A. SUNCOR IS ENTITLED TO SUMMARY JUDGMENT ON ITS THIRD AFFIRMATIVE DEFENSE ("MEETING COMPETITION"), WHICH IS DIRECTED TO WCS'S FIRST CLAIM FOR RELIEF.**

### 1. Burden of proof and element

Suncor bears the burden of proving its Third Affirmative Defense, based on 15 U.S.C. § 13(b), which is an absolute defense to WCS's First Claim for Relief. (Dkt. #31). Suncor satisfies this defense by showing "the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 451 (1978) (interpreting 15 U.S.C. § 13(b)).

### 2. Suncor can meet the element of the "meeting competition" defense.

Element 1: The undisputed facts demonstrate that Suncor offered its prices to Kroger based on the good-faith belief that those prices were necessary to meet an equally low price of a competitor.

A. "[G]ood faith, rather than absolute certainty, is the touchstone of the meeting competition defense." *Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 82-83 (1979). The "good faith" standard is "flexible and pragmatic," and is "simply the standard of the prudent businessman responding fairly to what he reasonably believes is a situation of competitive necessity." *In re Cont'l Baking Co.*, 63 F.T.C. 2071, at *63 (1963). "Good faith" does not require that a seller bid the exact bid as others so that the seller is not lower. *See Great Atl. & Pac. Tea Co.*, 440 U.S. at 83. It merely requires that the bid be made in the reasonable belief that

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

the price bid was necessary to obtain the business. *Id.* at 83. As long as the winning bidder does not *know* the exact bids that others made, the winning bidder is within the protection of the meeting competition defense: "In a competitive market, uncertainty among sellers will cause them to compete for business by offering buyers lower prices." *Id.* at 80 (rejecting argument that buyer must either reject the lower bid or inform the seller "that his bid has beaten competition" because that "would almost inevitably frustrate competitive bidding and, by reducing uncertainty, lead to price matching and anticompetitive cooperation among sellers"). "[A] seller can assert the [meeting competition defense] even if it has unknowingly made a bid that in fact not only met but beat his competition." *Id.* at 83.

B.  For the "meeting competition" defense, a seller must act reasonably with respect to information concerning a competitor's price, such as, for example, by evaluating such information in light of the seller's knowledge of the market. *See, e.g., Water Craft Mgmt. LLC v. Mercury Marine*, 457 F.3d 484, 490 (5th Cir. 2006) (finding "sufficient basis" for seller's good faith where competing price corroborated through knowledge of marketplace and second-hand information); *Reserve Supply Corp.v. Owens Corning Fiberglass Corp.*, 971 F.2d 37, 44-45 (7th Cir. 1992) (finding good faith as a matter of law where seller "evaluated the reasonableness of the reported discount [price] in light of market conditions and believed that it was credible"). The defense does not require that the seller have "absolute certainty" as to its competitor's lower price. *Great Atl. & Pac. Tea Co.*, 440 U.S. at 82-83. Indeed, communications with a competitor about price can run afoul of Section 1 of the Sherman Act (15 U.S.C. § 1). *See Water Craft Mgmt.*, 457 F.3d at 490 (rejecting notion that sellers must verify competitor's price to the point of "exposing themselves to risk of liability under section 1 of the Sherman Act").

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

C. Courts will grant summary judgment on the "meeting competition" defense when the undisputed facts demonstrate that the seller's price was in response to a reasonable, good-faith belief that a competitor was offering a lower price. *See, e.g., Great Atl. & Pac. Tea Co.*, 440 U.S. at 82-83 (reversing judgment against seller and holding, as a matter of law, that seller satisfied "meeting competition" defense); *Reserve Supply Corp.*, 971 F.2d at 42-48 (affirming summary judgment in favor of seller on "meeting competition" defense); *Jones v. Borden Co.*, 430 F.2d 568, 572-73 (5th Cir. 1970) (affirming summary judgment on "meeting competition" defense where undisputed facts demonstrated seller's good faith).

D. Courts consider (1) the credibility of the competing price information; (2) the seller's past relationship with the buyer; (3) the significance of the loss if the seller failed to meet the competing price; and (4) the seller's efforts to corroborate or evaluate the competing price. *See, e.g., U.S. Gypsum Co.*, 438 U.S. at 454-55 (discussing factors); *see also Great Atl. & Pac. Tea Co.*, 440 U.S. at 82-83 (examining substantial loss faced by seller as well as seller's past relationship with buyer); *Reserve Supply Corp.,* 971 F.2d at 44-48 (holding for seller on "meeting competition" defense where seller prudently considered competing price information in light of prevailing market).

E. No one factor is dispositive, nor is it necessary that a seller meet all the factors. For example, in *Reserve Supply Corp.*, the Seventh Circuit affirmed summary judgment for the seller because it evaluated the competing price information based on its understanding of the market. *See* 971 F.2d at 44-48. As the Court of Appeals explained, the "pragmatic criteria" for evaluating the seller's conduct "makes assessment of the defense considerably easier" in the summary judgment context "than it might otherwise be." *Id.* at 43.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

     F.    In *FTC v. Standard Oil Co.,* 355 U.S. 396 (1958), a refiner established its good faith and satisfied the "meeting competition" defense when it lowered its prices in an attempt to win back customers it had lost because its competitors had lowered their prices. *See* 355 U.S. at 403.

     G.    Each year the Kroger Company Supermarket Petroleum Group ("Kroger" or "SPG") would send a Request for Proposal ("RFP") into a particular market, asking for bids to supply certain grades and volumes of gasoline and diesel fuel. *See* Moss Dep., Exh. B, 43:21-22; 44:4-8 and 61:10-15; Thiessen Dep., Exh. C, at 34:8-13. The RFPs did not request a specific price. *See* Thiessen Dep., Exh. C, at 61:5-13. Kroger had been sending out RFPs on a regular basis since at least 2006. *See* Wilson Dep., Exh. D, at 9:5-6; 15:12-14 and 27:8-13. Separate RFPs were sent for King Soopers/City Markets and Loaf 'N Jug. *See* Moss Dep., Exh. B, at 107:16-24 and 108:5-12; Thiessen Dep., Exh. C, at 34:8-23.

     H.    Kroger had contracts to supply gasoline and diesel fuel with suppliers other than Suncor. *See* Wilson Dep., Exh. D, at 13:16-17. Accordingly, Kroger kept a "bid list" of potential suppliers to whom it would send the RFPs. *E.g.* 2/11/08 email, Exh. I.

     I.    All of Suncor's business with Kroger was done through the bid process. *See* Moss Dep., Exh. B, at 210:15-23; 261:8-18; 262:6-9 and 278:16-18; Wilson Dep., Exh. D, at 13:16-17 and 27:8-13. Suncor was not the only bidder. Kroger "always [got] more than one supplier bidding in response" to an RFA to supply fuel in Colorado. *See* Thiessen Dep., Exh. C, at 92:5-10. Kroger's goal through the RFP process was "to pay the least amount [it] had to"—to "buy low." *See* Wilson Dep., Exh. D, at 39:13-19; Thiessen Dep., Exh. C, at 19:4-8 and 83:14-17.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

J.      Based on its knowledge of the market, Suncor knew there were other competitors, including Valero and Frontier, who either had the Kroger business or were trying to get it. *See* Ewing Dep., Exh. E, at 200:3-22; Moss Dep., Exh. B, at 289:5-23 and 311:7-313:3; Wilson Dep., Exh. D, at 13:16-17. Suncor did not know its competitors' bids but it had "a pretty good idea of what the market drives." *See* Ewing Dep., Exh. E, at 200:17-201:8. However, Suncor never discussed with Kroger the nature of the other suppliers' bids—either before or after the bid process. *See* Moss Dep., Exh. B, at 267:17-268:2; Wilson Dep., Exh. D, at 55:5-13; Thiessen Dep., Exh. C, at 93:1-94:2. "[I]t's tight-lipped." *See* Thiessen Dep., Exh. C., at 93:20.

