SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

# STEVE MOSS - MAY 25, 2012

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-CV-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., A Colorado
corporation, WESTERN TRUCK ONE, LLC, a Colorado limited
liability company,
Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., A DELAWARE CORPORATION,
Defendant, Third-party plaintiff

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,
Third-party defendants.
-------------------------------------------------------
     CONFIDENTIAL VIDEOTAPED DEPOSITION OF STEVE MOSS
                      May 25, 2012
-------------------------------------------------------

Deposition location:
370 17th Street, Suite 3500
Denver, Colorado 80202

APPEARANCES:

        Kathleen E. Craigmile, Esq.
        Kenneth R. Bennington, Esq.
        Bennington Johnson Biermann & Craigmile
        370 17th Street, Suite 3500
        Denver, Colorado 80202
        Phone: (303) 629-5200
   For Western and the Taraghis

        Anthony J. Shaheen, Esq.
        Holland & Hart, LLP
        555 17th Street, Suite 3200
        Denver, Colorado 80202
        Phone: (303) 295-8054
   For Suncor Energy

ALSO PRESENT:  Jason Woods, Videographer

EXHIBIT B

1d5cf8ba-8e0b-4ed3-8aac-b6ac60ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

**Page 10**

1 supplies.
2 Q And have you provided any consulting
3 services to Suncor since you retired from Suncor?
4 A No.
5 Q And how much of your time would you say
6 that the consulting practice takes since your
7 retirement from Suncor?
8 A Oh, just a few hours a month. It varies.
9 Q All right. Sort of catch-as-catch-can?
10 A Yes, exactly. Thank you.
11 Q All right. When did you first start
12 working for Suncor?
13 A In 2003 when Suncor acquired the Denver
14 refinery.
15 Q And from whom did Suncor acquire the
16 refinery?
17 A ConocoPhillips.
18 Q All right. Were you a ConocoPhillips
19 employee?
20 A I was a ConocoPhillips employee.
21 Q All right. And what was your job at
22 ConocoPhillips at the time the refinery was acquired?
23 A I was a process operator.
24 Q What — generally what does a process
25 operator do?

**Page 11**

1 A My particular job I worked in a division
2 called oil movements. So I was responsible for the
3 handling of fuels and finished products, base products,
4 blending, et cetera.
5 Q Okay. What was your first job once the
6 refinery was acquired by Suncor?
7 A Shortly after Suncor acquired the
8 refinery, I became a — I went into management as a
9 process manager.
10 Q Okay.
11 A Overseeing the supervision of the
12 operations.
13 Q And those are general operations at the
14 refinery?
15 A At the refinery, correct.
16 Q All right. And when, if at all, did your
17 job at Suncor change after 2003?
18 A In approximately 2005 I became the
19 planning and blending manager for Suncor refinery.
20 Q And what does a planning and blending
21 manager do?
22 A The planning and blending manager is
23 responsible for making sure all products are blended
24 and on spec for sales, also managing inventory and
25 coordinating with the sales and marketing and crude

**Page 12**

1 groups as to the slate of products that we need for
2 that time.
3 Q And that would be with respect to
4 unbranded gas and branded gas and other products Suncor
5 sold?
6 A All products of that kind, yes.
7 Q All right. When did your job next change
8 at Suncor after 2005?
9 A In 2007 I became the manager for
10 unbranded and commercial sales at the Suncor corporate
11 office.
12 Q And where is the Suncor corporate office?
13 A At that time it was in Orchard Falls, the
14 U.S. corporate office.
15 Q I'm sorry. Where?
16 A The United States corporate office,
17 Suncor USA.
18 Q Was where?
19 A Orchard Falls.
20 Q Orchard Falls. Where is that?
21 A Centennial.
22 Q Okay. So here in town?
23 A Correct.
24 Q And the office at some point moved to
25 downtown?

**Page 13**

1 A Yes, in — I don't remember the exact
2 date we moved.
3 Q All right. So from 2007 when you took
4 this job until 2011 when you retired, did you have any
5 changes in position?
6 A No.
7 Q All right. And you were generally called
8 the manager of unbranded sales?
9 A Correct.
10 Q Did you share your general job duties
11 with anyone else, or were you the only manager of
12 unbranded sales?
13 A I was the only manager of unbranded
14 sales.
15 Q Did you replace someone in that position?
16 A My predecessor was a gentleman called
17 James Hanson.
18 Q James Hanson?
19 A Correct.
20 Q And what was the reason for you replacing
21 Mr. Hanson?
22 A Mr. Hanson had left the company and moved
23 on to another job.
24 Q All right. Do you know who replaced you
25 in the manager of unbranded sales position when you

1d5cf8ba-8e0b-4ed3-8aac-b6ac60ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

Page 42

1  pickup available. Either you're going to be a terminal
2  customer or not a customer at all?
3      A  No. It was predominantly a Western
4  decision.
5      Q  All right. And during these time frames
6  in 2008/2009, Western was one of your biggest -- or in
7  fact your biggest -- unbranded customer, is that
8  correct, in terms of volume?
9      A  I would say they were in the top five. I
10 couldn't say they were the biggest customer.
11     Q  Okay. So Western and Offen. Were there
12 any other customers that picked up at the pipeline?
13     A  Just Mansfield, for me, at Suncor.
14     Q  Were there others at Suncor?
15     A  Not that I'm aware of.
16     Q  All right. And then you talked about the
17 bid customers. Who were the bid customers?
18     A  The bid customers that Suncor did
19 business with was -- we had -- eventually we had Kroger
20 or the Dillon family businesses. We had a Loaf 'N Jug;
21 the RTD for Denver; Union Pacific Railroad; Burlington
22 Northern, who were a slightly different classification.
23 And the airlines were all bid customers, but that's a
24 different portfolio as well.
25     Q  Do you consider RTD, Union Pacific,

Page 43

1  Burlington, and the airlines being the commercial
2  customers?
3      A  They're commercial customers, separate
4  entities.
5      Q  Okay. So the only entities that were the
6  bid customers that were kind of unbranded, the typical
7  unbranded, were Dillon and then the Loaf 'N Jug --
8  which I understand is also referred to as Mini Mart --
9      A  Mini Mart.
10     Q  -- and is all within this Kroger family,
11 is that correct?
12     A  Correct.
13     Q  Any others with which you did a bid
14 process?
15     A  Not that I recollect directly, but there
16 were some that were done through third-parties.
17     Q  All right. And for the bid process, did
18 Kroger or the Dillon families issue some sort of
19 request for proposal that Suncor and other suppliers
20 responded to?
21     A  Correct. That was the bid process. Each
22 year they would put out a request for supply into a
23 particular market or nationwide depending on the
24 companies. And everybody -- that becomes a public bid.
25 Everybody in the business can -- in the industry can

Page 44

1  put in a bid or a proposal to supply that volume.
2      Q  Did they tell you basically here's what
3  we want to pay for this?
4      A  No. The bids are strictly put out saying
5  we need X volume of product in this particular market.
6  And they may say we want this particular grade of
7  product or these specs, and that was it. There's no
8  price point.
9      Q  Okay. And you come up -- each company or
10 each supplier comes up with its own price and hopes
11 that it's the best one?
12     A  Correct.
13     Q  Was there negotiation after the bid
14 process where Kroger/Dillon Companies would come back
15 and say, well, X is giving us this. We'd really like
16 to do business with you, Suncor. Can you ratchet it
17 down?
18     A  No. That is not the -- that is not the
19 way the system works.
20     Q  Okay. They just chose whomever they felt
21 gave them the bid?
22     A  They let you know that you are the
23 successful bidder or you aren't the successful bidder.
24 They could not or would not divulge whether your price
25 is the best or whether you need to better it.

Page 45

1      Q  Under -- given this product process under
2  the contracts with the Dillon family, was Suncor able
3  to allocate them, reduce the volume sold to them, or
4  did you always have to meet the volume commitment to
5  Dillon?
6      A  Part of those bid processes is that we
7  have to guarantee that we will supply their volume at
8  all times. It doesn't mean that if there's extreme
9  supply issues that we can request it.
10     Q  Was that kind of a two-way process? Did
11 they guarantee that they would purchase a certain
12 amount?
13     A  Correct. That was the agreement. They
14 had to purchase all the volume from -- from the
15 supplier that they picked.
16     Q  Could they purchase more, at the
17 agreement of the parties, at the same price?
18     A  It could be negotiated or it could be
19 agreed on if both parties agreed on it, yes.
20     Q  Okay. So if you have a contract with the
21 Dillon Companies for X volume -- and was it by a -- in
22 a monthly period? Was that how usually how it was --
23     A  It was broken down into a monthly period.
24     Q  Okay. So if you have a contract price
25 and amount for a monthly period and at the end of the

12 (Pages 42 to 45)

1d5cf5ba-8e0b-4ed3-8aac-b6ac60ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

### Page 46

1  month Dillon wants to pick up more gas, do they just --
2  was there just a practice where they did or were they
3  cut off at that point until you come up with a new
4  agreement for excess?
5      A.  No.  They had -- it had to be an
6  agreement between ourselves and them.  They would have
7  to call me and say -- and request more product, and we
8  would have to agree to it.  We weren't obliged to
9  supply more than the contract stated.
10     Q.  Did you ever agree to supply it at a
11  price different than what was in the contract?
12     A.  I couldn't say because I don't think I
13  ever did it.
14     Q.  Okay.  What -- personally what kind of
15  authority or leeway did you have to make changes to the
16  standard form of the contract?
17     A.  I did not have the authority to do that
18  directly.  I would have to get the permission of my
19  director --
20     Q.  Okay.  So Mr. Ewing could do that?
21     A.  -- to make a change.  I could request it,
22  but I couldn't make a change arbitrarily.
23     Q.  Okay.  And how would that happen?  Just
24  by email or you would walk down to his office and say,
25  Steve, these people need this.  Can we agree to this

### Page 47

1  change?
2      A.  A bit of both.  Sometimes I would email
3  it and say this is my request or I would just go over
4  to his desk if he was in the office.  It was very
5  informal.
6      Q.  Did Mr. Ewing or his predecessors,
7  Ms. Carbone and Mr. Smith, did they have the authority
8  in your mind to make whatever changes to the contracts
9  they deemed appropriate for Suncor's business?
10     A.  Yes.
11     Q.  Okay.  So that level, the director level,
12  didn't have to go up in the chain to get approval?
13     A.  My understanding was that they could make
14  those decisions, yes.
15     Q.  All right.  Was it -- were changes made
16  to the standard form contract more than occasionally?
17     A.  I don't recall any -- any specific
18  changes, no.
19     Q.  Who do you understand originally drafted
20  the form of the contract?
21     A.  That I don't know.  It was just the
22  standard contract that was in place for Suncor.
23     Q.  Did that really change in the period that
24  you were the manager of unbranded sales, or did you
25  always generally start with that same two-page or one-

### Page 48

1  or two-page form, the purchase and sale confirmation?
2      A.  We always started -- sorry.  We always
3  started with that.
4      Q.  For -- were the prices on the unbranded
5  contracts during the period you were there with the
6  exception of these bid contracts, were they always
7  based on Suncor rack prices?
8      A.  Correct, for regular unbranded.
9      Q.  Were they ever based on OPIS rack prices
10  or anything other than Suncor rack prices?
11     A.  Only for bid processes.
12     Q.  All right.  Did all of the unbranded
13  customers have some type of cents per gallon discount?
14     A.  Correct.
15     Q.  And why was that?  Why wasn't it just you
16  get your Suncor rack price?
17     A.  Well, the Suncor rack price is just a
18  basis.  It's a closer price for the industry to have a
19  starting point.
20     Q.  Okay.
21     A.  And it was common practice in the
22  industry to have a differential of that price.
23     Q.  Okay.  Because customers feel better when
24  they feel they're getting a discount?
25     A.  That I can't -- I don't know.

### Page 49

1      Q.  Okay.  Who determined the amount of the
2  discount, the cents per gallon discount off the rack
3  price?
4      A.  It was a marketing decision within
5  Suncor, so it would have been more of a group decision.
6      Q.  Okay.  So I understand there's a pricing
7  group that sets the Suncor rack prices daily or on some
8  very, very, very regular basis for all of the products
9  whether they're branded or unbranded; is that correct?
10     A.  Correct.  Pricing is done by the supply
11  department.
12     Q.  All right.  And the supply department
13  doesn't report up through Mr. Ewing?
14     A.  No.  That's a separate department.
15     Q.  Okay.  And that was headed by someone
16  named Ms. Thonen?
17     A.  Correct.
18     Q.  All right.  So the pricing department
19  sets the rack price.  Does the pricing department have
20  anything to do with setting the standard cents per
21  gallon off that would make its way into the unbranded
22  purchase and sale confirmation contracts?
23     A.  No.  That was done by the marketing or
24  the rack forward department.
25     Q.  Okay.  So that's Mr. Ewing's group when

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

**Page 50**

1  he was there?
2      A   Correct.
3      Q   Did you participate in that decision or
4  give input into that decision?
5      A   I would give input into that decision.
6  And that was mainly to say, hey, your price is out or
7  the price is good. I would give them the information
8  as to how sales was to reflect the pricing.
9      Q   How frequently were those decisions made?
10  Weekly?
11      A   Pricing was done every day.
12      Q   By Mr. Ewing's group?
13      A   No. That was done by supply.
14      Q   Okay.
15      A   Mr. Piscatelli.
16      Q   Okay. So the rack price is determined —
17  the Suncor rack price is determined every day?
18      A   Uh-huh.
19      Q   On what kind of frequency is the cents
20  per gallon discount determination made?
21      A   That determination on what you mentioned
22  on the cents per gallon discount was done in
23  extraordinary situations, i.e., we're excess product,
24  our sales have plummeted, and we would re-evaluate our
25  position.

**Page 51**

1      Q   Okay. I'm trying to understand. Say
2  we've got a contract in one year for a particular
3  customer and it talks about E-10 or some type of diesel
4  fuel, and for this particular year it's minus 3.5 cents
5  per gallon and maybe minus 3 cents per gallon for, you
6  know, other product.
7      A   Uh-huh.
8      Q   When did you make — did your group make
9  the determinations to change that? Was it every year?
10      A   No. Those contract prices were never
11  changed. Once the contract was done, that was it.
12  Those prices are locked in and solid.
13      Q   So with a particular customer, can you
14  change it the next time you do a contract; or did it
15  always for the life of a particular customer stay the
16  same?
17      A   It stayed the same in respect to all my
18  customers got the same contract price. There was no
19  differentiating.
20      Q   Okay. So I understand that Suncor sold
21  fuel that was ultimately sold by the big retailers such
22  as Costco and Sam's, but it was sold via third-party
23  marketers.
24      A   Correct.
25      Q   Who were — who were the third-party

**Page 52**

1  marketers that sold to Costco for ultimate sale to
2  Costco consumers or customers?
3      A   The Costco business was Overland DATS in
4  2010 and 2011. Before that it was a Truman Arnold
5  contract.
6      Q   So in 2009 and forward, if there was, it
7  was Truman Arnold?
8      A   It was — no. Truman Arnold had it, and
9  Overland took that business over in 2010.
10      Q   Okay. And is Overland associated with
11  DATS, or was it acquired?
12      A   It's the same company, Overland DATS,
13  correct.
14      Q   All right. And then how about Sam's?
15      A   Sam's Club was a Truman Arnold contract.
16      Q   The whole time?
17      A   Correct.
18      Q   When did Sam's start?
19      A   I'm not sure of the date. I believe they
20  had that contract when I took over — when I came into
21  the job in 2007.
22      Q   Okay. So there was a period of time when
23  Truman Arnold had both Sam's and Costco?
24      A   Correct.
25      Q   All right. And then Costco made the

**Page 53**

1  shift to Overland DATS at some point?
2      A   Yes.
3      Q   All right. Was Safeway one of those
4  deals?
5      A   Safeway became an Offen Petroleum
6  contract.
7      Q   Did Suncor sell fuel that ultimately was
8  both sold by Safeway prior to Offen becoming the
9  middleman for that?
10      A   No.
11      Q   All right. So Safeway never sold Suncor
12  gas until Offen started selling to Safeway?
13      A   I did not sell — Suncor did not sell to
14  Safeway knowingly.
15      Q   Okay. So you could have sold to somebody
16  that ultimately sold to Safeway, but you didn't know
17  about it?
18      A   I didn't know that was one of their
19  customers, correct.
20      Q   Why did — why did you ultimately know
21  that Overland or Truman Arnold were selling to Costco
22  or Sam's?
23      A   They entered into a contract with those
24  customers, the individual customers through the bid
25  system. They'd actually been awarded the bid and then

14  (Pages 50 to 53)

1d5cf6ba-8e0b-4ed3-8aac-b6ac60ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

**Page 58**

1  supply it? Do we have the volume? Are we comfortable
2  with the price?
3      Q   Okay. Did you -- what I'm trying to get
4  at is did you see what they wanted to pay and did you
5  independently go over to the pricing people, the
6  pricing analysts and say, Can you run some numbers on
7  these so I can give them to Mr. Ewing to see if this is
8  a deal that made sense for us?
9      A   No.
10      Q   Is that something that Mr. Ewing could
11  have done if he wanted to do?
12      A   I don't know the answer to that one.
13  Sorry.
14      Q   Do you know whether he did?
15      A   Sometimes they did. Sometimes they
16  didn't. I don't know. I wasn't really involved at
17  that level. I would just give him the business
18  opportunity, and they would say yes or no.
19      Q   Who are the pricing analysts that would
20  have been doing that work?
21      A   He would have come through the customer
22  service department.
23      Q   Did you know any of their names or --
24      A   At any one time we had Janell Joshua.
25  There was Robert White. All had different job

**Page 59**

1  descriptions in there, and I couldn't tell you which of
2  them actually had the final say in it.
3      Q   Okay. All right. And what I'm trying to
4  get at is how did you -- you know, this DATS or Truman
5  Arnold comes to you and says, we want this deal, and
6  the deal that they want to have is based on the OPIS
7  rack price less a certain cents per gallon, how did you
8  say in your mind, you know, that's a decent deal? Did
9  you have an understanding at a given time how much the
10  OPIS rack average differed from the Suncor average?
11      A   When they approached me, I would look at
12  the initial thing and say, okay, I'd have an idea in my
13  mind whether that was a good or a possibly good deal or
14  if it wasn't before I'd take it to my manager.
15      Q   Do you have reports that show like for
16  the end of year where generally Suncor's rack price
17  falls vis-a-vis the OPIS rack prices so you can tell
18  what the difference is?
19      A   I could look at the daily OPIS reports
20  and see what the pricing was. We had -- we had --
21  Suncor had a program -- which I didn't use very often
22  because it wasn't part of my position -- where we could
23  go in and look up historical numbers.
24      Q   Uh-huh. Could you generalize, though?
25  Did you know, okay, the Suncor rack price for this

**Page 60**

1  product is generally, you know, around 2, 3 cents off
2  the OPIS rack price for this particular project -- or
3  product?
4      A   No, because it really varied depending on
5  the time.
6          MS. CRAIGMILE: All right. Why don't we
7  take a brief break because you probably would not mind
8  doing that.
9          THE VIDEOGRAPHER: We're going off the
10  record at 10:02 a.m.
11          (Whereupon, from 10:02 a.m. to
12  10:16 a.m., there was a break in the proceedings.)
13          THE VIDEOGRAPHER: We are back on the
14  record at 10:16 a.m.
15      Q   (BY MS. CRAIGMILE) All right. Mr. Moss,
16  we're back on the record after a brief break. And I
17  wanted to follow up on a couple of issues. We talked
18  about these customers that were bid customers and we
19  talked about the Dillon Companies, and that was a bid
20  that was directly -- that Suncor directly participated
21  in.
22          And then we also talked about Costco and
23  Sam's Club, and that was a bid process that Suncor
24  didn't participate directly in but was participated in
25  by Suncor's customers DATS and Truman Arnold. Is that

**Page 61**

1  accurate?
2      A   DATS, Truman Arnold, and Offen Petroleum.
3      Q   And Offen Petroleum, with respect to
4  Safeway?
5      A   Correct.
6      Q   All right. I want to understand if there
7  are some distinctions between the Dillon business on
8  one hand and then the Safeway, Sam's, Costco business
9  on the other hand.
10          When you talked about the Dillon
11  Companies bid process, you described the bid process as
12  seeking a volume and then the bidder was entitled to
13  bid its own price and Suncor evidently won the bid for
14  that business. Is that an accurate description of how
15  the Dillon Companies bidding process went?
16      A   Correct.
17      Q   All right. Now, with respect to the
18  bidding process that involved Sam's, Costco, and
19  Safeway, to the extent that you know, did Sam's,
20  Costco, and Safeway or any of those in their RFP
21  process to the marketers specify a volume and a price?
22      A   No. The bids would not have specified a
23  price. The original bids that went out from people
24  like Costco, Safeway, and Sam's Club would have been
25  the same as Kroger's. They would have put out an

16  (Pages 58 to 61)

1d5cf8ba-8e0b-4ed3-8aac-b6ac80ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

**Page 106**

1     A   I'm trying to -- not that I recollect
2 that we terminated any of my customers. There have
3 been other customers that were -- that had issues in
4 2011, and they were either terminated or were
5 resolving. I don't remember exactly what the
6 circumstances were and what the final outcome was.
7     MS. CRAIGMILE: All right. Let's take a
8 break and discuss how we want to schedule lunch.
9     THE VIDEOGRAPHER: We're going off the
10 record at 11:12 a.m.
11     (Whereupon, from 11:12 a.m. to 11:27 a.m.
12 there was a break in the proceedings.)
13     THE VIDEOGRAPHER: We're back on the
14 record at 11:27 a.m.
15     Q  (BY MS. CRAIGMILE) Mr. Moss, I'd like to
16 talk a little bit about your relationship with the
17 folks at Kroger, Mini Mart, Dillon. Who did you work
18 with principally in that family of companies? Who was
19 your main contact?
20     A   My main contact was a gentleman who
21 worked out of -- out of Kansas, and I don't recall his
22 name at this time.
23     Q  Something like Wilson?
24     A  Thank you. David Wilson.
25     Q  David Wilson? All right. And was David

**Page 107**

1 Wilson the internal contact for both the Mini Mart/
2 Loaf 'N Jug relationship and the supermarket
3 relationship, meaning the King Soopers/Dillon
4 Companies?
5     A  David was responsible for the Dillon, the
6 King Soopers retail outlets.
7     Q  Okay. Was a different person responsible
8 for the Mini Mart outlets?
9     A  The gentleman who I dealt with for the
10 Mini Marts was -- I want to say it was Andrew Spain I
11 think his name was who did the original bidding. But I
12 dealt with a gentleman down in Trinidad who kind of ran
13 their supply organization.
14     Q  In Trinidad, Colorado?
15     A  Yes. Pueblo, Colorado. Sorry.
16     Q  Okay. Do you understand why within the
17 Kroger family they separated out the fuel purchases for
18 the Mini Mart side and the King Soopers side?
19     A  They ran the Loaf 'N Jug, Mini Mart, and
20 the King Soopers as two totally separate entities.
21 They were kind of run as separate divisions. So they
22 were separated out for that purpose.
23     Q  Did they have separate RFP processes?
24     A  Yes.
25     Q  Did they ultimately get the same price

**Page 108**

1 for the same products or --
2     A  I don't recall the exact contract
3 pricing, if it was different. I believe they were both
4 the same in the long run.
5     Q  Did you meet with the folks -- the Mini
6 Mart folks and the King Soopers folks ever together?
7     A  I don't believe so.
8     Q  Or did you -- did you feel like you were
9 free to discuss all of the business together, or did
10 you keep the Mini Mart business totally separate from
11 the King Soopers business?
12     A  We kept it separate.
13     Q  And you don't know internally whether
14 they ever --
15     A  No.
16     Q  -- ever discussed the business
17 collectively?
18     A  Correct.
19     Q  Did you meet with any -- what position
20 was Mr. Wilson's?
21     A  I believe his title was supply manager
22 for the U.S.
23     Q  Okay. So he bought things for King
24 Soopers?
25     A  Just fuel.

**Page 109**

1     Q  Okay. So he bought fuel for King
2 Soopers. And was the person in Pueblo for Mini Mart,
3 did that person have the same role for Mini Mart?
4     A  Yeah.
5     Q  All right. And bought fuel only?
6     A  He -- I don't know if he was just fuel
7 only or if he ran the whole organization.
8     Q  Okay.
9     A  But he was responsible for fuel
10 definitely.
11     Q  Did you meet with anyone -- any kind of
12 executives of King Soopers as part of your relationship
13 or Suncor's relationship with Dillon or Mini Mart?
14     A  No.
15     Q  Did you ever have direct meetings with
16 anyone at Costco about the Suncor fuel or any
17 relationship involving Suncor fuel being sold by
18 Costco?
19     A  The only time I ever met anybody from
20 Costco was at an industry function. We have an annual
21 function in Las Vegas every year, and I was introduced
22 to a particular -- I think her name was Nancy who was
23 with Costco. And I couldn't even tell you what her
24 position was. It was just a --
25     Q  Were you introduced by someone at DATS or

1d5cf8ba-8e0b-4ed3-8aac-b6ac60ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

## STEVE MOSS - MAY 25, 2012

**Page 118**

1 who was on board at the first time that you did a King
2 Soopers or Mini Mart response to RFP or bid process?
3 A I believe Don Smith would have been the
4 director at that time when we first brought it on.
5 Q Did you go through this process every
6 year with King Soopers and Mini Mart, or is it you did
7 it once and you won the original bid and then you just
8 kept going on as their supplier because --
9 A No. I believe we -- we won that
10 business -- the first time I won -- we got their
11 business was -- I believe it was in 2009. And that was
12 the first time we -- that's the first time we won the
13 bid. Before that they had obviously a different
14 supplier, and I couldn't tell you who that was at the
15 time.
16 Q Do you recall doing bids previously --
17 A Not for Kroger.
18 Q -- for King Soopers and not winning them?
19 A No. That was the first bid I did. I
20 don't know if Suncor had bid on their business before I
21 came into that position. I don't know.
22 Q Okay. But not during your --
23 A Not during my tenure. That was the first
24 time I bid their business.
25 Q Okay. And what I'm just trying to

**Page 119**

1 understand is did you go through that bidding process
2 more than once for Dillon Companies?
3 A We -- if I recall correctly, I said that
4 we got their business in 2009, so the bid process would
5 have been 2008 for 2009 supply. It was a one -- 2009,
6 2010 -- it was a two-year supply, so I would have
7 re-bid it in 2010.
8 Q Okay. So those -- were those two-year
9 contracts?
10 A That particular Kroger contract, if I
11 remember rightly, was a two-year contract. Without
12 actually looking at the contract, I couldn't say for
13 sure.
14 Q Okay.
15 A I just seem to recall it was a two-year.
16 Q So they did their bids in two-year
17 increments?
18 A If I remember correctly; but again, I'd
19 have to look at the contract to see for sure.
20 Q Okay.
21 A I don't remember bidding more than twice.
22 Q Okay. We might pull out the contract
23 files after lunch.
24 A Okay.
25 Q And you can help me there.

**Page 120**

1 A Thank you.
2 Q Were you on the same schedule for Mini
3 Mart, a two-year bid process?
4 A No. I believe that was a one-year bid;
5 but again, without looking at the contract, I really
6 don't remember.
7 Q Okay. And do you remember doing Mini
8 Mart bids more than once?
9 A I only did one Mini Mart bid, if I
10 remember.
11 Q How long did it take you to do these RFP
12 responses? Was it a substantial investment of time?
13 A Yes. They're fairly -- they're very
14 detailed. They're very time-consuming. You start -- a
15 company would normally -- say, for instance, they were
16 looking at product for -- what are we in now? 2012.
17 So if the company is looking for product for 2013, the
18 bids will already be out.
19 Q Uh-huh.
20 A And it will take you until December to
21 finish that bid process.
22 Q Okay. Did Ms. Carbone get involved in
23 determining the bid amount to the Dillon Companies or
24 to Mini Mart on either of those contracts or those RFP
25 responses?

**Page 121**

1 A I believe -- you know what? I believe
2 Ms. Carbone was there when we took on the Mini Mart
3 volume. Again, I'd have to look at their contracts to
4 know exactly the time and who was there and what -- but
5 I believe she was the director at that time.
6 Q Okay. So your recollection is that King
7 Soopers was already on board when she took over that
8 position?
9 A Yes.
10 Q And -- but Mini Mart was new when she
11 was -- she had her tenure as director?
12 A Yes.
13 Q Did Ms. Carbone ever negotiate directly
14 with Western about prices or contracts to the best of
15 your knowledge?
16 A Not to my knowledge.
17 Q Did she negotiate directly with other
18 unbranded customers to your knowledge?
19 A No. That was pretty much my job. She
20 would have given me direction and I would keep her --
21 obviously keep my director in the loop. But actually
22 negotiating directly, I don't believe so.
23 Q Was there a change in model, a Suncor
24 model in terms of these unbranded contracts between the
25 time that Mr. Smith was there to Ms. Carbone's time?

31 (Pages 118 to 121)

1d5cf6ba-8e0b-4ed3-8aac-b8ac60ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

**Page 198**

1  is saying that was in '09. I didn't update it, as I
2  said. This was not a worksheet that I really used.
3  Q  I thought — my recollection of your
4  testimony was that Suncor -- or Western wasn't really
5  purchasing diesel by the pipeline. Because when we
6  looked at all those purchase and sale confirmations, it
7  would make a distinction for diesel to be picked up at
8  the terminal.
9  Is that your recollection?
10  A  That was in 2010 when we were doing --
11  when we started doing more of the truck rack stuff.
12  They started lifting diesel at the truck racks, so they
13  were set up for diesel.
14  Q  Okay.
15  A  But they did take diesel over the
16  pipeline. But again, small volumes, very little. I
17  can't even tell you how much or when.
18  Q  Okay. Is there a reason that, for
19  example, Sapp Brothers -- well, let's look at Offen
20  Petroleum and Sapp Brothers. And Offen Petroleum has
21  an expiration date of September — excuse me --
22  October 2010, and Sapp Brothers has an expiration date
23  of September 2010, so a month different. And Offen is
24  getting a different cents off amount than Sapp Brothers
25  for diesel. Do you know why that would be?

**Page 199**

1  A  On the face of it, no, I can't answer
2  that without looking into it further. It may have been
3  a special deal or it may have been an end user contract
4  that they entered into.
5  Q  Okay. Then you look at -- if you look up
6  at Kroger Grand Junction, was Kroger Grand Junction --
7  was the contract price for Kroger Grand Junction, to
8  the best of your recollection, off the Suncor rack as
9  it indicates here?
10  A  In 2010 I don't believe it was.
11  Q  All right. So you think that might be
12  just a typo?
13  A  I think that was a pre-2009 pricing.
14  Q  Okay. That one indicates it's going to
15  expire at the end of April 2010.
16  A  I'd have to look at the contracts, once
17  again. I'd have to look and see what the paperwork
18  said.
19  Q  Okay. So when --
20  A  When we started in Grand Junction, we had
21  a small volume with Grand Junction with City Market was
22  the -- was the division over there.
23  Q  Uh-huh.
24  A  Which we'd had for a long time. But when
25  we took that big Dillon contract, they rolled the Grand

**Page 200**

1  Junction into the Dillon contract. So somewhere along
2  the line all of that changed.
3  Q  How did your customers get their
4  invoices? Was it all the same way?
5  A  That I don't know. It was done by the
6  accounting department.
7  Q  Well, for example, did -- if one of your
8  customers had a problem with, you know, oh, I don't
9  think I got my right cents off per gallon on this load,
10  would they sometimes send it to you or copy you on the
11  invoice and say, can you help me out, Steve?
12  A  Yeah, there were times when some of the
13  customers would CC me on it so that I knew what was
14  going on.
15  Q  Okay.
16  A  And it was more of, you know, maybe they
17  needed to have a little follow-up, so I would follow up
18  on their behalf.
19  Q  Okay. So you've indicated that in your
20  mind this is not necessarily an accurate picture of
21  what the discounts were at any particular time because
22  some of the information is outdated, is that correct?
23  A  Yes. I was -- as I said, it was an
24  internal worksheet, and I wasn't very good at updating
25  it, or used it as I needed for any particular time.

**Page 201**

1  Like on this one you're looking at --
2  Q  Uh-huh.
3  A  -- really what I'm looking at is the
4  volumes I'm seeing. These are my volumes. Somewhere
5  along the line I was calculating volumes. The rest of
6  it didn't make any -- didn't mean anything to me.
7  Q  Is there a reason why there is no volume
8  for Western Convenience or, say, Western Petroleum but
9  there's other entries?
10  A  On the ones that say zero -- again, I'd
11  have to go back. It could be that I just -- this
12  particular worksheet I got halfway through it and then
13  said okay, I've already got my numbers and I don't need
14  to do them.
15  Q  Okay. In your mind would the best way
16  for us to figure out what the actual cents off per
17  gallon each customer was receiving, would the best way
18  for us to be to get the complete contract for every
19  customer and lay those contracts out for a given time
20  period and get those straight off the contract?
21  A  I don't know if that would be the best
22  way. I would look at an individual contract if I was
23  looking for particular information.
24  Q  Okay. So that's how you would do it?
25  You would get the entire contract file?

1d5cf5ba-8e0b-4ed3-8aac-b8ac80ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

**Page 210**

1 publically available?
2    A  Yes.
3    Q  Okay.
4    A  Well, I don't know what you mean by
5 publically available. It was available to the --
6 obviously to the petroleum market.
7    Q  Okay.
8    A  I don't know if they actually put it out
9 or if -- so that the consumer or public could go look
10 at it.
11    Q  So would it be accurate to say that
12 whenever your price for Kroger got better, it was
13 because of a new bid process?
14    A  Correct.
15    Q  All right. There was no time where you
16 negotiated with Kroger for like a second year at a
17 lower rate without an official bid process where the
18 bids were open to other parties?
19    A  No. Everything would have gone through
20 the bid process.
21    Q  Did Kroger ever do business with Suncor
22 to your understanding even before you came on board in
23 a way that wasn't governed by the bid process?
24    A  Not that I'm aware of. We had the
25 business in Grand Junction with the City Market which

**Page 211**

1 was a division of Dillon.
2    Q  So that was your existing relationship,
3 and then you bid for the bigger piece of work?
4    A  Correct.
5    Q  All right. If you take a look at --
6 there's some documents near the end of the pile that
7 start with 5813. And let's actually start at 5814
8 because that's the earliest in this email chain. So
9 that's an email from you to David Wilson dated
10 September 4, 2009, and it says Suncor update.
11    And there are very few -- there are just
12 a couple of pages of emails in this contract file. So
13 I take it that it wasn't your practice to include all
14 of your emails -- or Suncor's practice to include all
15 of the emails with respect to any kind of contract
16 negotiation in the contract file, but this somehow made
17 its way in? Is that --
18    A  Could you ask that again? I'm sorry.
19    Q  Well, based on the low volume of emails
20 that are actually in this contract file, is it safe to
21 assume that there were other emails related to Kroger
22 business that didn't make it into this contract file?
23    A  Without going through all of them, I --
24 I'm not sure. I mean, there possibly could, but I
25 don't know for sure.

**Page 212**

1    Q  I mean, do you remember sending more than
2 two emails to David Wilson in the time that you worked
3 with him?
4    A  In the whole --
5    Q  Yes.
6    A  Yes, there would be more emails than
7 that.
8    Q  Okay. And do you have an understanding
9 as to how communications other than signed contracts
10 made it into -- or drafts of contracts made it into
11 this file?
12    A  I can't -- I'm sorry. Repeat.
13    Q  Do you have an understanding as to how or
14 why documents other than just signed contracts or
15 drafts of contracts made it into this file?
16    A  Probably just some emails I kept. I
17 mean, I could have done business -- I could have done a
18 lot of the -- the finer -- not the finer details, but a
19 lot of the details by phone. These are probably just
20 some of the emails that I kept in my file.
21    Q  Do you think this Exhibit No. 33 was a
22 file that you typically kept at your own office, or is
23 it a file from some other location within Suncor?
24    A  This is some other location. I didn't
25 keep all these together.

**Page 213**

1    Q  Okay. All right. So this email that
2 began on September 4, 2009, on 5814 says, "Dave, I will
3 have preliminary draft for the new contract in place
4 today and sent to you next week. Could you give me the
5 official company for the company, exact volumes and
6 carriers for the account."
7    It was my understanding that when you did
8 the bid process you were bidding on an exact volume.
9    A  Yeah, but I still had to reiterate that
10 bid. What I'm asking him here for is information.
11 This is the first -- first contract we did.
12    Q  Uh-huh.
13    A  So obviously there's more information
14 from an official standpoint to go on the contract:
15 exactly what the addresses are, what's the official
16 company name. I want exact volumes broke out by
17 Fountain or Denver. I'm asking him to just reiterate,
18 and then the carriers so we can set up the account.
19    Q  Okay. And so when you're referring to
20 new contract, you're not referring to a new contract
21 with Kroger. You're just referring to the new
22 contractual relationship?
23    A  This is a new contract with -- this
24 particular one ended up being Dillon I think. So this
25 was our first contract with them. We had nothing to do

54 (Pages 210 to 213)

1d5cf6ba-8e0b-4ed3-8aac-b6ac60ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEVE MOSS - MAY 25, 2012

Page 214

1  with previous contracts.
2      Q   Okay. And so he replies to you and says
3  here's the name of the company. "I don't have exact
4  volumes, but here's what I would like on the contract
5  plus or minus 10 percent." So he's telling you what to
6  put in. Were these the same numbers that were in the
7  RFP or do you know if they differ?
8      A   No. These would have been close to the
9  same numbers.
10     Q   Do you recall if the RFP included --
11  specified the terminals for the deliveries?
12     A   No, which is what I broke out here, they
13  are -- I would imagine that the RFP said I need product
14  in Colorado, boom, or Denver and Colorado Springs; and
15  we broke it out or he's giving me a much more precise
16  breakdown of those volumes.
17     Q   Okay. So this email is after you've
18  already won the process?
19     A   Correct.
20     Q   Okay. And you're just telling Linda
21  apparently in the following email what to put in the
22  contract, is that correct?
23     A   Correct.
24     Q   All right. You can put that document
25  aside.

Page 215

1          (Whereupon, Moss Deposition Exhibit
2  No. 34 was marked for identification.)
3      Q   (BY MS. CRAIGMILE) All right. I'm going
4  to hand you what's been marked as Exhibit 34. And for
5  the record, Exhibit 34 is basically the same thing
6  except it's the packet of contract documents for Mini
7  Mart, Inc. So is your testimony similar, this is not a
8  pile that you kept, but this apparently is some sort of
9  contract pile from Suncor?
10     A   Correct.
11     Q   All right. This packet of documents if
12  you look at the first substantive page which is 5824
13  has a Master Product Purchase and Sale Agreement for
14  Mini Mart and Loaf 'N Jug. And I didn't see one of
15  these in the packet for Kroger. Do you recall whether
16  Kroger had one of these?
17     A   I don't know. Again, this would have
18  been sent -- it wasn't part of my package.
19     Q   Okay.
20     A   Or my, you know, paperwork.
21     Q   In this document it indicates that
22  notices are to be sent if they're sent to Mini Mart to
23  this David Wilson person in Kansas. And he is the same
24  as the contact that you talked about on Kroger.
25     A   Okay.

Page 216

1      Q   Did you understand him to be involved on
2  Mini Mart's behalf?
3      A   He was the Dillon purchaser, so it looks
4  like he was also managing the supply -- the agreement
5  here. He wasn't the person I contacted or dealt with
6  when I was dealing with Mini Mart on a day-to-day or
7  weekly basis.
8      Q   Okay. So for Kroger you dealt with him
9  on a day-to-day and weekly basis, but for Mini Mart you
10  didn't?
11     A   Until Mr. Wilson left, yes.
12     Q   Okay. You dealt with the person in
13  Pueblo?
14     A   Yeah, and I can't -- still can't
15  recollect that gentleman's name.
16     Q   Okay. He must have made a big impression
17  on you. All right. You'll notice on all of these
18  contracts Mr. Wilson is the -- at least listed as a
19  contact person or the representative for Mini Mart as
20  well; but that was not something that was significant
21  to you, I take it?
22     A   Correct.
23     Q   Did -- to the best of your recollection,
24  did Mini Mart always buy the contracted volumes?
25     A   As far as I can recollect.

Page 217

1      Q   Was there ever any time that you
2  recollect Mini Mart or Kroger telling you or Suncor
3  that they would not be bound to sell -- or excuse me --
4  to buy the contracted volumes?
5      A   Not that I can recall.
6          MS. CRAIGMILE: All right. Let's take a
7  break. Do you have the time, Tony?
8          MR. SHAHEEN: I do. It's 3:00.
9          MS. CRAIGMILE: All right. Let's go off
10  the record.
11         THE VIDEOGRAPHER: We're going off the
12  record at 3:00 p.m.
13         (Whereupon, from 3:00 p.m. to 3:09 p.m.
14  there was a break in the proceedings, and
15  Mr. Bennington is not present.)
16         THE VIDEOGRAPHER: We're back on the
17  record at 3:09 p.m.
18         (Whereupon, Moss Deposition Exhibit
19  No. 35 was marked for identification.)
20     Q   (BY MS. CRAIGMILE) All right. Mr. Moss,
21  I've handed you what's been marked as Exhibit 35.
22         MR. KORENBLAT: Correct. This is --
23  highly confidential for the time being.
24         MR. KORENBLAT: Correct. This is --
25     Q   (BY MS. CRAIGMILE) All right. So this

55 (Pages 214 to 217)

1d5cf6ba-8e0b-4ed3-8aac-b6ac60ef2807

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

## STEPHEN MOSS - JANUARY 30, 2013

Page 246

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado
corporation, WESTERN TRUCK ONE, LLC, a Colorado
limited liability company,

Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

Defendant.

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,

Third-Party Defendants.
--------------------------------------------------------

VIDEOTAPED DEPOSITION OF STEPHEN MOSS -- VOLUME II
January 30, 2013

--------------------------------------------------------

                        Deposition location:
                        370 17th Street, Suite 3500
                        Denver, Colorado

APPEARANCES:

            KATHLEEN E. CRAIGMILE, ESQ.
            KENNETH R. BENNINGTON, ESQ.
            BENNINGTON JOHNSON BIERMANN &
            CRAIGMILE, LLC
            370-17th Street, Suite 3500
            Denver, Colorado 80202

                    and

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

## STEPHEN MOSS - JANUARY 30, 2013

**Page 259**

1 that date Suncor has produced some of those
2 documents, as has Kroger. So we'll go through a
3 number of those documents, but I'd like to ask you a
4 few general questions about that process first.
5 In the first deposition you testified
6 that there were times that you believed that Kroger
7 would send you a package of RFP materials
8 electronically and that there were times that perhaps
9 you went on to a Kroger website to input Suncor's
10 responsive information. At other times we've only
11 received copies of electronic transmissions from
12 Kroger to you, principally in the form of e-mails
13 requesting Suncor's participation in the RFP process.
14 Do you believe that there were times where you went
15 out to a website and input information, or is it
16 possible that there simply are electronic e-mails?
17 A. I believed Kroger was, but if there was
18 only e-mails, that meant that I was incorrect in that
19 case.
20 A lot of those bid processes, which I
21 had numerous by this -- by this -- by that time,
22 by -- before I left Suncor I had numerous bid --
23 Q. Sure.
24 A. -- companies, most of those were, and I
25 just -- I think I probably just believed that Kroger

**Page 260**

1 was one of those --
2 Q. Okay. So you can't remember --
3 A. Yeah, correct.
4 Q. All right. We're going to start going
5 through exhibits, and a lot of the exhibits will be
6 new exhibits. Some of the exhibits will be exhibits
7 that have been used in other depositions, such as the
8 deposition of Ms. Carbone or Mr. Ewing, and so those
9 are contained in the notebooks to your right.
10 A. Okay.
11 Q. So there will be times when I ask you
12 to reach for one of the notebooks.
13 (Whereupon, Deposition Exhibit 162 was
14 marked for identification by the reporter.)
15 Q. All right. Mr. Moss, I've handed you
16 what's been marked as Exhibit 162. And we're trying
17 to save paper in this room and in this case in
18 general so it's double-sided. And for the record,
19 this appears to be an e-mail from David Wilson at
20 Kroger -- which I understand to be Kroger, is that
21 correct?
22 A. Correct.
23 Q. -- dated February 11th, 2008, and it
24 relates to the Kroger Grand Junction Company RFP and
25 includes an attachment which is the second page of

**Page 261**

1 the document.
2 Is this -- does this appear to be a
3 document that you received from Mr. Wilson in
4 connection with 2008 RFP for Grand Junction?
5 A. Yes, it appears to be a request for
6 supply, and it does state that it's for Grand
7 Junction.
8 Q. Do you recall receiving any of -- any
9 RFPs for Kroger business that occurred before 2008?
10 A. I don't recall the exact dates, but
11 yes, we would have had some -- some RFPs from Kroger
12 because we had their -- when I came to work for
13 Suncor in 2007 we already had the Kroger distribution
14 center, which was a diesel contract --
15 Q. Okay.
16 A. -- for their transportation company,
17 and we also had business in Grand Junction under City
18 Market I believe it was.
19 Q. So the 2007 business, when you talk
20 about the distribution center business --
21 A. Yes.
22 Q. -- that would have been for the sale of
23 ultra low sulfur diesel number 1 fuel for their truck
24 fleet as opposed to fuel for them to sell to
25 consumers. Is that correct?

**Page 262**

1 A. Correct.
2 Q. All right. And then you had Grand
3 Junction business for their purchase of fuel that
4 would ultimately be sold to the consumers?
5 A. Sold to the consumers, correct.
6 Q. Was it your understanding that the
7 Kroger business always was obtained via an RFP from
8 the beginning?
9 A. Yes.
10 Q. All right. You'll notice that this
11 request for proposal indicates that the -- under
12 Pricing: The price should be quoted in cents per
13 gallon. If basing your quote on OPIS, you must state
14 which OPIS index you are quoting.
15 I understand that the contracts with
16 Kroger ultimately were based on an OPIS rack average
17 rather than a Suncor rack average.
18 A. That would -- the OPIS rack average
19 from me, from Suncor, was a -- their pricing index
20 from Suncor was OPIS rack average, correct.
21 Q. Why was it OPIS rack average rather
22 than Suncor rack average?
23 A. Companies like Kroger pretty much
24 always want an OPIS. OPIS is a pricing reporting
25 company for all intents and purposes. They compile

5  (Pages 259 to 262)

3a760724-5adf-4f57-b97c-716fd022e733

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

## STEPHEN MOSS - JANUARY 30, 2013

### Page 267

1  What I've done here and during that --
2  during my time that I'm there, I make appointments to
3  see customers and usually people who were out of
4  state. Kroger is based out of Kansas so it's not
5  somebody who I would see very often, so I made a
6  point of getting together. Don Smith was the
7  director of sales at that time, he was my boss, so I
8  thought it was important that he met with -- with
9  this customer as well.
10  Q.   And did -- when you met with Mr. Wilson
11  at the Mirage, did you discuss the anticipated bid at
12  all?
13  A.   I don't recall, recollect, what the
14  conversation would have been. I would -- I would --
15  I would say that I probably did ask him when the bids
16  were coming up and get my name on the list to bid.
17  Q.   Did you ever discuss with Mr. Wilson,
18  either at this meeting or any other conversations
19  with you -- with Mr. Wilson that you might have had,
20  the nature of the bids by any other suppliers?
21  A.   No, that -- and even if I'd have asked
22  him, he wouldn't -- he wouldn't have disclosed that
23  information, so I wouldn't have asked him.
24  Q.   So that issue was entirely --
25  A.   No.

### Page 268

1  Q.   -- off the table.
2  A.   Off the table.
3  Q.   Did Mr. Smith attend that meeting as
4  well, do you recall?
5  A.   Yes.
6  Q.   All right. Can you take a look at
7  Deposition Exhibit Number 71, which probably is at
8  the beginning of that book that you have?
9  A.   71?
10  Q.   Yes. Really all I think I need you to
11  do is tell me whether this is your response to
12  Mr. Wilson with respect to the bid for Grand Junction
13  petroleum supply.
14  A.   It states it was 2008. Correct. This
15  would have been my response to -- to their -- the
16  RFP.
17  Q.   All right. And on the actual proposal
18  document, it indicates that pricing would be based on
19  Grand Junction OPIS gross rack average, and for the
20  Number 2 ultra low sulfur diesel it would be gross --
21  OPIS gross rack average less ███ cents and for clear
22  gasoline it would be OPIS gross rack average less ███
23  cents.
24  Is that the same price that was in
25  place previously to the best of your knowledge?

### Page 269

1  A.   I would have to look back. I don't
2  recollect what the previous contract contained.
3  Q.   Do you recall a pattern in which you
4  would lower prices for Kroger each time a new bid
5  process would come around to maintain the business?
6  A.   No. There wouldn't have been -- they
7  wouldn't have automatically lowered the price. I --
8  in this particular case, I believe this was the first
9  time I'd actually done a bid for Kroger, I would have
10  done like I always do; I would have looked at the
11  market, seen if there was any significant changes.
12  As the incumbent, I more than likely would have --
13  would have stayed with my -- with the original bid,
14  you know, pricing, but I can't be certain of that.
15  Q.   Did Mr. Wilson ever say to you you need
16  to go lower that you recall?
17  A.   Not that I recall.
18  Q.   All right. Why don't you take a look
19  at Deposition Exhibit 72.
20  A.   72.
21  Q.   Exhibit 72 is an e-mail from you to
22  Mr. Wilson dated March 19th, 2008, which is
23  approximately three weeks after the e-mail that's at
24  Exhibit 71, and that looks to be a second -- like a
25  second version of the Kroger proposal for the Grand

### Page 270

1  Junction business.
2  And it appears that in this proposal
3  the price is going down, because there's a larger
4  cents per gallon discount. Does that look accurate
5  to you?
6  A.   This was March 19th, and the original
7  one was -- I'm sorry, I'm just looking at the
8  dates -- was February, so this was about two weeks
9  after.
10  Q.   Right.
11  A.   This is a different product. The
12  original bid -- the original bid was -- when I --
13  when I put in the original proposal --
14  Q.   M-hm.
15  A.   -- it was gross rack average less ███
16  cents a gallon. I'm just looking to see where it
17  was. Was for gasoline, which was clear gasoline, is
18  what it looks like. And this second is we've changed
19  and -- oh, we've addended it, that's why. The
20  Addendum I was E-10.
21  Q.   Okay.
22  A.   What they've done is, you know, during
23  the bid is we've bid on clear -- I'd given them a
24  price for clear gasoline, and then they came back and
25  said they wanted also a price for ethanol which was

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEPHEN MOSS - JANUARY 30, 2013

**Page 271**

1 becoming available over there from what I can tell.
2     Q.   All right.  In the -- under the
3 proposal, the first page of the proposal it talks
4 about:  At this time we will be able -- we will be to
5 offer E-10 supply at Grand Junction in the near
6 future, May 2008.  E-10 will be based -- will be
7 priced based on Grand Junction OPIS clear rack
8 average less ▓ cents per gallon and less 5.1 fed
9 tax applied at the time of billing for a total of ▓
10 cents per gallon.
11         Why was Suncor willing to pay the
12 federal tax?
13     A.   We did that for all our customers.
14     Q.   Okay.
15     A.   Every -- everybody who bought gasoline
16 from us got that federal tax.  By this time we were
17 passing that on.  It was a tax credit to the oil
18 companies for blending ethanol.  What we had done by
19 then is we were passing that 5 cents on to our
20 customers, so everybody got that tax thing.
21     Q.   Okay.  For ethanol --
22     A.   This was just -- it was strictly
23 ethanol use.
24     Q.   For ethanolized gas.
25     A.   Correct.

**Page 273**

1     A.   Not at this price, because as I said --
2 as I mentioned earlier on, this -- I think this was
3 the first company of this stature that we were doing
4 this OPIS number, that we were bidding on a OPIS
5 number.
6     Q.   All right.  Western at that time in
7 2008 was your largest unbranded customer from what we
8 can tell from the records.
9     A.   Correct.
10     Q.   Is that your recollection?
11     A.   Correct.
12     Q.   Because Western was your largest
13 customer, did you ever go to Western and say we would
14 like to give you this price for a long term contract
15 with us or we will give you this price for your
16 purchase of clear gasoline?
17     A.   At this time in 2008 I would have
18 already renewed -- Western's -- Western's contracts
19 came up in January or February time frame, if I'm not
20 mistaken.  I believe we did talk about it, and I
21 believe we did actually -- I did actually offer them
22 an OPIS number if they would request -- if they would
23 like it.  It wasn't a number that -- or a price index
24 that I believed they were interested in, because I
25 never did do a contract with OPIS.

**Page 272**

1     Q.   All right.  Can you take a look at
2 Deposition Exhibit Number 73?
3     A.   73.
4     Q.   All right.  And this appears to be a
5 bid proposal for Denver business for Kroger for 2008
6 that you submitted to Mr. Wilson dated March 31st,
7 2008.  Is that accurate?
8     A.   Correct.
9     Q.   So is this the first time to the best
10 of your recollection that Kroger was going to be
11 purchasing gas to be picked up from the Suncor
12 terminals in Denver?
13     A.   This was the first time Suncor had --
14 that I -- this was the first time I bid on Kroger in
15 Denver.  And I don't believe they bid on them before
16 I got there, but I couldn't swear to that.
17     Q.   All right.  And again we've got an OPIS
18 average price less a certain number of cents per
19 gallon, and we've got clear gasoline would be clear
20 rack average less ▓ cents per gallon and then some
21 different prices for the E-10 and the ultra low
22 sulfur diesel.  Do you know whether at this time you
23 offered any of your other customers this same price
24 for purchases of these products, meaning the clear
25 gasoline, the ultra low sulfur diesel or the E-10?

**Page 274**

1     Q.   Do you recall giving them the OPIS rack
2 average less these discounts that are reflected in
3 the Kroger contract?
4     A.   I don't know if they were the same as
5 these discounts.  I would --
6     Q.   All right.  So you may have offered
7 Western the opportunity to look at an OPIS rack
8 average index --
9     A.   Yeah.
10     Q.   -- versus the Suncor index, but you
11 can't recall giving them an offer to sell gasoline to
12 Western based on these same discounts off of on OPIS
13 rack average?
14     A.   I don't?
15         MR. SHAHEEN:  I'm going to object.
16 You've mischaracterized his testimony.
17         Go ahead and answer.
18     A.   I don't believe we would have done
19 these numbers, but their business was different.
20 Again, he was -- they were pipeline and it was a
21 whole different business model.  So I'd be very
22 surprised if I offered him the same price.
23     Q.   All right.  Could you take a look at
24 Exhibit 74, which should be in that same notebook.
25     A.   Okay.

8  (Pages 271 to 274)

3a760724-5adf-4f57-b97c-716fd022e733

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

## STEPHEN MOSS - JANUARY 30, 2013

### Page 275

1  Q.  All right.  This is a May 16th, 2008
2  e-mail from you to David Wilson at Kroger regarding
3  the Kroger proposal for Denver 2008.  So I assume
4  that it relates to the same proposal that you had
5  just reviewed.  Is that accurate?
6       A.  Correct.
7       Q.  And you say:  David, after further
8  review, OPIS average less ▮ cents per gallon is the
9  best pricing we can do.  This reflects the current
10  market and is by far Suncor's best pricing offered in
11  the market.
12       Let me ask you a couple of questions
13  about that.  First, the OPIS average less ▮ cents
14  per gallon is -- seems to be a better price than you
15  were offering in the RFP that's marked as Exhibit 73,
16  going down another half a cent per gallon.
17       A.  73 was the Denver one, correct?
18       Q.  Right.
19       A.  Yes.
20       Q.  Do you recall the discussions that led
21  to you reducing the offered price by another half
22  cent per gallon by May 16th?
23       A.  I don't recall the -- what led to me
24  changing the price to ▮, no.
25       Q.  Can you say for certain that it was

### Page 276

1  based on a conversation with Mr. Wilson?
2       A.  It would have been based on some sort
3  of communication.  Again, what that communication was
4  I don't know.  They don't usually -- a company like
5  this doesn't normally come back and say, hey, you
6  know, give you a second bite of the cherry --
7       Q.  All right.  But at any --
8       A.  -- to say --
9       Q.  But any rate by this time you're
10  offering a slightly better deal to Kroger than you
11  had been in the -- in the --
12       A.  I changed my price to ▮ is what this
13  is saying, correct.
14       Q.  Okay.  Then your e-mail says:  This is
15  by far Suncor's best pricing offered in the market.
16       Was that a true statement at that time?
17       A.  If I wrote it, I would have said that,
18  yes, that had to have been a fair statement in
19  regards to -- the way I did these bids -- the way I
20  do all my -- did all my bids -- this would have been
21  about the same as what my other customers were
22  getting depending on the price mechanism.
23       Q.  What would you mean this would have
24  been the same that my other customers were getting
25  depending on the price mechanism?

### Page 277

1       A.  If I offered OPIS average less than
2  ▮ and I was saying it was my best price, at the
3  time when this bid was out in February of 2008, more
4  than likely the Suncor rack less ▮ cents, ▮
5  whatever I was offering all my other customers,
6  worked out at about the same as this.
7       Q.  Then why would you have said this is by
8  far Suncor's best pricing offered in the market?
9       A.  That was my way of saying this is my
10  best price, I'm not going to -- this is as good as it
11  gets, I'm not going any lower, or I'm not changing my
12  price at this time.
13       Q.  Was it your understanding generally at
14  least going forward that the Kroger entities got a
15  more favorable price than your other unbranded
16  customers in the 2009 and 2010 and 2011 time frame?
17       A.  No, I wouldn't say that was a fair
18  statement.
19       Q.  How about in the 2010 time frame?
20       A.  Without going back and looking at all
21  the market information that I had at that time, I
22  would say no, it was -- it was comparable to what --
23  what our -- what other prices I had out there to
24  other customers.
25       Q.  So you think it was comparable to the

### Page 278

1  Western deal?
2       A.  Correct.
3       Q.  All right.  Will you take a look at
4  Deposition Exhibit Number 46, which may or may not be
5  in that notebook?
6       A.  46?
7       Q.  Right.  And that appears to be a
8  contract between Suncor and Dillon dated
9  September 4th, 2009 for fuel and diesel purchases out
10  of Denver and Fountain.
11       Does that look an accurate
12  characterization to you?
13       A.  This is for Dillon, clear gasoline,
14  Denver, Fountain -- correct.
15       Q.  I am not certain that we've seen an RFP
16  for this contract.  Again, do you ever recall doing a
17  contract with Dillon that was not subject to an RFP?
18       A.  All their business came through an RFP.
19       Q.  Let me ask you this.  There were times
20  that we can see in the contracts where you have a
21  year-long contract with Dillon or Mini Mart, I think
22  more Dillon because you had a longer relationship
23  with Dillon, and then mid-cycle Suncor enters into a
24  new year-long contract.  Do you ever recall that
25  happening?

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEPHEN MOSS - JANUARY 30, 2013

**Page 279**

1  A.  I don't recall the exact times or the
2  circumstances, but after I – in 2009, this
3  particular contract, Exhibit 46, is the actual
4  contract, that was the first time I got the business
5  in Denver.  And then there were changes because the
6  business changed over a period of time.  So, yes, the
7  contract was opened up and we amended it.  I think at
8  the time it was mainly just to – I can't – I can't
9  recollect.  I'd have to really look at the –
10  Q.  What do you mean the –
11  A.  – at the circumstances.
12  Q.  What do you mean the business changed?
13  A.  We were – at that time we were getting
14  rid of a lot of regular gasoline, a lot of E-10.  I
15  think there were some changes to their business as
16  regards to whether we supplied Fountain, which was
17  Colorado Springs at the time.  There was changes in
18  terminals.  So I think it was mostly language, I
19  don't believe we opened up the contracts, but again I
20  would have to go back and really look at those
21  documents.
22  Q.  All right.  In this contract, by this
23  time Suncor is paying Denver gross rack average less
24  ▮ cents per gallon for gas and gross rack average
25  less ▮ cents per gallon for diesel.

**Page 280**

1  A.  Correct.
2  Q.  All right.  And that is – seems like a
3  substantially better price than they were previously
4  paying in 2008 and early 2009.  Does that comport
5  with your memory?
6  MR. SHAHEEN:  I think the question –
7  I'm going to object.  I think the question is vague.
8  Previously paying.  If you're referring to something,
9  it would be helpful to show him what you're talking
10  about.
11  Q.  (BY MS. CRAIGMILE)  All right.  Let's
12  look at the Deposition Exhibit 74.
13  A.  74.
14  Q.  Yes.
15  A.  Sorry.
16  74, correct?  Deposition – so that's
17  the 2008 proposal, correct?
18  Q.  Right.  The 2008 proposal.  Suncor is
19  offering to sell Kroger gas or Dillon gas.  E-10 gas
20  would be rack average less ▮ cents per gallon, and
21  ultra low sulfur diesel would be rack average less ▮
22  cents per gallon.  And then by 2009 the gasoline,
23  meaning the E-10, is going down to Denver gross rack
24  average less ▮ cents per gallon, and the diesel is
25  going down to Denver gross rack average less ▮

**Page 281**

1  cents per gallon.
2  A.  Correct.
3  Q.  So it looks to me like there's a cent
4  and a half drop in the E-10 price per gallon off the
5  rack and a 0.5 cent drop in the – oh, excuse me, a
6  1.5 cent drop in the diesel price.  Is that accurate?
7  A.  Correct.
8  Q.  All right.  What is your recollection
9  for the reason why Suncor would now be offering a
10  lower price to Dillon?
11  A.  The Exhibit 46 is the contract for a
12  bid that came out in 2009.  That was a year later.
13  Q.  Okay.
14  A.  2008 to 2009 there was a lot of changes
15  in our business.  The pricing, the market value.
16  Plus the 2008 contract – bid proposal I did not get.
17  I was not the winner of that bid.  One of my
18  competitors got that business.
19  Q.  Okay.
20  A.  As you can see on the 2009 we actually
21  won the business.  Suncor's business model had
22  changed, and the difference between 2008 and 2009 is
23  we really wanted the King Soopers business.  We were
24  going to chase it.  And the ▮ cents pricing here
25  pretty much reflects the change in the market on what

**Page 282**

1  we felt we needed to do to win this business based on
2  the fact that I knew I didn't – ▮ cents did not
3  get me the business the previous year.
4  Q.  All right.  In 2009 Western was still
5  your biggest unbranded customer.  Did you ever sit
6  down with Mr. Taraghi in 2009 and say, listen, I
7  would like to do a long term deal with you at these
8  prices that are reflected in Deposition Exhibit 46?
9  A.  No, because this is a totally different
10  company with regards to these prices and everything.
11  I wouldn't have done that.
12  Q.  Why is Kroger a totally different
13  company?
14  A.  It's a national company, they only work
15  on bids, i.e. they're putting their business out.
16  They put – they ask people to offer them product for
17  their – you know, for their sales to suppliers or
18  their marketers.  What they do is when they award the
19  bid you are strictly – you – once they give you
20  these volumes, they lift them regardless.  They don't
21  go to other companies.  They don't change their
22  prices.  They only want to lift from you.  So –
23  Q.  Dillon is a much bigger company to your
24  understanding than Western.  Is that accurate?
25  A.  Yeah, that's a fair statement.

10 (Pages 279 to 282)

3a760724-6adf-4f57-b97c-716fd022e733

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEPHEN MOSS - JANUARY 30, 2013

**Page 287**

1    MR. SHAHEEN: I'm going to object. I
2    think you're mischaracterizing, and certainly it's an
3    incomplete statement of what Mr. Ewing said. And so
4    it's also vague and ambiguous in that regard.
5        Go ahead and answer it if you can.
6        A.    I'm sorry. Could you repeat the
7    question?
8        Q.    (BY MS. CRAIGMILE) Well, let me just
9    separate what Mr. Ewing (sic) said and not use that.
10       An accurate characterization of
11   Suncor's business with Kroger is that there was a —
12   there was some component of it that was commercial
13   because you were selling Kroger ULSD 1 that was
14   commercial for its use in its own fleet?
15       A.    Correct.
16       Q.    But most of the gasoline and diesel
17   sold to Kroger, meaning Dillon and ultimately Loaf 'N
18   Jug, was non-commercial because it was fuel that the
19   Kroger entities were purchasing for resale to
20   consumers. Is that accurate?
21       A.    Correct. The majority of our business
22   with Kroger was for their outlet stores. The
23   Number 1 fuel in this particular case is — it's a
24   winterized fuel. Nearly everybody buys it to put in
25   the diesel. Basically stops diesel gelling up in

**Page 288**

1    wintertime.
2        (Whereupon, Deposition Exhibit 163 was
3    marked for identification by the reporter.)
4        Q.    I'm going to hand to you what's been
5    marked as Exhibit 163. And Exhibit 163 is an e-mail
6    from Mr. Wilson to blank, which I assume you
7    received, that was an RFP from Mini Mart, Loaf 'N
8    Jug, for responses due by December 18th, 2009.
9        Does that look like an accurate
10   characterization to you?
11       A.    Correct.
12       Q.    All right. And was this — this was a
13   contract that was to start in February 2010. Is that
14   accurate?
15       A.    Yes.
16       Q.    And was this the first request for
17   proposal that you recall receiving or responding to
18   for Mini Mart Loaf 'N Jug business as opposed to
19   Dillon supermarket business?
20       A.    Yes, correct.
21       Q.    All right. And again if you look at
22   the second page of the exhibit, it talks about
23   estimated monthly volumes in gallons.
24       A.    Yes.
25       Q.    During the time frame 2009 for Dillon,

**Page 289**

1    going back to Dillon, were you aware that Dillon had
2    any other suppliers for its non-commercial business
3    in Denver other than Suncor?
4        A.    I'm sorry. Could you repeat that?
5        Q.    Did you know whether Dillon ultimately
6    had any other suppliers for non-commercial fuel
7    purchased out of Denver?
8        A.    In 2008, 2009?
9        Q.    2009?
10       A.    2009. Yeah, they had other suppliers
11   for sure.
12       Q.    Okay. Did you know who the suppliers
13   were?
14       A.    Not — not — I didn't know absolute.
15   I mean, I had — I had inclinations, you know, but I
16   didn't know who — who was supplying or how much.
17       Q.    Did you have your inclinations based on
18   your own knowledge or communications that you had
19   from — with Kroger?
20       A.    Not from Kroger. Just what I'd seen in
21   the market and who I know was lifting. It was kind
22   of one of those follow a truck and I'm like, oh, they
23   must be selling to Kroger.
24       Q.    All right. And did you ultimately win
25   the bid for the Loaf 'N Jug?

**Page 290**

1        A.    I did get the bid — the Loaf 'N Jug
2    business, correct.
3        Q.    All right. Will you take a look at
4    Deposition Exhibit 80?
5        A.    Number 80?
6        Q.    Yes. And does that appear to be your
7    response to the exhibit I just showed you, the RFP
8    dated November 25th, 2009?
9        A.    Yeah, submit the following bid for Loaf
10   'N Jug on — yeah, this is what it appears to be.
11       Q.    It says in that response that Suncor is
12   willing to do an evergreen clause if so desired.
13   What does that mean to you?
14       A.    An evergreen clause is — a lot of
15   companies by this time were going to what we call an
16   evergreen. What it meant is we had a contract for a
17   year but that contract would just be renewed if — if
18   both parties agreed or didn't have a desire — a need
19   to go — to put out.
20       What it meant for me is at the end of
21   that contract Kroger could call and say we're just
22   going to roll the contract over for another year,
23   we're going to extend it basically. Or, you know, it
24   gave me an out; I could call Kroger and say, you
25   know, we want out of this contract, I can't fulfill

3a760724-5adf-4f67-b97c-716fd022e733

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEPHEN MOSS - JANUARY 30, 2013

**Page 295**

1  All right.  And is this part of the
2  paperwork process?
3      A.  It looks like it from my first glancing
4  at it.
5      Q.  All right.  And in fact this e-mail
6  communication was sort of initiated at first by you
7  with an e-mail to Mr. Wilson requesting some
8  information related to Loaf 'N Jug?
9      A.  That is correct.
10     Q.  All right.  I'd like to -- let me --
11  let me just go back.
12         You were awarded the Loaf 'N Jug
13  contract in about a month's time, sort of a short --
14  relatively short period of time.  How do you find out
15  that you are awarded the contract from Kroger?  I
16  haven't seen really congratulation e-mails.
17     A.  Normally I would expect to get an
18  e-mail.  It could have been done by phone.  You know,
19  the -- the -- Kroger -- in this particular -- I would
20  imagine Dave, I can't say for sure, but somebody from
21  Kroger would have said, hey, you know, we just want
22  to let you know that, you know, you've won the --
23  the -- you know, the Loaf 'N Jug business, et cetera,
24  and then it would have been put in formally in
25  writing.

**Page 296**

1      Q.  Okay.  So if it's a new entity like
2  Mini Mart was, then you would start this new
3  paperwork process?
4      A.  Yeah, then we would need all the setup
5  before we could actually start the business.
6      Q.  All right.  I'd like you to take a look
7  at some of the documents in the attachments,
8  specifically starting -- there are some little
9  numbers at the bottom of the page that say Dillon?
10  Do you see that at the bottom of the pages?
11     A.  I do.
12     Q.  Go to Dillon 023834.
13     A.  34?
14     Q.  Right.  And at that page Mini Mart is
15  providing to Suncor for its records, beginning at
16  that page and then going on for several pages, fuel
17  tax licenses for various states.  So we've got North
18  Dakota, then South Dakota, a few for South Dakota, a
19  couple for Nebraska, for Montana, for Colorado, and
20  then finally it appears for Wyoming.
21         What are -- what are these fuel
22  licenses and why does Suncor need them?
23     A.  I'll be honest.  I don't know.  This is
24  not -- this is not something I would normally get
25  involved in.  I think -- it looks to me like they're

**Page 297**

1  just licenses to do business in these states and they
2  passed them on to us.  I don't recall doing business,
3  I mean, with Dakota or setting them up for Dakotas or
4  anywhere like that, so I really can't tell you what
5  this is about.
6      Q.  Did you understand that Kroger in
7  purchasing this fuel did not have necessarily an
8  obligation to keep it within Colorado, that they
9  could take it out to their retail sites in some of
10  these other states?
11     A.  I don't believe they were set up that
12  way, because when -- to transport fuel across state
13  lines they would have had to -- it would have to be
14  registered that they purchased fuel in Colorado and
15  that they were shipping it to another state.
16  Normally if a company was going to take product
17  across to another destination, we would -- somebody
18  in our office, our transportation setup department,
19  which I think was Mr. Lingnau, Aaron Lingnau, at the
20  time, would set them up with a loading number.
21         So say, for example, they wanted to
22  take product to Oklahoma or Wyoming, they would have
23  a loading number which specifically said this was for
24  Wyoming or Nebraska, to keep all the records and
25  taxes -- again, I'm very vague on that because it

**Page 298**

1  wasn't really my department.
2      Q.  So that's not something you tracked.
3  Once the fuel was sold --
4      A.  No, I didn't --
5      Q.  -- you didn't care where it went.
6      A.  I didn't track where it went, if they
7  had a different destination.
8      Q.  All right.  Will you take a look at
9  Deposition Exhibit 48.  And that is a new Product
10  Purchase/Sale Agreement Addendum with Dillon it
11  appears to be.
12         Does that look like an accurate
13  characterization?
14     A.  This is January 2010.  Correct.
15     Q.  All right.  And if you look back at
16  Deposition Exhibit 53.
17     A.  53.
18     Q.  That -- that's your Loaf 'N Jug
19  contract that you'd done just a day before it looks
20  like.
21     A.  Correct.
22     Q.  Why are you doing a new contract with
23  Dillon at this point when you had one in late 2009
24  that was a year-long contract?
25     A.  What we're -- what was the original

14  (Pages 295 to 298)

3a760724-5adf-4f57-b97c-716fd022e733

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

STEPHEN MOSS - JANUARY 30, 2013

**Page 299**

1  Dillon contract number?  We just looked at that,
2  didn't we?
3          By this time then -- this was January
4  2010.
5      Q.   Well, let's take a look at
6  Exhibit 48 -- or, I'm sorry, you've got -- look at 46
7  and 48.
8      A.   46.  46.
9      Q.   So 46 is the Dillon contract dated
10  September 4th, 2009.
11     A.   And the date --
12     Q.   That's a one-year contract.  Is that
13  accurate?
14     A.   That is correct.  And it states October
15  to September of 2010.
16     Q.   All right.  And then Exhibit 48 is the
17  January 19th, 2010 contract with Dillon.
18     A.   With Dillon.
19     Q.   So three months into the previous
20  contract, Deposition Exhibit 46, you are giving
21  Dillon a new contract, and the price for gasoline
22  appears to be going down by another quarter of a
23  cent, from ██ cents per gallon off the Denver gross
24  rack average price or the Fountain gross average
25  price to ██ cents per gallon.

**Page 300**

1      A.   Correct.
2      Q.   Do you recall why Suncor would have
3  lowered the price once again to Dillon this time
4  frame mid-contract?
5      A.   I don't recall --
6          MR. SHAHEEN:  I'm going to object to
7  the characterization.  Mischaracterizes his
8  testimony.
9          Go ahead though.
10          THE DEPONENT:  Oh.
11     A.   I don't recall the -- what the details
12  were of changing that contract, but it definitely
13  coincides with the Loaf 'N Jug, and the only thing I
14  can think of is that it was possibly to get -- even
15  though Loaf 'N Jug and the King Soopers were two --
16  you know, were run as two separate entities with
17  regards to organizing supply and trucking and loading
18  and everything like that, different numbers, they
19  were still the same company, so the only thing I can
20  think of is we -- we wanted to get the whole
21  portfolio on the same pricing mechanism for --
22     Q.   (BY MS. CRAIGMILE)  So you wanted to
23  give Dillon the same price as you were giving Loaf 'N
24  Jug?
25     A.   I can't say that for certain, whether

**Page 301**

1  we wanted to or whether they wanted to, but it sure
2  looks like it was to make all the contracts uniform
3  in Denver and Fountain.
4      Q.   For the Kroger entities.
5      A.   Correct.
6      Q.   All right.
7          (Whereupon, Deposition Exhibit 165 was
8  marked for identification by the reporter.)
9      Q.   All right, Mr. Moss.  I've handed you
10  what's been marked as Exhibit Number 165.  That's an
11  e-mail from you to Robert White and Audrey Saunders
12  about a month after the Dillon and Mini -- the Dillon
13  contract is amended and the Mini Mart contract is
14  entered.  Is that accurate?
15     A.   Correct.
16     Q.   Who's Robert White?  What's his job or
17  what was his job?
18     A.   Robert White was head of -- and I can't
19  remember what the group was -- it was basically the
20  customer support group.  That's where they did all
21  the billing, contracts, documentation, things like
22  that.
23     Q.   All right.  And it -- you're attaching
24  what's called a 2010 February 9th Aging Excel
25  Spreadsheet?

**Page 302**

1      A.   Correct.
2      Q.   What is that Aging Excel Spreadsheet in
3  Suncor speak?  What was that used for?
4      A.   This was -- it was basically a sheet
5  that the -- Robert White's group put out, I'll say it
6  was like once or twice a week, once for sure, which
7  told us all our -- which listed every company that
8  Suncor did business with, what their credit line was
9  and what their balance was, what their -- how much
10  they owed, you know, what was outstanding.  So it was
11  more of a financial overview.
12     Q.   So was one of the purposes in you
13  getting this document to make sure that if you had
14  customers that were going over their credit limits or
15  were slow pays that you sort of nipped that in the
16  bud?
17     A.   Yes and no.  I used this pretty much --
18  it was a financial.  I didn't really have much to do
19  it with initially.
20     Q.   Okay.
21     A.   It was just a snapshot.  I could look
22  and say, oh, you know -- yes, I could look at say,
23  oh, so and so is, you know, like, you know, twice
24  their credit limit.  I'd have -- it didn't tell me if
25  they were overdue or if I needed to chase them.

3a760724-6adf-4f57-b97c-716fd022e733

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-3

# STEPHEN MOSS - JANUARY 30, 2013

**Page 311**

1    THE VIDEOGRAPHER: We are off the
2 record at 10:45 a.m.
3    (Whereupon, there was a recess from
4 10:45 a.m. to 10:57 a.m.)
5    THE VIDEOGRAPHER: We are on the record
6 at 10:57 a.m.
7    Q.  (BY MS. CRAIGMILE) Mr. Moss, we're back
8 on the record.  And you had testified previously that
9 you had, I believe, an inkling of what other
10 suppliers that Dillon might be using for — Dillon
11 and Loaf 'N Jug might be using for their Colorado
12 business.
13    A.  Correct.
14    Q.  Do you recall that?
15    And that was an inkling based on your
16 sort of understanding of the market rather than
17 something you learned from Kroger.  Is that correct?
18    A.  That is correct.
19    Q.  All right.  And did you have an inkling
20 about the other suppliers that were bidding for the
21 Kroger business or just the other suppliers that were
22 ultimately selected for Kroger business?
23    A.  No, I had no inclination as to what
24 they were bidding or who was bidding on the -- on the
25 business.

**Page 312**

1    Q.  All right.  What other suppliers did
2 you have an inkling were actually supplying — ended
3 up supplying Kroger fuel?
4    A.  Well, in — in Denver obviously the --
5 my inclination, I mean, we didn't -- Suncor didn't
6 have the business.  My competitors, Conoco, didn't --
7 that wasn't part of their business model, that -- as
8 far as I was aware, so I kind of ruled them out.
9    Q.  M-hm.
10    A.  Which kind of -- which left my big
11 competitors in this market would have been Valero,
12 Sinclair and Frontier.  So, you know, I could narrow
13 it down and assume that one or more of those
14 companies was supplying it.  As to which -- why I --
15 you know, which -- which of those were doing it, if
16 it was just one company or two companies, I don't
17 know.  I just narrowed it down to my major
18 competitors.  I knew Frontier's business model, and
19 that was kind of their business model, so I just
20 figured if it was anybody it would be Frontier, or
21 Valero possibly because they didn't have a lot of
22 stations so they had to be using other --
23    Q.  So they had supply and maybe looking --
24    A.  And they were looking -- so in my mind
25 those were the two most probable.  You know, if

**Page 313**

1 somebody said, you know, who are they hauling from, I
2 would say Frontier or Valero based on my knowledge of
3 the market.
4    Q.  Did you ever have discussions about
5 these inklings with your superiors at Suncor or make
6 any decisions based on these inklings?
7    A.  No, because really, you know, who the
8 supplier was at that time really didn't matter to me.
9 It was a matter of what I thought, if I wanted the
10 business, which I did back then, by 2009, was what I
11 thought it was going to take to win that business.
12    Q.  Okay.  So it was sort of a matter of
13 professional curiosity for you, but you didn't
14 discuss it with anyone else at Suncor?
15    A.  No, because really it was -- you know,
16 we didn't -- I didn't have any proof really of who
17 was doing it.
18    Q.  Okay.
19    A.  Or how much.
20    Q.  So it seems like, and correct me if I'm
21 wrong, on Suncor's behalf you just bid as low as you
22 felt Suncor could go without giving consideration to
23 what others were bidding?
24    A.  No --
25    MR. SHAHEEN: I think it

**Page 314**

1 mischaracterizes what he's been saying.
2    But go ahead and answer.
3    A.  No, that's incorrect.  I wouldn't just
4 put a low number out there.  The way -- I mean, the
5 way I approached a bid was what I -- what could
6 the -- you know, what was my price, what was a
7 competitive and fair price to offer for the business
8 based on my other customers, no matter what their
9 channel was, what their price index was, how did it
10 match up, obviously knowing in this particular case
11 what didn't get me the business so I knew the 5-1/2
12 was out.  So I had to -- I had to find the price that
13 I thought would get me the business but was still
14 fair for -- or acceptable for Suncor.  I mean, Suncor
15 was in the business of making money, so obviously I
16 wasn't just going to go so low that, you know, it was
17 a non-profitable margin.
18    The other thing that I always did was
19 look at what the market was.  I'd go back and do
20 trends, look at what the -- you know, what the market
21 had done for the last two or three years, how the
22 prices compared, and make -- you know, make as best I
23 could a professional or a guesstimate as to what I
24 thought the market was going to do.
25    Q.  (BY MS. CRAIGMILE) Did you ever consult

18 (Pages 311 to 314)

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER