SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-4

CHAD THIESSEN - FEBRUARY 7, 2013

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation, WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

Defendant.

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,

Third-Party Defendants.

---

DEPOSITION OF CHAD THIESSEN
(AS RULE 30(b)(6) DESIGNEE OF KROGER COMPANY)
February 7, 2013

(THIS TRANSCRIPT CONTAINS TESTIMONY DESIGNATED SECRET)

---

Deposition location:
370 17th Street, Suite 3500
Denver, Colorado

APPEARANCES:

KENNETH R. BENNINGTON, ESQ.
BENNINGTON JOHNSON BIERMANN &
CRAIGMILE, LLC
370-17th Street, Suite 3500
Denver, Colorado 80202

and

EXHIBIT C

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-4

CHAD THIESSEN - FEBRUARY 7, 2013

Page 18

1  Q. Then if we again look at the same
2  store, Number 12, in Pueblo, for Vendor B we see
3  deliveries for 2009 and some smaller deliveries in
4  2010. Do you see that?
5  A. Store 12, correct.
6  Q. Yeah. Are you aware today of why there
7  was a need for there to be supplemental deliveries
8  beyond the Suncor contract amounts to the store in
9  Pueblo?
10 A. No.
11 Q. The next line is Store 39, which is on
12 Parker Road in Aurora, Colorado. And again for the
13 location on Parker, we see that there are deliveries
14 for all three of the time periods, although the 2009
15 deliveries are very small. Do you see that?
16 A. Yes.
17 Q. And then from Vendor B for Store 39 on
18 Parker in Aurora, we see deliveries during 2009-2010.
19 A. Okay.
20 Q. Can you tell me why for the store in
21 Parker supplemental deliveries were needed for that
22 store outside of what was to be provided under the
23 Suncor contract?
24 A. No.
25 Q. Were you involved in negotiating the

Page 19

1  contracts for either Vendor A or B?
2  A. Yes.
3  Q. Is the -- let me ask it this way.
4    I take it that one of the goals that
5  you would have in the fuel procurement business is to
6  obtain as low a wholesale price as possible. Is that
7  fair?
8  A. Yes, that is correct.
9  Q. And in terms of that process, for
10 either Vendor A or B, for both Vendor A and B, were
11 there separate requests for proposals for them?
12 A. Yes.
13 Q. And when we price -- when a wholesale
14 price is arrived at, an index is typically used.
15 Correct?
16 A. That is correct.
17 Q. And we've seen the index that's used in
18 the Suncor contract, which has been, I believe, OPIS
19 rack average.
20 A. Yes.
21 Q. Then there's a differential.
22 A. Yes.
23 Q. And again we've seen how that has
24 ranged in terms of the contracts that we have seen as
25 between Suncor and Kroger, ranging between ▇ cents

Page 20

1  per gallon discount up to ▇ cents per discount for
2  E-10.
3  A. Yes.
4  Q. Were the prices obtained from Vendors A
5  and B better or worse than the discounts for Suncor?
6  A. I do not remember.
7  Q. Would you agree with me, for example,
8  looking at Exhibit 192, that, for example, Store
9  Number 9 in Fort Collins, these delivery amounts
10 represent regular delivery?
11 A. Yes.
12 Q. If you would then take a look at the
13 next line on that same page of Exhibit 192, we're
14 into Store 42. That's in Longmont, Colorado. Do you
15 see that?
16 A. Yes.
17 Q. Store Number 44 is the next one listed
18 here, and that appears to be in Loveland. Do you see
19 that?
20 A. Yes.
21 Q. Store Number 74 is the next one listed.
22 That also appears to be in Loveland.
23 A. Yes.
24 Q. Do you know whether or not Store 44 in
25 Loveland was around in 2009?

Page 21

1  A. Store 44?
2  Q. Yeah.
3  A. I don't believe it was.
4  Q. That's my surmise based on the data
5  here --
6  A. That is correct. That is correct.
7  Q. If you would look at the next store,
8  81, is in Brighton?
9  A. Yes.
10 Q. And Store 102 also appears to be in
11 Longmont, on the next page.
12 A. Yes.
13 Q. Store 118 is in Broomfield, correct?
14 A. Yes.
15 Q. Store 119 is in Colorado Springs.
16 A. Yes.
17 Q. And Store 133 is also in Colorado
18 Springs.
19 A. Yes.
20 Q. As I am reading these locations,
21 they're all along the Front Range?
22 A. That is correct.
23 Q. And so I take it then that there has
24 not been any need for any supplemental supply on the
25 Western Slope of Colorado, Grand Junction, that may

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-4

CHAD THIESSEN - FEBRUARY 7, 2013

Page 34

1  Q.  And then if we compare that with the
2  last page of Exhibit 192, which is C-store sales from
3  Vendor A, we can compare in terms of an order of
4  magnitude the differential not quite ▮ million for
5  the C-stores that are listed here compared to ▮
6  million.
7  A.  Yes.
8  Q.  Now, it's also the case, as my
9  understanding has been, that there have historically
10 been separate procurement contracts from Kroger with
11 Suncor, one for the grocery store side and one for
12 the C-store side.
13 A.  Yes.
14 Q.  Is that still the case?
15 A.  Yes.
16 Q.  Okay.
17 A.  Separate entities.
18 Q.  Separate divisions -- yeah, actually I
19 think they may be separate legal entities.
20 A.  Yeah.
21 Q.  And, I mean, they're all part of Kroger
22 but they operate independently?  Is that fair?
23 A.  That is correct.
24 Q.  And so I asked you a series of
25 questions about the availability of supply for the

Page 35

1  grocery stores just a bit ago.  I want to focus on
2  that same concept here for the C-stores.
3  A.  Okay.
4  Q.  We see that based on the data here that
5  for 2010 there was about ▮ million and change
6  gallons for Mini Mart combining the sales from
7  Vendor A.
8  A.  ▮ million?
9  Q.  Well, if you look at the ▮ --
10 A.  Yes.
11 Q.  And combine it with the almost ▮.
12 A.  Yes, that is correct.
13 Q.  And so my question to you is, do you
14 know whether or not under your contract with Suncor
15 you could have purchased another ▮ million gallons
16 to meet all of your needs?
17 A.  No.
18 Q.  You don't know?
19 A.  I don't know if we could have.
20 Q.  Let's get these locations squared away
21 here.
22 A.  Okay.
23 Q.  As I'm looking -- and again only
24 Vendor A has provided supplemental supply to Mini
25 Mart for the time frames we're talking about here, so

Page 36

1  that'll help speed us through here a little bit.
2  Store 1 is in Fowler.  Do you see that?
3  C-store 1.
4  A.  Yes.
5  Q.  And that's a relatively small amount,
6  wouldn't you agree?
7  A.  Yeah.
8  Q.  And it's only for 2010 for store
9  Number 1.
10 A.  Yes.
11 Q.  Store Number 3 is in Walsenburg.  Do
12 you know where Walsenburg is?
13 A.  No.
14 Q.  Okay.  It's south.  I'll just tell you
15 that.
16 A.  Okay.  Thank you.
17 Q.  And again only purchases in 2010, and
18 again not a significantly large amount.  Would you
19 agree?
20 A.  Yes.
21 Q.  Store Number 7 is in Parker, and it has
22 purchases for 2010 and 2011, and again as I'm looking
23 at these volumes here, I'm going to make -- I'm
24 making a surmise, and maybe -- so you can correct me.
25 I take it that there was no contract for the C-stores

Page 37

1  with Vendor A for 2009.
2  A.  That is correct.
3  Q.  All right.  And that sometime in 2010 a
4  contract was entered into between Kroger and Vendor A
5  for the Loaf 'N Jugs.
6  A.  Yes.
7  Q.  Did that contract expire then in 2011?
8  A.  I don't remember.
9  Q.  Today is there a separate supplemental
10 contract?
11 A.  For?
12 Q.  C-stores?
13 A.  C-stores?  Yes.
14 Q.  To your recollection in your time there
15 has there always been a supplemental contract?
16     And I'm calling it a supplemental
17 contract because Suncor's the main provider, right?
18 I mean, we've seen the volumes.
19 A.  Yes.
20 Q.  Plainly they are.
21 A.  Yes.
22 Q.  You might not call it a supplemental
23 contract and I'll -- but it's an additional
24 contract --
25 A.  Yes.

10 (Pages 34 to 37)

975bcec3-e4f6-44e5-bc67-6009423c413b

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-4

CHAD THIESSEN - FEBRUARY 7, 2013

Page 58

1 understanding?
2    Q. (BY MR. BLEDSOE) Yeah.
3    A. No.
4    Q. All right. Let me ask it in a slightly
5 less argumentative way.
6    A. Thank you.
7    Q. I think I'm hearing you say that from
8 Kroger's standpoint it is aware of no business reason
9 why the price dropped, the differential dropped from
10 ■ cents to ■. Is that correct?
11    A. I can't -- I honestly don't know why it
12 dropped. I'm being honest with you.
13    Q. And that's fine.
14    A. Yeah.
15    Q. And I'm just trying to determine that
16 that's Kroger's official position, is they do not
17 know of any business reason as to why that price
18 dropped. Either Kroger does or doesn't know, and if
19 you don't know, that's okay.
20       So that's my question. Does Kroger
21 know any business reason why that price dropped?
22    A. I'll just repeat what I said earlier.
23 David Wilson may know, but I don't know. I'm
24 speaking for me. I mean, I don't know.
25    Q. And in fairness, Mr. Thiessen, and I'm

Page 59

1 not trying to pick on you, you're speaking on behalf
2 of Kroger today.
3    A. Correct.
4    Q. And so I'm taking your answers to be on
5 behalf of Kroger.
6    A. Okay.
7    Q. As you've been designated.
8    A. Okay.
9    Q. In your tenure with Kroger, have you
10 ever had any discussions with Mr. Moss, Stephen Moss?
11    A. Yes.
12    Q. When?
13    A. I don't recall.
14    Q. Is it accurate to say that you had no
15 personal involvement in developing this 2009
16 contract, the September 4th, 2009 contract?
17    A. No.
18    Q. You had no involvement?
19    A. In this particular contract?
20    Q. Yeah.
21    A. No.
22    Q. All right. Let me reask it, because I
23 think we know what we mean.
24       Did you have any personal involvement
25 in the negotiation or development of the

Page 60

1 September 4th, 2009 contract?
2    A. No.
3    Q. You've been designated as somebody --
4 under paragraph 9 of Exhibit 173, the 30(b)(6)
5 notice, as the representative who can identify the
6 data and information provided by Dillon to Suncor in
7 connection with the response to the RFP.
8       What data and information was provided
9 by Dillon to Suncor in connection with the RFP
10 process?
11    A. Can you rephrase that question?
12    Q. Yeah, let me ask it again.
13       There's an RFP process for the grocery
14 store side.
15    A. Correct.
16    Q. We'll touch Loaf 'N Jug later.
17       In advance of that RFP process, we're
18 asking here what information was provided to Suncor
19 or any other bidder in connection with the grocery
20 store RFP process?
21    MR. TARAVELLA: For that time frame,
22 right?
23    MR. BLEDSOE: For that time frame,
24 right.
25    MR. TARAVELLA: You said in advance of,

Page 61

1 right?
2    MR. BLEDSOE: Yeah.
3    A. Just an e-mail goes out to the
4 potential bidders with the volumes and --
5    Q. (BY MR. BLEDSOE) Other than a reference
6 to volumes, is any other hard core information given?
7    A. No.
8    Q. And hard core is -- you understood what
9 I mean. I'm not talking about addresses and stuff,
10 I'm talking about meaningful information for forming
11 a bid.
12    A. Just examples of what a bid looks like
13 in the RFP form.
14    Q. You've been identified as someone who
15 can testify about the offers and counteroffers
16 concerning prices -- price or terms in response to
17 the request for proposal for Dillon.
18       Can you identify for me the price
19 negotiations that occurred between Kroger and Suncor
20 for the time periods we've discussed related to the
21 grocery stores?
22    A. Identify? Could you reask that?
23    Q. We have asked and you have agreed --
24    A. Yes.
25    Q. -- and are being produced to testify

16 (Pages 58 to 61)

975bcec3-e4f6-44c5-bc67-6009423c413b

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-4

CHAD THIESSEN - FEBRUARY 7, 2013

Page 74

1   A.  For this first contract.
2   Q.  Exhibit 53.
3   A.  Yes.
4   Q.  For one year's contract, Loaf 'N Jug
5   had a contractual right for a differential of less
6   ■ cents per gallon.
7   A.  Yes.
8   Q.  And that one year's time ran until the
9   end of January 2011. Right?
10  A.  M-hm.
11      MR. TARAVELLA: E-10, right, counsel?
12      MR. BLEDSOE: Yeah, we're talking about
13  E-10.
14  A.  Yes.
15  Q.  (BY MR. BLEDSOE) And just so we're
16  clear, that contractual right of less ■ cents per
17  gallon ran until the end of January 2011.
18  A.  Yes.
19  Q.  So if you would then look at
20  Exhibit 54, that's also a one-year contract, right?
21  A.  Yes.
22  Q.  But that one year's time overlaps in
23  part the time period we just discussed, correct?
24  A.  That is correct.
25  Q.  And that time period we just discussed

Page 75

1   ran until the end of January 2011, right?
2   A.  Yes.
3   Q.  This one runs until the end of
4   September 2011, right?
5   A.  Yes.
6   Q.  So for a period of time and
7   specifically four months -- follow me here -- October
8   2010, November 2010, December 2010 and January 2011,
9   there's an overlap in the time frames of these two
10  contracts.
11  A.  Correct.
12  Q.  This second contract for Mini Mart for
13  the same company, Loaf 'N Jug, for the same type of
14  fuel, E-10, changes the differential of less ■
15  cents per gallon to less ■ cents per gallon,
16  correct?
17  A.  Yes.
18  Q.  Can you tell me as a representative of
19  Kroger anything about the negotiation or offers and
20  counteroffers that led to Kroger giving up four
21  months of its contractual right to receive less ■
22  cents per gallon?
23  A.  From what it looks like, we amended our
24  volumes, and when we did that we must -- we
25  renegotiated the deal.

Page 76

1   Q.  But at a lesser discount, correct?
2   A.  It looks that way, yes.
3   Q.  So you got a lesser discount but with
4   increased volumes.
5   A.  Correct.
6   Q.  So in other words you did not receive
7   additional volume discount.
8   A.  Correct.
9   Q.  Looking at the differentials that we've
10  looked at here for Mini Mart and the grocery store
11  side --
12  A.  Yes.
13  Q.  -- for the time periods we've talked
14  about -- and we've seen what they are; they look like
15  ■, ■, ■. That's what we've seen so far,
16  correct?
17  A.  Yeah.
18  Q.  -- were the discounts for either
19  Vendors A and B for E-10 better or worse than that
20  range?
21  A.  They're in the range. Better or worse
22  I couldn't tell you without knowing.
23  Q.  Would you agree with me then that
24  generally from your view the differentials were not
25  material?

Page 77

1   A.  Could you rephrase that, please?
2   Q.  Yeah. When you say they're in the
3   range, I'm kind of taking that to mean that in the
4   long run it's not a material difference. Is that
5   fair? You know, the differences in the differential.
6   A.  No, it matters.
7   Q.  Okay. But you say it's in the range.
8   A.  It's likely close to that amount.
9   Q.  And when you say --
10      MR. SHAHEEN: I'm sorry, I couldn't
11  hear his answer.
12      And I apologize, Chad.
13      THE DEPONENT: I said it's likely close
14  to that amount.
15     MR. SHAHEEN: Okay.
16  Q.  (BY MR. BLEDSOE) But as to whether or
17  not it is higher or lower you are unable to say.
18  A.  I -- yeah, I am. I do not recall.
19  Q.  We were looking a little bit ago at
20  Exhibit 53, which is the January 18th, 2010 contract.
21  A.  Yes.
22  Q.  And we saw that that's for ■ million
23  gallons --
24  A.  Yes.
25  Q.  -- monthly? Right?

20 (Pages 74 to 77)

975bcec3-e4f6-44c5-bc67-6009423c413b

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-4

CHAD THIESSEN - FEBRUARY 7, 2013

Page 82

1  amend the volume. That's what...
2      Q.   That ▇ percent differential has
3  remained consistent pretty much through the present
4  day, hasn't it?
5      A.   Yes.
6      Q.   And as I read the data here, the ▇
7  percent started in October of 2010?
8      A.   That is correct.
9          MR. SHAHEEN: You keep saying percent.
10 It's cents.
11         MR. BLEDSOE: And if I've said percent,
12 I appreciate that. Let me make sure that's
13 clarified.
14     Q.   (BY MR. BLEDSOE) I asked you just a bit
15 ago about whether or not the ▇ cents differential
16 has remained essentially consistent since October of
17 2010 to the present time, and you've said yes.
18     A.   Yes, that's correct.
19         MR. TARAVELLA: I'm going to object to
20 that. It's beyond the scope that -- the temporal
21 scope.
22         But you can answer.
23         MR. BLEDSOE: I appreciate that.
24         MR. TARAVELLA: And it's not a big
25 deal, counsel.

Page 83

1          MR. BLEDSOE: It actually is referenced
2  in the exhibit you all have produced so -- nor is it
3  a secret in that sense.
4      Q.   (BY MR. BLEDSOE) You've got no role of
5  any kind or character in the setting of pump prices,
6  do you?
7      A.   No.
8      Q.   Has anybody ever talked to you about
9  the prices you have been able to obtain from the Loaf
10 'N Jug division or the Kroger division?
11     A.   No.
12     Q.   I'm not sure --
13     A.   That's out of the scope of what I do.
14     Q.   I assume that you are trying to obtain
15 the most favorable wholesale price you can for the
16 companies.
17     A.   Yes.
18     Q.   No one has ever suggested to you that
19 you seem to be trying to do something different than
20 that, have they?
21     A.   No.
22     Q.   Take a look at Exhibit 88.
23     A.   88?
24     Q.   Yeah. And this is an example of the
25 request for proposal form that is sent out on behalf

Page 84

1  of Kroger.
2      A.   Right.
3      Q.   Correct?
4      A.   Yes.
5      Q.   And this particular one is for Mini
6  Mart or Loaf 'N Jug, right?
7      A.   Yes.
8      Q.   But has it been your experience that
9  Kroger's requests for proposal, whether it's for
10 grocery store or Loaf 'N Jug, look pretty much the
11 same? Is that fair?
12     A.   Yes.
13     Q.   There's a reference here to an index
14 under pricing. Do you see that?
15     A.   Yes.
16     Q.   Asking for if using OPIS identification
17 of which OPIS index is being used. Do you see that?
18     A.   Correct.
19     Q.   Has it been Kroger's experience that
20 they have a preference for an OPIS index?
21     A.   Yes.
22     Q.   What has been Kroger's preference for
23 the OPIS index?
24     A.   OPIS low.
25     Q.   And by that you meant morning low?

Page 85

1      A.   Or close.
2      Q.   Okay.
3      A.   There's two of them.
4      Q.   Well, there's a morning and an
5  afternoon, right?
6      A.   Well, the price -- I mean, they post at
7  10 and they post at 6.
8      Q.   Okay.
9      A.   So that's what I mean.
10     Q.   Okay.
11     A.   There's not a big difference really.
12     Q.   All right.
13     A.   It's just certain people have different
14 preferences.
15     Q.   Okay. And I guess that's my question,
16 is what's Kroger's preference?
17     A.   We don't really have one.
18     Q.   Okay.
19     A.   It really doesn't -- at the end of the
20 day usually it's about -- shakes out the same.
21     Q.   Okay. It's more important that it be
22 the same throughout the contract term.
23     A.   That is correct.
24     Q.   Because that tends to even out any
25 daily difference, right?

22 (Pages 82 to 85)

975bcec3-e4f6-44c5-bc67-6009423c413b

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-4

CHAD THIESSEN - FEBRUARY 7, 2013

Page 90

1  Q.  And I believe there's at least one from
2  Wyoming. Correct?
3  A.  Yes.
4  Q.  And I believe there's at least one that
5  starts in Oklahoma and may come through part of
6  Kansas. Right?
7  A.  Yes.
8  Q.  And is there a pipeline that comes out
9  of Utah?
10 A.  I'm not sure where it feeds.
11 Q.  And you're referencing the Grand
12 Junction terminal.
13 A.  That is correct.
14 Q.  A number of people supply product
15 besides Suncor out of the Grand Junction terminal,
16 right?
17 A.  Yes.
18 Q.  How does Kroger determine how it's
19 going to divide up or allocate -- strike that, I
20 don't want to use allocate. That's a bad word for
21 us.
22     How does Kroger determine what kind of
23 volumes it's going to award different vendors?
24 A.  Price, supply availability.
25 Q.  Okay. And so if a particular vendor

Page 91

1  has an inherent limitation of how much supply they
2  can make available, that's going to affect the Kroger
3  decision, correct?
4  A.  Could you rephrase that, please?
5  Q.  Yeah. We saw earlier in -- for
6  calendar year 2010 there was in the ball park ▓
7  million gallons purchased between Loaf 'N Jug and the
8  grocery stores.
9  A.  Yes.
10 Q.  In terms of awarding contracts for that
11 supply, a supplier would have to be able to produce
12 ▓ million gallons, correct?
13 A.  Yes.
14 Q.  Do you know whether or not Vendor A or
15 Vendor B had the ability to produce ▓ million
16 gallons annually?
17 A.  No.
18 Q.  You don't know one way or the other?
19 A.  I don't know if they have the
20 capability of doing ▓ million gallons.
21 Q.  Do you have a surmise as to whether
22 they could or couldn't?
23 A.  No.
24     MR. BLEDSOE: That's all I have for
25 you, Mr. Thiessen, again, we appreciate you coming

Page 92

1  in from Hutchinson for us.
2      MR. SHAHEEN: I have a couple
3  questions.
4           EXAMINATION
5  Q.  (BY MR. SHAHEEN) When Kroger sent out
6  the requests for proposals to supply in Colorado, be
7  it for King Soopers, City Market or Loaf 'N Jug, did
8  Kroger always get more than one supplier bidding in
9  response to the request for proposal?
10 A.  Yes.
11     MR. SHAHEEN: That's all I have.
12          EXAMINATION
13 Q.  (BY MR. BLEDSOE) And who was it? Who
14 were they?
15     MR. BLEDSOE: It's okay if you're going
16 to direct him not to answer, that's fine. I expect
17 that you will.
18 Q.  (BY MR. BLEDSOE) Just so our record is
19 clear, you've answered his question that yes, there
20 have been more than one responses.
21 A.  Yes.
22 Q.  And I've asked you who they were, and
23 you're going to follow your lawyer's direction to not
24 answer that question.
25 A.  Yes.

Page 93

1  Q.  Has it been your practice or Kroger's
2  practice, either one, during the time frames we're
3  talking about where there have been discussions with
4  vendors about this is the price level it's going to
5  take to get the business?
6  A.  During the bid process?
7  Q.  Yeah.
8  A.  No.
9  Q.  I mean, your testimony is no one from
10 Kroger during the time frames we're talking about has
11 ever said it's going to take something in this
12 neighborhood to win the business.
13 A.  I don't know.
14 Q.  Okay. Have you ever done that?
15 A.  No.
16 Q.  Are the bids ever shared with the --
17 A.  No.
18 Q.  -- other people?
19     Even at the end of the process?
20 A.  No. It's -- it's tight-lipped.
21 Q.  So when somebody is awarded the
22 business -- and we'll use Suncor as an example.
23 A.  Okay.
24 Q.  -- they don't know whether they made a
25 good deal or a bad deal by offering, for example,

24 (Pages 90 to 93)

975bcec3-e4f6-44c5-bc67-6009423c413b

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-4

CHAD THIESSEN - FEBRUARY 7, 2013

Page 94

1  less ▮
2     A.  Exactly.
3     Q.  All right.
4     MR. BLEDSOE: Thanks.
5     MR. SHAHEEN: Thank you. Thanks a lot
6  for coming out here.
7     (Deposition Exhibits withdrawn by
8  Mr. Bennington.)
9     (Whereupon, at 11:31 a.m., the
10 deposition was concluded.)

Page 95

1     I, CHAD THIESSEN, do hereby state
2  under oath that I have read the above and foregoing
3  deposition, and that the above transcript and
4  accompanying correction sheets, if any, constitute a
5  true and correct record of my testimony.

             CHAD THIESSEN

STATE OF COLORADO  )
                   ) ss.
CITY AND COUNTY OF DENVER )

     Subscribed and sworn to before me,
by the said CHAD THIESSEN, this _____ day of
_____, 2013.

     My commission expires _____

          NOTARY PUBLIC

          Address

Page 96

          CERTIFICATE
STATE OF COLORADO  )
                   ) ss.
CITY AND COUNTY OF DENVER )

     I, Patricia M. Wrede, a Registered Professional Reporter and a Notary Public within and for the State of Colorado, do hereby certify that previous to the commencement of the examination of the said CHAD THIESSEN, a witness called for examination herein in the said suit in the said District Court, was duly sworn by me to testify the truth in relation to the matters in controversy now pending and undetermined between the said parties so far as he should be interrogated concerning the same;

     That the said deposition was taken in shorthand by me at 370 17th Street, Suite 3500, City of Denver, State of Colorado, on February 7, 2013, at 8:34 a.m., and was reduced to typewritten form under my supervision;

     That the foregoing is a true transcript of the questions asked, the testimony given, and the proceedings had;

     That I am neither attorney nor counsel, nor in any way connected with any attorney or counsel for any of the parties to said action, or otherwise interested in its event.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 8th day of February, 2013. My commission expires August 8, 2016.

          Patricia M. Wrede, RPR
          and Notary Public.

25 (Pages 94 to 96)

975bcec3-e4f6-44c5-bc67-8009423c413b

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER