SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-5

DAVID M. WILSON - FEBRUARY 5, 2013

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation, WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

Defendant.

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,

Third-Party Defendants.

DEPOSITION OF DAVID M. WILSON
February 5, 2013

(THIS TRANSCRIPT CONTAINS TESTIMONY DESIGNATED SECRET)

Deposition location:
370 17th Street, Suite 3500
Denver, Colorado

APPEARANCES:

KENNETH R. BENNINGTON, ESQ.
BENNINGTON JOHNSON BIERMANN &
CRAIGMILE, LLC
370-17th Street, Suite 3500
Denver, Colorado 80202

and

EXHIBIT D

58724bc7-d70b-45p1-9bf0-746-k04ce5588

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-5

DAVID M. WILSON - FEBRUARY 5, 2013

Page 6

1  able to communicate. I'm going to ask you some
2  general questions about your work history and your
3  time with Kroger, and then I'm going to show you a
4  series of documents and ask you a few questions about
5  those. I don't anticipate an extended time here
6  today.
7          And you are entitled from me to a
8  question that you can understand. If I ask one that
9  you don't understand, you tell me, and I'll see what
10 I can do about improving it. Is that understandable?
11     A.  Yes.
12     Q.  Okay. I am entitled from you to your
13 best, truthful recollection. And you understand
14 that, don't you?
15     A.  Yes.
16     Q.  And to the extent that the question
17 calls for a yes or no answer, you have to do that
18 instead of nodding your head or giving an uh-huh or
19 an huh-uh, because as good as our fine reporter is,
20 she's not in the interpretation business. Is that
21 agreeable?
22     A.  Yes.
23     Q.  All right. I want to orient us to some
24 time here. Obviously this is early February 2013.
25 We're going to spend some time, obviously most --

Page 7

1  virtually all of our time talking about your tenure
2  with Kroger, but let me ask you where you currently
3  work, sir.
4      A.  Tesoro Refining & Marketing.
5      Q.  And is Tesoro an exploration and
6  production company, or are they solely in the
7  refining business?
8      A.  Solely refining.
9      Q.  And in their marketing do they operate
10 branded or unbranded gasoline stations, or any for
11 that matter?
12     A.  Clarify "operate."
13     Q.  Sure. Own and operate.
14     A.  They own, yes.
15     Q.  All right. They have franchise
16 agreements with operators?
17     A.  What's the relevance?
18     Q.  I'm just asking what they do, sir. You
19 can answer.
20     A.  We have relationships with operators.
21     Q.  All right.
22         MR. TARAVELLA: Counsel, just so I can
23 explain his hesitance, Tesoro allowed him to testify
24 and have me represent him to the extent that we
25 didn't get into their business, so that's why I

Page 8

1  believe -- I can't speak for the witness why he's
2  hesitating, so -- we assured them you weren't going
3  to get into their business.
4          MR. BLEDSOE: I'm really not planning
5  to get into their business.
6          MR. TARAVELLA: That's why he's
7  hesitant.
8          MR. BLEDSOE: This is merely a matter
9  of getting some idea about the witness's familiarity
10 with branded versus unbranded stations, for example,
11 which I don't think is a big secret anywhere in the
12 petroleum marketing business.
13     Q.  (BY MR. BLEDSOE) Are any of the
14 stations that are owned operated under branded --
15 under a branded fuel name?
16     A.  Yes.
17     Q.  Are any operated under an unbranded
18 fuel name?
19     A.  No.
20     Q.  What's the brand?
21     A.  Shell, Tesoro and U.S.A.
22     Q.  When did you move to the Salt Lake
23 area?
24     A.  From Kroger?
25     Q.  Yes.

Page 9

1      A.  In June of 2011.
2      Q.  And have you been with Tesoro since
3  that time?
4      A.  Yes.
5      Q.  When did you start at Kroger?
6      A.  January 2006.
7      Q.  And during that little over five, five
8  and a half years approximately, what positions did
9  you hold at Kroger?
10     A.  When I started I was the Manager of
11 Petroleum Procurement, and when I left I was the
12 Senior Manager of Petroleum Procurement.
13     Q.  Did your essential job functions change
14 during that time at Kroger?
15     A.  Not substantially.
16     Q.  And I take it that procurement means
17 exactly that; you had some responsibilities for
18 acquiring supply for the various Kroger retail
19 gasoline outlets.
20     A.  Correct.
21     Q.  During your tenure there, I take it all
22 of the Kroger outlets were operated as what is
23 generally referred to as unbranded outlets.
24     A.  Can you rephrase the question?
25     Q.  Sure. And maybe you can help me. We

3 (Pages 6 to 9)

58724bc7-d70b-45b4-8efd-746ee4ce5588

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-5

DAVID M. WILSON - FEBRUARY 5, 2013

Page 10

1  know from the documents, and we'll get to those in a
2  bit, that in the geographic area that we care about
3  stores are operated by Kroger, fuel stores are
4  operated by Kroger, in connection with City Market or
5  King Soopers locations and also in connection with
6  Loaf 'N Jug.
7      A.  Correct.
8      Q.  Loaf 'N Jugs generally being C-stores,
9  is that right?
10     A.  Correct.
11     Q.  Did you have procurement
12 responsibilities for both the C-stores, Loaf 'N Jug,
13 as well as City Market and King Soopers fuel centers?
14     A.  Yes.
15     Q.  Did you have a specific geographic
16 orientation for your job, that is, responsibility for
17 procurement in half the country or a quarter of the
18 country or --
19     A.  No.
20     Q.  So is it correct then that the fuel
21 procurement of Kroger went through your office in
22 Hutchinson?
23     A.  Yes.
24     Q.  Before you joined Kroger did you have
25 any experience in the petroleum marketing and

Page 11

1  refining business?
2      A.  Yes.
3      Q.  What was that experience?
4      A.  I worked for Flying J.
5      Q.  And Flying J operate truck stops
6  primarily? Is that fair?
7      A.  At the time, yes.
8      Q.  Okay. How long did you work for
9  Flying J?
10     A.  Roughly two and a half years.
11     Q.  Did you have any petroleum marketing
12 experience before your time with Flying J?
13     A.  No.
14     Q.  And in terms of your role at Flying J,
15 was it also in procurement?
16     A.  Yes.
17     Q.  And again was it throughout the
18 Flying J geographic footprint?
19     A.  No.
20     Q.  Was it limited in scope?
21     A.  Yes.
22     Q.  What scope?
23     A.  It's tough to remember. Mostly the
24 mid-continent and the south.
25     Q.  All right. Is that where most of the

Page 12

1  Flying J outlets are?
2      A.  No. They're across the country.
3      Q.  Did you have any prior experience
4  dealing with Suncor from your time at Flying J?
5      A.  I don't remember.
6      Q.  When you joined Kroger, did that
7  require you to move to Hutch?
8      A.  Yes.
9      Q.  Where were you before?
10     A.  I was in Utah.
11     Q.  And at that time you moved to
12 Hutchinson, Kansas on behalf of Kroger, did either
13 King Soopers or Loaf 'N Jug have any existing supply
14 relationships with Suncor?
15     A.  I don't remember.
16     Q.  At the time that you joined Kroger in
17 2006, who do you recall Kroger was acquiring fuel
18 from for King Soopers, City Markets and Loaf 'N Jug?
19     A.  I don't remember.
20     Q.  Other than Suncor do you have any
21 recollection of people with contracts as between
22 Kroger and any refiner?
23         MR. TARAVELLA: Counsel, I thought we
24 weren't going to get into identity of suppliers by
25 agreement.

Page 13

1          MR. BLEDSOE: We're not getting into
2  the identity of any of their current suppliers. This
3  is historical. I think it's entitled.
4      Q.  (BY MR. BLEDSOE) You can answer the
5  question.
6          MR. TARAVELLA: In the 2009 time frame?
7          MR. BLEDSOE: I'm just trying to test
8  his memory at this point.
9      Q.  (BY MR. BLEDSOE) You can answer the
10 question.
11         MR. TARAVELLA: You can answer whether
12 you recall the identity of the supplier, if you know
13 the identity. If you know the identity, just tell
14 him you know the identity. But we'll have a problem
15 identifying them.
16     A.  I'm sure we had contracts with others
17 than Suncor.
18     Q.  (BY MR. BLEDSOE) Well, I'm sure you did
19 too. My question is a little bit different.
20         Do you have a recollection of who those
21 contracts were with?
22     A.  Not specifically.
23     Q.  We know from other evidence in this
24 case that Kroger was buying supply from Valero
25 immediately before the contracts that were signed

4 (Pages 10 to 13)

56724bc7-d70b-45b4-8efd-746ee4ce5588

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-5

DAVID M. WILSON - FEBRUARY 5, 2013

Page 14

1  between Suncor and Kroger.
2         Q.  Do you recall having any dealings with
3  Valero?
4         A.  Where specifically?
5         Q.  For Colorado.
6         A.  Yes.
7         Q.  Who was your contact at Valero?
8         A.  I don't remember.
9         Q.  Do you remember what kind of contracts
10 you had with Valero?
11        A.  No.
12        Q.  Do you remember whether or not that
13 contract supplied virtually all of the needs for
14 Kroger in Colorado?
15        A.  No.
16        Q.  Do you recall whether the contracts
17 with Suncor supplied virtually all of Kroger's needs
18 in Colorado?
19        A.  No.
20        Q.  What do you recall being your first
21 contact or connection with anybody at Suncor?
22        A.  I don't remember his name.
23        Q.  Do you remember when that was?
24        A.  I don't.
25        Q.  Was it a gentleman named Steve Moss?

Page 15

1         A.  He was not the first person I contacted
2  at Suncor.
3         Q.  All right. Who was involved at Kroger
4  in making the decision to issue a RFP or request for
5  proposal?
6         A.  Me.
7         Q.  Had there been previous requests for
8  proposals used by Kroger for procuring supply?
9         A.  Before my time?
10        Q.  No, before the Suncor contracts.
11        A.  Yes.
12        Q.  So when you joined Kroger, there had
13 been a history of using an RFP?
14        A.  Yes.
15        Q.  Was it Kroger's general operating
16 philosophy, at least as it applied to the Colorado
17 area, to try to acquire or procure its petroleum
18 needs from a single source?
19        A.  I don't remember.
20        Q.  Do you recall whether or not the
21 contracts between Kroger -- and when I say Kroger I
22 mean both Dillon and Loaf 'N Jug in this question --
23 whether or not those contracts supplied virtually all
24 of the needs in Colorado?
25        A.  I don't remember.

Page 16

1         Q.  Who was the person that you spoke with
2  most often in terms of procurement in connection with
3  the King Soopers side of the business? And I mean
4  internally at Kroger.
5         A.  Who did I speak to at King Soopers with
6  regard to procuring fuel?
7         Q.  Yeah.
8         A.  Nobody.
9         Q.  Did you have a boss?
10        A.  I did have a boss.
11        Q.  Did you talk to that boss?
12        A.  Yes.
13        Q.  Did that boss have a name?
14        A.  Yes.
15        Q.  What's the name?
16        A.  Rick Krafels.
17        Q.  Was Mr. Krafels your boss the entire
18 time you were there?
19        A.  Yes.
20        Q.  Is he still there?
21        A.  As far as I know.
22        Q.  Okay. Do you remember Mr. Krafels' job
23 title?
24        A.  I don't.
25        Q.  Did you have staff that reported to

Page 17

1  you?
2         A.  Yes.
3         Q.  What did they do for you, very
4  generally?
5         A.  I had people in transportation, I had
6  people in pricing.
7         Q.  And what did people in pricing
8  generally do for you?
9         A.  Gathered prices from suppliers and
10 input them into the accounting system.
11        Q.  And those prices they were gathering, I
12 take it those were the prices that Kroger was paying
13 under its current contracts, under its then current
14 contracts.
15        A.  Yes.
16        Q.  Did Kroger subscribe or use the OPIS
17 service?
18        A.  Yes.
19        Q.  So you're familiar with the OPIS
20 service?
21        A.  Yes.
22        Q.  Did Kroger have -- and again when I'm
23 saying Kroger I'm referring to both the King Soopers
24 and Loaf 'N Jug side -- did Kroger have a preference
25 for either the grocery store side or the C-store side

5 (Pages 14 to 17)

58724bc7-d70b-45b4-8efd-748ee4ce5588

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-5

DAVID M. WILSON - FEBRUARY 5, 2013

Page 26

1  Q. While on the later contract dated
2 January 19th, 2010, the differential per gallon for
3 E-10 is ▮▮▮, correct?
4  A. Correct.
5  Q. Do you have a recollection about why
6 that increased differential occurred during an
7 existing contract here?
8  A. No.
9  (Whereupon, Deposition Exhibit 191 was
10 marked for identification by the reporter.)
11  Q. I'm going to come back to those, so you
12 might as well leave those open, but in the meantime
13 will you look at what we've marked as Exhibit 191?
14 And Exhibit 191 is a two-page exhibit, the first page
15 of which -- it is a two-page exhibit from you with a
16 blank to but also copying some other people at the
17 Hutchinson, Kansas office of Kroger. It references
18 an RFP for Loaf 'N Jug, correct?
19  A. In the subject, yes.
20  Q. Yes. And it purports to have an
21 attachment, and indeed this exhibit has an attachment
22 which is a request for proposal that relates to
23 Loaf 'N Jug, right?
24  A. I don't see on the attachment where it
25 says Loaf 'N Jug. I might be missing it.

Page 27

1  Q. All right. It actually says -- and
2 that's fair enough -- it says: Sales under this
3 agreement will be made to Mini Mart.
4  A. Oh, okay.
5  Q. But Mini Mart, Inc. is Loaf 'N Jug here
6 in Colorado, correct?
7  A. Yes.
8  Q. And in terms of the attachment, the
9 request for proposal that's part of Exhibit 191, you
10 indicated in your earlier testimony that an RFP
11 process is something you did regularly during your
12 tenure at Kroger, right?
13  A. Yes.
14  Q. And is this generally how you would set
15 out the terms of what you were looking for in an RFP?
16  A. Yes.
17  Q. And it makes a reference here to
18 products being purchased in full truckloads. And
19 then it defines what a full truckload is. Do you see
20 that?
21  A. Yeah.
22  Q. Again for the Colorado market, did
23 Kroger have any independent storage capability or
24 purchases --
25  A. Define "independent."

Page 28

1  Q. It's kind of a long way around. Just
2 make sure that you and I are talking about this.
3  When somebody would go to a rack, a
4 refiner or a pipeline and make a lift, it would be
5 generally driven directly to a retail outlet.
6 Correct?
7  A. In terms of Kroger, yes.
8  Q. What about Mini Mart?
9  A. In terms of all of Kroger, yes.
10  Q. All right. And all I was asking is
11 whether or not Kroger would ever purchase fuel in
12 inventory. You know, in a storage -- in an inventory
13 type arrangement.
14  A. At a refinery or a terminal, no.
15  Q. Did they have inventory separate and
16 apart from facilities at refineries or terminals?
17  A. If they did, I was not aware of it.
18  Q. And just so you and I are communicating
19 then, typically then whether it was Kroger -- the
20 grocery side or the C-store side, their fuel needs
21 for any particular location would be met by a tanker
22 truck lifting at either a terminal or a pipeline and
23 then delivering it to that location.
24  A. Yes.
25  Q. I take it that during your time at

Page 29

1 Kroger you had no role or responsibility at all about
2 the setting of retail pricing.
3  A. Correct. I had nothing to do with
4 retail pricing.
5  Q. In terms of -- and that's true for both
6 City Market and Loaf 'N Jug.
7  A. Correct. My role never included retail
8 pricing.
9  Q. During your time at Kroger, do you ever
10 recall any inability of Kroger to obtain supply for
11 the Colorado area?
12  A. I'm sure there were times.
13  Q. All right. And would that have related
14 to short periods of time when there are what are
15 referred to as allocations?
16  A. It could have. I don't recall
17 specifics.
18  Q. Okay. Do you recall one way or the
19 other whether there was even any allocations in
20 Colorado during your time with Kroger?
21  A. I'm sure there were. Their standard
22 practice.
23  Q. In terms of pricing it asks, obviously,
24 that the price be quoted in cents per gallon and then
25 asks if somebody is using an OPIS index to identify

8 (Pages 26 to 29)

58724bc7-d70b-45b4-8efd-746ee4ce5588

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-5

DAVID M. WILSON - FEBRUARY 5, 2013

Page 30

1  which one they're using. Correct?
2      A.  Correct.
3      Q.  Then you also ask about whether a
4  pricing formula is to be based on prior day or same
5  day postings.
6      A.  Correct.
7      Q.  What do you understand the real
8  difference to be between prior day or same day
9  postings?
10     A.  Prior day means yesterday sets today's
11 price. Same day means today sets today's price.
12     Q.  Did Kroger have a preference?
13     A.  No.
14     Q.  Has it been your experience that over
15 the long run previous day or same day makes any
16 difference?
17     A.  No.
18     Q.  I asked that question very badly. I'm
19 going to reask it, because I think you answered it
20 correctly.
21         Has it been your experience that in
22 terms of the price Kroger paid there was no material
23 difference between prior day or same day?
24     A.  Over the long run, no.
25     Q.  There is no real difference. Is that

Page 31

1  fair?
2      A.  Without looking at the analysis, I
3  can't answer that.
4      Q.  All right. There's a reference here
5  right after that where you asked the potential
6  bidders to please save time by providing your
7  absolute best bid for each location the first time.
8      A.  Correct.
9      Q.  And I take it you routinely ask
10 potential suppliers to do that.
11     A.  It was standard on this form.
12     Q.  Was it your experience that they didn't
13 always do that?
14     A.  I don't remember.
15     Q.  You ask in this RFP under Submittal
16 Evaluation and Supplier Selection that in the
17 evaluation process you all take into consideration
18 pricing and company supply logistics.
19         When you reference company supply
20 logistics, what do you mean?
21     A.  I don't recall exactly what I meant by
22 that.
23     Q.  Do you recall whether there were any
24 issues of -- again, that you can recall, about supply
25 in the Colorado market?

Page 32

1      A.  I'm sure there were issues with supply
2  in the Colorado market.
3      Q.  But do you have any recollection of
4  what those issues might have been?
5      A.  Not specifically, no.
6      Q.  Do you recall how many refineries there
7  were within the state of Colorado during your time at
8  Kroger?
9      A.  I don't remember.
10     Q.  Do you recall whether or not there was
11 any other refiner operating a refinery within the
12 state of Colorado other than Suncor?
13     A.  Conoco at one time operated a refinery
14 before Suncor bought them.
15     Q.  All right.
16     A.  I don't recall when that was -- when
17 that sale took place.
18     Q.  Do you recall whether anybody else
19 operated a refinery besides Conoco that Suncor later
20 bought in Colorado?
21     A.  I don't remember.
22     Q.  Do you recall ever obtaining supply
23 through Rocky Mountain Pipeline for the Colorado
24 market?
25     A.  I don't remember.

Page 33

1      Q.  Under Submittal Evaluation and Supplier
2  Selection, there's a reference to Kroger retaining
3  the right to accept part or reject any part of the
4  RFP. Do you see that?
5      A.  I do.
6      Q.  And it talks about in that same section
7  that Kroger will award the contract based on both
8  price and non-price factors that provide the best
9  overall value to Kroger. Do you see that?
10     A.  I see it.
11     Q.  What do you recall being the non-price
12 factors that Kroger would consider?
13     A.  We would consider reliability of a
14 supplier.
15     Q.  And when you say reliability of a
16 supplier, what generally are you thinking about?
17     A.  They would meet the obligation.
18     Q.  In your discussions with any potential
19 supplier, do you ever recall negotiating -- strike
20 that.
21         In any dealings with Suncor, do you
22 ever recall negotiating the plus or minus variance in
23 the amount of supply you were contracted for?
24     A.  Volume?
25     Q.  Yes.

9 (Pages 30 to 33)

58724bc7-d70b-45b4-8efd-746ee4ce5588

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-5

DAVID M. WILSON - FEBRUARY 5, 2013

Page 38

1  you see that?
2  　　A.　Yes.
3  　　Q.　And it calls for a quantity of ▌
4  million gallons a month. Right?
5  　　A.　That's what's here, yes.
6  　　Q.　And it actually says plus or minus 10
7  percent. Do you see that?
8  　　A.　I see that.
9  　　Q.　And this contract also has a
10 differential for E-10 at both the Fountain and Denver
11 racks of ▌ cents per gallon. Do you see that?
12 　　A.　I see that.
13 　　Q.　We just looked at Exhibit 53, which is
14 for the time period February 1st, 2010 through end of
15 January 2011, and then we see Exhibit 54 covering a
16 portion of that same time, don't we?
17 　　A.　Yes.
18 　　Q.　Do you recall why the Mini Mart
19 contract, the original Mini Mart contract,
20 Exhibit 53, was shortened?
21 　　A.　No.
22 　　Q.　And I'm sure you would agree with me
23 that the differential of ▌ cents per gallon is a
24 smaller discount or differential than ▌ correct?
25 　　A.　Yes.

Page 39

1  　　Q.　Do you recall having any discussions
2  with anybody from Suncor about why Kroger should take
3  a lesser discount during an existing contract period?
4  　　A.　I don't remember.
5  　　Q.　Can you think of any reason why
6  Kroger -- or why you as the senior manager of
7  procurement would take a lesser discount than what
8  you had already contracted for?
9  　　A.　Can I think of any reason?
10 　　Q.　Yeah.
11 　　A.　I can't remember the specifics of these
12 deals.
13 　　Q.　I mean, I take it that, like any other
14 purchaser of a product, you would prefer to pay the
15 least amount you had to, correct?
16 　　A.　Generally you buy low, yes.
17 　　Q.　Yeah. I mean, that's a fellow's goal
18 normally, right?
19 　　A.　Yeah.
20 　　Q.　All right. And that's my question
21 here, is because you had a contract that ran through
22 January of '11 at ▌ but I see a new contract which
23 is Exhibit 54 at a less --
24 　　A.　At a better deal.
25 　　Q.　Huh?

Page 40

1  　　A.　At a better deal.
2  　　Q.　Actually it's at a lesser deal. That's
3  my question.
4  　　A.　Oh, the original contract was at ▌
5  cents, yes.
6  　　Q.　Well, the original contract for Mini
7  Mart was ▌ That's Exhibit 53.
8  　　A.　Okay.
9  　　Q.　And it ran through September of 2011 --
10 I'm sorry.
11 　　A.　You're talking about Exhibit 54 was the
12 original contract that started October 1, 2010
13 through September 30th, 2011.
14 　　Q.　All right.
15 　　A.　And Exhibit 53 is from February 1, 2010
16 through January 31, 2011.
17 　　Q.　54. You're looking at Exhibit 54.
18 　　A.　Yes.
19 　　Q.　And it's for the time frame October
20 2010 through September 30, 2011.
21 　　A.　Correct.
22 　　Q.　All right. And Exhibit 53 is for the
23 time period before that, is it not?
24 　　A.　Yes.
25 　　Q.　All right. And just so we're clear --

Page 41

1  because I don't think we were speaking the same
2  language, Mr. Wilson.
3  　　A.　We weren't.
4  　　Q.　I want to make sure we do.
5  　　　　As I'm reading this, the first Mini
6  Mart contract, which begins in January of 2010 -- or
7  February 2010 was for ▌ and ran through the end of
8  January '11.
9  　　A.　Yeah.
10 　　Q.　All right. And then I see a second
11 agreement, Exhibit 54, that covers a portion of that
12 same time frame.
13 　　A.　Yes.
14 　　Q.　But at a lesser discount.
15 　　A.　Yes.
16 　　Q.　And my questions to you, and just so
17 we're clear on this, is I was asking you if you had
18 any recollection about why Kroger would have accepted
19 a lesser discount for the C-store contracts when they
20 had a contract at a better one.
21 　　A.　I don't remember.
22 　　Q.　You don't recall anybody giving any
23 reason why the price had to change from the Suncor
24 standpoint.
25 　　A.　I don't remember.

11 (Pages 38 to 41)

58724bc7-d70b-45b4-8efd-746ee4ce5588

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-5

DAVID M. WILSON - FEBRUARY 5, 2013

### Page 54

1  A. Yes.
2  Q. Did he come out to Hutch?
3  A. I don't remember if he ever came to
4  Hutch.
5  Q. Do you recall where it was where you
6  met him face to face?
7  A. I met him more than once face to face.
8  I know I met him in Las Vegas face to face.
9  Q. Do you recall meeting anybody else from
10  Suncor face to face in Las Vegas?
11  A. Yes.
12  Q. Who do you recall?
13  A. I don't remember their name.
14  Q. As part of the RFP process, did you
15  ever have any discussions with any supplier, Suncor
16  or otherwise, about what you thought it would take to
17  get the bid?
18  A. Clarify your question.
19  Q. Yeah, it wasn't very good, but I just
20  want to make sure I'm hearing this.
21  This isn't like some government sealed
22  bid process, is it?
23  A. Define government sealed bid --
24  MR. SHAHEEN: I'm going to object.
25  It's vague and ambiguous.

### Page 55

1  Q. (BY MR. BLEDSOE) Well, you reserved the
2  right to negotiate the price further, didn't you,
3  after you received the response from an RFP?
4  A. Yes.
5  Q. And as part of that reservation, if you
6  will, did you ever have any discussions in advance of
7  the bids about the price differential you thought it
8  would take to get the business?
9  A. No.
10  Q. Did you ever have any back and forth
11  with Mr. Moss or anybody else from Suncor about the
12  price it would take?
13  A. Not that I recall.
14  Q. Did Mr. Moss ever tell you -- we saw
15  one piece of it in writing from an exhibit just a bit
16  ago. Do you recall any other times when he ever told
17  you you were getting -- you being Kroger -- were
18  getting the best price Suncor could offer?
19  A. I don't recall.
20  Q. Do you remember him ever discussing
21  any -- or making any concerns about whether or not it
22  was too good of a price?
23  A. No. If it was too good, he wouldn't
24  have sold it to me.
25  Q. Well, do you know whether or not it was

### Page 56

1  or wasn't a better price than what they were selling
2  to others?
3  A. I have no idea.
4  Q. So, for example, if they had been
5  providing supply to Valero who was in turn supplying
6  Kroger, you wouldn't have any knowledge about that
7  yourself, would you?
8  A. No.
9  Q. So if Suncor missed its pricing targets
10  by merely moving supply from Valero -- or supply to
11  Valero from supply -- let me restate that.
12  If Suncor's contracts with Kroger for
13  grocery and C-stores moved supply from Valero to
14  Kroger at a worse price, you wouldn't know anything
15  about that.
16  A. No.
17  Q. And as we sit here today, do you recall
18  whether or not prior to the RFP's that we've talked
19  about here today Kroger was buying supply from
20  Valero?
21  A. I don't remember who we bought from.
22  Q. Do you recall whether or not Kroger was
23  buying supply prior to the RFP process from
24  ConocoPhillips?
25  A. I don't remember.

### Page 57

1  Q. Do you recall whether or not Kroger was
2  buying supply prior to the RFP processes we've talked
3  about from Frontier?
4  A. I don't remember.
5  Q. Do you remember whether you ever had
6  any contracts with Frontier for Kroger for Colorado?
7  MR. TARAVELLA: Objection to the extent
8  that it requires him to identify a supplier. By
9  agreement, he doesn't have to identify any suppliers.
10  Q. (BY MR. BLEDSOE) You can answer the
11  question.
12  MR. TARAVELLA: No. You can't answer
13  the question.
14  MR. BLEDSOE: Read the question back.
15  MR. TARAVELLA: He can't answer and
16  identify a supplier.
17  MR. BLEDSOE: That agreement, as I'm
18  recalling it, dealt with 30(b)(6) depositions. This
19  gentleman has not been designated for 30(b)(6)
20  purposes, and we're here to ask him anything that's
21  relevant on that point.
22  MR. TARAVELLA: Let's go off the
23  record.
24  MR. SHAHEEN: Why don't we stay on the
25  record for this.

15 (Pages 54 to 57)

58724bc7-d70b-45b4-8efd-746ee4ce5588

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER