SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-6

STEVEN EWING-DECEMBER 14, 2012

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation, WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

Defendant.

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,

Third-Party Defendants.

---

DEPOSITION OF STEVEN EWING
December 14, 2012

---

Deposition location:
370 17th Street, Suite 3500
Denver, Colorado

APPEARANCES:

KENNETH R. BENNINGTON, ESQ.
KATHLEEN E. CRAIGMILE, ESQ.
JEFFREY H. McCLELLAND, ESQ.
BENNINGTON JOHNSON BIERMANN &
CRAIGMILE, LLC
370-17th Street, Suite 3500
Denver, Colorado 80202

and

EXHIBIT E

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-6

## STEVEN EWING-DECEMBER 14, 2012

**Page 194**

1     Q. The proposed Western contract, Western
2 Convenience Stores contract that was on your desk in
3 May, was Suncor rack, Suncor gross rack minus 4-1/2
4 cents. Do you remember that?
5     A. I do.
6     Q. If Western had wanted rack average,
7 would you have cared?
8     A. No.
9     Q. Would it have affected the discount?
10     A. Would it have affected the discount?
11     Q. Yeah.
12     A. That would have been a negotiating
13 part.
14     Q. So it might have changed the discount.
15     A. Yeah. Anything is possible in
16 negotiations.
17     Q. You have a -- in 2011 you had a
18 contract, at least one, with Truman Arnold.
19     A. Okay.
20     Q. And is my understanding correct there's
21 a Truman Arnold contract for its supply to big box
22 stores?
23     A. Okay.
24     Q. Is that right?
25     A. Yeah. These marketers change and then

**Page 195**

1 supply different, so when I look at you with a little
2 bit of confusion, yes, that's possible.
3     Q. They're responding to RFP's --
4     A. Yes.
5     Q. -- from the Costcos, Sam's and
6 everybody else, right?
7     A. Yes.
8     Q. So they're coming to you with an I've
9 got a RFP and they're negotiating whatever price they
10 get, right?
11     A. Right.
12     Q. And they're also buying fuel for
13 their -- for their non-big box --
14     A. That's correct.
15     Q. -- distribution.
16     A. Correct.
17     Q. Has Offen always -- I'm sorry, Truman
18 Arnold, has that always, at least in your experience,
19 been what you would call a ratable contract customer?
20     A. Yeah. That fits into one of those
21 categories where our marketers supply a Safeway or
22 Sam's.
23     Q. And again steady volume --
24     A. Steady volume.
25     Q. -- over a long period of time, at least

**Page 196**

1 a year.
2     A. Yeah. And deep pockets corporations to
3 support the credit.
4     Q. And to the extent there is any
5 difference between their deal and the Kroger deal, is
6 it -- I take it it is a matter of negotiation.
7 You're negotiating the best deal you can get.
8     A. Correct. And what is the market
9 bearing. Right? What's it going to take to get that
10 business and what do we have going on at the
11 refinery.
12     Q. Let's talk about though what's it going
13 to take to get that business consideration. What
14 does it mean? Is it -- well, stop there. What does
15 that mean?
16     A. To get the business? What --
17     Q. No, what does that concept mean. What
18 does it take to get the business.
19     A. What does it take to get the business?
20     Q. Yeah.
21     A. It's a concept that I know that other
22 major oils are probably bidding on the business, so
23 what is that -- one, do I have any history that tells
24 me what that contract has been in the past as far as
25 data, what's the market -- I mean, we go through the

**Page 197**

1 market intelligence with Steve Moss and the Offens
2 and the Truman Arnolds, and we understand a good idea
3 of what it takes to get the Safeway business. We
4 don't know exactly but we know by talking. So we
5 have a pretty good idea of what it will take to land
6 the business.
7     Q. When you renegotiated or negotiated the
8 new current Kroger contract, so that's Dillon and
9 Loaf 'N Jug --
10     A. Yeah.
11     Q. -- the discount changed, it went down a
12 bit --
13     A. It did.
14     Q. -- to ▇
15     A. That's correct.
16     Q. You look like you're proud of that.
17     A. I think that's an okay deal.
18     Q. Good for you.
19 What factors went into that? I assume
20 they didn't give that to you willingly.
21     A. They -- the factors that went into
22 that -- and it goes back to realizing kind of that
23 marriage type of situation. We both need each other,
24 and we're driving towards the same goal of
25 reliability. And so while Kroger has other options

50 (Pages 194 to 197)

d582e44e-b44c-45d3-9713-de4c61503d91

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-6

## STEVEN EWING - DECEMBER 14, 2012

**Page 198**

1  outside of Suncor, it gets back to that customer
2  relationship and have we supplied that relationship
3  to the way that we said we would. And kind of that
4  discount and that -- the discount that we negotiated,
5  that was right on the cusp, like I said earlier.
6      We had had some supply issues with the
7  refinery, and we had to tell Kroger to pull back off
8  their liftings, and it was at the last minute, and I
9  bellied up to the table and said I will transport
10 product in for you, I won't pay for that product, for
11 the actual gasoline, but I'll bear the cost of that
12 to get you settled in here. So it's that type of
13 relationship.
14     And I know I keep saying it. It's that
15 ratability and the credit and everything else that
16 you quickly learn that you respect each other and you
17 need each other. And that's where our relationship
18 is.
19     Q. What made you think you could do a
20 better deal than what they'd had before?
21     A. We were signing a long term commitment,
22 so we were taking -- one, we're taking the process of
23 renegotiating this deal out in another 12 months, so
24 we were signing a two-year contract, and we tossed
25 that number out there to roll both of them underneath

**Page 199**

1  kind of the same deal, and we threw that number out
2  there.
3      Q. Did you have any indication of what
4  opportunity -- what anybody else might have been
5  offering them or what competitive offers there may
6  have been, or do you know if there were any?
7      A. We just had a sense that there were
8  competitive offers out there, and -- but we knew --
9  we knew that our relationship was really good, and we
10 knew that we produced long term standings over the
11 contract, we were able to deliver on our supply
12 commitment. And we also recognize that maybe Holly
13 Frontier wasn't delivering on all the commitments.
14 So -- or Sinclair, one of their other majors.
15     Q. So your market intelligence told you
16 they may have had some supply problems with their
17 other suppliers and this was on opportunity for you
18 to make it clear you could supply the volume and
19 negotiate a better deal while doing it.
20     A. Absolutely.
21     Q. I think we've covered this, but forgive
22 me, I'm going to ask again.
23     You know nothing of the negotiation of
24 the original contract, right?
25     A. I don't -- I don't know any -- I don't

**Page 200**

1  know how it was negotiated. I know looking back at
2  history and asking, I know the details of it.
3      Q. In having looked back at history, were
4  you able to learn that there were other suppliers,
5  you know, in the arena hoping to snag the Kroger
6  contract?
7      A. I quickly found out that Kroger was
8  supplied by Valero in the -- back in the early days
9  and that we had actually bid against that business
10 and took that business away and paid more for that
11 business than what Valero was paying when Valero was
12 supplying it, so we lost that supply too.
13     Q. That was Kendall Carbone's analysis.
14     A. Yeah.
15     Q. I think we talked to her about that.
16     A. Yeah.
17     Q. But in terms of a competitive price,
18 did anybody ever tell you that Suncor was aware of
19 some price being offered specifically to Kroger and
20 if you didn't meet it you weren't going to get it?
21     A. No. But if they're putting out a bid
22 package, we know there's competitors out there, so
23 we're going to try to hit close to that mark where we
24 know worked last time.
25     Q. So it's truly a -- it's -- in a sense

**Page 201**

1  it's somewhat like e-Bay, you don't know what the
2  competing bids are and you just put one out and hope
3  you get it.
4      A. You have a pretty good idea of what the
5  market drives. Again, it's that market intelligence
6  and being in the business for X amount of years, you
7  understand what it's going to take to get that
8  business.
9      Q. With the Kroger renewal that you did in
10 June 2011, was there any indication, well, Steve,
11 I've got another offer from somebody else? Were they
12 playing anybody against you?
13     A. I'm sure they were with Steve Moss, and
14 Steve Moss came back and said, you know, if we want
15 this deal, it's going to take ▓ cents, we can get
16 it for ▓ cents, and let's secure this deal.
17     Q. There. That's what I want to know.
18 Did he tell you -- how did he know --
19     A. We didn't --
20     Q. -- if we're going to get this deal it's
21 going to take ▓ cents?
22     A. I assume that he's talking to the
23 Kroger representative so he's getting a feeling.
24 Probably not coming out and directly saying it, but
25 he's getting a feeling.

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-6

STEVEN EWING-DECEMBER 14, 2012

Page 202

1  Q. Something to the effect of Kroger
2  saying, look, if you want this, it's got to be ▓▓?
3  A. I wasn't there, so yeah.
4  Q. Did you start out the negotiations at
5  ▓▓ or did they initially let's just renew the
6  contract under the existing price structure?
7  A. I don't know the detail of that. I --
8  Q. Again that's Moss.
9  A. Yeah, that's Moss.
10 Q. When you're entering into long term
11 contracts, is it not true that you also -- you're
12 taking with that a risk, a credit risk?
13 A. I'm relying on the credit department
14 for that, but specifically if you're speaking of
15 Kroger, we've got a perennial guarantee from the
16 company, it's golden.
17 Q. You didn't think of that as much of a
18 risk.
19 A. No.
20 Q. But with smaller companies willing to
21 sign one of your contracts, do you take into account
22 that they might not be as solvent a year from now as
23 they are today?
24 A. I think there's always a risk, yeah.
25 Q. Do you consider that or do you just --

Page 203

1  do your credit people tell you you're okay now and so
2  you accept that and go forward?
3  A. The credit people run the credit and
4  they give that output, they establish a credit line.
5  We manage those credit lines and ensure they don't go
6  over those credit lines, so in that part of the
7  business we manage that and I think that's...
8  Q. Do you ever ask the credit people to go
9  in midterm and do a re-analysis of somebody's credit
10 rating or risk?
11 A. If -- if certain items would pop up, I
12 certainly wouldn't have any question -- any concerns
13 about asking to have them take a look at it.
14 Q. Do you recall, has that ever happened
15 while you were been at the helm?
16 A. Yeah, I'm sure it has. We have --
17 there's credit issues that we're dealing with, so
18 we're always communicating.
19 Q. Do you have an understanding as to
20 whether your contracts -- I ask for a business
21 understanding, not his, but a business understanding
22 as to whether the contracts give you a right to
23 change the contract midstream or alter it because you
24 suddenly see a credit risk?
25 A. I would check with legal on that, but I

Page 204

1  would -- I'm not going to go out on a limb.
2  Q. I know you would.
3  A. Yeah, but I would -- from a business
4  sense, if we have credit risk and it's -- people
5  haven't paid or they're up against their credit
6  limit, I would certainly take the corrective actions
7  with legal to see what the options were.
8  Q. How do you in the big picture balance
9  supply with demand?
10 A. Those are those LOOP meetings and
11 understanding. You know, it's moving towards those
12 long term contracts to -- to get supply -- or, yeah,
13 supply commitments, and that matches with the
14 production commitments, and then they'll adjust the
15 refinery in accordance on crude rate. So it's all
16 balanced together with three or four different
17 organizations.
18 Q. At least before 2010 was it your
19 understanding that -- I believe it was in the
20 summer -- Suncor didn't produce enough premium to
21 cover demand?
22 A. Oh, yeah, I'm sure that happened. I
23 don't remember but it's not uncommon.
24 Q. Well, I think Piscatelli told us that
25 in 2010 there was a change of policy, you stopped

Page 205

1  selling clear so you would have to --
2  A. Okay, yeah.
3  Q. -- so you could not bring in somebody
4  else's premium.
5  A. Okay. That's his world. I've got my
6  own problems.
7  Q. But do you understand that from time to
8  time Suncor in the past and presently has to buy fuel
9  in the market from whomever it's available?
10 A. I agree with you, absolutely.
11 Q. And by necessity some of that is coming
12 in -- well, it's coming in from out of state because
13 you're the only refiner in Colorado, right?
14 A. That's right.
15 Q. Is it part of your need to know where
16 fuel that's sold to your unbranded customer is
17 originating, who refined it?
18 A. No.
19 Q. So you generally know there could be
20 outside fuel coming in, but where it came from and
21 when it's there are just not something that's in your
22 area of need to know?
23 A. No, I don't need to know.
24 Q. I think you said that there were some
25 refinery issues before 2011, you had to ask Kroger to

52 (Pages 202 to 205)

d582e44e-b44c-45d3-9713-de4c81503d91

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER