Document 185-17



Contract #: DIL-1H02
September 4, 2009

### Product Purchase / Sale Agreement
### Addendum

Upon acceptance by you, this letter constitutes our entire agreement whereby:

Suncor Energy (U.S.A.) Inc.
7800 East Orchard Road
Suite 300
Greenwood Village, CO 80111

Telephone: (303) 793-8000
Telecopier: (303) 793-8003

("Vendor")

agrees to sell and deliver to:

Dillon Companies DBA King Soopers
2800 East Fourth Avenue
Hutchison, Kansas 67501

Telephone: 620 694-5122
Telecopier: 620 694-5153

("Purchaser")

and Purchaser agrees to purchase and receive from the Vendor the hereinafter specified quantity of petroleum products upon the terms and conditions set forth herein.

**Product:** Clear Gasoline (RUL/PUL) – E-10 (RUL/PUL)
#2 USLD-Clear / PRM

**Specifications:** At ASTM standards.

**Quantity:**
Denver – E-10 RUL - ▇▇▇ GPM ▇▇▇ BPM)
Denver – E-10 PUL - ▇▇▇ GPM ▇▇▇ BPB)
Denver – Diesel (#2 ULSD – Clear/Premium, #1 ULSD Clear) - ▇▇▇ GPM ▇▇▇ BPM)

Fountain – E-10 RUL - ▇▇▇ GPM ▇▇▇ BPM)
Fountain – E-10 PUL - ▇▇▇ GPM ▇▇▇ BPM)
Fountain – Diesel (#2 ULSD – Clear/Premium, #1 ULSD Clear) - ▇▇▇ GPM ▇▇▇ BPM)

**Term:** This agreement shall be in effect from October 1, 2009 through September 30, 2010

**Price:**
Gasoline –Denver – Denver Gross Rack Avg Less ▇▇▇ cpg
Diesel #2 – Denver –Denver Gross Rack Avg Less ▇▇▇ cpg

Gasoline – Fountain – Fountain Gross Rack Avg Less ▇▇▇ cpg
Diesel #2 – Fountain – Fountain Gross Rack Avg Less ▇▇▇ cpg

All prices are in U.S. dollars. Purchaser shall pay all applicable taxes in addition to the price of the Products, as specifically set forth in Section 6 of the attached General Terms and Conditions.

**Delivery/Title:** Product shall be delivered to Denver West/East Terminal. And RMPL Fountain Terminal. Title and risk of loss shall pass from Vendor to Purchaser as the Product passes through the flange at the truck (the "Delivery Point").

Depo exh. 46

EXHIBIT P

Highly Confidential Attorneys' Eyes Only          Suncor_WCS 00005757

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-17

2

| | |
|---|---|
| Transportation: | Counterparties Trucks. |
| Payment: | Terms of payment hereunder shall be Net 10 days from the date of lifting. All payments are to be made through and in accordance with Seller's pre authorized payment system (electronic funds transfer). |
| Credit: | Vendor may extend credit to Purchaser on such terms as Vendor shall specify from time to time and Purchaser shall pay Vendor for Products in accordance with such terms and any other payment terms applicable at the time of delivery. Vendor reserves the right to modify or withdraw such credit terms at any time without prior notice to Purchaser. In addition, Vendor may require Purchaser to enter into a separate Credit Agreement and/or Security Agreement in connection with the extension of any credit to Purchaser. |
| Security: | Vendor's rights and obligations are set forth under Section 16 of the attached General Terms and Conditions. |
| Special: | This is new and separate contract from the two existing set ups. |

The General Terms and Conditions as contained in Schedule A attached to this agreement are expressly incorporated herein, by this reference, and constitute a part of this agreement.

Approved and Accepted:

Suncor Energy (U.S.A.) Inc.

By: _Kendall R. Culver_ (signature)
Title: Director, Sales and Marketing
Date: 10-7-09

Dillon Companies Inc. (dba King Soopers)

By: (signature)
Title: VP
Date: 9-24-09

Highly Confidential Attorneys' Eyes Only

Suncor_WCS 00005758

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-17

3

Schedule A
Suncor Energy (U.S.A.) Inc.
Product Purchase / Sale Agreement
General Terms and Conditions

1. **General.** References to the "Main Document" herein shall mean the Product Purchase / Sale Agreement to which this Schedule A is attached. The Main Document and this Schedule A are referred to collectively herein as the "Agreement." In the event of an express conflict or inconsistency between the terms of the Main Document and this Schedule A, the terms of the Main Document shall control. Otherwise, any additional rights or obligations set forth in this Schedule A, even if relating to a subject matter addressed in the Main Document, shall be binding on both parties.

2. **Measurement.**

**Tank Trucks/Tank Cars.** Vendor shall read its meters at the time Product is loaded into Vendor's tank trucks/tank cars to determine bill of lading volume(s) for each delivery of Product. If meters are not available at or near the loading point, the driver/tank car loader shall innage/ullage each tank truck and/or tank car immediately before and immediately after delivery of the Products to determine the volume(s) of Products delivered. These innages/ullages shall be converted to net delivered gallons based on each tank truck's/tank car's official calibration tables.

**Pipelines.** At the time of delivery, the operator shall read meters installed on the pipeline(s) at or near the Delivery Point(s) to determine the volume(s) of Products delivered.

**Other.** If the applicable measurement method(s) described above are not available, the parties shall establish another mutually acceptable method for determining the volume of Product(s) delivered.

All volumes of delivered product(s) shall be corrected for temperature to 60 degrees Fahrenheit in accordance with then current ASTM standards, which as of the effective date of this Agreement is ASTM D-1250 and Petroleum Measurement Table 6B in its latest revision. The term "barrel" means 42 U.S. gallons of 231 cubic inches per gallon. All measurements and/or test shall be made in accordance with the latest standards or guidelines published by the API or ASTM. The meter operator shall, upon request, allow the other party to witness meter proving and review and copy relevant meter proving records.

3. **Demurrage.** Purchaser is responsible for all demurrage and detention incurred on rail tank cars at Purchaser's facility or such other facility designated by Purchaser for unloading of Product.

4. **Warranty.** Vendor warrants it has the right to dispose of all Product sold and transferred under this Agreement, and that the Product delivered hereunder shall conform to the specifications and descriptions contained in the Agreement and that such Products will be delivered to Purchaser free from all lawful security interests, liens and adverse claims including taxes and royalties created by, through, or under Vendor. THE ABOVE IS VENDOR'S ONLY WARRANTY CONCERNING THE PRODUCTS AND THIS AGREEMENT, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, CONDITIONS AND REPRESENTATIONS, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EVEN IF SUCH PURPOSES ARE KNOWN TO VENDOR.

5. **Payment.** Unless otherwise agreed to in writing, Vendor shall furnish Purchaser with invoices for all Product sold and delivered to Purchaser hereunder, and Purchaser shall, upon receipt of each invoice, make payment to Vendor immediately in accordance with the terms of payment provisions of this Agreement without deduction or set-off. If the due date falls on a Saturday or bank holiday, Purchaser shall make payment on the preceding business day, and if the due date falls on a Sunday, Purchaser shall make payment on the next business day. Vendor shall deliver each invoice to Purchaser by facsimile or electronic transmission, unless otherwise agreed by the parties. Each invoice shall be deemed received upon successful transmission of the invoice by Vendor to Purchaser or actual receipt by Purchaser, whichever occurs first.

6. **Taxes.** Purchaser shall pay, in addition to applicable prices hereunder, any and all applicable taxes, duties, imposts or other charges imposed by any governmental or regulatory authority or agency in connection with the sale of the Products to the Purchaser (excluding any taxes on the income of Vendor). Failure of Vendor to add any such tax, fee or charge to the invoice shall not relieve Purchaser from liability therefor. Purchaser shall reimburse Vendor for any interest and/or penalty assessed by any governmental or regulatory authority or agency when the penalty and/or interest is assessed as the result of false, incorrect or delinquent certification(s) made to Vendor by Purchaser. In the event Purchaser seeks to claim any tax exemption status in connection with its purchases hereunder, Purchaser shall provide to Vendor all proper exemption certificates prior to delivery of all applicable Products that is licensed to engage in tax free transactions with respect to the Products under all international, federal, or state laws which may apply to this Agreement and the Products to be delivered hereunder.

Highly Confidential Attorneys' Eyes Only    Suncor_WCS 00005759

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-17

4

7. **Rules and Regulations: Compliance with Laws.** All of the terms and provisions of this Agreement shall be subject to the applicable laws, orders, rules, regulations, and ordinances of all governmental authorities and regulatory bodies having jurisdiction, and each party agrees to comply with all such laws, orders, rules, regulations, and ordinances during the term of this Agreement.

8. **Warning.** THE PRODUCT SOLD BY VENDOR MAY BEAR OR CONTAIN HAZARDOUS CHEMICALS, RESIDUES OR OTHER HAZARDOUS MATERIALS WHICH MAY BE, OR MAY BECOME BY CHEMICAL REATIONS OR OTHERWISE, DIRECTLY OR INDIRECTLY HAZARDOUS TO LIFE, HEALTH OR PROPERTY BY REASON OF TOXICITY FLAMMABILITY, EXPLOSIVENESS, OR FOR OTHER SIMILAR OR DIFFERENT REASONS DURING TRANSPORTATION, USE, HANDLING, REMOVAL, REFINING, CLEANING OR RECONDITIONING.

Vendor may provide Purchaser with Material Safety Data Sheets concerning the Products, which shall be made a part of this Agreement and which contain information regarding health risks and recommendations for the safe use and handling of the Product. Purchaser shall read and comply with such Material Safety Data Sheets and the above warning, and undertake to exercise the degree of care required to protect persons and properties from all hazards of the Product disclosed in the Material Safety Data Sheets and warning, including but not limited to, by: (i) providing employees of the Purchaser and its affiliates who may be handling the Products with appropriate safety equipment and ensuring such safety equipment is adequately maintained and properly used and (ii) warning third parties who may purchase or come into contact with the Products or who handle or transport the Products on behalf of the Purchaser of the aforesaid hazards of the Products.

9. **Allocation.** The amount of Products to be supplied to Purchaser shall be subject to any good faith allocation program which Vendor may find necessary to effect for any reason, including but not limited to shortage of Products or government regulation. Vendor may equitably allocate its available Products to its customers (including Purchaser). When an allocation program is in place, Vendor shall have the right to impose a surcharge on any gallons purchased which exceed 100% of Purchaser's allocation. In the event Vendor's inventory, ability to refine or sources of supply of crude petroleum or refined petroleum products are not sufficient to meet demand at Vendor's normal or assigned supply sources (regardless of whether Vendor may have diverted supply to other supply sources to alleviate shortages at such other supply sources), Vendor shall not be bound to acquire by purchase or otherwise additional quantities of crude petroleum or refined petroleum products from other suppliers or to take any other action which is uneconomic for Vendor. Vendor may, but is not obliged to, designate a temporary alternate source of supply and/or offer Purchaser temporary substitute Products. No allocation pursuant to this paragraph shall operate to extend the period of this Agreement and Vendor shall not be obligated to make available any quantities omitted due to any allocation program.

10. **Force Majeure.** If either party to this Agreement fails to observe or perform any of the covenants or obligations herein, in whole or part, to the extent that such failure is occasioned by war, flood, fire, explosion, extreme heat or cold, earthquake, storm, riot, labor dispute causing work stoppage, strike, lockout, act of God, governmental regulation, disruption or breakdown of production facilities, refining or transportation facilities, failure of transportation providers to furnish transportation, failure of supplier to furnish supplies, any law, rule, order or action of any court, agency, or instrumentality of the federal, state, or municipal government, or any cause or causes, whether similar or dissimilar, without enumeration, beyond the reasonable control of such party, but excluding lack of funds or inability to pay, such failure shall be deemed not to be a breach of the covenants or obligations under this Agreement, provided that the party claiming such failure shall give the other written notice, as soon as reasonably practicable, of the occurrence affecting it. This Section shall not, however, relieve any party from its obligations to pay amounts owing hereunder at the time of claiming force majeure. The parties further agree at the conclusion of any force majeure event, neither Vendor nor Purchaser shall have any obligation to each other with respect to any quantities of Product not delivered as a result of such force majeure event. No condition of force majeure shall operate to extend the term of this Agreement or any renewal thereof.

11. **Indemnity.** Purchaser shall defend, indemnify and save Vendor, its parent, subsidiaries, affiliated companies and their officers, directors, employees, and agents (the "Indemnified Parties") harmless from and against any and all liabilities, claims, judgments, costs and expenses (including, without limitation, reasonable attorney's fees, court costs, and all other legal expenses) for injury to or death of any person (including, without limitation, Purchaser or Purchaser's employees, carriers, agents, or customers), or for damage to or destruction of any property where such injury, death, damage or destruction directly or indirectly arises out of this Agreement, Purchaser's business, or the storage, handling, transportation, sale or use of any Products purchased hereunder. The foregoing obligations shall not apply to incidents proximately caused by the sole negligence of the Indemnified Parties, but shall apply to incidents proximately caused in part by the negligence of the Indemnified Parties.

12. **Limitation of Liability.** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, ARISING UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. Vendor's liability with respect to this Agreement, any Products delivered hereunder, or any action relating to the same (whether in contract, equity, tort, or otherwise) shall be limited to, and shall not exceed, the amount paid by Purchaser for the applicable Products hereunder. Further, any actions to enforce any rights or obligations under this Agreement must be filed against the other party in a court in the State

Highly Confidential Attorneys' Eyes Only

Suncor_WCS 00005760

Document 185-17

5

of Colorado no later than one (1) year after the date that the party had actual or constructive knowledge of the events giving rise to the alleged breach of this Agreement.

13. **Applicable Law and Forum Selection.** This Agreement shall be governed by and construed in accordance with laws of the State of Colorado, without regard to its rules regarding conflicts of laws. Each of the parties irrevocably and unconditionally consents to the exclusive jurisdiction of the courts of the Sate of Colorado and of the United States of America located in the City of Denver, Colorado for any actions, suits, or proceedings arising out of or relating to this Agreement or the transactions contemplated thereby, and each of the parties further agrees not to commence any action, suit, or proceeding except in such courts. Each of the parties also hereby irrevocably and unconditionally waives any objection to the laying of venue of any such proceedings in the courts of the State of Colorado, and waives and agrees not to plead or to make any claim than ay proceeding brought in any court in the State of Colorado has been brought in an improper or inconvenient forum.

14. **Assignment.** No rights or obligations arising under this Agreement shall be assigned by either party without the prior written consent of the other party, which consent may not be unreasonably withheld, conditioned, or delayed; provided, however, Vendor and its successors and assigns may, without the consent of or notice to the Purchaser, sell, transfer and/or assign from time to time any part of, or any interest in, the indebtedness of Purchaser to Vendor pursuant to this Agreement, together with any security interests, liens, property, guarantees and other agreements or arrangements supporting or securing payment of same, and/or declare that another person has a beneficial interest therein. Notwithstanding the foregoing, either party may, without the consent of or notice to the other, assign its rights and obligations hereunder to any subsidiary or affiliate, provided that in no event shall such assignment relieve the assigning party of its obligations hereunder.

15. **Title and Risk of Loss.** Title to and risk of loss of the Product shall pass to Purchaser and delivery and purchase shall be deemed to occur on delivery at the Delivery Point specified in this Agreement. It is expressly understood and agreed by the parties that the passage of title and risk of loss as set forth above is not conditioned upon the delivery or receipt of Bills of Lading or pipeline meter tickets.

16. **Security.** If Vendor, in its sole discretion, believes that it has grounds for insecurity regarding the performance of any obligation under this Agreement by Purchaser (whether or not then due) for any reason (including, without limitation, the occurrence of a Material Change in the creditworthiness of Purchaser or Purchaser's failure to timely pay any invoice), Vendor may: (a) immediately demand Performance Assurance (as defined below) and Purchaser shall provide and maintain such Performance Assurance during the term of the Agreement or any extension thereof or until such requirement is waived by Vendor, and (b) without notice, suspend, withdraw, alter, or terminate any credit or line of credit previously extended to Purchaser, or, at Vendor's sole option, make Performance Assurance (in a form and amount acceptable to Vendor) a condition precedent to the further extension of credit to Purchaser.

In this section 14, "Performance Assurance" shall mean sufficient security in a form, amount and term acceptable to Vendor including, but not limited to, a standby irrevocable letter of credit, a prepayment, a security interest in an asset, or a performance bond, and "Material Change" shall mean that the senior long-term debt or deposits of Purchaser, or in the event of reorganization, the resulting, surviving or transferee of Purchaser is or are, as the case may be, rated less than BBB by Standard & Poor's Corporation or Baa2 by Moody's Investors Service, Inc.

17. **Default.** In the event (each an "Event of Default") either party (the "Defaulting Party"): (i) makes an assignment for any general arrangement for the benefit of creditors; (ii) files a petition or otherwise commences, authorizes, or acquiesces in the commencing of a proceeding or cause under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise becomes bankrupt or insolvent (however evidenced); (iv) is unable to pay its debts as they fall due; (v) has a receiver, provisional liquidator, conservator, custodian trustee or other similar official appointed with respect to it or substantially all of its assets; (vi) fails to provide Performance Assurance within two (2) business days (being any day other than a Saturday, Sunday or statutory holiday in Colorado) after a written request by Vendor; (vii) has breached or defaulted in the performance of any term or condition of this Agreement, and failed to have cured such breach or default within ten (10) days of receiving written notice from the other party, or (viii) has not paid any amount due on or before the second business day following the due date for such amount; then the other party (the "Non-Defaulting Party") shall, in addition to any other rights or remedies which it may have at law or in equity, have the right, at its sole discretion, to (a) immediately withhold and/or suspend the delivery or acceptance of Product upon notice or (b) terminate this Agreement and/or any transactions hereunder.

18. **Quality Claims.** Purchaser agrees to give Vendor notice of any claims of defect in quality or shortage in quantity within twenty-four (24) hours after the relevant product is delivered. Purchaser shall inspect the products and, whenever possible, any equipment used to make the delivery of such products in order to determine the cause of any defects or shortages and notify Vendor within above-specified time period. If Purchaser fails to timely notify Vendor of any claim for defect or shortage, Purchaser agrees that it will have waived the right to make or pursue any such claims. If Purchaser gives Vendor timely notice of a defect in quality, Purchaser shall give Vendor the opportunity to test the product in question. If the product is found to have been contaminated while in Vendor's custody, Vendor shall pay for such test. If the product is found to have been contaminated after it has left Vendor's custody, Purchaser shall pay for such test.

Highly Confidential Attorneys' Eyes Only       Suncor_WCS 00005761

Document 185-17

6

19. **Interest.** Purchaser shall pay interest on all amounts that are owing to Vendor and overdue at the rate of twelve percent (12%) per annum. Interest shall be calculated from the date that the amount becomes overdue, regardless of whether Vendor has made demand for payment from the Purchaser. Purchaser shall pay all of Vendor's costs and expenses (including reasonable attorney's fees, court costs, and all other legal expenses) of collecting past due payments.

20. **Notices.** Notices, invoices and reports given under this Agreement shall be in writing and delivered by fax, e-mail, or other telecommunication device, or mailed by prepaid post, addressed to the parties at the addresses given in this Agreement.

21. **Set-Off.** If any amount payable by Purchaser hereunder is not paid as and when due, Purchaser authorizes Vendor to proceed without prior notice by way of set-off, counterclaim or otherwise against any assets of Purchaser that may at any time be in the possession of Vendor, including without limitation against any amounts owing from Vendor to Purchaser.

22. **Confidentiality.** Vendor and Purchaser each agrees to hold in the strictest confidence the terms of this Agreement or any information containing any of the terms of this Agreement, including pricing and volume information (collectively, "Confidential Information"), and not to disclose it to any third party without the prior written consent of the other party, unless required by law or government request subject to Section 23 (Subpoenas) below. Vendor and Purchaser shall be entitled to disclose Confidential Information to its attorneys, tax advisors, and its employees, provided that prior to any such disclosure, such persons agree to be bound by the terms of this Section. In the event either party breaches the confidentiality obligations set forth herein, the other party shall have the right to immediately terminate this Agreement upon notice to the other party. This Section shall survive any termination, expiration, or non-renewal of this Agreement for a period of two (2) years.

23. **Subpoenas.** In the event that either party receives a subpoena or other legal process requesting it to produce any documents or tangible things relating to this Agreement, including any Confidential Information (collectively, a "Subpoena"), the subpoenaed party agrees that it shall: (a) immediately provide the other party notice of and a copy of any Subpoena, (b) if permitted by law, not produce any documents or tangible things until it receives an order from the relevant court or administrative body, or written consent from the other party, and (c) in any event, shall only produce such documents and tangible things as are expressly required by the Subpoena or order of the court, strictly construed.

24. **Records and Audit Rights.** Each party agrees to maintain all records created in the course of such party's performance under this Agreement for a period of three (3) years, and shall continue to maintain such records for a period of two (2) years after the expiration of this Agreement. Each party shall have the right to inspect and audit the other party's books and records, at the initiating party's sole cost and expense, upon written notice and at such times so as to not unreasonably interfere with the other party's business, as to be mutually agreed upon by the parties. However, a party can only conduct one audit per year, and the same year cannot be re-audited. This Section shall survive any termination, expiration, or non-renewal of this Agreement for a period of two (2) years.

25. **Ethics; Commissions and Gifts.** No director, officer, employee, or agent of either party shall give or receive any commission, fee, rebate, gift or entertainment of significant cost or value to or from any director, officer, employee, or agent of the other party. Neither party shall enter into business arrangements with the directors, officers, or employees of the other party, unless such directors, officers, or employees are acting as representatives of the other party.

26. **Waiver.** The delay or failure of any party to enforce any of its rights under this Agreement arising from any default or breach by the other party shall not constitute a waiver of any such default, breach, or any of the party's rights relating thereto. No custom or practice which may arise between the parties in the course of operating under this Agreement will construed to waive any parties' rights to either ensure the other party's strict performance with the terms and conditions of this Agreement, or to exercise any rights granted to it as a result of any breach or default under this Agreement. Neither Party shall be deemed to have waived any right conferred by this Agreement or under any applicable law unless such waiver is set forth in a written document signed by the party to be bound, and delivered to the other party. No express waiver by either party of any breach or default by the other party shall be construed as a waiver of any future breaches or defaults by such other party.

27. **Headings.** The headings used in this Agreement are for convenience only and shall not be used for the purpose of construction or interpretation. When the context so requires, the singular shall include the plural and vice versa.

28. **Entire Agreement; Modification.** This Agreements reflects the entire agreement between the parties with respect to its subject matter, and supersedes any previous agreement between the parties relating to its subject matter. There are no oral or written agreements, inducements, statements, representations, promises, or understandings between the parties except as expressly set forth herein. No amendment or modification to this Agreement shall be of any force or effect unless it is: (1) is in writing, (2) expressly indicates that it modifies the Agreement, (3) reflects the effective date of the modification, and (4) is either signed by both parties or is sent by Vendor to Purchaser and Purchaser fails to object to any of the terms of the modification within ten (10) days thereof.

Highly Confidential Attorneys' Eyes Only        Suncor_WCS 00005762

Document 185-17

7

29. Severability. Each provision of this Agreement, shall be interpreted to make it effective under applicable law. If any provision of this Agreement is contrary to law, void, or unenforceable, such provision shall be ineffective only the extent of such invalidity or modified so as to conform to law, and the remainder of such provision and the Agreement shall remain in full force and effect.

30. No Third Party Beneficiaries. This Agreement is solely between Vendor and Purchaser and intended for the sole use and benefit of such parties. No other person or party is a third party beneficiary under this Agreement.

31. Effectiveness. This Agreement shall not be binding on Vendor until Vendor signs it, and prior sales shall not be construed as a waiver by Vendor of this requirement. After Vendor has signed this Agreement, any prior sales not otherwise covered by contract shall bee deemed to have been made under this contract.

32. Survival. The following Sections of this Schedule A shall survive termination, cancellation, or non-renewal of this Agreement: Sections 5, 6, 11, 12, 13, 19, 20, 21, and 23.

- End of Schedule A -

Highly Confidential Attorneys' Eyes Only    Suncor_WCS 00005763