SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Case No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC., a Colorado corporation, WESTERN TRUCK ONE, LLC, a Colorado limited liability company,

Plaintiffs,

vs.

SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation,

Defendant.

vs.

HOSSEIN AND DEBRA LYNN TARAGHI,

Third-Party Defendants.

---

DEPOSITION OF SUSAN GIANNOLA
(AS RULE 30(b)(6) DESIGNEE OF KROGER COMPANY)
January 31, 2013

(THIS TRANSCRIPT CONTAINS TESTIMONY DESIGNATED SECRET)

---

Deposition location:
370 17th Street, Suite 3500
Denver, Colorado

APPEARANCES:

    KENNETH R. BENNINGTON, ESQ.
    BENNINGTON JOHNSON BIERMANN &
    CRAIGMILE, LLC
    370-17th Street, Suite 3500
    Denver, Colorado 80202

    and

EXHIBIT W

b77b34b4-32ae-48f3-a095-46bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 2

```
 1    PHILIP W. BLEDSOE, ESQ.
      POLSINELLI SHUGHART, P.C.
 2    1515 Wynkoop Street
      Suite 600
 3    Denver, Colorado 80202
 4         For the Plaintiffs.
      ANTHONY J. SHAHEEN, ESQ.
 5    HOLLAND & HART, LLP
      555-17th Street
 6    Suite 3200
 7    Denver, Colorado 80202
 8         For the Defendant.
      CHRISTOPHER A. TARAVELLA, ESQ.
 9    MONTGOMERY LITTLE & SORAN, P.C.
      5445 DTC Parkway
10    Suite 800
      Englewood, Colorado 80111
11
12         For Kroger Company and
           Affiliates.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX OF EXAMINATION
 2                                      PAGE
 3    EXAMINATION BY MR. BLEDSOE          5
 4
 5               INDEX OF EXHIBITS
 6    EXHIBIT NO.                       PAGE NO.
      Deposition Exhibit No. 173           5
 7    (Deposition Notice)
      Deposition Exhibit No. 174           8
 8    (Spreadsheet Printout of Store Info)
      Deposition Exhibit No. 175          10
 9    (Price Survey Information)
      Deposition Exhibit No. 176          58
10    (Website Info re Fuel Discount Program)
      Deposition Exhibit No. 177          74
11    (Site Feasibility Study - Loveland)
      Deposition Exhibit No. 178          77
12    (Site Feasibility Study - Colorado Spgs.)
      Deposition Exhibit No. 179          78
13    (Fuel Accumulation Program - February 2010)
      Deposition Exhibit No. 180          85
14    (Market Research)
      Deposition Exhibit No. 181          87
15    (Fuel & Cigarette Purchase 8-25 to 9-4-09)
      Deposition Exhibit No. 182          89
16    (Fuel Rewards Accumulation Research)
      Deposition Exhibit No. 183          90
17    (Kroger Company Fact Book - 2011)
      Deposition Exhibit No. 184          92
18    (November 2010 Kroger Fuel Rewards Program -
       Price Sensitive/Mainstream Shoppers and
19     Value/Mainstream Stores)
      Deposition Exhibit No. 185          93
20    (Kroger Fuel Behavior Triggers)
      Deposition Exhibit No. 186          95
21    (Off-Site Fuel Station Performance Customer
       Intercept Program)
22    Deposition Exhibit No. 187          98
      (Drivers of Fuel Choice)
23    Deposition Exhibit No. 188         100
      (Fuel Discount Research)
24    Deposition Exhibit No. 189         102
      (Giannola Declaration)
25    Deposition Exhibit No. 190         102
```

Page 3

```
 1         The deposition of SUSAN GIANNOLA, as the
 2    Rule 30(b)(6) representative of Kroger Company and
 3    Affiliates, called for examination by the Plaintiffs,
 4    was taken in the offices of BENNINGTON JOHNSON
 5    BIERMANN & CRAIGMILE, LLC, 370 17th Street, Suite
 6    3500, Denver, Colorado, commencing at 8:39 a.m. on
 7    January 31, 2013, before Patricia M. Wrede of
 8    Avery/Woods Reporting Service, Inc., 455 Sherman
 9    Street, Suite 250, Denver, Colorado 80203, a
10    Registered Professional Reporter and a Notary Public
11    in and for the State of Colorado, pursuant to the
12    Federal Rules of Civil Procedure.
13               *****************
```

Page 5

```
 1         (Whereupon, Deposition Exhibit 173 was
 2    marked for identification by the reporter.)
 3         SUSAN GIANNOLA,
 4    being first duly sworn to state the truth, the whole
 5    truth and nothing but the truth, testified on oath as
 6    follows:
 7              EXAMINATION
 8         Q.  (BY MR. BLEDSOE) State your name,
 9    please.
10         A.  Susan Giannola.
11         Q.  And I've been saying Gianelli, but it's
12    Giannola?
13         A.  Giannola.
14         Q.  "nola," okay. Well, it's your --
15         A.  Like granola without an R.
16         Q.  Well, it's your name, and you're
17    entitled to have it pronounced the right way.
18              You've been designated as a 30(b)(6)
19    representative of Kroger to testify about a number of
20    areas for which you've been designated in connection
21    with Exhibit 173, which I'm going to ask you to look
22    at in just a minute.
23              Before we start on that though, I'm
24    going to try to move through this as expeditiously as
25    possible. If I ask -- you're entitled from me to a
```

2 (Pages 2 to 5)

b77b34b4-32ae-48f3-a095-48bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

### Page 6

1  question you understand. If I ask a question that
2  you don't understand, you tell me, and I'll see what
3  I can do to make it a better question. Is that okay?
4      A.  Sure.
5      Q.  I'm sure you've spent some time with
6  counsel in preparation, and I'm sure he's told you to
7  be careful about not talking over my questions, and I
8  will try to be careful to not talk over your answers.
9  Is that okay?
10     A.  Yes.
11     Q.  I'm sure he's also told you to be -- to
12 respond yes or no as appropriate and not uh-huh or
13 huh-uh, because no matter how fine our reporter is,
14 she's not really in the interpretation business. Is
15 that agreeable?
16     A.  Yes.
17     Q.  Thank you. Would you take a look at
18 what we've marked as Exhibit 173, and for our record,
19 that is a copy of the 30(b)(6) notice of deposition
20 that has been filed in this case and on which you
21 appear. You have been designated -- and we're not
22 going to cover these in order necessarily because I
23 think I've got a way that might help move us through
24 a little bit quicker, but you have been designated
25 for item number 1 as it relates to Kroger or Dillon,

### Page 7

1  item number 3 as it relates to Kroger or City Market
2  or King Soopers or however we're trying to say this.
3  I'm going to generally use the word "Kroger" or "King
4  Soopers" in connection with this questioning.
5        And it's my understanding that's where
6  your responsibility lies, King Soopers.
7      A.  Yes.
8      Q.  And City Market. Correct?
9      A.  Yes.
10     Q.  You have been designated also for a
11 portion of the category number 4, again as it relates
12 to King Soopers or City Markets. And likewise on 5
13 and 6 as they again relate to City Market or King
14 Soopers. You've been designated as to item 7, again
15 as it relates to King Soopers. And then we drop down
16 to item 12, again as it relates to King Soopers or
17 City Markets. Item 15 as it relates to a King
18 Soopers. And item 18, again as it relates to King
19 Soopers.
20       Have you spent time preparing to answer
21 questions for those designated areas today?
22     A.  Yes.
23     Q.  And are you -- let me say this right --
24 are you an officer, director or managing agent of
25 Kroger or King Soopers?

### Page 8

1      A.  No.
2      Q.  And you don't need to be. I take it
3  then that you have consented to be the representative
4  of Kroger for this deposition today.
5      A.  Yes.
6      Q.  And to that extent you understand that
7  you are speaking on behalf of the company within the
8  areas in which you've been designated.
9      A.  Yes.
10       (Whereupon, Deposition Exhibit 174 was
11 marked for identification by the reporter.)
12     Q.  I'd like you to take a look at what we
13 have marked here as Exhibit 174. And I'm going to
14 tell you what I think it is, and then you can tell me
15 whether you understand it the same way. It's my
16 understanding that this is a printout of some
17 spreadsheet information that gives on the right-hand
18 column store numbers, some of which would include,
19 perhaps many of which would include, Loaf 'N Jugs but
20 some of which may include King Soopers.
21       Can you tell me by looking at the
22 reference to the store numbers here whether any of
23 these are King Soopers in this exhibit?
24     A.  Yes.
25     Q.  Can you generally identify for me what

### Page 9

1  the King Soopers numbers are on this list?
2      A.  I'm not sure what you're asking.
3      Q.  Sure. You keep track of your stores by
4  store numbers?
5      A.  Yes.
6      Q.  Okay.
7      A.  I don't know all the store numbers
8  but...
9      Q.  And that's fair enough. We're going to
10 focus today on just a few here and there, and again
11 if you'll reference to item 6 in the exhibit, there's
12 a reference to what has been identified as City
13 Market 203, which is 128 South Townsend in Montrose.
14 Can you find that store on this exhibit?
15     A.  I can't be certain, but I would assume
16 that it's CM03. There's no address so there's no way
17 to know. This isn't our document so...
18     Q.  Well, actually it is from data provided
19 by you all. That's what the Dillon number shows.
20 And when you say CM04 (sic), where are you
21 identifying?
22     A.  On the first page towards the bottom of
23 the page.
24     Q.  Why don't we do it this way. This
25 might be easier. We're going to be spending some

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 14

1  A. Yes.
2  Q. All right. And this store numbered 25,
3  again is this the King Soopers on Ken Caryl?
4  A. Yes. I know this store.
5  Q. Okay.
6  A. Because it's the first one we opened.
7  Q. All right. And, again, Store Number on
8  this document identified as 25 shows competitors of a
9  Shamrock, a Conoco, a 7-Eleven, a Valero, another
10 Conoco, another Valero and another Conoco. Do you
11 see all that?
12 A. Yes.
13 Q. That's seven stores?
14 A. Yes.
15 Q. That are identified as competitors?
16     Five of which are -- well, three of
17 which, excuse me, are a half mile or less and then a
18 couple of which are more than 2 miles.
19 A. Yes.
20 Q. I have not seen in my review of the
21 material that you all have provided -- and like I
22 say, this is very voluminous -- any store identified
23 as a competitor in your documentation that's more
24 than 3 miles away from any location. Is that
25 consistent with your experience?

Page 15

1  A. Yes.
2  Q. And in fact in reviewing it, and again
3  I'm making a generalization, but generally it also
4  appears to me that most of the competitors are within
5  2 miles. Is that a fair statement?
6  A. Generally, yes.
7  Q. If you would then turn to the
8  Spreadsheet Page identified as 8993, right at the top
9  there's a reference to a Kroger store and Store 42.
10     Can you tell by looking at these
11 competitors where this store is located?
12 A. I'm not certain.
13 Q. It references a Highway 66 and Main
14 Conoco as a competitor that's only 0.2 miles away.
15     And I take it for all these stores that
16 are identified here they are stores that have what
17 you refer to as a fuel station?
18 A. Correct.
19 Q. And a fuel station as used by King
20 Soopers or City Market is just that, a fuel station
21 that is at or near the -- very near the property
22 that -- the grocery store property. Is that a fair
23 characterization?
24 A. Yes.
25 Q. And that's different than a Loaf 'N Jug

Page 16

1  store, correct?
2  A. Yes.
3  Q. I take it from reading the material
4  that you provided and the areas in which you've been
5  designated that Loaf 'N Jug operates as an entirely
6  distinct division. Is that fair?
7  A. Yes.
8  Q. And that you individually have no role
9  in setting any prices in connection with Loaf 'N Jug.
10 A. Correct.
11 Q. All right. You do have a role about
12 setting prices in connection with City Market or King
13 Soopers fuel stations.
14 A. Yes.
15 Q. Is there any other category of fuel
16 outlet other than what we have described as a fuel
17 station that you have price responsibility for in
18 terms of gasoline or diesel?
19 A. No. I mean, I have other divisions,
20 but no.
21 Q. And when you say you have other
22 divisions, you mean like Ralphs or something like
23 that?
24 A. I'm the corporate fuel person.
25 Q. For the entirety of the country?

Page 17

1  A. Mainly the -- in my current role I'm
2  responsible for the east.
3  Q. Okay.
4  A. Eastern part of the United States.
5  Q. Was there a time you were responsible
6  for the west?
7  A. It was mixed.
8  Q. Okay.
9  A. A little bit of everything.
10 Q. All right. And so there's a number of
11 different Kroger banners, as you all refer to them,
12 across the country, right?
13 A. Yes.
14 Q. And what you're saying is, for example,
15 the Dillon banner, which is, I think, in Kansas and
16 other places, they have fuel stations, and you have
17 responsibility for them as well.
18 A. Yes.
19 Q. And likewise the actual name Kroger,
20 which is more in the middle-middle west and some
21 other locales, you have responsibility for the fuel
22 stations associated with Kroger.
23 A. Yes.
24 Q. If you would again turn to number 6 in
25 which you have been designated to testify, one of the

5 (Pages 14 to 17)
b77b34b4-32ae-48f3-a095-46bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

### Page 22

1  documents that have already been designated Secret.
2      MR. TARAVELLA: Right.
3      MR. BLEDSOE: I'm going to presume that
4  any testimony related to a document designated as
5  Secret is likewise going to be covered as Secret.
6      MR. TARAVELLA: And off the record for
7  one second.
8      (Whereupon, there was discussion
9  outside the record.)
10     Q. (BY MR. BLEDSOE) And with those off the
11 record clarifications and the understanding as has
12 been represented here, tell me what your general
13 practice is for setting pump prices, and then we're
14 going to talk about how that might apply to this
15 particular example.
16     A. We survey the competition twice a day.
17     Q. Okay.
18     A. We provide each location with a pricing
19 strategy. And if the -- the reaction falls within
20 the strategy, the store manager reacts to that. If
21 not, then they contact the fuel manager for guidance.
22     Q. And you're not the fuel manager.
23     A. No.
24     Q. Who's the fuel manager? Are there a
25 number of them?

### Page 23

1      A. 18.
2      Q. And they're assigned some number of
3  stores within your area of responsibility?
4      A. There's one for each division in the
5  company.
6      Q. So there's a fuel manager for King
7  Soopers-City Markets?
8      A. Yes.
9      Q. And that person, he or she, is resident
10 here in Colorado.
11     A. Yes.
12     Q. And they report to you?
13     A. No.
14     Q. There's somebody between you and them?
15     A. They report to the vice president in
16 their division.
17     Q. Okay. And who do you report to?
18     A. Jerry DeHague, the Vice President of
19 Supermarket Petroleum.
20     Q. And your title is Director of
21 Supermarket Petroleum Operations?
22     A. Yes.
23     Q. All right. And then you have a number
24 of divisions besides King Soopers and City Market.
25     A. Yes.

### Page 24

1      Q. Focusing on the geographic area that
2  we're here in Colorado, and maybe in particular this
3  store, does the store in Montrose then have a
4  specific pricing strategy, or is your pricing
5  strategy consistent within Colorado?
6      A. Each store has a specific strategy.
7      Q. Okay. And the strategy for this
8  particular store by way of example in Montrose, do
9  you recall what it is?
10     A. I don't know the specific strategy.
11     Q. Okay. Is the strategy for pricing
12 normally described as gross margin?
13     A. No.
14     Q. Is it normally a strategy driven
15 towards achieving volume?
16     A. No. No.
17     Q. It's a strategy towards addressing
18 geographic competitive pricing.
19     A. Yes.
20     Q. And that strategy, is that to be the
21 lowest or the highest price?
22     A. Generally the low -- match the lowest.
23     Q. And when we say a strategy, and
24 generally I appreciate that, there are 365 days in
25 every year and there are a lot of stores and a lot of

### Page 25

1  competitors here. I take it it's fair that you don't
2  hit that strategy every time every day for every
3  store.
4      A. No, probably not.
5      Q. But your general strategy is to match
6  the lowest price in your geographic -- for the stores
7  you survey.
8      A. Generally that's our strategy.
9      Q. Okay. I take it again from the
10 division of responsibility as I understand it within
11 the Kroger umbrella, you play no role at all in
12 procurement of fuel. Is that correct?
13     A. Yes.
14     Q. And as fuel is made available to your
15 division, as the Director of Supermarket Petroleum,
16 you get a price.
17     A. Yes.
18     Q. That's provided to you --
19     A. We get --
20     Q. -- from the procurement side of Kroger?
21     A. A cost, yes.
22     Q. Thank you. Because the price is what
23 you charge the consumer, a cost is what it costs --
24 is what you get charged, right?
25     A. Yes.

7 (Pages 22 to 25)

b77b34b4-32ae-48f3-a095-46bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 26

1  Q. And in this circumstance, that cost, I
2  take it, is the wholesale price that's been delivered
3  to you from whatever source the Kroger procurement
4  people get.
5  A. There's other costs involved in the
6  cost that we see, like taxes and freight.
7  Q. Sure, okay. But I'm talking about the
8  wholesale price of the gasoline itself. That's a
9  cost that is identified to you as part of your
10 pricing decision.
11 A. It's identified to us, yes.
12 Q. Yes. And is it fair to say that
13 generally increases in wholesale prices generally
14 lead to increases of retail prices, and likewise
15 decreases of wholesale prices lead to decreases of
16 retail prices?
17 A. No.
18 Q. Has it been your experience that the
19 decrease -- that a decrease of retail prices drives
20 increased volumes to a particular locale?
21 A. Yes.
22 Q. And that could be either good or bad
23 depending whether or not you're making money on that
24 volume, right?
25 A. Yes.

Page 27

1  Q. As part of your pricing strategy, does
2  the fact that you might be losing money on a matching
3  price ever limit how long you match the price?
4  MR. TARAVELLA: Objection, form.
5  A. Could you say that again, please?
6  Q. (BY MR. BLEDSOE) Sure.
7  MR. TARAVELLA: Form, foundation.
8  MR. BLEDSOE: I'm sorry. I want to
9  make this clear. She is entitled to a fair question
10 from me. You don't have any standing for that kind
11 of objection here. You're just -- you're only
12 representing the witness.
13 MR. TARAVELLA: Well, I have --
14 MR. BLEDSOE: Tony has -- no, Tony has
15 standing for that kind of objection.
16 MR. TARAVELLA: Counsel, I can make any
17 objection that I feel I need to on behalf of my
18 client. Okay? I have standing.
19 MR. BLEDSOE: She's not a party or
20 representing a party here.
21 MR. TARAVELLA: I'm not instructing her
22 not to answer. I've made the objection. Continue.
23 And I will continue to make objections if I don't
24 like the question, because I don't think it's
25 clear --

Page 28

1  MR. BLEDSOE: You don't get to object
2  to them if you don't like the question.
3  MR. TARAVELLA: Yes, I can, if --
4  MR. BLEDSOE: You have to have a --
5  well, there has to be --
6  MR. TARAVELLA: It's not funny.
7  MR. BLEDSOE: There has to be --
8  MR. TARAVELLA: First of all, it's not
9  funny. And second of all --
10 MR. BLEDSOE: You have to have
11 recognized grounds --
12 MR. TARAVELLA: I just said form and
13 foundation. There's a ground. Move on.
14 MR. BLEDSOE: Counsel, I don't believe
15 you really have the level of standing to make those
16 objections. I'm not going to fight about it. Just
17 so we're clear, I don't believe you have proper
18 standing to make --
19 MR. TARAVELLA: I made the objection.
20 We'd be finished now. I'm not instructing her not to
21 answer. Move on.
22 Q. (BY MR. BLEDSOE) Do you understand the
23 question?
24 A. No. I was saying can you restate --
25 Q. I can.

Page 29

1  A. -- the question?
2  Q. I can.
3  You've just indicated generally that a
4  lower retail price can increase volume at a store,
5  and that has generally been your experience, correct?
6  A. Yes.
7  Q. And that might be a good thing or that
8  might be a bad thing, because sometimes you might be
9  losing money on that volume, right?
10 A. Yes.
11 Q. In terms of your pricing policies, do
12 you have a limitation on how many days you will go
13 losing money on the volumes that you're selling?
14 A. No.
15 MR. TARAVELLA: Objection, form and
16 foundation.
17 Q. (BY MR. BLEDSOE) You can answer.
18 MR. TARAVELLA: Assumes facts --
19 Q. (BY MR. BLEDSOE) You can answer.
20 MR. TARAVELLA: -- not in evidence.
21 A. No.
22 MR. SHAHEEN: Come on, you two. Let
23 him finish his objection, Phil, and then you can
24 speak, or we're going to be here all day, so come on.
25 Q. (BY MR. BLEDSOE) You can answer.

8 (Pages 26 to 29)

b77b34b4-32ae-46f3-a095-46bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 30

1 A. No.
2 Q. Did you understand the question?
3 A. Yes.
4 Q. Okay.
5 MR. BENNINGTON: Let's go off the
6 record a second.
7 (Whereupon, there was discussion
8 outside the record.)
9 MR. TARAVELLA: We're back on the
10 record. Just to clarify our discussion off the
11 record, I was objecting and will continue to object
12 to any question that implies in that Dillon is
13 supposedly losing money that Dillon is selling below
14 cost. That's my objection.
15 And, counsel, I believe Mr. Bledsoe has
16 agreed for a continuing objection to that. So I'm
17 not trying to disrupt his deposition. I just want to
18 make it clear that anything that assumes without
19 evidence that we're selling below cost, I'm going to
20 object to that.
21 So, counsel, thank you.
22 MR. BLEDSOE: And it's my view I
23 haven't asked a question that assumes that yet.
24 MR. TARAVELLA: Okay. Right.
25 MR. BLEDSOE: So that was part of my

Page 31

1 concern.
2 MR. TARAVELLA: Okay. Thank you.
3 Q. (BY MR. BLEDSOE) When you talk about
4 matching prices in terms of your pricing strategy, is
5 that the posted price, the so-called street price?
6 A. Yes.
7 Q. All right. And that street price, as I
8 understand your pricing strategies for King Soopers
9 and City Markets, is exclusive of any loyalty or
10 affinity discounts available at the pump itself.
11 A. No.
12 Q. Does your posted price include your 3
13 cent discount?
14 A. Well, we match the lowest price, street
15 to street, not assuming the 3 cent discount, with the
16 exception of Western and Bradley.
17 Q. Okay. Explain that exception to me.
18 A. We allow Western and Bradley to price 3
19 cents under us. So our net price with our discount
20 is the same.
21 Q. And can we see an example of that in
22 the page that we're looking at, which is page –
23 Spreadsheet Page 9004 of Exhibit 175?
24 A. In this -- in the instance you're
25 referring to, we're 4 cents above Western.

Page 32

1 Q. Okay. And there happens to be a
2 Bradley in this survey as well that you're actually 8
3 cents above.
4 A. Yes.
5 Q. And, again, what you've articulated is
6 your general pricing strategy for stores involving
7 competition with Western. Is that fair?
8 A. Yes.
9 Q. And you've included Bradley in there as
10 well.
11 A. Yes.
12 Q. So in those stores -- and just so we're
13 clear, I'm driving by -- I'm driving down Townsend
14 Avenue in Montrose, and you've got a posted price
15 visible from the street, it's going to say -- would
16 have said on June 29th, 2010 2.729 for regular.
17 A. Yes.
18 Q. And since we happen to know this store
19 is also -- the Western store and the Bradley stores
20 are also on Townsend and are also pretty close, a
21 half mile or so according to this survey data, their
22 street sign would have said 2.689 or 2.649
23 respectively?
24 A. If the information was reported
25 correctly.

Page 33

1 Q. Do you double-check your survey data
2 with any other publicly available data of reported
3 pricing?
4 A. No.
5 Q. Do you report your daily pricing to any
6 of the publicly available sources?
7 A. No.
8 Q. You generally described your process
9 as -- and I want to make sure I'm saying it right and
10 that I understand it -- as -- with the exceptions
11 you've noted, as matching the street price. Is that
12 correct?
13 A. Yes.
14 Q. All right. And that's your strategy
15 for all of the City Market-King Soopers fuel centers
16 in Colorado.
17 A. Generally.
18 Q. Are there any exceptions to that other
19 than the ones you've just testified about involving
20 Western and Bradley?
21 A. Not in our strategy, not that I can
22 think of.
23 Q. You've described to me the difference
24 between your general strategy and the strategy as it
25 applies to when you're competing with Western or

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 34

1  Bradley. Why is that strategy different for those
2  two stores?
3       A.   Because Western and Bradley are
4  low-price low-ballers in the market, and if we start
5  trying to match them, they just keep going down and
6  down and down and we create a price war that affects
7  entire markets.
8       Q.   Item number 3 in the subpoena
9  references a description of how and when changes in
10 the price paid by Kroger affect the daily pump prices
11 at locations in Colorado. Do you see that?
12      A.   M-hm.
13      Q.   And again that's an area in which you
14 have been designated and agreed to testify.
15           Can you give me a general description
16 of how and when changes in the price paid by Kroger
17 affects -- how it affects prices at the pump?
18      A.   It doesn't on a daily basis unless we
19 are at cost.
20      Q.   Does it affect it on a weekly or
21 monthly type basis?
22      A.   No.
23      Q.   And I'm not sure I understood your
24 answer, and that's -- it wasn't anything wrong with
25 your answer, it's a problem with my understanding.

Page 35

1  Tell me again about what you said about
2  it doesn't affect it unless we're at cost. Did I
3  hear that right?
4       A.   There are below-cost selling laws in
5  Colorado, so we abide by those laws.
6       Q.   All right. And so when you say that --
7  and this is where I'm not understanding your answer,
8  and maybe you can help me.
9            When you say how and when changes in
10 the prices paid by Kroger for its fuel go up to avoid
11 selling below cost, do your pump prices have to go
12 up?
13      A.   We can legally match competition below
14 cost, and we include our 3 cent discount in that
15 cost.
16      Q.   Do you include any of the other
17 discounts that are available, such as the $1.00 a
18 gallon discount that's available with the King
19 Soopers cards, in calculating your cost?
20      A.   No.
21      Q.   And that 3 cent discount that you give
22 for -- just for using your King Soopers card, what
23 cost is that charged against?
24      A.   Fuel.
25      Q.   Is that shown as a discount then?

Page 36

1       A.   No.
2       Q.   So when I go to a fuel center pump,
3  ring in my affinity card or my whatever you all call
4  it -- my wife has one, I don't use one, I'm just like
5  your surveys, we'll talk about that later -- puts
6  that into the pump, that lowers the price at the pump
7  then and there.
8       A.   Yes.
9       Q.   And that 3 cent differential is charged
10 as a cost against the price of fuel so that you will
11 remain in compliance. Correct?
12      A.   Yes.
13      Q.   I want to go back to number 6 in the
14 subpoena where you've got your other data there.
15      A.   Yes.
16      Q.   And we also asked you to testify, to
17 identify those stations that compete for -- and maybe
18 we can cover the two Grand Junction stores together.
19 That might be a little bit easier, because I think
20 that we might have some overlap.
21           We've identified as City Market 218 and
22 City Market 225 one on North Avenue and one on 32
23 Road in Grand Junction. Can you identify the
24 competing stores for me for those stores?
25      A.   The store you called 218 closed on

Page 37

1  12-11 of 2010, so I didn't have any data readily
2  available.
3       Q.   Okay.
4       A.   I'm sure we could research and have
5  records, but I don't have that today.
6       Q.   Okay.
7       A.   And then the store that you referred to
8  as 225, we have Diamond Shamrock, Conoco, Bradley and
9  Maverick.
10      Q.   And again if we would turn to
11 Spreadsheet Page 9006 of Exhibit 175, there's a
12 reference here to a Store Number 425 on this data.
13 And that's the same store, isn't it?
14      A.   Yes.
15      Q.   And, again, the Diamond, Conoco,
16 Bradley and Maverick that you've just referenced,
17 these particular stores are all within 1 mile of one
18 another.
19      A.   Yes.
20      Q.   Or 1 mile of the fuel center.
21      A.   Yes.
22      Q.   Do you recall whether or not during the
23 period of time that the North Avenue store was open
24 whether or not the Western store in Grand Junction
25 was included in the survey?

10 (Pages 34 to 37)

b77b34b4-32ae-48f3-a095-46bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SUSAN GIANNOLA - JANUARY 31, 2013

Page 46

1  and the confusion is mine, not yours. I made a
2  reference to street price, and just so I'm clear,
3  when I'm talking about street price I'm talking about
4  what would be on the banner out in front of the
5  building.
6          You and I are communicating when we
7  talk about the street price, aren't we?
8      A.  The posted price on the street sign.
9      Q.  Yes.
10     A.  Yes.
11     Q.  And as I understand it, that price,
12 whatever it is, does not ever include the 3 cent
13 discount.
14     A.  Correct.
15     Q.  Okay. And then you described the
16 pricing differential that you've testified about
17 earlier, because not everybody gets the 3 cent
18 discount, right?
19     A.  Correct.
20     Q.  And again I was a little confused, and
21 I just want to make sure I understand on the effect
22 of lowering the wholesale price that you have to pay
23 of fuel. Because you attempt to be scrupulous about
24 not pricing below cost, I am assuming that the
25 wholesale charge to you is part of your overall cost.

Page 47

1      A.  I'm not sure I understand the question.
2      Q.  Sure. There are a variety of things
3  that you can include as cost in determining whether
4  you're pricing below cost, correct?
5      A.  Yes.
6      Q.  All right. One of those is the price
7  paid to the refinery.
8      A.  Yes.
9      Q.  And so ultimately if that cost paid to
10 the refinery declines, what -- Kroger's cost will
11 also have to decline, correct?
12     A.  No.
13     Q.  And that's where I guess I'm not sure
14 I'm understanding.
15         There are a variety of components in
16 cost: advertising, mileage, you know, fuel hauling,
17 all that kind of stuff. But there is a charge that
18 Kroger pays to whoever its fuel source is. Right?
19     A.  Yes.
20     Q.  And that price doesn't stay the same
21 all the time. It goes up and down. Right?
22     A.  Yes.
23     Q.  And in those periods of time when the
24 price from the refinery is declining, doesn't that
25 necessarily have to lower your cost input in

Page 48

1  determining what your total cost is?
2          MR. SHAHEEN: I'm going to object. I
3  think the question is vague and ambiguous. It also
4  assumes facts not in evidence. It's a incomplete
5  hypothetical.
6          But you go ahead and answer it as far
7  as I'm concerned.
8      A.  I'm not sure I understand.
9      Q.  (BY MR. BLEDSOE) Sure. And I may not
10 be making it clear here. All right?
11         Kroger pays somebody to buy gasoline,
12 right?
13     A.  Yes.
14     Q.  That's a cost. Correct?
15     A.  Kroger pays someone to buy --
16     Q.  Yeah.
17     A.  -- gasoline?
18     Q.  We know that Kroger buys a lot of gas
19 from Suncor.
20     A.  Right.
21     Q.  All right? And Suncor's not giving it
22 away. They're charging Kroger for it. Correct?
23     A.  Yes.
24     Q.  And I understand you're not involved in
25 that procurement process, I'm not trying to make you

Page 49

1  involved in it, but Suncor has a price it charges
2  Kroger. That's not a hypothetical, there's an actual
3  charge there, right?
4      A.  There is a cost for fuel, yes.
5      Q.  Yes, okay. And all I'm trying to make
6  sure I understand is that the cost of fuel is
7  necessarily included in your notion of not selling
8  below cost.
9      A.  Yes.
10     Q.  All right. And therefore as the cost
11 of fuel declines, doesn't that necessarily have to
12 affect what can be charged so that you won't be below
13 cost?
14         MR. SHAHEEN: Same objection.
15     Q.  (BY MR. BLEDSOE) You can answer.
16     A.  When it declines...
17     Q.  Yeah. Let me --
18     A.  How would that put us below cost?
19     Q.  All right. Let me put it the other
20 way.
21         If it increases, you've got to pay
22 attention to that, don't you?
23     A.  Yes.
24     Q.  All right. And what you're saying here
25 is that for as long as you all can get away with it,

13 (Pages 46 to 49)

b77b34b4-32ae-48f3-a095-46bfa8cfd449

SUSAN GIANNOLA - JANUARY 31, 2013

Page 50

1  you keep the cost high in declining -- while your
2  price is declining wholesale?
3      A.  No, that's not --
4          MR. SHAHEEN: Objection. That
5  mischaracterizes her testimony. It's argumentative.
6      A.  No.
7          MR. TARAVELLA: I think it's beyond the
8  scope of what she's been designated as.
9          But if you know, you may answer --
10     A.  The answer is no. The answer is no.
11     Q.  (BY MR. BLEDSOE) All I'm trying to say
12 is if it is Kroger's official position that a change
13 in the fuel price paid by Kroger to Suncor declines,
14 if it's Kroger's position that it has no affect on
15 the street price.
16         MR. SHAHEEN: That wasn't -- objection.
17 That wasn't the question you've been asking her,
18 Phil.
19     Q.  (BY MR. BLEDSOE) You can answer.
20         MR. TARAVELLA: I'm going to object.
21 It's --
22     A.  No, it's not. We price to the market.
23 So the answer is no.
24     Q.  (BY MR. BLEDSOE) All right. But when
25 it increases, you might not be able to price to the

Page 51

1  market.
2      A.  We don't price below cost.
3      Q.  Does Kroger maintain storage for its
4  fuel?
5      A.  Could you define storage?
6      Q.  Do you have dedicated storage space at
7  any refinery or terminal?
8      A.  No.
9      Q.  And do you therefore have deliveries
10 virtually each and every day to your fuel centers?
11     A.  In most cases.
12     Q.  And those deliveries are achieved by
13 going to wherever rack they pull product or lift
14 product and then deliver to your stores?
15     A.  That's not my expertise.
16     Q.  All right. And so all I'm saying here
17 is that because of your concern about being below
18 cost, if somebody else for whatever reason has a
19 lower street price because of a beneficial cost, you
20 might not be able to match if you're in one of those
21 time periods when the wholesale price is going up.
22 Is that correct?
23     A.  Yes.
24     Q.  And when wholesale price is going down,
25 you are able to fully implement your general strategy

Page 52

1  of matching the lowest competitive price except for
2  when Western and Bradley are the competitors,
3  correct?
4      A.  Yes.
5      Q.  Item number 4 on the subpoena, I think
6  you may have answered already and I just want to see
7  if I've missed anything. You've identified the
8  competitors and the specifics, some of the specifics,
9  and I think you've told me that generally it's 2
10 miles but there's some variation on that from time to
11 time. Is that correct?
12     A.  Yes.
13     Q.  Is there any other thing that drives
14 that in terms of how you would describe how you
15 identify competitors for your fuel stations? Is it
16 location?
17     A.  No.
18     Q.  What besides location is considered?
19     A.  Well, if they sell fuel or they're a
20 like competitor like a supermarket, then -- or a big
21 truck stop, that drives product.
22     Q.  So you might go beyond 2 miles for
23 those kinds of folks?
24     A.  We could go beyond 2 miles for
25 anything.

Page 53

1      Q.  Sure.
2      A.  In rural areas.
3      Q.  So you just look at where your store is
4  and where the other stores are to determine what's
5  competitive.
6      A.  Yes.
7      Q.  There's plainly a geographic component
8  to that, but you're saying there's other things
9  involved as well.
10     A.  Yes.
11     Q.  Those other things might include it
12 being a big truck stop or another grocery competitor
13 like a Safeway with a fuel center. Am I
14 understanding that right?
15     A.  Yes.
16     Q.  Anything else that you can add about a
17 description of how Kroger determines and identifies
18 competitors for its fuel centers?
19     A.  No.
20     Q.  You've already talked a little bit --
21 I'm looking now at item number 5 in your subpoena for
22 which you've been designated. You've already
23 testified a little bit about the competition between
24 your fuel centers and Western stores.
25         Is there anything else that you can

14 (Pages 50 to 53)
b77b34b4-32ae-48f3-a095-48bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 54

1  describe about the competition between King Soopers
2  and City Market fuel centers and Western Convenience
3  other than what you've already testified about?
4      A.  No.
5      Q.  In those places where you are
6  competing, you watch their price, like you do other
7  competitors, correct?
8      A.  Yes.
9      Q.  Anything different about that vis-a-vis
10 Western versus Bradley versus Valero, for example?
11     A.  Only what I've already described.
12     Q.  Fair enough. And I'm not asking you to
13 repeat what you've already testified about.
14          So really in terms of the competition
15 between Western and King Soopers-City Market fuel
16 centers is that you will allow them to go 3 cents
17 below your street price.
18     A.  Yes.
19     Q.  Is any of this written down in a
20 document anywhere?
21     A.  Yes.
22     Q.  What's the name of that document?
23     A.  I don't recall.
24     Q.  Who wrote it down? You or anybody
25 else?

Page 55

1      A.  I'm not sure who wrote it.
2      Q.  How long have you been in your role?
3      A.  Forever.
4      Q.  Well, I was going to say, you're a
5  Kroger lifer, aren't you?
6      A.  Since '99.
7      Q.  Okay. Are you a Kroger --
8      A.  When we started fuel. When we started
9  fuel.
10     Q.  And was this pricing strategy you've
11 described here generally, was that the same strategy
12 throughout your tenure?
13     A.  No.
14     Q.  When did it change?
15     A.  Well, can you be more specific about
16 pricing strategy?
17     Q.  Yeah, it wasn't a very good question.
18          You have told me -- and we're talking
19 about a specific time frame generally here, you know,
20 2010 through mid '11. I'm sure you've been told
21 that. '09 to mid '11.
22          You've told me the pricing strategy
23 generally with the exception of Western and Bradley
24 is you want to meet the street price to your
25 competitor -- for those within your competition area.

Page 56

1  Right?
2      A.  Yes.
3      Q.  How long has that -- I assume that's
4  still Kroger's strategy today.
5      A.  Yes.
6      Q.  Has that always been Kroger's strategy
7  with its fuel centers?
8      A.  Yes.
9      Q.  And in terms of establishing that
10 strategy, you've indicated somewhere it was written
11 down. I'm just trying to find out where it was
12 written down.
13     A.  There's many different documents over
14 the years. I could not even begin to...
15     Q.  Do store managers have a handbook?
16     A.  They should. Do they? I cannot answer
17 that.
18     Q.  I've represented many big companies, I
19 understand that answer completely.
20          But in that handbook for the store
21 manager would there be a discussion about pricing?
22     A.  There should be.
23     Q.  Do you ever send memos to your store
24 managers about pricing?
25     A.  I don't.

Page 57

1      Q.  Do you send managers (sic) to your
2  fuel -- to the fuel managers about pricing?
3      A.  I could.
4      Q.  Have you?
5      A.  Yes.
6      Q.  All right. Do your fuel managers send
7  memos to the store managers?
8      A.  I would say yes.
9      Q.  You would expect that the store
10 managers would have received written communications
11 from people higher up the corporate food chain about
12 pricing, right?
13     A.  Yes.
14     Q.  You don't recall whether any of those
15 would have come from you?
16     A.  No, they would not.
17     Q.  In our relevant time frame, 2009 to mid
18 '11, who would those most likely have come from?
19     A.  A fuel manager.
20     Q.  And there's a fuel manager for
21 Colorado?
22     A.  Correct.
23     Q.  And what's that person's name?
24     A.  Well, in that time frame we're
25 referring to, it's Steve Callahan.

15 (Pages 54 to 57)
b77b34b4-32ae-48f3-a095-46bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 62

1  A. Yes.
2  Q. Where are they?
3  A. Well, they're not in states in the --
4  that we're referring to in this lawsuit.
5  Q. Okay. So they're not like in Nebraska
6  or Utah or anything like that?
7  A. Yeah.
8  Q. Okay.
9  A. They're outside of the state of
10 Colorado and Nebraska.
11 Q. But are they generally in the western
12 part of the country?
13 A. Yes.
14 Q. Yeah, I'm not worried about the gory
15 detail.
16     MR. BENNINGTON: Nebraska panhandle is
17 actually part of the --
18     MR. BLEDSOE: Right.
19 Q. (BY MR. BLEDSOE) Are there any City
20 Markets in the Nebraska panhandle?
21 A. No.
22 Q. Are there any in Nebraska?
23 A. No.
24 Q. Are those the only changes in the
25 accumulation portion of the program that you've just

Page 63

1  testified about?
2  A. Well, there's many different changes
3  about multiple points for pharmacy or gift cards,
4  but -- and then in May of 2012 we started
5  accumulating up to $2.00.
6  Q. Okay. And these points are accumulated
7  based upon the purchase of merchandise?
8  A. The purchase of groceries.
9  Q. Okay. Thank you. And that's an
10 important distinction. Not every item that City
11 Market sells qualifies for point accumulation.
12 Correct?
13 A. Yes.
14 Q. Okay.
15 A. Correct.
16 Q. All right. Thank you. I asked that
17 inartfully, and I think what you're saying is only
18 qualified groceries allow you to accumulate points.
19 A. Yes.
20 Q. And it's been expanded to include
21 pharmacy?
22 A. Yes.
23 Q. Has it been expanded to include
24 anything else?
25 A. I'm not certain.

Page 64

1  Q. Does it include defined grocery items
2  within Loaf 'N Jug?
3  A. Yes. Recently. And I don't know those
4  dates because I don't deal with that.
5  Q. Colorado is what you all refer to as a
6  bridged market, correct?
7  A. Yes.
8  Q. And that means you've got both C-stores
9  and more traditional grocery stores under different
10 brands, banners, correct?
11 A. Yes.
12 Q. Item number 12 asks for a description
13 and the purposes of the use of daily fuel survey
14 data.
15     We've talked about one use so far
16 today, and that's the setting of your price that day
17 at the store. Correct?
18 A. Setting fuel prices.
19 Q. Yes, fuel prices.
20 A. Yeah.
21 Q. What other purposes and use of your
22 daily survey data, if any, are there?
23 A. It's strictly for setting fuel prices.
24 Q. And you set your fuel prices every day?
25 A. Yes.

Page 65

1  Q. When you look at your fuel price
2  surveys, do you ever give any import to things, to
3  the price from like the day before or the day before
4  that or the week before?
5  A. No.
6  Q. So when you set your daily pump price,
7  it's driven vis-a-vis the surveys totally by that
8  day's survey data.
9  A. The price that we set, yes.
10 Q. And what the price was a month ago
11 doesn't enter into it, right?
12 A. Yes.
13 Q. That's correct.
14 A. Correct. Correct.
15 Q. And there are no other -- just so we're
16 clear -- no other purposes or use of the daily fuel
17 survey data other than the setting of daily prices at
18 your fuel centers.
19 A. Not that I can think of.
20 Q. We've asked in item number 15 a little
21 bit more of a specific question about a particular
22 King Soopers store in Pueblo. What store number is
23 that?
24 A. I don't know the store number.
25 Q. Well, we've asked here for a

17 (Pages 62 to 65)
b77b34b4-32ae-48f3-a095-46bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

Page 66

1  description of -- item 15 -- of the processes for
2  setting of daily pump prices for all grades of fuel
3  for the King Soopers store on Northern Avenue in
4  Pueblo.
5       Do you know where that store is?
6    A. Yes.
7    Q. Are you familiar with that store?
8       What can you tell me about the
9  description of the process for the setting of those
10 daily fuel prices?
11   A. It's the same as it is for our general
12 strategy.
13   Q. Okay.
14   A. With the exception that we pay -- we
15 focus more on Loaf 'N Jug in that market.
16   Q. And do you know whether or not for this
17 particular King Soopers the Loaf 'N Jug Store Number
18 52 is included in your survey data?
19   A. I don't know without looking into that.
20   Q. Okay. You are familiar with the store
21 on Northern Avenue in Pueblo?
22   A. Yes.
23   Q. And this is what I'm trying to see if I
24 can identify where it -- which one of these it is
25 here, because you didn't know the store number.

Page 67

1       Are you aware of whether there are one
2  or two Western stores nearby that?
3    A. I don't know.
4    Q. Take a look at what's been identified
5  as Store 404.
6    A. What page?
7    Q. It's on page 9004 of the spreadsheet.
8  It's about halfway down. Do you see that?
9    A. Yes.
10   Q. And for this particular store it
11 references two Western locations. Do you see that?
12   A. Yes.
13   Q. And one is on Highway 50, and it's
14 listed as 2-1/2 miles away from the Kroger store
15 that's referenced there.
16      Do you know what Kroger store that is?
17   A. No.
18   Q. You're not able to say whether that's
19 the Kroger store in Pueblo?
20   A. No. I thought Highway 50 is in Grand
21 Junction but...
22   Q. Can you tell me then based on item
23 number 15, give me a description of the processes for
24 setting of daily pump prices for all grades of fuel
25 at the King Soopers store on Northern Avenue?

Page 68

1    A. It's the same as our general pricing
2  strategy, but we emphasize -- we have more emphasis
3  on the Loaf 'N Jug sites there.
4    Q. Okay.
5    A. So we would more likely follow Loaf 'N
6  Jug.
7    Q. And just so I'm sure I understand that,
8  you don't typically -- you, Kroger, City Market, King
9  Soopers -- you don't normally consult with your
10 counterpart at Loaf 'N Jug, do you?
11   A. Yes.
12   Q. Okay. Every day?
13   A. Most days.
14   Q. So when there's price setting, do you
15 ever have a discussion with your counterpart at
16 Loaf 'N Jug?
17   A. I don't.
18   Q. Okay.
19   A. But the two divisions do, yes.
20   Q. And who has those conversations in
21 terms of setting the daily price?
22   A. The fuel manager.
23   Q. The fuel manager for Loaf 'N Jug is a
24 different person than you've identified, than the
25 fuel manager for Kroger?

Page 69

1    A. Yes.
2    Q. Who is that?
3    A. Ed Sharp.
4    Q. Is he your counterpart at Loaf 'N Jug?
5    A. It's kind of a different role.
6    Q. Do you spend any time generally
7  discussing pricing with Mr. Sharp?
8    A. Rarely.
9    Q. Can you say why in terms of the process
10 of setting daily pump prices you focus more on
11 Loaf 'N Jug in Pueblo than elsewhere?
12   A. Because we have one location in Pueblo
13 and Loaf 'N Jug has many.
14   Q. Like eight or nine, something like
15 that?
16   A. I don't know the number.
17   Q. It's a large number?
18   A. It's more than two.
19   Q. Okay. So what I'm hearing you say is
20 regardless of whether Western is or isn't in Pueblo,
21 you're really following Loaf 'N Jug there.
22   A. We still follow competition.
23   Q. Would you take a look -- I know it will
24 take a couple minutes, and I apologize for that, but
25 I want to confirm something that I think is correct.

18 (Pages 66 to 69)

b77b34b4-32ae-48f3-a095-46bfa8cfd449

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-26

SUSAN GIANNOLA - JANUARY 31, 2013

**Page 106**

1  (Whereupon, there was a recess from
2  11:45 a.m. to 11:53 a.m.)
3  Q. (BY MR. BLEDSOE) I do have a couple
4  things just to clarify. I think I understand but I
5  want to make sure.
6  I asked you about generally whether or
7  not having lower prices will increase volume, will
8  drive volume, and I think you told me yes.
9  A. Yes.
10  Q. Okay. And that will also then have the
11  tendency, if your prices are consistently lower than
12  others in your competitive market, of taking volume
13  away from your competitors.
14  A. Possibly.
15  Q. All right. I mean, if there's
16  generally a given amount of volume in a particular
17  market area, any competitor who gets their volume up
18  is necessarily taking it from others, correct?
19  A. For the most part.
20  Q. Yeah. And then in terms of your
21  pricing -- and I think I have finally understood
22  where I was disconnecting on your comment on where we
23  were about wholesale prices as an input -- your
24  pricing strategy as you've outlined it is one of
25  following the lowest in the market, not setting the

**Page 107**

1  lowest in the market. Is that a fair way of saying
2  it?
3  A. Yes.
4  Q. And so if lower wholesale prices are
5  driving the lowest in the market, you're following
6  the lowest in the market.
7  A. Yes.
8  Q. And to that extent, lower wholesale
9  prices can lead your charges to be lower as well.
10  A. If the market dictates that.
11  Q. All right.
12  MR. BLEDSOE: Thank you. I appreciate
13  your time today.
14  MR. SHAHEEN: I have nothing. Thanks.
15  (Deposition Exhibits withdrawn by
16  Mr. Bennington.)
17  (Whereupon, at 11:55 a.m., the
18  deposition was concluded.)

**Page 108**

1  I, SUSAN GIANNOLA, do hereby state
2  under oath that I have read the above and foregoing
3  deposition, and that the above transcript and
4  accompanying correction sheets, if any, constitute a
5  true and correct record of my testimony.

8  SUSAN GIANNOLA

12  STATE OF COLORADO  )
13  ) ss.
   CITY AND COUNTY OF DENVER )

15  Subscribed and sworn to before me,
   by the said SUSAN GIANNOLA, this _____ day of
   _____, 2013.

17  My commission expires _____

18  NOTARY PUBLIC

19  Address

**Page 109**

1  CERTIFICATE
2  STATE OF COLORADO  )
    ) ss.
3  CITY AND COUNTY OF DENVER )
4  I, Patricia M. Wrede, a Registered
   Professional Reporter and a Notary Public within and
5  for the State of Colorado, do hereby certify that
   previous to the commencement of the examination of
6  the said SUSAN GIANNOLA, a witness called for
   examination herein in the said suit in the said
7  District Court, was duly sworn by me to testify the
   truth in relation to the matters in controversy now
8  pending and undetermined between the said parties so
   far as she should be interrogated concerning the
9  same;
10  That the said deposition was taken
    in shorthand by me at 370 17th Street, Suite 3500,
11  City of Denver, State of Colorado, on January 31,
    2013, at 8:39 a.m., and was reduced to typewritten
12  form under my supervision;
13  That the foregoing is a true
    transcript of the questions asked, the testimony
14  given, and the proceedings had;
15  That I am neither attorney nor
    counsel, nor in any way connected with any attorney
16  or counsel for any of the parties to said action, or
    otherwise interested in its event.

18  IN WITNESS WHEREOF, I have hereunto
    set my hand and affixed my notarial seal this 31st
    day of January, 2013. My commission expires August
19  8, 2016.

22  Patricia M. Wrede, RPR
    and Notary Public.

28 (Pages 106 to 109)

b77b34b4-32a0-48f3-a095-48bfa8cfd449