Document 185-29

Western Convenience Stores, Inc. et al. vs. Suncor Energy (U.S.A.) Inc.
United States District Court for the District of Colorado
Case No. 11-cv-01611-MSK-CBS

Expert Report of

John Mayes
Turner, Mason & Company
Suite 2920, LB 38
2100 Ross Avenue
Dallas, Texas 75201
(214) 754-0898

EXHIBIT Z

Dated: January 22, 2013

CONTAINS OR REFERENCES MATERIAL IDENTIFIED AS
CONFIDENTIAL, HIGHLY CONFIDENTIAL, OR SECRET                                                              PAGE 1

Case 1:11-cv-01611-MSK-CBS Document 265-30 Filed 11/20/13 USDC Colorado Page 2 of 15
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-29

I. QUALIFICATIONS

I am a Senior Consultant at Turner, Mason & Company (TM&C), a firm which provides management and engineering consulting services for entities engaged or involved in the petroleum and petrochemical industries. A copy of my resume is attached as Exhibit A.

As set forth in my resume, I have a chemical engineering degree and have worked in the petroleum and petrochemical industries since 1976, including in the following areas relevant to this matter:

- Supervised sales, pricing, and discounts for 67 MBPD of petroleum products as General Manager of Wholesale Marketing with Ultramar, Inc.;
- Supervised Branded operations for 195 retail stations as General Manager of Wholesale Marketing with Ultramar, Inc. Branded over 50 new stations;
- Supervised sales, pricing, and discounts for over 50 MBPD of petroleum products as Manager of Unbranded Sales with Ultramar, Inc.;
- Prepared financial analysis leading to acquisition of 172 retail site chain of Southwest Convenience Stores as Manager of Business Development with Alon USA;
- Evaluated store profits, expenses, capital requirements, and growth opportunities for 172 retail sites of Southwest Convenience Stores as Manager of Business Development with Alon USA; and
- Developed retail marketing benchmarking study for 172 company owned retail sites as Manager of Business Development with Alon USA.

The following areas of expertise were an important component in most or all previous work assignments:

- Refinery operations and planning;
- Refinery and petroleum marketing and sales – economics analysis;
- Management and optimization of branded and unbranded petroleum product sales operations;
- Management and optimization of crude oil supply operations; and
- Evaluation and management of acquisitions and sales of refinery assets, petroleum pipelines and terminals, wholesale marketing entities, and retail operations, including convenience store operations.

Attached as Exhibit B is a list of all articles or other publications I have authored in the past ten years.

I have not testified, either by deposition or at trial, in any case during the past four years.

Case 1:11-cv-01611-MSK-CBS  Document 265-30  Filed 11/20/13  USDC Colorado  Page 3 of 15
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-29

## II. COMPENSATION

TM&C is compensated at the following rates for my services in connection with this matter: $225 per hour for analysis and related services; $280 per hour for deposition or trial testimony. These rates are subject to change by TM&C. A surcharge of 5% of professional fees is charged for secretarial services, telephone, fax, deliveries, reproduction, report materials and binding. Travel expenses are reimbursed at cost.

## III. RETENTION IN THIS MATTER

I have been retained by the Plaintiffs in this matter to provide expert testimony relating to the petroleum industry and as to certain opinions relevant to this case. A summary of the areas in which I have been retained and intend to provide non-opinion testimony is set forth in Section IV. Section V contains a summary of the areas in which I have been retained and intend to provide opinion testimony, together with a statement of each opinion to be expressed, the basis and reasons for the opinions, the facts or data considered in forming the opinions, and any exhibits that will be used to summarize or support the opinions.

I understand that depositions and other discovery in this case have not been completed and that, in particular, depositions of relevant individuals currently or formerly employed by the Kroger entities (Dillon Companies, a/k/a King Soopers or City Market, and Mini Mart, Inc., a/k/a Loaf N Jug) have not yet been taken and reports of experts for Suncor have not been completed or disclosed. I anticipate that I may need to modify or supplement this report, including the anticipated areas of non-opinion testimony, based on the additional discovery to be taken or matters raised in the reports of Suncor's experts. I also understand that the president of WCS, Hossein Taraghi, has been prohibited from seeing discovery, primarily related to Kroger pricing which has been designated Highly Confidential or Secret. Accordingly, I have not been able to discuss such discovery with Mr. Taraghi particularly as it pertains to Kroger. I, thus, reserve the right to modify or amplify the opinions and other matters contained in this report should that be necessary or appropriate after I am allowed to fully interview Mr. Taraghi.

## IV. NON-OPINION TESTIMONY

I anticipate providing the following testimony to assist the Court in understanding the evidence or determining facts in the case:

A. An explanation of the processes involved in the development and sale of petroleum products from the extraction of crude, to and through the refinery process, to and through delivery of the products via pipeline and/or terminal for wholesale sale, and to and through delivery and sale to retail sites for consumer sale. A summary of these processes is described in Exhibit C.

Document 185-29

B. An explanation of the pipeline systems and refineries relevant to the fuel product sales involved in this case, such as those reflected at pages 55-58 of Deposition Exhibit 93 and pages 3-8 of Deposition Exhibit 94.

C. An explanation of the different types of gasoline and fuel products involved in this matter.

D. A general explanation of the chemical components of gasoline and fuel products, including seasonal or other relevant modifications to the components required by government regulations.

E. An explanation of branded vs. unbranded fuel including the differences in manufacturing, marketing and sale of branded and unbranded petroleum products.

F. An explanation of industry terms and their usage in connection with various stages of the development and sales process. Terms that I would anticipate explaining include the following:

- basic terms: additive, additized, blended, blending, branded, clear, conventional, crude oil, diesel, distillate, dose, gasoline, grade, G-grade, hydrocarbon, jobber, light-oil, marketer, middleman, mid-grade, octane, pipeline, pipeline batch, premium, premium-grade, rack, raw, RBOB, regular, RFG, RFS2, RVP, supply, tank, terminal, truckload, unadditized, unbranded, volume;

- component terms or product names, e.g., asphalt, ethanol, gasoline, jet, MTBE, NRLM, PUL, RUL, ULSD#1, ULSD#2;

- units of measure for petroleum products and their abbreviations, e.g., gallons, UG6, barrels, bpm, bpd, bbls;

- pricing terms and measures, e.g., cpg, credit, ethanol credit, gross, low, net, net-10, OPIS, rack average, rack price, street price;

- industry indices, compilations, and related terms, e.g., Argus, Crude WTI, Group III, Gulf, OPIS, NYMEX, Platt's;

- operations terms, e.g., allocation; assets, bill of lading, capacity, lift, liftings, nominations, PTO, ratable, ratability, spot, turnaround;

- other terms not listed above, including those in the summary attached as Exhibit C;

G.    An explanation of the industry practices for wholesale purchase and delivery of petroleum products, including the contractual structure and logistics involved in such purchases. Concepts include master product purchase arrangements for purchases from a refiner; agreements covering specific terms for purchases under the master agreement (such as by month, year or other term); arrangements for spot purchases; credit terms and agreements for wholesale fuel purchases, including changes to credit extension agreements; trade, exchange or other agreements between refiners or wholesalers; agreements for access by trucking or other transport entities to terminals or pipelines for delivery of purchased fuel and transport to retail sites;

H.    An explanation of the pricing of petroleum products for wholesale and retail sale, including the various pricing mechanisms used;

I.    An explanation of customs and practices in the petroleum industry, as described in the statement of opinions below; and

J.    An explanation of methods in which petroleum retailers determine the competitive market for the sale of their petroleum and non-petroleum products.

V.    OPINION TESTIMONY

**A.    Retailer price checking is a competent and industry-accepted method to define the competitive market for the sale of consumer petroleum products.**

This opinion is based on my experience in the petroleum industry, particularly in my roles as General Manager of Wholesale Marketing at Ultramar and Manager of Business Development at Fina and Alon, as well as in consulting engagements at TM&C.

As I have learned/observed in nearly all of my employment and consulting positions in the petroleum industry, gasoline/diesel retailers and others in the industry use a variety of methods to determine the competitive market for a particular retailer of petroleum products, i.e., the competitors for a particular retail station. Frequently, these methods include analysis of the geographical distance, driving distance or driving times and/or routes between particular stations. While distances and drive times between stations are relevant, there are cases in which stations compete with one another even though they are outside a particular distance radius. This can occur where, for example, one station is on or near a major thoroughfare near a populous residential area and another is on or near the same thoroughfare that, although several miles away, is near a major commercial or retail area, or where more rural stations compete with one another although separated by greater distances.

Case 1:11-cv-01611-MSK-CBS Document 265-30 Filed 11/20/13 USDC Colorado Page 6 of 15
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-29

It is my experience that many, if not most, gasoline retailers undertake their own efforts to identify competitive stations, including to observe and track pump prices and consumer patterns at those stations they consider to be their competitors. Often, store managers, district managers or those responsible for a retailer's pricing decisions are most familiar with which stations compete with each of the retailer's stations, through such things as observing consumer reactions to price changes by their stations and the stations of other retailers or observing whether, and the extent to which, they or the other stations raise or lower their own pump prices based on changes in the pump prices of the other stations. It is these persons who would understand whether stations outside a particular radius or driving distance would be a competitor notwithstanding a lack of physical proximity. Therefore, a common and accepted practice for retailers is to engage in price checking and tracking of surrounding stations or stations the retailer otherwise determines to be competitive. These price checks are used for a variety of purposes, including to make daily pump price determinations.

In all of the positions I have held which involved retail sales of petroleum products, price checks or surveys were used to determine and track competitors. Most of the gasoline retailers for which I have done consulting work have undertaken price survey activities to monitor pricing of stations determined to be competitors. It is my opinion, based on my experience in the industry, that reference to retailer price check surveys is certainly a competent and industry accepted method of determining a competitive market for a particular station.

**B.  Very small changes in the wholesale price of consumer petroleum products influence retail gas prices and thus impact competition between retailers.**

During my many years of working in the petroleum industry, it has been my experience that very small changes in the wholesale price of gasoline and diesel fuel ultimately have an effect on the retail price of such fuel. It has been my experience in my employment and consulting positions that retailers of gasoline and diesel fuel operate under relatively small margins for the sale of those products. Because of these relatively small margins, my experience indicates that retail price changes will generally follow changes in wholesale prices. Retailers attempt to maintain their relative pricing relationships with their competitors for several reasons through the use of the retail price surveys. Gasoline prices are often used to entice customers into the retail site to, hopefully, make convenience store or other non-fuel purchases. Product margins for convenience store or other non-fuel product are generally many times higher than the margins for fuel sales. Surveys also indicate that most customers develop a long-term loyalty to a retail site. If fuel pricing at a retail site rises as compared to the competition for a significant length of time, an existing loyal customer may shift to another retailer and not return for several months. If only one station in a local market responds to a wholesale move, the surrounding stations are then also likely to respond. As a result, even minor changes in wholesale prices tend to ripple through retail markets quickly.

It is accepted in the industry that a significant portion of consumers make purchasing decisions based on small differences (1 to 2 cents per gallon) in the retail prices for gasoline or diesel products. Similarly, small differences in the amounts charged by wholesalers (such as

Document 185-29

Suncor) to gasoline purchasers (such as Western or the Kroger entities) are significant. In my experience in the industry, both working internally for a refiner/wholesaler and in consulting roles, a .25 to .5 cent difference in a refiner/wholesaler's per-gallon price to different customers is considered to be a substantial. I understand from the work of Mark Glick and Ted Tatos that the average price difference in this case between the Suncor wholesale price charged to Western and its price charged to the Kroger entities is approximately ▇ cents per gallon. That price differential is highly significant, and almost unheard of, in the petroleum industry.

    C.    **The product sales to Western and to Kroger entities that are the subject of Western's price discrimination claims are of products that are recognized by the petroleum industry to be of products that are the same or like grade and quality.**

As described in the depositions and documents identified in Section VI below (particularly Mr. Moss's deposition at page 21 and Deposition Exhibits 30, 31, 33, 34), the Suncor sales to Western and the Kroger entities both involved the sale of unbranded gasoline and diesel fuel of the same grade and quality. Both Western and the Kroger entities were considered to be Suncor unbranded customers, with Western identified by Suncor to be Suncor's largest unbranded purchaser (by volume sold) in 2008 and 2009 and Kroger taking over that position in 2010 and (presumably) 2011. See Deposition Exhibit 30, attached.

Unbranded gasoline and diesel fuels are considered in the industry to be a fungible commodity, meaning that there is no commercial difference between the gasoline or diesel of particular grades (e.g., RUL, PUL, E-10 RUL, PUL, #2 ULSD) as sold by different refiners or as sold to different purchasers. This is illustrated in this case by the fact that certain of the purchases for Western and Kroger fuel were made from the Rocky Mountain Pipeline facilities in Dupont, Colorado and Fountain, Colorado where product purchases come from large tanks supplied via pipeline from multiple refiners or sources which are segregated only by product grade but not by product source or refiner. It is also consistent with my experience in the industry, in which unbranded gasoline and diesel products of each particular grade are widely traded and the industry does not recognize any distinction between unbranded fuel refined by different refiners so long as it meets governmental standards for each geographic region. As noted below in connection with Opinion E, even for sales directly from Suncor-owned terminals (e.g., Commerce City East and West Plants and Grand Junction), the unbranded products are completely fungible by product grade.

The standardization of gasoline and diesel product specifications for each region has not only been encouraged by government initiatives but is consistent across the United States. From previous employment positions and current consulting assignments, I have observed this condition in all areas of the country. The use of fungible gasoline and diesel grades by refiners greatly facilitates pipeline and product terminal operations and substantially minimizes product inventories. These practices also reduce supply disruptions with the resulting price spikes and encourages competitiveness in pricing.

Case 1:11-cv-01611-MSK-CBS   Document 265-30   Filed 11/20/13   USDC Colorado   Page 8 of 15
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-29

Once commingled, there is no means to separate or distinguish gasoline and diesel products refined by a particular refinery from those refined by another refinery. In accounting for their inventories of fuel products, while refiners distinguish between inventories of particular grades or specifications, they do not distinguish between fuel refined within the refinery itself and the finished fuel products of the same grade and specifications within the inventory from other refiners.

  D.  **Suncor's stated reasons for not making the same fuel prices it given to Kroger available to Western are not consistent with industry practice or industry use of terms.**

Suncor states in response to Interrogatory No. 6:

**The Fuel prices offered to [Kroger] were not made available to WCS because, among other reasons, the prices offered to [Kroger] were the result of requests for proposals/competitive bids, were for long term contracts and not spot contracts or sales, were based on a different pricing mechanism, and were for a creditworthy, reliable, ratable customer, which WCS was not, and were made in response to competitive offers.**

I also understand from depositions and case filings that Suncor distinguishes its sales to Western from those to Kroger by characterizing the Western sales as "spot." It is my opinion, based on my review of the relevant documents and depositions described below as well as my experience in the industry, that the purported bases that Suncor asserts for giving better prices to Kroger are not consistent with industry practice.

It is my understanding based on Deposition Exhibit 30 and the deposition testimony (relevant excerpts attached), that Western Convenience was Suncor's highest volume unbranded gasoline purchaser in both 2008 and 2009 and that it was effectively supplanted as highest-volume purchaser by Kroger entities Dillon and Mini Mart in 2010 (and presumably 2011). It also is my understanding that Western's demand for fuel did not decrease and that Western continued to desire to purchase fuel from Suncor, particularly as Suncor is Colorado's only refiner. According to Deposition Exhibit 97 (p. 63) (copy attached), unbranded gasoline and diesel account for nearly half (46.2%) of Suncor's gasoline production and nearly three-quarters (74.4%) of Suncor's diesel production. Therefore, the purchases of unbranded products, whether by Western, Kroger or other unbranded purchasers, is a substantial portion of Suncor's business.

As is the common practice in the industry, Western and Kroger both had Master Product Purchase and Sale agreements and/or general terms and conditions which governed their contractual relationship with Suncor. See Deposition Exhibits 31, 33 and 34. These agreements are/were essentially the same for both entities.

Case 1:11-cv-01611-MSK-CBS Document 265-30 Filed 11/20/13 USDC Colorado Page 9 of 15
SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-29

As is also a common practice in the industry, Western and Kroger both had purchase and sale "confirmations" or agreements for specific purchases under the master agreements that defined contractual purchases for a particular duration.

For example, Western had two year-long contracts with Suncor which covered the periods January 1, 2007 through December 31, 2007 (WES-1C79) and January 1, 2008 through December 31, 2008 (WCS-1E29). Thereafter, Western had a series of month-long or slightly longer than month-long contracts with Suncor in 2009 and 2010 (WCS-1H16, WCS-1A21, SCS-1A62, WCS-1B24, WCS-1B69, WCS-1C35, WCS-1D02, WCS1D44, WCS-1F14, WCS-1F72, WCS-1H67, WCS-1K36, WCS-IK071, WCS-1L020, WCS-1A088, WCS-09B060, WCS-1C006, WCS-1D029). Then, beginning at the end of 2010 and in early 2011, Western had contracts with Suncor that lasted multiple months (WCS-1H064, WCS-1A043). (Copies of all of these agreements are included within the deposition exhibits, particularly Deposition Exhibit 31). Each of these purchase and sale agreements provided for deliveries of fuel over the course of the stated term, and Western consistently purchased fuel from Suncor under these contracts from 2008 through the first half of 2011 until the relationship was terminated.[1] It is my understanding based on the depositions that, at the time the relationship was severed, Suncor and Western had been negotiating and agreed on terms of a year-long contract to be effective from May 1, 2011 to April 30, 2012. All of these contracts and the proposed contracts (whether of one-year, one-month, or multi-month term) provided that Western would purchase from Suncor certain and consistent volumes of product.

Dillon and Mini Mart similarly had a series of contracts with Suncor. See generally Deposition Exhibits 33 and 34 and documents produced by Kroger. Each of these contracts through mid-2011[2] was designated to have a one-year term, although Suncor and Kroger apparently changed these contracts mid-term by entering into new one-year contracts. See copies of agreements, attached. Although each of the Suncor-Kroger contracts were designated to be for a term of one year (or a two-year term beginning in June 2011), as was the case with the Western contracts, each of the contracts provided that Dillon or Mini Mart would purchase from Suncor certain volumes of products on a monthly basis. Thus, Western and Kroger were both certain and consistent purchasers of substantial volumes of Suncor products.

Despite the fact that they both consistently purchased substantial volumes of gasoline and diesel from 2008 through May 2011, Suncor offered Kroger different price terms and what amounted to be a substantially lower price. (See contracts and deposition testimony of Ms. Carbone at page 81). Specifically, Ms. Carbone testified:

---

[1] It is my understanding that there are a few periods within these timeframes that there was not a written and signed contract for specific purchases by Western from Suncor but that Suncor sold Western products under the same consistent terms nevertheless.

[2] In June 2011, Suncor entered into two-year term contracts with Dillon and Mini-Mart.

CONTAINS OR REFERENCES MATERIAL IDENTIFIED AS
CONFIDENTIAL, HIGHLY CONFIDENTIAL, OR SECRET                                                    PAGE 9

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

    Q.    Are you generally aware that the pricing to Kroger was more favorable than the pricing to Western Convenience Stores.

    **A.**    **Yes.**

    MR. SHAHEEN. I'll object but go ahead.

    **A.**    **Yes, I recall it was lower.**

Suncor states in its interrogatory response number 6 that one reason that it gave a lower price to Kroger was that its price to Kroger was in response to a request for "competitive bids" and was offered in response "to competitive offers." That answer suggests that the bid process served as the basis for claiming that Suncor was meeting competition. However, the process did not allow bidders to meet the competition because bidders were not responding to each another. In fact, bidders were unaware of what their competitors were bidding. In other words, the bid process was conducted in such a way as to prevent bidders from making an offer that met the competition as the bidders had no knowledge of what the competition was bidding.

The testimony of Mr. Moss establishes that this was not a competitive process in which Suncor knew the bid amounts of competitors. Mr. Moss stated:

    Q    All right. And for the bid process, did Kroger or the Dillon families issue some sort of request for proposal that Suncor and other suppliers responded to?

    **A**    **Correct. That was the bid process. Each year they would put out a request for supply into a particular market or nationwide depending on the companies. And everybody -- that becomes a public bid. Everybody in the business can -- in the industry can put in a bid or proposal to supply that volume.**

    Q    Did they tell you basically here's what we want to pay for this?

    **A**    **No. The bids are strictly put out saying we need X volume of product in this particular market. And they may say we want this particular grade of product or these specs, and that was it. There's no price point.**

    Q    Okay. And you come up -- each company or each supplier comes up with its own price and hopes that it's the best one?

    **A**    **Correct.**

    Q    Was there negotiation after the bid process where Kroger/Dillon Companies would come back and say, well, X is giving us this. We'd really like to do business with you, Suncor. Can you ratchet it down?

> **A** **No. That is not the -- that is not the way the system works.**
>
> **Q** Okay. They just chose whomever they felt gave them the bid?
>
> **A** **They let you know that you are the successful bidder or you weren't the successful bidder. They could not or would not divulge whether your price is the best or whether you need to better it.**

Moss deposition testimony at pages 43-44. This is also established by Suncor's *Responses to Plaintiffs' Second Set of Interrogatories, Third Set of Requests for Production of Documents, and First Requests for Admissions to Defendant*, page 2, in which Suncor stated that it did not confirm (or have any way of confirming) who the other bidders for Kroger business were or what price they were offering.

Suncor also states that it gave Kroger a different (lower) price than Western was charged because the contracts with Kroger were for a longer term. Western had been on one-year contracts with Suncor before moving to the month-long term contracts and, later the three-month contracts. Suncor's pricing strategy for Western did not appear to be altered based on the length of the contract. This is particularly illustrated by the fact that Western and Suncor came to terms on a proposed one-year contract just before Suncor terminated the parties' relationship. See Deposition Exhibit 117. That one-year contract contained the same prices as had been contained in the three-month contract that immediately preceded it (WCS-1A043) as well as the month-long contracts that preceded it (WCS-1D029). If Suncor was basing its prices on length of contract, presumably the proposed year-long contract with Western would have contained the same prices that it had/was giving to Kroger.

Suncor states that it gave Kroger different (lower) prices because Kroger was a "ratable" customer and that Western was a non-ratable "spot" customer. "Spot" is a term used in the industry to refer to a one-time delivery/pick-up of fuel, typically via a pipeline shipment. I am aware that Suncor inserted in its one-month and three-month contracts with Western a reference to those contracts as being "spot" (e.g., "Spot deal for May...."). However, none of the month long, three-month long, or one-year contracts between Western and Suncor would be considered in the industry to be "spot" deals. To the contrary, each of these contracts involved multiple deliveries of fuel from Suncor to Western that would occur over the term of each contract.[3] An example of a contract between Suncor and Western that reflects what the industry would consider to be a "spot" deal is Contract WCS-1H25, which had a two-day term

---

[3] An illustration would be Contract WCS-1H67, under which Western agreed to purchase 150,000 BPM (barrels per month) of gasoline and 30,000 BPM of diesel during the month of October 2009 via truck pickup from the Suncor terminals in Denver and Grand Junction and the Rocky Mountain Pipeline facility in Fountain. Each barrel of gasoline or diesel contains 42 gallons. A truckload of gasoline or diesel fuel contains approximately 8,000 gallons. Thus, Western picked up from the Suncor or RMPL terminals for delivery to the various Western retail sites approximately 945 separate truckloads of gasoline during October 2009. Neither these deals, nor the deals with Kroger, would be considered by the industry to be spot deals.

(November 24 -25, 2008) and involved a purchase by Western of 5,000 barrels of gasoline via the Rocky Mountain Pipeline at a discount of 10 cents per gallon off of Suncor's unbranded rack price.

In the industry, a "ratable" customer is considered to be one which pulls products on a consistent basis. Ratability is not considered to mean the same thing as long-term, although long-term customers which purchase on a consistent basis certainly could be considered to be "ratable." Western was a ratable customer during the relevant periods as, based on my understanding, it consistently purchased the amounts which Suncor contracted to sell to it. Also, it does not appear that "ratability" was actually a factor that Suncor relied upon in determining price differences given to Kroger and Western. The proposed year-long contract with Western (Deposition Exhibit 117) was identified as a "RATABLE CONTRACT" and yet contained the same pricing that Suncor had given to Western under the earlier contracts referenced as "spot" deals.

### E. The product sales to Western and to Kroger entities involved sales of finished products that crossed state lines.

I understand that an issue in this case is whether finished gasoline or diesel products purchased by Western and/or Suncor during relevant timeframes crossed state lines. It is my opinion, based on my knowledge of the industry and my review of the deposition of Mr. Piscatelli, certain deposition exhibits and other documents produced in the action, that the finished fuel products purchased by Western and Kroger during the relevant time frame included fuel refined as a finished product in Colorado by Suncor at its own refinery and fuel that was refined as a finished product outside of Colorado and brought into Colorado by Suncor for immediate or near immediate sale to Suncor purchasers, including Western and Suncor.

Suncor is the only refiner of finished gasoline and diesel fuel products in Colorado. As noted in the depositions and reflected on the diagrams contained at pages 55-58 of Deposition Exhibit 93 and pages 3-8 of Deposition Exhibit 94, Suncor refined products are sold not only within the state of Colorado from Suncor terminals in Commerce City (known as the East and West Plant terminals) and Grand Junction but also through terminals operated by Rocky Mountain Pipeline in Dupont and Fountain Colorado

There are multiple supply channels (reflected on these same diagrams), through which fuel products refined by others outside Colorado are imported into Colorado through pipelines to terminals in Commerce City, Dupont and Fountain (there are no pipelines to terminals in Grand Junction; the terminals there are supplied via truck and rail car deliveries from inside or outside Colorado). The major refiners which transport finished fuel products refined outside of the state into Colorado include Valero (products refined in McKee, Texas), ConocoPhillips (products refined at Borger, Texas), Holly Frontier (products refined at El Dorado, Kansas and Cheyenne, Wyoming), Sinclair (products refined at Casper, Wyoming); Exxon/Mobil (products refined at Billings, Montana) and Cenex (products refined at Laurel, Montana).

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-29

As set forth in Section V.C above, unbranded gasoline and fuel products are fungible, so long as they are the same grade and meet government requirements for sale in a particular geographic area at a particular time. Therefore, it is a common, almost universal practice among gasoline refiners and other wholesalers to enter into arrangements with other refiners through which refined products are purchased, sold, exchanged or otherwise transferred to meet the particular supply needs of the refiner/wholesaler or demands of the refiner/wholesaler's customers. These transfers are typically memorialized by an agreement or agreements (typically called Supply Agreement, Purchase Agreement, Exchange Agreement, Trade Agreement or the like). A refiner may be required to purchase fuel manufactured by another refiner for a variety of reasons, such as need for supply during refinery maintenance periods (i.e., turnarounds), demands for seasonal specifications that cannot be met by the refiner's own production, and committed or other sales to customers exceeding the refiner's own refining capacity. As described in Section V.C, the products manufactured by other refiners may be commingled with the refiner's own finished products for sale in tanks. When this occurs, there is no means to separate the finished products once commingled, and there is no distinction in the accounting for such products based on where the product was refined.

Mr. Piscatelli confirmed in his deposition that fuel sold to customers by Suncor to customers via each of its terminals and the RMPL sites in Dupont and Fountain is commingled fuel comprised of Suncor fuel as well as fuel finished by other refiners, all of which are located outside of Colorado. See Mr. Piscatelli's deposition at pages 58-74, 175-181. In addition, I have reviewed numerous supply or related agreements which reflect that Suncor purchased and imported into Colorado for sale hundreds of thousands of barrels of fuel products during the time period relevant to this case. These agreements are identified in Section VI.J below.

As a rule, refiners do not stockpile inventories of finished fuel products purchased from other refiners for significant period of time. Rather, the goal of a refiner almost always is to sell off any inventories of fuel as fast as possible, generally within days. There are several reasons for this. First, refiners want to operate at maximum refinery operating capacity to the greatest extent possible so as to maximize profits. Refiners have limited storage capacity and usually cannot operate at maximum capacity when storing significant amounts of refined products. Second, fuel formulation requirements change frequently, for example, seasonally. A refiner that stockpiles purchased products for a significant period of time faces a substantial risk that the stockpiled products would exceed seasonal vapor measure requirements by the time of sale. Refiners typically sell purchased inventories of product as quickly as possible to eliminate these risks. Third, refiners typically purchase inventories of fuel from other refiners only when they know that the purchased fuel can be resold immediately at a margin above the purchase price. Conversely, when a refiner holds fuel purchased from other refiners for significant periods, it faces a substantial risk that the price of the fuel will drop and that the purchased fuel will be sold for a significant loss. Refiners typically are risk averse and sell inventories as quickly as possible to reduce or eliminate this risk.

Documents produced by Suncor, in particular certain product supply plans (also called "RIOT Graphs," e.g., Document Suncor_WCS 00044835) reflect that Suncor turns over its

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

Document 185-29

inventory of products multiple times each month. (An example would be October 2010 reflected in the reference documents, in which it appears that Suncor turned its inventory 7.2 times, the equivalent of approximately once every 4.3 days. Suncor's practice reflected in these documents is consistent with the industry practice of holding finished refined products (whether self-refined or sourced from other refiners) for a very short period of time prior to sale.

Finally, a significant portion of the gasoline products at issue in this case are a blend of gasoline and anhydrous ethanol.[4] In particular, E10 gasoline is a mixture of 90% unleaded gasoline and 10% ethanol. It is my understanding from Mr. Piscatelli's testimony (see pages 75-76), that all of the ethanol used in Suncor products is manufactured by a third-party (i.e., not Suncor) and that one-third of the ethanol used by Suncor in its gasoline blends is produced from outside of Colorado. As is the case with gasoline, once ethanol is blended into a gasoline product, it is impossible to determine the manufacturing or refining source of the ethanol.

I understand that depositions and other discovery in this case have not been completed and that, in particular, depositions of relevant individuals currently or formerly employed by the Kroger entities have not yet been taken and reports of experts for Suncor have not been completed or disclosed. I anticipate that I may need to modify or supplement this report, including the areas of opinion testimony, based on the additional discovery to be taken or matters raised in the reports of Suncor's experts. I also understand that the president of WCS, Hossein Taraghi, has been prohibited from seeing discovery, primarily related to Kroger pricing data which has been designated Highly Confidential or Secret. Accordingly, I have not been able to discuss such discovery with Mr. Taraghi, particularly as it pertains to Kroger. I, thus, reserve the right to modify or amplify the opinions and other matters contained in this report should that be necessary or appropriate after I am allowed to fully interview Mr. Taraghi.

VI. MATERIALS AND INFORMATION CONSIDERED (contained on the attached DVD)

A. Filings in this action provided to me, including the Complaint and Amended Complaint filed by WCS, the Suncor Answers to those documents, and Suncor's responses to interrogatories, requests for documents and requests for admissions.

B. Depositions reviewed or partially reviewed: Suncor Rule 30(b)(6) Deposition (Aaron Lingnau, Vance Kopp, Steven Ewing); Diane Kriskovich; Steve Moss; Kendall Carbone; James Piscatelli; Steven Ewing; Don Smith.

C. Western/Suncor contracts, agreements and related documents, including Master Product Purchase and Sale Agreement (Deposition Exhibit 2); Terminal Access Agreement (Deposition Exhibit 1); various Confirmation of Purchase/Sale Agreements (Deposition Exhibit 31), contract or related communications (Deposition Exhibits 36, 86, 114, 116, 117, 118, 120, 122, 131).

---

[4] Anhydrous ethanol is frequently referred to as simply "ethanol."

CONTAINS OR REFERENCES MATERIAL IDENTIFIED AS
CONFIDENTIAL, HIGHLY CONFIDENTIAL, OR SECRET                                    PAGE 14

SECRET - SUBJECT TO SUPPLEMENTAL PROTECTIVE ORDER

- D. Kroger/Suncor contracts, agreements, and related documents, including Master Product Purchase and Sale Agreement, Product Purchase/Sale Agreements with Addenda, Transaction Summaries and related files (Deposition Exhibits 32, 33, 46, 47, 48, 49, 50, 53, 54); contract or related communications (Deposition Exhibits 37, 82, 87, 125, 135).

- E. Kroger request for proposal documents (Deposition Exhibits 71, 72, 73, 74, 80, 88, 89).

- F. Summary of contract terms.

- G. Other contract documents as contained in the "Contract Files" directory on the DVD.

- H. Price checking surveys created by Western, Kroger and Suncor for retail stores (representative samples contained on DVD).

- I. Suncor summaries or descriptions of price terms or credit status for specific unbranded customers, including Western and Kroger entities (Deposition Exhibits 32, 98, 126).

- J. Documents relating to Suncor supply agreements and arrangements with other refiners (Deposition Exhibits 79, 81, 90, 100 (e.g., pages 55-62), 101-111). See also "Supply Agreement" folder on DVD.

- K. Suncor slide and other materials relating to Suncor operations, pricing, contractual strategies (Deposition Exhibits 69, 92, 93, 97, 123, 124).

- L. EAI, Inc. reports prepared for Suncor (Deposition Exhibits 94, 96).

- M. EAI, Inc, Denver/North Front Range Fuel Supply Costs and Impacts Report REV 1 for Regional Air Quality Council, dated February 16, 2011.

- N. Other identified Deposition Exhibits (numbered 1-136, with gaps).

- O. Expert Report of Professor Mark Glick and Mr. Ted Tatos.

- P. Telephone and in-person discussions with Professor Mark Glick and Mr. Ted Tatos.

Date: January 22, 2013

_____
John Mayes