IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01611-MSK-CBS

WESTERN CONVENIENCE STORES, INC. and
        Plaintiff/Counterclaim Defendant,
v.

SUNCOR ENERGY (U.S.A.) INC.,
        Defendant/Counterclaim Plaintiff,
and

SUNCOR ENERGY (U.S.A.) Inc.,
        Third-Party Plaintiff,
v.

HOSSEIN TARAGHI, and
DEBRA LYNN TARAGHI,
        Third-Party Defendants.

---

## ORDER REGARDING DILLON COMPANIES, INC.'S
## MOTION FOR FEES AND COSTS

---

Magistrate Judge Shaffer

        This matter comes before the court on non-party Dillon Companies, Inc. ("Dillon")[1] Motion for

Fees and Costs (doc. #226) filed on April 26, 2013.  With the instant motion, Dillon seeks to recover

attorney fees and costs incurred in (1) "responding to four subpoenas submitted to Dillon and a former

Dillon employee by Plaintiffs," (2) "responding to Western's motions to re-designate or provide public

access to documents containing Dillon's trade secrets that Dillon produced in reliance upon the

---

[1]The April 26, 2012 subpoena duces tecum that precipitated the instant motion was broadly directed to "The Kroger Company, Dillon Companies, Inc. and their subsidiaries, affiliates, and related entities, including but not limited to *King Soopers, City Market*, and *Loaf'N Jug*."  *See* Exhibit A (doc. #57-1) attached to Dillon Companies, Inc.'s Motion to Quash or Modify Subpoena (emphasis in original).  For purposes of this Order, the court will continue the parties' convention and collectively refer to the foregoing entities as "Dillon."

1

Supplemental Protective Order," and (3) "filing motions to restrict public access to documents designated as 'secret' under the Supplemental Protective Order . . . that Western filed with the Court with no restrictions on public access in violation of the Supplemental Protective Order." *See* Dillon's Motion for Fees and Costs, at 1-2.  More specifically, Dillon contends that as a non-party, it was served with "discovery requests that were overly burdensome and totally unrelated to this litigation," *id.* at 37, and that "required Dillon to disclose its trade secrets to a direct competitor." *Id.* at 40. Dillon insists that the requested $122,202.50[2] in attorney fees and $26,547.32 in costs reflects its reasonable "steps throughout this matter to minimize fees and expenses ." *Id.* at 41.

Plaintiffs Western Convenience Stores ("WCS") and Western Truck One, LLC ("WTC") (collectively "Western") filed their Response to Dillon's Motion for Fees and Costs (doc. #239) on June 11, 2013, arguing that "Dillon has not met its Rule 45 burden for cost or fee shifting and [that] any costs or fees to which Dillon could conceivably be entitled should be offset by the very substantial expense incurred by Plaintiffs as a result of Dillon's efforts to avoid and delay production." *See* Plaintiffs' Response, at 2.  Indeed, Western maintains that cost-shifting in this case would be inappropriate as Dillon initially

> refused to produce any responsive documents, refused to engage in meaningful discussions regarding the scope of the subpoena requests, made contradictory representations regarding availability of responsive documents and [electronically stored information], and delayed any production at all for more than four months until the Court denied its motion to quash. . . . [E]ven after the Court denied Dillon's motion, Dillon caused additional unnecessary expense and detriment to Plaintiffs by filing and refusing to withdraw additional motions and objections which were entirely, or largely moot . . .

*Id.* at 2-3.  Western does not challenge Dillon's motion to the extent it seeks "hard' costs incurred in

---

[2]Dillon claims that it actually incurred $182,728.50 in attorney fees and reserves "its right to seek [the additional $60,526.00 in] attorney fees from the Court at a later time." *See* Dillon's Motion for Fees and Costs at 26, n.9.

complying with Plaintiffs subpoenas, but fixes that amount at $3,388.55.  Western opposes Dillon's

internal costs of $24,470.56 and all of its requested attorneys fees.

Dillon filed a Reply in Support of Motion (doc. #247) on July 12, 2013.  Once again, Dillon

insists that it "engaged in a massive six month production of 98,437 pages of documents for Western's

benefit" and that it "incurred several hundred thousand dollars in attorney fees and costs and lost

hundred hours of employee time in this matter."  Dillon seeks an order "requiring Western, jointly and

severally, to pay Dillon $122,202.50 for its attorney fees and $26,546.32 for its costs for a total of

$148,749.82."

After reviewing the parties' briefs, which total 357 pages and 40 exhibits, as well hearing

transcripts and submissions filed over the course of this litigation, I have gained a greater appreciation

for the Supreme Court's observation that a request for fees and costs "should not result in a second

major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  If counsel for Western and Dillon

had expended even a fraction of this same energy in working together from the outset in a cooperative

manner, this dispute could have been avoided.  That salient point seems to be lost in the parties'

barrage of cross-accusations.  With this Order, the court will attempt to bring closure to this discovery

dispute.

## PROCEDURAL HISTORY

The court presumes the parties' familiarity with the procedural history of the litigation and,

therefore, will only summarize those facts necessary to place the instant motion and the court's

analysis in context.  That said, I apologize to the uninitiated reader for the length of the following

factual recitation.

Western Convenience Stores, Inc. is a Colorado corporation, owned by Hossein Taraghi and

his wife, that operates 42 convenience stores in Colorado and Nebraska, selling as its principal

products gasoline and diesel fuel.  As an independent retailer, WCS is a "discounter," that sells only unbranded fuel.  Suncor is in the business of refining and selling petroleum products, including gasoline and diesel fuel, to retailers such as WCS.  Suncor also sells certain name brand fuels through its own retail business.  Suncor operates two refineries and terminals in Commerce City, Colorado and one terminal in Grand Junction, Colorado.  From 2004 to 2011, WCS purchased 70-80% of its fuel from Suncor.  Western Truck One is a Colorado limited liability company owned by Hossein Taraghi that transports petroleum products by truck for WCS.

On January 17, 2007, Suncor and WCS entered into a "Master Product Purchase and Sale Agreement" (hereinafter "Master Agreement") under which WCS purchased fuel on a $3 million line of credit extended by Suncor, with payment by electronic funds transfer due ten days after WTO loaded the fuel.  On May 20, 2011, Suncor informed WCS that henceforth it would require prepayment for shipments of fuel.  Believing this violated the Master Agreement, WCS instructed its bank not to honor draw requests made by Suncor.  Thereafter, Suncor discontinued all fuel sales to WCS.  Since May 23, 2011, WCS has continued to operate by purchasing fuel from other suppliers.

Plaintiffs initiated this lawsuit on June 20, 2011.  On February 1, 2012, Plaintiffs filed an Amended Complaint (doc. #43) asserting six claims for relief:  (i) price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13, based on Suncor's alleged sale of fuel on preferential terms to "favored retailers" (such as Dillon Companies, Inc.); (ii) breach of the  Master Agreement by, among other things, improperly suspending WCS' purchasing ability, withdrawing credit terms to WCS  without cause, and engaging in price discrimination; (iii) breach of contract by revoking WTO's ability to receive fuel from third-party sellers through Suncor's terminal; (iv) tortious interference with contract by wrongfully interfering with the Plaintiffs' "performance of their agreements and relationships with middlemen;" (v) tortious interference with contract, in that Suncor's revocation of

terminal access to WTO interfered with a contract between WTO and WCS; and (vi) a violation of

C.R.S. § 6-2-108, in that Suncor engaged in unlawful restraint of trade by offering secret rebates or

refunds to favored purchasers without offering those same terms to Plaintiffs.  Suncor asserted a

counterclaim for breach of contract, based upon WCS' alleged failure to pay for fuel received from

Suncor.  Defendant also filed a Third-Party Complaint (doc. # 37) alleging that Mr. Taraghi and his

wife failed to honor their personal guaranty of WCS' contractual obligations to Suncor.[3]

To establish a Robinson-Patman Act claim, Western Convenience Stores, Inc. must make a

*prima facie* showing:

> (i) two or more contemporaneous sales by the same seller to different buyers at different prices; (ii) of commodities of like grade and quality; (iii) at least one of the sales was made in interstate commerce; (iv) the discrimination had the requisite effect on competition generally; and (v) the discrimination caused injury to WCS. If WCS carries its burden of demonstrating these elements, Suncor may avail itself of an affirmative defense by showing that its price discrimination "was made in good faith to meet an equally low price of a competitor."

*See Western Convenience Stores, Inc.*, 2013 WL 4775894, at *3 (D. Colo. Sept. 5, 2013).  From the

outset of this litigation, Western has alleged that Suncor "engaged in price discrimination by charging

WCS more for fuel than it charges WCS's competitors, including Dillon Companies, Inc. d/b/a King

Soopers Fuel Center."  *See* Complaint (doc. #1), at ¶25.  *See also* Amended Complaint, at ¶25.

On November 17, 2011, I held a Fed. R. Civ. P. 16 scheduling conference and entered a

scheduling order.  During that conference, counsel were advised that they could not file an opposed

discovery motion without first complying with the "meet and confer" requirement in Fed. R. Civ. P.

---

[3]On September 5, 2013, Chief Judge Krieger denied Suncor's motion for summary judgment on Western Convenience Stores' statutory claims under the Robinson-Patman Act and C.R.S. § 6-2-108, as well as Suncor's motion for summary judgment on its own counterclaims.  In the same Order, Chief Judge Krieger granted summary judgment in favor of Suncor on Plaintiffs' common law claims, thus dismissing WTO from this action. *See Western Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc.*, No. 11-cv-01611-MSK-CBS, 2013 WL 4775894, *26 (D. Colo. Sept. 5, 2013).

26(c)(1) and 37(a)(1), and D.C.COLO.LCivR 7.1A.  If the parties were unable to resolve their discovery dispute through the "meet and confer" process, they were required to arrange a telephone conference, on the record, with me.  If, at the end of the court-supervised conference, the discovery dispute was still unresolved, the court would direct a party to file a motion and set an expedited briefing schedule to ensure the motion was decided promptly.  *See* Courtroom Minutes/Minute Order (doc. #27).

This court signed the parties' proposed stipulated Protective Order on March 12, 2012.  Under the terms of that Protective Order (doc. #49), "[a]ny Party to this action or any non-party may designate any Discovery Material produced by it as 'Confidential Information' or 'Highly Confidential Information.'"

> For purposes of this Protective Order, "Highly Confidential Information" affords a higher level of protection for Discovery Material and is to be used only for *extremely sensitive information,* the disclosure of which may cause *substantial* competitive or business injury to the Designating Party or which would give a competitor or a customer a competitive advantage over other competitors or customers of the Designating Party. . . . Except as provided in subparagraphs (d) and (e), below, Counsel for a Receiving Party **may *NOT disclose* "Highly Confidential Information" and/or any information derived from such Information to the officers, directors, owners, shareholders, principals or employees (except and not including in-house counsel) of the Receiving Party** ("Excluded Persons") . . .

*See* Protective Order, at ¶¶3 and 9 (emphasis in original).[4]  *Cf. Layne Christensen Co. v. Purolite Co.*, 271, F.R.D. 240, 248 (D. Kan. 2010) (while there is "no absolute privilege for trade secrets or similar confidential information," a court may, for good cause, issue a protective order requiring that trade secrets or confidential commercial information be disclosed only under specified conditions).

Plaintiffs served their First Set of Interrogatories and Requests for Production of Documents on

---

[4]The Protective Order stipulates that subject to specified conditions, "Confidential Information" and "Highly Confidential Information" can be disclosed to a retained expert or consultant, provided that the producing party receives advance notice in writing. *See* Protective Order, at ¶11.

Suncor on February 28, 2012.  Western sought, in part, contract documents between Suncor and Dillon, and various categories of data "regarding each load of Fuel sold in the Pertinent Geographic Area and Pertinent Time Frame to WCS" and other fuel purchasers, including Dillon.[5]  Plaintiffs also broadly sought production of "all Communications and Documents which memorialize, relate to or reflect discounts to Fuel Purchasers during the Pertinent Time Frame and in the Pertinent Geographic Area," as well as "all Communications and Documents relating to disputed facts alleged with particularity in the pleadings."  *See* Exhibit C (doc. #52-3) attached to Plaintiffs' Motion to Compel.  Although it objected to many of Western's defined terms and discovery requests, Suncor indicated on April 2, 2012, that it would provide, subject to objection, "the requested, specified data it has in its possession . . . for WCS and [Dillon]," as well as its contract documents with WCS and Dillon.

Thereafter, on May 2, 2012, Plaintiffs moved to compel "Suncor financial and accounting data for the years 2007 through 2011" in order to "determine what Off-Invoice discounts and/or rebates were provided by Suncor to the Favored Retailers," including Dillon.  *See* Plaintiff's Motion to Compel (doc. #52), at 4.  Western's motion, however, did not address its First Request for Production, which sought data regarding each load of fuel sold to Dillon during the Pertinent Time Frame and within the Pertinent Geographic Area, or its Second Request for Production, which asked for all contract documents between Suncor and Dillon.  After allowing multiple extensions of time to complete briefing, on June 25, 2012 I granted in part and denied in part Western's motion to compel and directed Suncor to produce responsive documents within two weeks.

---

[5]Plaintiffs' discovery requests defined the "Pertinent Geographic Area" as "Colorado and the area of Nebraska within a 25 mile radius of the towns of Sidney, Ogallala and Hershey," and defined the "Pertinent Time Frame" to "mean and include January 1, 2007 to the present."  These same defined terms were included in the subpoena duces tecum served on Dillon in April 2012.

A.      *Western's First Subpoena*

Even as they were pursuing discovery from Suncor, Plaintiffs issued a subpoena duces tecum

(the "First Subpoena") on or about April 26, 2012, directing the Dillon Companies, Inc. to produce 9

categories of documents specifically relating to the "Pertinent Time Frame" and "Pertinent Geographic

Area."[6]   *See* Exhibit A (doc. #57-1) attached to Motion to Quash or Modify Subpoena.  Plaintiffs

requested *inter alia*,

> 1.   "all contract documents between [Dillon] and Suncor;"
>
> 2.   "all communications between [Dillon] and Suncor referring or relating to any
> Discount;"
>
> 5.   "such ESI and other Documents as will identify the Net Price for each delivery of
> Fuel purchased by [Dillon] from Suncor . . . ;"
>
> 7.   "such ESI as will identity . . . each customer on each credit or debit card purchase of
> Fuel from [Dillon] at retail;"
>
> 8.   "such ESI and other Documents as will disclose the daily pump price at each of
> Your Retail Sites for each Fuel type (regular or premium gasoline, E85 or diesel); " and
>
> 9.   "such ESI and other Documents as will disclose the results of all retail Fuel Price surveys
> done by You or on Your behalf, or on which You rely."

In addition, Request No. 10 required Dillon to disclose "all reports and research studies, examinations,

investigations, surveys or analysis . . . done by [Dillon] or on [Dillon's] behalf relating to the

characteristics of consumer demand for Fuel, or competition at the retail level," but did not limit this

particular request to the Pertinent Time Frame or Geographic Area.

The subpoena duces tecum defined the terms "document" and "documents" to include "all

manner of exemplification of information in the broadest sense provided for by the Federal Rules of

Civil Procedure, including . . . the originals, the best available copies where originals are not available,

---

[6]Dillon concedes that it operates 155 retail fuel locations within the pertinent geographic area,
while WCS operates 42 retail fuel locations.  *See* Motion to Quash or Modify Subpoena, at 2.

and all non-identical copies and drafts whether different because of notes made thereon or otherwise," as well as "computer records, email records" and "all copies of Documents by whatever means made." Western separately defined "ESI" to include "information created, manipulated, communicated, stored and best utilized in digital form." The subpoena required production by May 18, 2012, but Dillon produced no documents or materials on or before the return date.

On May 18, 2012, Dillon filed a Motion to Quash or Modify Subpoena[7] (doc. #57), refusing to produce any information responsive to the First Subpoena. While conceding that "Dillon and Plaintiffs are competitors in the sale of fuel to consumers" within the Pertinent Geographic Area, Dillon argued that Western sought information that was not relevant or necessary to its antitrust claims against Suncor[8] and that Dillon would suffer competitive harm if required to disclose confidential or proprietary information in response to Request Nos. 7, 8, 9 and 10. Dillon also asserted that Plaintiffs' requests encompassed an "extraordinary quantity of documents" the production of which "would require an extraordinary amount of time from Dillon's employees and cause an extreme disruption to Dillon's operations." *See* Motion to Quash or Modify Subpoena, at 8 and 9. A supporting affidavit executed by corporate counsel stated in conclusory terms that

> To comply with the Subpoena, Dillon would be forced to undertake a search of millions of documents in thousands of different locations. . . . Because of the enormous quantity of information requested, Dillon is unable to calculate the amount of time compliance

---

[7]Notwithstanding the caption, Dillon's motion did not seriously press for modification of the First Subpoena. Dillon started its argument by insisting that the court "must quash the Subpoena." The concluding paragraph in the motion speaks only of quashing, and not modifying, the First Subpoena. *See* Motion to Quash or Modify Subpoena, at 3 and 10.

[8]*But see SLB Enterprise, LLC v. AGI Corp.*, No. 11-mc-259, 2011 WL 6134542, at *1 (E.D. Pa. Dec. 8, 2011) (noting that "Rule 45 must be read in connection with Rule 26, which defines the permissible scope of discovery; however, a district court may deny a motion to quash 'if there is any ground on which [the information sought] might be relevant").

would require.[9]

*See* Exhibit B (doc. #57-2) at ¶¶ 2 and 3, attached to the Motion to Quash or Modify Subpoena.

Plaintiffs responded to Dillon's Motion on June 11, 2012.  As a threshold matter, Western argued the motion should be denied based upon Dillon's repeated refusal "to engage in efforts to reach any compromise regarding the subpoena requests, or to produce documents responsive to requests that were not even arguably objectionable."  While insisting that the subpoena duces tecum sought relevant information, Plaintiffs also noted that Dillon failed to provide any factual basis for its broad assertion of undue burden.  Western further suggested that Dillon's proprietary information could be adequately protected with a "Highly Confidential" designation under the Protective Order.

In its reply brief (doc. #85), Dillon again argued that the existing Protective Order "would allow disclosure of any of [Dillon's] trade-secret information to Plaintiffs' principals" as "Plaintiffs can offer no assurance of 'attorney-eyes only' protection for Dillon's trade secret information."  Dillon denied that it had failed to satisfy its meet-and-confer obligation under D.C.COLO.LCivR 7.1A, given Plaintiffs' counsel's refusal to compromise or withdraw any of the requests set forth in the subpoena. Notably, Dillon's Reply did not elaborate on its claim of undue burden.

On July 16, 2012, this court heard argument on Dillon's motion to quash.  In response to the court's concern over the paucity of information in corporate counsel's affidavit, Dillon's attorney conceded that the affiant was "painting in broad strokes" and only intended to provide a "snapshot of the time and effort that will go into producing" responsive documents.  *See* Transcript of Proceedings on July 16, 2012 (doc. #121) at 10 and 11.  *But see*, *e.g.*, *International Brotherhood of Teamsters,*

---

[9]Although Plaintiffs' subpoena duces tecum specifically referenced "ESI" as a defined term, Dillon's corporate affidavit only referred to the burden of searching "documents" and provided no insight into how Dillon maintains electronically stored information or to what extent Dillon has the ability to search for responsive ESI.

*Airline Division v. Frontier Airlines, Inc.*, No. 11-cv-02007-MSK-KLM, 2012 WL 1801979, at *7 (D. Colo. May 16, 2012) (noting that the party opposing discovery as unduly burdensome can sustain their burden of persuasion only "by providing sufficient details or 'a compelling showing of undue burden' to obviate the overwhelming preference for requiring that relevant discovery materials be exchanged"); *Ohio Valley Environmental Coalition, Inc. v. United States Army Corps of Engineers*, No. 1:11MC35, 2012 WL 112325, at *2 (N.D. W. Va. Jan. 12, 2012) ("the party claiming undue burden as a basis for a motion to quash is held to a high burden of proof which requires the party to demonstrate the actual 'manner and extent of the burden and the injurious consequences of insisting compliance with the subpoena'"). Counsel further acknowledged that he did not know how his client maintained ESI or whether it had the capability to search for responsive data, notwithstanding Dillon's "undue burden" objection to Request No. 9 which sought responsive information maintained in electronic form. *See* Transcript of Proceedings on July 16, 2012 , at 14. Given those factual deficiencies, I found Dillon had not substantiated its claim of undue burden. *Cf. Malibu Media, LLC v. John Does 1-15*, No. 12-2077, 2012 WL 3089383, at *5 (E.D. Pa. July 30, 2012) (noting that the party seeking to quash a subpoena bears the heavy burden of demonstrating that the requirements of Rule 45 are satisfied).

Indeed, many of the arguments advanced by Dillon's counsel during the July 16 hearing collapsed upon closer scrutiny. Dillon challenged as unduly burdensome Request No. 4 that sought "such ESI or other Documents as will identify all [pertinent] retail sites, locations and outlets . . . where You sold Fuel at retail." As I pointed out during the hearing, compliance with this request did not require production of *all documents and all ESI* pertaining to every relevant retail outlet, but simply the production of a document or discrete ESI that identified each outlet. *See* Transcript of Proceedings on July 16, 2012 , at 16-17. It defied logic to suggest that Dillon could not readily (and inexpensively) identify its own stores. Dillon's counsel also continued to insist that Request No. 8

11

required his client to divulge trade secrets. I noted that Western simply asked for "the daily pump price" for fuel at pertinent retail outlets; information that would have been immediately available to any consumer driving by or purchasing fuel from those stores. Finally, Dillon's counsel insisted that the existing Protective Order was inadequate to protect his client's trade secrets given the possibility that proprietary information might be revealed to Western's principals or employees. While I refused to presume that Plaintiffs' counsel would condone any violation of the Protective Order, I observed that "nothing prevents Dillon from asking me to impose a more stringent protective order." *Id.* at 28.

During the July 16th hearing, the court did express concern over the breadth of Western's subpoena. Western's counsel insisted that he had propounded "reasonable requests" that "were narrowed to what is relevant to my case." *See* Transcript of Proceedings on July 16, 2012, at 41. This court expressed some skepticism. Although Request No. 1 sought "all [pertinent] Contract Documents" between Dillon and Suncor, Western's counsel conceded that the same documents had been the subject of a Rule 34 request directed to Suncor and that he was still in discussions with Suncor's attorney to complete that production. Counsel insisted, however, that his client was not required "to rely on Suncor to find out all the documents." *Id.* at 36. *But compare Soto v. Castlerock Farming and Transport, Inc.*, 282 F.R.D. 492, 505 (E.D. Cal. 2012) ("In general, there is a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests.") and *State Farm Mutual Automobile Insurance Co. v. Accurate Medical, P.C.*, No. CV 2007-0051(ENV)(MDG), 2007 WL 2993840, at *1(E.D.N.Y. Oct. 10, 2007) ("[N]othing in the Federal Rules of Civil Procedure requires a litigant to rely solely on discovery obtained from an adversary instead of utilizing subpoenas."). Request No. 7 sought credit and debit card numbers for "each customer on each credit or debit card purchase of fuel" at every Dillon outlet in Colorado, even if there was no competing WCS store within a 25 mile radius. Similarly, Request No. 10 was not

limited to a particular geographic area or specific period of time, but rather sought "all reports and research, studies, examinations, investigations, surveys or analysis" (together with 17 discrete types of information) "relating to the characteristics of consumer demand for Fuel or competition at the retail level."  Read literally, Request No. 10 encompassed all responsive documents generated "since the day Dillon started selling fuel."  *See* Transcript of Proceedings on July 16, 2012 at 45.  During his colloquy with the court, Western's counsel eventually conceded that Dillon did not become a Suncor customer until 2009 and, thus, the relevant time period could not extend back to 2007 as the subpoena mandated. *Id.* at 68.

At the conclusion of the July 16 hearing, the court admonished Western and Dillon to work cooperatively "in a way that allows discovery to go forward efficiently."  *Id.* at 50.

> The problem that I've got, . . . is [Western has] asked for stuff that I think is too broad. [Dillon has] raised objections that are not factually supported. . . . Now, my question is: . . . how can we approach this discovery in a way that moves this process forward, that focuses on what you really need, and get you that stuff in some phased way? . . . So stop thinking like advocates, stop thinking as adversaries and start helping me to figure out a way that I can move this case forward, because that's ultimately my only objective.[10]

_____

[10]Within minimal research, counsel could found my decision in *Cartel Asset Management v. Ocwen Financial Corp.*, No. 01-cv-01644-REB-CBS, 2010 WL 502721, at *13-14 (D. Colo. Feb. 8, 2010), where I wrote

> This court has endorsed *The Sedona Conference Cooperation Proclamation* (2008) . . . and its call for "cooperative, collaborative, [and] transparent discovery." In my view, the *Cooperation Proclamation* correctly recognizes that while counsel are

>> retained to be zealous advocates for their clients, they bear a professional obligation to conduct discovery in a diligent and candid manner.... Cooperation does not conflict with the advancement of their clients' interests—it enhances them. Only when lawyers confuse *advocacy* with *adversarial conduct* are these twin duties in conflict.

I am convinced that much of the time and expense incurred by Dillon *and* Western in months of protracted discovery disputes could have been avoided if counsel and their clients had followed the principles underlying the Cooperation Proclamation.

*Id.* at 50-51 and 67.  Plaintiffs' counsel indicated that he would take the court's guidance to heart and "do this without taking any more of your time."  *Id.* at 67.

On July 25, 2012, Western submitted a Status Report Regarding Dillon Companies' Motion to Quash Subpoena (doc. #89).  Western reported that Plaintiffs were willing to "substantially narrow" their subpoena requests and had conferred with Dillon's outside counsel on July 18, 2012 "in an effort to reach agreements regarding a mutually acceptable scope of each subpoena request."  However, Dillon's outside counsel apparently had "been unable to confer" with  client representatives having final decision-making authority.  In a Second Status Report (doc. #92) dated August 1, 2012, Western advised that

> Despite follow-up requests by [Plaintiffs' counsel], Dillon has not provided any Documents responsive to any of the 10 subpoena requests (as narrowed by Plaintiff's agreement), any commitment to provide any such Documents, *or* any substantive information as to Dillon's position regarding any of the 10 subpoena requests (again, as narrowed by Plaintiff's agreements).

Plaintiffs asked for a hearing on the earliest available date.  I set that hearing for August 17, 2012 at 2:00 pm.

On August 17, 2012 at 1:58 pm, Dillon filed its Status Report re: Plaintiffs' Subpoena (doc. #94).  Dillon reiterated its belief that Request Nos. 7, 8, 9 and 10 sought the production of trade secret information that required "extra protection."  Dillon argued that this trade secret information "should only be produced under a protective order providing 'attorneys' eyes only' protection," and asked the court to enter such an order.  Although the court had invited Dillon to submit such an order during the hearing on July 16, Dillon's Status Report did not include a proposed order for the court's or

----

Western's consideration.  Rather than moving the discovery process forward, Dillon continued to raise the "protective order" issue as an excuse for its non-compliance.

Although Request No. 8 purportedly encompassed trade secret information, Dillon indicated that it would be "willing to produce this information only if Western is willing to pay for retrieval." Dillon also suggested that such retrieval efforts would require approximately 200 employee hours at a total cost of $10,000, and the purchase to two servers at an estimated cost of $70,000.  As for Request No. 7, Dillon refused to produce responsive documents, but suggested that the burden of complying the subpoena would be significant.

> While Dillon is unable to estimate the time and expense involved in retrieving data for millions of transactions for hundreds of thousands of consumers, it has requested that its third-party vendor provide such an estimate.

Dillon said that even if Request No. 9 did not involve trade secrets, it "would not be willing to produce [responsive information] because of the time and expense involved."  Dillon reported that it had "not conducted" any research responsive to Request No. 10.

Dillon's Status Report indicated that it was producing contract documents responsive to Request No. 1.  Dillon also conceded that it had responsive documents that had not been included in Suncor's production of contract documents, thus suggesting that Plaintiffs' counsels' decision to err on the side of caution had been well-founded.  Dillon also said that it was producing lists of its Colorado and Nebraska retail fuel outlets in response to Request No. 4, and reported that it had no materials responsive to Request No. 6.  As for Request Nos. 2 and 3, Dillon stated that it would produce responsive information only "if Western agrees to pay all expenses related to the search," including time expended by Dillon employees or expenses incurred by a vendor hired to undertake the search. Dillon claimed that it would be "extremely difficult to locate documents responsive to Request No. 5.

> Invoices - [Dillon] estimated that it will take 400 hours to locate what invoices can be found.  At $50 per hour this would cost the requesting party $20,000.  The search would

take many months, possible over a year to search the records within [Dillon's] possession.  There is no guarantee as to what [Dillon] will be able to find.

Bills of Lading - [Dillon] estimates that it will take 800 hours to locate what Bills of Lading can be found.  At $50 per hour this would cost the requesting party $40,000.  The search would take many months, possible over a year to search the records within [Dillon's] possession.  There is no guarantee as to what [Dillon] will be able to find.

Dillon's Status Report did not include an affidavit or any other documentation to support these time and cost estimates.[11]  Dillon made its first production of documents at the August 17, 2012 hearing, limited to 25 pages of contract documents between Suncor and Dillon and a list of Dillon stores located in the Pertinent Geographic Area.  *See* Plaintiffs' Response to Motion for Fees and Costs (doc. #239), at 9.

During the August 17 hearing, I again attempted to move the discovery process forward.  When pressed, Dillon's outside counsel explained that his client had not authorized the filing of  a status report "until the very last moment," despite the court's admonition that counsel for WCS and Dillon should explore possible solutions to their discovery disputes and the court's July 16, 2012 Order requiring the filing of a joint status report.  *See* Transcript of Proceedings on August 17, 2013 (doc. #120), at 5.  *See also* Courtroom Minutes/Minute Order (doc. #88).  Counsel could only advise the court that "one of Kroger's attorneys" had offered to be "on call" "if there were questions that [outside counsel] couldn't answer during the hearing."

After considering the parties' status reports and the arguments of counsel, I denied Dillon's

_____

[11]During the hearing, this court expressed surprise that Dillon had not provided a more detailed explanation for how it arrived at these estimates.  Dillon's outside counsel conceded that his client had "elected to give a very, you know, abbreviated response."  *See* Transcript of Proceedings on August 17, 2013, at 13.  *But see Cartel Asset Management v. Ocwen Financial Corp.*, 2010 WL 502721, at *15 (holding that a "party seeking to invoke the protections of [Fed. R. Civ. P.] 26(b)(2)(B) . . . bears the burden of persuasion" which cannot be sustained with bald generalizations).  Counsel also acknowledged that his client's estimate of the time and expense required to produce responsive documents was based on the subpoena as originally drafted and served; not on the requests as subsequently narrowed in Plaintiffs' July 25, 2012 Status Report.  *Id.* at 25-26

Motion to Quash (doc. #57), finding that Dillon had not sustained its burden to show that a search for responsive information would be unreasonably burdensome or expensive, or that the requested materials were not reasonably accessible. *See* Transcript of Proceedings on August 17, 2013 (doc. #120), at 17-18. *See also* Courtroom Minutes/Minute Order dated August 17, 2012 (doc. #95).[12] Although Plaintiffs had narrowed their subpoena, I found that further modifications were appropriate. Accordingly, I limited the "Pertinent Time Frame" to the period from January 1, 2009 to May 2011, and the "Pertinent Geographic Area" to those Dillon retail outlets within 25 miles of WCS' stores. I also held that initially Dillon was only required to produce responsive information existing on active computer systems. *See* Transcript of Proceedings on August 17, 2013, at 27. *Cf. Williams v. City of Dallas*, 178 F.R.D. 103, 110 (N.D. Tex. 1998) (observing that "[m]odification of a subpoena is preferable . . . to quashing it"). I directed Dillon to produce responsive information within 30 days, or file a status report within ten days of the August 17 hearing explaining why responsive information could not be produced by the court-imposed deadline. *See* Transcript of Proceedings on August 17, 2013, at 34-35. The court also held in abeyance Dillon's demand for fees and costs, finding that "I have no information from which I could discern that cost-shifting is appropriate." *Id.* at 9. Rather than awarding fees and costs at the outset of the search process and thereby creating a dis-incentive for Plaintiffs to pursue reasonable discovery or for Dillon to search in an efficient and cost-effective

---

[12]On August 31, 2012, Dillon filed an Object of Interested Party Dillon Companies, Inc. To Magistrate Judge's Order Dated August 17, 2012 (doc. #107). On the same day, the court received a Motion by Interested Party Dillon Companies, Inc. for Reconsideration of the August 17, 2012 Order of Magistrate Judge (doc. #110), together with Interested Party Dillon, Inc.'s Motion for Partial Stay of the August 17, 2012 Magistrate Judge's Order (doc. #109). The latter motion sought to stay Dillon's duty to produce documents responsive to subpoena Request Nos. 5, 6, 8, 9 and 10 pending decisions on the Objection and Motion for Reconsideration. This court denied without prejudice Dillon's Objection and Motion for Reconsideration on November 16, 2012. Chief Judge Krieger denied Dillon's Objection on September 5, 2013 after concluding that Dillon had "essentially abandoned those Objections." *See Western Convenience Stores, Inc.*, 2013 WL 4775894, at *23.

manner, the court indicated that it would entertain a motion for fees and costs after discovery was

completed.

> I am not suggesting for a second that Dillon, a non-party to this litigation, should be
> subjected to unreasonable burdens and expenses.  So in that regard, I'm sympathetic to
> Dillon.  But I am also somewhat sympathetic to Plaintiff's position when the Plaintiff
> has taken strides to narrow the request[s], largely at my instigation, and then I get a
> response from Dillon Companies' in-house counsel which is singularly uninformative
> and notably belated. . . . *I will look at all the attendant circumstances, and based on the
> attendant circumstances decide whether or not this is a case where cost shifting is
> appropriate.*

*Id.* at 32-33 (emphasis added).  *Cf. Daimler Truck North America, LLC v. Younessi*, No. 08-MC-

5011RBL, 2008 WL 2519845, at *3 (W.D. Wash. June 20, 2008) (suggesting that the court should

seek a compromise between the requesting party's need for information and the burden on the

producing non-party).

Dillon filed a new Status Report (doc. #99) on August 27, 2012, indicating it would provide

some responsive information "on or before September 17, 2012 to the extent it is able to do so, subject

to the Court's Order, applicable privilege, attorney work product, and trade secrets."[13]  Dillon also

renewed its request that Plaintiffs "reimburse [Dillon] for all costs, fees and expenses incurred in

responding to the Subpoena pursuant to [Dillon's] document production policies and procedures."  *See*

Exhibit B (doc. #99-2) at ¶16, attached to Status Report of Interested Party Dillon Companies, Inc.

Western filed its Response (doc. #100) to Dillon's Status Report two days later, in which it

disputed the suggestion that Dillon had made any good faith attempt to confer after the August 17

hearing.[14]  According to Western,

---

[13]Dillon retained new outside counsel who entered their appearance on August 27, 2012,  and
its original outside counsel withdrew on August 30, 2012.

[14]While the court has not been provided with all time records for all of Dillon's outside counsel
starting back in May 2012, the first billing entry that references an actual "meeting" between Dillon's
new outside counsel and Western's counsel is dated September 5, 2012.

> Plaintiffs offered to make available their ESI expert . . . to assist Dillon in enabling the
> efficient and cost-effective production of the ESI that is responsive to the Subpoena.
> Plaintiffs previously offered to speak to Dillon or its counsel about ESI (or to make
> [their expert] available to do so) . . . .  Dillon has never responded to any of these offers
> or made any Dillon personnel available to speak with [Plaintiffs' expert] or discuss ESI
> or production of files.

*See* Plaintiffs' Response to Dillon Companies' Status Report, at ¶3.  Had Dillon responded in good

faith to these overtures, Western believed that it could have better assessed or responded to Dillon's

claim of undue burden.

Not surprisingly, Dillon then filed a Reply Regarding Status Report (doc. #108) on August 31,

2012.  This Reply started by alluding to "some miscommunication" in the past and apologizing to the

court "for any prior misunderstandings regarding the availability of information."  Dillon's counsel

asked for "the Court's patience as Dillon attempts to rectify same and provide the Court with the best

available information . . . ."  So, for example, Request No. 5 had requested "ESI or other Documents as

will identify the Net Price (and other discrete categories of data) for each delivery of Fuel purchased

by Dillon from Suncor from January 1, 2009 through May 31, 2011."  Dillon's August 31 Reply

explained that it had readily accessible ESI for pertinent convenience stores during the period from

March 24, 2011 to May 31, 2011, but that ESI predating that period was archived data that would be

"enormously expensive" to restore and retrieve.  As for supermarkets, Dillon admitted that it could

readily provide responsive data for the period from January 1, 2009 through May 31, 2011.  Dillon

also renewed its claim that information responsive to Request No. 5 could include trade secrets.  As for

Request No. 10, Dillon again insisted that responsive information constituted trade secrets and made

no representation as to when or even whether that Request would be answered.

On September 13, 2012, Dillon filed yet another Supplement Regarding Status Report (doc.

#116).  This Supplement stated that Dillon had received documents from an outside vendor retained to

search e-mail files responsive to Request Nos. 2 and 3, and "has begun the process of designating

confidential documents responsive to [these requests] in accordance with" the court's March 12, 2012

Protective Order.  Dillon advised that this production process could not be completed by the court's

September 17, 2012 deadline.  As for Request No. 5, Dillon continued to report that archived data was

not reasonably accessible without the purchase of "three computer servers to store and prepare the

archived data in searchable format," and that some responsive data "is a trade secret."  "As of the data

of this filing, Dillon [had] produced 23,779 pages of documents responsive to the Subpoena."  *See*

Supplement Regarding Status Report, at 6.

At a hearing on September 14, 2012, counsel for Dillon again stated that his client was

objecting to Request Nos. 5(h), 8, 9 and portions of 10 based on Dillon's belief that a protective order

could not adequate protect the trade secrets subsumed by those requests.  *See* Transcript of

Proceedings on September 14, 2012 (doc. #129), at 16, 17 and 22.  *But see Dr. Greens, Inc. v.*

*Spectrum Laboratories, LLC*, No. 12-MC-226-KHV-GLR, 2012 WL 3111746, at *3 (D. Kan. July 31,

2012) (where the non-party moved to quash on grounds that the subpoena required production of the

non-party's trade secrets and other confidential information, the court held this information could be

adequately protected under an "outside attorneys eyes only" protective order).  Dillon maintained that

it was "proceeding and producing documents in good faith," but wished to "persuade this Magistrate

Judge that certain things should not be produced to anyone even Attorney's Eyes Only."  *See*

Transcript of Proceedings on September 14, 2012, at 27.  In Dillon's view, limiting access only to

Plaintiffs' counsel was illusory because "they're going to ask you to modify your protective order, and

you're going to grant it."  *Id.* at 24.  That colloquy prompted the court to observe: "I've already told

you that my objective in the near term is to protect Dillon's trade secrets, certainly on an interim basis,

and consistent with that, I can impose any restrictions on access that allow the discovery process to

move forward, that allow the completion of the production, and limit access."  *Id.* at 53.  Once again,

the court said that it would welcome a "joint motion filed by Dillon and Suncor and Plaintiffs to modify the protective order." *Id.* at 55.

During the September 14 hearing, Dillon advised that production of all non-privileged documents could not be completed by September 17, and expressed a preference to produce responsive documents on a rolling basis with all production finished by October 1, 2012. *Id.* at 28-29.  In the face of continued bickering between counsel, I renewed my plea for cooperation:

> I would strongly encourage Dillon and Plaintiffs' counsel and their IT people to get together. . . . [I]n one respect, Dillon's interests and Plaintiff's interests are perfectly aligned.  Perfectly aligned.  Dillon doesn't want to produce anything more than is absolutely necessary.  And Plaintiffs don't want to read and potentially pay for anything that's not absolutely necessary.  The problem is you folks can't put your heads together and put your IT people together to figure out how you can efficiently and cost-effectively identify that more limited universe."

*Id.* at 36.

Western filed a Status Report for October 3, 2012 Hearing (doc. ##128) on October 2, 2012.  Plaintiff's advised that Request Nos. 5(h), 7, 8, 9, and 10, "required the most attention from the Court" and that Dillon had not "produced any documents responsive to Requests 8, 9 or 10."  According to Western,

> Dillon continues to withhold responsive documents and data (or portions of responsive documents and data) on the assertion that they contain Dillon trade secrets.  Plaintiffs have stated on multiple occasions a willingness to agree to a form of Protective Order proposed by Dillon which permits disclosure of Dillon trade secrets solely to counsel of record, necessary outside experts, and Court or related personnel.  To date, Dillon has not provided a proposed protective order or identified specific provisions of the existing Protective Order (doc. 49) that are problematic.  During a status call on October 1, 2012, Dillon's counsel indicated that he would prepare a proposed protective order that may or may not be circulated in advance of the October 3 hearing.

*See* Plaintiffs' Status Report, at 2.

The court held another hearing on October 3, 2012 and re-visited the same arguments about trade secrets, protective orders and the scope of Western's subpoena.  As for the status of a protective

order, Dillon's counsel indicated that he had received a draft protective order from Western's counsel the day before the hearing and had forwarded that document to his client for comment. I expressed my surprise at the lack of progress since the hearing on September 14:

> Now, if Dillon felt that the protective order currently in place was inadequate,[15] I do not see how Dillon could then have sat back and done nothing for approximately 18 or 19 days. . . . I don't see why the deadline of October 1st was missed and documents were withheld, ostensibly over a protective order. . . . If Dillon felt they needed more protection, then I think it was incumbent upon Dillon, and the case law I think makes it clear, it's incumbent upon Dillon to act in a timely manner. And that generally means that the protective order should be in place before the documents were due to be produced.[16]. . . I think I made it abundantly clear on September 14, that at least at this point I will not allow Dillon's documents to be seen by anyone but counsel of record and the employees of their law firm . . . they are not allowed to show those materials to anybody employed by Western Convenience. . . . I have never heard plaintiffs' counsel oppose those safeguards, and I thought those safeguards were well established by September 14.

*See* Transcript of Proceedings on October 3, 2012 (doc. #136), at 18 and 29. The effect of Dillon's recalcitrance was obvious.

> [M]y minute order said that I required rolling production concluding with final production on October 1st. And if you've pulled this stuff and if you have it available to produce and you've only withheld it because you are waiting to get a protective order that met your specifications, yet you made no attempt to initiate the drafting of such a protective order before October 1st, then honestly, counsel, you did violate my order.

*Id.* at 39.

---

[15]Plaintiffs insist that they "provided Dillon a copy of the existing Protective Order" at the same time they serviced the subpoena. *See* Plaintiffs' Response to Motion for Fees and Costs (doc. #239), at 7.

[16]*See, e.g., Brittain v. Stroh Brewery Co.*, 136 F.R.D. 408, 413 (M.D.N.C. 1991) (held that a motion for protective order should be timely and certainly should be filed before the date set for production; "the party seeking the protective order, who has the burden of requesting and supporting it, should also be responsible for initiating the process . . . permitting that party to merely note its objections and then sit back and wait for a motion to compel can only serve to prolong and exacerbate discovery disputes").

The court then proceeded to address each of the outstanding subpoena requests.  For some requests, Dillon indicated that responsive documents and ESI could only be retrieved if Dillon purchased three new computer servers.  However, in response to questioning from the court, Dillon's counsel acknowledged that data could readily be retrieved for approximately 40 grocery stores that also sold fuel during the time period from January 1, 2009 through March 23, 2011.  That prompted the court to suggest that Western initially focus on "the information for the 40 stores that is immediately available . . . because that will give you an immediate body of information your experts can use."  *Id*. at 61.  What was more troubling to the court was Dillon's apparent inability or unwillingness to seize upon this phased approach immediately upon receiving Western's subpoena *duces* tecum.

> THE COURT:  . . . number 8 says they want you to disclose daily pump prices for every one of your retain outlets.  You've got on an active [computer] system daily pricing information for, as I understand it, all the convenience stores for three or four months in 2011 and 40 some odd grocery stores for the entire two year period.  If you have that and if it's not going to require extraordinary efforts to produce, that should have already been produced.  Then you come back to me and say, Judge, we've given them all the stuff that's reasonably accessible without undue burden and expense . . . now, Judge, the onus should be on the plaintiff to explain why we should have to undertake extraordinary efforts to build three servers to capture everything else.

*Id*. at 78-79.  Addressing data responsive to the specific sub-categories in Request No. 10, the court instructed Dillon's counsel

> [W]hat I'm going to require you to do by noon tomorrow with respect to [Request No.] 10 and each of the subsections in 10, either tell them it doesn't exist and therefore you cannot produce it, or tell them it does exist.  If it exists on an active system, then it should be produced subject to the protective order.  If it cannot be produced without undue burden expense, explain why it cannot be produced without undue burden and expense, and then we'll have to decide whether or not the Court is going to impose some cost-shifting mechanism to get around those burdens.  But until you guys have that discussion and until you give them that information in a definitive way, I mean, your asking me to wrestle with a constantly shifting target, and I can't do that.

*Id*. at 89-90.

Western, Suncor, and Dillon filed a Motion for Entry of Supplemental Protective Order on October 16, 2012, which I granted the following day.  The Supplemental Protective Order (doc. #140) adopted many of the same procedures and safeguards incorporated in the earlier Protective Order, but also created a new "Secret" designation that would be "used only for *trade secret information*, the disclosure of which may cause *irreparable* competitive or business injury to the Designating Party." *See* Supplemental Protective Order, at ¶5.  With specified exceptions, "'Secret' Discovery Material" and any information derived from those materials could not be disclosed "to the officers, directors, owners, shareholders, principals or employees of the Receiving Party."  *Id.* at ¶12.  However, the Supplemental Protective Order also provided that "'Secret' Discovery Material" could be disclosed to excluded individuals

> [I]f counsel for the Receiving Party has a good faith believe that disclosure of certain "Secret" Discovery Material specifically identified by Bates number and providing copies thereof to the Designating Party, is necessary for the defense or prosecution of this case and only if the Designating Party agrees in writing that disclosure may be made or, if there is no agreement, then by order of the Court, with Party seeking disclosure bearing the burden of proof that disclosure is necessary. Disclosure is limited to the "Secret" Discovery Material so identified.

*Id.* at ¶12(e).  After bemoaning the lack of adequate safeguards for its trade secrets for almost five months, Dillon successfully negotiated a Supplement Protective Order in less than two weeks.

I received Dillon's Third Supplement Regarding Status Report (doc. #137) on October 11, 2012.  Dillon advised that it had complied with the court's October 3, 2012 Order and produced 70,446 pages of documents responsive to Western's subpoena.  On October 17, 2012, Dillon also produced five CDs in response to Request No. 7, consisting of 13,305 pages marked "Secret" pursuant the Supplemental Protective Order (doc. #140).  *See* Fourth Status Report by Interested Party Dillon Companies, Inc. (doc. #142).

On November 16, 2012, counsel for Western advised the court that "there's been adequate

24

compliance [on the part of Dillon] following the Court's order" of October 3, 2012, save for Request

No. 10 as to which "[Dillon was] still pulling documents." *See* Transcript of Proceedings on

November 16, 2012 (doc. #236), at 7.  Dillon's counsel agreed that all issues relating to production of

documents responsive to Request Nos. 1 through 9 had been resolved.  In light of those

representations, this court denied without prejudice Dillon's earlier Motion for Partial Stay of the

August 17, 2012 Magistrate Judge's Order (doc. #109) and Motion for Reconsideration of the August

17, 2012 Order of Magistrate Judge (doc. #110).  The court encouraged Dillon and Western to reach

some resolution regarding Request No. 10, and acknowledged Dillon' right to seek further relief under

Rules 26 and 45 if those efforts proved unsuccessful.

In summary, Dillon filed its Motion to Quash or Modify Subpoena on May 18, 2012 and

approximately six months later, on November 12, 2012, counsel for Western and Dillon advised the

court that production under that subpoena was largely complete.  Over the course of that six month

period, Western and Dillon submitted 11 status reports, supplemental status reports or responses to

status reports totaling 191 pages and 22 exhibits.  This court held five hearings between July 16 and

November 16, 2012 which resulted in 301 pages of recorded transcripts.


B.      *Disputes Over the Designation of Documents*

Given the difficulties surrounding Dillon's motion to quash, it was almost inevitable that the

associated production would spark disputes concerning the designation of certain data and/or

documents pursuant to the Protective Order and Supplemental Protective Order.  The pending motion

seeks to recover fees and costs that Dillon attributes to Western's repeated attempts to challenge its

designation of certain documents and data as "Secret."

Disputes over the designation of documents surfaced almost from the start of discovery in this

case.  On May 21, 2012, Western filed a Motion Challenging Defendant's Designation of Certain

Documents and Data as "Highly Confidential" (doc. #59), arguing that "pricing materials (i.e., pricing

spreadsheets, contracts and related communications) during the period relevant to the parties' claims"

provided only historical information and did not represent "the type of 'highly sensitive' material

contemplated" by the parties' Protective Order.  Plaintiffs' counsel argued that if they were precluded

from disclosing these documents, or any information "derived from" those documents, to their clients,

it would be impossible for Mr. Taraghi "to plan strategy, evaluate this case, and ultimately settlement."

*Id.* at 5 and 7.  In response, Suncor insisted that allowing Mr. Taraghi access to the contested

documents would give Western an unfair competitive advantage in the marketplace, particularly as

"pricing does not change significantly from year to year."  *See* Opposition to Plaintiffs' Motion

Challenging Designation of Certain Documents (doc. #72), at 5-6.  Moreover, Suncor argued that

Western's motion offered little more than conclusory statements that could not sustain Plaintiffs'

burden to show that "Mr. Taraghi's need to see the 'Highly Confidential' information outweigh[ed] the

substantial injury to competition that could occur if disclosure were permitted."  *Id.* at 1and 6-7.  The

court denied Plaintiffs' motion without prejudice on June 25, 2012, after concluding that Western had

not made a persuasive showing that "Mr. Taraghi needs the information right now to assist his

counsel."  *See* Transcript of Proceedings on June 25, 2012 (doc. #126), at 90.

During a telephone status conference on December 12, 2012, Plaintiffs' counsel once again

challenged Suncor's designation of certain pricing spreadsheets as "Highly Confidential."  *See*

Transcript of Proceedings on December 12, 2012 (doc. #197), at 3.  More specifically, Mr. Taraghi

sought access to certain "pricing spreadsheets" produced by Suncor and pertaining to "The King

Sooper and City Market Stores, as well as some subsidiary Loaf 'N Jug."  *Id.* at 4.  Counsel argued that

allowing Mr. Taraghi to see these spreadsheets would not prejudice Suncor or, by implication, Dillon

because the spreadsheets reflected out-dated prices and contained nothing but "stale" information that did not warrant Suncor's "Highly Confidential" designation. *Id.* at 7. Suncor's counsel argued to the contrary that the "Highly Confidential" designation was mandated by contractual obligations with its customers to keep "pricing and volume-type information . . . almost eyes only." *Id.* at 9-10. To his credit, Plaintiffs' counsel conceded that he had

> asked [Western's] experts, can they explain their conclusions and can they do their job with respect to bringing Mr. Taraghi up to date without disclosing anything produced by [Dillon]. And the answer was yes, we can do that without disclosing anything produced by [Dillon].

*Id.* at 5.

In response to questions from the court, Western's attorney admitted that his request was not motivated by necessity, but rather by Mr. Taraghi's personal interest in looking that the pricing information and counsel's desire "to accommodate our client by showing him this data." *Id.* at 13. I acknowledged that the sensitivity or significance of this pricing data might change with the passage of time. I also opined that if the case proceeded to trial, Chief Judge Krieger might well find "there is no compelling justification to preclude the public from having access to this information." *Id.* at 16.

> Now, having said that, I can't sit here and guarantee this case is going to go to trial. And I can't preclude the possibility that some of this information may be attached to either a summary judgment motion or a response to a summary judgment motion and it might be sealed.[17] At this juncture, save for curiosity on the part of Mr. Taraghi, I haven't seen a particularly compelling reason to modify the designation of this particular data. And I would think there's probably not much reason to re-explore this question until at a

---

[17]Indeed, in ruling on summary judgment motions, Chief Judge Krieger referred to the price discounts that Suncor provided to Dillon, albeit in fictionalized form to protect the actual prices that Suncor and Dillon claimed as protected trade secrets. *See Western Convenience Stores,* 2013 WL 4775894, at *9 n. 4. In the same Opinion and Order, Chief Judge Krieger acknowledged that Dillon had "sufficiently articulated a private interest and potential injury" that might be implicated by unrestricted access to "data showing specific prices quoted to and the specific qualities of fuel purchased by Dillon." *Id.* at *25.

minimum summary judgment motions are decided.[18]

> [T]o the extent that your experts want to tell Mr. Taraghi how they evaluate the case, I don't see anything that prevents your experts from providing, if you will, an executive summary of their opinions that doesn't include the data, but certainly tells Mr. Taraghi based upon the data that we've reviewed, data from Suncor, data from Western Convenience, data from Dillon, and data within the . . . public domain this is what we opine. This is how we read that data, and this is the conclusion, or these are the conclusions we reach. There's nothing in this protective order that keeps Mr. Taraghi in the dark, save for this specific pricing information.

*Id.* at 16-17.

On December 18, 2012, Western filed a Renewed Motion Challenging Defendant Suncor's and Interested Party Dillon's Designation of Certain Documents and Data as "Highly Confidential" and "Secret" Pursuant to the Supplemental Protective Order (doc. #153).  Once again, Plaintiffs argued that the documents at issue, *i.e.,* pricing spreadsheets, contracts and related communications, contained "historical" information that did not merit a "Highly Confidential" or "Secret" designation, and that denying Mr. Taraghi access to this information deprived counsel of "critical input" and prevented the client from making "meaningful decisions regarding this action."  While the arguments raised in the Renewed Motion largely tracked the December 12 telephone status conference, Plaintiffs admittedly filed their Renewed Motion "to get to the point of an order that could be appealed" to the district judge.  *See* Transcript of Proceedings on January 28, 103 (doc. #180), at 48.  Not surprisingly, Suncor and Dillon opposed the requested relief, insisting that Western's counsel had failed to demonstrate a "real need" or "necessity" for overriding the designations permitted by the Supplemental Protective

---

[18]As I anticipated, Mr. Taraghi might need access to Dillon's pricing information if Western's claims survived a motion for summary judgment and the case proceeded to trial.  To that end, on February 13, 2014, Chief Judge Krieger found, "with the case on the eve of trial," that "Mr. Taraghi's need to review the identified store data in preparation for trial outweighs Dillon's interest . . . in preserving the confidentiality of such material" and modified the Protective Order and Supplemental Protective Order to allow access to discrete types of information.  *See* Opinion and Order Granting in Part and Denying in Part Motion to Restrict Access (doc. #305).

Order.

I heard oral argument on the Renewed Motion on January 28, 2013.  Plaintiffs' counsel explained that their experts' report contained information "derived from" data designated by Suncor and Dillon as "Highly Confidential" or "Secret."

> And so where we are now is the experts very much would like and need to share that data, or the derivatives of that data as embodied in their report, with Mr. Taraghi to ensure that their conclusions are accurate, to perhaps amplify their conclusions if that becomes necessary.[19]

*Id.* at 8.  Western's counsel insisted that without access to the disputed data, "Mr. Taraghi cannot answer a number of the experts' questions with respect to what happened on this day at this time, this season; why did you do this, why did you do that."  *Id.* 27.  In the same vein, an affidavit provided by Western's expert explained that

> [W]e need to be able to discuss with Mr. Taraghi each of the 26 competing sets of WCS/[Dillon] stores to understand such things as:  the effect on WCS' business during the periods in which the competing [Dillon] stores purchased Suncor fuel at a price lower than Suncor made available to [WCS]; how Western responded in terms of its own pricing to particular changes in retail fuel prices by [Dillon] at the identified competing stores; and whether there were additional factors relating to business at each of the 26 stores that would explain or partially explain fuel pricing decisions for those stores.

*See* Declaration of Ted P. Tatos, at ¶7, attached to Notice of Submission of Declaration of Plaintiff's Expert (doc. #168).

---

[19]Ironically, when the court asked Dillon's counsel to respond to this argument, counsel indicated that "[i]t's hard to respond" because Western had refused to share its expert report with Dillon on the grounds that it contained confidential data belonging to Western.  That prompted the court to observe that if Plaintiffs were "concerned that somehow [WCS'] proprietary trade secrets might be divulged to Dillon, and thereby adversely affect your clients' competitive position, why shouldn't I be just as respectful of Dillon's concerns?"  *See* Transcript of Proceedings on January 28, 2013, at 15-17 ("I'm not going to allow [Western] to take the position . . . that Dillon has not demonstrated any need for protection, yet at the same time pound[] the table strenuously saying I have to bend over backward to protect Mr. Taraghi and Western Convenience.").  Western then agreed to produce their expert report to Dillon's counsel under the terms of the Supplemental Protective Order.

The court did not find these arguments persuasive since logic would suggest that any effect on Western's business, such as pricing or sales volumes, would be reflected in Plaintiffs' own data. Western's business decisions and corresponding actions presumably were

> based upon what Mr. Taraghi knew at the time the pricing decisions were made. He didn't know the discounts that Dillon was getting at the time. So to give him [that "Highly Confidential" or "Secret" pricing information] would give him data that he didn't have in the first instance when he made, quote, those fuel pricing decisions.

*Id.* at 41. I concluded that Western failed to demonstrate a need to override Suncor's and Dillon's designations. Given Western's recycled arguments, "[t]he only thing that's changed since July is Mr. Taraghi's level of desire [to see this material] as far as I can tell." *Id.* at 44.

In denying Western's Renewed Motion, the court drew upon the analysis in *Stanislaus Food Products Co. v. USS-POSCO Industries*, No. 1:09-cv-00560-LJO-BAM, 2012 WL 6160468 (E.D. Cal. Dec. 11, 2012). In that antitrust case, plaintiff had moved for reconsideration of an earlier order denying its request to re-designate discovery materials that defendants had marked "attorney's eyes only." Much like Western's Renewed Motion, the plaintiff in *Stanislaus* argued that the disputed information was "stale" and that its executives needed to review this information "so they may evaluate this case and the prospects for settlement." *Id.* at *1. The court rejected plaintiff's suggestion that the information was "stale," reasoning that "even to the extent it does not provide direct insight into current business strategies, the information can be extrapolated to predict future strategies and practices, and is still relevant today." *Id.* The court also found that plaintiff had failed to persuasively

> show that non-disclosure would prejudice its ability to litigate the case. Where a party challenges an attorney's eyes only designation, that party must show the protective order "actually prejudice[s] presentation of [that] party's case, not merely increase the difficulty of managing the litigation." . . . Plaintiff's attorney and experts have access to this confidential information. Plaintiff does not offer an adequate reason why its executives need this information to litigate the case.

*Id.* at *5-6 (internal citations omitted). *Cf. Layne Christensen Co.*, 271 F.R.D. 240, 248-50  (rejecting

plaintiffs' opposition to defendant's designation of certain materials as "Attorney's Eyes Only" after finding that counsel had failed to show their client needed broader access to defendant's pricing information, contracts, sales, marketing and strategic business information in order to effectively prepare for trial).

Ruling from the bench, the court denied Western's Renewed Motion, having concluded that Plaintiffs had not made a adequate showing to warrant reconsideration of my earlier orders.  The court found that Plaintiffs' affidavits did not "establish the necessity for the requested disclosure [to Mr. Taraghi] or establish good grounds to change the designation of the [contested] pricing information." *Id.* at 52.[20]

The issue of public access to Dillon's trade secrets surfaced again in March 2013 in the context of briefing on Suncor's motion for summary judgment.  On February 12, 2013, Suncor filed a Motion to Restrict Access to Motion for Summary Judgment (doc. #188), because that motion and attached exhibits "contain data or derivatives of data that are designated as 'Confidential,' 'Highly Confidential,' or 'Secret' by WCS, Suncor and Interested Party Dillon."  Suncor's motion asked that the Motion for Summary Judge and all exhibits be accepted for filed with access restricted to the filing party and the court.  Western filed its Response to Suncor's Motion to Restrict Access (doc. #193), in which it renewed its contention that information could not longer be withheld from Mr. Taraghi given that the case had progressed to the summary judgment phase.  Dillon once again reasserted its position in a Response By Interested Non-Party Dillon (doc. #220), filed on April 3, 2013.  On February 25, 2013 and March 13, 2013, Western filed two documents with the court containing Dillon trade secrets. Dillon contends Western violated the Supplemental Protective Order by failing to ensure that Dillon's

---

[20]Although Western filed its Renewed Motion purportedly for the purpose of seeking further relief from the district court, Plaintiffs never filed an objection to my January 28, 2013 ruling pursuant to Fed. R. Civ. P. 72.

"Secret" materials were filed with appropriate measures to restrict public access.

Dillon claims that it was forced to incur additional attorneys fees to rectify Western's deficient public filings. In its Response to Dillon's Motion for Fees and Costs, Western argues it complied with the Supplemental Protective Order and D.C.COLO.LCivR 7.2 ("Public Access to Documents and Proceedings") which sets forth the procedure for restricting access to court filings. Local Rule 7.2(e) provides that a document subject to a motion to restrict shall be filed as a restricted document and will remain subject to restriction until the motion to restrict access is decided. In the event that a restricted document is filed without an accompanying motion to restrict, it will retain its restricted status for 14 days. If a separate motion to restrict is not filed within that 14 day period, the restriction is lifted and the document is open to public inspection. Western contends that it fully complied with its obligations under the Supplemental Protective Order by filing the subject documents with a Level 1 restriction. Thereafter, "if Dillon wished to continue the Level 1 restriction, it had 14 days to file a motion to maintain the restriction."[21] Having consistently opposed Dillon's attempts to restrict access to pricing information that Plaintiffs continued to believe was "stale" and not appropriate for a restricted designation, Western felt that Dillon should be responsible for filing a motion to protect its particular interests within the 14-day window contemplated by Local Rule 7.2(e).

Chief Judge Krieger addressed this particular issue in her Opinion and Order of September 5, 2013. That decision reaffirmed the presumption that documents essential to the judicial process should be available to the public, but also acknowledged that in a narrow range of circumstances, the public's

---

[21]The Supplemental Protective Order, however, provides that discovery materials containing "Confidential," "Highly Confidential," or "Secret" designation "shall not be filed with the Court, except by filing the Discovery Material as a "restricted document" and Filing a Motion to Restrict Access pursuant" to Local Rule 7.2. A fair reading of that provision negotiated between the parties and Dill would seem to contemplate that the designated materials and the motion to restrict access would be filed simultaneously.

right of access may be outweighed by interests that favor non-disclosure. *Western Convenience Stores, Inc. v. Suncor Energy*, 2013 WL 4775894, at *24. In addressing various motions to restrict access filed by Suncor and Dillon, Chief Judge Krieger noted that none of these motions fully complied with Local Rule 7.2, because they failed to "devote any attention to balancing the claimed privacy interests . . . against the strong public interest in access." *Id.* However, Chief Judge Krieger agreed that Dillon, as a non-party,

> should not be forced to expose data that could conceivably compromise its competitive position with suppliers or competitors, and the Court is satisfied that disclosure of specific prices charged to Dillon or quantities of fuel purchased poses a significant risk in that regard.

*Id.* at *25.

In a subsequent passage that speaks to the current dispute, Chief Judge Krieger went on to observe that

> often times, the filer of a given document is not the person asserting the privacy interest and has little interest in undertaking extensive redaction and other efforts necessary to render the document suitable for public disclosure. Nevertheless, because those parties have invoked a third-party's private information in this dispute, such parties have assumed the responsibility to minimize the public disclosure of that information while simultaneously ensuring the maximum public access to their filings. To ensure that each filer undertakes a thorough and good-faith review of their filings, they shall provide Dillon with a copy of any proposed redacted filing and confer with Dillon as to whether additional redactions are necessary to full comply with the Court's Order.[22]

*Id.* Where the parties cannot agree on appropriate redactions, Chief Judge Krieger required that they fill a "joint motion . . . seeking a determination by the Court as the propriety of the contemplated redaction. In short, Chief Judge Krieger envisioned a process predicated on communication and cooperation between counsel; an approach that I had been urging the parties and Dillon to adopt as far back as July 2012.

---

[22]Chief Judge Krieger issued her Opinion and Order after Dillon and Western completed briefing on the pending Motion for Fees and Costs.

C.      *Western's Second, Third and Fourth Subpoenas*

On December 18, 2012, Plaintiffs served on Dillon a Fed. R. Civ. P. 30(b)(6) deposition notice

and subpoena (the "Second Subpoena") requiring Dillon to designate a person or persons to testify

regarding 18 discrete topics.  The following day, Western served a subpoena (the "Third Subpoena")

on David Wilson, a former Dillon employee.  *Cf. Alexander v. FBI*, 192 F.R.D. 37, 40-41 (D.D.C. 200)

(Rule 45 does not require parties to choose between depositions and document requests; allowed the

deposition of a records custodian after the non-party had already responded to requests for production).

Motion by Interested Party Dillon Companies, Inc. to Quash or Modify Kroeger and Wilson

Subpoenas (doc. #159).  In moving to quash or modify these subpoenas, Dillon once again argued that

the "Supplemental Protective Order does not afford Dillon adequate protection of its trade secrets,"

and that the information requested through the subpoenas was "overly broad, unduly burdensome, and

expensive for Dillon to produce."  *Id.* at 11-12.  I set this matter for oral argument on January 28, 2013.

Western and Dillon filed a Joint Status Report (doc. #167) on January 24, 2013, stating that

they had reached certain "agreements and understandings" with respect to the Second and Third

Subpoenas.  In the wake of those discussions, counsel indicated that "there do not appear to be any

issues regarding the Motion to Quash requiring the Court's attention at this time" and that "Dillon has

agreed that Plaintiffs need not file a formal response to the Motion to Quash . . . and that by not filing a

response, Plaintiffs are not confessing the motion."  *Id.* at 3.  During the hearing on January 28, 2013,

Dillon's counsel reiterated that he had "extensively conferred and have continued to confer with the

plaintiffs," and that he only filed the motion to quash because of the return date on the subpoenas.  *See*

Transcript of Proceedings on January 28, 2013 (doc. #180), at 4.  Dillon's counsel assured the court

that "[b]ased on our conferral we do not anticipate any [ ] issues."  *Id.*  In light of those

representations, I denied as moot Dillon's motion to quash, but also recognized the parties' right "to

34

pursue in the future whatever remedies they think are warranted by the case law and the rules." *Id.* at

6.

> [That] would seem the logical thing to do, since you're not asking me at this point to
> quash or modify, and since the depositions will go forward pursuant to whatever
> understandings you all have arrived at, this motion would seem to be either moot or
> premature.

*Id.* at 5.  The court assured counsel that they were "always free to call [chambers]" if disputes arose

during the depositions and the parties felt that the court's guidance would be helpful.

Mr. Wilson was deposed on February 5, 2013.  According to Dillon, Western's counsel twice

asked Mr. Wilson to provide information, over Dillon's objection, that breached the parties'

agreements as reflected in the January 24, 2013 Joint Status Report.  Notwithstanding my earlier

invitation for counsel to contact chambers if disputes arose during the Dillon and Wilson depositions, I

received no calls.  Moreover, it appears that Dillon elected not to suspend the Wilson deposition and

seek further relief pursuant to Fed. R. Civ. P. 30(d)(3) (permitting a deponent to move to terminate or

limit a deposition on the ground that it is being conduct in bad faith or in a manner that oppresses the

deponent, and to demand that the deposition be suspended "for the time necessary to obtain an order").

Western deposed Dillon's Rule 30(b)(6) designees on January 31, 2013 and February 7 and 19, 2013.

Dillon claims that Western's counsel violated the parties' prior understanding in questioning Dillon's

designees on February 7 and 19.  Once again, Dillon elected not to contact my chambers and chose not

to seek relief under Rule 30(d)(3).  Instead, on February 11, 2013, Dillon filed an Objection to

Magistrate Judge's Order Dated January 28, 2013 (doc. #187), "out of an abundance of caution and to

preserve its rights to appeal this mater to the District Court Judge under F.R.C.P. 72(a)."[23]  Dillon

---

[23]Dillon did not move to stay the February 19, 2013 depositions of its Rule 30(b)(6) designees
during pendency of its Rule 72(a) Objection, notwithstanding its apparent belief that my Order was
clearly erroneous or contrary to law.

specifically sought to reverse my January 28, 2013 Order denying its motion to quash or modify the Second and Third Subpoenas.[24]

Dillon's Motion for Fees and Costs also refers to a subpoena duces tecum served on Dillon on February 15, 2013 (the "Fourth Subpoena") and requiring production of materials by February 22, 2013.  Dillon claims that after its counsel confirmed with Western's attorneys on February 20, 2013, it served an objection to the Fourth Subpoena pursuant to Fed. R. Civ. P. 45(c)(2)(B) and simultaneously produced 13 pages of documents.  However, Dillon also redacted information that did not relate to the Pertinent Timeframe and Geographic Area.  This court was not asked to resolve any disputes and was never required to enter any orders regarding the Fourth Subpoena.

## ANALYSIS

The pending motion highlights tensions that run throughout the civil discovery process.  "[I]t has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence."  *Jaffee v. Redmond*, 518 U.S. 1, 10 (1996).  Rule 26(b)(1) allows parties to obtain discovery regarding "any matter . . . that is relevant to the claim or defense of any party" and the court, for good cause, may order discovery "of any matter relevant to the subject matter involved in the litigation."  *See* Fed. R. Civ. P. 26(b)(1).  In establishing the scope of discovery, Rule 26(b)(1) does not distinguish between parties and non-parties.  *Cf. United States v. Blue Cross Blue Shield of Michigan*, No. 10-CV-14155, 2012 WL 4838987, at *2 (E.D. Mich. Oct. 11, 2012) ("A subpoena to a third party under Rule 45 is subject to the same discovery limitations as those set out in Rule 26.").  It is generally recognized that a non-party involuntarily embroiled in civil litigation should not be subjected to undue burden or

---

[24] Chief Judge Krieger subsequently overruled Dillon's February 11 Objection (doc. #187) after finding this court had not abused its discretion.  As Chief Judge Krieger noted, "Dillon's remedy was not to revive a motion that it a previously conceded, but rather, to file a new motion that properly addressed the new developments."  *See Western Convenience Stores, Inc.*, 2013 WL 4775894, at *23.

significant expense merely by virtue of having received a subpoena. *Cf. Exxon Shipping Co. v. United States Department of Interior*, 34 F.3d 774, 779 (9th Cir. 1994) ("The Federal Rules . . . afford nonparties special protection against the time and expense of complying with subpoenas."). Yet, in the final analysis, the court must exercise its discretion to allocate discovery costs based upon the particular circumstances of each case. *Cf. Spears v. City of Indianapolis*, 74 F.3d 153, 158 (7th Cir. 1996) (noting that trial courts have "considerable discretion in determining whether expense-shifting in discovery production is appropriate in a given case").

Rule 45(d) of the Federal Rules of Civil Procedure contemplates three scenarios in which costs may be shifted from the non-party to the requesting party. Rule 45(d)(1) requires the court to impose "appropriate sanctions" if the party or attorney issuing and serving a subpoena fails to "take reasonable steps to avoid imposing undue burden or expense" on the non-party recipient. *See* Fed. R. Civ. P. 45(d)(1).[25] Those sanctions may include lost earnings and reasonable attorney's fees. In determining whether sanctions should be imposed under Rule 45(d)(1), courts consider a number of factors, "including the person's status as a non-party, the relevance of the discovery sought, the subpoenaing party's need for the documents, the breadth of the request, and the burden imposed on the subpoenaed party." *Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181, 188 (N.D. Ill. 2013). *Cf. EEOC v. Ford Motor Credit Co.*, 26 F.3d 44, 47 (6th Cir. 1994) (the court must weigh "the likely relevance of the requested material . . . against the burden . . . of producing the material").

Rule 45(d)(2)(B) provides that a person or entity commanded to produce materials may serve on the party issuing the subpoena a timely written objection to any or all of the materials requested. The requesting party may move to compel in response to that objection. If that motion is granted, the

---

[25]As of December 1, 2013, Rule 45(d) contains the provisions previously set forth in subsection (c). For simplicity, this Order will convert citations to reflect the current version of Rule 45(d).

court "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." *See* Fed. R. Civ. P. 45(d)(2)(B)(ii).[26]  "Protection of a non-party from significant expense does not necessarily mean that the party issuing the subpoena must bear the entire cost of compliance." *See Georgia-Pacific LLC v. American International Specialty Lines Insurance Co.*, 278 F.R.D. 187, 190 (S.D. Ohio 2010).  "[A] non-party can be required to bear some or all of its expenses where the equities of a particular case demand it." *Sound Security, Inc. v. Sonitrol Corp.*, No. 3:08-cv-05350-RBL, 2009 WL 1835653, at *2 (W.D. Wash. June 26, 2009) (quoting *In re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C. 1992)).

Finally, Rule 45(d)(3) addresses those occasions where the non-party moves to quash or modify a subpoena.  The court must grant relief where the subpoena (1) fails to provide a reasonable time to comply; (2) requires compliance beyond certain geographical limits; (3) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (4) "subjects a person to undue burden." *See* Fed. R. Civ. P. 45(d)(3)(A).  Under the facts of this case, none of these mandatory grounds for quashing or modifying a subpoena were applicable.  Dillon's legitimate interest in protecting its trade secrets and confidential information did not justify quashing Western's subpoena. *Cf. Stewart v. Mitchell Transport*, No. 01-2546-JWL, 2002 WL 1558210, at *5 (D. Kan. July 11, 2002) (noting that a party may not rely on the confidential nature of documents as a basis to quash a subpoena, inasmuch as "[c]onfidentiality does not equate to privilege").  For the reasons previously stated, I found that Dillon failed to sustain its claim of undue burden.

Where there are insufficient grounds to trigger the relief required by Rule 45(d)(3)(A),  the

---

[26] Dillon cannot obtain relief under Rule 45(d)(2)(B)(ii), as it  moved to quash or modify Western's subpoena, in lieu of serving written objections. *Cf. Williams v. City of Dallas*, 178 F.R.D. 103, 113 (N.D. Tex. 1998) (noting that relief provided by Rule 45(d)(2)(B) applies only when a motion to compel is filed in response to an objection to a subpoena).

court may exercise its discretion to modify or quash the subpoena if it requires:

(I)      disclosing a trade secret or other confidential research, development or commercial information;

(ii)     disclosing an unretained expert's opinions or information; or

(iii)     a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

*See* Fed. R. Civ. P. 45(d)(3)(B).  This court declined to modify or quash Western's First Subpoena, notwithstanding its request for trade secrets and other confidential information.

If the court does not quash or modify the subpoena, under Rule 45(d)(3)(A) or (B), the non-party may still seek relief.  Under the specific circumstances describe in Rule 45(d)(3)(B), the court may, in lieu of quashing or modifying the subpoena, require production under specified conditions.  So, for example, if the subpoena requires the non-party to disclose a trade secret or confidential information, the court may order production if the serving party:

(i)     shows a substantial need for the material that cannot be otherwise met without undue hardship; and

(ii)     ensures that the subpoenaed person will be reasonably compensated.

*See* Fed. R. Civ. P. 45(d)(3)(C).

Dillon first argues it is entitled to its fees and costs under Rule 45(d)1).  While that Rule requires the court to impose sanctions in favor of the non-party, cost-shifting is not required simply because production obligations are imposed on the subpoena recipient.  Rather, sanctions are required only if the attorney or party issuing the subpoena failed to take "reasonable steps" to protect the non-party from "undue burden or expense."   Here, the facts and the equities militate against an award of sanctions under Rule 45(d)(1).

Rule 45(d)(1) imposes a standard of reasonableness on the attorney or party issuing the subpoena.  Given the broad discovery permitted under Rule 26(b)(1), I cannot find that Plaintiffs were

seeking irrelevant information.  Indeed, as previously noted, some of the information produced in response to the First Subpoena was referenced in Chief Judge Krieger's Opinion and Order denying summary judgment on Plaintiffs' statutory claims.  This court does not discount the breadth of Western's original subpoena, or the fact that Plaintiffs sought information that was in some respects duplicative of materials produced by Suncor.  *But see Columbus Drywall and Insulation, Inc. v. Masco Corp.*, No. 2:06-MC-0034, 2006 WL 2871834, at *2 (S.D. Ohio Sept.25, 2006) (in declining to quash a third party subpoena in an antitrust matter, the court recognized that "information from a non-party participant in the market may, from a tactical standpoint, present advantages in the litigation not easily realized from parties or experts").  While Western's document requests could have been drafted more narrowly,[27] that fact standing alone does not justify sanctions.  *Cf. Legal Voice v. Stormans, Inc.*, 738 F.3d 1178, 1185 (9th Cir. 2013) (held that the district court "need not impose sanctions every time it finds a subpoena overbroad; such overbreadth may sometimes result from normal advocacy, which we have said should not give rise to sanctions").

This court also cannot ignore Western's subsequent willingness to narrow the scope of its subpoena, as evidenced by its Status Report of July 25, 2012.  *Cf. Tiberi v. CIGNA Insurance Co.*, 40 F.3d 110, 112 (5th Cir. 1994) (holding that the requesting party's good faith efforts to negotiate reasonable parameters on a subpoena duces tecum were sufficient to prelude an award of sanctions under Ruled 45(c)(1)).  *See also Avalon Risk Management Ins. Agency v. Taylor*, No. 13-22800-CIV, 2014 WL 808156, at *4 (S.D. Fla. Feb. 28, 2014) (declining to find that plaintiff failed to take

---

[27]I am aware that Dillon produced over 90,000 pages of documents in response to Western's subpoenas.  It also appears, from a review of the Revised Proposed Final Pretrial Order (doc. #226) submitted by Western and Suncor on November 20, 2013, that only 10 proposed trial exhibits had DILLON bates numbers and those exhibits totaled 83 pages. While that disparity is certainly striking, the scope of relevance under Fed. R. Civ. P. 26(b)(1) is not defined by the Federal Rules of Evidence. *Cf. Herrera v. Sante Fe Public Schools*, No. CIV 11-0422 JB/KBM, 2013 WL 4782160, at *28 (D.N.M. Aug. 19, 2013) (noting that "discovery's scope is broader than trial").

"reasonable steps to avoid imposing undue burden or expense" on the subpoena recipients where the plaintiff engaged in "long negotiations" that ultimately  narrowed the subpoena); *Watson v. State of Montana*, No. CV-04-16-H-CSO, 2006 WL 2095420, at *2 (D. Mont. July 27, 2006) (suggesting that sanctions should be imposed under Rule 45(c)(1) "only when the actions of the party responsible for issuing the subpoena are patently unreasonable") (quoting *Orgulf Transport Co. v. Grillot Co., Inc.*, No. Civ. A. 97-228, 1998 WL 313732, at *2 (E.D. La. 1998)).   On more than one occasion, Plaintiffs offered to reduce the burdens of collecting and producing ESI by arranging a meeting between Western's and Dillon's IT specialists.  *See* Transcript of Proceedings on September 14, 2012 (doc. #129), at 31, and Plaintiffs' Response to Dillon Companies' Status Report (doc. #100), dated August 20, 2012, at ¶3.[28]  To the extent that sanctions under Rule 45(d)(1) should be predicated on a requesting party's failure to "take reasonable steps to avoid imposing undue burden or expense," I find that Dillon's motion fails to establish that threshold violation.  *Cf. In re New England Compounding Pharmacy, Inc. Products Liability Litigation,* MDL No. 13-2419-FDS, 2013 WL 6058483, at *14 (D. Mass. Nov. 13, 2013) (declining to award attorneys fees under Rule 45(c)(1) where the requesting party modified their subpoenas after the non-parties objected and where the court later imposed further limitations).

This court further finds that Dillon was not subjected to "undue burden or expense" for purposes of Rule 45(d)(1).[29]  "Determinations of issues of 'undue burden' are committed to the

---

[28]The record indicates that even after September 14, 2012, Plaintiffs' counsel continued to express a willingness to modify the subpoena "to come up with an alternative request [for credit card data] that would satisfy [Western's antitrust experts'] need for data yet seek information which should be more readily available to Dillon" and asked "Dillon [to] determine the availability of this data so we can address the issue before or at our status conference on October 3."  *See* Exhibit 5 (doc. #128-5) attached to Plaintiffs' Status Report for October 3, 2012 Hearing.

[29]In their Response to Dillon's Motion for Fees and Costs, Plaintiffs assert, without apparent contradiction, that they "advised Dillon when serving the initial subpoena that they would reimburse

discretion of the trial court." *Jones v. Hirschfeld*, 219 F.R.D. 71, 74 (S.D.N.Y. 2003).  More to the point, Dillon has the burden of coming forward with evidence to sustain its claim of undue burden or expense.  On July 16, 2012, I found that Dillon had not demonstrated "undue burden" sufficient to grant its request to quash the First Subpoena.  I find nothing in the factual record after July 16, 2012 to alter that conclusion.[30]

In determining whether to shift expenses to the requesting party, courts look to various factors, including "whether the nonparty has an interest in the outcome of the litigation, whether the nonparty can more readily bear the costs than the requesting party, and whether the litigation is of public interest." *In re Application of Michael Wilson & Partners, Ltd,* No. 06-CV-02575-MSK-KMT*,* 2012 WL 1901218, at *5 (D. Colo. Mar. 19, 2012).  *See also Linder v. Calero-Portocarrero*, 180 F.R.D. 168, 177 (D.D.C. 1998).

Courts have held that expenses should not be shifted "if the non-party was 'substantially involved in the underlying transaction and could have anticipated that [the transaction would] reasonably spawn some litigation." *United States v. Blue Cross Blue Shield of Michigan*, 2012 WL 4838987, at *3 (E.D. Mich. Oct. 11, 2012) (holding that when non-party hospitals entered into agreements with the defendant that included provisions that had an anti-competitive impact on the marketplace, they could have anticipated that the agreements could spawn litigation from the plaintiff or one of defendant's competitors).  To the extent that Western's price discrimination claim hinges, in large part, on allegedly anti-competitive  discounts provided to Dillon, it would be disingenuous to

---

Dillon for reasonable costs associated with production."  *See* Plaintiffs' Response (doc. #239), at 2.

[30]Indeed, on October 3, 2012, the court directed that Dillon would only be required to produce responsive information residing on an active computer system and that Dillon would not be required to retrieve legacy data unless Western could demonstrate why the active data was inadequate to meet its discovery needs.  *See* Transcript of Proceedings on October 3, 2012 (doc. #77), at 77.

suggest that Dillon does not have "an interest in the outcome of the litigation."[31] *Cf. In re Mushroom Direct Purchaser Antitrust Litigation*, No. 06-0620, 2012 WL 298480, at *7 (E.D. Pa. Jan 31, 2012) (holding that the non-party recipient of the contested subpoena had an interest in the antitrust litigation, in part, by virtue of its exclusive distributorship agreement with one of the defendants).

As for the other two factors, I find no significant disparity in Dillon's or Western's ability to bear the costs of production. The "public importance" of the underlying litigation is very much in the eye of the beholder. *Compare Behrend v. Comcast Corp*. 248 F.R.D. 84, 87 (D. Mass. 2008) (in a dispute concerning a third-party subpoena, the court suggested that the underlying antitrust litigation "is a matter of real concern to the cable industry" and could impact the defendant's customers) and *United States v. International Business Machines Corp.*, 62 F.R.D. 507, 509 (S.D.N.Y. 1974) (suggesting that a distinction could be drawn between "an action between private litigants seeking to resolve personal grievances" and "a major antitrust suit brought on behalf of all the people"). Weighing the foregoing factors in the context of this case, the court does not find sufficient grounds to impose sanctions under Rule 45(d)(1).

I am further disinclined to award fees and costs under Rule 45(d)(1) given the lack of detail in Dillon's supporting documents. Exhibit J (doc. #226-11) to Dillon's Motion for Fees and Costs identifies 16 Dillon employees who spent time collecting materials for production in response to Western's subpoenas. That Exhibit does not identified specific tasks performed by specific individuals, but rather provides total hours attributed to each Dillon employee. Exhibit HH (doc. # 247-4) attached to Dillon's Reply purports to provide "a more detailed description of the tasks that each Dillon employee performed in order to respond to Western's discovery requests and for related

---

[31]This conclusion seems borne out by discussions in November 2012 between counsel for Western and Dillon's regarding a possible covenant not to sue. *See* Exhibit F (doc. #226-7), at pages 2-5 of 9, attached to Dillon's Motion for Fees and Costs.

matters." *See* Amended and Restated Declaration of Sara Sudkamp (doc. #274-4), at ¶4. For example, in responding to the First Subpoena, Ron Prior purportedly spent 25 hours working on tasks described as "time coordinating," "prep meetings, "phone conversations" and "taking data" to outside counsel. These descriptions are not particularly helpful in determining whether Dillon's demand for costs is reasonable. *Cf. Arthrex, Inc. v. Parcus Medical, LLC*, No. 11-mc-00107-SEB-DML, 2:10-civ-151-FtM-CEH-DNF, 2011 WL 6415540, at *8 (S.D. Ind. Dec. 21, 2011) (noting that the lack of detail in the affidavit provide by the non-party prevented the court from understanding the nature of the work performed or the basis for the amount claimed). Dillon's claim of undue expense is further belied by its own shifting estimates. On May 18, 2012, Dillon moved to quash the First Subpoena by arguing, in part, that the costs of production were incalculable but would involve an extraordinary amount of time on the part of Dillon employees. Dillon continued to advance these expansive cost estimates even as Western narrowed the scope of its First Subpoena. *Cf. Texas Instruments Inc. v. Powerchip Semiconductor Corp.*, No. 06 Civ. 2305(SHS)(RLE), 2007 WL 1541010, at *11 (S.D.N.Y. May 24, 2007) (suggesting that inconsistencies in the defendant's representations undercut the credibility of any assertions as to the true burdensomeness of plaintiff's requests).

Finally, and perhaps most importantly, I have considered whether "the equities of [this] particular case" justify shifting costs under Rule 45(d)(1). *Cf. Sound Security, Inc. v. Sonitrol Corp.*, 2009 WL 1835653, at *2. The Advisory Committee Notes to Rule 45 acknowledge that subsection (c)(1) was added in 1991 "to give specific application to the principle stated in [Fed. R. Civ. P.] 26(g)." *See Builders Association of Greater Chicago v. City of Chicago*, No. 96C1122, 2002 WL 1008455, at *5 (N.D. Ill. May 13, 2002). More recently, one court has observed that "[b]ecause Rule 45[(d)](1) gives 'specific application' to Rule 26(g), it follows that a violation of any one of the Rule 26 duties will be relevant to assessing propriety of sanctions under Rule 45[(d)](1)'s 'undue burden'

language." *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 425 (9th Cir. 2012).

> Federal Rule of Civil Procedure 26(g)(1)(B) requires parties seeking discovery to act (1) consistently with the rules of existing law or with good reason to change the law; (2) without bad faith; and (3) reasonably without imposing undue burden or expense considering the needs of the case.

*Id.*

Yet Rule 26(g)(1)(B) imposes those same obligations on a party or attorney responding or objecting to discovery.  As the court noted in *Mancia v. Mayflower Textile Services, Co.*, 253 F.R.D. 354, 360 (D. Md. 2008),

> Rule 26(g) charges those responsible for the success or failure of pretrial discovery – the trial judge and lawyers for the adverse parties – with approaching the process properly: discovery must be initiated and responded to responsibly, in accordance with the letter and spirit of the discovery rules, to achieve a proper purpose (i.e., not to harass, unnecessarily delay, or impose needless expense), to be proportional to what is at issue in the litigation, and if it is not, the judge is expected to impose appropriate sanctions to punish and deter.

*Cf. Qualcomm Inc. v. Broadcom Corp.*, No. 05cv1958-B (BLM), 2008 WL 66932, at *7 (S.D. Cal. 2008) ("Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. . . . This subdivision provides a deterrent to both excessive discovery and evasion"), *vacated in part on other grounds*, No. 05CV1958-RMB (BLM), 2008 WL 638108 (S. D. Cal. March 5, 2008).

I understand that the court should be "especially vigilant to protect the non-party from undue burden and expense." *See, e.g., Arthrex, Inc. v. Parcus Medical, LLC,* 2011 WL 6415540, at *5. However, this principle should not be invoked to excuse the non-party's own evasive or obstructive conduct.  *Cf. Heartland Surgical Specialty Hospital, LLC v. Midwest Division, Inc.*, No. 05-2164-MLB-DWB, 2007 WL 2122437, at *14 (D. Kan. July 20, 2007) (declining to impose sanctions under Rule 45(d)(1) after noting that "a significant part of the delay and expense concerning these subpoenas was self-imposed by [the non-parties]").  It strains logic to suggest that the court should hold a party or

45

attorney issuing a subpoena to a standard of reasonableness, but then turn a blind eye to a non-party's unreasonable behavior in determining whether sanctions are appropriate under Rule 45(d)(1).

Cost-shifting under Rule 45 recognizes that in many instances "[n]onparty witnesses are powerless to control the scope of litigation and discovery, and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party." *See, e.g.*, *United States v. Columbia Broadcasting System, Inc.,* 666 F.2d 364, 371 (9th Cir. 1982).  Counsel for a  non-party subpoena recipient, however, should be expected to "stop and think" before taking actions that will almost certainly result in unnecessary delay and burden an already congested court docket.  *See, e.g., Bottoms v. Liberty Life Assurance Co. of Boston*, No. 11-cv-01606-PAB-CBS, 2011 WL 6181423, at *4-5 (D. Colo. Dec. 13, 2011) (noting that Rule 26(g) provides a deterrent to both excessive discovery and evasion by imposing a "'stop and thin' mandate" on each attorney).  Rule 45(d)(1) correctly focuses on the burdens imposed upon the subpoena recipient.  However, Rule 45(d)(1) should not be construed or applied in a way that ignores the subpoena recipient's own conduct or confers "a right to obfuscation or obstinacy."  *Apple Inc. v. Samsung Electronics Co., Ltd.*, No. 12-CV-0630-LHK (PSG), 2013 WL 1942163, at *3 (N.D. Cal. May 9, 2013) (while conceding that a non-party should not be required to subsidize litigation, the court held that a non-party subject to a subpoena is expected to "participate in transparent and collaborative discovery").

Dillon's counsel forthrightly apologized on August 31, 2012 for his client's "misunderstandings" and asked for the court's "patience as Dillon attempts to rectify same." However, that belated concession does not excuse Dillon's consistent pattern of avoiding its discovery obligations or circumventing court orders.  I acknowledge that Dillon is not seeking to recover fees

and costs paid to its first outside law firm prior to August 22, 2012.[32]  However, Dillon cannot avoid the consequences of its own pattern of deliberate foot-dragging by now exercising "billing judgment." I cannot find in this record any justification to award Dillon fees and costs under Rule 45(d)(1).

As an alternative basis for awarding fees and costs, Dillon invokes Rule 45(d)(3)(B)(i) which provides that the court "may" quash or modify a subpoena if, *inter alia,* it requires the "disclo[sure] of a trade secret or other confidential research, development or commercial information."  Dillon has consistently and successfully argued that Western's First Subpoena, even as modified, encompassed trade secrets and confidential information disclosed under the terms of the Supplemental Protective Order.  In lieu of quashing or modifying the subpoena,  Rule 45(d)(3)(C)(ii) allows the court to order production of those materials subject to the requirement that the disclosing party be "reasonably compensated."  *See also* Advisory Committee Notes to the 1991 Amendments to Fed. R. Civ. P. 45(c) (acknowledging that a court may impose appropriate accommodations, such as providing reasonable compensation to the subpoenaed person, in lieu of quashing a subpoena where the request involves the "costly production of documents").

I find that Dillon is claiming some fees and costs that fall squarely within Rule 45(d)(3)(C). Western sustained its burden of demonstrating "substantial need" under Rule 45(d)(3)(C)(i).  *Cf. Aevoe Corp. v. AE Tech Co., Ltd.,* No. 2:12-cv-00053-GMN-NJK, 2013 WL 5954570, at *2 (D. Nev. Nov. 6, 2013) (holding that for purpose of Rule 45(d)(3)(C), "substantial need" equates to a showing that "the requested discovery is relevant and essential to a determination of the [party's] case").  I also gave Dillon leave to submit a Supplemental Protective Order that was executed by Western, Suncor and Dillon.  Dillon produced trade secrets and confidential information under the terms of  that

---

[32]I note that Dillon has reserved the right to ask for an additional $60,526 in attorneys fees.  *See* Dillon's Motion for Fees and Costs (doc. #226), at 21, and Dillon's Reply in Support of Motion for Fees and Costs (doc. #347).

Supplemental Protective Order, with the understanding that it could later file a motion for fees and costs.  The sole issue thus becomes what constitutes "reasonable compensation" for costs incurred by Dillon in connection with the production of trade secrets and confidential information.

My research has not found any judicial precedent that establishes a definitive standard for setting or awarding "reasonable compensation" under Rule 45(d)(3)(C)(ii).  *Cf. Dr. Greens, Inc. v. Spectrum Laboratories, LLC*, 2012 WL 3111746, at *3 n.13 (D. Kan. July 31, 2012) ("What constitutes 'reasonable compensation" is left to the discretion of the courts").  *See also Klay v All Defendants*, 425 F.3d 977, 984 (11th Cir. 2005) (suggesting that while "reasonable compensation may require more than reimbursement for the costs of production, it need not always be so" and conceding that term is "both broad and flexible").  Therefore, I will be guided again by the "reasonableness" of Western's and Dillon's actions and the equities of this particular case.  Time sheets provided by Dillon's current outside counsel appear to reflect a total of 8.7 hours spent drafting and finalizing a Supplemental Protective Order between October 5 and 16, 2012.  *See* Exhibit E (doc. #226-6), at pages 3-7 of 19, attached to Dillon's Motion for Fees and Costs.  On closer examination, Dillon's counsel is claiming 2.2 hours (or $473.00) expended on October 15, 2012 for

> Phone call with Sara re: [redacted from time sheet]; Phone call with [Suncor's counsel]; Phone call with [Western's counsel]; Revised draft Motion for Suppl Prot Order and sent to counsel; forwarded to client.

Dillon's counsel also is claiming .3 hours on October 16, 2012 in connection with "Voice mail to [Western's] counsel re: protective order.  Phone call with Aldrich re: same.  Phone call with Sara.  E-mails to Sara."  There are very few substantive differences between the original Protective Order and the Supplemental Protective Order.  That fact, coupled with the lack of detail in the October 15 and 16 billing entries justifies excluding 2.5 hours from a fee award.  *Cf. Ellis v. University of Kansas Medical Center*, 163 F.3d 1186, 1202 (10th Cir. 1998) (noting that while counsel must exercise billing

judgment, the "district court has a corresponding obligation to exclude hours not 'reasonably expended' from the calculation"). Therefore, the court finds that $1,333.00 in attorney fees is reasonable compensation under Rule 45(d)(3)(C)(ii) for preparing the Supplemental Protective Order.

I also find that Dillon should receive reasonable compensation for fees and costs incurred in responding to Western's December 18, 2012 Renewed Motion challenging Dillon's designation of certain documents and materials as "Secret" under the Supplemental Protective Order. Here, the equities favor Dillon. Western certainly had the right to challenge Suncor's and Dillon's designations under the terms of the Protective Order and Supplemental Protective Order. On May 21, 2012, Western filed a motion disputing Suncor's classification of pricing materials as "Highly Confidential." That motion was denied without prejudice on June 25, 2012. During roughly the same period, Western's counsel was taking exception to Dillon's refusal to produce trade secrets and confidential information in response to the First Subpoena. In its response to Dillon's Motion to Quash or Modify, Western argued that any concerns that Dillon might have with respect to its trade secrets were unfounded, because those "trade secrets may be designated 'Highly Confidential' pursuant to the Protective Order such that they cannot be disclosed to Plaintiffs' representatives." At the hearing on September 14, 2012, Dillon's counsel expressed the fear that this court would relax its restrictions and allow access to his client's trade secrets beyond Plaintiffs' counsel. Western's attorney promptly reaffirmed the effectiveness of the Protective Order and expressed Western's willingness to stipulate to that protection "right now." *See* Transcript of Proceedings on September 14, 2012 (doc. # 129), at 51.

Yet, during the telephone status conference on December 12, 2012, Western's counsel again challenged Suncor's designation of pricing information as "Highly Confidential." When the court expressed a disinclination to require Suncor to re-designate the contested materials in advance of a ruling on summary judgment, Western's counsel indicated that he might file a written motion

contesting Suncor's and Dillon's designation of materials as "Highly Confidential" or "Secret."  I

noted that if such a motion was filed, the court likely would not want to decide such a motion on the

papers alone.

> I would probably want to have some sort of evidentiary hearing where witnesses would
> testify.  So, for instance, I would probably want to have somebody from [Dillon] who
> could get on the witness stand and, subject to cross-examination, explain to me how
> pricing information in 2010 impacts pricing decisions that Kroger makes today; and
> explain to me how it does and why it does.  I probably would not want to have just an
> affidavit, because my experience with affidavits is they're not generally helpful.

*See* Transcript of Proceedings on December 12, 2012 (doc. #197), at 22.  Western's counsel thanked

the court for its guidance and indicated that he would confer with his colleagues and client before

deciding on a future course of action.  Western filed its Renewed Motion on December 18, 2012,

which was denied at the conclusion of a hearing on January 28, 2013.  At that hearing, I heard

argument from counsel but ultimately decided the motion without the need to hear testimony from

either side.

Dillon's pending Motion seeks, in part, reimbursement of fees and costs incurred in responding

to Western's Renewed Motion and appearing at the January 28, 2013 hearing.  Western contends those

fees and costs should not be reimbursed because Plaintiffs simply were exercising their right under the

Supplemental Protective Order to challenge access restrictions.

While the court is not suggesting that Western could not pursue remedies incorporated in the

Supplemental Protective Order, Rule 45(d)(3)(C)(ii) still provides that Dillon should be "reasonably

compensated" for costs associated with the production of trade secrets and confidential information.

Relief is particularly appropriate in this case, given Western's repeated, unsuccessful attempts to

challenge Suncor's and Dillon's designations.  With slight variation, Western raised similar arguments

in its May 21, 2012 motion and during the December 12, 2012 telephone status conference.  Indeed,

Western's counsel conceded on December 12 that he was challenging Suncor's designation "to

accommodate our client" and that Western's experts could keep Mr. Taraghi apprised of their work "without disclosing anything produced by Dillon."  Western filed a Renewed Motion on December 18, 2012, ostensibly for the purpose of obtaining a ruling which could then been appealed under Fed. R. Civ. P. 72(a).  Notably, Plaintiff never filed a Rule 72(a) objection to my January 28, 2013 order.

I believe it would violate the intent of Rule 45(d)(3)(A) to preclude Dillon from recovering the fees and costs incurred in responding to Western's third unsuccessful challenge.  As with Dillon, at some point Western must accept the financial consequences of its own tactical decisions.  Accordingly, I will award fees and costs incurred by Dillon in responding to Western's Renewed Motion, and preparing for and attending the January 28, 2013 hearing on that motion.  If I have correctly interpreted the exhibits attached to Dillon's Motion for Fees and Costs and  Reply in Support of Motion, Dillon's outside counsel is claiming $14,880,50 in attorneys fees for 77.4 hours of work.  I will also require Western to pay $1,246.77 as reimbursement for travel expenses Dillon paid to have its Assistant Manager of Petroleum available to testify at the January 28 hearing.

I have no doubt that Dillon incurred additional costs in producing trade secrets and other confidential information, however, I am not awarding any other fees and costs under Rule 45(d)(3)(C)(ii).  While Dillon is requesting $122,202.50 in fees and $26,547.32 in costs, I do not know with any certainty what portion of Dillon's total production involved trade secret or confidential materials, or the amount of fees and costs specifically devoted to the production of those specific materials.  I do know, however, that during the hearing on July 16, 2012, Dillon's first outside counsel conceded that none of the information responsive to subpoena Request Nos. 1 through 6 implicated trade secrets.  *See* Transcript of Proceedings on July 16, 2012 (doc. #121), at 57.  I will not use Rule 45(d)(3)(C) to broadly award fees and costs that Dillon could not recover under Rule 45(d)(1).

Moreover, I will not award fees and costs that have the effect of rewarding Dillon for its own

foot-dragging.  Although the First Subpoena required Dillon to produce responsive documents on May 18, 2012, Dillon's initial production of 25 documents did not occur until August 17, 2012.  Dillon rationalized its inactivity, in part, by arguing that the Protective Order was wholly inadequate to protect its confidential information and trade secrets.  Yet, Dillon now seeks reimbursement for legal fees incurred to redact and label documents pursuant to that very same Protective Order.  For example, Dillon's outside counsel is claiming $756.00 for 8.4 hours spent on September 11, 2012 to "start redacting documents and labeling pursuant to the Protective Order" and $414.00 for 4.6 hours spent on September 16, 2012 in "redacting documents and labeling pursuant to the Protective Order."  *See* Exhibit C (doc. #226-4), at 8 and 9 of 21, attached to Dillon's Motion for Fees and Costs.

On September 14, 2012, Dillon's replacement outside counsel argued that "a protective order is not going to adequately protect the trade secret once its out,"[33] only to concede on October 3, 2012 that his client had produced certain contracts in response to the First Subpoena without any designation under the existing Protective Order.  *See* Transcript of Proceedings on October 3, 2012 (doc. #136), at p. 25.  At that same hearing, Dillon's counsel indicated that his client was now insisting that those previously disclosed contracts required the most restrictive designation under a Supplemental Protective Order.  *Id.*  While I can appreciate Dillon's desire to protect its trade secrets and confidential information, I will not require Western to pay for fees and costs that were incurred pursuant to a strategy of delay and evasion.

My ability to award full reimbursement under Rule 45(d)(3)C)(ii) is further complicated by the time sheets provided by Dillon's outside counsel.  For example, one of Dillon's attorneys is claiming

---

[33]*See* Transcript of Proceedings on September 14, 2012 (doc. #129), at 22.

$1,091.50 for 5.9 hours of work on September 28, 2012.  The "block billing"[34] entry that appears on the time sheet identifies nine different tasks, including "prepare contracts and proposals for higher designation under amended protective order."  Unfortunately, the court is left to guess what portion of the 5.9 hours was devoted to each of the itemized tasks.  That same attorney is claiming $1,535.50 for 8.3 hours of work on September 29, 2012.  While apparently some of that 8.3 hours was spent designating materials "as highly confidential and bates number for production," I have no way of knowing what portion of that 8.3 hours is reimbursable under Rule 45(d0(3)(C)(ii).  *See, e.g., Cox v. Council for Developmental Disabilities, Inc.*, No. CIV-12-0183-HE, 2013 WL 1915066, at *3 (W.D. Okl. May 8, 2013) (noting that "block billing"does "hinder meaningful evaluation of the time spent and determination of how much adjustment for particular factors, such as unreasonable duplication, is warranted").  I will not require Western to reimburse fees and costs that lack sufficient description or particularity.

Although Dillon's Motion seeks to recover fees and costs incurred as a result of Western's filing of "Secret" documents under Local Rule 7.2, I could not find within the various exhibits submitted by Dillon any breakdown of costs and fees associated with those specific events.  More to the point, this court believes those costs were incurred not because of Dillon's production under Rule 45(d)(3)(C), but rather because of an unnecessarily adversarial relationship between Dillon and Western that had developed over several months and multiple motions.  As Chief Judge Krieger correctly point out, individuals seeking restricted access under Local Rule 7.2 should make a "thorough and good-faith review of their filings," and should  cooperate to the fullest extent to ensure that the letter and spirit of Rule 7.2 is followed.  Similarly, Chief Judge Krieger suggested that disputes

---

[34]"'Block billing' is the practice of lumping multiple tasks into a single entry of time such that the billing entry does not delineate how hours were allocated to specific tasks." *Wilhelm v. TLC Lawn Care, Inc.*, No. 07-2465-KHV, 2009 WL 57133, at *3 (D. Kan. Jan. 8, 2009).

concerning a document's restricted status should be resolved through a joint motion seeking the court's guidance as to the propriety of any redaction. This solution should have been obvious to any group of lawyers intent on achieving a "just, speedy and inexpensive" resolution. As to this discrete issue, I suspect that Dillon and Western share equal blame for their inability or unwillingness to find a cooperative solution. Awarding fees and costs for actual or perceived violations of Local Rule 7.2 would require the court to parse degrees of fault that defy mathematical precision.

Finally, the court will not award Dillon fees and costs relating to the Second, Third and Fourth Subpoenas. I do not find that Dillon's request is factually and legally supported. More to the point, the court is not inclined to award fees and costs that could have been avoided if counsel had simply requested my assistance in a timely manner. Dillon's counsel could have contacted my chambers during the deposition sessions on February 5, 7 or 19, and thereby saved everyone time and money. Alternatively, if Dillon truly felt that Western's counsel was proceeding in bad faith, Dillon could have file a motion to terminate or limit these depositions pursuant to Fed. R. Civ. P. 30(d)(3)(A). If such a motion had been filed, the court could have terminated or limited the scope of the depositions and could have awarded expenses to the prevailing party under Fed. R. Civ. P. 37(a)(5). Rather than pursuing those alternatives, Dillon seeks to recover fees and costs that I believe could have been avoided. I will not reward Dillon for that tactical decision.

## CONCLUSION

After reviewing the court record and setting forth the chronological history of the disputes between Dillon and Western, I remain convinced that both sides incurred fees and costs that were largely unnecessary. Those fees and costs were the product of affirmative decisions made by each party and their counsel, perhaps in the misguided belief that an adversarial approach to discovery would carry the day for their particular side. To the contrary, that mind set simply insured that both

sides would continue to spend money that could have been saved simply by adopting a cooperative attitude.  Rather than considering how and where their interests might align, Dillon and Western chose to raise and then recycle arguments that did not materially advance the litigation.

For the foregoing reasons, I will not award Dillon fees and costs as a sanction under Rule 45(d)(1).  As Western has expressed a willingness to pay Dillon $3,388.55 in costs associated with producing documents in response to Subpoena One, I will award Dillon that amount.  I also find that some fees and costs should be awarded under Rule 45(d)(3)(C)(ii) and, for the reasons previously stated, I will require Western to pay an additional $16,127.27 in fees and costs.  Dillon's Motion is GRANTED in the amount of $19,515.82, and DENIED in all other respect.

Dated this 27th day of March, 2014.

BY THE COURT:


  s/Craig B. Shaffer
United States Magistrate Judge