**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 11-cv-01611-MSK-CBS

**WESTERN CONVENIENCE STORES, INC.**

      **Plaintiffs/Counterclaim Defendants,**

**v.**

**SUNCOR ENERGY (U.S.A.) INC.,**

      **Defendant/Counterclaim Plaintiff,**

**and**

**SUNCOR ENERGY (U.S.A.) INC.,**

      **Third-party Plaintiff,**

**v.**

**HOSSEIN TARAGHI, and**
**DEBRA LYNN TARAGHI,**

      **Third-Party Defendants.**

_____

**OPINION AND ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF**
**SUNCOR ENERGY (U.S.A.)**
_____

      **THIS MATTER** is before the Court following a multi-day bench trial.[1]  Having

considered the admissible evidence and the written and oral arguments by counsel, the Court's

findings of fact and conclusions of law follow.

_____

[1]      At the time of trial, there were motions (**#256, #280**) by non-party Dillon Companies, Inc. to restrict access to or redact documents of record.  The first motion is **DENIED**.   To the extent that the documents were admitted at trial, those documents are necessarily relevant to the Court's decision-making process and the public possesses a strong interest in having access to them.  If

## JURISDICTION AND BACKGROUND

The Plaintiff ("Western") brings two substantive antitrust claims based on assertions of second-line price discrimination: 1) violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a); and 2) violation of Colorado's Unfair Trade Practices Act, C.R.S. § 6-2-108.  The Defendant ("Suncor") asserts a counterclaim against Western for breach of contract and a third-party claim based on personal guarantees of the Third-Party Defendants ("the Taraghis") for Western's contractual obligation.  The Court exercises jurisdiction pursuant to 28 U.S.C. §§ 1331and 1337(a).  It also exercises supplemental jurisdiction over the counterclaim and third-party claims pursuant to 28 U.S.C. § 1367.

Suncor filed several motions for summary judgment directed at the Plaintiffs' claims. The first (**# 185**) was directed at the statutory (Robinson-Patman and Colorado Unfair Trade Practices) claims.  The second (**# 181**) was directed at the Plaintiffs' common-law claims. Suncor also moved for summary judgment on its own counterclaim and third-party claim (**# 182**).  The Court ruled on the Motions in a single order (**#251**).  The Court determined that Plaintiff's statutory claims should proceed to trial, dismissed Plaintiffs' claims for breach of contract and tortious interference with contract, dismissed claims of Plaintiff Western Truck One, LLC, and, based on undisputed facts, pursuant to Fed.R.Civ.P. 56(g), found facts sufficient to entitle Suncor to judgment on its Counterclaim and Third-party claim (**#182**) unless Western prevailed on either of its price discrimination claims.

---

such documents were not admitted at trial, there are no documents to restrict, and, in any event, there is no public interest in access to documents that were never presented to or considered by the Court.  *See Riker v. Fed. Bureau of Prisons*, 315 F. App'x. 752, 755 (10th Cir. 2009). Accordingly, as to unadmitted documents, the motion is denied as moot.

The second motion seeks to restrict public access to the Revised Proposed Final Pretrial Order (**#274**).  Such pretrial order governed the course of the case through trial, and the trial was open to the public. The Court finds no justification for restriction at this time, and therefore **DENIES** the motion.

This decision makes those interlocutory determinations final, and addresses Western's statutory claims for unlawful secondary price discrimination.

## FACTS[2]

### A.  Entities involved

The allegations in this case concern wholesale sales of unbranded gasoline, made by Defendant Suncor, to two allegedly competing entities, Western and Kroger.

Western is a Colorado corporation owned by the Taraghis and operated by Mr. Taraghi. Mr. Taraghi opened his first convenience store in 1989.  Western now operates 39 convenience stores in Colorado and 3 in Nebraska.  The stores sell unbranded gasoline (mid-grade, premium, and, sometimes, E-85), diesel fuel, and merchandise including food and beverages.  In Colorado, Western stores are located from Grand Junction to close to the Kansas state line, and from Fort Collins to south of Pueblo.

Western's stores compete with nearby outlets of other convenience store chains, such as Bradley, 7-Eleven, and Diamond Shamrock.  In addition, in some locations, retail supermarket chains such as Safeway or wholesale clubs such as Costco operate fuel centers adjacent to their own operations, and Western considers these entities to be its competition as well.  Western's evidence in this case focused on its competition with various subsidiaries of the Kroger Company.  Through its subsidiary Dillon Companies, Kroger owns and operates the King Soopers and City Market supermarket chains.  Some King Soopers and City Market locations in Colorado offer on-site gasoline sales, sometimes in close proximity to a Western location. Through its subsidiary Mini-Mart, Inc., Kroger operates a chain of convenience stores under the name Loaf N Jug, and some Loaf N Jug locations also compete directly with Western stores.

---

[2]     The Court summarizes pertinent facts here, but elaborates, as necessary, in its analysis.

(Except where greater specificity is required, the Court will generally use "Kroger" to refer both to the Kroger Company overall, as well as to refer collectively to its subsidiaries' operations.)

During the time period at issue in this case, both Western and Kroger obtained substantial quantities of gasoline from Defendant Suncor, the only petroleum refiner in Colorado. Suncor's refinery was located in Commerce City. It also sold fuel from terminals owned by other entities and located elsewhere in Colorado, including two terminals operated by the Rocky Mountain Pipeline System in Dupont, CO and Fountain, CO. Most of the purchases at issue in this case occurred at Suncor's Commerce City, Fountain, and Grand Junction terminals.

The Fountain and Dupont terminals received fuel transported by pipeline from refineries located outside of Colorado. At the Fountain terminal, Suncor's Colorado-refined fuel was mixed with fuel that had been refined outside of Colorado. Once mixed, the fuel had the same chemical and physical properties as its component parts, and therefore, the source of the fuel was no longer determinable. The mixed fuel was stored in common tanks, from which it was drawn to fill trucks (including those used by Western). In addition, at all terminals, ethanol and other additives transported from outside of Colorado were mixed with fuel that was ultimately received by Western.

This controversy involves Suncor's sale of unbranded fuel to Western and Kroger over a period of 606 days, from October 2009 through May 2011 (the operative period). During this period, Western and Kroger bought the same fuel products from Suncor but were charged different prices. During this period, Western stores competed with one or more Kroger stores in 27 Colorado locations.[3]

---

[3]      Exhibit 758 shows the 27 locations where Western stores competed with Kroger stores — Steamboat Springs, the Fort Collins metro area, Loveland, Longmont, the Denver Metro area, the

**B. Fuel Purchases**

**1. Western's purchases**

Between October 2009 and May 2011, Western bought approximately 60% of its fuel from Suncor. The rest of its fuel needs were met by other suppliers.

Western made fuel purchase decisions on a daily basis.  Wholesale fuel prices were released by suppliers each evening, reflecting the prices to be charged the following day. Western selected the supplier for the next day's purchases based on price.  Often, Western would receive suppliers' prices, then call one or more competing suppliers to see if a lower price could be negotiated.

Western purchased, received, and delivered its fuel on a daily basis because Western stores did not have storage tanks large enough to hold a supply sufficient to meet multiple days' demands.  To reduce costs and to enable Western to purchase from suppliers with the most favorable price, the Taraghis owned a trucking company that had a fleet of ten trucks.  Trucks picked up fuel at suppliers and delivered it to Western locations twenty-four hours per day, seven days per week.  During the operative time period, the trucking company enabled Western to sometimes purchase fuel at Front Range terminals for delivery to Western Slope stores, and to buy from terminals in Utah, New Mexico, Nebraska, Kansas, and Wyoming to supply Colorado stores.

Western's purchases of unbranded fuel from Suncor were governed by a "Master Agreement," dated January 17, 2007, that set forth the general terms of the parties' relationship. Individual purchases were made pursuant to documents know as Confirmation of Purchase/Sale

---

Colorado Springs metro area, the Pueblo metro area, the area east of Pueblo, Salida, Montrose, Delta, and Grand Junction.

Agreements ("Confirmations").[4]  Each Confirmation specified the volume to be bought and the price to be charged.  Throughout the operative period, Western's agreement with Suncor was to pay Suncor's daily "Rack Price" (the standard price charged by Suncor at a specific terminal on the day of purchase), less a stated discount.  Consistent with refinery practices, Western also received discounts when Suncor had a fuel surplus, and was subject to volume limits (known as "allocation") when Suncor had a fuel shortage.

The amount of fuel available to Western from Suncor decreased during the operative time period and although Mr. Taraghi requested a yearly contract from Suncor, his request was not promptly addressed.  As a result, Mr. Taraghi became concerned that Suncor was favoring other customers at Western's expense.  During this period, Suncor was also dissatisfied with its dealings with Western.

Although the circumstances and causes are disputed, it is sufficient to find that Western and Suncor ended their relationship on May 25, 2011.  As of that date, according to the terms of the parties' Master Agreement, Western owed Suncor $3,755,141.95 for outstanding fuel purchases.  The Taraghis had executed a personal guarantee of Western's debts to Suncor, up to the amount of $ 3 million.

### 2. Kroger's purchases

The Kroger entities also bought unbranded gasoline and diesel from Suncor during the operative period.  These purchases, however, were made pursuant to year-long contracts that used a different method of computing the price.

---

[4]     The last one-year Confirmation prior to the operative period was executed about January 1, 2008. After January 1, 2009, Western purchased fuel from Suncor on three-month or one-month Confirmations or by unwritten agreement.

The Kroger supermarkets' (that is, King Soopers and City Market) contract with Suncor became effective on October 1, 2009.  Although Kroger's purchases were also made pursuant to a "rack price less specified discount formula," Kroger negotiated to use the "OPIS Rack Average" as the rack price reference point.  The OPIS Rack Average, which is published to potential purchasers, is an average of the prices being charged by all suppliers in a particular area on a particular day.  As with Western, Kroger's price from Suncor was subject to further reduction through periodic discounts, and volume was subject to allocation when Suncor had a shortage of fuel.

Kroger purchased fuel from Suncor to supply its Loaf 'N Jug convenience stores through a year-long contract beginning February 1, 2010.  As with the contract between Suncor and the Kroger supermarkets, the contract price was based upon the OPIS Rack Average, less a stated discount.  This contract was subject to additional periodic discounts and allocation.

As a general matter, Suncor kept confidential the details of its contracts and pricing with each buyer.  Thus, Kroger was not necessarily aware of the terms of Western's arrangement with Suncor, and Western and the Taragahis were not aware of the terms of Kroger's deals with Suncor.

The record reflects that, in general, Kroger received more favorable prices from Suncor than Western did for the same grades of gasoline.  (The record did not specifically address the cause of this discrepancy, although one might infer that the blended OPIS Rack Average, used by Kroger as a starting reference price, was often less than Suncor's rack price, from which Western's price was determined.)  According to the record, on 449 days during the operative period, Western and the Kroger entities bought the same type of fuel from Suncor at different

prices.  On 78% of those days, Western paid the higher price.  On 22% of the days, the Kroger entities paid the higher price.

### 3.  Retail Competition

Both of Western's statutory claims depend on proof that the difference in the wholesale price Suncor charged Western and Kroger affected retail competition between  them.  The parties agree that retail fuel sale is a competitive business with high price sensitivity, and that twenty-seven Western stores compete with one or more Kroger stores.  However, merely stating that Western and Kroger are "competitors" in the gasoline market fails to capture some subtle, yet important, nuances of that market.

For example, although both Western and Kroger surveyed the fuel prices charged by each other and other sellers on a daily basis, they ascribed different significance to those prices.  Mr. Taraghi described Western as a price leader, meaning that its stores most often had the lowest price for fuel.  Mr. Taragahi's philosophy was "you don't let people cut you."  Indeed, over the operative time period, Western stores had the lowest retail price or were tied with the lowest price 70% of the time.  This is largely because convenience stores in general, and Western in particular, depend heavily on fuel sales.  Mr. Taraghi testified that even though his fuel markup was only about 10-12%, whereas his merchandise markup was closer to 30%, about 80% of Western's revenues come from fuel sales and only 20% from merchandise.  However, fuel sales are critical to the generation of merchandise sales, from which a greater profit can be realized. The convenience store operator's hope is that when a customer stops to purchase fuel, the customer will go into the store and to purchase other items.  Convenience stores market by posting prices on the street, and by being highly responsive to the prices of nearby competitors. Thus, Mr. Taraghi surveyed prices of competitors within a 5-mile radius of each store.

In contrast, the supermarkets did not depend heavily upon fuel sales to generate merchandise sales; instead, their marketing strategy suggests, to some degree, the opposite approach.  The supermarkets appeared to view fuel as another form of merchandise.  The Kroger supermarkets marketed fuel to its existing customers by offering two discounts — a three cent per gallon discount for shoppers who used a loyalty card and price reductions on gas for particular grocery and other purchases.  This approach played to customers' loyalty and the convenience of the fuel station to the grocery store (and was quite effective, with more than 80% of purchasers using a loyalty card), allowing customers to combine refueling with grocery shopping, even if there was a slight price penalty to doing so compared to shopping at Kroger and buying fuel separately at a price leader like Western.

Because Kroger's supermarkets relied upon customer loyalty to drive fuel purchasing decisions, the supermarkets did not engage in heavy price competition for fuel sales.   The pricing strategy for the supermarkets was to set the retail fuel price at least three cents higher than the lowest competitive price in a 2-3 mile radius (suggesting that Kroger supermarkets considered their customers less price-sensitive than Western did).  The supermarkets were price followers, rather than price leaders.  Ms. Giannola, the person in charge of setting Kroger supermarket fuel prices, characterized Western as a "low-baller" — by giving Western at least the three-cent differential associated with the loyalty program, King Soopers and City Market could avoid participating in a price war for fuel sales.  As a result, Kroger supermarkets set or matched the lowest fuel prices in the market on less than 3% of the days in the operative time period.  Moreover, as discussed in some detail herein, the record indicated that Kroger's retail fuel prices were not necessarily influenced by its wholesale prices.

As noted above, Kroger also operated a chain of traditional convenience stores under the Loaf N Jug name, including some stores located in close proximity to Western stores. Presumably, the Loaf N Jug entities were more direct and comparable competitors to Western than Kroger's supermarket entities were, as one would reasonably expect the Loaf N Jug convenience stores to have similar revenue models, price margins, etc. as Western's convenience stores. Although Loaf N Jug stores are most comparable to Western, a number of factors (including the fairly recent contract between Loaf N Jug and the corresponding lack of extensive data on Loaf N Jug fuel purchases and sales) resulted in relatively little trial testimony about Loaf N Jug's activities. There was testimony that Loaf N Jug set its own retail fuel prices with the intent of meeting certain daily volume and revenue targets. In other words, although the retail prices of competing stores may have played an indirect role in Loaf N Jug's setting of retail prices (as such prices would inform Loaf N Jug's ability to set and meet its volume or revenue targets), even Loaf N Jug did not duplicate Western's lowest-price approach.

In presenting its case, Western ignored the differences in business models and pricing strategies between Western and Kroger. Its expert, Dr. Leffler, acknowledged that the market for retail fuel sales has changed dramatically over the past 30 years, and that retail gas sales are no longer solely the domain of the typical "service station." Dr. Leffler testified that "the degree of competition [historically] was not the same as it is today. We've had the rise of the Kroger-type stations that are associated with grocery stores, C[onvenience] stores that become very prominent, where gasoline has almost become a mechanism to get customers in to buy the high margin products."

Dr. Leffler stated that, when called upon as an economic consultant in antitrust cases, he would ordinarily look at the nature and extent of the competitive market, but he did not do so

here because he was tasked by Western solely to develop a model that would calculate Western's damages resulting from conduct assumed to be unlawful.  Asked about his general antitrust methodology, he explained:  "Obviously one study is the competitive environment. My focus in this case was not the broader picture of 'did these stations compete?  How did they compete?' After satisfying myself there was sufficient knowledge by others, I focused strictly on how does one empirically implement a methodology that, if the data is sufficient, would reveal whether or not in a reliable way there are damages."  The complexity of the market led him to formulate a damages model using multiple regression analyses to account for multiple variables influencing Western's retail pricing.  The model is addressed later, but the nature of the competitive environment that drove Dr. Leffler to develop a complex damages model was not addressed.  In short, there was no expert assessment of whether, to what degree, and how the Western stores and Kroger stores competed.

Thus, although the parties presented evidence as to the operation of the "convenience store market" and Dr. Glick referred to the "gas station market," the Court cannot necessarily conclude that Western and Kroger are perfectly congruent competitors with regard to retail fuel sales, even where both entities maintained locations within close proximity to one another.

### 4.  Losses

Although Western presented opinions from Dr. Leffler concerning its damages resulting from the alleged price discrimination, such damages were purely hypothetical; Western presented no evidence of <u>actual</u> losses it suffered during the relevant period.  For example, Western closed no stores during or immediately following the operative period.  Indeed, Western opened two new stores during the operative period, both in areas in which it would compete with Kroger stores.

Dr. Leffler's calculation of Western's lost profits was based upon a multivariate model that employs numerous regression analyses to make two determinations — first, what Western's wholesale price would have been had there been no price discrimination by Suncor; and second, what profits Western would have had "but for" the price discrimination. Western characterizes this as a "but for" damage model that selects neither the actual price that Western or Kroger stores paid. The model yields a calculation of lost profits between $999,361 and $1,651,009.

## ANALYSIS

## I.      COUNTERCLAIM AND THIRD-PARTY CLAIM

Although it is most common to address claims, counterclaims and third-party claims *seriatim*, this case is somewhat unusual in that there is no dispute as to the facts underlying the counterclaim and third-party claim. Pursuant to the Master Agreement between Western and Suncor, Western is obligated to pay Suncor for the fuel it received between May 9 and May 25, 2011, valued at $3,755,141.95, as well as other costs such as attorney fees. Mr. and Ms. Taraghi personally guaranteed this obligation up to $3 million. Western's and the Taraghi's defense to this obligation is that the Master Agreement is not enforceable due to discriminatory pricing that violated the Robinson-Patman Act, 15 U.S.C. § 13(a) and Colorado's Unfair Trade Practices Act C.R.S. § 6-2-108. They specifically refer to  Paragraph 7 of the Master Agreement's Terms and Conditions that states "All of the terms and provisions of this Agreement shall be subject to the applicable laws . . . of all governmental authorities, and each Party agrees to comply with all such laws . . . during the term of this Agreement" and to C.R.S. § 6-2-109, which deems any contract made in violation of Colorado's Unfair Trade Practices Act to be illegal and provides that "no recovery thereon shall be had" by either party. As stated in the Court's ruling on Suncor's Motions for Summary Judgment (**#251**), if the Master Agreement is enforceable,

Suncor is entitled to judgment against Western and Mr. and Ms. Taraghi for such sums.  It is appropriate, therefore, to turn to the Robinson-Patman and Unfair Trade Practices Act claims.

## II.      ROBINSON-PATMAN ACT CLAIM

The Robinson-Patman Act, 15 U.S.C. § 13(a), makes it unlawful "to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in [interstate] commerce, . . . where the effect of such discrimination may be substantially to lessen competition . . . or prevent competition with any person who grants or knowingly receives the benefit of such discrimination."  When the sales in question are made at a wholesale level, to customers who compete for retail sales of the product to end users, the type of price discrimination involved is defined as "secondary line" discrimination.

To establish this type of Robinson-Patman Act claim, Western must prove by a preponderance of the evidence that: (i) Suncor made at least two contemporaneous sales of fuel of like grade and quality to it and to a Kroger entity at different prices; (ii) at least one sale was made in interstate commerce; (iii) the difference in sales price affected competition; and (iv) and the difference in price caused injury to Western.  *Volvo Trucks of N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176-77 (2006); *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 677 (9th Cir. 1975).  Suncor has asserted an affirmative defense that any price discrimination "was made in good faith to meet an equally low price of a competitor."  15 U.S.C. § 13(b).

### A.  Contemporaneous sales of the same fuel at different prices to different customers

There is no dispute that between October 2009 and May 2011, Suncor sold unbranded gasoline and diesel fuel of like grade and quality to Western and Kroger entities from the same terminals, and that it charged different prices for such fuel.  Western was charged Suncor's

standard pricing for unbranded customers — the daily Suncor Rack price less a stated discount. Suncor charged Kroger the OPIS Rack Average less a stated discount. The use of these different pricing methods, together with other Suncor discounts, resulted in Western and the Kroger entities being charged different prices for the same commodity on at least 449 days between October 2009 and May 2011. Thus, the Court finds that the first element is satisfied.

### B. Sale in interstate commerce

The phrase "in commerce" in the Robinson-Patman Act addresses "the generation of goods and services for interstate markets and their transport and distribution to the consumer." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195 (1974). Thus, it is not sufficient to show merely that the alleged price discrimination simply "affect[s] commerce" or that the seller is engaged in interstate activities. Rather, Western must show that at least one of Suncor's discriminatory sales "occur[ed] in the course of its interstate activities" — in other words, that some fuel sold to Western or Kroger entities occurred across state lines.[5] *Id.*; *Belliston v. Texaco, Inc.* 455 F.2d 175, 178 (10th Cir. 1972).

Because the focus of the "in commerce" inquiry is upon the fuel being sold at different prices, if the product sold was locally "transformed in a material way" from the raw materials or goods that had previously moved in commerce, the "in commerce" requirement is not satisfied. *Able*, 406 F.3d at 63. *Belliston* illustrates this proposition. There, Texaco sold gasoline in Utah to the plaintiffs, owners of service stations, and offered the same gasoline to Flinco, a distributor who owned a chain of service stations that bore Texaco's brand, at a lower price. Texaco sold

---

[5] In *Able Sales Co. v. Compania de Azucarde Puerto Rico*, 406 F.3d 56, 62 (1st Cir. 2005), the court explained that this distinction is because "the recognized purpose of the Robinson-Patman Act is to reach the operations of large interstate businesses in competition with small local concerns," in order to prevent "predatory pricing by defendants who engaged in interstate commerce, not by those who acted purely locally."

gasoline it obtained from a refinery in Utah, owned by a company called American.  American produced the gasoline from crude oil shipped from Colorado to Utah.  455 F.2d at 178.  The 10th Circuit found that, under these circumstances, the plaintiffs could not demonstrate the "in commerce" element of their claim. *Belliston* drew a distinction between its facts and those of *Standard Oil Co. v. Federal Trade Commission*, 340 U.S. 231 (1951), where the "in commerce" element was satisfied by the fact that the seller "shipped the gasoline to itself across a state line [but] the product was never altered"; in such circumstances, the very product being sold had moved in the "flow of commerce."  455 F.2d at 180.  It also highlighted the difference between *Dean Milk Company v. Federal Trade Commission*, 395 F.2d 696 (7th Cir. 1968) ("in commerce" element satisfied where "raw milk which was produced out of state retained its essential identity and underwent only minimal changes during processing and it was ultimately sold as milk") and *Central Ice Cream Company v. Golden Rod Ice Cream Company*, 287 F.2d 265 (7th Cir. 1961) ("when out-of-state butterfat and other ingredients are combined [into ice cream] in Illinois, a new product is created" and the "in commerce" element is not satisfied by purely intrastate ice cream sale).  455 F.2d at 180-81.

As noted in its ruling on Suncor's Motion for Summary Judgment, the Court derives several general rules concerning the "in commerce" element.  The product being sold at differing prices must travel across state lines, either by virtue of the sale itself (*i.e.* it is shipped to an out-of-state buyer), or because the seller has imported the product from out of state (*i.e. Standard Oil*'s "flow of commerce" doctrine).  If the interstate nexus turns on the seller's importation of the product, the Court must consider whether the product being sold is in essentially the same form and of the same character as the product that was imported (in which case the commerce element is satisfied) or whether the seller has materially transformed the imported substance into

something sufficiently distinct as to "interrupt the flow of commerce." *See Able*, 406 F.3d at 63 n. 8.

It is undisputed that Suncor operates a refinery in Colorado, and that some (perhaps even much) of the fuel products it sold to Western and Kroger was produced entirely in Colorado. However, that does not end the inquiry. Suncor also sold unbranded fuel to Western and Kroger from terminal locations where its domestically refined fuel was mixed and stored with fuel transported by pipeline from other states. Once mixed, the fuel in such tanks was chemically indistinguishable, and for legal and practical purposes was fungible. Thus, Suncor sales included both fuel it refined within Colorado and fuel that was refined outside of Colorado.[6] In addition, gasoline purchased by Western and Kroger contained ethanol of varying amounts. One third of the ethanol added to gasoline at Suncor's refinery was produced by suppliers outside of Colorado. As a consequence, the Court finds that some of the fuel sold by Suncor to Western and Kroger entities was obtained from outside of Colorado.

Suncor argues that although it derives some of its gasoline from outside of Colorado, it materially transforms that gasoline into a different product by "blending different grades of gasoline" and including additives (such as ethanol) to produce various products of specific grades and composition. It argues that the finished product "is a completely different product from the one acquired by Suncor from a refinery outside of Colorado," such that the "flow of commerce" doctrine would not apply. The evidence at trial did not support this contention. The

---

[6] At the summary judgment stage, Suncor argued that "comingled" local and foreign gasoline is not sufficient to satisfy the "in commerce" requirement, and that Western "bears the burden of identifying the specific goods that traveled in commerce, citing *Chawla v. Shell Oil Co.*, 75 F.Supp.2d 626, 646 (S.D. Tex. 1999), *S&M Materias v. S. Stone Co.*, 612 F.2d 198, 200 (5th Cir. 1980), *Roorda v. American Oil Co.*, 446 F.Supp. 939, 945 (W.D.N.Y. 1978), and *McGoffin v. Sun Oil Co.*, 539 F.2d 1245, 1248 (10th Cir. 1976). The Court previously found that none of the cited decisions stand for such proposition, and indeed, the reasoning in *Roorda*, is opposite to Suncor's contention. Nothing presented at trial changes this conclusion.

evidence is that the introduction of additives occurs after the fuel has been commingled and as it is pumped to the truck. The additives, particularly ethanol, are required by federal law and do not change the purpose or the function of the gasoline.  Thus, the Court finds that some of the product sold to Western and the Kroger was brought into Colorado and thus traveled in interstate commerce.

Suncor also argues that to invoke protection under the Robinson-Patman Act, Western must show that all purchases subject to discriminatory pricing were of product that traveled in interstate commerce.  For this proposition, Suncor relies on *Belliston v. Texaco, Inc.*, 455 F.2d 175, 178 (10th Cir.), *cert. denied*, 408 U.S. 928 (1972); *Black Gold, Ltd. v. Rockwool Indus., Inc.*, 729 F.2d 676, 683 (10th Cir.), *cert.denied*, 469 U.S. 854 (1984); *Coastal Fuels of Puerto Rico*, 79 F.3d at 189; and *Hanson v. Pittsburgh Plate Glass Indus., Inc.*, 482 F.2d 220, 224 (5th Cir. 1973), *cert. denied*, 414 U.S. 1136 (1974).  A careful review of these decisions does not reveal such a requirement.  Indeed, such a requirement would be inconsistent with the express language of 15 U.S.C. § 13(a), which requires that "either or any of the purchases involved in such discrimination are in [interstate] commerce."  This requirement is satisfied if one of the "two or more sales" crossed a state boundary.  *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, (1974); *McGoffin v. Sun Oil Co.*, 539 F2d 1245 (10th Cir 1976).  In this case, the standard has been satisfied.

### C.  Effect on competition

Section 2(a) prohibits price discrimination where the effect is "to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who . . . receives the benefit of the discrimination."  15 U.S.C. § 13(a).  Western

asserts a "secondary line" injury, contending that competition between its stores and Kroger stores was affected because Kroger was a "favored purchaser." *Volvo Trucks*, 546 U.S. at 176.

It is worth pausing at this juncture to focus on the primary purpose of the Robinson-Patman Act. Its function is not to protect one competitor against another, but instead to protect the competitive process for the benefit of the ultimate consumer; it is often said that the Act "protects competition, not competitors." *See Black Gold*, 729 F.2d at 680, *citing Foremost Pro Color, Inc. v. Eastman Kodak Co*., 703 F.2d 534 (9th Cir 1983); *Atlas Building Products Co. v. Diamond Block & Gravel Co.,* 269 F.2d 950 (10th Cir. 1959); 4 J. von Kalinowski, <u>Antitrust Laws and Trade Regulation</u> § 28.03 (1983). Put another way, the Court views the effect of discriminatory wholesale pricing from the perspective of the retail fuel-buying consumer — in this case, did it affect the choices, prices, or stores available to the ordinary drivers buying fuel? On this issue, Western bears the burden of proof. Western must establish by a preponderance of the evidence that the difference in wholesale prices it and Kroger paid to Suncor had an impact on competition among retailers of unbranded fuel.

In determining whether there has been an injury to competition, courts generally have employed two approaches. The first approach, known as the *Morton Salt* doctrine,[7] permits the Court to infer an injury to competition where: (i) there is a permanent and substantial wholesale price difference that is sufficient to influence the retail price charged by the purchaser who received the lower wholesale price; or (ii) the wholesale price difference occurs among competitors operating in a market where profit margins are low and competition is keen. The *Morton Salt* inference assumes that when the favored wholesale customer pays less, it will

_____

[7] The Supreme Court formulated this doctrine in *FTC v. Morton Salt Co*., 334 U.S. 37 (1948).

reduce its retail price to the detriment of other merchants.  S*ee Chroma Lighting v. GTA Prods. Corp.*, 111 F.3d 653, 654 (9th Cir. 1997).

The second approach relies on qualitative and quantitative analyses to determine the effect of a lower wholesale price upon the favored wholesale customer's retail price and the effect of such lower retail price on the competitive market.  Typical studies consider relevant economic and market factors, such as the amount and duration of the price differential, the pattern of the pricing scheme, the degree of competition, the purpose of the price differential, the size of the profit margin, the degree of profit impairment, the extent of the loss of sales, and the nature of product sold.  3 von Kalinowski, Antitrust Laws and Trade Regulation, § 39.02.

Western argues that both approaches demonstrate injury to competition in the market for retail sale of unbranded fuel.  Considering each, the Court disagrees.

### 1. *Morton Salt*

Western argues that the *Morton Salt* inference should be used in this case because both of the customary scenarios where the inference can be applied are present here.  It argues that: (i) the difference between wholesale prices paid by Western and Kroger was substantial and continued over a significant period of time and was capable of influencing Kroger's retail prices, and (ii) the profit margin in retail gas sales is narrow and the competition is keen.  Assuming, without determining, that the *Morton Salt* doctrine could properly be invoked here, the Court does not find the inference it permits to be warranted for several reasons.

First, the Court finds little basis to resort to inferences here.  By definition, an inference may be drawn where circumstances preclude the development or presentation of direct evidence of the fact in question.  Here, the parties have presented both direct and extensive expert opinion evidence with regard to whether the lower wholesale price charged to the Kroger entities affected

their retail prices and therefore impacted the retail prices of other stores competing in the retail unbranded fuel market.  The expert testimony is supported by substantial statistical studies and models, which the Court has carefully reviewed.  Given concrete and specific evidence, there is little justification for instead resorting to the blunt and imprecise instrument of inferences.  Rather, as discussed below, the Court can merely address the persuasiveness of the direct evidence itself.[8]

Second, even if it were appropriate to consider the *Morton Salt* inference despite the presence of direct evidence, the Court would nevertheless find that it is not appropriate to draw any inference of injury to competition under the particular circumstances of this case.  The *Morton Salt* inference is most appropriately applied in a classic market where retail pricing occurs in accordance with rational, readily-anticipated motivations.  That is not the case here.  As noted previously, there is some question as to whether Western and Kroger's supermarket entities are comparable competitors when it comes to retail fuel sales, as the two types of retail operations have different business models, margins, and product mixes.  In addition, none of the stores use the same pricing mechanism.  Western bases its retail price solely on competitive pricing; Loaf 'N Jug sets its retail price to combine with anticipated volume in order to meet sales targets; the supermarkets purposefully price fuel several cents above the lowest competitive price.  Thus, it would appear that none operate according to the *Morton Salt* assumption that changes in wholesale prices will be directly reflected in retail prices charged to consumers.

Thus, as noted by Dr. Leffler,  it is improvident to assume that there was a retail market for unbranded fuel in which Western and the Kroger entities participated that was subject to uniform, rational economic behavior that influenced pricing and market activity.  As a

---

[8]     *See, e.g.*, *Falls City Indus. v. Vanco Beverage, Inc.*, 460 U.S. 428 (1983); *Volvo.*, *supra*.; *Black Gold, supra.*

consequence, the Court declines to draw any inferences via *Morton Salt*, and instead turns to the analytical evidence.

### 2. Qualitative and Quantitative Evidence

The parties' economic experts, Dr. Glick and Dr. Griffen, agree that the quintessential question for determination is whether differences in wholesale pricing caused injury to competition in the retail market; in other words, whether Kroger used its wholesale price savings to drive the retail price of fuel below where it would otherwise have been, thus depriving Western of profits it would have earned had both parties paid the same wholesale price and harming the competitive landscape for retail fuel sales. Dr. Glick concisely summarized this in a logical syllogism: if Kroger's wholesale price influenced its retail price, and if Kroger's retail price influenced Western's retail price, then Kroger's (discounted) wholesale price influenced Western's retail price (adversely).

The Court assumes that the second premise of this syllogism is true. There is no dispute that Western set its daily retail fuel prices in reaction to its surveys of competitors' fuel prices, and among those were Kroger entities. Mr. Taraghi testified that he gauged Western's retail fuel price to beat competitors and "you don't let people cut you." Thus, it is fair to find that the prices charged by those Kroger stores in competition with Western store influenced Western's retail prices.

The more difficult question concerns the first portion of the syllogism: whether Kroger's wholesale price influenced its retail price — that is, whether Kroger passed the savings it received from Suncor through to its retail price. In resolving this issue, the Court considers both direct and opinion evidence.

### a. Direct Evidence

The direct evidence is limited to the testimony of the people who set retail prices.  As previously discussed, two separate Kroger subsidiaries own and operate supermarkets (King Soopers and City Market) and convenience stores (Loaf 'N Jug).  The subsidiaries had independent contracts with Suncor with different terms and made independent retail pricing decisions based upon different criteria.

Ms. Giannola testified with regard to the supermarkets.  She testified that she handled only retail pricing; another individual bought fuel pursuant to a single contract/terminal that provided a uniform wholesale fuel purchase price regardless of the Kroger supermarket that ultimately took delivery.  Despite Kroger paying a uniform wholesale fuel price for all fuel purchased on a particular day, its retail prices for that fuel varied among the supermarkets.  This suggests that Kroger did not mechanically pass wholesale price savings through to lower the retail price.

Moreover, the evidence established that the primary driver of Kroger's supermarket fuel pricing was not Kroger's wholesale fuel cost, but rather, the retail prices posted by competitors. Like Western, the supermarkets set daily retail prices in conjunction with daily surveys of the prices charged by competitors.  Unlike Western stores, however, the supermarkets generally did not lead the market in setting retail prices, they followed it.  With relatively few exceptions, the supermarkets set their retail prices at least three cents higher than the lowest competitive price and never dropped below the lowest competitive price.

As to the Loaf N Jug stores, Mr. Sharpe was the person responsible for setting retail fuel prices.  Like Ms. Giannola, he did not buy fuel, although he was generally aware of wholesale fuel prices.  As with the Kroger supermarkets, fuel bought for Loaf N Jug stores had a uniform wholesale price based on the contract and terminal at which it was purchased.  Also similar to the

Kroger supermarkets, the retail price varied among Loaf N Jug stores.  Mr. Sharpe reviewed daily price surveys prepared by Loaf N Jug store managers.  However, he made pricing decisions differently than both Western and the supermarkets.  He reviewed that the competitive prices, then factored in the sales volume necessary to meet sales objectives.[9]  In some locations, Loaf N Jug stores usually followed the pricing of competitors; in other locations (such as Pueblo), the Loaf N Jug sometimes led the market.  Most often, but not always, the Loaf N Jug price was higher than the Western price.

Thus, the direct evidence suggests three types of retail pricing strategies — Western's approach of leading the pack, the Kroger supermarkets' approach of following the pack by setting a price at least three cents higher than the lowest competitive price, and Loaf N Jug's practice of individualized pricing in order to meet sales objectives.  It is clear, however, that Kroger's wholesale fuel costs were not the primary, or even an important, driver of its retail fuel prices.  Different personnel were responsible for wholesale fuel buying than were responsible for retail pricing, and Kroger generally set its retail prices mostly based on its competitor's prices or based on revenue targets.  Nothing in the record suggests that Kroger routinely took advantage of the discounted prices it paid Suncor to drive down the retail prices to the detriment of competitors such as Western.  Having found no direct evidence supporting the first premise of Dr. Glick's syllogism, the Court turns to the expert opinion evidence.

### b.  Opinion Evidence

Both parties offered testimony of well-qualified witnesses with expertise in economic theory and antitrust concepts.  Western offered the opinions of Dr. Mark Glick and Suncor

---

[9]     Although the record is not clear, the Court assumes that this refers to revenue objectives — that is, Loaf N Jug determined what it wanted for fuel sales revenues and set a retail price that, multiplied by an anticipated volume of sales, would reach the desired sales target.

offered the opinions of Dr. James Griffen.  Although they agreed on many things, they disagreed as to whether the statistical evidence during the operative period shows that the Kroger stores passed their wholesale price savings through to their retail prices.

Dr. Glick opined that Kroger stores did so.  He considered Mr. Taraghi's operation of the Western stores, studies of the convenience store industry[10] and gas stations, Western's and Kroger supermarket's day-by-day pricing surveys, Suncor's sales to Kroger,[11] and general economic theory.  He concluded that among the factors that influence customer purchasers (location of station, traffic pattern, type of store, etc.), retail price is the most significant, and that even a small difference in price is significant in the "retail gasoline business."  He further reasoned that in the "retail gasoline market," competitors quickly respond to changes in retail price.  Then, looking at the difference between the wholesale prices that Suncor charged Western and Kroger, he concluded that "there was enough price discrimination over time to likely affect the retail price."

Dr. Glick explained that there were three useful approaches to the question of whether the difference in wholesale prices had an effect on retail prices.  The first is "to try to see if we can form an inference that the retail prices were affected by –by the wholesale price difference."  Dr. Glick did not propose any particular way to devise and test such an inference; instead, he merely stated that "[i]t's hard to see how there would be no impact over 608 days, it really is . . . if there

---

[10]      Dr. Glick relied, in part, on the testimony and studies considered by John Mayes.  Mr. Mayes' experience and testimony, however, was limited to the refinery and convenience store industries.  As noted earlier, the Court accepts his testimony in those areas but has reservations about extrapolating those findings to the operations of fuel-selling supermarkets or warehouse clubs.

[11]      For King Soopers supermarkets, the parties had information for purchases from Suncor, by store, by day, and by fuel grade for the relevant period.  For Loaf N Jug, they had limited purchase records only from March to May 2011.

is no competitive injury in a case like this, tell me the—what case is there competitive injury?" This is essentially a rephrasing of the *Morton Salt* approach, inferring an effect on competition simply from the existence of a long-term price differential in a competitive market.  As discussed above, the Court has declined to infer any injury to competition in the circumstances presented here.

According to Dr. Glick, the second approach is a direct statistical approach that he acknowledges is "the more difficult task."  For this approach, he defers to the damages model designed by Dr. Leffler and prepared by Mr. Tatos.  The Court finds this damage model to be unhelpful in evaluating whether Kroger rolled its wholesale price savings into its retail price because the damages model did not include Kroger's retail price as a variable.  Without that variable, the model becomes one that begs the question, assuming that there must be a relationship between Kroger's wholesale cost and its retail price at each store.[12]

Finally, Dr. Glick relies on the logical syllogism described above.  It offers a methodology for determining whether there was injury to competition, but by itself does not establish any injury.  As the preceding discussion indicates, the Court cannot say that a key premise of that syllogism — that Kroger's receipt of discounts on fuel at the wholesale level had any effect on the retail prices that Kroger charged for such fuel — is valid, and thus, cannot

---

[12]     This assumption is premised upon assessments made by Mr. Tatos in reviewing Kroger's average retail price and wholesale cost.  (Ex. 593).  He observed that the **averages** moved "in tandem" but with some lag effect.  He observed that wholesale costs and retail prices may not move exactly the same direction in any period, but over the entire operative period, the wholesale costs and retail prices seem move together.  The Court is unpersuaded by this analysis because it is too general, it is not based on an generally accepted methodology, and it fails to account for the complexity in the market as articulated by Dr. Leffler and as is reflected in the direct evidence.  The Court agrees with Dr. Griffen's observation that the issue is not whether retail prices go up or down in response to market changes, but instead whether a change in the wholesale cost of one market participant affects its retail price. Use of price and cost averages over the entire operative period does not address that issue.

adopt the conclusion that the discounts received by Kroger had any effect on Kroger's competition with Western.

Dr. Griffen disagrees with Dr. Glick's conclusion that that the wholesale cost savings was passed on through lower prices charged by Kroger.  Dr. Griffen concedes that if all of the retailers experienced a lower wholesale cost, the market would reflect lower retail prices.  However, he is unconvinced that any specific wholesale cost savings realized by Kroger during the operative period resulted in a lowered retail price charged at Kroger stores.  He opines that the data shows that, rather than reducing their retail prices, Kroger pocketed the wholesale savings as additional profit.

Focusing on the data available to the parties (noting the meager data regarding directly-competitive Loaf N Jug stores), Dr. Griffen conducted three tests to determine whether Kroger was passing its wholesale savings through to its retail prices.  First, he compared retail Kroger prices, store by store, during two periods: a period prior to the contracts with Suncor and the period after the contracts became effective.  For King Soopers and City Market, the contract with Suncor began October 1, 2009, and for Loaf 'N Jug, the contract became effective in February of 2010.  He theorized that if Kroger was passing its wholesale price savings through to lower retail prices, there would be a decrease in the trend of retail prices once those contracts became effective.  For twenty-two of the Kroger stores competing with Western stores, the Suncor contract had no apparent effect on the retail price.

In five stores, however, there was some reduction in the retail price trend.  Therefore, Dr. Griffen examined what might have caused the retail price reduction.  He reasoned that if a wholesale cost savings under the Suncor contracts caused the decreasing trend in retail pricing (*i.e.* Kroger using its discount from Suncor to drive the retail price down), then there should be a

corresponding structural break in the profit trend in the competing Western stores over the same time period.  Put another way, if the Kroger stores dropped retail prices because their costs were lower, and the Western stores either lost sales to a lower-priced Kroger store nearby or were forced to lower their own prices even further in order to compete, the Western stores would show a drop in profitability.  Dr. Griffen analyzed the profit trends for all of the twenty-seven Western stores that competed with a Kroger entity, examining profits both before and after the Suncor contracts became effective.  He compared the profit trend of each store for a time prior to the Suncor contract with the profit trend after Kroger's contracts with Suncor became effective. None of the Western stores showed a structural break in the profit trend line.  In other words, the profit trend line for the Western stores did not suffer due to Kroger's contract with Suncor.  To the contrary, Western opened a new store that experienced climbing profits.  From this, Dr. Griffen concluded that no Western store experienced a loss in profitability, including those that competed with the five Kroger stores where retail prices dropped.

Dr. Griffen's third test looked at Kroger's pricing behavior relative to competitive stores. Using Western's surveys, Western had (or was tied for) the lowest retail price on 73% of the days in the operative period.  Kroger stores had (or were tied for) the lowest retail fuel price on only 3% of the days.  (For the remaining 25% of the time, other competitors had the lowest retail price.)  This is consistent with the observations discussed above: Western aggressively sought to be the low-price leader, and Kroger was usually content to charge more than Western.

Dr. Griffen then recalculated Kroger prices to reflect the common use by Kroger customers of the three cent-per-gallon discount offered by use of a Kroger loyalty card.  Even with that reduction, Western still had (or was tied for) the lowest retail fuel price some 70% of the time.  The Kroger entities had (or were tied) for the lowest price 33% of the time, and the

other competitors continued having the lowest price approximately 23-24% of the time. Although this sharpens the picture somewhat, the fact still remains that Western was persistently the price leader, and demonstrates that Kroger only occasionally competed on price.  Moreover, recalling that the contract with Suncor granted Kroger a price advantage over Western for 78% of the days in the operative time period, it is clear that Kroger was not regularly using that wholesale discount to match (much less undercut) Western's retail pricing.

None of the tests conducted by Dr. Griffen suggested that Kroger's wholesale cost savings was passed on in its retail price.  Therefore, Dr. Griffin opined that the Kroger entities simply treated the wholesale savings as additional profit, rather than using those savings to undercut competitors and injure competition.

As between the two expert opinions, the Court finds Dr. Griffen's opinion to be more persuasive.  His opinion that the wholesale price differential had no demonstrable effect on competition is consistent with the direct evidence.  Kroger stores did not routinely convert wholesale cost savings into lower retail prices.  Kroger stores most often were price followers rather than leaders.  During the operative time period, there is no evidence of a Western store closing due to a nearby Kroger store persistently undercutting its fuel prices — there is no evidence that Kroger even sought to undercut Western's pricing.  Instead, the evidence shows that during the operative time period, Western opened two new stores in competition with Kroger stores.  Although Western might have liked to have opened more than two additional stores during this period, it is hard to explain expansion of stores — especially in locations with Kroger competitors — if Western's existing competition with Kroger was as unfavorable as Western claims.  Dr. Griffen's opinion is not absolute.  It allows for the possibility that some of the wholesale cost savings may have bled into a Kroger store's retail price, but when viewed

over the twenty-seven stores and the operative period, the price differential did not cause a discernible effect on competition.

The standard of proof on this issue is a preponderance of evidence.  Based on the evidence presented, the Court cannot find that it is more likely than not that price discrimination by Suncor affected competition between Western and Kroger stores or in the retail unbranded fuel market as prohibited by Robinson-Patman Act.[13]  Because Western did not carry its burden on this element, judgment shall enter in favor of Suncor and against Western on this claim.

### III.    Colorado Unfair Trade Practices Act

Western also seeks to recover under Colorado's Unfair Trade Practices Act, C.R.S. § 6-2-108.  This statute states that "the secret payment or allowance of rebates, refunds, commissions, or unearned discounts . . . not extended to all purchasers upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is an unfair trade practice."  Western has the burden of proof by a preponderance of evidence to establish each of the following three elements: 1) that Suncor gave a secret, unearned discount to Kroger entities; 2) that the secret discount had a tendency to destroy competition; and 3) that Western was injured by the discount given to the Kroger entities.

#### A.  Secret Discount

At the summary judgment stage, the parties argued extensively about the purpose and meaning of the operative terms of this statute.  The Court extensively addressed the arguments in its order at Docket # 251, and in the absence of any further argument at trial, the Court incorporates that Opinion's discussion of the governing law.  Consistent with its prior reasoning,

---

[13] By virtue of this finding, it is not necessary to address Suncor's affirmative defense of "meeting competition," nor the intricacies of the damage model formulated by Dr. Glick, Dr. Tatos and Dr. Lefler.

the Court will assume that the contract prices Suncor gave to the Kroger entities was a secret, unearned discount.

**B.    Tendency to Destroy Competition**

It is evident in their Proposed Final Pretrial Order (**#266-1**) and in the trial presentation that the parties understand the requirement that Western prove that the secret discount granted to Kroger had "a tendency to destroy competition" is the equivalent of the Robinson-Patman claim's element of "injury to competition."  As with the Robinson-Patman claim, Western requests application of the *Morton Salt* inference and in the alternative relies on the opinions of Drs. Glick and Tatos to establish the "tendency to destroy competition" element, whereas Suncor relies on the testimony of the Kroger representatives and Dr. Griffen.

In parallel construction, the Court's prior findings and assessment of the evidence with regard to the Robinson-Patman claim is dispositive here.  There was price discrimination in Suncor's sales to the Kroger entities and Western.  However, the evidence does not support a finding that such discrimination adversely impacted, much less had a tendency to destroy competition in, the retail, unbranded fuel market.  Accordingly, judgment shall enter in favor of Suncor and against Western on this claim.

## CONCLUSION

For the reasons stated above, the Court finds in favor of Suncor on Western's Robinson-Patman Act and C.R.S. § 6-2-108 claims, and will enter judgment in favor of Suncor on those claims.  The Court further finds in favor of Suncor on its counterclaim against Western for breach of contract and on its cross-claim against the Taraghis for breach of the personal guaranty, as set forth in the Court's prior Opinion (and deemed incorporated herein).  Within 14 days of this Order, the parties shall jointly tender an agreed-upon form of judgment reflecting the

findings herein (and any prejudgment interest as may be recoverable).  The motions at Docket **# 256** and **# 280** are **DENIED** as set forth herein, with no further action required by the Clerk of the Court.

Dated this 22nd day of August, 2014.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge