# EXHIBIT 3

EXHIBIT 3

MOTION HEARING - SEPTEMBER 28, 2011

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 11-CV-1611-MSK-CBS

WESTERN CONVENIENCE STORES, INC.,
a Colorado corporation,

WESTERN TRUCK ONE, LLC
a Colorado limited liability company,
    Plaintiffs,
vs.
SUNCOR ENERGY, (U.S.A.), INC.,
a Delaware corporation,
    Defendants.

Proceedings before CRAIG B. SHAFFER, United States Magistrate Judge, United States District Court for the District of Colorado, commencing at 9:13 a.m., September 28, 2011, in the United States Courthouse, Denver, Colorado.

WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

APPEARANCES

MR. KENNETH R. BENNINGTON, ESQ., and
MS. KATHLEEN E. CRAIGMILE, ESQ.
    Appearing on behalf of the Plaintiffs.

MR. JOHN R. ROBERTSON, ESQ., MR. WILLIAM L. MONTS, ESQ.,
and MR. ANTHONY J. SHAHEEN, ESQ.
    Appearing on behalf of the Defendants.

MOTION HEARING

Page 2

1           PROCEEDINGS
2       (Whereupon, within the electronically recorded
3   proceedings are herein transcribed, pursuant to order of
4   counsel.)
5       THE COURTROOM DEPUTY: All rise.
6       THE COURT: Please, everybody have a seat.
7   All right. We're on the record in Western Convenience
8   Stores, Inc. versus Suncor Energy, 11-CV-1611. I'll
9   take appearances of counsel.
10      MR. BENNINGTON: Good morning, Your Honor.
11  Kenneth Bennington and Kathleen Craigmile for the
12  plaintiffs.
13      MS. CRAIGMILE: Good morning, Your Honor.
14      THE COURT: Okay. Good morning.
15      MR. ROBERTSON: Good morning, Your Honor.
16  Robby Robertson. I also have with me Anthony Shaheen
17  and Mr. William Monts. We represent the defendant.
18      THE COURT: All right. This poses a threshold
19  issue. I need to ask you, what do you all envision as
20  the scope of my role in light of Judge Krieger's order
21  of reference? How much or how little do you want me to
22  do? Because she gave you the chance to consent to me
23  deciding this motion or, alternatively, I can simply
24  write a recommendation which would almost guarantee that
25  you build in more time and money. What would you like

Page 3

1   to do?
2       MR. BENNINGTON: I have been proceeding in the
3   assumption that you will rule, Your Honor.
4       THE COURT: Okay. What's Suncor's view?
5       MR. ROBERTSON: Your Honor, plaintiff wants to
6   put on its case and we're here to defend it.
7       THE COURT: No.
8       MR. ROBERTSON: I mean --
9       THE COURT: But the -- the order of reference
10  was is that you could either consent to me deciding the
11  motion, or under 636(c) --
12      MR. ROBERTSON: I see. Could I confer with --
13      THE COURT: Sure. Absolutely. You can have
14  just a mass conferral.
15      MR. ROBERTSON: And, Your Honor, since --
16  actually, my client hasn't -- isn't here and the last
17  word he gave us was to go ahead and ask Your Honor
18  respectfully to give a recommendation.
19      THE COURT: Okay. I'm happy to do that.
20      MR. ROBERTSON: I apologize, I can't change --
21  I don't -- that's the last word I got.
22      THE COURT: No, and your client absolutely has
23  the right to decide it. I don't necessarily see the
24  economic efficiency of that, but that's fine.
25      MR. ROBERTSON: And I agree, but I just don't

Page 4

1   have the authority to change my mind, so --
2       THE COURT: No, I understand. Okay. I have
3   reviewed the motion, the response and the reply. I have
4   read the exhibits that you tendered and I have read the
5   cases you cited and I have done my own research. But I
6   will turn the matter over to you. It's plaintiff's
7   motion, so please.
8       MR. BENNINGTON: You want an opening, Your
9   Honor or should we proceed direct to --
10      THE COURT: I mean, I've read everything and I
11  suspect your opening is simply going to tell me what's
12  in your motion.
13      MR. BENNINGTON: It is. I'm happy to proceed.
14      THE COURT: Well, suffice to say that having
15  read your motion, there's really not much surprise left.
16  So, why don't --
17      MR. BENNINGTON: Yeah.
18      THE COURT: -- you just go ahead and begin.
19      MR. BENNINGTON: Very good.
20      THE COURT: Sir, come on up. Sir, what I'd
21  ask you to do is have a seat. That chair does not roll
22  so --
23      MR. TARAGHI: Okay.
24      THE COURT: Now, once you get yourself
25  comfortably positioned, please raise your right hand.

MOTION HEARING - SEPTEMBER 28, 2011

Page 57

```
 1   A   No.
 2         MR. ROBERTSON: Objection, leading. He can
 3   just say what he heard on the voicemail without having
 4   counsel tell him what's there.
 5         THE COURT: Counsel, in fairness there have
 6   been a whole slough of leading questions. If you were
 7   really concerned about leading questions you're about,
 8   by my calculation, maybe 45 minutes late. And I'll
 9   sustain that objection. That is a leading question.
10         MR. ROBERTSON: Thank you, Your Honor. I'm
11   trying not to interrupt. I want to keep things moving
12   as much as I can.
13         THE COURT: Okay.
14   Q   (By Mr. Bennington) What, if anything, did he say
15   about price differential that you had been complaining
16   about in that voicemail?
17   A   Nothing.
18   Q   What did you do in response to that -- that
19   message?
20   A   I had Chris call Steve Moss and go detail with him.
21   He probably will tell you that.
22   Q   All right. But as a result of that conversation,
23   which Mr. Wehrle will tell us about, did anything
24   change?
25   A   No.
```

Page 58

```
 1   Q   What did you do then knowing that your credit had
 2   been cut off?
 3   A   Nothing I can do. I mean --
 4   Q   All right. At that point were there ACH
 5   transactions --
 6   A   Yes.
 7   Q   -- coming through?
 8   A   Yes.
 9   Q   Did Western pay those ACH transactions?
10   A   I reject them all.
11   Q   When you say "I reject them all" what do you mean?
12   A   Everything came through, I reject them.
13   Q   This is the positive pay system you were telling us
14   about earlier, correct?
15   A   Pardon me?
16   Q   Is it the positive pay system that --
17   A   Right.
18   Q   -- the bank has?
19   A   Right. Electronic system, yeah.
20   Q   You have to approve each transaction?
21   A   That's correct.
22   Q   So what happened then with respect to the pending
23   transactions on Friday the 20th? Did you reject them or
24   accept them?
25   A   Reject them.
```

Page 59

```
 1   Q   Why?
 2   A   Because I felt they owe me money. I'm going to --
 3   I mean -- they owe me more money than I owe them.
 4         THE COURT: Okay. Hold on.
 5   A   That's why I reject them.
 6         THE COURT: Hold on for a second. Help me
 7   again to understand the transaction process. In the
 8   abstract, as I understand it you would send a Western
 9   truck to pick up fuel. Your Western truck would pick up
10   the fuel and bring it to one of your stores?
11         THE WITNESS: Correct.
12         THE COURT: Once the fuel was picked up at a
13   Suncor facility, then Suncor under this line of credit
14   would send a request for payment?
15         THE WITNESS: Correct.
16         THE COURT: Now, was it always the case that
17   by the time Suncor put in the request for payment your
18   truck had already picked up the fuel?
19         THE WITNESS: Correct.
20         THE COURT: So you had their product in your
21   truck, and then they go to seek payment for the product
22   that you already had?
23         THE WITNESS: Correct.
24         THE COURT: And how did they owe you money?
25         THE WITNESS: Because --
```

Page 60

```
 1         THE COURT: You just told me that you thought
 2   they owed you more than you owed them. How -- what part
 3   of this process under which did they owe you money?
 4         THE WITNESS: Because --
 5         THE COURT: Because you had their product.
 6         THE WITNESS: It is their product.
 7         THE COURT: Well, not anymore.
 8         THE WITNESS: Okay. Now, this is a question.
 9   We had an agreement. We had an agreement how this
10   agreement has to be implemented. They cut me off every
11   time they want to. They didn't give me product. They
12   were hurting me. They make me to the point -- now, what
13   their motivation was I'm trying to find out right now
14   from the court, and if -- if tomorrow the court decides
15   that I owe them the money, they will get it right away.
16   I don't think I owe them money because they took my
17   money from me by not giving me -- by cutting me off with
18   no reason, which we had an agreement.
19         THE COURT: So here's --
20         THE WITNESS: Why you not giving me that 10
21   cents --
22         THE COURT: Here's what I understand what
23   you're saying is, is that you had picked up product at
24   their facility and they sent you a bill, essentially,
25   seeking electronic payment for that transaction.
```

15 (Pages 57 to 60)

Page 61

1  Your -- your view was that by not giving you the same
2  10-cent discount they were costing you money in terms of
3  your ability to conduct business and compete with your
4  competitors.
5       THE WITNESS: Correct.
6       THE COURT: So when you say they owed you
7  money, you felt they owed you money because of what they
8  weren't doing for you.
9       THE WITNESS: That's -- that's correct. That
10 part --
11      THE COURT: So when you say -- and I just want
12 to make sure, Mr. Taraghi, that I understand your
13 terminology. It wasn't that they owed you money, it's
14 they had costed you money?
15      THE WITNESS: If they giving somebody else
16 money, they're not giving them money. They owe me
17 money. I mean, I don't know. You -- this is my -- I --
18      THE COURT: In other words --
19      THE WITNESS: I can't --
20      THE COURT: -- what you're basically saying is
21 is that as a result of them -- you got gas from them for
22 which you recognized you owed them an obligation to
23 pay --
24      THE WITNESS: Correct.
25      THE COURT: -- but you felt that they had a

Page 62

1  commensurate obligation to give you the same price break
2  that they were giving your competitors?
3       THE WITNESS: If you take that 10 cents for
4  five months that I know of, it will be $6 million.
5       THE COURT: So they had -- so, as I understand
6  it, they had been giving your competitors this price
7  break for 10 months?
8       THE WITNESS: Five months.
9       THE COURT: Five months.
10      THE WITNESS: That I have information, yes.
11      THE COURT: All right.
12      THE WITNESS: If you calculate that, it will
13 be more than what that money is that I'm thinking they
14 owe me.
15      THE COURT: No. Yeah, see --
16      THE WITNESS: That's what --
17      THE COURT: -- I'm just trying to -- it's the
18 owing that I'm -- I'm trying to figure out --
19      THE WITNESS: I don't know. I'm --
20      THE COURT: -- where that owing kicks in.
21      THE WITNESS: They gave it to somebody else,
22 why they are not giving it to me.
23      THE COURT: Okay. I think I have a better
24 understanding of --
25 Q   (By Mr. Bennington) It's not so much that they

Page 63

1  owed you, it's that they had damaged you?
2  A   Yes. I don't have that money. I don't know how
3  you want to put it.
4       THE COURT: Okay. I think I have a better
5  sense. It was the owing part that I couldn't figure out
6  where that kicked in. Go ahead.
7  Q   (By Mr. Bennington) All right. We've -- what led
8  us into this was the voicemail on Friday the 20th.
9  Okay. And the voicemail you said -- just laying the
10 background here -- Moss says your credit is revoked.
11 What happens next in terms of your dealing with Suncor?
12 A   I tried to talk to them to see if we can work
13 something out. They said we already had a meeting. We
14 already made the decision. That's just our final
15 decision.
16 Q   Were you still able to buy Suncor fuel later that
17 week if you had -- if you're willing to pay cash for it,
18 COD, or did they cut of off?
19 A   No. They told me if I pay cash for it --
20 Q   All right. What happens eventually though? Are
21 you still able to buy fuel and pay cash for it or did
22 they change that?
23 A   Right now, no. No. We are out. I mean, right now
24 I can't.
25 Q   Did you have another conversation or any

Page 64

1  interchange with Steve Moss or Mr. Ewing about whether
2  they would still sell Suncor fuel to you?
3  A   They said they won't. I did have a conversation
4  with Steve Ewing.
5  Q   All right. When did that conversation occur?
6  A   He called me. He told me that they will not sell
7  gas to me, and they would not allow my truck to go there
8  and pick up anything from their -- any facility they
9  own.
10 Q   So, it's two parts. They won't sell Suncor fuel to
11 you; is that right?
12 A   Yes.
13 Q   And what else?
14 A   They would not allow my truck to go pull from third
15 party, which I can understand that.
16 Q   Third party, meaning the middlemen we've talked
17 about?
18 A   Middlemen, yes.
19 Q   What is the economic effect to your company of your
20 inability to buy fuel from middlemen at Suncor
21 terminals?
22 A   It's big. I can't even operate without them.
23 Q   Does it also have -- are you also -- do these other
24 companies have lines of credit that they would extend to
25 you; that is, these middlemen?