K.      From the available record, Suncor's involvement in the Kroger RFP process began in March 2004. *See* 3/15/04 RFP, Exh. F; Moss Dep., Exh. B, at 261:8-18 and 262:6-9. The RFP began: "SPG would like *to invite you to provide a bid* for the sale of petroleum products to the King Soopers/City Market located in Colorado and Wyoming" (emphasis added). *See* Exh. F at 1. The RFP continued: "It is the goal of SPG to procure *competitively priced* quality service" (emphasis added). *See* Exh. F, at 1. Finally, the RFP explained that "[w]hile it is Kroger's intent in issuing this RFP to secure *reliable* petroleum products at a *lower overall cost* to the Company, it will award the contract based *both on price and non-price factors* that provide the *best overall value* to Kroger" (emphasis added). *See* Exh. F at 2. The reliability of the supplier was the most important "non-price" factor. *See* Exh. F at 1; Wilson Dep., Exh. D, at 33:11-17.

L.      Sometimes Suncor was the successful bidder and sometimes it was not. *See* 4/2/04 letter, Exh. G; 12/21/05 letter, Exh. H.

M.      For purposes of this Motion, the material events in the Suncor-Kroger relationship began in 2008. In 2008, Suncor was supplying fuel to Kroger's City Market stores in Grand

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

Junction. *See* Moss Dep., Exh. B at 269:12**.** On February 11, 2008, Kroger sent Suncor an RFP, inviting Suncor to submit a bid to supply gasoline and diesel in Grand Junction, Colorado, starting May 1, 2008 for twelve months. *See* 2/11/08 email, Exh. I; Moss Dep., Exh. B, at 268:6-16.

N.      Steve Moss, Suncor's Manager for Unbranded and Commercial Sales, responded to this RFP—it was the first one he did. *See* Moss Dep., Exh. B, at 12:9-11 and 269: 8-9; 2/29/08 email, (Dep. Exh. 71), Exh. J. In responding, he surveyed the market to see if there were any significant changes and bid the same price that was in effect under the previous contract. *See* Moss Dep., Exh. B, at 269:8-14. Suncor won the bid. *See* 2008 Contract, Exh. K.

O.      Suncor was not as successful with the next RFP. On March 13, 2008, Kroger sent another email inviting Suncor to submit a bid to supply gasoline and diesel to King Soopers in Denver. *See* 3/13/08 email, Exh. L. The RFP contained the same language as previous RFPs. Suncor responded on March 11, offering to sell E-10 gasoline (gasoline with 10% ethanol) at a "differential" or "discount" of $█ per gal. *See* 3/31/08 email, (Dep. Exh. 73) Exh. M; Moss Dep., Exh. B, at 272:1-8. Kroger wanted a better discount, however. *See* Moss Dep., Exh. B, at 275:20-276:4. Suncor responded by increasing its discount by $.005 per gallon, from $█ to $█ per gallon, telling Kroger that is "the best pricing we can do, this reflects the current market and is by far Suncor's best pricing offered in the market." *See* 5/16/08 email, (Dep. Exh. 74), Exh. N; Moss Dep., Exh. B, at 274:23-275:11. **Suncor did not win this bid.** *See* Moss Dep., Exh. B, at 281:16-18.

P.      On July 17, 2009, Kroger sent Suncor an email to supply E-10 gasoline and diesel for King Soopers in Denver and Colorado Springs. *See* July email, Exh. O, at 3. Suncor responded by offering a discount of $█ cents per gallon on E-10 gasoline. *See* Exh. O at

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

(Dillon 025108).  Suncor won the bid, starting October 1, 2009 through September 30, 2010.

*See* Moss Dep., Exh. B, at 118:5-13; Contract, (Dep. Exh. 46), Exh. P.  This was the first time

Suncor had won a bid to supply Kroger stores with fuel outside Grand Junction.  *See* Moss Dep.,

Exh. B, at 118:5-13; 199:20-200:2; 210:24-211:4; 213:1-11; and 213:23-214:1.

    Q.    In winning the 2009 RFP for Denver, Suncor lowered its price (that is, increased

the discount) over its unsuccessful bid in 2008, from ▮▮ to $.▮ per gallon.  *See* Moss Dep.,

Exh. B, at 280:18-281:10.  Suncor lowered its bid price for several reasons.  *First*, Suncor had

lost the 2008 bid.  *Id.* at 281:16-18.  *Second*, Suncor's business model had changed—it really

wanted the business and was "going to chase it."  *Id.* at 281:21-23.  *Third*, the $▮ discount

reflected the "change in the market."  *Id.* at 281:24-25.  *Fourth*, the ▮▮ discount is what Moss

"felt we needed to do to win this business based on the fact that I knew I didn't – ▮ cents did not

get me the business the previous year."  *Id.* at 281:24-282:3.  "It was a matter of what I thought,

if I wanted the business, which I did … by 2009, … what I thought it was going to take to win

that business."  *Id.* at 313:7-11.

    R.    On November 25, 2009, Kroger sent Suncor an RFP "invit[ing] [Suncor] to

provide a bid" to supply gasoline to MiniMart, d/b/a Loaf 'N Jug, starting February 2010.  *See*

11/25/09 email, (Dep. Exh. 163), Exh. Q; Moss Dep., Exh. B, at 288:4-15.  On December 14,

Suncor responded, bidding a discount of ▮▮▮ per gallon for E-10 gasoline and a discount of

▮▮▮ per gallon for diesel.  *See* 12/14/09 email (Dep. Exh. 80), Exh. R.  Suncor won the bid

and entered into a one year contract starting February 1, 2010 and ending January 31, 2011.  *See*

Contract (Dep. Exh. 53), Exh. R-1.  Afterwards, Suncor and Kroger amended the King Soopers

contract discussed in paragraph P, above, increasing the discount from ▮▮ to ▮▮▮, so as to

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

put the King Soopers and Loaf 'N Jug contracts on the same pricing mechanism. *See* Moss Dep., Exh. B, at 298:8-14; 300:11-301:6; Contract (Dep. Exh. 48), Exh. R-2.

S.      In June 2011, Suncor and Dillon and Loaf 'N Jug renegotiated their respective contracts, reducing the discount for E-10 gasoline from ███ to ███ cents per gallon. *See* Ewing Dep., Exh. E, at 197:7-15.  Suncor "had a sense that there were competitive offers out there" but that Kroger was having supply problems, so it believed it could reduce the discount to ███  *See* Ewing Dep., Exh. E, at 199:7-20 and 201:9-202:3.

T.      The ███ and ███ discounts that Suncor successfully bid were "in the range" of Kroger's contract prices with its other suppliers. *See* Thiessen Dep., Exh. C, at 76:9-77:8.  But even though the difference in these discounts was relatively small, that "matter[ed]" to Kroger. *See* Thiessen Dep. Exh. C, at 76:23-77:6.

U.      The lower ███ discount, which resulted in a higher price, was consistent with Suncor's philosophy.  In responding to the RFPs, Moss did not "just bid as low as [he] felt Suncor could go without giving consideration to what others were bidding." *See* Moss Dep., Exh. B, at 313:20-314:3.  He "wouldn't just put a low number out there." *See* Moss Dep., Exh. B, at 314:3-4.  Rather he would (i) figure out "what was a competitive and fair price to offer for the business;" (ii) take into account his other customers; (iii) determine a price that he "thought would get me the business but was still fair for—or acceptable for Suncor" because "Suncor was in the business of making money;" (iv) "look at what the market was," looking at "what the market had done for the last two or three years [and] how the prices compared; and (v) make his best professional "guesstimate" as to what the market was going to do. *See* Moss Dep., Exh. B, at 314:4-24.  As David Wilson, Kroger's former Senior Manager of Procurement, explained: "If

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

it was too good [the price], he wouldn't have sold it to me." *See* Wilson Dep., Exh. D, at 9:7-12 and 55:20-24.

V.   Kroger's RFP process was not a secret.  Taraghi was aware of it.  He explained that the word "on the street" was that Kroger was "going to other places … they're price negotiation people.  They do–they want a product but they do negotiate the price too." *See* Taraghi Dep., Exh. S, at 162:2-17.  As he explained, "They're going to places and trying to bid in for the product, yeah, and a price, yeah," trying to get other suppliers to supply them with gas. *See* Taraghi Dep., Exh. S, 162:18-163:1.

**B.   SUNCOR IS ENTITLED TO SUMMARY JUDGMENT ON WCS'S FIRST CLAIM FOR RELIEF (VIOLATION OF THE ROBINSON-PATMAN ACT).**

   **1.   Burden of proof and elements.**

WCS bears the burden of proving a violation of the Robinson-Patman Act.  *See Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648 (1969).  WCS's claim against Suncor is a "secondary-line claim" under the Act, meaning that WCS contends that, as a customer purchasing Fuel from Suncor, it has been injured by price discrimination in the retail gasoline market in which WCS competes.  *See McGoffin v. Sun Oil Co.*, 539 F.2d 1245, 1248 (10th Cir. 1976) (defining "secondary-line claim").

WCS must prove (1) the relevant sales were made in interstate commerce; (2) the products sold to both WCS and Kroger were of "like grade and quality;" (3) Suncor discriminated in price between WCS and Kroger; (4) the sales to WCS and Kroger were made under "similar circumstances" and (5) the effect of such discrimination may be "to injure, destroy, or prevent competition" ("causation") to Kroger's advantage.  *Volvo Trucks N. Am,. Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 166 (2006) (applying 15 U.S.C. § 13(a)); *Raynor Mfg. Co. v. Raynor Door Co.*, 2009 WL 211942, *9 (D. Kan. 2009) (same).  In addition, to

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

recover damages,[2] WCS must show that it suffered an antitrust injury; that is, injury of the type that the antitrust laws are designed to prevent and that flows from Suncor's unlawful conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) (to recover damages, Robinson-Patman plaintiff must show antitrust injury); *Atl. Richfield Co. v. USA Petroleum Corp.*, 495 U.S. 328, 334 (1990) (without antitrust injury, private plaintiff has no antitrust claim).

For purposes of this Summary Judgment Motion, only the first and last elements are at issue, which will be discussed in reverse order. However, there are other elements, such as "similar circumstances," which WCS cannot satisfy but which raise disputed issues of fact and are, therefore, not appropriate for summary judgment.

**2.** **First element that cannot be satisfied by WCS: A competitive injury for purposes of the Robinson-Patman Act.**

To prevail on a price discrimination claim under the Robinson-Patman Act, WCS must demonstrate that the effect of such discrimination may be "to injure, destroy, or prevent competition" to the advantage of the favored purchaser. 15 U.S.C. § 13(a). Thus "by its terms, [the Robinson-Patman Act] condemns price discrimination *only* to the extent that it threatens to injure competition." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993) (emphasis added). WCS cannot prove competitive injury.

A. "It is axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'" *Brooke Group*, 509 U.S. at 224 (emphasis added); *accord Motive Parts Warehouse v. Facet Enter.*, 774 F.2d 380, 395 (10th Cir. 1985) ("[N]either section

[2]     Although WCS's price discrimination claim arises under section 2(a) of the Robinson-Patman Act, its claim for damages springs from section 4 of the Clayton Act, 15 U.S.C. § 15. Section 4 of the Clayton Act creates a private right of action and imposes the antitrust injury requirement. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561-62 (1981); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 (1977).

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

2(a) nor any other provision of the antitrust laws was intended to protect competitors as opposed to competition."). Under controlling Tenth Circuit law, "[t]he naked demonstration of injury to a specific competitor without more is not sufficient to show that a price discrimination 'may' substantially lessen competition; *the test must always focus on injury to competition*." *Motive Parts*, 774 F.2d at 395 (emphasis added) (citing *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 548 (9th Cir. 1983)).

B. Here, WCS made no attempt to establish any injury to competition in the antitrust sense. WCS has not offered any evidence that the alleged price discrimination harmed consumers by restricting output and raising prices for gasoline and diesel. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (antitrust laws designed as a "consumer welfare prescription"); *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623 (7th Cir. 2005) ("The antitrust laws protect consumers, not producers. They favor competition of all kinds, whether or not some other producer thinks the competition 'fair.'"). The expert report of WCS's economists, Mark Glick and Ted Tatos, does not mention, let alone opine, that the alleged price discrimination had any effect on the competition or on consumers. The report is limited to an analysis of the harm WCS allegedly suffered. *See* Glick/Tatos Report, Exh. A, Opinions 3 and 4 at pp. 14 and 16.

C. This focus on injury to a single competitor is contrary to the Supreme Court's admonition that the Robinson-Patman Act should be construed and harmonized to the fullest extent possible with the other antitrust statutes. The Supreme Court has repeatedly stated that the Act should be read "consistently with broader policies of the antitrust laws." *Brooke Group,* 509 U.S. at 220 (quoting *Great Atl. & Pac. Tea Co. v. FTC,* 440 U.S. 69, 80 n.13 (1979)); *see also Volvo Trucks*, 546 U.S. at 181 ("resist[ing] interpretation [of the Robinson-Patman Act] geared

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

more to the protection of existing *competitors* than to the stimulation of *competition*") (emphasis in original).

D.      Hossein Taraghi started WCS, opening his first store in 1989 and today has 39 stores in Colorado and 3 in Nebraska.  *See* Taraghi Dep., Exh. S, at 6:15-18; Glick/Tatos, Exh. A, at 4.  He is WCS's president and CEO.  Taraghi Dep., Exh. S, at 13:24-14:3.  Taraghi described WCS as a "discounter"; that is, it is "very competitive."  *See* Taraghi Dep., Exh. S, at 27:2-13.  As a "discounter," Taraghi's goal is "not [to] let people cut me."  *Id.* at 27:15-17.  To the extent he can, he tries to sell gasoline at a price lower than anyone else.  *Id.* at 28:1-7.  If he cannot, his strategy is to "equal" the lowest price on the street; so WCS is "not … higher than anybody."  *Id.* at 28:1-10; 40:16-20 and 111:14-25.  That has always been his pricing philosophy.  *Id.* at 28:11-13.

E.      WCS is not the only "discounter."  *See* Taraghi Dep., Exh. S, at 41:6-45:10. Others, such as Bradley, 7-Eleven, Safeway, King Soopers, City Markets, Loaf 'N Jug, Diamond Shamrock, Kum & Go, Gasomat, U-Pump-It, Tank & Tummy, Farm Crest and Maverick, against whom WCS competes, are all "discounters."  *Id.* at 41:6-45:10 and 123:17-25.  Bradley, for example, has the same pricing philosophy as WCS:  "[T]hey don't let people cut them."  *Id.* at 41:23-42:4.  According to Taraghi, Diamond Shamrock is a "brutal" competitor because it owns its own refinery, giving it a huge pricing advantage.  *Id.* at 42:14-43:24.  In order not to be higher in price, Taraghi will sell gasoline at a loss.  *Id.* at 46:2-6.

F.      Between 2006 and February 2009, Taraghi had "a competitive edge" over other gasoline retailers.  *See* Taraghi Dep., Exh. S, at 83:5-19; 84:3-4 and 87:23-88:1.  He bought gasoline from Suncor and blended it with natural gasoline which allowed him "to make … more profit" because natural gasoline was cheaper than conventional gasoline.  *Id.* at 82:4-8; 84:6-8;

14
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

85:4-7 and 100:25-101:3. Taraghi saved about $.10 per gallon by doing this. *Id.* at 90:7-20. However, in February 2009, the EPA forced him to stop blending natural gasoline and as a result, WCS made "less profit." *Id.* at 81:9-17: 96:22-97:6 and 98:5-8. WCS's margins or profits and sales dropped after he stopped blending. *See* Fuel Margins, (Dep. Exh. 159) Exh. T; Same Store Sales (Dep. Exh. 160), Exh. U; Taraghi Dep., Exh. S, at 96:22-97:6.

G.     According to Taraghi, WCS does not compete only against Kroger. It competes against all nearby gasoline stations, including other "discounters," such as Bradley. *See* ¶E, above. WCS sets its retail gasoline prices against the prices of all the other stations, not just against Kroger.

H.     Every day, each store manager surveys the prices of the gas stations with which his store competes—once on the way to work and again on the way home. *See* Taraghi Dep., Exh. S, at 112:1-8. These surveys are done "to make sure [WCS] stays competitive"; that is to achieve Taraghi's goal of trying not "to be higher than anybody else in the competitive survey range." *Id.* at 111:12-25. Taraghi and Bob Van Meter, his operations manager, selected the stores to survey. *Id.* at 113:15-22 and 115:8-14. They are the ones with which WCS "compete[s] the most"; that is, they are WCS's "biggest" or "main competitors." *Id.* at 115:15-18; 116:109 and 140:7-12. In addition to his own surveys, Taraghi uses an OPIS (Oil Price Information Service) report, which covers a larger area, to "double-check" the accuracy of his own survey prices and "to make sure we cover all our corners in order to compete properly." *Id.* at 113:23-114:6; 115:8-24; 118:2-10; 136:23-137:12; 137:20-138:20 and 140:7-18. Sometimes, however, Taraghi just "go[es] off [his] gut" in setting the price. *Id.* at 136:8-14. "[T]o stay competitive," WCS may change its prices two or three times a day. *Id.* at 15:1-16:11.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

I.      Using a sample set of daily surveys (Dep. Exh. 156), Taraghi explained at his deposition how he sets WCS's daily fuel prices. *See* Taraghi Dep., Exh. S, at 104:15-105:15; sample surveys (Dep. Exh. 156), Exh. V.  Taraghi started with WCS store #104 at page 1 of the sample survey, which showed that the price at two competing Bradley stations was $3.579 per gallon and that the price at WCS store #104 was one cent higher, at $3.589. *Id.* at 119:18-22. Taraghi explained, however, that WCS should have been at the same price as Bradley but that there was "probably … a little bit delay.  He changed it a little bit before us." *Id.* at 119:21-23. "Usually we match Bradley." *Id.* at 119:25-120:1.

J.      Based on that testimony, Taraghi was asked: "So is that the principle[,] you [Taraghi] look at the survey, you look at the lowest price, you see if your store can match it, and you match it?"  To which he answered, "Right." *See* Taraghi Dep., Exh. S, at 120:15-18.  He was also asked:

> Q.      And it doesn't matter what store it is that's the competitor; what's important is the lowest price.  Is that correct?
> A.      Match the lowest price.
> Q.      Yes.
> A.      Yeah.
> Q.      So if, for example, Safeway's price was 3.57 instead of Bradley's price being 3.57, you would have tried to match the 3.57 price, it didn't matter it was Safeway or Bradley.
> A.      It doesn't matter.

*See* Taraghi Dep., Exh. S, at 120:19-121:4; *see also* 124:12-21.

K.      Taraghi was asked about the price at WCS store # 124 in Grand Junction which competes with a City Market (a Kroger store), as well as an Albertson's, two Bradley stations, a Sam's Club and others. *See* Price Survey (Dep. Exh. 156), Exh. V, at 6; Taraghi Dep., Exh. S, at 121:5-13.  Store #124 was selling regular gasoline at $3.669 per gallon, whereas the price at the two Bradley stations and at Sam's was $3.629.  Taraghi explained he could not meet their $3.629 price. *Id.* at 121:15-21 and 122:4-20.  City Market's posted price was even higher—at $3.699.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

L.      At WCS store #125, also in Grand Junction, on that same day, WCS was selling gasoline for $3.619—to meet Maverick's price. *See* Taraghi Dep., Exh. S, at 122:25-124:11. The City Market store that competes with store #125 was selling gasoline at $3.699—$.08 higher than either Maverick or WCS store 125. *See* Price Survey (Dep. Exh. 156), Exh. V, at 6.

M.      Taraghi admits his profits decreased after he stopped blending natural gasoline in 2009, but does not think he had a drop in sales. *See* Taraghi Dep., Exh. S, at 101:4-19. But if there were any drop, he said, that would be due "to some other factors," not the blending— "there's a lot of things involved … sometime you can't even wipe anybody out, give it away." *Id.* at 101:15-102:6.

N.      In trying to determine the cause of any decrease in sales, Taraghi would look at factors other than just his competitors' retail prices: "It's not just the price. There's a lot of things[,] you look at the competitors." *See* Taraghi Dep., Exh. S, at 197:18-23. He would "look at …their prices first, and their services." *Id.* at 197:25-198:1. Taraghi would also "look at" government programs, the weather, the temperatures, and the economy. *Id.* at 198:2-15; 199:13-14. As he said, "there's a lot of things involved." *Id.* at 101:23-25.

O.      Like WCS, Kroger does price surveys of its competitors. *See* Giannola Dep., Exh. W, at 64:12-23. The daily price surveys are used "strictly for setting fuel prices" and are the only things that Kroger uses to set prices. *Id.* at 64:12-65:19.

P.      Kroger is a price follower, not a price setter. *See* Giannola Dep., Exh. W, at 106:23-107:3. As explained by Susan Giannola, a Rule 30(b)(6) deponent who testified about King Soopers and City Market's retail gasoline pricing[3], Kroger's strategy is, and always has

---

[3]      Kroger designated Ed Sharpe to testify more specifically about MiniMart/Loaf 'N Jug's strategy. Because of scheduling issues, his deposition will not occur until February 19. It is Suncor's understanding from Giannola's deposition that MiniMart's strategy is the same as King

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

been, "one of following the lowest in the market, not setting the lowest in the market." *Id.* at 106:23-107:7; 69:22.  With two exceptions, Kroger matches the lowest "posted price on the street sign."[4]  *Id.* at 5:18-7:9; 16:11-24; 24:20-22; 25:5-8; 33:8-22; 46:6-10; 55:22-56:8  The two exceptions are WCS and Bradley, which Kroger allows to price 3 cents lower "[b]ecause Western and Bradley are low-price low-ballers in the market, and if we start trying to match them, they just keep going down and down and down and we create a price war that affects entire markets." *Id.* at 31:12-20; 32:5-11; and 33:23-34:7.

> Q.    The price that Kroger sets for the retail sale of gasoline at its stations is independent of the wholesale price it pays for gasoline because Kroger "price[s] to the market." *See* Giannola Dep. Exh. W, at 26:12-17; 34: 15-22; 47:9-12; 50:11-23.  The only exception is if they "are at cost":  "There are below-cost selling laws in Colorado, so we abide by those laws." *Id.* at 34:15-19 and 35:1-5.

> R.    WCS's experts, Glick and Tatos, have identified 26 WCS stores which they contend compete with a Kroger store and suffered damages as a result of the discriminatory pricing.  *See* Glick/Tatos Report, Exh. A, at 11.  The very price surveys that WCS uses to set its prices proves Glick and Tatos are wrong.  Their conclusion is contrary to the real world facts.

> S.    The Damage Period in this case is nineteen months, from October 2009 through April 30, 2011. *See* Glick/Tatos Report, Exh. A, at 5.  Using WCS's own daily price surveys as the source, there are 13,352 pieces of daily price data for the 26 WCS stores that allegedly compete with a Kroger store.  For the entire Damage Period, there are only 111 out of 13,352

Soopers and City Market's.  Suncor will supplement this Motion with the pertinent parts of Sharpe's deposition.

---

[4]    Kroger's posted street price does not include the 3 cent per gallon loyalty card discount. *See* Giannola Dep., Exh. W, at 31:11-23.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

times where a Kroger store, standing alone, has the absolute lowest posted street price. *See* Griffin Aff., Exh. X, ¶4. That is 0.08%—less than 1% of the time. *Id.* Yet Taraghi testified he priced his stores priced against the lowest street price. *See* ¶¶D-E and H-J, above. More than 99 percent of the time, another WCS competitor, not Kroger, had the lowest posted price on the street. 217 out of 13,352 times, a Kroger store was tied with some other station (or 1.6%) for the lowest posted price. *See* Griffin Aff., Exh. X, ¶4. These results, derived from simply looking at WCS's own price surveys and counting the number of times Kroger has the lowest price or is tied for the lowest price, confirm that the Kroger's strategy was that of a price follower, not a price setter. Since Taraghi priced against the lowest street price, and 99% of the time Kroger's price was not the lowest posted price, Suncor's allegedly discriminatory price to Kroger could not have caused WCS any injury. Moreover, price alone is not the only factor to be considered, but that is the only factor that Glick/Tatos considered. *See* ¶N, above. Not surprisingly, WCS has not identified any customers it lost to Kroger because of Suncor's allegedly discriminatory price.

S.      WCS's case on injury to competition, thereon, rests on the notion that WCS had to cut its margins to retain volume. But the record contains no evidence that WCS ever cut margins in response to prices charged by Kroger. On the contrary, WCS's own documents, which Glick and Tatos did not factor into their opinions, indicate that WCS's margins and volumes began dropping after the EPA forced WCS to stop blending with natural gas and WCS lost its competitive advantage. *See* ¶F, above. They simply accept as a given that "[a]*ccording to WCS*, when Kroger lowers its retail prices in response to lower wholesale prices, WCS will typically (but not always) try to match the Kroger price reduction." *See* Glick/Tatos Report, Exh. A at 14 (emphasis added). Glick and Tatos' whole damages regression analysis at pages 17

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

and 18 of their report, accordingly, is based on the assumption that WCS's only competitor is Kroger as evidenced by the formulae which only include WCS and Kroger.

T.    Glick and Tatos did not do any analysis to determine whether there is any economic evidence to support the notion that WCS cut margins in response to Kroger's lower retail prices. Under oath, Taraghi testified that he priced his WCS to meet or beat the lowest price on the street, regardless of who it was and 99% of the time it was not Kroger. *See* ¶J, above. Moreover, Kroger testified that it did not lower its street prices in response to lower wholesale prices. *See* ¶Q, above. That testimony is unrebutted and breaks the causal chain between any alleged price discrimination and any putative reduction in margins WCS supposedly suffered. *Falls City*, 460 U.S. at 435. WCS cannot establish any injury to competition.

**3.    Second element that cannot be proven by WCS:  That the relevant sales were made in interstate commerce.**

A.    The Robinson-Patman Act "mean[s] what it says.… [A]t least one of the discriminatory sales complained of must be in commerce." *Food Basket, Inc. v. Albertson's, Inc.*, 383 F.2d 785, 787 (10th Cir. 1967). WCS must show that, in each instance, "'at least one of the two transactions which, when compared, generate a discrimination… *cross[ed] a state line.*'" *Belliston v. Texaco, Inc.*, 455 F.2d 175, 178 (10th Cir. 1972) (emphasis added) (quoting *Hiram Walker Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 8-9 (5th Cir. 1969)); *see also McGoffin*, 539 F.2d at 1248. It is not enough that the challenged sales affect interstate commerce. *See Belliston v. Texaco, Inc.*, 455 F.2d 175, 178 (10th Cir. 1972). They "must be in commerce." *Food Basket*, 383 F.2d at 787.

B.    As explained below, WCS cannot satisfy the "in commerce" requirement of the Robinson-Patman Act for three distinct reason:

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

*First*, WCS claims that Suncor "commingles" Fuel produced inside of Colorado with Fuel produced outside Colorado, but this "commingling" theory has been expressly rejected under the Robinson-Patman Act. *See infra* at ¶¶F and G.

*Second*, WCS incorrectly assumes that Suncor has acquired gasoline and diesel fuel produced outside of Colorado throughout the Damage Period. The indisputable facts reveal that Suncor has not. *See infra* at ¶¶L-M.

*Third*, even when Suncor has acquired gasoline and diesel fuel produced outside of Colorado, it has only used these products to create a different, finished product in Colorado. As a matter of law, this is insufficient to satisfy the Robinson-Patman Act's "in commerce" requirement. *See infra* at ¶¶H-J, N-P.

C.     While most of the gasoline sold by Suncor in Colorado was refined in Colorado, from time to time, Suncor would purchase gasoline from refineries located outside of Colorado. *See* Piscatelli Dep., Exh. Y, at 23:22-24:4. These purchases were "not particularly predictable," and depended on various factors, such as "[t]he ebb and flow of production and demand." *See* Piscatelli Dep., Exh. Y at 22:20-24; 23:4-15, 60:11-13, 177:13-25.

D.     Suncor produced the relevant contracts and transaction summaries (Bates Nos. Suncor_WCS 00043578-44720) for the purchase of gasoline from out-of state refineries, identifying the volumes purchased and purchase dates.

E.     Despite the fact that Suncor produced the relevant contracts and summaries in discovery, WCS cannot demonstrate, and has not even attempted to demonstrate, which of the hundreds of Fuel sales over the 19-month Damage Period occurred in interstate commerce, *i.e.*, which sales crossed a state line. *See Gulf Oil Co. v. Copp Paving Co.*, 419 U.S. 186 (1974) (interpreting interstate commerce requirement of 15 U.S.C. § 13(a)); *McGoffin*, 539 F.2d at 1248

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

(holding plaintiff bears burden of proving interstate commerce requirement under Robinson-Patman Act); *see also Coastal Fuels of Puerto Rico v. Caribbean Petrol. Corp.*, 79 F.3d 182, 189 (1st Cir. 1996) (holding that jurisdiction under Robinson-Patman Act requires goods in question to "physically cross[ ] a state boundary in either the sale to the favored buyer or the sale to the buyer allegedly discriminated against").

F.      WCS's expert, John Mayes, avoids the issue by simply claiming in conclusory fashion that "product sales to [WCS]… involved sales of finished products that crossed state lines." *See* Expert Report of John Mayes, attached as Exhibit Z, at 12.  Mayes assumes that because Suncor occasionally purchased *some* conventional gasoline and diesel fuel produced from out of state for sale in Colorado, *all* of Suncor's Fuel sales to WCS during the Damage Period took place in interstate commerce. *Id.*  Mayes claims that interstate and intrastate Fuel is "commingled" for sale by Suncor. *Id.* at 13.  That is not good enough. *See Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626, 646 (S.D. Tex. 1999).

G.      Mayes's "commingling" assumption fails as a matter of law, because the "commingling" of interstate and intrastate goods does not satisfy the Robinson-Patman Act's interstate commerce requirement. *See S & M Materials v. S. Stone Co.*, 612 F.2d 198, 200 (5th Cir.), *cert. denied* 449 U.S. 832 (1980) (for purposes involving of the Robinson-Patman Act, transactions involving goods manufactured within the state are not "in commerce," despite defendant's separate sales of goods manufactured outside the state); *see also Roorda v. Am. Oil Co.*, 446 F. Supp. 939, 945 (W.D.N.Y. 1978) (limiting price discrimination claim against refinery to gasoline manufactured out of state, and dismissing claims relating to gasoline manufactured inside the state).  When goods acquired from out of state are "commingled" for

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

sale with goods manufactured in-state, the plaintiff bears the burden of identifying the specific goods that traveled "in commerce." *McGoffin*, 539 F.2d at 1248; *Chawla*, 75 F. Supp. 2d at 646.

H.     Mayes's flawed "commingling" theory also obscures the underlying detail behind Suncor's creation of different fuels for sale to WCS. These details, however, are critical, and they are fatal to Mayes's conclusion that *all* Fuel sold by Suncor was in interstate commerce. The details also are fatal to WCS's Robinson-Patman Act claim.

I.     At a general level, Suncor's conventional fuel sales to WCS included "blended" gasoline, that is, specific gasoline created by blending different grades of gasoline and other components. *See* Shields Decl., Exhibit AA, at ¶2 (describing different gasoline blends). These blends were created entirely at Suncor's refinery in Colorado. *Id. **These blends also are an entirely different product, with qualities (such as octane and vapor pressure) that are different from the products used to create them.** Id.* ¶¶2(a)-(f). "Midgrade unleaded gasoline with 10 percent ethanol" (or "Midgrade E-10"), for example, is a specific gasoline product with a specific octane level. *Id.* ¶2(f). It is made, however, from three different blending components: "subpremium unleaded gasoline," "subregular gasoline," and ethanol. *Id.* "Midgrade E-10," however, has different qualities (and is a different product) from any of the three blending components used to create it. *Id.* ¶¶2(b), (d) and (f).

J.     Thus even if WCS could demonstrate, for example, that Suncor acquired "subpremium unleaded gasoline" produced outside of Colorado, WCS's purchase of "Midgrade E-10" is a completely different product from the one acquired by Suncor from a refinery outside of Colorado. The gasoline acquired by Suncor has been changed, and the new gasoline product sold to WCS did not travel in interstate commerce for purposes of the Robinson-Patman Act.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

*See Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778, 781 (5th Cir. 1974); *Red Apple Supermarkets, Inc. v. Deltown Foods, Inc.*, 419 F. Supp. 1256, 1258 (S.D.N.Y. 1976).

      K.      The law is clear that the Robinson-Patman Act's interstate commerce requirement is not satisfied when interstate goods are used as "mere ingredients" in a product manufactured and sold entirely within the state. *Scranton Constr. Co.*, 494 F.2d at 781. As explained in *Red Apple Supermarkets*, the Robinson-Patman Act "applies only to situations where a finished product is shipped into one state and is there resold in a substantially unchanged condition." 419 F. Supp. at 1258. For example, in *Scranton Construction*, the Fifth Circuit refused to apply the Robinson-Patman Act to the defendant's ready-mix concrete sales, despite the fact that a key ingredient (concrete) was obtained across state lines. *See* 494 F.2d at 781. "[A]ll the interstate ingredients were mixed together" at one location and sold to the plaintiff in the state. *Id.* "This is fatal" to a Robinson-Patman Act claim. *Id.*; *accord Belliston*, 455 F.2d at 178 (reversing district court's decision permitting claims involving gasoline sales to proceed, when crude oil used to manufacture gasoline was delivered from out of state, but refining took place entirely within the state); *Red Apple Supermarkets*, 419 F. Supp. at 1259 (refusing to apply Robinson-Patman Act to low-fat milk sales, since milk from out-of-state was simply raw material used to create skim milk).

      L.      Even under Mayes's flawed "commingling" theory, WCS still has failed to meet its burden of showing that all Fuel purchased by WCS or Kroger crossed a state line. Indeed, the indisputable facts reveal that WCS *cannot* satisfy this burden. For example:

      i.      "subpremium unleaded gasoline" is used to create different products, such as "Midgrade E-10" and "premium unleaded gasoline with 10 percent ethanol" (or "Premium E-10"). *See* Shields Decl., Exh. AA, ¶¶2(b) and (f). **With the exception of one month (April**

24
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

*2011), Suncor did not acquire any "subpremium unleaded gasoline" produced outside of Colorado during the Damage Period. Id.* ¶3(a).  Thus "Premium E-10" purchased by WCS or Kroger from October 2009 through March 2011 could not have been made with "subpremium unleaded gasoline" that crossed a state line.[5]  *Id.*

     ii.    "subregular unleaded gasoline" is used to create different products, such as "Premium E-10" and "Midgrade E-10."  *See* Shields Decl., Exh. AA, ¶¶2(b) and (f).  *With the exception of one month (April 2011), Suncor did not acquire any "subregular unleaded gasoline" produced outside of Colorado that was delivered to the west plant of the Commerce City refinery during the Damage Period. Id.* ¶3(e).  Thus "regular unleaded gasoline with 10 percent ethanol" (or "Regular E-10") purchased by WCS or Kroger at the west plant of the Commerce City refinery from October 2009 through March 2011 could not have been made with "subregular unleaded gasoline" that crossed a state line.  *Id.*

     iii.    WCS purchased diesel fuel from Suncor throughout the Damage Period, including from Suncor's Commerce City refinery.  *In 2009 and 2010, however, Suncor did not purchase any diesel fuel produced outside of Colorado that was delivered to the west plant of its refinery. See id.* ¶3(d).  Thus none of the diesel fuel purchased from Suncor at the west plant of its Commerce City refinery could have crossed a state line in 2009 or 2010.  *See id.*

     M.    The indisputable facts set forth in paragraph L underscore why federal courts have rejected the "commingling" theory relied upon by WCS and its expert.  WCS has made no effort to identify (i) the specific Fuel that it purchased from Suncor that crossed a state line, or (ii) the months in which it purchased that specific Fuel from Suncor.  It therefore has completely failed

---

[5]    The vast majority of the products were purchased in Colorado where title transferred.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

to identify the sales to either WCS or Kroger that involved Fuel traveling in interstate commerce.
*See Coastal Fuels of Puerto Rico*, 79 F.3d at 189.

N.     In addition, even if WCS could identify the Fuel it purchased that crossed a state
line, that still would not be sufficient to satisfy the interstate commerce requirement.  The
undisputed facts reveal that conventional gasoline and diesel fuel purchased by Suncor from out-
of-state refineries was not intended for any specific customer—it was simply to meet general
demand. *See* Piscatelli Dep., Exh. Y, at 22:20-23:3.  Such gasoline was stored in tanks at
Suncor's Colorado terminals. *See id.* at 68:6-18.  Goods shipped across state lines "leave the
stream of commerce," and therefore are not subject to the Robinson-Patman Act, "when they are
stored . . . for general inventory purposes, that is, with no particular customer's needs in mind."
*Precision Printing Co. v. Unisource Worldwide, Inc.*, 993 F. Supp. 338, 347 (W.D. Pa. 1998).

O.     As a final effort to satisfy the interstate commerce requirement, Mayes, WCS's
expert, contends that all of the Fuel is within interstate commerce because Suncor purchased
ethanol from outside of Colorado and blended it with gasoline refined in Colorado. *See* Mayes
Report, Exh. Z, at 14.  Two-thirds of the ethanol used by Suncor is refined inside Colorado, and
only a third is acquired by Suncor from outside Colorado. *See* Piscatelli Dep, Exh. Y, at 76:9-20.

P.     Suncor, however, does not sell pure ethanol to WCS.  Suncor uses ethanol as an
ingredient which is added to gasoline to increase and meet octane requirements, thereby creating
a new and different product with a higher octane rating. *Id.* at 24:1-17 and 76:9-20; *see also*
Shield Decl., Exh. AA, at ¶¶3, 4.  Ethanol, therefore, is a "mere ingredient"—less than 10
percent by volume—for Suncor's in-state product. *Scranton Constr. Co. v. Litton Indus. Leasing
Corp.*, 494 F.2d 778, 781 (5th Cir. 1974).  The Robinson-Patman Act "applies only to situations
where a *finished product* is shipped into one state and is there resold in a substantially unchanged

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

condition," and thus does not apply to gasoline blended with ethanol by Suncor. *Red Apple Supermarkets*, 419 F. Supp. at 1258 (emphasis added).

Q.      Here, WCS has produced no evidence that it purchased *any* finished gasoline or other finished petroleum product from Suncor across a state line. All of WCS's purchases from Suncor occurred in the state of Colorado. Likewise, WCS has failed to produce any evidence that finished gasoline or diesel purchased by Kroger crossed a state line. This failure is fatal to its claim, and Suncor therefore is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (defendant entitled to summary judgment when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

**C.      SUNCOR IS ENTITLED TO SUMMARY JUDGMENT ON WCS'S SIXTH CLAIM FOR RELIEF (VIOLATION OF THE COLORADO UNFAIR TRADE PRACTICES ACT).**

**1.      Burden of proof and elements.**

WCS bears the burden of proving its Sixth Claim for Relief, which alleges violation of C.R.S. § 6-2-108. Section 6-2-108 provides:

> The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending certain purchasers special services or privileges not extended to all purchasers upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is an unfair trade practice. Any person, firm, partnership, corporation, or association resorting to such unfair trade practice is guilty of a misdemeanor and, upon conviction thereof, shall be subject to the penalties provided in section 6-2-116.

To prove its claim for damages, WCS must show (1) it has a private right of action under Section 6-2-108, (2) Suncor gave a "secret… unearned discount," (3) WCS suffered injury as a competitor, and (4) Suncor intended to destroy competition and that its actions "tended to

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

destroy competition." *See* C.R.S. § 6-2-108; *Q-T Markets, Inc. v. Fleming Cos., Inc.*, 394 F. Supp. 1102, 1108 (D. Colo. 1975) (limiting private right of actions under Unfair Trade Practices Act); *Beneficial Finance Co. of Arvada v. Sullivan*, 534 P.2d 1226, 1229 (Colo. App. 1975) (rejecting claim under C.R.S. § 6-2-108 for failure to show intent to destroy competition).

The undisputed facts demonstrate that WCS cannot satisfy any element of its Sixth Claim for Relief as a matter of law.

> **2.    First element that cannot be proven by WCS:  WCS has no private right of action under C.R.S. § 6-2-108.**

A.      Under Colorado law, statutory interpretation "start[s] with the plain meaning of the language, which [is] consider[ed] within the context of the statute as a whole." *Boulder County Bd. of Comm'rs v. Hygiene Fire Protection Dist.*, 221 P.3d 1063, 1066 (Colo. 2009); *accord Sussman v. Stoner*, 143 F. Supp. 2d 1232, 1238 (D. Colo. 2001). "Where two statutes address the same subject, [courts] construe them together to avoid inconsistency and attempt to reconcile them." *Boulder County Bd. of Comm'rs*, 221 P.3d at 1066 (citations omitted); *accord Loughridge v. Goodyear Tire & Rubber Co.*, 207 F. Supp. 2d 1187, 1190 (D. Colo. 2002).

B.      Applying these black-letter interpretive principles, WCS has no private right of action under C.R.S. § 6-2-108 as a matter of law.  On its face, C.R.S. § 6-2-108 is a *criminal* statute—its violation is "a misdemeanor and, upon conviction thereof," exposes a party "to the penalties provided in section 6-2-116." The penalties in C.R.S. § 6-2-116 are entirely criminal, not civil, in nature. *See* C.R.S. § 6-2-116. The plain language of C.R.S. § 6-2-108, therefore, does not contemplate a private right of action, and Colorado courts "do not add words to a statute." *Boulder County Bd. of Comm'rs v. HealthSouth Corp.*, 246 P.3d 948, 951 (Colo.2011).

C.      C.R.S. § 6-2-111 does not salvage the claim.  That statute, provides that "[a]ny person, firm, [or] private corporation… may maintain an action to enjoin a continuance of any

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

act in violation of *section 6-2-103 to 6-2-108* or section 6-2-110 and, if injured thereby, for the recovery of damages." C.R.S. § 6-2-111(1) (emphasis added). But that language has been specifically read to preclude a private claim under C.R.S. § 6-2-108. *See Q-T Markets*, 394 F. Supp. at 1108.

D.     In *Q-T Markets*, the federal district court interpreted C.R.S. § 6-2-109, which provides that "[a]ny contract… in violation of any of the provisions of *sections 6-2-103 to 6-2-108* is an illegal contract[.]" (emphasis added). *Q-T Markets* rejected a purchaser's reliance on C.R.S. § 6-2-109 to declare a contract illegal for violation of C.R.S. § 6-2-108, because the plain language of Section 6-2-109 applies only to contracts "made in violation of the provisions of §§ 103 *to* 108." 394 F. Supp. at 1107 (emphasis added). "Since the reference is 'to' 108, *that section is excluded*." *Id.* (emphasis added).

E.     The same language interpreted in *Q-T Markets* is used in C.R.S. § 6-2-111(1), which authorizes private causes of action only for "violation of section 6-2-103 *to* 6-2-108." (emphasis added). Therefore, Section 108 is not included in C.R.S. § 6-2-111(1) because the private right of action only applies to sections 103 through 107. By use of the word "to," as construed in *Q-T Markets*, the legislature did not intend to include Section 108 but to stop short of it. WCS has no private right of action under C.R.S. § 6-2-108 following *Q-T Markets*, as well as the principle that "statutes address[ing] the same subject" should be construed consistently. *Boulder County Bd. of Comm'rs*, 221 P.3d at 1066.

**3.     Second element that cannot be proven by WCS:  WCS cannot prove Suncor offered a "secret… unearned discount" for purposes of C.R.S. § 6-2-108.**

A.     WCS alleges that "Suncor has engaged… in the secret payment of rebates and unearned discounts to Favored Retailers not extended to WCS." Compl. ¶62.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

     B.     Suncor has not provided a "secret rebate" or "secret… unearned discount" to any purchaser.  While these terms are undefined in C.R.S. § 6-2-108, a "rebate" is generally defined as "[a] return of part of a payment, serving as a discount or reduction."  *Black's Law Dictionary* (9th ed. 2009).  A "discount," in turn is "[a] reduction from the full amount or value of something, esp. a price."  *Id.*

     C.     While no Colorado appellate court has considered the definition of a "secret rebate" or "discount" for purposes of C.R.S. § 6-2-108, courts in other jurisdictions have limited such language to actual returns of payment or reductions of a negotiated value.  For example, in *Eddins v. Redstone*, 134 Cal. App. 4th 290, 35 Cal. Rptr. 3d 863 (2005), the court found a revenue-sharing program entered into between movie studios and a video distributor constituted an "unearned discount" because "Blockbuster would receive more tapes for the same money it paid under traditional pricing."  134 Cal. App. 4th at 299-300.  The court remanded, however, to determine whether those rebates or discounts were, in fact, "secret."  *See id.* at 335-36.  Similarly, in *Lorenzo v. Qualcomm, Inc.*, 603 F. Supp. 2d 1291 (S.D. Cal. 2009), the "discounts" in question were reductions in a manufacturer's set price for computer chips awarded to purchasers who agreed to exclusively use the manufacturer's product.  *See id.* at 1301-03.

     D.     These "rebates" or "discounts" bear no relation to the contractual pricing mechanism used by Suncor when negotiating the price for Fuel sold to WCS or Kroger.  The contract price is simply a function of Suncor's rack price, less a negotiated differential.  The rack price is "a starting point" for the contract price.  *See* Moss Dep., Exh. B, at 48:18-19.  Suncor then negotiated a price differential with purchasers off the rack price.  *Id.* at 48:12-27.  "[A]ll of the unbranded customers" received a differential, which is "a common practice in the industry to have a differential of that [rack] price."  *Id.* at 48:12-14, 48:21-22.  The resulting price represents

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

the full value of the Fuel purchased from Suncor, and the contract price does not change. *Id.* at 51:10-19. Suncor's contract prices are not "rebates" of money or "discounts" off full value for purposes of C.R.S. § 6-2-108.

     E.     Independent of the nature of Suncor's pricing, there is no evidence in the record that Suncor's use of a differential was "secret." Again, all Suncor purchasers like WCS received a differential, and it is a "common practice in the industry." *See* Moss Dep., Exh. B, at 48:12-22. Indeed, WCS was aware that Kroger was actively negotiating for the best price for Fuel. *See* Taraghi Dep., Exh. S, at 162:2-17. When the "essential terms" of an alleged discount are publicly known, it is not a "secret" as required by C.R.S. § 6-2-108. *See Lorenzo*, 603 F. Supp. 2d at 1305 (dismissing action based on "secret" discount where discount was common knowledge).

     **4.**     <u>**Third element that cannot be proven by WCS**</u>**: WCS cannot prove injury to a competitor.**

     A.     WCS alleges that, "[a]s a result of Defendant's violation of C.R.S. § 6-2-108," it "has suffered, and will continue to suffer, damages and losses." *See* AC, ¶64.

     B.     Section 6-2-108 is not concerned with any injury. Violations of C.R.S. § 6-2-108 are limited to "injury *of a competitor*." (emphasis added). WCS and Suncor are not competitors. As WCS concedes, it is a "an independent retailer" of Fuel; Suncor is a Fuel supplier that sells to retailers such as WCS. *See* AC, ¶¶7-8, 25-26. On its face, C.R.S. § 6-2-108 is limited to competitors, or what under the Robinson-Patman Act is known as "primary-line competition."

     C.     While the Robinson-Patman Act extends to "secondary-line competition," C.R.S. § 6-2-108 does not. As explained in *Venta, Inc. v. Frontier Oil & Refining Co.*, 827 F. Supp. 1526, 1529 (D. Colo. 1993), "The [Robinson-Patman] Act is clearly worded very differently" from the Colorado Unfair Trade Practices Act. Consequently, "the Colorado legislature appears

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

to have made a conscious choice not to use the language of Robinson-Patman." *Id.* (interpreting C.R.S. § 6-2-103). In contrast, California's Unfair Practices Act contains express, broader language that extends its "secret rebate" statute to secondary-line claims. *See ABS Int'l Traders, Inc. v. Matsushita Elec. Corp.*, 14 Cal. 4th 1247, 1255 (Cal. 1997) (interpreting specific language in California statute). There is no such language here. Therefore, applying C.R.S. § 6-2-108 to "secondary-line" claims would improperly expand the scope of the statute. *See C.A. Staack P'ship v. Arapahoe County Bd. of Comm'rs*, 802 P.2d 1191, 1193 (Colo. App. 1990) (holding that, where a statute is silent, "a court should not inject [a provision] by interpretation"); *Burns v. City Council of City & County of Denver*, 759 P.2d 748, 749 (Colo. App. 1988) ("Courts will not interpret a statute… to mean that which it does not express.").

D.    Regardless of the scope of C.R.S. § 6-2-108, WCS cannot prove an injury. As explained on pages 13 through 20 above in connection with WCS's First Claim for Relief, WCS cannot demonstrate that Suncor has caused it any injury. In the absence of injury, WCS has no claim for violation of C.R.S. § 6-2-108.

5.    **Fourth element that cannot be proven by WCS: WCS cannot prove Suncor acted with an intent to destroy competition, or that Suncor in fact destroyed competition.**

A.    To sustain its claim for violation of C.R.S. § 6-2-108, WCS must prove that Suncor acted with an intent to destroy competition, and that its actions "tended to destroy competition." C.R.S. § 6-2-108. The undisputed facts reveal that WCS cannot prove either of these requirements.

B.    WCS must prove Suncor acted with the intent to destroy competition. *See Beneficial Finance*, 534 P.2d at 1229. In *Beneficial Finance*, the Colorado Court of Appeals affirmed the dismissal of a claim for violation of C.R.S. § 6-2-108, finding that, even assuming

32
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

the defendant offered a discount or rebate, "*no intent to destroy competition was shown*, and thus no violation of" Section 6-2-108 was established. *Id.* (emphasis added).

C.     The record is devoid of any evidence that Suncor intended to destroy competition as required by C.R.S. § 6-1-108.  Suncor's motivation was to obtain the highest price possible for Fuel without losing business. *See* Moss Dep., Exh. B, 281:14-282:3.  Suncor had no motivation to lower prices to Kroger or other purchasers unnecessarily. *Id.* at 313:20-314:17.  As Moss explained, "Suncor was in the business of making money, so obviously I wasn't just going to go so low... that it was a non-profitable margin." *Id.* at 314:14-17.  David Wilson, who negotiated contracts on behalf of Kroger, agreed: "If it was too good [the price], he wouldn't have sold it to me." *See* Wilson Dep., Exh. D, at 55:20-24.

D.     Indeed, the undisputed facts demonstrate that Suncor's pricing mechanism was incapable of "destroying competition."  Suncor's rack pricing of Fuel is based strictly on market conditions, and has nothing to do with either discounts offered to specific buyers or the demand of specific buyers for Product. *See* Piscatelli Dep., Exh. Y, at 28:22-29:8, 54:1-4, 55:6-24.  Rack pricing is based on demand only on a "macro" level and an analysis of prevailing market conditions, not the demand of a specific customer for a specific volume of Product. *See id.* at 55:6-24, 56:14-57:3.  Suncor's rack pricing is deliberately separated from the group responsible for negotiating price discounts (known as the "rack forward group") in order to avoid any conflict of interest. *See id.* at 30:1-20.  The rack forward group is walled off from the rack pricing group, and therefore has no influence on Suncor's rack price. *See id.* at 49:13-20.  Suncor had no intent to "destroy competition" under C.R.S § 6-2-108 and, indeed, could not coordinate its actions in such a way as to "destroy competition." *See Vitkus v. Beatrice Co.*, 11

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

F.3d 1535, 1539 (10th Cir. 1993) (requiring more than "scintilla" of evidence to avoid summary judgment).

E.    WCS also has not shown, and has made no effort to show, that Suncor has "destroy[ed] competition." C.R.S § 6-2-108. As explained in pages 12 and 13 above in connection with WCS's First Claim for Relief, WCS has made absolutely no attempt to demonstrate a harm to competition in the retail marketplace resulting from Suncor's pricing. Indeed, the evidence is completely to the contrary. WCS therefore has failed to demonstrate that Suncor's action have "tend[ed] to destroy competition," an essential element of C.R.S. § 6-2-108.

## CONCLUSION

For the reasons discussed above, Suncor is entitled to summary judgment on WCS' First and Sixth Claims for Relief.

Dated:  February 8, 2013.

Respectfully submitted,

*s/ Anthony J. Shaheen*
HOLLAND & HART LLP
Post Office Box 8749
Denver, CO  80201-8749
Telephone: 303-295-8054
Fax: 303-291-9126
E-Mail:  ajshaheen@hollandhart.com

*s/ William L. Monts III*
J. Robert Robertson
William L. Monts III
HOGAN LOVELLS LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Telephone:  202-637-5600
Fax:  202-637-5910
E-Mail:  robby.robertson@hoganlovells.com
        william.monts@hoganlovells.com

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

**ATTORNEYS FOR DEFENDANT**

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Doc. #185

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2013, the foregoing was served to the recipients below via email to the following email addresses:

Kenneth R. Bennington
Kathleen E. Craigmile
Adam F. Aldrich
BENNINGTON JOHNSON
BIERMANN & CRAIGMILE, LLC
370 17th Street, Suite 3500
Denver, CO 80202
(303) 629-5200

Philip W. Bledsoe
POLSINELLI SHUGHART, P.C.
1515 Wynkoop Street, Suite 600
Denver, CO 80202
pbledsoe@polsinelli.com


s/ Susanne Johnson

5960041_6

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER